# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

| | | |
|---|---|---|
| ROBERT YELL, | ) | |
| | ) | |
| PLAINTIFF , | ) | |
| | ) | |
| v. | ) | CASE NO.   1:20-cv-47-GNS |
| | ) | |
| The CITY OF RUSSELLVILLE; | ) | |
| RUSELLVILLE POLICE OFFICERS | ) | |
| KENNETH EDMONDS, JOHN E. | ) | |
| HIGGINS, | ) | |
| CHAD EGGLESTON, RONALD MILLS, | ) | |
| and JIM PENDERGRAF, | ) | |
| *in their individual capacities;* | ) | |
| KENTUCKY STATE POLICE OFFICERS | ) | |
| DAVID WEST, JAMAN CHILDERS, and | ) | |
| WILLIAM T. SMITH, *in their individual* | ) | |
| *capacities;* | ) | JURY TRIAL DEMANDED |
| SCOTT COUNTY SHERIFF'S DEPUTY | ) | |
| and | ) | |
| GEORGETOWN FIRE DEPARTMENT | ) | |
| CAPTIAN BUSTER CANNON, *in his* | ) | |
| *individual capacity*; SCOTT COUNTY; | ) | |
| CITY OF GEORGETOWN, Kentucky; | ) | |
| DEPUTY STATE FIRE MARSHAL | ) | |
| ALAN GREGORY, *in his individual* | ) | |
| *capacity;* the Estate of STATE FIRE | ) | |
| MARSHAL SAMUEL JACK FLOWERS, | ) | |
| *in his individual capacity;* | ) | **COMPLAINT** |
| LOGAN COUNTY DETENTION CENTER | ) | |
| JAILER BILL JENKINS, *in his individual* | ) | |
| *capacity;* and LOGAN COUNTY. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

1

## COMPLAINT

NOW COMES Plaintiff, ROBERT YELL, by his attorneys LOEVY & LOEVY, and complaining of Defendants CITY OF RUSSELVILLE, Kentucky; Russellville Police Officers KENNETH EDMONDS, JOHN E. HIGGINS, CHAD EGGLESTON RONALD MILLS, and JIM PENDERGRAF and other unknown officers from the Russellville Police Department, in their individual capacities; Kentucky State Police Officers DAVID WEST, JAMAN CHILDERS, and WILLIAM T. SMITH,  and other unknown officers from the Kentucky State Police, in their individual capacities; Scott County Sheriff's Deputy and Georgetown Fire Department Captain BUSTER CANNON, in his individual capacities; SCOTT COUNTY, Kentucky; City of Georgetown, Kentucky; Deputy State Fire Marshal ALAN GREGORY, in his individual capacity; the ESTATE OF STATE FIRE MARSHAL SAMUEL JACK FLOWERS, in his individual capacity; LOGAN COUNTY DETENTION CENTER JAILER BILL JENKINS, in his individual capacity, and other unknown employees of the Logan County Detention Center; and LOGAN COUNTY, Kentucky and states as follows:

### INTRODUCTION

1.      On September 11, 2004, Plaintiff Robert Yell suffered the unimaginable: his two-year-old son Cameron perished in a trailer fire.

2.      Mr. Yell's eleven-month-old daughter Saralynn sustained third-degree burns over 50% of her body in the blaze.

3.      Robbed of the opportunity to grieve for his son and care for his injured daughter, Mr. Yell spent the next fifteen years fighting to clear his name after the Defendants conspired to frame him for various offenses, including: the capital murder of Cameron, the attempted murder of Saralynn, and first-degree of arson.

4.      Plaintiff did not commit the crimes.

5.      There was no reliable evidence that the fire was intentional.

6.      Nonetheless, Defendants fabricated a false narrative in order to quickly "solve" a high-profile tragedy, naming Mr. Yell a suspect at the scene – even before investigating the blaze.

7.      In so doing, Defendants from the Russellville Police Departments and the Kentucky State Police fabricated incriminating statements allegedly made by Mr. Yell at the scene, in a police cruiser on the way to the Logan County Detention Center (hereinafter LCDC), and at the LCDC.

8.      Additionally, Defendant Higgins physically assaulted Yell and pepper sprayed him multiple times, some of which occurred in the sally port.

9.      To conceal the fabrication of the statements and the assault, the Defendants Officers conspired with the Defendant LCDC Jailer to withhold and/or destroy an exculpatory video of the actions taken by Defendant John E. Higgins in the sally port at the LCDC and a report from a deputy jailer regarding what truly occurred in that sally port.

10.     To ensure Mr. Yell would be charged and prosecuted, the Defendants ignored the leading fire investigation methodologies of the time, intentionally

applying "junk science" instead, while falsely attributing arson as the cause of the blaze.

11.     In so doing, they knowingly relied upon false "hits" of an accelerant detection canine (ADC).

12.     Defendants' misdeeds were scientifically proven to be false, as laboratory testing has determined that no evidence of accelerants was found at the scene or on Mr. Yell and his clothing.

13.     This manifest injustice was not the result of mere flaws in the investigation undertaken by the Defendants. Rather, the Defendants named herein conspired to take Mr. Yell's liberty by knowingly initiating false charges against him.

14.     As a result of the Defendants' fabricated evidence against Mr. Yell, he was charged with capital crimes and wrongfully convicted of first-degree arson, second-degree manslaughter, and first-degree assault. The Logan Circuit Court sentenced him to 52 years' imprisonment.

15.     Over fourteen years later, on March 18, 2019, the Logan Circuit Court entered an Order granting the Commonwealth of Kentucky's request to dismiss all charges against Mr. Yell.

16.     Mr. Yell now brings this lawsuit seeking justice for the harm caused to him by the Defendants' misconduct and seeking to enforce the Constitutional right to liberty guaranteed to all citizens by the United States Constitution.

## Jurisdiction and Venue

17.     This action is brought pursuant to 42 U.S.C. § 1983 and Kentucky law to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

18.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b) and (c). Plaintiff resides in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. Additionally, on information and belief, all parties reside in this judicial district and are subject to the personal jurisdiction of the courts of this judicial district.

## The Parties

20.     Plaintiff Robert Yell spent 12 years in prison for crimes he did not commit and over two years more fighting to clear his name. He was only 27 years old when falsely charged. He is a resident of Logan County, Kentucky.

21.     At all relevant times, Defendants Robert Edmonds, John E. Higgins, Chad Eggleston and Ronald Mills were officers with the Russellville Police Department. These Defendants were responsible for investigating crimes, including the alleged crimes at issue in this case, and/or for supervising other Russellville police officer Defendants. Defendant Edmonds was the lead investigator for the Russellville Police Department in this case and charged Plaintiff with murder,

5

attempted murder, and fourth-degree assault. Defendant Higgins charged Plaintiff with alcohol intoxication, disorderly conduct and resisting arrest. Each of these Defendant Officers are sued in their individual capacities, and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

22.     At all relevant times, Defendant Jim Pendergraf was the Chief of Police at the Russellville Police Department. He was in charge of supervising other Defendant Russellville Officers. Pendergraf is sued in his individual and official capacity, and he acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

23.     Defendants Edmonds, Higgins, Eggleston, Mills, and Pendergraf are collectively referred to as the "Defendant Russellville Officers."

24.     Defendant City of Russellville, Kentucky is a political subdivision of the Commonwealth of Kentucky and is a home-rule class city. Defendant City of Russellville is responsible for the policies, practices, and customs of the Russellville Police Department. Defendant City of Russellville is liable for all torts committed by the Defendant Russellville Officers pursuant to the doctrine of *respondeat superior*. Finally, Defendant City of Russellville is responsible under Kentucky law for any judgment entered against Defendant Russellville Officers.

25.     At all relevant times, Defendants David West, Jaman Childers, and William T. Smith were officers with the Kentucky State Police (KSP). These Defendants were responsible for investigating crimes, including the alleged crimes

at issue in this case, and/or for supervising other KSP Defendants. Defendant West was a fire investigator with KSP, was the lead KSP investigator in this case, and brought the charge of arson against Plaintiff. Each of these Defendant Officers are sued in their individual capacities, and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

26.     Defendants West, Childers and Smith are collectively referred to as the "Defendant KSP Officers."

27.     At all relevant times, Defendant Buster Cannon was a deputy with the Scott County Sheriff's Department, was a Captain with the Georgetown Police Department, and was an Accelerant Detection Canine handler in this case. He was responsible for investigating fires in the Commonwealth of Kentucky, including the fire at issue in this case. He is sued in his individual capacities, and he acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

28.     Defendant Scott County is a political subdivision of the Commonwealth of Kentucky responsible for the policies, practices and customs of the Scott County Sheriff's Department. Scott County is liable for all torts committed by Defendant Cannon while employed by Scott County, while acting under the color of law and within the scope of his employment pursuant to the doctrine of *respondeat superior*.

29.     Defendant City of Georgetown, Kentucky is a political subdivision of the Commonwealth of Kentucky and is a home-rule class city. Defendant City of Georgetown is responsible for the policies, practices, and customs of the Georgetown

Fire Department. Defendant City of Georgetown is liable for all torts committed by Defendant Cannon pursuant to the doctrine of *respondeat superior*.   Finally, Defendant City of Georgetown is responsible under Kentucky law for any judgment entered against Defendant Cannon.

30.   At all relevant times, Defendants Alan Gregory and Samuel Jack Flowers were employed by the Kentucky Fire Marshal's office. These Defendants were responsible for investigating fires in the Commonwealth of Kentucky, including the fire at issue in this case, and/or for supervising other Defendants. Defendant Gregory was the "primary arson investigator" for the Fire Marshal's office on this case. Each of these Defendant Marshals are sued in their individual capacities, and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

31.   Defendants Gregory and Flowers are collectively referred to as the "Defendant Fire Marshals."

32.   At all relevant times, Defendant Bill Jenkins was the Jailer at the Logan County Detention Center. He is sued in his individual capacity, and he acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

33.   Defendant Logan County is a political subdivision of the Commonwealth of Kentucky responsible for the policies, practices and customs of the Logan County Detention Center. Logan County is liable for all torts committed by Defendant Jenkins while employed by Logan County, while acting under the

8

color of law and within the scope of his employment pursuant to the doctrine of *respondeat superior.*

## FACTS

### The Fire

34.    On September 11, 2004 at approximately 7:30 pm, Robert Yell's trailer caught fire. His two children, two-year-old Cameron and eleven-month-old Saralynn, were inside the burning home.

35.    Mr. Yell's girlfriend and the mother of his children, April, ran into the trailer to retrieve Saralynn. Saralynn suffered third-degree burns over 50% of her body.

36.    Mr. Yell, too, attempted to run into the burning home to retrieve his children.

37.    The Defendant Russellville Officers, however, physically tackled and dragged Mr. Yell away from the fire, preventing him from entering the trailer to retrieve Cameron. Tragically, Cameron perished from smoke inhalation before firefighters were able to pull him out of the blaze.

38.    Defendant Russellville Officers Higgins and Mills arrested Mr. Yell at the scene for alcohol intoxication.

### Plaintiff Did Not Set Fire to His Home

39.    Plaintiff Yell did not set fire to his trailer.

40.    In fact, the fire was not an incendiary fire at all.

41.     When Mr. Yell learned his home was on fire, he raced to it. Defendant Russellville Officers stopped him from running into the trailer, tackling him in his front yard and forcing him to watch the burning home before physically pulling him away from the scene.

42.     Laboratory testing of Mr. Yell's hands and clothing tested *negative* for accelerants.

43.     Rather than truly investigate the fire, the Defendant Russellville Officers, the Defendant KSP Officers, the Defendant Fire Marshals, and Defendant Cannon short-circuited the process and myopically focused on Mr. Yell to solve what they said was a crime.

44.     The Defendants named Mr. Yell a "suspect" before even conducting a fire investigation.

### The Physical Evidence Never Supported the Theory that the Fire Was an Intentional Fire

45.     To this day, there is no physical evidence that the fire was deliberately set.

46.     Instead, all the evidence at the crime scene was consistent with an accidental fire.

47.     For example, the burn patterns were entirely consistent with a fire that began without the use of an accelerant.

48.     Further, laboratory testing confirmed the absence of accelerants at the scene and on Mr. Yell's person.

**Defendants Manufactured Evidence to Support Their Fabricated
Claims that the Fire was Intentionally Set**

49.     To get around the obvious problem of no accelerants being found on
Mr. Yell or at the scene, the Defendants fabricated conclusions as to the cause of the
blaze that were not scientifically supported, relied upon unconfirmed "hits" by an
accelerant detection canine (ADC), failed to document possible accidental sources of
the fire, and manufactured false statements incriminating Mr. Yell. The fabricated
evidence was inconsistent with the crime scene and all legitimate conclusions that
could be drawn from it.

50.     For instance, Defendants West, Cannon, Gregory and Flowers
fabricated their conclusions that the fire was intentional by employing "pre-
flashover" methods to investigate a "post-flashover fire" - even though fire science
did not support those conclusions at the time.

51.     Specifically, the Defendants falsely stated that burn patterns and floor
burn-through indicated an ignitable liquid had been poured onto the floor. In so
doing, they intentionally ignored the fire science stating that the conditions are not
probative evidence of an incendiary fire with an ignitable liquid but instead
indicative of flashover and full-room involvement.

52.     Similarly, Defendants West, Cannon, Gregory and Flowers fabricated
findings – known at the time to be false – that there were multiple "points of origin"
of the blaze because of three areas of "low burn" that the Defendants claimed were
separate and unconnected. The scientific evidence, however, revealed the exact

opposite: that the "separate fires" were a natural outgrowth of the initial fire – a conclusion supported by Defendant Mills' own observations.

53.     In this way, Defendant Mills described a rapidly developing trailer fire that began in the bedroom and quickly spread to the hallway, kitchen and living room. Defendant Mills witnessed the living room undergo flashover and transition into full-room involvement. To frame Mr. Yell of arson, the Defendants dismissed Defendant Mills' eyewitness account and fraudulently averred multiple points of origins in a fire where all the alleged points of origin were connected by fire damage - as supported by scientific evidence.

54.     Fire science, available and known at the time, demonstrated that the fire progression and damage were normal and consistent with a non-accelerated fire.  But the Defendants ignored this and intentionally fabricated their acceleration findings to frame Plaintiff for an arson murder.

### Defendants Used Unconfirmed Alerts of an Accelerant Detection Canine to Manufacture Evidence to Support Their Fabricated Claims that the Fire was Intentionally Set

55.     To further their fabricated claim that the fire was an incendiary fire for which Mr. Yell was responsible, Defendants West, Cannon, Gregory, Edmonds and Flowers fabricated unconfirmed alerts of Defendant Cannon's ADC, PJ. Specifically, Defendant Cannon alleged that the ADC "hit" on six separate locations in the living room, kitchen and bedroom of the trailer, indicating an ignitable liquid was present in each location.

12

56.    The scientific evidence, however, revealed otherwise: Subsequent gas chromatograph examination by the Kentucky State Police Laboratory of *all six* samples were *negative* for the presence of any form of ignitable liquid.

57.    Continuing their conspiracy to frame Mr. Yell for an intentional arson and resulting murder, Defendant Gregory called in Defendant Cannon to "verify his findings" of an incendiary fire. To that end, Defendants Gregory and Cannon met for breakfast before Defendant Cannon conducted the walk through with PJ so that Defendant Gregory could tell Defendant Cannon the areas in which he wanted the dog to concentrate. Defendant Gregory shared other details of the fire with Defendant Cannon before Defendant Cannon went to the scene, including details of a domestic altercation Mr. Yell – the "suspect"- and his children's mother had prior to the fire and that Mr. Yell had been drinking on the day in question.

58.    Thereafter, Defendant Cannon conducted an interior "examination" of the trailer with the ADC. On the initial walk through, Defendant Cannon put her on a long leash to allow her "to roam as she pleases." While on the long leash, PJ *failed to alert anywhere.*

59.    To manipulate the "evidence" of an intentional fire and further the confirmation bias, Defendant Cannon immediately put PJ on a short leash and showed her where to sniff. Only then did PJ behave (sitting) in a manner that Defendant Cannon alleged was an alert – in six different spots in the trailer. To reward this behavior, and further manipulate the evidence, Defendant Cannon told

PJ she was a "pretty girl" and gave her a treat after each "alert." If she failed to "alert", Defendant Cannon did not reward her with food.

60. Defendants West, Cannon, Gregory, Flowers and Edmonds intentionally failed to document or accurately video record the walk through with PJ so that it could not be properly challenged.  No one, including Defendant Cannon, retained or disclosed any record of where, how, or with what specific encouragement PJ sat down six times in the trailer.

61. Even after receiving scientific evidence from the KSP laboratory that there were *no* ignitable liquids found on the samples on which PJ had alerted, Defendants Cannon, West, Gregory and Flowers continued in their conspiracy to frame Mr. Yell for arson. Ignoring the scientific evidence and standards in place at the time, Defendant Cannon falsely averred that the dog's nose was "more sensitive" than a laboratory test and that PJ was nearly 100% accurate in alerting to the presence of ignitable liquids. He stated as such although he had *no* records of the ADC's accuracy because he kept no logs of PJ's field work and did no follow-up to confirm whether she was right or wrong in her hits.

## Defendants Withheld Exculpatory Evidence to Support Their Fabricated Claims that the Fire was Intentionally Set

62. In furtherance of their quest to falsely establish probable cause against Mr. Yell, Defendants West, Cannon, Gregory, Flowers intentionally failed to disclose evidence unearthed during their investigation which illustrated accidental sources of the fire– as the fire investigation standards mandated at the time.

63.     Specifically, Defendants West, Cannon, Gregory and Flowers withheld documentation regarding evaluation of even the most common and likely accidental ignition sources, such as a failure in the trailer's electrical system, including a potential faulty outlet in the southeast bedroom (where the fire began) into which a window air conditioner unit was plugged, misuse or malfunction of a household appliance, or a smoldering cigarette.

### The Defendant Officers Fabricated Statements They Attributed To Plaintiff To Further Support Their Claims the Fire Was Intentionally Set

64.     In furtherance of their conspiracy to manufacture evidence against Mr. Yell for the accidental fire, the Defendant Officers fabricated false statements they attributed to Mr. Yell.  For instance, on September 11, 2004, Defendants Higgins and Eggleston conspired to manufacture a statement they contend Mr. Yell made at the scene and on the way to the Logan County Detention Center. Specifically, Defendant Eggleston stated that Mr. Yell repeatedly said, "If she had done to you what she done to me, you would have done the same f….thing." According to Defendant Eggleston, Mr. Yell allegedly made this statement at the scene – "word for word" "over and over." Yet, no other officer reported hearing this purported statement at the scene.

65.     Defendant Higgins reported that Mr. Yell allegedly made the same statement – without any questioning from Defendant Higgins - while sitting in the back of his cruiser on the way to the LCDC.  This statement was fabricated to bolster the Defendant Russellville Officers' claims implicating Mr. Yell in the fire.

66.     Additionally, Defendant Higgins fabricated several other statements he attributed to Mr. Yell to further the Defendant Russellville Officers' claims of an intentional fire, to bring further charges against Mr. Yell, and to further paint him in a bad light – claims we know to be false because of the eyewitness observations of a Sergeant at the LCDC. Specifically, Defendant Higgins falsely alleged that while in the sally port of the LCDC, Mr. Yell threatened to kill Defendant Higgins, that he said, "You don't know how evil I am, you better be scared of me," and that when advised his son was in the fire, Mr. Yell replied, "I told her. I told her."

67.     Defendant Higgins also falsely claimed that Mr. Yell spit blood on him – blood coming from a cut on Mr. Yell's lip. Although Defendant Higgins admitted to striking Mr. Yell in the chest and to pepper spraying him multiple times – while he was handcuffed- Defendant Higgins conveniently had no explanation for the cause of Mr. Yell's split, bleeding lip.

68.     Sergeant William Porter, a deputy jailer at the LCDC who remained in the sally port with Defendant Higgins and Mr. Yell during the entirety of their time in the sally port, observed a completely different picture than the false narrative manufactured by Defendant Higgins. According to Sgt. Porter, Mr. Yell never threatened Defendant Higgins and did not spit on Defendant Higgins. Instead, it was Defendant Higgins who antagonized Mr. Yell, who was deeply distressed, confused and worried about his children's wellbeing, by repeatedly asserting, "You Mother F…., you know you killed your two kids."

69.     Further, when Sgt. Porter specifically asked Defendant Higgins if Mr. Yell had made any incriminating statements (so that he could isolate him from the general population if so, per policy, since there were child victims), Defendant Higgins admitted that Mr. Yell had not.

70.     Despite Mr. Yell's innocence of the charges, Defendant Higgins fraudulently charged Mr. Yell with terroristic threatening, menacing, and third-degree assault for what he falsely reported transpired in the sally port.

### The Defendants Withheld and/or Destroyed Exculpatory Evidence from the Logan County Detention Center So They Could Bolster Their False Claims Against Mr. Yell

71.     The Defendants also conspired to withhold and/or destroy exculpatory evidence from the Logan County Detention Center.

72.     While in the sally port, Defendant Higgins fabricated claims of Yell spitting on him, threatening him, and making incriminating statements about the fire. Higgins antagonized Yell about his children's well-being, cursed at him, pepper sprayed him, and physically hit him.

73.     After Mr. Yell was brought into the LCDC, Sgt. Porter pulled the video of the sally port and composed a report about the incidents that occurred therein. Thereafter, he left the video tape and the report on the desk of Defendant Jailer Bill Jenkins, locked in his office. Sgt. Porter called Defendant Jenkins to inform him of what had occurred and the whereabouts of the tape and report.

74.     Despite Sgt. Porter's attempt to document the physical and emotional abuse Defendant Higgins inflicted upon Mr. Yell, and Mr. Yell's innocence of the

charges falsely lodged against him, the Defendants conspired to withhold and/or destroy the exculpatory evidence, "losing" the tape and report before it could be disclosed to Mr. Yell.   This evidence would have proved that the Defendants lied and were framing Plaintiffs for crimes he did not commit.

### Plaintiff's Wrongful Conviction and Imprisonment

75.   On September 11, 2004, Defendant Higgins arrested Mr. Yell for alcohol intoxication, disorderly conduct, and resisting arrest and transported him to the Logan County Detention Center. While at the LCDC, and after physically assaulting and emotionally tormenting Mr. Yell, Defendant Higgins added charges of terroristic threatening, menacing, and third-degree assault against him.

76.   On September 13, 2004, Defendant West initiated charges against Mr. Yell for first-degree arson. On that same date, Defendant Edmonds initiated charges against Mr. Yell for first-degree murder, attempted murder, and fourth-degree assault, for his son's death and injuries to his daughter and girlfriend.

77.   Mr. Yell remained at the Logan County Detention Center until his trial.

78.   The Commonwealth filed notice of its intent to seek the death penalty.

79.   In February of 2006, Plaintiff was tried by a Logan County jury. As a result of the Defendants' misconduct, the false evidence they conspired to create, and the exculpatory evidence they conspired to withhold, Plaintiff was convicted of first-degree arson, second-degree manslaughter, first-degree assault and two

18

misdemeanors: disorderly conduct and fourth-degree assault. The Logan Circuit Court sentenced him to 52-years' imprisonment.

80.    Plaintiff denied guilt of setting an intentional fire at every stage of his arrest, including testifying on his own behalf at trial.

81.    Without the Defendants' fabricated evidence of an intentional fire, there

was nothing to support a criminal proceeding against Plaintiff for the charged lodged against him.

### Plaintiff's Exoneration

82.    For over fourteen years, the Defendants contrived to frame Mr. Yell for arson, resulting in the death of his son and serious injury to his daughter, depriving him of his freedom without the due process of law.

83.    Mr. Yell fought his wrongful conviction for over a decade, asserting his innocence to the charges against him at each step.

84.    At a two-day evidentiary hearing in December of 2016, Mr. Yell presented the testimony of two fire investigation experts who established the blaze was not the result of an intentional fire and that the "evidence" presented by the Defendants against Mr. Yell was fabricated and in violation of the scientific methodologies in place at the time of the investigation.

85.    Thereafter, the Logan Circuit Court entered an order granting Mr. Yell a new trial. In so doing, the Court held the trial testimony of the Defendants concerning the fire having multiple points of origin and the canine hits having

indicated the presence of an ignitable liquid was "unreliable and baseless and should not have been admitted."

86.     Ultimately, on March 18, 2019, by motion of the prosecutor, the Logan Circuit Court entered an Order dismissing the charges of arson, murder, and attempted murder against Mr. Yell.

### Plaintiff's Damages

87.     Robert Yell was only 27 years old when his two-year-old son was killed, and his eleven-month old daughter was injured in a horrific accident. His entire life was turned upside down with no warning. Maliciously arrested and prosecuted for the fire and his own son's death, the Defendants' misconduct robbed Mr. Yell of the opportunity to truly grieve Cameron. It traumatizes him still today.

88.     Instead, Mr. Yell spent the next fourteen plus years defending himself, his life, and his name for crimes he did not commit. He lived with the fear of execution.

89.     He was removed from his home, his vocation, and his family, and sentenced to 52 years' imprisonment. While unlawfully detained, he missed out on his daughter's childhood and early teenage years, and on multiple holidays, birthdays, and family gatherings. Both his grandmother and his stepfather died, and he was unable to attend their funerals.

90.     Mr. Yell was also deprived of opportunities to engage in meaningful labor, to develop his career, and to pursue his interests and passions. He has been deprived of all the basic pleasures of human experience, from the simplest to the

most important, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

91.     Mr. Yell's years of unlawful arrest, prosecution, and imprisonment caused him to suffer from extreme trauma, emotional and psychological pain, including, but not limited to: humiliation, constant fear, severe anxiety, deep depression, despair, and anger, which persist to this day.

## FEDERAL LAW CLAIMS

### Count I – 42 U.S.C. § 1983
### Malicious Prosecution

92.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

93.     As described more fully above, all of the Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Yell of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

94.     In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Yell for arson, capital murder, and attempted murder, among other charges, for which prosecution there was no probable cause and which caused Mr. Yell to suffer a deprivation of liberty. Their misconduct included falsifying and manipulating evidence and withholding exculpatory and impeachment evidence.

95.     As described more fully above, the prosecution was resolved in Mr. Yell's favor in a manner indicative of his innocence.

96.     The Defendants' misconduct directly resulted in the unlawful prosecution and continued deprivation of Mr. Yell's liberty in violation of his constitutional rights.

97.     As a result of this violation of his constitutional rights, Mr. Yell suffered injuries, including, but not limited to: emotional distress, great mental anguish, humiliation, anxiety, the threat of physical harm, and other injuries as is more fully alleged above.

98.     The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Yell's constitutional rights.

99.     The misconduct described in this Count was undertaken pursuant to a routine practice of the municipal and government Defendants to pursue wrongful prosecutions and wrongful convictions through reckless investigations and fabricated evidence. In this way, the municipal and government Defendants violated Mr. Yell's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

100.    These widespread practices, so well-settled so as to constitute *de facto* policy in the City of Russellville and the other Defendant municipalities and governments, were able to exist and thrive because city policymakers with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

101.   The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal and government Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II – 42 U.S.C. § 1983
### Due Process Violations

102.   Each paragraph of this Complaint is incorporated as if restated fully herein.

103.   In the manner described more fully above, the Defendants, individually, jointly and in conspiracy with each other, while acting under color of law and within the scope of their employment, deprived Mr. Yell of his constitutional right to a fair trial.

104.   In the manner described more fully above, Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Mr. Yell could not and would not have been pursued.

105.   The Defendants' misconduct directly resulted in the unjust criminal conviction of Mr. Yell, thereby denying him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

106.   As a direct and proximate result of the Defendants' actions, Mr. Yell's constitutional rights were violated, and he suffered from injuries and damages, including, but not limited to: the loss of liberty, the threat of physical injury,

emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

107.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with willful indifference to Mr. Yell's constitutional rights and innocence.

108.   Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Mr. Yell and state prosecutors, thereby misleading and misdirecting the criminal prosecution of Mr. Yell and precluding Mr. Yell's attempts to free himself from his wrongful imprisonment, including his 2008 RCr 11.42 Motion to Vacate, his 2011 CR 60.02 Motion for a New trial, and his 2016 CR 60.02 Motion for a New Trial.

109.   Defendants who were supervisors charged with overseeing both the investigation in the case at hand and the other Defendants knew of the Defendants' misconduct, the suppression of exculpatory evidence, and the fabrication of a manufactured case against Mr. Yell. These supervisors, nonetheless, intentionally ignored Defendants' misconduct and held Mr. Yell responsible for crimes he did not commit, rather than directing the officers to go out and fully investigate the fire.

110.   The misconduct described in this Count was undertaken pursuant to a routine practice of the municipal and government Defendants to pursue wrongful prosecutions and wrongful convictions through reckless investigations and fabricated evidence. In this way, the municipal and government Defendants

24

violated Mr. Yell's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

111.    These widespread practices, so well-settled so as to constitute *de facto* policy in the City of Russellville and the other Defendant municipalities and governments, were able to exist and thrive because city and government policymakers with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

112.    The widespread practices described in the preceding paragraphs flourished because the municipal and government Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count III – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments Fabrication of False Evidence

113.    Each paragraph of this Complaint is incorporated as if restated fully herein.

114.    In the manner described more fully above, the Defendants, individually, jointly and in conspiracy with each other, fabricated evidence, including, without limitation: false police reports, fabricated statements attributed to Mr. Yell, and fabricated testimony introduced at the grand jury and trial proceedings. The Defendants knowingly fabricated this evidence. A reasonable likelihood exists that the false evidence affected the decision of the court that considered this false evidence when determining whether probable cause existed.

115.    The Defendants were acting under color of law and within their scope of employment when they took these actions.

116.    The Defendants' misconduct directly resulted in the unjust continued incarceration of Mr. Yell, thereby denying him from his constitutional right to due process as guaranteed by the U.S. Constitution. In 2004, no reasonable officer or investigator would have believed that fabricating statements and evidence was lawful. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.

117.    Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Mr. Yell and state prosecutors, thereby misleading and misdirecting the criminal prosecution of Mr. Yell and precluding Mr. Yell's attempts to free himself from his wrongful imprisonment, including his 2008 RCr 11.42 Motion to Vacate, his 2011 CR 60.02 Motion for a New trial, and his 2016 CR 60.02 Motion for a New Trial.

118.    By failing to provide exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Mr. Yell's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

119.    As a direct and proximate result of the Defendants' actions, Mr. Yell's constitutional rights were violated, and he suffered from injuries and damages, including but not limited to the loss of liberty, the threat of physical injury, emotional pain and suffering, and other grievous and continuing injuries and

26

damages as set forth above.

### Count IV – 42 U.S.C. § 1983
### Supervisory Liability

120. Each paragraph of this Complaint is incorporated as if restated fully herein.

121. The continued wrongful detention of Mr. Yell was caused by the deliberate indifference and recklessness of supervisory Defendants, including but not limited to Defendant Flowers and Defendant Pendergraf, when they failed to adequately train and supervise the individual Defendants.

122. Specifically, these supervisory Defendants were personally involved in the case against Mr. Yell and/or knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

123. Furthermore, these supervisory Defendants failed to supervise the Defendants in constitutionally adequate fire investigation and law enforcement practices, thereby encouraging and/or permitting their employees and other Defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Yell.

124. These failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement and fire investigation agencies. The fact that the Defendant supervisors failed to train and supervise their subordinates to ensure that they

employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Yell's constitutional rights.

125.    The personal involvement of the Defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Yell, including the above-mentioned injuries and damages.

126.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Yell's clearly established constitutional rights.

## Count V - 42 U.S.C. § 1983
## Failure to Intervene

127.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

128.    In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

129.    As a result of the Defendants' failure to intervene to prevent the violation of Mr. Yell's constitutional rights, he suffered pain and injuries, as well as emotional distress.

130.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Yell's rights.

131.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the municipal and government Defendants in the manner

described more fully in preceding paragraphs and was tacitly ratified by policymakers for the municipal and government Defendants with final policymaking authority.

## Count VI - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

132.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

133.    After the trailer fire, the Defendants reached an agreement amongst themselves to frame Mr. Yell for the crime and to thereby deprive him of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

134.    In this manner, the Defendants, acting in concert conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

135.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

136.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Yell's rights were violated, and he suffered financial damages, as well as emotional distress and anguish, as is more fully alleged above.

137.    Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Mr. Yell and state prosecutors, thereby misleading and misdirecting the criminal prosecution of Mr.

Yell and precluding Mr. Yell's attempts to free himself from his wrongful imprisonment, including his 2008 RCr 11.42 Motion to Vacate, his 2011 CR 60.02 Motion for a New Trial, and his 2016 CR 60.02 Motion for a New Trial.

138.    By failing to come forward with exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Mr. Yell's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

139.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

140.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the Russellville Police Department and the other municipal and government Defendants, in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal and government Defendants with final policymaking authority.

### Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Russellville

141.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

142.    The actions of Russellville Defendants in fabricating and withholding material exculpatory information from Mr. Yell and his counsel were undertaken pursuant to the policies and practices of the City of Russellville Police Department, described above, which were ratified by policymakers for the City of Russellville

with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of exculpatory evidence and the prohibition of fabricating evidence.

143.    The policies and practices described in this Count were maintained and implemented by the Defendant City of Russellville with deliberate indifference to Mr. Yell's constitutional rights.

144.    As a direct and proximate result of the Defendant City of Russellville's actions, Plaintiff's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

145.    The Defendant City of Russellville is therefore liable for the misconduct committed by its officers.

### Count VIII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Logan County

146.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

147.    The actions of the Logan County Defendants in withholding and/or destroying material exculpatory information from Mr. Yell and his counsel were undertaken pursuant to the policies and practices of Logan County, described above, which were ratified by policymakers for Logan County with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning

the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

148.   The policies and practices described in this Count were maintained and implemented by the Logan County Government with deliberate indifference to Mr. Yell's constitutional rights.

149.   As a direct and proximate result of Defendant Logan County's actions, Plaintiff's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

150.   The Defendant Logan County Government is therefore liable for the misconduct committed by its employees.

## STATE LAW CLAIMS

### Count IX – State Law Claim
### Malicious Prosecution

151.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

152.   Through their actions as described above, the Defendants, acting as investigators, caused Mr. Yell to be improperly subjected to a prosecution for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Mr. Yell's favor, in a manner indicative of his innocence.

153.   The Defendants accused Mr. Yell of criminal activities knowing those accusations to be without genuine probable cause, fabricated evidence and withheld the manner in which that evidence was fabricated, and made statements and

reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

154.     The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendants within the scope of their employment and/or official responsibilities.

155.     As a result of this misconduct, Mr. Yell suffered injuries, including the threat of bodily harm, and emotional pain and suffering as more fully alleged above.

## Count X – State Law Claim
## Negligent Supervision

156.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

157.     The municipal and government Defendants, as well as the supervisory Defendants, including Defendant Pendergraf and Flowers, and other unknown supervisors, had a duty to properly train and supervise officers, detectives, investigators, and supervisor employees and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating statements, and concealing material impeachment evidence.

158.     The municipal and government Defendants and the supervisory Defendants were grossly negligent in the training, supervision and discipline of the Defendants, resulting in Mr. Yell being deprived of their right to due process, and their right to be free from false arrest, false imprisonment, and wrongful conviction.

159.     As a result of this misconduct, Mr. Yell suffered injuries, including the threat of bodily harm, and emotional pain and suffering as more fully alleged above.

### Count XI – State Law Claim
### Intentional or Reckless Infliction of Emotional Distress

160.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

161.   As described more fully in the preceding paragraphs, by framing Mr. Yell for an arson and murder he did not commit, the Defendants intended to cause emotional distress, or knew or should have known that their actions would result in serious emotional distress.

162.   In doing so, the Defendants' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Mr. Yell to suffer serious emotional distress of the nature no reasonable man or woman could be expected to endure.

163.   The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendants within the scope of their employment.

164.   As a result of this misconduct, Mr. Yell sustained injuries, including emotional pain and suffering, as is more fully alleged above.

### Count XII – State Law Claim
### Negligent Infliction of Emotional Distress

165.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

166.    Pleading in the alternative, Defendants owed Mr. Yell a duty to refrain from framing him for an arson and murder he did not commit and to conduct a legal and thorough investigation of the fire.

167.    In the manner described more fully above, the actions, omissions, and conduct of the Defendants breached this duty.

168.    The misconduct described in this Count was objectively unreasonable. It was reasonably foreseeable that Defendants' actions would cause any reasonable person, including Mr. Yell, emotional distress.

169.    In doing so, the Defendants' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Mr. Yell to suffer, and to continue to suffer, serious emotional distress of the nature no reasonable man or woman could be expected to endure.

### Count XIII – State Law Claim
### Negligence

170.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

171.    Defendants owed Mr. Yell a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the fire that resulted in the accurate identification of the cause and origin of the fire.

172.    In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

173.    The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Mr. Yell's clear innocence.

174.    As a result of Defendants' misconduct described in this Count, Mr. Yell suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count XIV
### Respondeat Superior

175.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

176.    In committing the acts alleged in the preceding paragraphs, the Defendants were members and agents of the Russellville Police Department, the Scott County Sheriff's Office, the Georgetown Fire Department, the Kentucky State Police, the State Fire Marshal's Office, and the Logan County Detention Center, acting at all relevant times within the scope of their employment.

177.    The above-names entities are liable as principal for all state law torts committed by their agents.

WHEREFORE, Plaintiff, ROBERT YELL, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF RUSSELLVILLE, Kentucky; Russellville Police Officers KENNETH EDMONDS, JOHN E. HIGGINS, CHAD EGGLESTON   RONALD MILLS, and JIM PENDERGRAF and other unknown officers from the Russellville Police Department; Kentucky State Police Officers DAVID WEST, JAMAN CHILDERS,

and WILLIAM T. SMITH, in their individual capacities, and other unknown officers from the KSP; Scott County Sheriff's Deputy and Georgetown Fire Department Caption BUSTER CANNON, in his individual capacities; SCOTT COUNTY, Kentucky; the CITY OF GEORGETOWN, Kentucky; Deputy State Fire Marshal ALAN GREGORY, in his individual capacity; the ESTATE OF STATE FIRE MARSHAL SAMUEL JACK FLOWERS, in his individual capacity; LOGAN COUNTY DETENTION CENTER JAILER BILL JENKINS, in his individual capacity; and LOGAN COUNTY, Kentucky awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff, ROBERT YELL hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Amy Robinson Staples
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902