IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

| | | |
|---|---|---|
| ROBERT YELL | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20-CV-0047-GNS |
| v. | ) | |
| | ) | |
| CITY OF RUSSELLVILLE, *et al.* | ) | Chief Judge Greg N. Stivers |
| | ) | Mag. H. Brent Brennenstuhl |
| Defendants. | ) | |

## ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT CANNON

Comes Defendant Carmel R. (Buster) Cannon, and for his answers to Plaintiff's First Set of Interrogatories to Defendant Cannon, state as follows:

### INTERROGATORIES

1.    Please identify by name and address all Persons who, to the best of your understanding, have knowledge of facts that relate to any of the claims or defenses in this action, including but not limited to all Persons who are not listed in the Defendants' Rule 26 Initial Disclosures. For each Person with knowledge responsive to this interrogatory, please describe with particularity any categories of facts known by each such Person, including all categories of facts about which the Person may be competent to testify at trial. If this Interrogatory is answered by incorporating Documents, please state under oath whether there are any categories of facts known to any witness relating to the claims or defenses in this action that are not reflected in the documents upon which you rely; in the event you fail to do so, Plaintiff will

1

Exhibit 1

assume the substance of the witnesses' testimony is strictly limited to what is contained in such documents.

**ANSWER: This Defendant objects to the form of this Interrogatory including its "assumption." This Defendant further objects to this Interrogatory as overbroad and unduly burdensome in that it seeks a complete recitation of each fact that supports this Defendant's position; This Defendant may rely on any fact or piece of evidence that is in the record at summary judgment or at trial.**

_____
**Attorney for Defendant**

**Notwithstanding the foregoing objection, this Defendant identifies and incorporates the Rule 26(a)(1) Disclosures of the Defendants City of Georgetown, Kentucky, and its former employee, Carmel R. Buster Cannon (as supplemented).**

2.      For any Document requested in Plaintiff's discovery requests which has been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed; the circumstances and manner in which it was lost, discarded or destroyed, including the identities of all persons involved; the reasons for disposing of the Document; the identity of any persons with knowledge of its content; and the identity of the last person known to have seen it.

**ANSWER: This Defendant prepared no documents in connection with the fire investigation of the State Fire Marshall's Office or the criminal/fire investigation of the Kentucky State Police, and he did not prepare nor is he in possession of any documents concerning the fire incident that is the subject matter of this litigation, investigation of same and the subsequent criminal proceedings (*see* testimony below)**

except for documents that have been produced by the Plaintiff and other Defendants after the filing of this civil action and, therefore, he relies upon the document production of the Plaintiff and other Defendants. *See* Rule 26(a)(1) Disclosures of the Defendants City of Georgetown and its former employee Carmel R. (Buster) Cannon (as supplemented) at "Documents in the possession, custody or control of non-parties and/or other parties to this civil action." *See also* Responses to Plaintiff's First Set of Discovery Requests for Production to Defendant City of Georgetown and Cannon, which were served on the same date of service as this Defendant's Answers to the Interrogatories herein.   Documents consisting of exhibits introduced through Cannon at the pretrial hearing held in the underlying criminal action and at the underlying criminal trial have been located by the Clerk/Deputy Clerk of the Logan Circuit Court and are marked as LOGAN CIRCUIT 0001-36 (Prehearing, Exhibits 1, 2 and 3) and LOGAN CIRCUIT 0037-51 (Trial, Commonwealth Exhibits 37A, 37B and 37C, 38, 39, 40 and Defendant's Exhibit 1) and are provided for purposes of this Interrogatory. *See also* (Testimony concerning records as captured on the video of the underlying criminal trial video record on 2/14/06 at 5:00:41 p.m. through 5:01:34 p.m. on continued examination <u>in the presence of the jury</u> by Yell's attorney, Jill Giordano)

Q. And that --
A.   And they also inquire whether or not it was an ATF call out or an ATF assist.
Q.  Who gets that form?
A.   ATF.
Q.  It's not made a part of this investigation, is it?
A.   No.
Q.  You don't follow --
A.   I keep a copy of it and I send a copy to the ATF.

**Q.    But do you keep any records at the time you were conducting the investigation?  In other words, do you have a log book where you're writing, you're diagramming, you're writing as you're walking through with the dog as to what the dog is doing, what the dog doesn't do, any observations?  Do you have any kind of record of that, whatsoever?**
**A.    No, ma'am, not on this case.  Only the ones of my own interest.  My investigations I do, but if I'm called out to help somebody else, I don't.**
**Q.    And are you aware -- did you ask anyone else to make such a record or make a log for you?**
**A.    I assumed the investigators, they were doing so.  So, no, I didn't.**

**The above referenced form was not made a part of this investigation. This form was also not made an exhibit at trial or otherwise. *See also* RPD001184 (Form 10-01-04) as compared to RPD001206 (Form 6-5-05).**

3.    Under oath, please identify all Complaints that have ever been made against you relating to your role as an employee of the Scott County Sheriff's Department (including Plaintiff's Complaint or any Complaints which presently remain pending), including but not limited to any and all internal affairs, intra- or inter-departmental, and citizen complaints alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive methods on suspects, arrestees, or witnesses, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, and lawsuits or administrative complaints filed in state or federal courts or agencies alleging misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If you do not possess an identifying number of a particular Complaint, please investigate and obtain it.

4

Objection to the ambiguousness (i.e. "Complaint") and overbroad and unduly burdensome nature this Interrogatory.

_____
**Attorney for Defendant**

ANSWER: The Complaint in this civil action makes allegations against Defendant Cannon as a "deputy with the Scott County Sheriff's Department." *Compl.* at ¶ 27; *see also Compl.* at p. 1. Otherwise, this Defendant is not aware of any complaints that are responsive to this Interrogatory with the exception of: Carmel R. (Buster) Cannon was a named Defendant as a result of his employment with the Scott County Sheriff's Department in the civil action *James Schulte v. Bobby Hammons, et al.*, Commonwealth of Kentucky, Scott Circuit Court, 08-CI-00421, filed on 05/28/2008. There was no discipline imposed in connection with the incident that was the subject matter of this lawsuit.

4.      Under oath, please identify all Complaints that have ever been made against you relating to your role as an employee of the Georgetown Fire Department (including Plaintiff's Complaint or any Complaints which presently remain pending), including but not limited to any and all internal affairs, intra- or inter-departmental, and citizen complaints alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interviews, use of improperly suggestive, coercive methods on suspects, arrestees, or witnesses, fabrication or planting of evidence, concealment of evidence, and lawsuits or administrative complaints filed in state or federal courts or agencies alleging misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in

5

connection with each Complaint. If you do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**Objection to the ambiguousness (i.e. "Complaint") and overbroad and unduly burdensome nature this Interrogatory.**

**Attorney for Defendant**

**ANSWER: The Complaint in this civil action makes allegations against Defendant Buster Cannon as a "Captain with the Georgetown Police (sic) [Fire] Department."** *Compl.* **at ¶ 27;** *see also Compl.* **at p. 1. Otherwise, this Defendant is not aware of any complaints that are responsive to this Interrogatory.**

5.      Under oath, please identify all Complaints that have ever been made against you relating to your role as an accelerant detection canine handler (including Plaintiff's Complaint or any Complaints which presently remain pending), including but not limited to any and all internal affairs, intra- or inter-departmental, and citizen complaints alleging dishonest behavior, lying under oath, witness manipulation, improper behavior in relation to the handling of the canine during fire investigations, failure to adequately train the canine, failure to confirm the accuracy of the canine's "alerts" and lawsuits or administrative complaints filed in state or federal courts or agencies alleging misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If you do not possess an identifying number of a particular Complaint, please investigate and obtain it.

6

**Objection to the ambiguousness (i.e. "Complaint") and unduly burdensome nature**

**this Interrogatory.**

_____

**Attorney for Defendant**


**ANSWER: This Defendant identifies the Complaint in the present civil cause of action.**


6.    Under oath, please identify in what professional capacity and for what Department you were acting when participating in the Investigation at 638 Bonnie Drive, Russellville, Ky. on or about September 11, 2004.

**Objection to the extent that this Interrogatory concerns a conclusion of law as opposed to an interrogatory aka question of fact.**

_____

**Attorney for Defendant**

**ANSWER: Notwithstanding the foregoing objection, on the above date, Carmel R. (Buster) Cannon was an ATF certified accelerant canine detection handler on September 11, 2004 and he was requested by the Commonwealth of Kentucky, State Fire Marshall's Office, on or about September 12, 2004, to bring the ATF accelerant canine (PJ) to 638 Bonnie Drive, Russellville, Ky. and went to this address with the canine on or about September 12, 2004.  On these dates, Cannon was an employee of the City of Georgetown, Kentucky, and was a member of the Georgetown Fire Department, and Cannon was also an employee of the Scott County Sheriff's Department and was a Scott County Deputy Sheriff.  It is the recollection of Cannon**

**that he was paid by the City of Georgetown when he was called to appear with the canine at fire scenes under similar circumstances.**

7.     Under oath, please identify every Communication that you have had with any Person, including but not limited to Plaintiff and any of the Defendants, about any of the allegations, events, or circumstances described in Plaintiff's Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when and with whom the Communications occurred; and (c) provide the date of the Communication. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your Communications responsive to this Interrogatory are contained in the Documents that you reference.

**This Defendant objects to this Interrogatory as overbroad and unduly burdensome.**

**Attorney for Defendant**

**ANSWER: Notwithstanding the foregoing objection, Carmel R. (Buster) Cannon recalls receiving a phone call from the Commonwealth of Kentucky State Fire Marshall's Office requesting that he come to the fire scene with the accelerant detection canine, and Cannon recalls meeting with Deputy State Fire Marshall Alan Gregory for breakfast on a day following the fire, and their communications at breakfast included discussion of the fire incident. (Testimony concerning this breakfast communication is captured on the video of the underlying criminal trial video record on 2/14/06 at 4:51:02 p.m. through 4:57:13 p.m. on continued examination in the presence of the jury by Yell's attorney, Jill Giordano).**

**Q. Okay. And what was the nature of your conversations with Mr. Gregory at breakfast?**

A.    It was pouring down rain, so we decided to at.  And I like to have a little bit of information on what I'm going into.  And he basically just described -- just gave me, not described, but just filled me in on what was happening.  And he had felt some different things, and wanted me to look at it with the dog and see if I would have the same opinion as he had.

Q.    So when you say he found some different things, did he tell you specifically what he had found and what he believed he had found?

A.    No.  As a matter of fact, I don't want him to do that, you know, for the simple reason I want the dog to show us what she's done.  Because the last thing I want to do is give the dog discreditability.  And so I don't really want to know a whole lot about the scene, other than just basic information.

Q.    Well, then let me ask you again; what    exactly did he tell you then?  You just said he -- . . . .  Do you remember what he told you?

A.    Some, vaguely.  He explained to me that we did have a structure fire or I wouldn't be there, obviously.  And then he went into some detail about the suspects had been drinking, and one of them was found in the back in another neighbor's house and so forth.  And that there was some speculation about what was going on that night.  I think there was a domestic and, you know, just things of that nature.

Q.    So did he -- was it your understanding that it had already been determined it was an arson?

A.    No.

Q.    Okay.  What did he tell you about the premises, about the scene, or about the property you were getting ready to examine with PJ?

A.    He told me the areas that had been burned, and of course he told me about the little boy that had been in there, and how the mom had went in, the    police officer had went in.  At that time where the smoke and such was at that time.  Basically, all the damage was up toward the front part of the house.  That was about it.

Q.    When you say he told you the areas that had been burnt, when you were looking at that u, do you recall which areas he told you had been burned? A.    Well, basically he said just the front part of the house.  The rest like that there, I assume it was just this area here.  And I didn't realize it was back here until I got inside.

Q.    Did you all discuss fire patterns?

A.    No.

Q.    Did you discuss any unusual findings he had or that anyone else involved in the investigation had?

A.    No.  Because I don't want to know what those are.

Q.    Did you tell him that?  Did you say don't --

A.    He didn't bring it up.

Q.    So he didn't bring it up and you didn't --

A.    I didn't ask.

Q.    You didn't have to tell him don't --

A.    I did ask one question, whether or not there was the presence of any ignitable liquids in the house, such as lighter fluids and things like that that you find in ordinary households.  And I don't remember what his response was to that, to be honest with you.

9

Cannon further recalls the following: (Testimony captured on the video of the

underlying criminal trial on 2/14/06 at <u>4:58:01 p.m. through 5:00:02</u> <u>on examination</u>

<u>in the presence of the jury</u> by Yell's attorney, Jill Giordano).)

Q.  You arrive at the scene.  Who did you talk arrived at the scene?
A.  It was just Alan is the only --
Q.  He was the only one there?
A.  You know, at that time.  I think David came in later, or Detective West came in
later.
Q.  Was Mr. Flowers there at that time?
A.  Uh-huh.  Later.
Q.  Later?  And Mr. West?
A.  Later.
Q.   And did you discuss with anyone what steps had been taken to preserve the
scene at that point?
Q.  Did you have that discussion with anyone?
A.   Other than the fact that I guess permission was gained, or we still had
accessibility to the room or to the house.
Q.   So did you -- did you discuss decontamination?  What did you do as far as
decontamination before you entered with the dog?
A.  Every scene that I go to I clean up immediately after I leave.  Because the only
contamination I'm going to have is on the soles of my shoes, because I don't
generally touch anything, other than maybe point out as far as what evidence to
take, and I don't touch that most generally, but my boots are cleaned after every fire
scene. . .
* * *

Q. Did you ask whether or not other people who had been in and out, firefighters or
police officers or bystanders, did you ask whether or not any decontamination
procedures had been set up by any of the fire personnel or the police, prior to
undertaking your investigation with the dog?
A.  No, ma'am.
Q.  Is it standard for you to do that?
A.  No, ma'am.

Cannon also revisiting the scene at 638 Bonnie Drive with Kentucky State Police

Detective David West on 2/14/16.  (Testimony captured on the video of the

underlying criminal trial on 2/14/06 at <u>3:34:21 p.m.</u> through <u>3:37:21 p.m.</u> p.m. on

continued examination <u>outside the presence of the jury</u> by Yell's attorney, Jill

Giordano).

10

Q. Officer Cannon, do you recall we had a telephonic hearing, and I want to say it was either the last week of December or the first week of January this year?

A. Yes, ma'am.

Q. And Judge Gill contacted you by phone?

A. Yes, ma'am.

Q. All right. And at that hearing you testified that you did not recall the locations where PJ had had alerts. At that time you did not recall that?

A. I remember I said that, yes.

Q. All right And you also testified that there was no record kept by you or as far as you knew by anyone else?

A. No. I said there was no record kept by me.

Q. Okay.

A. I was going to rely on the other investigators --

Q. All right.

A. -- such as when we videotaped it.

Q. And you may or may not know, but the videotape did not work.

A. And that's the reason for documentation.

Q. Okay. So is there any documentation other than that videotape as to where -- I think you testified previously there wasn't. Do you today know of any documentation that someone kept at the time that PJ made alerts?

A. If there is, I'm not aware of it.

Q. Okay. Now, did you say you revisited the scene today?

A. Yes, ma'am.

Q. And who went to the scene with you?

A. It was myself and David West.

Q. And when you went there, were there lights set up inside that mobile home? were being set up.

A. They were being set up.

Q. Okay. So some were up and some were not?

A. Yes.

Q. And by coincidence were these lights at places where you now remember that PJ hit, several of these lights placed in those areas?

A. When I first went in, there wasn't any up.

Q. All right.

A. Okay.

Q. As you remained there, were there?

A. When I left -- they were being still put up as I left. At the time that I was going over, the lights were not up.

Q. So it's your testimony that when you went through the mobile home today, there were lights being put up, but none were put up at the time you walked through?

A. That's correct. None were shining on any of the places where the canine alerted.

Q. Okay. Well, I know none were shining but were they just sitting there?

A. No.

Q. Okay. What about photographs? You said you reviewed photographs. Who did you go over those with?

11

**A.**   We brought some out here and myself and a couple of the investigators went over them.

**Q.**   And what discussions did they have with you at the time that you reviewed those photographs to see if you recalled -- excuse me -- where PJ had hit?

**A.**   During --

**Q.**   Alerted, excuse me.

**A.**   With the -- with the photographs, I was able to pick out all but I believe number 47, that I could remember doing.

**Q.**   So they just handed you a photograph and said what to you as you were reviewing these?

**A.**   Well, while we had the photographs I could tell you, yes, we got one here.  But as far as looking down and saying, this is exactly where it was at, I couldn't do that unless I went back to the scene.

Cannon also recalls meeting with the prosecutor on the day of his initial testimony in the underlying criminal trial. *See also* Answer to Interrogatory No. 9.

8.     Do you contend the fire at 638 Bonnie Drive, Russellville, Ky. on September 11, 2004 was an intentional fire? If so, please state with particularity (a) the steps you took to make such a determination; (b) the fire methodologies you relied upon in making that determination; (c) the physical evidence you relied upon in making that determination; and (d) the steps you took to rule out an accidental fire.

This Defendant objects to this Interrogatory to the extent this interrogatory lacks relevancy or purports to impose a burden on Defendant Cannon.  Such relevant issues are found in the *prima facie* case for the Plaintiff to prove, i.e. his cause of action for alleged malicious prosecution.  Should the Plaintiff present facts and/or arguments of an accidental fire or innocence, then this Defendant reserves the right to present contrary facts and/or arguments.

_____

**Attorney for Defendant**

ANSWER: Notwithstanding the foregoing objection, it was not the role of Cannon, as a canine handler, to determine intent – he was not the investigator of this fire scene. A fire investigation was performed by the State Fire Marshall's Office, and a criminal/fire investigation was performed by the Kentucky State Police. That notwithstanding, it is the reasonable belief of this Defendant that the fire was intentionally set based upon the fire investigation of the State Fire Marshall's Office and Kentucky State Police's criminal/fire investigation that resulted in criminal charges. Cannon's role was as follows: (Testimony captured on the video of the underlying criminal trial video record on 2/14/06 at <u>4:57:14</u> p.m. through <u>4:57:59</u> p.m. on examination <u>in the presence of a jury</u> by Yell's attorney, Jill Giordano).

Q. And then right after that is when you went to the scene and undertook the investigation you referred to when you were being questioned by Mr. Orange?
A. I didn't really do any investigation. My job was just to run the dog through there.
Q. Well, you testified a few minutes ago he asked you what all you observed.
A. What I did.
Q. You testified --
A. I testified investigating the fire.
Q. What did you consider your job?
A. To run the dog through there and see if there was the presence of ignitible liquids.
Q. You also apparently felt it was –
A. I'm a fire investigator. I'm going to look, okay?
Q. Your testimony is you were just looking?
A. I'm not trying to be rude or anything, but I'm going to look.
Q. So your job was there just to, you said, run the dog?
A. Yes, ma'am. That was my sole role, basically.

(a) *See* answer and testimony above. *See also* Answer to Interrogatory No. 9 below.
(b) *See* answer and testimony above. *See also* Answer to Interrogatory No. 9 below.
(c) *See* answer and testimony above. *See also* Answer to Interrogatory No. 9 below.

9.     Please state with specificity each activity and investigative task that you participated in during the Investigation (involving the fire at 638 Bonnie Drive, Russellville, Ky. on September 11, 2004 and Robert Yell's subsequent arrest) including, but not limited to, your involvement in the Investigation involving the accelerant detection canine. For each activity and task, please describe the Person who assigned you each task, to whom you reported for each task, and with whom you worked on each task. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from September 11, 2004 up to and including the present day. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your participation in the Investigation is described in the Documents that you reference.

**This Defendant objects to this Interrogatory as overbroad and unduly burdensome.**

_____

**Attorney for Defendant**

**ANSWER: Notwithstanding the foregoing objection: (Testimony concerning Cannon's role in the investigation is captured on the video of the underlying criminal trial on 2/14/06 at 4:57:14 through 4:57:59 on continued examination <u>in the presence of a jury</u> by Yell's attorney, Jill Giordano)**

**Q.    And then right after that is when you went to the scene and undertook the investigation you referred to when you were being questioned by Mr. Orange?**
**A.    I didn't really do any investigation.  My job was just to run the dog through there.**
**Q.    Well, you testified a few minutes ago he asked you what all you observed.**
**A.    What I did.**
**Q.    You testified --**
**A.    I testified investigating the fire.**
**Q.    What did you consider your job?**
**A.    To run the dog through there and see if there was the presence of ignitible**

liquids.

Q.  You also apparently felt it was --

A.  I'm a fire investigator.  I'm going to look, okay?

Q.  Your testimony is you were just looking?

A.  I'm not trying to be rude or anything, but I'm going to look.

Q.  So your job was there just to, you said, run the dog?

A.  Yes, ma'am.  That was my sole role, basically.


(Testimony concerning Cannon's role in the investigation is captured on the video of the underlying criminal trial on 2/14/06 on continued examination <u>outside the presence of a jury</u> by the Commonwealth's Attorney, Charles Orange)

VR 2/14/06 at 3:27:41 p.m. through 3:27:49 p.m.

Q.  And are you the gentleman who was the handler of the arson dog named PJ?

A.  Yes, I was.

* * *

VR 2/14/06 at 3:28:24 p.m. through 3:29:43 p.m.

Q.  And can you tell the Court -- well, first of all, it's my understanding that your dog made what's called hits at, at certain times in the structure?

A.  Alerts, yes.

Q.  And can you tell the Court how you determine what a hit was?

A.  I usually calibrate the dog before I even take her into a scene.  And what I mean by calibrate the dog is that I will drop an accelerant down away from a structure somewhere and I'll run the dog by it just to get her calibrated.  She'll sniff the area and she'll locate it.  And when the dog finds what she's looking for, her alert sign will be a sit position.  At that time I'll --

Q.  Will be a what now?

A.  A sit position.  She'll -- she'll sit.  And at that time I'll reward the dog with a couple of kibbles of food and tell her what a good girl she is.  And then I'll ask her to show me where the product is.  At that time she'll take her nose and she'll pinpoint the product.  And then I'll mark it as a sample area and, again, praise the dog by petting her and giving her a couple more kibbles of food.

* * *

VR 2/14/06 at 3:30:28 p.m. through 3:31:34 p.m.

Q.  And could you just tell the Court what you remember?

A.  After we done the outside, when we went inside and in the front room area, she alerted an area around the front corner of the couch.  Also there was two windows on the far side of the couch.  She had alerted in two particular areas there.  And there was an area in the back bedroom adjacent to the kitchen and living room area.

We got two alerts out of that. One was at the corner of a bed in that area and the other one was on the far wall -- about dead center of that wall at the floor molding, between the molding and the floor area. And another spot that we -- or that she alerted on was a crack in the kitchen area and living room area.

Q. And there's been some testimony that there was a -- that you took your dog or -- I'm sorry, maybe you didn't, but I'm aware you took your dog into the room where Cameron was alleged to have been recovered, this -- the deceased boy?

A. I took the dog through the whole structure, yes, sir.

Q. Okay. It was in a debris pile. Where are the other locations that you -- that your dog hit?

A. There was three locations in the living room area. One at the couch -- the corner of the couch, one under the windowsills, and one near the register vent. One at the kitchen floor in the crack in the flooring there where an accelerant would run into. And then two in a bedroom adjacent from the living room, at the corner of the bed and the wall – the farthest wall dead center of the floor and the base molding.

Q. Now, after you -- you took your dog in, did you take your dog out?

A. Yes. Took the dog out and recalibrated the dog again.

Q. Did you take her in a second time?

A. I don't recall.

Q. Okay. And were there collections of samples collected while you were there?

A. Yes, there was.

Q. And after the samples were collected, was the -- was the dog allowed to look at those – or review those collected samples?

A. Yes. For the simple reason if we missed a product or a can that she didn't alert on, then we could go back in, let her run that area again because we might have missed the product. So we took all of the cans out on the concrete porch, it had an awning over it, lined them up. And we also took a comparison sample.

Q. And what was the result of this – her review of the cans under the awning?

A. She alerted on every one of the cans that we took the samples from, except the comparison sample.

10.      Do you contend that Robert Yell committed arson, murder, or any other illegal act relating to the incidents in Plaintiff's Complaint? If so, please describe each alleged illegal act that you contend was committed by Robert Yell, provide the complete factual basis for your contention, and identify all evidence and witnesses upon which you may rely to support your contention.

This Defendant objects to this Interrogatory to the extent this interrogatory lacks relevancy or purports to impose a burden on Defendant Cannon. Such relevant issues are found in the *prima facie* case for the Plaintiff to prove, i.e. his cause of

action for alleged malicious prosecution. This Interrogatory also calls for a legal conclusion. Should the Plaintiff present facts and/or arguments of innocence, then this Defendant reserves the present contrary facts and/or arguments.

_____

**Attorney for Defendant**

**ANSWER:** Notwithstanding the foregoing objection, it was not the role of Cannon, as a canine handler, to determine if an illegal act occurred – he was not the investigator of this fire scene. A fire investigation was performed by the State Fire Marshall's Office, and a criminal/fire investigation was performed by the Kentucky State Police. It is the reasonable belief of this Defendant that a criminal act did occur based upon the Kentucky State Police's investigation that resulted in criminal charges. *See* **Answer to Interrogatory No. 8 (and No. 9) above, which is incorporated by reference for this Answer.** *See also* **testimony that follows:**

(Testimony captured on the video of the underlying criminal trial video record on 2/14/06 at <u>4:57:14</u> p.m. through <u>4:57:59</u> p.m. on examination <u>in the presence of a jury</u> by Yell's attorney, Jill Giordano).

Q.    And then right after that is when you went to the scene and undertook the investigation you referred to when you were being questioned by Mr. Orange?
A.    I didn't really do any investigation. My job was just to run the dog through there.
Q.    Well, you testified a few minutes ago he asked you what all you observed.
A.    What I did.
Q.    You testified --
A.    I testified investigating the fire.
Q.    What did you consider your job?
A.    To run the dog through there and see if there was the presence of ignitible liquids.
Q.    You also apparently felt it was –
A.    I'm a fire investigator. I'm going to look, okay?
Q.    Your testimony is you were just looking?

17

**A. I'm not trying to be rude or anything, but I'm going to look.**
**Q. So your job was there just to, you said, run the dog?**
**A. Yes, ma'am. That was my sole role, basically.**

11.     For any affirmative defenses that you have asserted or will assert in this matter, please describe the entire factual basis supporting each such defense and specifically identify any witnesses or physical, documentary, or testimonial evidence that supports each such defense. The information sought by this interrogatory is not a mere recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiff requests that you provide a detailed description of every fact and legal basis on which the affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of additional discovery requests. For example, if you intend at any point in this litigation to assert an immunity defense, please state all facts, evidence, and legal bases for such a defense, identifying any witnesses or physical, documentary, or testimonial evidence relating to the immunity defense.

> **ANSWER: This Defendant objects to this Interrogatory as overbroad and unduly burdensome in that it seeks a complete recitation of each fact that supports this Defendant's position; This Defendant may rely on any fact or piece of evidence that is in the record at summary judgment or at trial.**
>
> _____
> **Attorney for Defendant**

12.     Given the sum total of your personal knowledge of the policies, customs, and practices of the Georgetown Fire Department as you understand them (formal or informal, written or unwritten), please state whether you or any of the other Defendants acted inconsistently with any of those policies, customs, or practices at any time during the Fire Investigation. If the answer is in the affirmative, please: (a) identify any particular policy,

custom, or practice which, to your knowledge was violated; (b) describe the circumstances and manner in which said policy, custom, or practice was violated; and (c) state whether any discipline resulted from that violation.

**This Defendant objects to this Interrogatory as overbroad and unduly burdensome in that it seeks a complete recitation "sum total" of the policies of the Georgetown Fire Department and the "actions" of other Defendants as applied to the policies of the Georgetown Fire Department.**

**Attorney for Defendant**

**ANSWER: Notwithstanding the foregoing objection, this Defendant Cannon acted consistently with his training and does not believe that any of his actions were in violations of any polices of the Georgetown Fire Department.**

13.    Did any Investigator (including yourself) in the Investigation (involving the fire at 638 Bonnie Drive in Russellville, Ky. on September 11, 2004 and Robert Yell's arrest) conduct or participate in any formal or informal witness interviews or have any Communications with witnesses that were not memorialized in a report? If the answer to this question is anything other than an unqualified "no," please list the dates and locations of all such interviews or Communications, the names of each person involved in each interview or Communication, and the content of any such interview or Communication.

**This Defendant objects to form this Interrogatory and its presumptive terms of "Investigator" and this Interrogatory is also overbroad and unduly burdensome.**

**Attorney for Defendant**

**ANSWER: Notwithstanding the foregoing objection, no - this Defendant Cannon did not participate in any witness interviews.** *See also* **Answers to Interrogatory Nos. 8, 9 and 10.**

14.    Have you given any testimony in regard to the charges levied against Robert Yell described in the Complaint? If so, please state with particularity the proceeding in which the testimony was given and the date on which it was given.

**Cannon gave telephonic testimony at a preliminary held on January 3, 2016, and Cannon testified at the trial on February 14 and 15, 2006.**

15.    Under oath, please identify any and all training P.J., the accelerant detection canine, had received in regard to detecting accelerants from 2000-2004. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your Communications responsive to this Interrogatory are contained in the Documents that you reference.

**Training records that fall within this period of time have been produced as a part of this civil action and have been marked RPD001167-1320 and YELL 000354-555. In addition,** *see* **documents consisting of exhibits introduced through Cannon at the pretrial hearing held in the underlying criminal action and at the underlying criminal trial have been located by the Clerk/Deputy Clerk of the Logan Circuit Court and are marked as LOGAN CIRCUIT 0001-36 (Prehearing, Exhibits 1, 2 and 3) and LOGAN CIRCUIT 0037-51 (Trial, Commonwealth Exhibit 39 re: ATF Certificate of Training 4/5/2004 and Defendant's Exhibit 1 re: Accelerant Detection Canines).**

**Defendant Carmel R. (Buster) and the canine (PJ) received initial training in the**

Spring 2002 with the United States Department of Treasury, Bureau of Alcohol,

Tobacco and Firearms, ATF's Accelerant Detection Canine Program at the ATF,

Canine Training Branch, 122 Calvary Drive, Front Royal, Virginia 22630, and ATF

annual training for Accelerant Detection Canine Re-Certification at various host

cities, including Murfreesboro, Tennessee in May 2005; College Park, Maryland in

April 2004; and Las Vegas, Nevada in April 2003. Defendants City of Georgetown

and Carmel R (Buster) Cannon are not in possession of documentation concerning

this training. Photographs of such training in 2004 are attached in the range of

CANNON 0001-244. Furthermore, Carmel R (Buster) Cannon maintained records

stored at the Stamping Ground Fire Department (where he served as a volunteer

firefighter) consisting of three (3) boxes of materials. The first box contains assorted

personnel records; certifications and commendations; medical and training

materials related to the canine (PJ); and reference manuals. The contents of the

first box is attached as CANNON 0001-244. The second and third boxes contain fire

investigation files, photographs and audio recordings related to other fire incidents.

The two subsequent boxes are available for inspection at the law offices of Sturgill,

Turner, Barker & Moloney, PLLC.


16.    Under oath, please identify any and all training you had received prior to

September 11, 2004 relating to the use of accelerant detection canines in fire investigations. If

you answer this Interrogatory by referring to Documents, please affirm under oath that the sum

total of your Communications responsive to this Interrogatory are contained in the Documents

that you reference.

Training records that fall within this period of time have been produced as a part of this civil action and have been marked RPD001167-1320 and YELL 000354-555. In addition, *see* documents consisting of exhibits introduced through Cannon at the pretrial hearing held in the underlying criminal action and at the underlying criminal trial have been located by the Clerk/Deputy Clerk of the Logan Circuit Court and are marked as LOGAN CIRCUIT 0001-36 (Prehearing, Exhibits 1, 2 and 3) and LOGAN CIRCUIT 0037-51 (Trial, Commonwealth Exhibit 39 re: ATF Certificate of Training 4/5/2004 and Defendant's Exhibit 1 re: Accelerant Detection Canines).

Defendant Carmel R. (Buster) and the canine (PJ) received initial training in the Spring 2002 with the United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms, ATF's Accelerant Detection Canine Program at the ATF, Canine Training Branch, 122 Calvary Drive, Front Royal, Virginia 22630, and ATF annual training for Accelerant Detection Canine Re-Certification at various host cities, including Murfreesboro, Tennessee in May 2005; College Park, Maryland in April 2004; and Las Vegas, Nevada in April 2003. Defendants City of Georgetown and Carmel R (Buster) Cannon are not in possession of documentation concerning this training. Photographs of such training in 2004 are attached as CANNON 0147-187. Furthermore, Carmel R (Buster) Cannon maintained records housed with the Stamping Ground Fire Department (where he served as a volunteer firefighter) consisting of three (3) boxes of materials. The first box contains assorted personnel records; certifications and commendations; medical and training materials related to the canine (PJ); and reference manuals. The contents of the first box is attached

22

**as CANNON 0001-244.  The second and third boxes contain fire investigation files, photographs and audio recordings related to other fire incidents.  The two subsequent boxes are available for inspection at the law offices of Sturgill, Turner, Barker & Moloney, PLLC.**

17.    Please state whether you had any conversation(s) with or obtained any statements from any of the following individuals on or subsequent to September 11, 2004: (a) Robert Yell; (b) April Carpenter. If so, please describe with particularity the location of the conversations/statements, the names of anyone else who was present, and what was said by whom.

**ANSWER: No.**

18.    Please state whether you had any conversation(s) with the jailer and/or any staff members of the Logan County Detention Center in regard to Robert Yell, including any conversation(s) regarding the Investigation, charges against Mr. Yell, anything that occurred when Mr. Yell was held in the sally port on September 11, 2004 and anything in regard to the video recording of the sally port from September 11, 2004. If so, please describe with particularity the substance of the conversation(s), the date and location of the conversation(s)/statement(s), the names of anyone else who was present, and what was said by whom.

**ANSWER: No.**

19.    Were you ever in possession of the video of the Logan County Detention Center sally port from September 11, 2004? If so, please describe with particularity how and when you came into possession of the video. If you still have possession of the video, please state the

location of that video. If you are no longer in possession of the video, please state with particularity what you did with the video and when.

**ANSWER: No.**

20.    For punitive damages purposes, please estimate your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities. Please also provide an income statement for the five years prior to the filing of this complaint, including your annual salary and any income from any other source for those years.

**ANSWER: This Defendant objects to this Interrogatory as premature, irrelevant and not likely to lead to relevant information, and based on harassment, annoyance, or embarrassment.** *Sand Hill Energy v. Smith*, **142 S.W.3d 153 (2004). It is overly broad and inapplicable to individuals, who, as opposed to businesses, do not ordinarily have or draft income statements. Counsel objects to disclosing this information prior to the Plaintiff establishing an adequate foundation for it to the Court's satisfaction and objects to disclosing it without a protective order restricting it to attorney's eyes only.**

_____
**Attorney for Defendant**

24

Respectfully submitted,

/s/ *Charles D. Cole*
Charles D. Cole
M. Todd Osterloh
Derrick T. Wright
Janet S. Luo
STURGILL, TURNER, BARKER
& MOLONEY, PLLC
333 W. Vine Street, Suite 1500
Lexington, KY 40507
Telephone: (859) 255-8581
ccole@sturgillturner.com
tosterloh@sturgillturner.com
dwright@sturgillturner.com
jluo@sturgillturner.com
ATTORNEYS FOR DEFENDANTS
CITY OF GEORGETOWN, KENTUCKY, AND
CARMEL ("BUSTER") CANNON, in his individual
capacity

and

/s/ *D. Barry Stilz*
D. Barry Stilz
Lynn Sowards Zellen
KINKEAD & STILZ, PLLC
301 East Main Street, Suite 800
Lexington, Kentucky 40507
Phone: (859) 296-2300
Facsimile: (859) 296-2566
bstilz@ksattorneys.com lzellen@ksattorneys.com
Counsel for Defendant Scott County Deputy Sheriff Buster
Cannon, In His Individual Capacity

24

## VERIFICATION

I hereby certify that the foregoing answers are true and accurate to the best of my knowledge and belief.

_Carmel R. Cannon_ (signature)

Carmel R. Cannon

---

### NOTARY CERTIFICATE

**COMMONWEALTH OF KENTUCKY**

**COUNTY OF** _Scott_

Subscribed, acknowledged and sworn to before me by _Carmel Cannon_ on this

_4_ day of _June_ , 20 _21_

My commission expires: _3/8/2025_

NOTARY PUBLIC, STATE AT LARGE
KENTUCKY

_Amanda L. Hensley_ (signature)



OFFICIAL SEAL
AMANDA L. HENSLEY
NOTARY PUBLIC - KENTUCKY
STATE-AT-LARGE
My Comm. Expires _3/8/25_
ID # _KYNP 35953_

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served via electronic mail on all attorneys of record on this the �add, day of June ,2021.

/s/ *Charles D. Cole*
ATTORNEYS FOR DEFENDANTS
CITY OF GEORGETOWN, KENTUCKY, AND
CARMEL ("BUSTER") CANNON, in his individual
capacity

01456200.docx

27