LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA



# KENTUCKIANA
## —COURT REPORTERS—

## CASE NO. 04 CR 00232

# COMMONWEALTH OF KENTUCKY

### V.

# ROBERT YELL

# DAUBERT HEARING

Exhibit ___1___
Cannon
Date 11-8-22



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856  502.589.2273



www.kentuckianareporters.com

Exhibit 6

1          LOGAN CIRCUIT COURT

2           JUDGE TYLER GILL

3          CASE NO. 04 CR 00232

4

5    COMMONWEALTH OF KENTUCKY,

6              PLAINTIFF

7

8                V.

9

10           ROBERT YELL,

11             DEFENDANT

12

13

14

15

16    DAUBERT HEARING

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          INDEX
 2                                            Page
 3
 4   Deputy Carmel R. Cannon:
 5   DIRECT EXAMINATION BY MR. ORANGE          3
 6   CROSS EXAMINATION BY MS GIORDANO         24
 7   REDIRECT EXAMINATION BY MR. ORANGE       36
 8   RECROSS EXAMINATION BY MS. GIORDANO      38
 9   FURTHER DIRECT EXAMINATION BY MR. ORANGE 41
10
11   Alan Gregory:
12   DIRECT EXAMINATION BY MR. ORANGE         50
13   CROSS EXAMINATION BY MS. GIORDANO        54
14   REDIRECT EXAMINATION BY MR. ORANGE       62
15   RECROSS EXAMINATION BY MS. GIORDANO      64
16
17   David West:
18   DIRECT EXAMINATION BY MR. ORANGE         66
19   CROSS EXAMINATION BY MS. GIORDANO        81
20   REDIRECT EXAMINATION BY MR. ORANGE       95
21   RECROSS EXAMINATION BY MS. GIORDANO      96
22   FURTHER DIRECT EXAMINATION BY MR. ORANGE 99
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              DEPUTY CANNON:  Deputy Cannon.
 2              JUDGE GILL:  Yes, Deputy Cannon, this is Tyler
 3       Gill.  I'm Circuit Judge in Logan County.
 4              DEPUTY CANNON:  Yes, sir.
 5              JUDGE GILL:  And Mr. Charles Orange is standing
 6       here next to the bench.  We're in the courtroom, and
 7       we're having a hearing in the case of Commonwealth
 8       v. Robert Yell known as a Daubert hearing, and we
 9       also have Ms. Giordano on behalf of the defendant.
10       And Mr. Orange tells me that he wants to take your
11       testimony via telephone, that suit you okay?
12              DEPUTY CANNON:  Yeah, that's fine.
13              JUDGE GILL:  Okay.  And I'm going to ask you,
14       do you swear or affirm under penalties of perjury,
15       that the testimony you're about to give is the
16       truth?
17              DEPUTY CANNON:  Yes, I do.
18              JUDGE GILL:  All right.  And if you can't hear
19       any of the questions or any statements just tell us.
20       I'm asking counsel to step up here at the bench, and
21       we're recording your testimony and the questions and
22       answers by videotape.
23                   DIRECT EXAMINATION
24  BY MR. ORANGE:
25       Q     State your name please.  State your name,
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  please.

 2      A    Deputy Carmel (phonetic) R. Cannon at Scott

 3  County Sheriff's Department.

 4      Q    And how long have you been in law enforcement?

 5      A    17 years.

 6      Q    And what kind of professional training do you

 7  have, as far as law enforcement goes?

 8      A    Well, I've also got about 23 years in the fire

 9  service as well --

10      Q    I was going to get to that, talk about your

11  police --

12      A    -- traffic collision.  Domestic, numerous

13  times.

14      Q    Okay.  And what -- let's limit to the

15  Sheriff's office and police work.  What kind of police

16  background do you have?

17      A    Can you repeat the question?

18      Q    What kind of professional training and

19  experience do you have as a police officer as opposed to

20  be a firefighter?

21      A    Well, actually I worked 15 years full-time

22  with the City of Georgetown as a firefighter, as well as

23  doing full-time position at Scott County Sheriff's

24  Office.  So I've done both jobs for the past 12 years

25  full-time position at both places.  As it turns out, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   work every third day in the fire service and the other

 2   two days I work at the Sheriff's Office.  And during

 3   that time I was at the fire service I had an arson --

 4   excuse me, accelerants trained canine.  What the dog was

 5   trained to do was to be sniff out accelerants that an

 6   arsonist might use in setting a fire or starting a fire.

 7   And I've also done fire scenes across the country and

 8   across the state, while being in fire service and with

 9   the sheriff's office as well.

10       Q    Okay.  And did you take training to handle an

11   accelerant canine?

12       A    Yes, I did in 2002 I was in Front Royal,

13   Virginia for five weeks learning how to be a handler for

14   an accelerant sniffing canine.

15       Q    Okay.  And did they give you a certificate of

16   training for that five weeks of training?

17       A    Yes, they did.  As a matter of fact, I believe

18   I forwarded -- forwarded you a copy of that.

19       Q    And I'm going to shows those to the Judge

20   here.

21            JUDGE GILL:  Now, I've got a certificate

22       training, "Certifying that Carmel R. Cannon has

23       successfully completed accelerant canine course

24       February 18, 2002 to March 20, 2002," signed by a

25       Mark -- looks like Logan (phonetic) -- assistant

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| | |
|---|---|
| 1 | director. Is that what you sent Mr. Orange? |
| 2 | THE WITNESS: Yes, I believe it is. |
| 3 | JUDGE GILL: Okay. I've also been handed a |
| 4 | Department of the Treasury Bureau of Alcohol, |
| 5 | Tobacco and Firearms certificate of training. It |
| 6 | says, "This is to certify that Carmel R. Cannon and |
| 7 | Canine PJ has successfully completed accelerant odor |
| 8 | recognition testing" -- |
| 9 | THE WITNESS: Yes, that's an annual test that |
| 10 | we do every year. |
| 11 | MR. ORANGE: Okay. |
| 12 | JUDGE GILL: And that's dated March 20, 2002. |
| 13 | BY MR. ORANGE: |
| 14 | Q    While we're into this, I have a certificate |
| 15 | which is dated May of 2005, one dated April of 2004 |
| 16 | certifying your re-training with PJ. Did you, in fact, |
| 17 | complete a re-training in both 2004 and 2005 with PJ? |
| 18 | A    Yes, I did. |
| 19 | Q    And did you complete -- are you member of the |
| 20 | National Association of Fire Investigators? |
| 21 | A    Yes, I am. |
| 22 | Q    And I believe that's current, 2005 and 2006? |
| 23 | A    Yes, it is. |
| 24 | Q    Okay. And you are currently the trainer of an |
| 25 | arson dog named PJ? |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

7

```
 1        A    Yes, I am.

 2        Q    PJ (coughs) excuse me.  And how long have you

 3   been the handler of that dog?

 4        A    Since February of 2002.  The dog was issued to

 5   me a couple of days after we arrived at the scene for

 6   the training.

 7        Q    Okay.  And so you spent about five weeks in

 8   training with BJ back in 2002 at an ATF type school?

 9        A    Yes.

10             JUDGE GILL:  It's PJ, I think.

11        Q    PJ.

12        A    Yes.

13        Q    And how long did these re-trainings --

14   re-certifications, what do they involve?

15        A    They're a 40-hour class where we'll have about

16   two days of in-service of lectures.  And then what that

17   would consist of just bringing up new techniques, and as

18   far as what the dogs are alerting on and what they're

19   not alerting on, or what they want the dogs to do.  And

20   just different things that are -- that are traveling

21   around, just different techniques that they're learning

22   every -- I'm going to say every week or possibly every

23   day that different investigators run across -- across

24   the nation.  And both PJ and myself are both on the

25   National ATF Response Team as well, so we could be
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   utilized across the country.
 2       Q    And I just noticed I got a certificate of
 3   training from 2003, also in April.  And you did that
 4   training also?
 5       A    Yes, we had trainings.  We do a 40-hour
 6   in-service class with canines every year.
 7       Q    Okay.  And since 2002, how many fire scenes
 8   have you taken PJ to?
 9       A    I've probably average about 50 per year, so
10   I've had her almost four years, so it would be close to
11   200 fire scenes.
12       Q    Okay.  And what geographic area do you
13   normally work in with your dog?
14       A    That would be -- example --
15       Q    Kentucky or --
16       A    Can you be more specific?
17       Q    How far do you normally travel to -- in these
18   200 cases, what would the area that you've traveled in
19   with -- to fire scenes?
20       A    I've probably done -- probably 50 percent of
21   my fires in western Kentucky, 25 percent eastern
22   Kentucky, and the other 25 in northern Kentucky and
23   Ohio.
24       Q    Okay.  And have you provided me a training
25   summary report concerning PJ?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Can you repeat the question?

 2        Q    Have you provided me a training summary report

 3   involving PJ?

 4        A    Yeah, her daily training activities are done

 5   monthly, and you should have a copy of that as well, as

 6   to what she was trained on and the type of accelerant

 7   that was used.

 8        Q    Okay.  And that's a multiple-page document?

 9        A    It should be a two-page document.  The first

10   document will have the accelerant.  Both -- for example,

11   the first page will have what she was trained, what -

12   what we were doing that day such as, you know, we might

13   have been working on vehicles that day, we might have

14   been doing daisy wheels (phonetic), or just a can

15   line-up, or walls, or clothing line up, or burnt carpet,

16   anything of that nature.  Then it would give the amount

17   of alerts that the dog did.  And then on the next page

18   it would give the products that we used and the training

19   and then the accelerant used as well.

20        Q    Okay.  And I also got some of this training

21   summary report here.  Is that what you're talking about?

22   I'm going to show these to the Judge.  And you're

23   talking about -- it says, like, wheel, and can line up,

24   stairs, walls, cracks, clothing?

25        A    That's correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.  And how did you -- did you personally
 2   put these records together?
 3        A     Yes, I do.  Yeah, we're -- we're required to
 4   send those documents monthly to the ATF, so they can
 5   keep up with what we're doing and what we're training
 6   the dogs on, as well as what accelerants we're using.
 7        Q     Okay.  So these are documents you keep under
 8   your contract with ATF?
 9        A     That's correct.
10        Q     And how long have you been under contract with
11   T -- ATF?
12        A     Since I was granted the canine back in 2002.
13        Q     Okay.
14        A     That was one of the stipulations of getting
15   the canine was to be under contract with the ATF for the
16   first five years.  Then you could renew after that, if
17   you chose to --
18        Q     Okay.
19        A     -- but you had to do the first five years?
20        Q     And so do you remain under contract with ATF
21   to this day?
22        A     I am at this time, yes.
23        Q     Okay.  And what do you have to do remain under
24   contract to keep your contract valid?
25        A     Actually, it's rather simple.  They provide
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the dog at no expense to the taxpayers, and all I got to

2  do is when they call I go.

3      Q     Okay.  And that's these -- it involves these

4  40 -- excuse, 40 -- approximately 40 fires a year that

5  you go to?

6      A     Not all of them will involve ATF.  I believe I

7  also sent maybe a year's worth of calls that I have

8  done.  And, you know, I may not have any ATF call outs

9  that -- for example, for -- for this year or for the

10  past year 2005.  But I'd go back to 2003.  I may have

11  had three that year.

12      Q     Okay.

13      A     So it's -- you know, it's -- they will -- they

14  will utilize each handler two, three times a year at

15  most.  There's -- there's about 60 of these canines

16  currently across the US, and they're trying to use more

17  of the ones that's just getting out of school that

18  haven't been utilized in these ATF call outs for these

19  bigger fires and things of that nature.  So they kind of

20  kept me on the back burning right now, getting some of

21  the newer guys out.

22      Q     Okay.

23      A     But that's not to say that they may not call

24  as soon as I get off this phone and I have to pack my

25  bags and go to North Dakota somewhere either.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  So you're subject to go anywhere in the

2   United States that they call ATF --

3      A     Yes, sir.

4      Q     -- with your dog?

5      A     Yes, sir.

6      Q     And there's about 60 of these dogs in the

7   United States that are specifically under contract with

8   the ATF?

9      A     Yes, sir.

10     Q     And do those 60 dogs cover all 50 states?

11     A     Well, actually, they've kept the areas across

12  the United States set up in regions, and I'm in what we

13  call the Midwest region.  So my region would cover

14  Kentucky, Ohio, Illinois, Indiana, North and South

15  Dakota, Nebraska, and then such.  But I'll give you

16  another example.  There was two canines -- or at least

17  one more that I know of in Chicago, but that dog may be

18  either in Chicago, or it could be in Toledo somewhere.

19  Therefore, they would call the closest dog, which may be

20  me, and I would end up having to go to Chicago even

21  though they have a dog, but that dog may not be in

22  Chicago.

23     Q     Now, also -- back it up a little bit.  Hey,

24  did you receive -- or go to the 35th Annual Greater

25  Cincinnati Regional Arson and Fire Investigative

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

13

```
 1   seminar?
 2        A    I've done a couple of those classes up there,
 3   but I'm -- without looking, I couldn't tell you whether
 4   it was a 35th or the 34th.
 5        Q    Okay.  And did you a certificate of training
 6   for the National Fire Academy in 2000?
 7        A    Emmitsburg, Maryland.  Yes, I did.
 8        Q    And did you go -- and did you go to again the
 9   -- the 41st Greater Cincinnati Regional Arson and Fire
10   Investigators seminar?
11        A    I'll give you the answer.  I've been there I
12   know on two occasions, but I couldn't tell you whether
13   it was the 40th or the 41st.
14        Q    Okay.  You did send me some certificates
15   evidencing your participation in those --
16        A    Yes.
17        Q    -- those fire schools.  And did you have an
18   occasion where you were asked by the State Fire
19   Marshall's Office to come to Logan County, Kentucky last
20   year to investigate a fire scene?  A trailer fire here
21   in the City of Russellville?
22        A    I remember going to Russellville, but I don't
23   think it was last year.
24        Q    Okay.
25             MS. GIORDANO:  2004.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     It would have been in 2000 -- excuse me this
2   is a new year.  September of 2004?
3      A     That's correct.  I believe that's --
4      Q     Okay.
5      A     I believe we're in the ballpark.
6      Q     Okay.  And can you tell us about that fire
7   scene?
8      A     (coughs) Excuse me.  Well, the first thing
9   that I usually want to do is just get a rundown on
10  what's going on at the fire scene.  Second thing I'll
11  usually do is I'll go in and do a walk around just to
12  make sure that there's nothing in there that will hurt
13  my dog or cause my dog to get, like -- a -- for example,
14  broken glass, I would have to get that cleaned up before
15  I bring her in because she doesn't wear any special foot
16  padding or anything like that.  So actually, I'm going
17  to make sure the scene is safe before I'll bring the dog
18  in.  And I want to know if there's any accelerant in the
19  house and where would I expect to find them if I was, so
20  I'll ask a question of that nature.  If there was, then
21  I want to know where so I could keep the dog aware from
22  that area because obviously she would be expected to
23  find it.  But, yeah, I believe I went into the house and
24  presented the dog with an order to -- to work and -- and
25  she did so.  She did alert in several places -- several



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   different places in the -- in the house or in the home.

2       Q    Okay.  And did you point those spots out to

3   anyone?

4       A    Yes, I did.

5       Q    And do you recall who you pointed them out to?

6       A    There were numerous officials on scene.  State

7   police, I believe.  State fire marshal's office, a

8   couple from there, maybe, and if I recall some

9   firefighters, maybe.  They -- yes, most generally, I'll

10  have one or two that will follow with me and either

11  photograph the scene where the dog alerts or -- or leave

12  some type of marker, to where we can go back and pull

13  the samples on them.

14      Q    And you're telling this Court that PJ did, in

15  fact, alert on more than one site -- several sites there

16  at the -- where we might call the Yell residence?

17      A    Yes.

18      Q    And have you had any training or any -- do you

19  have any knowledge about the ability of the dog to smell

20  accelerants, when there are negative laboratory test

21  results of those locations?

22      A    I've actually had two occasions.  There was a

23  case in Beaver Dam as well as a case in or around

24  Bowling Green, in your area, a year or two ago where --

25  an example, we got a sample back from the chemist, and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    he says without a doubt there's something there.  But

2    it's not reading on meters high enough for me to make a

3    call on it, and so, therefore, I'm not going to make a

4    call on it.  And so in other words, the chemist just

5    didn't have enough there to where he would go on a limb

6    and say the dog has found something, but yes off the

7    record he would tell me the dog made a good alert.  And

8    as it turned out, after they got a confession from the

9    perpetrator, there was an accelerant used and it was

10   used in the area of origin that the dog did alert.  And

11   the same aspect, as the other fire in Beaver Dam where

12   the dog did make an alert, we got negative results back.

13   But, again, the chemist couldn't verify what the dog had

14   found, and then we got a confession later that the dog

15   did alert, in fact, again, in the area where gasoline

16   was used.

17        Q     And this was -- was this a sign that PJ -- the

18   same dog that you used in the Yell fire?

19        A     Oh, yeah.  I only use the one dog.

20        Q     Okay.  And do you have any specific training

21   or knowledge of dogs being able to find accelerants or

22   alerting on accelerants, when the lab results of those

23   locations come back negative?

24        A     My personal experience is, no, but I've always

25   been told the dog's --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MS. GIORDANO:  I'm going to object, Your Honor,
 2     on hearsay.
 3     A    -- sniffing ability --
 4            JUDGE GILL:  Overruled.
 5     A    -- is 400 times greater than that of a human.
 6     And if they could honestly pick up results before the
 7     lab could even tell you that -- that it was there or
 8     could produce the confirmation sample.  But, you know,
 9     myself and a dog, I'm going to believe my dog.  I've
10     been taught to believe what my dog has found.  If she's
11     being truthful with me, but they still want something to
12     back it up as well.
13     Q    Okay.  Now, you said you had heard it was four
14     times -- 400 times better than a human nose.  Did I hear
15     you say that?
16     A    Yes, you did.
17     Q    Is that something you had heard on the street
18     or is that something you came by through your
19     professional training and --
20     A    Something I've came by through my special
21     training.
22     Q    And have you had any training on -- or do you
23     recall, what parts per million that a dog may be able to
24     detect?
25     A    Not as much as parts per million, but I can
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   tell you that I have trained her on as little as one

2   microliter, which is the equivalent of half of an eye

3   drop up to 15 microliters which will be, of course,

4   eight times greater than the first result.  And I get

5   the same results, it's a positive.  In other words, I'm

6   telling you that if I put down half a drop versus a

7   gallon of it, I'll get the same result from a canine.

8       Q    And that's from your dog PJ?

9       A    That's from my dog.

10      Q    Okay.  And how long are -- how long has it

11  been or how often do you train with these different

12  amounts?  And I guess you've given us that data, as to

13  these particularly these smaller amounts?

14      A    Seven days a week, 24 hours a day, 365 days a

15  year.  The only way the dog eats is by training or

16  actually working a fire scene, so I have to work the dog

17  daily.

18      Q    Okay.

19      A    She -- and she gets worked twice a day.  She's

20  on a two-cup ration of food a day plus dog biscuits.  So

21  I work her twice a day.  Her dog biscuit lets her know

22  that she's through training for the day.

23      Q    Okay.

24      A    And if by chance if I'm through training her

25  and I get called on a fire scene, then I just keep the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   ration from her the next day what she ate.  She's also
 2   on a weight restricted program.
 3        Q    So your testimony today is it -- it's based
 4   upon your training -- your professional training both as
 5   the handler of PJ and your training -- the training of
 6   PJ?
 7        A    Yes.
 8        Q    Based upon your training as -- with ATF, and
 9   other fire schools, and your training as a firefighter
10   for, I think you said, 15 years?
11        A    Uh-huh.  So that's a full-time firefighter.
12   I've been in the fire service for 23 years.
13        Q    Okay.  And you continue to still work part-
14   time as a firefighter also do you not?
15        A    Yes, sir.  I'm heading there as soon as I
16   leave here.
17        Q    Is your testimony part of reliable principles
18   and methods of fire detection and use of a canine unit
19   in fire detection and accelerants?
20        A    Yes, to the base of my knowledge it is, yes,
21   sir.
22        Q    Okay.
23        A    I don't think anything has changed in the last
24   four years since I've had the dog that would say --
25   well, ATF keeps us informed on any changes anyway.  So I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   would know if there had been, so everything is based on

2   my training experience with the canine and a firefighter

3   and fire investigator for past 23 years.

4       Q    And as it concerns the Yell fire here in

5   Russellville, did you use the applied principles and

6   methods that you had been taught by the ATF and the

7   other fire training?

8       A    Yes, I did.  I calibrate the dog before I took

9   her in and calibrated her again when I brought her out.

10  And what I'm saying by that is that I'll usually put

11  down a drop or so some type of accelerant away from the

12  fire scene.  Her job is to find that.  And what it does,

13  it just, kind of, gets her into a working mode and then

14  as a reward when I bring her back out, she'll -- she'll

15  go back and calibrate out, and that's part of the

16  training as well.

17      Q    And also, I believe if I'm correct there were

18  six samples -- six, or seven samples taken in the Yell

19  case -- the Yell fire; do you recall?

20      A    Without documentation in front of me, I

21  couldn't swear to it if there were several.

22      Q    Well, if there were samples taken, do you

23  recall whether or not your dog was allowed to check

24  those samples after they were taken?

25      A    Yes.  As a rule I also -- when the samples are

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   taken, I'll have the lead investigator contain them in a

2   metal paint container and we'll take them outside.  And

3   just to make sure that we've got the proper evidence,

4   I'll run the dog back across them again, and if she

5   alerts on the containers that we've taken our evidence

6   and put in -- and I'm pretty -- pretty sure we have our

7   samples.  If she doesn't alert on that can, then we'll

8   go back in and run her again, because we may have missed

9   exactly where she was pointing to.

10       Q    And just for the record, you're talking about

11   paint cans.  Are these that you get down at the local

12   paint store that has paint in them, or how do you come

13   across these paint cans?

14       A    Absolutely not.  These cans are manufactured

15   from a paint dealership that has never had a product in

16   them.  These paint cans are bought by the KSP, and

17   they're at the state police laboratory, and that's where

18   myself and probably most of your state fire marshals

19   retrieve these cans from.

20       Q    Okay.  And to the best of your knowledge did

21   you, in fact, have PJ check the cans in the Yell case

22   after the samples were taken?

23       A    Yes, I did.

24       Q    Okay.  And did you do anything different or

25   unusual in the Yell case that would be different from

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    many other of the 200 or so fires that you and PJ had

2    worked?

3         A     I wouldn't see why I would.  I mean, she --

4    she goes through the same routine at every fire scene

5    and I just -- no, I don't.  No, I -- I could honestly

6    say that nothing was done any different.

7         Q     Okay.  And you turned the samples -- or the

8    samples were taken by the Kentucky State Police after

9    they were taken, to the best of your knowledge?

10        A     I assume that they were.  They were in the

11   control of the arson investigator and the state police

12   at the time I left.  So I'm assuming that he took them

13   and had them analyzed at their laboratory.

14        Q     And based on your professional knowledge and

15   experience is the use of accelerants smelling dogs -- is

16   that a common practice in the United States and other

17   countries around the world?

18        A     Yes, those that are aware of it will most

19   oftenly [sic] call on an accelerant sniffing canine to

20   help locate the accelerant.  I mean the dog is not an

21   investigator, it's just a tool that we use, it really

22   breaks down a whole lot of time saving.  Again, just a

23   tool.  She finds it, we take it, and have it analyzed

24   and sure saves a whole lot of time from taking the whole

25   carpet and sending it off.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

23

```
1        Q    And is it possible in this case for there to
2   be accelerants present and the dog hit on them, but the
3   lab not to get a result -- a positive result?
4        A    I'd say that's always a possibility.
5        Q    And --
6        A    You never know what amount was there, or what
7   was consumed in the fire, or what was left and what part
8   might have even evaporated before the lab got them
9   tested.
10       Q    Okay.  So you've given some reasons that the
11  lab might not get a positive result, is that what you're
12  sharing with us?
13       A    I would say that's one.  I mean accelerants
14  will consume in the fire.  There's been fires I've been
15  to that know there was an accelerant used and not be
16  able to find it because it was consumed in the fire. But
17  that doesn't mean that all of it is and if the dog picks
18  up on such a minute trace, and by the time it takes the
19  lab to get to it, you know, unless it's a high profile,
20  top priority case it can sit on the shelf two to three
21  months before the lab can even check it.  And once they
22  check it, you know, it may or may not even -- may have
23  evaporated or still may be a faint odor (Inaudible) know
24  that they can get a test results back on.
25       Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. ORANGE:  You may ask.

 2              THE WITNESS:  I'm sorry.

 3              JUDGE GILL:  You may want to step on up here,

 4         where he won't be --

 5              MS. GIORDANO:  No.  I've got all this stuff

 6         spread out here.

 7              JUDGE GILL:  All right.

 8              MS. GIORDANO:  I'll see if he can hear me.

 9                   CROSS EXAMINATION

10   BY MS GIORDANO:

11        Q    Officer, can you hear me all right?

12        A    Yes, a little bit.

13        Q    All right.  I'll come a little closer.  Just

14   bear with me a minute, I'm trying to balance my cross-

15   examination material.  Now can you hear me better?

16        A    I can hear you better, go ahead.

17        Q    All right.  My name is Jill Giordano and I

18   represent Mr. Yell in this case --

19        A    Okay.

20        Q    -- and I just have a questions for you.

21   Officer, tell me when you arrived at the scene in

22   Russellville in September 2004, who did you meet with

23   initially; if you recall?

24        A    I believe it was the state fire marshal.

25        Q    All right.  Did you meet with just one
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25

```
 1   individual?
 2        A    I believe there was two.
 3        Q    Okay.  Would that be Mr. Flowers, Mr. West?
 4        A    I believe it would be Jack Flowers.
 5        Q    Okay.  Thank you.  And what discussions did
 6   the two of you have, prior to your undertaking an
 7   investigation on the scene with PJ?
 8        A    Well, again, as I stated earlier, if I recall
 9   it was pouring down raining when we got there, and I was
10   a little bit early.  So we went and had breakfast, and
11   we sat and talked about the case a little bit.  Myself
12   being an investigator, I want to know a little bit about
13   what I'm getting into, as to what I'm going to put my
14   dog into.  So they pretty much told me the rundown on
15   the case.
16        Q    All right.  When you say a, "Rundown on the
17   case," would that have included or did it include
18   details about findings they had already made such as,
19   oh, burn patterns they had observed, or any conclusions
20   -- preliminary conclusions they had come to regarding
21   the origin of this fire -- or origins of this fire?
22        A    I believe that they may have been the
23   discussion, yes.
24        Q    Okay.  So before you actually took PJ into the
25   mobile home -- the home, you had already met with the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   arson investigators, had breakfast with them, discussed
2   the case, and that discussion included information such
3   as where they believe you might find accelerants or
4   points of origin when you brought PJ into the house?
5       A    As I said --
6       Q    Possibly?
7       A    Yes.
8       Q    Okay.  Who accompanied when you and PJ when
9   you went through the house and took him to these various
10  -- throughout the house, these various places?
11      A    I believe it was Jack Flowers and Cooper
12  West --
13      Q    Okay.
14      A    -- basically.
15      Q    Did you --
16      A    Now, we're talking a little over two years
17  ago, so I might be a little vague on some of it.
18      Q    I understand -- I understand you're just
19  giving us the information, as you best remember it.  Do
20  you recall whether or not you-all had discussions about,
21  again, their investigation as you went from place to
22  place throughout the building with PJ?
23      A    I'm sure we would have.  Like I said, I want
24  to know pretty much what's going on before I take the
25  dog in.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    All right.  Would you agree that PJ is trained

2  to detect odors and not substances?

3     A    My dog is trained to take odors and not what

4  else, hon?

5     Q    Not -- not substances?  In other words, he's

6  trained to detect an odor?

7     A    She's trained to -- to detect hydrocarbons,

8  which is used in an accelerant to promote flammable

9  liquids.

10     Q    All right.  What -- tell us in lay person's

11  terms what a hydrocarbon is?

12     A    I can't give you the answer to that, but I

13  know hydrocarbons is in -- is what's in the accelerant.

14     Q    And it's detected through odor, is that a fair

15  statement?

16     A    Yes.

17     Q    Okay.  Would you agree that a laboratory

18  actually detects the substances, the dog detects the

19  odor, and then it's sent to a lab to detect the

20  substance; is that true?

21     A    I couldn't tell you what the lab -- what --

22  what their role in this is to be perfectly honest with

23  you.  I'm not a chemist on that end.

24     Q    Okay.

25     A    All I know is, is either I get a confirmation

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   back that it is a flammable liquid -- and they won't

2   tell me that it's a flammable liquid, they will -- they

3   will give you a result back.  Such as different

4   materials or -- or things that will make up a substance

5   such as lighter fluid or kerosene.  They won't say that

6   it's kerosene.  They will -- they will give you a bunch

7   of chemicals that say which will make up the equivalent

8   of --

9       Q    Okay.

10      A    -- minerals appearing in kerosene and things

11  of that nature.

12      Q    Okay.  So PJ obviously doesn't tell you what

13  it finds, as far as the type of accelerant or type of

14  liquid, it just gives you an alert that he has detected

15  hydrocarbons?

16      A    Absolutely.  I wish she could talk.

17      Q    Okay.  There's no signals or anything that the

18  dog gives different signals for?

19      A    Her first alert will be a sit position.  Now

20  this will tell me that she has picked up an odor that is

21  flammable.  And what I'll do is I'll give her a couple

22  of kibbles of food, and I'll tell her what a good girl

23  she is, and then I'll ask her to show me.  Now, when she

24  first gives me that alert, that chemical or flammable

25  liquid might be as much as 30 feet away if the wind is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

29

```
 1   blowing, you know, in -- in --
 2        Q    Right.
 3        A    -- her direction.  But when I ask her to show
 4   me where it is that's when she'll get up, and move to
 5   the product, and point to it with her nose.
 6        Q    Okay.
 7        A    And she'll sit and do that.
 8        Q    Is -- in your opinion is PJ's alert, if it's,
 9   positive, is it absolute or can it be not absolute?
10        A    I'm not really understanding your question.
11        Q    Well, when she gives you an alert, is it your
12   testimony that that's one -- 100 percent positive that
13   she has detected a hydrocarbon?
14        A    Well, again, as I've stated earlier, we've --
15   we've been trained to trust your dog, okay.  Like I
16   said, and I didn't hold back on this, I've got samples
17   back that were negative before --
18        Q    Right.
19        A    -- but I've also got samples back that were so
20   close to border line, that the lab technician just
21   wouldn't make a call because he didn't want to put his
22   -- I guess, put his name on the line or put his
23   reputation on the line and it turned out to be something
24   bogus.  But, yes, the dog does sometimes give me a bogus
25   alert.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  That's possible?

2      A    Yes.

3      Q    And that's the point -- would you agree that's

4   the point of having a lab then, to either confirm -- to

5   confirm the alert or hopefully when you send the samples

6   off, to confirm the alert?

7      A    That's correct.  You know, I guess that's

8   another reason why they want the lab technician to be

9   able to confirm that the dog has found something.  But,

10  again, on the other hand as I explained earlier, the

11  dog's noses are so keen, that sometimes the lab just

12  can't pick it up.

13     Q    Right.

14     A    So therefore you don't get a confirmation on

15  what the dog done, even though the dog may be telling

16  you the truth.

17     Q    I understand that.  When you -- and I should

18  have asked you this earlier, I apologize.  Did you-all

19  have -- you-all being you, and Mr. West, or Mr. Flowers,

20  and any of the other arson specialists or police

21  officers that you talked with, prior to going in with

22  PJ, did you have a discussion about the use of the Grace

23  device?  I assume you're familiar with the Grace device?

24     A    There wasn't -- yes, I am.

25     Q    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A      But there was another state fire marshal
 2    there, and I believe he did follow up with a Grace
 3    device, and was getting positive samples with that as
 4    well.
 5       Q      When you say, "follow up," do you believe that
 6    was done before you took PJ in or after you took PJ in?
 7       A      I really can't remember, but I believe it was
 8    done before and after.
 9       Q      Okay.  So it's possible you don't recollect
10    exactly, but you believe you probably had a discussion
11    about that with these -- one or more of these various
12    officers?
13       A      Yeah, but I must tell you something, too.
14       Q      Okay.
15       A      When I use this dog and they've used other
16    instruments on that, I ask them not to tell me where
17    they got their alerts at because I want my dog to tell
18    us.
19       Q      Okay.
20       A      So I'm not going to take the word of a Grace
21    device or any other type of equipment and -- and back it
22    up with my dog's nose.  I want to know what my dog is
23    doing not with the Grace device.
24       Q      Okay.  Did you know -- do you know that in
25    this instance if you had this discussion, that you told
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   me not to tell you where the Grace device had hit, for

 2   lack of a better word?

 3       A    I think I've been quite honest with you up to

 4   this point, but I can't answer that question --

 5       Q    Okay.

 6       A    -- I just don't know.

 7       Q    Okay.  That's fine.  Tell me a little bit,

 8   Mr. Cannon -- Officer Cannon, about a dog's ability to

 9   distinguish accelerants from pyrolysis products -- from

10   the products.  Isn't it true that there are

11   inconsistencies when it comes to a dog being able to

12   determine one from the other?  There have been

13   scientific studies that show that sometimes they can't

14   tell the difference?

15       A    There is a chemical that is put into some

16   pines, that the dogs will alert -- alert to sometimes

17   and especially those that have been treated.  And what

18   I'm meaning by it -- such as treated lumber that you

19   would use in a basement for a water substance, where

20   it's moist and things of that nature.  There's chemicals

21   in that type of material, that the dogs will alert on.

22       Q    Okay.  So there are other things that the dogs

23   will alert on that aren't a result of a detection of an

24   hydrocarbon, is that a good way to put it?

25       A    Well, those things would be flammable, but the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   dogs wouldn't -- wasn't trained on it, so they shouldn't
 2   alert on it, but sometimes they will.
 3       Q   Okay.  Are you familiar with the manual
 4   accelerant detection canine -- well, I think you
 5   probably provided that manual to Mr. Orange.  It's a
 6   manual that I assume accompanies the dog and it was
 7   produced by the ATF, and it's called Accelerant
 8   Detection Canines.  Are you familiar with that manual?
 9       A   Yes, I am.
10       Q   All right.  And you're -- are you also
11   familiar that -- with that manual to the point where it
12   states that, "Confirmation of the canine alert must
13   occur.  Any alert given by the canine that is not
14   confirmed by laboratory analysis should be considered an
15   unconfirmed indication of the presence of an ignitable
16   liquid for the purposes of origin and cause
17   determination"?
18       A   Yes, I'm familiar with that.
19       Q   And that's part of your training as well?
20       A   Yes, it is.
21       Q   Okay.  Could the dog -- is it possible that PJ
22   could alert on such a small quantity of a vapor or odor,
23   that it is an unconnected -- that is unconnected or
24   related to an earlier event, not related to this
25   particular fire?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    You would have to give me an example.  I've
 2   never seen her do that.
 3        Q    Okay.  Well, what about, for instance, could
 4   she alert to -- you mentioned earlier when you were
 5   testifying that you al -- always want to know if there
 6   had been accelerants found in the house.  And I was a
 7   little bit confused by that, but I think what you meant
 8   were -- like, if they were kept there in the home
 9   perhaps --
10        A    Such as lighter fluid --
11        Q    Right.
12        A    -- (Inaudible) and if they got lighter fluid
13   in there, I would want to know about it.  If they've got
14   paint thinners in there for -- for cleaning up paint
15   brushes, things like that, I would want to know about it
16   and the location of that.
17        Q    Okay.  And so following up on that, is it
18   possible -- I assume those things have hydrocarbons?
19        A    Yes.
20        Q    And so the dog could alert to those and not
21   necessarily be related to the origin of this fire; is
22   that true?
23        A    Absolutely, that's why I would want to know
24   the whereabouts of those chemicals.
25        Q    But let's just say nobody knows the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    whereabouts of those chemicals, that hasn't been

2    determined yet, that is possible isn't it?

3         A    Sure.

4         Q    Okay.  For instance, when you have a fire

5    investigation and there's not been any inventory done of

6    any sorts of cleaning products, or anything that might

7    contain accelerants, then you may not know, and they may

8    not know where those things were located in the home?

9         A    I would assume that would be possible --

10        Q    Okay.

11        A    -- to the investigator anyway.

12        Q    I understand.  I understand some of this maybe

13   goes beyond what you do but I assume, again, in your

14   training you've had some contact with these various

15   elements of this investigation?  Give me just a minute,

16   that may be all the questions I have.  Let me look over

17   my notes, if you'll bear with me for a second.

18        A    That would be fine.

19             MS. GIORDANO;  I think that's all I have at

20   this time.  Thank you, Officer.

21             THE WITNESS:  All right.

22             JUDGE GILL:  Mr. Orange may have some more

23        questions.  We'll find out in a minute, just a

24        second.

25                  REDIRECT EXAMINATION

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   BY MR. ORANGE:
2       Q    And in this particular case, is a normal
3   procedure -- do you use a control -- is there a control
4   taken, when there are hits by your canine dog?
5       A    Is a sample taken?
6       Q    Is there a control sample taken?
7       A    Yes, a sample is taken when a dog alerts.
8       Q    Is it normal procedure to do a control sample
9   also?
10      A    Yes, it is normal procedure.
11      Q    Okay.  And this particular -- in the Yell
12  case, there were six hits by your dog; is that correct?
13      A    As I stated earlier, I can't remember how
14  many, but there were several.
15      Q    Okay.  However many there was plus there would
16  have been a control taken for you dog to --
17      A    Compare --
18      Q    -- compare to?
19      A    Yes, it would be --
20      Q    And --
21      A    -- comparison samples.
22      Q    -- isn't it true that in this particular case,
23  there were the samples that -- where your dog hit, plus
24  control samples taken out -- put into paint cans, taken
25  outside, and your dog allowed to smell all the samples
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   where there was a hit plus a control?

 2        A    Yes, there was.

 3        Q    And did you dog hit on the samples where --

 4   that were taken and put into the plate -- paint can?

 5        A    The dog did alert on the samples that were in

 6   the paint can.

 7        Q    Did he alert on the control sample?

 8        A    No.

 9        Q    Now, based on your professional experience, I

10   believe the evidence in this case shows that there's six

11   sites that -- where samples were taken plus the control.

12   What's the likelihood of your dog hitting on six

13   different sites and there being no hydrocarbons in any

14   of those six sites -- for it to hit on?

15        A    Again, I trust my dog.  I believe that there

16   was something there.  Why we got negative samples back,

17   I just -- I -- I can't tell you that's -- of course

18   that's the lab technician, it may have been such a

19   minute sample, as I've stated, that the instruments

20   couldn't pick it up in the lab.

21        Q    I read about one study where they said that

22   out of 184 fires the accuracy rate was 92 percent by

23   another dog.  Is that something that would sound

24   reasonable to you based on your professional experience?

25        A    Yes, I think the dog would fall right in that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   category.

2       Q    Okay.

3       A    Of course I would be a little biased.

4       Q    Okay.

5           MR. ORANGE:  And I believe that's all the

6       questions that I have.

7           MS GIORDANO.:  One more, Your Honor.

8                 RECROSS EXAMINATION

9   BY MS. GIORDANO:

10      Q    Officer Cannon, this is Jill Giordano again. I

11  failed to ask you this.  What kind of record do you keep

12  at the time you're conducting your investigation? In

13  other words, do you keep a chart, or do you make notes

14  as you go through?  What kind of written record do you

15  have of what you did that day?

16      A    I usually -- when I get back, I'll usually

17  just -- on my notes on the back of the sheet that I'll

18  fille out, I'll just put down what the canine was

19  calibrated on.  And that she was calibrated in and out,

20  meaning that she was calibrated before she went in and

21  calibrated after she came out and that it would be a

22  positive scene.

23      Q    So you're -- you wouldn't necessarily have a

24  chart, or a diagram, or even a note, that says I walked

25  here, and she hit here? It just says it was positive?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     I really don't recall doing that on this fire
 2   scene.
 3        Q     Okay.  Is it safe to assume that if you had
 4   such a record or a document, that you would have already
 5   probably given that to Mr. Orange or one of the
 6   investigators that worked the case?
 7        A     Oh, yeah, I -- you know, I've given everything
 8   I've got.  So, yeah, I wouldn't withhold that.
 9        Q     Is it typical, in a case of a dog handler for
10   you to rely on your memory as opposed to some kind of a
11   report or a document that you prepare at the time you're
12   actually conducting your investigation?  Is that typical
13   procedure that you've been trained to do?
14        A     No, I don't usually rely on my memory, what I
15   usually do is have time to sit back, and talk with the
16   others before the event, and -- and go over the case,
17   and make sure that I haven't forgotten anything.
18   Obviously documentation is most important on anything
19   that we do and --
20        Q     Okay.
21        A     -- I'm not going to say I'm a perfect human
22   being, okay.
23        Q     I understand that I'm just trying --
24        A     I'm not and sometimes I fail to document some
25   things that needs to be documented.  And, yes, this is
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    obviously one thing that I probably should have
2    documented on my return.

3        Q    Okay.

4        A    But, again, I rely on others as well doing the
5    investigation.

6        Q    When you receive your training what sort of
7    training do you get that relates to predisposition or
8    contamination of your judgement, based on information
9    you received prior to ever going in and doing your
10   investigation?  And to make that easier, are you trained
11   that you should receive no information, just go in there
12   and let the dog do its work, and then talk to your
13   investigators?  Or is it standard practice -- or
14   standard training, that you get all this information
15   from them prior to ever even going in and taking your
16   dog to make these hits?

17       A    It's usually standard practice to get the
18   information before you go in.  As I said, safety is of
19   the utmost concern for my canine.

20       Q    Sure.

21       A    I'm not going to take the dog into a hole
22   that's burnt out in the floor -- or a weak floor -- and
23   obviously if -- if an investigator tells me I've got a
24   weak floor in here, well, something's going to tell me
25   right off the bat, okay, there's a reason why that floor



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   right there, it must have burnt there the longest.  In

2   order for that to happen, there may or may not be an

3   accelerant place there.  So a lot of this stuff, I'm

4   already aware of.  All they got to do is basically tell

5   me where the fire started at and I'm going to see that

6   when I go in obviously.  But I want to know where it

7   started at, what kind of surroundings we have on the

8   inside, and I also want to work the dog on the outside

9   structure as well.

10      Q    Okay.

11           MS. GIORDANO:  Thank you.  That's all I have,

12      Officer.

13           THE WITNESS:  You're welcome.

14                FURTHER DIRECT EXAMINATION

15  BY MR. ORANGE:

16      Q    Before you go into talk to -- when you talk to

17  the other officers, do they just tell you the general

18  condition of what you're going to find, or do they say,

19  look under the second window by the first door?  Or how

20  do you -- how does that work?

21      A    We don't go into detail.  You know, we may go

22  into something -- like, an example, we had a domestic

23  here last night, perpetrator left the house and swore he

24  would burn it down.  Well, now the house is burnt down.

25  It -- it may be something that's short and sweet or it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   may be something a little more lengthy.  It just depends
 2   on each fire.
 3       Q    Okay.  In this particular case -- in the Yell
 4   case, did they tell you exactly where to look with your
 5   dog?
 6       A    Absolutely not.  I'm going through the whole
 7   house.
 8       Q    And I met before -- before you went in?
 9       A    They may or may have gave me some suspicions
10   about where the fire may or may have not started at, but
11   I'm going to still do the whole house because there may
12   have been contamination to the house.  Example,
13   firefighters stepping through the evidence, the arsonist
14   himself stepping into it and bringing it to the house.
15   So I'm going to search the whole house with the dog
16   because just because she alerts under a window seal and
17   she alerts under a bed, they may have -- may or may not
18   have even told me that.
19       Q    Okay.
20            MR. ORANGE:  We'd move into evidence the
21       documents that we've given to the Court,
22       specifically the certificates and the history of the
23       training of the dog.
24            JUDGE GILL:  All right.  I'll mark those as
25       exhibits for this hearing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1              (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2              (EXHIBIT 2 MARKED FOR IDENTIFICATION)
3              (EXHIBIT 3 MARKED FOR IDENTIFICATION)
4         MR. ORANGE:  I believe that's all the questions
5    I --
6         JUDGE GILL:  Any other questions from counsel?
7         MS. GIORDANO:  No, Your Honor.
8         JUDGE GILL:  All right.  This is Judge Gill. I
9    have just a couple of questions.
10        THE WITNESS:  Yes, sir.
11        JUDGE GILL:  On this particular fire scene, am
12   I correct that you do not have any records yourself
13   indicating where in the fire scene the dog may have
14   made a hit?
15        THE WITNESS:  No, I just done that by memory
16   and relied on documentation --
17        JUDGE GILL:  Okay.
18        THE WITNESS:  -- that West --
19        JUDGE GILL:  And I use the word, "hit," you
20   say, "alert."  What does a dog do when it alerts?
21        THE WITNESS:  When the dog first gets an odor
22   of the scent, she will sit, and it could be right at
23   her feet or it could be 30 feet away.  And then I'll
24   feed her, and tell her what a good girl she is, and
25   then I'll ask her to show me where it's at.  And she
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   may get up, and move to it, and then sit and point

2   with her nose again, or she may bend over and point

3   with her nose at that particular time.  It just

4   depends on where she's at when she first recognizes

5   the odor because the dog is on a food and reward

6   system.  So she don't work, she don't eat.  So, you

7   know, I guess, what I'm saying is she don't find it,

8   she don't eat.  So, you know, she gets -- she

9   recognizes the odor and she sits, that's telling me

10  that the dog is onto something.

11       JUDGE GILL:  Okay.

12       THE WITNESS:  And I'll ask her to give me -- to

13  show me, that's when she'll go to it, she'll sit

14  again, and take her nose, and point to the product.

15       JUDGE GILL:  Okay.  What I was trying to get at

16  is who -- how subjective is an alert?  Is that

17  something that -- and you talked about her giving

18  sometimes bogus alerts.  How clear is it when she

19  makes an alert to you?

20       THE WITNESS:  Well, usually she'll get more

21  excited when she's really onto something.  And if I

22  try to bring her off of it, she won't come.  But if

23  she's giving me a bogus alert and I'll say,

24  negative, PJ, you know, she -- she's realizing now I

25  caught onto her game, she's not going to get

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

45

```
 1   anything to eat, so she'll get up and move on.
 2        JUDGE GILL:  Now, that's --
 3        THE WITNESS:  If she doesn't get up and move
 4   on, when I give her a negative --
 5        JUDGE GILL:  Okay.
 6        THE WITNESS:  -- and she sits there -- and I'm
 7   pretty much convinced that she's got something
 8   because she's not going to walk away from that food.
 9        JUDGE GILL:  Okay.  And when you know it's --
10   how do you know it's a negative and you say,
11   negative, PJ, how do you know that?
12        THE WITNESS:  We're going back to trusting your
13   dog.  It's -- sometimes, just the way the dog acts
14   to me.  Usually, she'll get real excited wagging her
15   tail when she -- when she's got the recognition of
16   an odor.  And if she gives me a bogus alerts
17   sometimes, she's just nonchalant, she's not really
18   into her games, and she'll just drop, hoping that
19   I'll feed her.
20        JUDGE GILL:  Okay.  And on this particular fire
21   scene, do you know how -- do you have any way to
22   determine where or how many times the dog alerted?
23        THE WITNESS:  No, as I stated before, I know it
24   was several, but I couldn't give you the exact
25   number.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| 1 | JUDGE GILL: Okay. Did you relate the location |

1        JUDGE GILL:  Okay.  Did you relate the location

2    or numbers of alerts to anyone else?

3        THE WITNESS:  Yes, there was at least one,

4    maybe two other investigators with me that was

5    either marking the samples or photographing the

6    samples that we were going to take.

7        JUDGE GILL:  Okay.  And so when the dog

8    alerted, somebody else was there, and they took

9    photographs of an area that the dog alerted on?

10       THE WITNESS:  Yes, sir, even videotaped it. It

11   may be on videotape, I just can't recall.

12       JUDGE GILL:  There may be a videotape of the

13   dog making these alerts?

14       THE WITNESS:  There could be.

15       JUDGE GILL:  There could be.

16       THE WITNESS:  Or photographs.  I'm just

17   thinking --

18       JUDGE GILL:  Okay.

19       THE WITNESS:  -- something else was used.

20       JUDGE GILL:  All right.  You mentioned the

21   bogus alerts, and this is -- some of the bogus

22   alerts that you have with the control that you know

23   is -- has no accelerant in it, is that how that

24   works?

25       THE WITNESS:  Yes, usually if I'm -- I'm -- if

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  she's starting to give me too many of them I'll use

2  a chemical that is such as styrene-- liquid styrene.

3  Every once in a while these dogs will get off on a

4  styrene kick and they'll start alerting on styrene.

5  So we have -- of course, the chemist will let us

6  know that, hey, your samples came back negative we

7  think your dog is hitting on styrene, you need to

8  start working her on styrene again.  And so if that

9  should happen, I get my liquid styrene, and I start

10  working her on this styrene. And if she alerts on

11  that styrene, then I just don't feed her, until she

12  gets up and moves away from it.  And then after --

13  after several revolutions of that, she will no

14  longer alert on the styrene.

15      JUDGE GILL:  And as far as bogus hit go, in

16  other words where she might hit on something that

17  you know is not a -- not an accelerant, what would

18  be the percentage of that; if you know?

19      THE WITNESS:  I'll give you a shot in the dark,

20  five percent, maybe.

21      JUDGE GILL:  Okay.  Is that your best estimate?

22      THE WITNESS:  That's my best estimate and that

23  may be a high one.

24      JUDGE GILL:  Okay.  Okay.  Any other questions

25  from counsel?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         MS. GIORDANO:  No, Your Honor.

 2         MR. ORANGE:  I don't believe so.

 3         JUDGE GILL:  Okay.  No other questions from

 4   counsel.  We're going to turn you loose here.  It's

 5   possible that depending on what happens today, and

 6   maybe later in the case, that you may have to come

 7   and testify.  Is that right, Mr. Orange --

 8         MR. ORANGE:  Yes, sir.

 9         JUDGE GILL:  -- you intend to call him?  And

10   our trial is set for February the 6th.  And I

11   believe that would be a Monday and we would go

12   Monday, Tuesday, and Friday until -- Monday,

13   Tuesday, Friday until the trial is concluded.  Will

14   you be available for the trial?

15         THE WITNESS:  Yes, I should be with subpoena,

16   that way I can at least plan more and -- and --

17         JUDGE GILL:  Okay.

18         THE WITNESS:  -- at least so I wouldn't forget.

19         JUDGE GILL:  Okay.  I assume they will notify

20   you, and send you a subpoena if necessary, and I

21   just want to be sure you're clear for your trial

22   date?

23         THE WITNESS:  Yeah, I'm clear.  Thank you.

24         JUDGE GILL:  Okay.  Any reason I shouldn't

25   excuse this witness for the day?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MS. GIORDANO:  No, Your Honor.
 2        JUDGE GILL:  All right.  I'm going to hung up
 3   on you.  Thank you, sir.
 4        THE WITNESS:  Thank you.
 5        JUDGE GILL:  Have a good one.  Okay.  All
 6   right.  What do you-all want to do now?
 7        MR. ORANGE:  I would like to Alan Gregory.  I
 8   think he stepped out just a minute -- we can get
 9   him.
10        JUDGE GILL:  Okay.  He don't know where he
11   went.  Do you-all want to take a break, or do you
12   want to move onto another witness maybe?
13        MR. ORANGE:  Let's see if we can locate him.
14        JUDGE GILL:  Okay.
15        MS. GIORDANO:  We're going to what -- I'm
16   sorry?
17        JUDGE GILL:  They're going to try to locate
18   this witness.
19        MS. GIORDANO:  Okay.
20        MR. ORANGE:  He was here just a minute ago.
21        JUDGE GILL:  One of the -- the one thing I
22   wanted to mention is when he started mentioning
23   videotaping of this dog making hits, did you-all
24   have a videotape of that?
25        MS. GIORDANO:  Judge, we know what happened to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        the video because we had talked with the detective

 2        about.  They tried -- they did tape through the

 3        video and didn't realize until they tried to watch

 4        it, that it didn't record.

 5              JUDGE GILL:  Didn't take.

 6              MR. ORANGE:  Detective Edmonds was the --

 7              JUDGE GILL:  Okay.

 8              MR. ORANGE:  Tried to take that.

 9              MS. GIORDANO:  He was inept video operator. He

10        tried it didn't work.

11              JUDGE GILL:  Okay.

12              MR. ORANGE:  I think he's back now.

13              JUDGE GILL:  Okay.  All right.

14              MR. ORANGE:  Fire and explosions do not seize

15        with just court hearings, so...

16              JUDGE GILL:  I understand.  Just raise your

17        right hand.  Do you swear or affirm under penalties

18        under perjury that the testimony you're about to

19        give is the truth?

20              THE WITNESS:  Yes.

21              JUDGE GILL:  Just have a seat please.

22                    DIRECT EXAMINATION

23   BY MR. ORANGE:

24        Q    State your name?

25        A    Alan Gregory.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    You may want to pull that microphone right
2   there in front of you a little bit.  And I believe
3   you're the senior deputy state fire marshal --
4        A    Yes, sir.
5        Q    -- for Kentucky?
6        A    Yes, sir.
7        Q    And I believe you were called to the scene of
8   the Yell fire here in Russellville back in 2004 -- fall
9   of 2004?
10       A    Yes, sir.
11       Q    And you were one of the earlier investigators,
12  other than Detective Edmonds on the scene?
13       A    Yes, sir.
14       Q    And were you present -- or were you involved
15  in the dog PJ being called to the scene with his handler
16  Buster Cannon?
17       A    Yes, sir, I was there when they arrived.
18       Q    Okay.  And there's been some testimony, there
19  was some discussion that went on between you, and maybe
20  others, and Mr. Cannon -- or Deputy Cannon.  Can you
21  tell us generally what you would have shared with Deputy
22  Cannon about the fire scene or what you overheard being
23  shared with him?
24       A    Well, for sure, I know I told him it was a
25  cold scene because in the usage of dogs you want to make

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   sure that, you know, the safety of that dog and not

 2   being around anything that's still burning.

 3       Q    And would there have been a discussion about

 4   the conditions of structure?

 5       A    Probably, you know, basically, you know, if

 6   you watch where you were at, you know, it was still

 7   pretty well good to walk through.

 8       Q    Okay.  And did you tell him where to take the

 9   dog to find a possible sites of accelerants, based on

10   your previous investigations?

11       A    No, sir.  Knowing Mr. Cannon the way I do, I

12   think I may have said something to him about, and you'll

13   see what you need to do.

14       Q    Okay.  And were you -- when the dog was taken

15   in with -- by Mr. Cannon, did you go in with him?

16       A    I don't think I went in at that time.

17       Q    Do you recall if anyone else went in besides

18   the dog and Mr. --

19       A    I think Mr. Flowers may have went in and I

20   think --

21       Q    Initially, when the dog first went in?

22       A    The -- when the dog first went in?

23       Q    The first time in?

24       A    I don't think I went in with the dog.

25       Q    Okay.  And do you recall, was there anybody

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   else there or not?
 2        A    I know we were prepared to video, which
 3   actually didn't -- didn't work and I'm not sure if we
 4   did that one the first --
 5        Q    Okay.
 6        A    -- time or the second time.
 7        Q    Okay.  Were there some samples taken of sites
 8   where the dog hit?
 9        A    Yes, sir.
10        Q    And who took those samples?
11        A    Detective West and myself.
12        Q    And so it was kind of a joint venture with the
13   state police?
14        A    Yes, sir.
15        Q    And how did you take those samples?
16        A    Some of the samples were collected by trawling
17   them over in a bucket and I think on at least one we
18   sawed out.
19        Q    Okay.  And do you recall the number of
20   locations you took samples?
21        A    I'm going to say at least six.
22        Q    Okay.  And did you take a control sample?
23        A    Yes, sir.
24        Q    And after you took these six samples -- plus
25   control; is that correct?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

54

```
1        A    Yes, sir.

2        Q    What did you do with them?

3        A    They were canned, and Detective West had those

4   in his possession to go to the lab.

5        Q    Do you recall taking them outside and letting

6   the dog smell them again?

7        A    Yes, sir, we did do that.

8        Q    Tell the Court about what you observed there.

9        A    The dog hit on all the cans, except for the

10  control sample.

11       Q    And where were the cans at?

12       A    The cans were sitting on a concrete area

13  outside the trailer.

14       Q    Okay.  And do you recall was the site of the

15  -- where the accelerants were allegedly taken or where

16  the dog made a hit; was that photographed?

17       A    Yes, sir.

18       Q    Okay.  And do you recall who did that?

19       A    I think the state police along with maybe

20  Detective Edmonds.

21       Q    Okay.

22            MR. ORANGE:  That's all the questions I have.

23       You may ask.

24                  CROSS EXAMINATION

25  BY MS. GIORDANO:
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

55

```
 1        Q     Officer, you do recall having breakfast that
 2   morning with Officer Cannon?
 3        A     Yes.
 4        Q     And he testified that you-all had a pretty
 5   lengthy discussion about what had been done so far in
 6   the investigation so far, and you recall him testifying
 7   to that?
 8        A     Yes.
 9        Q     I assume you -- I think you were in the
10   courtroom.  Is it your testimony that you did not
11   discuss with them that you-all had seen fire patterns
12   that determined -- or that appeared to be six points of
13   origin, or where those were possibly -- which bedroom
14   which room?  You know that you did not discuss that with
15   him or are you not sure?
16        A     That part about how many or anything, that I
17   can't be sure of.  I know -- more than that told him
18   that we had some areas of question.  If we hadn't, we
19   wouldn't have him down there, and he would be able to
20   see it when he got inside.
21        Q     Okay.  So you recollect discussing with him
22   that you had some areas in question you weren't sure
23   about from your own investigation at that point, and
24   that's why you wanted to bring the dog to see what the
25   dog would do?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

56

```
 1        A    Yes, I probably told him that I had some areas

 2   of concern, but those specific areas --

 3        Q    Okay.

 4        A    -- by rule of thumb, I usually don't bring

 5   those up.

 6        Q    Okay.  So it's unusual for you to request that

 7   the dog be brought in an arson investigation -- you

 8   don't do that in every case by any means?

 9        A    No.

10        Q    Okay.  To the best of your recollection, had

11   the Grace device already been used prior to your calling

12   in PJ and Officer Cannon?

13        A    Yes.

14        Q    All right.  And is it fair to say that you had

15   some question about the reliability of the Grace device

16   at that point and you wanted further confirmation?

17        A    No, I just wanted additional confirmation.

18        Q    So you had Grace device and had some results

19   from it at that point?

20        A    Yes.

21        Q    And then you decided to go ahead and call PJ

22   in, to see if you could get results from the dog as

23   well?

24        A    Right.

25        Q    Did you walk around with Officer Cannon -- I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

57

```
1    think you said you did not.  Did you walk around with

2    Officer Cannon, when he did his walk through with PJ?

3         A    Not initially.

4         Q    Okay.  And went back with him again?

5         A    Right.

6         Q    Was that after the samples were pulled or

7    before?

8         A    That was when he came out and said you-all

9    need to come in and look at this.

10        Q    Okay.  He said, I've had some hits, I want

11   you-all to -- and you-all walked around again to the

12   same areas, and do you recall who, besides yourself and

13   Officer Cannon, did that?

14        A    I think at that time Mr. Flowers, Mr. West,

15   and along with Detective Edmonds.

16        Q    Okay.  Now I supposed you have seen the

17   results from the state police lab, as far as the testing

18   goes of those samples that were pulled?

19        A    Yes.

20        Q    And they were negative?

21        A    Right.

22             MS. GIORDANO:  Okay.  That's all I have. Thank

23        you, Officer.

24             MR. ORANGE:  That's all the questions I have,

25        at this time.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| 1 | MS. GIORDANO: Nothing else. |
|---|---|
| 2 | JUDGE GILL: All right. Do you recall the dog |
| 3 | -- being told that the dog hit on any particular |
| 4 | spot in the house? |
| 5 | THE WITNESS: As far as -- |
| 6 | JUDGE GILL: Did the handler of the dog tell |
| 7 | you the dog hit here, and here, and here? |
| 8 | THE WITNESS: Second go round, yes, sir, |
| 9 | because we -- the dog hit in those locations the |
| 10 | second time -- |
| 11 | JUDGE GILL: Okay. |
| 12 | THE WITNESS: -- after I went in. |
| 13 | JUDGE GILL: All right. |
| 14 | THE WITNESS: The dog had already hit with Mr. |
| 15 | Cannon in the first go round. |
| 16 | JUDGE GILL: Okay. And the dog hit again the |
| 17 | second time? |
| 18 | THE WITNESS: Yes, sir. |
| 19 | JUDGE GILL: How do you know that? |
| 20 | THE WITNESS: I watched him. |
| 21 | JUDGE GILL: Okay. So the handler wasn't |
| 22 | telling you he's hitting here, or he did hit here |
| 23 | before, you just on your own observation saw the dog |
| 24 | hit? |
| 25 | THE WITNESS: Yes, sir. I think Mr. Cannon may |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   have said here, and here, and here, and then at time
 2   he walked back through.
 3       JUDGE GILL:  Did you make some sort of a record
 4   of where that was?
 5       THE WITNESS:  Yes, sir.  It should be in the -
 6   - in the file that -- that came out with the map and
 7   the locations that the samples came from.
 8       JUDGE GILL:  So there's something on that map
 9   that says dog hit, dog hit, dog hit?
10       THE WITNESS:  Basically where all six of those
11   are -- are circled and it's even -- as I recall off
12   the top of my head without looking at one, the upper
13   end of the hallway where the control sample was
14   taken was also marked on there.
15       JUDGE GILL:  I want to be sure I understand
16   your answer.  There's some map that says -- not just
17   of certain areas or circle, but that said the dog
18   hit here -- the dog hit here?
19       THE WITNESS:  No, it's just -- it's just a
20   drawing, it doesn't per se, but that's where the
21   samples were taken from.
22       JUDGE GILL:  Did you take samples from
23   everywhere that the dog hit?
24       THE WITNESS:  Yes, sir.
25       JUDGE GILL:  Did you take samples from places
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that the dog didn't hit?

2        THE WITNESS:  I think there's a sample in there

3   possibly of some bedding or something, but all --

4   yes, sir.  The individual's shoes and I think

5   there's some hand wipes that were in sample cans

6   that the dog didn't -- we didn't run the dog over.

7        JUDGE GILL:  And whether the dog hit or not was

8   recorded by you based on your observations and not

9   based on whether the handler said that the dog hit

10  here?

11       THE WITNESS:  Yes, sir.  And I even assume the

12  dog hit on the outside with the cans after the

13  samples were taken.

14       JUDGE GILL:  You understand my question?  I'm

15  trying to figure out if there's some means in

16  determining, where the dog hit and where he didn't

17  hit?

18       THE WITNESS:  Okay.  Where the dog --

19       JUDGE GILL:  Is there a means to do that based

20  on your records?

21       THE WITNESS:  The -- I would have to look at

22  the case file and see but the actual map -- or the

23  actual drawing and diagram, I'm not sure if it's

24  worded sample loc -- I think it's worded, sample

25  locations.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

61

```
 1           JUDGE GILL:  Okay.  Okay.  And there's a couple
 2      of things here.  And one is I've got -- I'm trying
 3      to avoid a miscommunication.  I don't know if you're
 4      interpretation of what an alert is or hit is the
 5      same as the handler's interpretation.  So I'm trying
 6      to figure out who's making these conclusions and
 7      who's --
 8           THE WITNESS:  Along with that Mr. Cannon will
 9      say -- told us, you know, I've got hits here and
10      here.
11           JUDGE GILL:  Okay.
12           THE WITNESS:  That's goes along with it.
13           JUDGE GILL:  And there's a record of that -- of
14      where that is?
15           THE WITNESS:  That I'm not sure of.
16           JUDGE GILL:  Okay.  Any other questions from
17      counsel?
18           MS. GIORDANO:  Just one, Your Honor, to follow
19      up on yours.
20  BY MS. GIORDANO:
21      Q    You're not trained -- you're not a trained dog
22  handler.
23      A    No, ma'am, I'm not.
24      Q    You relied on Mr. Cannon and what he tells
25  you.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I rely on Mr. Cannon.  Yes, ma'am.

 2        Q    You cannot yourself read the dog as far as --

 3    that's not part of your training, you don't have any

 4    training --

 5        A    I'm not a dog person.

 6        Q    Okay.  Thank you.

 7             JUDGE GILL:  Okay.

 8                  REDIRECT EXAMINATION

 9    BY MR. ORANGE:

10        Q    Just a couple of questions.  What -- is the

11    dog actually a tool you use along like your shovel and

12    your --

13        A    Right, a dog is -- a dog is nothing more than

14    -- than a tool.

15        Q    And did the dog hit in any locations, other

16    than where you had already identified as a -- as what

17    might be called as a poor siter (phonetic) -- or a site

18    where there's an accelerant?

19        A    No, sir, not really.

20        Q    And was the locations where the dog hit, were

21    they the same sites that you took samples -- you and --

22    or Detective West took samples from?

23        A    Right inside the house.

24        Q    So if he's got a map showing where he took the

25    samples from, are there going to be -- are those sites
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   where the dog hit going to be different or are they

2   going to be the same?

3       A    They'll be the same.

4       Q    Now, back to Judge Gill's question, how do you

5   know where Buster Cannon says the dog hit and where you

6   took the samples from are the same?

7       A    That's where Mr. Cannon -- not only did we

8   watch the dog, but Mr. Cannon was there when we took the

9   samples, and watched where David and I took the samples.

10      Q    Okay.  So you took samples where he directed

11  you to take them?

12      A    Yes, sir.

13      Q    Okay.

14          MR. ORANGE:  No further questions.

15          MS. GIORDANO:  I have one.

16          JUDGE GILL:  Well, I just want to clarify that.

17      You took the samples where he told you the dog

18      alerted, plus some.  So we have no means of

19      determining where the dog alerted by reference to

20      where the samples were taken?

21          THE WITNESS:  Now, I'm confused worse.

22          JUDGE GILL:  You told me just a little while

23      ago, I thought, that you took samples from places

24      where the dog did not alert?

25          THE WITNESS:  Only one.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              JUDGE GILL:  One place?
 2              THE WITNESS:  The control sample.
 3              JUDGE GILL:  Where -- do you know -- well, can
 4        you identify where that place was?
 5              THE WITNESS:  Yes, sir.
 6              JUDGE GILL:  Okay.  And where was that?
 7              THE WITNESS:  It's in the upper end of the
 8        hallway.
 9              JUDGE GILL:  Okay.  And you did that for what
10        purpose?
11              THE WITNESS:  For a controlled sample, to go
12        along with the other samples.
13              JUDGE GILL:  Okay.  An area that you felt
14        strongly that would not be any accelerant.
15              THE WITNESS:  Yes, from a safe area.
16              JUDGE GILL:  Okay.  I understand.  Go ahead.
17                    RECROSS EXAMINATION
18   BY MS. GIORDANO:
19        Q    I don't mean to nitpick about your words, but
20   when Mr. Orange asked you, did the dog hit any places
21   other than where you took samples, you said, not hardly.
22   Were there other places the dog hit -- no, no, I'm
23   sorry.  He asked you did the dog hit places -- the same
24   places where you had previously determined in your work
25   that was a possible point or origin?  And you said,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    "Well, not hardly."  I'm trying to determine exactly.
 2    Are you saying that it's possible that the dog made some
 3    hits that were not the same as what you have previously
 4    in your own investigation determined to be, I'm calling
 5    the points of origin or points of accelerant?
 6         A    The dog hit in the areas that I had questions
 7    of.
 8         Q    Okay.  When you say, "Questions of," do you
 9    mean by that, questions of -- that it was possibly a
10    location where an accelerant might be detected?  Or you
11    thought there might be an accelerant detected?
12         A    Possibly, yes.
13         Q    Okay.  Did the dog make other hits?
14         A    Like other --
15         Q    Did the dog make other hits -- or if you know
16    and if you don't know that's fine.
17         A    Not that I recall.
18         Q    Okay.  You were -- I know you weren't there
19    the first go through, but to the best of your knowledge
20    did the dog make other hits?
21         A    Not that I recall.
22         Q    Okay.  But you're -- again, no record of that?
23         A    Other than I --
24         Q    Other than where you drew samples?  The record
25    -- I've seen -- I know the chart you're referring to,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the Judge hasn't seen it, but we've seen it, and it's a
 2   record of where the samples were pulled.
 3        A    Okay.
 4        Q    But there's no determination on that that
 5   says, dog hit here, here, here, and here.  It just says,
 6   samples were pulled from these spots.  Is that your
 7   recollection as well?
 8        A    Well, I guess -- yes, ma'am.
 9        Q    Okay.  And there's no other record that you're
10   aware of?
11        A    No other record that I'm aware of.
12        Q    Okay.  Thank you.
13            MS.:  That's all, Judge.
14            JUDGE GILL:  Okay.  Anything else from the
15        Commonwealth?
16            MR. ORANGE:  Yes, we'll call Detective West.
17            JUDGE GILL:  All right.  You may step aside
18        there.  All right.  Do you swear or affirm under
19        penalties under perjury that the testimony you're
20        about to give is the truth?
21            THE WITNESS:  I do.
22            JUDGE GILL:  Just have a seat please.
23                  DIRECT EXAMINATION
24   BY MR. ORANGE:
25        Q    State your name?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    David West.
 2        Q    And what position do you hold?
 3        A    Arson investigator for the Kentucky State
 4   Police.
 5        Q    And how many years of experience do you have
 6   in arson investigation?
 7        A    I've been investigating fire since 1993.
 8        Q    I believe you at one point worked for the
 9   state fire marshal's office; is that correct?
10        A    That's correct.
11        Q    And were you involved in investigating the
12   Yell fire?
13        A    Yes, I was.
14        Q    And were you present when the dog PJ was --
15   walked through the house when the -- the time that
16   Mr. Gregory just testified concerning?
17        A    On the initial walk through I wasn't present.
18        Q    Okay.  And there was a subsequent walk
19   through; is that correct?
20        A    It was -- yes, sir, there was a walk through
21   that I have photographed here, after I arrived --
22        Q    Okay.
23        A    -- up in the day -- the following day.
24        Q    Okay.  And did you take photographs of where
25   the dog hit?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes, I did.

 2        Q    And do you have those with you?

 3        A    I sure do.

 4        Q    And can you share those -- did you take -- did

 5   you personally take these photographs?

 6        A    Yes, I did.

 7        Q    And can you share those with the Court?

 8        A    Let me correct that, also Mr. Flowers also has

 9   some film that he gave -- he relinquished to me some

10   pictures as well.

11        Q    And do those pictures accurately -- fairly and

12   accurately depicted the fire scene on the morning after

13   the fire when you walked through it?

14        A    Yes, they do.

15        Q    Have they been altered or -- in any way?

16        A    No they have not.

17        Q    Okay.  And can you share with the Court those

18   pictures you have?

19        A    I'll be happy to.

20        Q    Okay.

21        A    Well, first off, a minute ago there was some

22   discussion about the control sample, Your Honor.  Here's

23   the can and the control sample, where it was taken at

24   the end of the hallway.

25        Q    And can we have that mark as exhibit --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

69

```
 1          MS. GIORDANO:  Is there any way I can identify
 2     -- I know I've got them.  Are they -- do they have
 3     any numbers or anything associated with them, so
 4     that --
 5          THE WITNESS:  Well, this is number 69, at the
 6     bottom of the page.
 7          MS. GIORDANO:  Would I have those numbers?
 8     Probably not.
 9          MR. ORANGE:  I don't think so.
10          JUDGE GILL:  Just a minute here.  Do you want
11     me to take this and mark it as an exhibit for
12     hearing?
13          MR. ORANGE:  I believe we need to do that. And
14     that would be controlled -- that's where your
15     control came from?
16          THE WITNESS:  That's the control at the end of
17     the hall, yes, sir.
18   BY MR. ORANGE:
19     Q    And did you take six additional samples?
20     A    Yes, every sample is taken at different areas
21   in the living room and then also in the children's
22   bedroom.
23     Q    And can you show the Court those?
24     A    Yes I'll pick those out.
25     Q    Here's a sample being taken in the -- in the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    boy's bedroom.  Zack and Nicholas exhibit -- or number
2    73.  We're sealing the can up.
3              JUDGE GILL:  Okay.  All right.  You want to
4         make these exhibits?
5              MR. ORANGE:  Yeah, I'd like to make them
6         exhibits.
7              JUDGE GILL:  Just hand them to me then.
8    BY MR. ORANGE:
9         Q    And do you have another location?
10        A    There's been an exhibit of PJ going back in
11   and sitting on the alert in the kitchen, near -- near
12   the kitchen area.
13             JUDGE GILL:  Okay.
14        A    And this is some of the area along the living
15   room wall.  There was double windows, when you go into
16   the right and here's some -- some patterns -- some
17   demarcation patterns going back to the corner of that
18   room, where it turned and there was collections with a
19   baseline out and along that wall right there.
20             JUDGE GILL:  Okay.  I'm going to mark these as
21        6 -- 6 and 7.
22             (EXHIBIT 6 MARKED FOR IDENTIFICATION)
23             (EXHIBIT 7 MARKED FOR IDENTIFICATION)
24             MR. ORANGE:  The last one -- was that going to
25        be a composite exhibit?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

71

```
 1              THE WITNESS:  We did a collection of couch as
 2       well at the end of the couch.  The foaming -- the
 3       Styrofoam-ing was -- or not Styrofoam, but
 4       polyurethane type material was (Inaudible) point as
 5       well.
 6              JUDGE GILL:  Okay.
 7              THE WITNESS:  And then basically, after we did
 8       the collection, Mr. Orange, we then went outside
 9       with the exhibits.
10   BY MR. ORANGE:
11       Q     Okay.  Now these points that you've given the
12   Court the six locations plus control -- the pictures of
13   them?
14       A     Yes.  I'm still finding some more.  This --
15   this goes with the first one I gave you.  This is just
16   -- if you want it, it's a different view of the angle
17   that I was collected at.
18              JUDGE GILL:  I don't want it.  If you give me
19       the option, I'll decline.
20       A     All right.
21       Q     Now, did you prepare a drawing matching the
22   six locations plus the -- plus control?
23       A     Yes, sir.  I did.
24       Q     And do you have that with you today?
25       A     I do.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      And does this drawing accurately reflect were

2    the six samples plus control were taken?

3      A      Yes, sir, it does.

4      Q      Okay.  And you've prepared this personally?

5      A      Yes, sir.

6      Q      And show you the pictures now if we could.

7            MS. GIORDANO:  Judge, I don't think we've

8      received a copy of that.  So if I could just --

9      maybe make me a copy before you leave.  That's the

10     first time I've seen it.

11           JUDGE GILL:  You have not received a copy of

12     what?

13           MS. GIORDANO:  I don't think so, and some of

14     those pictures aren't familiar, but some of them we

15     have on disc and it's possible.  I'll just try to

16     get copies.

17           JUDGE GILL:  Okay.  Are you wanting -- there's

18     a drawing there he's holding up, are you wanting me

19     to mark that as an exhibit?

20           MR. ORANGE:  Yes, please.

21           JUDGE GILL:  Okay.  You'll have to hand that to

22     me and then I think the next one is number 9.  I

23     guess, I hope that right.

24           MR. ORANGE:  This one is a copy -- is number 8.

25              (EXHIBIT 9 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          JUDGE GILL:  Okay.  Okay.

2     BY MR. ORANGE:

3          Q     And if you could, would you mark location

4     where each sample was taken, or it's already marked, and

5     can you match the pictures up to the location on this

6     drawing?

7          A     Sure.  This is the living room area right here

8     and, in fact, if you go to the back of the structure you

9     can see the hole.  This hole visibly burnt through --

10    melt through the aluminum.  Your pattern goes down from

11    the floor very low.  Here's a --

12         Q     This is number 8.  Would you mark on your

13    drawing where Exhibit number 8 was taken?

14              (EXHIBIT 8 MARKED FOR IDENTIFICATION)

15         A     Okay.  Okay.

16         Q     Can you put a small 8 there?

17         A     Yes.

18         Q     Okay.  Now I want to show you Exhibit number

19    7.  Do you know where that exhibit was taken?

20         A     That's an continuation down toward the end

21    here where the shovel was at along this wall right here.

22         Q     Okay.  So it's part of number 8 also?

23         A     Yes.

24         Q     So --

25         A     Pretty much all along that exterior wall there

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   we had a --

2       Q    Can you put a 7 there by that end, too.  And

3   now I want to show you what's been marked -- got the

4   wrong -- Exhibit number -- I believe, that's a 6.

5       A    Yes there was a hole in the -- where that

6   corner -- where that framing corner, where that turn is

7   there was a hole in the floor and that was one of the

8   collection points in the vicinity of the kitchen and the

9   dining area there.

10      Q    Okay.  And can you mark number 6 on the

11  drawing?  Can you mark number 6 on this drawing?  I want

12  to show you what's been marked as Exhibit number 5.

13           (EXHIBIT 5 MARKED FOR IDENTIFICATION)

14      A    That's in Nick -- Nick and Zach's bedroom.  We

15  had an alert along this wall right here and so --

16      Q    Okay.

17      A    -- that was one of the collection points.

18      Q    Okay.  And can you mark that -- put a number 5

19  for that location.  And I've got Exhibit number 4 here.

20           (EXHIBIT 4 MARKED FOR IDENTIFICATION)

21      A    That's a control sample.

22      Q    And that was taken where?

23      A    That was taken down the hallway at the end --

24  the very end bedroom.

25      Q    Okay.  And can you put number 4 by where you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    took your control sample.  And now you have some other

2    locations where you took samples; is that correct?

3        A    Right.  We collected the blanket and the

4    sheets, the mickey mouse sheet from the deceased

5    Cameron's bed.  The linens, I wanted to collect those

6    and send those off for analysis as well, and that was

7    Exhibit number 47.

8        Q    Okay.  And that's on your sheet?

9        A    Yeah.

10        Q    How about where the dog hit?

11        A    Well, the dog -- the dog, when we carried the

12    cans, all six of them outside that come out of the

13    structure and lined them up, the dog hit on the six out

14    of the seven samples.

15        Q    Okay.  Now did you take the sample -- did the

16    dog hit at 32?

17        A    On -- on the couch -- yeah --

18            (OFF THE RECORD)

19            JUDGE GILL:  We just changed our Court tapes

20        which were at their end.  The two top tapes and the

21        two bottom tapes still -- counsel still have a lot

22        of room left on them, so we'll leave those on and go

23        ahead and proceed when you're ready.

24    BY MR. ORANGE:

25        Q    During the break, did you identify some other

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   pictures in your records where you took samples from?

2       A    Yes, sir.

3       Q    And can I show you what you've labeled 57 and

4   can you tell us what this is?

5       A    That's the photograph of the shovel I -- I was

6   speaking of a minute ago there, down toward the hallway.

7   This is the back north wall in the living room.  Here's

8   a tag which the -- the writing on the tag is not real --

9   it's not real plain, but anyway, from this shovel down

10  toward the corner of the bedroom -- the -- the boy's

11  bedroom along that wall is where we did some collecting

12  of samples.

13          MR. ORANGE:  I'd like to have this marked as an

14      exhibit also.

15          JUDGE GILL:  You have all my exhibits, so do

16      you know where we are?

17          MR. ORANGE:  I think this would be number 10?

18          (EXHIBIT 10 MARKED FOR IDENTIFICATION)

19          JUDGE GILL:  10?

20  BY MR. ORANGE:

21      Q    And I want to show you this picture here, so

22  you can identify it.

23      A    Yes, sir.  That's the collection point at the

24  couch.

25          JUDGE GILL:  Okay.  You want this -- to number

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   11?

2                (EXHIBIT 11 MARKED FOR IDENTIFICATION)

3            MR. ORANGE:  Yes, sir, please.

4            JUDGE GILL:  Okay.

5   BY MR. ORANGE:

6        Q    **And you have another picture.**

7        A    Yes here's the foot of a bed in the boy's

8   room, where we collected this sample right at the foot

9   of his bed right here.

10       Q    **Okay.**

11           MR. ORANGE:  Mark that number 12, please.

12               (EXHIBIT 12 MARKED FOR IDENTIFICATION)

13       A    There's a picture of the linens that we

14   collected if you wanted a shot of that, too, off the

15   bed.

16       Q    **Okay.**

17           MR. ORANGE:  Number 13.

18               (EXHIBIT 13 MARKED FOR IDENTIFICATION)

19           JUDGE GILL:  Okay.  All right.

20           THE WITNESS:  There's the can that had the

21       sample in.

22   BY MR. ORANGE:

23       Q    **Now, go back to your drawing and issue -- I**

24   **mean Exhibit number 9, I want to show you what's been**

25   **marked as Exhibit number 10.  Can you identify on your**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   drawing board, where number 10 was taken?
 2        A    It's right here at the shovel.
 3        Q    Okay.  And can you put a ten there.  And
 4   Exhibit number 11 -- mark that.
 5        A    Number 11 is the couch.
 6        Q    And Exhibit number 12, which is a bed.
 7        A    Yes.
 8             MS. GIORDANO:  At number 35 there -- bed?
 9             THE WITNESS:  35, yes.
10             MS. GIORDANO:  Okay.  That's 12?
11             THE WITNESS:  I'm sorry, 12.  Yes, ma'am.
12             MS. GIORDANO:  Okay.  Thank you.
13   BY MR. ORANGE:
14        Q    I've got your what's been labeled Exhibit
15   number 13.
16        A    Yes, sir.
17        Q    And this was taken and analyzed also?
18        A    Yes, had a reason to take the linens, the
19   sheets, the -- off of the bed of the deceased.
20        Q    Did the dog hit on 13?
21        A    Yes.
22             MR. ORANGE:  So can you mark that number 13,
23        and if you don't mind putting bed linens or whatever
24        on the outside of it, so we know.
25   BY MR. ORANGE:
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q     Now, were there any other locations where the

2    dog hit, that we have not marked on this drawing?

3        A     To my knowledge no other locations, Mr.

4    Orange.

5        Q     Okay.  Now how did you choose the locations

6    where you took the samples?

7        A     Those locations had been identified by the

8    other fire officials before I arrived.

9        Q     Okay.  And did the -- were you present when

10   the dog was in there on the second round?

11       A     I was there when the dog was in there on --

12   I'm not sure what round it was.  As my pictures

13   illustrate, I had a shot of the dog on one sitting --

14   one alert there in the kitchen area, but it's my

15   understanding the dog had been in prior to that.  And

16   how many times -- I wasn't there so I can't tell you.

17       Q     Okay.  You arrived later in the morning then

18   the other detectives did; is that correct?

19       A     Yes, this fire occurred in the evening around

20   7:25.  I was notified, and I have to look at my report

21   -- I believe around 7:00 to 8:00 the following morning

22   from Mr. Gregory and I arrived here at 11:00 in the

23   morning.

24       Q     Now, --

25             JUDGE GILL:  Let me interrupt you just a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        second, I have a photograph that was laying right
 2        here that has not been marked as an exhibit.  I
 3        don't know what it is.  And I'm just going to --
 4        back to the witness there.
 5             THE WITNESS:  Let you-all do what you want to
 6        with it.
 7             JUDGE GILL:  Okay.
 8   BY MR. ORANGE:
 9        Q    Do you know what that is for the sake of --
10        A    That's some of the framing of the arm of the
11   couch it looks like.
12        Q    Okay.  Did the dog hit on the locations where
13   you took samples?
14        A    I witness the dog hit on the samples -- the
15   sample location.  I'm almost -- and here again, I didn't
16   -- I didn't document or take notes.  I do remember the
17   dog hitting in the kitchen -- on a sample in the
18   kitchen.  I believe the handler proceeded to take the
19   dog to the boy's bedroom along the wall and that the dog
20   hit on that location.
21        Q    Okay.  Now distinguish between the dog hitting
22   on location and the dog hitting on the samples?  Did --
23   after the samples were taken what was done?
24        A    Well, the samples were taken -- they were
25   collected.  Of course we went through the process of
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   decontamination or cross-contamination.  And any time

2   you have multiple collections you -- that's -- that's a

3   standard practice.  And then the samples were taken

4   outside under a carport, and they were lined up along

5   what's the control sample.  And the handler brought the

6   dog through once again and the handler hit on -- or the

7   dog hit on the six samples and did not hit on the -- hit

8   on the control sample.

9          Q     Okay.

10               MR. ORANGE:  You may ask.

11                     CROSS EXAMINATION

12   BY MS. GIORDANO:

13         Q     Officer, you stated -- Mr. Orange asked you

14   how did you determine where sample were drawn, and you

15   stated, the locations that were the samples were drawn

16   were determined by the officer's prior to my -- other

17   fire investigative officers prior to my arrival.  That

18   was your answer just a few minutes ago.

19         A     Right.

20         Q     So the samples weren't drawn based on where

21   the dog hit, but that determination had already been

22   made prior to the dog being brought in, is that true

23   based on what you just testified to?

24         A     Well, my understanding was the samples were in

25   the locations.  And the decisions of where to collect is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   based on a number of -- of applications into the fire

2   investigation.  Visual analysis, Grace device, PJ the

3   canine, assessment, and analysis from the investigators

4   prior to my arrival.  It wasn't --

5        Q    A collaboration of --

6        A    Right.  And it wasn't for me to come in once a

7   scene had been, what I would consider, you know, went

8   through --

9        Q    Contaminated to a certain extent?

10       A    Well, that's not the word I'm looking for, you

11  know, these guys were very meticulous, and I know

12  everyone about doing their job.  It wasn't contaminated,

13  but it was -- you have to go through a scene and

14  analysis each and every aspect of it, you know, if -- if

15  -- if there wasn't even a dog there, to know what to

16  collect.  You just don't go in and start shoving up

17  ashes and say this is going -- going to the lab.

18       Q    I'm just trying to determine at what point you

19  got there.  I thought you there when the dog was brought

20  in --

21       A    No.

22       Q    Okay.  So everything had been done when you

23  got there including the dog, the Grace device,

24  everything?

25       A    Well, if you look at the methodology in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   chapter 4 of 9-21, which is a document that we use of

2   the proper approach.  You don't call an arson

3   investigator as soon as you have a fire, you have to

4   pretty much come to an conclusion that there is a

5   criminal act or -- or an incendiary fire here before you

6   call an arson investigator.

7        Q    I understand that, I'm not questioning your

8   methodology, I'm just asking a factual question.  Did

9   you arrive at the time all of this had been done?  I'm

10  just trying to figure --

11       A    No, I did not.

12       Q    -- out what point you got there.

13       A    No, no.

14       Q    Okay.  What time did you get there on which

15  day approximately -- you don't have to tell me exactly,

16  just approximately.

17       A    I believe it was around 10:30, 11:00.

18       Q    But at the time you had arrived there had

19  already been investigation done by these other officers,

20  some of whom have testified.  And there had already been

21  investigation -- or the tool -- the Grace device had

22  been used and the dog had brought in, but then you were

23  prior to the dog going through the second time, is that

24  my understanding?

25       A    Well, like I told Mr. Orange, I'm not sure how

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   many times the dog --

 2        Q    Okay.

 3        A    -- had been through when I got there.  I do

 4   remember the dog being inside the structure one time

 5   while I was there, and I do remember the dog alerting in

 6   that dining, kitchen area and --

 7        Q    Okay.  So he was still on the scene when you

 8   got there -- the dog was?

 9        A    The dog was still on the scene.  Yes, ma'am.

10        Q    And you recall seeing him alert in one or two

11   of the areas, you may have seen more, but you remember

12   those two specifically?

13        A    Yes, that's correct.

14        Q    Did you do this graph that we're looking at --

15   this chart that we're looking at, is that drawn by --

16   not drawn, it looks like it was done on a computer.  Did

17   you prepare this?

18        A    Well, in conjunction with Mr. Alan Gregory.

19        Q    Okay.  What do those little -- when I'm

20   looking at this, those little areas that have the little

21   dots on them, what do those little dots mean?  You see

22   what I'm talking about, there's a number beside them,

23   40, 35, 34, 33, 31, what do those little groups of dots

24   mean?

25        A    Those are collection points I assume; I don't
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   have my drawing out here in front of me.  It normally
 2   indicates a number -- a little placard that we have --
 3        Q    Okay.
 4        A    -- a number to go by.
 5             MR. ORANGE:  Did I bring them over here?
 6             THE WITNESS:  What are you looking for?
 7             JUDGE GILL:  The exhibits.
 8             MS. GIORDANO:  Exhibit 9, Judge.
 9             JUDGE GILL:  I have the exhibits here.
10   BY MS. GIORDANO:
11        Q    Okay.  Go ahead and look at that.
12             MR. ORANGE:  The drawing is what she's asking
13        you about.
14        Q    Yes.
15        A    Yes, ma'am.
16        Q    Okay.
17        A    Yes.
18        Q    Those little groups of dots are where --
19        A    The -- the 40, the 34, the 35, which is in --
20   in correlation with the KSP41 which is our evidence --
21        Q    Okay.
22        A    -- document.
23        Q    That's where samples were drawn?
24        A    That's where samples were pulled or taken.
25        Q    Were pulled.  Okay.  You had mention in your
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

 1   testimony that there was an alert in the bedroom where

 2   the deceased was found.  And then I thought you said a

 3   sample was pulled from there, but it's not marked.  And

 4   I'm just trying to determine that I'm looking at number

 5   47 -- area of number 47 on your graph there.

 6       A    Ma'am, it is marked.  It says, "Blankets and

 7   sheets," right above it.

 8       Q    I know that, but it's not marked with one of

 9   those little -- you got this little -- what I assume is

10   some sort of a key, those little sets of dots.  I'm

11   trying to find out what those dots represent.  I assume

12   it either meant dog hit here or samples drawn?

13       A    Well, that's the location where the dog hit.

14   That's a location where a sample was taken.

15       Q    Okay.  But there's no sets of dots in that

16   bedroom and I'm just trying to determine why, or if that

17   was a mistake, or do you know why?

18       A    Oh, I see -- I'm sorry.  I see what you're

19   talking about.

20       Q    Okay.  I don't know any other way to describe

21   them.

22       A    The little dots that's just -- that's just

23   debris.  I just -- that's one thing that we have on our

24   crime cabinet.

25       Q    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    That's just debris and since we didn't --

2  since the debris was -- consisted of blankets and

3  sheets, it wasn't debris, as far as wood product --

4    Q    Okay.

5    A    -- and ash and stuff.

6    Q    I just didn't know any other way to describe

7  them, other than dots.

8    A    That's why I didn't drag the debris symbols

9  around the --

10   Q    Okay.

11   A    -- collection location.

12   Q    Okay.  All right.  I thought maybe that was a

13 symbol you were using for something, and I was just

14 trying to figure out what it was.  I couldn't tell if it

15 was significant or not without asking you that question.

16 So that just means debris just happens to be, for the

17 most part, in the same places where you drew those

18 samples?

19   A    Well, that's -- that's -- that symbolizes the

20 area where we collect samples --

21   Q    Okay.

22   A    -- at, normally what that means.

23   Q    All right.

24        MS. GIORDANO:  That's all I have, Judge.

25        JUDGE GILL:  Okay.  Anything else?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MR. ORANGE:  That's all the questions I have
 2   except I would like to have these exhibits, of
 3   course, marked -
 4        (EXHIBIT 14 MARKED FOR IDENTIFICATION)
 5        JUDGE GILL:  Okay.
 6        MR. ORANGE:  -- for the deposition's purpose of
 7   this hearing.
 8        MS. GIORDANO:  We just need a copy of those
 9   photos --
10        JUDGE GILL:  All right.
11        MS. GIORDANO:  -- at your convenience.
12        JUDGE GILL:  I want to be sure I understand
13   something.  I understood from the dog handler's
14   standpoint that he made no record of where the dog
15   hit, but that he told someone else where the dog
16   hit.  Do you know who he told that to?
17        THE WITNESS:  No, Your Honor, I really don't.
18   Like I said, there was -- obviously there had been
19   discussion one -- before I arrived and for me to sit
20   here and tell you --
21        JUDGE GILL:  Right.
22        THE WITNESS:  -- who he told what to, I would
23   be --
24        JUDGE GILL:  Right.  So when you say those dots
25   are something indicates on that map where the dog
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    hit, why do you think that?

2         THE WITNESS:  Well, the vicinity of what we

3    collected, Your Honor, is what that indicates.  And

4    -- and obviously that -- the dog was one of the

5    tools, as well as the Grace, and as well as physical

6    observation --

7         JUDGE GILL:  Right.

8         THE WITNESS:  -- that led to that collection

9    point.  It's a whole entity of things, it's not just

10   one -- it's not just one thing.  I -- for example, I

11   have -- I have a test as well.  I have a -- what

12   they call a praxamatic (phonetic) which is a

13   hydrocarbon tester that I use occasionally.  And

14   sometimes I will call a dog in to assist me on an

15   investigation, when I'm the first one on the -- or

16   one of the first one on the scene, and have to do an

17   overhaul in -- in an examination.

18        JUDGE GILL:  Right.

19        THE WITNESS:  I would use and drag the same --

20   and use the same --

21        JUDGE GILL:  Let me ask -- let me tell

22   Mr. Orange what my question is, what my concern is,

23   so he'll understand.  The witness is telling me we

24   just use this as a tool, it's no big deal.  But what

25   I understand the Commonwealth is wanting me to do,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   is to rule that the dog alert or the dog hit is
 2   going to be used by the Commonwealth not just to
 3   show that this is a tool but to show that there was
 4   an accelerant in a particular point -- a particular
 5   area.  And to do that I have to show that an
 6   appropriate methodology was used in reaching that
 7   conclusion.  By analysis a laboratory worker might
 8   use a test, sometimes tests are done with biological
 9   agents.  Dogs not that much different, but when they
10   make a result if you got a laboratory agent when a
11   result is reached and there is sometimes some
12   subjectivity in determining whether a litmus paper
13   -- whether it turns pick or blue, sometimes there's
14   some subjectivity.  My sister's is a pathologist,
15   there's some subjectivity sometimes, in making a
16   call as to whether a cell is a certain type of cell
17   or -- and that's okay sometimes, if they're trained
18   to do that. In this case, as I understand, the
19   Commonwealth is saying that the dog handler is
20   trained with this dog and that dog handler would
21   know whether there's an alert at a particular point.
22   And I'm hesitant to say -- to allow anybody else to
23   come in and testify besides the handler, the dog
24   alerted here.  Because as the handler himself said,
25   sometimes the dog gives bogus hits, I can tell that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    So if he's the one who's doing it -- if he's the one
 2    determining the results of the test, how did those
 3    results get recorded?  If he's already told me that
 4    he doesn't remember where the dog hit specifically.
 5    If he assigned that task to someone else and said,
 6    oh, the dog hit here and somebody else is going dog
 7    hit, then possibly you could make a connection.
 8    We've got a trained lab person, so to speak, he gets
 9    a certain result, and that result is recorded, and
10    that recorded test result gets put into evidence.
11    As I'm seeing it right now that didn't happen.  I'm
12    having a hard time making that connection, that
13    there was somebody there -- well, obviously, we had
14    a videotape going at one time, but that didn't work.
15    So how do we go from test result -- actual test
16    result to a record of what happened?  And not
17    someone else's interpretation of what a hit was or
18    an alert was.  You see my problem?  I just want to
19    let you know where I'm having a hard time --
20          MR. ORANGE:  Well --
21          JUDGE GILL:  -- making the -- no pun intended
22    but making all the dots line up.
23          MR. ORANGE:  I understand Alan Gregory's
24    testimony to be that the samples were taken where
25    Mr. Cannon told him the dog had hit.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MS. GIORDANO:  They're negative.

 2        MR. ORANGE:  And we got a record of where the

 3   samples were taken.

 4        MS. GIORDANO:  But they're negative.

 5        MR. ORANGE:  We're admitting they're negative.

 6   I mean, that's --

 7        JUDGE GILL:  But you're going to have to him

 8   -- you're going to have him testify that the dog

 9   handler told me that the dog hit here, and that is

10   these six points, and I know that -- and I know that

11   because I remember it specifically.

12        MR. ORANGE:  That's my understanding of his

13   testimony.

14        JUDGE GILL:  Okay.  All right.  Go ahead then.

15        MS. GIORDANO:  I don't have any further

16   questions.

17        MR. ORANGE:  I think I asked you to admit that

18   into evidence and that was --

19        JUDGE GILL:  What do you want me to admit into

20   evidence?

21        MR. ORANGE:  The things that you had marked as

22   exhibits.

23        JUDGE GILL:  All 9 -- 11 -- everything that's

24   been marked.  Okay.  I'll accept them into evidence

25   for purposes of this hearing, and you don't have
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   anything that I've marked, do you?  Okay.
 2        THE WITNESS:  No, sir.  I do not.
 3        JUDGE GILL:  All right.  Thank you.  All right.
 4   You can step aside then.  Call your next witness,
 5   please.
 6        MS. GIORDANO:  Hand you back that (Inaudible)
 7   -- did you give it back to the Judge?  I know you'll
 8   want him to have that.  Okay.
 9        JUDGE GILL:  That's number 9?
10        MS. GIORDANO :  Yes, sir.
11        JUDGE GILL:  Where is number 9?  I believe I
12   have number 9 -- do you have that graph, that chart
13   of the building?
14        MS. GIORDANO:  That's what I was afraid it got
15   out of order because I knew --
16        THE WITNESS:  I'm looking for it, Your Honor,
17   let me see if I --
18        JUDGE GILL:  Okay.
19        MR. ORANGE:  We'd like to recall Mr. Gregory.
20        JUDGE GILL:  Okay.  I may have it here.  I'm
21   just not laying my hand on it.
22        MR. ORANGE:  Number 10, I believe --
23        MS. GIORDANO:  I think it's number 9.
24        THE WITNESS:  Let me over, Your Honor.  I'll
25   try -- I'll keep looking.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            JUDGE GILL:  Okay.
 2            THE WITNESS:  I'll keep looking for it.
 3            JUDGE GILL:  I'm still missing that little
 4    chart, I think.
 5            THE WITNESS:  Okay.  I'll see if I can grab
 6    it --
 7            JUDGE GILL:  The diagram of the trailer.
 8            MR. ORANGE:  Some of these papers here.  You
 9    got the chart?
10            THE WITNESS:  That's what I'm looking for here.
11            JUDGE GILL:  What you were looking that had the
12    little dots on that she was talking about.  It's
13    probably right in front of me, but I don't see it
14    amongst all this stuff.  He was looking at it, and
15    she got him to realize what those dots were, and I
16    don't think we got it back from there.  He'll find
17    it in a minute.  Right there.  Just grab that on
18    your way by.
19            THE WITNESS:  Here, Your Honor.
20            JUDGE GILL:  Okay.
21            THE WITNESS:  Those match with these.
22            JUDGE GILL:  Okay.  You're still under oath.
23    I'll remind you that you're still under oath for the
24    purpose of this hearing.  Okay.
25                      REDIRECT EXAMINATION
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

95

```
 1    BY MR. ORANGE:
 2        Q    So for the -- for clarification you understand
 3    you're still under oath -- obligated to tell this Court
 4    the truth?
 5        A    Yes, sir.
 6        Q    And were you present when canine PJ was taken
 7    back through to reidentification of the hits?
 8        A    Yes, sir.
 9        Q    And how did you -- how were you -- did you
10    come to have personal knowledge where the hit sites were
11    at?
12        A    Okay.  If this is what we were --
13        Q    No, how -- the morning of the fire, how did
14    you know where the hit sites were at?  Did you --
15        A    Where we took --
16        Q    How did you know that?
17        A    We took the -- where we took the samples is
18    where we was directed by Mr. Cannon.
19        Q    How did you know where the hit sites were at?
20        A    Through Buster Cannon and watching the dog on
21    the second go round.  But Mr. Cannon showed us where to
22    take the samples at and the hits that Mr. Cannon
23    directed us to take -- where the dog hit, and the
24    samples are on this list in here in items 31 through 40.
25        Q    And did you take that list to take those
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   samples?

 2        A    Yes, sir.

 3        Q    And you say 31 through 40.  What are you

 4   referring to?

 5        A    The numbers on Detective West's chain of

 6   custody.

 7        Q    And that's a state police form, correct?

 8        A    Yes, sir.

 9        Q    And do those numbers match anything on that

10   mail --

11        A    That's --

12        Q    -- on Exhibit number 9?

13        A    That's what I'm trying to decipher now, and it

14   might take Detective West to match these numbers with

15   this one here.

16        Q    Are these numbers on that?

17        A    I see 12.  I'm looking at items 31 through 40.

18        Q    Okay.  But you take the samples where the

19   handler told you take them?

20        A    Yes, sir.

21             MR. ORANGE:  No further questions.

22                  RECROSS EXAMINATION

23   BY MS. GIORDANO:

24        Q    Officer, you've already testified you did not

25   walk through these locations, or this building, this
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    home with Officer Cannon the first time you walked
 2    through with the dog?
 3         A    Not on the first go round, no, ma'am.
 4         Q    And you heard him testify he did not make a
 5    record at that time or any time of where the dog hit?
 6    Did you hear him testify to that?
 7         A    Yes, ma'am.
 8         Q    And you did not make a record
 9    contemporaneously with the walk through the first time
10    or even the second time -- you did not make a record at
11    that time of where he told you the dog hit -- not at
12    that time you didn't?
13         A    Not at that time, no.
14         Q    And you are not trained to identify canine
15    alerts?
16         A    I'm not a dog person.  No, ma'am.
17         Q    Thank you.  That's all I have.
18              JUDGE GILL:  Did you have any other questions?
19              MR. ORANGE:  That's all the questions I have.
20              JUDGE GILL:  Let me be sure.  I think I
21         understood your answer, I just want to be sure.  You
22         said that you identified these locations to take
23         samples from by what you observed the dog to hit and
24         what he told you?
25              THE WITNESS:  I saw the dog hit on the -- on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the second walk through on a number of these.  Now
 2   either it was all of them or not, I don't know.  But
 3   Mr. Cannon directed David and I where to take these
 4   samples at and this is the samples that Mr. Cannon
 5   directed us to take.
 6        JUDGE GILL:  Let me ask you this.  What I'm
 7   trying to figure out, did you observe the dog hit on
 8   three, and did he tell you to hit on -- that the dog
 9   hit on three more?  Or did he tell you the dog hit
10   on six places, and these are the places that he hit
11   on?
12        THE WITNESS:  Mr. Cannon directed us to all
13   these places.  I -- I can't be with certainty on how
14   many of them I saw the dog actually hit on, but I
15   can tell you that Mr. Cannon directed us to take
16   these samples.
17        JUDGE GILL:  And do you know what basis he used
18   to tell you that?
19        THE WITNESS:  Dog hit.
20        JUDGE GILL:  How do you know that?
21        THE WITNESS:  Per se, Mr. Cannon.
22        JUDGE GILL:  What does that mean?
23        THE WITNESS:  I guess, he told me.
24        JUDGE GILL:  You guess?  Okay.  The reason I'm
25   asking is that he's also an arson --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              THE WITNESS:  Right.

 2              JUDGE GILL:  -- a trained arson person.

 3              THE WITNESS:  I -- I would say with this vast

 4      experience he knew exactly where to go to.

 5              JUDGE GILL:  Right.  And see what -- and that's

 6      the thing is I don't know whether he told you to

 7      test that spot because the dog alerted or because

 8      he's an arson expert?  Because the Commonwealth

 9      wants somebody to testify that there was an

10      accelerant at this particular point in the house

11      because the law -- the dog alerted here.  And I'm

12      trying to figure out did anybody -- has anybody made

13      a record or can anybody testify that a dog alerted

14      here?  You see my problem?

15              THE WITNESS:  Yes, sir, I do now.

16              JUDGE GILL:  As opposed to, gosh, I'm an arson

17      expert, and I think I'd test this site and my dog.

18      He hits three places -- three or four places.  I

19      think these are other good sites, too.  You see the

20      difficulty there?  All right.

21                      FURTHER DIRECT EXAMINATION

22      BY MR. ORANGE:

23         Q    Did -- so to your knowledge, did Mr. Cannon,

24      did he perform investigations in addition to using his

25      dog, PJ?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    To my knowledge, no.  But I'm -- he would have

2    to answer that for himself.  I'm sure he did -- formed

3    an opinion.

4            MR. ORANGE:  No further questions.

5            JUDGE GILL:  Okay.  Anything else from the

6        defense?

7            MS. GIORDANO:  No, Your Honor.

8            JUDGE GILL:  Thank you, sir.  You may step

9        aside.

10           MR. ORANGE:  I have no further witnesses.

11           JUDGE GILL:  Okay.  All right.  Anything from

12       the defense?

13           MS. GIORDANO:  I'll take just a minute, Judge.

14       Let me -- my client needs to go to the restroom.

15       Can that be arranged while I -

16           JUDGE GILL:  Okay.  Let's take about a

17       ten-minute break, I need one myself.

18           MS. GIORDANO:  Okay.  I'll let you know.

19               (END OF RECORDING)

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

101

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the said matter was reduced to
type written form under my direction, and constitutes a
true record of the recording as taken, all to the best
of my skill and ability. I certify that I am not a
relative or employee of either counsel, and that I am in
no way interested financially, directly or indirectly,
in this action.



SAMEEN SHABBIR

COURT REPORTER / NOTARY

COMMISSION EXPIRES ON: 01/07/2023

SUBMITTED ON: 12/03/2021

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

102

| | | | | |
|---|---|---|---|---|
| **1** | **23** 4:8 19:12 20:3 | 10,11 | 62:18 64:14 65:5,10,11 90:4 99:10 | **alert** 14:25 15:15 16:7,10, 12,15 21:7 28:14,19,24 29:8,11,25 30:5,6 32:16, 21,23 33:2,12, 13,22 34:4,20 37:5,7 43:20 44:16,19,23 47:14 61:4 63:24 70:11 74:15 79:14 84:10 86:1 90:1,21 91:18 |
| **1** 43:1 | **24** 18:14 | **60** 11:15 12:6, 10 | |
| **10** 76:17,18,19 77:25 78:1 93:22 | **25** 8:21,22 | **69** 69:5 | **accelerants** 5:4,5 10:6 15:20 16:21,22 19:19 22:15 23:2,13 26:3 32:9 34:6 35:7 52:9 54:15 |
| **3** | **6th** 48:10 | |
| **100** 29:12 | **3** 43:3 | **7** | |
| **10:30** 83:17 | | **accept** 92:24 | |
| **11** 77:1,2 78:4,5 92:23 | **30** 28:25 43:23 | **7** 70:21,23 73:19 74:2 | **accompanied** 26:8 | **alerted** 45:22 46:8,9 63:18,19 90:24 99:7,11, 13 |
| | **31** 84:23 95:24 96:3,17 | **73** 70:2 | |
| **11:00** 79:22 83:17 | **32** 75:16 | **7:00** 79:21 | **accompanies** 33:6 | |
| **12** 4:24 77:11, 12 78:6,10,11 96:17 | **33** 84:23 | **7:25** 79:20 | **accuracy** 37:22 | **alerting** 7:18, 19 16:22 47:4 84:5 |
| | **34** 84:23 85:19 | **8** | |
| **13** 77:17,18 78:15,20,22 | **34th** 13:4 | **8** 72:24 73:12, 13,14,16,22 | **accurately** 68:11,12 72:1 | **alerts** 9:17 15:11 21:5 31:17 36:7 42:16,17 43:20 44:18 45:16 46:2,13,21,22 47:10 97:15 |
| | **35** 78:8,9 84:23 85:19 | | **act** 83:5 | |
| **14** 88:4 | **8:00** 79:21 | **activities** 9:4 | |
| **15** 4:21 18:3 19:10 | **35th** 12:24 13:4 | | **acts** 45:13 | |
| | **365** 18:14 | **9** | **actual** 60:22,23 91:15 | |
| **17** 4:5 | | **9** 72:22,25 77:24 85:8 92:23 93:9,11, 12,23 96:12 | | **allegedly** 54:15 |
| **18** 5:24 | **4** | | **addition** 99:24 | |
| **184** 37:22 | **4** 74:19,20,25 83:1 | | **additional** 56:17 69:19 | **allowed** 20:23 36:25 |
| **1993** 67:7 | | **9-21** 83:1 | | **altered** 68:15 |
| | **40** 11:4 84:23 85:19 95:24 96:3,17 | **92** 37:22 | **admit** 92:17,19 | |
| **2** | | **A** | **admitting** 92:5 | **aluminum** 73:10 |
| **2** 43:2 | **40-hour** 7:15 8:5 | | **affirm** 3:14 50:17 66:18 | |
| **20** 5:24 6:12 | | **ability** 15:19 17:3 32:8 | | **amount** 9:16 23:6 |
| **200** 8:11,18 22:1 | **400** 17:5,14 | | **afraid** 93:14 | |
| | **40th** 13:13 | **absolute** 29:9 | **agent** 90:10 | **amounts** 18:12,13 |
| **2000** 13:6 14:1 | **41st** 13:9,13 | | | |
| **2002** 5:12,24 6:12 7:4,8 8:7 10:12 | **47** 75:7 86:5 | **Absolutely** 21:14 28:16 34:23 42:6 | **agents** 90:9 | **analysis** 33:14 75:6 82:2,3,14 90:7 |
| | | | **agree** 27:1,17 30:3 | |
| | **5** | **Academy** 13:6 | | |
| **2003** 8:3 11:10 | **5** 74:12,13,18 | **accelerant** 5:11,14,23 6:7 9:6,10,19 14:18 16:9 20:11 22:19,20 23:15 27:8,13 28:13 33:4,7 41:3 46:23 47:17 | **ahead** 24:16 56:21 64:16 75:23 85:11 92:14 | **analyzed** 22:13,23 78:17 |
| **2004** 6:15,17 13:25 14:2 24:22 51:8,9 | **50** 8:9,20 12:10 | | | |
| | **57** 76:3 | | **Alan** 49:7 50:25 84:18 91:23 | **angle** 71:16 |
| **2005** 6:15,17, 22 11:10 | **6** | | | **annual** 6:9 12:24 |
| **2006** 6:22 | **6** 70:21,22 74:4, | | **Alcohol** 6:4 | |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

103

answers 3:22

apologize 30:18

appeared 55:12

appearing 28:10

applications 82:1

applied 20:5

approach 83:2

approximately 11:4 83:15,16

April 6:15 8:3

area 8:12,18 14:22 15:24 16:10,15 46:9 54:12 64:13,15 70:12,14 73:7 74:9 79:14 84:6 86:5 87:20 90:5

areas 12:11 55:18,22 56:1,2 57:12 59:17 65:6 69:20 84:11,20

arm 80:10

arranged 100:15

arrival 81:17 82:4

arrive 83:9

arrived 7:5 24:21 51:17 67:21 79:8,17, 22 83:18 88:19

arson 5:3 6:25 12:25 13:9 22:11 26:1 30:20 56:7 67:3,6 83:2,6 98:25 99:2,8,16

arsonist 5:6 42:13

ash 87:5

ashes 82:17

aspect 16:11 82:14

assessment 82:3

assigned 91:5

assist 89:14

assistant 5:25

Association 6:20

assume 22:10 30:23 33:6 34:18 35:9,13 39:3 48:19 55:9 60:11 84:25 86:9,11

assuming 22:12

ate 19:1

ATF 7:8,25 10:4,8,11,15,20 11:6,8,18 12:2, 8 19:8,25 20:6 33:7

average 8:9

avoid 61:3

aware 14:21 22:18 41:4 66:10,11

_____

B

back 7:8 10:12 11:10,20 12:23 15:12,25 16:12, 23 17:12 20:14, 15 21:4,8 23:24 28:1,3 29:16, 17,19 31:21 37:16 38:16,17 39:15 45:12 47:6 50:12 51:8 57:4 59:2 63:4 70:10,17 73:8 76:7 77:23 80:4 93:6,7 94:16 95:7

background 4:16

bags 11:25

balance 24:14

ballpark 14:5

base 19:20

based 19:3,8 20:1 22:14 37:9,24 40:8 52:9 60:8,9,19 81:20,23 82:1

baseline 70:19

basement 32:19

basically 26:14 41:4 52:5 59:10 71:7

basis 98:17

bat 40:25

bear 24:14 35:17

Beaver 15:23 16:11

bed 42:17 75:5 77:7,9,15 78:6, 8,19,23

bedding 60:3

bedroom 55:13 69:22 70:1 74:14,24 76:10,11 80:19 86:1,16

behalf 3:9

bench 3:6,20

bend 44:2

biased 38:3

big 89:24

bigger 11:19

biological 90:8

biscuit 18:21

biscuits 18:20

bit 12:23 24:12 25:10,11,12

32:7 34:7 51:2

BJ 7:8

blanket 75:3

blankets 86:6 87:2

blowing 29:1

blue 90:13

board 78:1

bogus 29:24 44:18,23 45:16 46:21 47:15 90:25

border 29:20

bottom 69:6 75:21

bought 21:16

Bowling 15:24

boy's 70:1 76:10 77:7 80:19

break 49:11 75:25 100:17

breakfast 25:10 26:1 55:1

breaks 22:22

bring 14:15,17 20:14 44:22 55:24 56:4 85:5

bringing 7:17 42:14

broken 14:14

brought 20:9 26:4 56:7 81:5, 22 82:19 83:22

brushes 34:15

bucket 53:17

building 26:22 93:13 96:25

bunch 28:6

Bureau 6:4

burn 25:19 41:24

burning 11:20 52:2

burnt 9:15 40:22 41:1,24 73:9

Buster 51:16 63:5 95:20

_____

C

cabinet 86:24

calibrate 20:8, 15

calibrated 20:9 38:19,20, 21

call 11:2,8,18, 23 12:2,13,19 15:16 16:3,4 22:19 29:21 48:9 56:21 66:16 83:2,6 89:12,14 90:16 93:4

called 18:25 33:7 51:7,15 62:17

calling 56:11 65:4

calls 11:7

Cameron's 75:5

canine 5:4,11, 14,23 6:7 10:12,15 18:7 19:18 20:2 22:19 33:4,12, 13 36:4 38:18 40:19 82:3 95:6 97:14

canines 8:6 11:15 12:16 33:8

canned 54:3

Cannon 3:1,2, 4,12,17 4:2 5:22 6:6 32:8 38:10 51:16,20,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22 52:11,15
55:2 56:12,25
57:2,13 58:15,
25 61:8,24 62:1
63:5,7,8 91:25
95:18,20,21,22
97:1 98:3,4,12,
15,21 99:23

**cans** 21:11,13,
14,16,19,21
36:24 54:9,11,
12 60:5,12
75:12

**Carmel** 4:2
5:22 6:6

**carpet** 9:15
22:25

**carport** 81:4

**carried** 75:11

**case** 3:7 15:23
20:19 21:21,25
23:1,20 24:18
25:11,15,17
26:2 36:2,12,22
37:10 39:6,9,16
42:3,4 48:6
56:8 60:22
90:18

**cases** 8:18

**category** 38:1

**caught** 44:25

**cell** 90:16

**certainty**
98:13

**certificate**
5:15,21 6:5,14
8:2 13:5

**certificates**
13:14 42:22

**certify** 6:6

**certifying** 5:22
6:16

**chain** 96:5

**chance** 18:24

**changed** 19:23
75:19

**chapter** 83:1

**Charles** 3:5

**chart** 38:13,24
65:25 84:15
93:12 94:4,9

**check** 20:23
21:21 23:21,22

**chemical**
28:24 32:15
47:2

**chemicals**
28:7 32:20
34:24 35:1

**chemist** 15:25
16:4,13 27:23
47:5

**Chicago**
12:17,18,20,22

**children's**
69:21

**choose** 79:5

**chose** 10:17

**Cincinnati**
12:25 13:9

**circle** 59:17

**circled** 59:11

**Circuit** 3:3

**City** 4:22 13:21

**clarification**
95:2

**clarify** 63:16

**class** 7:15 8:6

**classes** 13:2

**cleaned** 14:14

**cleaning** 34:14
35:6

**clear** 44:18
48:21,23

**client** 100:14

**close** 8:10
29:20

**closer** 24:13

**closest** 12:19

**clothing** 9:15,
24

**cold** 51:25

**collaboration**
82:5

**collect** 75:5
81:25 82:16
87:20

**collected**
53:16 71:17
75:3 77:8,14
80:25 89:3

**collecting**
76:11

**collection**
71:1,8 74:8,17
76:23 84:25
87:11 89:8

**collections**
70:18 81:2

**collision** 4:12

**common** 22:16

**Commonwealt
h** 3:7 66:15
89:25 90:2,19
99:8

**compare**
36:17,18

**comparison**
36:21

**complete** 6:17,
19

**completed**
5:23 6:7

**composite**
70:25

**computer**
84:16

**concern** 40:19
56:2 89:22

**concerns** 20:4

**concluded**
48:13

**conclusion**
83:4 90:7

**conclusions**
25:19,20 61:6

**concrete**
54:12

**condition**
41:18

**conditions**
52:4

**conducting**
38:12 39:12

**confession**
16:8,14

**confirm** 30:4,5,
6,9

**confirmation**
17:8 27:25
30:14 33:12
56:16,17

**confirmed**
33:14

**confused** 34:7
63:21

**conjunction**
84:18

**connection**
91:7,12

**considered**
33:14

**consist** 7:17

**consisted** 87:2

**consume**
23:14

**consumed**
23:7,16

**contact** 35:14

**container** 21:2

**containers**
21:5

**contaminated**
82:9,12

**contamination**
40:8 42:12

**contemporane
ously** 97:9

**continuation**
73:20

**continue** 19:13

**contract** 10:8,
10,15,20,24
12:7

**control** 22:11
36:3,6,8,16,24
37:1,7,11 46:22
53:22,25 54:10
59:13 64:2
68:22,23 69:15,
16 71:12,22
72:2 74:21 75:1
81:5,8

**controlled**
64:11 69:14

**convenience**
88:11

**convinced**
45:7

**Cooper** 26:11

**copies** 72:16

**copy** 5:18 9:5
72:8,9,11,24
88:8

**corner** 70:17
74:6 76:10

**correct** 9:25
10:9 14:3 20:17
30:7 36:12
43:12 53:25
67:9,10,19 68:8
75:2 79:18
84:13 96:7

**correlation**
85:20

**couch** 71:1,2
75:17 76:24
78:5 80:11

**coughs** 7:2
14:8

**counsel** 3:20
43:6 47:25 48:4
61:17 75:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

countries 22:17

country 5:7 8:1

County 3:3
4:3,23 13:19

couple 7:5
13:2 15:8 28:21
43:9 61:1 62:10

court 15:14
42:21 50:15
54:8 68:7,17
69:23 71:12
75:19 95:3

courtroom 3:6
55:10

cover 12:10,13

cracks 9:24

crime 86:24

criminal 83:5

CROSS 24:9
54:24 81:11

cross- 24:14

cross-contamination 81:1

current 6:22

custody 96:6

D

daily 9:4 18:17

daisy 9:14

Dakota 11:25
12:15

Dam 15:23
16:11

dark 47:19

data 18:12

date 48:22

dated 6:12,15

Daubert 3:8

David 63:9
67:1 98:3

day 5:1 7:23
9:12,13 10:21
18:14,19,20,21,
22 19:1 38:15
48:25 67:23
83:15

days 5:2 7:5,16
18:14

deal 89:24

dealership
21:15

debris 86:23
87:1,2,3,8,16

deceased 75:4
78:19 86:2

decided 56:21

decipher
96:13

decisions
81:25

decline 71:19

decontamination 81:1

defendant 3:9

defense 100:6,
12

demarcation
70:17

Department
4:3 6:4

depending
48:5

depends 42:1
44:4

depicted 68:12

deposition's
88:6

deputy 3:1,2,4,
12,17 4:2 51:3,
20,21

describe 86:20
87:6

detail 41:21

details 25:18

detect 17:24
27:2,6,7,19

detected 27:14
28:14 29:13
65:10,11

detection
19:18,19 32:23
33:4,8

detective 50:1,
6 51:12 53:11
54:3,20 57:15
62:22 66:16
96:5,14

detectives
79:18

detects 27:18

determination
33:17 66:4
81:21

determine
32:12 45:22
65:1 81:14
82:18 86:4,16

determined
35:2 55:12
64:24 65:4
81:16

determining
60:16 63:19
90:12 91:2

device 30:23
31:3,21,23 32:1
56:11,15,18
82:2,23 83:21

diagram 38:24
60:23 94:7

difference
32:14

difficulty 99:20

dining 74:9
84:6

DIRECT 3:23
41:14 50:22
66:23 99:21

directed 63:10
95:18,23 98:3,
5,12,15

direction 29:3

director 6:1

disc 72:15

discuss 55:11,
14

discussed
26:1

discussing
55:21

discussion
25:23 26:2
30:22 31:10,25
51:19 52:3 55:5
68:22 88:19

discussions
25:5 26:20

distinguish
32:9 80:21

document 9:8,
9,10 39:4,11,24
80:16 83:1
85:22

documentatio
n 20:20 39:18
43:16

documented
39:25 40:2

documents
10:4,7 42:21

dog 5:4 6:25
7:3,4 8:13 9:17
11:1 12:4,17,
19,21 14:13,17,
21,24 15:11,19
16:6,7,10,12,
13,14,18,19
17:9,10,23
18:8,9,15,16,
20,21 19:24
20:8,23 21:4
22:20 23:2,17
25:14 26:25
27:3,18 28:18
29:15,24 30:9,
15 31:15,17,22
32:11 33:6,21
34:20 36:4,7,
12,16,23,25
37:3,5,12,15,

23,25 39:9
40:12,16,21
41:8 42:5,15,23
43:13,20,21
44:5,10 45:13,
22 46:7,9,13
47:7 49:23
51:15 52:1,9,
14,18,21,22,24
53:8 54:6,9,16
55:24,25 56:7,
22 58:2,3,6,7,9,
14,16,23 59:9,
17,18,23 60:1,
6,7,9,12,16,18
61:21 62:2,5,
11,13,15,20
63:1,5,8,17,19,
24 64:20,22,23
65:2,6,13,15,20
66:5 67:14,25
75:10,11,13,16
78:20 79:2,10,
11,13,15 80:12,
14,17,19,21,22
81:6,7,21,22
82:15,19,23
83:22,23 84:1,
4,5,8,9 86:12,
13 88:13,14,15,
25 89:4,14
90:1,19,20,23,
25 91:4,6,25
92:8,9 95:20,23
97:2,5,11,16,
23,25 98:7,8,9,
14,19 99:7,11,
13,17,25

dog's 16:25
30:11 31:22
32:8

dogs 7:18,19
10:6 12:6,10
16:21 22:15
32:16,21,22
33:1 47:3 51:25
90:9

domestic 4:12
41:22

door 41:19

dots 84:21,23
85:18 86:10,11,
15,22 87:7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| | | | | |
|---|---|---|---|---|
| 88:24 91:22 94:12,15 | **enforcement** 4:4,7 | 76:15 85:7,9 88:2 92:22 | 87:14 98:7 99:12 | 24 32:25 |
| **double** 70:15 | **entity** 89:9 | **expect** 14:19 | **file** 59:6 60:22 | **floor** 40:22,24, 25 73:11 74:7 |
| **doubt** 16:1 | **equipment** 31:21 | **expected** 14:22 | **fille** 38:18 | **Flowers** 25:3,4 26:11 30:19 |
| **drag** 87:8 89:19 | **equivalent** 18:2 28:7 | **expense** 11:1 | **film** 68:9 | 52:19 57:14 68:8 |
| **drawing** 59:20 60:23 71:21 | **estimate** 47:21,22 | **experience** 4:19 16:24 20:2 22:15 37:9,24 | **find** 14:19,23 16:21 20:12 23:16 26:3 35:23 41:18 | **fluid** 28:5 34:10,12 |
| 72:1,18 73:6,13 74:11 77:23 78:1 79:2 85:1, 12 | **evaporated** 23:8,23 | 67:5 99:4 | 44:7 52:9 86:11 94:16 | **foaming** 71:2 |
| | **evening** 79:19 | **expert** 99:8,17 | **finding** 71:14 | **follow** 15:10 31:2,5 61:18 |
| **drawn** 81:14, 15,20 84:15,16 | **event** 33:24 39:16 | **explained** 30:10 | **findings** 25:18 | **food** 18:20 28:22 44:5 45:8 |
| 85:23 86:12 | **evidence** 21:3, 5 37:10 42:13, | **explosions** 50:14 | **finds** 22:23 28:13 | **foot** 14:15 77:7, 8 |
| **drew** 65:24 87:17 | 20 85:20 91:10 92:18,20,24 | **extent** 82:9 | **fine** 3:12 32:7 35:18 65:16 | **forget** 48:18 |
| **drop** 18:3,6 20:11 45:18 | **evidencing** 13:15 | **exterior** 73:25 | **fire** 4:8 5:1,3,6, 7,8 6:20 8:7,11, | **forgotten** 39:17 |
| ——————— | **exact** 45:24 | **eye** 18:2 | 19 12:25 13:6, 9,17,18,20 | **form** 96:7 |
| **E** | **examination** | ——————— | 14:6,10 15:7 16:11,18 18:16, | **formed** 100:2 |
| | 3:23 24:9,15 | **F** | 25 19:9,12,18, | **forwarded** |
| **earlier** 25:8 29:14 30:10,18 | 35:25 38:8 41:14 50:22 | ——————— | 19 20:3,4,7,12, 19 21:18 22:4 | 5:18 |
| 33:24 34:4 36:13 51:11 | 54:24 62:8 64:17 66:23 | **fact** 5:17 6:16 15:15 16:15 | 23:7,14,16 24:24 25:21 | **found** 16:6,14 17:10 30:9 34:6 |
| **early** 25:10 | 81:11 89:17 94:25 96:22 | 21:21 73:8 | 31:1 33:25 34:21 35:4 39:1 | 86:2 |
| **easier** 40:10 | 99:21 | **factual** 83:8 | 41:5 42:2,10 | **framing** 74:6 80:10 |
| **eastern** 8:21 | **excited** 44:21 45:14 | **fail** 39:24 | 43:11,13 45:20 50:14 51:3,8,22 | **Friday** 48:12, |
| **eat** 44:6,8 45:1 | **excuse** 5:4 7:2 | **failed** 38:11 | 55:11 67:7,9,12 68:12,13 79:8, | 13 |
| **eats** 18:15 | 11:4 14:1,8 | **faint** 23:23 | 19 81:17 82:1 | **front** 5:12 20:20 51:2 85:1 |
| **Edmonds** 50:6 51:12 54:20 | 48:25 | **fair** 27:14 56:14 | 83:3,5 95:13 | 94:13 |
| 57:15 | **exhibit** 43:1,2, 3 68:25 69:11 | **fairly** 68:11 | **Firearms** 6:5 | **full-time** 4:21, 23,25 19:11 |
| **elements** 35:15 | 70:1,10,22,23, 25 72:19,25 | **fall** 37:25 51:8 | **firefighter** 4:20,22 19:9, | ——————— |
| **else's** 91:17 | 73:13,14,18,19 74:4,12,13,19, | **familiar** 30:23 33:3,8,11,18 | 11,14 20:2 | **G** |
| **Emmitsburg** | 20 75:7 76:14, | 72:14 | **firefighters** 15:9 42:13 | ——————— |
| 13:7 | 18 77:2,12,18, 24,25 78:4,6,14 | **February** 5:24 7:4 48:10 | **fires** 8:21 11:4, | **gallon** 18:7 |
| **end** 12:20 27:23 59:13 | 80:2 85:8 88:4 96:12 | **feed** 43:24 45:19 47:11 | 19 22:1 23:14 37:22 | **game** 44:25 |
| 64:7 68:24 69:16 71:2 | **exhibits** 42:25 | **feet** 28:25 | **flammable** | **games** 45:18 |
| 73:20 74:2,23, 24 75:20 | 70:4,6 71:9 | 43:23 | 27:8 28:1,2,21, | **gasoline** 16:15 |
| 100:19 | | **felt** 64:13 | | **gave** 42:9 68:9 71:15 |
| | | **figure** 60:15 61:6 83:10 | | |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

general 41:17

generally 15:9
51:21

geographic
8:12

Georgetown
4:22

get all 40:14

Gill 3:2,3,5,13,
18 5:21 6:3,12
7:10 17:4 24:3,
7 35:22 42:24
43:6,8,11,17,19
44:11,15 45:2,
5,9,20 46:1,7,
12,15,18,20
47:15,21,24
48:3,9,17,19,24
49:2,5,10,14,
17,21 50:5,7,
11,13,16,21
58:2,6,11,13,
16,19,21 59:3,
8,15,22,25
60:7,14,19
61:1,11,13,16
62:7 63:16,22
64:1,3,6,9,13,
16 66:14,17,22
69:10 70:3,7,
13,20 71:6,18
72:11,17,21
73:1 75:19
76:15,19,25
77:4,19 79:25
80:7 85:7,9
87:25 88:5,10,
12,21,24 89:7,
18,21 91:21
92:7,14,19,23
93:3,9,11,18,20
94:1,3,7,11,20,
22 97:18,20
98:6,17,20,22,
24 99:2,5,16
100:5,8,11,16

Gill's 63:4

Giordano 3:9
13:25 17:1
24:5,8,10,17
35:19 38:7,9,10
41:11 43:7 48:1

49:1,15,19,25
50:9 54:25
57:22 58:1
61:18,20 63:15
64:18 69:1,7
72:7,13 78:8,
10,12 81:12
85:8,10 87:24
88:8,11 92:1,4,
15 93:6,10,14,
23 96:23 100:7,
13,18

girl 28:22 43:24

give 3:15 5:15
9:16,18 12:15
13:11 27:12
28:3,6,21 29:24
34:1 35:15
44:12 45:4,24
47:1,19 50:19
66:20 71:18
93:7

giving 26:19
44:17,23

glass 14:14

good 16:7
28:22 32:24
43:24 49:5 52:7
99:19

gosh 99:16

grab 94:5,17

Grace 30:22,23
31:2,20,23 32:1
56:11,15,18
82:2,23 83:21
89:5

granted 10:12

graph 84:14
86:5 93:12

greater 12:24
13:9 17:5 18:4

Green 15:24

Gregory 49:7
50:25 67:16
79:22 84:18
93:19

Gregory's
91:23

groups 84:23
85:18

guess 18:12
29:22 30:7 44:7
66:8 72:23
98:23,24

guys 11:21
82:11

—

**H**

—

half 18:2,6

hall 69:17

hallway 59:13
64:8 68:24
74:23 76:6

hand 30:10
50:17 60:5 70:7
72:21 93:6,21

handed 6:3

handle 5:10

handler 5:13
7:3 11:14 19:5
39:9 51:15
58:6,21 60:9
61:22 80:18
81:5,6 90:19,
20,23,24 92:9
96:19

handler's 61:5
88:13

happen 41:2
47:9 91:11

happened
49:25 91:16

happy 68:19

hard 91:12,19

he'll 89:23
94:16

head 59:12

heading 19:15

hear 3:18 17:14
24:8,11,15,16
97:6

heard 17:13,17
97:4

hearing 3:7,8
42:25 69:12
88:7 92:25
94:24

hearings
50:15

hearsay 17:2

hesitant 90:22

hey 12:23 47:6

high 16:2 23:19
47:23

history 42:22

hit 23:2 32:1
36:23 37:1,3,14
38:25 43:14,19
47:15,16 53:8
54:9,16 58:3,7,
9,14,16,22,24
59:9,18,23
60:1,7,9,12,16,
17 61:4 62:15,
20 63:1,5
64:20,22,23
65:6 66:5 67:25
75:10,13,16
78:20 79:2
80:12,14,20
81:6,7,21
86:12,13 88:15,
16 89:1 90:1
91:4,6,7,17,25
92:9 95:10,14,
19,23 97:5,11,
23,25 98:7,8,9,
10,14,19

hits 36:4,12
40:16 49:23
57:10 61:9
65:3,13,15,20
90:25 95:7,22
99:18

hitting 37:12
47:7 58:22
80:17,21,22

hold 29:16 67:2

holding 72:18

hole 40:21 73:9
74:5,7

home 15:1
25:25 34:8 35:8
97:1

hon 27:4

honest 27:22
32:3

honestly 17:6
22:5

**Honor** 17:1
38:7 43:7 48:1
49:1 61:18
68:22 88:17
89:3 93:16,24
94:19 100:7

hope 72:23

hoping 45:18

hours 18:14

house 14:19,
23 15:1 26:4,9,
10 34:6 41:23,
24 42:7,11,12,
14,15 58:4
62:23 67:15
99:10

human 17:5,14
39:21

hung 49:2

hurt 14:12

hydrocarbon
27:11 29:13
32:24 89:13

hydrocarbons
27:7,13 28:15
34:18 37:13

—

**I**

—

**IDENTIFICATI
ON** 43:1,2,3
70:22,23 72:25
73:14 74:13,20
76:18 77:2,12,
18 88:4

identified
62:16 79:7
97:22

identify 64:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

69:1 75:25
76:22 77:25
97:14

**ignitable** 33:15

**Illinois** 12:14

**illustrate**
79:13

**important**
39:18

**in-service**
7:16 8:6

**Inaudible**
23:23 34:12
71:4 93:6

**incendiary**
83:5

**include** 25:17

**included** 25:17
26:2

**including**
82:23

**inconsistencie**
**s** 32:11

**Indiana** 12:14

**indicating**
43:13

**indication**
33:15

**individual** 25:1

**individual's**
60:4

**inept** 50:9

**information**
26:2,19 40:8,
11,14,18

**informed**
19:25

**initial** 67:17

**initially** 24:23
52:21 57:3

**inside** 41:8
55:20 62:23
84:4

**instance** 31:25
34:3 35:4

**instruments**
31:16 37:19

**intend** 48:9

**intended** 91:21

**interpretation**
61:4,5 91:17

**interrupt** 79:25

**inventory** 35:5

**investigate**
13:20

**investigating**
67:7,11

**investigation**
25:7 26:21
35:5,15 38:12
39:12 40:5,10
55:6,23 56:7
65:4 67:6 82:2
83:19,21 89:15

**investigations**
52:10 99:24

**investigative**
12:25 81:17

**investigator**
20:3 21:1
22:11,21 25:12
35:11 40:23
67:3 83:3,6

**investigators**
6:20 7:23 13:10
26:1 39:6 40:13
46:4 51:11 82:3

**involve** 7:14
11:6

**involved** 51:14
67:11

**involves** 11:3

**involving** 9:3

**issue** 77:23

**issued** 7:4

**items** 95:24
96:17

— — —

**J**

— — —

**Jack** 25:4
26:11

**Jill** 24:17 38:10

**job** 20:12 82:12

**jobs** 4:24

**joint** 53:12

**Judge** 3:2,3,5,
13,18 5:19,21
6:3,12 7:10
9:22 17:4 24:3,
7 35:22 42:24
43:6,8,11,17,19
44:11,15 45:2,
5,9,20 46:1,7,
12,15,18,20
47:15,21,24
48:3,9,17,19,24
49:2,5,10,14,
17,21,25 50:5,
7,11,13,16,21
58:2,6,11,13,
16,19,21 59:3,
8,15,22,25
60:7,14,19
61:1,11,13,16
62:7 63:4,16,22
64:1,3,6,9,13,
16 66:1,13,14,
17,22 69:10
70:3,7,13,20
71:6,18 72:7,
11,17,21 73:1
75:19 76:15,19,
25 77:4,19
79:25 80:7
85:7,8,9 87:24,
25 88:5,10,12,
21,24 89:7,18,
21 91:21 92:7,
14,19,23 93:3,
7,9,11,18,20
94:1,3,7,11,20,
22 97:18,20
98:6,17,20,22,
24 99:2,5,16
100:5,8,11,13,
16

**judgement**
40:8

— — —

**K**

— — —

**keen** 30:11

**Kentucky**
8:15,21,22
12:14 13:19
22:8 51:5 67:3

**kerosene** 28:5,
6,10

**key** 86:10

**kibbles** 28:22

**kick** 47:4

**kind** 4:6,15,18
11:19 20:13
38:11,14 39:10
41:7 53:12

**kitchen** 70:11,
12 74:8 79:14
80:17,18 84:6

**knew** 93:15
99:4

**Knowing**
52:11

**knowledge**
15:19 16:21
19:20 21:20
22:9,14 65:19
79:3 95:10
99:23 100:1

**KSP** 21:16

**KSP41** 85:20

— — —

**L**

— — —

**lab** 16:22 17:7
23:3,8,11,19,21
27:19,21 29:20
30:4,8,11
37:18,20 54:4
57:17 82:17
91:8

**labeled** 76:3
78:14

**laboratory**
15:20 21:17
22:13 27:17

33:14 90:7,10

**lack** 32:2

**law** 4:4,7 99:11

**lay** 27:10

**laying** 80:1
93:21

**lead** 21:1

**learning** 5:13
7:21

**leave** 15:11
19:16 72:9
75:22

**lectures** 7:16

**led** 89:8

**left** 22:12 23:7
41:23 75:22

**lengthy** 42:1
55:5

**lets** 18:21

**letting** 54:5

**lighter** 28:5
34:10,12

**likelihood**
37:12

**limb** 16:5

**limit** 4:14

**line-up** 9:15

**lined** 75:13
81:4

**linens** 75:5
77:13 78:18,23

**liquid** 28:1,2,
14,25 33:16
47:2,9

**liquids** 27:9

**list** 95:24,25

**litmus** 90:12

**living** 69:21
70:14 73:7 76:7

**loc** 60:24

**local** 21:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

locate 22:20
49:13,17

located 35:8

location 34:16
46:1 65:10 70:9
73:3,5 74:19
80:15,20,22
86:13,14 87:11

locations
15:21 16:23
53:20 58:9 59:7
60:25 62:15,20
71:12,22 75:2
79:1,3,5,7
80:12 81:15,25
96:25 97:22

Logan 3:3 5:25
13:19

long 4:4 7:2,13
10:10 18:10

longer 47:14

longest 41:1

loose 48:4

lot 22:22,24
41:3 75:21

low 73:11

lumber 32:18

**M**

made 16:7
25:18 43:14
54:16 65:2
81:22 88:14
99:12

mail 96:10

make 14:12,17
16:2,3,12 21:3
28:4,7 29:21
38:13 39:17
40:10,16 51:25
59:3 65:13,15,
20 70:4,5 72:9
90:10 91:7
97:4,8,10

makes 44:19

making 46:13

49:23 61:6
90:15 91:12,21,
22

manual 33:3,5,
6,8,11

manufactured
21:14

map 59:6,8,16
60:22 62:24
88:25

March 5:24
6:12

mark 5:25
42:24 68:25
69:11 70:20
72:19 73:3,12
74:10,11,18
77:11 78:4,22

marked 43:1,2,
3 59:14 70:22,
23 72:25 73:4,
14 74:3,12,13,
20 76:13,18
77:2,12,18,25
79:2 80:2 86:3,
6,8 88:3,4
92:21,24 93:1

marker 15:12

marking 46:5

marshal 24:24
31:1 51:3

marshal's
15:7 67:9

Marshall's
13:19

marshals
21:18

Maryland 13:7

match 73:5
94:21 96:9,14

matching
71:21

material 24:15
32:21 71:4

materials 28:4

matter 5:17

meaning 32:18
38:20

means 56:8
60:15,19 63:18
87:16,22

meant 34:7
86:12

meet 24:22,25

melt 73:10

member 6:19

memory 39:10,
14 43:15

mention 49:22
85:25

mentioned
34:4 46:20

mentioning
49:22

met 25:25 42:8

metal 21:2

meters 16:2

methodology
82:25 83:8 90:6

methods 19:18
20:6

meticulous
82:11

mickey 75:4

microliter 18:2

microliters
18:3

microphone
51:1

Midwest 12:13

million 17:23,
25

mind 78:23

minerals 28:10

minute 23:18
24:14 35:15,23
37:19 49:8,20
68:21 69:10
76:6 94:17

100:13

minutes 81:18

miscommunic
ation 61:3

missed 21:8

missing 94:3

mistake 86:17

mobile 25:25

mode 20:13

moist 32:20

Monday 48:11,
12

monthly 9:5
10:4

months 23:21

morning 55:2
68:12 79:17,21,
23 95:13

mouse 75:4

move 29:4
42:20 44:1
45:1,3 49:12

moves 47:12

multiple 81:2

multiple-page
9:8

**N**

named 6:25

nation 7:24

National 6:20
7:25 13:6

nature 9:16
11:19 14:20
28:11 32:20

Nebraska
12:15

necessarily
34:21 38:23

negative 15:20
16:12,23 29:17
37:16 44:24

45:4,10,11 47:6
57:20 92:1,4,5

newer 11:21

Nicholas 70:1

Nick 74:14

night 41:23

nitpick 64:19

nonchalant
45:17

normal 36:2,8,
10

north 11:25
12:14 76:7

northern 8:22

nose 17:14
29:5 31:22
44:2,3,14

noses 30:11

note 38:24

notes 35:17
38:13,17 80:16

noticed 8:2

notified 79:20

notify 48:19

number 45:25
53:19 69:5 70:1
72:22,24 73:12,
13,18,22 74:4,
10,11,12,18,19,
25 75:7 76:17,
25 77:11,17,24,
25 78:1,4,5,6,8,
15,22 82:1
84:22 85:2,4
86:4,5 93:9,11,
12,22,23 96:12
98:1

numbers 46:2
69:3,7 96:5,9,
14,16

numerous
4:12 15:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| O | oftenly 22:19 | Overruled | person 62:5 | 56:12,21 57:2 |
|---|---|---|---|---|
| | Ohio 8:23 | 17:4 | 91:8 97:16 99:2 | 67:14 70:10 |
| oath 94:22,23 | 12:14 | | person's | 82:2 95:6 99:25 |
| 95:3 | operator 50:9 | **P** | 27:10 | PJ's 29:8 |
| object 17:1 | opinion 29:8 | pack 11:24 | personal | placard 85:2 |
| | 100:3 | | 16:24 95:10 | place 26:21,22 |
| obligated 95:3 | opposed 4:19 | padding 14:16 | personally | 41:3 64:1,4 |
| observation | 39:10 99:16 | paint 21:2,11, | 10:1 68:5 72:4 | places 4:25 |
| 58:23 89:6 | option 71:19 | 12,13,15,16 | phone 11:24 | 14:25 15:1 |
| observations | | 34:14 36:24 | | 26:10 59:25 |
| 60:8 | Orange 3:5,10, | 37:4,6 | phonetic 4:2 | 63:23 64:20,22, |
| | 24 6:1,11,13 | paper 90:12 | 5:25 9:14 62:17 | 23,24 87:17 |
| observe 98:7 | 24:1 33:5 35:22 | | 89:12 | 98:10,13 99:18 |
| observed | 36:1 38:5 39:5 | papers 94:8 | photograph | plain 76:9 |
| 25:19 54:8 | 41:15 42:20 | part 19:17 | 15:11 76:5 80:1 | |
| 97:23 | 43:4 48:2,7,8 | 20:15 23:7 | photographed | plan 48:16 |
| | 49:7,13,20 | 33:19 55:16 | 54:16 67:21 | plate 37:4 |
| occasion | 50:6,8,12,14,23 | 62:3 73:22 | photographin | point 15:2 29:5 |
| 13:18 | 54:22 57:24 | 87:17 | g 46:5 | 30:3,4 32:4 |
| occasionally | 62:9 63:14 | part- 19:13 | | 33:11 44:1,2,14 |
| 89:13 | 64:20 66:16,24 | | photographs | 55:23 56:16,19 |
| occasions | 69:9,13,18 | participation | 46:9,16 67:24 | 64:25 67:8 71:4 |
| 13:12 15:22 | 70:5,8,24 71:8, | 13:15 | 68:5 | 76:23 82:18 |
| | 10 72:20,24 | parts 17:23,25 | photos 88:9 | 83:12 89:9 |
| occur 33:13 | 73:2 75:24 | | | 90:4,21 99:10 |
| | 76:13,17,20 | past 4:24 11:10 | physical 89:5 | |
| occurred | 77:3,5,11,17,22 | 20:3 | | pointed 15:5 |
| 79:19 | 78:13,22,25 | pathologist | pick 17:6 30:12 | pointing 21:9 |
| odor 6:7 23:23 | 79:4 80:8 | 90:14 | 37:20 69:24 | |
| 27:6,14,19 | 81:10,13 83:25 | | 90:13 | points 26:4 |
| 28:20 33:22 | 85:5,12 88:1,6 | pattern 73:10 | picked 28:20 | 55:12 65:5 |
| 43:21 44:5,9 | 89:22 91:20,23 | patterns 25:19 | | 71:11 74:8,17 |
| 45:16 | 92:2,5,12,17,21 | 55:11 70:16,17 | picks 23:17 | 84:25 92:10 |
| | 93:19,22 94:8 | | picture 76:21 | |
| odors 27:2,3 | 95:1 96:21 | penalties 3:14 | 77:6,13 | police 4:11,15, |
| office 4:15,24 | 97:19 99:22 | 50:17 66:19 | | 19 15:7 21:17 |
| 5:2,9 13:19 | 100:4,10 | percent 8:20, | pictures 68:10, | 22:8,11 30:20 |
| 15:7 67:9 | order 14:24 | 21 29:12 37:22 | 11,18 71:12 | 53:13 54:19 |
| | 41:2 93:15 | 47:20 | 72:6,14 73:5 | 57:17 67:4 96:7 |
| officer 4:19 | | | 76:1 79:12 | polyurethane |
| 24:11,21 32:8 | origin 16:10 | percentage | pines 32:16 | 71:4 |
| 35:20 38:10 | 25:21 26:4 | 47:18 | | |
| 41:12 55:1,2 | 33:16 34:21 | | PJ 6:7,16,17,25 | poor 62:17 |
| 56:12,25 57:2, | 55:13 64:25 | perfect 39:21 | 7:2,10,11,24 | position 4:23, |
| 13,23 81:13 | 65:5 | perfectly | 8:8,25 9:3 | 25 28:19 67:2 |
| 96:24 97:1 | origins 25:21 | 27:22 | 15:14 16:17 | |
| officer's 81:16 | outs 11:8,18 | perform 99:24 | 18:8 19:5,6 | positive 18:5 |
| | | | 21:21 22:1 | 23:3,11 29:9,12 |
| officers 30:21 | overhaul | perjury 3:14 | 25:7,24 26:4,8, | 31:3 38:22,25 |
| 31:12 41:17 | 89:17 | 50:18 66:19 | 22 27:1 28:12 | possession |
| 81:17 83:19 | | | 30:22 31:6 | 54:4 |
| officials 15:6 | overheard | perpetrator | 33:21 44:24 | |
| 79:8 | 51:22 | 16:9 41:23 | 45:11 51:15 | possibility |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

23:4

**possibly** 7:22
26:6 55:13 60:3
65:9,12 91:7

**pouring** 25:9

**practice** 22:16
40:13,17 81:3

**praxamatic**
89:12

**predisposition**
40:7

**preliminary**
25:20

**prepare** 39:11
71:21 84:17

**prepared** 53:2
72:4

**presence**
33:15

**present** 23:2
51:14 67:14,17
79:9 95:6

**presented**
14:24

**pretty** 21:6
25:14 26:24
45:7 52:7 55:4
73:25 83:4

**previous**
52:10

**previously**
64:24 65:3

**principles**
19:17 20:5

**prior** 25:6
30:21 40:9,15
56:11 79:15
81:16,17,22
82:4 83:23

**priority** 23:20

**problem** 91:18
99:14

**procedure**
36:3,8,10 39:13

**proceed** 75:23

**proceeded**
80:18

**process** 80:25

**produce** 17:8

**produced** 33:7

**product** 21:15
29:5 44:14 87:3

**products** 9:18
32:9,10 35:6

**professional**
4:6,18 17:19
19:4 22:14
37:9,24

**profile** 23:19

**program** 19:2

**promote** 27:8

**proper** 21:3
83:2

**provide** 10:25

**provided** 8:24
9:2 33:5

**pull** 15:12 51:1

**pulled** 57:6,18
66:2,6 85:24,25
86:3

**pun** 91:21

**purpose** 64:10
88:6 94:24

**purposes**
33:16 92:25

**put** 10:2 18:6
20:10 21:6
25:13 29:21,22
32:15,24 36:24
37:4 38:18
73:16 74:2,18,
25 78:3 91:10

**putting** 78:23

**pyrolysis** 32:9

---

**Q**

**quantity** 33:22

---

**question** 4:17
9:1 14:20 29:10
32:4 55:18,22
56:15 60:14
63:4 83:8 87:15
89:22

**questioning**
83:7

**questions**
3:19,21 24:20
35:16,23 38:6
43:4,6,9 47:24
48:3 54:22
57:24 61:16
62:10 63:14
65:6,8,9 88:1
92:16 96:21
97:18,19 100:4

---

**R**

---

**raining** 25:9

**raise** 50:16

**rate** 37:22

**ration** 18:20
19:1

**re-**
**certifications**
7:14

**re-training**
6:16,17

**re-trainings**
7:13

**reached** 90:11

**reaching** 90:6

**read** 37:21 62:2

**reading** 16:2

**ready** 75:23

**real** 45:14 76:8,
9

**realize** 50:3
94:15

**realizing** 44:24

**reason** 30:8
40:25 48:24
78:18 98:24

**reasonable**
37:24

**reasons** 23:10

**recall** 15:5,8
17:23 20:19,23
24:23 25:8
26:20 39:1
46:11 52:17,25
53:19 54:5,14,
18 55:1,6 57:12
58:2 59:11
65:17,21 84:10
93:19

**receive** 12:24
40:6,11

**received** 40:9
72:8,11

**recognition**
6:8 45:15

**recognizes**
44:4,9

**recollect** 31:9
55:21

**recollection**
56:10 66:7

**record** 16:7
21:10 38:11,14
39:4 50:4 59:3
61:13 65:22,24
66:2,9,11 75:18
88:14 91:16
92:2 97:5,8,10
99:13

**recorded** 60:8
91:3,9,10

**recording** 3:21
100:19

**records** 10:2
43:12 60:20
76:1

**RECROSS**
38:8 64:17
96:22

**REDIRECT**
35:25 62:8
94:25

**reference**
63:19

**referring** 65:25
96:4

**reflect** 72:1

**region** 12:13

**Regional**
12:25 13:9

**regions** 12:12

**reidentificatio**
**n** 95:7

**relate** 46:1

**related** 33:24
34:21

**relates** 40:7

**reliability**
56:15

**reliable** 19:17

**relied** 43:16
61:24

**relinquished**
68:9

**rely** 39:10,14
40:4 62:1

**remain** 10:20,
23

**remember**
13:22 26:19
31:7 36:13
80:16 84:4,5,11
91:4 92:11

**remind** 94:23

**renew** 10:16

**repeat** 4:17 9:1

**report** 8:25 9:2,
21 39:11 79:20

**represent**
24:18 86:11

**reputation**
29:23

**request** 56:6

**required** 10:3

**residence**
15:16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Response**
7:25

**restricted** 19:2

**restroom**
100:14

**result** 18:4,7
23:3,11 28:3
32:23 90:10,11
91:9,10,15,16

**results** 15:21
16:12,22 17:6
18:5 23:24
56:18,22 57:17
91:2,3

**retrieve** 21:19

**return** 40:2

**revolutions**
47:13

**reward** 20:14
44:5

**Robert** 3:8

**role** 27:22

**room** 55:14
69:21 70:15,18
73:7 75:22 76:7
77:8

**round** 58:8,15
79:10,12 95:21
97:3

**routine** 22:4

**Royal** 5:12

**rule** 20:25 56:4
90:1

**run** 7:23 21:4,8
60:6

**rundown** 14:9
25:14,16

**Russellville**
13:21,22 20:5
24:22 51:8

_____
**S**
_____

**safe** 14:17 39:3
64:15

**safety** 40:18
52:1

**sake** 80:9

**sample** 15:25
17:8 36:5,6,7,8
37:7,19 53:22
54:10 59:13
60:2,5,24 64:2,
11 68:22,23
69:20,25 73:4
74:21 75:1,15
77:8,21 80:15,
17 81:5,8,14
86:3,14

**samples** 15:13
20:18,22,24,25
21:7,22 22:7,8
29:16,19 30:5
31:3 36:21,23,
24,25 37:3,5,
11,16 46:5,6
47:6 53:7,10,
15,16,20,24
57:6,18 59:7,
21,22,25 60:13
62:21,22,25
63:6,9,10,17,
20,23 64:12,21
65:24 66:2,6
69:19 72:2
75:2,14 76:1,12
79:6 80:13,14,
22,23,24 81:3,
7,15,20,24
85:23,24 86:12
87:18,20 91:24
92:3 95:17,22,
24 96:1,18
97:23 98:4,16

**sat** 25:11

**saves** 22:24

**saving** 22:22

**sawed** 53:18

**scene** 7:5
13:20 14:7,10,
17 15:6,11
18:16,25 20:12
22:4 24:21 25:7
38:22 39:2
43:11,13 45:21
51:7,12,15,22,
25 68:12 82:7,

13 84:7,9 89:16

**scenes** 5:7 8:7,
11,19

**scent** 43:22

**school** 7:8
11:17

**schools** 13:17
19:9

**scientific**
32:13

**Scott** 4:2,23

**seal** 42:16

**sealing** 70:2

**search** 42:15

**seat** 50:21
66:22

**seize** 50:14

**seminar** 13:1,
10

**send** 10:4
13:14 30:5
48:20 75:6

**sending** 22:25

**senior** 51:3

**September**
14:2 24:22

**service** 4:9
5:1,3,8 19:12

**set** 12:12 48:10

**sets** 86:10,15

**setting** 5:6

**share** 68:4,7,
17

**shared** 51:21,
23

**sharing** 23:12

**she'll** 20:14
29:4,7 44:13,20
45:1,14,18

**sheet** 38:17
75:4,8

**sheets** 75:4

78:19 86:7 87:3

**shelf** 23:20

**sheriff's** 4:3,
15,23 5:2,9

**shoes** 60:4

**short** 41:25

**shot** 47:19
77:14 79:13

**shovel** 62:11
73:21 76:5,9
78:2

**shoving** 82:16

**show** 9:22
28:23 29:3
32:13 43:25
44:13 69:23
72:6 73:18
74:3,12 76:3,21
77:24 90:3,5

**showed** 95:21

**showing** 62:24

**shows** 5:19
37:10

**sic** 22:19

**sign** 16:17

**signals** 28:17,
18

**signed** 5:24

**significant**
87:15

**simple** 10:25

**sir** 3:4 12:3,5,9
19:15,21 43:10
46:10 48:8 49:3
51:4,6,10,13,17
52:11 53:9,14,
23 54:1,7,17
58:8,18,25
59:5,24 60:4,11
62:19 63:12
64:5 67:20
69:17 71:23
72:3,5 76:2,23
77:3 78:16
93:2,10 95:5,8
96:2,8,20 99:15

100:8

**sister's** 90:14

**sit** 23:20 28:19
29:7 39:15
43:22 44:1,13
88:19

**site** 15:15
54:14 62:17
99:17

**siter** 62:17

**sites** 15:15
37:11,13,14
52:9 53:7
62:21,25 95:10,
14,19 99:19

**sits** 44:9 45:6

**sitting** 54:12
70:11 79:13

**small** 33:22
73:16

**smaller** 18:13

**smell** 15:19
36:25 54:6

**smelling** 22:15

**sniff** 5:5

**sniffing** 5:14
17:3 22:19

**something's**
40:24

**sort** 40:6 59:3
86:10

**sorts** 35:6

**sound** 37:23

**South** 12:14

**speak** 91:8

**speaking** 76:6

**special** 14:15
17:20

**specialists**
30:20

**specific** 8:16
16:20 56:2

**specifically**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

12:7 42:22
84:12 91:4
92:11

spent 7:7

spot 58:4 99:7

spots 15:2
66:6

spread 24:6

stairs 9:24

standard
40:13,14,17
81:3

standing 3:5

standpoint
88:14

start 47:4,8,9
82:16

started 41:5,7
42:10 49:22

starting 5:6
47:1

state 3:25 5:8
13:18 15:6,7
21:17,18 22:8,
11 24:24 31:1
50:24 51:3
53:13 54:19
57:17 66:25
67:3,9 96:7

stated 25:8
29:14 36:13
37:19 45:23
81:13,15

statement
27:15

statements
3:19

states 12:2,7,
10,12 22:16
33:12

step 3:20 24:3
66:17 93:4
100:8

stepped 49:8

stepping
42:13,14

stipulations
10:14

store 21:12

street 17:17

strongly 64:14

structure 41:9
52:4 73:8 75:13
84:4

studies 32:13

study 37:21

stuff 24:5 41:3
87:5 94:14

styrene 47:2,4,
7,8,9,10,11,14

styrene-- 47:2

Styrofoam
71:3

Styrofoam-ing
71:3

subject 12:1

subjective
44:16

subjectivity
90:12,14,15

subpoena
48:15,20

subsequent
67:18

substance
27:20 28:4
32:19

substances
27:2,5,18

successfully
5:23 6:7

suit 3:11

summary 8:25
9:2,21

supposed
57:16

surroundings
41:7

suspicions

42:9

swear 3:14
20:21 50:17
66:18

sweet 41:25

swore 41:23

symbol 87:13

symbolizes
87:19

symbols 87:8

system 44:6

_____

T

_____

tag 76:8

tail 45:15

takes 23:18

taking 22:24
40:15 54:5

talk 4:10 28:16
39:15 40:12
41:16

talked 25:11
30:21 44:17
50:1

talking 9:21,23
21:10 26:16
84:22 86:19
94:12

tape 50:2

tapes 75:19,20,
21

task 91:5

taught 17:10
20:6

taxpayers
11:1

Team 7:25

technician
29:20 30:8
37:18

techniques
7:17,21

telephone
3:11

telling 15:14
18:6 30:15 44:9
58:22 89:23

tells 3:10 40:23
61:24

ten 78:3

ten-minute
100:17

terms 27:11

test 6:9 15:20
23:24 89:11
90:8 91:2,10,15
99:7,17

tested 23:9

tester 89:13

testified 55:4
67:16 81:23
83:20 96:24

testify 48:7
90:23 92:8
97:4,6 99:9,13

testifying 34:5
55:6

testimony
3:11,15,21
19:3,17 29:12
50:18 51:18
55:10 66:19
86:1 91:24
92:13

testing 6:8
57:17

tests 90:8

thing 14:8,10
40:1 49:21
86:23 89:10
99:6

things 7:20
11:19 28:4,10
32:20,22,25
34:15,18 35:8
39:25 61:2 89:9
92:21

thinking 46:17

thinners 34:14

thought 63:23
65:11 82:19
86:2 87:12

thumb 56:4

time 5:3 10:22
19:14 22:12,22,
24 23:18 35:20
38:12 39:11,15
44:3 52:16,23
53:6 57:14,25
58:10,17 59:1
67:15 72:10
81:1 83:9,14,
18,23 84:4
91:12,14,19
97:1,5,9,10,11,
12,13

times 4:13
11:14 17:5,14
18:4 45:22
79:16 84:1

Tobacco 6:5

today 19:3
48:5 71:24

told 16:25
25:14 31:25
42:18 51:24
55:17 56:1 58:3
61:9 63:17,22
83:25 88:15,16,
22 91:3,25 92:9
96:19 97:11,24
98:23 99:6

Toledo 12:18

tool 22:21,23
62:11,14 83:21
89:24 90:3

tools 89:5

top 23:20 59:12
75:20

trace 23:18

traffic 4:12

trailer 13:20
54:13 94:7

train 18:11

trained 5:4,5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

DAUBERT HEARING

114

9:6,11 18:1
27:1,3,6,7
29:15 33:1
39:13 40:10
61:21 90:17,20
91:8 97:14 99:2

trainer 6:24

training 4:6,18
5:10,16,22 6:5
7:6,8 8:3,4,24
9:2,4,18,20
10:5 13:5 15:18
16:20 17:19,21,
22 18:15,22,24
19:4,5,8,9 20:2,
7,16 33:19
35:14 40:6,7,14
42:23 62:3,4

trainings 8:5

travel 8:17

traveled 8:18

traveling 7:20

trawling 53:16

Treasury 6:4

treated 32:17,
18

trial 48:10,13,
14,21

true 27:20
32:10 34:22
36:22 81:22

trust 29:15
37:15

trusting 45:12

truth 3:16
30:16 50:19
66:20 95:4

truthful 17:11

Tuesday
48:12,13

turn 48:4 74:6

turned 16:8
22:7 29:23
70:18

turns 4:25
90:13

two-cup 18:20

two-page 9:9

Tyler 3:2

type 7:8 9:6
15:12 20:11
28:13 31:21
32:21 71:4
90:16

typical 39:9,12

— U —

Uh-huh 19:11

unconfirmed
33:15

unconnected
33:23

understand
26:18 30:17
35:12 39:23
50:16 59:15
60:14 64:16
83:7 88:12
89:23,25 90:18
91:23 95:2

understanding
29:10 79:15
81:24 83:24
92:12

understood
88:13 97:21

undertaking
25:6

unit 19:18

United 12:2,7,
12 22:16

unusual 21:25
56:6

upper 59:12
64:7

usage 51:25

utilize 11:14

utilized 8:1
11:18

utmost 40:19

— V —

vague 26:17

valid 10:24

vapor 33:22

vast 99:3

vehicles 9:13

venture 53:12

verify 16:13

versus 18:6

vicinity 74:8
89:2

video 50:1,3,9
53:2

videotape 3:22
46:11,12 49:24
91:14

view 71:16

Virginia 5:13

visibly 73:9

Visual 82:2

— W —

wagging 45:14

walk 14:11
45:8 52:7 56:25
57:1,2 67:17,
18,20 96:25
97:9 98:1

walked 38:24
57:11 59:2
67:15 68:13
97:1

wall 70:15,19
73:21,25 74:15
76:7,11 80:19

walls 9:15,24

wanted 49:22
55:24 56:16,17
75:5 77:14

wanting 72:17,
18 89:25

watch 50:3
52:6 63:8

watched 58:20
63:9

watching
95:20

water 32:19

weak 40:22,24

wear 14:15

week 7:22
18:14

weeks 5:13,16
7:7

weight 19:2

West 25:3
26:12 30:19
43:18 53:11
54:3 57:14
62:22 66:16
67:1 96:14

West's 96:5

western 8:21

wheel 9:23

wheels 9:14

whereabouts
34:24 35:1

wind 28:25

window 41:19
42:16

windows
70:15

wipes 60:5

withhold 39:8

witnesses
100:10

wood 87:3

word 31:20
32:2 43:19
82:10

worded 60:24

words 16:4
18:5 27:5 38:13
47:16 64:19

work 4:15 5:1,2
8:13 14:24
18:16,21 19:13
40:12 41:8,20
44:6 50:10 53:3
64:24 91:14

worked 4:21
18:19 22:2 39:6
67:8

worker 90:7

working 9:13
18:16 20:13
47:8,10

works 46:24

world 22:17

worse 63:21

worth 11:7

writing 76:8

written 38:14

wrong 74:4

— Y —

year 6:10 8:6,9
11:4,9,10,11,14
13:20,23 14:2
15:24 18:15

year's 11:7

years 4:5,8,21,
24 8:10 10:16,
19 19:10,12,24
20:3 26:16 67:5

Yell 3:8 15:16
16:18 20:4,18,
19 21:21,25
24:18 36:11
42:3 51:8 67:12

you-all 26:20
30:18,19 49:6,
11,23 55:4,11
57:8,11 80:5

— Z —

Zach's 74:14

Zack 70:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com