LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

**CASE NO. 04 CR 00232**

# COMMONWEALTH OF KENTUCKY

V.

# ROBERT YELL

## CRIMINAL TRIAL

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273
www.kentuckianareporters.com

LOGAN CIRCUIT COURT

JUDGE TYLER GILL

CASE NO. 04 CR 00232

COMMONWEALTH OF KENTUCKY,

PLAINTIFF

V.

ROBERT YELL,

DEFENDANT

CRIMINAL TRIAL

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL

2

INDEX

| | Page |
|---|---|
| Alan Gregory: | |
| DIRECT EXAMINATION BY MR. ORANGE | 4 |
| CROSS EXAMINATION BY MS. GIORDANO | 38 |
| REDIRECT EXAMINATION BY MR. ORANGE | 56 |
| RECROSS EXAMINATION BY MS. GIORDANO | 57 |
| Deputy Buster Cannon: | |
| DIRECT EXAMINATION BY MR. ORANGE | 72 |
| CROSS EXAMINATION BY MS. GIORDANO | 78 |
| REDIRECT EXAMINATION BY MR. ORANGE | 82 |
| Deputy Buster Cannon: | |
| DIRECT EXAMINATION BY MR. ORANGE | 91 |
| CROSS EXAMINATION BY MS. GIORDANO | 115 |
| REDIRECT EXAMINATION BY MR. ORANGE | 139 |
| FURTHER DIRECT EXAMINATION BY MR. ORANGE | 163 |
| RECROSS EXAMINATION BY MS. GIORDANO | 164 |
| FURTHER DIRECT EXAMINATION BY MR. ORANGE | 166 |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL

3

INDEX (CONTINUED)

David West:

DIRECT EXAMINATION BY MR. ORANGE 167

CROSS EXAMINATION BY MS. GIORDANO 227

REDIRECT EXAMINATION BY MR. ORANGE 260

RECROSS EXAMINATION BY MS. GIORDANO 262

FURTHER DIRECT EXAMINATION BY MR. ORANGE 277

FURTHER CROSS EXAMINATION BY MS. GIORDANO 282

FURTHER DIRECT EXAMINATION BY MR. ORANGE 286

Kenneth Edmonds:

DIRECT EXAMINATION BY MR. ORANGE 289

CROSS EXAMINATION BY MR. WELLS 291

Ed Higgins:

DIRECT EXAMINATION BY MR. ORANGE 301

CROSS EXAMINATION BY MS. GIORDANO 301

RECROSS EXAMINATION BY MS. GIORDANO 302

FURTHER CROSS EXAMINATION BY MS. GIORDANO 306

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL

4

JUDGE GILL: All right. Just come right on through here. I want to ask you to raise your right hand. Do you swear or affirm under penalties of perjury that the testimony you are about to give is the truth?

THE WITNESS: Yes, sir.

JUDGE GILL: Just have a seat, please.

DIRECT EXAMINATION

BY MR. ORANGE:

**Q State your name, please.**

A Alan Gregory.

**Q And who's your employer?**

A I work for the Office of the Kentucky State Fire Marshal.

**Q How long have you worked for the state fire marshals?**

A 12 years.

**Q And what are your job responsibilities?**

A I am the western area supervisor for the office out of the hazardous materials section.

**Q And how many people do you have working under you?**

A Four.

**Q And who do you currently report to?**

A Mr. Jack Flowers

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Q And he's the?**

A The -- at this time, he's the acting Kentucky State Fire Marshal.

**Q And back in September 2004, who was -- who did you report to?**

A Mr. Flowers and he was the assistant state fire marshal at that time.

**Q And what kind of professional training do you have to do your job?**

A I have completed arson one, arson two. I've worked additional areas with the national response team. Additionally, I have completed seminars yearly in Cincinnati with the Cincinnati Arson seminars that are yearly there, along with the one in Somerset. This year, in conjunction with the National Fire Marshals Association, I completed the Juvenile Fire Setters Program.

**Q Earlier, I heard you say you completed arson one and arson two -- can you explain what arson one and arson two is?**

A That is a -- the course description for courses that are given through the Kentucky Firefighters Association in conjunction with the Kentucky State Fire School.

**Q And where are these courses held at?**

A Lexington.

**Q And in your job responsibilities, what geographic area are your normally responsible for?**

A Say again, sir?

**Q What geographic area of Kentucky are you normally responsible for overseeing --**

A I have from eight counties, north of I-65 through the Paducah area and down to Hickman County to the Tennessee state line.

**Q So basically, from E-town area to the Mississippi state -- Mississippi River?**

A Yes, sir.

**Q And now, these responsibilities includes -- include fires and what else?**

A Right now, I'm a senior official on fires, but now the hazardous material side of the house, the overall responsibilities for all (Inaudible) storage and transportation of any hazardous materials inside the State of Kentucky.

**Q And if a pipeline blows up, who's responsible for that?**

A I have to either go or send one of my guys to it, too.

**Q So that -- that's included in your job responsibilities to oversee; things like that?**

CRIMINAL TRIAL

7

A Yes, sir.

**Q And where do you live at?**

A I live in Lewisburg.

**Q So Logan County's home for you?**

A Yes, sir.

**Q And back in September 11th of 2004, Saturday afternoon or evening, did you receive a call?**

A Yes, sir. I received a call from Assistant State Fire Marshal, Mr. Corbin Hudson (phonetic).

**Q And what was the nature of that call?**

A At the time, Mr. Hudson advised me of a fire involving a trailer in Russellville.

**Q And what -- where were you at when you received the call?**

A I was in Bowling Green.

**Q And what did you do at that point?**

A After leaving Bowling Green, I had to come onto Russellville anyway to be able to get home. I stopped at the scene, found out for sure the particulars. Then, I traveled onto Lewisburg, got my equipment in my car, and came back to Russellville.

**Q And the first time you were there at -- there at on Bonnie Drive, what did you observe?**

A At that time, the firefighters were still in the process of what they call overhaul. I was able to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

talk to the chief. He informed me of one fatality for sure and another serious injury.

**Q So was the fire out?**

A For most practical purposes, the fire was out. The fire department was still in the process of overhauling.

**Q And when you arrived back from Lewis -- Bowling -- approximately what time were you there the first time?**

A Probably around 9:30.

**Q And the second time, approximately when did you arrive back?**

A It was 10:00 or so, by the time I got the groceries put up.

**Q And can you tell us what you observed and what you did the second time you came back?**

A Second time I came back, I met with the fire chief and some fire -- firefighters to, kind of, get follow up on what I had started originally. They informed me of the locations of where these individuals were found or removed from. I was able, at that time, to talk to -- no, sir. At that time, I -- I wasn't ab -- the police department were -- the one guy was left on scene. The actual officers were away from the scene at that time and I initially started on the interior work

because the fire department already had lights set up.

**Q And did you proceed with an investigation?**

A Yes, sir.

**Q Can you tell us what you did?**

A The fire chief gave me two individuals, but just prior to this, I had made a walk around of the outside. Even though it was dark, it was pretty well illuminated in front and illuminated on the sides, and determined that the fire had not really vented through the top at all. This was verified later on by the fire department and basically was able to confirm that the fire had vented through the windows at some point. After that, with the two firefighters that the chief had assigned to me to help me, we made entry into the -- what's called the -- the living room area.

**Q Would it help you if I gave you a document here to work from?**

A Yes, sir.

**Q And does this accurately and fairly depict the trailer -- schematic of it?**

A Yes, sir.

**Q Okay. And go ahead and tell the jury what you did?**

A The living room area had been involved in fire. This was apparent, not only from being able to

look at the interior of it, but the scene where it had vented out of the -- what's deplicted [sic] here as the two front -- two front windows. While standing in the -- in the living room area, you were able to detect that fire had involved the area next to the kitchen -- or called the kitchen and an area in this bedroom. Again, this was confirmed by talking to firefighters on the scene that verified that when they made initial entry, they had fire over here, and fire was heavy coming out of here, rolling over them.

**Q And after you identified where fire was on the scene and you was in the house, what did you do?**

A At that point, after evaluating these different areas and on close examination of trying to separate these areas, I deplec -- detected a low burn in this kitchen area. And with the fire coming out of this bedroom, tried to find a place or a reason for fire to be in there, and detected a low burn in this area here (indicating).

**Q Now, what do you mean by "Low burn"?**

A These are areas that where the fire actually burnt down -- I say, i.e., a reason, most instances fire loads, fire burns up. Fire burns straight up, forms a heat layer, but it only burning -- it's only burning the actual products that are right there, i.e., a trash can

-- trash can sitting in a configuration next to a wall or something, even a plastic trash can. It'll consume the contents of that trash can. Most often, the bottom of that trash can will still be there. In this area here (indicating), it actually burnt all the way through the flooring in the house. This area (indicating) confused me a whole lot because again, looking in this room, there's a lot of fire in this room. But going back again, it loaded down and burnt through -- all the way through a hole here (indicating), which this was a fire. At that point, I had a real problem because I could not connect this fire (indicating) with this fire in the bedroom. Even looking at the -- the paneling and, of course, this was a mobile home, early '70s model, and the -- I guess the fire community, unfortunately, is probably why mobile homes got a bad name. The materials that these things are made of originally in the 1970s were very, very low-grade comp -- to compare with today's standards. Even with the high velocity of the materials that this trailer was made out of, I could not get this fire into this bedroom. Then, coming back to here (indicating), this fire here (indicating), or this area of concern here, I could not put it into this bedroom. Continuing on, I get back in after doing more evaluations, looking at the

paneling down through here (indicating), showing me that the fire stayed high.

**Q What do you mean by "High"?**

A The paneling itself in a room -- this paneling here was only curled from the top next to the ceiling line probably down a foot -- maybe two foot, something similar to that. Few places maybe a little bit lower, but it was not totally consumed. The surface area of the ceiling, being a 1970s vintage trailer, the actual ceiling in there -- and the firefighters did pull a lot of that ceiling -- this ceiling in there, in my terminology, is wrong, but to make it in common language, it is a pace (phonetic) board-type ceiling. It's a layment (phonetic) material with a -- what I call a pace board core with another type of layment material over it. Over the years, heat, sunshine, natural wear and tear, it becomes pretty -- pretty volatile.

**Q Now, I think my question was, was what's a "High" -- you're talking about there being -- burning along that living room wall. And my question was about the high -- being a "High fire"? Can you go ahead and tell us about what you observed in the living area?**

A In the living room area, going back again, you know, the fire coming out here (indicating) where it vented -- and that's where it naturally seeks oxygen out

this door or through the windows. You know, it showed that the fire rolled, stayed high, come across here (indicated), and then, loaded down and at some point, for some reason, ignited this. But the fire stayed high, ignited this (indicating) before it consumed the rest of the paneling all the way down the walls.

JUDGE GILL: I didn't see what he pointed at when he said, "This"? Would you describe it --

A Oh, going back again to basically referring to furnishings and things like that. First echelon, I think the fire stayed high for a long time until it rolled down and ignited those (indicating) first after it rolled down from the ceiling.

**Q And did you find anything interesting in the -- I'm going to call it the back bedroom there where there's a bed?**

A Yes, sir. This -- this bed here (indicating) was -- was really -- really took a load. There was a bed. It was located in this area over here (indicating). Adjacent to that bed on this wall here (indicating), which would be, I guess, the south -- there was patterns along this wall here (indicating), consistent with what we call V-patterns. It was located between this bed and this area here (indicating) and marked 34 and that was -- turned out to be a sample

location.

**Q And when you said that bed, it is -- I face it on the -- the one that's drawn in that room, was loaded -- what do you mean by "Loaded"?**

A That's where it's conducive and going back again to where the heat flume goes up, it appears that it filled this room up, come down, and loaded back down onto this bed and it being the closest combustibles, consumed that bed.

**Q And now, did you inspect the rest of the trailer?**

A Yes, sir. Going back again, coming back to these areas and efforts trying to link this together, the fire, as it traveled just past to here (indicating) -- the fire never really went much past where the shovel is going to the north. We had heat loads that traveled up through here. The fire damage itself pretty well ceased right along here (indicating). From that point, we came back in. After identifying these three points, started some -- some light debris removal and possible reconstruction. And again, trying to link all of these together, while on our hands and knees in this area here (indicating), there was -- we run up on something that -- that had a slight odor. I can't really describe the odor, but it was a -- it was an odor that was detected

by myself and the firefighter that was with --

**Q Just talk about what you observed now -- don't talk about other people.**

A Right. Some type of odor. At that point, combining that with what I was seeing and I was not able to con -- again, I was not able to connect these fires. Going back and looking, I could not find anything that would have naturally caused these fires in those areas. And looking at the potential of loss of life and a second -- maybe a second, that was when I contacted Mr. Flowers.

**Q Did you find anything that caused you to believe that this was an act of God -- that lightning had hit the building, or anything of that nature?**

A No, sir.

**Q And did you find anything that lead you to believe this was -- this fire was electrical in origin?**

A No, sir.

**Q And did you find any evidence that it started from the cook stove?**

A No, sir.

**Q Now, can you describe -- describe the condition in the bedroom? I think there's been some -- do you know which bedroom the little boy, C., was found in?**

CRIMINAL TRIAL

16

A The boy was found in this bedroom over here.

**Q Okay. Can you describe the condition of the bedroom when you first observed it?**

A The bedroom -- when I first observed the bedroom, showed very, very little, if any, direct flame damage. We had some breakthrough -- just slight breakthrough in a top corner from the living room area in at the top. We had heavy smoke and discolorization (phonetic) on the inside, but as far as direct flame impingement damage, didn't find any.

**Q And I believe there's a bathroom and a master bedroom there labeled?**

A Yes, sir.

**Q Did you find anything in significance in either one of those?**

A Smoke and heat.

**Q No. Was there any fire damage in either of those?**

A Not particularly.

**Q And coming back there, it looks like there's a label up there, "East room," is it? I'm having a little trouble reading it.**

A Yes, sir.

**Q Was there anything of significance in that room that you found?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A There was a sliding glass door back here (indicating) that was broke. Fire had -- in the about center ways in the very top here (indicating), fire had tried to enter at the ceiling area of this room (indicating) into this room (indicating). The kitchen fire, at one point, had tried to vent through a closed door right here (indicating).

**Q And did you -- while you were in this -- examining the scene, were you able to locate the remnants of a -- what appeared to be a baby bed?**

A Yes, sir.

**Q And where was that located at?**

A It was located just about where the drawing is here (indicating).

**Q And were you able to locate a couch in the home?**

A Yes, sir. The couch is sitting just about in the middle of the room right here (indicating).

**Q And were there any other chairs or articles in that -- towards -- been labeled "Living room"?**

A There was two additional chairs that sit and a table that sit against this wall right here (indicating) where this window is.

**Q And was there any dining room furniture in the house?**

A The dining room furniture was located just about in this alleyway that cuts into what's marked the kitchen here (indicating). It actually kind of lines up with this door. This is somewhere close though.

**Q Now, did -- at some point, did you decide you needed some assistance in this investigation?**

A Yes, sir. That's when I called Mr. Flowers.

**Q And where did you -- or how did you contact Mr. Flowers?**

A By phone.

**Q And do you know where Mr. Flowers normally lives?**

A Yes, sir.

**Q And where is that?**

A In Louisville.

**Q And did Mr. Flowers arrive at some point?**

A Yes, sir. During that time frame, the same time I was notifying Mr. Flowers, being in the dominance (phonetic) of the assistant state fire marshal is automatically contacted at the same time anytime there's a fatality.

**Q And we heard a fireman yesterday talk about the bald-headed man showing up during the night -- can you help us who that might have been?**

A Yes, sir. That'd be Mr. Flowers.

**Q And when Mr. Flowers arrived, what kind of -- what -- did you tell him anything?**

A Basically, that's -- here it is. I -- I need you to take a look at it.

**Q And did you observe Mr. Flowers do anything?**

A Mr. Flowers made a walk around the outside and then Mr. Flowers made entry.

**Q Did you follow him in?**

A No, sir. I sat out front on the car.

**Q So whatever Mr. Flowers did in there, you just -- he did on his own?**

A Yes, sir.

**Q And at some point, did you and Mr. Flowers make the decision that you-all needed this additional assistance in the way of law enforcement?**

A Yes, sir. When Mr. Flowers got through inside, he came back outside, concurred with me that we had at least three separate fires.

**Q And what does -- does this decision that you-all made?**

A At that point, we wanted to cross index our findings and we made arrangements to contact Mr. Buster Cannon.

**Q Okay. And who is Buster Cannon?**

A Mr. Cannon is with the -- at the time, was

with the Scott County Fire Department and the Scott County Sheriff's Office, which -- he is the handler that's assigned to a K-9.

**Q And did you, in fact, make contact with Mr. Cannon?**

A Yes, sir.

**Q And did Mr. Cannon arrive on the scene?**

A Mr. Cannon arrived about 8:00-something the next morning.

**Q Okay. And was the scene secured during the night?**

A Yes, sir.

**Q Did you remain there or did you leave?**

A I left. Mr. Flowers maintained the scene.

**Q And without going into any detail, can you tell us what the general purpose of having Mr. Cannon that -- was for being there?**

A Mr. Cannon was to verify our findings -- with our -- our findings plus with our equipment.

**Q And did he bring with him a K-9?**

A Yes. He did.

**Q Okay. And after Mr. Cannon and his K-9 completed their investigation, what did you do next?**

A Well, Mr. Cannon's K-9 was in there. That was when I had contacted Detective West and his people. They

KENTUCKIANA
COURT REPORTERS

arrived while Mr. Cannon was inside, I do believe -- as I recall.

**Q And Mr. Cannon came back outside with his dog; is that correct?**

A Yes, sir.

**Q And what did you observe Mr. West do at that point?**

A At that point, Mr. Cannon advised us all of his first initial findings.

**Q Did Mr. West ever go inside and examine the scene?**

A Yes, sir.

**Q And when did he do that?**

A After Mr. Cannon was done with it, ever -- put the dog through for the first -- if I'm not wrong, I would say the first time or the second time.

**Q And after Mr. West made his examination, did you-all confer again?**

A Yes, sir.

**Q And was there a determination made to pull some samples?**

A Yes, sir.

**Q And do you know the locations where those samples were pulled?**

A Yes, sir. Samples were pulled --

**Q Were you there personally when they were pulled?**

A Yes, sir.

**Q And did you assist in pulling them?**

A Yes, sir.

**Q And where were they pulled from?**

A Samples were pulled in this area marked 36, 35, 34, 31 -- 33, 31, an area of 32, and what we had was a control sample of 40.

**Q And what do you mean by "Control sample"?**

A this is a sample that we all determined to be free of any kind of problem at all. It was not involved in fire. It was past the doorway just a little bit, so it would not be affected by anybody coming in and out, with anything else on the bottom of the feet. It should be about as clean a carpet sample from foreign debris, as we could find anywhere.

**Q Okay.**

A Additionally, I missed this one -- this was 47. Detective West canned a sheet in that area.

**Q And we already had somebody in here talking about these cans sitting in front of you -- can you tell us what procedure you went through to collect these samples?**

A Yes, sir. The samples that we collected on

the inside of the residence --

**Q Did you go down to the local paint store and get some paint cans to start out with?**

A No, sir. These cans are specialized cans that are determined to meet the specifications of the lab. These cans are assigned to the Kentucky State Police and they're pure when they get them and they have to maintain them in that condition.

**Q Okay. And was there any effort made to avoid any cross contamination between your samples that you took?**

A Yes, sir. Even to the point that the equipment that I used had -- on the Friday beforehand, had just been cleaned and reloaded into the car, all the way down to my clothes. As you can see in some of the photographs, we all gloved up during the handling of these samples. The equipment that we used to take these samples were -- we used clean tubes every time and these tubes were washed in between sampling by Mr. Flowers.

**Q And by washing them, what -- what do you do, get a -- how do you wash them?**

A We wash these with pure water and a -- and a bleach-type solution.

**Q And as far as the gloves, put a set of gloves on when you went on the scene, and take them off when**

you come out?

A No, sir. We gloved at each individual site.

**Q And can you tell us the purpose of that?**

A To avoid cross contamination.

**Q And when the samples were finished being taken, who took possession of them?**

A Detective West took possession of the samples.

**Q And now, who-all participated in collection of the samples?**

A Detective West, myself, and Mr. Flowers -- I think the fire department assisted us with a reciprocating saw, along with Mr. Cannon.

**Q And did you-all take any wood samples anywhere?**

A Yes, sir. We sawed off a corner of this bed over here (indicating), and took a base sample against this side over here (indicating), and took a wood sample off this hole here (indicating).

**Q And why did you take those there by the kitchen -- why did you take that wood sample?**

A This wood sample here (indicating) went along with complete burn that we had at that location -- the hole that I described to start with, where we first had a question and --

**Q And I believe you said you took a couple**

**samples in that back room where you took some wood?**

A Yes, sir. Here (indicating) and over here (indicating).

**Q And why did you take those wood samples?**

A This one here (indicating) was taken at the bottom of the wall V-pattern. This one was taken where it appeared that something may have been over here (indicating).

**Q And while you're holding your pointer there, is there anything that you observed to be unusual between those -- the bed that's depicted there and the other bed that you've talked about across the room from it?**

A Yes, sir. There is a pattern -- some type of distinctive pattern in kind of a semi-U shape, in this area right here (indicating).

**Q And did you notice any patterns on the carpeting, anywhere else in the building?**

A Yes, sir. We deplicted [sic] -- after the arrival of Mr. Cannon, in this area here (indicating) coming across certain patterns on this carpet here (indicating).

**Q And that's basically in front of the couch?**

A Yes, sir.

**Q Now, you've been back to the scene since the**

day of the fire -- or the day after the fire; is that correct?

A Yes, sir.

Q And as it concerns the floor there and in the kitchen, is there any difference today and the day it -- when you completed your examination and took that wood sample?

A Yes, sir. In this area here (indicating), where the initial hole is, part of this subflooring that's in this area is still sitting there. This is adjacent piece of the subflooring and the next joint over, that's gone. It had been raised up during firefighting efforts, but there's one whole piece there, just guessing, maybe 3.5x4, is gone.

Q Okay. And is there any carpet missing that was there the day you did your examination?

A Yes, sir. While we were trying to pla -- where we put these signs at for this area, one of the samples that we had taken right here (indicating), Detective West -- his index card that gives us the distances off these walls --

Q I just want you to testify from your observation, not what somebody else did.

A Yes, sir. The -- this piece of carpet gone right here (indicating) that we verified through

remeasurement of the distance of the carpet.

**Q And how big a piece of carpet's gone there? Do you know how big that piece of carpet is, approximately, that's gone?**

A A fairly large sized piece

**Q And do you have any knowledge -- any personal knowledge at all of why, where, or how this piece of flooring or this piece of carpet is now not there?**

A No, sir.

**Q Now, at some point, did you assist in the retrieval of an item from the backyard or the adjoining yard?**

A Yes, sir.

**Q And can you tell us about that?**

A On up in the day, Sunday, between the Kentucky State Police, Officer Ed -- or Detective Edmonds, they had gained information that, through the neighbors next door --

MS. GIORDANO: Judge, I'm going to object to the hearsay.

JUDGE GILL: Okay. Counsel, step up just a second.

(BENCH CONFERENCE)

MS. GIORDANO: I think he just needs to say he looked -- went to look for the lighter and he found

it rather than --

JUDGE GILL: Okay. When -- I thought he was going to say was that he was -- he was going to gain -- gain information from the neighbor next door, that something had fallen out of Mr. Yell's pocket. Do you know what he's going to say?

MR. ORANGE: I think so. I think that's correct.

JUDGE GILL: You think that's correct? Well --

MS. GIORDANO: Well --

JUDGE GILL: If that's the case, it's -- it's not an important statement, not intended to prove that she him -- something fall out of his pocket, but just to show why she -- why he looked there.

MR. ORANGE: Uh-huh.

JUDGE GILL: So I'm going to overrule the objection.

MS. GIORDANO: Judge, if I could just ask that if he say rather than plural, he say, "A neighbor" because there perhaps was another neighbor that may or may not going to testify -- that she's not available to testify, so I don't want him to give the impression that --

JUDGE GILL: Another neighbor may have done

what now?

MS. GIORDANO: Have observed this lighter.

JUDGE GILL: Well, did another neighbor observe?

MS. GIORDANO: And that neighbor's not going to testify.

JUDGE GILL: Oh.

MS. GIORDANO: So just -- if he just says, "A neighbor," that would be -- because that's --

JUDGE GILL: Okay.

MS. GIORDANO: -- already in evidence.

JUDGE GILL: Try to -- you can lead him. I'll let you lead him to say --

MS. GIORDANO: That's fine.

JUDGE GILL: -- he gained information that there might have been a lighter out there or something falling out of his pocket.

MS. GIORDANO: That's fine.

JUDGE GILL: Okay. Why don't you just lead him?

MR. ORANGE: Okay.

(BENCH CONFERENCE ENDS)

BY MR. ORANGE:

**Q During the course of your investigation, did you have reason to -- or gain information that allowed**

you to go examine the yard next door?

A Yes.

Q And did you, in fact, do that?

A Yes. I did.

Q And did anyone go with you?

A Yes.

Q And who went with you to examine the yard next door?

A Detective West and Detect -- Detective Edmonds, for sure.

Q And I'm going to show you a picture here, and can you identify this picture?

A Yes, sir.

Q And what is that picture?

A That is me pointing to a lighter that was found on the ground.

Q And who's in that picture with you?

A Detective Edmonds.

Q And does that picture accurately and fairly depict, you pointing toward the ground where you found the lighter?

A Yes, sir.

Q Now, I'm going to show you another picture and see if you can identify this picture.

A Yes, sir.

PageID #: 2048
CRIMINAL TRIAL
31

Q And what is that?
A That's a closeup of the lighter.
Q And does this picture air -- accurately and fairly depict, the lighter you found?
A Yes, sir.
Q And just so the jury will be crystal clear, do you recall whose home this is in the back here? Or if you don't recall the person's name --
A It was a --
Q -- can you show us in adjacent to the Yell home --
A It was a --
Q -- where it was at?
A It was a Black lady, that lived in this residence right here.
Q So it was somewhat behind this residence, but not exactly?
A Yes, sir. Just, kind of, offset at the back of this house, behind the red plank fence.
Q And I want to ask that these be marked, submitted into evidence as composite exhibit.

(DEFENDANT'S EXHIBIT 13 A ADMITTED INTO EVIDENCE)

(DEFENDANT'S EXHIBIT 13 B ADMITTED INTO EVIDENCE)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL

32

JUDGE GILL: Okay. Next number and then, A and B?

MR. ORANGE: Yes. That'll be fine.

JUDGE GILL: We'll mark it as admitted then.

BY MR. ORANGE:

**Q And laying here to your left is something that's been marked Commonwealth's Exhibit 13 and 13A -- can you look at that and identify that?**

A Yes, sir. This appears to be the lighter.

**Q And is that the same lighter that is depicted in this exhibit, which is 34 A?**

A Yes. It is.

**Q And after you found this lighter, can you tell us what you did with it?**

A At that point, between Detective Edmonds and Detective West, it was labeled and taken into evidence.

**Q And it was given to Detective who?**

A Detective West ended up in control of it.

**Q Okay. Now, I have in here a handful of pictures -- have you previously had the opportunity to look at these and examine --**

A Yes, sir. Some of them.

**Q -- them? And can you tell us, do these pictures -- take a -- just take a minute and thumb through them, make sure we haven't put something in it**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL
33

by mistake. Do all the pictures that you have there in your hand, do they fairly and accurately depict the scene at 638 Bonnie Drive that you investigated --

A Yes. It is.

Q -- the result of the fire was September the 11, 2004? And these pictures, were they -- do they apparently be taken close sequence to time A, the next day after the fire?

A Yes, sir. By looking at the pictures, the date is wrong. I think we run into that problem on our cameras.

Q Okay. So should disregard the date?

A Right.

Q Which says what -- 6 --

A 6-28-98.

Q That's incorrect? Could you take each one of these pictures individually -- and if you want to get up and walk around in front of the jury, that'd be fine. Or if you want to show them where you're at --

A Probably, stand up, but --

Q And we probably could set up a table if you want to show them close.

A (Inaudible).

UNIDENTIFIED SPEAKER: How about using the easel?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

UNIDENTIFIED SPEAKER: They said they can see -- they said they can see.

MR. ORANGE: Let's walk up here and we'll -- could just give this easel and let you use it. We may have to make to bunches out of them. There you go.

A This is a -- this is a view of the trailer from the rear, showing the -- and outstretched -- what's noted in -- in my report as the stick addition. This is not -- this area here (indicating) is just an added area with 2x4 site construction added onto the side of the manufactured home. This one here (indicating), the plex -- the end was basically on the drawing showing the north end of the home. This area here shows going into the front door. The front door was offset with a set of stair steps coming down, as she would go up to it from the driveway, with Bonnie Drive being along here (indicating). This would basically be the -- what we commonly call the south end, showing the sliding glass doors that were referred to. That's actually, in this one, listed as the east bedroom and again a little bit more of a view from the rear -

BY MR. ORANGE:

**Q If I could, in the interest of time, could I take these and have them marked for identification**

**purposes that he's just -**

(DEFENDANT'S EXHIBIT 14 ADMITTED INTO EVIDENCE)

JUDGE GILL: All right.

**Q -- went through.**

JUDGE GILL: Go right ahead.

A This is a view from inside the living area -- the living room area looking through the kitchen, showing the intensity of the down burn and what we call the area 36. This is a view looking from the center of the living room towards the back windows. The questionable area behind the table and chair right under this window in 33, 31.

JUDGE GILL: (coughs) Excuse me.

A Same area, just a little different view from it -- a view from the upper end of this hallway looking back, a view from inside the living room looking in to this bedroom area. The bed is left, which is marked 35 in that bedroom. This is a view from the upper end of this hallway from about right along here to this doorway, looking back towards the living area, showing the extent of flame damage just about where it quit. And a view from the living area looking back down that hallway, showing basically the same thing from a different angle.

JUDGE GILL: And you may be seated.

MR. ORANGE: I'd also like to have these marked as part of our continuing exhibit and could I have this (inaudible)? Just a minute, Your Honor.

JUDGE GILL: Okay.

MR. ORANGE: And have we got all the pictures marked yet? Your Honor, I'm not sure whether I made a motion or not, but I move introduction of all the composite Exhibit 35 and I will composite Exhibit 34 into evidence.

(DEFENDANT'S EXHIBIT 34 ADMITTED INTO EVIDENCE)

(DEFENDANT'S EXHIBIT 35 ADMITTED INTO EVIDENCE)

JUDGE GILL: All right. We'll mark those as admitted into evidence.

BY MR ORANGE:

**Q And Mr. Gregory, after having examined this fire scene and using your professional -- by the way, how many fires have you investigated?**

A Something over 200.

**Q And you have training to investigate fires?**

A Yes, sir.

**Q Based on your professional training, your professional knowledge, your experience, were you able**

CRIMINAL TRIAL
37

**to conclude what type of fire this was?**

A I could not make this to be an accidental fire of any kind, by nature of having, what I considered initially three separate fires, and with nothing there to show anything in the way of an accidental fire. I found this to be an intentionally set fire.

**Q And just using your pictures, if you need to take a minute, can you thumb back though those and show the jury why you came to that conclusion by your pictures? If you could, refer to the pictures by the number that we now have on them.**

A What's noted is 35L shows the kitchen area. That's what we looked that a while ago. The hole in this floor right here (indicating), I could find nothing that would make this hole in the floor. Going back again, trash can, a fuel load of some kind that could have been sitting there, and nothing that I considered to be able to -- to make a fire at that location. There's a contributing factor there, being the HVAC system, but yet, that didn't start the fire. 35J and K shows the area behind 33 and 31 between this ca -- the two chairs and that little table that is right under the window. You'll be able to see in a different photograph that, not in this series, actual rug line and looking back again, you could tell a little bit about it in this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

photograph here (indicating), to where the fire almost patterns to a V, back down to this area here (indicating). As you notice this right here, this is a hole that goes and penetrates the wall of this trailer, but it actually depleted on the outside of this one here that's marked 35E. This hole here (indicating) matches up with this hole here (indicating) and normally, there's nothing there to produce that type of heat load, unless something's been added there to give that combustible capabilities of that much fuel load there and melted through the side of that house.

MR. ORANGE: You may cross.

MS. GIORDANO: Thank you.

CROSS EXAMINATION

BY MS. GIORDANO:

**Q Good afternoon, Mr. Gregory. I understood that -- what did you tell me your exact title is?**

A I'm the western area supervisor for the hazardous material section of the Fire Marshal's Office.

**Q So do you more specifically deal with hazardous material -- is that your primary area of concentration?**

A I inherit that, plus fire investigations.

**Q Okay. So you do both?**

A Yes, ma'am.

Q Is there any particular educational or certification requirements for being a fire marshal in Kentucky?

A That's on-the-job description. Before they put you out, you have to meet the criteria of your senior supervisor.

Q You -- they give you training, I guess -- they give you training themselves --

A Right.

Q -- "They," being the state?

A Right.

Q But --

A Plus you --

Q You don't have to hold any particular certification or anything prior to going to work for them, I guess is my question?

A You either have to have past experience or a college degree.

Q Okay. What was your -- what was the purpose of you being called to that fire -- or to the scene of that fire on September the 11th?

A Investigate the cause and origin of that fire.

Q Okay. Cause and origin? That's your -- that's what you were there for?

A Right.

PageID #: 2057
CRIMINAL TRIAL
40

Q Okay. And if I understand it correctly, there are basically -- once you classify a fire, there are four basic classifications of fire -- accidental, undetermined, incendiary, and -- what did I leave out?

A Natural.

Q Natural. Do you agree that that's the classification system that you use when you're doing an investigation?

A We try to work off those guidelines.

Q Okay. And to get -- you've testified -- in response to Mr. Orange, you testified -- I might be putting the cart before the horse here, but I think this is important what you said. You testified, "I could not make a finding that this fire was accidental."

A Right.

Q But aren't there certain criteria that have to be met, or set in threshold that has to be met, before you make a finding that a fire is intentional?

A If you go back to -- going back again to 921 that you're looking at, you'll see that the last entry in that chapter will talk about elimination and that's what I based this on.

Q Let's clarify for the jury -- you're talking about something they don't know what you're talking about -- what -- when you refer to 921, what do you mean

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**by that?**

A That is a guide that is used in fire investigations.

**Q Is it -- would you call it an authoritative text? And what I mean by that, pretty much everyone who's involved in fire investigation uses this text as an authority?**

A They use it as authority. We use it as -- as a base guide and a tool. It -- it's -- it's not, per se --

**Q Not the bible.**

A -- a bible in the State of Kentucky, no.

**Q But you do use it as a guideline.**

A Right.

**Q And what you're --**

A And --

**Q -- telling me is that in accordance with that text, you can use elimination? And I think what you mean by that is, if you can't -- if it's not this, if it's not this, if it's not this, if it's not this, then I can make a finding it's this.**

A It leaves the latitude to the investigator.

**Q So are you saying by the process of elimination, you determined it was an intentionally set fire, as opposed to saying it's going to have to meet**

PageID #: 2059
CRIMINAL TRIAL
42

**these steps -- several criteria before I make that determination -- you used the process of elimination?**

A Going back again, three areas of concern -- in those three item -- areas of concern, no electrical devices I determined to pose a threat, no extension cords, nothing of an open flame nature that would normally be there to create that situation.

**Q So again, you, kind, of went through an elimination process and that's how you arrived at your conclusion?**

A That portion of it.

**Q Okay. You were the principal investigator from the Fire Marshal's Office -- is that correct, of this particular fire? And you arrived at the scene at say -- I think your report says about 20:45 and then, you went back -- I think you said you left, got your equipment, and went back; is that correct?**

A Yes.

**Q When you arrived at the scene, who was in charge prior to your arrival?**

A The city fire chief, at that time.

**Q Okay. Is it a fair statement to say you took over supervision of the fire scene from the fire chief?**

A No. The fire chief maintains --

**Q Okay.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A -- control of that fire scene.

**Q So you did not assume his position? He continued to maintain the fire scene even while you were there working?**

A Right.

**Q All right. Do you work at his direction, or he at yours, or you-all just do separate things?**

A It's kind of a joint.

**Q Okay. All right. Do you have any knowledge as to what was done before your arrived? I know you were told certain things, but as far as preservation of the fire scene, any measures taken to avoid contaminating the fire scene? Do you have any knowledge of what was done prior to your arrival?**

A Nothing other -- other than fire suppression, overhaul, and maintaining the scene, and getting lights set up.

**Q But as far as -- I think someone testified earlier what overhaul was, but as far as someone monitoring who was in and out of there, whether or not they were there -- you referred to some techniques earlier, their feet were clean, or things of that nature -- as far as you know, no one was in charge of that?**

A Not that I know of.

**Q Okay. Now, you had filed a report and I think**

PageID #: 2061
CRIMINAL TRIAL
44

the name of that report is the "Fire investigative report produced by the State Fire Marshal's Office," and I assume you have a copy of it there?

A Yes.

Q I could not find a date on that report -- do you have any idea what the date of that report is?

A I will have to agree with you.

Q I couldn't find a date and I'm -- do you know -- if you don't know, that's all right?

A It's -- it will be a -- an educated -- and this is going to be thoroughly speculation, it will be within a ten-day window.

Q Okay. That was going to be my next question -- not knowing the exact date, when do you normally generate your reports and you say within about ten days?

A It'll be -- it'll be -- it'll be within probably, a ten-day window.

Q Okay. So that's your best guess on when that report was generated?

A Yes. It is.

Q Okay. You referred in that report -- in the narrative portion of that report, to an odor and you referred to it in your testimony. You talked about, I think, it was under the window area back there -- I think that's where you said you detected an odor -- can

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PageID #: 2062
CRIMINAL TRIAL
45

you describe what that odor was?

A I really can't.

Q Okay. It was just noticeable to you?

A It was a noticeable odor.

Q All right. That's the best you can do? I understand. You just don't have any idea -- in your experience investigating fires, it was not an odor you had come across before -- is that a fair statement?

A I don't want to say I've never came across it before, but it was a noticeable odor.

Q Okay. So you can't, in your mind, I guess, tell me what substances might emit this odor, if you're not really sure what the odor was? All right. I also notice in your report that you stated, and let me find it here -- in the narrative, you state, "Could not determine how the fire traveled into each area of the residence," and I think you've testified to that as well; is that correct?

A Correct.

Q All right. And then, Section 33 of your report, if you'll refer to that -- found that? You state, "Area of origin, multiple. Point of origin, multiple. Heat source, undetermined at this time. First material ignited, undetermined at this time." Do you agree that that's what your report says?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A Yes.

**Q Now, "Undetermined at that time," has that been changed at any point since you originally did your investigation? Or are those still your findings under that report?**

A At my -- at this time, for me, it is -- it's still maintained as set in this report.

**Q Okay. So if you were writing that report today, that portion of it would not change. You would still say, in those categories, "Undetermined at this time," in, "First material ignited, undetermined at this time"?**

A From what I saw, at that time, it would be.

**Q And yet, you placed this fire in the incendiary category. Tell the ladies and gentlemen of the jury what that means -- what does an, "Incendiary fire," mean?**

A It means that it is a set fire.

**Q Okay.**

A Short and simple.

**Q Would you not agree that to determine that a fire is incendiary or intentionally set in nature, that you would at least need to determine the first material ignited and the heat source -- do you not find those necessary findings to come to that conclusion? There's**

CRIMINAL TRIAL
47

**still a lot of things you don't know about this fire today -- is that a fair statement?**

MR. ORANGE: (Inaudible).

**Q But you don't find those -- you don't believe those findings are necessary to come into the con -- to come to the conclusion that you came to, which is that it was an incendiary or ignited fire -- intentionally ignited fire?**

A My -- again, the first materials ignited, that encompasses a whole lot -- that we'll break down -- that would require a total breakdown of everything that was involved. Unless I had a concrete -- something set in concrete, i.e., some type of flammable liquid sitting there, I wouldn't know that that's what it was.

**Q Your role as a fire marshal is not a law enforcement role -- would you agree with that?**

A That's right.

**Q I think that's probably what you'll -- testimony was while you call in Mr. West?**

A That's Mr. West.

**Q You're strictly a cause and origin?**

A Right.

**Q Would you agree that the determination that a fire has been intentionally set requires some subjective decision on your part about someone's behavior? In**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

other words, when you say it's intentionally set, you're basically saying, I've made the deter -- the determination that someone intentionally, with the mind to do so, set that fire? I mean, there's a requirement that you're making some subjective decision about somebody else's actions -- is that a fair statement?

A I guess you could say that because I made a determination that these were unnatural fires and were set.

Q So are you willing to go so far as to -- okay, I think you just said it. So you're willing to go so far as to say, that someone set these fires?

A Yes.

Q Intentionally?

A Yes.

Q Okay. Now, I think you alluded to this a little bit, talked about mobile homes, the ones that were built in the early 1970s are not built to the same standards that they're built today; is that agreeable?

A That's correct.

Q Just a real easy way of putting it, they were whole lot more dangerous back then?

A That's right.

Q And through -- for a lot of reasons, the standards have been raised and those mobile homes now

CRIMINAL TRIAL
49

**have to be built to certain standards. A lot of which returned -- pertained to safety, and particularly, fire safety -- would you agree with that?**

A That's correct.

**Q As a part of your investigation, did you try to obtain a materials list of this particular mobile home, go back to the manufacturer at any time and try to obtain any information about this particular mobile home?**

A This was a Vindale, which are no longer in business, but I did consult with our manufactured housing section, which is assigned to the Fire Marshal's Office, and Chief Rucker (phonetic) forwarded that information out.

**Q Okay. So I think what you're telling me is, you got what information was available to you about that?**

A Right.

**Q Is that factor important in making the determination that you made? I.e., considering the age of the mobile home, the age of the materials in the home, those sorts of things -- did that have any bearing on your findings?**

A Yes.

**Q Okay. Specifically, what kind of bearing did**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

it have on it?

A It goes back, again, specifically, say to the patterns in the area of the kitchen marked 36, the way the fire spread in that area. Going back again, this -- we talked about in the living room that's related to some of the photographs, the way the fire traveled across the ceiling.

**Q Okay. So is it fair to say that even if there were fire-resistant components of furnishings, carpets, those sorts of things, that they can deteriorate over period of time?**

A Deteriorate, as far as?

**Q Well, if I buy a fire-resistant carpet --**

A Yes.

**Q -- today and put it in my house, 50 years from now, if that carpet's still in my house, it may not have the same resistances it did, when I bought it?**

A That's correct.

**Q Okay. All right. After -- and I -- let's think in terms of the carpeting that was in this house. After carpet or furniture become contaminated and over a period of time they're exposed to saturation, perhaps, from liquids, fluids, cleaners, things that are tracked in -- I mean, that would occur, you would agree, in a home of any age, but particularly a home or furnishings**

that may have been years old -- would you agree --

A Yes --

Q -- that that could happen? How do you differentiate between incendents (phonetic) such as those described above, which may result in contamination? As opposed to one that may have been within normal wear and tear and one that may have been just recently put down -- can you decipher between the two?

A In terms of contamination, or breakdown, or -- or what --

Q Well, I'm speaking of, for instance, if you have a couch or a piece of carpet that has been contaminated at some point with spillage and maybe there is, in that spillage, there are combustible materials -- how do you differentiate between that and between the combustible material that someone may say was just put there yesterday -- can you differentiate between the two?

A That would be for somebody else to answer other --

Q Okay.

A -- than me.

Q If you don't know, that's okay.

A I can tell you, it will -- each application of

PageID #: 2069
CRIMINAL TRIAL
52

a -- something red -- any time you put anything else other than it on it, reduces its (inaudible) --

**Q Say that again?**

A You put -- use something other than what's recommended, it would deplete the protection factor.

**Q Okay. But getting away from the issue of protection -- and that's probably my fault because I kind of led you from one to the other. If you -- if over a course of 20 or 25 years, various things were spilled on a carpet -- some of them may be no more than apple juice or grape juice. But some may be certain chemicals used in the kitchen or gasoline for whatever reason. And those saturate the carpet -- can you distinguish between that and an ignitable fluid that might have been put down the day before you examine something?**

A I'm not sure how long that residue would stay --

**Q Okay.**

A -- in that carpet.

**Q Okay.**

A It would be hard for me to answer because I'm not a chemist.

**Q And I think that's what you said, that you just didn't think you were qualified to answer that**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PageID #: 2070
CRIMINAL TRIAL
53

question, and I appreciate that. I want to change tracks just a minute and ask you about the lighter that you found.

MS. GIORDANO: May I approach, Your Honor?

JUDGE GILL: You may.

Q If I could hand you that?

A What's this?

Q I'll just let you hold it. Does that lighter appear to be in the same condition today -- relatively the same condition today, as it was the day you found it?

A As far as?

Q Anything. Is there anything it that's any different today, than when you found it in September?

A It may be a little darker in color.

Q Okay. The amount of lighter fluid that's in there, does that appear to be the same amount of lighter fluid that was in that lighter on the day that you found it?

A As I recall, somewhere close.

Q Okay. Would you agree that there's not much missing, that most of the lighter fluid is still in that container -- there's some missing, but not a lot?

A I suppose. I don't use that -- see through.

Q Well, how many inches is the container that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PageID #: 2071
CRIMINAL TRIAL
54

holds the fluid, approximately?

A Looks like close to three inches.

Q And when you hold that straight, how -- of the three inches, how much is --

A Maybe an inch gone out of it.

Q Okay. You found the lighter on Sunday, the 12th, is my understanding; is that correct?

A That's correct.

Q Did it rain that day or rain the night before?

A You know, I can't recall.

Q Okay. I don't think anyone's testified that it did, you just don't remember whether or not it rained on the night of the 11th or the day of the 12th? When you look at those photos, does it appear that it's -- and I'm -- again, I'm just asking -- does it appear that it's raining in any of those photos?

A The ones that I looked at, I can't tell.

Q Okay.

MS. GIORDANO: Just a minute, Your Honor.

Q Okay. I want to go back to my -- revisit my previous question about the determination of origin and cause of the fire. And, again, in your original testimony, you said, "I could not make a finding that it was accidental." And when I asked you about it again, you stated, "By the process of elimination, I found it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL
55

**to be intentional." Have you ever determined what the cause -- what the ignition point of that fire was?**

A The -- the actual cause of ignition?

**Q Yes.**

A No.

**Q Have you ever determined what the heat sourc -- heat source for that fire was?**

A That, again, would be no.

**Q Okay. And do you not agree that when you don't know those factors and when the intent of the person's action cannot be determined or proven to accept -- an acceptable level of certainty, that a fire should be found to be undetermined cause?**

A What again now?

**Q When you don't know the intent of the person's action, you don't know the heat source, you don't know the ignition source, do you not agree that the fire -- the cause of the fire would be undetermined -- based on the criteria that you operate under?**

A That -- the criteria itself, based on one's -- no.

**Q Okay. You think you --**

JUDGE GILL: I didn't understand. He said, "Based on," what?

A You said, one's in -- one's individual?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PageID #: 2073
CRIMINAL TRIAL
56

Q Let me just restate it. You made a finding that it was a fire intentionally set, which infers you mean someone had that intent when they set the fire, to set a fire?

A Right.

Q When the intent of the person's action cannot be determined and when you don't know these other factors that you've testified to you don't know, isn't it true that the appropriate determination of the origin and cause of the fire is undetermined?

A In my opinion, no.

Q Okay.

MS. GIORDANO: That's all I have. Thank you, Mr. Gregory.

JUDGE GILL: What -- any redirect?

MR. ORANGE: Just a minute, Your Honor.

REDIRECT EXAMINATION

BY MR. ORANGE:

Q If one looks at the kitchen floor, Mr. Gregory --

A Say again?

Q If one looks at the kitchen floor --

A Yes.

Q -- kitchen area, what does appear to be the first material that was ignited in there?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PageID #: 2074
CRIMINAL TRIAL
57

A Something that was in that particular area of that hole, probably some type of flammable, but something that was there -- something that was unnatural to be there.

MR. ORANGE: Okay. That's all the questions I have.

JUDGE GILL: Okay. Any other cross?

MS. GIORDANO: I have one, Your Honor.

RECROSS EXAMINATION

BY MS. GIORDANO:

**Q Mr. Gregory, I don't know if we're -- you're in those photos, or if there's a photo that shows the kitchen, but I'm sure you recall that on the stove, there was a pan that had been burned through. I think that was actually been referred to by someone -- a burned through pan?**

A Yes. It was.

**Q Actually, burned through the -- would you call it the coil?**

A Aluminum -- the bottom of the aluminum -- small aluminum frying pan --

**Q Yes.**

A -- of some kind.

**Q Did you determine what was in that pan or did you look to determine what was in that pan, if there was**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

PageID #: 2075
CRIMINAL TRIAL
58

**any drip through of that pan?**

A I didn't determine anything was in the pan.

**Q Are you saying you didn't -- you just didn't look to determine or you did look and you were unable to determine?**

A I --

**Q I'm not trying to put words in your mouth, I'm just trying to --**

A I didn't determine anything was in the pan originally.

**Q Okay. Is that as far as your investigation went regarding the pan, and the stove, and the burn through?**

A I looked at that pan, I looked at everything else around it, and I could not contribute that to the area that I was looking at.

**Q Did you consider grease spillage out of that pan?**

A Right.

**Q And?**

A I couldn't get grease spillage out of that fan -- pa -- pan, correct, going -- getting away from that burner, going across the top of the stove, and ended up that distance over to that hole.

UNIDENTIFIED SPEAKER: Unless it was --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL
59

**Q What if someone spilled it?**
A As in pouring it out?
**Q Well, or just spilled it -- just grabbed the pan, and it was hot, and dropped it. I mean, is that possible, whether it was a child or anyone -- is that possible?**
A I don't think so. In my opinion, no.
**Q Why?**
A It just didn't fit with what I was saw -- seeing.
**Q Okay.**

MS. GIORDANO: Okay. That's all I have. Thank you.

JUDGE GILL: All right.

MR. ORANGE: No further questions.

JUDGE GILL: All right. Any members of the jury have any questions? I do have a question. Counsel approach, please.

(BENCH CONFERENCE)

MS. GIORDANO: I don't think he's going to say it didn't matter.

JUDGE GILL: Okay. Okay. Here's the question. What do you mean by "Fuel load"? I wondered that. I think I know what he means -- I can define that.

MS. GIORDANO: Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JUDGE GILL: "Did you find spalling? If so, where and what is that a sign of? What is significant about the V-pattern you mentioned? What was the composition of the bedroom? What was the," compos -- "Composition of the bedroom was next to the east room? Was it constructed of drywall? If so, how is that different than a burning trailer paneling?"

MS. GIORDANO: Okay.

JUDGE GILL: "During your investigation, did you find any evidence of flashover? What rooms, if any flashed over?"

MS. GIORDANO: Okay (inaudible)

JUDGE GILL: Anything wrong with those?

MS. GIORDANO: No, sir.

JUDGE GILL: Okay. "Did you order the fire area samples? Did you order the testing of Mr. Yell's clothing, shoes, and hands? If so, at what time and based on what evidence?" I'm not sure I want to go there.

MS. GIORDANO: Uh-uh.

JUDGE GILL: I'm not even sure if it matters who ordered it. I'm thinking no on these --

MS. GIORDANO: Yeah.

JUDGE GILL: -- so far. "Did you consider

April as a suspect?" I'm not sure --

MS. GIORDANO: That he could answer that? I mean, that's fine with me if you ask him.

JUDGE GILL: No. I -- I'm thinking he hasn't named Yell as a suspect --

MS. GIORDANO: No.

JUDGE GILL: -- and so, I don't think -- "If you did not order the clothing (inaudible) -- I can't even read the question. "If you did not order the clothing of Yell, do you know who did and what time?" Okay.

MS. GIORDANO: Okay.

JUDGE GILL: "At approximately what time did you call in Mr. West?" I'll tell you what my opinion is, is --

MS. GIORDANO: Just ask that way?

JUDGE GILL: -- I might ask that last one --

MS. GIORDANO: That's fine.

(BENCH CONFERENCE ENDS)

JUDGE GILL: -- forget the rest. Okay. Right. You've talked about a fuel load -- could you ex -- define that for the jury?

THE WITNESS: A "fuel load" is -- is in the event of a fire, and it is a -- a legitimate statement that I ask because, unfortunately, we run

KENTUCKIANA
COURT REPORTERS

off and leave a lot of people. A fuel load is a -- like combustibles -- newspapers, articles of clothing, anything that is rapidly -- or anything that -- that really easily, like kindling, that burns and would normally -- a pile of kindling stacked up against a wall, I think most of you can theoretically see how it will burn a lot quicker and more intense, than what a hole chunk laying there would be.

JUDGE GILL: Okay. And the next question is, "Did you find any spalling? We've heard some testimony about spalling."

THE WITNESS: Spalling? Not really because that's a deceiving thing. Years ago, spalling was a very big thing. In recent years, everything is -- went away from spalling due to the fact that they have realized that concrete, rock, similar things get hot with fire. And any time that you throw cold water on them, they have a tendency to pop and unfortunately or fortunately, most fire application water is not preheated and so, you see a lot of concrete pops.

JUDGE GILL: Okay. So I think the next part of that question is, "Do you assign these to any significance to spalling?"

THE WITNESS: In this application, no, and in very few because even in automotive-type garages, you will see this, but guess what they do.

JUDGE GILL: I'm sorry?

THE WITNESS: In automotive garages --

JUDGE GILL: Uh-huh.

THE WITNESS: -- where you've got loads of combustibles and various other things where it burns hot, you're going to have it there just the same as you would a brand-new pair -- a piece of cement that has been subjected to fire most -- in most -- most instances.

JUDGE GILL: "What is significant about the V-pattern that you mentioned?"

THE WITNESS: V-patterns, going back again, with a -- and I'm probably the worst in the world for having to look at things or -- or show somebody.

JUDGE GILL: You want to draw something? Here you go.

THE WITNESS: This -- this is very crude. This being a -- a room with a wall. For some reason, we depict the fire here with the load and variations, it -- depending on the load, and accumulation, and how long it burns. It kind of brings you back to a load point here (indicating) and like I said, this

is very, very crude. It could be a -- a straight line type pattern, wavy line, or in the middle of the room, it might build up and pulling back down, but it's just -- just basically a V.

JUDGE GILL: Okay. And next question is, "What was the composition of the bedroom that was next to the east room"? And -- and it goes on -- it says, "Was it constructed of drywall? If so, how is that different than burning trailer paneling?"

THE WITNESS: Okay. The addition of both of these bedrooms here, east and one just says bedroom, and we said stick addition. These are built out of fir grade -- what we call 2x4s and sheetrock versus what's actually in the manufactured house. Manufactured homes, at this version, typically -- very typically, the paneling that's in there was non-treated. It was built prior to 1976. Most of the time, in the manufactured home community, of our inspectors, the paneling in there, they call it, 400 mile-an-hour paneling, should it be exposed to fire. It's real thin, it's real brittle, and it is highly -- the flashpoint on it is around 600 degrees, and that was when it came out from the factory. After a period of years, when it's been through the normal things that homes go through -- ultraviolet rays,

heating and cooling, and use of wear and tear at the house, that would probably decrease that flash point and burn points.

JUDGE GILL: Okay. And during your investigation, did you find any evidence of flashover?

THE WITNESS: No. Might have had a little rollover, but the key word there, might have been a little rollover. The deceiving thing about a flashover, if it flashed over everything, it's going to be encompassed in fire.

JUDGE GILL: Okay. Any other questions from counsel?

MS. GIORDANO: (inaudible)

JUDGE GILL: Any other questions from any member of the jury?

MS. GIORDANO: I have a quick --

JUDGE GILL: All right.

MS. GIORDANO: -- question, Your Honor. I was -- I thought Mr. Orange had one. I'm sor -- I want to, that's --

JUDGE GILL: I'm sorry. Well, you better jump up when I ask the question. Otherwise, you're going to --

MS. GIORDANO: That's my fault I didn't jump

in --

JUDGE GILL: -- lose your chance.

BY MS. GIORDANO:

Q Mr. Gregory, you referred to the place underneath the window in the living where there was a couple of chairs and a table. You referred to a pattern on the wall or -- ma -- pattern might not be the word you used -- you know what I'm talking about?

A Right. I think I do. Go ahead.

Q Okay. You referred to something significant on that wall there -- was that created by the chairs and the table being there?

A I don't think so.

Q Okay. In your opinion, it was not?

A No. I think it was fed from a bottom source.

Q All right. Second question, you referred to this area (indicating) in the kitchen in front of the stove, where there was a burn down?

A Right.

Q At any time, were you made aware that there had been a repair there where the flooring had been kind of shabbily replaced by the tenant? Anyone ever talk to you about that? Did that have any effect on your determination?

A I didn't know that, but --

**Q Okay.**

A -- but, really, it won't.

MS. GIORDANO: Okay. That's all I have. Thank you.

JUDGE GILL: All right. Anything else from the Commonwealth?

MR. ORANGE: No further questions.

JUDGE GILL: Any other questions from the jury? All right. Thank you, sir. You can step aside, and this witness is going to stay with us, I think.

MS. GIORDANO: We'd like to have him available --

JUDGE GILL: Okay.

MS. GIORDANO: -- just --

JUDGE GILL: All right.

MS. GIORDANO: -- in case.

MR. ORANGE: And -- and Your Honor, just for the record, he's been out of the room other than during his testimony up to this point.

JUDGE GILL: Okay. All right. What I ne -- we need to take a break, right? Let's take about ten minutes and everybody, I want you to remember the admonitions I've given you, remain -- everybody remain in place. All rise, and let the jury exit the courtroom.

(JURY EXITS THE COURTROOM)

JUDGE GILL: And what else can we get done while the jury's gone?

MR. ORANGE: The -- the other issue that I'm concerned about is the Court had a talk -- telephonic hearing with Mr. Buster Cannon, who was the handler on P.J. Mr. Cannon's been here -- been here since 9:00 this morning and is ready -- may be very well be our next witness. I've re-read, briefly, this morning, the Court's order. I'm not sure I completely understand it. I've asked Mr. Cannon if he understands it and if I understood him, he said that he didn't completely. Certainly don't want him to fall outside the Court's orders. The second to that, obviously, this fire took place a year-and-a-half or more ago. Mr. Cannon did go to the scene this morning and viewed the scene. He also, I think, has looked at the pictures, maybe some which are in evidence and some which may not be. He has indicated to me that he does remember his dog hitting on five of the six spots that had been -- were there -- I should say near five of the six spots that had been identified as collection points. He indicated to me that his dog acted very different in -- in -- I'd rather he explain it, but

the dog had -- did not specifically make a hit on the little boy's bed, where C. was found, but did act different in that area. He pointed out to me, for instance, there's been discussion about this diagram, that the hits were near some of those before we had marks, maybe not exactly on them, so we -- we just need some direction from the Court. Mr. Cannon's in the next room, I assume -- I thinks available to come in here, but that's kind of where -- where we're at and is -- is -- can -- can he testify to what he remembers after going to the scene? Or is he limited to saying, my dog went in there, made some hits, and come back out? And, of course, we also got pictures of the can sitting outside, which my understanding, dog made hits on the collection container standing -- sitting outside in the -- in the front of the trailer.

JUDGE GILL: On these (indicating) collection containers?

MR. ORANGE: Yes. On the six -- five or six of them.

JUDGE GILL: I assume that would be after the -- something was put inside?

MR. ORANGE: Yeah. Yes, sir -- yes, sir.

JUDGE GILL: Okay.

 MR. ORANGE: They were lined up out front.

JUDGE GILL: Okay.

MR. ORANGE: I'm not sure, we -- we got a picture --

JUDGE GILL: Is he going to say the dog hit on all six or -- maybe we ought to ask him what he remembers now?

MR. ORANGE: That's fine -- that's fine. That's why I want to --

JUDGE GILL: Okay.

MR. ORANGE: -- clear this up so that we don't --

JUDGE GILL: If the dog hit on six areas, it didn't hit on the control sample -- it did not hit on the comparison sample.

MS. GIORDANO: Judge, I'm -- I guess I'm not really sure what's going on? Is he asking us that we had a hearing, you made a ruling? Is he asking to do that again? I -- I understand the clarification part, but is that --

JUDGE GILL: I think -- the way I understand it is that I di -- I ruled that he could not testify about the dog hitting in a particular place because at the time, he said he couldn't remember where the dog hit and now --

MS. GIORDANO: Well, I think it's --

JUDGE GILL: -- I think what they're saying is he now remembers where the dog hits.

MS. GIORDANO: And I'm trying to find my order. I was thinking that part of the Court's determination was based on the fact that there was no record kept from where the dog had hit either? That it was asked specifically did anyone, you know, talk about the video? It didn't tape. Did anyone walk around and say he hit here --

MR. ORANGE: He had his clipboard at the time --

MS. GIORDANO: -- he hit -- and everyone that was involved said no, and, I mean, I -- I'm -- you know, I guess that goes to credibility -- if I could question that now he suddenly remembers, but --

JUDGE GILL: Why don't we -- let's do this. While the jury's gone, let's talk to him and find out what the deal is and then I -- then I can make a decision on what to do.

MR. ORANGE: Can you just bring him in? Judge, these are the pictures we have of cans that were burned.

JUDGE GILL: Okay.

MR. ORANGE: Yeah.

JUDGE GILL: All right. Hello.

THE WITNESS: How are you?

JUDGE GILL: Okay. And sir, would you raise your right hand to be sworn? Do you swear or affirm under penalties of perjury that the testimony you are about to give is the truth?

THE WITNESS: Yes. I do.

JUDGE GILL: All right. Just have a seat. I -- I'm ready when you are, Mr. Orange.

DIRECT EXAMINATION

BY MR. ORANGE:

**Q State your name.**

A Deputy Buster Cannon.

**Q And where are you employed?**

A Scott County Sheriff's Department and Georgetown Fire Department.

**Q And are you the gentleman who was the handler of the arson dog named PJ?**

A Yes. I was.

**Q And do you recall having a hearing -- telephonic hearing where you were -- I assume at your office in Georgetown and a few weeks ago concerning PJ --**

A Yes. I'm familiar with it.

**Q -- in the matter on Bonnie Drive here in**

**Russellville?**

A Yes.

**Q And since that hearing -- or today, have you gone to the scene of the alleged crime?**

A Yes. I have.

**Q And have you also reviewed photographs of the crime scene?**

A Yes. I have.

**Q And can you tell the Court -- well, first of all, it's my understanding your dog made what's called "hits" at -- at certain times in the structure?**

A Alerts, yes.

**Q And can you tell the Court how you determined what a hit was?**

A I usually calibrate the dog before I even take her into a scene, and what I mean by "Calibrate the dog" is that I'll drop an accelerant down away from the structure somewhere and I'll run the dog by it just to get her calibrated. She'll sniff the area, and she'll locate it, and when the dog finds what she's looking for, her alert sign will be a set position. At that time, I'll --

**Q Will be a what now?**

A A set position. She'll -- she'll sit and at that time, I'll reward the dog with a couple of kibbles

of food, and told her what a good girl she is, and then I'll ask her to show me where the product is. At that time, she'll take her nose and she'll pinpoint the product, and then I'll mark it as a -- a sample area, and again, praise the dog by petting her and giving her a couple more kibbles of food.

**Q And in this particular case, do you recall -- first of all, did you take any written notes the day you took the dog in there?**

A The notes that I generally take, I generally forward onto the ATF. It's just a small report that I'll send back to the ATF, just to let them know that the scene that I worked was a positive or a negative scene. As far as documentation as exactly where the dog alerts, no. I did not.

**Q And after having reviewed the scene and looked at the photographs, do you have -- do you recall where your dog alerted --**

A I'm very familiar.

**Q -- on this scene at 638 Bonnie Drive?**

A I'm very familiar. Yes.

**Q And could you just tell the Court what you remember?**

A After we done the outside, we went inside and in the front room area, she alerted an area around the

front corner of the couch. Also, there was two windows on the far side of the couch. She had alerted in two particular areas there and there was an area in the back bedroom adjacent to the kitchen and living room area. We got two alerts out of that -- one was at the corner of a bed in that area and the other was on the far wall about dead center of that wall at the floor molding -- between the molding and the floor area. And another spot that we -- that she alerted on was a crack in the kitchen area and living room area.

**Q And there's been some testimony that there was -- that you took your dog -- or I'm sorry, maybe you didn't. But I'm aware you took your dog into the bo -- room where C. was alleged to have been recovered -- the deceased boy?**

A Yeah. I took the dog through the whole structure. Yes, sir.

**Q Was there anything in particular about C.'s room that you noticed?**

A I noticed a sheet on the bed with an imprint of a body. PJ normally will jump up on a bed on her own and then sniff the area looking for accelerants and such. She didn't stay up there very long and then, down she came and we went back through the rest of the house with no negative -- or no positive alerts through the

rest of the house. So I mean, the part that was unburned back toward the rear.

**Q So how many alerts did your dog make?**

A I believe it was six or seven total. There was one alert that she made that we didn't document nor did we pick up.

**Q Okay. Can you tell us again where those points were?**

A Other than the one that I haven't mentioned, it was about center of the floor area, in a debris pile.

**Q You said there's one you haven't mentioned?**

A Yeah.

**Q And that was where now?**

A In the center of the living room floor, adjacent from the couch, out about three or four feet from the couch in a debris pile.

**Q Okay. There's one in dupree -- debris pile -- where are the other locations that your dog hit?**

A There was three locations in the living room area -- one at the couch -- the corner of the couch, one under the windowsills, and one near the register vent, one at the kitchen floor -- in the crack in the flooring there where an accelerant would -- would run into, and then two in a bedroom adjacent from the living room at the corner of the bed and the wall -- farthest wall dead

center with the floor and the base molding.

**Q Now, after you took your dog in, did you take your dog out?**

A Yes. I took the dog out and recalibrated the dog again.

**Q Did you take her in a second time?**

A I don't recall.

**Q Okay. And were there collections of -- samples collected while you were there?**

A Yes. There was.

**Q And after the samples were collected, was the dog allowed to look at those -- or review those collected samples?**

A Yes. For the simple reason if we missed a product or a can that she didn't alert on, then we could go back in and let her run that area again because we might have missed a product. So we took all the cans out on the concrete porch that had an awning over it, lined them up, and we also took a comparison sample.

**Q And what was the result of this -- her review of the cans under the awning?**

A She alerted on every one of the cans that we took the samples from except the comparison sample.

MR. ORANGE: I don't have further questions.

CROSS EXAMINATION

BY MS. GIORDANO:

Q Officer Cannon, do you recall we had a telephonic hearing, and I want to say it was either the last week of December or the first week of January this year --

A Yes, ma'am.

Q -- and Judge Gill contacted you by phone?

A Yes, ma'am.

Q All right. And at that hearing, you testified that you did not recall the locations where PJ had had alerts -- at that time, you did not recall that?

A I may have said that. Yes.

Q All right. And you also testified that there was no record kept by you or as far as you knew, by anyone else?

A No. I said there was no record kept by me.

Q Okay.

A I was going to rely on the other investigators --

Q All right.

A -- such as when we videotaped it.

Q And you may or may not know but the videotape did not work?

A And that's the reason for documentation.

Q Okay. So is there any documentation other

**than that videotape, as to where -- I think you testified previously there wasn't -- do you today know of any documentation that someone kept at the time that PJ made alerts?**

A If there is, I'm not aware of it.

**Q Okay. Now, did you say you revisited the scene today?**

A Yes, ma'am.

**Q And who went to the scene with you?**

A It was myself and David West.

**Q And when you went there, were there lights set up inside that mobile home?**

A They were being set up.

**Q Okay. So some were up and some were not?**

A Yes, ma'am.

**Q And by coincidence, were these lights in places where you now remember that PJ hit -- several of these lights placed in those areas?**

A When I first went in, there wasn't any up.

**Q All right.**

A Okay.

**Q As you remained, there were there?**

A When I left, they -- they were being still put, up as I left. At the time that I was going over, the lights were not up.

**Q But your testimony that when you went through the mobile home today, there were lights being put up, but none were put up at the time you walked through?**

A That's correct. None were shining on any of the places where the K-9 alerted.

**Q Well, I know none of them were shining, but were they just sitting there?**

A No.

**Q Okay. What about photographs? You said you reviewed photographs -- who did you go over those with?**

A We brought some out here -- myself and a couple of the investigators went over them.

**Q And what discussions did they have with you at the time that you reviewed those photographs to see if you recall, (coughs) excuse me, where PJ had hit --**

A During --

**Q -- alerted, excuse me.**

A With the fro -- with the photographs, I was able to pick out all but, I believe, number 47 that I could remember doing.

**Q So they just handed you a photograph and said what do you -- as you were reviewing these?**

A Well, at -- while we had the photographs, I could tell you yes, we got one here, but as far as looking down and saying, this is exactly where it was

at, I couldn't do that unless I went back to the scene.

**Q Okay.**

A You know, I was looking at a --

**Q Understand.**

A -- a big picture and there was a -- you know, there was samples that we -- we took out that were probably six inches wide and maybe three feet long and the purpose for that is because when the -- the K-9 alerts, she may be four, five, six inches off.

**Q Uh-huh.**

A Okay? So I'll take a bigger sample and it's in my discretion to the detectives as what to take, myself knowing the K-9.

**Q You make that decision over the detective -- is that what you're saying or the --**

A Yes.

**Q -- detective makes it? Okay.**

A Yes.

**Q Makes that decision? How many crime scenes have you worked PJ on since -- approximately since September 2004 -- if you had an idea?**

A Since September 2004, I can tell you how many fire scenes, but as far as crime scenes, I don't investigate all of them. I've probably done 100 fire scenes, maybe more.

Q Okay. So that's a lot of fire scenes in the last year-and-a-half?

A Yes, ma'am.

Q Okay. And you're relying today on your recollection, after looking at the photos with Detective West and after going there, over your recollection at the time that we had the hearing in, I want to say, December or January?

A Yeah. After looking at the photos and going back to the scene over there, I'm positive I know where they're at.

Q Thank you.

JUDGE GILL: Anything else, Mr. Orange?

REDIRECT EXAMINATION

BY MR. ORANGE:

Q Are you a certified fire investigator?

A Yes. I am.

Q And what does that mean?

A That means I have taken the test, and I had the appropriate training to pass the national certification that it takes to become a CFI.

MR. ORANGE: No further questions.

JUDGE GILL: Let me -- let me ask you this -- how many places did this dog alert on at this trailer?

THE WITNESS: Approximately six.

JUDGE GILL: I wasn't asking approximately.

THE WITNESS: Oh. Six.

JUDGE GILL: A minute ago, you said six or seven.

THE WITNESS: There was a -- a discretion about one of the -- one of the possible places that she alerted was in the bedroom where the little boy was at. I couldn't recall her alerting in there, so I was not including that, but -- so I'm still not going to include it. I don't think we done one in there, so we'll call it six.

JUDGE GILL: All right. And now, you had told me, what was it, a couple months ago that you didn't recall where the dog hit? And tell me what's happened between now and then that -- to make you have these specific recollections?

THE WITNESS: Photographs and revisiting the scene can -- can bring back a lot of memories, so -- and --

JUDGE GILL: Okay.

THE WITNESS: -- in which case, it did. I do see a lot of fire scenes and sometimes, you have to look at the pictures, I guess, to -- to bring back the memories.

JUDGE GILL: Okay. Are you familiar with what this trial's about?

THE WITNESS: Yes, sir.

JUDGE GILL: Okay. And do you know what the charge in this trial is?

THE WITNESS: Yes, sir.

JUDGE GILL: Okay. What is it?

THE WITNESS: Arson first.

JUDGE GILL: Okay. And -- anything else that you know about this?

THE WITNESS: Capital?

JUDGE GILL: Okay -- okay. What do you all think now?

MS. GIORDANO: Judge, I think there's also question whether or not there's been a violation of the rule of separation against witnesses. I mean, he obviously had conversations today, and reviewed evidence with Detective West, and I -- I have a concern about that as well. I -- I object. I don't think it's reliable. I think the Court's opinion was clear, that part of the reason perhaps he didn't remember was because there was no record kept. And with no record kept, we're just relying on his best guess at this point and he said, "Approximately six." You know, I'm - "I'm certain after looking at

 it today," but I don't -- I think the Court's ruled and I don't think -- I think there should have been the opportunity for him to rehabilitate him after Detective West had been in here. And he's reviewed photographs and gone to the scene, so we object to the Court broadening its decision over and above what's already been ruled.

JUDGE GILL: Well, I have a good deal of faith in the jury's ability to give the appropriate weight to evidence. He now remembers and I -- and can -- if I understand it now, and maybe we ought to have him draw out where these hits took place. I think I need to have that happen before I rule on this because there -- there may be some -- could I have you draw on a diagram that's not marked already --

THE WITNESS: Yes, sir.

MS. GIORDANO: Does it have collection points marked on it?

MR. ORANGE: They all got mar -- they already got --

JUDGE GILL: You-all have already marked all those? Well, I guess he's already seen one, so let's have him -- let's have him draw on one, if you've got a blank one for him, of where in the world this dog --

THE WITNESS: Sure.

JUDGE GILL: -- hit on.

MR. ORANGE: Your Honor, here's a clean one.

JUDGE GILL: Okay. Then let's let him -- let's let him draw on there one, two, three, four, five, six, where this dog -- it's clean, but of course, it has the collection points on it, but I want to see where this dog hit or alerted.

THE WITNESS: (Inaudible) right here, right here, right (inaudible), right here, right here -- that's -- that's --

JUDGE GILL: Uh-huh.

THE WITNESS: Crack in the wall there.

JUDGE GILL: Wall right here.

THE WITNESS: And at this window and here, one here and then comparison sample was taken back here.

JUDGE GILL: So this is one, two, three, four, five, six -- and you didn't have a hit right here (indicating)?

THE WITNESS: No, sir.

JUDGE GILL: And I was under the impression from the testimony last time, that the dog didn't hit anywhere that a sample wasn't taken? That's not true apparently now?

THE WITNESS: No. There may be some

misunderstanding on the control sample. The control sample is taken for a purpose to try to mislead the dog. As I stated, I've ran the K-9 through the whole building, okay? She did an alert back here, that's why we took the control sample in the area that we did. The control sample is then placed in the same type of container, as the evidence that was taken.

JUDGE GILL: Well -- well, let me ask you this.

THE WITNESS: Yes, sir.

JUDGE GILL: Are you saying that a sample was taken here (indicating) as a control because you knew that there wouldn't be any -- any accelerant there?

THE WITNESS: We didn't suspect anything to be there, nor did the K-9 alert there.

JUDGE GILL: Wow. Haven't we heard testimony that that's one of the spots that they suspected the fire -- fire started?

THE WITNESS: No, Your Honor. That is a control sample.

JUDGE GILL: Okay.

THE WITNESS: That is a neutral zone, out of the origin and area of the fire. That's why we went to the end of the hall where the carpet was not singed -- it wasn't damaged to collect that and

that's a normal --

JUDGE GILL: Okay.

THE WITNESS: -- procedure when you're doing a fire.

MR. ORANGE: Unless you're taking an issue.

JUDGE GILL: Okay.

THE WITNESS: If I may shed some light here, there may be some confusion on this bed here (indicating).

JUDGE GILL: Uh-huh.

THE WITNESS: The Mickey Mouse sheet -- or Minnie Mouse sheet that was on this bed, it's -- that we had a can here by -- Detective Edmonds and I removed this sheet, and I did place it in a can. And the dog did hit on the sheet in the can and then, I don't know if that's causing some confusion or not.

JUDGE GILL: Well, I had written in this order, and I made a finding of fact, that the dog did not hit anywhere that a sample wasn't taken. And I guess looking at it now, a sample was taken for a control and the dog didn't hit at that --

THE WITNESS: Correct.

JUDGE GILL: -- point?

MR. ORANGE: That's correct.

THE WITNESS: Correct.

JUDGE GILL: Okay. And which one of these cans has the control sample in it?

MR. ORANGE: Number 40.

MS. GIORDANO: (inaudible)

JUDGE GILL: I didn't understand that from the testimony today that that was something that -- that was not supposed to have anything in it and wasn't suspected?

MS. GIORDANO: 30G is --

JUDGE GILL: 30G. Okay. Well, I -- it's just the can, so I'm -- I don't need to see the cans.

MR. ORANGE: On your comparison.

JUDGE GILL: Okay. Comparison. Okay. All right. Well, as I was saying then, I think the jury -- if we put in front of the jury that he now remembers, he didn't remember when we had the hearing -- I think if we lay it all in front of them and how he refreshed his recollection, as I said, theoretically, this type of evidence would come into -- into evidence. It would certainly be able to come into evidence or I think it would, if they had kept a record of it. And I think it also needs to be laid in front of the jury, that when they were doing this, this was not being done as for any

purpose other than to try to tell the investigators where to take a sample from for further testing; is that correct?

THE WITNESS: Absolutely. It's -- the dog's just a tool. The dog's not going to tell --

JUDGE GILL: Okay.

THE WITNESS: -- anything of it.

JUDGE GILL: All right. Anything else we need to talk about? All right. We'll go off the record then. There's no other -- no other --

(OFF THE RECORD)

(JURY ENTERS THE COURTROOM)

JUDGE GILL: Let's all be seated now, we're back on the record. Our jury's all back. Can we waive the call?

MR. ORANGE: Yes, sir.

JUDGE GILL: Okay. And the jury has been out to the scene now and had a chance to view the scene. I asked the bailiff and I understood -- I want to state for the record, that all of the jurors did go through the -- the house; is that right? That everybody got to go through and see what they needed to see? And we have another witness here who's seated and ready to go and I'm going to ask you, sir, if you would turn and raise your right hand.

Do you swear or affirm under penalties of perjury that the testimony you are about to give is the truth?

THE WITNESS: Yes.

JUDGE GILL: All right. And Mr. Orange will proceed.

DIRECT EXAMINATION

BY MR. ORANGE:

**Q Scoot up about six inches from that microphone and tell us who you are?**

A Deputy Buster Cannon, Scott County --

**Q Buster Cannon --**

A -- Kentucky.

**Q -- Scott County?**

A Kentucky.

**Q And I notice you got a uniform on, so --**

A Sheriff -- sheriff's department.

**Q -- that means what?**

A Sheriff department.

**Q And you're a deputy sheriff?**

A Deputy sheriff and a firefighter with Georgetown City Fire Department.

**Q Okay. And can you tell us, first of all, about your experience as a police officer -- as a sheriff -- how many years you been involved?**

A I have been involved in law enforcement for 17 years. I've been involved in the fire department a number of -- 23 years, full-time for 15.

**Q And how many years do -- or what certifications or what training do you have to do your job as a deputy sheriff?**

A Attend my regular 40 hours in-service through the week -- or every - annually, through Eastern Kentucky University. I've had all types of different types of training through Eastern.

**Q And what kind of training have you had as a firefighter?**

A Actually, my main role on the fire department is a captain on our engine company, but I've also been doing fire investigations with that department for approximately 13 years. I've been sent to Emmitsburg, Maryland for the National Fire Academy up there for arson investigation -- fire scene investigations plus numerous of other places.

**Q Now, are you a certified fire investigator?**

A I am.

**Q And can you tell us -- tell the jury what that means, that you're a certified fire investigator?**

A That means I've met the criteria. I've got approximately 500 hours in training in fire

investigations. I've taken a written test to become certified in fire investigations along with the class.

**Q And who's the certification by?**

A The National Fire --

**Q National Board?**

A The National Fire Investigation [sic].

**Q And --**

A It's the National Board, I'm sorry.

**Q -- have you had some close association with the Alcohol, Tobacco, and Firearms branch of the federal government?**

A Yes. I'm also on the National -- was on the national response team with the ATF with an accelerant K-9.

**Q And how did you become associated with ATF?**

A Our department was looking for other ways, and other tools, and -- and means to help us investigate fire scenes and we were going through a rash of set fires in our community. And I -- and through the years, I've met some of the ATF accelerant K-9 handlers who helped me get involved in that situation. And there's an application that you have to fill out and it's -- the applications are taken nationwide. And if you're just lucky enough to get picked to go to their academy in Front Royal, Virginia, which I was, you'll spend five

weeks up there learning how to handle the dog. The dog's already trained or imprinted when I get it.

**Q And when did you go to have this training?**

A Front Royal, Virginia.

**Q I said, when? When?**

A 2002 March -- February, March of 2002.

**Q And you said something about a dog being imprinted -- can you tell us about that?**

A It's -- a dog is taught, basically, on memory and -- and repetitive sequences and I'm not real sure how they do it. As I said, the dog was already trained or imprinted when I got the K-9, but the dog has -- has learned to recognize an odor and therefore, being rewarded by a food. And over a period of time, the dog just recognizes that if he smells a certain product, and does what he's asked to do, then he's going to be rewarded by given a -- a couple kibbles of food.

**Q And did you, in fact, receive a dog to be in your care?**

A Yes. I did.

**Q And what was that dog's name?**

A PJ.

**Q And can you tell us exactly what PJ was trained to do?**

A PJ was trained to detect ignitable liquids

KENTUCKIANA
COURT REPORTERS

such as lighter fluids, lamp oils, gasoline, paint thinners, turpentine, some kerosenes, things of that nature.

**Q And did PJ -- I notice you said you were like certified in certain matters -- did PJ have any certifications?**

A Yes. She was also certified through the ATF. There's an annual certification, that all the dog handlers have to go through annually.

**Q And what kind of certification process did -- was involved in PJ being recertified annually?**

A Well, for the dog handlers themselves, there's a 16-hour course that we have to go through. And then there's a three-day course where the dog handler, and the K-9 goes out and demonstrates the ability to continue doing what she's been doing, such as picking up ignitable liquids that are hid in a structure. And they will -- they will even go as far as to ignite burn cells and go in there and put a sample down and then, ourselves as handlers, we'll take the dogs through these burn cells, and the dog locates these samples, and does their set position for a food reward. And then we'll ask the dog to show us exactly where the sample's at by a simple phrase, "Show me." The dog will then take her nose and pinpoint the product that's been placed there.

**Q And also, were you responsible for some kind of weekly or monthly training of PJ?**

A I was responsible for daily training. The only way the dog got to eat was through training because she was rewarded by food. So we'd go through an hour session twice a day, in order for her to get her ration of food that -- to keep her healthy.

**Q And did you have some sort of agreement with the Ameri -- excuse me, with the Alcohol, Tobacco, and Firearms concerning this dog?**

A There was a contract that was signed by myself, and the fire chief, and the ATF that we would automatically be on the national response team with the ATF, and reward that we would get the dog at no charge. And so, we signed the contract, and I've been called out a few times with the ATF anywhere across the country, to bring the dog in to help with their investigations.

**Q And when you talk about a national response team, can you elaborate on that a little bit?**

A ATF has a -- a team organized, where they'll bring in their own scientist to examine the products that the dog may alert on. They'll bring in people to do nothing but interviews. They'll do -- they'll have people that'll do nothing but examine the fire scene, doing the digging. They'll have a photographer there.

They'll have their own engineers there for chasing wires and things of that nature, so it's pretty well set up and organized.

**Q And in addition to cooperating with ATF, did you assist or work with other fire investigators across Kentucky?**

A Yes. That was another part of the agreement, that we would help other communities if needed.

**Q And over the course of -- so you said you got this dog in 2002?**

A Yes, sir.

**Q And approximately how many fires annually did you take the dog to to assist in investigations?**

A I'd say 50 to 54 is what it's been averaging out --

**Q So --**

A -- a year.

**Q -- in total, how many fires, approximately, had you taken the dog to?**

A Approximately, a couple hundred.

**Q Now --**

A (coughs) Excuse me.

**Q -- I understand you had PJ at the site of the fire here in Russellville on September 11, 2004?**

A I'm not sure what date, but I was at the

KENTUCKIANA
COURT REPORTERS

scene. Yes.

Q And since that time, is PJ, is she -- she's still with us?

A Unfortunately, no.

Q And I understand she got hit by a car?

A Yes.

Q Escaped from her pen and -- do you recall how you became involved with the fire on Bonnie Drive that were the subject of this trial here today?

A Yes. State Fire Marshal's office called me and asked me if I'd come down and assist them in -- in investigating this fire.

Q And do you recall coming to Russellville to do that?

A Yes, I do. It was pouring down raining.

Q And you remember about what time you arrived?

A No, sir.

Q Do you remember how many days after the fire it had been?

A No, sir, but let me back up on that first question. I -- I said I didn't remember what time I arrived. It had to have been early because we had breakfast, before we went up to the fire scene.

Q And when you went to the fire scene, what did you first observe?

A I usually like to do an outside -- walk around the outside of the structure, just to see what was going on around there. Because I don't want to get the dog in any broken glass or anything like that, and then I'll go inside and do a self-inspection of the inside for safety purposes for the dog and myself.

**Q And so, after you went around the building, you -- did you go inside the structure?**

A Yes. After I went around the building.

**Q And what was the purpose of going inside the structure?**

A To try to locate points of accelerants that might have ignite -- ignited a fire.

**Q Okay. And did you do that with or without the dog -- at first?**

A At first, I didn't take the dog in with me.

**Q And, again, the purpose of going in yourself was what?**

A Safety reasons for myself and the dog -- so I wouldn't get her in any glass or debris that would cut -- cut her feet because she doesn't wear any protection on her feet or anything. So if there's any broken glass, I want to keep her away from that or pick it up.

**Q And after you went in yourself, did you take the dog in?**

CRIMINAL TRIAL

100

A Yes. I did.

**Q And when you took the dog in, can you tell us what happened?**

A Well, before I took the dog in, of course, I -- I calibrated the dog by dropping a sample out away from the structure, and letting her alert on that, just to get her in gear. Because now she knows she's getting ready to go to work, and she's getting ready to be fed, so that kind of builds her up, and gets her anxious, and ready to go. And then, I took the K-9 in.

**Q So when you took the K-9 in, can you tell us what took place?**

A The first role with the dog is I leave her on a loose leash, and just let her do as she pleases, and if she alerts, she alerts. If she doesn't, then after we've done the entire house, I'll bring her back and I'll do a direct approach to her, which I'll get down or bend over with her, and -- and show her things, and -- and get her to sniff certain things.

**Q And what happened in this particular case?**

A After we done the walkthrough of the house -- right after I done the walkthrough of the house, and got her calibrating, and got her in, I put her on a loose leash, and she just kind of meandered around. She wasn't really concerned about working that hard and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

then, I started doing -- it was a more direct approach and -- and making her getting her nose down, and making her work, and sniffing everything, and she started making alerts on different areas in the house.

**Q And when you say, "Alerts," can you describe to the jury what an "alert" is, or what appeared or what the dog does?**

A When the dog gives me an alert, she'll sit and then, I'll tell her what a pretty girl she is, and I'll give her something to eat. And then I'll ask her to show me, and that's when she'll take her nose, and she'll pinpoint the product and again, I'll baby her a little bit, and give her some more to eat. And then, we'll move on to another area after marking that spot there.

**Q And what -- now what is the purpose of her -- the spot?**

A It's -- she's -- she has found something ignitable -- an ignitable liquid.

**Q Now, I believe there's a diagram here that we used before -- used one similar in this trial, but could -- I want to hand you a green magic marker and can you show this jury where your dog, PJ, made hits?**

A Yes. I can.

**Q And can you mark that?**

A One of the areas was 32, right at the corner of the couch area here (indicating) and there was a clack -- crack in the floor.

**Q Go ahead and mark, like a circle there where you --**

A And there was a crack running along the floor in this area this way (indicating).

**Q Which way did the crack run?**

A It ran parallel to this wall (indicating).

**Q Okay.**

A And she alerted in that crack. In this back bedroom here, there was a wall and floor base molding here (indicating) and some carpet and she alerted about center ways here (indicating) and over here at the corner of the bed in the same room. And then over here around this window, there was two alerts here (indicating) -- one around the heat vent and another one over on this end of the window (indicating).

**Q Okay. And were there any other alerts in that building?**

A I know of one more.

**Q And where was that other alert at?**

A It was right out here in front of the couch in a debris pile, maybe a little further back toward -- toward this area here (indicating).

**Q And what do you mean by "debris pile"?**

A Apparently, during overhaul, the fire department had pushed up some -- some rubbish, old burnt materials. It could have been books, some old clothing, or anything of that nature, or the investigators did it prior to my arrival, one or the other. And -- and as we were coming through there, she alerted in that area right there.

**Q And did you take the dog through the entire structure?**

A Yes.

**Q And were there any other alerts anywhere in the structure?**

A No, sir.

**Q And after you took the dog through the structure, were you present when some samples were taken?**

A Yes. I was.

MS. GIORDANO: Judge, may we approach?

JUDGE GILL: Counsel, step up.

(BENCH CONFERENCE)

MS. GIORDANO: I need to (Inaudible) prior to this testimony that he was asked earlier if there had been an alert on C.'s bed and he had said no, dog jumped up on it, but it wasn't an alert. That

being said, he was asked did he (Inaudible) on the sheet that was in the cannister, and he said, "I don't know."

JUDGE GILL: Uh-huh.

MS. GIORDANO: And so if he's going to ask him about alerting on that, I mean, I think since he doesn't know and didn't have a recollection of it, he should not -- I believe that he's going to ask him the alert on all those cannisters that were outside, but he had testified earlier that he didn't know.

JUDGE GILL: What do you want me to do?

MS. GIORDANO: Well, I'm asking do -- I guess I'm making a motion in limine that he not ask him alerting on that sheet in that cannister because he's already testified an hour ago that he did not -- I'm trying to remember if he said I don't remember or I don't know. It's one of those two things.

JUDGE GILL: Well, I'm not inclined to do that. I think it's important what he knows and what he doesn't know, and I'm not inclined to do that. Let's see what happens.

MS. GIORDANO: Can I -- while we're up here, let me go ahead and ask. Is there any reason I

can't refer to -- whenever I'm crossing him, any reason I can't refer to a previous hearing? Do you recall testifying in a previous hearing and you made these statements?

JUDGE GILL: I think you're allowed to impeach him for prior inconsistent statements.

MS. GIORDANO: Okay.

(END OF BENCH CONFERENCE)

BY MR. ORANGE:

**Q Now, were there samples taken inside the house while you were in Russellville or at the scene on that Sunday morning?**

A Yes. There was.

**Q And who took those samples?**

A Detective David West.

**Q And do you recall if anybody else was there?**

A Alan was there.

**Q Alan Gregory?**

A Yes.

**Q And you're an experienced fire investigator yourself; is that correct?**

A Correct.

**Q And as far as you know, did they use the correct technique and procedure in taking those samples?**

A Yes. They did.

**Q And that would be what?**

A Glove on, glove off after handling each sample --

**Q Okay. And what about --**

A -- with each glove.

**Q -- tools?**

A Tools were all cleaned or -- or replaced.

**Q And after the samples were taken, what were they placed in?**

A Metal paint container.

**Q And would they be containers like are here in front of you?**

A Yes. They would be.

**Q In fact, could these be some of those?**

A They very well could be.

**Q And after you -- by the way, was there a control sample taken, or do you know?**

A Yes. There was.

**Q And what do we mean by "control"?**

A It's a comparison sample and -- and what we use that for is -- we'll -- we'll go to an area of the house that we believe that is non-partisan with any type of accelerant where the dog did not alert and where we didn't see any types of fires in that area or anything like that. Other words, something that's not

CRIMINAL TRIAL

107

contaminated, and we'll -- we'll take it and put it in a container as well as these containers here that's holding the evidence. And then I'll take them all outside, and we'll set them all up outside and run the dog through them again to make sure that we have the correct evidence. And if the dog passes up the comparison sample, which she should, then she's doing her job. And then I'll do this occasionally two or three times, maybe four, by switching that comparison -- comparison sample in another location and run the dog back through them again and make sure that she passes up on that compare -- excuse me, comparison sample.

**Q And was the comparison sample or control taken in this case?**

A Yes. It was.

**Q Do you know where it was taken at?**

A It was taken at the back door down the hallway, marked down here number 40.

**Q And was that taken in your presence?**

A I really don't recall.

**Q Did the dog hit on that number 40?**

A No.

**Q And after all this was done, where were the samples taken?**

A We took them out onto a concrete porch with an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

awning on top of it and lined them up along with the evidence tags and run the dog back through them again.

Q And did the dog hit in C.'s bedroom?

A No.

Q And when you lined the samples up out front on the --

A Porch.

Q -- front, do you know whether or not there was anything from C.'s bedroom included?

A If there was, I didn't see it and didn't notice it.

Q Okay. And can you tell us what the results were when the dog was -- did you use the dog out front on the cans?

A Yes.

Q And can you tell us what the results were out there?

A I got a positive alert, again, on every can except the comparison can.

Q Okay. Now, I'm going to show you three pictures here and can you just look at these and see if you recognize them?

A Yeah.

Q And what is that?

A That's the can lineup with the samples in

them.

**Q And do those pictures fairly and accurately depict the lineup of the cans?**

A Yes. They do.

**Q And I believe one of them may have the dog's picture in it?**

A A couple of them do.

**Q Okay. And can you just show that to the jury rather than you and I just talking about it and can you explain to them what's going on in these pictures?**

A As I explained about the can lineup, each can is set about three feet apart and they're all marked with their evidence tags. The lids are off. I'll run the dog past each can. If she sits at this can, we know we've got the evidence in that can. She's showing me that it's positive alert. She has smelled an accelerant. And move to the next can. We'll do the same thing and so forth and -- and -- and then when she runs across the comparison sample, I expect her to walk past it and not sat, which she did. This picture here (indicating) -- well, let's -- let's get this one here (indicating). This picture here is showing PJ alerting on one of the cans. She's got her head stuck down in the can where you can't see it and she's in the set position and when she comes up, I'll pat her on the head

and give her a couple of kibbles. In this picture here (indicating), she's waiting on her reward. She's already letting me know that she's found something and now she's waiting for me to pull that hand out of that food bag and give her some food so...

MR. ORANGE: And Your Honor, we'd move these introduction to the composite exhibit.

JUDGE GILL: All right. Let's mark those -- label them and mark them as (Inaudible).

(COMMONWEALTH COMPOSITE EXHIBIT ADMITTED INTO EVIDENCE)

**Q I believe last thing you said was that -- what happened outside with the cans?**

A She alerted on all the cans except the comparison sample, which I expected her not to and she didn't.

**Q Okay.**

MR. ORANGE: And Judge, we'd move introduction of his drawing into -- or his markings here on this diagram into evidence.

JUDGE GILL: Okay. We'll mark that as the Commonwealth's next numbered exhibit -- mark and admitted.

(COMMONWEALTH EXHIBIT ADMITTED INTO EVIDENCE)

**Q And Mr. Cannon, how long's it been before the**

**last day or two since you've been to the fire scene here in Russellville?**

A Since September the 11th, I guess, was the date you gave me.

**Q 2004?**

A 2004.

**Q And do you recall a telephonic hearing about a few weeks ago in which you were interviewed, I believe, from your office in Georgetown, Kentucky by the Court?**

A Yes. I do.

**Q And during that hearing, do you recall telling the Court you couldn't remember exactly where the dog hit?**

A Yes. I do.

**Q And at the time, were you telling the Court the truth?**

A Yeah. I wasn't going to say something that would bite me later.

**Q And since that time, have you done anything to refresh your memory to give your testimony that you've given here to these 14 men and women?**

A Yes. I have. I didn't have any photographs of the scene. And since I've gotten here, I've gotten a chance to look at the photographs and refresh my memory. And I've been able to go back out and walk through the

fire scene and -- and look at it.

**Q And as a result of looking at photographs and going to the fire scene, can you tell us what's happened?**

A I remember pretty much detail of where all the alerts were at and what samples were taken.

**Q Okay. And the purpose of bring the dog was for what now?**

A Again, the dog's just used as a tool and -- and -- and she'll cut down man hours trying to locate an accelerant that may have been used or may not have been used. Her purpose is to let us know that there was one used and where could we find it. And she did that.

**Q And what's the purpose of putting the cans outside and running the dog by them after the samples are taken?**

A To make sure that we collected the right spot that the dog indicated that the samples were at.

**Q Now, I believe you are a certified fire investigator yourself?**

A Yes. I am.

**Q And did you look at this fire scene apart from your dog?**

A Yes.

**Q And did you see anything that you thought were**

**unusual burn patterns or anything that caught your attention --**

A Yes. I did.

**Q -- visually?**

A Yes. I did.

**Q Can you tell us about that?**

A There was a burn pattern in the bedroom next to the kitchen -- I -- I guess it was built on. It's in the back of the house. It had, like, a horseshoe-shaped burn pattern away from the bed. The damage above that area was exceeding more than what damage was above the bed, which is a heavier fire load. So that would tell me that there had to have been something there to have caused the damage in the ceiling -- that you had a fire load over here with the bed, and there wasn't as much damage in the ceiling area there so that -- that told me there. Plus I also noticed a sheen over there today when I was over there if I can -- that, you know, is normally put down by people walking on areas of stuff, like, there's a name for it and I -- I can't recall it at the moment, but this sheen will sometimes come up later. A lot of times when you're doing fire suppression, you'll see a -- a shiny coat on the water surface because most of your accelerants are going to be lighter than water.

**Q And was there anything else in the other things in the structure that you noticed that caught your attention?**

A Well, there was a -- a burnt pattern down the wall toward the double bedrooms. It looked like it came out here (indicating) and went right down this wall and then just stopped on the other side of the window and was just a carpet area there. And also, in front of the couch right here (indicating) -- this whole area right here, the floor was burned out. There was a part here in the kitchen where the canine alerted. There's a hole burnout right there with no explanation there because we did get an alert there and some deep char in that area.

**Q And what does a hole burnout mean?**

A That either something was poured or you had a fire burn there a whole lot longer than anywhere else.

**Q Okay.**

MR. ORANGE: Anything else you think of?

UNIDENTIFIED MALE SPEAKER: That dog's nose -- that dog's nose (Inaudible).

MR. ORANGE: I'm (Inaudible) up to you.

UNIDENTIFIED MALE SPEAKER: (Inaudible).

MR. ORANGE: No further questions. You may ask. See if I can get (Inaudible) and ask him.

CROSS EXAMINATION

CRIMINAL TRIAL

115

BY MS. GIORDANO:

Q We've met before, Officer Cannon. Deputy Cannon, you told us that PJ's trained to recognize what? She or he?

A She.

Q What was she trained to recognize?

A Ignitable liquids.

Q And how does she alert to ignitable liquids?

A She alerts -- she -- she alerts by going into the sitting position.

Q What is she detecting?

A I couldn't tell you.

Q All right.

A Any type of a liquid.

Q So you don't know what part of that ignitable -- what about an ignitable fluid makes her --

A Oh, probably the hydrocarbons in -- in the -- that's just processed in there.

Q Do you know for sure or you don't know for sure?

A It's the hydrocarbons.

Q And hydrocarbons are found in various substances; is that correct?

A Correct.

Q Can you name some of the substances that a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**hydrocarbon can be found in?**

A Cement glue for tile floors. Off the top of my head, it's -- there's probably several things. But off the top of my head, glue and stuff -- stuff like that that you would use --

**Q So there are various chemicals that have hydrocarbons --**

A Yes.

**Q -- is that correct?**

A Yes.

**Q And PJ would detect any of those chemicals if they had hydrocarbons?**

A Probably so, yes. But --

**Q Well --**

A -- let -- let me -- let me clarify this for you. She wasn't trained -- or let me give you an example. Alcohol has the same type of base in it. She wasn't trained on alcohol. Therefore, she will not alert on alcohol.

**Q Does alcohol have hydrocarbons?**

A I'm -- I don't know, but there's other products that do that she wasn't trained on such as glues. If she wasn't trained on them, she won't alert on them.

**Q Well, do you have a list of things she's**

trained to alert to and a list of things she's not trained to alert to?

A There probably is no such list.

Q Well, how do you know? I mean, you've testified today you're a fire expert and that you have trained --

A No -- no. I didn't say I was an expert.

Q What term would you use? I thought you said ---

A Certified fire investigator.

Q Okay. Certified fire investigator. You testified you're a certified fire investigator --

A Yes, ma'am.

Q -- and that you were certified and trained along with PJ, but you're telling us now you don't even know what a hydrocarbon is?

A I -- I know what a hydrocarbon is. It's a --

Q Well, tell the ladies and gentlemen of the jury what a hydrocarbon is.

A It's a product that is made up -- a chemical that's made up in -- in lots of different types of accelerants. As far as giving you the scientific makeup of it, I can't do that. I'm not a scientist here.

Q But a hydrocarbon is -- would you agree that accelerant is an adjective -- it's a use of a chemical?

PageID #: 2135
CRIMINAL TRIAL
118

Would you agree with that?
A Yes.
Q Okay. So a hydrocarbon is found in a lot of different substances or chemical. And when I say, "a lot," I don't know how many, and apparently you don't know how many, but it's not just found in ignitable fluids or is it just found in ignitable fluids?
A It probably isn't. No.
Q But she's not trained to alert to accelerants, correct?
A She is trained to alert to ignitable liquids.
Q Okay. Because an accelerant is a definition? It's a use of a chemical?
A I'll -- I'll agree.
Q And can she tell you what she has found?
A No.
Q In other words, there's no different signals, or positions, or alerts that say, "I'm alerting to this as opposed to this. All she does is alert to the detection of a hydrocarbon"?
A Correct.
Q Okay. So when you were referring to her alerting to those cans, you said she has smelled an accelerant, I know she has smelled an accelerant, that was actually a misnomer. She didn't smell an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

accelerant. She just smelled a --

A Ignitable liquid.

Q Okay. Do you know what the -- what do you use as the definition of accelerant? Do you have a guideline you follow to say what the definition of an accelerant is?

A What I would call an accelerant would be an ignitable liquid or of its type that would accelerate a fire.

Q Okay.

JUDGE GILL: I'm sorry. Would you say that again? I didn't understand the last thing you said.

THE WITNESS: An accelerant would be a chemical such as an ignitable liquid that would accelerate a fire.

BY MS. GIORDANO:

Q And PJ can only detect the presence or absence in the negative of the odors of chemicals, compounds, or substances to which she's been trained to recognize?

A Correct.

Q And she has not been trained to recognize all substances I think is your testimony.

A Correct.

Q Okay. And she cannot tell you when she alerts to a compound --

JUDGE GILL: Just a moment, please. We're having --

MS. GIORDANO: Okay.

JUDGE GILL: -- a technical problem.

MS. GIORDANO: Okay.

JUDGE GILL: Well, let me turn it off.

(OFF THE RECORD)

JUDGE GILL: Just a second, sometimes it -- three out of four is not usually bad. We got four tapes going now. We got one -- one is just slow.

BY MS. GIORDANO:

**Q Let me go back to what we were talking about. PJ cannot input a motive nor determine the use of what she's detected? She's just telling you she detects something; is that correct?**

A That's correct.

**Q And therefore, she can't tell you if she alerts to something, whether it is an innocent chemical compound or a substance that was used to -- is an ignitable substance or to accelerate a fire?**

A Can I explain a little further on that?

**Q Yes or no?**

JUDGE GILL: You can answer the question and then explain all you want.

A No.

MS. GIORDANO: That -- please. That's what I was going to say.

A No. No.

**Q No? Okay.**

A PJ was trained on several different types of ignitable liquids. And I believe I named a few of them off earlier. She would have no reason to alert on anything except those ignitable liquids that she's been trained on, if you understand what I'm saying.

**Q I understand, but you still don't know what the use of that substance may have been. In other words, it could be an innocent chemical or compound found in a household -- something I use in my household. And if you alert that --**

A I understand what you what you're saying. It still could be the make-up of the product that she was trained on.

**Q And you agree with that?**

A Yes.

**Q Okay. Now, you were called into the scene -- I'm not sure who you said gave you the call -- but you arrived there on September the 12th -- was your testimony.**

A I didn't testify to what day I got there, but I don't remember it was 11th or 12th.

CRIMINAL TRIAL

122

**Q You don't know what day you got there?**
A No. I don't recall.
**Q I'm sorry?**
A I don't recall what day it was.
**Q Okay. And you don't recall -- I think you were asked if you know how many days after the fire. You do not recall that as well?**
A No.
**Q All right. But you recall arriving here in Russellville?**
A Yes.
**Q And you've already mentioned that when you first got here, before you did anything else, you went out and had breakfast?**
A Yes.
**Q And who did you have breakfast with?**
A Alan.
**Q Alan being Alan Gregory?**
A Alan Gregory.
**Q And he's previously testified he's the deputy fire marshal. He's previously testified here today that he is the deputy fire marshal; is that correct?**
A I assume so.
**Q Okay. And what was the nature of your conversations with Mr. Gregory at breakfast?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A Well, it was pouring down rain and so we decided to get a bite to eat. And -- and I like to have a little bit of -- of information of what I'm going into. And he basically just described -- or just gave me, not described -- but just filled in me on what was happening, and -- and that he had felt some different things and wanted me to look at it with a dog and -- and see if I would have a same opinion as he had.

**Q So when you said he felt some different things, did he tell you specifically what he had found or what he believed he had found?**

A No. As a matter of fact, I -- I -- I don't want him to do that, you know, for the simple reason I want the dog to show us what she's done because the last thing I want to do is -- you give the dog discredibility [sic]. And so I don't really want to know a whole lot about the scene other than just basic information.

**Q Well then let me ask you again. What exactly did he tell you then? You just said he --**

A It's been a year-and-a-half ago. I'll do the best I can.

**Q I know, but you remembered today exactly where the dog went so I'm you asking you about that conversation.**

A That's because I had something to refresh my

KENTUCKIANA
COURT REPORTERS

memory. If you can give me a tape, I can tell you too.

**Q Could you remember what he told you?**

A Some, vaguely. He explained to me that we did have a structure fire, or I wouldn't be there, obviously. And then he went into some detail about the -- suspects had been drinking and one of them was found in the back at another neighbor's house and so forth. And that there was some speculation about what was going on that night. I think there was a domestic and -- you know, just things of that nature.

**Q So did he -- was it your understanding it had already been determined it was an arson?**

A Nope.

**Q Okay. What did he tell you about the premises, about the scene, or about the property you were getting ready to examine with PJ?**

A He told me the areas that had been burnt. And of course he told me about the little boy that had been in there and how the mom had went in. The police officers had went in at that time. And where the smoke and such was at at that time. And basically all the damages up toward the front part of the house. That was about it.

**Q And you say he told you the areas that had been burnt. When you're looking at that diagram behind**

KENTUCKIANA
COURT REPORTERS

**you, do you recall which areas he told you have been burnt?**

A Well, basically, he said just the front part of the house. So after I got there, I just assumed it was just this area here (indicating) and I didn't realize this back here (indicating) until I got inside.

**Q Did you-all discuss fire patterns?**

A No.

**Q Did you discuss any unusual findings he had or that anyone else involved in the investigation had?**

A No because I don't want to -- I don't want to know what those are.

**Q Did you tell him that? Did you say don't --**

A Well, he didn't bring it up.

**Q So he didn't bring it up, and you didn't.**

A I didn't ask.

**Q You didn't have to tell him don't tell something?**

A I -- I did ask one question that whether or not there was a presence of any ignitable liquids in the house such as lighter fluids and things like that, that -- that you would find in an ordinary household. And I -- I don't remember what his response was to be honest with you.

**Q And then right after that is when you went to**

KENTUCKIANA
COURT REPORTERS

**the scene and undertook the investigation you referred to when you were being questioned by Mr. Orange?**

A Well, I didn't really do any investigation. My job was just to run the dog through there.

**Q Well, you testified a few minutes ago he asked you what all you had observed, and you testified several things.**

A What? I did. I didn't testify to investigating the fire.

**Q Well, what did you consider your job?**

A To run the dog through there and see if there was a presence of ignitable liquids.

**Q You also apparently felt that was --**

A I'm an -- I'm a fire investigator, I'm going to look, okay? I --

**Q So your testimony you were just look --**

A I'm not trying to rude or anything, but it -- I'm going to look.

**Q So your job was there just to -- you said, "run the dog"?**

A Yes, ma'am. That was my sole role basically.

**Q You arrive at the scene. Who did you talk to when you arrived at the scene?**

A I believe it just Alan. He was the only --

**Q He was the only one there?**

A At that time. I think David came in later -- or Detective West came in later.

**Q Was Mr. Flowers there at that time?**

A That was later.

**Q Later? And Mr. West?**

A Later.

**Q And did you discuss with anyone what steps had been taken to preserve the scene at that point? Did you have that discussion with anyone?**

A Other than the fact that, I guess, permission was gained or they still had accessibility to the room -- or to the house.

**Q So you did?**

A Uh-huh.

**Q Did you discuss decontamination? What did you do as far as decontamination before you entered with the dog?**

A Well, every -- every scene that I go to, I clean up immediately after I leave. Of course, the only contamination I'm going to have is on my soles of my shoes because I don't generally touch anything other than maybe point out as far as what evidence to take, and I don't touch that most generally. But my boots are cleaned after every fire scene. In this case here, it was even raining so that made it even better.

CRIMINAL TRIAL

128

Q So prior to entering the home with the dog, you did not undertake any decontamination of yourself or your feet before you went in?

A My clothes were clean. I hadn't been to a fire scene prior.

Q Was that a yes or a no?

A That I'm -- I'm decontaminated. I don't have anything on me.

Q What steps did you take to decontaminate? Well, you walked through the yard into the home. Did you take any steps to decontaminate your feet?

A No, ma'am.

Q Did you ask whether or not other people had been in and out of there? Firefighters, or police officers, or bystanders? Did you ask whether or not any decontamination procedures had been set up by any of the fire personnel or the police prior to undertaking your investigation with the dog?

A No, ma'am.

Q Is it standard for you to do that?

A No, ma'am.

Q What about a log? What kind of a log do you keep or did you keep at the time that you undertook this -- I'll call it an investigation for lack of a better word -- investigation with PJ?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A Okay. I had a form that I have to fill out and send to the ATF quarterly. And on that form, all it requests on there is -- is who invited me to the fire scene, what agency invited me to the fire scene, and was it a positive or a negative scene. And I answered those questions.

**Q Is that sometime after you leave the scene that you answered those questions?**

A I do that as soon as I get back to my office.

**Q And that --**

A And they also --

**Q I'm sorry.**

A And they also inquire whether or not it was an ATF call out or an ATF assist.

**Q Who gets that form?**

A ATF.

**Q It's not made a part of this investigation?**

A No.

**Q You don't file it with --**

A I keep a copy, and then I send a copy to ATF.

**Q But do you keep any record of any sort at the time you're conducting an investigation? In other words, do you have a logbook where you're writing, and you do a diagram, and you're writing as you're walking through with the dog as to what the dog's doing, what**

**the dog doesn't do, any observations? Do you have any kind of a record of that whatsoever?**

A No, ma'am. Not on that case. Only the ones I've put my own interest -- my investigations I do, but if I'm called out to help somebody else, I don't.

**Q And are you aware -- did you ask him what else to make such a record or make a law for you?**

A I'd say being investigators, they were doing so. So no, I didn't ask.

**Q You assumed that the investigators were doing so?**

A Well, they were videotaping it so...

**Q And do you know whether or not there is a video tape of your work with PJ?**

A I can't answer that.

**Q You don't know?**

A I don't know.

**Q So to the best of your knowledge, there is no concurrent record of what happened while you were in there with PJ that day?**

A I haven't seen the videotape, no.

**Q And haven't seen any other records anyone may have kept?**

A No, ma'am.

**Q Okay. Did the agency in charge of the scene**

make you log in and log out anything of any nature? Any entries of any kind?

A I didn't see anything, no.

Q Now, you are now aware that the samples that were sent to the lab were negative for ignitable fluids?

A Yes, I am aware.

Q In your training, what are you taught in your own training about what we call unconfirmed alerts? What would be an unconfirmed alert?

A If a -- if a canine alerts, and it's sent off to the lab and it cannot be confirmed, and then the lab agree with the canine, it's an unconfirmed alert.

Q An unconfirmed alert. And in your training, what are you taught about an unconfirmed alert?

A That they can't be used.

Q And why?

A There's no backup to support the dog.

Q Basically, what you're told in your training is that if it's unconfirmed by a lab -- a lab being a laboratory -- it can't be used as evidence because it is, in fact, unconfirmed?

A That's correct.

Q The dog is only a tool to find something, right?

A That's correct.

**Q It cannot confirm that it is something.**

A That's correct.

**Q What is pyrolysis? Tell the ladies and gentleman of the jury what is pyrolysis.**

A Pyrolysis is a degree that the wood is burnt. It's degrading of the wood. The wood itself is not actually what's on fire. It's the vapors that's coming off the heated wood. And -- and these vapors sometimes will come from a deeper segment which will cause a deeper pyrolysis in the -- in the part -- in the combustion.

**Q And isn't it true that sometimes these trained canines will alert the pyrolysis?**

A Depending on what type of wood is being burnt.

**Q Understood. But sometimes, depending on the type of wood, a dog will alert the pyrolysis as opposed to an ignitable chemical or a ignitable substance?**

A That's correct. That's correct.

**Q So that would be a false alert?**

A That's correct.

**Q How do you record your dog's alerts? Do you have -- I asked if you kept a record of this time, but do you have any kind of -- when you're scoring -- maybe scoring's a better word -- do you have any method you used to score your dog's alerts?**

A Well, no and -- and -- and the reason why is because I do so many different fire scenes in so many different locations, not all of the investigators get back with me and either tell me if the dog got a confirmed alert or a negative alert so there would be no sense in it because I'm not getting accurate results.

**Q And is there any way to follow up on that yourself?**

A Yeah, I could probably take the time to call them.

**Q And normally that's not customary?**

A No.

**Q Okay. You recall -- Mr. Orange has asked you about a previous hearing we had when you testified regarding PJ's work at this fire here in Russellville, correct?**

A Yes. Yes.

**Q On that date, you could not recall and did not have any record of where PJ alerted at this structure on 638 Bonnie Drive; is that correct?**

A Yeah. I believe I told you that was correct because I didn't have any resources to look back to.

**Q Today, you've come here, and you spent the day -- you reviewed some photos with Detective West; is that correct?**

A That's correct.

**Q And he took you back out to the fire scene?**

A That's correct.

**Q And now you do remember?**

A Yes, ma'am.

**Q And how many fire scenes have you investigated since -- and I know this is an approximation. I know you don't know for sure. How many fire scenes have you investigated since September 12th 2004 approximately?**

A 150 to 200.

**Q A lot of fire scenes.**

A Yeah.

**Q You provided -- I'm sorry -- to Mr. Orange some time ago a document that is actually a manual that you used to go by in your -- I get -- well, just tell me -- this manual -- I'll show it to you. I think you know the one I'm talking about. Get to here in a minute.**

MS. GIORDANO: May I approach the witness, Your Honor?

JUDGE GILL: You may.

BY MS. GIORDANO:

**Q Go ahead. I was just going to show it to the Judge to look at.**

A That's fine. Let me look at it.

JUDGE GILL: Thank you.

PageID #: 2152
CRIMINAL TRIAL
135

MS. GIORDANO: Thank you. Have two.

**Q Just tell us what that manual is and how you received it.**

A This was given to me at the ATF Academy where they train the handlers and canines. It goes into to discuss a little bit -- a little bit about the history of the Canine Acceleration Detection Program, and the feasibility study, and the ATF pilot project.

**Q Is it somewhat of a training manual? It's not in great detail, but is it an outline or guide that you're given to go by in your work as a canine handler?**

A Yeah.

**Q And I think you, at the request of Mr. Orange, had provided to him -- like I said, it was some time ago. You were supplying some materials that he owned that you rely upon and that was a document that you provided to him.**

A Uh-huh.

**Q And, in fact, you do refer it and use it from time to time in your training?**

A Yes. Yes.

MS. GIORDANO: I'd like to have this marked. It's got collate there as well, and I'm going to staple it if that's all right.

JUDGE GILL: All right. We'll mark that as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Defendant's number -- what number?

(DEFENDANT'S EXHIBIT 101 ADMITTED INTO EVIDENCE)

CLERK: 101.

JUDGE GILL: 101? Okay.

MS. GIORDANO: And I'll move the introduction of Defendant's Exhibit 1.

JUDGE GILL: All right. And I'll mark it as admitted, then.

(DEFENDANTS' EXHIBIT 1 ADMITTED INTO EVIDENCE)

MS. GIORDANO: Thank you, Judge.

BY MS. GIORDANO:

**Q Mr. Cannon, how did you develop an accurate statistical model of PJ's performance? Is that something you're required to keep?**

A We've got a -- a daily worksheet that we have, okay? And on that worksheet it goes down and breaks down into several different things that the dog could be trained on, and what the dog was -- or what was cooked up, or what was burnt the dog had trained on. And also, at the top of that, I believe it gives whether or not it was a negative response or a positive response. And then that's about all I have to go with.

**Q If that log is a training log -- in other**

words you're logging how she performs in training. Is that my understanding?

A Yes. Yes. Yes.

Q Do you keep a separate log for how she actually performs --

A No, ma'am.

Q -- when she's called out to do a job?

A No, ma'am.

Q Do you keep a record of that at all, other than the ATF record you referred to where you just send in and say you were called out and so forth?

A No, ma'am.

Q So how do you know when it's time for her to be re-certified? Is that just based on the training records?

A No, that's -- that's ATF's call. They -- they send us e-mails or letters letting us know the dates, and times, and locations, and when we need to be there with our canines for the annual training or recertification.

Q If you don't keep records on her performance in the field, how do you know she's performing to the standards that have been set in the field?

A As I explained a while ago, I can't get a lot of the investigators to call back and tell me what type

 of response they were getting back from the lab.

Q Is that not important to you? I mean, if you're taking this dog out, and come in to testify in trials, and gather evidence at the scene, is it not important for you to have a record of whether or not she's having false positive or confirmed results? Is that not an important factor for you to know?

A Yes, it is. And -- and there's even been an occasion where a lab technician will call and tell you what your dog is doing, which I have had on one occasion.

Q But you don't keep a record of it?

A No, ma'am. I don't have --

Q You don't have any record today in the field -- not in training -- but in the field, you do not have a record today of how many times she's been confirmed or she's been given alerts that were not confirmed by the lab. And therefore, according to your own manual, not to be used as evidence? You do not have a record of that?

A No.

Q In some cases, you don't even know because unless -- what you're saying is unless the lab calls you and says hey, by the way, I thought you'd want to know your dog's performance was -- you know, made these

KENTUCKIANA
COURT REPORTERS

alerts but everything came back negative. If they don't voluntarily call you back, and you've said I don't call and follow up so you don't even know that?

A That's correct.

Q So out of these 100 fires, it's possible that out of 50 of them, PJ's been wrong, and you wouldn't even know that?

A But it's also possible that out of 75 of them, she was right.

Q Absolutely, but you don't know.

A No.

Q You don't know if it's been 99, or 20, or ten, or 100, or five. You don't know.

A That's correct.

MS. GIORDANO: I'll pass the witness, Your Honor. Thank you.

JUDGE GILL: Any redirect?

MR. ORANGE: Yes, sir.

REDIRECT EXAMINATION

BY MR. ORANGE:

Q Do you have a copy of that document that was referred to you in front of you?

A No.

Q Not --

UNIDENTIFIED MALE SPEAKER: I've got it here.

**Q I can refer you to a set of similar documents.**

A Yes, it is.

**Q Same thing, just a copy?**

A Yeah.

**Q Now, I believe I understood your testimony correctly, that this is a document that you received from the ATF when you became involved in their program?**

A It is.

**Q When was the ATF accelerate dog program started? Do you know?**

A They say it was started in 1982. The feasibility study.

**Q And can a canine respond to the accelerant odor with greater sensitivity than other methods it can be used?**

A It's my belief they can.

**Q And can a canine differentiate between accelerants and similar chemical gases that might normally be found in a home?**

A And -- and again, it would depend on the makeup of that chemical.

**Q And according to this document, the accelerant detection canines properly trained and used can be a very effective investigative tool for the fire and arson investigators. Is that something you agree with?**

A Yes, it is.

Q And it continues -- and I'm on the last page or next to the last page. "Its responsibility to professionals in the field of fire/arson investigation and professional canine handlers -- excuse me -- trainers/handlers to ensure this valuable tool is used properly to accomplish our arson investigation goals in the United States." Is that what it says?

A Yes, it does.

Q And in your use of the dog PJ out at the scene that we've talked about, and your observation of what took place with other fire investigators there, was PJ used responsibly investigating this fire?

A Yes, she was.

Q And are you aware of any misconduct, or misuse, or any sort of improper use of PJ by yourself, or anything else connected with this fire?

A I certainly didn't, and nobody else is going to near her so no.

Q And have you seen laboratory reports from the Kentucky Labs before? Are you familiar with them?

A I'm familiar with the reports, yes.

Q Okay. And isn't it true that many times they continue the statement that does not exclude --

MS. GIORDANO: Objection. I mean, unless he's

KENTUCKIANA
COURT REPORTERS

seen this lab report.

JUDGE GILL: He's going to read that statement that we've heard so many times today. He's asking whether he's heard that and is there -- where we headed with this?

MR. ORANGE: Basically, I'm asking what that means to him.

JUDGE GILL: Okay. On the basis of relevance, I'm going to sustain the objection.

BY MR. ORANGE:

**Q There was a number of questions asked of you about the dog hitting on certain types of wood.**

A Yes.

**Q Ms. Giordano used a big word. Can you help me remember what that --**

A Pyrolysis. Pyrolysis.

**Q Pyrolysis? Okay. Thank you. What does pyrolysis mean?**

A Well, we used to call it alligator-ing [sic]. It's the way the wood is burnt, and well, it kind of looks like an old alligator's back.

**Q And --**

A Another term is shiny blisters.

**Q While you were down at the scene on Bonnie Drive, did you see any cedar wood or a conifer-type wood**

**in that house?**

MS. GIORDANO: Your Honor, may we approach?

JUDGE GILL: Counsel, step up just a minute.

(BENCH CONFERENCE)

MS. GIORDANO: Judge, my objection to this line of question is number one, the condition of the wood was in. I can't imagine how anybody could determine the wood it is. And number two, he's not an expert in deciphering oat from pine from cedar. And even if he is, he doesn't qualify as such.

JUDGE GILL: What you're saying he needs to establish a foundation before he goes into it?

MS. GIORDANO: Yes, sir.

JUDGE GILL: All right.

MS. GIORDANO: That's a better way of saying it, Judge.

JUDGE GILL: All right.

MR. ORANGE: She brought it all up.

JUDGE GILL: I understand, but she's saying you need establish foundation if he's going to do that.

(END OF BENCH CONFERENCE)

BY MR. ORANGE:

**Q Do you have any practical knowledge -- identification of various types of wood? For instance, do you know what difference in pine, oak, hickory, if**

**you were looking at it?**

A Some, yes.

**Q And did you look at the wood in the house when you were down on Bonnie Drive?**

A I didn't pay attention to it, no.

**Q Did you notice any of this alligator-type burning down there when you were -- at Bonnie Drive?**

A Yes, I did see that. I thought -- I thought you was talking about the clean wood or things of that nature. Yes, I did notice burn areas.

**Q Okay. You did notice burn areas?**

A Uh-huh.

**Q Was there any kind of alligator design on the wood that you noticed?**

A Yeah.

**Q And do you know whether that was cedar, or pine, or what kind of wood it was?**

A It appeared to be mostly pine.

**Q And did your dog hit on any of that pine?**

A She hit -- there was some base board in that back bedroom beyond the living room -- this area back here (indicating). There was some baseboard right in there and some pine plate on top of the floor in that area. And of course the bed was wood product, but I'm not sure what type of wood product the bed was.

 **Q And do you know whether your dog can detect the presence of accelerants at a lower level than current laboratory technology available?**

A They can.

MS. GIORDANO: I'm sorry. What was the response?

A They can. Do I have any proof of that? No.

JUDGE GILL: Hang on just a second here. Do we need to do something to help you guys?

BAILIFF: She wanted me to give this to --

JUDGE GILL: To who?

FEMALE JUROR: Yeah, to get my daughter's prescription picked up. I'm not going to make it in time, so I've got somebody who's going to pick it up for me.

JUDGE GILL: Okay. You got somebody that's going to do that?

FEMALE JUROR: (No verbal response.)

JUDGE GILL: Who's going to do that for you?

FEMALE JUROR: I'm going to have her call her sister.

JUDGE GILL: Okay. All right. Do you the know the lady there to have her call her sister and have the prescription picked up? All right. I think we better -- is that -- can you just do that? Who do

you want to ask to pick your prescription up?

FEMALE JUROR: I was going to have her call her sister to see if she'd pick it up for me because I'm not going to make it in time.

JUDGE GILL: All right. Okay.

UNIDENTIFIED FEMALE SPEAKER 1: Does she know where -- does she know where to pick it up?

FEMALE JUROR: (Inaudible)

JUDGE GILL: Okay. All right.

MS. GIORDANO: Judge, may we approach?

JUDGE GILL: Okay.

MS. GIORDANO: You knew it was coming, didn't you?

JUDGE GILL: Yeah. Yeah. Come here.

(BENCH CONFERENCE)

JUDGE GILL: What you up here about?

MS. GIORDANO: Well, I guess that one, I'm concerned about the interaction with the -- not any thought that Mr. Orange was interacting with the prosecution team.

JUDGE GILL: Okay.

MS. GIORDANO: And I guess I also have a concern about this juror.

JUDGE GILL: Uh-huh.

MS. GIORDANO: And the question was asked if

they knew anybody that worked in county attorney's office --

JUDGE GILL: Why don't we break for the evening and come back in the morning?

MS. GIORDANO: Okay. Finish up. That's fine.

JUDGE GILL: Yeah. Finish up with this witness.

MS. GIORDANO: Let her go, yeah. That's fine.

JUDGE GILL: It's 5:30. Then we can --

MS. GIORDANO: That's fine. I don't have much --

MR. ORANGE: We're just going to stay overnight from Georgetown, but I guess we'll do what you say.

JUDGE GILL: That happens sometimes. All right.

MS. GIORDANO: Thanks, Your Honor.

(END OF BENCH CONFERENCE)

JUDGE GILL: Why don't we do this? It's going on about 5:25. And we're going to have to break, and we'll reconvene tomorrow morning at 9:00. Remember the admonitions I've given you. Any questions from any of the jury before we break?

UNIDENTIFIED FEMALE SPEAKER 2: (Inaudible)

JUDGE GILL: I'm sorry?

UNIDENTIFIED FEMALE SPEAKER 2: (Inaudible)

KENTUCKIANA
COURT REPORTERS

JUDGE GILL: Okay. Let's all rise and let the jury exit the courtroom. Yeah, 9:00 in the morning -- about 9:00 -- we're going to be here at 8:00. You-all be here at 9:00. Jury's here at 9:00.

(JURY EXITS THE COURTROOM)

JUDGE GILL: Okay. Let's all be seated. Counsel, step up just a second. Hey, Victor (phonetic). Would you quickly run and give this $10 back to that juror?

VICTOR: Which one?

JUDGE GILL: The young lady who needed her prescription picked up if you can catch her. "There's $10 wrapped up in this note. Can you call and ask if she can pick up Tia's medicine for me at the medicine shop? They close at 6:00. Here's the money." Okay. What do you-all want to do now?

MS. GIORDANO: I don't know, Judge. I don't know.

UNIDENTIFIED MALE SPEAKER: Certainly, if we go through this trial and get a conviction and appeal, how's that going to look? The appearance -- it certainly looks terrible for me if the prosecution and a juror is --

JUDGE GILL: We haven't established for the record where this note was going.

UNIDENTIFIED MALE SPEAKER: It could, though. I'm taking that. There's an African American juror. I can't remember her name right now.

JUDGE GILL: Yeah. And this note was going to

MR. ORANGE: I have no idea, but I have a lady who works for me sitting behind me --

JUDGE GILL: Who'd she want you to give this note to?

BAILIFF: Her (indicating).

JUDGE GILL: Okay.

UNIDENTIFIED MALE SPEAKER: Linda Yancey (phonetic).

JUDGE GILL: Linda Yancey. Okay. All right.

MR. ORANGE: Who's an employee at the Commonwealth's Attorney Office.

JUDGE GILL: Okay. Well -- so what's the problem?

MS. GIORDANO: Well, I don't want to say that I did without reviewing the tape, but customarily I --

JUDGE GILL: For the record, the jury's out of the courtroom, out of sight and sound.

MR. ORANGE: And for this here --

MS. GIORDANO: And the community is here. Customarily, I asked the jurors during voir dire if they know anyone who works at the Commonwealth

Attorney's Office. Now, I'm not by all means was aware that I did that but --

JUDGE GILL: I don't think Linda was here that day either. You weren't here when we chose the jury, were you? Were you here?

MS. YANCEY: No, I wasn't.

JUDGE GILL: Okay.

MS. GIORDANO: And she probably wasn't identified by name.

JUDGE GILL: Right.

MS. GIORDANO: But I guess I probably need to take a minute to review that and just see if that's an issue.

JUDGE GILL: Okay.

MS. GIORDANO: I just think we would be remiss if we didn't call it to the Court's attention. And I'm not saying it's any fault of Mr. Orange's --

MR. ORANGE: I want to put it on the record that the Commonwealth -- and I'm going to say personally I have no idea what's going on here other than what occurred in the courtroom. But, obviously, we have some duty to say that this trial is conducted fairly. And I have not spoken to Ms. Yancey other than I told her to be quiet since this occurred. But I would like for us just to bring her

up here before --

MS. GIORDANO: That's fine. That's fine.

MR. ORANGE: -- Ms. Yancey be condemned for. And the Court ask her what her relationship is, and then everybody will have it on top of the table because I don't know.

MS. GIORDANO: That's fine with me, Judge.

JUDGE GILL: All right. Ms. Yancey, did you know the juror?

MS. YANCEY: I do know her.

JUDGE GILL: Okay. How do you know her?

MS. YANCEY: She's a friend of one of my sisters.

JUDGE GILL: A friend of your sister's? Okay. And where does she live?

MS. YANCEY: Where does the juror live?

JUDGE GILL: The juror live. Yes.

MS. YANCEY: She lives in Auburn.

JUDGE GILL: In Auburn? And how did you get to know her?

MS. YANCEY: Through my sister.

JUDGE GILL: Through your sister? And where does your sister live?

MS. YANCEY: She lives here in Russellville.

JUDGE GILL: Okay.

MS. YANCEY: Okay. But they work together.

JUDGE GILL: Okay. How long have you known the juror approximately?

MS. YANCEY: Five or six years, maybe.

JUDGE GILL: Five or six years? So you didn't know her growing up, or going to school with her, anything like that?

MS. YANCEY: No.

JUDGE GILL: All right. Anything else?

MR. ORANGE: When you say, "by knowing her," is this a -- where you-all meeting once a year or do you have Sunday dinner every day -- every Sunday together or what kind of relationship is that?

MS. YANCEY: I see her occasionally.

JUDGE GILL: Okay.

MS. YANCEY: Like I said, she hangs out with my sister.

MS. GIORDANO: Has she had any conversations with you during the course of this trial?

MS. YANCEY: No. Absolutely not.

MS. GIORDANO: She hasn't sought out to talk to you or called you at home or anything of that nature? You have not talked with her in any way whatsoever?

MS. YANCEY: No. NO. No. No, absolutely not.

JUDGE GILL: Okay. So what do we do now? My take on it right now is a juror had a need. She saw a friendly face, wanted somebody to help her, reached out for help. Okay. Unless I hear anything in motions or anything else on that, that's all I'm going to say about that and --

MS. GIORDANO: I reserve the right to think it over tonight if there's something we'll bring it for the Court at 8:00 but I don't --

JUDGE GILL: Yeah, I think we need to talk about it tomorrow if it's something.

MS. GIORDANO: I don't anticipate.

JUDGE GILL: All right.

MS. GIORDANO: We'll talk about it.

JUDGE GILL: Let us know if there's something we need to talk about.

MS. GIORDANO: All right.

JUDGE GILL: And -- let's see. Where were we when that --

UNIDENTIFIED MALE SPEAKER: I think the Judge needs to reiterate to the jury if they need a break, if they need to do something, just raise their hand so that we don't -- and the Court can address them, and then we don't have any --

JUDGE GILL: I thought I saw her trying to flag

somebody down. It was you, Wayne. I looked and she didn't do anything right then so she apparently -- she may have tried, and I just didn't see her. Okay. All right.

UNIDENTIFIED MALE SPEAKER: I'll try pay more attention to.

JUDGE GILL: Okay. Remind me tomorrow, and I'll reiterate that. Anything else we need to talk about before 8:00? And we'll see you-all at 8:00 in the morning, right?

MS. GIORDANO: Yes, sir.

MR. ORANGE: Yes.

JUDGE GILL: All right. We better quit so we don't stay here all night.

UNIDENTIFIED MALE SPEAKER: What are we doing today?

JUDGE GILL: 8:00 tomorrow we got a hearing.

MS. GIORDANO: Oh, he might not have been here.

UNIDENTIFIED MALE SPEAKER: I was. I was just kidding.

JUDGE GILL: All right. We'll see you at 8:00 in the morning. Thank you.

MR. ORANGE: Thank you, sir.

JUDGE GILL: Court's adjourned until 8:00.

(HEARING ADJOURNED AT 5:29 P.M.)

 JUDGE GILL: All right. Let's go ahead and call our next witness, please.

MR. ORANGE: Your Honor, Mr. Cannon was on the stand.

JUDGE GILL: Okay. Yeah, that's right. And I'm going to remind you that you're still under oath just like you were yesterday. Just go ahead and have a seat. I believe we're going to have a cross examination or were you finished with him?

MR. ORANGE: I was finished with my, I believe, redirect.

JUDGE GILL: Okay. And were you-all finished with your cross?

MS. GIORDANO: We are, Your Honor.

JUDGE GILL: And maybe I didn't get to the point where if the jury --

MS. GIORDANO: Well, we didn't get to that point. And I said we had some more questions. I don't have anything else to ask him, maybe the jury does.

JUDGE GILL: Okay. Any questions from any member of the jury of this witness? We do have a question --

MS. GIORDANO: Yeah, I have a full set.

JUDGE GILL: Okay. We have a couple of

questions.

MS. GIORDANO: Okay. Yeah.

(BENCH CONFERENCE)

JUDGE GILL: Okay. We got a bunch of other questions here.

MS. GIORDANO: I think there was a lot of them.

JUDGE GILL: All right. "If the trailer had been painted a few months ago and it got on the floor, would the dog detect it as a flammable (The owner said they replaced the smoke detectors because of fresh paint to make it look better)? Does it matter how long a chemical has been on the floor for the dog to detect? Days, months, or years?" Okay. Any objections to those? I'll just put that there.

MS. GIORDANO: No.

JUDGE GILL: "Does the weather have an effect on PJ's alerts? Could you absolutely say that the -- something you use during" -- I don't know what this says.

MS. GIORDANO: "(Inaudible) tool you used during -- was free of defect?" I don't know what they're referring to or what word.

JUDGE GILL: Okay.

MS. GIORDANO: Good Lord. I'll put it right there.

JUDGE GILL: I'm looking at this word. Is this word --

MR. ORANGE: I think she said was PJ free of defects?

JUDGE GILL: Oh. Maybe it is.

MS. GIORDANO: Is that what that says?

MR. ORANGE: PJ is a two.

JUDGE GILL: Okay.

MS. GIORDANO: Well, that's fine.

MR. ORANGE: Was there two free of defects -- or was there two in good working order?

JUDGE GILL: I'm thinking we'll stay away from that one.

MS. GIORDANO: Probably because we're not -- yeah. We'll stay away.

JUDGE GILL: Yeah, I think we're going to stay away from that question. "How do you calibrate PJ?"

MS. GIORDANO: That's a good question.

JUDGE GILL: Yeah. I can't believe that.

MS. GIORDANO: I missed that one back.

JUDGE GILL: He did mention that.

MS. GIORDANO: Better questions than I asked of him.

JUDGE GILL: "Do you also have the same fluid -- I guess -- or calibrated with a control fluid

that is not ignited?"

MS. GIORDANO: Okay.

MR. ORANGE: A follow-up question on that is when we told me that he uses different levels of parts per million in calibrating him, which I didn't know that until I asked him.

JUDGE GILL: Here's one: "Where were the locations of the alligator burned wood? Does Kingsford fluid contain hydrocarbons? Would the dog alert to this fluid?" Do we want that?

MS. GIORDANO: Yes, sir.

MR. ORANGE: I'm not sure he's an expert in hydrocarbons of Kingsford fluids. He may or may not know.

MS. GIORDANO: He didn't even know what one was. I don't know.

JUDGE GILL: "Do you remember the last time that PJ had been recertified before he had been taken to this crime scene?"

MS. GIORDANO: No problem.

JUDGE GILL: Okay. All right. Mr. Cannon, I'm going to go over some of the juror's questions. Do you recall the last time PJ had been re-certified before he was taken to this crime scene?

THE WITNESS: It would have been either May or

April the same year.

JUDGE GILL: 2004?

THE WITNESS: Yes.

JUDGE GILL: Okay. And maybe part of that question: How does he -- who recertifies and how does that happen?

THE WITNESS: ATF recertifies the canine at various locations across the US because they have so many dogs spread out.

JUDGE GILL: Okay.

THE WITNESS: And of course they get cities to put in a request to sponsor that event. And the dogs are -- are gone through some annual tests. We have to produce the vaccines for the dog also, the medical history for the year, along with the physicals. And then the dogs are run through a series of tests. They'll do can-lineups where they may have 40 cans sitting out there and only ten of them will have accelerant put in them. And the dog will run by those cans and sit at the appropriate ones that have the accelerant or the ignitable liquid. And of course be fed and rewarded or we call it -- we usually just pet them and tell them what a good girl they are and then reward them with food. Then there's another pinpoint test that

they'll do. They'll take a -- maybe a two- foot square piece of carpet, and they'll put maybe in one corner or in the center -- somewhere on that piece of carpet they'll put a -- a drop of liquid accelerant on that. And then the dog will have to get within three inches of that in order to pass that test. We'll drop a flag down and they'll do several burns, whether they'll be real structures or they'll do burn cells. And they may have furniture put in there and they'll hide an accelerant some place in that structure. And the dog has to find that and make the proper alert and -- and pass at 100 percent.

JUDGE GILL: Okay. And how do you calibrate PJ?

THE WITNESS: I calibrate her before we enter and then after we leave the scene. Just before we go in and directly after we come out. Again, as I stated yesterday, I will move away from the fire scene somewhere -- maybe out on the blacktop and find a crack, or just a bottle cap, or just anything -- a leaf -- and I'll put down five or ten microliters of accelerant in that specific area. And I'll run the dog in the area and her -- her response is to pick it up, find it, and locate it,

and make the alert.

JUDGE GILL: Okay. And what accelerant do you use for that?

THE WITNESS: It varies. I've got 17 different types that I use. And it will vary from, you know, maybe I used diesel fuel to train her on yesterday so I may use lighter fluid today. If I use lighter fluid today, I may use kerosene tomorrow, you know, it will just vary. I'll mix it up so she don't get trained on the same accelerant daily.

JUDGE GILL: Okay. And have you ever calibrated with a control fluid that is not ignitable?

THE WITNESS: No.

JUDGE GILL: Okay. If this trailer had been painted a few months ago and that paint was on the floor, would the dog detect that as flammable?

THE WITNESS: No.

JUDGE GILL: And does it matter how long the chemical was on the floor before a dog to detect it?

THE WITNESS: There's a manual that I was looking at through the night and dogs have been used as long as 18 days after a fire scene so there's -- you know, gives a reason to respond within, say, six or eight hours. But ATF done a test that I was

visible -- or present and -- and visually saw this test. There was six months difference between the class I attended and the class that graduated prior to me. And they had put some drops down in a crack in an old parking lot six months prior. And the dogs that we had -- just for kicks and giggles, we decided we'd take the dogs over and see what they would do. Well, the dogs were alerting on -- on accelerants that had been down for six months.

JUDGE GILL: Okay. And does Kingsford lighter fluid contain hydrocarbons?

THE WITNESS: It contains an ignitable liquid, yes.

JUDGE GILL: You said it contains an ignitable liquid, yes? Would the dog alert to this fluid?

THE WITNESS: I've never tried her on it. I can't answer it.

JUDGE GILL: And where were the locations of this alligator-burned wood that you observed at the scene?

THE WITNESS: It was throughout the burned area in the front part.

JUDGE GILL: Say that again, please.

THE WITNESS: It was throughout the front part of the building.

KENTUCKIANA
COURT REPORTERS

JUDGE GILL: Okay. Any other questions from counsel?

MR. ORANGE: Yes, sir.

FURTHER DIRECT EXAMINATION

BY MR. ORANGE:

**Q I believe the jurors asked when PJ was recertified. The copy's a little fragile down, but I can show you this certificate and see if you could explain the document.**

A The document here is myself and PJ was graduated from the recert class April 5th of 2004.

**Q Is this a true and accurate copy certificate that you and PJ received from the ATF?**

A Yes, it is.

**Q And who's this from?**

A Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives.

MR. ORANGE: We believe this needs to be put into evidence.

JUDGE GILL: All right. We'll mark that as Commonwealth's next exhibit. We'll mark and introduce.

(COMMONWEALTH'S EXHIBIT ADMITTED INTO EVIDENCE)

**Q And you've indicated you use different -- I'm**

**going to get my terminology wrong -- but different -- what's the things you train her on?**

A Ignitable liquids -- ignitable liquids.

**Q Ignitable liquids. You use different ignitable liquids at different days, different times?**

A Not specifically in a random order. I'll just -- I just keep it mixed up so she don't get accustomed to alerting on one specific product.

**Q And do you know the level of concentrations of these ignitable liquids that you've used in training her?**

A I have used as little as five microliters and as many as 30.

**Q Say that again so I'm clear on it?**

A I have used as little as five microliters and as many as 30, so she doesn't get used to smelling specific amounts.

**Q Does that mean a drop of five microliters or can you explain that -- what you mean to that?**

A Five microliters would probably be equivalent to maybe two drops off an eyedropper.

MR. ORANGE: No further questions.

RECROSS EXAMINATION

BY MS. GIORDANO:

**Q Just a couple questions, Mr. Cannon. So you**

**said when testing was done on several dogs, including PJ, some of the alerts that they gave were on substances that have been there for as long as six months.**

A Yes.

**Q Okay. I forgot to ask you this yesterday. When you started testifying yesterday, you said -- you were referring to going when you first got to the scene at 638 Bonnie Drive. You said, "We first walked into the structure, and she wasn't really interested. She really didn't do anything so then I really put her to work." What'd you mean by that?**

A When you have a habit of letting the dogs try to do things on their own and -- and you have to have to understand that dogs have their own type of -- of attitudes, okay? PJ was like a little kid, okay? She was -- she was more interested in playing and things like that. And we always introduce the dogs into a structure first to let them work on their own to see what they find. And if -- if they get to goofing and playing around and -- that's when I get down and start presenting different things to her to where she'll put her nose down and start paying attention.

**Q So what did you present to her when you did?**

A I presented the whole structure to her. I walked around the baseboards, walked up and down, done a

diagonal crisscross of each room and -- and let her explore the back area of the structure that was unburnt.

**Q Did you start there at the front door and then move in a certain direction?**

A Yes. Left to right, all the way around. Yeah, left is --

**Q Round -- just kind of turn around there and look behind you. Just left through the building and**

A And we started off -- we come in this door here (indicating) and start it off here. And then so much debris here, we went down and around this way (indicating) and back up and down there in the living room area and then on back and came back up.

**Q So you would kind of direct her and ask her -- put her down a certain place or?**

A If there's a specific item I wanted her to check, yes, I would present it to her and ask her to see if she can -- she would sniff it.

MS. GIORDANO: Thank you. That's all I have.

JUDGE GILL: All right.

FURTHER DIRECT EXAMINATION

BY MR. ORANGE:

**Q Would you mind signing your name on that display?**

MR. ORANGE: And we move that as evidence in

our next numbered exhibit.

JUDGE GILL: All right.

(COMMONWEALTH'S EXHIBIT ADMITTED INTO EVIDENCE)

JUDGE GILL: All right. Will there be --

MR. ORANGE: That's all the questions I have.

JUDGE GILL: -- any questions from the members of the jury? If you don't mind. All right. And no questions from any member of the jury? Okay. Thank you, sir. You can step aside.

MR. ORANGE: Would witness be free to go back to Georgetown, Kentucky?

MS. GIORDANO: Yes, sir.

JUDGE GILL: He can finally be released. Thank you, sir.

JUDGE GILL: Just have a seat, please.

DIRECT EXAMINATION

BY MR. ORANGE:

**Q State your name.**

A David West.

**Q And who's your employer?**

A The Kentucky State Police.

**Q And how long have you been employed with Kentucky State Police?**

A It'll be four years August 1st.

**Q And what responsibilities do you have at Kentucky State Police?**

A I specialize in fire investigations for the agency and -- and -- and in addition to other type of work as well.

**Q And you assigned down the Bowling Green post?**

A That's correct.

**Q And what's your primary geographic area of responsibility?**

A I have eight counties.

**Q And is investigating fires in those eight counties one of your primary responsibilities?**

A That's correct.

**Q And what other specialized training have you had to investigate fires?**

A Well, in 1976, I completed a course. Got a certificate in Industrial Commercial Wiring and Blueprint Reading. I'm a member of International Association of Arson Investigators. I'm a member of the International -- or the National Association of Fire Investigators. I completed some training in 1983, became a certified fire alarm inspector. I've been to FBI evidence collection training. A certified peace officer. And I can't think of the year -- the year of the Oklahoma City bombing, I was in Denver this week in

some training with the U.S. Health Administration on explosive gasses in hospitals. My most recent training was completion last spring at Eastern Kentucky University with the -- the fire academy to receive a certification as a certified fire investigator.

**Q And are you a law enforcement officer as well as a fire investigator?**

A That's correct.

**Q And do you have continued education created that's required for that?**

A Yes, we're required 40 hours continued education annually.

**Q And are you a certified fire investigator?**

A Yes, sir.

**Q And can you tell us how one becomes a certified fire investigator?**

A Well, you have to have I believe it's five years of experience of minimum. You go before a National Advisory Board, kind of like a review board. They review your credentials. If they feel you're competent to take the test, then you're allowed to take a test. And with a score of 75 or better, if you pass on 100 question written test pertaining to pretty much every aspect of fire investigation, then you -- then your test goes before another review board in Saratosa

[sic], Florida. And then if they deem you qualified, they issue a license to you and a registration number.

**Q So you're properly registered, certified, whatever that is to be a --**

A Yes, I have a national registration number.

**Q And do you have a area of expertise or specialty that you developed earlier in your career?**

A Well, in 1976, I thought I wanted to be an electrical engineer and I pursued that rather heavily in -- in my beginning. I became a -- I went to University of Louisville in 1990. I took an examination -- a national examination to be a certified electrical inspector, and I passed that. And prior to that, I was a -- I was a contractor in the electrical and commercial and residential installations. And then I became an inspector. I worked locally for One Rule Electric and some utility companies until June 1st of '94. I went to the work for the State Fire Marshall. And as a state electrical inspector -- and at that time, I was also sworn in as a Deputy State Fire Marshall. And the two kind of intertwined between being an electrical inspector on state owned or leased properties for pretty much every university in the state. And then I was called out to --to investigate fires throughout the state as well during that tenure.

**Q And can you just tell us some of the practical experience you had investigating fires?**

A Well I've had -- I have quite a bit of experience with -- I've worked with ATF, FBI, state police. Some of the major fires that we've had in this -- in this part of the state or in this area as well as other areas in the state too, assisting other agencies with investigation and including the State Fire Marshal's office that I was once a -- a member of.

**Q And I believe you're just talking -- I heard you say something about marina fires?**

A Yes, I helped -- I did a lot of -- I can -- I can think of three major marina fires that happened out in the west Kentucky area. There was one I believe in '94 at Lake Barkley. A pier had burnt there. There was several really expensive boats -- yachts that burnt. I worked that case and it became into federal court into litigation -- into civil litigation. And after that happened, our office -- pretty much we didn't have a good standard on marina installations, which is NFPA 303. It's the document that governs marinas in Kentucky. And I helped write the standards to upgrade the laws in the state in reference that -- I --- I -- or that code.

**Q And approximately how many fires have you been**

**to as an investigator to help determine cause of origin and/or investigated from a criminal standpoint?**

A Mr. Orange, to be exact, I -- and this is just -- here again, a figure. 100, possibly. 75 to 100 fires. And here again, that's just an estimate.

**Q And in that 75 to 100, you got any estimate of how many have involved a fatality?**

A One, two, three, four, five. Well, I can recall six right now that involved fatalities. Six right now just off the top of my head that involved fatalities.

**Q And as part of your responsibility, were you called to come to Logan County on September 11th or 12th of 2004 to investigate a fire matter?**

A That's correct. I was called on Sunday morning, September the 12th, by Deputy Marshall Gregory in reference to a -- a mobile home fire where a child had perished in it at 638 Bonnie Drive here in Russellville.

**Q And do you recall about what time you arrived?**

A I around -- arrived around 10:15.

**Q And when you arrived, what was the situation regarding the scene?**

A Well, this was -- the first thing when I arrive to a scene is -- I pretty much don't want to talk

to anybody. I want to get out of my car, and walk around, and kind of get a feel for what's going on myself as well as look at the exterior of the structure. And so that's what I did. Of course the firemen were there. I remember the Fire Marshall's car. FM7, which is Gregory, was there. And I got out and walked around the trailer, started taking some pictures, looked at the electrical service on the exterior near the -- near the trailer, examined it. And when -- then once I completed that task, I went inside and I started -- I started from the area of north room -- the north master bedroom area. And the way I like to look at a fire scene is go from the area with least damage and work my way back to the area of greatest damage or area of concern. So that's what I did. Photographing along the way and some of the photographs you've seen -- that you've been seeing during this trial are the ones that I have taken. And --

MR. ORANGE: I'm going move this a little closer.

JUDGE GILL: Okay.

BY MR. ORANGE:

**Q By the way, does this diagram accurately depict the schematic of the scene you walked into?**

A Yes. And if you'll note the little disclaimer

down here -- of course it's not to scale, but I did -- I did this drawing. And it's a 12x70 mobile home is what it is with two rooms built on it. And so pretty much examined out here around this area. The service was right here (indicating). The electrical service was right here (indicating) near this door. Went in, started looking into the rooms, and I wanted to find out -- I want to get my own ideas about the soot line where the heat and soot -- at what levels it had -- had -- had generated to in this part of the trailer. And then I started working my way on through. Obviously, the scene had been overhauled when I arrived. This was, like, some 12 hours after the fact of the fire. Course the scene had been retained all night by the Fire Marshall as he testified and -- so there hadn't anyone other than authorized people on the property. But anyway, walked through, and started photographing, and looking at where areas had been clean and things had been overhauled.

**Q And what did you begin to find that -- anything of significance that caught your attention?**

A Well what caught my attention was -- I had a hole -- I started -- of course -- I see this hole in the living room or in the kitchen area right here (indicating). And then from the outside when I was walking around the entire property, I noticed right here

(indicating) by this shovel to the right of the window the skin of the trailer the aluminum had a hole burnt through it. And so I just -- I was taking mental notes as I was walking through and looking at this scene. And then I noticed down in this area here, which I later found to be the boys, N.Y, and Z.Y's, bedroom -- I noticed this paneling on this wall right here (indicating) that had a distinct V pattern that was -- appeared to be generated in this area right here (indicating). And it was going up that wall toward this wall right here (indicating) and then I believe there was a bookcase at one time right here (indicating). And it was also going this direction (indicating). So I had a concern here (indicating) -- a concern right here (indicating) of this hole in the kitchen floor which is not consistent with a solid type product. You know if you had -- and I'll give you an example of that. A liquid, a solid, and a gas. The most easily burnt product is a gas. I have with me today a piece of solid wood and I have some shavings from -- from -- from -- from wood just for a comparison and I have a can of lighter fluid. And with those three illustrations, I can show the similarities of how the three products will burn differently. But this three areas of importance. I then went and got with Alan Gregory, the Fire

Marshall. I talked with him and I expressed my concerns to what I -- what I was seeing.

**Q And so after you spoke with Fire Marshall Gregory and was Jack Flowers on the scene at that point?**

A Yes, he was.

**Q And what conclusion did you-all reach that you needed to be at that point?**

A We come to the conclusion that this was an intentionally set fire in this structure and that we had three points of origin in this -- in this mobile home.

**Q At that point, had the dog been through the structure?**

A Yes, Mr. Cannon was there with PJ and the dog had been through the structure. And at that point, I began to find out where the dog had been hitting -- where the dog had hit. And it just so happened it was the areas -- or three of the areas that I had a concern about. So then we began collecting evidence from these areas. And this material you see displayed here in front of me is the -- well, these materials right here (indicating) were relinquished to me from the Russellville Police Department or from the coroner. The ones on the other table are the ones that -- that we collected from the scene.

**Q If you could, could you just get up and come**

**around here and show us what you collected from coroner and -- if you don't mind, I'm going to move this board up a little closer to the jury so that if you need to refer to this, you can.**

A Okay. This is photographs -- and like I said, the date on the camera is off so please don't pay any attention to that. This is the boys' bedroom. This was the location that -- that like I said, I later found after my arrival and my survey that the dog had hit at this area. So we did a collection. Here's Mr. Gregory with -- with the gloves on collecting the product from this location. And this is Exhibit 34, which is noted here in this can as 34 and is on what we call a KSP 41 which is our evidence log. Okay. Okay. Now we move over here to item 32. If you remember going into the scene yesterday, when you walked in the front door, there's a couch. There's a couch sitting there. At the corner of the couch, next to the front door, if you remember -- and of course, this is -- the environment has somewhat depleted the couch since this happened, but this is how the couch looked on that Sunday morning. This is a -- this is what they call stirring foam and I brought a piece right there. That's similar product on that table over there. There was collection made off this product down on this couch. Carpet foam.

JUDGE GILL: Well, the jurors may not be able to see.

THE WITNESS: I'm sorry, Your Honor.

A Carpet foam. And we bridged a tag and we'll lay a tag where we're going to collect something. And in some instances it would feel like a measurement is needed and we'll do that also. But we collected some foam out of this corner of this couch. Yeah, this area (indicating) -- this is the same tag you're seeing right here only just closer up. And also adjacent to that couch, the carpeting in front of it, it has some irregular patterns like it melted. Like it's melting away there. And we collected some there as well. Here is a -- that picture of that carpet on that couch I was talking about right here (indicating). As you can see the irregularities in the carpet. And here again, that's a card. I was having trouble focusing so what I did with the carpet in the living room -- I took another shot of the same tag. I got a baseline measurement of 84 inches off of the wall with the double windows, the one the -- to your right. I got a 114 inches baseline from C.'s room, where the little boy was in, out to this, like, where I'm standing right here. And that's where this was at. And this is over top of that right there that you're seeing. And again, this material is

in the can labeled S32. Okay. 31 on the drawing -- Mr. Orange has a drawing here and you can see the shovel. Along the shovel line right here, there was also an alert. And also there's a chair that was sitting right here against this bookshelf. When fires -- if fire has enough fuel load and is starting to build itself, what it does -- if you've ever been outside camping outside at night and you build a campfire, and if it's in the summertime and you've got your shoes off, if you ever got your feet close to this fire, you'll feel cool air coming across your feet. Okay. What that's doing -- this fire has to have oxygen to burn. That's one of the elements it has to have. Cool air is what they call in training into that fire to keep it -- to keep it functioning. Just like we need air to breathe, a fire needs it to be able to generate. So we have a good pattern right here (indicating) really went into this chair that was sitting right here by this bookshelf right there (indicating). Then you have what they call a shadowing effect. The -- the cabinet actually was a shadow effect and protected, somewhat, the contents on the other side of this bookshelf right here (indicating). And we didn't have an explanation for this fire starting right here There's no electrical outlet on that wall. In fact, the base boarding -- if

you look at the baseboard of, like, a three-and-a-half-inch baseboard from the beginning, it -- it just -- it just slow -- slow -- slowly losing its material. Its composition is slowly going down to the point you got -- you got right in the carpet. So that's why we collected on this area right here (indicating). Any copies I'll just put right here.

JUDGE GILL: So your next one is this marked area --

THE WITNESS: 36, Your Honor.

JUDGE GILL: -- 36 on this, which is?

THE WITNESS: The kitchen.

JUDGE GILL: This area right here?

THE WITNESS: Uh-huh, yes.

JUDGE GILL: Okay.

A Okay. Again, we identified with a tag. Now this is a better shot right here. This is standing -- remember where the table was standing. This was kind of standing back somewhat behind the table into the living room. And you can see, of course, the stove would be over here (indicating). You can see a stove over here. But if you -- if you -- if you notice right here, there's a line. And I have a better shot of it.

Sorry to interrupt you, but I'm not sure the juror on this side --

MS. GIORDANO: Judge, can we approach for a minute?

JUDGE GILL: All right. Just have a seat.

(BENCH CONFERENCE)

MS. GIORDANO: I am not trying to be hard to get along with, but it's so hard for me to take notes and compare his testimony to his previous testimony and carry those books with me back there if it's something that the jury can easily see from the easel beside him and him pointing at it. It would be a whole lot easier if he could testify from the witness stand. It's just -- it looks like there's going be a whole of testimony from that point.

JUDGE GILL: Well --

MS. GIORDANO: If he doesn't believe that's his -- if he needs to be more demonstrative than this, like, he needs to be closer, I understand. But it's

JUDGE GILL: Okay.

MR. ORANGE: We would like for him to proceed like he was proceeding. If we need to slow him up a little bit for her to take notes or something.

MS. GIORDANO: Well, it's not that. It's that I've got these books to juggle and I have to sit them on my lap back there. I got -- okay.

JUDGE GILL: Well, I think the only thing that bothers me -- and I think I'm going let the Commonwealth handle it -- maybe things on the photographs that he can point out to them --

MS. GIORDANO: Put them on the easel?

JUDGE GILL: -- that they couldn't see from back here. So I'm going let you do that. The only problem I have is that in between all that, we got these speeches going on. No, it's not necessary to stand up there like a college professor giving a lecture just to show a picture. I will just ask you to try to guide him a little bit and let him show what's on the picture and then all of his other pontificating to do back here on the witness stand. That's just -- you know, I'm not going stop you. All right, let's proceed.

(END OF BENCH CONFERENCE)

BY MR. ORANGE:

**Q Just tell us about what you believe is what significant on the photographs that you're pointing to the jury.**

A What I believe is significant about this kitchen picture right here (indicating) is this one. Well -- well, we'll just join this right here. Obviously something has been within the joining location of this

 tempered -- of this wood. Something's burning in that. Well, fire burns up and out. You really don't have what you call a linear burn, which is a horizontal burn on a surface unless the fire is actually traveling with something. So that was a concern. Another concern I had was this air duct, which was underneath the floor, is melted.

**Q Can you speak up for me just a little?**

A Yes, sir. This piece of air duct. If you remember, there's not -- three foot in this hole right here in the kitchen floor, there's an air diffuser that's kind of right out from the stove. Well, that down toward this opening right here -- the aluminum was melted. The aluminum duct melted -- which aluminum melts about 1200 degrees, you know? And so, not only did I have a fire on this wood product right here that was or some reason burning more rapid than the rest of the floor mount here that actually made a hole through the floor, but I also had a -- a metallic product underneath the floor that was burnt as well under it. And if it's air conditioning -- and here again, I haven't been able to --

JUDGE GILL: (Inaudible).

THE WITNESS: -- okay --

A -- confirm if the air was running or not. But

KENTUCKIANA
COURT REPORTERS

here again, this could have been very well if they want to call it a ventilation-controlled fuel instead of a fuel controlled fire. There is a difference in the two.

**Q And what about your next exhibit?**

A We will look at 33. And, here again, tags identified as such and so as KSP 41. But this is a shovel there by the window. After this card was located right here, we did cut out -- you probably seen a cut out place there. And this is -- that pattern I was talking about right here (indicating) is the extension of it right here. The pattern going back down. And you can see the base board wood right here and you're starting -- deluded. It's a condition called, you know, we talked about pyrolysis when wood starts to decompose, it gets all the water vapor and gases. That's what happens to wood when it starts to burn. It's not like a liquid where most liquids burn from the vapor just like gasoline does. But wood has to actually decompose during the fire process.

**Q Okay. And I believe your next one is site number 35?**

A Yes, 35 is in the bedroom right here at the foot of the bed. I have two -- of course, there's a can labeled as such and it's also noted on the KSP 41.

**Q By the way, you keep saying the KSP 41 and I**

 **suspect there's people on this jury that might not know what that is.**

A That's our evidence documentation that we use to maintain integrity of our evidence through -- through the proper channels.

**Q Piece of paperwork, in other words?**

A It's just -- yes, it's paperwork.

**Q Okay. Go ahead.**

A Okay. This is the -- this is the bed. I believe this was Z.Y.'s bed if I'm not mistaken right here. This picture -- of course, we had a -- had an alert. They had an alert on this corner right here, okay? So the Fire Marshall and I had a -- we had a solve and we cut off a piece of this timber right here (indicating) and some of this area right in here (indicating) and collected that as a sample. And there's just identification with the can ready to receive the sample, okay? Another thing that's interesting about this photograph that it depicts as well if -- if I want you to look at this wood line right here on these two by four's, you pretty much have a consistent burn unlike the other side of the wall where you got somewhat of a pattern. This fire right over here on this side of the room -- I wish I had a laser I can point -- in my professional opinion -- the 34

location -- once it got to burning, rolled over onto this bed (indicating). And again, from here, once the fire went up, the fire would roll over to this location. Now another thing I want to mention as well, in this room right here between these beds, we had, like, an island of carpet. An island of carpet. Around that island, the carpet and padding is gone. It's burnt down to the floor. If you look -- and I have a photograph -- but if you remember, if you looked in this room, right here -- right in this area right here, some of the lathing strips that was used for this type of ceiling -- the strips directly above this fire -- the strips have burn away. Okay. What does that tell you? That matches in conjunction with what is missing right here. And if you look, over this bed right here, the lathing strips are still -- they're burnt, they're charred -- but they're still intact. They're also still intact on this bed right here But out in the middle right here, some of them are completely burned away. So that's the stuff I wanted to point out as well.

A Okay. Exhibit 40 is a control sample. This was taken down the hallway, number 40. I tried to take them under a piece of furniture where there's not been any fire as best I can or behind the door. And the reason I do that is I don't want to take it in a traffic

area where foot traffic may have carried something in -- in the house. So I try to take a control sample as much -- as best I can in an area where I feel like it's not -- has not happened. And that's what we did. We cut it out behind the door.

**Q And does this complete the photographs you took of the areas you sampled?**

A Yes, it does.

**Q And do all these photographs you showed the jury here on this table with Exhibits 36, 31, 33, 40, 34, 35, and 32 -- do those fairly and accurately depict the scene as you saw it that morning when you were there investigating the fire?**

A Yes, sir. They do.

**Q Okay.**

MR. ORANGE: And if we could, your Honor, I think before we get too complicated here, we'd like to get these all marked if it's not marked.

THE COURT: Okay. Can you gather those up that you want to have us mark?

MR. ORANGE: Okay. With Exhibit 36, we have 35A already marked. And we'd like to have this marked as our next numbered exhibit. That is 42, which was control -- or excuse me with site 36. With 31, we already have 35J and that's the ones

I'll leave there. Number 32. We have four photographs, none of which are marked. We'd like to mark those as composite exhibits, if we could, as our next composite exhibit. So number 32, Exhibit 32, there's 43 through A through D, and the Exhibit 34, and two pictures marked in there next to Composite 6. 34 and 34A, and 44B, number 40 marked as our next exhibit. And 35, I have two pictures. One of them is 35. H has already been marked. And will just be one moment.

(COMMONWEALTH'S EXHIBIT 42 ADMITTED INTO EVIDENCE)

(COMMONWEALTH'S COMPOSITE EXHIBIT 32 ADMITTED INTO EVIDENCE)

(COMMONWEALTH'S EXHIBIT 40 ADMITTED INTO EVIDENCE)

UNIDENTIFIED MALE SPEAKER: What number is that going to be, Judge?

JUDGE GILL: 45.

UNIDENTIFIED MALE SPEAKER: All right.

MR. ORANGE: So we've got number 45, 35H. And number 33, we'd like to have that marked. And that's number 46.

(COMMONWEALTH'S EXHIBIT 33 ADMITTED INTO EVIDENCE)

BY MR. ORANGE:

Q And while we're into this, I see some other cans here where the other samples are. Would you tell the jury what this involves?

A Yes, sir. Item 41 in front of me here is a metal can containing the left -- the left work boot belonging to Mr. Yell.

Q You mean this exhibit right here (indicating)?

A Yes. That's the shoe -- the left shoe that he had on at the time of the fire.

Q And that is marked number 5. Okay.

A Item 42 is the right work boot that Mr. Yell had on at the time of the fire.

Q Which is marked number 4. And where did you receive these? How did you receive them?

A They were relinquished to me by Officer Mills with the Russellville Police Department.

Q Okay. And what else do you have?

A Item 43 is -- that contains the deceased's shoes and black shorts which he was wearing at the time of the fire.

Q And how did you receive -- come to be in possession of these?

A They were given to me by the deputy coroner.

Q And that was Mary Gibbons?

A Yes, sir.
Q And I have here Picture 21 and 26. Do these depict those shoes that's in this can?
A Yes, sir.
Q And I have an Exhibit number 44 here which has been labeled the Commonwealth's Exhibit number 6. How did you come into possession of that?
A That contains cotton swabs from Mr. Yell's hands by Officer Mills.
Q Exhibit 6, how did you come into possession of that?
A That also was given to me from the Russellville Police Department.
Q Okay. And we have here Exhibit number 45, which is Commonwealth's Exhibit 30I. And can you tell us what this is?
A That's a can of Kingsford charcoal fluid.
Q And do you know where it came from?
A It came from the trailer.
Q Whereabouts in the trailer?
A The kitchen cabinet.
Q And how did you come into possession of it?
A Trooper Evans went with Ms. Davis to the trailer and -- and got it.
Q Okay. And I see here Commonwealth's Exhibit

**number 13. Do you know how you came into possession of that?**

A Yes. Item 48. That's a big cigarette lighter that was found in the backyard between -- near the fence and Ms. Tina Maskin's residence.

**Q And I believe -- does this envelope here have any significance?**

A Well, that's -- that's what it was in, sir.

**Q Which you placed it in for preservation?**

A Yes, for preservation. Uh-huh.

**Q I'm also going to show you what's been labeled Commonwealth's Exhibit number 16 in an envelope that says 49 on the envelope in the bag.**

A Yes. That is a nine-volt battery and what could be a smoke detector, but I can't say for sure due to the -- the damage of it.

**Q And how did you come into possession of that?**

A I got a call in November of '04 from the foster mother, Ms. Robins (phonetic), Jan Robins, and she informed me that I -- what the boys had been -- had been talking about, the smoke detector and --

MS. GIORDANO: Judge, I'm going to object to the hearsay.

THE COURT: Yeah. Okay. Where are you-all headed here?

**Q Did you hear some information that caused you to get a search warrant and go back and look at the property?**

A Yes, sir.

**Q And as a result of going back to the property, did you discover something you thought of significance?**

A Yes, sir.

**Q And what was that?**

A Item 48 -- or I'm sorry, 49.

**Q 49. And where was it located at?**

A It was laying right inside the door, the back door.

**Q And after you went to the scene, you looked at these, these samples were taken, what did you do next?**

A On the 13th, Detective Edmonds and I -- I met him at the -- at the Russellville Police Department and we started interviewing Mr. Yell, Ms. Davis that day.

**Q And did you do your interviewing on the 12th?**

A Other than talking with the fire officials and talking with Buster Cannon, Mr. Edmonds, the deputy -- the deputy coroner -- I remember talking with her. I was pretty much involved with the scene, but I did have other staff there. Sergeant Smith, he came down to assist with interviewing. And also Trooper Eric Evans and Detective Childers -- they were summoned to the

location to assist with the interviews.

**Q And on the 13th, who did you interview?**

A Interviewed Robert Yell.

**Q And who was present during the interview?**

A Ken Edmonds.

**Q And during that interview, did you at any point read to Mr. Yell his rights?**

A Yes, I did.

**Q And when during the interview did you do that?**

A Before the interview started.

**Q And during the interview, what did Mr. Yell tell you?**

A Well, pretty much in summary that he remembered his activity that day -- that Saturday morning when they got up. He informed me that him and April had been having trouble for some time and that he -- he wasn't working. And that -- that April had an affair and had really caused a lot of strain on their relationship and a lot of trouble. He told me that they would pretty much drink every day some type of alcohol. In fact, that they had a fight that morning over bacon -- cooking bacon that morning. And that -- pretty much remembered his entire activity. Going to buy the bug spray, going -- Kay Lyons transporting him to the ATM machine. He remembered everything in detail that day up

to about 0630 hours.

**Q And what did he tell you about the bug spray and Kay Lyons?**

A That she transported him into the -- I believe to the Dollar Store to buy the -- the items. And he didn't have a car or didn't have one running.

**Q And did he go anywhere else besides the Dollar Store?**

A Yes. They been down to Donald Lindsey's -- I'm sorry, Donald Powell and Lindsey Brawns, which is about a couple -- one or two streets over that we looked at the other day. And they spent some time down there. I think they were drinking and -- down there at that -- at that residence, too.

**Q And was there any information given to you about any liquor store, anybody going to a liquor store?**

A Yes. They went to the liquor store and bought some vodka.

**Q Who is "they"?**

A Kay and -- let me read my notes just a minute here. Looking at my summary here, I have -- without listening to my tape, I want to say there was two trips made to the liquor store that I remember, but I -- without listening to my tape, I can't

**Q And -- so when you get down to 6:30 in the**

PageID #: 2212
CRIMINAL TRIAL
195

**evening on the September the 11th, what did Robert tell you happened after that?**

A He couldn't remember anything.

**Q Did he remember anything about being transported to the jail?**

A He had a memory -- his memory, he couldn't remember between 6:30 and about 7:19. He couldn't remember where he was at or what he was doing.

**Q And who was helping you do this interview?**

A Mr. Edmonds.

**Q And was Robert asked more than once about his whereabouts during this time period or was it just a casual question?**

A Well, we pretty much -- like I said, from the time they got up that morning -- this interview is -- is fairly long. And we, you know, as best we could, we detailed every activity throughout that day. And right up until 6:30, he didn't have any problem remembering where he was at and what he was doing and what was going on. But from that time on until he was arrested by the Russellville Police Department, he couldn't remember where he was at or what he was doing.

**Q Now, I notice you've got some other pictures up here. I want to just show you again, number 21 and 26. Did you find these pictures to be of any**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 **significance?**

A Well, yes I did.

**Q Can you tell us about that?**

A. The reason I wanted these pictures -- and also the shoes as an exhibit -- or the 43 can here with the shoes and the clothing -- is the amount of soot that's on the -- the shoes right here (indicating). And in my professional opinion, if you look at the bed -- and I have the sheet that was on the bed, the Minnie Mouse sheet, the soot on these shoes --

MS. GIORDANO: Judge, I'm going to object to him telling the jury what they see. They can draw their own conclusions from looking at the pictures and looking at the sheet.

JUDGE GILL: Counsel, step up just a minute.

(BENCH CONFERENCE)

JUDGE GILL: I'm not sure what he's going to say or what your objection is.

MS. GIORDANO: Well, he's saying, if you look at the pictures and you look at the sheet, you can see that the amount of soot on the shoes -- I believe is what he's going to say is not consistent with the soot on the sheets.

JUDGE GILL: You got to be careful here.

MS. GIORDANO: Soot on the sheet.

JUDGE GILL: Okay. All right.

MS. GIORDANO: And in my opinion, we've got the pictures. They can look at them and they can draw their own conclusions. He should not be allowed to testify as to a conclusion.

JUDGE GILL: Well, where he is going here, Charles?

MR. ORANGE: I think he's probably going to - - and she's probably correct, that he's going to say that the soot on the shoes is not consistent with the soot on the sheet.

JUDGE GILL: And what does the soot on the shoes or the soot on the sheet have to do with anything in this case? That's what I'm ultimately trying to figure out.

MS. GIORDANO: Those are their theory about the fire. They're trying to lead the jury to believe that this child was at a different location when the fire started. And it could be significant, you know, in determining in looking at intent. I mean, I --

JUDGE GILL: I'm still not putting A, B, and C together.

MS. GIORDANO: Part of their theory is that he intentionally set this fire and placed his children

so that they'd be intentionally harmed after the fire started.

JUDGE GILL: Well, I think he can point out the soot on the shoes and the soot on the sheet. And if he has a theory, I guess, I'm going to let him testify as to what his theory is. I mean if that gets him into some sort of an expert conclusion, I'll reconsider that.

MR. ORANGE: Okay.

(END OF BENCH CONFERENCE)

BY MR. ORANGE:

**Q Again, if you can maybe stand up where the jury can see and point out what you thought was significant, sir, regarding the young man's legs or feet or shoes.**

A I'd be happy to. What I thought was significant was the amount of soot on his shoe right here (indicating). And I also had a concern on this burn on his leg right here (indicating) that would have been turned down to a sheet. And -- and mind you, there was -- there is a soot pattern outlining C.Y. on the bed even now on the actual mattress. But I had a concern because of this burn right here (indicating) --

MS. GIORDANO: Judge, I would object to any expert testimony about the burn.

THE COURT: I'll sustain that objection.

MS. GIORDANO: It's already been testified to by the expert.

JUDGE GILL: I understand.

BY MR. ORANGE:

**Q And do we have a picture of that sheet?**

A We have a picture of it, and we have the sheet as well.

**Q Okay. And where is the sheet?**

A It's in --

**Q Exhibit 47.**

A -- 47, Mr. Orange. Right there. I have a knife if you want --

**Q Would you open this?**

A Sure.

**Q Somebody want to let me help him. Someone -- do you want to step around here? You need to show the jury what you have here.**

A The reason I had a concern is the amount of soot on that shoe, in my opinion, doesn't -- doesn't relate with this sheet where you see the white area of the outline of the imprint. You know, had there been that much soot, the radiant heating --

MS. GIORDANO: Judge, I'm going to object.

JUDGE GILL: Basis?

MS. GIORDANO: I think he's offering expert opinion that I don't think he's qualified to make.

JUDGE GILL: I'm going to overrule. Finish your statement. Let me see what you're going to say.

A Based on the amount of soot on his shoes, to me, it's not consistent with the amount of heat that was in that room.

BY MR. ORANGE:

**Q Could you hold that up for the jurors standing there? You might want to turn that around and let them see the other side of that. (Inaudible).**

UNIDENTIFIED MALE SPEAKER: You-all might want to turn that around and see the other side of that. Okay.

**Q All right. Why don't you just have a seat here? I noticed you pulled something else out of that can too. Just so that everybody knows what else was in the can, can you tell us what this is here?**

A Yes, sir. That's the blanket off the bed, the same bed.

**Q And did you place any significance on it?**

A Well, again, I wanted to collect it in case there could have been any trace evidence because all this stuff was going to the lab. And since I had a had

a concern over the shoes, and the soot, and the burn injury on his leg, I didn't want to leave nothing behind.

**Q Now, I also notice you have a stack of pictures here which has 35K on top.**

A Yes.

**Q And are those pictures that you place any significance on?**

A Those are pictures of the interior of the structure after --

MS. GIORDANO: Can we approach?

JUDGE GILL: Counsel, step up just a minute.

(BENCH CONFERENCE)

MS. GIORDANO: Judge, if he's done with this exhibit, I'd like this to go now. I think it's prejudicial. And if he's going to refer to it in his testimony -- but if he's done with it --

JUDGE GILL: Are we finished with that part of the -- what you're trying to -- are you going to get the shoes out?

MR. ORANGE: If we may.

JUDGE GILL: Okay. Well --

MR. ORANGE: I'll take it down after we get the shoes out.

JUDGE GILL: All right. If you're going to do

that, we're going to finish up with that.

(END OF BENCH CONFERENCE)

BY MR. ORANGE:

**Q And if I could back up just a moment. I believe you've got the shoes of C.Y. here also?**

A Yes, sir. That would be Item 43.

**Q Item 43?**

A Right here.

**Q Can you open this and tell to the jury what's in here?**

THE WITNESS: May I, your Honor?

JUDGE GILL: Do what?

THE WITNESS: May I leave the bench and show the jury?

JUDGE GILL: Sure.

A These are the -- these are the items that was given to me by the coroner -- by the deputy coroner. And this is -- this is the little shorts that -- that C.Y. was wearing at the time of the -- of the incident. Here's the shoes, which the shoes -- they've been -- mind you, they've been to a lab, and they've been analyzed, and they've been in and out of that can and that bag right there (indicating).

JUDGE GILL: Just go ahead and show them the shoes, and then you can testify when you get back up

here. Both sides of the shoes, front and back. All right. And let's go on back up here then.

BY MR. ORANGE:

**Q You can just bring those back and put them in here in the can. Go back in the original container. And also could be the cabinet sheet so the speak. I believe I was just about to ask you if you put any significance on this stack of pictures, which is Exhibit 35K, that I don't think was actually marked?**

A Yes, I do.

**Q And can you tell us the significance you believe that those -- and I believe they are marked. It must have been marked. Go ahead.**

A Okay.

**Q If you don't mind, refer to the number in your (Inaudible).**

A Commonwealth Exhibit number 34B is a photograph behind Tina Maskin's residence. And that's Marshall Gregory pointing to the lighter that we found on the ground. And there's Detective Ken Edmonds of the Russellville Police Department standing adjacent to him. Commonwealth Exhibit 34A is a picture of the Bic lighter that's -- that we have shown you here today.

MS. GIORDANO: Can we move that can if you could?

KENTUCKIANA
COURT REPORTERS

CRIMINAL TRIAL

204

JUDGE GILL: Yeah. They can't see because of this can. Thank you. I'm sorry.

A Again, 34A is -- it's a lighter that Mr. Gregory was pointing at in the yard right here (indicating). Commonwealth Exhibit number 12. I wanted to get a shot of this fence. A fence is pretty much a permanent piece of structure that you can relate to. And this is -- again, this is -- this is the yard behind Tina Maskin's residence. And there's Mr. Williamson, the fire chief, and one of his firemen walking from the direction of that house. Okay. Here -- here we are looking at the -- the kitchen -- the hole in the kitchen floor. One thing I want to point out is. You notice that I'm gloved up and that is procedure when we collect multiple evidence locations - - that we deglove and re-glove to avoid cross- contamination of the scene.

**Q And I don't believe that's got a number on it, does it?**

A Yes. No, sir. It does not.

**Q And does this fairly and accurately depict the kitchen floor when you arrived there for the investigation that you performed on the 12th and 13th?**

A Yes, sir, it does.

MR. ORANGE: I move this as our next numbered exhibit.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JUDGE GILL: All right. Commonwealth has admitted.

(COMMONWEALTH'S EXHIBIT ADMITTED INTO EVIDENCE)

BY MR. ORANGE:

**Q Let's proceed.**

A Okay. The next one I have is Commonwealth Exhibit 35G. And this is a -- a picture from standing toward the north end of the home in the hallway right here and taking a photograph back down this -- this direction. And the reason I wanted to do that -- I wanted to point out two things. First off, I wanted you to be able to see that the heat line -- where the heat line is on the structure -- where it's actually banking down. And it is -- it is migrating and moving from the living room area. Remember I talked about shadowing a while ago? Just as that bookcase that's in the edge of the hallway right there. As you can see, there's no burning at all of this side of the bookcase. However, on the other side where the chair was, you have the fire moving in from that direction. And here is Commonwealth Exhibit 35K. And again, you can see this very large chair that would be turned right around to this bookcase right here (indicating). And you can see where the fire has attacked off of this heat line right here

(indicating). And on the other side of the chair you still have some of the actual material -- the cloth material that the chair was covered in still intact so -- mainly I wanted to show you the direction of fire travel.

**Q Then we have another stack of pictures here which -- and do you place any significance on these?**

A One thing I wanted to point out, and there's kind of -- Commonwealth exhibit number on this, we're back in the bedroom. We're back in this little built-on room right here where 35 and 34 was taken -- was collected. In this area right here is where we had the island I was speaking about a moment ago with the carpet with the wood pretty much burnt. All the carpet melted away around this island. And right here is an example of a fire that is coming down and is not going up. As you can see, when fire -- when you have a rollover, you have what they call a U-burn sometimes is when fire actually comes down a wall, you know, somewhat of an inverted pattern. And I also wanted to point out something else, too, that's there's also an incline -- there's a step-up right here of a few inches, you know. And so any kind of product -- if there could have been something accidentally right in here (indicating), with an incline, it didn't run to the kitchen area where the

other fire was at. It was separated from it.

MR. ORANGE: We'd like to mark as our next numbered exhibits, your Honor.

BY MR. ORANGE:

**Q You can proceed.**

A Okay. We're in --

**Q This is number 48, just for the record.**

A Yes, sir. Okay. Here again, we're in the same room -- we're in the same room. This is -- this is the wall that early on I was talking about had the V pattern on it. If you'll notice -- and I have a better picture of it someplace here -- it really shows a good, what I call a linear burn, on this two-by-four right here, which is a floor plate. But also, this is the corner of the bed where we did the collection at. And you can kind of see an outline of the island right here of the carpet I was talking about.

MR. ORANGE: Move that as our next numbered exhibit.

JUDGE GILL: Okay. We'll go ahead and mark that.

MR. ORANGE: This will be 49.

(COMMONWEALTH'S EXHIBIT 49 ADMITTED INTO EVIDENCE)

BY MR. ORANGE:

**Q Ready to proceed.**

A In this picture here, really it shows the table -- it shows a table, and it's also -- I was trying to get my camera focused to get a really close- up of this right here, and I didn't. Obviously, I didn't -- I didn't get that like I wanted it. But it also -- it shows the overhaul and some of the debris that's piled outside this room right here. And this is how it was when I -- when I -- when I got there.

**Q And that's Commonwealth's exhibit what?**

A Exhibit 35I. Okay. One thing, this is Commonwealth Exhibit 35F. This right here is the burn-through. And, you know, it's been -- obviously, this paneling burns pretty -- pretty rapidly, but right here is a burn-through into C.'s room, which no doubt emitted a lot of heat into his room. But that -- that's why I wanted that shot right there. From the rollover effect, it actually consumed both sides of the paneling, and even really burned the 2x4s, the wall structure, itself. And when this happened, when this cavity became open, of course, that's going to -- fire and heat is just like -- you know, it's like water. It takes the least resistance. If it can find an opening, and it's air and tranquil, then it's going to go. And if you can see right here, you see this electrical outlet right there?

If you notice this heat line of fire is to the right of the outlet. And here again, it's going right back down to the baseboard line.

**Q None of these are significant to the fire, itself, are they?**

A No, sir. No, sir.

**Q Now, I want to show you three other pictures that have not been marked, but if we see any significance to those?**

A Okay. Well, first off, this is the couch in the living room that I was talking about. Right here is that corner that I was mentioning where we did the collection. Right out here is where that baseline dimension was created. Behind this couch, as noted on the drawing, is where the baby bed was at. And the baby bed is consumed, which I feel was an after -- after the fact.

**Q And can we have that picture?**

MR. ORANGE: It's not marked, is it? This would be Exhibit number 50, is it?

JUDGE GILL: All right. We'll mark those at least.

(COMMONWEALTH'S EXHIBIT 50 ADMITTED INTO EVIDENCE)

BY MR. ORANGE:

CRIMINAL TRIAL

210

**Q You can proceed.**

A Okay. And talking about fire movement and fire patterns, you notice this arm of this couch right here, the wood is more intact. It's not -- there's not that much decomposition on this chair arm in the front part right here. But if you look at the slatting and look as you go back toward the back of this couch you can see there's more product -- we're losing more product back here. So here, again, obviously, you had a more intense heat right there in this area than what you had up here. But if fire burns out of this -- out of this couch, it's going to roll that arm right there to some extent.

**Q Was that significant to each point?**

A Yes, I believe it is.

**Q You can proceed.**

A Okay. This exhibit here, this is -- this is getting back away from the fire. Soot -- soot in a fire is just incomplete combustion. It's just hydrocarbons. And the further you get away from the fire, the cooler they obviously become. And they get to the point that they're no longer buoyant and supported. They start settling and they start sticking to things. And as you can see, these windows right here are pretty good laden with soot on the glass. So the further away

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

from the -- that's why I like to work from the area of least damage and go back to where areas where I believe the origins were at. And that way, I can get a mindset on a fire scene as to what went on there.

MR. ORANGE: And we'd like to move that as our next numbered exhibit, which I believe would be 52.

JUDGE GILL: Hand that to me. Okay.

(COMMONWEALTH'S EXHIBIT 52 ADMITTED INTO EVIDENCE)

BY MR. ORANGE:

**Q And during the course of your testimony today and over the last several days, I've heard a lot of words used that I don't necessarily understand from a layperson's understanding. For instance, flashover, rollover. Can you explain, from the aspect of a certified fire investigator, what these terms mean, and then identify whether or not they occurred at this structure?**

A Okay. Fire is pretty much a reproduction act. It's a chemical reaction. And when it evolves, it gives off heat and light as a result of that reaction. To have a flashover in a building or a structure, number one, you've got to have enough fuel load in that building to sustain that quantitative heat level of buildup in a room. At the same time that's going on,

all the objects -- furnitures and things -- that's adjacent to this point of origin, they're being heated as well. And at the same time, they're giving off carbon monoxide, cyanide gas, that is elevating and rising to the very highest point that it can reach. Okay. That's called -- when you have a smoke-heat line and you have a clean air line, that's called a a stratification line. Now, if you have enough fuel at this base of this fire to continue the emitting of the gases, those gases will eventually ignite. And at the same time they ignite, providing you have enough oxygen to supply the fire, the contents in the room will simultaneously ignite as well. And then you have what's called a really aggressive fire and thermal collapse. You have what's known as thermal collapse. All that heat comes down to the floor levels.

**Q Now, again you used, I believe, load in defining this. Can you tell us what you mean by "load"?**

A A fire is the nature -- the nature of a fire and, you know, in times past, fire investigators have talked about the fire triangle. And those three elements are the heat, fuel, and oxygen. As long as you have adequate amounts of those three, you know, a fire is pretty much running rampant and in control. You take one of those elements away, and obviously it's going to

change the dynamics of the fire.

**Q Now, in this particular structure, was there a flashover?**

A In my opinion, there was not a flashover.

**Q And why was there not a flashover?**

A Because there wasn't enough fuel sustained in those areas to cause radiant buildup on the components and the furnitures in that room to cause a flashover.

**Q And was there any rollover?**

A I suspect there -- from what I can gather, just like looking at the wall going into C.'s room, the living room down the hallway, obviously as these gases and this heat plume, heat's rising. And think of a hot air balloon. What raises that hot air balloon? It's the hot gases going into that balloon. Okay. Heat goes up. It hits an obstacle. It hits a resistance. It's got to go someplace. It's either going to go out and roll down a ceiling or down a hall. It's going to -- it's going to move. It's constantly on the move.

**Q And, for instance, we note in the pictures that the couch and the baby bed in the living room are obviously burnt. Can you explain how they got burnt based on your professional expertise?**

A Here again, I'm looking at it from after the overhaul, but in my opinion, that was from fall-down

after the fire had been involved, long after the officers had been in there.

**Q And by fall-down, you mean what?**

A Well, you have combustible embers and things that do fall down from ceiling areas.

**Q Earlier you used the term "fuel." Can you explain that to --**

A Fuel is a -- a product that will combust given the right conditions, whether it be liquid, solid, or gas.

**Q Now, in your professional opinion, and I'm going to ask you to explain this, what was the cause and origin of this fire?**

A In my professional opinion, based on looking over the scene, examining the interior, the exterior, examining the electrical service, the gas to this building, this fire was intentionally set with the aid of a combustible, flammable liquid.

**Q And was it intentionally set?**

A Yes, sir.

**Q And why do you say it was intentionally set?**

A Because of locations -- these locations right here, 34, 36, and 33, 31, there was nothing that could have accidentally -- spontaneously have ignited in those locations, number one. Number two, at this location

right here and right here, we have burning that -- there's a product burning here that is not a solid product. A floor is a solid product. You know, if you go into a scene and you have even burning, you don't think a whole lot about that. But when you have a localized hole burned through a floor and then into an aluminum air duct, obviously, something is going on there. There's far more burns -- far greater than -- it has to go through a decomposition process.

**Q And could this fire have started at the electric stove?**

A It did not.

**Q And why do you say that?**

A Well, I looked at the electric stove. There's no fire behind the electric stove. The oven has French fries still in it. It has a yellow dish in the oven. There's no fire about that stove. In fact, the fire from the kitchen area on that floor moved into the front of the stove and actually taken the outer skin of the stove -- oven off.

**Q And earlier you talked about, you had some expertise in electrical -- you were a certified electrical inspector and so forth?**

A I am a certified electrical inspector. I'm just currently -- I keep my license with continuing

education, but --

**Q And did you check the electrical circuits to the stove?**

A Yes. The circuits are fine. No breakers tripped. Nothing to indicate there'd been a fault or a short condition.

**Q And did you investigate and consider the possibility of either a grease fire or something of that nature, a food -- some kind of food fire on top of the stove?**

A The patterns to the stove were not consistent with a grease fire. Had that been the case, there'd been a burning on top of the stove, some of the plastic around the door handle. If grease had ran down the stove on fire, it would have left signs behind the hook of the handle on the stove door.

**Q And did you place -- there was a skillet on that stove. Did you place any significance on it?**

A I placed no significance on that skillet. I did note the skillet on the drawing, as noted right here (indicating). Of course, this element on most of your stoves, the oven is about eight-and-a-half KW or eight-and-a-half thousand watts, normal residential stove elements. This burner was about an 1800-watt element burner, and I couldn't -- I could not simulate exactly

that burner, the type, or the brand, or whatever. So I just -- that's as far as I went with the burner, but it had no significance on the fire. But since I knew there'd be a question about it, and that's why I noted it on the drawing and brought it up.

**Q Now we've got, obviously, a lot of exhibits out here. Did you collect all these exhibits?**

A I collected the ones on the table. I collected, with the assistance of the fire marshal, 31 through 40, and -- well, 31 through 36, and then a control of 40. I collected that with the assistance of the fire marshal's office. I collected Exhibit 49 and I was given the 41 through 47 by the Russellville Police Department, the coroner, or they were relinquished from the scene.

**Q And did you log them into your evidence lab at post?**

A Yes, sir, I did. And this is the KSP 41s that I've been talking about. And as you can see, anytime we have evidence that becomes our custody, there has to be a real -- a real good chain of evidence.

MS. GIORDANO: Your Honor, we'll stipulate to chain of custody.

JUDGE GILL: Okay. They're stipulating the chain of custody.

THE WITNESS: Pardon?

JUDGE GILL: They're stipulating, agreeing to the chain of custody, so you don't have to worry about that.

BY MR. ORANGE:

**Q And just so the jury has something to refer to, if they need to, those 41s, are those documents as kept by the Kentucky State Police so you've got evidence of the chain of custody?**

A They're retained by the evidence sergeant.

MR. ORANGE: And, your Honor, we would move that either those or a copy of those KSP 41s be put into evidence, so that we just have a complete record on that.

JUDGE GILL: Have you got those?

MR. ORANGE: Yes, sir. Just a minute.

THE WITNESS: These are the originals, your Honor.

JUDGE GILL: All right. If you'll give me what you want me to put in evidence, and if there's no objection, we'll staple them together --

MS. GIORDANO: No, your Honor.

JUDGE GILL: -- and mark them as the Commonwealth's next numbered exhibit. Let's mark that as the next exhibit.

(COMMONWEALTH'S EXHIBIT 53 ADMITTED INTO EVIDENCE)

MR. ORANGE: Your Honor, can we take a ten-minute break or so?

JUDGE GILL: Okay. Let's just do that. Remember the admonitions I've given you. Everybody, please rise. Let the jury exit the courtroom. Ma'am -- hold on just a second. The jury can go on out, please. No, no. I was -- that lady was wanting to say something to us, and I'd kind of like the jury to go on and exit in silence.

(JURY EXITS THE COURTROOM)

JUDGE GILL: And I apologize for that. I have to -- I get a little paranoid after a while. I heard this person saying something that I could hear up here, and I wasn't sure if she was talking to a juror or what.

UNIDENTIFIED FEMALE: The bathroom -- talking about the bathroom. Sorry.

JUDGE GILL: Okay.

(OFF THE RECORD)

JUDGE GILL: Okay. We're back on the record. The jury is still out of the courtroom, out of sight and sound. And we've got the defendant, counsel, and everybody ready to resume?

MS. GIORDANO: Yes, your Honor.

MR. ORANGE: Yes, sir.

JUDGE GILL: Okay. Let's bring the jury on back in. All rise, please.

(JURY ENTERS THE COURTROOM)

JUDGE GILL: Okay. Let's all be seated. We are on the record. Our jury appears to all be back. Can we waive the call?

MS. GIORDANO: Yes, your Honor.

MR. ORANGE: Yes, sir.

JUDGE GILL: All right. And proceed when you're ready, Mr. Orange.

BY MR. ORANGE:

**Q Did you locate another picture that you thought had significance that you wanted to -- concerning the electrical service to the Yell home?**

A Yes, sir, I did.

**Q And which picture is that?**

A Commonwealth Exhibit 35A.

**Q And what do you find of significance in this picture regarding the electrical service to the home?**

A Well, the significance is I wanted to identify to the people of this Court where the electrical service was at, which is right here at the back of the trailer near the back door, and that it was -- it's 100-amp

KENTUCKIANA
COURT REPORTERS

service, what they call an overhead- type service. It has two 100-amp bus-type fuses in this disconnect right here; that it was wired with number 2 aluminum conductor with an underground ladder going into a load panel in the closet; that it has a number 6 ground on it for an equipment grounding of the service. And once we get inside, it has three double pole breakers and seven single pole breakers, 28 amperes. And as noted in my report, I didn't find anything abnormal about that.

**Q And I believe you're an electrical inspector, you testified?**

A That's correct.

**Q You're state certified?**

A That's correct.

**Q And was the electrical service to this trailer properly installed, in your professional opinion?**

A For its time and era, yes, it was.

**Q And did you find any indication about the electrical service, that there was a short or any sort of ignition point, or caused by the electrical service in this trailer?**

A No, I did not.

**Q And was there any indication of any burning around the electrical service or caused ignition around the panel inside?**

A No, there was not.

**Q And I believe you and Detective Edmonds worked together in this case, particularly after Sunday the 12th?**

A That's correct.

**Q And did you -- through your interviews, did you or Detective Edmonds consider whether or not that April Davis-Carpenter, Z., N., or C., or even S., set this fire?**

A Yes, we did consider that.

**Q And what did you consider or how did you consider it and what was the results of the consideration?**

A Well, S. is about 11 months old, I believe, and C. was about 23 months old. They didn't set the fire. April was at a friend's house with Z. and N., so they didn't set the fire. Kay Lyons had brought Robert home about 6:30 before the -- the event happened over at the 911 caller's.

**Q Did you have information that, for instance, Kay Lyons or Charlotte Bellor could have set this fire?**

A We have nothing to indicate that they set the fire.

**Q And in your interviews with Mr. Yell, did you question him about any specific people who may have**

**wanted to set his house on fire or would have had reason to set his house on fire?**

A I believe his comment was, "There's people that was mad at him," but he didn't have any knowledge of anyone that would want to set this fire. There's never been any indication of anyone leaving the scene in an automobile or on foot away from the trailer.

**Q At any point, did you learn about the names of, or even any kind of identification about any suspicious people, identified or unidentified, around the trailer, other than what's been testified here in these proceedings?**

A I have not.

**Q And in talking with April, was she able to identify anybody who you should consider as a person who set this fire?**

A No.

**Q And when you interviewed Robert Yell, what was his demeanor about the setting of the fire? Was he angry or solemn or what?**

A He became angry into the interview -- toward the end of the interview, he became angry. And finally -- he finally, I think, said, "You-all are trying to say that I set this fire, and I'm not -- I'm not talking with you anymore."

**Q And at any point during that interview, did he use his physical condition as any sort of excuse?**

A He commented about that he drunk -- that he was drinking heavily all the time; and that, you know, that he hadn't worked. And, you know, he talked about what April did to him, about the relationship with the -- the soldier. And he just pretty much -- and as the interview progressed, conditions -- conditions worsened, as far as getting responses from him.

**Q And as you and Detective Edmonds went through this investigation, two agencies cooperating and two officers cooperating, were you able to put anyone else, other than what's been shared here these past few days, at the scene, as even a suspect?**

A No, sir, I have not.

**Q And did Robert Yell use his drunken condition and -- how did he use that during the interview?**

A I can't remember his exact words. He was talking that -- without listening to my tape -- he was -- he was down on himself pretty bad about the drinking and stuff that was going on. He didn't remember -- he didn't remember choking or anything like that -- choking April before the fire happened.

**Q Did he use it as an excuse?**

A Yeah. He didn't remember.

MS. GIORDANO: Object to the leading, your Honor.

JUDGE GILL: Sustained.

BY MR. ORANGE:

**Q During the course of your questioning, did he have any excuses he used?**

A That he was a drunk; that he drunk a lot; and that, you know, that -- and I can't remember his exact words, Mr. Orange, without listening to my tape, because in my summary -- in my statement with him, I did not -- I didn't indicate every word for word.

**Q And investigating this burning of this house, after you had investigated it, looked at the scene, after you considered the interviews with all the people that were interviewed, after you looked at the physical evidence and circumstances of the evidence, what did you conclude as a result of all that information?**

A I concluded that this was a set fire in three locations of the house -- of that trailer.

**Q And did you take charges against anyone as a result of that conclusion?**

A Yes, I did.

**Q And did you consult with Detective Edmonds?**

A Yes. We talked about it.

**Q And what charges did you bring?**

A I brought an arson charge. And if you start a fire causing an explosion in a building, that's --

MS. GIORDANO: Objection. I request the Court direct the witness just answer the question. He's asked what charges did he take.

JUDGE GILL: All right. I think he's answered the question.

BY MR. ORANGE:

**Q And what charges did Detective Edmonds bring against Mr. Yell?**

A Murder and attempted murder.

**Q And can you tell this jury why these charges were brought?**

A C. died in this fire of smoke inhalation in his bedroom, that little boy, 23 months old. And S.

almost perished in this fire. As we've all heard here this week what's going on with her is she was burnt over 50 percent of her body, and she was burnt with flames. 11-month-old baby in critical condition was taken to Vanderbilt and almost died, and as the doctor indicated, is looking at a long time down the road of still having to have medical attention and care. That's why Mr. Edmonds brought the charges.

MR. ORANGE: You may ask.

MS. GIORDANO: Thank you.

KENTUCKIANA
COURT REPORTERS

CROSS EXAMINATION

BY MS. GIORDANO:

Q Before I forget, I want to ask you something that's going to be kind of out of context, then I'll come back to it. But I want to be sure something is clear for the jury. Mr. Orange asked you, Mr. West, did Mr. Yell offer any excuses, and you said, "Well, just that he was drunk." Offered an excuse for what? He didn't -- you're not suggesting to the jury that he said, "Oh, I started the fire and the reason I did it was that I was drunk," are you? He never made any statements of that nature?

A He never admitted to starting the fire.

Q He didn't admit to doing any of the things he's being charged with, did he?

A He couldn't remember.

Q Okay. So when you said, "offered an excuse," I'm not sure what you're testifying he offered an excuse for. I just wanted to be sure that was clear, that there weren't any admissions on his part when he said, "I was drunk"?

A He was offering an excuse to his demeanor and the way things had been going at his house and his residence.

Q Okay. All right. Fair enough. I got to get

**organized here. Mr. West, what was your primary role in this investigation?**

A I was called in once the fire is deemed to be a crime scene. And then, whatever location it's in, we're called in to assist with the investigation and proceed with a criminal matter.

**Q Who makes that decision that you needed to be called in if you know?**

A The state fire marshal.

**Q Okay. So is it fair to say you're not called in to all fire scenes?**

A I -- I couldn't work all fire scenes. All fires are not intentionally set. There are fires that are accidentally caused.

**Q So had Mr. Flowers and Mr. Gregory determined that this was an undetermined cause of fire, is it a fair statement to say you most likely would not have been called in?**

A Well, I think if you look at my synopsis here, or in my statement, he told me after examination of the scene throughout the night that it appeared to be a set fire.

**Q And I'm just asking a question. Had they not determined that, would you probably have not been called in?**

KENTUCKIANA
COURT REPORTERS

A No, I wouldn't have been.

**Q Okay. And do you come in and try to determine origin and cause?**

A I can do origin and cause. But here again, their statute ends where mine begins in the KRS. They're not law enforcement.

**Q I understand that. And you are?**

A I am.

**Q But in this case, were you called in to determine origin and cause?**

A The origin and cause had done been determined.

**Q All right. So the answer is no, you were not called in --**

A I was not called in for origin and cause.

**Q Okay. Once you were called in, was it already a preconceived notion that there was a crime, and that's why you were being called in, is that --**

MR. ORANGE: I'm going to object, your Honor.

JUDGE GILL: Basis?

MR. ORANGE: He's called in -- "preconceived," who's preconceived? She's calling for somebody else's speculation.

JUDGE GILL: Overruled.

BY MS. GIORDANO:

**Q All right. When you're called in to a fire,**

**there is a preconceived notion on the part of the -- I'll say it a little clearer -- on the part of the fire marshals that are working the fire, they're calling you in, and so you would come in with a preconceived notion that there's already been determined there's a crime; is that a fair statement?**

A There would have been or they wouldn't have called me.

**Q Okay. So that is a fair statement?**

A Yes, that's a fair statement.

**Q I'm sorry?**

A That's a fair statement.

**Q All right. And once you came in, one of the first things you did was become involved with Buster Cannon. That would have been the same day, would it not, on Sunday the 12th, I believe?**

A Well, that would be -- I talked to Buster Cannon. But if you look at my -- at my narrative here when I arrived at the scene, my first correspondence was looking over the scene, and then correspondence with Mr. Gregory.

**Q You testified to that. You did your own survey --**

A Sure. Sure.

**Q -- outside and outside?**

A Right.

Q And then after that, you got involved -- and when I say, "got involved," you were involved in the collection of evidence with Buster Cannon; is that a fair statement?

A Buster Cannon -- Alan Gregory, if I remember, assisted me with the collection of the evidence.

Q Okay. Alan Gregory did?

A Yes.

Q Okay.

A In fact, he --

Q Did Mr. Cannon?

A I don't recall Mr. Cannon assisting at all.

Q You think it was just you and Mr. Gregory?

A Yes, just me and Mr. Gregory, because we had the saws and the gloves and the tools and everything.

Q Now, in connection with your initial examination of the fire scene, you state in your narrative that it was obvious the fire had moved from the living room area. Isn't this statement inconsistent with some of the statements we've heard from the fire officials that have testified over the course of the last week, as far as what they testified to, that it was primarily in the back bedroom and in the kitchen; and that there was little or no fire in the living room?

A I don't see a discrepancy there. When I said it had moved from the living room area, I pointed out the hole going into -- through the paneling, going into C.'s bedroom. I also illustrated and photographed the heat migration down the hallway to the back door. So I don't -- you know -- and I showed the different sides of the bookshelf. So where is that in discrepancy with the other reports?

**Q Well, because their reports is that there was little or no fire in the living room. They testified there was little or no fire in the living room. And you testified in your report, "It was obvious the fire had moved from the living room -- had moved from the living room area." And I understand what you're saying. You've testified here today that you believe it moved from the living room area, correct?**

A Well, there was fire obviously in the living room.

**Q You testified that there was fire today in the living room area, and the fire moved from the living room --**

A Absolutely. And I'm sticking with that.

**Q I understand that. My question is, is that not inconsistent with the statements we received from the witness chair --**

PageID #: 2250
CRIMINAL TRIAL
233

A No.

Q -- from several firefighters that said there was little or no fire in the living room?

A No, it's not.

Q Okay. You don't see that as an inconsistency?

A No, I do not.

Q Okay. And I want to go back to the electric range you've referred to. You did look at it, but you did not consider it significant. How do you explain that -- I don't know if I want to call it a pot or a skillet or whatever you want to call it -- melting through the burner? Do you have an explanation for that?

A Well, with the fighting and the activity going on there that day, I believe that skillet -- that element had been left on for several hours for some time in a dry pan. You know, I talked to a gentleman at the university about that --

Q I don't -- I don't want -- no. I'm not interested in hearing who you've talked to. I'm asking you specific questions. So now you're telling me that you do believe that burner was left on all that day on a dry pan, but you're saying you don't think it's related to the fire. I understand --

A It's not related to the fire. You can leave a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

dry pan on an element, and it will eventually burn through the product of that material.

Q And you think that happened that day?

A I sure do.

Q Okay. But I understand you still believe it was not related to this fire?

A None whatsoever.

Q Okay. And you continued to refer to patterns of a flammable liquid, but there's not been any flammable liquid identified at this scene; is that correct? There's not been any flammable liquid confirmed at this scene; is that correct?

A None were identified in the analysis. No flammable liquids -- no ignitable liquids were identified in the analysis by Mr. Rider (phonetic).

Q Today can you testify as to what that flammable liquid was? You still believe there was a flammable liquid; is that a --

A I sure do, and I can't tell you what it was.

Q Okay. You testified today that there were -- and I believe this is also what Mr. Flowers testified to -- I'm not going to say Mr. Gregory, because I don't remember -- that there were three points of origin -- if that's the correct term, I believe it is -- of the fire; and that you pointed those out to be --

KENTUCKIANA
COURT REPORTERS

MS. GIORDANO: May I approach, your Honor?

JUDGE GILL: You may.

**Q Or you can point one out That might be easier. Show those to us again, just briefly.**

A The one by the living room.

**Q Yes, sir.**

A The one in the living room, and the one in the bedroom, and then the one by the kitchen. Okay.

**Q Now you previously testified that there were six points of origin in this fire; is that correct?**

A Six collection locations.

**Q Well, I'm going to --**

MS. GIORDANO: May I approach the witness?

JUDGE GILL: You may.

**Q Do you remember testifying at the preliminary hearing? I want to say it was in October of 2004.**

A Uh-huh.

**Q All right. Now that you've refreshed your memory, do you recall testifying?**

A I sure do.

**Q That there were established six points of origin in the home?**

A Well, we got -- today, we got three points of origin. I did testify to six points. And the simple reason I said that was because of the corner of the

couch that I pointed out earlier was burned out. And at the time I testified, we hadn't gotten our lab results back, to my knowledge, on this sheet that you looked at a while ago. And with the burn on his leg that I had a question about, there had very -- possible had been a transfer of product by his shoes or his clothing to that item right there. Now, had all of our samples have come back --

**Q Positive, which would then --**

A Yeah. We would have had six areas of concern.

**Q But they were all negative?**

A They didn't find any ignitable liquids in the samples.

**Q So how did you eliminate some and decide to keep others? I mean, what was the determining factor between, "I'm going to keep these as points of origin"? Were there distinctions?**

A Well, there is a distinction. Like I said, this living room fire right here, in my opinion -- we've already heard testimony of people going in the structure that didn't sustain any type of burn -- thermal, radiant, or whatever, hair singing or anything. And luckily, the mother was able to go in and retrieve this child from this bed right here (indicating) and, you know, thank goodness that that occurred. This fire

right here, the one in the kitchen, and this one right here along this window, I have no doubt -- I have no doubt they are incendiary- set fires.

**Q I understand that. But I'm asking you the question. Why did you eliminate some points? All the information you know today --**

A All I know today is --

**Q Wait a minute. Let me ask the question. All of the information you have today from which you testified, there were three points of origin, you have in October of 2004, everything that you used in your professional capability -- and I believe you do know a lot about fires and fire investigation -- you have all that information then and -- you had the same information then that you have today. What changed your mind?**

A I don't have -- I didn't have the analysis then, Ms. Giordano. I didn't have my analysis from the lab. I wanted to be on the conservative side. Okay? This is a very, very serious matter.

**Q Absolutely.**

A And I wanted to be on the conservative side. I know I had three points of origin right here, right there, and right there. I have no question or doubt about it. Now --

Q But my question is, if the only distinguishing factor between then and now was the analysis from the lab and the lab was negative on all six --

A Well --

Q -- and that came in in September 27, 2004, was when those test results came back, I still don't understand why you've eliminated -- basically, why you've changed your opinion. And I think that's important.

A It's important because it's important --

Q If you don't know, that's okay.

A -- for the defendant here, it's important for this jury and for this Court, I'm on the side of conservative here. I know I had three points of origin for sure. I know the structure, the flooring, the timbers depicts that accurately.

Q So is it just a fair statement to say you changed your opinion?

A It's a fair statement to be fair.

Q And that you changed your opinion since that time?

A After the analysis, looking at the analysis, the fact that we did have a rollover in that living room, we did have a fire extension from the living room through the wall going into C.'s room and down the

 hallway, I am conservatively sitting here and telling you that we had three points of origin -- defined three points of origin in that structure.

**Q And to answer my question, so you have, therefore, changed your mind about your opinion -- or changed your opinion, would be a better way to put that, let me rephrase that -- you have changed your opinion since October of 2004, yes or no?**

A Yes.

**Q Now, I'm assuming you have attempted to establish some timeline. When I refer to "timeline," kind of lining up the events of the day as they relate to the fire. Is that something you do in the course of your evaluation?**

A Well, what you do is you look at the product, you look at the structure, you look at the amount of oxygen, you look at whether it's got forced ventilation, whether it's going to be a ventilation- controlled fire atmosphere, and whether it's going to be a fuel-controlled atmosphere.

**Q And in your report and commentary, you indicate that you believe that there is a period of fire initiation and growth. I mean, that's typical?**

A I'm sorry?

**Q The period of fire initiation and growth, and**

CRIMINAL TRIAL
240

**I'm asking you when is that -- when was that on this particular fire?**

A I believe it was around 7:00.

**Q So your opinion differs somewhat from Mr. Flowers who estimated 20 to 30 minutes prior to 7:39, close -- well, within a 45-minute window?**

MR. ORANGE: Your Honor, she's mischaracterizing Mr. Flowers' statement.

MS. GIORDANO: I mis --

JUDGE GILL: Why don't you just ask him?

MS. GIORDANO: Okay.

JUDGE GILL: You've already asked him when he thinks it is. The jury can analyze what they recall from the last witness.

BY MS. GIORDANO:

**Q 7 p.m.?**

A Around 7 p.m., ma'am.

**Q And then the growth period would obviously be from 7 p.m. until --**

A The growth period would be until 7:25 when the 911 caller discovers smoke coming -- emitting from the residence.

**Q Just because some of us don't know as much about it as you do, is the growth period the time that the fire goes on until it's put out?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A That's the time when the fire has, number one, it has been -- the fuel source has been ignited. It has the available oxygen to sustain reproduction and combustion of it. The fire is growing and it's building.

**Q In a sequential analysis of fire initiation, growth, and development, is that the first step to determine the ignition source?**

A You look at the very -- you look at the -- here's the thing about a fire. You want to try to find exactly, as best you can, where this fire began. And if at all possible, you want to find what was the first -- first fuel ignited. Now, at times, I have found newspapers wadded up in the closets where they had went out -- where they had gotten smothered out. The hardest thing and the most powerful thing, if you take lighter fluids or some kind of a petroleum distillate, petroleum product, a lot of times those things are consumed by a fire, and you won't have any evidence -- traceable evidence left.

**Q Well, in this particular fire, can you explain the exact mechanism, modality, and methodology of the ignition of the fire in question?**

A I think the mechanism of ignition was human intervention.

KENTUCKIANA
COURT REPORTERS

**Q Can you be more specific?**

A I think someone -- I believe, in my opinion, that the defendant had the time and the opportunity to set the fire in these locations.

**Q Do you have a specific scenario? And what I mean by that, is specifically the facts of how you think he started this fire.**

A Well, we had a --

**Q If you don't, that's fine. But if you do, I'd like to hear what it is.**

A In the bedroom along the wall where the V-pattern is at, obviously, ruled out accidental.

**Q What time do you think he did this?**

A I'm going to say around 7:00.

**Q Okay.**

A Around 7:00 I believe is when -- and here again, I could be off a few minutes. You know, I can't be exact because there's a lot of things you have to factor in there with the fire. I believe around 7:00, a fire -- a product was applied in that room, also in the vicinity of the kitchen by the ventilation duct, and along the window -- the north double windows a product was applied and some type of incendiary device was used to ignite it.

**Q And you've heard all the testimony, and don't**

disagree with the testimony as to how drunk Mr. Yell was on this night?

A Yes.

Q And your suggestion is that he -- do you think he did this in some sort of pattern -- planned pattern?

A I think it was a -- I think it was a revenge reaction.

Q I'm not asking why he did it; I'm asking how he did it. Do you think he had a plan in mind when he went around in his drunken state with perceivably this, which is the Kingston [sic] charcoal fluid, or whatever it is, without -- in some kind of pattern or planned pattern, and placed this liquid in certain places and started this fire around 7:00?

A Yes.

Q Okay. Tell the ladies and gentlemen of the jury again what's in that?

A That's a can of Kingsford charcoal fluid.

Q Did you weigh it?

A I didn't weigh it.

Q So you don't have any idea how much charcoal fluid was in it, obviously, before you found it. And where did you find it?

A It was in the cabinet above the stove.

Q And do you know how much --

MR. ORANGE: Your Honor, I'm going to object to the question. She's making conclusions that are not in evidence.

JUDGE GILL: Overruled. Go ahead.

MR. ORANGE: May we approach?

JUDGE GILL: No, sir. State your objection.

MR. ORANGE: She said that he had no way of knowing how much was in that.

MS. GIORDANO: I'll ask him. I'll ask.

MR. ORANGE: And that's not -- that's not been in evidence.

JUDGE GILL: Okay. Restate your question.

MS. GIORDANO: Okay. I'll ask it.

JUDGE GILL: If he has a reason to know, I think he'll tell us. Go ahead.

MS. GIORDANO: Okay.

BY MS. GIORDANO:

**Q You found it in the cabinet, the Kingsford charcoal fluid that's Exhibit --**

A Exhibit 45, ma'am.

**Q -- 45. You found it in the kitchen cabinet?**

A Yes, ma'am -- well, under the sink.

**Q Under the sink. In the cabinet under the sink?**

A What used to be a door.

**Q And do you have any idea how much Kingsford charcoal fluid was in that can prior to the fire?**

A I have no idea.

**Q And do you have any idea how much Kingsford charcoal fluid is in that can when you picked it up?**

A I didn't -- I didn't weigh the ounces or the quantity of the thing, no.

**Q Did you not think that was important?**

A I didn't do the -- I didn't do the cause and origin of this fire.

**Q Well, who should have done that, in your opinion? In your professional opinion, who should have taken that can and taken it somewhere and weighed it to see if any charcoal fluid was missing out of that can?**

A Well, normally, if we find on a fire scene a flammable product, you know, we may not know whether or not that product was even used to start that fire. With such a simple fact that it's on the property and on the premises mandates in our policy that we do collect it as evidence and retain it. And then when we do get our analysis back that says, "Hey, you had this. This item contained charcoal fluid." Then guess what they can do? They can do a comparison analysis with the product that I don't have in your custody.

**Q So is it your testimony that you do not**

**believe now, and never at any time believed that possibly that charcoal fluid, lighter fluid was used to start a fire?**

A I can't say that. That's why my report here, my modus -- my MO says that, "A fire was set in a mobile home with the aid of a flammable/combustible liquid."

**Q So yes or no --**

A Okay? I'm not identifying flammable or combustible. I'm -- I'm saying it could have been either one.

**Q And what's the difference?**

A A flammable liquid, the flashpoint is -45 degrees on a flammable liquid -- gasoline, for example. This is above 100 degrees is the flashpoint on this.

**Q Which makes it a --**

A It's a less volatile product than gasoline is. Much less.

**Q So I'm going to go back to my question. Do you now, or any time, did you believe that it was possible that the fire at 6838 Bonnie Drive was started with what's in that can?**

A Could have been, very well.

**Q Okay.**

A But here again, without analysis to confirm that, I can't say that. That's why --

Q **Well, we had an analysis. You had an analysis.**

A But what --

Q **Did you have an analysis?**

A Ms. Giordano, what I'm saying is, that's why I noted the report the way I did.

Q **Did you have --**

A We found the can on the scene. Okay. It became an evidentiary item.

JUDGE GILL: Okay. Let's state your question. Listen to her question. Try to answer her question.

BY MS. GIORDANO:

Q **Did you have an analysis done, however, in this case?**

A Yes.

Q **And I used the term "negative"; you used the term, "The test results were that there were no combustible or ignitable fluids found," correct?**

A Correct.

Q **All right. And it is possible, you're saying now, and at the time, you believe that this was used to start the fire?**

A I never have ruled it out.

Q **Okay. Did you find anything else there that it was possible, any other combustible or flammable**

liquids --

A No.

Q -- at the scene?

A No.

Q Didn't find any others?

A No.

Q And you didn't weigh this one to see how much had been taken out of it?

A No, I didn't.

Q And you -- at your direction or Mr. Edmonds' direction, the shoes and the shorts of Mr. -- the highly intoxicated Mr. Yell, were taken and sent to the lab, and they were negative as well?

A Correct.

Q You've testified earlier about the statement of Robert Yell, and you referred to a summary. You prepared a summary of Mr. Yell's statement that was taken on September 13, 2004; is that correct?

A Correct.

Q And you were present at that statement, when that statement was given, along with Detective Edmonds; is that correct?

A Right.

Q You testified earlier that Mr. Yell did not remember anything from 6:30 until the time he was

**arrested?**

A That's what he told me and Mr. Edmonds, Detective Edmonds.

**Q Look at your summary. I think you're looking at it there. About halfway through the page there's a sentence that starts with, "Robert says while." Can you find that statement?**

A On the Robert Yell statement summary?

**Q Yes. I'll show it to you.**

A Well, he remembered everything -- he remembered -- he didn't remember choking April Saturday or pulling a knife on his aunt, Fay [sic] Lyons. He remembered him and April drinking vodka beginning in the afternoon. He recalled" --

**Q I'm talking about -- just a minute. I'm talking about the statement -- let me just show it to you. Is this the same summary you prepared?**

A That's not my summary.

**Q All right. This is Mr. Edmonds' summary?**

A It must be. It's not mine.

**Q Mr. Edmonds' summary statements that, "Robert says while at the Black lady's house, he looked out the window and saw his house on fire. He stated he went back to the house to get the kids out, but the police tackled him." That's Mr. Edmonds' summary. You're**

**saying your recollection of what he said that day is different from Mr. Edmonds?**

A I said, like a while ago, that I'd need to listen to my tape. And I just basically hit the -- what I felt like at the time was very important points in this --

**Q I understand.**

A -- in this short narrative. But the tape is obviously -- has both of our entire interviews on it.

**Q What you're saying is it's just a summary. You didn't try to include every point.**

A I don't -- and that's the way I do my reports. I don't try to write every detail, you know, in --

**Q I understand. Is it possible then that Mr. Edmonds' summary is accurate?**

A I'm sure it is.

**Q Okay. I want to go back to the fire patterns within the trailer. You testified today that -- going back to that preliminary hearing --**

MS. GIORDANO: Chris, do you have that handy, that preliminary hearing, because I misplaced it when I'm talking.

BY MS. GIORDANO:

**Q Today you've testified that you saw fire patterns; and that the fire patterns were the basis --**

CRIMINAL TRIAL
251

part of the basis for your determination that this was an incendiary fire; that it was an intentionally set fire. Is that what you said?

A Correct.

Q Okay. Again, going back to your testimony at the preliminary hearing, do you recall -- you do recall that testimony -- not word for word, but do you recall the --

A I don't recall it word for word. I remember we had a hearing.

Q You were asked the question at that hearing, "And you refer to patterns. Are you saying the patterns indicate there's some kind of liquid accelerant?" And your response is, "Well, we are basing that on PJ, the ATF dog." So in your testimony at the preliminary hearing, you were saying that the accelerant was indicated by the dog, not by any patterns. Are you saying today that the fire patterns indicate an accelerant?

A I think it's a combination of both. I think the dog -- the fact the dog did hit -- so happened to hit in three areas that we had determined to be fire origins, number one. Number two, as I demonstrated with the photographs and tried to show the jury why I feel like these areas are points of original, I think is a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

combination of the entire package.

Q But at the time when you were given the opportunity to answer that question affirmatively, "Do you believe the patterns indicate an accelerant?" you said, "Well, we are basing that on PJ." You didn't -- as if to say --

A Well, I didn't elaborate on the fire marshal's findings. And I probably didn't have their report in front of me there at that time. And, you know, as I've told Mr. Spies in this -- you know, I'm very careful about speaking for the other person.

Q Okay.

A I don't like doing that.

Q Now we've had a lot of testimony today about the age of this trailer. We know it was 30, 35 years old, correct?

A Correct. Built in '72.

Q Okay. And I'm going to make some assumptions, and I probably shouldn't, but based on the testimony of those fellows who have testified before you, because of the date of the trailer, you-all don't know the materials? Is it normal for you to get a materials list when you're investigating a fire of a mobile home -- to attempt to get one?

A I didn't attempt to get one, but I have -- I

KENTUCKIANA
COURT REPORTERS

have knowledge of what was in that trailer and the age of it.

**Q Okay. But is it an important part of your investigation when you're looking at an old trailer and you're going to be studying the growth of a fire, the pattern of the fire. Is it not an important factor to know, if you can find out, what the materials are that were used to manufacture that trailer?**

A Well, that's very important. Just like the paneling -- the gentleman testified about the paneling, called it the -- what, the 400-mile paneling or whatever. Of course, that's important when you're -- when a fire is in the developing and the growing stages, absolutely. The carpeting is important. Whether it has -- you know if it's retardant. If it's -- you know if it's flame retardant or not. All those things are important. You know, the age of this home and, you know, since I've found out that the carpets had not been changed in this home, that it had pretty much been in a family ownership since the '70s, and that led me to believe that, more than likely, this carpet wasn't treated.

**Q What about the additions to the home? Did you take any steps to try to find out who had done that and what materials had been used in the additions to the**

CRIMINAL TRIAL

254

**home, and how that may differ from the composition of the rest of the home?**

A No, I didn't, Ms. Giordano.

**Q Okay.**

A Sure didn't.

**Q Isn't it true that knowing those factors sometime can help you understand fire resistance, how that could be modified, if you know the materials and the additions and things that were done and when they were done and other things that may have occurred? Is that a significant factor to know?**

A That is significant if I'm trying to replicate an exact model of what happened. In fire modeling, I want to know the thickness of the drywall; I want to know the type of carpets and everything. But in this situation here, I wasn't planning on modeling the structure in fire dynamics. So no, I didn't look into the carpet.

**Q But if all those things affect the growth and the distribution of a fire, and your conclusion that you come to or have come to in this case is based upon, primarily, the growth and the distribution of the fire, isn't that an important thing to know?**

A The important thing to know in this case is -- I've spent a lot of years working on fire scenes and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

fire investigations. What I see in that room -- in particular, this room right here, I see a fire that has been generated and it's created in a room where not many hours before this fire was set, there was a choking incident that occurred.

**Q So is that a no? Is that just a no? No, I didn't want to know that? I didn't care. I didn't need to know that. I just need a yes or a no. Did you want to know that? Did you -- you're studying the growth and distribution of this fire and how it determines whether or not this fire was accidentally set or intentionally set?**

A Well --

**Q You've already made up your mind that this man intentionally set it.**

A If you'll just let me --

**Q Is that not important to know? Yes or no?**

A Repeat your question.

**Q When you're studying the growth and distribution of a fire as it relates to cause and origin, as it relates to how it started, who it started, is it not important to know certain factors about a mobile home, such as materials, additions, when they were constructed and what they were constructed of? Let's go further. Let's talk about furniture, carpet,**

**bedding, anything they would have had in there, are those things important?**

A In some instances it is. Like I said --

**Q In this incident, was it important?**

A In this incident, I didn't arrive there until after the scene had done been overhauled, 12 hours. I wasn't going to do a cause and origin of this fire. I was going to look at what was there and decide whether or not I agreed or concurred with what they had found.

**Q So do you believe --**

A And that was it.

**Q Go ahead.**

A I'm through.

**Q So do you believe someone else should have done that, is that what you're saying?**

A If someone else did it?

**Q Do you believe someone else should have done that? Is that what you're saying? That wasn't my job, but somebody else should have done that.**

A I don't think so. I don't think so. I believe the patterns speak for themselves in this house.

**Q So to go back to my original question. No, that wasn't important to know --**

A No.

**Q -- your opinion --**

A No.
Q -- in looking at this fire?
A No.
Q Do you not believe it would have been better practice to have found out all those factors?
A No.
Q Did you consider -- you mentioned you didn't consider any other suspects. You, or no one else, took any steps to collect the clothing or do any swabbing of April; is that correct?
A I didn't collect anything from April, no.
Q Did you -- are you aware of whether or not anybody else did this?
A To my knowledge, no one did.
Q Were folks -- at this point, once you arrived, and as far as the criminal investigation goes, were they working for you -- not literally, but were they working under your direction? That's a better way to --
A Well, my sergeant that testified here the other day, he was there and he was doing the assignments, Sergeant Smith.
Q He is a Russellville PD --
A No. He's Kentucky State Police sergeant.
Q Okay. So --
A He's the investigative sergeant.

**Q So he was in charge?**

A He was in charge, and when he arrived, he started assigning different tasks for different troopers and detectives. And, of course, there was another detective there as well, Detective Childers.

**Q So would you have considered it his responsibility to have -- I don't know if order is the proper word or just requested that, for instance, one of the people that we know that was at the fire, according to the testimony as recent as 7 p.m., that her clothing be taken and bagged for evidence, swabs be done, you're saying that would have been his responsibility, if he had felt that was important?**

A He would have left that up to me as the arson investigator on the scene.

**Q All right. So you did not do that. And it's your testimony that you did not think that was important to do?**

A I didn't think that was important, but what I did think was important was --

**Q I didn't ask you what you did think was important. I asked you if that one specific thing was important and your answer is no? Your answer is no, it was not important?**

A No.

**Q What about interviewing, for instance, David Smith. Did you consider -- Mr. Smith, can you identify who that is from your investigation?**

A I can't identify Mr. Smith.

**Q Let me rephrase that. You maybe can't identify him by sight. Do you recognize the name?**

A Yes.

**Q Okay. And who is David Smith?**

A That's the man that April had the affair with.

**Q Did you talk with him or did you investigate him in any way, shape, or form?**

A I didn't investigate him. I believe the Commonwealth has had contact with him if I'm not mistaken.

**Q So well into the investigation, someone did. But you never, as a part of your investigation, undertook interviewing or talking with Mr. Smith?**

A I never did.

**Q Okay. You mentioned earlier fuel load. And just so I'm clear, a fuel load -- I think you explained it, but a fuel load can be anything that's in a building or a house, right? It could be furniture; it could be anything that combusts?**

A Anything that can go through the combustion process, uh-huh.

Q Okay. I just wanted to be sure there was no confusion about that.

MS. GIORDANO: I think that's all I have at the present time. Thank you, Mr. West.

JUDGE GILL: All right. Any redirect?

REDIRECT EXAMINATION

BY MR. ORANGE:

Q On September 11, 2004, do you have any information that Mr. Smith, the gentleman that it's alleged that the affair was with April Davis Carpenter, was anywhere in Russellville or Logan County?

A No.

Q And do you have any reason -- any way to connect him with the setting of this fire?

A I do not.

MR. ORANGE: Your Honor, we have a number of exhibits who -- think they're -- out here that are numbered, been marked for identification purposes and perhaps have not been entered into evidence. We would move that all numbered exhibits that are not into evidence be admitted into evidence that the Commonwealth has introduced.

MS. GIORDANO: No objection.

JUDGE GILL: All right. We'll mark them -- do you want to hand that -- we'll mark those as

PageID #: 2278
CRIMINAL TRIAL
261

admitted.

(COMMONWEALTH'S EXHIBIT ADMITTED INTO EVIDENCE)

All right. Any other questions, then, of this witness from the Commonwealth?

MR. ORANGE: Just a minute, your Honor.

(OFF THE RECORD)

BY MR. ORANGE:

**Q Are there situations where -- or can there be flammable liquids at a fire scene that are used to ignite a fire that do not show in tests? And if so, why?**

A Well, yes, they can be. Here again, alcohol will burn, but it pretty much will consume itself. You know, lighter fluid, for example, if I were to put lighter fluid out on this table right here, then chances are when you lit it, it would burn completely up, and there wouldn't be any residue of it left. And it probably wouldn't be enough heat there to damage the table even. So yes, there -- you know about the really the -- a house or a structure that has been set on fire with gasoline is really, in my experience of collecting evidence, is where I normally get my positive samples at or kerosene, one of the two.

MR. ORANGE: No further questions.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL

262

JUDGE GILL: Recross?

MS. GIORDANO: Just one, your Honor.

RECROSS EXAMINATION

BY MS. GIORDANO:

Q **Mr. West, you testified earlier about the sheet that was on C.'s bed.**

A Yes, ma'am.

Q **And I'm trying to remember what you said. You testified that the sheet was -- at the time this other evidence was collected, I believe you testified that the sheet was taken off and put into a -- and maybe you just need to restate that, because I don't want to restate your testimony wrong.**

A Yes, ma'am. Detective Edmonds and I went back to the scene and collected the sheet.

Q **When was that?**

A That was the day of the fire -- or I'm sorry, it was Sunday.

Q **Okay.**

A The day after the fire.

Q **And what did you do with it?**

A I put it in a can.

Q **Was that before or after Buster Cannon had left if you know?**

A I can't remember.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Q Okay. You're just not sure?**
A I'm not sure.
**Q Okay. Thank you.**

JUDGE GILL: All right. Any redirect?

MR. ORANGE: No further questions of this witness, your Honor.

JUDGE GILL: All right. Any questions from the jury?

(BENCH CONFERENCE)

JUDGE GILL: Okay. We've got -- nearly every juror had a question. Let's see what we got.

MS. GIORDANO: I guess that means that we didn't do a very good job.

JUDGE GILL: "Since Mr. Yell was so intoxicated, in your opinion, how was there no fluid on his clothing?" I don't know -- what do you-all think about that?

MS. GIORDANO: I was going to ask it, so I don't have a problem with it.

JUDGE GILL: Here it is. Okay. Any problem with that?

MS. GIORDANO: No.

MR. ORANGE: The problem with it, fluid -- defining what fluid are we talking about. Are we talking about lighter fluid? Are we talking about

water? Are we talking about some of the beer or alcohol?

MS. GIORDANO: I think the better question would be, "Do you know why?" And he's probably just going to say no -- "Do you know why there wasn't" -

JUDGE GILL: Well, of course, the answer is if we don't know what the fluid is, we don't know why. So I'm not going to ask that question.

MS. GIORDANO: Okay.

JUDGE GILL: I'm going to let you-all ask it if you want.

MS. GIORDANO: Okay.

JUDGE GILL: Here's the one I've been waiting for. "Can insect repellant be inflammable -- flammable? Did anyone find any of the insect repellant that was purchased?" And I told -- I told Chris, when I heard bug spray, I thought flame thrower. That is a flame thrower. But most bug spray is flammable. Of course, insect repellant can burn your skin. There probably would not be anything wrong with that question. That's why I was really interested in that bug spray, because we used to play with that when I was a kid. "Did anyone talk or anything with Donald? Where was he at the time that this happened?" And we really shouldn't

ask that, oh, Lord. "Do you have any physical evidence that Mr. Yell set the fire, or is it your conclusion by the process of elimination?" Anything wrong with that?

MR. ORANGE: That's good.

JUDGE GILL: Say what?

MR. ORANGE: I don't think there's anything wrong with it.

JUDGE GILL: "How did you eliminate Donald Smith or April?" "What was the type of flooring in the kitchen? How was it affixed to the subfloor and how was the living room floor adjoined to that in the kitchen? If glue was used to hold the floor in place, could a line of glue between a linear glue burn in a linear pattern?" "Did Mr. Yell give any reason for leaving the children alone unattended?" "Do you know all of the elements of a fire tetrahedron?" Any questions -- any problems with any of that?

MS. GIORDANO: No, sir.

MR. ORANGE: No.

JUDGE GILL: "What is the frying mentioned on the diagram?"

MS. GIORDANO: I think he answered that.

JUDGE GILL: I don't believe I want to ask

that, "Why is it mentioned on the diagram?" I don't believe I want to ask that. "Were you there while C. [sic] and PJ were there?"

MS. GIORDANO: Buster Cannon?

MR. ORANGE: Cannon.

MS. GIORDANO: Cannon and PJ?

JUDGE GILL: Yeah, Cannon and PJ were there.

MS. GIORDANO: I thought you said C.

JUDGE GILL: Okay. I think he said enough about that. "Who videotaped Cannon and PJ? If so, where's the video?"

MS. GIORDANO: I think he testified to that. There's a question on the back I think.

JUDGE GILL: I don't think he did. I wish they wouldn't write on the back.

MS. GIORDANO: I think Edmonds testified he lost the tape.

JUDGE GILL: "Can we see the can of Kingsford fluid that's in evidence?"

MS. GIORDANO: Sure.

JUDGE GILL: I'll just tell them that they'll be able to look at it in the jury room. "How," something, "and told how much fluid might be there?" I'll just tell them that they can look at that.

MS. GIORDANO: Nobody's testified to that.

JUDGE GILL: "What do," something, "control on 40 mean on the diagram? What does," something, "control on 40," or "control on 40 mean on the diagram?" Anything wrong with any of those?

MS. GIORDANO: No, sir.

JUDGE GILL: "Was the shovel in the house?"

MS. GIORDANO: I think it's very confusing about the shovel.

JUDGE GILL: I don't know the answer to that, so I don't want to ask that. "Was the Kingsford lighter fluid can checked for fingerprints?" "Were the 22-ounce bottle of beer and the eight vodkas ever found?"

MS. GIORDANO: Good question.

JUDGE GILL: "That cage that Robert purchased. If so, where? Could they be the accelerants?"

MS. GIORDANO: Good question.

JUDGE GILL: "If this can be asked -- not for sure, okay. If someone had been able to go through the back door for the search for baby C. If so, why was it not done?"

MS. GIORDANO: That's one thing to be wondered.

JUDGE GILL: I'm going to stay away from that. It doesn't make it -- it doesn't make it, more or less, uglier than anything in this case if the

defendant's guilty. "As you know, all the evidence taken from the scene, the little boy, and Mr. Yell, so why wasn't any clothing or shoes taken from Ms. Davis to be checked for substance?"

MS. GIORDANO: I think I asked that.

JUDGE GILL: You've asked that. Already been asked.

MS. GIORDANO: That might have been --

JUDGE GILL: "Based on your observations and the reports you've seen, approximately how long do you believe the fire had been burning before the first entry by the fire department at approximately 7:30, 7:40?" "If it were to have heated the aluminum vent in the kitchen area to 1,200 degrees for it to melt?" I think you've already talked about that.

MS. GIORDANO: Yeah.

JUDGE GILL: "Do you know whether there was no samples?" I'm going to mark through that. It's redundant. I'm not going to do that.

MS. GIORDANO: That is redundant.

JUDGE GILL: "Do you know why there were no samples taken of clothing from April?" We've already got that. I'm going to ask that. "Is it because Mr. yell had been already identified as the

primary suspect?"

MS. GIORDANO: That's a good question.

JUDGE GILL: Okay.

MR. ORANGE: Don't know what this witness knows.

JUDGE GILL: "With the heat degree inside the trailer, why did the can of charcoal lighter not ignite itself?"

MS. GIORDANO: I asked that question myself.

JUDGE GILL: Okay. "Did you ever consider Donald as a suspect since he was not at home with Lindsey, April, and the children, during the time of April's" -- because they had just had a fight, yeah. Hadn't thought about that.

MS. GIORDANO: Blame it on him leaving.

JUDGE GILL: "You and Detective Edmonds did not interview Mr. Yell on the night of the fire, you had not identified a suspect until at least 24 hours later. All clothing samples taken from him the night of the fire." Well, I think we've been over that, don't you think?

MS. GIORDANO: Uh-huh, I do.

MR. ORANGE: Yeah.

JUDGE GILL: All right. I'm going to ask these and see where we go.

(END OF BENCH CONFERENCE)

JUDGE GILL: Okay. I'm going to try to go through some of the jurors' questions. Were the 22-ounce bottle of beer and the eight vodkas ever found that Kay Lyons took Robert to purchase?

THE WITNESS: Not to my knowledge.

JUDGE GILL: Okay. Is it possible that the -- and I'm assuming the vodka they're referring to -- could be the accelerants?

THE WITNESS: No.

JUDGE GILL: I'm sorry?

THE WITNESS: No.

JUDGE GILL: Okay. The next question, why is that not possible?

THE WITNESS: Because of the flammability of it. I did a burn analysis with that type -- very type of product, and it would not sustain combustion well enough to ignite that type of material.

JUDGE GILL: Okay. With the heat inside the trailer during the fire, it's presumed, why did the can of charcoal lighter not explode or ignite itself?

THE WITNESS: Because it was down low to the floor, which is a cooler environment during the fire.

 JUDGE GILL: And you've said it was in a -- where did you say it was?

THE WITNESS: It was next to the stove. It was in the bottom of a cabinet under the sink.

JUDGE GILL: Was it in -- was the door closed over or was it an open cabinet?

THE WITNESS: The best I remember, the door was burned off of the cabinet. So that kind of shielded it somewhat during the migration of the fire.

JUDGE GILL: All right. Did you ever consider Donald as a suspect since he was not at home with Lindsey and April and the children during the time of April's trip there?

THE WITNESS: No, I did not.

JUDGE GILL: Okay. Do you know why there were no samples of clothing taken from April?

THE WITNESS: Immediately after the fire, I wasn't around April. And due to the testimony and the -- later the investigation revealed that she was at those -- at these friends' house. And here again, I assumed that the local authorities didn't deem it necessary, due to her locations, of taking her clothing.

JUDGE GILL: Was the Kingsford lighter fluid can checked for fingerprints?

THE WITNESS: Not to my knowledge.

JUDGE GILL: And this is a question. Can we see the can of Kingsford fluid that's in evidence and be told how much fluid is in it? It is in evidence. And all of this evidence, all of these exhibits will be allowed to go with the jury back into the jury room. And can you explain to the jury what control on this number 40 means -- talking about that control, I think on the diagram is what they're referring to?

THE WITNESS: That's a sample that the lab can use for a comparison. Here again, that's why I tried to get one in the cleanest area that I could find -- cleanest environment.

JUDGE GILL: And just to clarify for the jury, that sample was taken not at a spot that you suspected of being involved in an arson?

THE WITNESS: That's correct.

JUDGE GILL: Okay. It was a sample of what? What was it actually?

THE WITNESS: It was just a carpet with padding.

JUDGE GILL: Carpet with padding?

THE WITNESS: Yes, sir.

JUDGE GILL: Okay. And the shovel that's

represented on the diagram that's been used, was that in the house at the time of the fire?

THE WITNESS: No, it was not.

JUDGE GILL: Okay. Do you know where it came from?

THE WITNESS: Mr. Gregory brought it with him.

JUDGE GILL: Okay.

THE WITNESS: And I should clarify that as part of the overall process.

JUDGE GILL: Okay. And were you present while Mr. Cannon -- Officer Cannon and PJ were there doing their investigation?

THE WITNESS: They had already -- he had already been through the structure before I arrived.

JUDGE GILL: Okay. Do you know who videotaped that?

THE WITNESS: I believe Mr. Edmonds did --

JUDGE GILL: Okay.

THE WITNESS: -- if I'm not mistaken.

JUDGE GILL: And do you know what happened to that video?

THE WITNESS: I believe it had a malfunction on it, maybe, on the video or -- if that's the one I'm thinking of.

JUDGE GILL: Meaning that it's not --

THE WITNESS: It's not visible.

JUDGE GILL: Not visible. Okay. This is similar to another question I've asked just a minute ago. Did anyone talk or interview Donald Lindsey [sic] -- Donald's [sic] boyfriend?

THE WITNESS: Donald Powell?

JUDGE GILL: I would assume that was her boyfriend. I can't remember.

THE WITNESS: Detective -- or I'm sorry, Sergeant Smith interviewed him.

JUDGE GILL: Okay. Insect repellant, is that flammable?

THE WITNESS: It depends on what the propellant is in the can, your Honor. All aerosols have to have some kind of propellant to eject the product.

JUDGE GILL: Okay. Did anyone find a can of repellant that Mr. Yell may have purchased?

THE WITNESS: I didn't. Not to my knowledge.

JUDGE GILL: Okay. Do you have any physical evidence that Mr. Yell set the fire or is it your conclusion -- is your conclusion a process of elimination?

THE WITNESS: It's a process of elimination.

JUDGE GILL: The next question is, how did you eliminate Donald Smith or April?

KENTUCKIANA
COURT REPORTERS

THE WITNESS: Because April was at her friend's house with two of the children at the time of this fire development. And the other question was Donald?

JUDGE GILL: Yes.

THE WITNESS: My sergeant in command interviewed Donald Powell and he -- I think he testified the other day he'd been working for 17 years. He didn't have any reason to go further with Mr. Powell, based on his interview.

JUDGE GILL: All right. What was the type of flooring in the kitchen, do you know?

THE WITNESS: Yes. It was a pressed wood compositive-type floor.

JUDGE GILL: The rest of the question is, how was it affixed to the subfloor?

THE WITNESS: It appeared that it was -- appeared that it was nailed down. I did find some nails along the top members of the flooring. Could have been some of it screwed down as well. And there was a section, as the photograph shows, where one part was out.

JUDGE GILL: How was the living room flooring joined to the kitchen flooring?

THE WITNESS: It was -- all the flooring was

joined on rafter members.

JUDGE GILL: I think the question is probably aimed at, was it nailed or glued or do you know how it was?

THE WITNESS: It appeared to be fastened with screws or nails. I didn't -- I didn't see any indication of it being glued.

JUDGE GILL: That's the next question. If glue was used to hold the flooring in place, could a line of glue burn in a linear pattern?

THE WITNESS: Well, here again, glue can burn, but you -- it would have to start at the bottom and work your way up. Since these fires occurred from the top side down, as Mr. Flowers showed in the illustration on the chalkboard a while ago. The fire started from the top and went down. Obviously, there wouldn't be glue attaching the floor to the framing members on top of the floor.

JUDGE GILL: Did Mr. Yell give any reason for leaving the children unattended?

THE WITNESS: He couldn't remember -- he couldn't remember beyond 6:30 what he did or what was going on.

JUDGE GILL: Okay. And this is one that maybe you'll understand this question. It says, do you

know the elements of a fire tetrahedron?

THE WITNESS: Tetrahedron?

JUDGE GILL: Yes.

THE WITNESS: That's the -- that's the heat, fuel, and oxygen of a fire that come together.

JUDGE GILL: Okay. All right. Any other questions from counsel?

MS. GIORDANO: No, sir.

MR. ORANGE: Yes, sir.

JUDGE GILL: All right.

FURTHER DIRECT EXAMINATION

BY MR. ORANGE:

**Q I believe there may have been an intent by a juror to ask how did you eliminate David Smith or did you eliminate David Smith?**

A I personally did not eliminate David Smith. It's my understanding that -- and I have read this or Someone's told me that through the investigation that he has --

MS. GIORDANO: I would object, your Honor.

JUDGE GILL: I'll sustain the objection.

BY MR. ORANGE:

**Q Did you have any reason to believe David Smith set this fire?**

A No, I didn't.

**Q And earlier this week I believe one of the witnesses, Kay Lyons, testified that she went to the liquor store with the defendant.**

A That's correct.

**Q And we didn't put those bottles in evidence that she identified bought some bottles similar to those or like those maybe with a different colored top?**

A Yes, sir.

**Q And what is that?**

A It's Smirnoff vodka -- flavored vodka.

**Q And what percentage alcohol is --**

MS. GIORDANO: Judge, I'm going to object. I'm just stating my objection. I don't think she identified those as being the same, but similar to. And they were -- those size bottles come in different proofs and different -- I mean, he can answer those bottles, but --

JUDGE GILL: But it will be relevant if we don't know what bottles, what proof was the bottles that were purchased. Wouldn't I be right about that?

MS. GIORDANO: Yes, sir.

BY MR. ORANGE:

**Q Those particular bottles, what composition are the bottles?**

CRIMINAL TRIAL
279

MS. GIORDANO: Judge, it's not relevant. I object to relevancy.

JUDGE GILL: How is that relevant?

MR. ORANGE: Your Honor, the materials that those bottles are made of, we believe that a fire would have consumed those bottles.

JUDGE GILL: You believe that? I'm going to sustain the objection.

MS. GIORDANO: Thank you.

JUDGE GILL: All right. Let's move on.

BY MR. ORANGE:

**Q Also, have you had the occasion to --**

JUDGE GILL: Before we go forward, let's have counsel step up. I'm having a second thought. I want to be sure I understood where you-all are going.

(BENCH CONFERENCE)

JUDGE GILL: Okay. Where are you headed?

MR. ORANGE: Your Honor, these bottles are plastic. They've also got a tin top on them.

JUDGE GILL: You're talking about which bottles?

MS. GIORDANO: These bottles are --

MR. ORANGE: Those right there.

MS. GIORDANO: Oh, okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JUDGE GILL: Okay. The bottles, themselves, are plastic, not glass. All right.

MR. ORANGE: It's my understanding that these are 70 or 80 proof, depending on the specific ones a person buys. There's two questions here: One, does it contain ethyl alcohol? He's alluded to that already. The other one is, would the bottles have been consumed in the fire if they were there?

JUDGE GILL: Okay.

MS. GIORDANO: But, Judge, until there's evidence that these are the very same, both the bottle, the plastic or glass bottle; and B, that it's the very same alcohol content. And we don't have any. We just have "similar to."

JUDGE GILL: Well, what I think you might do is just say if the bottles were made of plastic, as some of them are, establishing some of them are and may have been plastic, well, plastic might have been consumed in the fire.

MS. GIORDANO: Yes, sir.

JUDGE GILL: What are you going to do with those two now?

MR. ORANGE: Your Honor, there's testimony that they went to the Dollar Store and bought Cutter.

JUDGE GILL: Right.

MR. ORANGE: I went to the Dollar Store and I bought Cutter.

JUDGE GILL: Right.

MR. ORANGE: The two aerosol models they have.

JUDGE GILL: All right.

MR. ORANGE: On the label it says it's flammable.

JUDGE GILL: Okay.

MR. ORANGE: And I would propose to show this to the witness and ask him if it shows on the label that Cutter is flammable.

JUDGE GILL: Okay. What do you think?

MS. GIORDANO: If that's all he's going to ask, I don't have a problem. I don't want to think about that. I may take --

JUDGE GILL: Did this guy get a -- did he get a spray or did he get --

MS. GIORDANO: She said, I think it was Cutter, but we don't know if it was spray, mist, or whatever you call that, non-aerosol, dab it on, we don't know. I mean, I assume they can ask him when he testifies if he knows.

(END OF BENCH CONFERENCE)

MR. ORANGE: I think I was asking questions. I have no more.

CRIMINAL TRIAL

282

JUDGE GILL: Okay. All right. Any other cross?

FURTHER CROSS EXAMINATION

BY MS. GIORDANO:

**Q I had a question. I forgot it. You testified in response to a question by a juror that the primary reason or the reason for eliminating April as a suspect was because she was at a friend's house at the time the fire started. Is that correct?**

A Correct.

**Q And you were referring to Lindsay Braun.**

A I'm referring to Donald Powell and Lindsay Braun, uh-huh.

**Q Okay. And Ms. Braun testified that she arrived there around 7:00; is that correct?**

A I'm sorry?

**Q Around 7:00 is what Ms. Braun testified to when she was in the courtroom. Is that you recollection?**

JUDGE GILL: I didn't understand the question.

A I didn't --

**Q Around 7:00 p.m. is the time that Ms. Braun testified, when she was here the other day, that Ms. Davis came to her house.**

MR. ORANGE: I'm going to object. That's not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

accurate.

A I don't think that's --

**Q I'll withdraw it then. I thought that was accurate, but I don't want to misstate. Do you recall what she said? Let me ask it that way.**

A I don't -- I don't remember, ma'am, exactly what time she did say that she --

**Q Okay. Your elimination of her is based on information other people gave you. What I mean by that is to where she was at certain times; is that correct?**

A Well, that's what my sergeant went -- and the Trooper Evans went and gathered information, and canvassed that area, and talked to these people and obtained taped statements from them. And then that -- that fits with what the first responders on the scene witnessed her and the child coming up the street from -- by that church.

**Q I understand that, but that was after the fire had fully started whenever they saw her.**

A Well, the fire had already occurred.

**Q Exactly.**

A Well, she had to have been there to have started the fire. The fire --

**Q Well, you said the fire developed for 15-to-20 minutes. They didn't see her that entire 15 to**

**20 -- well, let me finish.**

A And -- smoke --

JUDGE GILL: Let her finish asking the question.

**Q They did not see her during that entire 15- to-20-minute time, did they?**

A They didn't see her until she come running up the street.

**Q Okay. That was right after a couple of the firemen had arrived at approximately 7:39, I believe is pretty accurate, 7:25 to 7:39. Is that --**

MR. ORANGE: Object to the form of the question.

JUDGE GILL: Overruled.

BY MS. GIORDANO:

**Q That's when they saw her?**

A Around 7:25, I assume, between 7:25 and 7:30, I would say.

**Q That's when she was first seen at the scene of the fire?**

A When she come up the street, yes, ma'am.

**Q Okay. Do you know who was interviewed? You said, "They canvassed the area and interviewed people." Who gave interviews as to where April was from 6:45 to 7:25, when she was seen by the first responders if you**

**know?**

A Yes. Donald Powell and Lindsay Braun.

**Q Okay. So just those two?**

A Well, that's -- yes, to my knowledge.

**Q So the sole elimination of April as a potential cause, whether intentional or accidental, the fire was based on their statements of the approximate time she was at their house?**

A And her statement of what happened to her just before she left.

**Q That -- those were the only factors that were considered?**

A All those factors had to be considered. Every --

**Q I understand that. Are those the ones that were considered in eliminating her?**

A Absolutely.

**Q So if that information was inaccurate, even by five or ten minutes, you agree that that could change your decision that she should be eliminated as a suspect?**

A The investigation has revealed the only people at this trailer -- the only people at the time of this fire was C., S., and Robert Yell.

**Q You don't have any evidence Robert Yell was at**

**that house at that time. Do you have any evidence of that?**

A I have evidence of when his aunt said she dropped him off there.

**Q Okay. And that was at --**

A And I have --

**Q -- 6:30, right?**

JUDGE GILL: Let him finish.

A And he didn't tell me he didn't remember beyond that. He remembered a wicker basket beside the big chair in the living room and drinking vodka in his living room is the last thing he told me he remembered.

**Q I'm going to ask my question again. Do you have any evidence that Robert Yell was at the house at 7:00 p.m.? Any evidence?**

A No.

MS. GIORDANO: Okay.

JUDGE GILL: All right. Any redirect?

FURTHER DIRECT EXAMINATION

BY MR. ORANGE:

**Q Did you also interview -- in addition to Ms. Braun and Mr. Powell, did you also interview Z.C.?**

A Yes. We talked to Z. He followed his mom down the street.

MS. GIORDANO: I'm going to object to any --

JUDGE GILL: Okay.

MS. GIORDANO: -- recitation of any testimony, exactly.

JUDGE GILL: I don't think they're going to do that.

MS. GIORDANO: Okay.

JUDGE GILL: Why don't you ask your next question.

MR. ORANGE: No further questions.

JUDGE GILL: Okay. Any other questions from any member of the jury? All right. Thank you, sir. You can step aside, and he's going to be with us, I think, for the duration. And did you-all have another witness you want to call, Mr. Orange?

MR. ORANGE: I've got -- actually, I may call two more witnesses, Your Honor.

JUDGE GILL: All right. Anybody need a break? I've got one person, at least -- or more than one, I think, needs a break. I think I do. Let's take about ten minutes. Remember the admonitions I've given you. All rise and let the jury exit the courtroom.

(JURY EXITS THE COURTROOM)

JUDGE GILL: All right. The jury is out of the courtroom. The door is closing and they're out of

sight. We'll see you in ten minutes.

(OFF THE RECORD)

TESTIMONY OF KENNETH EDMONDS:

JUDGE GILL: Okay. We're back on the record. Defendant is in the courtroom. Counsel is all in the courtroom. Everybody ready to go again?

BAILIFF: They're ready, Your Honor.

JUDGE GILL: Tell them to come on in then. Who is our next witness going to be?

MR. ORANGE: Kenneth Edmonds.

JUDGE GILL: Okay. Have you -- you have already testified?

MS. GIORDANO: Yes.

JUDGE GILL: Once?

THE WITNESS: Yes, sir.

JUDGE GILL: Okay. I thought you had.

MR. ORANGE: We promise we won't make him recite it all back again.

JUDGE GILL: Okay. I was just trying -- trying to think whether I need to swear him again. All right. All right. Let's all be seated and back on the record. Our jury's back and will waive the call?

MS. GIORDANO: Yes, Your Honor.

MR. ORANGE: Yes, sir.

JUDGE GILL: And Mr. Edmonds is being recalled by the Commonwealth and he has already been placed under oath, sworn, or affirmed to tell the truth. I'll remind you that you're still under oath, and you may proceed.

DIRECT EXAMINATION

BY MR. ORANGE:

**Q And you're Kenneth Edmonds. You realize you're supposed to tell this jury the truth?**

A Yes, sir.

**Q And you were involved in this investigation?**

A Yes, sir.

**Q And you worked with Detective Edmonds close -- excuse me, Detective West closely?**

A Yes, sir.

**Q And after you and Detective West completed your investigation, were you able to place anyone else at the scene of this fire, other than Robert Yell?**

A No, sir.

**Q And on what basis do you say that?**

A Well, I have to go into just a little bit here. For me to be there was in reference to the criminal part, but there was a fire also. My evidence came from circumstantial evidence, which means that I didn't have any of the physical evidence. My evidence

is going to come from interviews, those type things. After conducting our interviews, finding that the enemies or what we talked about, April wasn't there, Z., C., Tina Masking, those individuals, Kay Lyons, Charlotte Bellor, even down to Donald Powell, I think is what his name was, and Lindsay Braun, which Trooper Smith interviewed. Those individuals, none of those, as far as that goes, we could not put nobody -- he was the person that had told us he was there. Nobody else around -- even the police officers when they got there, the ones first on the scene, saw nobody leaving that scene. Nobody else is there. He's the only one that came out from around that area.

**Q And so what charges did you bring as the investigator in this case?**

A My charges came, I think it was two days later, after we'd done all our interviews, whatever. There was murder, attempted murder, and fourth-degree assault.

**Q And what was the basis of those charges?**

A Those charges was in -- murder was in reference to C.C. The attempted murder was in reference to S., and the fourth-degree assault was in reference to April Davis-Carpenter.

**Q And can you tell us why you brought these**

PageID #: 2308
CRIMINAL TRIAL
291

**charges?**

A Because like I said, after the investigation -- after we had completed our investigation, after we had -- they went through the fires with their experts and themselves, and Mr. West, after we done all our interviews, after we sit down and talked about after all our interviews, the conclusion was is that nobody else was around, and because there was two children -- a child death -- this is the criminal part, plus S. being seriously injured -- that's an attempted murder, even though she didn't die, and then plus the assault is where Robert Yell had choked April Davis-Carpenter.

MR. ORANGE: No further questions. Pass the witness.

JUDGE GILL: All right.

CROSS EXAMINATION

BY MR. WELLS:

**Q Detective Edmonds, you stated your elimination of other suspects came through interviews, correct?**

A Uh-huh.

**Q So it's based on what other people told you?**

A Right.

**Q So your conclusion as to eliminate people is only as good as the information you got, correct?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
KENTUCKIANA COURT REPORTERS
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A Yes.

Q **So if somebody lied to you, then your basis isn't correct, is it?**

A If somebody lied to us?

Q **If somebody's recollection was mistaken or wrong about where there were or what they saw at a certain time, then your basis for elimination wouldn't be correct either, would it?**

A That's a possibility.

Q **Okay. And you wouldn't expect to -- the actual perpetrator of the fire to say in one of your interviews with you to say, "Oh, yeah. You caught me. I was there. I did it," would you?**

A Say that one more time.

Q **You wouldn't expect whoever may have actually set the fire, if it's Tina Masking, or April Davis, or Donald Powell to say, "Oh, yeah. You caught me. I actually set the fire," when you're asking them where they were at time, were you?**

A In some cases it happens.

Q **And when you were -- when you talking with them, you weren't actually considering Donald Powell to be a suspect, were you?**

A No. Because as far as Donald Powell, I knew about him. That was taken care of through KSP when they

arrived to interview him.

**Q You stated that Robert Yell was the only one at the scene coming from that direction around the time of the fire.**

A He's the only one that was at everybody's house in his -- in that area.

**Q Tina Masking came from the same area Robert Yell did, didn't she?**

A Tina Masking had groceries, unloading the groceries in the car. He's at her house.

**Q But answer the question. She came from that area, correct?**

A As far as that -- I mean, her testimony -- as far as that, we briefly -- Mr. West and I, we just briefly talked to her. She was in depth investigation with, I think, Trooper Childers.

**Q And Charlotte Bellor was in the area, wasn't she? Because she was on the phone with 911?**

A She was on the phone.

**Q Okay. And April was in the area because she showed up right after the police showed up, didn't she?**

A Well, from my investigation, April had Z.
coming from Donald and Lindsay's house, and of course you had the statement from Lindsay Braun.

**Q And that's from your information, from**

**interviews?**

A I had it from the police officer who actually saw April going to the burning --

**Q But she was in the area right after the fire was discovered, wasn't she?**

A She was coming --

**Q Right.**

A -- from Lindsay and Donald's, from the interview.

**Q It's only a three-to-five-minute walk from --**

A I couldn't tell you what the walk was. I haven't walked it yet.

**Q All right. So but your information about where April was and when she was -- wherever she was prior to the fire, comes from --**

JUDGE GILL: I think the jury is having a hard time hearing. Go ahead.

**Q Your information about where April had been prior to her arriving at the scene after the police are there are based on what other people have told you?**

A Well, it's based on Lindsay Braun and actually, Z.C.

**Q Okay. So if their information is wrong or incorrect, then your conclusion is based on faulty assumption, correct?**

A If that was the case.

MR. WELLS: Okay. That's all the questions I have, Your Honor.

JUDGE GILL: Any redirect?

MR. ORANGE: No further questions, Your Honor.

JUDGE GILL: Any questions from any member of the jury? They do have a question.

(BENCH CONFERENCE)

MR. WELLS: Excuse me, Your Honor. I was just looking up.

JUDGE GILL: That's all right. But one of our jurors was shaking her head or something.

MR. ORANGE: You were asking if what's her name set the fire, and I said she was on the phone with 911.

JUDGE GILL: "Tina Masking testified that she came from her house with Mr. Yell." Okay. Came from her house -- "In a response to a juror question, she said the officers would have to have seen her. Was not Mr. Yell accounted for with her? Lindsay testified that Donald was not present when April was there following the choking incident. Is that not significant since he and Robert had earlier argued?" Anything wrong with these questions? Okay. I'll ask them, all right.

(END OF BENCH CONFERENCE)

JUDGE GILL: Okay. Now, you may have been in the courtroom. Tina Masking testified -- this is a juror's question -- that she came from her house with Mr. Yell, and she said the officer would have to have seen her, and the question is, was not Mr. Yell accounted for with her? In other words, his whereabouts.

THE WITNESS: Say that one more time, please.

JUDGE GILL: Tina Masking testified that she came from her house with Mr. Yell. She said, at some point in her testimony, that the officers would have to have seen her. Was not Mr. Yell accounted for with her?

THE WITNESS: Can I --

JUDGE GILL: I think the question is, is that not an alibi for Mr. Yell?

THE WITNESS: Can I answer it in two parts?

JUDGE GILL: You can answer it --

THE WITNESS: Okay.

JUDGE GILL: -- however you -- however you --

THE WITNESS: As far as that, I mean, that could possibly be a possibility, but if he's there with her and he's already done what he wanted to do, then maybe that's why he went there to be accounted

KENTUCKIANA
COURT REPORTERS

for. The second of all is that police officers, if their excited, if you don't know in a hyped-up situation, you can get tunnel vision, and you may not see a person. You may have -- be focused on what you're doing at that point in time, which may be the fire. They had already supposedly been alerted that possibly there is an individual -- a child in the fire, they're going to sit on that particular incident at that point in time.

JUDGE GILL: Okay. This is the second question, here. "Lindsey testified that Donald was not present while April was there. This is the second time that April was at her house, following the choking incident. Is that not significant since he and Robert had earlier argued?"

THE WITNESS: One more time, Judge.

JUDGE GILL: Okay. Here's the question. "Lindsay testified that Donald was not present while April was there following the choking incident."

THE WITNESS: Okay.

JUDGE GILL: "Is that not significant since he and Robert had earlier argued?

THE WITNESS: I would have to ask that question that from the information that Trooper Smith -- You would have to ask him about that because he is the

one who took the statements from Donald Powell and Lindsay Braun, and he would be the one who would have the documentation to prove that part, and also even thinking about that, I think Mr. West said that Donald was with some other people. Like I said, Trooper Smith would be the one you would have to ask that question to, because he interviewed those individuals for us, because we had so many other interviews to do.

JUDGE GILL: Okay. Any other questions from counsel?

MR. ORANGE: No, sir.

BY MR. WELLS:

**Q Detective Edmonds, you mentioned that Robert could have possibly gone to Tina Masking and says to create an alibi for himself. It's just as likely that April could have gone to Lindsay Braun's house to provide an alibi for herself, isn't it?**

A Anything is possible, Mr. Wells.

MR. WELLS: All right. Nothing further, Your Honor.

JUDGE GILL: All right. Any other questions from counsel?

MR. ORANGE: No, sir.

JUDGE GILL: Any other questions from the jury?

We've got one more question here.

(BENCH CONFERENCE)

JUDGE GILL: "Can you tell me when Ms. Lindsay Braun said April came back looking for Robert? She had the three boys with her. Where was S.?" Do you-all understand the question?

MR. ORANGE: Yeah. I understand the question and I think -- I tried to plant that answer in my mind. Number one, I think Lindsay Braun said it was from 20 to 40 minutes --

MR. WELLS: I think the answer is --

MR. ORANGE: -- that she was at her house, and she only had two boys with her.

MR. WELLS: I think the answer is Lindsay Braun has testified. I don't think we need to take evidence -- testimony as to what --

JUDGE GILL: Right.

MR. WELLS: -- he thinks she said or didn't say.

JUDGE GILL: Okay.

MR. WELLS: I mean, that's in the record and they -- I suppose if they wanted to view it in deliberations, but I think -- I think that --

JUDGE GILL: It's asking for hearsay.

MR. WELLS: Yes.

MR. ORANGE: I would -- could we just tell them that these proceedings are videotaped, the testimony is videotaped.

JUDGE GILL: Well, I'll just tell them that the question has been addressed in other evidence.

(END OF BENCH CONFERENCE)

JUDGE GILL: Okay. Well, this last question, it has -- it involves matters that have been presented through other witnesses already, so I'm going to decline to ask that particular question. Any other questions from counsel?

MR. ORANGE: No, sir.

MR. WELLS: No, Your Honor.

JUDGE GILL: All right. And I'll ask the witness to step aside. Thank you, sir. And will there be another witness today?

MR. ORANGE: Yes, sir. I'd like to call Mr. Ed Higgins or recall him.

JUDGE GILL: All right. All right. Raise your right hand. Do you swear or affirm under penalties of perjury that the testimony you're about to give is the truth?

THE WITNESS: I do.

JUDGE GILL: And I actually did something out of road habit. I should have said, "You've already

been sworn and you're still under oath, but I just did that out of habit, sorry. I don't want the jury to think that I did that intentionally.

TESTIMONY OF ED HIGGINS

DIRECT EXAMINATION

BY MR. ORANGE:

**Q You're Mr. Ed Higgins and you've testified previously in this matter?**

A That's correct.

**Q And was there a matter down at the sally port at the Logan County Detention Center regarding a statement that Mr. Robert Yell made to you that you either was not asked about or forgot to tell the jury when you testified previously?**

A That's correct.

**Q And what was that?**

A Robert Yell told me, he said, "You don't know how evil I am. You better be scared of me."

**Q No further questions.**

JUDGE GILL: All right. Any cross?

CROSS EXAMINATION

BY MS. GIORDANO:

**Q I do have a question, but it's going to take me a minute. I've got two of them. Officer Higgins, I think we went through this the other day. I think you**

**stated the other day that you did not have any recollection, whatsoever, of testifying before the Grand Jury in regard to the Commonwealth versus Robert Yell from October 24, 2004; is that correct?**

A That's correct.

**Q I'm going to -- I'm going to withdraw the question. I don't have any questions for you.**

JUDGE GILL: All right.

MR. ORANGE: No further questions of this witness.

JUDGE GILL: Any questions from any member of the jury? I do have --

FEMALE JUROR: Could you recite that?

JUDGE GILL: I'm sorry?

FEMALE JUROR: Could you recite that?

JUDGE GILL: Okay. I think we've got some jurors that didn't -- you didn't hear the answer?

FEMALE JUROR: Not well.

JUDGE GILL: Okay. Would you restate the answer to the question Mr. Orange asked you about the statement that the defendant made?

THE WITNESS: Robert Yell advised, while we were in the sally port, he said, "You don't know how evil I am. You better be scared of me."

JUDGE GILL: All right. Any other questions?

RECROSS EXAMINATION

BY MS. GIORDANO:

Q **I will ask my questions.**

MS. GIORDANO: I'm going to approach the witness, Your Honor.

JUDGE GILL: Okay.

Q **This is, again, a -- is that you?**

A Yes, ma'am.

JUDGE GILL: What's the question?

Q **I'm going to get back here to my podium.**

JUDGE GILL: Okay.

Q **Is it true that when you -- that you've refreshed your recollection looking at this transcript of your testimony; is that correct? I just showed it to you.**

A Does it refresh my recollection --

Q **Yes.**

A -- that I testified at the Grand Jury?

Q **Yes.**

A No, it does not.

Q **Okay. Well, let me just have you read to this jury what you testified --**

A Those are my words.

Q **These are your words, okay.**

A That I just stated. He said, "You don't know

how evil I am."

**Q Is that all you said that he said, at that point?**

**Q Yes, ma'am. So you just today remembered that in addition to that he said, "I'm going to get you or you better be scared of me."**

A It's in my report.

**Q So but you didn't remember it on the day that you testified before the Grand Jury?**

A I did not.

MS. GIORDANO: That's all.

JUDGE GILL: Okay. Any other direct?

MR. ORANGE: And -- no further questions.

JUDGE GILL: All right. Any other questions from the jury? We have a couple questions. You can go ahead and bring me the one and then I might get a chance to read that one while he's still working on that.

(BENCH CONFERENCE)

JUDGE GILL: This is a juror saying, "Repeat whatever Robert's quote was said, and where." He wants to know where and when it happened.

MS. GIORDANO: Okay.

JUDGE GILL: Okay. I'll ask the question.

MS. GIORDANO: Okay.

JUDGE GILL: You can do it. He wants to -- it says for Mr. Orange. If you want to ask it, I'll let you.

MR. ORANGE: I don't want to answer the jury's questions that way.

JUDGE GILL: And this one is, "You testified earlier that Robert spat on you what appeared to be blood. How did he -- how did you know it was blood? Could it have been a byproduct of pepper spray in his mouth?

MS. GIORDANO: I have no problem.

JUDGE GILL: All right. This statement that you just testified that the defendant made, when and -- again, when and where was that said?

THE WITNESS: It was in the sally port at the Logan County Detention Center.

JUDGE GILL: On September the 11th there?

THE WITNESS: That's correct. When I had taken him to jail -- the jail.

JUDGE GILL: Okay. One of these questions goes back to your earlier testimony, and it said you testified earlier that Robert spat on you what appeared to be blood, and here's the question. How do you know it was blood? Could it have been a byproduct of pepper spray in his mouth?

THE WITNESS: Pepper spray is yellow and brown. From my observation, blood is red. There was red --

JUDGE GILL: Okay.

THE WITNESS: -- in the spit.

JUDGE GILL: All right. Any other questions from counsel?

FURTHER CROSS EXAMINATION

BY MS. GIORDANO:

**Q Yes, Your Honor. Officer Mills --**

A Higgins.

**Q I'm sorry. Officer Higgins, isn't it true that you struck Mr. Yell while he was being transported to the jail with a fist?**

A We -- that's correct. I did strike him.

**Q Is it possible that's an explanation for his statements and his aggression toward you that you've testified to?**

A I struck him in the chest because he wouldn't stop kicking my car window.

**Q I understand that. My question is --**

A He was pepper sprayed. That didn't work, so I struck him in the chest, which was by policy and by our academy training that we do in.

**Q And my question is, is that a possible explanation for any statements he made or any aggression**

PageID #: 2324
CRIMINAL TRIAL
307

**he showed toward you when you-all got to the jail?**

A I do not believe so.

MS. GIORDANO: Okay. Thank you.

JUDGE GILL: All right. Any other questions from counsel?

MR. ORANGE: No, sir.

JUDGE GILL: Any questions from any member of the jury?

UNIDENTIFIED FEMALE: No.

JUDGE GILL: Thank you, sir. You can step aside. And do you have another witness today?

MR. ORANGE: That's all the witnesses we have today, Your Honor.

JUDGE GILL: Okay. Counsel, step up just a second.

(END OF RECORDING)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CRIMINAL TRIAL

308

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the said matter was reduced to type written form under my direction, and constitutes a true record of the recording as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

SAMEEN SHABBIR
COURT REPORTER / NOTARY
COMMISSION EXPIRES ON: 01/07/2023
SUBMITTED ON: 12/03/2021

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**$**

**$10** 148:8,13

**-**

**--to** 170:24

**-45** 246:12

**0**

**04** 191:18

**0630** 194:1

**1**

**1** 136:7,10 146:6

**1,200** 268:14

**100** 81:24 139:5,13 160:13 169:23 172:4,6 246:14

**100-amp** 220:25 221:2

**101** 136:2,4,5

**10:00** 8:13

**10:15** 172:21

**11** 33:6 97:24 222:14 260:8

**11-month-old** 226:19

**114** 178:21

**11th** 7:6 39:21 54:13 111:3 121:25 172:13 195:1 305:17

**12** 4:17 174:13 204:5 256:6

**1200** 183:15

**12th** 54:7,13 121:22,25 134:9 172:13, 16 192:18 204:22 222:4 230:16

**12x70** 174:2

**13** 31:22,24 32:7 92:16 191:1 248:18

**13A** 32:7

**13th** 192:15 193:2 204:22

**14** 35:2 111:21

**15** 92:3 283:25

**15-** 284:6

**15-to-20** 283:25

**150** 134:10

**16** 191:12

**16-hour** 95:13

**17** 92:1 161:4 275:8

**18** 161:23

**1800-watt** 216:24

**1970s** 11:18 12:9 48:18

**1976** 64:17 168:16 170:8

**1982** 140:11

**1983** 168:21

**1990** 170:11

**1st** 167:25 170:17

**2**

**2** 147:23,25 221:3

**20** 52:9 139:12 240:5 284:1 299:10

**200** 36:21 134:10

**2002** 94:6 97:10

**2004** 5:4 7:6 33:6 81:21,22 97:24 111:5,6 134:9 159:2 163:11 172:14 235:16 237:11 238:5 239:8 248:18 260:8 302:4

**20:45** 42:15

**21** 190:2 195:24

**22-ounce** 267:12 270:4

**23** 92:3 222:15 226:15

**24** 269:18 302:4

**25** 52:9

**26** 190:2 195:25

**27** 238:5

**28** 221:8

**2x4** 34:11

**2x4s** 64:13 208:19

**3**

**3.5x4** 26:14

**30** 164:13,16 240:5 252:15

**303** 171:21

**30G** 89:10,11

**30I** 190:15

**31** 22:8 35:13 37:21 179:1 187:10,25 214:23 217:9, 10

**32** 22:8 102:1 177:15 187:11 188:1,4,5,13

**33** 22:8 35:13 37:21 45:20 184:5 187:10 188:22,24 214:23

**34** 13:25 22:8 32:11 36:9,11 177:12,13 185:25 187:11 188:6,7 206:11 214:23

**34A** 188:7 203:22 204:3

**34B** 203:17

**35** 22:8 35:18 36:9,13 184:21, 22 187:11 188:8,9 206:11 252:15

**35A** 187:22 220:19

**35E** 38:6

**35F** 208:12

**35G** 205:8

**35H** 188:21

**35I** 208:11

**35J** 37:20 187:25

**35K** 201:5 203:8 205:22

**35L** 37:12

**36** 22:7 35:10 50:3 180:10,11 187:10,21,24 214:23 217:10

**4**

**4** 189:14

**40** 22:9 89:4 92:7 107:18,21 159:18 169:11 186:21,22 187:10 188:7, 15 217:10,11 267:2,3 272:8 299:10

**400** 64:19

**400-mile** 253:11

**41** 177:13 184:6,24,25 189:5 217:13

**41s** 217:18 218:7,12

**42** 187:23 188:11 189:12

**43** 188:5 189:19 196:5 202:6,7

**44** 190:5

**44B** 188:7

**45** 188:19,21 190:14 244:20, 21

**45-minute** 240:6

**46** 188:23

**47** 22:20 80:19 199:11,12 217:13

**48** 191:3 192:9 207:7

**49** 191:13 192:9,10 207:22,23 217:12

**5**

**5** 189:11

**50** 50:15 97:14 139:6 209:20, 23 226:18

**500** 92:25

**52** 211:6,8

**53** 219:1

**54** 97:14

**5:25** 147:19

**5:29** 154:25

**5:30** 147:9

**5th** 163:11

**6**

**6** 33:14 188:7

190:6,10 221:5
**6-28-98** 33:15
**600** 64:22
**638** 33:3 74:20 133:20 165:8 172:18
**6838** 246:20
**6:00** 148:15
**6:30** 194:25 195:7,18 222:18 248:25 276:22 286:7
**6:45** 284:24

**7**

**7** 240:16,17,19 258:10
**70** 280:4
**70s** 11:14 253:20
**72** 252:17
**75** 139:8 169:22 172:4,6
**7:00** 240:3 242:14,16,19 243:14 282:15, 17,22 286:15
**7:19** 195:7
**7:25** 240:20 284:11,17,25
**7:30** 268:13 284:17
**7:39** 240:5 284:10,11
**7:40** 268:13

**8**

**80** 280:4
**84** 178:20
**8:00** 148:3 153:9 154:9,17, 21,24
**8:00-something** 20:8

**9**

**911** 222:19 240:21 293:18 295:15
**921** 40:19,25
**94** 170:17 171:15
**99** 139:12
**9:00** 68:8 147:20 148:2,3, 4
**9:30** 8:10

**A**

**ab** 8:22
**ability** 85:9 95:15
**abnormal** 221:9
**absence** 119:17
**absolutely** 90:4 139:10 152:20,25 156:17 232:22 237:21 253:14 285:17
**academy** 92:17 93:24 135:4 169:4 306:23
**accelerant** 73:17 76:23 87:12 93:13,20 106:23 109:17 112:11 117:25 118:12,24 119:1,4,6,7,13 140:13,22 159:19,21 160:5,10,23 161:2,10 251:13,16,19 252:4
**accelerants** 75:22 99:12 113:24 117:22 118:9 140:18 145:2 162:9 267:16 270:9
**accelerate** 119:8,14 120:20 140:9
**Acceleration** 135:7
**accept** 55:11
**acceptable** 55:12
**accessibility** 127:11
**accidental** 37:2,5 40:3,14 54:24 242:12 285:6
**accidentally** 206:24 214:24 228:14 255:11
**accomplish** 141:7
**accordance** 41:17
**accounted** 295:20 296:7, 13,25
**accumulation** 63:23
**accurate** 133:6 136:14 163:12 250:15 283:1,4 284:11
**accurately** 9:19 30:19 31:3 33:2 109:2 173:23 187:11 204:20 238:16
**accustomed** 164:7
**act** 15:13 69:3 211:19
**acted** 68:24
**acting** 5:2
**action** 55:11, 16 56:6
**actions** 48:6
**activity** 193:14,23 195:17 233:14
**actual** 8:24 10:25 12:9 37:24 55:3 198:22 206:2 292:11
**added** 34:10, 11 38:9
**addition** 34:9 64:10,12 97:4 168:4 286:21 304:5
**additional** 5:11 17:21 19:14
**Additionally** 5:12 22:19
**additions** 253:23,25 254:9 255:23
**address** 153:23
**addressed** 300:5
**adequate** 212:23
**adjacent** 13:20 26:11 31:10 75:4 76:15,24 178:10 203:21 212:2
**adjective** 117:25
**adjoined** 265:12
**adjoining** 27:11
**adjourned** 154:24,25
**Administration** 169:1
**admissions** 227:20
**admit** 227:14
**admitted** 31:22,24 32:4 35:2 36:11,13, 16 110:10,23, 24 136:2,9,10 163:23 167:3 188:11,13,15, 24 205:2,3 207:23 209:23 211:8 219:1 227:13 260:21 261:1,2
**admonitions** 67:23 147:21 219:6 287:20
**advised** 7:11 21:8 302:22
**Advisory** 169:19
**aerosol** 281:4
**aerosols** 274:14
**affair** 193:18 259:9 260:10
**affect** 254:19
**affected** 22:14
**affirm** 4:3 72:4 91:1 300:20
**affirmatively** 252:3
**affirmed** 289:3
**affixed** 265:11 275:16
**African** 149:2
**afternoon** 7:7 38:16 249:14
**age** 49:20,21 50:25 252:15 253:1,17
**agencies** 171:7 224:11

**agency** 129:4 130:25 168:4

**aggression** 306:16,25

**aggressive** 212:14

**agree** 40:6 44:7 45:25 46:21 47:16,23 49:3 50:24 51:1 53:21 55:9,17 117:24 118:1, 14 121:18 131:12 140:25 285:19

**agreeable** 48:19

**agreed** 256:9

**agreeing** 218:2

**agreement** 96:8 97:7

**ahead** 9:22 12:21 35:6 66:9 102:4 104:25 134:22 155:1,7 185:8 202:24 203:13 207:20 244:4,15 256:12 294:17 304:16

**aid** 214:17 246:6

**aimed** 276:3

**air** 31:3 179:11, 13,15 183:6,9, 11,21,25 208:23 212:7 213:14 215:7

**Alan** 4:11 105:17,18 122:17,18,19 126:24 175:25 231:6,8

**alarm** 168:22

**alcohol** 93:10 96:9 116:17,18, 19,20 163:16 193:20 261:13 264:2 278:11 280:6,13

**alert** 73:21 76:5 77:15 82:24 87:4,15 96:22 100:6 101:6,8 102:22 103:24, 25 104:9 106:23 108:18 109:16 114:13 115:8 116:19, 23 117:1,2 118:9,11,19 121:7,14 131:9, 12,13,14 132:13,16,19 133:5 158:10 160:12 161:1 162:15 179:4 185:12

**alerted** 74:18, 25 75:2,9 77:22 80:5,17 83:8 86:8 102:11,13 103:7 110:14 114:11 133:19 297:6

**alerting** 83:9 104:6,15 109:22 118:18, 23 162:8 164:8

**alerts** 73:12 74:15 75:5,25 76:3 78:11 79:4 81:9 100:15 101:4,5 102:16, 19 103:12 112:6 115:9 118:18 119:24 120:18 131:8, 10 132:21,25 138:17 139:1 156:17 165:2

**alibi** 296:17 298:16,18

**alleged** 73:4 75:14 260:10

**alleyway** 18:2

**alligator** 144:13 158:8

**alligator's** 142:21

**alligator-burned** 162:19

**alligator-ing** 142:19

**alligator-type** 144:6

**allowed** 29:25 77:12 105:5 169:21 197:4 272:6

**alluded** 48:16 280:6

**aluminum** 57:20,21 175:2 183:13,14 215:7 221:3 268:14

**Ameri** 96:9

**American** 149:2

**amount** 53:16, 17 196:6,21 198:17 199:19 200:6,7 239:16

**amounts** 164:17 212:23

**amperes** 221:8

**analysis** 234:13,15 237:17,18 238:2,22 241:6 245:21,23 246:24 247:1,2, 4,13 270:16

**analyze** 240:13

**analyzed** 202:22

**and-a-half** 216:23

**and/or** 172:2

**angle** 35:25

**angry** 223:20, 21,22

**annual** 95:8 137:19 159:13

**annually** 92:8 95:9,11 97:12 169:12

**anticipate** 153:12

**anxious** 100:9

**anymore** 223:25

**anyone's** 54:11

**anytime** 18:20 217:19

**apologize** 219:13

**apparent** 9:25

**apparently** 33:7 86:24 103:2 118:5 126:13 154:2

**appeal** 148:20

**appearance** 148:21

**appeared** 17:10 25:7 101:6 144:18 175:9 228:21 275:17,18 276:5 305:7,23

**appears** 14:6 32:9 220:7

**apple** 52:11

**application** 51:25 62:20 63:1 93:22

**applications** 93:23

**applied** 242:20,23

**approach** 53:4 59:18 100:17 101:1 103:19 134:18 143:2 146:10 181:1 201:11 235:1, 13 244:5 303:4

**approximate** 285:7

**approximately** 8:8,11 27:3 54:1 61:13 81:20 83:1,2 84:24 92:16,25 97:12,18,20 134:9 152:3 171:25 268:10, 12 284:10

**approximation** 134:7

**April** 61:1 159:1 163:11 193:16,17 222:8,16 223:14 224:6, 23 249:11,13 257:10,11 259:9 260:10 265:10 268:23 269:12 271:12, 16,18 274:25 275:1 282:7 284:24 285:5 290:3,24 291:12 292:16 293:20,22 294:3,14,18 295:22 297:12, 13,19 298:17 299:4

**April's** 269:13 271:13

**area** 4:19 6:3,5, 8,10 9:15,24 10:4,5,6,16,18 11:4,6,23 12:8, 22,23 13:19,24 14:22 16:7 17:4 22:7,8,20 25:16,20 26:8, 10,18 34:10,14 35:7,8,10,12, 15,18,21,23 37:12,21 38:2, 18,21 44:24 45:16,22 50:3,4 56:24 57:1 58:16 60:17 66:17 69:3

73:19 74:4,25 75:3,4,6,8,10, 22 76:10,20 77:16 87:5,23 101:14 102:2,7, 25 103:7 106:21,24 113:11,16 114:8,9,13 125:5 144:21, 24 160:23,24 162:21 166:2, 13 168:8 170:6 171:6,14 173:11,13,14 174:4,23 175:5, 9 177:10 178:8 180:6,9,13 185:15 186:10 187:1,3 199:21 205:16 206:12, 25 210:10 211:1 215:18 231:20 232:2, 14,16,20 268:14 272:13 283:13 284:23 290:13 293:6,7, 12,17,20 294:4

**areas** 5:11 10:14,15,21 14:13 15:8 42:3,4 70:13 75:3 79:18 101:4 102:1 113:19 124:17, 24 125:1 144:10,11 171:7 174:18 175:24 176:17, 19 187:7 211:2 213:7 214:5 236:10 251:22, 25

**argued** 295:24 297:15,22

**arm** 210:3,5,12

**arrangements** 19:22

**arrested** 195:20 249:1

**arrival** 25:20 42:20 43:14

103:6 177:9

**arrive** 8:12 18:16 20:7 126:22 172:25 256:5

**arrived** 8:7 19:1 20:8 21:1 42:9,14,19 43:10 98:16,22 121:22 126:23 172:20,21,22 174:12 204:21 230:19 257:15 258:2 273:14 282:15 284:10 293:1

**arriving** 122:9 294:19

**arson** 5:10,13, 18,19,20 72:18 84:8 92:18 124:12 140:24 141:7 168:19 226:1 258:14 272:17

**articles** 17:19 62:2

**aspect** 169:24 211:15

**assault** 290:19,23 291:12

**assign** 62:24

**assigned** 9:14 20:3 23:6 49:12 168:6

**assigning** 258:3

**assignments** 257:21

**assist** 22:4 27:10 97:5,13 98:11 129:14 192:24 193:1 228:5

**assistance** 18:6 19:15 217:9,11

**assistant** 5:6 7:8 18:19

**assisted** 24:11 231:7

**assisting** 171:7 231:13

**association** 5:16,23 93:9 168:19,20

**assume** 43:2 44:3 69:8,22 72:21 122:23 274:7 281:21 284:17

**assumed** 125:4 130:10 271:21

**assuming** 239:10 270:8

**assumption** 294:25

**assumptions** 252:18

**ATF** 74:11,12 93:13,15,20 95:7 96:12,14, 16,20 97:4 129:2,14,16,20 135:4,8 137:10 140:7,9 159:7 161:25 163:13 171:4 251:15

**ATF's** 137:16

**ATM** 193:24

**atmosphere** 239:19,20

**attaching** 276:17

**attacked** 205:25

**attempt** 252:24,25

**attempted** 226:11 239:10 290:18,22 291:10

**Attend** 92:7

**attended** 162:3

**attention** 113:2 114:3 144:5 150:16 154:6 165:22 174:20,21 177:7 226:22

**attitudes** 165:15

**Attorney** 149:15

**attorney's** 147:1 150:1

**Auburn** 151:18,19

**August** 167:25

**aunt** 249:12 286:3

**authoritative** 41:4

**authorities** 271:21

**authority** 41:7, 8

**authorized** 174:16

**automatically** 18:20 96:13

**automobile** 223:7

**automotive** 63:5

**automotive-type** 63:2

**averaging** 97:14

**avoid** 23:9 24:4 43:12 204:16

**aware** 66:20 75:13 79:5 130:6 131:4,6 141:15 150:2 257:12

**awning** 77:18, 21 108:1

**B**

**baby** 17:10 101:12 209:15 213:21 226:19 267:20

**back** 5:4 7:6,21 8:7,12,16,17 11:9,22,25 12:23 13:9,15 14:5,7,12,19 15:7 16:20 17:1 19:17 21:3 25:1,25 31:7,18 35:11,17,21,23 37:8,15,25 38:2 40:19 42:3,16, 17 44:24 48:22 49:7 50:2,4 54:20 63:15,24 64:3 69:13 74:12 75:3,24 76:2 77:16 81:1 82:10 83:19,24 86:16 87:4 90:14 98:20 100:16 102:11, 24 107:11,17 108:2 111:25 113:9 120:12 124:7 125:6 129:9 133:4,22 134:2 137:25 138:1 139:1,2 142:21 144:21 147:4 148:9 157:20 166:2, 12,13 167:11 173:13 180:19 181:8,25 182:7, 14 184:11 192:2,5,11 202:4,25 203:1, 2,4,5 205:10 206:10 209:2 210:7,9,18 211:2 219:22 220:4,7,24,25 227:5 231:24 232:5 233:7 236:3,8 238:6 245:21 246:18

249:24 250:17, 19 251:5 256:22 262:14 266:13,15 267:20 272:6 288:4,18,21,22 299:4 303:10 305:21

**backup** 131:17

**backyard** 27:11 191:4

**bacon** 193:21, 22

**bad** 11:16 120:9 224:20

**bag** 110:5 191:13 202:23

**bagged** 258:11

**bailiff** 90:19 145:10 149:9 288:7

**bald-headed** 18:23

**balloon** 213:14,15

**banking** 205:14

**Barkley** 171:15

**base** 24:16 41:9 77:1 102:12 116:17 144:20 179:25 184:12 212:9

**baseboard** 144:22 180:1,2 209:3

**baseboards** 165:25

**based** 36:24 40:22 55:18,20, 24 60:19 71:6 137:14 200:6 213:23 214:14 252:19 254:21 268:9 275:10 283:8 285:7 291:22 294:20, 21,24

**baseline** 178:19,21 209:13

**basic** 40:3 123:17

**basically** 6:10 9:11 13:9 19:3 25:23 34:13,18 35:24 40:2 48:2 64:4 94:9 123:4 124:21 125:3 126:21 131:18 142:6 238:7 250:4

**basing** 251:14 252:5

**basis** 142:8 199:25 229:19 250:25 251:1 289:20 290:20 292:2,7

**basket** 286:10

**bathroom** 16:11 219:18, 19

**battery** 191:14

**bearing** 49:22, 25

**bed** 13:16,17, 19,20,24 14:2, 8,9 17:10 24:15 25:11,12 35:18 69:2 75:6,20,21 76:25 88:8,12 102:15 103:24 113:10,12,15 144:24,25 184:23 185:9, 10 186:2,15,18 196:8,9 198:21 200:20,21 207:15 209:15, 16 213:21 236:24 262:6

**bedding** 256:1

**bedroom** 10:6, 17 11:13,22,24 13:15 15:23,24 16:1,3,4,5,12 34:21 35:18,19 60:4,5 64:6,11 75:4 76:24 83:8 102:12 108:3,9 113:7 144:21 173:11 175:6 177:7 184:22 206:10 226:15 231:24 232:4 235:8 242:11

**bedrooms** 64:11 114:5

**beds** 186:5

**beer** 264:1 267:12 270:4

**began** 176:15, 18 241:11

**begin** 174:19

**beginning** 170:10 180:2 249:13

**begins** 229:5

**behavior** 47:25

**belief** 140:16

**believed** 123:11 246:1

**Bellor** 222:21 290:5 293:17

**belonging** 189:7

**bench** 27:23 29:22 59:19 61:19 103:21 105:8 143:4,21 146:15 147:17 156:3 181:4 182:17 196:16 198:10 201:13 202:2,13 263:9 270:1 279:17 281:23 295:8 296:1 299:2 300:6 304:19

**bend** 100:18

**bible** 41:11,12

**Bic** 203:22

**big** 27:2,3 62:15 81:5 142:14 191:3 286:11

**bigger** 81:11

**bit** 12:7 22:13 34:21 37:25 48:17 96:19 101:13 123:3 135:6 171:3 181:22 182:12 289:21

**bite** 111:18 123:2

**black** 31:14 189:20 249:22

**blacktop** 160:20

**Blame** 269:15

**blank** 85:24

**blanket** 200:20

**bleach-type** 23:23

**blisters** 142:23

**blood** 305:8, 23,24 306:2

**blows** 6:20

**Blueprint** 168:18

**bo** 75:13

**board** 12:15 93:5,8 144:20 169:19,25 177:2 184:12

**board-type** 12:13

**boarding** 179:25

**boats** 171:16

**body** 75:21 226:18

**bombing** 168:25

**Bonnie** 7:23 33:3 34:17 72:25 74:20 98:8 133:20 142:24 144:4,7 165:8 172:18 246:20

**bookcase** 175:12 205:17, 19,23

**books** 103:4 181:8,24

**bookshelf** 179:5,19,22 232:7

**boot** 189:6,12

**boots** 127:23

**bothers** 182:2

**bottle** 160:21 267:12 270:4 280:12

**bottles** 278:5, 6,15,17,19,24, 25 279:5,6,19, 22,23 280:1,7, 16

**bottom** 11:3 22:15 25:6 57:20 66:15 271:4 276:12

**bought** 50:17 194:17 278:6 280:24 281:2

**Bowling** 7:15, 17 8:8 168:6

**boy** 15:24 16:1 75:15 83:8 124:18 178:22 226:15 268:2

**boy's** 69:2

**boyfriend** 274:5,8

**boys** 175:6 191:20 299:5, 13

**boys'** 177:7

**branch** 93:10

**brand** 217:1

**brand-new** 63:10

**Braun** 282:11, 13,14,17,22 285:2 286:22 290:6 293:24 294:21 298:2 299:4,9,14

**Braun's** 298:17

**Brawns** 194:10

**break** 47:10 67:21 147:3,19, 22 153:21 219:4 287:17, 19

**breakdown** 47:11 51:10

**breakers** 216:4 221:7,8

**breakfast** 98:23 122:14, 16,25

**breaks** 136:18

**breakthrough** 16:6,7

**breathe** 179:16

**bridged** 178:4

**briefly** 68:10 235:4 293:14, 15

**bring** 20:20 71:21 83:19,24 96:17,21,22 100:16 112:7 125:14,15 150:25 153:8 203:4 220:3 225:25 226:9 290:14 304:16

**brings** 63:24

**brittle** 64:21

**broadening** 85:6

**broke** 17:2

**broken** 99:4,22

**brought** 80:11 143:18 177:23 217:5 222:17 226:1,13,23 273:6 290:25

**brown** 306:1

**bug** 193:23 194:2 264:17, 18,22

**build** 64:3 179:6,8

**building** 15:14 25:18 87:4 99:7,9 102:20 162:25 166:8 211:22,24 214:17 226:2 241:5 259:21

**builds** 100:9

**buildup** 211:25 213:7

**built** 48:18,19 49:1 64:12,17 113:8 174:3 252:17

**built-** 206:10

**bunch** 156:4

**bunches** 34:5

**buoyant** 210:22

**Bureau** 163:16

**burn** 10:15,18, 20 24:22 35:9 58:12 62:7 65:3 66:18 95:18,21 113:1,7,10 114:16 144:10, 11 160:9 175:24 179:12 183:3 184:16, 17 185:22 186:13 198:19, 23,25 201:1 207:13 234:1 236:4,21 261:14,17 264:20 265:15 270:16 276:10, 11

**burn-** 208:12

**burn-through** 208:15

**burned** 57:14, 16,18 71:23 114:10 158:8 162:21 186:19 208:19 215:6 236:1 271:8

**burner** 58:23 216:24,25 217:1,2 233:12, 22

**burning** 10:24 12:19 60:7 64:9 144:7 183:1,17 186:1 205:19 215:1,2,4 216:13 221:23 225:12 268:11 294:3

**burnout** 114:12,14

**burns** 10:23 62:5 63:8,24 160:8 183:2 208:14 210:11 215:8

**burnt** 10:22 11:5,9 103:3 114:4 124:17, 25 125:2 132:5, 14 136:21 142:20 171:15, 16 175:2,18 183:20 186:7, 16 206:14 213:22 226:18

**bus-type** 221:2

**business** 49:11

**Buster** 19:22, 24 68:6 72:13 91:11,12 192:20 230:14, 17 231:4,6 262:23 266:4

**buy** 50:13 193:23 194:5

**buys** 280:5

**byproduct** 305:9,25

**bystanders** 128:15

**C**

**C.'s** 75:18 103:24 108:3,9 178:22 208:15 213:11 232:4 238:25 262:6

**C.C.** 290:22

**C.Y.** 198:21 202:5,18

**ca** 37:21

**cabinet** 179:20 190:21 203:6 243:24 244:18, 21,23 271:4,6,8

**cage** 267:15

**calibrate** 73:15,16 157:17 160:14, 16

**calibrated** 73:19 100:5 157:25 161:12

**calibrating** 100:23 158:5

**call** 7:7,8,10, 14,25 12:14 13:15,23 34:19 35:9 41:4 47:19 57:18 61:14 64:13,19 83:12 90:15 119:7 121:21 128:24 129:14 131:8 133:9 137:16, 25 138:9 139:2 142:19 145:20, 23 146:2 148:13 150:16 155:2 159:23 177:13,22 179:14,20 183:3 184:2 191:18 206:18 207:13 220:8 221:1 233:10, 11 281:20 287:14,15 288:23 300:17

**called** 9:15 10:6 18:7 39:20 73:10 96:15 98:10 121:20 130:5 137:7,11 152:22 170:24 172:13,15 184:13 212:6,7, 14 228:3,5,8, 10,18,24 229:9, 13,14,15,17,20, 25 230:8 253:11

**caller** 240:21

**caller's** 222:19

**calling** 229:21 230:3

**calls** 138:23

**camera** 177:6 208:4

**cameras** 33:11

**campfire** 179:8

**camping** 179:8

**can-lineups** 159:17

**canine** 114:11 131:10,12 135:7,11 140:13,17 141:5 159:7

**canines** 132:13 135:5 137:19 140:23

**canned** 22:20

**cannister** 104:2,15

**cannisters** 104:9

**Cannon** 19:23, 24,25 20:5,7,8,

16,18,22 21:1, 3,8,14 24:12 25:20 68:6,12, 16 72:13 78:2 91:11,12 110:25 115:2,3 136:14 155:3 158:21 164:25 176:13 192:20 230:15,18 231:4,6,12,13 262:23 266:4,5, 6,7,10 273:11

**Cannon's** 20:24 68:7 69:8

**cans** 22:22 23:3,4,6 71:22 77:17,21,22 89:2,12 108:14 109:3,23 110:13,14 112:14 118:23 159:18,20 189:3

**canvassed** 283:13 284:23

**cap** 160:21

**capabilities** 38:10

**capability** 237:12

**Capital** 84:11

**captain** 92:14

**car** 7:21 19:9 23:14 98:5 173:1,5 194:6 293:10 306:19

**carbon** 212:4

**card** 26:20 178:17 184:7

**care** 94:19 226:22 255:7 292:25

**career** 170:7

**careful** 196:24 252:10

**Carpenter** 260:10 291:13

**carpet** 22:16 25:21 26:15,24 27:1,3,8 50:13, 21 51:13 52:10, 13,20 87:24 102:13 114:8 160:2,4 177:25 178:4,14,16,18 180:5 186:6,7 206:13,14 207:17 253:21 254:18 255:25 272:21,23

**carpet's** 27:2 50:16

**carpeting** 25:18 50:20 178:11 253:14

**carpets** 50:9 253:18 254:15

**carried** 187:1

**carry** 181:8

**cart** 40:12

**case** 28:12 67:16 74:7 83:22 100:20 107:14 127:24 130:3 171:17 197:14 200:23 216:12 222:3 229:9 247:14 254:21,24 267:25 290:15 295:1

**cases** 138:22 292:20

**casual** 195:13

**catch** 148:12

**categories** 46:10

**category** 46:15

**caught** 113:1 114:2 174:20, 21 292:12,17

**caused** 15:8, 12 113:14 192:1 193:18 221:20,24 228:14

**causing** 88:16 226:2

**cavity** 208:20

**ceased** 14:18

**cedar** 142:25 143:9 144:16

**ceiling** 12:5,9, 10,11,13 13:13 17:4 50:7 113:14,16 186:11 213:18 214:5

**cells** 95:18,21 160:9

**cement** 63:10 116:2

**center** 17:3 35:10 75:7 76:10,14 77:1 102:14 160:3 301:11 305:16

**certainty** 55:12

**certificate** 163:8,12 168:17

**certification** 39:2,15 82:21 93:3 95:8,10 169:5

**certifications** 92:5 95:6

**certified** 82:16 92:20,23 93:2 95:5,7 112:19 117:10,11,12, 14 168:22,23 169:5,13,16 170:3,12 211:16 215:22, 24 221:13

**CFI** 82:21

**chain** 217:21, 23,25 218:3,9

**chair** 35:12 179:4,18 205:20,23 206:1,3 210:5 232:25 286:11

**chairs** 17:19, 21 37:22 66:6, 11

**chalkboard** 276:15

**chance** 66:2 90:18 111:24 304:17

**chances** 261:16

**change** 46:9 53:1 213:1 285:19

**changed** 46:3 237:15 238:8, 18,20 239:5,6,7 253:19

**channels** 185:5

**chapter** 40:21

**char** 114:13

**charcoal** 190:17 243:11, 18,21 244:19 245:2,5,14,22 246:2 269:7 270:21

**charge** 42:20 43:23 84:5 96:14 130:25 226:1 258:1,2

**charged** 227:15

**charges** 225:20,25 226:5,9,12,23 290:14,16,20, 21 291:1

**Charles** 197:7

**Charlotte** 222:21 290:5 293:17

**charred** 186:16

**chasing** 97:1

**check** 166:17 216:2

**checked** 267:11 268:4 271:25

**chemical** 117:20,25 118:4,13 119:13 120:18 121:12 132:17 140:18,21 156:12 161:20 211:20

**chemicals** 52:12 116:6,11 119:18

**chemist** 52:23

**chest** 306:18, 22

**chief** 8:1,18 9:5,13 42:21, 23,24 49:13 96:12 204:10

**child** 59:5 172:17 197:18 236:24 283:16 291:9 297:7

**Childers** 192:25 258:5 293:16

**children** 197:25 265:16 269:12 271:12 275:2 276:20 291:8

**choked** 291:12

**choking** 224:22 249:11 255:4 295:22 297:14,19

**chose** 150:4

**Chris** 250:20 264:17

**chunk** 62:8

**church** 283:17
**cigarette** 191:3
**Cincinnati** 5:13
**circle** 102:4
**circuits** 216:2, 4
**circumstances** 225:16
**circumstantial** 289:24
**cities** 159:11
**city** 42:21 91:22 168:25
**civil** 171:18
**clack** 102:3
**clarification** 70:20
**clarify** 40:23 116:15 272:15 273:8
**class** 93:2 162:3 163:11
**classification** 40:7
**classifications** 40:3
**classify** 40:2
**clean** 22:16 23:18 43:22 86:3,6 127:19 128:4 144:9 174:18 212:7
**cleaned** 23:14 106:7 127:24
**cleaners** 50:23
**cleanest** 272:13,14
**clear** 31:6 70:11 84:21 164:14 227:6, 19 259:20
**clearer** 230:2
**CLERK** 136:4
**clipboard** 71:11
**close** 10:14 18:4 33:7,22 53:20 54:2 93:9 148:15 179:10 240:6 289:13
**close-** 208:4
**closed** 17:6 271:5
**closely** 289:14
**closer** 173:20 177:3 178:10 181:18
**closest** 14:8
**closet** 221:5
**closets** 241:14
**closeup** 31:2
**closing** 287:25
**cloth** 206:2
**clothes** 23:15 128:4
**clothing** 60:18 61:8,10 62:3 103:4 196:6 236:6 257:9 258:10 263:16 268:3,23 269:19 271:16, 23 257:9,11
**coat** 113:23
**code** 171:24
**coil** 57:19
**coincidence** 79:16
**cold** 62:18
**collapse** 212:14,15
**collate** 135:23
**collect** 22:23 87:25 178:5 200:23 204:14 217:7 245:19
**collected** 22:25 77:9,11, 13 112:17 176:24 177:1 178:7,13 180:6 185:16 206:12 217:8,9,11,12 262:10,15
**collecting** 176:18 177:11 261:22
**collection** 24:8 68:23 69:16,18 85:17 86:7 168:23 177:10, 24 207:15 209:13 231:4,7 235:11
**collections** 77:8
**college** 39:18 182:10
**color** 53:15
**colored** 278:7
**combination** 251:20 252:1
**combining** 15:5
**combust** 214:8
**combustible** 38:10 51:15,17 214:4,18 246:9 247:18,25
**combustibles** 14:8 62:2 63:8
**combustion** 132:11 210:19 241:4 259:24 270:17
**combusts** 259:23
**command** 275:6
**comment** 223:3
**commentary** 239:21
**commented** 224:3
**commercial** 168:17 170:14
**common** 12:12
**commonly** 34:19
**commonwealth** 67:6 110:10, 24 149:25 150:19 182:3 203:17,22 204:5 205:1,7, 21 206:9 208:12 220:19 259:13 260:22 261:5 289:2 302:3
**commonwealth's** 32:7 110:22 149:15 163:21, 23 167:3 188:11,13,15, 24 190:6,15,25 191:12 205:3 207:23 208:10 209:23 211:8 218:24 219:1 261:2
**communities** 97:8
**community** 11:15 64:18 93:19 149:23
**comp** 11:18
**companies** 170:17
**company** 92:14
**compare** 11:19 107:12 181:7
**comparison** 70:15 77:19,23 86:16 89:13,14 106:20 107:7,9, 10,12,13 108:19 109:19 110:15 175:21 245:23 272:12
**competent** 169:21
**complete** 24:22 187:6 218:13
**completed** 5:10,12,16,18 20:23 26:6 168:16,21 173:9 289:16 291:3
**completely** 68:11,13 186:19 261:17
**completion** 169:3
**complicated** 187:17
**components** 50:9 213:7
**compos** 60:5
**composite** 31:21 36:9 110:7,10 188:3, 4,7,13
**composition** 60:4,5 64:6 180:4 254:1 278:24
**compositive-type** 275:14
**compound** 119:25 120:19 121:12
**compounds** 119:18
**con** 15:6 47:5
**concentration** 38:22
**concentrations** 164:9
**concern** 11:23 42:3,4 84:19 146:23 173:14

KENTUCKIANA
COURT REPORTERS

175:14 176:17 183:5 198:18, 22 199:19 201:1 236:10

**concerned** 68:5 100:25 146:18

**concerns** 26:4 176:1

**conclude** 37:1 225:17

**concluded** 225:18

**conclusion** 37:9 42:10 46:25 47:6 176:6,8 197:5 198:7 225:21 254:20 265:3 274:21 291:7, 24 294:24

**conclusions** 196:13 197:4 244:2

**concrete** 47:12,13 62:17, 22 77:18 107:25

**concurred** 19:17 256:9

**concurrent** 130:19

**condemned** 151:3

**condition** 15:23 16:2 23:8 53:9,10 143:6 184:13 216:6 224:2,16 226:19

**conditioning** 183:21

**conditions** 214:9 224:8

**conducive** 14:5

**conducted** 150:23

**conducting** 129:22 290:2

**conductor** 221:3

**confer** 21:18

**CONFERENC E** 27:23 29:22 59:19 61:19 103:21 105:8 143:4,21 146:15 147:17 156:3 181:4 182:17 196:16 198:10 201:13 202:2 263:9 270:1 279:17 281:23 295:8 296:1 299:2 300:6 304:19

**configuration** 11:1

**confirm** 9:11 132:1 183:25 246:24

**confirmed** 10:7 131:11 133:5 138:6,16, 17 234:12

**confused** 11:7

**confusing** 267:7

**confusion** 88:8,16 260:2

**conifer-type** 142:25

**conjunction** 5:15,23 186:14

**connect** 11:12 15:6 260:14

**connected** 141:17

**connection** 231:17

**conservative** 237:19,22 238:14

**conservatively** 239:1

**consideration** 222:13

**considered** 37:3,17 225:14 258:6 285:12, 13,16

**consistent** 13:23 175:16 185:22 196:22 197:10 200:7 216:11

**constantly** 213:19

**constructed** 60:6 64:8 255:24

**construction** 34:11

**consult** 49:11 225:23

**consume** 11:2 261:14

**consumed** 12:8 13:5 14:9 208:18 209:16 241:18 279:6 280:8,19

**contact** 18:8 19:22 20:4 259:13

**contacted** 15:10 18:20 20:25 78:7

**contained** 245:22

**container** 53:23,25 69:16 87:7 106:10 107:2 203:5

**containers** 69:19 106:11 107:2

**contaminated** 50:21 51:14 107:1

**contaminating** 43:13

**contamination** 23:10 24:4 51:6,10 127:20 204:16

**content** 280:13

**contents** 11:3 179:22 212:12

**context** 227:4

**continue** 95:16 141:24 212:9

**continued** 43:3 169:9,11 234:8

**continues** 141:2

**continuing** 11:24 36:3 215:25

**contract** 96:11,15

**contractor** 170:14

**contribute** 58:15

**contributing** 37:19

**control** 22:9,10 32:18 43:1 70:14 87:1,5,6, 11,20 88:22 89:3 106:17,19 107:13 157:25 161:12 186:21 187:2,24 212:24 217:11 267:1,3 272:8,9

**controlled** 184:3 239:18, 20

**conversation** 123:24

**conversations** 84:17 122:25 152:18

**conviction** 148:20

**cook** 15:20

**cooked** 136:20

**cooking** 193:22

**cool** 179:11,13

**cooler** 210:21 270:24

**cooling** 65:1

**cooperating** 97:4 224:11,12

**copies** 180:7

**copy** 44:3 129:20 139:21 140:3 163:12 218:12

**copy's** 163:7

**Corbin** 7:9

**cords** 42:6

**core** 12:15

**corner** 16:7 24:15 75:1,5 76:20,25 102:1, 15 160:3 177:18 178:8 185:12 207:15 209:12 235:25

**coroner** 176:22 177:1 189:24 192:21 202:17 217:14

**correct** 21:4 26:2 28:8,9 42:13,17 45:18, 19 48:20 49:4 50:18 54:7,8 58:22 80:4 88:23,25 89:1 90:3 105:21,22, 24 107:6 115:23,24 116:9 118:10, 21 119:20,23 120:15,16 122:22 131:22, 25 132:2,18,20 133:16,20,21, 25 134:1,3 139:4,14 168:7,

13 169:8 172:15 197:9 221:12,14 222:5 232:16 234:11,12,24 235:10 247:18, 19 248:14,18, 19,22 251:4 252:16,17 257:10 272:18 278:4 282:9,10, 15 283:10 291:20,25 292:3,8 293:12 294:25 301:9, 15 302:4,5 303:14 305:18 306:14

**correctly** 40:1 140:6

**correspondence** 230:19,20

**cotton** 190:8

**couch** 17:15, 17 25:23 51:13 75:1,2 76:15, 16,20 102:2,23 114:9 177:17, 18,20,21,25 178:8,11,14 209:10,14 210:3,7,12 213:21 236:1

**coughs** 35:14 80:15 97:22

**counsel** 27:21 59:18 65:13 103:20 143:3 148:7 163:2 196:15 201:12 219:24 277:7 279:14 288:5 298:11,23 300:11 306:6 307:5,14

**counties** 6:7 168:10,12

**country** 96:16

**county** 6:8 20:1,2 72:15 91:11,14 147:1 172:13 260:11 301:11 305:16

**County's** 7:4

**couple** 24:25 66:6 73:25 74:6 80:12 83:14 94:17 97:20 109:7 110:1 155:25 164:25 194:11 284:9 304:15

**courses** 5:22, 25

**court** 68:5 69:7 73:9,13 74:22 85:6 111:9,12, 15 151:4 153:9, 23 171:17 187:19 191:24 199:1 220:23 226:3 238:13

**Court's** 68:10, 14 71:5 84:20 85:1 150:16 154:24

**courtroom** 67:25 68:1 90:12 148:2,5 149:21 150:21 219:7,12,23 220:5 282:18 287:22,23,25 288:5,6 296:3

**covered** 206:3

**crack** 75:9 76:22 86:13 102:3,6,8,11 160:21 162:4

**create** 42:7 298:16

**created** 66:11 169:9 209:14 255:3

**credentials** 169:20

**credibility** 71:15

**crime** 73:4,7 81:19,23 158:19,24 228:4 229:16 230:5

**criminal** 172:2 228:6 257:16 289:23 291:9

**crisscross** 166:1

**criteria** 39:5 40:16 42:1 55:19,20 92:24

**critical** 226:19

**cross** 19:21 23:10 24:4 38:12,14 57:7 77:25 114:25 155:8,13 227:1 282:2,3 291:17 301:20,21 306:7

**cross-** 204:16

**crossing** 105:1

**crude** 63:20 64:1

**crystal** 31:6

**curled** 12:5

**current** 145:3

**custody** 217:20,23,25 218:3,9 245:24

**customarily** 149:19,24

**customary** 133:11

**cut** 99:20,21 112:10 184:8 185:14 187:4

**cuts** 18:2

**Cutter** 280:24 281:2,11,18

**cyanide** 212:4

D

**dab** 281:20

**daily** 96:3 136:17 161:10

**damage** 14:17 16:6,10,17 35:22 113:10, 11,14,16 173:13,14 191:16 211:2 261:19

**damaged** 87:25

**damages** 124:22

**dangerous** 48:22

**dark** 9:7

**darker** 53:15

**date** 33:10,12 44:5,6,8,14 97:25 111:4 133:18 177:6 252:21

**dates** 137:17

**daughter's** 145:12

**David** 79:10 105:15 127:1 167:20 259:1,8 277:14,15,16, 23

**Davis** 190:23 192:17 260:10 268:4 282:24 292:16

**Davis-** 291:12

**Davis-carpenter** 222:8 290:24

**day** 26:1,5,16 27:15 33:8 52:15 53:10,18 54:9,13 74:8 96:6 111:1 121:24 122:1,4 130:20 133:23 150:4 152:12 192:17 193:14, 20,25 194:12 195:17 230:15 233:15,22 234:3 239:12 250:1 257:20 262:17,20 275:8 282:23 301:25 302:1 304:8

**days** 44:15 98:18 122:6 156:13 161:23 164:5 211:12 224:13 290:16

**dead** 75:7 76:25

**deal** 38:20 71:19 85:8

**death** 291:9

**debris** 14:20 22:16 76:10,16, 17 99:20 102:24 103:1 166:11 208:7

**deceased** 75:15

**deceased's** 189:19

**deceiving** 62:14 65:9

**December** 78:4 82:8

**decide** 18:5 236:14 256:8

**decided** 123:2 162:7

**decipher** 51:8

**deciphering** 143:9

**decision** 19:14,19 47:25 48:5 71:20 81:14,19 85:6 228:7 285:20

**decline** 300:10

**decompose** 184:14,18

**decomposition** 210:5 215:9
**decontaminate** 128:9,11
**decontaminated** 128:7
**decontamination** 127:15,16 128:2,16
**decrease** 65:2
**deem** 170:1 271:22
**deemed** 228:3
**deep** 114:13
**deeper** 132:9, 10
**defect** 156:21
**defects** 157:4, 10
**defendant** 219:24 238:12 242:3 278:3 288:5 302:21 305:13
**defendant's** 31:22,24 35:2 36:11,13 136:1, 2,7 268:1
**DEFENDANTS'** 136:10
**define** 59:24 61:22
**defined** 239:2
**defining** 212:18 263:24
**definition** 118:12 119:4,5
**deglove** 204:15
**degrading** 132:6
**degree** 39:18 132:5 269:6
**degrees** 64:22 183:15 246:13, 14 268:14
**deliberations** 299:23
**deluded** 184:13
**demeanor** 223:19 227:22
**demonstrated** 251:23
**demonstrates** 95:15
**demonstrative** 181:17
**Denver** 168:25
**department** 8:5,23 9:1,11 20:1 24:11 72:15,16 91:17, 19,22 92:2,13, 15 93:16 103:3 163:16 176:22 189:17 190:13 192:16 195:21 203:21 217:14 268:12
**depend** 140:20
**depending** 63:23 132:14, 15 280:4
**depends** 274:13
**depict** 9:19 30:20 31:4 33:2 63:22 109:3 173:24 187:11 190:3 204:20
**depicted** 25:11 32:10
**depicts** 185:19 238:16
**deplec** 10:15
**deplete** 52:5
**depleted** 38:5 177:20
**deplicted** 10:2 25:19
**depth** 293:15
**deputy** 72:13 91:11,20,21 92:6 115:2 122:20,22 170:20 172:16 189:24 192:20, 21 202:17
**describe** 13:8 14:24 15:22 16:2 45:1 101:5
**description** 5:21 39:4
**design** 144:13
**detail** 20:15 112:5 124:5 135:10 193:25 250:13
**detailed** 195:17
**detect** 10:4 30:9 94:25 116:11 119:17 145:1 156:9,13 161:17,20
**detected** 10:15,18 14:25 44:25 120:14
**detecting** 115:11
**detection** 118:20 135:7 140:23
**detective** 20:25 22:20 24:7,10 26:20 27:16 30:9,18 32:15,16,17,18 81:14,17 82:5 84:18 85:4 88:13 105:15 127:2 133:24 192:15,25 203:20 222:2,7 224:10 225:23 226:9 248:21 249:3 258:5 262:14 269:16 274:9 289:13, 14,16 291:19 298:14
**detectives** 81:12 258:4
**detector** 191:15,21
**detectors** 156:10
**detects** 120:14
**Detention** 301:11 305:16
**deter** 48:2
**deteriorate** 50:10,12
**determination** 21:20 42:2 47:23 48:3,8 49:20 54:21 56:9 66:24 71:6 251:1
**determine** 45:16 46:21,23 57:24,25 58:2, 4,5,9 120:13 143:7 172:1 229:2,10 241:8
**determined** 9:9 22:11 23:5 41:24 42:5 55:1,6,11 56:7 73:13 124:12 228:15,24 229:11 230:5 251:22
**determines** 255:10
**determining** 197:20 236:15
**develop** 136:14
**developed** 170:7 283:24
**developing** 253:13
**development** 241:7 275:3
**device** 242:23
**devices** 42:5
**di** 70:22
**diagonal** 166:1
**diagram** 69:5 85:15 101:20 110:20 124:25 129:24 173:23 265:23 266:1 267:2,4 272:9 273:1
**die** 291:11
**died** 226:14,20
**diesel** 161:6
**differ** 254:1
**difference** 26:5 143:25 162:2 184:3 246:11
**differentiate** 51:4,16,18 140:17
**differently** 175:24
**differs** 240:4
**diffuser** 183:11
**digging** 96:25
**dimension** 209:14
**dining** 17:24 18:1
**dinner** 152:12
**dire** 149:24
**direct** 4:8 16:5, 9 72:10 91:7 100:17 101:1 163:4 166:14, 21 167:17 226:4 277:11 286:19 289:6 301:5 304:12
**direction** 43:6 69:7 166:4 175:13 204:11 205:11,21

206:4 248:10, 11 257:18 293:3

**directly** 160:18 186:12

**disagree** 243:1

**disclaimer** 173:25

**discolorization** 16:8

**disconnect** 221:2

**discover** 192:6

**discovered** 294:5

**discovers** 240:21

**discredibility** 123:15

**discrepancy** 232:1,7

**discretion** 81:12 83:6

**discuss** 125:7, 9 127:7,15 135:6

**discussion** 69:4 127:9

**discussions** 80:13

**dish** 215:16

**display** 166:24

**displayed** 176:19

**disregard** 33:12

**distance** 27:1 58:24

**distances** 26:21

**distillate** 241:17

**distinct** 175:8

**distinction** 236:18

**distinctions** 236:17

**distinctive** 25:15

**distinguish** 52:14

**distinguishing** 238:1

**distribution** 254:20,22 255:10,20

**doctor** 226:21

**document** 9:16 76:5 134:14 135:16 139:21 140:6, 22 163:9,10 171:21

**documentation** 74:14 78:24, 25 79:3 185:3 298:3

**documents** 140:1 218:7

**dog** 21:3,15 68:21,24 69:1, 12,15 70:5,13, 23,25 71:3,7 72:18 73:10,15, 16,18,20,25 74:5,9,14,18 75:12,13,16 76:3,18 77:2,3, 4,5,12 82:24 83:15 85:25 86:6,8,22 87:3 88:15,19,22 94:1,7,9,11,12, 14,18 95:8,12, 14,21,23,24 96:4,10,14,17, 22 97:10,13,19 99:3,6,15,16, 19,25 100:2,4, 5,13 101:7,8,23 103:9,15,25 106:23 107:5,6, 10,21 108:2,3, 13 109:14 111:12 112:7, 15,18,23 123:7, 14,15,23 126:4, 11,20 127:17 128:1,18 129:25 130:1 131:17,23 132:16 133:4 136:19,20,21 138:3,10 140:9 141:10 142:12 144:19 145:1 156:9,13 158:9 159:14,19 160:5,11,24 161:17,20 162:15 176:11, 13,15,16 177:9 251:15,17,21

**dog's** 90:4,5 94:2,21 109:5 112:9 114:19, 20 129:25 132:21,25 138:25

**dogs** 95:20 159:9,13,16 161:22 162:6,7, 8 165:1,12,14, 17

**Dollar** 194:5,7 280:24 281:1

**domestic** 124:9

**dominance** 18:18

**Donald** 194:9, 10 264:24 265:9 269:11 271:11 274:4,6, 25 275:4,7 282:12 285:2 290:5 292:17, 22,24 293:23 295:21 297:11, 18 298:1,5

**Donald's** 274:5 294:8

**door** 13:1 17:1, 7 18:4 27:18 28:4 30:1,8 34:15 107:17 166:3,9 174:6 177:16,18 186:24 187:5 192:11,12 216:14,16 220:25 232:5 244:25 267:20 271:5,7 287:25

**doors** 34:20

**doorway** 22:13 35:21

**double** 114:5 178:20 221:7 242:22

**doubt** 208:15 237:2,3,24

**draw** 63:18 85:12,15,23 86:5 196:12 197:3

**drawing** 17:13 34:13 110:19 174:2 179:1,2 209:15 216:20 217:5

**drawn** 14:3

**drink** 193:20

**drinking** 124:6 194:13 224:4, 20 249:13 286:11

**drip** 58:1

**Drive** 7:23 33:3 34:17 72:25 74:20 98:8 133:20 142:25 144:4,7 165:8 172:18 246:20

**driveway** 34:17

**drop** 73:17 160:4,7 164:18

**dropped** 59:4 286:4

**dropping** 100:5

**drops** 162:4 164:21

**drunk** 224:3 225:7 227:8,11, 21 243:1

**drunken** 224:16 243:10

**dry** 233:17,23 234:1

**drywall** 60:6 64:8 254:14

**duct** 183:6,9,14 215:7 242:21

**due** 62:16 191:15 271:18, 22

**dupree** 76:17

**duration** 287:13

**duty** 150:22

**dynamics** 213:1 254:17

E

**e-mails** 137:17

**E-TOWN** 6:10

**earlier** 5:18 43:19,22 103:23 104:10 121:7 170:7 214:6 215:21 236:1 248:15, 24 259:19 262:5 278:1 295:23 297:15, 22 305:7,21,22

**early** 11:14 48:18 98:22 207:10

**easel** 33:25 34:4 181:10 182:5

**easier** 181:11 235:4

**easily** 62:4 175:18 181:9

**east** 16:21 34:21 60:6 64:7,11

**Eastern** 92:8, 10 169:3

**easy** 48:21

**eat** 96:4 101:10,13 123:2

**echelon** 13:10

**Ed** 27:16 300:17 301:4,7

**edge** 205:17

**Edmonds** 27:16 30:10,18 32:15 88:13 192:15,20 193:5 195:10 203:20 222:2,7 224:10 225:23 226:9,23 248:21 249:2,3 250:2 262:14 266:16 269:16 273:17 288:3, 10 289:1,8,13 291:19 298:14

**Edmonds'** 248:10 249:19, 21,25 250:15

**educated** 44:10

**education** 169:9,12 216:1

**educational** 39:1

**effect** 66:23 156:16 179:20, 21 208:17

**effective** 140:24

**effort** 23:9

**efforts** 14:13 26:13

**eight-** 216:22

**eight-and-a-half** 216:22

**eject** 274:15

**elaborate** 96:19 252:7

**electric** 170:16 215:11,14,15 233:7

**electrical** 15:17 42:4 170:9,12,14,19, 21 173:8 174:5 179:24 208:25 214:16 215:22, 23,24 216:2 220:16,21,23 221:10,15,19, 20,24

**element** 216:21,24 233:16 234:1

**elements** 179:13 212:22, 25 216:24 265:17 277:1

**elevating** 212:4

**eliminate** 236:14 237:5 265:9 274:25 277:14,15,16 291:24

**eliminated** 238:7 285:20

**eliminating** 282:7 285:16

**elimination** 40:21 41:18,24 42:2,9 54:25 265:3 274:22, 23 283:8 285:5 291:19 292:7

**else's** 48:6 229:22

**embers** 214:4

**emit** 45:12

**emitted** 208:15

**emitting** 212:9 240:21

**Emmitsburg** 92:16

**employed** 72:14 167:23

**employee** 149:14

**employer** 4:12 167:21

**encompassed** 65:11

**encompasses** 47:10

**end** 34:13,14, 19 35:16,19 87:24 102:18 105:8 143:21 147:17 182:17 198:10 202:2 205:9 223:22 270:1 281:23 296:1 300:6 307:16

**ended** 32:18 58:23

**ends** 29:22 61:19 229:5

**enemies** 290:3

**enforcement** 19:15 47:16 92:1 169:6 229:6

**engine** 92:14

**engineer** 170:9

**engineers** 97:1

**ensure** 141:6

**enter** 17:4 160:16

**entered** 127:16 260:19

**entering** 128:1

**ENTERS** 90:12 220:5

**entire** 100:16 103:9 174:25 193:23 250:9 252:1 283:25 284:5

**entries** 131:2

**entry** 9:14 10:8 19:7 40:20 268:12

**envelope** 191:6,12,13

**environment** 177:19 270:24 272:14

**equipment** 7:21 20:19 23:13,17 42:17 221:6

**equivalent** 164:20

**era** 221:17

**Eric** 192:24

**Escaped** 98:7

**establish** 143:12,20 239:11

**established** 148:24 235:21

**establishing** 280:17

**estimate** 172:5,6

**estimated** 240:5

**ethyl** 280:6

**evaluating** 10:13

**evaluation** 239:14

**evaluations** 11:25

**Evans** 190:23 192:24 283:12

**evening** 7:7 147:3 195:1

**event** 61:24 159:12 222:18

**events** 239:12

**eventually** 212:10 234:1

**everybody's** 293:5

**evidence** 15:19 29:11 31:21,23,25 32:16 35:3 36:10,12,14,16 60:11,19 65:5 68:19 84:18 85:10 87:7 89:20,21,22 107:3,6 108:2 109:13,15 110:11,20,24 127:22 131:20 136:3,11 138:4, 19 163:19,24 166:25 167:4 168:23 176:18 177:14 185:3,4 188:12,14,16, 25 200:24 204:15 205:4 207:24 209:24 211:9 217:16, 20,21 218:8,10, 13,20 219:2 225:16 231:4,7 241:19,20 244:3,11 245:20 258:11 260:19,21 261:3,23 262:10 265:2 266:19 268:1 272:3,5 274:20 278:5 280:11 285:25 286:1,3, 14,15 289:23, 24,25 299:16 300:5

**evidentiary** 247:9

**evil** 301:18 302:24 304:1

**evolves** 211:20

**exact** 38:17 44:14 172:3 224:18 225:8 241:22 242:18 254:13

**examination** 4:8 10:14 21:17 26:6,16 38:14 56:17 57:9 72:10 77:25 82:14 91:7 114:25 139:19 155:9 163:4 164:23 166:21 167:17 170:11, 12 227:1 228:20 231:18 260:6 262:3 277:11 282:3 286:19 289:6 291:17 301:5, 21 303:1 306:7

**examine** 21:10 30:1,7 32:21 52:15 96:21,24 124:16

**examined** 36:18 173:9 174:4

**examining** 17:9 214:15,16

**exceeding** 113:11

**excited** 297:2

**exclude** 141:24

**excuse** 35:14 80:15,17 96:9 97:22 107:12 141:5 187:24 224:2,24 227:8, 17,18,22 289:14 295:9

**excuses** 225:6 227:7

**exhibit** 31:21, 22,24 32:7,11 35:2 36:3,9,11, 13 110:7,10,22, 24 136:2,7,10 163:21,23 167:1,3 177:12 184:4 186:21 187:21,23 188:4,5,8,11, 13,15,24 189:8 190:5,6,10,14, 15,25 191:12 196:5 199:11 201:15 203:8, 17,22 204:5,25 205:3,8,22 206:9 207:19, 23 208:10,11, 12 209:20,23 210:17 211:6,8 217:12 218:24, 25 219:1 220:19 244:19, 20 261:2

**exhibits** 187:10 188:3 207:3 217:6,7 260:17,20 272:6

**exit** 67:24 148:2 219:7,11 287:21

**EXITS** 68:1 148:5 219:12 287:23

**expect** 109:19 292:10,15

**expected** 110:15

**expensive** 171:16

**experience** 36:25 39:17 45:7 91:24 169:18 171:2,4 261:22

**experienced** 105:20

**expert** 117:5,7 143:8 158:12 198:7,25 199:3 200:1

**expertise** 170:6 213:23 215:22

**experts** 291:4

**explain** 5:19 68:25 109:10 120:21,24 163:9 164:19 211:15 213:22 214:7,12 233:9 241:21 272:7

**explained** 109:11 124:3 137:24 259:20

**explanation** 114:12 179:23 233:12 306:15, 25

**explode** 270:21

**explore** 166:2

**explosion** 226:2

**explosive** 169:2

**Explosives** 163:17

**exposed** 50:22 64:20

**expressed** 176:1

**extension** 42:5 184:10 238:24

**extent** 35:22 210:13

**exterior** 173:3, 8 214:15

**eyedropper** 164:21

F

**face** 14:2 153:3

**fact** 20:4 30:3 62:16 71:6 88:19 94:18 106:14 123:12 127:10 131:21 135:19 174:13 179:25 193:21 209:17 215:17 231:11 238:23 245:18 251:21

**factor** 37:19 49:19 52:5 138:7 236:15 238:2 242:19 253:6 254:11

**factors** 55:10 56:8 254:6 255:22 257:5 285:11,13

**factory** 64:23

**facts** 242:6

**fair** 42:22 45:8 47:2 48:6 50:8 227:25 228:10, 17 230:6,9,10, 12 231:5 238:17,19

**fairly** 9:19 27:5 30:19 31:4 33:2 109:2 150:23 187:11 195:16 204:20

**faith** 85:8

**fall** 28:14 68:14 214:5

**fall-down** 213:25 214:3

**fallen** 28:5

**falling** 29:17

**false** 132:19 138:6

**familiar** 72:24 74:19,21 84:1 141:21,22

**family** 253:20

**fan** 58:21

**farthest** 76:25

**fastened** 276:5

**fatalities** 172:9,11

**fatality** 8:1 18:21 172:7

**fault** 52:7 65:25 150:17 216:5

**faulty** 294:24

**Fay** 249:12

**FBI** 168:23 171:4

**feasibility** 135:8 140:12

**February** 94:6

**fed** 66:15 100:8 159:22

**federal** 93:10 171:17

**feel** 169:20 173:2 178:6 179:11 187:3 209:16 251:24

**feet** 22:15 43:22 76:15 81:7 99:21,22 109:12 128:3, 11 179:10,11 198:14

**fellows** 252:20

**felt** 123:6,9 126:13 250:5 258:13

**FEMALE** 145:12,18,20 146:2,6,8 147:23,25 219:18 302:13, 15,18 307:9

**fence** 31:19 191:4 204:6

**field** 137:22,23 138:14,15 141:4

**fight** 193:21 269:13

**fighting** 233:14

**figure** 172:4 197:15

**file** 129:19

**filed** 43:25

**fill** 93:22 129:1

**filled** 14:7 123:5

**finally** 167:14 223:22,23

**find** 10:17 13:14 15:7,12, 16,19 16:10,14 22:17 37:14 44:5,8 45:14 46:24 47:4 60:1,11 62:11 65:5 71:4,18 112:13 125:22 131:23 160:11, 21,25 165:19 174:7,19 176:15 195:25 208:23 220:20 221:9,18 236:12 241:10, 12 243:23 245:15 247:24 248:5 249:7 253:7,24 264:15 272:14 274:16 275:18

**finding** 40:14, 18 41:21 54:23 56:1 88:19 290:2

**findings** 19:22 20:18,19 21:9 46:4,25 47:5 49:23 125:9 252:8

**finds** 73:20

**fine** 29:14,18 32:3 33:18 61:3,18 70:8 134:24 147:5,8, 10 151:2,7 157:9 216:4 242:9

**fingerprints** 267:11 271:25

**finish** 147:5,6 200:3 202:1 284:1,3 286:8

**finished** 24:5 155:9,10,12 201:18

**fir** 64:13

**fire** 4:14,15 5:3, 7,15,16,23 7:9, 11 8:3,4,5,17, 18 9:1,5,9,10, 12,25 10:5,9, 11,16,17,21,22, 23 11:8,11,12, 15,21,23 12:2, 21,24 13:2,4,11 14:14,15,17 15:17 16:17 17:2,3,6 18:19 20:1 22:13 24:11 26:1 33:5,8 36:19 37:1,2,5,6,18, 20 38:1,19,23 39:2,20,21,22 40:2,3,14,18 41:2,6,25 42:13,14,21,23, 24 43:1,3,12, 13,15 44:1,2 45:16 46:14,17, 18,22 47:1,7,8, 15,24 48:4 49:2,12 50:4,6 54:22 55:2,7, 12,17,18 56:2, 3,4,10 60:16 61:24 62:18,20 63:11,22 64:20 65:11 68:15 72:16 81:23,24 82:1,16 83:23 87:18,23 88:4 91:22 92:2,13, 15,17,18,20,23, 25 93:2,4,6,18 96:12,24 97:5, 24 98:8,10,12, 18,23,24 99:13 103:2 105:20 111:1 112:1,3, 19,22 113:12, 14,22 114:16 117:5,10,11,12 119:9,15 120:20 122:6, 21,22 124:4 125:7 126:9,14 127:24 128:5, 17 129:3,4 132:7 133:2,15 134:2,6,8,11 140:24 141:12, 13,17 160:19 161:23 168:3, 20,22 169:4,5, 7,13,16,24 170:18,20 171:8 172:14, 17 173:5,12 174:13,14 175:25 176:3,9 179:6,10,12,14, 16,24 183:2,4, 16 184:3,19 185:13,23 186:3,12,24 187:13 189:10, 13,21 192:19 197:17,19,25 198:2 204:10 205:20,24 206:4,16,17,18 207:1 208:21 209:1,4 210:2, 3,11,18,19,21 211:4,16,19 212:9,12,14,19, 20,21,23 213:1 214:1,13,17 215:10,15,17 216:8,9,12,15 217:3,9,12 222:9,16,17,21, 23 223:1,2,5, 16,19,24 224:23 225:18 226:2,14,16 227:10,13 228:3,9,11,12, 16,22 229:25 230:2,3 231:18, 19,21,25 232:10,11,12, 17,19,20 233:3, 24,25 234:6,24 235:10 236:19, 25 237:13 238:24 239:13, 18,22,25 240:2, 25 241:1,4,6, 10,11,19,21,23 242:4,7,19,20 243:14 245:2, 10,15,17 246:3, 5,20 247:22 249:23 250:17, 24,25 251:2,3, 18,22 252:7,23 253:5,6,13 254:7,13,17,20, 22,25 255:1,2, 4,10,11,20 256:7 257:2 258:9 260:14 261:10,11,21 262:17,20 265:2,17 268:11,12 269:17,20 270:20,25 271:9,17 273:2 274:20 275:3 276:16 277:1,5, 24 279:5 280:8, 19 282:9 283:18,20,23, 24 284:20 285:7,24 289:18,23 292:11,16,18 293:4 294:4,15 295:14 297:6,8

**fire-resistant** 50:9,13

**fire/arson** 141:4

**Firearms** 93:10 96:10 163:17

**firefighter** 15:1 91:21 92:12

**firefighters** 5:22 7:24 8:18 9:13 10:7 12:10 128:14 233:2

**firefighting** 26:13

**fireman** 18:22

**firemen** 173:4 204:10 284:10

**fires** 6:14,15 15:6,8 19:18 36:20,22 37:4 45:7 48:8,12 93:19 97:12,18 106:24 139:5 168:11,15 170:24 171:2,5, 11,13,25 172:5 179:5 228:13 237:3,13 276:13 291:4

**fist** 306:13

**fit** 59:9

**fits** 283:15

**flag** 153:25 160:7

**flame** 16:5,9 35:22 42:6 253:16 264:17, 18

**flames** 226:19

**flammability** 270:15

**flammable** 47:13 57:2 156:9 161:17 214:18 234:9, 10,11,14,17,18 245:16 246:8, 12,13 247:25 261:10 264:15, 19 274:12 281:7,11

**flammable/ combustible** 246:6

**flash** 65:2

**flashed** 60:12 65:10

**flashover** 60:11 65:6,10 211:14,22 213:3,4,5,8

**flashpoint** 64:22 246:12, 14

**flavored** 278:10

**floor** 26:4 37:14,15 56:19, 22 75:7,8 76:10,14,22

77:1 102:3,6,12 114:10 144:23 156:9,12 161:17,20 175:15 183:6, 11,18,19,20 186:8 204:13, 21 207:14 212:16 215:3,6, 18 265:12,13 270:24 275:14 276:17,18

**flooring** 11:6 27:8 66:21 76:22 238:15 265:10 275:12, 19,23,24,25 276:9

**floors** 116:2

**Florida** 170:1

**Flowers** 4:25 5:6 15:11 18:7, 9,11,16,18,25 19:1,5,6,7,10, 13,16 20:14 23:19 24:10 127:3 176:4 228:15 234:21 240:5 276:14

**Flowers'** 240:8

**fluid** 52:14 53:16,18,22 54:1 115:16 157:24,25 158:9,10 161:7, 8,12 162:11,15 175:22 190:17 243:11,18,22 244:19 245:2,5, 14,22 246:2 261:15,16 263:15,23,24, 25 264:7 266:19,23 267:11 271:24 272:3,4

**fluids** 50:23 95:1 118:7 125:21 131:5 158:13 241:17 247:18

**flume** 14:6

**FM7** 173:5

**foam** 177:22,25 178:4,8

**focused** 208:4 297:4

**focusing** 178:17

**folks** 257:15

**follow** 8:19 19:8 119:5 133:7 139:3

**follow-up** 158:3

**food** 74:1,6 94:14,17 95:22 96:5,7 110:5 159:25 216:9

**foot** 12:6 160:1 183:10 184:23 187:1 223:7

**forced** 239:17

**foreign** 22:16

**forget** 61:20 227:3

**forgot** 165:5 282:5 301:13

**form** 129:1,2, 15 259:11 284:12

**forms** 10:23

**fortunately** 62:20

**forward** 74:11 279:13

**forwarded** 49:13

**foster** 191:19

**found** 7:19 8:21 15:24 16:1,25 27:25 30:16,20 31:4 32:13 37:6 45:21 53:3,10, 14,18 54:6,25 55:13 69:2 101:18 110:3 115:22 116:1 118:3,6,7,15 121:13 123:10, 11 124:6 140:19 175:6 177:8 191:4 203:19 241:13 243:22 244:18, 21 247:8,18 253:18 256:9 257:5 267:13 270:5

**foundation** 143:12,20

**four's** 185:21

**fourth-degree** 290:18,23

**fragile** 163:7

**frame** 18:17

**framing** 276:18

**free** 22:12 156:21 157:3, 10 167:11

**French** 215:15

**fresh** 156:11

**Friday** 23:13

**friend** 151:12, 14

**friend's** 222:16 275:1 282:8

**friendly** 153:3

**friends'** 271:20

**fries** 215:16

**fro** 80:18

**front** 9:8 10:3 19:9 22:22 25:23 33:18 34:15 66:17 69:17 70:1 74:25 75:1 89:16,18,24 93:25 94:4 102:23 106:12 108:5,8,13 114:8 124:22 125:3 139:22 162:22,24 166:3 176:20 177:16,18 178:11 189:5 203:1 210:5 215:18 252:9

**frying** 57:21 265:22

**fuel** 37:16 38:10 59:23 61:21,23 62:1 161:6 179:6 184:2,3 211:23 212:8,22 213:6 214:6,8 241:2, 13 259:19,20, 21 277:5

**fuel-** 239:19

**full** 155:24

**full-time** 92:3

**fully** 283:19

**functioning** 179:15

**furnishings** 13:10 50:9,25

**furniture** 17:24 18:1 50:21 160:9 186:23 255:25 259:22

**furnitures** 212:1 213:8

**fuses** 221:2

G

**gain** 28:3,4 29:25

**gained** 27:17 29:15 127:11

**garages** 63:2,5

**gas** 175:18,19 212:4 214:10, 16

**gases** 140:18 184:15 212:10 213:12,15

**gasoline** 52:12 95:1 184:18 246:13,16 261:22

**gasses** 169:2

**gather** 138:4 187:19 213:10

**gathered** 283:12

**gave** 9:5,16 111:4 121:21 123:4 165:2 283:9 284:24

**gear** 100:7

**general** 20:16

**generally** 74:10 127:21, 23

**generate** 44:15 179:16

**generated** 44:19 174:10 175:9 255:3

**gentleman** 72:17 132:4 233:17 253:10 260:9

**gentlemen** 46:15 117:18 243:16

**geographic** 6:3,5 168:8

**Georgetown** 72:16,22 91:22 111:9 147:13 167:12

**get along** 181:6

**Gibbons** 189:25

**giggles** 162:6

**Gill** 4:1,7 13:7 27:21 28:2,9, 12,17,25 29:3, 7,10,12,15,19 32:1,4 35:4,6, 14 36:1,5,15

53:5 55:23 56:15 57:7 59:14,16,22 60:1,10,14,16, 22,25 61:4,7, 13,17,20 62:10, 23 63:4,6,13,18 64:5 65:4,12, 15,18,22 66:2 67:5,8,13,15,20 68:2 69:18,22, 25 70:2,5,10, 13,21 71:2,17, 24 72:1,3,8 78:7 82:13,23 83:2,4,13,21 84:1,4,7,9,12 85:8,21 86:2,4, 12,14,17,21 87:8,10,16,21 88:2,6,10,18,24 89:2,6,11,14 90:6,8,13,17 91:5 103:20 104:4,12,20 105:5 110:8,21 119:11 120:1,4, 6,8,23 134:20, 25 135:25 136:5,8 139:17 142:2,8 143:3, 11,14,17,19 145:8,11,16,19, 22 146:5,9,11, 14,16,21,24 147:3,6,9,14, 18,24 148:1,6, 11,24 149:4,7, 10,13,16,20 150:3,7,10,14 151:8,11,14,17, 19,22,25 152:2, 5,9,15 153:1, 10,13,15,18,25 154:7,13,17,21, 24 155:1,5,12, 15,21,25 156:4, 7,16,23 157:1, 5,8,12,16,19, 21,24 158:7,17, 21 159:2,4,10 160:14 161:2, 11,15,19 162:10,14,18, 23 163:1,20 166:20 167:2,5, 7,14,16 173:21 178:1 180:8,11, 13,15 181:3,15, 19 182:1,6 183:23 188:19 196:15,17,24 197:1,6,12,22 198:3 199:4,25 200:3 201:12, 18,22,25 202:12,15,24 204:1 205:1 207:20 209:21 211:7 217:24 218:2,15,19,23 219:5,13,20,22 220:3,6,11 225:3 226:6 229:19,23 235:2,14 240:10,12 244:4,6,12,14 247:10 260:5, 24 262:1 263:4, 7,10,14,20 264:6,10,13 265:6,9,22,25 266:7,9,14,18, 21 267:1,6,9, 15,18,23 268:6, 9,18,22 269:3, 6,10,16,24 270:2,7,11,13, 19 271:1,5,10, 15,24 272:2,15, 19,23,25 273:4, 7,10,15,18,20, 25 274:2,7,11, 16,19,24 275:5, 11,15,23 276:2, 8,19,24 277:3, 6,10,21 278:18 279:3,7,10,13, 18,21 280:1,9, 15,21,25 281:3, 5,8,12,16 282:1,20 284:3, 14 286:8,18 287:1,4,7,10, 17,24 288:4,8, 11,14,16,19 289:1 291:16 294:16 295:4,6, 11,16 296:2,10, 16,19,21 297:10,17,21 298:10,22,25 299:3,17,20,24 300:4,7,14,19, 24 301:20 302:8,11,14,16, 19,25 303:6,9, 11 304:12,14, 20,24 305:1,6, 12,17,20 306:3, 5 307:4,7,10,14

**Giordano** 27:19,24 28:11, 19 29:2,5,8,11, 14,18 38:13,15 53:4 54:19 56:13 57:8,10 59:12,20,25 60:9,13,15,21, 24 61:2,6,12, 16,18 65:14,17, 19,25 66:3 67:3,11,14,16 70:16 71:1,4,13 78:1 84:14 85:17 89:5,10 103:19,22 104:5,13,24 105:7 115:1 119:16 120:3,5, 11 121:1 134:18,21 135:1,22 136:6, 12,13 139:15 141:25 142:14 143:2,5,13,15 145:5 146:10, 12,17,22,25 147:5,8,10,16 148:17 149:18, 23 150:8,11,15 151:2,7 152:18, 21 153:7,12,14, 17 154:11,18 155:14,17,24 156:2,6,15,20, 24 157:6,9,14, 18,20,22 158:2, 11,15,20 164:24 166:19 167:13 181:1,5, 16,23 182:5 191:22 196:11, 19,25 197:2,16, 24 198:24 199:2,24 200:1 201:11,14 203:24 217:22 218:22 220:1,9 225:1 226:3,25 227:2 229:24 235:1,13 237:18 240:9, 11,15 244:9,13, 16,17 247:5,12 250:20,23 254:3 260:3,23 262:2,4 263:12, 18,22 264:3,9, 12 265:20,24 266:4,6,8,12, 16,20,25 267:5, 7,14,17,22 268:5,8,17,21 269:2,9,15,22 277:8,20 278:12,22 279:1,9,23,25 280:10,20 281:13,18 282:4 284:15 286:17,25 287:2,6 288:13, 24 301:22 303:2,4 304:11, 23,25 305:11 306:8 307:3

**girl** 74:1 101:9 159:24

**give** 4:4 28:23 34:4 38:9 39:7, 8 72:6 85:9 91:2 101:10,13 110:1,5 111:20 116:16 123:15 124:1 145:10 148:8 149:7 175:17 218:19 265:15 276:19 300:21

**giving** 74:5 117:22 182:10 212:3

**glass** 17:1 34:19 99:4,20, 23 210:25 280:2,12

**glove** 106:2,5 204:16

**gloved** 23:16 24:2 204:14

**gloves** 23:24 177:11 231:16

**glue** 116:2,4 265:13,14 276:8,10,11,17

**glued** 276:3,7

**glues** 116:23

**goals** 141:7

**God** 15:13

**good** 38:16 74:1 85:8 156:24 157:11, 18 159:24 171:20 179:17 207:12 210:25 217:21 263:13 265:5 267:14, 17 269:2 291:25

**goodness** 236:25

**goofing** 165:19

**government** 93:11

**governs** 171:21

**grabbed** 59:3

**grade** 64:13

**graduated** 162:3 163:11

**Grand** 302:2 303:18 304:9

**grape** 52:11

**grease** 58:17, 21 216:8,12,14

**great** 135:10

**greater** 140:14 215:8

**greatest** 173:14

**green** 7:15,17 101:22 168:6

**Gregory** 4:11 36:18 38:16 56:14,20 57:11 66:4 105:18 122:18,19,25 172:16 173:6 175:25 176:4 177:10 203:19 204:4 228:15 230:21 231:6,8, 14,15 234:22 273:6

**groceries** 8:14 293:9,10

**ground** 30:16, 20 203:20 221:5

**grounding** 221:6

**growing** 152:6 241:4 253:13

**growth** 239:23, 25 240:18,20, 24 241:7 253:5 254:19,22 255:9,19

**guess** 11:15 13:21 39:7,16 44:18 45:11 48:7 63:3 70:16 71:15 83:24 84:24 85:22 88:21 104:13 111:3 113:8 127:10 146:17, 22 147:13 150:11 157:25 198:5 245:22 263:12

**guessing** 26:14

**guide** 41:2,9 135:10 182:12

**guideline** 41:13 119:5

**guidelines** 40:9

**guilty** 268:1

**guy** 8:23 281:16

**guys** 6:22 145:9

**H**

**habit** 165:12 300:25 301:2

**hair** 236:22

**halfway** 249:5

**hall** 87:24 213:18

**hallway** 35:16, 20,24 107:18 186:22 205:9, 18 213:12 232:5 239:1

**hand** 4:3 33:2 53:6 72:4 90:25 101:22 110:4 153:22 211:7 260:25 300:20

**handed** 80:21

**handful** 32:19

**handle** 94:1 182:3 216:14, 16

**handler** 20:2 68:7 72:17 95:14 135:11

**handlers** 93:20 95:9,12, 20 135:5 141:5

**handling** 23:16 106:2

**hands** 14:22 60:18 190:9

**handy** 250:20

**Hang** 145:8

**hangs** 152:16

**happen** 51:3 85:13 159:6

**happened** 83:16 100:3,20 110:13 112:4 130:19 171:13, 19 176:16 177:20 187:4 195:2 208:20 222:18 224:23 234:3 251:21 254:13 264:25 273:20 285:9 304:22

**happening** 123:6

**happy** 198:16

**hard** 52:22 100:25 181:5,6 294:16

**hardest** 241:15

**harmed** 198:1

**hazardous** 4:20 6:16,18 38:19,21

**he'll** 244:15

**head** 109:23,25 116:3,4 172:10 295:12

**headed** 142:5 191:25 279:18

**Health** 169:1

**healthy** 96:7

**hear** 153:4 192:1 219:15 242:10 302:17

**heard** 5:18 18:22 62:11 87:16 142:3,4 171:10 211:12 219:15 226:17 231:21 236:20 242:25 264:17

**hearing** 68:6 70:18 72:20,21 73:3 78:3,9 82:7 89:18 105:2,3 111:7, 11 133:14 154:17,25 233:20 235:16 250:19,21 251:6,10,11,16 294:17

**hearsay** 27:20 191:23 299:24

**heat** 10:24 12:16 14:6,16 16:16 38:8 45:23 46:24 55:6,7,16 102:17 174:9 200:7 205:13, 25 208:16,21 209:1 210:10 211:21,24 212:15,22 213:13,15 232:5 261:19 269:6 270:19 277:4

**heat's** 213:13

**heated** 132:8 212:2 268:13

**heating** 65:1 199:23

**heavier** 113:12

**heavily** 170:9 224:4

**heavy** 10:9 16:8

**held** 5:25

**helped** 93:21 171:12,22

**helping** 195:9

**hey** 138:24 148:7 245:21

**Hickman** 6:8

**hickory** 143:25

**hid** 95:17

**hide** 160:10

**Higgins** 300:18 301:4,7,24 306:10,11

**high** 11:20 12:2,3,19,21 13:2,5,11

**highest** 212:5

**highly** 64:21 248:11

**history** 135:6 159:15

**hit** 15:14 69:1 70:5,13,14,25 71:7,10,13 73:14 76:18 79:17 80:15 83:15 86:2,8, 18,23 88:15,20, 22 98:5 107:21 108:3 111:13 144:19,20 176:16 177:9 250:4 251:21, 22

**hits** 69:5,13,15 71:3 73:11 85:12 101:23 213:16

**hitting** 68:21 70:23 142:12 176:15

**hold** 39:14 53:8 54:3 200:10 219:8 265:13 276:9

**holding** 25:9 107:3

**holds** 54:1

**hole** 11:10 24:18,23 26:9 37:13,15 38:4, 6,7 57:2 58:24 62:8 114:11,14 174:22 175:2, 15 183:10,18 204:12 215:6 232:3

**home** 7:4,18 11:14 17:16 31:7,11 34:12, 14 49:7,9,21,22 50:25 64:18 79:12 80:2 128:1,10 140:19 152:22 172:17 174:2 176:10 205:9 220:16,21 222:18 235:22 246:6 252:23 253:17,19,23

254:1,2 255:23 269:11 271:11

**homes** 11:16 48:17,25 64:15, 25

**honest** 125:23

**Honor** 36:4,7 53:4 54:19 56:16 57:8 65:19 67:17 86:3 87:19 110:6 134:19 139:16 143:2 147:16 155:3, 14 178:3 180:10 187:16 202:11 207:3 217:22 218:11, 18,22 219:3 220:1,9 225:2 229:18 235:1 240:7 244:1 260:16 261:6 262:2 263:6 274:14 277:20 279:4,19 280:23 287:16 288:7,24 295:3, 5,9 298:21 300:13 303:5 306:9 307:13

**hook** 216:15

**horizontal** 183:3

**horse** 40:12

**horseshoe-shaped** 113:9

**hospitals** 169:2

**hot** 59:4 62:18 63:9 213:13,14, 15

**hour** 96:5 104:16

**hours** 92:7,25 112:10 161:25 169:11 174:13 194:1 233:16 255:4 256:6 269:18

**house** 6:16 10:12 11:6 17:25 31:19 38:11 50:15,16, 20 64:14 65:2 75:24 76:1 90:21 100:16, 21,22 101:4 105:10 106:22 113:9 124:7,22 125:4,21 127:12 143:1 144:3 187:2 204:11 222:16 223:1,2 225:12, 19 227:23 249:22,23,24 256:21 259:22 261:21 267:6 271:20 273:2 275:2 282:8,24 285:8 286:1,14 293:6,10,23 295:17,18 296:4,11 297:13 298:17 299:12

**household** 121:13 125:22

**housing** 49:12

**how's** 148:21

**Hudson** 7:9,11

**human** 241:24

**hundred** 97:20

**HVAC** 37:19

**hydrocarbon** 116:1 117:16, 17,19,24 118:3, 20

**hydrocarbons** 115:17,21,22 116:7,12,20 158:9,13 162:11 210:20

**hyped-up** 297:2

**I**

**I-65** 6:7

**i.e.** 10:22,25 47:13 49:20

**idea** 44:6 45:6 81:21 149:5 150:20 243:21 245:1,3,4

**ideas** 174:8

**identification** 34:25 143:24 185:17 223:9 260:18

**identified** 10:11 68:23 150:9 180:16 184:6 223:10 234:10,13,15 268:25 269:18 278:6,14

**identify** 30:12, 24 32:8 211:17 220:22 223:15 259:2,4,6

**identifying** 14:19 246:8

**ignitable** 52:14 94:25 95:17 101:19 115:7,8, 15,16 118:6,7, 11 119:2,8,14 120:20 121:6,8 125:20 126:12 131:5 132:17 159:21 161:13 162:12,14 164:3,4,5,10 234:14 236:12 247:18

**ignite** 95:18 99:13 212:10, 11,13 242:24 261:11 269:8 270:18,21

**ignited** 13:4,5, 12 45:24 46:11, 24 47:7,8,9 56:25 99:13 158:1 214:24 241:2,13

**ignition** 55:2,3, 17 221:20,24

241:8,23,24

**illuminated** 9:8

**illustrated** 232:4

**illustration** 276:15

**illustrations** 175:22

**imagine** 143:7

**immediately** 127:19 271:17

**impeach** 105:5

**impingement** 16:10

**importance** 175:24

**important** 28:13 40:13 49:19 104:21 138:2,5,7 238:9,10,12 245:8 250:5 253:3,6,9,12, 14,17 254:23, 24 255:17,22 256:2,4,23 258:13,17,19, 20,22,23,24

**impression** 28:24 86:21

**imprint** 75:20 199:22

**imprinted** 94:2,8,12

**improper** 141:16

**in-service** 92:7

**inaccurate** 285:18

**inaudible** 6:17 33:23 36:4 47:3 52:2 60:13 61:8 65:14 86:9,10 89:5 103:22 104:1 110:9

114:20,21,22, 24 146:8 147:23,25 156:20 183:23 200:12 203:16

**incendents** 51:4

**incendiary** 40:4 46:15,16, 22 47:7 242:23 251:2

**incendiary-** 237:3

**inch** 54:5 180:2

**inches** 53:25 54:2,4 81:7,9 91:9 160:6 178:20,21 206:22

**incident** 202:19 255:5 256:4,5 295:22 297:9,14,19

**incline** 206:21, 25

**inclined** 104:20,22

**include** 6:14 83:11 250:11

**included** 6:24 108:9

**includes** 6:13

**including** 83:10 165:1 171:8

**incomplete** 210:19

**inconsistency** 233:5

**inconsistent** 105:6 231:20 232:24

**incorrect** 33:16 294:24

**index** 19:21 26:20

**indicating** 10:19 11:5,6, 10,12,22,23 12:1,24 13:5, 12,17,20,21,22, 24 14:14,18,23 17:2,3,5,7,14, 18,22 18:3 24:16,17,18,21 25:2,3,5,8,16, 20,22 26:8,19, 25 34:10,12,18 37:14 38:1,3,6, 7 63:25 66:17 69:18 86:19 87:11 88:9 102:2,7,9,13, 14,17,18,25 109:21,22 110:2 114:6,9 125:5,6 144:22 149:9 166:10, 12 174:5,6,24 175:1,8,10,11, 12,13,14,15 176:21 178:9, 15 179:17,19, 23 180:6,21 182:23 184:10 185:15,16 186:2 189:8 196:7 198:18, 19,23 202:23 204:5 205:24 206:1,24 216:21 236:24

**indication** 221:18,23 223:6 276:7

**individual** 24:2 55:25 297:7

**individually** 33:17

**individuals** 8:20 9:5 290:4, 7 298:8

**Industrial** 168:17

**infers** 56:2

**inflammable** 264:14

**information** 27:17 28:4 29:15,25 49:8, 14,16 123:3,17 192:1 194:15 222:20 225:17 237:6,9,14,15 260:9 283:9,12 285:18 291:25 293:25 294:13, 18,23 297:24

**informed** 8:1, 20 191:20 193:15

**inhalation** 226:14

**inherit** 38:23

**initial** 10:8 21:9 26:9 231:17

**initially** 8:25 37:4

**initiation** 239:23,25 241:6

**injured** 291:10

**injury** 8:2 201:2

**innocent** 120:18 121:12

**input** 120:13

**inquire** 129:13

**insect** 264:14, 15,19 274:11

**inside** 6:18 16:9 19:17 21:1,10 23:1 35:7,17 69:23 74:24 79:12 99:5,8,10 105:10 125:6 173:10 192:11 221:7,25 269:6 270:19

**inspect** 14:10

**inspector** 168:22 170:13, 16,19,22 215:23,24 221:10

**inspectors** 64:19

**installations** 170:15 171:20

**installed** 221:16

**instance** 51:12 69:4 143:24 211:14 213:20 222:20 258:8 259:1

**instances** 10:22 63:12 178:6 256:3

**intact** 186:17 206:3 210:4

**integrity** 185:4

**intended** 28:13

**intense** 62:8 210:10

**intensity** 35:9

**intent** 55:10,15 56:3,6 197:20 277:13

**intentional** 40:18 55:1 285:6

**intentionally** 37:6 41:24 46:22 47:7,24 48:1,3,14 56:2 176:9 197:25 198:1 214:17, 19,21 228:13 251:2 255:11, 15 301:3

**interacting** 146:19

**interaction** 146:18

**interest** 34:24 130:4

**interested** 165:9,16 233:20 264:22

**interesting** 13:14 185:19

**interior** 8:25 10:1 201:9 214:15

**International** 168:18,20

**interrupt** 180:24

**intertwined** 170:21

**intervention** 241:25

**interview** 193:2,4,6,9,10, 11 195:9,15 223:21,22 224:1,8,17 269:17 274:4 275:10 286:21, 22 293:1 294:9

**interviewed** 111:8 193:3 223:18 225:15 274:10 275:7 284:22,23 290:7 298:7

**interviewing** 192:17,18,24 259:1,17

**interviews** 96:23 193:1 222:6,24 225:14 250:9 284:24 290:1,2, 17 291:6,7,20 292:12 294:1 298:9

**intoxicated** 248:12 263:15

**introduce** 163:22 165:17

**introduced** 260:22

**introduction** 36:8 110:7,18 136:6

**inverted** 206:20

**investigate** 36:22 39:22 81:24 93:17 168:15 170:24 172:14 216:7 259:10,12

**investigated** 33:3 36:20 134:6,9 172:2 225:13

**investigating** 45:7 98:12 126:9 141:13 168:11 171:2 187:13 225:12 252:23

**investigation** 9:2 18:6 20:23 29:24 40:8 41:6 46:4 49:5 58:11 60:10 65:5 92:18 93:6 125:10 126:1,3 128:18,24,25 129:17,22 141:4,7 169:24 171:8 204:22 224:11 228:2,5 237:13 253:4 257:16 259:3, 15,16 271:19 273:12 277:18 285:22 289:11, 17 291:2,3 293:15,22

**investigations** 38:23 41:3 92:15,18 93:1,2 96:17 97:13 130:4 168:3 255:1

**investigative** 44:1 140:24 257:25

**investigator** 41:22 42:12 82:16 92:20,23 105:20 112:20 117:10,11,12 126:14 169:5,7, 13,16 172:1

211:16 258:15 290:15

**investigators** 78:19 80:12 90:1 97:5 103:5 130:8,10 133:3 137:25 140:25 141:12 168:19, 21 212:20

**invited** 129:3,4

**involved** 9:24 10:5 22:12 41:6 47:12 71:14 91:25 92:1,2 93:21 95:11 98:8 125:10 140:7 172:7,9, 10 192:22 214:1 230:14 231:2,3 272:17 289:11

**involves** 189:4 300:8

**involving** 7:12

**irregular** 178:12

**irregularities** 178:16

**island** 186:6,7 206:13,15 207:16

**issue** 52:6 68:4 88:5 150:13 170:2

**item** 27:11 42:4 166:16 177:15 189:5,12,19 191:3 192:9 202:6,7 236:7 245:21 247:9

**items** 194:5 202:16

J

**Jack** 4:25 176:4

**jail** 195:5 305:19 306:13 307:1

**Jan** 191:19

**January** 78:4 82:8

**job** 4:18 5:9 6:2,24 92:6 107:8 126:4,10, 19 137:7 256:18 263:13

**join** 182:24

**joined** 275:24 276:1

**joining** 182:25

**joint** 26:11 43:8

**Judge** 4:1,7 13:7 27:19,21 28:2,9,12,17, 19,25 29:3,7, 10,12,15,19 32:1,4 35:4,6, 14 36:1,5,15 53:5 55:23 56:15 57:7 59:14,16,22 60:1,10,14,16, 22,25 61:4,7, 13,17,20 62:10, 23 63:4,6,13,18 64:5 65:4,12, 15,18,22 66:2 67:5,8,13,15,20 68:2 69:18,22, 25 70:2,5,10, 13,16,21 71:2, 17,21,24 72:1, 3,8 78:7 82:13, 23 83:2,4,13,21 84:1,4,7,9,12, 14 85:8,21 86:2,4,12,14, 17,21 87:8,10, 16,21 88:2,6, 10,18,24 89:2, 6,11,14 90:6,8, 13,17 91:5 103:19,20 104:4,12,20 105:5 110:8,18, 21 119:11 120:1,4,6,8,23 134:20,23,25 135:25 136:5,8, 12 139:17 142:2,8 143:3, 5,11,14,16,17, 19 145:8,11,16, 19,22 146:5,9, 10,11,14,16,21, 24 147:3,6,9, 14,18,24 148:1, 6,11,17,24 149:4,7,10,13, 16,20 150:3,7, 10,14 151:7,8, 11,14,17,19,22, 25 152:2,5,9,15 153:1,10,13,15, 18,20,25 154:7, 13,17,21,24 155:1,5,12,15, 21,25 156:4,7, 16,23 157:1,5, 8,12,16,19,21, 24 158:7,17,21 159:2,4,10 160:14 161:2, 11,15,19 162:10,14,18, 23 163:1,20 166:20 167:2,5, 7,14,16 173:21 178:1 180:8,11, 13,15 181:1,3, 15,19 182:1,6 183:23 188:18, 19 191:22 196:11,15,17, 24 197:1,6,12, 22 198:3,24 199:4,24,25 200:3 201:12, 14,18,22,25 202:12,15,24 204:1 205:1 207:20 209:21 211:7 217:24 218:2,15,19,23 219:5,13,20,22 220:3,6,11 225:3 226:6 229:19,23 235:2,14 240:10,12 244:4,6,12,14 247:10 260:5, 24 262:1 263:4, 7,10,14,20 264:6,10,13 265:6,9,22,25 266:7,9,14,18, 21 267:1,6,9, 15,18,23 268:6, 9,18,22 269:3, 6,10,16,24 270:2,7,11,13, 19 271:1,5,10, 15,24 272:2,15, 19,23,25 273:4, 7,10,15,18,20, 25 274:2,7,11, 16,19,24 275:5, 11,15,23 276:2, 8,19,24 277:3, 6,10,21 278:12, 18 279:1,3,7, 10,13,18,21 280:1,9,10,15, 21,25 281:3,5, 8,12,16 282:1, 20 284:3,14 286:8,18 287:1, 4,7,10,17,24 288:4,8,11,14, 16,19 289:1 291:16 294:16 295:4,6,11,16 296:2,10,16,19, 21 297:10,16, 17,21 298:10, 22,25 299:3,17, 20,24 300:4,7, 14,19,24 301:20 302:8, 11,14,16,19,25 303:6,9,11 304:12,14,20, 24 305:1,6,12, 17,20 306:3,5 307:4,7,10,14

**juggle** 181:24

**juice** 52:11

**jump** 65:22,25 75:21

**jumped** 103:25

**June** 170:17

**juror** 145:12, 18,20 146:2,8, 23 148:9,23 149:2 151:9,16, 17 152:3 153:2 180:25 219:17 263:11 277:14 282:6 295:18 302:13,15,18 304:20

**juror's** 158:22 296:4

**jurors** 90:20 149:24 163:6 178:1 200:10 295:12 302:17

**jurors'** 270:3

**jury** 9:22 31:6 33:18 37:9 40:23 46:16 59:17 61:22 65:16 67:8,24 68:1 89:15,16, 24 90:12,17 92:22 101:6,23 109:8 117:19 132:4 147:22 148:2,5 150:5 153:21 155:16, 19,22 167:8,9 177:3 181:9 182:21 185:1 187:10 189:4 196:12 197:17 198:13 199:18 202:9,14 218:6 219:7,8,11,12, 23 220:3,5,7 226:12 227:6,9 238:13 240:13 243:17 251:24 263:8 266:22 272:6,7,15 287:11,21,23, 24 289:9 294:16 295:7 298:25 301:2, 13 302:3,12 303:18,22 304:9,15 307:8

**jury's** 68:3 71:18 85:9 90:14 148:4 149:20 288:22 305:4

**Justice** 163:16

**Juvenile** 5:16

**K**

**K-9** 20:3,20,22, 24 80:5 81:8,13 87:3,15 93:14, 20 94:12 95:15 100:10,11

**Kay** 193:24 194:3,20 222:17,21 270:5 278:2 290:4

**Ken** 193:5 203:20

**Kenneth** 288:3,10 289:8

**Kentucky** 4:13 5:2,22,23 6:5, 19 23:6 27:15 39:3 41:12 91:13,15 92:9 97:6 111:9 141:21 167:12, 22,24 168:2 169:3 171:14, 22 218:8 257:23

**kerosene** 161:8 261:24

**kerosenes** 95:2

**key** 65:8

**kibbles** 73:25 74:6 94:17 110:1

**kicking** 306:19

**kicks** 162:6

**kid** 165:15 264:23

**kidding** 154:20

**kids** 249:24

**kind** 5:8 8:18 18:3 19:1 22:12 25:15 31:18 37:3,16 42:8 43:8 49:25 52:8 57:23 63:24 66:21 69:9 92:11 95:10 96:1 100:9,24 128:22 130:2 131:2 132:23 142:20 144:13, 17 152:13 166:7,14 169:19 170:21 173:2 180:18 183:12 206:9, 23 207:16 216:9 219:10 223:9 227:4 239:12 241:17 243:12 251:13 271:8 274:15

**kindling** 62:4,5

**Kingsford** 158:9,13 162:10 190:17 243:18 244:18 245:1,4 266:18 267:10 271:24 272:3

**Kingston** 243:11

**kitchen** 10:5,6, 16 17:5 18:3 24:20 26:5 35:8 37:12 50:3 52:12 56:19,22, 24 57:13 66:17 75:4,9 76:22 113:8 114:11 174:23 175:15 180:12 182:23 183:11 190:21 204:12,21 206:25 215:18 231:24 235:8 237:1 242:21 244:21 265:11, 13 268:14 275:12,24

**knees** 14:22

**knew** 78:14 87:12 146:12 147:1 217:3 292:24

**knife** 199:13 249:12

**knowing** 44:14 81:13 152:10 244:8 254:6

**knowledge** 27:6,7 36:25 43:9,13 130:18 143:23 223:4 236:3 253:1 257:14 270:6 272:1 274:18 285:4

**KRS** 229:5

**KSP** 177:13 184:6,24,25 217:18 218:12 292:25

**KW** 216:22

**L**

**lab** 23:5 131:5, 11,19 138:1,9, 18,23 142:1 200:25 202:21 217:16 236:2 237:19 238:3 248:12 272:11

**label** 16:21 110:9 281:6,10

**labeled** 16:12 17:20 32:16 179:1 184:24 190:6 191:11

**laboratory** 131:20 141:20 145:3

**Labs** 141:21

**lack** 128:24

**ladder** 221:4

**laden** 210:25

**ladies** 46:15 117:18 132:3 243:16

**lady** 31:14 145:23 148:11 149:5 219:9

**lady's** 249:22

**laid** 89:24

**Lake** 171:15

**lamp** 95:1

**language** 12:13

**lap** 181:25

**large** 27:5 205:22

**laser** 185:24

**lathing** 186:11, 15

**latitude** 41:22

**law** 19:15 47:15 92:1 130:7 169:6 229:6

**laws** 171:23

**lay** 89:18 178:5

**layer** 10:24

**laying** 32:6 62:8 192:11

**layment** 12:14, 15

**layperson's** 211:14

**lead** 15:16 29:12,13,19 197:17

**leading** 225:1

**leaf** 160:22

**learn** 223:8

**learned** 94:13

**learning** 94:1

**leased** 170:22

**leash** 100:14, 24

**leave** 20:13 40:4 62:1 100:13 127:19 129:7 160:17 188:1 201:2 202:13 233:25

**leaves** 41:22

**leaving** 7:17 223:6 265:16 269:15 276:20 290:11

**lecture** 182:11

**led** 52:8 253:20

**left** 8:23 20:14 32:6 35:18 42:16 79:23,24 166:5,6,8 189:6,9 216:15 233:16,22 241:20 258:14 261:18 262:24 285:10

**leg** 198:19 201:2 236:4

**legitimate** 61:24

**legs** 198:14

**letters** 137:17

**letting** 100:6 110:3 137:17 165:12

**level** 55:12 145:2 164:9 211:24

**levels** 158:4 174:9 212:16

**Lewis** 8:7

**Lewisburg** 7:3,20

**Lexington** 6:1

**license** 170:2 215:25

**lids** 109:13

**lied** 292:2,4

**life** 15:9

**light** 14:20 88:7 211:21

**lighter** 27:25 29:2,16 30:15, 21 31:2,4 32:9, 10,13 53:2,8, 16,17,18,22 54:6 95:1

113:25 125:21 161:7 162:10 175:22 191:3 203:19,22 204:3 241:16 246:2 261:15, 16 263:25 267:11 269:7 270:21 271:24

**lightning** 15:13

**lights** 9:1 43:16 79:11,16, 18,25 80:2

**limine** 104:14

**limited** 69:12

**Linda** 149:11, 13 150:3

**Lindsay** 282:11,12 285:2 290:6 293:24 294:8, 21 295:21 297:18 298:2, 17 299:3,9,14

**Lindsay's** 293:23

**Lindsey** 194:10 269:12 271:12 274:4 297:11

**Lindsey's** 194:9

**linear** 183:3 207:13 265:14, 15 276:10

**lined** 70:1 77:19 108:1,5

**lines** 18:3

**lineup** 108:25 109:3,11

**lining** 239:12

**link** 14:13,21

**liquid** 47:13 101:19 115:14 119:2,8,14 159:22 160:4 162:12,15 175:18 184:17 214:9,18 234:9, 10,11,17,18 243:13 246:6, 12,13 251:13

**liquids** 50:23 94:25 95:17 115:7,8 118:11 121:6,8 125:20 126:12 164:3,4, 5,10 184:17 234:14 236:12 248:1 261:10

**liquor** 194:16, 17,23 278:3

**list** 49:6 116:25 117:1,3 252:22

**listed** 34:21

**listen** 247:11 250:4

**listening** 194:22,24 224:19 225:9

**lit** 261:17

**literally** 257:17

**litigation** 171:18

**live** 7:2,3 151:15,16,17, 23

**lived** 31:14

**lives** 18:12 151:18,24

**living** 9:15,24 10:4 12:20,22, 23 16:7 17:20 35:7,8,11,17, 21,23 50:5 66:5 75:4,10 76:14, 19,24 144:21 166:12 174:23 178:18 180:19 205:16 209:11 213:12,21 231:20,25 232:2,10,11,13, 16,17,20 233:3 235:5,7 236:19 238:23,24 265:12 275:23 286:11,12

**load** 13:18 37:16 38:8,10 59:23 61:21,23 62:1 63:22,23, 25 113:12,15 179:6 211:23 212:17,18 221:4 259:19, 20,21

**loaded** 11:9 13:3 14:3,4,7

**loads** 10:23 14:16 63:7

**local** 23:2 271:21

**localized** 215:6

**locally** 170:16

**locate** 17:9,15 73:20 99:12 112:10 160:25 220:14

**located** 13:19, 23 17:12,13 18:1 184:7 192:10

**locates** 95:21

**location** 14:1 24:22 37:18 107:10 177:8, 12 182:25 186:1,3 193:1 197:18 214:25 228:4

**locations** 8:20 21:23 76:18,19 78:10 133:3 137:18 158:8 159:8 162:18 204:15 214:22, 25 225:19 235:11 242:4 271:22

**log** 128:22 131:1 136:25 137:4 177:14 217:16

**Logan** 7:4 172:13 260:11 301:11 305:16

**logbook** 129:23

**logging** 137:1

**long** 4:15 13:11 52:17 63:24 75:23 81:7 152:2 156:12 161:19,23 165:3 167:23 195:16 212:22 214:1 226:21 268:10

**long's** 110:25

**longer** 49:10 114:16 210:22

**looked** 27:25 28:15 37:13 54:17 58:14 68:18 74:16 114:5 154:1 173:7 177:21 186:9 192:13 194:11 215:14 225:13,15 236:3 249:22

**loose** 100:14, 23

**Lord** 156:24 265:1

**lose** 66:2

**losing** 180:3 210:8

**loss** 15:9

**lost** 266:17

**lot** 11:7,8 12:10 47:1,10 48:22, 24 49:1 53:23 62:1,7,21 82:1 83:19,23 113:22 114:16 118:3,5 123:16 134:11 137:24 156:6 162:5 171:12 181:11 193:18,19 208:16 211:12 215:5 217:6 225:7 237:13 241:18 242:18 252:14 254:25

**lots** 117:21

**Louisville** 18:15 170:11

**low** 10:15,18, 20 270:23

**low-grade** 11:18

**lower** 12:7 145:2

**luckily** 236:23

**lucky** 93:24

**Lyons** 193:24 194:3 222:17, 21 249:12 270:5 278:2 290:4

M

**ma** 66:7

**machine** 193:25

**mad** 223:4

**made** 9:6,14 10:8 11:17,21 19:6,7,20,22 21:17,20 23:9 36:7 48:2,7 49:20 56:1 66:20 69:13,15 70:18 73:10 76:5 79:4 88:19 101:23 105:3 117:20,21 127:25 129:17 138:25 177:24 183:18 194:23 227:11 255:14 279:5 280:16 301:12 302:21 305:13 306:25

**magic** 101:22

**main** 92:13

**maintain** 23:8 43:3 185:4

**maintained** 20:14 46:7

**maintaining** 43:16

**maintains** 42:24

**major** 171:5,13

**make** 12:12 19:14 20:4 32:25 34:5 37:2,15,18 40:14,18 41:20 42:1 54:23 69:1 71:19 76:3 81:14 83:16 107:5,11 112:17 130:7 131:1 145:13 146:4 156:11 160:12 161:1 200:2 252:18 267:24 288:17

**make-up** 121:16

**makes** 81:17, 19 115:16 228:7 246:15

**makeup** 117:22 140:21

**making** 48:5 49:19 101:2,4 104:14 244:2

**MALE** 114:19, 22 139:25 148:19 149:1, 11 153:20 154:5,15,19 188:17,20 200:13

**malfunction** 273:22

**man** 18:23 112:10 255:14 259:9

**man's** 198:14

**mandates** 245:19

**manual** 134:14,16 135:2,9 138:18 161:21

**manufacture** 253:8

**manufactured** 34:12 49:11 64:14,15,18

**manufacturer** 49:7

**mar** 85:19

**March** 94:6

**marina** 171:11, 13,20

**marinas** 171:21

**mark** 32:4 36:15 74:4 101:25 102:4 110:8,9,21,22 135:25 136:8 163:20,21 187:20 188:3 207:2,20 209:21 218:23, 24 260:24,25 268:19

**marked** 13:25 18:2 22:7 31:20 32:7 34:25 35:18 36:2,7 38:6 50:3 85:15,18,21 107:18 109:12 135:22 180:8 187:18,22,23 188:2,6,7,9,22 189:11,14 203:9,12,13 209:8,19 260:18

**marker** 101:22

**marking** 101:14

**markings** 110:19

**marks** 69:6

**marshal** 4:14 5:3,7 7:9 18:19 39:2 47:15 122:21,22 217:9 228:9

**marshal's** 38:19 42:13 44:2 49:12 98:10 171:9 217:12 252:7

**Marshall** 170:18,20 172:16 174:14 176:1,3 185:13 203:19

**Marshall's** 173:5

**marshals** 4:16 5:15 230:3

**Mary** 189:25

**Maryland** 92:17

**Maskin's** 191:5 203:18 204:9

**Masking** 290:4 292:16 293:7,9 295:16 296:3, 10 298:15

**master** 16:11 173:11

**matches** 38:6 186:14

**material** 6:16 12:14,15 38:19, 21 45:24 46:11, 23 51:17 56:25 176:19 178:25 180:3 206:2,3 234:2 270:18

**materials** 4:20 6:18 11:17,20 47:9 49:6,21 51:15 103:4 135:15 176:20 252:22 253:7, 25 254:8 255:23 279:4

**matter** 59:21 72:25 123:12 156:12 161:19 172:14 228:6 237:20 301:8, 10

**matters** 60:22 95:5 300:8

**mattress** 198:22

**meandered** 100:24

**Meaning** 273:25

**means** 46:16, 18 59:24 82:19 91:18 92:23,24 93:17 142:7 150:1 263:12 272:8 289:24

**measurement** 178:6,19

**measures** 43:12

**mechanism** 241:22,24

**medical** 159:15 226:22

**medicine** 148:14,15

**meet** 23:5 39:5 41:25

**meeting** 152:11

**melt** 268:15

**melted** 38:11 178:12 183:7, 14 206:14

**melting** 178:12 233:11

**melts** 183:15

**member** 65:16 155:22 167:9 168:18,19 171:9 287:11 295:6 302:11 307:7

**members** 59:16 167:7 275:19 276:1, 18

**memories** 83:19,25

**memory** 94:9 111:20,24 124:1 195:6 235:19

**men** 111:21

**mental** 175:3

**mention** 157:21 186:4

**mentioned** 60:3 63:14 76:9,11 122:12 257:7 259:19 265:22 266:1 298:14

**mentioning** 209:12

**met** 8:17 40:17 92:24 93:20 115:2 192:15

**metal** 106:10 189:6

**metallic** 183:19

**method** 132:24

**methodology** 241:22

**methods** 140:14

**Mickey** 88:11

**microliters** 160:23 164:12, 15,18,20

**microphone** 91:9

**middle** 17:18 64:2 186:18

**migrating** 205:15

**migration** 232:5 271:9

**mile-an-hour** 64:20
**million** 158:5
**Mills** 189:16 190:9 306:9
**mind** 45:11 48:3 166:23 167:8 177:2 198:20 202:21 203:15 237:16 239:5 243:9 255:14 299:9
**mindset** 211:3
**mine** 229:5 249:20
**minimum** 169:18
**Minnie** 88:12 196:9
**minute** 32:24 36:4 37:8 53:2 54:19 56:16 83:4 134:17 143:3 150:12 181:2 194:20 196:15 201:12 218:16 219:4 237:8 249:15 261:6 274:3 301:24
**minutes** 67:22 126:5 240:5 242:17 283:25 285:19 287:20 288:1 299:10
**mis** 240:9
**mischaracterizing** 240:8
**misconduct** 141:15
**mislead** 87:2
**misnomer** 118:25
**misplaced** 250:21
**missed** 22:19 77:14,17 157:20
**missing** 26:15 53:22,23 186:14 245:14
**Mississippi** 6:11
**misstate** 283:4
**mist** 281:19
**mistake** 33:1
**mistaken** 185:10 259:14 273:19 292:5
**misunderstanding** 87:1
**misuse** 141:16
**mix** 161:9
**mixed** 164:7
**MO** 246:5
**mobile** 11:14, 16 48:17,25 49:6,8,21 79:12 80:2 172:17 174:2 176:10 246:5 252:23 255:23
**modality** 241:22
**model** 11:15 136:15 254:13
**modeling** 254:13,16
**models** 281:4
**modified** 254:8
**modus** 246:5
**molding** 75:7,8 77:1 102:12
**mom** 124:19 286:23
**moment** 113:21 120:1 188:10 202:4 206:13
**money** 148:16
**monitoring** 43:20
**monoxide** 212:4
**monthly** 96:2
**months** 83:14 156:8,13 161:16 162:2,5, 9 165:3 222:14, 15 226:15
**morning** 20:9 68:8,10,17 105:12 147:4, 20 148:2 154:10,22 172:16 177:21 187:12 193:15, 21,22 195:15
**mother** 191:19 236:23
**motion** 36:8 104:14
**motions** 153:5
**motive** 120:13
**mount** 183:18
**Mouse** 88:11, 12 196:9
**mouth** 58:7 305:10,25
**move** 36:8 101:14 109:17 110:6,18 136:6 160:19 166:4, 25 173:19 177:2,14 203:24 204:24 207:18 211:5 213:19 218:11 260:20 279:10
**moved** 215:18 231:19 232:2, 13,15,20
**movement** 210:2
**moving** 205:15,21
**multiple** 45:22, 23 204:15
**murder** 226:11 290:18,21,22 291:11

N

**N.y** 175:6
**nailed** 275:18 276:3
**nails** 275:19 276:6
**named** 61:5 72:18 121:6
**names** 223:8
**narrative** 44:22 45:15 230:18 231:19 250:8
**national** 5:11, 15 82:20 92:17 93:4,5,6,8,12, 13 96:13,18 168:20 169:19 170:5,12
**nationwide** 93:23
**natural** 12:16 40:5,6
**naturally** 12:25 15:8
**nature** 7:10 15:14 37:3 42:6 43:22 46:22 95:3 97:2 103:5 122:24 124:10 131:1 144:10 152:23 212:19 216:9 227:12
**ne** 67:20
**necessarily** 211:13
**needed** 18:6 19:14 90:22 97:8 148:11 176:7 178:7 228:7
**negative** 74:13 75:25 119:18 129:5 131:5 133:5 136:23 139:1 236:11 238:3 247:16 248:13
**neighbor** 28:4, 20,21,25 29:3,9
**neighbor's** 29:5 124:7
**neighbors** 27:17
**neutral** 87:22
**newspapers** 62:2 241:14
**NFPA** 171:20
**night** 18:23 20:11 54:9,13 124:9 154:14 161:22 174:14 179:8 228:21 243:2 269:17, 20
**nine-volt** 191:14
**Nobody's** 266:25
**non-aerosol** 281:20
**non-partisan** 106:22
**non-treated** 64:17
**normal** 51:7 64:24 88:1 216:23 252:22
**north** 6:7 14:16 34:14 173:11 205:9 242:22
**nose** 74:3 95:25 101:2,11 114:19,20 165:22
**note** 148:13,25 149:4,8 173:25 213:20 216:20

**noted** 34:9 37:12 177:12 184:24 209:14 216:20 217:4 221:8 247:6

**notes** 74:8,10 175:3 181:7,22 194:20

**notice** 25:17 38:3 45:14 91:16 95:4 108:11 144:6, 10,11 180:22 195:23 201:4 204:13 207:11 209:1 210:3

**noticeable** 45:3,4,10

**noticed** 75:19, 20 113:17 114:2 144:14 174:25 175:5,7 200:17

**notifying** 18:18

**notion** 229:16 230:1,4

**November** 191:18

**number** 32:1 37:11 80:19 89:4 92:3 107:18,21 136:1 142:11 143:6,8 170:2,5 184:21 186:22 188:1,4,7,17, 21,22,23 189:11,14 190:5,6,14 191:1,12 195:24 203:15, 17 204:5,17 206:9 207:7 209:20 211:22 214:25 221:3,5 241:1 251:23 260:16 272:8 299:9

**numbered** 110:22 167:1 187:23 204:24 207:3,18 211:6 218:24 260:18, 20

**numerous** 92:19

**O**

**oak** 143:25

**oat** 143:9

**oath** 155:6 289:3,4 301:1

**object** 27:19 84:19 85:5 191:22 196:11 198:24 199:24 225:1 229:18 244:1 277:20 278:12 279:2 282:25 284:12 286:25

**objection** 28:18 141:25 142:9 143:5 196:18 199:1 218:21 226:3 244:6 260:23 277:21 278:13 279:8

**objections** 156:14

**objects** 212:1

**observation** 26:23 141:11 306:2

**observations** 130:1 268:9

**observe** 7:23 19:5 21:6 29:4 98:25

**observed** 8:15 12:22 15:2 16:3,4 25:10 29:2 126:6 162:19

**obstacle** 213:16

**obtain** 49:6,8

**obtained** 283:14

**obvious** 231:19 232:12

**occasion** 138:9,11 279:12

**occasionally** 107:8 152:14

**occur** 50:24

**occurred** 150:21,25 211:17 236:25 254:10 255:5 276:13 283:20

**October** 235:16 237:11 239:8 302:4

**odor** 14:24,25 15:4 44:22,25 45:1,4,7,10,12, 13 94:13 140:14

**odors** 119:18

**offer** 227:7

**offered** 227:8, 17,18

**offering** 200:1 227:22

**office** 4:13,20 20:2 38:19 42:13 44:2 49:13 72:22 98:10 111:9 129:9 147:2 149:15 150:1 171:9,19 217:12

**officer** 27:16 78:2 91:24 115:2 168:24 169:6 189:16 190:9 273:11 294:2 296:5 301:24 306:9, 11

**officers** 8:24 124:20 128:15 214:2 224:12 290:10 295:19 296:12 297:1

**official** 6:15

**officials** 192:19 231:22

**offset** 31:18 34:15

**oils** 95:1

**Oklahoma** 168:25

**on-the-job** 39:4

**one's** 55:20,25

**open** 42:6 199:14 202:9 208:20 271:6

**opening** 183:13 208:23

**operate** 55:19

**opinion** 56:11 59:7 61:15 66:14 84:20 123:8 185:25 196:8 197:2 199:20 200:2 213:4,25 214:11,14 221:16 236:19 238:8,18,20 239:5,6,7 240:4 242:2 245:12 256:25 263:15

**opportunity** 32:20 85:3 242:3 252:3

**opposed** 41:25 51:6 118:19 132:16

**Orange** 4:9 28:7,16 29:21, 23 32:3,5 34:3, 23 36:2,6,17 38:12 40:11 47:3 56:16,18 57:5 59:15 65:20 67:7,17 68:4 69:20,24 70:1,3,8,11 71:11,21,25 72:9,11 77:24 82:13,15,22 85:19 86:3 88:5,25 89:4,13 90:16 91:5,8 105:9 110:6,18 114:18,21,23 126:2 133:13 134:13 135:13 139:18,20 142:6,10 143:18,22 146:19 147:12 149:5,14,22 150:18 151:3 152:10 154:12, 23 155:3,10 157:3,7,10 158:3,12 163:3, 5,18 164:22 166:22,25 167:6,11,18 172:3 173:19, 22 179:2 181:20 182:18 187:16,21 188:21 189:1 197:8 198:9,11 199:5,12 200:9 201:21,23 202:3 203:3 204:24 205:5 207:2,4,18,22, 25 209:19,25 211:5,10 218:5, 11,16 219:3 220:2,10,12,13 225:4,9 226:8, 24 227:6 229:18,20 240:7 244:1,5, 7,10 260:7,16 261:6,8,25 263:5,23 265:5, 7,21 266:5 269:4,23 277:9, 12,22 278:23 279:4,11,19,24 280:3,23 281:1, 4,6,9,24 282:25 284:12 286:20 287:9,14,15

288:10,17,25 289:7 291:14 295:5,13 298:12,24 299:7,12 300:1, 12,17 301:6 302:9,20 304:13 305:2,4 307:6,12

**Orange's** 150:17

**order** 60:16,17 61:8,9 68:10 71:4 88:18 96:6 157:11 160:6 164:6 258:7

**ordered** 60:23

**orders** 68:14

**ordinary** 125:22

**organized** 96:20 97:3 228:1

**origin** 15:17 39:22,23 45:22 47:21 54:21 56:9 87:23 172:1 176:10 212:2 214:13 229:3,4,10,11, 14 234:23 235:10,22,24 236:16 237:10, 23 238:14 239:2,3 245:10 255:21 256:7

**original** 54:22 203:5 251:25 256:22

**originally** 8:19 11:18 46:3 58:10

**originals** 218:17

**origins** 211:3 251:23

**ounces** 245:6

**outer** 215:19

**outlet** 179:25 208:25 209:2

**outline** 135:10 199:22 207:16

**outlining** 198:21

**outstretched** 34:8

**oven** 215:15, 16,20 216:22

**overhaul** 7:25 43:16,19 103:2 208:7 213:25

**overhauled** 174:12,18 256:6

**overhauling** 8:6

**overhead-** 221:1

**overnight** 147:12

**overrule** 28:17 200:3

**Overruled** 229:23 244:4 284:14

**oversee** 6:25

**overseeing** 6:6

**owned** 135:15 170:22

**owner** 156:10

**ownership** 253:20

**oxygen** 12:25 179:12 212:11, 22 239:17 241:3 277:5

P

**P.J.** 68:7

**p.m.** 154:25 240:16,17,19 258:10 282:22 286:15

**pa** 58:22

**pace** 12:13,15

**package** 252:1

**padding** 186:7 272:22,23

**Paducah** 6:8

**paint** 23:2,3 95:1 106:10 156:11 161:16

**painted** 156:8 161:16

**pair** 63:10

**pan** 57:14,16, 21,24,25 58:1, 2,9,12,14,18,22 59:4 233:17,23 234:1

**panel** 221:4,25

**paneling** 11:13 12:1,4 13:6 60:8 64:9,16, 19,20 175:7 208:14,18 232:3 253:10, 11

**paperwork** 185:6,7

**parallel** 102:9

**paranoid** 219:14

**Pardon** 218:1

**parking** 162:5

**part** 26:9 36:3 47:25 49:5 62:23 70:20 71:5 76:1 84:21 97:7 114:10 115:15 124:22 125:3 129:17 132:10 159:4 162:22,24 171:6 172:12 174:10 197:24 201:18 210:6 227:20 230:1,2 251:1 253:3 259:16 273:8 275:22 289:23 291:9 298:3

**participated** 24:8

**particulars** 7:20

**parts** 158:5 296:18

**pass** 82:20 139:15 160:6, 12 169:22 291:14

**passed** 170:13

**passes** 107:6, 11

**past** 14:14,15 22:13 39:17 109:14,20 212:20 224:13

**pat** 109:25

**pattern** 25:14, 15 64:2 66:6,7 113:7,10 114:4 175:8 179:17 184:9,11 185:23 198:21 206:20 207:11 243:5,12,13 253:6 265:15 276:10

**patterns** 13:22 25:17,21 38:2 50:3 113:1 125:7 178:12 210:3 216:11 234:8 250:17, 25 251:12,17, 18 252:4 256:21

**pay** 144:5 154:5 177:6

**paying** 165:22

**PD** 257:22

**peace** 168:23

**pen** 98:7

**penalties** 4:3 72:5 91:1 300:20

**penetrates** 38:4

**people** 4:21 15:3 20:25 62:1 96:22,24 113:19 128:13 174:16 185:1 220:23 222:25 223:3,10 225:14 236:20 258:9 283:9,13 284:23 285:22, 23 291:22,24 294:20 298:5

**pepper** 305:9, 25 306:1,21

**perceivably** 243:10

**percent** 160:13 226:18

**percentage** 278:11

**performance** 136:15 137:21 138:25

**performed** 204:22

**performing** 137:22

**performs** 137:1,5

**period** 50:11, 22 64:24 94:14 195:12 239:22, 25 240:18,20, 24

**perished** 172:18 226:16

**perjury** 4:4 72:5 91:1 300:21

**permanent** 204:7

**permission** 127:10

**perpetrator** 292:11

**person** 219:15 223:15 252:11 280:5 287:18 290:9 297:4

**person's** 31:8 55:11,15 56:6

**personal** 27:6

**personally** 22:1 150:20 277:16

**personnel** 128:17

**pertained** 49:2

**pertaining** 169:23

**pet** 159:23

**petroleum** 241:17

**petting** 74:5

**phone** 18:10 78:7 293:18,19 295:14

**phonetic** 7:9 12:13,14 16:9 18:19 49:13 51:4 148:8 149:12 191:19 234:15

**photo** 57:12

**photograph** 37:23 38:1 80:21 185:19 186:8 203:18 205:10 275:21

**photographed** 232:4

**photographer** 96:25

**photographin g** 173:15 174:17

**photographs** 23:16 50:6 73:6 74:17 80:9,10, 14,18,23 83:18 85:5 111:22,24 112:2 173:16 177:5 182:4,20 187:6,9 188:2 251:24

**photos** 54:14, 16 57:12 82:5,9 133:24

**phrase** 95:24

**physical** 224:2 225:15 265:1 274:19 289:25

**physicals** 159:16

**pick** 76:6 80:19 99:23 145:14 146:1,3,7 148:14 160:25

**picked** 93:24 145:13,24 148:12 245:5

**picking** 95:16

**picture** 30:11, 12,14,17,19,23, 24 31:3 70:4 81:5 109:6,20, 22 110:1 178:14 182:11, 13,23 185:11 190:2 199:6,7 203:22 205:8 207:12 208:2 209:18 220:14, 18,21

**pictures** 32:20, 24 33:1,6,9,17 36:6 37:7,10 68:18 69:14 71:22 83:24 108:21 109:2, 10 173:7 188:6, 8 195:23,25 196:4,13,20 197:3 201:5,7,9 203:8 206:6 209:7 213:20

**piece** 26:11,13, 24 27:2,3,5,7,8 51:13 63:10 160:2,3 175:19 177:23 183:9 185:6,14 186:23 204:7

**pier** 171:15

**pile** 62:5 76:10, 16,17 102:24 103:1

**piled** 208:7

**pilot** 135:8

**pine** 143:9,25 144:17,18,19, 23

**pinpoint** 74:3 95:25 101:12 159:25

**pipeline** 6:20

**PJ** 72:18,23 75:21 78:10 79:4,17 80:15 81:20 94:22,23, 25 95:4,5,11 96:2 97:23 98:2 101:23 109:22 116:11 117:15 119:17 120:13 121:5 124:16 128:25 130:14, 20 133:19 141:10,12,16 157:3,7,17 158:18,23 160:15 163:6, 10,13 165:2,15 176:13 251:14 252:5 266:3,6, 7,10 273:11

**PJ's** 115:3 133:15 136:15 139:6 156:17

**pla** 26:17

**place** 10:17 66:4 67:24 68:15 70:23 85:12 88:14 100:12 141:12 160:11 166:15 184:9 200:22 201:7 206:7 216:17,18 265:14 276:9 289:17

**places** 12:7 79:17 80:5 82:24 83:7 92:19 243:13

**plan** 243:9

**plank** 31:19

**planned** 243:5, 12

**planning** 254:16

**plant** 299:8

**plastic** 11:2 216:13 279:20 280:2,12,16,18

**plate** 144:23 207:14

**play** 264:23

**playing** 165:16,20

**pleases** 100:14

**plex** 34:12

**plume** 213:13

**plural** 28:20

**pocket** 28:5,14 29:17

**podium** 303:10

**point** 7:16 9:12 10:13 11:11 13:3 14:18 15:4 17:6 18:5,16 19:13,21 21:7,8 23:12 27:10 32:15 45:22 46:3 51:14 55:2 63:25 65:2 67:19 84:24 88:24 127:8,22 155:16,18 176:4,7,11,14 180:4 181:14 182:4 185:25 186:20 193:7 198:3,13 204:13 205:12 206:8,20 210:14,22 212:2,5 221:20 223:8 224:1 235:3 250:11 257:15 296:12 297:5,9 304:3

**pointed** 13:7 69:3 232:2 234:25 236:1

**pointer** 25:9

**pointing** 30:15,20 181:10 182:20 203:19 204:4

**points** 14:19 65:3 68:24 76:8 85:17 86:7 99:12 176:10 234:23 235:10, 21,23,24 236:16 237:5, 10,23 238:14 239:2,3 250:5 251:25

**pole** 221:7,8

**police** 8:23 23:6 27:16 91:24 124:19 128:14,17 167:22,24 168:2 171:5 176:22 189:17 190:13 192:16 195:21 203:21 217:13 218:8 249:24 257:23 290:10 293:21 294:2,19 297:1

**policy** 245:19 306:22

**pontificating** 182:14

**pop** 62:19

**pops** 62:22

**porch** 77:18 107:25 108:7

**port** 301:10 302:23 305:15

**portion** 42:11 44:22 46:9
**pose** 42:5
**position** 43:2 73:21,24 95:22 109:25 115:10
**positions** 118:18
**positive** 74:13 75:25 82:10 108:18 109:16 129:5 136:23 138:6 236:9 261:23
**possession** 24:6,7 189:23 190:7,10,22 191:1,17
**possibility** 216:8 292:9 296:23
**possibly** 172:4 246:2 296:23 297:7 298:15
**post** 168:6 217:17
**pot** 233:10
**potential** 15:9 285:6
**poured** 114:15
**pouring** 59:2 98:15 123:1
**Powell** 194:10 274:6 275:7,10 282:12 285:2 286:22 290:5 292:17,22,24 298:1
**powerful** 241:16
**practical** 8:4 143:23 171:1
**practice** 257:5
**praise** 74:5
**preconceived** 229:16,20,21 230:1,4
**preheated** 62:21
**prejudicial** 201:16
**preliminary** 235:15 250:19, 21 251:6,15
**premises** 124:15 245:19
**prepared** 248:17 249:17
**prescription** 145:13,24 146:1 148:12
**presence** 107:19 119:17 125:20 126:12 145:2
**present** 103:16 162:1 165:23 166:17 193:4 248:20 260:4 273:10 295:21 297:12,18
**presented** 165:24 300:9
**presenting** 165:21
**preservation** 43:11 191:9,10
**preserve** 127:8
**pressed** 275:13
**presumed** 270:20
**pretty** 9:7 12:17 14:17 41:5 97:2 101:9 112:5 169:23 170:22 171:19 172:25 174:3 185:21 192:22 193:13,20,22 195:14 204:6 206:14 208:14 210:24 211:19 212:24 224:7, 20 253:19 261:14 284:11
**previous** 54:21 105:2,3 133:14 181:7
**previously** 32:20 79:2 122:20,21 235:9 301:8,14
**primarily** 231:24 254:22
**primary** 38:21 168:8,12 228:1 269:1 282:6
**principal** 42:12
**prior** 9:6 39:15 42:20 43:14 64:17 103:6,22 105:6 128:1,5, 17 162:3,5 170:13 240:5 245:2 294:15, 19
**problem** 11:11 22:12 33:10 120:4 149:17 158:20 182:8 195:18 263:19, 20,23 281:14 305:11
**problems** 265:18
**procedure** 22:23 88:3 105:24 204:14
**procedures** 128:16
**proceed** 9:2 91:6 181:20 182:16 205:6 207:5 208:1 210:1,16 220:11 228:6 289:5
**proceeding** 181:21
**proceedings** 223:12 300:2
**process** 7:25 8:5 41:23 42:2, 9 54:25 95:10 184:19 215:9 259:25 265:3 273:9 274:21, 23
**processed** 115:18
**produce** 38:8 159:14
**produced** 44:2
**product** 74:2,4 77:15,17 94:15 95:25 101:12 117:20 121:16 144:24,25 164:8 175:16, 19 177:11,23, 25 183:16,19 206:23 210:8,9 214:8 215:2,3 234:2 236:6 239:15 241:18 242:20,22 245:16,17,23 246:16 270:17 274:15
**products** 10:25 96:21 116:22 175:23
**professional** 5:8 36:19,24,25 141:5 185:25 196:8 213:23 214:11,14 221:16 237:12 245:12
**professionals** 141:4
**professor** 182:10
**program** 5:17 135:7 140:7,9
**progressed** 224:8
**project** 135:8
**promise** 288:17
**proof** 145:7 278:19 280:4
**proofs** 278:16
**propellant** 274:13,15
**proper** 160:12 185:5 258:8
**properly** 140:23 141:7 170:3 221:16
**properties** 170:22
**property** 124:15 174:16, 25 192:3,5 245:18
**propose** 281:9
**prosecution** 146:20 148:22
**protected** 179:21
**protection** 52:5,7 99:21
**prove** 28:13 298:3
**proven** 55:11
**provide** 298:18
**provided** 134:13 135:14, 17
**providing** 212:11
**pull** 12:10 21:20 110:4
**pulled** 21:24, 25 22:2,6,7 200:17
**pulling** 22:4 64:3 249:12
**purchase** 270:5
**purchased** 264:16 267:15

274:17 278:20

**pure** 23:7,22

**purpose** 20:16 24:3 39:19 81:8 87:2 90:1 99:10,17 101:16 112:7, 12,14

**purposes** 8:4 35:1 99:6 260:18

**pursued** 170:9

**pushed** 103:3

**put** 8:14 11:24 21:14 23:24 26:18 32:25 39:5 50:15 51:8,17 52:1,4, 15 58:7 69:23 79:24 80:2,3 89:16 95:19 100:23 107:1 113:19 130:4 150:18 156:14, 24 159:12,19 160:2,4,10,22 162:4 163:18 165:10,21 166:15 180:7 182:5 203:4,7 218:12,20 224:12 239:6 240:25 261:15 262:11,22 278:5 290:8

**putting** 40:12 48:21 112:14 197:22

**pyrolysis** 132:3,4,5,10, 13,16 142:16, 17,18 184:14

## Q

**qualified** 52:25 170:1 200:2

**qualify** 143:10

**quantitative** 211:24

**quantity** 245:7

**quarterly** 129:2

**question** 12:18,20 24:24 39:16 44:13 53:1 54:21 59:17,22 61:9 62:10,24 64:5 65:19,23 66:16 71:16 84:15 98:21 120:23 125:19 143:6 146:25 155:23 157:17,18 158:3 159:5 169:23 195:13 217:4 222:25 226:4,7 228:23 232:23 236:5 237:5,8,24 238:1 239:4 241:23 244:2, 12 246:18 247:10,11 251:11 252:3 255:18 256:22 263:11 264:3,8, 21 266:13 267:14,17 269:2,9 270:13 272:2 274:3,24 275:3,15 276:2, 8,25 282:5,6,20 284:4,13 286:13 287:8 293:11 295:7, 19 296:4,6,16 297:11,17,23 298:7 299:1,6,7 300:5,7,10 301:23 302:7, 20 303:9 304:24 305:23 306:20,24

**questionable** 35:12

**questioned** 126:2

**questioning** 225:5

**questions** 57:5 59:15,17 65:12,15 67:7,8 77:24 82:22 114:23 129:6,8 142:11 147:22 155:18,21 156:1,5 157:22 158:22 163:1 164:22,25 167:6,7,9 233:21 261:4, 25 263:5,7 265:18 270:3 277:7 280:5 281:24 287:9, 10 291:14 295:2,5,6,24 298:10,22,25 300:11 301:19 302:7,9,11,25 303:3 304:13, 14,15 305:5,20 306:5 307:4,7

**quick** 65:17

**quicker** 62:7

**quickly** 148:8

**quiet** 150:24

**quit** 35:22 154:13

**quote** 304:21

## R

**radiant** 199:23 213:7 236:22

**rafter** 276:1

**rain** 54:9 123:1

**rained** 54:12

**raining** 54:16 98:15 127:25

**raise** 4:2 72:3 90:25 153:22 300:19

**raised** 26:12 48:25

**raises** 213:14

**rampant** 212:24

**ran** 87:3 102:9 216:14

**random** 164:6

**range** 233:8

**rapid** 183:17

**rapidly** 62:3 208:14

**rash** 93:18

**ration** 96:6

**rays** 64:25

**re-** 204:15

**re-certified** 137:14 158:23

**re-read** 68:9

**reach** 176:6 212:5

**reached** 153:4

**reaction** 211:20,21 243:7

**read** 61:9 142:2 193:7 194:20 277:17 303:21 304:17

**reading** 16:22 168:18

**ready** 68:8 72:9 90:24 100:8,10 124:16 185:17 208:1 219:25 220:12 288:6,7

**real** 11:11 48:21 64:21 94:10 160:8 217:21

**realize** 125:6 289:8

**realized** 62:17

**rear** 34:8,22 76:2

**reason** 10:17, 22 13:4 29:25 52:13 63:21 77:14 78:24 84:21 104:25 105:2 121:7 123:13 133:1 161:24 183:17 186:25 196:4 199:19 205:11 223:1 227:10 235:25 244:14 260:13 265:16 275:9 276:19 277:23 282:7

**reasons** 48:24 99:19

**recalibrated** 77:4

**recall** 21:2 31:7,8 53:20 54:10 57:13 72:20 74:7,17 77:7 78:2,10,11 80:15 83:9,15 98:7,13 105:3, 16 107:20 111:7,11 113:20 122:2,4, 5,7,9 125:1 133:13,18 158:23 172:9, 20 231:13 235:19 240:13 251:6,7,9 283:4 300:18

**recalled** 249:14 289:1

**receive** 7:7 94:18 169:4 185:18 189:15, 22

**received** 7:8, 14 135:3 140:6 163:13 232:24

**recent** 62:15 169:2 258:10

**recently** 51:8

**recert** 163:11

**recertification** 137:20

**recertified** 95:11 158:18 163:7

**recertifies** 159:5,7

**reciprocating** 24:12

**recitation** 287:2

**recite** 288:18 302:13,15

**recognize** 94:13 108:22 115:3,6 119:19, 21 259:6

**recognizes** 94:15

**recollection** 82:5,6 89:19 104:7 250:1 282:19 292:5 302:2 303:13, 16

**recollections** 83:17

**recommended** 52:5

**reconsider** 198:8

**reconstruction** 14:21

**reconvene** 147:20

**record** 67:18 71:7 78:14,16 84:22,23 89:23 90:9,11,14,20 120:7 129:21 130:2,7,19 132:21,22 133:19 137:9, 10 138:5,12,14, 16,19 148:25 149:20 150:18 207:7 218:14 219:21,22 220:7 261:7 288:2,4,22 299:21

**RECORDING** 307:16

**records** 130:22 137:15, 21

**recovered** 75:14

**Recross** 57:9 164:23 262:1,3 303:1

**red** 31:19 52:1 306:2

**redirect** 56:15, 17 82:14 139:17,19 155:11 260:5,6 263:4 286:18 295:4

**reduces** 52:2

**redundant** 268:20,21

**refer** 37:10 40:25 45:21 105:1,2 135:19 140:1 177:4 201:16 203:15 218:6 234:8 239:11 251:12

**reference** 171:23 172:17 289:22 290:22, 23

**referred** 34:20 43:21 44:21,23 57:15 66:4,6, 10,16 126:1 137:10 139:22 233:8 248:16

**referring** 13:9 118:22 156:22 165:7 270:8 272:10 282:11, 12

**refresh** 111:20, 24 123:25 303:16

**refreshed** 89:19 235:18 303:13

**regard** 302:3

**register** 76:21

**registered** 170:3

**registration** 170:2,5

**regular** 92:7

**rehabilitate** 85:3

**reiterate** 153:21 154:8

**relate** 199:21 204:7 239:12

**related** 50:5 233:23,25 234:6

**relates** 255:20, 21

**relationship** 151:4 152:13 193:19 224:6

**released** 167:14

**relevance** 142:8

**relevancy** 279:2

**relevant** 278:18 279:1,3

**reliable** 84:20

**relinquished** 176:21 189:16 217:14

**reloaded** 23:14

**rely** 78:18 135:16

**relying** 82:4 84:23

**remain** 20:13 67:23,24

**remained** 79:22

**remeasurement** 27:1

**remember** 54:12 67:22 68:20 70:24 74:23 79:17 80:20 84:22 89:17 98:16,18, 21 104:17,18 111:12 112:5 121:25 124:2 125:23 134:4 142:15 147:21 149:3 158:17 173:5 177:15, 19 180:18 183:10 186:9 192:21 194:23 195:3,4,7,8,21 205:16 219:6 224:18,21,22, 25 225:8 227:16 231:6 234:23 235:15 248:25 249:11 251:9 262:8,25 271:7 274:8 276:21,22 283:6 286:9 287:20 304:8

**remembered** 123:22 193:14, 23,25 249:10, 11,13 286:10, 12 304:4

**remembering** 195:18

**remembers** 69:11 70:7 71:3,16 85:10 89:17

**remind** 154:7 155:6 289:4

**remiss** 150:15

**remnants** 17:10

**removal** 14:20

**removed** 8:21 88:14

**repair** 66:21

**Repeat** 255:18 304:20

**repellant** 264:14,16,19 274:11,17

**repetitive** 94:10

**rephrase** 239:7 259:5

**replaced** 66:22 106:7 156:10

**replicate** 254:12

**report** 4:24 5:5 34:9 42:15 43:25 44:1,2,5, 6,19,21,22 45:14,21,25 46:5,7,8 74:11 142:1 221:9 232:12 239:21 246:4 247:6 252:8 304:7

**reports** 44:15 141:20,22 232:8,9 250:12 268:10

**represented** 273:1

**reproduction** 211:19 241:3

**request** 135:13 159:12 226:3

**requested** 258:8

**requests** 129:3

**require** 47:11

**required** 136:16 169:10, 11

**requirement** 48:4

**requirements** 39:2

**requires** 47:24

**reserve** 153:7

**residence**

23:1 31:15,16 45:17 191:5 194:14 203:18 204:9 227:24 240:22

**residential** 170:15 216:23

**residue** 52:17 261:18

**resistance** 208:23 213:16 254:7

**resistances** 50:17

**resources** 133:22

**respond** 140:13 161:24

**responders** 283:15 284:25

**response** 5:11 40:11 93:13 96:13,18 125:23 136:23 138:1 145:6,18 160:25 251:14 282:6 295:18

**responses** 224:9

**responsibilities** 4:18 6:2,13, 17,25 168:1,12

**responsibility** 141:3 168:9 172:12 258:7, 12

**responsible** 6:3,6,20 96:1,3

**responsibly** 141:13

**rest** 13:6 14:10 61:20 75:24 76:1 183:17 254:2 275:15

**restate** 56:1 244:12 262:12 302:19

**result** 33:5 51:5 77:20 112:2 192:5 211:21 225:17, 21

**results** 108:12, 16 133:6 138:6 222:12 236:2 238:6 247:17

**resume** 219:25

**retain** 245:20

**retained** 174:14 218:10

**retardant** 253:15,16

**retrieval** 27:11

**retrieve** 236:23

**returned** 49:2

**revealed** 271:19 285:22

**revenge** 243:6

**review** 77:12, 20 150:12 169:19,20,25

**reviewed** 73:6 74:16 80:10,14 84:17 85:4 133:24

**reviewing** 80:22 149:19

**revisit** 54:20

**revisited** 79:6

**revisiting** 83:18

**reward** 73:25 95:22 96:14 110:2 159:24

**rewarded** 94:14,17 96:5 159:22

**Rider** 234:15

**rights** 193:7

**rise** 67:24 148:1 219:7 220:4 287:21

**rising** 212:5 213:13

**River** 6:11

**road** 226:22 300:25

**Robert** 193:3 195:1,11 222:17 223:18 224:16 248:16 249:6,8,21 267:15 270:5 285:24,25 286:14 289:18 291:12 293:2,7 295:23 297:15, 22 298:14 299:4 301:12, 17 302:3,22 305:7,22

**Robert's** 304:21

**Robins** 191:19

**rock** 62:17

**role** 47:15,16 92:13 100:13 126:21 228:1

**roll** 186:3 210:12 213:18

**rolled** 13:2,12, 13 186:1

**rolling** 10:10

**rollover** 65:8,9 206:17 208:17 211:15 213:9 238:23

**room** 9:15,24 10:4 11:8 12:4, 20,23 14:3,7 16:7,21,25 17:4,5,18,20,24 18:1 25:1,12 35:8,11,17 50:5 60:6 63:21 64:3,7 67:18 69:8 74:25 75:4,10,14,19 76:14,19,24 102:15 127:11 144:21 166:1, 13 173:11 174:23 178:18, 22 180:20 185:24 186:5,9 200:8 205:16 206:11 207:9 208:8,15,16 209:11 211:25 212:12 213:8, 11,12,21 231:20,25 232:2,10,11,13, 14,16,18,20,21 233:3 235:5,7 236:19 238:24, 25 242:20 255:1,2,3 265:12 266:22 272:7 275:23 286:11,12

**rooms** 60:11 174:3,7

**Round** 166:7

**Royal** 93:25 94:4

**rubbish** 103:3

**Rucker** 49:13

**rude** 126:17

**rug** 37:24

**rule** 84:16 85:13 170:16

**ruled** 70:22 85:1,7 242:12 247:23

**ruling** 70:18

**run** 14:23 33:10 61:25 73:18 76:23 77:16 102:8 107:4,10 108:2 109:13 126:4,11,20 148:8 159:16, 20 160:24 206:25

**running** 102:6 112:15 183:25 194:6 212:24 284:7

**runs** 109:19

**Russellville** 7:12,18,21 73:1 97:24 98:13 105:11 111:2 122:10 133:15 151:24 172:19 176:22 189:17 190:13 192:16 195:21 203:21 217:13 257:22 260:11

## S

**S32** 179:1

**safety** 49:2,3 99:5,19

**sally** 301:10 302:23 305:15

**sample** 13:25 22:9,10,11,16 24:16,17,20,21 26:7 70:14,15 74:4 77:19,23 81:11 86:16,23 87:1,2,5,6,10, 20 88:20,21 89:3 90:2 95:19 100:5 106:3,17, 20 107:7,10,12, 13 109:19 110:15 185:16, 18 186:21 187:2 272:11, 16,19

**sample's** 95:23

**sampled** 187:7

**samples** 21:21,24,25 22:7,24,25 23:10,17,18 24:5,7,9,13 25:1,4 26:19 60:17 77:9,11, 13,23 81:6 95:21 103:16 105:10,14,24 106:8 107:24 108:5,25 112:6,

15,18 131:4 189:3 192:14 236:7,13 261:23 268:19, 23 269:19 271:16

**sampling** 23:19

**Saratosa** 169:25

**sat** 19:9 109:20

**saturate** 52:13

**saturation** 50:22

**Saturday** 7:6 193:14 249:11

**sawed** 24:15

**saws** 231:16

**scale** 174:1

**scared** 301:18 302:24 304:6

**scenario** 242:5

**scene** 7:19 8:24 10:1,8,12 17:9 20:7,10,14 21:11 23:25 25:25 33:3 36:19 39:20 42:14,19,23 43:1,3,12,13,16 68:17 69:12 73:4,7,16 74:13,14,16,20 79:7,9 81:1 82:10 83:19 85:5 90:18 92:18 96:24 98:1,23,24 105:11 111:1, 23 112:1,3,22 121:20 123:17 124:15 126:1, 22,23 127:8,18, 24 128:5 129:4, 5,7 130:25 134:2 138:4 141:10 142:24 158:19,24 160:17,20 161:23 162:20 165:7 172:23, 25 173:12,24 174:11,14 175:4 176:4,24 177:16 187:12 192:13,22 204:16 211:4 214:15 215:4 217:15 223:6 224:14 225:13 228:4,21 230:19,20 231:18 234:10, 12 245:15 247:8 248:3 256:6 258:15 261:10 262:15 268:2 283:15 284:19 289:18 290:11,12 293:3 294:19

**scenes** 81:19, 23,25 82:1 83:23 93:18 133:2 134:6,8, 11 228:11,12 254:25

**schematic** 9:20 173:24

**school** 5:24 152:6

**scientific** 117:22

**scientist** 96:21 117:23

**Scoot** 91:9

**score** 132:25 169:22

**scoring** 132:23

**scoring's** 132:24

**Scott** 20:1 72:15 91:11,14

**screwed** 275:20

**screws** 276:6

**search** 192:2 267:20

**seat** 4:7 72:8 155:8 167:16 181:3 200:16

**seated** 36:1 90:13,24 148:6 220:6 288:21

**section** 4:20 38:19 45:20 49:12 275:21

**secured** 20:10

**seeks** 12:25

**segment** 132:9

**self-inspection** 99:5

**semi-u** 25:15

**seminars** 5:12, 13

**send** 6:22 74:12 129:2,20 137:10,17

**senior** 6:15 39:6

**sense** 133:6

**sensitivity** 140:14

**sentence** 249:6

**separate** 10:15 19:18 37:4 43:7 137:4

**separated** 207:1

**separation** 84:16

**September** 5:4 7:6 33:5 39:21 53:14 81:21,22 97:24 111:3 121:22 134:9 172:13,16 195:1 238:5 248:18 260:8 305:17

**sequence** 33:7

**sequences** 94:10

**sequential** 241:6

**sergeant** 192:23 218:10 257:19,21,23, 25 274:10 275:6 283:11

**series** 37:24 159:17

**service** 173:8 174:4,5 214:16 220:16,21,23 221:1,6,15,19, 20,24

**session** 96:6

**set** 9:1 23:24 33:21 34:15 37:6 40:17 41:24 43:17 46:7,18,22 47:12,24 48:1, 4,9,12 56:2,3,4 73:21,24 79:11, 13 93:18 95:22 97:2 107:4 109:12,24 128:16 137:23 140:1 155:24 176:9 197:25 214:17,19,21 222:8,15,17,21, 22 223:1,2,5, 16,24 225:18 228:13,21 237:3 242:4 246:5 251:2 255:4,11,12,15 261:21 265:2 274:20 277:24 292:16,18 295:14

**Setters** 5:16

**setting** 223:19 260:14

**settling** 210:23

**shabbily** 66:22

**shadow** 179:21

**shadowing** 179:20 205:16

**shaking** 295:12

**shape** 25:15 259:11

**shared** 224:13

**shavings** 175:20

**she'd** 146:3

**she'll** 73:19,24 74:3 101:8,11, 12 112:10 165:21

**shed** 88:7

**sheen** 113:17, 21

**sheet** 22:20 75:20 88:11,12, 14,15 104:2,15 196:9,10,14,20, 25 197:11,13 198:4,20 199:6, 7,9,21 203:6 236:3 262:6,9, 11,15

**sheetrock** 64:13

**sheets** 196:23

**sheriff** 91:17, 19,20,21,25 92:6

**sheriff's** 20:2 72:15 91:17

**shielded** 271:8

**shining** 80:4,6

**shiny** 113:23 142:23

**shoe** 189:9 198:17 199:20

**shoes** 60:18 127:21 179:9 189:20 190:3 196:5,6,7,10,21 197:10,13 198:4,15 200:6

201:1,20,24 202:5,20,25 203:1 236:6 248:11 268:3

**shop** 148:15

**short** 46:20 216:6 221:19 250:8

**shorts** 189:20 202:18 248:11

**shot** 178:19 180:17,23 204:6 208:17

**shovel** 14:15 175:1 179:3 184:7 267:6,8 272:25

**show** 28:15 30:11,23 31:10 33:19,22 37:5,8 63:17 74:2 95:23,24 100:18 101:11, 23 108:20 109:8 123:14 134:16,22 163:8 175:23 177:1 182:11, 12 191:11 195:24 199:17 202:13,24 206:4 209:7 235:4 249:9,16 251:24 261:11 281:9

**showed** 13:1 16:5 187:9 232:6 276:14 293:21 303:14 307:1

**showing** 12:1 18:23 34:8,13, 19 35:9,21,24 109:15,22

**shown** 203:23

**shows** 34:14 37:12,21 57:12 207:12 208:2,3, 7 275:21 281:10

**sic** 10:2 25:19 93:6 123:16 142:19 170:1 243:11 249:12 266:3 274:5

**side** 6:16 24:17 34:11 38:11 75:2 114:7 179:22 180:25 185:22,24 200:12,14 205:19,20 206:1 237:19, 22 238:13 276:14

**sides** 9:8 203:1 208:18 232:6

**sight** 149:21 219:23 259:6 288:1

**sign** 60:2 73:21

**signals** 118:17

**signed** 96:11, 15

**significance** 16:14,24 62:25 174:20 191:7 192:6 196:1 200:22 201:8 203:7,11 206:7 209:9 216:18, 19 217:3 220:15,20,22

**significant** 60:3 63:13 66:10 182:20, 22 197:19 198:14,17 209:4 210:14 233:9 254:11, 12 295:23 297:14,21

**signing** 166:23

**signs** 26:18 216:15

**silence** 219:11

**similar** 12:7 62:17 101:21 140:1,18

177:23 274:3 278:6,14 280:14

**similarities** 175:23

**simple** 46:20 77:14 95:24 123:13 235:24 245:18

**simulate** 216:25

**simultaneously** 212:13

**singed** 87:25

**singing** 236:22

**single** 221:8

**sink** 244:22,23, 24 271:4

**sir** 4:6 6:4,12 7:1,5,8 8:22 9:3,18,21 13:17 14:12 15:15,18, 21 16:13,23 17:11,17 18:7, 13,17,25 19:9, 12,16 20:6,12 21:5,12,19,22, 25 22:3,5,25 23:4,12 24:2,15 25:2,14,19,24 26:3,8,17,24 27:9,13 30:13, 22,25 31:5,18 32:9,22 33:9 36:23 60:15 67:9 69:24 72:3 75:17 84:3,6 85:16 86:20 87:9 90:16,25 97:11 98:17,20 103:14 139:18 143:13 154:11, 23 158:11 163:3 167:10, 13,15 169:14 183:9 187:14 189:5 190:1,4 191:8 192:4,7 198:14 200:20 202:6 204:19, 23 207:8 209:6

214:20 217:18 218:16 220:2, 10,17 224:15 235:6 244:6 265:20 267:5 272:24 277:8,9 278:8,22 280:20 287:11 288:15,25 289:10,12,15, 19 298:12,24 300:12,15,17 307:6,10

**sister** 145:21, 23 146:3 151:21,22,23 152:17

**sister's** 151:14

**sisters** 151:13

**sit** 17:21,22 73:24 101:8 159:20 181:24 291:6 297:8

**site** 24:2 34:11 97:23 184:20 187:24

**sits** 109:14

**sitting** 11:1 17:17 22:22 26:10 37:17 47:13 69:14,16 80:7 115:10 149:6 159:18 177:17 179:5, 18 239:1

**situation** 42:7 93:21 172:22 254:16 297:3

**situations** 261:9

**size** 278:15

**sized** 27:5

**skillet** 216:17, 19,20 233:11, 15

**skin** 175:2 215:19 264:20

**slatting** 210:6

**sliding** 17:1 34:19

**slight** 14:24 16:6

**slow** 120:10 180:3 181:21

**slowly** 180:3,4

**small** 57:21 74:11

**smell** 118:25

**smelled** 109:16 118:23, 24 119:1

**smelling** 164:16

**smells** 94:15

**Smirnoff** 278:10

**Smith** 192:23 257:21 259:2,4, 8,17 260:9 265:10 274:10, 25 277:14,15, 16,23 290:7 297:24 298:6

**smoke** 16:8,16 124:20 156:10 191:15,21 226:14 240:21 284:2

**smoke-heat** 212:6

**smothered** 241:15

**sniff** 73:19 75:22 100:19 166:18

**sniffing** 101:3

**soldier** 224:7

**sole** 126:21 285:5

**solemn** 223:20

**soles** 127:20

**solid** 175:16, 18,19 214:9

215:2,3
**solution** 23:23
**solve** 185:14
**somebody's** 292:5
**someone's** 47:25 277:18
**someplace** 207:12 213:17
**Somerset** 5:14
**something's** 38:9 183:1
**soot** 174:8,9 196:6,10,21,23, 25 197:10,11, 12,13 198:4,17, 21 199:20,23 200:6 201:1 210:18,25
**sor** 65:20
**sort** 96:8 129:21 141:16 198:7 221:19 224:2 243:5
**sorts** 49:22 50:10
**sought** 152:21
**sound** 149:21 219:24
**sourc** 55:6
**source** 45:23 46:24 55:7,16, 17 66:15 241:2, 8
**south** 13:21 34:19
**spalling** 60:1 62:11,12,13,14, 16,25
**spat** 305:7,22
**speak** 183:8 203:6 256:21
**SPEAKER** 33:24 34:1 58:25 114:19, 22 139:25 146:6 147:23, 25 148:19 149:1,11 153:20 154:5, 15,19 188:17, 20 200:13
**speaking** 51:12 206:13 252:11
**specialize** 168:3
**specialized** 23:4 168:14
**specialty** 170:7
**specific** 83:17 160:23 164:8, 17 166:16 222:25 233:21 242:1,5 258:22 280:4
**specifically** 38:20 49:25 50:2 69:1 71:8 123:10 164:6 242:6
**specifications** 23:5
**speculation** 44:11 124:8 229:22
**speeches** 182:9
**spend** 93:25
**spent** 133:23 194:12 254:25
**Spies** 252:10
**spillage** 51:14, 15 58:17,21
**spilled** 52:10 59:1,3
**spit** 306:4
**spoke** 176:3
**spoken** 150:23
**sponsor** 159:12
**spontaneously** 214:24
**spot** 75:8 101:14,17 112:17 272:16
**spots** 68:21,23 87:17
**spray** 193:24 194:2 264:17, 19,22 281:17, 19 305:9,25 306:1
**sprayed** 306:21
**spread** 50:4 159:9
**spring** 169:3
**square** 160:2
**stack** 201:4 203:8 206:6
**stacked** 62:6
**staff** 192:23
**stages** 253:13
**stair** 34:16
**stand** 33:20 155:4 181:12 182:10,14 198:12
**standard** 128:20 171:20
**standards** 11:19 48:19,25 49:1 137:23 171:22
**standing** 10:3 69:16 178:23 180:17,18,19 200:10 203:21 205:8
**standpoint** 172:2
**staple** 135:24 218:21
**start** 23:3 24:23 37:20 165:20,22 166:3,10 210:23 226:1 245:17 246:3 247:22 276:12
**started** 8:19,25 14:20 15:19 87:18 101:1,3 140:10,11 165:6 166:9 173:7,10 174:7, 11,17,22 192:17 193:10 197:19 198:2 215:10 227:10 242:7 243:14 246:20 255:21 258:3 276:16 282:9 283:19, 23
**starting** 179:6, 24 184:13 227:13
**starts** 184:14, 16 249:6
**state** 4:10,13, 15 5:3,6,23 6:9, 11,19 7:9 18:19 23:6 27:16 39:10 41:12 44:2 45:15,22 72:12 90:20 98:10 167:19, 22,24 168:2 170:18,20,22, 23,25 171:4,6, 7,8,23 218:8 221:13 228:9 231:18 243:10 244:6 247:10 257:23
**stated** 45:14 54:25 87:3 160:19 249:23 291:19 293:2 302:1 303:25
**statement** 28:13 42:22 45:8 47:2 48:6 61:25 141:24 142:2 200:4 225:10 228:17, 20 230:6,9,10, 12 231:5,20 238:17,19 240:8 248:15, 17,20,21 249:7, 8,16 285:9 293:24 301:12 302:21 305:12
**statements** 105:4,6 227:12 231:21 232:24 249:21 283:14 285:7 298:1 306:16,25
**States** 141:8
**stating** 278:13
**statistical** 136:15
**statute** 229:5
**stay** 52:18 67:10 75:23 147:12 154:14 157:12,15,16 267:23
**stayed** 12:2 13:2,4,11
**step** 27:21 67:9 103:20 143:3 148:7 167:10 196:15 199:17 201:12 241:7 279:14 287:12 300:15 307:10, 14
**step-up** 206:22
**steps** 34:16 42:1 127:7 128:9,11 253:24 257:9
**stick** 34:9 64:12
**sticking** 210:23 232:22
**stipulate** 217:22
**stipulating** 217:24 218:2

**stirring** 177:22

**stop** 182:15 306:19

**stopped** 7:19 114:7

**storage** 6:17

**store** 23:2 194:5,8,16,17, 23 278:3 280:24 281:1

**stove** 15:20 57:13 58:12,23 66:18 180:20, 21 183:12 215:11,14,15, 17,19,20 216:3, 10,11,13,15,16, 18,23 243:24 271:3

**stoves** 216:22

**straight** 10:23 54:3 64:1

**strain** 193:18

**stratification** 212:8

**street** 283:16 284:8,21 286:24

**streets** 194:11

**strictly** 47:21

**strike** 306:14

**strips** 186:11, 12,16

**struck** 306:12, 18,22

**structure** 73:11,18 75:17 95:17 99:2,8,11 100:6 103:10, 13,16 114:2 124:4 133:19 160:11 165:9, 18,24 166:2 173:3 176:9,12, 14 201:10 204:7 205:14 208:19 211:18, 22 213:2 236:20 238:15 239:3,16 254:17 261:21 273:14

**structures** 160:8

**stuck** 109:23

**study** 135:8 140:12

**studying** 253:5 255:9,19

**stuff** 113:19 116:4 186:20 200:25 224:21

**subfloor** 265:11 275:16

**subflooring** 26:9,11

**subject** 98:9

**subjected** 63:11

**subjective** 47:24 48:5

**submitted** 31:21

**substance** 120:19,20 121:11 132:17 268:4

**substances** 45:12 115:23, 25 118:4 119:19,22 165:2

**suddenly** 71:16

**suggesting** 227:9

**suggestion** 243:4

**summary** 193:13 194:21 225:10 248:16, 17 249:4,8,17, 18,19,21,25 250:10,15

**summertime** 179:9

**summoned** 192:25

**Sunday** 27:15 54:6 105:12 152:12 172:15 177:21 222:3 230:16 262:18

**sunshine** 12:16

**supervision** 42:23

**supervisor** 4:19 38:18 39:6

**supply** 212:12

**supplying** 135:15

**support** 131:17

**supported** 210:22

**suppose** 53:24 299:22

**supposed** 89:8 289:9

**supposedly** 297:6

**suppression** 43:15 113:23

**surface** 12:8 113:24 183:4

**survey** 177:9 230:23

**suspect** 61:1,5 87:14 185:1 213:10 224:14 269:1,11,18 271:11 282:7 285:21 292:23

**suspected** 87:17 89:9 272:17

**suspects** 124:6 257:8 291:20

**suspicious** 223:10

**sustain** 142:9 199:1 211:24 236:21 241:3 270:17 277:21 279:8

**sustained** 213:6 225:3

**swabbing** 257:9

**swabs** 190:8 258:11

**swear** 4:3 72:4 91:1 288:20 300:20

**switching** 107:9

**sworn** 72:4 170:20 289:3 301:1

**synopsis** 228:19

**system** 37:20 40:7

T

**table** 17:22 33:21 35:12 37:22 66:6,12 151:5 176:23 177:24 180:18, 19 187:10 208:3 217:8 261:16,20

**tackled** 249:25

**tag** 178:4,5,9, 19 180:16

**tags** 108:2 109:13 184:5

**takes** 82:21 208:22

**taking** 88:5 105:24 138:3 149:2 173:7 175:3 205:10 271:22

**talk** 8:1,22 15:2,3 18:22 40:21 66:22 68:5 71:9,18 90:9 96:18 126:22 152:21 153:10,14,16 154:8 172:25 255:25 259:10 264:24 274:4

**talked** 25:12 44:23 48:17 50:5 61:21 141:11 152:23 176:1 184:14 205:16 212:21 215:21 224:5 225:24 230:17 233:17,20 268:15 283:13 286:23 290:3 291:6 293:15

**talking** 10:7 12:19 22:21 40:23,24 66:8 109:9 120:12 134:17 144:9 171:10 178:15 184:10 191:21 192:19,20,21 207:10,17 209:11 210:2 217:19 219:16, 18 223:14,24 224:19 249:15, 16 250:22 259:17 263:24, 25 264:1 272:8 279:21 292:21

**tape** 71:9 124:1 130:14 149:19 194:22,24 224:19 225:9 250:4,8 266:17

**taped** 283:14

**tapes** 120:10

**task** 173:10

**tasks** 258:3

**taught** 94:9 131:7,14

**team** 5:11

93:13 96:13,19, 20 146:20

**tear** 12:17 51:7 65:1

**technical** 120:4

**technician** 138:9

**technique** 105:24

**techniques** 43:21

**technology** 145:3

**telephonic** 68:6 72:21 78:3 111:7

**telling** 41:17 49:15 111:11, 15 117:15 120:14 196:12 233:21 239:1

**tempered** 183:1

**ten** 44:15 67:21 139:12 159:18 160:22 285:19 287:20 288:1

**ten-** 219:3

**ten-day** 44:12, 17

**tenant** 66:22

**tendency** 62:19

**Tennessee** 6:9

**tenure** 170:25

**term** 117:8 142:23 214:6 234:24 247:16, 17

**terminology** 12:12 164:1

**terms** 50:20 51:10 211:16

**terrible** 148:22

**test** 82:19 93:1 159:25 160:7 161:25 162:2 169:21,22,23, 25 238:6 247:17

**testified** 40:10, 11,13 43:18 45:17 54:11 56:8 78:9,13 79:2 104:10,16 117:5,12 122:20,21 126:5,6 133:14 174:15 199:2 221:11 223:11 230:22 231:22, 23 232:10,12, 15,19 234:20, 21 235:9 236:2 237:10 248:15, 24 250:18,24 252:20 253:10 257:19 262:5,9, 10 266:12,16, 25 275:8 278:2 282:5,14,17,23 288:12 295:16, 21 296:3,10 297:11,18 299:15 301:7, 14 303:18,22 304:9 305:6,13, 22 306:17

**testifies** 281:22

**testify** 26:22 28:22,23 29:6 69:11 70:22 121:24 126:8 138:3 181:11 197:5 198:6 202:25 234:16 235:24

**testifying** 105:3 165:6 227:18 235:15, 19 302:2

**testimony** 4:4 44:23 47:19 54:23 62:12 67:19 72:5 75:11 80:1 86:22 87:16 89:7 91:2 103:23 111:20 119:22 121:23 126:16 140:5 181:7,8,13 198:25 201:17 211:11 236:20 242:25 243:1 245:25 251:5,7, 15 252:14,19 258:10,17 262:13 271:18 280:23 287:2 288:3 293:13 296:12 299:16 300:2,21 301:4 303:14 305:21

**testing** 60:17 90:2 165:1

**tests** 159:13,17 261:11

**tetrahedron** 265:18 277:1,2

**text** 41:5,6,18

**that'd** 18:25 33:18

**that'll** 32:3 96:24

**theoretically** 62:7 89:20

**theory** 197:16, 24 198:5,6

**there'd** 216:5, 12 217:4

**thermal** 212:14,15 236:21

**thickness** 254:14

**thin** 64:21

**thing** 35:24 62:14,15 65:9 109:18 110:12 119:12 123:15 140:3 172:24 182:1 185:18 186:4 204:13 206:8 208:11 241:10,16 245:7 254:23, 24 258:22 267:22 286:12

**things** 6:25 11:17 13:10 43:7,11,22 47:1 49:22 50:10,23 52:9 62:17 63:8,17 64:25 95:2 97:2 100:18,19 104:19 114:2 116:3,25 117:1 123:7,10 124:10 125:21 126:7 136:19 144:9 164:2 165:13,16,21 174:18 182:3 205:12 210:23 212:1 214:4 227:14,23 230:14 241:18 242:18 253:16 254:9,10,19 256:2 290:1

**thinking** 60:23 61:4 71:5 157:12 273:24 298:4

**thinks** 69:8 240:13 299:18

**thinners** 95:2

**thought** 28:2 65:20 112:25 117:8 138:24 144:8 146:19 153:25 170:8 192:6 198:13, 16 220:15 264:17 266:8 269:14 279:14 283:3 288:16

**thousand** 216:23

**threat** 42:5

**three-and-a-half-** 180:1

**three-day** 95:14

**three-to-five-minute** 294:10

**threshold** 40:17

**throw** 62:18

**thrower** 264:18

**thumb** 32:24 37:8

**Tia's** 148:14

**tile** 116:2

**timber** 185:14

**timbers** 238:16

**time** 5:2,7 7:11, 22,24 8:8,9,11, 13,16,17,21,22, 25 13:11 18:17, 18,20 19:25 21:16 23:18 33:7 34:24 42:21 45:23,24 46:2,6,11,12,13 49:7 50:11,22 52:1 60:19 61:11,13 62:18 64:18 66:20 70:24 71:12 73:22,25 74:3 77:6 78:11 79:3,24 80:3,14 82:7 86:22 94:14 98:2,16, 21 111:15,19 124:20,21 127:1,3 128:23 129:22 132:22 133:9 134:14 135:14,20 137:13 145:14 146:4 158:17, 23 170:19 172:20 175:12 189:10,13,20 193:16 194:12 195:12,15,20 202:19 211:25 212:3,11 221:17 224:4 226:21 233:16

236:2 238:21 240:24 241:1 242:3,13 246:1, 19 247:21 248:25 250:5 252:2,9 260:4 262:9 264:25 269:12 271:12 273:2 275:2 282:8,22 283:7 284:6 285:8,23 286:1 292:7,14, 19 293:3 294:17 296:9 297:5,9,13,16

**timeline** 239:11

**times** 73:11 96:16 107:9 113:22 137:18 138:16 141:23 142:3 164:5 212:20 241:13, 18 283:10

**tin** 279:20

**Tina** 191:5 203:18 204:9 290:4 292:16 293:7,9 295:16 296:3,10 298:15

**title** 38:17

**to-20-minute** 284:6

**Tobacco** 93:10 96:9 163:17

**today** 26:5 46:9 47:2 48:19 50:15 53:9,10, 14 73:3 79:2,7 80:2 82:4 84:17 85:1 89:7 98:9 113:17 117:5 122:21 123:22 133:23 138:14, 16 142:3 154:16 161:7,8 175:19 203:23 211:11 232:15, 19 234:16,20 235:23 237:6,7, 9,15 250:18,24 251:18 252:14 300:16 304:4 307:11,13

**today's** 11:19

**told** 43:11 74:1 83:13 113:16 115:3 124:2,17, 18,24 125:1 131:18 133:21 150:24 158:4 193:19 228:20 249:2 252:10 264:16 266:23 272:4 277:18 286:12 290:9 291:22 294:20 301:17

**tomorrow** 147:20 153:11 154:7,17 161:8

**tonight** 153:8

**tool** 41:9 90:5 112:9 131:23 140:24 141:6 156:20

**tools** 93:17 106:6,7 231:16

**top** 9:10 12:5 16:7,8 17:3 58:23 108:1 116:2,4 136:22 144:23 151:5 172:10 178:24 201:5 216:9,13 275:19 276:14, 16,18 278:7 279:20

**total** 47:11 76:4 97:18

**totally** 12:8

**touch** 127:21, 23

**trace** 200:24

**traceable** 241:19

**tracked** 50:23

**tracks** 53:2

**traffic** 186:25 187:1

**trailer** 7:12 9:20 11:20 12:9 14:11 34:7 38:4 60:7 64:9 69:17 82:25 156:7 161:15 173:7,9 174:10 175:2 190:19,20,24 220:24 221:15, 21 223:7,11 225:19 250:18 252:15,21 253:1,4,8 269:7 270:20 285:23

**train** 135:5 161:6 164:2

**trained** 94:2, 11,24,25 115:3, 6 116:16,18,22, 23 117:1,2,6,14 118:9,11 119:19,21 121:5,9,17 132:12 136:20, 21 140:23 161:10

**trainers/ handlers** 141:6

**training** 5:8 36:22,24 39:7,8 82:20 92:5,10, 11,25 94:3 96:2,3,4 131:7, 8,13,18 135:9, 20 136:25 137:1,14,19 138:15 164:10 168:14,21,23 169:1,2 179:14 306:23

**tranquil** 208:24

**transcript** 303:13

**transfer** 236:6

**transportation** 6:18

**transported** 194:4 195:5 306:12

**transporting** 193:24

**trash** 10:25 11:1,2,3,4 37:16

**travel** 206:5

**traveled** 7:20 14:14,16 45:16 50:6

**traveling** 183:4

**treated** 253:22

**trial** 84:5 98:9 101:21 148:20 150:22 152:19 173:17

**trial's** 84:2

**trials** 138:4

**triangle** 212:21

**trip** 271:13

**tripped** 216:5

**trips** 194:22

**Trooper** 190:23 192:24 283:12 290:6 293:16 297:24 298:6

**troopers** 258:3

**trouble** 16:22 178:17 193:16, 19

**true** 56:9 86:24 132:12 141:23 163:12 254:6 303:12 306:11

**truth** 4:5 72:6 91:3 111:16 289:3,9 300:22

**tubes** 23:18,19

**tunnel** 297:3

**turn** 90:25 120:6 166:7 200:11,14

**turned** 13:25 198:20 205:23

**turpentine** 95:2

**two-** 160:1

**two-by-four** 207:13

**type** 12:15 15:4 25:14 37:1 38:8 47:13 57:2 64:2 87:7 89:20 106:22 115:14 116:17 119:8 132:14,16 137:25 144:25 165:14 168:4 175:16 186:11 193:20 217:1 221:1 236:21 242:23 254:15 265:10 270:16, 17,18 275:11 290:1

**types** 92:9,10 106:24 117:21 121:5 142:12 143:24 161:5

**typical** 239:23

**typically** 64:15,16

U

**U-BURN** 206:18

**U.S.** 169:1

**uglier** 267:25

**uh-huh** 28:16 63:6 81:10 86:12 88:10 104:4 127:14 135:18 144:12 146:24 180:14 191:10 235:17 259:25 269:22 282:13 291:21

**Uh-uh** 60:21

**ultimately** 197:14

**ultraviolet** 64:25

**unable** 58:4

**unattended** 265:16 276:20

**unburned** 76:2

**unburnt** 166:2

**unconfirmed** 131:8,9,12,13, 14,19,21

**underground** 221:4

**underneath** 66:5 183:6,20

**understand** 40:1 45:6 55:23 68:11 70:19,21 81:4 85:11 89:6 97:23 98:5 119:12 121:9, 10,15 143:19 165:14 181:18 199:4 211:13 229:7 232:14, 23 233:24 234:5 237:4 238:7 250:7,14 254:7 276:25 282:20 283:18 285:15 299:6,7 306:20

**understanding** 54:7 69:15 73:10 124:11 137:2 211:14 277:17 280:3

**understands** 68:12

**understood** 38:16 68:12 90:19 132:15 140:5 279:15

**undertake** 128:2

**undertaking** 128:17

**undertook** 126:1 128:23 259:17

**undetermined** 40:4 45:23,24 46:2,10,11 55:13,18 56:10 228:16

**unidentified** 33:24 34:1 58:25 114:19, 22 139:25 146:6 147:23, 25 148:19 149:1,11 153:20 154:5, 15,19 188:17, 20 200:13 219:18 223:10 307:9

**uniform** 91:16

**United** 141:8

**university** 92:9 169:4 170:10,23 233:18

**unlike** 185:22

**unloading** 293:9

**unnatural** 48:8 57:3

**unusual** 25:10 113:1 125:9

**upgrade** 171:22

**upper** 35:16,19

**utility** 170:17

**V**

**V-PATTERN** 25:6 60:3 63:14 242:12

**V-PATTERNS** 13:23 63:15

**vaccines** 159:14

**vaguely** 124:3

**valuable** 141:6

**Vanderbilt** 226:20

**vapor** 184:15, 17

**vapors** 132:7,8

**variations** 63:22

**varies** 161:4

**vary** 161:5,9

**velocity** 11:20

**vent** 17:6 76:21 102:17 268:14

**vented** 9:9,12 10:2 12:25

**ventilation** 239:17 242:21

**ventilation-** 239:18

**ventilation-controlled** 184:2

**verbal** 145:18

**verified** 9:10 10:8 26:25

**verify** 20:18

**version** 64:15

**versus** 64:13 302:3

**vicinity** 242:21

**Victor** 148:7,10

**video** 71:9 130:14 266:11 273:21,23

**videotape** 78:22 79:1 130:21

**view** 34:7,22 35:7,10,15,16, 17,19,23 90:18 299:22

**viewed** 68:17

**Vindale** 49:10

**vintage** 12:9

**violation** 84:15

**Virginia** 93:25 94:4

**visible** 162:1 274:1,2

**vision** 297:3

**visually** 113:4 162:1

**vodka** 194:18 249:13 270:8 278:10 286:11

**vodkas** 267:12 270:4

**voir** 149:24

**volatile** 12:17 246:16

**voluntarily** 139:2

**W**

**wadded** 241:14

**Wait** 237:8

**waiting** 110:2, 4 264:13

**waive** 90:15 220:8 288:22

**walk** 9:6 19:6 33:18 34:3 71:10 99:1 109:19 111:25 173:1 294:10, 11

**walked** 80:3 128:10 165:8, 25 173:6,24 174:16 177:16 294:12

**walking** 113:19 129:24 174:25 175:4 204:10

**walkthrough** 100:21,22

**wall** 11:1 12:20 13:20,22 17:22 25:6 38:4 62:6 63:21 66:7,11 75:6,7 76:25 86:13,14 102:9, 12 114:5,6 175:7,10,11 178:20 179:25 185:22 206:19 207:10 208:19 213:11 238:25 242:11

**walls** 13:6 26:21

**wanted** 19:21 123:7 145:10 153:3 166:16 170:8 174:7 186:20 196:4 200:23 204:5 205:11,12 206:4,8,20 208:6,17 220:15,22 223:1 227:19 237:19,22 260:1 296:24 299:22

**wanting** 219:10

**warrant** 192:2

**wash** 23:21,22

**washed** 23:19

**washing** 23:20

**water** 23:22 62:19,21 113:23,25 184:15 208:22 264:1

**watts** 216:23

**wavy** 64:2

**Wayne** 154:1

**ways** 17:3 93:16 102:14

**wear** 12:16 51:7 65:1 99:21

**wearing**

189:20 202:19
**weather** 156:16
**week** 78:4 92:8 168:25 226:17 231:23 278:1
**weekly** 96:2
**weeks** 72:22 94:1 111:8
**weigh** 243:19, 20 245:6 248:7
**weighed** 245:13
**weight** 85:9
**Wells** 291:18 295:2,9 298:13, 19,20 299:11, 14,18,21,25 300:13
**west** 20:25 21:6,10,17 22:20 24:7,10 26:20 30:9 32:16,18 47:19, 20 61:14 79:10 82:6 84:18 85:4 105:15 127:2,5 133:24 167:20 171:14 227:6 228:1 260:4 262:5 289:14, 16 291:5 293:14 298:4
**western** 4:19 38:18
**What'd** 165:11
**whatsoever** 130:2 152:24 234:7 302:2
**whereabouts** 190:20 195:12 296:8
**white** 199:21
**Who'd** 149:7
**who-all** 24:8
**wicker** 286:10
**wide** 81:7
**Williamson** 204:9
**window** 17:23 35:13 37:23 44:12,17,24 66:5 86:15 102:16,18 114:7 175:1 184:7 237:2 240:6 242:22 249:23 306:19
**windows** 9:12 10:3 13:1 35:11 75:1 178:20 210:24 242:22
**windowsills** 76:21
**wired** 221:3
**wires** 97:1
**Wiring** 168:17
**withdraw** 283:3 302:6
**witnessed** 283:16
**witnesses** 84:16 278:2 287:16 300:9 307:12
**women** 111:21
**wondered** 59:23 267:22
**wood** 24:13,17, 20,21 25:1,4 26:6 132:5,6,8, 14,16 142:12, 20,25 143:6,8, 24 144:3,9,14, 17,24,25 158:8 162:19 175:20, 21 183:1,16 184:12,14,16, 18 185:20 206:14 210:4 275:13
**word** 65:8 66:7 128:25 132:24 142:14 156:22
157:1,2 225:11 251:7,9 258:8
**words** 48:1 58:7 106:25 118:17 121:12 129:23 137:1 185:6 211:13 224:18 225:9 296:7 303:23, 24
**work** 4:13 8:25 9:17 39:15 40:9 43:6 78:23 97:5 100:8 101:3 130:14 133:15 135:11 152:1 165:11,18 168:5 170:18 173:13 189:6, 12 211:1 228:12 276:13 306:21
**worked** 4:15 5:11 74:13 81:20 147:1 170:16 171:4, 17 222:2 224:5 289:13
**working** 4:21 43:4 100:25 157:11 174:11 193:17 230:3 254:25 257:17 275:8 304:17
**works** 149:6,25
**worksheet** 136:17,18
**world** 63:16 85:25
**worry** 218:3
**worsened** 224:8
**worst** 63:16
**Wow** 87:16
**wrapped** 148:13
**write** 171:22 250:13 266:15
**writing** 46:8 129:23,24
**written** 74:8 88:18 93:1 169:23
**wrong** 12:12 21:15 33:10 60:14 139:6 164:1 262:13 264:21 265:4,8 267:4 292:6 294:23 295:24

**Y**

**yachts** 171:16
**Yancey** 149:11,13 150:6,24 151:3, 8,10,12,16,18, 21,24 152:1,4, 8,14,16,20,25
**yard** 27:12 30:1,7 128:10 204:4,8
**year** 5:15 78:5 97:17 152:11 159:1,15 168:24
**year-and-a-half** 68:16 82:2 123:20
**yearly** 5:12,14
**years** 4:17 12:16 50:15 51:1 52:9 62:14,15 64:24 91:25 92:2,3,4, 16 93:19 152:4, 5 156:13 167:25 169:18 252:15 254:25 275:9
**yell** 31:10 61:5, 10 189:7,12 192:17 193:3,7, 11 220:16 222:24 223:18 224:16 226:10 227:7 243:1
248:12,16,24 249:8 263:14 265:2,15 268:2, 25 269:17 274:17,20 276:19 285:24, 25 286:14 289:18 291:12 293:2,8 295:17, 20 296:5,7,11, 13,17 301:12, 17 302:3,22 306:12
**Yell's** 28:5 60:18 190:8 248:17
**yellow** 215:16 306:1
**yesterday** 18:22 51:18 155:7 160:19 161:6 165:5,6 177:16
**you-** 19:19
**you-all** 19:14 21:18 24:13 43:7 85:21 125:7 148:4,16 152:11 154:9 155:12 176:6 191:24 200:13 223:23 252:21 263:16 264:10 279:15 287:13 299:6 307:1
**young** 148:11 198:14

**Z**

**Z.C.** 286:22 294:22
**Z.y's** 175:6
**Z.y.'s** 185:10
**zone** 87:22