

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

## CASE NO. 1:20-CV-0047-GNS

## ROBERT YELL

## V.

## CITY OF RUSSELLVILLE, ET AL.

## DEPONENT:

## WILLIAM PORTER

## DATE:

## February 01, 2022



schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1      IN THE UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF KENTUCKY

3      AT BOWLING GREEN

4      CHIEF JUDGE GREG N. STIVERS

5      MAG. H. BRENT BRENNENSTUHL

6      CASE NO. 1:20-CV-0047-GNS

7

8      ROBERT YELL,

9      Plaintiff

10

11      v.

12

13      CITY OF RUSSELLVILLE, ET AL.,

14      Defendants

15

16

17

18

19

20

21

22

23   DEPONENT:  WILLIAM PORTER

24   DATE:      FEBRUARY 1, 2022

25   REPORTER:  BETHANY BELLOFATTO



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 2

```
 1                    APPEARANCES
 2
 3    ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
 4    Amy Robinson Staples, Esquire
 5    Elliot Slosar, Esquire
 6    Molly Campbell, Esquire
 7    Loevy & Loevy
 8    311 North Aberdeen Street
 9    Third Floor
10    Chicago, Illinois 60607
11    Telephone No.: (312) 243-5900
12    E-mail: amy@loevy.com
13    (Appeared via videoconference)
14
15    ON BEHALF OF THE DEFENDANTS, RUSSELLVILLE POLICE
16    OFFICERS KENNETH EDMONDS, JOHN E. HIGGINS, CHAD
17    EGGLESTON, RONALD MILLS, AND JIM PENDERGRAFF:
18    Jennifer L. Langen, Esquire
19    Adams Law, PLLC
20    40 West Pike Street
21    Covington, Kentucky 41011
22    Telephone No.: (859) 495-3798
23    E-mail: jlangen@adamsattorneys.com
24    (Appeared via videoconference)
25
```

Page 3

```
 1                APPEARANCES (CONTINUED)
 2
 3    ON BEHALF OF THE DEFENDANTS, BILL JENKINS AND LOGAN
 4    COUNTY:
 5    Aaron D. Smith, Esquire
 6    English Lucas Priest & Owsley, LLP
 7    1101 College Street
 8    Bowling Green, Kentucky 42102
 9    Telephone No.: (270) 781-6500
10    E-mail: asmith@elpolaw.com
11    (Appeared via videoconference)
12
13    ON BEHALF OF THE DEFENDANT, BUSTER CANNON IN HIS
14    CAPACITY AS A SCOTT COUNTY SHERIFF'S DEPUTY:
15    Lynn Zellen, Esquire
16    Kinkead & Stilz
17    PNC Bank Tower
18    301 East Main Street
19    Suite 800
20    Lexington, Kentucky 40507
21    Telephone No.: (859) 296-2300
22    E-mail: lzellen@ksattorneys.com
23    (Appeared via videoconference)
24
25
```

Page 4

```
 1                APPEARANCES (CONTINUED)
 2
 3    ON BEHALF OF THE DEFENDANTS, KENTUCKY STATE POLICE
 4    OFFICERS DAVID WEST, JAMAN CHILDERS, and WILLIAM T.
 5    SMITH:
 6    Amber Arnett, Esquire
 7    Kentucky State Police Legal Office
 8    919 Versailles Road
 9    Frankfort, Kentucky 40601
10    Telephone No.: (502) 782-2163
11    Facsimile No.: (502) 573-1636
12    E-mail: alea.arnett@ky.gov
13    (Appeared via videoconference)
14
15    ON BEHALF OF THE DEFENDANTS, BUSTER CANNON AND CITY OF
16    GEORGETOWN:
17    Maureen C. Malles, Esquire
18    Sturgill, Turner, Barker & Moloney, PLLC
19    333 West Vine Street
20    Suite 1500
21    Lexington, Kentucky 40507
22    Telephone No.: (859) 255-8581
23    E-mail: mmalles@sturgillturner.com
24    (Appeared via videoconference)
25
```

Page 5

```
 1                APPEARANCES (CONTINUED)
 2
 3    ON BEHALF OF THE DEFENDANT, ALAN GREGORY:
 4    Elizabeth Stone, Esquire
 5    Benjamin Siegel, Esquire
 6    August Pozgay, Esquire
 7    Public Protection Cabinet
 8    500 Mero Street
 9    Frankfort, Kentucky 40601
10    Telephone No.: (502) 573-0365
11    Facsimile No.: (502) 573-1057
12    E-mail: betsy.stone@ky.gov
13    benjamin.siegel@ky.gov
14    august.pozgay@ky.gov
15    (Appeared via videoconference)
16
17    Also Present: Lyndsie Hosang, Videographer
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

                          INDEX

                                              Page

3  PROCEEDINGS                                 9

4  DIRECT EXAMINATION BY MS. STAPLES          10

5  CROSS EXAMINATION BY MS. LANGEN            110

7                        EXHIBITS

8  Exhibit                                     Page

9     1      Employee Evaluation for Mr.

10            Porter - Logan0145               38

11    2      Logan Cunty Detention Center

12           Counseling Session Document for

13           Mr. Porter - June 5, 2004

14           Logan0133                         41

15    3      Logan County Detention Center

16           Document - November 23, 2004 -

17           Logan0100                         45

18    4      Logan County Detention Center

19           Inmate Incident Report -

20           February 02-2004 - Logan0149      48

21    5      Handwritten Document by Mr. Porter

22           with Attached Provision -

23           Logan0154-0155                    52

Page 7

                  EXHIBITS (CONTINUED)

2  Exhibit                                     Page

3     6      Kentucky Division of Corrections

4            Training, Employee Training

5            Application - Logan0107           55

6     7      Transcript of Testimony Given by

7            Mr. Porter at Yell 2006 Trial,

8            Pages 34-77                        99

9     8      Document from Mr. Porter's

10           Personnel File - Logan0094-0096   154

11    9      Logan County Detention Center

12           Incident Report - Logan0120-0121  166

13   10      Incident Report - Logan0162-0163  170

14   11      Document from Mr. Porter's

15           Personnel File - Logan0069-0070   179

Page 8

                      STIPULATION

3  The VIDEO deposition of WILLIAM PORTER was taken at

4  KENTUCKIANA REPORTERS, LLC, 730 WEST MAIN STREET, SUITE

5  101, LOUISVILLE, KENTUCKY 40202 on TUESDAY the 1ST day

6  of FEBRUARY 2022 at 10:03 a.m.; said VIDEO deposition

7  was taken pursuant to the FEDERAL Rules of Civil

8  Procedure.

10 It is agreed that BETHANY BELLOFATTO, being a Notary

11 Public and Court Reporter for the State of KENTUCKY, may

12 swear the witness.

Page 9

                      PROCEEDINGS

2     VIDEOGRAPHER:  We're now on record.  My name's
3  Lyndsie Hosang.  I'm the videographer today, and
4  Bethany Bellofatto is the court reporter.  Today is
5  the 1st day of February 2022, and the time is
6  10:03 a.m.  We're at the offices of Kentuckiana
7  Reporters LLC to take the deposition of William
8  Porter in the matter of Robert Yell v. City of
9  Russellville, et al., pending in the Western
10 District of Kentucky at Bowling Green, case number
11 1:20-CD-0047-GNS.  Will the counsel please identify
12 themselves for the record starting with plaintiff's
13 counsel?
14    MS. STAPLES:  Hi.  I'm Amy Robinson Staples
15 here for plaintiff Robert Yell.
16    MS. CAMPBELL:  And I'm Molly Campbell here for
17 plaintiff Robert Yell.
18    MS. LANGEN:  My name's Jennifer Langen, and I
19 represent defendants Ken Edmonds, John Edward
20 Higgins, Ronald Mills, Chad Eggleston,
21 Jim Pendergraff and the City of Russellville.
22    MS. ARNETT:  I'm Amber Arnett, and I represent
23 the Kentucky State Police defendants
24 Jaman Childers, William Smith, and David West.
25    MS. STONE:  I'm Elizabeth Stone.  And I



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  represent Mr. Alan Gregory.
2       MR. SIEGEL:  Benjamin Siegel also on behalf of
3  Alan Gregory.
4       MR. POZGAY:  And August Pozgay also on behalf
5  of Alan Gregory.
6       VIDEOGRAPHER:  All right --
7       MS. ZELLEN:  Lynn Zellen on behalf of
8  Buster Cannon in his capacity as a Scott County
9  Sheriff's Deputy and Scott County.
10      MS. MALLES:  And Maureen Malles also on behalf
11 of Buster Cannon and the City of Georgetown.
12      MR. SMITH:  Last, but hopefully not least,
13 Aaron Smith for Logan County and Logan County
14 Jailer Bill Jenkins.
15      VIDEOGRAPHER:  Perfect.  Thank you.
16 Mr. Porter, please raise your right hand.
17      COURT REPORTER:  Do you solemnly swear or
18 affirm that the testimony you're about to give will
19 be the truth, the whole truth, and nothing but the
20 truth?
21      THE WITNESS:  I do.
22      COURT REPORTER:  Thank you.  Counsel, you may
23 begin.
24                  DIRECT EXAMINATION
25 BY MS. STAPLES:

Page 11

1  Q    Good morning, Mr. Porter.  How are you today?
2  A    I'm fine.  How are you-all doing today?
3  Q    I am well.  I am Amy Staples.  We've never met
4  in person so it's nice to see you.  I appreciate you
5  coming in today.
6  A    Not a problem.
7  Q    Have you ever given a deposition before?
8  A    I have several times.
9  Q    Several.  All right.  Let me just go over the
10 rules real quickly to refresh your memory.  First and
11 foremost, if, for any reason today, you need a break,
12 don't hesitate to let me know that.  My only request is
13 that if there's a question pending of you at the time,
14 that you answer the question first, and then we'll take
15 that break.  Okay?
16 A    Okay.
17 Q    If at any time you can't hear me, or I don't
18 ask a question clearly, or you don't understand what I'm
19 asking, please let me know that, and I'll do my best to
20 rephrase that question.  Okay?
21 A    Okay.
22 Q    Further, the other attorneys on the Zoom may
23 have some objections to the questions I'm asking you.
24 Obviously, there's not a judge here today to rule on
25 those objections, but what I would request of you is

Page 12

1  that you allow the attorneys to state their objections.
2  And then you can go ahead and proceed with your answer.
3  A    Okay.
4  Q    Because we are doing this virtually and
5  because we do have a court reporter who will be
6  transcribing your testimony today, I ask that you do
7  your best to answer all your questions verbally as
8  opposed to nodding your head.
9  A    Okay.
10 Q    All right.  Thank you, sir.  Do you have any
11 health conditions that would affect your ability to
12 testify here competently today?
13 A    No.
14 Q    Are you taking any type of medications that
15 may affect your memory?
16 A    No.
17 Q    Where did you grow up, sir?
18 A    Everywhere.  I was born in Roosevelt,
19 Kentucky.  I've lived on about 15 different military
20 bases.
21 Q    Were your parents in the military?
22 A    My father was in the Marine Corps and the U.S.
23 Army.
24 Q    All right.  So you moved around a lot.
25 A    Quite a bit.

Page 13

1  Q    Where did you live when you went to high
2  school?
3  A    Bowling Green, Kentucky.
4  Q    Did you graduate from high school?
5  A    I did.
6  Q    When did you graduate?
7  A    1997.
8  Q    Did you attend college?
9  A    I did.
10 Q    Where did you go to college?
11 A    Western Kentucky University.
12 Q    Did you have a major?
13 A    Yes.  Political Science and Religious Studies.
14 I had a double major.
15 Q    Did you graduate from Western Kentucky?
16 A    I did.
17 Q    When did you graduate?
18 A    May of 2006.
19 Q    Do you have any other higher education?
20 A    I do.  I also have a master's degree at
21 Western Kentucky University, social work, 2008 to 2010.
22 And I went to Salmon P. Chase College of Law for two
23 years.
24 Q    When did you go to law school?
25 A    Started in July of 2006 because the 1L year we

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1  all had to come in early.  So then I went there until, I
2  believe, it was January 2008.
3      Q    Did you graduate from Chase?
4      A    No.  I did not.
5      Q    At one time, were you a teacher?
6      A    I might have substitute taught a few times and
7  -- but that's it.
8      Q    Did you help teach any classes at Western?
9      A    Yes.
10     Q    What kind of classes did you teach there?
11     A    Intro to religious studies, several other
12  classes in the religious studies field.
13     Q    Sir, is it accurate that you're also a
14  certified emergency medical technician?
15     A    I did have the certification, but I've let it
16  lapse.
17     Q    When did you obtain that certification?
18     A    I believe it was in May of 2001.  In that
19  general area.
20     Q    Okay.  Are you currently employed?
21     A    I am.
22     Q    Where?
23     A    Advantage Solutions.
24     Q    Advantage Solutions?
25     A    Yes.  It's a company in Orange, California.

Page 15

1      Q    And what type of company is Advantage
2  Solutions?
3      A    I deal with retail merchandise and supply
4  chain logistics.
5      Q    What type of retail merchandise?
6      A    I work -- specifically, I work for Kroger, and
7  I'm working on the pilot program now where we're
8  installing electronic tags in the stores where the
9  information could be downloaded and updated
10  automatically by the store.
11     Q    How long have you been working for Advantage
12  Solutions?
13     A    About two years.
14     Q    And what's your position or title there?
15     A    Would be team lead.
16     Q    You supervise other employees?
17     A    I do.
18     Q    How many other employees do you supervise?
19     A    In this area, it -- I would be generally
20  considered to be over, I don't know, maybe 500 to 1000
21  employees.  But I don't have direct supervision over
22  them.  Does that make sense?
23     Q    How many people do you have direct supervision
24  over?
25     A    I wouldn't be considered to have direct

Page 16

1  supervision over anybody.
2      Q    Sir, is it accurate that you were once
3  employed at the Logan County Detention Center?
4      A    Yes.  Been employed there three times.
5      Q    Three times?
6      A    Three times.
7      Q    Okay.  When was the first time?
8      A    And this is a long time ago so I may not be
9  very accurate, but I started in 2000 and I left in
10  January of 2001.
11     Q    And --
12     A    Then I -- oh, go ahead.  I'm sorry.
13     Q    I'm sorry.  What were you doing?  What was
14  your role at the detention center during that tenure?
15     A    Just deputy jailer.
16     Q    Okay.  You left in 2001?
17     A    Yes.
18     Q    And for what reason did you leave?
19     A    I had a job at the Russellville Police
20  Department.
21     Q    Okay.  We'll talk about that more in just a
22  minute.  And when was your second tenure at the Logan
23  County Detention Center?
24     A    It was in the 2004 or 2005 range.  I believe I
25  may have started in 2004.  I'm not real sure on those

Page 17

1  dates honestly.
2      Q    Sir, I'll tell you that we were able to get
3  your personnel record from the detention center.  And it
4  looked like to me you were there from September of 2003
5  to December of 2004.  Does that ring a bell for you?
6      A    Yeah.  That sounds about right.
7      Q    And when you were at the jail during that
8  period, what was your rank or role?
9      A    The shift sergeant.
10     Q    Did you have a particular shift that you
11  worked?
12     A    Second -- second shift usually.
13     Q    And what were those hours?
14     A    It's usually from 2 p.m. to 10 p.m.
15     Q    When you left the Logan County Detention
16  Center in 2004, was that a voluntary exit from the
17  position?
18     A    Yes.  I had another job at a jail.
19     Q    What jail was that?
20     A    Simpson County.
21     Q    How long did you work at the Simpson County
22  jail?
23     A    I'm not real sure on the exact timeframe, but
24  I want to say it was probably three months or so.
25     Q    Why did you leave that jail?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM SCHER, taken on February 01, 2022

18..21

Page 18

1     A     To focus more on school.  One semester I had
2  to take about 21 hours of classes so I had to get
3  permission from the president of WKU to do that.  So I
4  was pretty covered up.
5     Q     Can imagine.  Okay.  And you said you were
6  there at the Logan County Detention Center a third time?
7     A     Yes.
8     Q     And when was that, sir?
9     A     I want to say I started in 2011 to 2012.  I'm
10 not sure the exact date on that either.
11    Q     What position did you hold during that time?
12    A     I worked with the recycle crew.
13    Q     The jail was in charge of the recycle crew?
14    A     The inmates at the jail provided labor for the
15 recycling center.
16    Q     Did you supervise the inmates during the job?
17    A     I did.  Yes, ma'am.
18    Q     Who was the jailer during the 2011, 2012
19 period that you worked for?
20    A     It was Bill Jenkins.
21    Q     Was Bill Jenkins jailer in 2004?
22    A     He was.
23    Q     2004, when you worked there the second time?
24    A     Yes.  He was.
25    Q     Was Bill Jenkins jailer in 2000 when you first

Page 19

1  worked at the jail?
2     A     Yes.  He was.
3     Q     Was Bill Jenkins in charge of hiring you all
4  three of those times?
5     A     Yes.  He was.
6     Q     How would you explain your relationship with
7  Bill Jenkins?
8     A     Employer/employee.  Very professional, but I
9  did have a lot of respect for him.
10    Q     Did the two of you get along?
11    A     Yes.  I believe so.
12    Q     So going back to the second time that you
13 worked for the Logan County Detention Center in 2003 to
14 2004, you said you were a second shift sergeant; is that
15 correct?
16    A     That's correct.
17    Q     What did your duties entail as a second shift
18 sergeant?
19    A     It's a little bit more than what a normal
20 deputy would do.  Along with the supervision of inmates,
21 I would kind of watch over employees to make sure that
22 policy and procedures were followed.  Any serious
23 situation I would immediately be involved in order to
24 kind of guide the situation.
25    Q     Did you also work directly with the inmates

Page 20

1  that were housed in the detention center?
2     A     Yes.  I did.
3     Q     As a sergeant in 2004 at the Logan County
4  Detention Center, how many deputy jailers did you
5  supervise?
6     A     It varied, but it was never maybe more than
7  five on a shift.  Just depends on who was on the shift.
8  Usually about three.
9     Q     When you began your employ with the
10 Logan County Detention Center in 2003, were you hired in
11 as a sergeant --
12    A     No.
13    Q     -- or did you make your way up the ranks?
14    A     I was promoted after I'd been there for a
15 while.
16    Q     Can you recall how long you'd been there
17 before you were promoted?
18    A     No.  I can't.  But I don't think it was very
19 long.  I'm not sure.
20    Q     And who was in charge of that promotion?  Who
21 promoted you?
22    A     It would have been Bill Jenkins.
23    Q     When you were employed with the Logan County
24 Detention Center in 2003 and 2004, can you recall who
25 your captain was?

Page 21

1     A     David Clayton.
2     Q     Would David Clayton have been your immediate
3  supervisor?
4     A     Correct.  Yes.  He would've.
5     Q     And would Bill Jenkins have been next in line
6  as far as your supervisors?
7     A     No.  There was a chief as well.
8     Q     Okay.  Who was the chief?
9     A     Richard Brooks.
10    Q     Now you mentioned earlier that one of the
11 reasons that -- or that the reason that you left your
12 employment with the jail the first time is because you
13 went to work for the Russellville Police Department.  Is
14 that accurate?
15    A     Yes.
16    Q     Okay.  And when did you begin your employment
17 with the Russellville Police Department?
18    A     I believe it was July of 2001.
19    Q     Had you ever applied for any other law
20 enforcement agencies before that time?
21    A     Not that I can recall.
22    Q     How long were you employed with the
23 Russellville Police Department?
24    A     Until -- I believe it was November of 2001.
25    Q     Who was the chief at the time that you were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of WILLIAM ARMOUR, taken on February 01, 2022

22..25

Page 22

1  hired in July of 2001?

2      A    Jim Pendergraff.

3      Q    And in what capacity were you hired with the
4  department?

5      A    Just as a patrolman -- a trainee.

6      Q    Why did your employment end with the
7  Russellville Police Department in November of 2001?

8      A    It ended voluntarily, but it was because I had
9  failed the firearms exam twice because of my limited
10 vision so I voluntarily quit at that time.  And it was
11 contingent upon if I got my vision corrected, I could
12 apply for the job back if I wanted to.

13     Q    Did someone communicate to you that you could
14 reapply if you wanted?

15     A    Yes.

16     Q    And who communicated that to you?

17     A    Jim Pendergraff.

18     Q    How would you describe your relationship with
19 Chief Pendergraff when you left the Russellville Police
20 Department?

21     A    It was good.

22     Q    It was an amicable --

23     A    Yes.  Definitely.

24     Q    -- termination or resignation?

25     A    Yeah.  We discussed the options and what would

Page 23

1  be best, and I determined that me resigning voluntarily
2  would be best.  It would allow them to bring somebody
3  else in if they needed to.

4      Q    Did you ever reapply with the department?

5      A    I don't believe I did.

6      Q    When your employment ended with the
7  Russellville Police Department in November of 2001, did
8  you hold any animosity to anyone at the department?

9      A    No.  None at all.

10     Q    Sir, what prompted you to apply for a position
11 at the Logan County Detention Center?

12     A    The first time I worked there?

13     Q    Uh-huh.

14     A    Felt like it was a kind of a good stepping
15 stone if someone wanted to be a police officer.  So
16 that's why I applied there.

17     Q    And then what prompted you to apply with the
18 Logan County Detention Center in 2003?

19     A    I was in school, and most of my classes were
20 on Tuesday and Thursday.  And I was able to work out a
21 schedule with the jail where I could continue to work
22 full-time, but I could be off the two days that I
23 needed.  So essentially I worked every weekend to kind
24 of sacrifice for those two days so I could go to school.

25     Q    How did you do when you were at Western?  How

Page 24

1  were your grades?

2      A    I graduated with a 4.0.

3      Q    Congratulations.

4      A    Thank you.

5      Q    During your tenure at the Russellville Police
6  Department, did you form any relationships with any of
7  the officers that were there at the top?

8      A    Not really anything -- I mean, of course
9  everybody knew each other.  We talked and we got along
10 but not really a personal relationship that continued
11 outside of work.

12     Q    Let me ask you about some of the specific
13 officers that are involved in this case to see if you
14 know them or worked with them at the time.  Okay?

15     A    Uh-huh.

16     Q    Are you familiar with Kenneth Edmonds?

17     A    I am.

18     Q    How do you know Kenneth Edmonds?

19     A    He was a detective at the Russellville Police
20 Department, and I was assigned to ride with him for some
21 of my field training experience.

22     Q    So when you were employed at the Russellville
23 Police Department, Mr. Edmonds was also employed there;
24 is that correct?

25     A    Correct.

Page 25

1      Q    And so he was a field training officer?

2      A    Yes.  That's one of the roles he had.  He was
3  also detective, I do believe.

4      Q    How would you describe your relationship with
5  Detective Edmonds while you were employed at the police
6  department?

7      A    It was good.  I had a lot of respect for him.
8  I think he's a tremendous officer.

9      Q    Did you ever socialize with Detective Edmonds
10 outside of the workplace?

11     A    No.  I did not.  Most of the time I was in
12 Richmond at training so I didn't really form any outside
13 of work relationships with anybody there.

14     Q    So while you were employed at the Russellville
15 Police Department, you went to training in Richmond?

16     A    Yes.

17     Q    Was that the police academy?

18     A    Yes.  The DOGC -- CT -- DOJCT.  Excuse me.

19     Q    I know.  I mess that up every time.

20     A    I do, too.  Still.

21     Q    And it was there that you failed the firearms
22 test.  Is that right?

23     A    That's -- that's correct.

24     Q    How long were you in training at that academy?

25     A    I want to say it was close to 12 weeks.  12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 9 of 80 PageID #:
2596
The Deposition of WILLIAM SCHER, taken on February 01, 2022
26..29

Page 26

1  out of 16 weeks, I believe.
2      Q    All right.  I'll ask you some more about that
3  here in just a minute.
4      A    Okay.
5      Q    When you left the Russellville Police
6  Department, how would you describe the relationship that
7  you had with Detective Edmonds at that time?  Was it an
8  amicable relationship?
9      A    Yes.  Yeah.  It was professional.
10     Q    Sir, are you familiar with an individual named
11  John Ed Higgins?
12     A    I am.
13     Q    How do you know Mr. Higgins?
14     A    We rode to the police academy together.  We
15  carpooled.
16     Q    So Mr. Higgins was employed at the
17  Russellville Police Department at the same time as you?
18     A    I think he had started maybe four or eight
19  weeks before I had at the police academy.
20     Q    And the two of you carpooled from Russellville
21  to Richmond?
22     A    Yes.  Until he graduated.
23     Q    And how far is that?  Oh, I'm sorry.
24     A    Yeah.  It's several hours.  I believe it was,
25  like, two and a half, maybe three.

Page 27

1      Q    And how would you describe your relationship
2  with Higgins at the time that you were employed at the
3  police department?
4      A    It -- it was friendly.
5      Q    Sir, do you know an individual named
6  Ronald Mills?
7      A    I do.
8      Q    And how do you know Mr. Mills?
9      A    He was a police officer at the Russellville
10  Police Department.
11     Q    At the same time that you were employed there?
12     A    Yes.
13     Q    What would you consider your relationship or
14  how would you describe your relationship with him?
15     A    The same as the others.  Professional.
16  Friendly but professional.
17     Q    Do you know Chad Eggleston?
18     A    I have met him several times.  But as far as
19  knowing him, I -- I did not work with him.  And I've
20  only met him a few times when he brought inmates to the
21  jail.
22     Q    You may have already told me this, but I'm not
23  sure.  Who was the chief at the time that you were
24  employed with the Russellville Police Department?
25     A    It was Jim Pendergraff.

Page 28

1      Q    And how would you describe the relationship
2  that you had with Chief Pendergraff at the time?
3      A    It was professional.  I had a lot of respect
4  for him.
5      Q    Sir, do you know who David West is?
6      A    I'm only familiar with that name by hearing it
7  here.  I know he's a state -- he worked for the state
8  police, I assume.
9      Q    You didn't have a working relationship with
10  David West --
11     A    No.
12     Q    -- while you were employed at the Russellville
13  Police Department?
14     A    No.  I did not.
15     Q    Did you come to know who David West was
16  through your employment with the detention center?
17     A    I believe I may have met him a few times when
18  he had -- he brought an inmate in, but as far a
19  relationship, it would've been only professional and
20  through that -- through the jail.
21     Q    Do you know a trooper by the name of Jaman?  I
22  think I'm pronouncing that correct but -- Childers?
23         MS. ARNETT:  Amy, it's pronounced Jaman.
24         MS. STAPLES:  Jaman.  Sorry.
25         MS. ARNETT:  It's okay.

Page 29

1         MS. STAPLES:  I messed it up last time.  I
2     thought -- so I was trying to do it different this
3     time.
4         MS. ARNETT:  It's okay.
5      A    I don't recall.  I don't recall that name --
6  that trooper's name.
7  BY MS. STAPLES:
8      Q    Are you familiar with KSP Officer
9  William Smith?
10     A    William Smith?  I don't recall that name
11  either.
12     Q    Okay.  Now, while you were employed as a
13  Russellville police officer, did you become familiar
14  with any of the local court bailiffs?
15     A    I knew who some of the bailiffs were, but that
16  would've been more of a relationship and interaction
17  that would've been formed at the detention center.
18     Q    Okay.  While you were employed at the
19  detention center, did you come to know a Noble Clark?
20     A    I did.
21     Q    And actually, I guess what I should ask you
22  is: Did you know Noble Clark outside of your employment
23  --
24     A    I didn't.
25     Q    -- with the detention center?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PORTER, taken on February 01, 2022

30..33

Page 30

1    A    No.  I did not.

2    Q    So your interaction with him would've been at
3 the detention center?

4    A    Correct.

5    Q    And what was Mr. Clark's role at the detention
6 center?

7    A    He worked at the sheriff's department, and I
8 believe the only thing I ever known him to do would be
9 transport inmates from court to the jail.  And I think
10 every now and then, he would serve the -- like an odd
11 (phonetic) warrant -- you know, maybe somebody with
12 fines or things like that.  He was an older gentleman so
13 he didn't do anything that was too risky that I'm aware
14 of.

15    Q    Did you ever observe Mr. Clark walking
16 unaccompanied through Mr. Jenkins' office?

17    A    No.  I did not.

18    Q    Did court bailiffs or sheriff's deputies have
19 access to Mr. Jenkins' office to your knowledge?

20    A    Not that I'm aware of.  No.

21    Q    Okay, sir.  Well, when you were hired the
22 second time by the Logan County Detention Center -- I'm
23 focusing on your employment from 2003 to 2004.  So when
24 you were hired in 2003 at the Logan County Detention
25 Center, were you provided with a copy of a policies and

Page 31

1 procedures manual or a standard operating procedures
2 manual?

3    A    Yes.  We always had access to that.

4    Q    What type of access did you have?

5    A    There was a copy that was kept in the control
6 room, and there was a copy that was kept in Bill
7 Jenkins' office.

8    Q    Were you given an individual or a personal
9 copy of that manual?

10    A    I don't recall.  I -- I can't say with 100
11 percent certainty whether I was or whether I wasn't.

12    Q    Can you recall in what form that manual
13 existed?

14    A    Yes.  It was printed.  It was in three-ring
15 binders.

16    Q    Did you review that manual --

17    A    Several times.

18    Q    -- in 2003?

19    A    Yes.  Several times.

20    Q    Is it your memory that there was a manual in
21 existence at the jail in 2004?

22    A    That's correct.

23    Q    Do you have any recollection as to who
24 informed you of the existence of that manual when you
25 were hired in 2003?

Page 32

1    A    It was Bill Jenkins.

2    Q    What did Mr. Jenkins tell you about that
3 manual?

4    A    That there was a policy and procedures that I
5 needed to review.  And if I had any questions about
6 anything, I should come to him.  But that I needed to
7 review it within the first week of my work.  Is I -- if
8 I recall correctly, that's what I was told.

9    Q    Were there any changes made to that manual
10 when you were employed at the detention center in 2003
11 through 2004?

12    A    Nothing specifically that I can recall, but
13 that doesn't mean that there weren't changes.

14    Q    Do you recall ever being made aware of changes
15 to the manual?

16    A    I recall being made aware of changes to
17 specific policies at the jail.

18    Q    How were you made aware of those specific
19 changes?

20    A    There were usually -- if it was something that
21 was specific to you in your operations, there would be a
22 -- a letter that had your name on it.  It would be
23 sealed.  It would be left at the time clock.  And
24 general policies -- they would be taped up at the time
25 clock where everybody could view it when they clocked in

Page 33

1 or out.  Most of the time, they would be covering the
2 time cards so you actually had to manually lift up the
3 piece of paper to get your time card.  Then you would
4 have to sign off.

5    Q    What do you mean by you had to sign off?

6    A    You had to put -- place your initials on the
7 memo showing that you had reviewed it, and you
8 understood the contents, and you had no questions.

9    Q    Okay.  Sir, do you happen to have any copies
10 of that manual in your possession?  Not necessarily
11 there with you today but at your home or anywhere?

12    A    No.  I do not.

13    Q    I understand that I'm asking you some
14 questions from quite a while ago, but I'm going to ask
15 you some questions about some specific policies that may
16 or may not have been in place at the jail in 2004.  I'm
17 just asking you to, you know, tell me what you remember
18 to the best of your memory, okay?

19    A    Okay.

20    Q    Did the Logan County Detention Center have a
21 specific policy in place in 2004 relating to the
22 handling of physical items that you recovered from an
23 individual during the booking process?

24    A    Yes.

25    Q    What was that policy?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    A    If I remember correctly, there was a manual
2  sheet  Let's say for instances I searched you, and you
3  had a set of car keys.  I would have a sheet that would
4  have a property list.  I would write car keys, a
5  description, anything describing the item.  And also, I
6  believe on the SOM program that we had, you could enter
7  that in as well.
8    Q    What's the SOM program?
9    A    It stands for sheriff's office management
10  program.  I believe it's just a generic term.  It was a
11  program that we used to book in inmates.
12    Q    Was that a program on the computer, like, an
13  electronic program?
14    A    Yeah.  Yes, ma'am.
15    Q    Was there any specific written policy in place
16  in 2004 relating to the documentation of an inmate's
17  physical or mental health at the time booking?
18    A    As far as I can remember -- I don't know if it
19  was out of policy or if it was out of just my personal
20  habit, but I always made an effort.  If there was
21  anything out of the ordinary, somebody was
22  extraordinarily intoxicated, if they had injuries or
23  anything like that, we were supposed to document it, I
24  do believe.  And we were allowed -- I know we were
25  allowed to refuse intake of an inmate that was so

Page 35

1  intoxicated we thought it was a risk, or they had
2  injuries that would need medical care before we could
3  take them into our custody.
4    Q    But sitting here today, you can't recall if
5  that was simply your habit or if you performed those
6  tasks related to a specific policy?
7    A    Documenting a person's condition -- I don't
8  know if that was a specific policy, but if a person was
9  too intoxicated or if they had sustained injuries -- I
10  know there was a specific policy about refusing intake,
11  but as far as documenting something else, something that
12  would have been out of the ordinary, I don't know if
13  there was a specific policy about writing any of that
14  information down.
15    Q    Okay.  Did the Logan County Detention Center
16  have a written policy in 2004 relating to the use of
17  physical force against one who was detained there?
18    A    Yes.  Absolutely.
19    Q    And what was that policy?
20    A    I cannot recall with 100 percent accuracy the
21  direct wording of it, but I know that there was a
22  continuum that was given.  Different levels of force for
23  different situations.  Like, step one would be verbal.
24  Step two would be what would be called soft hands like
25  moving, or pushing, or pulling a person.  Step three, I

Page 36

1  believe, would have been OC spray.  Step four would have
2  been taser or baton.  And step five would have been
3  lethal force if I remember correct.
4    Q    So the policy included language about that
5  continuum?
6    A    Yes.  It also had language about -- that
7  depending on the level of force you were met with, you
8  could enter the continuum at any step that was
9  necessary.  Does that make sense?
10    Q    Against the stated guidance on what type of
11  force could be utilized in specific situations.  Is that
12  right?
13    A    They gave you guidelines on what type of force
14  that you would use depending on what type of force you
15  were met with.
16    Q    Did the Logan County Detention Center have a
17  policy in place in 2004 relating to the documentation of
18  any physical force that was employed upon one that was
19  detained there?
20    A    Yes.  You had to record any use of force
21  action.
22    Q    And how would you report that?
23    A    Immediately after the incident, you would have
24  to write it down on a shift log because we had a manual
25  paper shift log.  At this time, this happened.  Then you

Page 37

1  would have to go off somewhere and, you know, sit down
2  write a -- handwritten or typed report.
3    Q    Is there a specific form that was utilized to
4  document use of force incidents?
5    A    It was just a general incident report, I do
6  believe.
7    Q    Earlier, you testified about the use of force
8  policy and mentioned that that use of force policy
9  included the continuum on the types of force that could
10  be used.  And one of those potential uses of force was
11  OC spray.  Is that right?
12    A    Correct.
13    Q    Was there anything specific in that policy
14  that dealt with the number of times OC spray could be
15  used against an individual within one setting?
16    A    Not that I can recall.
17    Q    Sir, do you know what the meaning of
18  exculpatory evidence is?
19    A    I do.
20    Q    What is that?
21    A    It is evidence that can be used by the
22  defendants to essentially show that it would be
23  beneficial for a defendant.
24    Q    Did the Logan County Detention Center have a
25  policy in 2004 relating to the preservation of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 12 of 80 PageID
#: 2599
The Deposition of WILLIAM PORTER, taken on February 01, 2022
38..41

Page 38

1  potentially exculpatory evidence?
2      A    Not that I can recall.
3      Q    Did the Logan County Detention Center have a
4  policy in 2004 relating to the disclosure of exculpatory
5  evidence?
6      A    Not that I would have been made aware of.
7      Q    All right, sir.  I believe Bethany may have
8  some documents there.
9          MS. STAPLES:  Bethany, do you have the
10  documents --
11         COURT REPORTER:  Yes.
12         MS. STAPLES:  -- that were printed?
13         COURT REPORTER:  I do.
14         MS. STAPLES:  Okay.  I'd like to mark
15  Plaintiff's Exhibit number 1 what's Bates stamped
16  Logan 145.
17     (EXHIBIT 1 MARKED FOR IDENTIFICATION)
18         COURT REPORTER:  Give me one second.  Is it
19  just one page?
20         MS. STAPLES:  It is.
21         COURT REPORTER:  Got you.  Give me one second.
22  There you go.  I've handed it to the witness.
23         MS. STAPLES:  Thank you.
24  BY MS. STAPLES:
25     Q    Sir, if you could take just a second to review

Page 39

1  that for me, please.
2      A    Okay.
3      Q    Do you recognize this document?
4      A    I do.
5      Q    What is this document?
6      A    It's an employee evaluation.
7      Q    And who is the employee that is being
8  evaluated?
9      A    That's me.
10     Q    And who is the employee who is doing the
11  evaluation?
12     A    That is definitely Bill Jenkins' writing.
13     Q    I know you recognize that writing.
14     A    100 percent.
15     Q    Do you also see his name there towards the
16  bottom of the page under "prepared by"?
17     A    Yes.  I see his printed name.
18     Q    Were employees regularly evaluated at the
19  Logan County Detention Center?
20     A    I do believe that every six months and year
21  you were evaluated.
22     Q    Okay.  I know it's been a long time, but do
23  you recall being evaluated by Bill Jenkins in February
24  of 2004?
25     A    I do recall being evaluated, but it may not be

Page 40

1  this specific time.  I can't really clarify that
2  chronologically in my memory, but I do remember being
3  evaluated.
4      Q    Okay.  Would you agree with me that according
5  to this document, number 1 stands for outstanding?
6      A    I do.
7      Q    And would you agree with me that under primary
8  abilities, you were ranked as outstanding on every
9  skill?
10     A    Yes, ma'am.
11     Q    Would you agree with me that under the general
12  job skill, you were ranked as outstanding on every job
13  skill there?
14     A    Yes, ma'am.
15     Q    And under management, would you agree with me
16  that you were given an evaluation of outstanding in
17  every task except for one?
18     A    Yes.
19     Q    And in that lone task, that was expressing
20  good judgment to make decisions and take action, you
21  were given a number 2?
22     A    Correct.
23     Q    And number 2 stands for above average; is that
24  correct?
25     A    Correct.

Page 41

1      Q    So you'd agree with me that Mr. Jenkins gave
2  you an outstanding evaluation in February of 2004?
3      A    Yes, ma'am.  According to this form.
4      Q    And there, Mr. Jenkins provided some comments,
5  correct?
6      A    Yes, ma'am.
7      Q    What are those comments?
8      A    It says "Bill Porter has been proven to be an
9  essential part of the shift he works.  He has great
10  computer skills and is an EMT and a first aid CPR
11  instructor.  He does a very good job at the jail."
12     Q    Okay.  I think you've already testified that
13  you had a good working relationship with Jailer Jenkins;
14  is that right?
15     A    Correct.
16     Q    Now during your employment with the Logan
17  County Detention Center, were you ever disciplined for
18  failing to follow a policy?
19     A    Not that I can recall.
20     Q    All right, sir.  So I'd like to show you what
21  we'll mark as Plaintiff's Exhibit number 2.
22     (EXHIBIT 2 MARKED FOR IDENTIFICATION)
23         MS. STAPLES:  Bethany, if you could please
24  give him what's Bates stamped Logan 133.
25         COURT REPORTER:  All right.  The witness has

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PEYTON, taken on February 01, 2022

42..45

Page 42

1    the document.
2 BY MS. STAPLES:
3    Q    You take a minute just to review that for me
4 please, sir.
5    A    Okay.
6    Q    Do you recognize this document, sir?
7    A    I'm -- I do now.  I -- I recognize what it is
8 now.
9    Q    Does it say, "counseling session document"?
10    A    It is.
11    Q    And it's dated June 5, 2004?
12    A    It is.
13    Q    What are the circumstances regarding this
14 counseling session?
15    A    According to this, it was over my absences on
16 Fridays.
17    Q    Okay.  Do you recall having a conversation
18 with Jailer Jenkins about your Friday absences?
19    A    I -- I do vaguely now.  Yes.  I do.
20 Absolutely.
21    Q    What were the reasons that you were absent on
22 those Fridays according to your recollection?
23    A    The issue was with my wife's grandparents.
24 They'd asked us to come stay with them because they were
25 getting older.  And there were none that -- they had a

Page 43

1 -- a large house.  They were unable to take care of it
2 so they thought it'd be beneficial for us to move in
3 with them, and it would be beneficial for them to move
4 in with them.  And that was the issue as far as I can
5 remember at that time.
6    Q    And you explained those circumstances to
7 Jailer Jenkins during this counseling session?
8    A    Yes.  According to this letter.
9    Q    And according to this letter, Jailer Jenkins
10 told you that he appreciated your truthfulness, and
11 being candid, and the explanation of your absences?
12    A    That's -- yes.  That's what it says.
13    Q    And he said that you'd been a good deputy and
14 a most dependable deputy; is that correct?
15    A    Correct.
16    Q    And he stated, during this counseling session
17 in June of 2004, that he hoped that you continued your
18 employment with the Logan County Detention Center.  Is
19 that correct?
20    A    That's correct.
21    Q    During your employment at the Logan County
22 Detention Center from 2003 to 2004, were you ever
23 disciplined for the use of force against an inmate?
24    A    Not that I can recall there being an actual
25 incident where I'd use force, but I think it may have

Page 44

1 been alleged one time that I'd use force that was out of
2 the ordinary under the circumstances.  But I -- I don't
3 recall.
4    Q    Do you remember what those circumstances were
5 regarding that incident where it was alleged that you
6 may have used force?
7    A    Yes.  I -- I believe it was -- a nurse at the
8 jail thought that I had assaulted an inmate or something
9 and maybe -- we were just horsing around or something
10 when we were passing out medicine.  I'm -- I'm not sure.
11    Q    Were you ever disciplined for that incident?
12    A    Not that I'm aware of.
13    Q    Sir, how would you describe your general
14 treatment of the inmates at the detention center in
15 2004?
16    A    I tried to be professional and respectful,
17 trying to, you know, stay neutral and remember that, you
18 know, sometimes people that are in jail -- they're
19 accused of incidents.  Sometimes they're there because
20 they've been found guilty, but they're still human.  And
21 so that's how I tried to treat everybody.
22    Q    Were there ever any occasions while you were
23 employed at the Logan County Detention Center that you
24 did have to employ physical force against an inmate?
25    A    There were several occasions.  Yeah.

Page 45

1 Absolutely.
2    Q    Was it your standard practice to document when
3 you employed that use of force?
4    A    It was my standard practice to document when
5 anything that was not normal routine happened.
6    Q    I'd like to show what we'll mark as
7 Plaintiff's Exhibit number 3.  It's Bates stamped
8 Logan 100.
9        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
10        COURT REPORTER:  I handed the document to the
11 witness.
12    A    Okay.
13    Q    Do you recognize this document?
14    A    I -- I do.
15    Q    And what is this document?
16    A    It's relating to an incident where an
17 intoxicated individual had been brought into the jail.
18 He was kicking the door to the point where -- you know,
19 he was also running face first into the door so we
20 determined that if we didn't take some sort of action,
21 that he was going to severely injury himself.
22    Q    And did you take action?
23    A    I did.
24    Q    Did you keep him from injuring himself?
25    A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1    Q    What did you do?

2    A    Okay.  The first few times we went in there,
3  we physically removed him from the detox cell door area.
4  We sat him down on the floor.  We tried to explain to
5  him, you know, if you don't stop this, we're going to
6  have to go take this a step further.  We couldn't take
7  him to isolation because he was intoxicated so he had to
8  be observed for at least eight hours to ensure that it
9  was safe to place him in either general population or
10  isolation.  So the incidents continued.  And one time
11  that I was in his cell, he came running at me head first
12  so I used a taser on him.  But I had -- before I went
13  into the cell -- I -- you -- the taser -- you can deploy
14  it from a distance or you can remove the cartridge and
15  you can use it as a -- a type of stun gun, which --
16  that's what I used because if you use the taser
17  cartridge, you're going to have to take the person to
18  the hospital and there's a risk that, you know, the
19  barbs will get stuck in him.  It could cause further
20  injury that I didn't think was necessary if I had to use
21  it.

22    Q    So when you deployed the taser, you did so in
23  the drive stun mode or --

24    A    Correct.

25    Q    -- the stun gun versus the throw --

Page 47

1    A    Yes.  The dry stun.

2    Q    And is this a -- I'm sorry.  I hate to talk
3  over you.  I promise I'm not trying to.

4    A    Oh, no.  I --

5    Q    That's the thing about doing this remotely.
6  It's hard to tell when you're finished talking so my
7  apologies for that.

8    A    Right.  No.  It's okay.  I understand.

9    Q    So this is document where you documented your
10  use of the taser.  Is that right?

11    A    Correct.

12    Q    To whom did you address this document?

13    A    It would have been to Bill -- oh, hold on.  I
14  think it was to Donnie Warren actually.

15    Q    Okay.  What's the date of this document?

16    A    It is Tuesday, November the 23, 2004.

17    Q    And so you're explaining to Donnie who was
18  your -- was Donnie your captain?

19    A    No.  Donnie was not the captain, but I can't
20  remember his exact title.  I think it may have been
21  field training officer, and he was in charge of training
22  deputies on OC spray, pepper ball guns, tasers, batons,
23  you know, any less than lethal weapon that we had there.
24  And I do believe he was in charge of firearms training
25  as well.

Page 48

1    Q    So you were documenting that you had used the
2  taser.  And in this documentation, you asked Donnie to
3  review it and to determine if he agreed that force was
4  necessary.  Is that correct?

5    A    Yes.  Absolutely.

6    Q    So you wanted the field training officer's
7  opinion on the actions that you took that day?

8    A    Correct.

9    Q    Do you agree that this is an example of a time
10  that you documented something out of the ordinary at the
11  detention center?

12    A    Yes.  Correct.

13    Q    Sir, was it also your standard practice to
14  document combative behavior inmates at the Logan County
15  Detention Center?

16    A    Yes.  It was.

17    Q    All right.  I would like you to take a quick
18  look at what we'll mark as Plaintiff's Exhibit number 4.
19  It's Bates stamped Logan 149.

20        (EXHIBIT 4 MARKED FOR IDENTIFICATION)

21        COURT REPORTER:  There you go.

22        THE WITNESS:  Thank you.

23        COURT REPORTER:  You're welcome.

24    A    Okay.

25  BY MS. STAPLES:

Page 49

1    Q    Do you recognize this document?

2    A    I do.

3    Q    What is this document?

4    A    It's about an incident where I was assisting
5  the court because they didn't have enough bailiffs that
6  day.  And I saw an inmate stuck a cigarette and a pack
7  of matches in his pants.  And when he asked to go to the
8  restroom, he went in there and smoked.

9    Q    And what's the date of this document?

10    A    It is February 4, 2004.

11    Q    Is this another example of a time that you
12  documented incidents that occurred at the Logan County
13  Detention Center?

14    A    It is.  That's my signature.

15    Q    After you drafted incident reports, what would
16  you do with those reports generally?  What was the
17  process?

18    A    I would make copies of the report.  I always
19  put one of them for myself in an envelope.  I would put
20  the date, the time, and what it was regarding.  A copy
21  would go to Bill Jenkins and anyone else that it was
22  necessary to go to depending on the type of the
23  incident.  And also I would put one in the inmate's file
24  folder.  And like this report here, this was talked out
25  using the sheriff's office management program.  So this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of WILLIAM PEDIGO, taken on February 01, 2022

50..53

Page 50

1  would have been in the digital file as well, I do
2  believe.
3      Q    Were there any occasions in which you
4  documented incidents that you did not use that software
5  that you're speaking of?
6      A    Yes.
7      Q    What type of incidents would cause you not to
8  use the software?
9      A    If I remember correctly, I believe there was a
10  time that we couldn't use the software for various
11  reasons.  I don't -- I don't mean we couldn't.  It
12  wasn't capable of taking these reports at the time if I
13  remember correct.  And we always had the handwritten
14  blank sheets that had lines on them that said incident
15  report and had in spots where you could fill out date,
16  time, and pertinent information.
17      Q    All right, sir.  You testified earlier that
18  you attended the police academy, correct?
19      A    Correct.
20      Q    What type of training did you receive there at
21  EKU?
22      A    There were several types.  From anything to
23  how to -- to drive, operate a police car defensively and
24  offensively to firearms training, crime scene
25  investigation, you know, collection of fingerprints,

Page 51

1  collection of evidence, general, you know, law,
2  constitutional law, the rights of individuals that you
3  arrest.  Things like that.
4      Q    Did you receive any training there at EKU on
5  the use of force against detainees?
6      A    Absolutely.  Extensive training.
7      Q    Did that training include the continuum like
8  you spoke of earlier?
9      A    Yes, ma'am.  It did.
10      Q    Now when you first began working for the
11  detention center in 2003, were you given any training
12  specifically by those employed at the detention center
13  or by the detention center to give you training?
14      A    You'll --
15      Q    That's a bad question.  Do you understand what
16  I'm saying?
17      A    I -- I do.
18      Q    I'm talking about internal training at the
19  Logan County Detention Center.
20      A    So you're not referring to whether I received
21  the Kentucky jail training that we did yearly that was
22  provided by external instructors.  You're asking whether
23  I received internal instruction from people in the jail.
24  Is that correct?
25      Q    Yes.  That's correct.

Page 52

1      A    Yeah.  Constantly.
2      Q    What kind of training did the Logan County
3  Detention Center provide you internally?
4      A    There would've been training on, you know,
5  actual -- the less-than-lethal devices we had available
6  at the jail.  You know, training on how to handle
7  somebody combative.  There was first aid training, CPR
8  training.  Just the type of general training of anything
9  that we would use inside the facility.  There was the
10  ability to always receive training.
11      Q    Now you mentioned earlier something about the
12  yearly training that was provided to you jail employees.
13  What did you mean by that?
14      A    Every year, each employee of the jail is
15  required to attend a certain number of hours of training
16  that's provided by the Department of Corrections.  And
17  in order to continue your employment, you have to attend
18  that training.
19      Q    Let me ask you about something that may
20  pertain to that DOC training.  We'll mark this as
21  Plaintiff's Exhibit 5.  It's Bates stamped Logan 154.
22      (EXHIBIT 5 MARKED FOR IDENTIFICATION)
23      COURT REPORTER:  Here you go.
24      THE WITNESS:  All right.
25      MR. SMITH:  Amy, can we take a break when you

Page 53

1  get to a stopping point?
2      MS. STAPLES:  Sure.  We can go ahead and take
3  that break now.  Five minutes good, Aaron?
4      MR. SMITH:  Absolutely.
5      MS. STAPLES:  All right.
6      VIDEOGRAPHER:  Off the record at 11:09.
7      (OFF THE RECORD)
8      VIDEOGRAPHER:  Back on the record at 11:16.
9  BY MS. STAPLES:
10      Q    Great.  So right before we took a break, we
11  handed in what we marked as Plaintiff's Exhibit number 5
12  Logan 154.  Did you have a second to review that
13  document?
14      A    I did.
15      Q    And what is this document?
16      A    As far as my recollection, I'm asking about a
17  provision.  I believe it was in -- it was either in the
18  Kentucky Administrative Regulations or it was in the
19  Kentucky Revised Statutes about the training that we
20  were required to receive.  It could have also been a DOC
21  regulation.  I'm not sure.
22      Q    Let me ask you, sir.  Do you have two pages to
23  that document or just one?
24      A    I just have one.
25      MS. STAPLES:  Okay.  Bethany, do you see

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 165     Filed 10/03/25     Page 16 of 80 PageID
#: 2603
The Deposition of WILLIAM PIERCE, taken on February 01, 2022
54..57

Page 54

1    what's Bates stamped Logan 155?
2         COURT REPORTER:  I do.
3         MS. STAPLES:  Can you hand that to him as
4    well?  That'll be part of Plaintiff's Exhibit 5.
5         COURT REPORTER:  Absolutely.  I just handed it
6    to him.
7         MS. STAPLES:  Thank you.
8    A    Okay.
9    BY MS. STAPLES:
10   Q    So first of all, looking back on that first
11   page, 154.
12   A    Uh-huh.
13   Q    Do you recognize the writing on this document?
14   A    Yeah.  That's mine.  It's definitely mine.
15   Q    To whom is this addressed?
16   A    Bill Jenkins.
17   Q    Okay.  And now that you've looked at that
18   second page, 155, does that refresh your recollection
19   of --
20   A    It -- it does, ma'am.
21   Q    -- training you were requesting?
22   A    Yes.
23   Q    And what was that?
24   A    The Department Of Corrections Basic Training.
25   Q    Was that something that, ultimately, you were

Page 55

1    permitted to attend?
2         A    Yes.  As far as my recollection, I do believe
3    so.  I did receive some DOC training, and I believe this
4    was it.
5    Q    And that DOC training is something, in this
6    incident, that you specifically requested you get.  You
7    were asking for additional training; is that right?
8         A    Yes.
9    Q    All right.  Sir, while you were employed with
10   the Logan County Detention Center in 2003-2004, did you
11   have any occasion to instruct any of the other Logan
12   County Detention Center employees?
13        A    I did.
14   Q    What type of instruction did you give to those
15   employees?
16        A    CPR and first aid.
17        MS. STAPLES:  All right.  And Bethany, if you
18   could please hand him what's marked Logan 107.
19   We'll mark this as Plaintiff's Exhibit number 6.
20   (EXHIBIT 6 MARKED FOR IDENTIFICATION)
21        COURT REPORTER:  Here you go.
22        THE WITNESS:  All right.  Thank you.
23        COURT REPORTER:  You're welcome.
24        A    Okay.
25   BY MS. STAPLES:

Page 56

1    Q    Do you recognize this document, sir?
2    A    I do.
3    Q    What's this document?
4    A    I received CPR and AED first aid instruction
5    -- instructor certification from the American Red Cross.
6    And I believe this was so I could provide that service
7    to the jail.
8    Q    Okay.  You were requesting credit for the
9    instruction that you were giving to the others; is that
10   correct?
11   A    Correct.
12   Q    And that instruction was on CPR and AED
13   certification?
14   A    Correct.
15   Q    And what's AED stand for?
16   A    Automated external defibrillator.
17   Q    Did you ever provide any other type of
18   training to employees of the Logan County Detention
19   Center?
20   A    In my role as a shift sergeant, there -- there
21   were times that I did provide instructions so I -- I
22   don't want to say with 100 percent certainty that I
23   recollect giving training, but I -- I do remember giving
24   instruction to employees.
25   Q    Do you have any recollection of any specific

Page 57

1    instruction that you gave to those employees who were
2    under you at the jail?
3         A    Not right off the top of my head.  I -- I
4    don't honestly.
5    Q    All right.  But as part of your job as a
6    sergeant at the jail, you would regularly give
7    instruction to those that you were in charge of.  Is
8    that correct?
9         A    Yes.  Instructions, guidance.
10   Q    Okay.  Now while you were employed with the
11   Logan County Detention Center, did you ever receive
12   specific instruction on the use of OC spray or chemical
13   spray?
14   A    I did.
15   Q    And what did you learn during your training on
16   the effects of that spray?
17   A    The effects are:  They completely -- if
18   properly administered, they completely incapacitate you
19   in your ability to fight momentarily enough to where an
20   officer or a deputy jailer could gain control if you
21   were combative, or aggressive, or in any other way
22   dangerous.
23   Q    And in what way would it incapacitate an
24   individual?  What were some of the physical effects of
25   the use of chemical spray that you learned during your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM POLSON, taken on February 01, 2022

58..61

Page 58

1  training?
2      A    Specifically, with the spray that we had at
3  the jail, it was called Freeze + P.  There was OC spray
4  mixed with a -- a CS gas, which is tear gas so it was a
5  loss of vision.  Intense burning.  You would discharge
6  mucus and saliva from your nose, mouth, and even
7  sometimes your ears would run with mucus fluid in
8  extraordinary pain.
9      Q    And you said that sometimes even your ears
10 would run with mucus after being sprayed?
11     A    Yeah.  Well, mine did.
12     Q    So you have personally been sprayed with this
13 spray?
14     A    Yes.  Purposefully and accidentally.
15     Q    And when you were purposely sprayed with the
16 chemical spray, was that during a training exercise?
17     A    It was.
18     Q    Was that training exercise at the jail?
19     A    It was.
20     Q    So what were the personal effects that you
21 experienced when you were sprayed with this chemical
22 spray?
23     A    It was almost an immediate reaction of intense
24 pain, and then blindness, and inability to breath.
25 Choking.  It's what I would imagine an asthma attack

Page 59

1  would have felt like.
2      Q    Did it cause you to cough?
3      A    It did.  I was choking, coughing all at the
4  same time.
5      Q    Did it affect your ability to walk steadily?
6      A    Yes.  You have no ability when your eyes are
7  lost.  In my personal opinion, you don't have the
8  ability to kind of maintain your equilibrium.  And I was
9  instructed specifically that I had to be sprayed and
10 then I had to fight to see if I could fight.  And I was
11 not successful to say the least.
12     Q    And you said in your personal opinion -- isn't
13 it also accurate to say in your personal experience that
14 you weren't able to walk steadily?
15     A    Yes.  In my personal experience.
16     Q    Is it accurate to say that in your personal
17 experience, you weren't able to fight after being
18 sprayed with that chemical spray?
19     A    Immediately after being sprayed, no, I was not
20 able to fight.
21     Q    Did the spray cause you to bleed in any way?
22     A    Personally, it did not.
23     Q    How long did the effects of that chemical
24 spray last on you personally?
25     A    The immediate effects were apparent for around

Page 60

1  -- about -- I would say six to ten minutes, but there
2  were residual effects.  And it was reactivated when I
3  took a shower, which I wasn't worrying about, and it was
4  quite unpleasant.
5      Q    What were those effects?
6      A    The oil that was on my face from the OC spray
7  ran down my entire body while I was in the shower.
8      Q    And what reaction did that cause?
9      A    It felt like I was on fire.
10     Q    When you were trained on the use of this
11 chemical spray, did you receive any training on the
12 decontamination process?
13     A    Yes.  Absolutely.
14     Q    What did that training entail?
15     A    There were -- I was instructed there were
16 several ways to decontaminate somebody, and one was the
17 use of water, which you always were -- you needed to be
18 sure that you were in a position where you could tilt
19 someone's hair over a sink and then run water over it
20 from behind and kind of let it run into the sink so that
21 way it didn't run down their body.  And we also had --
22 they almost looked like a moist towelette.  They had a
23 -- kind of like a deactivating chemical.
24     Q    And what would you do with these moist
25 towelettes?

Page 61

1      A    Wipe the affected area.
2      Q    Would that include eyes?
3      A    Yes.  Absolutely.
4      Q    I believe that you testified that you were
5  also accidentally sprayed with this chemical; is that
6  right?
7      A    Yes.
8      Q    Was that at the Logan County Detention Center?
9      A    Yes.
10     Q    And what were the circumstances surrounding
11 that accidental spray?
12     A    It's -- I don't know if you have any
13 experience with the spray, but if you spray in a closed
14 area, such as you would find in a jail, anybody in the
15 immediate area, including other inmates, would be
16 effected.  So it was always a consideration on not how
17 you used it or when you used it, but where you used it.
18 You wanted to protect everybody's safety.
19     Q    Okay.  And how was it that you were
20 accidentally sprayed?
21     A    I do believe it was an incident in an
22 isolation cell.  A male inmate had slit his wrists with
23 a paperclip, and he was spraying blood at us.  So we
24 were trying to subdue him and also protect ourselves
25 from being -- having been exposed to biological fluid of



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 62

1  any kind, any bloodborne pathogens.  So we had
2  determined to use the spray.  And in that close
3  quarters, it got all of us.
4      Q    How many times would you approximate that you
5  used chemical spray on inmates at the Logan County
6  Detention Center?
7      A    Personally?
8      Q    Personally.
9      A    I don't know if I ever used spray.  Maybe
10  once.  I don't recall any specific incident where I used
11  it.
12      Q    When you were trained on the use of the
13  chemical spray, was there any training on the number of
14  times that the spray should be employed against an
15  individual in one setting?
16      A    The only thing that I can recall -- there was
17  not a quantity -- a quantitative amount placed on the
18  amount of times you could use it.  But if you were using
19  the spray and you're putting an individual in distress,
20  then it's probably a good sign you didn't need to use it
21  anymore.  Significant distressed to where, you know, had
22  trouble breathing, loss of consciousness, or any kind of
23  bad reaction.  So it was more of a qualitative
24  assessment rather than a quantitative assessment.
25      Q    If one was having trouble breathing, you were

Page 63

1  trained not to use the chemical spray on that individual
2  again?
3      A    Significant trouble breathing.  One of the
4  effects of the spray is automatically going to be
5  trouble breathing.
6      Q    Uh-huh.
7      A    If you had somebody that appeared to be
8  presenting with a type of, let's say, anaphylactic
9  reaction where they were gasping for air or they
10  couldn't get air at all, and it was causing significant
11  distress -- physical distress, then it was probably safe
12  bet that you didn't need to do it again.
13      Q    All right.  Thank you for that explanation.
14  Now I want to ask you about some of the general
15  procedures in 2004 specifically in regard to when an
16  individual was first brought into the facility.
17      A    Okay.
18      Q    So In 2004, what were the typical procedures
19  when an individual was brought into the detention center
20  by law enforcement?
21      A    The officer would bring the individual in
22  depending on, you know, if they were combative or if
23  they weren't.  You know, we could immediately place them
24  in a detox cell if they were combative.  If not, we
25  would sit them down at a chair in front of the booking

Page 64

1  desk.  The officer would hand us the citation, and
2  usually they would go on about their business.  And
3  that's when we would start our booking process if we
4  were able to.  Sometimes we were busy handing out meals,
5  things like that so we had to -- we would write down
6  that we took in this person at this time, then we hand
7  -- do our normal duties, then we would go back and do
8  the physical booking process.
9      Q    In situations in which an individual was
10  brought into the jail who was combative, did you say
11  that you could immediately place that individual within
12  a detox cell?
13      A    You can.  You'd have to search them first, but
14  yes, you can -- actually, you can do the search in the
15  cell if you have to if there's a significant threat to
16  employees or other inmates.  You could take them
17  straight in there and then do a search, but you have to
18  search them before you leave them alone.
19      Q    In 2004, were there circumstances under which
20  an individual would be brought into the jail through the
21  sally port?
22      A    That's usually where 95 percent of individuals
23  came through the jail.
24      Q    Were there circumstances in which an
25  individual would be held out in the sally port for an

Page 65

1  extended period of time before bringing them in into the
2  physical facility?
3      A    There's only one incident I can recall where
4  that happened.
5      Q    And what incident would that be?
6      A    It would be the night of -- I believe it was
7  9-11-2004.
8      Q    And whom was the individual that you can
9  recall was brought in at that time?
10      A    It was Robert Yell.
11      Q    So in all your time at working at the Logan
12  County Detention Center, Robert Yell was the only
13  individual that you can recall specifically that was
14  held in the sally port for an extended period of time;
15  is that right?
16      A    Yes.
17      Q    And what's your recollection as to why
18  Mr. Yell was held in the sally port for an extended
19  period of time?
20      A    Russellville and Logan County is a small area
21  so, you know, with an allegation as serious as that,
22  they wanted to bring him in in order for him to be
23  physically secure, but he had to be held in that area so
24  that they could collect their evidence because they did
25  not ask us to do this.  But if they would have asked us

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 19 of 80 PageID
#: 2606
The Deposition of WILLIAM PARSON, taken on February 01, 2022
66..69

Page 66

1  to take custody, we probably wouldn't have because they
2  still needed to collect physical evidence, and we
3  wouldn't want to have destroyed any evidence.
4      Q    When you say, "they still needed to collect
5  physical evidence," who are you referring to as "they"?
6      A    I believe it would be the Russellville Police
7  Department when it was primarily responsible for that.
8      Q    All right, sir.  So on September 11th of 2004,
9  you were working at the Logan County Detention Center
10 when Mr. Yell was brought in; is that correct?
11     A    Correct.
12     Q    Can you recall where in the facility you were
13 when Mr. Yell arrived at the facility?
14     A    I was in the sally port.
15     Q    Were any other employees of the detention
16 center in the sally port with you at the time that
17 Mr. Yell arrived?
18     A    I know that Deputy J.W. Hayes was in there,
19 but I can't recall with 100 percent accuracy whether he
20 was in there at the exact time that Mr. Yell arrived or
21 not.
22     Q    Okay.  Who brought Mr. Yell into the sally
23 port?
24     A    I do believe it was Officer Ed Higgins.
25     Q    And you've already testified that you knew

Page 67

1  Officer Higgins from your time as patrolman with the
2  Russellville Police Department; is that correct?
3      A    Yes.  During the time I was receiving
4  training.  Yes.  Correct.
5      Q    Okay.  When Officer Higgins brought Mr. Yell
6  into the sally port, was Mr. Yell handcuffed?
7      A    Yes.
8      Q    Did he remain handcuffed the entire time that
9  he was in the sally port, or were those handcuffs
10 removed at some point?
11     A    As far as my recollection goes, he was
12 handcuffed the entire time.
13     Q    So you've already testified that your
14 recollection is that Mr. Yell was held in the sally port
15 for an extended period of time; is that correct?
16     A    Correct.
17     Q    Sitting here today, do you have an estimate of
18 how long Mr. Yell was held in the sally port?
19     A    I believe it'd being somewhere near the 45
20 minute to an hour mark, maybe a little longer.  An hour
21 and 15 minutes.  Somewhere in that general area, though.
22 It sticks out in my mind.
23     Q    Okay.  And why is it that he was held in the
24 sally port for that extended period of time?
25     A    The officers wanted a secure area to collect

Page 68

1  evidence.
2      Q    And when you say officers, who are you
3  referring to?
4      A    Officers with the Russellville Police
5  Department.
6      Q    You've already testified that Officer Higgins
7  brought Mr. Yell into the sally port.  Can you recall
8  any other officer with the Russellville Police
9  Department who was present at any time with Mr. Yell
10 that night?
11     A    Yes.  Officer Ron Mills was there.
12     Q    You knew Mr. Mills from your time as a
13 Russellville Police Department employee; is that right?
14     A    Correct.
15     Q    Okay (coughs).  Sorry.  What did you
16 personally observe regarding Robert's physical condition
17 when he was first brought in to the sally port when he
18 first arrived?
19     A    He was extraordinarily -- he appeared to be
20 extraordinarily intoxicated.
21     Q    Anything else that you can recall about his
22 physical condition?
23     A    He did have a cut on the right side of his lip
24 near the crease of his mouth.
25     Q    And you noticed that cut when he first arrived

Page 69

1  in the sally port?
2      A    I can't -- I do recall seeing that cut within
3  the first few minutes of him arriving.  I can't say as
4  soon as he got out of the car I noticed it, but I do
5  know, beginning with my interaction with him, that I did
6  notice that.
7      Q    Okay.  Was that cut bleeding?
8      A    It was lightly.  Yes.
9      Q    Did you inquire as to how Mr. Yell received
10 that injury?
11     A    I don't believe I did at the time.  No.
12     Q    Did you notice anything in particular about
13 any smells or odors that were coming from Mr. Yell's
14 person?  I know that sounds like a weird question.
15     A    No.  It's -- I won't forget it.  It was
16 alcohol and OC spray.
17     Q    And when did you notice the smell of alcohol
18 and OC spray on Mr. Yell?
19     A    As soon as the -- doors to the police car
20 were opened.
21     Q    So based on the fact that you could smell the
22 odor of chemical spray as soon as the police car was
23 opened, is it your belief that he had been sprayed with
24 chemical spray before arriving at the jail?
25     A    Correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

70..73

Page 70

1    Q    Now when Mr. Yell first exited the police
2  cruiser, did he have any trouble standing or walking?
3    A    He did.  Both.
4    Q    Did you take any action in response to his
5  trouble standing and walking?
6    A    I don't believe I did immediately.
7    Q    Did you at any point take any action in
8  response to his inability to walk or stand?
9    A    I do believe that we made him sit on the
10 floor, or we made him stay on the floor.
11   Q    What did you observe regarding Mr. Yell's
12 demeanor when he first arrived there in the sally port?
13   A    He was extraordinarily intoxicated.
14   Q    Do you recall anything else about his demeanor
15 in addition to being intoxicated?
16   A    He just -- he was very agitated.  Confused.
17   Q    It's your testimony that you were physically
18 in the sally port when Mr. Yell arrived; is that
19 correct?
20   A    Correct.
21   Q    And how is it that you ended up in the sally
22 port upon his arrival?
23   A    The jail radio.  We're able to communicate
24 directly with police officers, and they're able to
25 communicate with us.  If there was ever a situation

Page 71

1  where we needed assistance at the jail, we can call out
2  directly.  And if they need assistance when they're
3  bringing in somebody, they can call in directly so...
4    Q    And had you gotten a call about his arrival?
5    A    I had over the radio.  The control room had
6  received a request for help from Officer Higgins.
7    Q    And as a result, you went out to the sally
8  port and waited for his arrival; is that correct?
9    A    Correct.
10   Q    Sir, did you know Mr. Yell prior to his
11 arrival in the jail that night?
12   A    Yes.  I've met him.  He had been an inmate
13 before at the jail.
14   Q    What type of interaction had you had with
15 Mr. Yell in your previous experience with him?
16   A    Just normal interaction that he would have had
17 with the jail staff.  I think I may have booked him in
18 before, you know, delivered mail, handed out food trays,
19 things like that.  Just the normal interaction of
20 someone that was an inmate between someone that was an
21 employee.
22   Q    Other than the interaction that you had with
23 Mr. Yell when he was housed in the detention center, did
24 you know him in any other way?  Did you go to school
25 with him?  Did you live in the same town?  Did you know

Page 72

1  him personally?
2    A    Well, we lived in the same town, but I didn't
3  know him personally.  We never went to school together.
4  I'd seen him around town.  I mean, I recognized him from
5  the jail when I'd see him in town, and I knew who it
6  was.  But as far as any interaction, there was none.
7    Q    Does anything stick out to you as to when you
8  had seen him in town?
9    A    Yeah.  I used to see him riding bikes all the
10 time with his kids up by the old Red Kap Factory.  It
11 would run beside Armory Drive, and it would cut up and
12 go down into the neighborhood back there.  And I just
13 remember him.  Whenever I saw him with the kids, he
14 would, you know, stop, get off his bike, make them get
15 off the bikes on the side of the road, wait until the
16 car went by, and then, you know, he would get back on
17 and ride with them.  My wife at the time had made a
18 comment about it.  That's why it sticks out to me.
19   Q    And what type of comment had she made?
20   A    She -- she was pregnant at the time and she
21 was, like, oh, you know, that's -- you know, that's so
22 sweet, you know, look at him take care of those kids
23 like that essentially.  I don't remember her exact
24 words, but that was the spirit of what she was saying, I
25 guess you would say.

Page 73

1    Q    So you'd seen Mr. Yell in town, and you had
2  some previous experience with him when he was housed in
3  the detention center.  Would you call him a friend?
4    A    No.  No, no, no.  Uh-uh.
5    Q    Just someone that you knew from those
6  experiences?
7    A    Right.  Correct.
8    Q    You never socialized with Mr. Yell?
9    A    No.
10   Q    Okay.  Sir, you testified that it was Officer
11 Higgins that brought Mr. Yell into the sally port; is
12 that correct?
13   A    That's correct.
14   Q    What did you observe about Mr. Higgins'
15 interactions with Mr. Yell there in the sally port?
16   A    Are you inquiring about -- is -- you know,
17 when he first got there or specifically --
18   Q    Yeah.  When he first got there, what did you
19 observe regarding Mr. Higgins' interactions with
20 Mr. Yell?
21   A    Well, he asked for help getting him out of the
22 car.  He had -- according to Officer Higgins, Mr. Yell
23 was handcuffed behind the back and he was able to work
24 his handcuffs to the front.  So when he opened the door,
25 he wanted another person there just in case because

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1  according to what he'd told me, he'd been receiving
2  threats of physical violence. That's why he asked for
3  assistance.
4      Q   During your interaction with Officer Higgins
5  and Mr. Yell in the sally port, did you at any time hear
6  Mr. Yell threaten Officer Higgins?
7      A   I can't recall with 100 percent clarity. I
8  know that he cursed at him, but I can't recall if there
9  were any direct threats.
10     Q   Can you recall anything specifically that
11 Officer Higgins said to Mr. Yell?
12     A   I can.
13     Q   What were the comments that you heard
14 Mr. Higgins say to Mr. Yell?
15     A   It was essentially you -- pardon my language.
16 It's, like, you motherfucker. You know you killed those
17 kids. And the reason it sticks in my mind is because --
18 the reaction that it got. I don't know how to explain
19 it. It just -- the reaction is what kept that in my
20 mind.
21     Q   So Officer Higgins said to Robert Yell, you
22 motherfucker. You know that you killed those kids.
23     A   Correct.
24     Q   And you said one of the reasons that sticks
25 out in your mind is because of the reaction. Whose

Page 75

1  reaction are you referring to?
2      A   Mr. Yell.
3      Q   And what was Mr. Yell's reaction to that
4  comment by Officer Higgins?
5      A   It was a -- it was just shock. I don't know
6  how else to explain it. It really stuck with me. It
7  kind of bothered me.
8      Q   Did Mr. Yell respond in any way to Officer
9  Higgins when that comment was made?
10     A   Yeah. He was -- basically said, you know,
11 don't tell me that. That's not true. That didn't
12 happen.
13     Q   How many times did you hear Officer Higgins
14 make that statement to Mr. Yell?
15     A   That exact statement was only one time.
16     Q   Did he make similar statements to Mr. Yell?
17     A   Maybe one other time that I can recall with
18 100 percent factual accuracy.
19     Q   And you said that Mr. Yell's reaction was one
20 of shock?
21     A   Yes. The first -- the first incident. Yes.
22     Q   Okay. And are there other incidents that you
23 can recall?
24     A   Just vaguely. I can't really recall 100
25 percent accuracy what was said, but I do have a general

Page 76

1  vague remembrance of cursing. Mr. Yell cursing at
2  Mr. Higgins.
3      Q   Do you recall Officer Higgins cursing at
4  Mr. Yell?
5      A   Maybe that first time. Maybe a second time. I
6  can't say 100 percent factually. I can the first time,
7  but that's it.
8      Q   Have you ever witnessed any physical contact
9  between Officer Higgins and Mr. Yell when Mr. Yell was
10 in the sally port?
11     A   I did.
12     Q   What did you observe?
13     A   Mr. Yell, in my opinion, was stumbling
14 forward. And I can't speak to Officer Higgins' mind
15 state, whether he felt threatened or not, but he did
16 press Mr. Yell to the floor and told him to sit down.
17 Actually, he pushed him away from him. He hit a door
18 that was in the sally port, and he slid down on the
19 floor.
20     Q   So Officer Higgins pushed Mr. Yell?
21     A   Yes.
22     Q   Is that right? Mr. Yell then hit the door and
23 slid down the wall?
24     A   Yeah. He slid down the door onto the floor.
25     Q   So you recall Officer Higgins putting his

Page 77

1  hands on Mr. Yell. Do you recall at any point Mr. Yell
2  physically touching -- using force against Officer
3  Higgins?
4      A   Well, there is a difference between touching
5  and using force. If you want me to elaborate on
6  touching, I didn't see him touch him. But using force
7  is something subjective.
8      Q   And what do you mean by that?
9      A   Me and you could be in the same situation and
10 interpret it differently as to somebody's intent of harm
11 towards us, and both of us would be right. So I can't
12 speak to Officer Higgins' mind state, and what he felt
13 at the time, and whether he would have considered it
14 using force against him. I can only speak about what I
15 would consider if he had been using force against me.
16     Q   Okay. And that raises a good point. I don't
17 want you to guess as to what Mr. Higgins may --
18     A   Yeah. I can't speculate.
19     Q   -- have been thinking. That's for sure. What
20 I'd like to know is if you ever observed Mr. Yell
21 physically touch Mr. Higgins in any way.
22     A   I did not ever see him physically touch
23 Officer Higgins.
24     Q   Okay. And I guess that does raise another
25 point based on what you just said. Did you ever



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PROCTOR, taken on February 01, 2022

78..81

Page 78

1  personally feel physically threatened by Robert Yell
2  when you were in the sally port?
3      A   I did not.  But I was not the focus of any of
4  his aggression either.  And I'm --
5      Q   Well, you testified that Mr. Yell cursed at
6  Officer Higgins.  Correct?
7      A   That -- that's -- that's what I meant.  Verbal
8  aggression.  Let me clarify that statement.
9      Q   Okay.  So you agree with me that there's a
10  difference between verbal aggression and physical
11  aggression?
12      A   Yes.  I do.  Absolutely.
13      Q   And it's your testimony that you did not
14  observe Robert Yell be physically aggressive toward
15  Officer Higgins?
16      A   Not with his hands.
17      Q   Okay.  Now, while Mr. Yell was in the sally
18  port, did you observe anyone employ chemical spray
19  against him?
20      A   I did.
21      Q   Who did you observe use chemical spray on
22  Mr. Yell?
23      A   I believe another deputy that was with me used
24  it twice.  And I --
25      Q   And --

Page 79

1      A   I'm sorry.  Go ahead.
2      Q   Who was that deputy?
3      A   It was J.W. Hayes.
4      Q   Did you -- what was J.W. Hayes' role at the
5  detention center at that time?
6      A   He was a deputy jailer.
7      Q   Was he one of the deputy jailers that you
8  supervised as sergeant?
9      A   Yes, ma'am.  He was.
10      Q   Did you ask Deputy Hayes to employ the use of
11  chemical spray against Mr. Yell?
12      A   It was not at my instruction.  No.
13      Q   And you said you observed that happen two
14  times?
15      A   Correct.
16      Q   And what were the observations that you made
17  regarding the effects of the chemical spray on Mr. Yell?
18      A   He had seen that -- he -- he had irritated
19  eyes, trouble breathing.  I'm sure it affected his
20  vision from what I could tell.  It -- it caused him to
21  expel mucus from his nose and saliva from his mouth.
22      Q   Caused him to cough?
23      A   It did.
24      Q   Did it cause him to spit?
25      A   He was spitting.

Page 80

1      Q   Did you ever see Mr. Yell spit on Officer
2  Higgins?
3      A   I did not see that.
4      Q   Did you observe blood in the spit that
5  Mr. Yell was exhaling?
6      A   I did.
7      Q   You said that Mr. Yell was having trouble
8  breathing after he was sprayed with the chemical spray?
9      A   Correct.
10      Q   And did you take any action to help Mr. Yell
11  once you observed that he was having trouble breathing?
12      A   Yes.  I discussed it with Officer Higgins.  And
13  he was in agreement that I could decontaminate his face
14  area without, you know, harming the integrity of any
15  evidence that they wished to collect as long as I did it
16  physically and not allow Mr. Yell to touch any of the
17  decontamination cloths.
18      Q   And so what steps did you take?
19      A   I had a -- I believe I had Deputy Hayes
20  retrieve the decontamination towelette, and I
21  decontaminated around his eyes, and nose, and mouth.
22      Q   Using the towelette?
23      A   Correct.
24      Q   At any point, did you allow Mr. Yell to touch
25  that towelette?

Page 81

1      A   No.  Absolutely not.
2      Q   At any point, did you decontaminate Mr. Yell's
3  hands?
4      A   No.
5      Q   After you decontaminated Mr. Yell's face, was
6  he able to breathe better?
7      A   It seemed that he was.  Yes.
8      Q   So at that point, you had either physically
9  observed him -- well, at that point, you physically
10  observed him be sprayed twice with the chemical spray;
11  is that correct?
12      A   Correct.
13      Q   And you had smelled the odor of chemical spray
14  when he first arrived at the sally port?
15      A   Correct.
16      Q   Okay.  Did you ask Officer Higgins at any
17  point as to who had used that chemical spray on Mr. Yell
18  before he arrived at the jail?
19      A   I believe through -- just a course of a normal
20  conversation, he reported that he had used it.
21      Q   That he, himself, Officer Higgins had used it?
22      A   Correct.
23      Q   Did he tell you the number of times that he
24  had used chemical spray on Mr. Yell?
25      A   I do not remember the quantity being brought

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1  up in our discussion.  No.
2      Q     Did Officer Higgins tell you at any point
3  during your discussions about Mr. Yell that he had
4  physically punched Robert in the chest before he brought
5  him into the sally port?
6      A     No.  I don't remember that at all.
7      Q     Did Officer Higgins give you any explanation
8  for the bleeding cut on Mr. Yell's lip?
9      A     I don't remember that I inquired as to what
10 happened at the time.
11     Q     And did Officer Higgins offer any explanation
12 for that?
13     A     Not that I can recall with 100 percent
14 accuracy.  No.
15     Q     Okay.  So you say that you heard Officer
16 Higgins tell Mr. Yell that he had killed two of his kids
17 at least once, maybe twice; is that right?
18     A     Yeah.  At least once.
19     Q     And what tone of voice was Officer Higgins
20 using when he made this comment to Mr. Yell?
21     A     It seemed like he may have been upset by the
22 situation.  I could hear that in his voice.
23     Q     You could hear in Officer Higgins' voice that
24 he was upset by the situation?
25     A     I could hear tension in his voice. Definitely.

Page 83

1      Q     And it was with that tone of voice -- well,
2  explain to me what tone of voice that he used.  How
3  would you describe it?
4      A     Well, I'm not really sure how I would describe
5  it.  It was almost as if he were scolding a child maybe
6  but, you know, he wasn't yelling at him or anything like
7  that.  But it was very firm.  He was firm.
8      Q     Did he say it in a antagonizing manner?
9      A     I mean that's subject to interpretation.
10     Q     Is it your opinion that he said it in an
11 antagonizing manner?
12     A     In my opinion, it was designed to elicit a
13 response.
14     Q     What type of response, in your opinion, do you
15 think Mr. Higgins was trying to get from Mr. Yell?
16     A     Some type of, you know, excited utterance or
17 some information about what had happened.  Some type of
18 response.  Any kind of reaction.  In my opinion, it was
19 a -- I can only attest to what I would have in that
20 situation.  And if I had made an utterance like that, to
21 me, it would have been -- had an investigative basis.
22     Q     Would you characterize it as a taunting tone
23 of voice?
24     A     Not necessarily taunting.  No.
25     Q     Do you characterize it as a threatening tone

Page 84

1  of voice?
2      A     Not threatening.  No.
3      Q     Would you characterize it as an antagonizing
4  tone of voice?
5      A     Not in my opinion based on what I would have
6  felt in a similar situation.
7      Q     Did he say it in a caring manner?
8      A     No.  He did not.
9      Q     Did he say it in a stern manner?
10     A     Yes.  Definitely.
11     Q     Did he say it in an angry manner?
12     A     As if you were scolding a child that you
13 thought had done something wrong.  So if you would
14 characterize that as angry, I would say yes.
15     Q     Oh.  So you testified that you heard him call
16 Mr. Yell a motherfucker; is that right?
17     A     Correct.
18     Q     You've testified that you heard him tell
19 Mr. Yell that he knew that he's killed his kids.  Is
20 that right?
21     A     Correct.
22     Q     Did you hear Officer Higgins accuse Mr. Yell
23 of setting the fire?
24     A     Not that I can recall.  No.  I mean, unless
25 you consider the statement -- the original statement as

Page 85

1  accusatory.  I mean, by necessity of telling him he
2  killed the children, it would be necessary that he
3  started the fire in my opinion but
4      Q     And you said when Officer Higgins made this
5  statement to Mr. Yell, that Mr. Yell responded in a
6  manner indicative of shock; is that right?
7      A     Correct.
8      Q     Is there a specific reason that you can recall
9  that interaction so clearly?
10     A     Yeah.  My -- my oldest child was born on
11 September 2, 2004.  And the gravity of the situation and
12 the information that I had received -- it -- it stuck
13 out to me that his reaction would not be dissimilar to a
14 reaction that I would have given similar situation.
15     Q     Sir, did you ever hear Mr. Yell tell Officer
16 Higgins that he, Robert Yell, was evil?
17     A     I don't recall hearing that.  No.
18     Q     Did you ever tell Officer Higgins that you
19 thought he had shown restraint in his interaction with
20 Robert Yell that night in the sally port?
21     A     I can't recall saying that with 100 percent
22 factual accuracy.
23     Q     Do you believe that Officer Higgins showed
24 restraint in regard to the way that he was treating
25 Robert Yell that night in the sally port?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

```
 1      A    Again, this is a situation that I don't -- I
 2  can't speculate on any threats that he may have felt or
 3  may not have felt.  So whether he behaved with restraint
 4  or not, I'm not comfortable giving that opinion based on
 5  -- I'm just -- I'm not an expert.  I don't understand
 6  what he was feeling.  I can't speculate as to his
 7  mindset at the time.
 8      Q    Did you have any concern about the way Officer
 9  Higgins was treating Robert Yell in the sally port that
10  night?
11      A    Not that I can recall.  But then again, I
12  wouldn't have been concerned because I was there.
13      Q    What do you mean by that?
14      A    If I felt anything was unlawful or immoral,
15  then I believe I would have stepped in and stopped it.
16      Q    Do you recall wanting to testify at the grand
17  jury in Robert Yell's case?
18      A    I don't particularly recall why I would have,
19  but I know that I did ask to testify.
20      Q    And why did you ask to testify?
21      A    I really can't recall on why I would have
22  asked at the time other than the fact that I had strong
23  feelings about the -- the fact that I had the incident
24  recorded in order to have a record of it, and then that
25  record was gone.
```

Page 87

```
 1      Q    So let's talk about that.  What do you mean
 2  that you had the incident recorded?
 3      A    It was standard practice.  Whenever an officer
 4  would call in and ask for assistance, we had the ability
 5  to turn on any camera that we had in the building and
 6  record it.  So we always turned on those cameras.  We
 7  had two screens that were recording so we would turn on
 8  the one in the sally port.  There was one in the
 9  entrance area, which would be called door 126 and 127.
10  It recorded in that area where the breathalyzer machine
11  was.  So it always recorded those areas.  And the person
12  in control of the cameras in the control room would
13  switch the area they were recording as we moved through
14  the building with the individual.
15      Q    Did you ask that the sally port be recorded --
16      A    Yes.
17      Q    -- once Mr. Yell was brought into the sally
18  port?
19      A    I had them turn -- I requested that they be
20  turned on before they arrived.
21      Q    Before they arrived?  Okay.  And is it your
22  understanding that the events in the sally port that
23  evening were, in fact, recorded?
24      A    I 100 percent factually know they were
25  recorded.  I reviewed the tape myself.
```

Page 88

```
 1      Q    How did you go about reviewing the tape?
 2      A    In the control room on the left side, the two
 3  screens that you could record on -- they had VHS players
 4  there.  So I stopped the tape.  I rewound it.  There was
 5  a knob that you can turn that rewinds, and there's a
 6  knob that you can turn to push it forward.  And so I
 7  rewound it back.  I watched the incident.  Made sure it
 8  was there.  I took the tape out.  There was a tab on the
 9  tape that you can break in order to prevent it from
10  being recorded over.  I broke the tab, and then I think
11  I placed it in evidence bag and sealed my name over the
12  -- where you would fold the envelope over it and it
13  would seal.  I wrote my name on the bag in the taped
14  area so if the seal was broken, my signature wouldn't
15  line up.
16      Q    What did you do with that videotape after you
17  pulled that and sealed it in the bag?
18      A    I tried to stick in the safe that we had, but
19  it wouldn't fit so I put it in Bill Jenkins' office.
20      Q    Did you create a report --
21      A    Yes.
22      Q    -- about the incidents within the sally port
23  that night?
24      A    I did.
25      Q    And how did you create that report?
```

Page 89

```
 1      A    I believe I had to write it by hand because
 2  Robert was unable to be booked in at the time due to the
 3  fact that he was severely intoxicated so we put him a
 4  cell in order, you know, to kind of let him calm down
 5  and cool off before we attempted to book him in.  We
 6  needed him to sober up, too, obviously.
 7      Q    And so you drafted a report.
 8      A    I wrote it.
 9      Q    You weren't able to use the online system; is
10  that correct?
11      A    No.  I drafted -- yes.  I drafted it by hand.
12  And then I typed it in the Microsoft Notepad program,
13  and I stapled the copy of the typed report to the
14  handwritten one.  And then I turned it in with the tape.
15      Q    And when you say that you turned it in with
16  the tape, how did you turn it?
17      A    I placed it beneath the tape in the bag that
18  it was in.
19      Q    And then you placed that where?
20      A    It was on Bill Jenkins' desk.
21      Q    Was Bill Jenkins at the facility at the time?
22      A    No.  He was not.
23      Q    Was Bill Jenkins' desk in an office?
24      A    Yes.
25      Q    And was that office locked?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 25 of 80 PageID #: 2612
The Deposition of WILLIAM PONDER, taken on February 01, 2022
90..93

Page 90

1    A    It was.
2    Q    Did you lock that office back?
3    A    I did.
4    Q    Once you placed those materials there, did you
5    inform Mr. Jenkins that you had drafted a report and
6    pulled the videotape?
7    A    Any incident that would have happened at the
8    jail -- we would have always informed him. He was very
9    -- he was very involved with what happened at the
10   facility.
11   Q    And did you inform him of the incident
12   regarding Robert Yell in the sally port?
13   A    Yes.
14   Q    How did you inform him of that?
15   A    A phone call.
16   Q    Did you call him from the jail?
17   A    I did.
18   Q    Did you call him on the night of the incident?
19   A    As far as I can recall. It would have been my
20   standard practice to call him as soon as I was done
21   writing the report or -- if it was something that
22   warranted his direct intervention, I would have called
23   him immediately.
24   Q    Okay. Now let's backtrack just a little bit.
25   You testified that Robert Yell was not menacing to you.

Page 91

1    Is that correct?
2    A    Correct.
3    Q    And you testified that you couldn't recall
4    Robert Yell making any threats toward Officer Higgins.
5    Is that correct?
6    A    I cannot. No.
7    Q    What made you write a report and pull the
8    video of the events in the sally port that night?
9    A    It was completely out of the ordinary and the
10   gravity of the alleged crimes. I felt warranted I
11   report what had happened, and that the videotape should
12   be collected, and should go -- you know, it should be
13   used as it was seen fit by the court.
14   Q    Now at any point while you were in the sally
15   port with Mr. Yell, did other officers besides Ed
16   Higgins come into the sally port?
17   A    Yeah. I believe it was Officer Ron Mills. He
18   came -- 100 percent sure about that, and I believe
19   Deputy Steve Butler came in there, too, for a minute
20   maybe. I'm not 100 percent sure. I do remember his
21   face being there though.
22   Q    And when you say Deputy Steve Butler, was
23   Steve Butler a deputy at the jail?
24   A    He was.
25   Q    Okay. Now what did you observe Officer Mills

Page 92

1    do while he was in the sally port with Mr. Yell?
2    A    They began collecting the physical evidence
3    off of Robert Yell.
4    Q    And what physical evidence did you observe him
5    collect?
6    A    You know, their clothing, swabs, things of
7    that nature. Testing for accelerant.
8    Q    I'm sorry. What was that last part?
9    A    I said I believe they were testing for
10   accelerant.
11   Q    And you said you saw them collect swabs?
12   A    Yes.
13   Q    And what did they swab?
14   A    I want to say -- I believe they swabbed his
15   fingers, or in-between his fingers, or under -- and
16   under his nails. I believe they did both.
17   Q    And at any point prior to those swabs being
18   taken in the sally port, did you allow Mr. Yell to wash
19   his hands?
20   A    There would have been nowhere for him to wash
21   his hands.
22   Q    There's no sink in the sally port area?
23
24
25   A    No. There's no running water in that area

Page 93

1    that's not behind a locked door.
2    Q    Okay. Now, did you collect any physical
3    belongings off of Mr. Yell's person?
4    A    I -- yeah. I do remember he had some stuff on
5    him.
6    Q    And what do you remember collecting?
7    A    I think it was some paperwork. I do remember
8    particularly the orange lighter, and I believe he had a
9    credit card or debit card, something like that on him.
10   Maybe a pack of cigarettes. But I do remember the
11   lighter and the -- the card.
12   Q    And what did you do with the lighter and the
13   card that you collected from Mr. Yell?
14   A    They would've been put in a green zip-up
15   property bag.
16   Q    And what did you do with the zip-up bag after
17   it was collected?
18   A    It would have been placed in a file -- a
19   filing cabinet that we had that held the inmates'
20   property. It would have been placed in there in
21   alphabetical order.
22   Q    Was Officer Higgins present when you collected
23   those items from Mr. Yell?
24   A    I believe they were items that they had
25   collected it from him, and they had given them back to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 26 of 80 PageID
#: 2613
The Deposition of WILLIAM PORTER, taken on February 01, 2022
94..97

Page 94

1  him. That -- you know, sometimes an officer will search
2  somebody. They'll give them their stuff back and we --
3  they bring him to jail. Then they take the stuff from
4  them. I believe it was something he would have
5  considered maybe that it wasn't pertinent or evidentiary
6  at the time. I'm not sure. But I do recall that it was
7  found on him in the sally port, and then I took it from
8  him inside the jail.
9      Q    And when you found those items on Mr. Yell's
10 person while he was in the sally port, was Officer
11 Higgins present?
12     A    I can't recall. It would have to be -- if it
13 was in the sally port, then he would have to been
14 present. But I can't say for 100 percent factual
15 accuracy that he was there.
16     Q    Can you recall if Officer Mills was present
17 when you collected those items off of Mr. Yell?
18     A    I cannot.
19     Q    Sir, do you recall testifying at Robert Yell's
20 trial?
21     A    I do.
22     Q    Do you recall being asked specifically by
23 Commonwealth Attorney Orange whether you had told
24 Officer Higgins that he'd shown remarkable constraint
25 considering Mr. Yell's behavior?

Page 95

1      A    I do remember a line of questioning that was
2  similar to that. Yes.
3      Q    And do you recall telling the court that --
4  well, strike that. Did you tell the court that if
5  Higgins said that he said that, he was lying?
6      A    I'm not sure if I said that or not.
7      Q    Do you have any reason to refute you said that
8  if, in fact, that's what the transcript and the video of
9  the trial states?
10     A    No, ma'am. If it's part of the record, then I
11 most definitely said it.
12     Q    Okay. Now sir, while you were in the sally
13 port with Robert Yell, did you hear him make any
14 incriminating statements whatsoever about the fire?
15     A    Not that I can recall. And I would have been
16 able to recall that, I do believe.
17     Q    Do you recall Robert Yell making any
18 incriminating statements whatsoever about harming his
19 children?
20     A    No. I don't recall anything like that.
21     Q    Did you question Officer Higgins as to whether
22 Mr. Yell had made any incriminating statements prior to
23 booking Mr. Yell in the jail?
24     A    Yes. I did. Absolutely. I did.
25     Q    And why do you remember that so vividly?

Page 96

1      A    Because if he had been alleged of a crime
2  against children, it would have been necessary to
3  separate him from other inmates because we'd had
4  incidences in the past where inmates that were accused
5  of crimes against children were harmed significantly.
6      Q    Harmed by other inmates in the facility?
7      A    Correct. Significantly.
8      Q    Okay. So it was a jail policy to segregate
9  those individuals?
10     A    Yes. It was.
11     Q    And what was Officer Higgins' response to your
12 question as to whether Mr. Yell had made any
13 incriminating statements?
14     A    I don't recall 100 percent what he said. I --
15 I really don't but -- I really don't remember what he
16 said.
17     Q    Do you recall be asked about this at the --
18 when you testified at the trial?
19     A    No. But I'm sure I was.
20     Q    Like I told you at trial that you testified
21 that Officer Higgins said that Mr. Yell had not made any
22 incriminating statements, do you have any reason to
23 dispute that?
24     A    No. If I said that, then that was the truth
25 as it was to me at the time.

Page 97

1      Q    And let's talk about that Mister -- well,
2  strike that. I'm sorry.
3      A    I'm having a hard time hearing. I'm sorry.
4      Q    Oh, I'm sorry.
5      A    No. It's -- I'm -- I'm really hard of hearing
6  so I'm having just a little --
7           COURT REPORTER: Let me make sure the volume's
8  up.
9      A    That's why I have my head turned but
10          COURT REPORTER: There you go. The volume's
11 on 100 now.
12     Q    Is this better?
13     A    It's about the same, but I -- I can hear you.
14 It's fine.
15          COURT REPORTER: Amy, if we need -- sorry to
16          interrupt. I have an external speaker I can plug
17          in if that will help.
18     Q    Mr. Porter, do you think it would help if we
19 had plugged in that external speaker?
20     A    It might actually.
21     Q    Okay. Let's do that because we definitely
22 want you to be able to hear what's being asked of you.
23 Okay?
24     A    Okay.
25     Q    So let's take a small break for that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 98

1    A    Okay.  Thank you.
2         VIDEOGRAPHER:  Off the record at 12:20.
3              (OFF THE RECORD)
4         VIDEOGRAPHER:  Back on record at 12:35.
5              BY MS. STAPLES
6    Q    All right, sir.  I have a couple questions
about some of what we've already talked about.  Do you
recall testifying at Mr. Yell's trial in 2006?
9    A    I recall testifying at the trial.  I didn't
realize it was that late in 2006.
11   Q    Yeah.  I think you testified on
February 17, 2006.
13   A    Okay.
14   Q    And I'm actually going to share a transcript
with you on the screen.  So let me know if you can see
this.  Give me just one second.  Sorry.  I thought I had
it pulled up.  Sir, are you able to see that transcript
on the screen?
19   A    I am.
20   Q    Can you read what's on the transcript?
21   A    I can.
22   Q    Okay.  I'll tell you this is a transcript that
the defendants' attorney produced this morning.  I don't
think it has any Bates stamps, but we will go ahead and
mark this as Plaintiff's Exhibit number 7.  And this

Page 99

1    reports to be a transcript of the testimony that you
gave during Mr. Yell's 2006 trial.  And what I would
like for you to do is to read the transcript starting at
-- oh, sorry -- starting at line 23 on page 40.  Do you
see page 40?
6         (EXHIBIT 7 MARKED FOR IDENTIFICATION)
7    A    I do.
8    Q    All right.  So I'd like you to read down line
23 on that page, all the way through line 41.  And let
me know when you're done, and then I'm going to show you
page 42 as well.  Okay?
12   A    All right.  You said 23, correct?
13   Q    That's correct.
14   A    Okay.
15   Q    It starts with, "Did you hear Mr. Yell make
any specific statements to Officer Higgins?"
17   A    Okay.  And then I answered, "I don't
specifically remember him actually threatening him
directly."  Then "Okay."  I guess it's Charles Oranges
speaking; is that correct?
21   Q    All right.  Yes.
22   A    Okay.
23   Q    You were being questioned by Officer Orange.
And actually I -- to tell you the truth, I don't know if
this is by Mr. Orange or this was by the defense

Page 100

1    attorney.
2    A    Yeah.  I don't remember either.  And anyway,
that -- the statement was made.  "Okay."  And then I
answered, "But he was -- he was very angry with some
statements that he had -- that had been said to him
while he was in the sally port.  And he kind of made the
usual retaliatory remarks that most people would make in
that situation."  The question was: "What statements --
are you referring to statements that Officer Higgins
made to him?"  And that I answered, "Yes.  And what were
those statements?"  I said, "Excuse my language, but he
-- as Mr. Yell was sitting on the floor, I placed him
there.  He was having trouble standing up and Officer
14        Higgins told him -- he said, you mother
fucker.  He said, you've killed two of your kids."  And
the question was: "Did he say that in a calm voice or a
screaming voice?"  And I answered, "He didn't scream,
but he had a certain tone to his voice that would lead
me to believe that it was antagonistic."  And the
question was: "Did he repeat the statement to him, or
did he just say it one time?"  And I answered, "He said
it twice."
23   Q    Okay.  You can stop there for a second.  Does
reading this transcript of your testimony refresh your
recollection as to how many times Officer Higgins made

Page 101

1    that statement towards Mr. Yell?
2    A    I guess -- yes, it does.  I'm looking back on
this from 18 years or 16 years --
4    Q    Of course.
5    A    -- 18 from the incident just about.  So
obviously, if I said this at the time of trial, then
that's what happened.  He said it to him twice, which
was close to what I recalled.
9    Q    That is correct.  Do you believe that your
memory was better in 2006 regarding the incident that
took place in 2004, or that your memory's better today?
12   A    It was definitely better then.
13   Q    And does this refresh your recollection as to
the tone of voice that Officer Higgins used towards Mr.
Yell when he was making those statements towards him?
16   A    I can obviously see what I -- how I answered,
but I can't really -- if I said it was antagonistic,
then that must have been how I felt it was at the time.
19   Q    Okay.  You have no reason to refute that
today?
21   A    No.  No.  Not -- if I said it at trial, I
wouldn't have -- I would've -- I was taking it very
serious.
24   Q    All right.  And then I would like you read
from line 25 down to line 22 of the next page.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 28 of 80 PageID
#: 2615
The Deposition of WILLIAM POLLARD, taken on February 01, 2022
102..105

Page 102

1     A     Okay.  And then he said, "Did Mr. Yell
2  respond?"
3     Q     Sir, you don't have to read it out loud.
4     A     Oh, okay.
5     Q     If you want to read it to yourself, that's
6  fine.
7     A     Okay.  Okay.
8     Q     You get -- did you get through line 22 of page
9  42?
10    A     I did.
11    Q     Okay.  And did you see there where you were
12 questioned as to whether or not you had asked the
13 officers if Mr. Higgins -- I'm sorry, strike that -- if
14 you had asked Mr. Higgins whether Mr. Yell had made any
15 incriminating statements?
16    A     Yes.
17    Q     And does this refresh your recollection as to
18 the answer that the officers gave to you about that?
19    A     Yeah.  That's the -- to the -- that's how --
20 pretty much how I recall -- that I don't recall Officer
21 Higgins saying anything like that.
22    Q     Do you see there where you said, "I was told
23 he had not made any incriminating statements"?
24    A     Right.  Yeah.  I don't remember Officer
25 Higgins saying that, but if I said it, then that's --

Page 103

1  that's true.
2     Q     Okay.  All right, sir.
3     A     Because I do -- what I'm having trouble with
4  is -- I do remember having to segregate Robert, but I
5  don't think it was because of any statements he made.  I
6  think it was due to how he was acting in his physical
7  and mental wellbeing.
8     Q     Well, let's talk about that.  Did you have any
9  concerns about Robert's mental wellbeing --
10    A     I did.
11    Q     -- when he housed there in the detention
12 center?
13    A     I did.
14    Q     What were those concerns?
15    A     I think I voiced them to the nurse.  I was
16 afraid he was going to harm himself.  He wasn't eating.
17 He -- you know, he was -- he just -- he wasn't acting
18 human.  I don't know how else to put it.
19    Q     And so you spoke with a nurse about this?
20    A     I did.
21    Q     Did you request that Robert receive any
22 particular treatment?
23    A     Yeah.  I asked that she sedate him because he
24 -- I was afraid he was going to induce, you know, some
25 kind of episode.  He might harm himself, you know,

Page 104

1  physically or -- I just -- I was concerned.
2     Q     And --
3     A     He hadn't been sleeping, he wasn't eating, he
4  wasn't -- he was just back there.  Just upset.
5     Q     And this was after he had been told by
6  Officer Higgins that his children had died?
7     A     Yeah.  This is after he was already in our
8  custody and had been there.
9     Q     All right, sir.  Since booking Robert into the
10 jail in September of 2004, have you had any
11 conversations whatsoever with Officer Higgins about what
12 occurred that night in the sally port?
13    A     No.  Not at all.
14    Q     Did you speak with Officer Higgins before
15 Robert Yell's trial?
16    A     I mean, we spoke, but it wasn't anything
17 relating to the trial.
18    Q     Okay.  Have you had any conversations with
19 Officer Higgins since the civil suit was filed in this
20 case about what occurred that night?
21    A     When was the civil suit filed?
22    Q     That's a good question.  Well, let me just ask
23 you this.  Have you had any conversations with Officer
24 Higgins about Robert Yell's case?
25    A     Oh, no.  None about the case.

Page 105

1     Q     Not about his criminal case?
2     A     Not about the criminal case or the civil case.
3     Q     And not about the civil case?
4     A     No.  Not at all.
5     Q     Just for your information, the civil state was
6  filed in March of 2020.
7     A     Okay.
8     Q     Since September of 2004, have you had any
9  conversations with Ronald Mills about what occurred in
10 the sally port that night?
11    A     No.
12    Q     Have you had any conversations with
13 Officer Mills about this civil suit?
14    A     No.
15    Q     Since September of 2004, have you had any
16 conversations with Officer Edmonds about what occurred
17 in the sally port that night?
18    A     Yeah.  I do specifically remember one.
19    Q     What was that conversation?
20    A     In the old courthouse, you know, you have the
21 -- the room where the bench is.  And then off to the
22 side, they had, like, little chambers area, and I was
23 off to the left waiting to be called to testify.  And
24 Detective Edmonds was in there, and he asked me, you
25 know, what are you doing here?  What -- I mean, what do

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 29 of 80 PageID
#: 2616
The Deposition of WILLIAM PAYNE, taken on February 01, 2022
106..109

Page 106

1    you know?
2        Q    And what was your response?
3        A    I said -- I mean, I just basically told him I
4    was there to tell the truth of whatever they asked me.
5    And that's all I can do.
6        Q    And how did Officer Edmonds respond to you
7    when you told him that?
8        A    The -- my impression of it was he didn't -- he
9    didn't like that I was there.
10       Q    Did you have any further discussion with
11   Officer Edmonds as to why he would not want you there
12   testifying?
13       A    No.  But I think it was just -- the impression
14   I got was that, you know, I wasn't involved in the case
15   in any way so why did they have me there to ask
16   questions?
17       Q    Have you had any further conversation with
18   Officer Edmonds since you testified?
19       A    No.  Uh-uh.
20       Q    Have you had any conversations with any other
21   officer regarding what occurred in the sally port that
22   night?
23       A    No.
24       Q    Have you had any conversations with any
25   officer about this civil suit?

Page 107

1        A    No.
2        Q    Have you had any conversations with Bill
3    Jenkins since you gave testimony at Robert's criminal
4    trial about what occurred in the sally port that night?
5        A    No.  Not about what happened in sally port.
6        Q    Did you have any other conversations with
7    Mr. Jenkins about anything else involving Robert Yell or
8    this case?
9        A    No.
10       Q    You testified earlier that you had great
11   respect for the officers when you were employed with the
12   Russellville Police Department; is that correct?
13       A    Yes.  Absolutely.  Still do.
14       Q    Has your opinion changed about any of the
15   officers since then?
16       A    No.
17       Q    What effect would you say Robert Yell's case
18   and what occurred that night has had on you personally?
19       A    It's -- it is essentially what caused me to
20   take the LSAT and try to go to law school.
21       Q    And why is that?
22       A    Just seeing -- seeing how trials and -- I
23   don't know how to put it.  I'm not trying -- I don't
24   want to -- I'm not downplaying anybody or their ability
25   to do their job, and I understand that it's very hard

Page 108

1    being a public defender.  But that's what I wanted to do
2    -- be a public defender.  Because I felt like, you know,
3    they need as much help as possible, and I thought I
4    could assist.
5        Q    Robert's case made an impression on you?
6        A    It did.
7        Q    Did the treatment that he was given by
8    Officer Higgins that night in the sally port leave an
9    impression on you?
10       A    Not that I can recall right now.  No.
11       Q    You weren't concerned about how Officer
12   Higgins was talking to Robert Yell that night?
13       A    Personally?  Yeah.  I might have been
14   concerned about it, but professionally?  No.  I didn't
15   have any concerns, but I may have personal concerns.
16       Q    And you were concerned about Robert Yell's
17   mental health after learning that his child may have
18   passed away?
19       A    Absolutely.
20       Q    All right, sir.  Oh.  I do have another
21   question.  Since placing the videotape and the report on
22   Bill Jenkins' desk that evening, have you seen the
23   report since?
24       A    No.
25       Q    Have you seen the videotape since placing it

Page 109

1    on Bill Jenkins' desk that evening?
2        A    No.  I haven't.
3        Q    Do you have any idea where that videotape is
4    today?
5        A    No.  I do not.
6        Q    Do you have any idea where that report is
7    today?
8        A    No.  I do not.
9        Q    Did you inquire as to the report's
10   whereabouts?
11       A    I did ask for a copy of it before trial.
12       Q    Okay.  And what was the response you received?
13       A    I believe essentially -- I -- I can't recall
14   with 100 percent factual accuracy what they said, but
15   it's basically -- it -- there was no report there.
16       Q    Can you recall who told you that there was no
17   report?
18       A    I really can't.
19       Q    Was it an employee of the Logan County
20   Detention Center?
21       A    Yeah.  It would've had to have been because it
22   would've been in my personnel file.  But I don't recall
23   who I asked specifically.  No.
24            MS. STAPLES:  All right, sir.  That's all the
25       questions I have for you right now.  I may have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 30 of 80 PageID #: 2617
The Deposition of WILLIAM PORTER, taken on February 01, 2022
110..113

Page 110

1    some more for you once the defendants ask you some
2    questions.
3        MS. LANGEN:  Anybody care if I go next?
4            CROSS EXAMINATION
5    BY MS. LANGEN:
6    Q    Okay.  Mr. Porter, my name's Jennifer Langen.
7    And I introduced myself at the outset of the deposition,
8    but it's been a while and there are so many attorneys.  I
9    want to do it again.  I represent the Russellville
10   police officers who are defendants in this case as well
11   as the City of Russellville in this matter.
12   A    Okay.
13   Q    All the same rules that Ms. Staples gave you
14   at the beginning of the deposition about keeping your
15   voice up and that sort of thing still apply.  We want to
16   try to make a good, clean record so keep those rules in
17   mind as you answer my questions as well.  Okay?
18   A    Yes, ma'am.
19   Q    Okay.  I think at the very beginning of the
20   deposition, you said that you have given several
21   previous depositions.  Do you remember saying that?
22   A    Yes.
23   Q    What kind of cases were those in?
24   A    I can't remember.  I think it -- a civil --
25   maybe one or two -- maybe a civil one.

Page 111

1    Q    Were you a party or a witness in those cases?
2    A    I was a witness in one.  I may have been a
3    party -- and I think I've given testimony -- I think
4    what I was referring to was in a criminal trial instead
5    of a deposition.  But I've been -- yeah.  I've answered
6    questions before like this in this format.
7    Q    Okay.  As far as you know, have you ever given
8    a deposition like this in a civil case?
9    A    Specifically like this?  No.  No.  I haven't.
10   Q    Now I don't mean -- when I say like this, I'm
11   not talking about our Zoom arrangements.  I mean have
12   you sat in a conference room with attorneys and (coughs)
13   -- excuse me -- possible parties and answered questions
14   within the presence of a court reporter?
15   A    No.  I have not.
16   Q    Okay.  Prior to today, have you ever spoken
17   with anyone associated with Mr. Yell's legal team?
18   A    Have I spoken to anybody?  Yes.  I have.
19   Q    Okay.  Okay.  And let me clarify, too.  You
20   understand that Mr. Yell was criminally prosecuted,
21   right?
22   A    Correct.
23   Q    And that he had some criminal defense
24   attorneys in connection with that, correct?
25   A    Correct.

Page 112

1    Q    And then you also understand that he's filed a
2    civil lawsuit against a bunch of defendants that brings
3    us here today.  Correct?
4    A    Correct.
5    Q    And that he is got a legal team in connection
6    with the civil case as well, right?
7    A    Correct.
8    Q    So when I say Mr. Yell's legal team, I mean
9    any of those people, any of his criminal defense
10   attorneys, any of his civil litigation attorneys, and
11   anybody who's worked for any of those people.  Do you
12   understand?
13   A    Yes.  I understand.
14   Q    Okay.  So you said you had spoken with a
15   member of Mr. Yell's legal team.  Can you tell me who?
16   A    I spoke to Ms. Staples on the phone.  And then
17   I believe at trial, Robert had a -- there was a female
18   attorney that I spoke to.  I do not remember her name
19   though.
20   Q    Okay.  Do you recall --
21   A    She might not have -- she might not have been
22   an attorney, but I know she was associated with his
23   attorneys in the case.  Maybe she was a paralegal of
24   theirs or something.  I'm not real sure.
25   Q    Was she maybe a private investigator?

Page 113

1    A    She could have been.
2    Q    Okay.  And --
3    A    That does ring a bell.
4    Q    Okay.  First of all, tell me what you recall
5    -- first of all, when did you speak with Ms. Staples on
6    the phone?
7    A    The first time I ever spoke to her on the
8    phone, I believe, was -- it might have been Friday of
9    last week, I think, if I'm remembering correctly.  It's
10   hard -- I'm out of town all the time.  I'm either in
11   Chicago, Detroit, or Louisville, and everywhere
12   in-between.  So I'm trying to place where I was when I
13   talked to her, and I think it was at home.  It might
14   have been Friday or even Thursday or Friday because I
15   went home early last week.
16   Q    Okay.  So tell me what was said in that
17   conversation?
18   A    She -- you know, she just basically told me
19   who she was, what she was doing, and that, you know, the
20   only thing that she wanted me to do was tell the 100
21   percent truth.
22   Q    Okay.  And did she give you any kind of idea
23   of what kind of questions might be asked of you today?
24   A    She did.  She asked me some questions.
25   Q    What kind of questions did she ask you in that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 31 of 80 PageID
#: 2618
The Deposition of WILLIAM PORTER, taken on February 01, 2022

114..117

Page 114

1  conversation?
2       A    Close to what was -- has been asked today.
3       Q    Okay.  And is the information that you
4  provided her during your conversation with her on the
5  phone similar to the information that you've provided
6  today in response to the questions?
7       A    Yes.  And it should be pretty much exact.
8       Q    Okay.  But so you knew basically what kind of
9  questions were coming at you, correct?
10      A    I had a general idea.  I do believe so.
11      Q    And you've had -- I'm sorry.  Go ahead.
12      A    I do believe I had a general idea.
13      Q    Okay.  And so you've had time between last
14  Friday and today to sit and think about what your
15  answers might be to those questions, correct?
16           MS. STAPLES:  Objection to form.
17      Q    You can still answer the question.
18      A    I mean, physically yes, I've had time, if you
19  were to put it like that, to sit and think about it.  But
20  I didn't spend any time thinking about it.
21      Q    Okay.  Did Ms. Staples provide you with any
22  documents in preparation for the deposition today?
23      A    A subpoena.  I believe there was actually two
24  -- one -- there was a first one.  I had to be in Boston
25  for work so she had to change the date, and the location

Page 115

1  was changed, and I received a second one.
2       Q    Okay.  And that reminds me.  I believe your
3  deposition was scheduled previously to be done on a
4  different date, correct?
5       A    Correct.
6       Q    So there must have been some planning prior to
7  the selection of that particular date, correct?
8       A    No.  Actually, somebody showed up at my
9  mother's house and had a subpoena that had a date on it.
10  And I -- so she called me and gave me that.  And then,
11  you know, when I saw the date, I was, like, well, I've
12  got to be in Boston so I have to get in contact with
13  somebody to try to change this.
14      Q    Okay.  So you didn't have any conversations
15  with anybody before that date was selected?
16      A    No.  No.  Uh-uh.
17      Q    Okay.  Okay.  And you mentioned you had a
18  conversation with perhaps private investigator
19  associated with Mr. Yell's criminal defense team.  Is
20  that correct?
21      A    Yes, ma'am.
22      Q    Okay.  Do you recall when that conversation
23  was?
24      A    It would've been before trial.  So I don't
25  know the exact date, but it would've had to have been

Page 116

1  before trial.
2       Q    Okay.  How long did you have a conversation
3  with that person?
4       A    Oh, it wasn't very long.  They asked me to
5  meet them.  It was 15 minutes, maybe.  It was real
6  short.
7       Q    Okay.  And where -- I'm sorry.  I missed that
8  part.
9       A    It was real short conversation.
10      Q    Okay.  Where did you meet this person?
11      A    I don't remember, but I want to say it was at
12  -- I really -- I don't know.  Something tells me it was
13  at one of the -- the government buildings in town in
14  Russellville, but I don't remember.  I don't know why
15  that would stick out to me but
16      Q    Do you remember anything about the contents of
17  that conversation?
18      A    I do remember -- don't remember specifically
19  the exact words of the questions that were asked, but I
20  do remember generally what it was.
21      Q    Tell me -- what do you remember?
22      A    They asked me about the lighter that I found.
23  And they asked me similar questions to what I've been
24  asked today about the conduct of the officers.
25      Q    Okay.  Do you know whether or not there was a

Page 117

1  written document prepared concerning the information
2  that you provided by that person?
3       A    I don't recall.  No.  I don't.
4       Q    Do you know -- in any case, you never reviewed
5  one?
6       A    Not that I know of.
7       Q    Other than your conversation with Ms. Staples
8  sometime last week, I think you said on Friday, and your
9  conversation some time ago with a private investigator
10  from Mr. Yell's legal team, have you spoken with anyone
11  else from his legal team?
12      A    No.  I -- I received a text from Ms. Staples
13  yesterday, but that was it.  She just wanted to confirm
14  that I received the new subpoena, and I had the correct
15  address of where I needed to be at this morning.  But
16  that's the only other communication I've received.
17      Q    Okay.  Okay.  Other than what you told me
18  about your conversation with Ms. Staples, did you do
19  anything to prepare for today's deposition?
20      A    No.
21      Q    Have you reviewed any documents at all?
22      A    No.
23      Q    Okay.  And part of my job, since I'm doing
24  cleanup here -- she got to ask you questions first, is
25  I'm going to skip around a little bit more.  Ms. Staples

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB   Document 165   Filed 10/03/25   Page 32 of 80 PageID
#: 2619
The Deposition of WILLIAM PODRAY, taken on February 01, 2022

118..121

Page 118

1  was very chronological and methodical.  But since I'm
2  basically cleaning up, I'm going to skip around a little
3  bit so that I don't ask you the same question over and
4  over again.  Okay?
5      A    Sure.
6      Q    Okay.  You mentioned that you've worked at the
7  Logan County Detention Center, the Russellville Police
8  Department, the Simpkins [sic] County Jail.  And then
9  you mentioned your current employer.  Where else have
10 you worked?
11     A    Since the trial?  In the times in-between?
12     Q    Yes.
13     A    I was a graduate research assistant at Western
14 Kentucky University.  I worked at Rivendell Behavioral
15 Health Hospital in Bowling Green, Kentucky.  I worked at
16 Vermont Thread Gage.  I was a CNC machinist as well.  I
17 also worked for Tesla.  I had a private contract with
18 Tesla.  I made check fixtures for the Model S and Model
19 X vehicles.
20     Q    So was that, like, a manufacturing
21 facility-type job?
22     A    It was -- see, I worked at an agreement with
23 an employer.  I rented a machine from them and was able
24 to produce the parts for Tesla.
25     Q    Okay.  Where were you --

Page 119

1      A    It was a contract.
2      Q    Sorry.  Go ahead.
3      A    It was a contract.
4      Q    Okay.  Where were you physically located when
5  you worked for Tesla?
6      A    It was in Bowling Green, Kentucky.
7      Q    Is that true of all the jobs that you
8  previously have been -- they've been in or around
9  Bowling Green, Kentucky?
10     A    Yeah.  Simpson County, Bowling Green, Warren
11 County.  Yeah.  That's -- that's true.
12     Q    You said Vermont something and I missed the
13 rest of it.  What was the rest of that?
14     A    Thread Gage.
15     Q    Thread Gage?
16     A    Yes.
17     Q    Okay.  You talked about having been employed
18 for a short time by the Russellville Police Department.
19 Were you ever disciplined for any reason while you were
20 there?
21     A    No.
22     Q    Based on your testimony today, is it fair to
23 say that you were in the sally port with Yell and
24 Higgins once Higgins brought Yell to the Logan County
25 Detention Center?

Page 120

1      A    Correct.
2      Q    Okay.  And is it equally fair to say that you
3  were not with Yell and Higgins prior to the moment they
4  arrived in the sally port at the Logan County Detention
5  Center?
6      A    Absolutely.
7      Q    So is it fair to say that you did not know
8  what Yell may have said or done while he was at the
9  scene of the fire prior to being placed in the police
10 cruiser?
11     A    That's correct.
12     Q    And is it also fair to say that you do not
13 know what Yell may have said or done while he was in the
14 cruiser with Higgins, on the way to the Logan County
15 Detention Center?
16     A    That's correct.
17     Q    So to the extent that any charges against
18 Mr. Yell were premised on things that happened before
19 Higgins brought him to the sally port, you don't have
20 any knowledge about that, do you?
21     A    I have no knowledge of that.
22     Q    Will you be testifying that you noticed the
23 cut on Mr. Yell's lip when he was brought into the sally
24 port?
25     A    Correct.

Page 121

1      Q    Is that correct?
2      A    Yes.
3      Q    And you testified, if I remember correctly,
4  that you observed that cut within a few minutes of his
5  arrival.  Did I hear you correctly?
6      A    Correct.
7      Q    Okay.  So you're not able to account, as we
8  sit here today, for the top -- the very moment -- the
9  time between the very moment of his arrival and those
10 first few minutes before you observe the cut, correct?
11     A    I can account for the time.
12     MS. STAPLES:  Objection to form.
13     Q    Okay.  As far as having seen the cut --
14     A    No.  I cannot account.
15     Q    You cannot account for it?
16     A    No.  I cannot account for seeing the cut until
17 the time I noticed it.  No, ma'am.
18     MS. LANGEN:  Okay.  To the court reporter, can
19 you please hand him the criminal trial transcript,
20 the copy that I sent earlier today?
21     COURT REPORTER:  Do you want to mark this as
22 an exhibit?
23     MS. LANGEN:  Yeah.  We might as well.
24     COURT REPORTER:  All right.
25     MS. STAPLES:  I marked it earlier, Jennifer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 33 of 80 PageID
#: 2620
The Deposition of WILLIAM PORTER, taken on February 01, 2022
122..125

Page 122

1    MS. LANGEN:  You did?  Okay.  Thank you.
2    We'll --
3    MS. STAPLES:  Plaintiff's Exhibit 7.
4    COURT REPORTER:  Oh.  Is it the same
5    transcript?
6    MS. LANGEN:  We'll keep it as Plaintiff's
7    Exhibit 7.
8    COURT REPORTER:  Perfect.
9    MS. LANGEN:  But I just wanted to have the
10    hard copy because I'm not going to split the
11    screen.  And just for everybody else's reference, I
12    did send this by e-mail to all of you this morning.
13 BY MS. LANGEN:
14    Q    Mr. Porter, could you turn to -- let's see --
15 page 40 of the transcript.  And I'm going to
16 specifically direct you to line 10 to lines 13.  Do you
17 see that?
18    A    Yes.
19    Q    Okay.  And so can you read those, please, the
20 question and answer between lines 10 and 13?
21    A    Yes, ma'am.  The question is: "You do not know
22 how he got that cut because it was already on there when
23 he came in?" And the answer I gave: "When he arrived at
24 the facility, he had that injury already."
25    Q    Okay.  So does that refresh your recollection

Page 123

1 about whether or not Mr. Yell had the cut immediately
2 upon his arrival at the sally port?
3    A    It does.
4    Q    Okay.  And so what is your testimony in that
5 regard then?
6    A    If -- if I said that he had it when he got
7 there, then he had it when he got there.
8    Q    Okay.
9    A    But as far as my physical recollection,
10 looking back all these years, I remember getting him out
11 of the car, but I cannot factually say whether I saw it
12 or not.
13    Q    Okay.  Now I understand that, you know, we're
14 asking you questions about something that happened in
15 2004.
16    A    Yes, ma'am.
17    Q    This is 2021 so it's a lot of years that
18 passed, correct?
19    A    Yes, ma'am.
20    MS. STAPLES:  Objection to form.  It's
21    actually 2022, Jennifer.
22    MS. LANGEN:  I'm sorry.  I'm behind the times
23    once again.
24 BY MS. LANGEN:
25    Q    So when you were testifying in the criminal

Page 124

1 trial, though, that was 2006, correct?
2    A    Correct.
3    Q    Okay.  Would you say your memory was better in
4 2006 when you were testifying about these things that
5 happened in 2004, or is your memory better today?
6    A    Definitely better in 2006.
7    Q    Okay.  You said today earlier in response to
8 one of Ms. Staples questions -- I believe you said that
9 Officer Higgins pushed Yell against the wall, caused him
10 to slide down to the floor.  Do you remember saying that
11 today?
12    A    I remember Officer Higgins pushing Yell, but
13 that he slid down to the floor.  I don't know if it was
14 the cause of it or not.
15    Q    Okay.  I want you to look at page 40 of the
16 criminal trial transcript, which was already marked as
17 an exhibit.  Look at that again on page 40, if you
18 would.
19    A    Uh-huh.
20    Q    And I want to direct you to lines 16 through
21 22.  Can you read those please into the record?
22    A    "Did he have an encounter with Officer Higgins
23 soon after he came to the sally port area?  There was an
24 exchange of words, but there was not a physical
25 encounter."  And that question was: "All right.  No

Page 125

1 physical contact between the two?"  And then I said,
2 "No, ma'am."
3    Q    Okay.  So in 2006, when you testified at the
4 criminal trial, you said there was not any physical
5 contact between Officer Higgins and Mr. Yell; is that
6 correct?
7    A    If you can give me a second to review the
8 proceeding questions.
9    Q    Absolutely.  Take your time.
10    A    All right.  Thank you.  Okay.  Yeah.  I see
11 why I would've said that.
12    Q    Okay.  So once again in 2006, when you were
13 testifying at the criminal trial, you said that there
14 was no physical contact between Officer Higgins and
15 Mr. Yell, correct?
16    A    Correct.  This is in the time, you know, after
17 he arrived in the sally port area.  The first few
18 minutes.
19    Q    Okay.  So you're saying that that question
20 does not account for, like, a later period in time when
21 he was at the sally port.  Is that your testimony?
22    A    Correct.
23    Q    Officer Higgins did not deploy pepper spray on
24 Yell while you were in inside work together, did he?
25    A    No, ma'am.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 34 of 80 PageID
#: 2621
The Deposition of WILLIAM POTTER, taken on February 01, 2022
126..129

1    Q    You were asked earlier today if you had seen
2  Robert Yell spit at Officer Higgins, and I think you
3  said you did not see that.  Do you remember testifying
4  that way today?
5    A    Yeah.  I don't --
6         MS. STAPLES:  Objection to form.
7    A    I don't recall him spitting directly at
8  Officer Higgins.
9    Q    What do you recall?
10   A    I do recall him spitting a lot.
11   Q    Do you recall him spitting towards or in
12 Officer Higgins' direction?
13   A    I remember him spitting, and it got close to
14 myself, to Deputy Hayes, and Officer Higgins because he
15 spit more than one time.  It was several times.
16   Q    Okay.  And do you recall whether the spitting
17 occurred before or after the OC spray was deployed by
18 Deputy Hayes?
19   A    Honestly, I believe that it was after.
20   Q    Are you certain of that?
21   A    I'm not 100 percent certain.  No, ma'am.  No.
22 But for some reason, that does stick out in my memory
23 that that's when that started.
24   Q    You testified earlier today that Mr. Yell was
25 held in the sally port for possibly more than an hour

1  while Officer Higgins and Mills collected evidence.  Do
2  you recall saying that?
3    A    Yes, ma'am.
4    Q    I want to look at first pages 43 to 44,
5  the criminal trial transcript.  Start at line 21 of page
6  43 and go to line 2 of page 44 and read that into the
7  record, please.
8    A    I'm sorry.  Can you tell me what line you
9  wanted me to start with again?  I'm sorry.  I was
10 reading.  I apologize.
11   Q    Sure.  No problem.  Line 21 on page 43.
12   A    Okay.
13   Q    All the way through line 2 on page 44.
14   A    Yes, ma'am.  Sorry about that.
15   Q    That's okay.
16   A    The question was: "Okay.  Now, he was sprayed
17 again with pepper spray in the sally -- how long was he
18 in the sally port area, approximately?  To the best of
19 my recollection, I believe it would be a time period
20 between 30 and 45 minutes we were in the sally port area
21 waiting for Sergeant Mills to show up to collect
22 evidence off of him."
23   Q    Okay.  And then turn to page 61 and 62 of that
24 transcript.  And I'll direct your attention to line 25
25 of page 61.

1    A    All right.
2    Q    Through line 7 of page 62.
3    A    Okay.  The question was presented.  "Now, I
4  understood you to say it was 35 to 45 minutes before
5         Sergeant Mills showed up to collect clothing.
6  It was around 35 minutes when Officer Mills showed up."
7  The question: "So how long was Officer Mills there
8  before Mr. Yell was removed from the sally port?"  And
9  then I answered, "Around ten minutes."
10   Q    Okay.  Does that refresh your recollection at
11 all, having read this from the criminal trial transcript
12 about how long Mr. Yell was actually held in sally port
13 while Officer Higgins and Mills collected evidence?
14   A    It -- it does.  The best of my recollection
15 was it was a period between 45 minutes total to an hour
16 and 15 minutes.  I wasn't quite sure, but that does
17 refresh my memory.
18   Q    Okay.  But so you did testify that at trial,
19 you testified that it was between 35 and 45 minutes when
20 Mr. Yell was in sally port, right?
21   A    Correct.  Correct.
22   Q    And today your testimony is what about that?
23   A    Well, it would have to be that it was around
24 the time period of 35 to 45 minutes because that's what
25 was sticking out in my head -- was between 45 minutes to

1  an hour and 15 minutes, but my testimony here confirms
2  that it was around 45 minutes.
3    Q    Okay.  So just around 45 minutes, not the more
4  than an hour estimate that you gave earlier?
5    A    No, ma'am.
6    Q    I'm sorry.  That was probably a bad question.
7  Is your testimony today that Mr. Yell was held in sally
8  port for about 45 minutes?
9    A    Correct.  It is.  That is my testimony.
10   Q    And so you are correcting your earlier
11 testimony where you said that he was held in sally port
12 for about an hour and 15 minutes or so?
13        MS. STAPLES:  Object to the form.
14   A    Well, I believe what I said -- what I said
15 earlier was it was a range between 45 minutes to an hour
16 and 15 minutes so I'll stick with that original
17 estimate.  But now I can confirm that it was around 45
18 minutes.
19   Q    Okay.  Let's talk about the video of the
20 events in the sally port that you said you turned over
21 to Jailer Jenkins.  As I understood your testimony, you
22 said that you pulled the video that would've shown Yell,
23 and Officer Higgins, and Deputy Hayes, and I suppose
24 Officer Mills, and yourself in the sally port.  And you
25 left that video in Jailer Jenkins' desk behind a locked

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 35 of 80 PageID #: 2622
The Deposition of WILLIAM PRUITT, taken on February 01, 2022

130..133

Page 130

1  door.  Is that right?
2      A    Yeah.  I left it on top of his desk.  Correct.
3      Q    Okay.  When did you pull the video from the
4  system and place it in Jailer Jenkins' desk?
5      A    I believe it was -- I believe it was
6  immediately after the incident.  And that's a give or
7  take a time period of a few minutes to get Mr. Yell to
8  the shower and things like that for me to collect what I
9  needed to review the tape and then write my report.
10     Q    Okay.  So by the time that you pulled the
11 tape, had Officer Higgins and Officer Mills left the
12 jail?
13     A    Yes.  Yes.
14     Q    Okay.  Did you ever have any conversation --
15 I'm sorry.  Strike that.  Did you tell anyone from the
16 Russellville Police Department that you had pulled that
17 video?
18     A    Not that I can recall.  No.
19     Q    Okay.  And specifically, did you discuss the
20 existence of that video with Ken Edmonds, or Officer
21 Higgins, or Officer Mills, or Officer Eggleston, or
22 Chief Pendergraff?
23     A    No.  Not to my recollection.  No.  I wouldn't
24 have.  I don't think I would've discussed that.
25     Q    Okay.  As far as you know, did any of those

Page 131

1  officers -- I'm talking about Edmonds, Higgins, Mills,
2  Eggleston, or Pendergraff -- have any reason otherwise
3  to know that you pulled the video of the events in sally
4  port?
5          MS. STAPLES:  Objection to form.
6      A    I'm not sure if they're aware of our operating
7  procedure at the jail.  But in an incident that is
8  anything out of the ordinary like that, we always try to
9  pull the videotape.  So I don't think they would know if
10 -- unless they knew specifically about our policy or
11 they had specifically requested it, which they didn't.
12     Q    Okay.  So you think that they might know
13 generally that your policy at the jail was to pull video
14 of special incidents that occurred?
15     A    No.  No, ma'am.  I don't believe they would
16 have any reason to know that was our policy.
17     Q    Okay.  And you don't have any reason to
18 believe that they knew you had done it in this specific
19 incident?
20     A    No, ma'am.  I didn't tell anybody.
21     Q    Okay.  Do you have any evidence to suggest
22 that any of the Russellville police officers that I just
23 named are responsible for the fact that the video can no
24 longer be found?
25     A    No, ma'am.

Page 132

1      Q    For example, you don't have any knowledge to
2  suggest that any one of them or any combination of them
3  entered Jailer Jenkins' office and removed the video
4  from his desk, do you?
5      A    At any time that I was in the facility working
6  between the time of this incident and the time that I
7  terminated my employment, I saw no officers of any
8  department in that office that would've had access to
9  it.
10     Q    Okay.  You didn't see an opportunity while you
11 were there for Russellville police officers, who are
12 defendants in this case, to have gone in Jailer Jenkins'
13 office and remove that video?
14     A    No, ma'am.
15     Q    Have you ever told anyone that you do not
16 think highly of Russellville Police Department?
17     A    I'm sure.  I probably have said something like
18 that.
19     Q    Okay.  Because it's contrary to how you
20 testified earlier today that you have a lot of respect
21 for Russellville police --
22     A    I have respect for the individual officers,
23 but the individual officers don't make up the entire
24 department.
25     Q    Okay.  Okay.  So help me understand in what

Page 133

1  context and why you would've told somebody and who you
2  would've told that you do not think highly of the
3  Russellville Police Department.
4      A    It could have just been a general
5  conversation.  Like I said, I can't require -- I can't
6  remember a specific incident where I would've said
7  something critical of them, but I'm sure I've said
8  something critical of the police department.
9      Q    Okay.  And you can't remember a context in
10 which you've said that?
11     A    No.  But I do know I've not said anything
12 critical about Ed Higgins, Kenneth Edmonds, or Chief
13 Pendergraff.  I don't know Officer Eggleston very well
14 and I don't know Ron Mills very well, but I have no
15 opinion of them other than they were good police
16 officers that did their job.
17     Q    Okay.  So when you say that you have
18 previously expressed an opinion that you don't think
19 highly of the Russellville Police Department, are you
20 speaking of the organization in general?
21     A    I say I may have expressed that opinion, and
22 it wouldn't be the organization in general.  It would
23 just be how I've had personal interactions with some of
24 the officers that I didn't think were appropriate or
25 fair.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PORTER, taken on February 01, 2022

134..137

Page 134

1    Q   Okay.  I will get into that in just a minute
2  and give you a chance to talk about that, but when you
3  say that you've told people you don't think highly of
4  the Russellville Police Department, that's what you're
5  talking about?  This incidence?
6    A   Yeah.  If I have said that to anybody, which I
7  may have, I'm not sure if that would be what it's --
8  what it's referring to.
9    Q   Did you give a statement when you spoke with
10  Mr. Yell's private investigator in which you said, "If
11  we checked records of some of their police officers,"
12  referring to the Russellville Police Department, "we
13  would find that there are things in their backgrounds
14  that would indicate a history of corrupt behavior"?
15    A   Not that I can recall.
16    Q   You don't think you ever said that?
17    A   Not that I -- I don't recall saying that.  No.
18    Q   Okay.  But in any of event, have you checked
19  into the background of any of the Russellville police
20  officers who were defendants in this case?
21    A   No.  I have no -- it's none of my business.
22    Q   Okay.  So if there is a report somewhere in
23  which the private investigator indicated that you made a
24  statement to that effect about checking the records of
25  some of the Russellville police officers and finding

Page 135

1  things in their backgrounds that would indicate a
2  history of corrupt behavior, you didn't say that.  Right?
3        MS. STAPLES:  Object to the form.
4    A   I -- I don't recall saying anything like that.
5    Q   Have you heard any rumors about the
6  backgrounds of any of the Russellville police officers
7  who are defendants in this case?
8    A   Any of the defendants in this case?  No.  None.
9    Q   You haven't heard any rumors about Ken Edmonds
10  or his background as a police officer?
11    A   Nothing.  Well, I mean, I -- people say stuff,
12  but that doesn't mean -- you take it with a grain of
13  salt.
14    Q   And you wouldn't have said anything about any
15  of those rumors that you might have heard to this
16  private investigator.  Would you have?
17    A   I mean -- no.  There's no reason I would say
18  anything about -- hearsay to a private investigator.  Not
19  that I can recall.  No.
20    Q   Okay.  Is the same true about any rumors you
21  may have heard about Officer Higgins' background as a
22  police officer?
23    A   There's nothing that I would know of in
24  Officer Higgins' background that would cause me to say
25  anything like that.

Page 136

1    Q   And is there anything you know about Officer
2  Mills' background as a police officer that would cause
3  you to say something like that to the private
4  investigator?
5    A   No.
6    Q   Is there anything in Officer Eggleston's
7  background as a police officer that you're aware of that
8  would cause you to say something about checking into the
9  backgrounds of Russellville Police Department officers
10  to this private investigator?
11    A   There's nothing in his professional history.
12  There's nothing in any of their professional histories.
13  But are you asking me about their professional history
14  or their personal life?
15    Q   Yes.  Their professional histories.
16    A   Yes.  No.
17    Q   Is the same true about Pendergraff?
18    A   Yes.  There's nothing in his professional
19  history that would've allowed me to say that or caused
20  me to say that.
21    Q   Okay.  Did you ever make a statement to that
22  private investigator with whom you spoke that the
23  Russellville Police Department had pulled you over on
24  several occasions and accused you of being a drug
25  dealer?

Page 137

1    A   Yes.  Absolutely.
2    Q   Okay.  Tell me what you told a private
3  investigator about that.
4    A   I don't know specifically what I told the
5  private investigator, but I know that that did happen.
6    Q   Okay.  How many times has it happened that
7  someone from the Russellville Police Department has
8  pulled you over and accused you of being a drug dealer?
9    A   Probably about three times that I can recall
10  of specifically.  And this was while I was employed at
11  the jail.  Two times were.
12    Q   Okay.  Let's talk about the first incident
13  that you can recall specifically where a Russellville
14  Police Department officer had pulled you over and
15  accused you of being a drug dealer.
16    A   Uh-huh.
17    Q   Okay?  Just the first one right now.
18    A   Okay.  All right.
19    Q   When was that?
20    A   It was when I was employed at the jail the
21  second time so it would've had to have been between
22  September of 2003 to December of 2004, but I don't
23  recall specifically what day it was.
24    Q   Uh-huh.  Okay.  Which officer was it that was
25  involved in that incident?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1    A    To the best of my recollection, it was Roger
2 Lindsey.
3    Q    And what happened on that occasion?  Tell me
4 how the stop went.
5    A    I left the jail and was going home.  There's a
6 stoplight at the intersection of Highway 79 in the U.S.
7 60 bypass.  I was at that stoplight, and I see blue
8 lights so I pulled over.  And he walked up to the window
9 and asked me where the dope was, which I thought was
10 hilarious because I didn't -- I didn't think he was
11 serious at first.
12    Q    Okay.  Did he provide you with any information
13 about why he might have made that statement?
14    A    No.  But I have not -- I think I know why.
15    Q    Why do you think he made that statement?
16    A    Because at the time, there was an individual
17 that was working at the jail that was bringing in drugs.
18 A state police set up a sting operation at the jail and
19 arrested that individual.
20    Q    And why would he think -- well, did he say
21 anything that would indicate to you why he would think
22 you were involved in that?
23    A    No.  He didn't say anything specifically that
24 would indicate me or why he thought it would've been me.
25    Q    Were you cited or arrested --

Page 139

1    A    No.
2    Q    -- at all during that first incident?
3    A    No.  No, I was not.
4    Q    Okay.  And let's talk about the second
5 incident.  Who was the officer involved in that one?
6    A    There were several.  I do believe there were
7 two or there might have been three.  And I don't
8 remember specifically who they were, but I do remember
9 one of them was, again, Roger Lindsey.
10    Q    Okay.  Can you remember whether or not any of
11 the police officers present during that second occasion
12 are defendants in this action?
13    A    Oh, no.  They're not.  No.  They're not.  I
14 would've remembered that.
15    Q    When did that second incident happen?
16    A    This was after I had -- I think I'd been gone
17 from the jail for a while, but it was before my second
18 child was born and before I went to law school so it had
19 to be before July of 2007.
20    Q    Okay.  Tell me how the stop went down.
21    A    It was a similar thing.  And they asked me,
22 you know, can you -- can we search your car?  We think
23 you got drugs in there and -- you know, at the time, I
24 was, like, whatever.  Do what you got to do.  I don't
25 care.  There's nothing in here.

Page 140

1    Q    Did they tell you why they suspected there
2 might be drugs in your car?
3    A    Did not.  Nope.  I still don't know why.
4    Q    Were you cited or arrested as a result of that
5 second incident?
6    A    No.
7    Q    Are you aware whether are not there are any
8 reports made of that incident?
9    A    No.  I'm not.  I never asked for one.  You
10 know, I never asked for anything.
11    Q    Okay.  And then you mentioned there were three
12 specific incidents that you could remember so let's talk
13 about the third one.
14    A    Yes.
15    Q    When did that occur?
16    A    Well, the third one occurred around the same
17 time period as the second one and that was -- my wife at
18 the time was pulled over, and they mentioned something
19 to her about me selling drugs, and then they gave her a
20 ticket for having tinted windows.
21    Q    So this third incident.  Your wife was driving
22 the car?
23    A    Yeah.  She was driving her car.
24    Q    And you weren't present?
25    A    No.

Page 141

1    Q    Okay.  So according to her, what happened?
2    A    That she was pulled over.  They asked, you
3 know, do you have any information about him selling
4 drugs?  And she said, you know, basically what are you
5 talking about?  And so they gave her a ticket for tinted
6 windows and cut her loose.
7    Q    Do you know which officer was involved in this
8 incident?
9    A    I don't recall with 100 percent accuracy at
10 all.  No.  I don't.
11    Q    Do you know whether or not it was any of the
12 officers involved in this case?
13    A    I would have to say that it's not.  No.
14    Q    Okay.  What is your wife's name?
15    A    It's my ex-wife now.
16    Q    Okay.  What is her name?
17    A    Her name is Cyndal, C-Y-N-D-A-L.
18    Q    Okay.  And what's her last name?
19    A    M-O --- oh, what's her name?  You want her
20 maiden name or
21    Q    Yes, please.
22    A    Okay.  It's M-O-H-A-M-M-A-D-I.
23    Q    And at the time that this happened, was she
24 using the last name Porter?
25    A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1    Q    Okay.  Any other incidents that you can
2    specifically recall where any member of the Russellville
3    Police Department pulled you over and accused you of
4    being a drug dealer?
5    A    No.  That's it.
6    Q    Have you ever been charged with a drug-related
7    offense?
8    A    Yes.  I have been.
9    Q    When did that happen?
10   A    2019.
11   Q    Okay.  What was the charge?
12   A    They originally tried to charge me with
13   promoting contraband.
14   Q    And how did that charge come about?
15   A    I was in jail on a civil contempt charge after
16   I'd been incarcerated for about three weeks.  They
17   brought me out of the cell and said, we searched your
18   property and we found drugs.  And they threw a bag of
19   drugs at me -- pills and said, here..  What's this?  I
20   let it hit me in the chest and fall on the floor.
21   Q    Okay.  Is it your contention that that
22   material that they threw at you and fell on the floor
23   did not belong to you?
24   A    It did not belong to me.
25   Q    Okay.  So the original charge was promoting

Page 143

1    contraband.  Well, what happened to that charge?
2    A    Based on -- let me be careful how I word this.
3    It was amended down to a misdemeanor if I pled guilty
4    based upon -- the judge was -- this was a new judge at
5    the time -- was kind of upset about the -- what had
6    happened with the evidence.
7    Q    It was amended to what charge?
8    A    Possession of a controlled substance, third
9    degree.
10   Q    Okay.  And you pled guilty to that?
11   A    Yeah.  I did.  Of course.
12   Q    Why do you say "of course"?
13   A    Well, I'd sat in jail, by the time I was let
14   out, for 184 days on a civil contempt charge.  I was
15   ready to go home.
16   Q    Explain the civil contempt charge to me.  How
17   did that come about?
18   A    It was because of a missed -- missed child
19   support payments where I was unemployed.
20   Q    So were you -- am I understanding correctly
21   that you were initially in trouble for missing child
22   support?
23   A    Yeah.  That's what it was about.  The civil
24   contempt.  Yeah.
25   Q    Was there a court order in place that you pay

Page 144

1    child support?
2    A    Yeah.  There had been.  It was part of the
3    divorce.
4    Q    Okay.  What court issued that?
5    A    Logan Circuit Court.  Judge Gill.
6    Q    Okay.  And when was this?  What time period?
7    A    The order was issued in 2014.  And then this
8    happened in 2018 or '19, I think.
9    Q    Okay.  So when you missed your child support
10   payments, is that why, to your knowledge, you were
11   charged with civil contempt?
12   A    Yeah.  To my knowledge, that's why.
13   Q    Okay.  And you were jailed for that civil
14   contempt?
15   A    Yes.
16   Q    And you had been in jail -- I think you said
17   180-some days for that.
18   A    184 days.
19   Q    Okay.  At what point in those 184 days did
20   this incident happen where the deputy jailers came into
21   your cell, said they had searched it, and found these
22   drugs?
23   A    No.  They pulled me out of cell.  Said they
24   had looked through my property.  Said they found these
25   drugs, and then they threw them at me, and I let them

Page 145

1    hit the floor.  This was approximately three weeks after
2    I'd been booked in, I do believe.
3    Q    Okay.  So three weeks after you had been
4    booked in on the civil contempt charge.  Is that right?
5    A    Yes.  Yes.
6    Q    Okay.  So the charge originated while you were
7    in jail, right?
8    A    Yes.
9    Q    The charge of promoting contraband, right?
10   A    Correct.
11   Q    And when I asked you whether or not you
12   pleaded guilty to that, you said yes, of course.  And I
13   asked you why do you say "of course," and I still am not
14   understanding your answer.  Can you be more specific
15   when you answer that?
16   MR. SLOSAR:  Objection to form.
17   MS. LANGEN:  Who's handling this deposition
18   for the plaintiffs?  Is it Amy or is it Elliot?
19   MR. SLOSAR:  Jennifer, can you just ask your
20   question?  Thank you.
21   MS. LANGEN:  Elliot, I'm only going to deal
22   with Amy.
23   MR. SLOSAR:  That's fine.  You don't have to
24   deal with me.  I'm just making an objection for the
25   record.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 39 of 80 PageID
#: 2626
The Deposition of WILLIAM PORTER, taken on February 01, 2022

146..149

Page 146

```
1           MS. LANGEN:  You can't triple team me.  You
2     got three lawyers here.
3           MR. SLOSAR:  You can continue, Jennifer.
4           MS. STAPLES:  And just for the record, I would
5     note that's the first time that my co-counsel has
6     made any objection so I think we're okay.
7           MS. LANGEN:  All right.  Just snip it in the
8     bud.  That's all.
9  BY MS. LANGEN:
10     Q    So tell me again why did you plead guilty to
11  that charge?
12     A    I wanted to go home, and I didn't want to sit
13  in jail and have fight to trial for another, you know,
14  six to nine months so I plead guilty and went home.
15     Q    Okay.  But you were in jail on a civil
16  contempt charge for failure to pay child support, right?
17     A    Correct.
18     Q    So how would pleading guilty to the possession
19  of a controlled substance resolve that problem?
20     A    Because I'd already been sitting in jail for
21  almost five months at the time so my civil contempt time
22  almost up.  And in order to take it to trial and fight
23  it, I would've sat there for another amount of time, and
24  I wasn't willing to sit there.
25     Q    Okay.  I understand.  Thank you.
```

Page 147

```
1      A    Uh-huh.
2      Q    Back to the other line of questioning.  Did
3   you also tell Mr. Yell's private investigator that the
4   Russellville Police Department had pulled over your wife
5   and your mother and given them tickets?
6           MS. STAPLES:  Objection to form.
7      A    I could have said that.  I don't know, but
8   it's 100 percent accurate if I did say it.
9      Q    Okay.  What is your mother's name?
10     A    Sherry Gragg.  G-R-A-G-G.
11     Q    How many times do you believe an officer from
12  Russellville Police Department has written your mother a
13  ticket?
14     A    I'm not sure.  I have no idea.
15     Q    Do you know what the offenses were?
16     A    I don't know specifically at this time.  I
17  don't remember.  No.
18     Q    Do you know what officers from the
19  Russellville Police Department had written your mother a
20  ticket?
21     A    I want to believe it was Roger Lindsey, but I
22  -- I can't say that with 100 percent certainty.  But
23  that does stick out in my head.
24     Q    Okay.  Is it your contention that your mother
25  did not violate whatever traffic law the ticket was
```

Page 148

```
1   written for?
2           MS. STAPLES:  Objection to form.
3      A    I -- I wasn't present at the time so I don't
4   know.
5      Q    Okay.  So you harbor any resentment towards
6   the Russellville Police Department in connection with
7   any of these tickets that they've supposedly written
8   your mother?
9      A    No.  I don't.
10          MS. STAPLES:  Object to the form.
11     A    I don't harbor any resentment.
12     Q    Is there a reason why you might make a
13  statement to a private investigator about the
14  Russellville Police Department pulling over your mother
15  and giving her tickets if you didn't find that
16  significant in some way?
17     A    Significance and resentment are two different
18  things.
19     Q    Okay.  Why do you find it significant?
20     A    I just thought it was interesting at the time
21  based on the interactions I'd had with them -- the
22  things they'd said to me that all these incidents
23  happened within a certain time period.  I felt it was
24  significant.
25     Q    Did you feel like the fact that Russellville
```

Page 149

```
1   Police Department officers were pulling over your mother
2   had anything to do with these accusations of you being a
3   drug dealer?
4           MS. STAPLES:  Object to the form.
5      A    Possibly.  I -- I don't know the intent, but
6   it possibly -- I don't know.
7      Q    And when you say that Russellville Police
8   Department police officers had pulled over your wife and
9   given her tickets, are you, again, talking about Cyndal
10  Porter?
11     A    Yes.
12     Q    Okay.  How many times has an officer from the
13  Russellville Police Department written her a ticket?
14     A    As far as I know, she's only received a ticket
15  one time.
16     Q    Was that the time you described earlier?
17     A    Yes, ma'am.
18     Q    For tinted windows?
19     A    Yes, ma'am.
20     Q    Is it your contention that your now ex-wife
21  did not violate the law against having tinted windows?
22     A    I don't have -- I -- and I didn't -- at the
23  time, I didn't have access to the tint meter that the
24  Russellville Police Department uses to enforce the state
25  law.  So I have no -- I have no idea whether it was or
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PORTER, taken on February 01, 2022

150..153

Page 150

1  not.
2      Q    What led you to want to go to the police
3  academy?
4      A    I just wanted to help people.
5      Q    I'm a little confused on how many weeks you
6  actually attended the police academy so can you help me
7  with that?
8      A    I think it was about 12.
9      MS. STAPLES:  Object to form.
10     Q    12 weeks you attended?
11     A    I think it was about 12.  Somewhere in that
12  area.
13     Q    Do you know how many weeks somebody would have
14  had to attend the police academy back in 2001 to
15  graduate from it?
16     A    16.
17     MS. STAPLES:  Object to the form.
18     Q    Okay.  So you did not complete the entire
19  academy, correct?
20     A    No.  I did not.
21     Q    Okay.  Other than the firearms test, did any
22  other subject or subjects keep you from passing the
23  academy?
24     A    No.  I think in -- academically, I was number
25  one or two in my entire class.

Page 151

1      Q    Okay.  But you did not -- once you failed the
2  firearms test, you didn't continue with the remaining
3  four weeks.  Is that right?
4      A    No.  I was able to take a retest, and I failed
5  that one as well.  So that's what precluded me from
6  continuing with the training.
7      Q    Okay.  When you were a deputy jailer, you took
8  pride in the way you treated inmates, didn't you?
9      A    It's not that I took pride in it.  I just
10  thought it was appropriate and moral and, you know,
11  legally justifiable way to treat people.
12     Q    Okay.  Well, I think you testified earlier
13  today that you tried to treat them like they were human
14  -- I think were the words you --
15     A    Absolutely.  Yes.
16     Q    Correct?
17     A    Absolutely.
18     Q    Okay.  From your time working at the Logan
19  County Detention Center, do you recall a coworker by the
20  name of Daisy Higgins?
21     MS. STAPLES:  Objection to form.
22     A    No.  I really don't.  Did she have a nickname
23  or anything that might jog my memory?  Because I
24  don't --
25     Q    Only name I've seen for her is Daisy Higgins.

Page 152

1      A    No.  I don't.
2      Q    You don't recall her?
3      A    Uh-uh.
4      Q    In any event, you don't recall ever having any
5  run-ins or clashes with the jail employer by that name,
6  do you?
7      A    No.  Not that I can recall.
8      Q    Do you remember a coworker at the Logan County
9  Detention Center by the name of Cindy Suiter?
10     A    Yes.  I do.  Yeah.  I remember Cindy very
11  well.
12     Q    Okay.  Who was she?  What was her role with
13  the Logan County Detention Center?
14     A    Each shift's required to have a female deputy
15  on staff because we hold female inmates.  And of course
16  you don't want to send a bunch of men in with the
17  females so that -- we have the female deputy there for
18  that very reason.
19     Q    Okay.  So she was the female deputy to deal
20  with the female inmates.  Is that correct?
21     A    Correct.  Yes, ma'am.
22     Q    Okay.  Did you generally have a good work of
23  your relationship with her?
24     A    Yeah.  I thought she did a very good job.
25  Yeah.  Absolutely.

Page 153

1      Q    Did you and she have any run-ins or clashes at
2  work?
3      MS. STAPLES:  Object to the form.
4      A    I'm not sure.  I mean, everybody that works
5  together usually has a disagreement at some time or
6  another so I can't say with 100 percent accuracy whether
7  we never disagreed or not, but I don't remember anything
8  that would've stuck out in my mind.
9      Q    You don't remember a specific disagreement or
10  run-in with her?
11     MS. STAPLES:  Objection to form.
12     A    Not one that I had.  No.
13     Q    From your time working at the Logan County
14  Detention Center, do you recall an inmate by the name of
15  Kenny Duncan?
16     A    Yes.  I do.
17     Q    Do you recall an incident in which you had
18  physical contact with Kenny Duncan?
19     A    Yes.  I do.
20     Q    Can you describe that for me?
21     A    I don't remember 100 percent what happened,
22  but we were just joking around.  I think he like --
23  he asked me something about, you know, if I was to walk
24  up to you and do this, what would you do?  You know,
25  just kind of playing with me.  So I grabbed him by his

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of WILLIAM PORTER, taken on February 01, 2022

154..157

Page 154

1  arm and said, I'd do this.  I put my hand on his
2  shoulder, and held him by his arm, and pushed him down
3  like that (indicating).
4      Q    Okay.  That's your recollection of the events,
5  correct?
6      A    Yeah.  I -- I -- I've known Kenny for a long
7  time so that's the bad thing about small towns -- is we
8  all know each other.
9          MS. LANGEN:  To the court reporter, please
10         hand the deponent from the documents that I sent
11         over earlier this morning the one that's marked
12         Logan 94 to Logan 96.
13         COURT REPORTER:  Give me just one second.  And
14         do you want me to mark this as an exhibit?
15         MS. LANGEN:  Yes.  Would you please?  Thank
16         you.
17         COURT REPORTER:  Absolutely.  Do you want to
18         just follow in line with the numbers?
19         MS. LANGEN:  Yeah.  That's fine.
20         COURT REPORTER:  All right.  We'll mark this
21         Exhibit 8.
22         (EXHIBIT 8 MARKED FOR IDENTIFICATION)
23  BY MS. LANGEN:
24      Q    Okay.  Mr. Porter, I represent to you that
25  that's a document that came from your personnel file,

Page 155

1  which was furnished to us by Logan County.  Could you
2  please just read that to yourself and let me know when
3  you finished?
4      A    Okay.
5      Q    Okay.  Would you agree with me that this
6  appears to be a joint statement written by Cindy Suiter
7  and Daisy Higgins about an interaction you had with
8  Kenny Living as they perceived it -- or Kenny Duncan.
9  Sorry.
10     A    I'm not sure.  I don't know who wrote it.
11     Q    Somebody wrote it, right?
12     A    Yeah.  Somebody --
13         MS. STAPLES:  Objection to form.
14     A    -- somebody wrote it.  Yeah.  Somebody wrote
15  it.
16     Q    And do you see the name Cindy on the first
17  line of the first page of the document?
18     A    Yes.  It says "Cindy and I."
19     Q    And then do you see -- let's see, where is it
20  -- on Logan 95, the first line of that last paragraph
21  where it says "I, Cindy Suiter"?
22     A    Yes.  You mean where it's in the same
23  handwriting?  Yes.  I see that.
24     Q    Okay.  So --
25         MS. STAPLES:  I'm sorry.  Where did you say?

Page 156

1          MS. LANGEN:  On Logan 95, the last paragraph,
2      the first line.  It says, "I, Cindy Suiter."
3          MS. STAPLES:  Thank you.
4  BY MS. LANGEN:
5      Q    Okay.  Does that suggest to you, Mr. Porter,
6  that somebody by the name of Cindy Suiter took part in
7  writing this document?
8      A    No.  It doesn't.
9          MS. STAPLES:  Objection to form.
10     Q    That does not indicate that to you?
11     A    No.  It doesn't.
12         MS. STAPLES:  Objection.  Asked and answered.
13     Q    What do you understand by reading, "I,
14  Cindy Suiter," in that document?
15     A    Well, if you want my honest opinion, when it's
16  written in the same handwriting as the past two pages,
17  it means the same person wrote it.  But that doesn't
18  mean it's not a statement from Cindy.  But you asked my
19  opinion.  There it is.
20     Q    Do you -- whether or not she personally
21  physically handwrote that statement, is it your
22  understanding that somebody by the name of Cindy Suiter
23  took part -- participated in crafting this document?
24     A    I have no clue.
25         MS. STAPLES:  Objection to form.

Page 157

1      A    I don't know if she took part in it or not.
2      Q    Okay.  Do you see the name Daisy Higgins on
3  the first line of the page marked Logan 94?
4      A    I do.  Yeah.  The very first line.
5      Q    Okay.  I want to go through that document with
6  you now.  And I understand you're contending that
7  perhaps Cindy Suiter and Daisy Higgins didn't write this
8  document.
9      A    No.  I -- I don't know who wrote this
10  document.
11         MS. STAPLES:  Objection to form.
12     A    It's not signed.
13     Q    Understood.
14     A    It's not signed anywhere.
15     Q    Understood.  Understood.  But let's go through
16  the document.
17     A    Okay.
18     Q    So the first part reads, "At 15:20" --
19     A    Uh-huh.
20     Q    -- "Cindy and I, Daisy Higgins, were sitting
21  at booking desk doing door calls.  And Inmate
22  Kenny Duncan came up to ask about when are we going to
23  do door call.  That is when Billy Porter approached
24  Inmate Kenny Duncan and made physical contact."  Did I
25  read that correctly so far?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PORTER, taken on February 01, 2022

158..161

Page 158

1    A    You read exactly what was wrote.
2    Q    Okay.  There's no indication in this statement
3  that Duncan did anything to warrant your making physical
4  contact with him.  Is there?
5    A    No.  I don't see anything.
6    Q    Okay.  In general, is it appropriate for a
7  deputy jailer to approach an inmate and initiate
8  physical contact when the inmate has not done anything
9  to warrant that contact?
10   A    No.
11       MS. STAPLES:  Objection to form.
12   A    Yeah.  No.  It's not.
13   Q    Okay.  The document goes on to say, "Inmate
14  Kenny Duncan stated, 'Come on, man.  Don't be fucking
15  with me.'  Then Cindy and Daisy left from booking to
16  hand out door calls.  After finished door call, Cindy
17  and Daisy went to attorney's room to eat dinner.  Inmate
18  Kenny comes up asking when should he pick up door calls?
19  And Cindy said, 'After GED classes are over.'  Then
20  Billy Porter came around the library said while Kenny's
21  back was turned and grabbed him from behind.  Then made
22  a couple of karate moves with his hands."  Did I read
23  that part correctly?
24   A    You read exactly what was wrote.
25   Q    Okay.  And again, there's no indication in

Page 159

1  this document that Duncan did anything to warrant your
2  grabbing him from behind and making karate moves at him.
3  Is there?
4    A    No.  there's not.
5       MS. STAPLES:  Objection to form.
6    Q    Okay.  In general, is it appropriate for a
7  deputy jailer to grab an inmate from behind and make
8  karate moves at an inmate who has not done anything to
9  warrant being grabbed?
10   A    No.  There's not.
11   Q    The document continues.  "Then a second time,
12  still in attorney's office, Billy Porter comes from the
13  right side (booking side) and once again, Inmate Kenny
14  Duncan back was turned.  And Billy came up and grabbed
15  him again with a little more force.  Then Billy was
16  doing some kicking motions with his foot."  Did I read
17  that correctly?
18   A    You did.
19   Q    Do you see anything in the document up to this
20  point that would justify the actions that are attributed
21  to you in that part that I just read?
22   A    No.  I don't.
23       MS. STAPLES:  Object to the form.
24   Q    Okay.  The document goes on to say that you
25  "kept on picking on Inmate Kenny Duncan," that you

Page 160

1  "started more physical contact with Inmate
2  Kenny Duncan," and that you and Duncan were "Scuffling
3  in doorway of cell 148.  Inmate Kenny Duncan was
4  blocking himself from Billy Porter."  Do you see anything
5  in the document at all that would justify those actions?
6       MS. STAPLES:  Objection to form.
7    A    What actions are you referring to?
8    Q    Okay.  One that says that you kept on picking
9  with Inmate Kenny Duncan.
10   A    Well, it depends on what it says.  We were
11  scuffling.
12   Q    Read the -- you can read the whole document
13  and tell me if you see anything in the document at all
14  that would justify the actions that are attributed to
15  you in that document.
16   A    In what context?
17   Q    In the context of what's written in the
18  document.
19   A    I can't really understand what's written in
20  the document.
21   Q    What is it that confuses you about what's
22  written in the document?
23   A    The wording, the chronology, the implication.
24  I'm not sure what you're wanting me to answer.  But is
25  it procedure for a deputy to touch an inmate when

Page 161

1  they're not acting in an aggressive manner or using
2  physical force?  No.  It's not.
3    Q    Is the kind of conduct that is attributed to
4  you in this letter consistent with the behavior of
5  someone who wants to treat inmates "like a human"?
6       MS. STAPLES:  Objection to form.
7    A    No.  But it is indicative of somebody who's
8  friends with somebody and has been since childhood.
9    Q    What are you referring to?
10   A    I'm referring to the statement that I gave you
11  earlier.  I'm not -- I -- I don't know anything about
12  what's in this letter.
13   Q    Okay.  Is it your concession that you're
14  somehow friends with Kenny Duncan?
15   A    Yeah.  I knew Kenny Duncan.  Absolutely.  The
16  same age.
17   Q    So this is -- so I think earlier, when you
18  were answering questions from Ms. Staples, you made
19  mention of some incident where you were accused of using
20  force on an inmate, but it was really just horseplay.  Is
21  that what you're talking about here?
22   A    Yes.  That's correct.
23   Q    So it's your contention that what is -- that
24  the incident described in this document was horseplay
25  and not any kind of use of force?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

```
1     A    Correct.
2     Q    Is that right?
3     A    Correct.
4     Q    Okay.  While you were working as a deputy
5  jailer, did you use inmates to clean your personal
6  vehicle?
7     A    Yes.
8     Q    Did you pay the inmates for doing that work?
9     A    Yes.
10    Q    Did you document having paid the inmates for
11 that work?
12    A    I'm not sure if I did or not.
13    Q    In what way did you pay the inmates for that
14 work?
15    A    We gave them cash.
16    Q    You gave them cash?
17    A    We gave them cash.
18    Q    Who's "we"?
19    A    Everybody on the shift.
20    Q    Okay.  So this was something that you weren't
21 the only one that engaged in it, right?
22    A    No.  It's -- it's something that had happened
23 every Saturday during the summer.
24    Q    Okay.
25    A    The inmates would clean all the county cars.
```

Page 163

```
1  The cops would bring their cars by.  The inmates would
2  clean them.  And then when they were done, they were,
3  like, hey, you know, we'll clean you-all's cars, too.
4  But we decided that if they cleaned our cars, we had to
5  give them something in return so that it didn't look
6  unethical.  But it was commonplace.
7     Q    So just to be clear, the vehicle that you were
8  driving at the time was not a county-owned vehicle,
9  correct?
10    A    No.  It wasn't.
11    Q    It was a personal vehicle, correct?
12    A    It was.  Correct.
13    Q    Okay.  But it's your contention that you paid
14 the inmates for washing your car or cleaning your car?
15    A    Yes.  Absolutely.
16    Q    Did you document that in any fashion?
17    A    I'm not sure if I did or not.
18         MS. STAPLES:  Objection.
19    Q    And it's your contention that you provided the
20 inmates with cash in exchange for their services?
21    A    Yes.
22         MS. STAPLES:  Objection.  Asked and answered.
23    Q    What happened to the cash when you gave an
24 inmate cash for washing your car?
25         MS. STAPLES:  Objection to form.
```

Page 164

```
1     A    I have no clue.
2     Q    Okay.  So as a general rule, jails don't like
3  inmates to hold cash.  Is that right?
4          MS. STAPLES:  Objection to form.
5     A    No.  That's not true.  The whole jail --
6     Q    That's not true?
7     A    The whole jail was cash back then.  Entirely
8  cash.  There was no commissary account.  There were --
9  there was nothing like it.  It was all cash only.  $1
10 bills were allowed.
11    Q    So would it be common for an inmate to be
12 holding cash?
13    A    Oh, yeah.  Absolutely.  They all were allowed
14 to have $1 bills.  But only 1s.  They had to have
15 change.  We had to make change for them through the
16 commissary account.
17    Q    Okay.  So inmates did hold cash in their cells
18 at the Logan County Detention Center?
19    A    Yeah.  Yes.  They did.  Absolutely.
20    Q    And it's not your understanding that there's
21 any kind of security risk with inmates holding cash in
22 cells?
23         MS. STAPLES:  Objection to form.
24    A    The policy has changed, but that's more of a
25 policy question.
```

Page 165

```
1     Q    Well, but is it your understanding that that
2  might create a problem as far as theft among inmates or
3  violence among inmates?
4          MS. STAPLES:  Objection to form.
5     A    Inmates always steal from each other.
6     Q    But if an inmate has cash in their cell,
7  another inmate is more likely to be able to steal that
8  from them than if they did not have cash in their cell,
9  correct?
10    A    People that are going to steal will steal a
11 pencil.  I've seen it happen in jail before.  I've seen
12 a Snickers bar cause a fight, I've seen a pencil and
13 eraser cause a fight, a piece of paper, and even a
14 dictionary that was missing one third of the back of it
15 cause a fight.
16    Q    Do you recall a conflict that you had with
17 someone named Billy Gregory while you were in the
18 parking lot of the detention center?
19    A    I remember being attacked and assaulted in the
20 parking lot of the detention center.
21    Q    Okay.  Let's look at Logan 0120 to 0121.
22         MS. LANGEN:  Ms. Court Reporter, could you
23    please hand that to him?
24         COURT REPORTER:  Yes.  And would you like to
25    mark this document?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 166

1    MS. LANGEN:  Yes, please.
2    (EXHIBIT 9 MARKED FOR IDENTIFICATION)
3  BY MS. LANGEN:
4    Q    Again, I'm going to represent to you that
5  that's a document that came from your personnel file,
6  which we received from Logan County.  If you can take a
7  minute and look at that and let me know when you've
8  finished reviewing it.  That would be great.
9    A    I've already -- I know what this is.  And this
10  is accurate.  This is my signature on the last page.
11    Q    So who is Billy Gregory?
12    A    It was the spouse of a girl that worked with
13  my wife.
14    Q    Okay.  And you don't need Logan 0120-0121 to
15  refresh your recollection about this incident it sounds
16  like, right?
17    A    I would like to have it to refresh my
18  recollection.
19    Q    Okay.  Then you have it.  So Billy Gregory --
20  I'm sorry.  Can you repeat that?  I missed it.
21    A    He was the spouse of a girl that my wife
22  worked with.
23    Q    Okay.  What was the nature of your conflict
24  with Mr. Gregory?
25    MS. STAPLES:  Objection to form.

Page 167

1    A    Mr. Gregory showed up to the jail.  Told me to
2  keep my fucking mouth shut essentially.  Tried to hit me
3  with a crowbar.
4    Q    Had you said something that would warrant him
5  telling you to shut your fucking mouth?
6    MS. STAPLES:  Objection to form.
7    A    Well, I mean, have you ever told anybody to
8  shut their fucking mouth?
9    Q    What did you say before he said shut your
10  fucking mouth?
11    A    At the jail?  I didn't say anything to him.  He
12  just pulled up and said, you need to keep your fucking
13  mouth shut.
14    Q    Did you --
15    A    And then he pulled a crow -- and then he
16  pulled a crowbar out from under the seat.
17    Q    Did you have any idea what he was talking
18  about when he told you to shut your fucking mouth?
19    A    Oh, yeah.  Absolutely.
20    Q    Okay.  What was he talking about?
21    A    He was having sex with an underage girl.  His
22  name was Billy.  Everybody called me Billy.  So somebody
23  at work was talking about Billy was having sex with this
24  girl.  And it -- my wife was told it was me.  It wasn't
25  me.  It was him.  He ended up getting her pregnant.  So

Page 168

1  I guess he didn't like that I said, hey, don't nobody
2  need to say I'm doing this.  I could lose my job.  I
3  could lose everything.
4    Q    Okay.
5    A    So that's what happened.
6    Q    It's your recollection you called the person
7  who was spreading this rumor about you?
8    A    Yeah.  I asked -- absolutely.  I sure did.
9    Q    Okay.  And that person was connected to Billy
10  Gregory how?
11    A    It was his spouse.
12    Q    Okay.  Did this conflict result in you
13  threatening him with pepper spray?
14    A    No.  Absolutely not.  I punched him in his
15  mouth.
16    Q    Give me a minute here.  Do you see -- refer to
17  that document.
18    A    Yeah.  I see it.  I see it.
19    Q    Do you see the part --
20    A    Yes.
21    Q    -- about three quarters of the way down where
22  it says, "I then removed my pepper spray from its pouch
23  and told him that he needed to leave"?
24    A    I see that.  Yes.
25    Q    So do you not construe that as threatening him

Page 169

1  with pepper spray?
2    A    No.
3    MS. STAPLES:  Objection to form.
4    A    He attempted to assault me.
5    Q    Okay.
6    A    And I was a sworn law enforcement officer at
7  the time.  So I saw the crowbar as a threat.  Therefore,
8  I reacted to it on jail property.
9    Q    Okay.  So after he pulled out the -- yeah, the
10  tire arm --
11    A    Uh-huh.
12    Q    -- you pulled out your pepper spray?
13    A    No.
14    Q    But it's your contention that was not a
15  threat, right?
16    A    No.  it's not a threat.  I didn't pull it out
17  after he pulled the tire arm.
18    Q    Okay.  And this happened -- this was not a
19  work-related issue.  Was it?
20    MS. STAPLES:  Objection to form.
21    A    It was on -- it was on county property.  It
22  was on jail property during a time when I was clocked
23  in.  So it was very much a work incident.
24    Q    What I meant was: The rumor spreading was not
25  work related.  Was it?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 165     Filed 10/03/25     Page 45 of 80 PageID
#: 2632
The Deposition of WILLIAM PORTER, taken on February 01, 2022

170..173

Page 170

1    A    Oh, no.  Not at all.
2    Q    Okay.  So the conflict, other than the fact
3  that it happened on jail property, was not work related,
4  correct?
5    A    No.  It was not.
6    Q    Okay.  But this conflict that was not work
7  related did happen at the premises of your work at the
8  detention center, correct?
9    A    Correct.
10    Q    All right.  Were you disciplined in any way in
11  connection with this event?
12    A    No.  I was not.
13    Q    Okay.  While you were working for the Logan
14  County Detention Center, was there some incident in
15  which you initiated the pursuit of a vehicle?
16    A    No.  There was not.
17    MS. LANGEN:  Court reporter, could you hand
18    him the document that's been marked Logan 0162 to
19    Logan
20    0163?
21    COURT REPORTER:  Yes.  And would you like to
22    mark this?
23    MS. LANGEN:  Yes, please.  Thank you.
24    (EXHIBIT 10 MARKED FOR IDENTIFICATION)
25    COURT REPORTER:  Yes, ma'am.  There you go.

Page 171

1  BY MS. LANGEN:
2    Q    Mr. Porter, I'm going to represent to you
3  that, again, this is a document from your personnel
4  file, which we received from Logan County.
5    A    Uh-huh.
6    Q    Take a minute and review that.  Let me know
7  when you've finished.
8    A    I -- I -- I know what it's about.
9    Q    Okay.  Does this refresh your recollection
10  about an incident in which you were involved in the
11  pursuit of a vehicle?
12    A    I was involved, but I didn't initiate a
13  pursuit of a vehicle.  No, ma'am.
14    Q    Oh, you didn't initiate it?
15    A    No.  I did not.
16    MS. STAPLES:  Object to the form.
17    Q    Okay.  According to this report, you saw a
18  vehicle coming at you at a high rate of speed that
19  nearly struck you.  Is that consistent with your memory?
20    A    Correct.  It was on the wrong side of the
21  road.
22    Q    Okay.  In response, you did a U-turn and began
23  following that vehicle, didn't you?
24    A    Yes.  Follow.
25    Q    Okay.  So you're -- okay.  So you did

Page 172

1  initiate --
2    A    Pursuit is a high rate of speed.  No.  Pursuit
3  is a high rate of speed.  Follow is to get information
4  to relay to the proper authorities.
5    Q    Okay.  So was this vehicle traveling at a high
6  rate of speed, the one that you were following?
7    A    No.  Because at the intersection, it slowed
8  down.  It was coming towards me on 68-80, which is a
9  four-lane highway in the wrong lane, as I was traveling
10  through the light.  Then it stopped, and it crossed the
11  intersection to get over.  So when it did that, I
12  U-turned behind it.  Got his license plate number.
13    Q    Okay.  And according to the report at least,
14  at one point, the other vehicle crossed the median and
15  came to rest on the shoulder.  Is that what you're
16  talking about?
17    A    No.  That's -- that would be at the end of the
18  pursuit.
19    Q    But at -- that did happen.  The other vehicle
20  crossed the median and came to rest on the shoulder,
21  right?
22    A    Oh, yeah.  He -- well, he switched over
23  intersection and hit the side of the road, and then kept
24  driving like that.
25    Q    Okay.  And you -- at that point, you pulled in

Page 173

1  behind him and tried to detain him, didn't you?
2    A    No.  I did not.
3    Q    Isn't that what the report says?
4    A    It says, "I made contact with Officer Steve
5  Whittlesey of the Auburn Police Department and notified
6  him of location and description of the reckless vehicle.
7  As we approached the intersection of Kentucky 103 and
8  68-80, the reckless vehicle crossed the median and came
9  to rest in the eastbound shoulder.  I pulled in behind
10  the vehicle in an attempt to possibly detain the suspect
11  because he had presented a substantial danger to other
12  motorists."
13    Q    Okay.  So you had an intention to possibly
14  detain the suspect, correct?
15    A    Yes.  On the request of Bill Jenkins, the
16  jailer.
17    Q    All right.  When did you contact Jailer
18  Jenkins about this?
19    A    On the phone.  And I called into the jail
20  actually on the radio.  And the captain told me to
21  continue following with the officer in case he needed
22  assistance.
23    Q    And when the other vehicle started moving
24  again, you kept following it until a police officer
25  began pursuing.  Is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 46 of 80 PageID
#: 2633
The Deposition of WILLIAM PORTER, taken on February 01, 2022

174..177

Page 174

1   A   No.
2       MS. STAPLES: Object to form.
3   A   I followed -- I followed the vehicle while the
4   police officer was pursuing.
5   Q   This says -- let's see.  At the point after
6   which the vehicle crossed the median, it came to rest on
7   the eastbound shoulder.  "I pulled in behind the vehicle
8   in an attempt to possibly detained the suspect because
9   he presented a substantial danger to other motorists.
10  The suspect got out of his vehicle, kicked his car
11  several times, and got back in and drove off before I
12  could get within range to attempt to subdue him."  And
13  you notified Whittlesey who was on the way.  And then it
14  says, when you noticed Whittlesey, you backed off the
15  suspect's vehicle.  So you did continue to follow him
16  before Whittlesey got there.  Right?
17      MS. STAPLES:  Objection to form.
18  A   Of course I did.
19  Q   And then when Whittlesey pulled in, you
20  continued to follow, right?
21  A   Right.  I was actually ordered to continue to
22  follow.
23  Q   And then a Kentucky state police officer
24  joined the pursuit; is that right?
25  A   Yes.  An off-duty Kentucky state police

Page 175

1   officer.
2   Q   You were off duty from your position as a
3   deputy jailer at the Logan County Detention Center when
4   this happened, right?
5   A   Correct.
6   Q   You were not a police officer; is that right?
7   A   Correct.
8   Q   If you were off duty from your position as a
9   deputy jailer and were not a police officer yourself,
10  why did you feel compelled to do a U-turn and follow
11  this vehicle?
12  A   Because this man was going to kill somebody.  I
13  would've done the same thing as just an ordinary person
14  that worked at a gas station because I don't like to see
15  innocent people killed.
16  Q   In your experience, is that something ordinary
17  citizens do very often?
18  A   No.  It's not.
19  Q   Okay.  Why did you feel compelled to continue
20  following the pursuit even after police officers were
21  involved?
22  A   The officer requested that I follow him.
23  Q   In your experience, is that something that
24  normally happens -- that police officers tell ordinary
25  citizens to just follow them on a pursuit?

Page 176

1       MS. STAPLES:  Objection.  Form.
2   A   No.  But they do tell trained people to follow
3   them.
4   Q   How were you trained?  What training did you
5   have in police pursuits?
6   A   The police academy.  Defensive tactics in
7   driving, defensive tactics in the use of a motor
8   vehicle.
9   Q   So that was covered in the first number of
10  weeks that you attended the police academy?
11  A   Absolutely.  Yes.
12  Q   Okay.  But you are not a certified police
13  officer, correct?
14  A   No.  But I was a sworn law enforcement officer
15  at the time.  So there's a difference.
16  Q   You were a sworn deputy jailer, correct?
17  A   It's considered a police officer under the
18  Kentucky revised statutes.  That's why they asked me to
19  continue so I did.
20  Q   But it's not part of the ordinary job duties
21  of a deputy jailer to engage in police pursuits.  Is it?
22  A   Oh, no.  It's not.
23      MS. STAPLES:  Object to form.
24  A   It's highly unorthodox and extraordinary.  But
25  -- go ahead with your next question, actually.

Page 177

1       MR. SLOSAR:  Ms. Langen, do you know whether
2   there would be a good time for a break coming up?
3       MS. LANGEN:  We can take a break now if you
4   want, Elliot.
5       MR. SLOSAR:  Sure.  I just need to know if
6   there was a natural stopping point or if --
7       MS. LANGEN:  This is good.  We can take a stop
8   -- we can make it a stop if you want to take a
9   break.
10      THE WITNESS:  It's 2:00.  How long is this
11  going to take?
12      VIDEOGRAPHER:  Off the record at 2:08.
13          (OFF THE RECORD)
14      VIDEOGRAPHER:  We are back on the record at
15  2:16.
16      MS. LANGEN:  I'm ready to go whenever the
17  court reporter is ready to go and the deponent is
18  ready to go.
19      COURT REPORTER:  Yeah.  We're back on record.
20  BY MS. LANGEN:
21  Q   Okay.  Mr. Porter, I think you testified
22  earlier in response to Ms. Staples' question you had a
23  good relationship with Jailer Jenkins; is that right?
24  A   Yes.
25  Q   And I think you said that you would generally

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 47 of 80 PageID #: 2634
The Deposition of WILLIAM PORTER, taken on February 01, 2022
178..181

Page 178

1  get along; is that correct?
2      A   Yes.
3      Q   Did you ever know him to say or do anything to
4  you that you thought was unfair?
5      A   No.
6      Q   Okay.  In February of 2012, was part of your
7  job at the Logan County Detention Center to make loans
8  to Logan Aluminum factory and Logan County Recycling
9  Center as part of a program for inmates at the Logan
10 County Detention Center?
11     A   Yes.  It was.
12     Q   Okay.  To your knowledge, were allegations
13 made that you had a verbal confrontation on February the
14 9th of 2012 with a guard and the director of security at
15 Logan Aluminum?
16     A   Yes.
17     Q   To your knowledge, were allegations made that
18 you were rude and uncooperative with personnel at Logan
19 Aluminum?
20     A   Yes.
21     Q   To your knowledge, were allegations made that
22 you refuse to watch a video pertaining to the safety
23 protocols at Logan Aluminum?
24     Q   You don't recall that?
25     A   No.

Page 179

1      MS. LANGEN:  Well, my -- now's a good time as
2  any.  Ms. Court Reporter, if you could hand him
3  Logan 69 to Logan 70.  Appreciate it.
4      COURT REPORTER:  Yes.  And do you want to mark
5  this one?
6      MS. LANGEN:  Yes, please.
7      (EXHIBIT 11 MARKED FOR IDENTIFICATION)
8  BY MS. LANGEN:
9      Q   I'll represent to you, Mr. Porter, that this
10 is a document that came from your personnel file that we
11 received from Logan County.  If you could take a look at
12 that, let me know when you've had a chance to review it.
13     A   Okay.
14     Q   Okay.  If you could look, I guess, about
15 two-thirds of the way down on the first page, which is
16 Logan 69.  And do you see where it says, "Further, the
17 security personnel stated that they would require Billy
18 Porter to watch a safety video for the plant and conform
19 to all of their regulations.  According to these
20 personnel, Porter said, 'I am not watching your damn
21 video.  And I don't like this damn job in the first
22 place.'"  Do you see that?
23     A   Yes.  I see where it says that.  Yes.
24     Q   Okay.  So having reviewed this document, is it
25 your understanding now that there were allegations made

Page 180

1  against you, that you refused to watch a video
2  pertaining to the safety protocols at Logan Aluminum?
3      A   Yes.  There were allegations in this letter
4  here.
5      Q   Is it your -- sorry.  Is it your contention
6  that that allegation in particular is not true?
7      A   Yes.  It is my allegation.
8      Q   Okay.  And I think you said you understood
9  that there were allegations made that you had a verbal
10 confrontation on February 9th of 2012 --
11     A   Yes.
12     Q   -- with a guard and the director of security
13 at Logan Aluminum, correct?
14     A   Yes.
15     MS. STAPLES:  Objection to form.
16     Q   Is it your contention that you did not have
17 any verbal confrontation --
18     A   No.  I --
19     Q   -- (Inaudible) people?
20     A   I didn't have a confrontation.  And I was told
21 that it was about them wanting to search the truck,
22 which I asked them where I should pull up for them to do
23 it.  I don't really know anything about this video
24 except for what's in this letter.
25     Q   Okay.

Page 181

1      A   I've never seen this before.
2      Q   Okay.  And I think you said just before that
3  you were aware there were allegations that you were rude
4  and uncooperative with personnel at Logan Aluminum,
5  correct?
6      MS. STAPLES:  Object to form.
7      A   Yes.  That's -- yes.  I've stated that.
8      Q   Okay.  And is it your contention that you were
9  not rude and uncooperative with personnel at Logan
10 Aluminum?
11     A   It is my contention.
12     Q   That you were not --
13     A   Correct.
14     Q   Okay.  Okay.  Is it true that you were told by
15 the director of security that you would no longer be
16 permitted to enter Logan Aluminum property?
17     A   No.  Not that I -- not at that time I wasn't.
18     Q   Okay.
19     A   I don't remember being told that.  No.
20     Q   Do you see in the first paragraph where it
21 says, "After this confrontation, he was told by the
22 director of security that he would no longer be
23 permitted to enter Logan Aluminum property.  Billy
24 Porter came to my office and reported this occurrence."
25 Do you see that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 48 of 80 PageID
#: 2635
The Deposition of WILLIAM PORTER, taken on February 01, 2022

182..185

Page 182

1    A    Yeah. I believe those are two -- referring to
2  two different things.
3    Q    Do you recall having a conversation with
4  Bill Jenkins about this issue with Logan Aluminum?
5    A    Yeah. I went -- I went and directly reported
6  it to him -- is my recollection.
7    Q    What exactly did you report to him?
8    A    That they asked to search the vehicle. And I
9  asked them where to pull up and leave. And that the
10  security guard there, the man that I know, told me to
11  not worry about it and just leave. So I turned around
12  and left.
13    Q    Okay. So this document that we're looking at
14  -- would you agree with me that this is a document
15  written by Bill Jenkins?
16    MS. STAPLES:    Objection to form.
17    Q    Proceed.
18    A    It does -- it does have his signature on here.
19  That is his signature.
20    Q    Do you recognize --
21    A    Yes. 100 percent. I do recognize that
22  signature.
23    Q    Okay. And this signature appears after the
24  word from, correct?
25    A    Yes. At the very beginning of the document.

Page 183

1    Q    And the document is addressed to Logan County
2  Judge Executive Logan B. Chick, correct?
3    A    Correct.
4    Q    So do you have any reason to doubt that this
5  is a report written by Bill Jenkins to the judge
6  executive of Logan County?
7    MS. STAPLES:    Objection to form.
8    A    I know -- for me, I specifically sign things
9  after the statement to ensure that it's known that I
10  agree with the statement. This is signed before the
11  statement so I don't -- I don't know his intent. I
12  don't know the purposes of this. I have no idea.
13    Q    Do you have any reason to doubt that this is a
14  memorandum prepared by Jailer Jenkins and written to
15  Judge Executive Chick?
16    A    Just for the reasons I've stated before.
17  Normally --
18    Q    Just because the signature is on the front?
19    A    Right.
20    Q    Okay. So I think I read this language to you
21  before, but I'll read it again. It says, "After this
22  confrontation, he was told by the director of security
23  that he would no longer be permitted to enter Logan
24  Aluminum property. Billy Porter came to my office and
25  reported this occurrence." Is it your contention that

Page 184

1  when the memorandum states, "Billy Porter came to my
2  office and reported this occurrence," it is not talking
3  about the occurrence that is referenced in the
4  immediately preceding sentence?
5    MS. STAPLES:    Objection to form.
6    A    It seems to me that it's just stating that I
7  came and reported the totality of the circumstances of
8  what happened. I don't see it being specifically
9  related to the previous statement.
10    Q    Okay. And there's no mention of the issue
11  that you stated earlier about wanting to search the
12  truck, correct?
13    A    No. There -- absolutely not.
14    Q    At least not in this memo.
15    A    No. There's not.
16    Q    Okay. To your knowledge, were allegations
17  made that you used abusive language on February the 13th
18  of 2012 toward Logan County Recycling Center employees?
19    A    I did use abusive language.
20    Q    Oh. So you admit that. Okay.
21    A    No. No. I told them to fuck off and quit
22  abusing the inmates. That's what I told them.
23    Q    Okay. So you used the abusive language that
24  you just described because you thought they were dealing
25  improperly somehow with the inmates; is that right?

Page 185

1    A    Yes. Absolutely.
2    Q    What did you think was going on that they
3  shouldn't be doing with the inmates?
4    A    Cursing at them. Just generally treating them
5  like they were slaves essentially.
6    Q    Okay. Is it your understanding that one of
7  the Logan County Recycling Center employees, to whom you
8  directed that language, filed a complaint against you?
9    A    I'm sure. They were married.
10    Q    Okay. Do you remember their names?
11    A    Yeah. Keith and Pam Fuller.
12    Q    The ones referenced in the first paragraph of
13  the second page of this document?
14    A    Yes.
15    MS. STAPLES:    Objection to form.
16    Q    Is it your understanding that an investigation
17  was done of this complaint?
18    A    Yes. I would hope so.
19    Q    Is it your understanding that inmates were
20  interviewed about what happened at the recycling plant?
21    A    It says, "I had each one of the inmates who
22  were present at the recycling center brought to my
23  office for the purpose of being interviewed about this
24  incident."
25    Q    And it goes on to say, "Each of the male and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 186

1  female inmates stated that Billy Porter did, in fact,
2  use very obscene language directed to both Pam and Keith
3  Fuller, and then he left the recycling site," correct?
4      A    Yes.  I've already admitted to using the
5  language.
6      Q    Yeah.  But I read that right, didn't I?
7          MS. STAPLES:  Objection to form.
8      A    It's exactly as the way it's stated on here.
9      Q    Okay.  It doesn't say anything about the
10  inmates feeling as though they'd been abused by the
11  Fullers, does it?
12      A    No.  Uh-uh.  They weren't asked that.
13      Q    Okay.  How do you know they weren't asked
14  that?
15      A    Because it would be in here if they were asked
16  that.
17      Q    That's an assumption on your part, correct?
18      A    No.  That's just standard practice.
19      Q    Were you present when they were interviewed?
20      A    No.  I was not.
21      Q    So you don't really know one way or the other
22  whether they were asked that question about whether or
23  not they were abused by the Fullers at the recycling
24  center, correct?
25          MS. STAPLES:  Objection to form.

Page 187

1      A    It didn't happen because it's not in the
2  report.
3      Q    Well, by the same token, that incident about
4  you being asked to have the vehicle searched -- that's
5  not in the report either, is it?
6      A    No.  It's not.
7      Q    So by the same rule, that didn't happen
8  either, right?
9      A    Well, you're asking me --
10          MS. STAPLES:  Objection to form.
11      A    You're asking me directly what happened so I'm
12  telling you directly what happened.  I'm not a report.  I
13  was present.
14      Q    Did you resign your employment with the Logan
15  County Detention Center on February 15th of 2012?
16      A    That's what it says right here.  Yes.
17      Q    Okay.  Did your resignation have anything to
18  do with the allegations that were made against you by
19  personnel at Logan Aluminum and Logan County Recycling
20  Center?
21      A    Not that I recall.
22      Q    Why did you resign in your employment with,
23  excuse me, Logan County Detention Center?
24      A    I don't really remember.  But I think it had
25  something to do with the fact that if they said I wasn't

Page 188

1  allowed at Logan Aluminum, then, you know, what was the
2  point of me doing the job if I couldn't do 60 percent of
3  the work that was required of me?  So I think it was
4  more of an agreement that we came to.
5      Q    Mr. Porter, you talked about the drug
6  possession charge that you pleaded guilty to.
7      A    Uh-huh.
8      Q    Have you ever been convicted of another crime?
9      A    I've pled -- I've pled guilty to them.  Yes.
10      Q    Specifically, did you plead guilty to a charge
11  of theft by unlawful taking arising from an incident in
12  September of 2012, in which you took a firearm holster
13  from Walmart without paying for it?
14          MS. STAPLES:  Objection to form.
15      A    I did -- yeah.  I did not take a holster
16  without paying for it.
17      Q    Was the charge or the basis of the charge, as
18  you understand it, to be that you took a firearm holster
19  from Walmart without paying for it?
20      A    The basis of the charge, as my understanding,
21  was the fact that I opened a package in the store, which
22  they considered to be taking it.  That -- that's what I
23  was told.
24      Q    Did you walk out of the store with that
25  package in hand?

Page 189

1      A    No.  I did not.
2      Q    Did you walk out of that store concealing the
3  package?
4      A    No.  I did not.
5      Q    So is it your position that you did not take a
6  firearm holster from Walmart without paying for it?
7      A    No.  I left with the one I came in with.
8      Q    But you did not -- your contention is you did
9  not take one off the shelf, or off the rack, whatever
10  they stored it on, and remove it from the store without
11  paying for it?
12          MS. STAPLES:  Objection to form.
13      A    I took it off the shelf and removed it from
14  the package.
15      Q    But you left it in the store, correct?
16      A    In order to try to see if it fit the firearm
17  that I had.
18      Q    And that's your contention, right?
19      A    That's what happened.
20      Q    All right.  So help me understand why you
21  pleaded guilty to a charge of theft by unlawful taking
22  if you didn't take anything out of the store.
23      A    I believe it says I pled pursuant to Klopfer
24  v. North Carolina.
25      Q    Well, I understand --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PORTER, taken on February 01, 2022

190..193

Page 190

1    A    Which means under the circumstances that they
2  had enough evidence to show that I was guilty, I didn't
3  feel like fighting it at trial so I just went ahead with
4  the guilty plea.
5    Q    Okay.  So you pleaded guilty just to avoid the
6  hassle of the trial?
7    A    Absolutely.
8    Q    Even though you didn't do what you were
9  accused of doing?
10   A    Absolutely.
11   Q    Okay.  What law enforcement agency was
12 involved in arresting you in connection with that crime?
13   A    I wasn't arrested.
14   Q    Oh, you were cited?
15   A    Yes.
16   Q    Okay.  Which officer cited you?
17   A    I do not remember.
18   Q    Do you remember what agency they were with?
19   A    Yeah.  It was Russellville Police Department.
20   Q    Okay.  In 2016, were you and your now ex-wife
21 charged with a crime in connection with incidents in
22 which you were alleged to have taken items from the IGA
23 in Russellville without paying for those items, and then
24 returning later to the store to exchange stolen items
25 for groceries?

Page 191

1    A    No.
2    MS. STAPLES:  Objection to form.
3    Q    Okay.  Were you charged with a crime in 2016
4  arising from some incident at the local IGA?
5    A    No.
6    Q    Okay.
7    A    I wasn't charged with anything until about two
8  years ex post facto after she pled guilty to opening a
9  can of soda and walking out the door without paying for
10 it.  That's my understanding of the charges that were
11 against me at the time.
12   Q    Now, I didn't e-mail this over to you, but I
13 will tell you what I'm looking at.  It's a KYIBRS report
14 dated May 15th of 2016 to May 23, 2016.  It's in the
15 supplement.
16   MS. STAPLES:  Is there a Bates stamp on it?
17 I'm sorry.
18   MS. LANGEN:  You know what?  There is not.  I
19 don't -- must have come from CourtNet, Amy.
20 BY MS. LANGEN:
21   Q    But in any event, it says, "On May 15th of
22 2016, Richard Porter and Chrystal Gingrey entered Price
23 Less IGA in Russellville and took a box of Prilosec and
24 a box of Flonase.  The two came back into the store on
25 May 16, 2016 and exchanged the items for groceries.  The

Page 192

1  manager at Price Less IGA contacted this officer on May
2  19, 2016 at 1400 hours to view video of two subjects
3  shoplifting.  The manager stated it would be a week or
4  so to get a copy of the video and was advised to call if
5  the subjects returned.  On May 23rd of 2016, the manager
6  had the video, and it was picked up on this date.  On
7  May 23, 2016 at 1808 hours, the manager from Price Less
8  IGA called to report that the shoplifters were at the
9  location.  Contact was made with Richard Porter and
10 Chrystal Gingrey in the parking lot.  The video from the
11 previous shoplifting was reviewed, and it showed
12 Mr. Porter with the same hat on and Ms. Gingrey with the
13 same boots on enter the store and leave the items
14 without paying for them.  The video also shows the two
15 exchanging the items for groceries on the next date."  So
16 that is on a KYIBRS report and a UOR2 supplement form.
17 Are you telling me that -- do those facts look familiar
18 to you at all?
19   A    No.
20   MS. STAPLES:  Before you answer -- hold on,
21 Mr. Porter.  Before you answer.  Jennifer, clearly
22 -- I mean, I've not received this document.  I have
23 no idea what you're reading from.  I mean, other
24 than what you said.  Is there a way you can e-mail
25 that to counsel so we can see that?

Page 193

1    MS. LANGEN:  If you want to take a break, we
2  can.
3    MS. STAPLES:  Okay.  Let's do that please.
4    THE WITNESS:  Oh, my gosh.  I've got stuff to
5  do.
6    VIDEOGRAPHER:  Off the record at 2:35.
7    (OFF THE RECORD)
8    VIDEOGRAPHER:  Back on record at 2:42.
9    MS. LANGEN:  Are you ready, court reporter?
10   COURT REPORTER:  We're back on record.
11 BY MS. LANGEN:
12   Q    Okay.  All right, Mr. Porter.  Thank you for
13 your patience while we got that document that Ms.
14 Staples requested and sent it to everybody.  So does
15 everybody now have the KYIBRS report that I read from
16 just earlier?  If you don't, please speak up.
17   MS. LANGEN:  And Ms. Court Reporter, you
18 received it, right?
19   COURT REPORTER:  I do have an electronic copy.
20 Yes.
21 BY MS. LANGEN:
22   Q    Okay.  Mr. Porter, the court reporter can
23 print a copy of this off for you to reference if you so
24 choose, but you indicated off the record that you didn't
25 need to look at it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 51 of 80 PageID #: 2638
The Deposition of WILLIAM PORTER, taken on February 01, 2022
194..197

Page 194

1    A    I do not need a copy.
2    Q    Okay.  The facts that I read before from this
3  document -- do they sound familiar to you?
4    A    Do you know the conviction date on that?
5    Q    I don't know the conviction date, but the
6  incident date is May 15, 2016.  The reason I'm asking
7  you is so I can find out if you were convicted on this
8  matter -- in connection with this matter.
9        MS. STAPLES:  Jennifer, just for the record,
10       the very bottom of that report says the case is
11       closed due to victim declining to prosecute.
12       MS. LANGEN:  Where do you see that?
13       MS. STAPLES:  It says that the case is closed.
14       MS. LANGEN:  I got you.  I got you.  Thank
15   you.
16  BY MS. LANGEN:
17    Q    So is it -- so you were not prosecuted in
18  connection with this set of facts --
19    A    Not that I --
20    Q    -- that you're --
21    A    Not that I recall in any way.  No.
22    Q    Okay.  Okay.  Do you remember whether or not
23  you weren't prosecuted for the reason that the victim
24  didn't want to prosecute?
25    A    I have no clue.  The only thing that sounds

Page 195

1  familiar to me is that three years later, they show up
2  with a summons about a case that happened in 2016.  Said
3  I shoplifted something.  I have no recollection of it,
4  but there you go.
5    Q    So the facts that I just read into the record
6  according to the document happened in 2016.  But you're
7  saying that you never heard anything about it until
8  several years later?
9    A    I haven't heard anything about this.
10    Q    When you said they came back years later, what
11  were you talking about then?
12    A    Allegedly, we were in the store shopping at
13  IGA and there was a basket that had Cokes in it.  My
14  wife picked up a Coke and began drinking it.  And when
15  she scanned all the stuff at the register, she forgot to
16  pay for the Coke.  So as far as I understand, that's
17  what she pled guilty to.  After she pled guilty, they
18  came back to get me to plead guilty for it, almost three
19  years later.
20    Q    Okay.  But the incident that you're talking
21  about where she forgot to pay for her Coke has nothing
22  to do with taking Flonase and whatever else --
23    A    That's -- that's the only -- that's the only
24  incident I know of.
25    Q    Okay.  Okay.  Do you have any other

Page 196

1  convictions on your record besides the 2019 drug
2  possession --
3    A    No.
4    Q    -- that we talked federal?  Do you remember
5  being charged with resisting arrest on an open warrant
6  in 2019?
7    A    Oh, okay.  Yeah.  I remember that.
8    Q    Okay.  Tell me what you remember about that.
9    A    I remember the cop.  I asked him, you know, I
10  knew I had a child support warrant.  I said, could you
11  please handcuff me in front because I can't stand to
12  have my hands tied behind my back.  He said no.  Fuck
13  you.  Put your hands behind your back.  So I threw his
14  handcuffs across the parking lot.
15    Q    Okay.  Is that the only resistance that you
16  engaged in?
17    A    Yes.
18        MS. STAPLES:  Objection to the form.
19    Q    And that was when -- my understanding is that
20  that was when you had the open warrant for not paying
21  your child support.  Is that right?  We talked about
22  that before.
23    A    That's correct.
24    Q    Okay.  What jurisdiction was that police
25  officer from who tried to arrest you on the open

Page 197

1  warrant?
2    A    Simpson County.
3    Q    Do you remember the name of the officer?
4    A    I do not.
5    Q    Were you convicted on the charge of resisting
6  arrest?
7    A    It was supposed to be deferred for two years.
8  It's what my understanding was.
9    Q    Tell me what your understanding is of having
10  it deferred for two years.  What does that mean?
11    A    My understanding at the time was that if I
12  didn't get in trouble for two years, they were going to
13  dismiss the case.  I didn't know it resulted in a
14  conviction.
15    Q    I didn't say it resulted in a conviction.  I
16  just asked you if it did.
17    A    Okay.  Not that I know of.  I don't know if it
18  resulted in one or not.
19    Q    Have you ever lived in Tennessee?
20    A    No.
21    Q    Do you have any criminal convictions that you
22  know of in Tennessee?
23    A    I do not.
24    Q    Okay.  For some reason when I looked on
25  CourtNet, there was an indication of a charge of drug



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 52 of 80 PageID
#: 2639
The Deposition of WILLIAM PORTER, taken on February 01, 2022
198..201

Page 198

1  paraphernalia, but it was in 2019, which is the same
2  timeframe in which you had the guilty plea to the
3  possession.  Do you know if you had a separate charge of
4  drug paraphernalia against you?
5      A    Not that I know of.  No.  I have no clue.
6      Q    Have you ever pleaded guilty to a crime other
7  than the ones we've already talked about today?
8      A    Not that I recall.
9      Q    You could have.  You just can't recall?
10     A    Not that I can recall.
11         MS. STAPLES:  Object to the form.
12     Q    Have you ever been arrested by any member of
13 the Russellville Police Department without being
14 convicted of the crime that they charged you with?
15     A    Not that I recall.
16     Q    So are you saying it's possible that that
17 happened and you just don't recall it?  Or are you
18 saying it did not happen?
19     A    I don't recall.
20         MS. STAPLES:  Objection to the form.
21     Q    Have you ever been arrested by an officer of
22 any other law enforcement agency without being convicted
23 of the crime they charged you with?
24     A    Not that I recall.
25         MS. STAPLES:  Objection to form.

Page 199

1      Q    Have you ever sued anybody?
2      A    Not that I recall.
3      Q    Has anybody ever sued you?
4      A    Not that I recall.
5      Q    Have you ever been fired from or asked to
6  resign from any job?
7      A    Not that I recall.
8      Q    We talked about the fact that you attended law
9  school at Chase College of Law, Northern Kentucky.  Do
10 you remember talking about that today?
11     A    I do.
12     Q    Okay.  I think you said that you attended for
13 two years of law school.  Is that what you said?
14     A    I believe so.  I don't recall.
15     Q    Would it surprise you if Chase only has a
16 record of your attendance for one semester?
17     A    I don't recall.
18         MS. STAPLES:  Objection to form.  Foundation.
19     Q    Did you say you don't recall?
20     A    I don't recall.
21     Q    Okay.  Well, that's a yes or a no question.  It
22 either surprises you or it doesn't.  So does it surprise
23 you, or does it not?
24         MS. STAPLES:  Objection to form and
25         foundation.

Page 200

1      Q    So are you refusing to answer the question?
2      A    I would like to have an attorney present.  I'm
3  scared to death to even go visit my children in Logan
4  County in Russellville.  I'm not falling for this trap.
5      Q    Do you think it somehow incriminates you to
6  state that whether or not --
7      A    No.  I think -- I think you're fishing for
8  them to try to get some charges against me because I
9  know -- I know how they operate.  And you're not going
10 to get me locked up again.
11     Q    You know how --
12     A    I'm scared.  I won't even go visit my
13 children.  I won't go over there.
14     Q    You know how who operates?  What do you mean
15 by that?
16     A    The Russellville Police Department.
17     Q    Tell me what you mean by that.
18     A    I just explained it to you.  I will not answer
19 any more questions without an attorney present.  Is that
20 hard to understand?
21     Q    Do you think it somehow incriminates you to
22 explain what you just said?
23     A    I don't know.  That's why I want an attorney.
24 Do you not understand that?  I'm not an attorney.
25         MR. SLOSAR:  Jennifer.  Jennifer.

Page 201

1         MS. LANGEN:  I don't want to -- let me tell my
2  question.
3         MR. SLOSAR:  No.  I honestly -- I think
4  that --
5         MS. STAPLES:  Jennifer, you can't repeat with
6  your question.
7         MR. SLOSAR:  I think ethically, as a licensed
8  attorney, when somebody tells you that they want
9  counsel, you cannot continue questioning them.
10 Whether -- you know, like, it's not our choice.  So
11 if the witness has said he wants counsel, I think
12 that we're obligated to respect that and figure out
13 next steps for when to reconvene to the extent that
14 that has to happen.  How much of your outline do you
15 have left, Jennifer?
16         MS. LANGEN:  I really don't have a whole lot
17 left.  But yeah, sounds like he's going to just say
18 not that I recall and want an attorney the rest of
19 the time.  So I think it would be not productive at
20 this point to continue.  But I do want to be able
21 to finish my questions.
22         MS. STAPLES:  Well, yeah.  And obviously I had
23 some follow-up, and the others probably have
24 questions, too.
25         MS. LANGEN:  Sure.  I'm sure they all do.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  Yeah.  So
2      MR. SMITH:  I'll chime in just quickly.  I
3  have the same reservations that Elliot has.
4      MS. LANGEN:  Yeah.
5      MR. SMITH:  That once you said, I'm not
6  answering any more questions, we've at least got to
7  let that opportunity happen and maybe talk to the
8  magistrate about it.  That gives me thought.
9      MS. LANGEN:  That's fine.  He can get an
10  attorney if he wants an attorney.  I don't mind to
11  ask questions in the presence of his attorney if
12  that's what he wants to do.
13      MR. SMITH:  Yeah.  I agree completely.
14      MR. SLOSAR:  There have been some other cases
15  that we've had both in the Eastern District and
16  Western District where the magistrates have
17  actually just been kind enough to appoint counsel
18  for witnesses.  So I don't know if that's something
19  that we can facilitate here to move this thing
20  forward but certainly we would, you know, be
21  amenable to making that request to the magistrate
22  in order to finish this deposition if that helped
23  out.
24      MS. LANGEN:  Yeah.  Let's adjourn in progress.
25  I reserve my right to continue asking questions.

Page 203

1  If the witness cares to get an attorney, that's up
2  to him, and we'll certainly accommodate that but --
3  I mean, at this point, you know, I think that's
4  what we have to do.
5      MS. STAPLES:  Mr. Porter, would you like us to
6  take this to the judge and request that an attorney
7  be appointed for you?  Or do you have an attorney
8  that you would prefer to speak with yourself?
9      THE WITNESS:  You can request one if you want
10  to.
11      MS. STAPLES:  Well, we will alert the judge to
12  your request, and we'll be back in touch with you
13  regarding that, okay?
14      THE WITNESS:  Okay.
15      MS. STAPLES:  Okay.  Thank you for your time
16  today, sir.
17      MS. LANGEN:  Thanks for coming.
18      VIDEOGRAPHER:  This deposition is adjourned.
19  The time is 2:55.
20          (DEPOSITION CONCLUDED AT 2:55 P.M.)
21
22
23
24
25

Page 204

1      CERTIFICATE OF REPORTER
2      COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skills and ability. I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20  
21
22  BETHANY BELLOFATTO
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 09/11/2025
25  SUBMITTED ON: 02/10/2022

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 165   Filed 10/03/25   Page 54 of 80 PageID #: 2641
The Deposition of WILLIAM PORTER, taken on February 01, 2022
205

**Exhibits**

Exhibit 1_
Porter 38:15,
17

Exhibit 2_
Porter 41:21,
22

Exhibit 3_
Porter 45:7,9

Exhibit 4_
Porter 48:18,
20

Exhibit 5_
Porter 52:21,
22 53:11 54:4

Exhibit 6_
Porter 55:19,
20

Exhibit 7_
Porter 98:25
99:6 122:3,7

Exhibit 8_
Porter 154:21,
22

Exhibit 9_
Porter 166:2

Exhibit 10_
Porter 170:24

Exhibit 11_
Porter 179:7

**$**

$1 164:9,14

**0**

0120 165:21

0120-0121
166:14

0121 165:21

0162 170:18

0163 170:20

**1**

1 38:15,17 40:5

10 17:14
122:16,20
170:24

100 31:10
35:20 39:14
45:8 56:22
66:19 74:7
75:18,24 76:6
82:13 85:21
87:24 91:18,20
94:14 96:14
97:11 109:14
113:20 126:21
141:9 147:8,22
153:6,21
182:21

1000 15:20

103 173:7

107 55:18

10:03 9:6

11 179:7

11:09 53:6

11:16 53:8

11th 66:8

12 25:25 150:8,
10,11

126 87:9

127 87:9

12:20 98:2

12:35 98:4

13 122:16,20

133 41:24

13th 184:17

1400 192:2

145 38:16

148 160:3

149 48:19

15 12:19 67:21
116:5 128:16

129:1,12,16
194:6

154 52:21
53:12 54:11

155 54:1,18

15:20 157:18

15th 187:15
191:14,21

16 26:1 101:3
124:20 150:16
191:25

17 98:12

18 101:3,5

180-some
144:17

1808 192:7

184 143:14
144:18,19

19 144:8 192:2

1997 13:7

1:20-CD-0047-
GNS 9:11

1L 13:25

1s 164:14

1st 9:5

**2**

2 17:14 40:21,
23 41:21,22
85:11 127:6,13

2000 16:9
18:25

2001 14:18
16:10,16 21:18,
24 22:1,7 23:7
150:14

2003 17:4
19:13 20:10,24
23:18 30:23,24
31:18,25 32:10
43:22 51:11
137:22

2003-2004

55:10

2004 16:24,25
17:5,16 18:21,
23 19:14 20:3,
24 30:23 31:21
32:11 33:16,21
34:16 35:16
36:17 37:25
38:4 39:24 41:2
42:11 43:17,22
44:15 47:16
49:10 63:15,18
64:19 66:8
85:11 101:11
104:10 105:8,
15 123:15
124:5 137:22

2005 16:24

2006 13:18,25
98:8,10,12 99:2
101:10 124:1,4,
6 125:3,12

2007 139:19

2008 13:21
14:2

2010 13:21

2011 18:9,18

2012 18:9,18
178:6,14
180:10 184:18
187:15 188:12

2014 144:7

2016 190:20
191:3,14,22,25
192:2,5,7 194:6
195:2,6

2018 144:8

2019 142:10
196:1,6 198:1

2020 105:6

2021 123:17

2022 9:5
123:21

21 18:2 127:5,
11

22 101:25 102:8
124:21

23 47:16 99:4,9,
12 191:14
192:7

23rd 192:5

25 101:25
127:24

2:00 177:10

2:08 177:12

2:16 177:15

2:35 193:6

2:42 193:8

2:55 203:19,20

**3**

3 45:7,9

30 127:20

35 128:4,6,19,
24

**4**

4 48:18,20
49:10

4.0 24:2

40 99:4,5
122:15 124:15,
17

41 99:9

42 99:11 102:9

43 127:4,6,11

44 127:4,6,13

45 67:19 127:20
128:4,15,19,24,
25 129:2,3,8,
15,17

**5**

5 42:11 52:21,
22 53:11 54:4

500 15:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**6**

**6** 55:19,20

**60** 138:7 188:2

**61** 127:23,25

**62** 127:23 128:2

**68-80** 172:8
173:8

**69** 179:3,16

**7**

**7** 98:25 99:6
122:3,7 128:2

**70** 179:3

**79** 138:6

**8**

**8** 154:21,22

**9**

**9** 166:2

**9-11-2004** 65:7

**94** 154:12 157:3

**95** 64:22 155:20
156:1

**96** 154:12

**9th** 178:14
180:10

**A**

**a.m.** 9:6

**Aaron** 10:13
53:3

**abilities** 40:8

**ability** 12:11
52:10 57:19
59:5,6,8 87:4
107:24

**absences**

42:15,18 43:11

**absent** 42:21

**absolutely**
35:18 42:20
45:1 48:5 51:6
53:4 54:5 60:13
61:3 78:12 81:1
95:24 107:13
108:19 120:6
125:9 137:1
151:15,17
152:25 154:17
161:15 163:15
164:13,19
167:19 168:8,
14 176:11
184:13 185:1
190:7,10

**abused**
186:10,23

**abusing**
184:22

**abusive**
184:17,19,23

**academically**
150:24

**academy**
25:17,24 26:14,
19 50:18 150:3,
6,14,19,23
176:6,10

**accelerant**
92:7,10

**access** 30:19
31:3,4 132:8
149:23

**accidental**
61:11

**accidentally**
58:14 61:5,20

**accommodate**
203:2

**account** 121:7,
11,14,15,16
125:20 164:8,
16

**accuracy**
35:20 66:19

75:18,25 82:14
85:22 94:15
109:14 141:9
153:6

**accurate** 14:13
16:2,9 21:14
59:13,16 147:8
166:10

**accusations**
149:2

**accusatory**
85:1

**accuse** 84:22

**accused** 44:19
96:4 136:24
137:8,15 142:3
161:19 190:9

**acting** 103:6,
17 161:1

**action** 36:21
40:20 45:20,22
70:4,7 80:10
139:12

**actions** 48:7
159:20 160:5,7,
14

**actual** 43:24
52:5

**addition** 70:15

**additional**
55:7

**address** 47:12
117:15

**addressed**
54:15 183:1

**adjourn** 202:24

**adjourned**
203:18

**administered**
57:18

**Administrative**
53:18

**admit** 184:20

**admitted** 186:4

**Advantage**

14:23,24 15:1,
11

**advised** 192:4

**AED** 56:4,12,15

**affect** 12:11,15
59:5

**affected** 61:1
79:19

**affirm** 10:18

**afraid** 103:16,
24

**age** 161:16

**agencies**
21:20

**agency**
190:11,18
198:22

**aggression**
78:4,8,10,11

**aggressive**
57:21 78:14
161:1

**agitated** 70:16

**agree** 40:4,7,
11,15 41:1 48:9
78:9 155:5
182:14 183:10
202:13

**agreed** 48:3

**agreement**
80:13 118:22
188:4

**ahead** 12:2
16:12 53:2 79:1
98:24 114:11
119:2 176:25
190:3

**aid** 41:10 52:7
55:16 56:4

**air** 63:9,10

**Alan** 10:1,3,5

**alcohol** 69:16,
17

**alert** 203:11

**allegation**
65:21 180:6,7

**allegations**
178:12,17,21
179:25 180:3,9
181:3 184:16
187:18

**alleged** 44:1,5
91:10 96:1
190:22

**Allegedly**
195:12

**allowed** 34:24,
25 136:19
164:10,13
188:1

**alphabetical**
93:21

**Aluminum**
178:8,15,19,23
180:2,13 181:4,
10,16,23 182:4
183:24 187:19
188:1

**Amber** 9:22

**amenable**
202:21

**amended**
143:3,7

**American** 56:5

**amicable**
22:22 26:8

**amount** 62:17,
18 146:23

**Amy** 9:14 11:3
28:23 52:25
97:15 145:18,
22 191:19

**anaphylactic**
63:8

**angry** 84:11,14
100:4

**animosity** 23:8

**answering**
161:18 202:6

**answers**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

114:15

**antagonistic**
100:19 101:17

**antagonizing**
83:8,11 84:3

**anymore**
62:21

**apologies** 47:7

**apologize**
127:10

**apparent**
59:25

**appeared** 63:7
68:19

**appears** 155:6
182:23

**applied** 21:19
23:16

**apply** 22:12
23:10,17
110:15

**appoint** 202:17

**appointed**
203:7

**appreciated**
43:10

**approach**
158:7

**approached**
157:23 173:7

**approximate**
62:4

**approximately**
127:18 145:1

**area** 14:19
15:19 46:3
61:1,14,15
65:20,23 67:21,
25 80:14 87:9,
10,13 88:14
92:22,25
105:22 124:23
125:17 127:18,
20 150:12

**areas** 87:11

**arising** 188:11
191:4

**arm** 154:1,2
169:10,17

**Armory** 72:11

**Army** 12:23

**Arnett** 9:22
28:23,25 29:4

**arrangements**
111:11

**arrest** 51:3
196:5,25 197:6

**arrested**
138:19,25
140:4 190:13
198:12,21

**arresting**
190:12

**arrival** 70:22
71:4,8,11
121:5,9 123:2

**arrived** 66:13,
17,20 68:18,25
70:12,18 81:14,
18 87:20,21
120:4 122:23
125:17

**arriving** 69:3,
24

**assault** 169:4

**assaulted** 44:8
165:19

**assessment**
62:24

**assigned**
24:20

**assist** 108:4

**assistance**
71:1,2 74:3
87:4 173:22

**assistant**
118:13

**assisting** 49:4

**assume** 28:8

**assumption**
186:17

**asthma** 58:25

**attack** 58:25

**attacked**
165:19

**attempt** 173:10
174:8,12

**attempted**
89:5 169:4

**attend** 13:8
52:15,17 55:1
150:14

**attendance**
199:16

**attended** 50:18
150:6,10
176:10 199:8,
12

**attention**
127:24

**attest** 83:19

**attorney** 94:23
98:23 100:1
112:18,22
200:2,19,23,24
201:8,18
202:10,11
203:1,6,7

**attorney's**
158:17 159:12

**attorneys**
11:22 12:1
110:8 111:12,
24 112:10,23

**attributed**
159:20 160:14
161:3

**Auburn** 173:5

**August** 10:4

**authorities**
172:4

**Automated**
56:16

**automatically**
15:10 63:4

**average** 40:23

**avoid** 190:5

**aware** 30:13,20
32:14,16,18
38:6 44:12
131:6 136:7
140:7 181:3

---

**B**

**back** 19:12
22:12 53:8
54:10 64:7
72:12,16 73:23
88:7 90:2 93:25
94:2 98:4 101:2
104:4 123:10
147:2 150:14
158:21 159:14
164:7 165:14
174:11 177:14,
19 191:24
193:8,10
195:10,18
196:12,13
203:12

**backed** 174:14

**background**
134:19 135:10,
21,24 136:2,7

**backgrounds**
134:13 135:1,6
136:9

**backtrack**
90:24

**bad** 51:15
62:23 129:6
154:7

**bag** 88:11,13,
17 89:17 93:15,
16 142:18

**bailiffs** 29:14,
15 30:18 49:5

**ball** 47:22

**bar** 165:12

**barbs** 46:19

**based** 69:21
77:25 84:5 86:4

119:22 143:2,4
148:21

**bases** 12:20

**Basic** 54:24

**basically**
75:10 106:3
109:15 113:18
114:8 118:2
141:4

**basis** 83:21
188:17,20

**basket** 195:13

**Bates** 38:15
41:24 45:7
48:19 52:21
54:1 98:24
191:16

**baton** 36:2

**batons** 47:22

**began** 20:9
51:10 92:2
171:22 173:25
195:14

**begin** 10:23
21:16

**beginning**
69:5 110:14,19
182:25

**behalf** 10:2,4,
7,10

**behaved** 86:3

**behavior**
48:14 94:25
134:14 135:2
161:4

**Behavioral**
118:14

**belief** 69:23

**bell** 17:5 113:3

**Bellofatto** 9:4

**belong** 142:23,
24

**belongings**
93:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**bench** 105:21

**beneath** 89:17

**beneficial**
37:23 43:2,3

**Benjamin** 10:2

**bet** 63:12

**Bethany** 9:4
38:7,9 41:23
53:25 55:17

**bike** 72:14

**bikes** 72:9,15

**Bill** 10:14
18:20,21,25
19:3,7 20:22
21:5 31:6 32:1
39:12,23 41:8
47:13 49:21
54:16 88:19
89:20,21,23
107:2 108:22
109:1 173:15
182:4,15 183:5

**bills** 164:10,14

**Billy** 157:23
158:20 159:12,
14,15 160:4
165:17 166:11,
19 167:22,23
168:9 179:17
181:23 183:24
184:1 186:1

**binders** 31:15

**biological**
61:25

**bit** 12:25 19:19
90:24 117:25
118:3

**blank** 50:14

**bleed** 59:21

**bleeding** 69:7
82:8

**blindness**
58:24

**blocking** 160:4

**blood** 61:23
80:4

**bloodborne**
62:1

**blue** 138:7

**body** 60:7,21

**book** 34:11
89:5

**booked** 71:17
89:2 145:2,4

**booking** 33:23
34:17 63:25
64:3,8 95:23
104:9 157:21
158:15 159:13

**boots** 192:13

**born** 12:18
85:10 139:18

**Boston** 114:24
115:12

**bothered** 75:7

**bottom** 39:16
194:10

**Bowling** 9:10
13:3 118:15
119:6,9,10

**box** 191:23,24

**break** 11:11,15
52:25 53:3,10
88:9 97:25
177:2,3,9 193:1

**breath** 58:24

**breathalyzer**
87:10

**breathe** 81:6

**breathing**
62:22,25 63:3,5
79:19 80:8,11

**bring** 23:2
63:21 65:22
94:3 163:1

**bringing** 65:1
71:3 138:17

**brings** 112:2

**broke** 88:10

**broken** 88:14

**Brooks** 21:9

**brought** 27:20
28:18 45:17
63:16,19 64:10,
20 65:9 66:10,
22 67:5 68:7,17
73:11 81:25
82:4 87:17
119:24 120:19,
23 142:17
185:22

**bud** 146:8

**building** 87:5,
14

**buildings**
116:13

**bunch** 112:2
152:16

**burning** 58:5

**business** 64:2
134:21

**Buster** 10:8,11

**busy** 64:4

**Butler** 91:19,
22,23

**bypass** 138:7

———————

**C**

———————

**C-Y-N-D-A-L**
141:17

**cabinet** 93:19

**California**
14:25

**call** 71:1,3,4
73:3 84:15 87:4
90:15,16,18,20
157:23 158:16
192:4

**called** 35:24
58:3 87:9 90:22
105:23 115:10
167:22 168:6
173:19 192:8

**calls** 157:21
158:16,18

**calm** 89:4
100:16

**camera** 87:5

**cameras** 87:6,
12

**Campbell** 9:16

**candid** 43:11

**Cannon** 10:8,
11

**capable** 50:12

**capacity** 10:8
22:3

**captain** 20:25
47:18,19
173:20

**car** 34:3,4
50:23 69:4,19,
22 72:16 73:22
123:11 139:22
140:2,22,23
163:14,24
174:10

**card** 33:3 93:9,
11,13

**cards** 33:2

**care** 35:2 43:1
72:22 110:3
139:25

**careful** 143:2

**cares** 203:1

**caring** 84:7

**Carolina**
189:24

**carpooled**
26:15,20

**cars** 162:25
163:1,3,4

**cartridge**
46:14,17

**case** 9:10
24:13 73:25
86:17 104:20,
24,25 105:1,2,3
106:14 107:8,
17 108:5

**calm** 89:4
110:10 111:8
112:6,23 117:4
132:12 134:20
135:7,8 141:12
173:21 194:10,
13 195:2
197:13

**cases** 110:23
111:1 202:14

**cash** 162:15,
16,17 163:20,
23,24 164:3,7,
8,9,12,17,21
165:6,8

**caused** 79:20,
22 107:19
124:9 136:19

**causing** 63:10

**cell** 46:3,11,13
61:22 63:24
64:12,15 89:4
142:17 144:21,
23 160:3 165:6,
8

**cells** 164:17,22

**center** 16:3,14,
23 17:3,16
18:6,15 19:13
20:1,4,10,24
23:11,18 28:16
29:17,19,25
30:3,6,22,25
32:10 33:20
35:15 36:16
37:24 38:3
39:19 41:17
43:18,22 44:14,
23 48:11,15
49:13 51:11,12,
13,19 52:3
55:10,12 56:19
57:11 61:8 62:6
63:19 65:12
66:9,16 71:23
73:3 79:5
103:12 109:20
118:7 119:25
120:5,15
151:19 152:9,
13 153:14
164:18 165:18,
20 170:8,14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 58 of 80 PageID
#: 2645
The Deposition of WILLIAM PORTER, taken on February 01, 2022
209

certainty
31:11 56:22
147:22

certification
14:15,17 56:5,
13

certified 14:14
176:12

Chad 9:20
27:17

chain 15:4

chair 63:25

chambers
105:22

chance 134:2
179:12

change 114:25
115:13 164:15

changed
107:14 115:1
164:24

characterize
83:22,25 84:3,
14

charge 18:13
19:3 20:20
47:21,24 57:7
142:11,12,14,
15,25 143:1,7,
14,16 145:4,6,9
146:11,16
188:6,10,17,20
189:21 197:5,
25 198:3

charged 142:6
144:11 190:21
191:3,7 196:5
198:14,23

charges
120:17 191:10
200:8

Charles 99:19

Chase 13:22
14:3 199:9,15

check 118:18

checked
134:11,18

checking
134:24 136:8

chemical
57:12,25 58:16,
21 59:18,23
60:11,23 61:5
62:5,13 63:1
69:22,24 78:18,
21 79:11,17
80:8 81:10,13,
17,24

chest 82:4
142:20

Chicago
113:11

Chick 183:2,15

chief 21:7,8,25
22:19 27:23
28:2 130:22
133:12

child 83:5
84:12 85:10
108:17 139:18
143:18,21
144:1,9 146:16
196:10,21

Childers 9:24
28:22

childhood
161:8

children 85:2
95:19 96:2,5
104:6 200:3,13

chime 202:2

choice 201:10

choking 58:25
59:3

choose 193:24

chronological
118:1

chronologicall
y 40:2

chronology
160:23

Chrystal
191:22 192:10

cigarette 49:6

cigarettes
93:10

Cindy 152:9,10
155:6,16,18,21
156:2,6,14,18,
22 157:7,20
158:15,16,19

Circuit 144:5

circumstance
s 42:13 43:6
44:2,4 61:10
64:19,24 184:7
190:1

citation 64:1

cited 138:25
140:4 190:14,
16

citizens
175:17,25

City 9:8,21
10:11 110:11

civil 104:19,21
105:2,3,5,13
106:25 110:24,
25 111:8 112:2,
6,10 142:15
143:14,16,23
144:11,13
145:4 146:15,
21

clarify 40:1
78:8 111:19

clarity 74:7

Clark 29:19,22
30:15

Clark's 30:5

clashes 152:5
153:1

class 150:25

classes 14:8,
10,12 18:2
23:19 158:19

Clayton 21:1,2

clean 110:16
162:5,25 163:2,
3

cleaned 163:4

cleaning 118:2
163:14

cleanup
117:24

clear 163:7

clock 32:23,25

clocked 32:25
169:22

close 25:25
62:2 101:8
114:2 126:13

closed 61:13
194:11,13

clothing 92:6
128:5

cloths 80:17

clue 156:24
164:1 194:25
198:5

CNC 118:16

co-counsel
146:5

Coke 195:14,
16,21

Cokes 195:13

collect 65:24
66:2,4 67:25
80:15 92:5,11
93:2 127:21
128:5 130:8

collected
91:12 93:13,17,
22,25 94:17
127:1 128:13

collecting 92:2
93:6

collection
50:25 51:1

college 13:8,
10,22 199:9

combative
48:14 52:7
57:21 63:22,24
64:10

combination
132:2

comfortable
86:4

comment
72:18,19 75:4,9
82:20

comments
41:4,7 74:13

commissary
164:8,16

common
164:11

commonplace
163:6

Commonwealt
h 94:23

communicate
22:13 70:23,25

communicate
d 22:16

communicatio
n 117:16

company
14:25 15:1

compelled
175:10,19

competently
12:12

complaint
185:8,17

complete
150:18

completely
57:17,18 91:9
202:13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 59 of 80 PageID
#: 2646
The Deposition of WILLIAM PORTER, taken on February 01, 2022

210

computer
34:12 41:10

concealing
189:2

concern 86:8

concerned
86:12 104:1
108:11,14,16

concerns
103:9,14
108:15

concession
161:13

CONCLUDED
203:20

condition 35:7
68:16,22

conditions
12:11

conduct
116:24 161:3

conference
111:12

confirm 117:13
129:17

confirms
129:1

conflict 165:16
166:23 168:12
170:2,6

conform
179:18

confrontation
178:13 180:10,
17,20 181:21
183:22

confused
70:16 150:5

confuses
160:21

Congratulatio
ns 24:3

connected
168:9

connection

111:24 112:5
148:6 170:11
190:12,21
194:8,18

consciousnes
s 62:22

consideration
61:16

considered
15:20,25 77:13
94:5 176:17
188:22

consistent
161:4 171:19

Constantly
52:1

constitutional
51:2

constraint
94:24

construe
168:25

contact 76:8
115:12 125:1,5,
14 153:18
157:24 158:4,8,
9 160:1 173:4,
17 192:9

contacted
192:1

contempt
142:15 143:14,
16,24 144:11,
14 145:4
146:16,21

contending
157:6

contention
142:21 147:24
149:20 161:23
163:13,19
169:14 180:5,
16 181:8,11
183:25 189:8,
18

contents 33:8
116:16

context 133:1,
9 160:16,17

contingent
22:11

continue 23:21
52:17 146:3
151:2 173:21
174:15,21
175:19 176:19
201:9,20
202:25

continued
24:10 43:17
46:10 174:20

continues
159:11

continuing
151:6

continuum
35:22 36:5,8
37:9 51:7

contraband
142:13 143:1
145:9

contract
118:17 119:1,3

contrary
132:19

control 31:5
57:20 71:5
87:12 88:2

controlled
143:8 146:19

conversation
42:17 81:20
105:19 106:17
113:17 114:1,4
115:18,22
116:2,9,17
117:7,9,18
130:14 133:5
182:3

conversations
104:11,18,23
105:9,12,16
106:20,24
107:2,6 115:14

convicted

188:8 194:7
197:5 198:14,
22

conviction
194:4,5 197:14,
15

convictions
196:1 197:21

cool 89:5

cop 196:9

copies 33:9
49:18

cops 163:1

copy 30:25
31:5,6,9 49:20
89:13 109:11
121:20 122:10
192:4 193:19,
23 194:1

Corps 12:22

correct 19:15,
16 21:4 24:24,
25 25:23 28:22
30:4 31:22 36:3
37:12 40:22,24,
25 41:5,15
43:14,15,19,20
46:24 47:11
48:4,8,12
50:13,18,19
51:24,25 56:10,
11,14 57:8
66:10,11 67:2,
4,15,16 68:14
69:25 70:19,20
71:8,9 73:7,12,
13 74:23 78:6
79:15 80:9,23
81:11,12,15,22
84:17,21 85:7
89:10 91:1,2,5
96:7 99:12,13,
20 101:9
107:12 111:22,
24,25 112:3,4,7
114:9,15 115:4,
5,7,20 117:14
120:1,11,16,25
121:1,6,10
123:18 124:1,2
125:6,15,16,22

128:21 129:9
130:2 145:10
146:17 150:19
151:16 152:20,
21 154:5
161:22 162:1,3
163:9,11,12
165:9 170:4,8,9
171:20 173:14
175:5,7 176:13,
16 178:1
180:13 181:5,
13 182:24
183:2,3 184:12
186:3,17,24
189:15 196:23

corrected
22:11

correcting
129:10

Corrections
52:16 54:24

correctly 32:8
34:1 50:9 113:9
121:3,5 143:20
157:25 158:23
159:17

corrupt 134:14
135:2

cough 59:2
79:22

coughing 59:3

coughs 68:15
111:12

counsel 9:11,
13 10:22
192:25 201:9,
11 202:17

counseling
42:9,14 43:7,16

county 10:8,9,
13 16:3,23
17:15,20,21
18:6 19:13
20:3,10,23
23:11,18 30:22,
24 33:20 35:15
36:16 37:24
38:3 39:19
41:17 43:18,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 60 of 80 PageID
#: 2647
The Deposition of WILLIAM PORTER, taken on February 01, 2022

211

44:23 48:14
49:12 51:19
52:2 55:10,12
56:18 57:11
61:8 62:5
65:12,20 66:9
109:19 118:7,8
119:10,11,24
120:4,14
151:19 152:8,
13 153:13
155:1 162:25
164:18 166:6
169:21 170:14
171:4 175:3
178:7,8,10
179:11 183:1,6
184:18 185:7
187:15,19,23
197:2 200:4

**county-owned**
163:8

**couple** 98:6
158:22

**court** 9:4
10:17,22 12:5
29:14 30:9,18
38:11,13,18,21
41:25 45:10
48:21,23 49:5
52:23 54:2,5
55:21,23 91:13
95:3,4 97:7,10,
15 111:14
121:18,21,24
122:4,8 143:25
144:4,5 154:9,
13,17,20
165:22,24
170:17,21,25
177:17,19
179:2,4 193:9,
10,17,19,22

**courthouse**
105:20

**Courtnet**
191:19 197:25

**covered** 18:4
176:9

**covering** 33:1

**coworker**
151:19 152:8

**CPR** 41:10 52:7
55:16 56:4,12

**crafting** 156:23

**crease** 68:24

**create** 88:20,
25 165:2

**credit** 56:8
93:9

**crew** 18:12,13

**crime** 50:24
96:1 188:8
190:12,21
191:3 198:6,14,
23

**crimes** 91:10
96:5

**criminal** 105:1,
2 107:3 111:4,
23 112:9
115:19 121:19
123:25 124:16
125:4,13 127:5
128:11 197:21

**criminally**
111:20

**critical** 133:7,
8,12

**Cross** 56:5
110:4

**crossed**
172:10,14,20
173:8 174:6

**crow** 167:15

**crowbar** 167:3,
16 169:7

**cruiser** 70:2
120:10,14

**CS** 58:4

**CT** 25:18

**current** 118:9

**cursed** 74:8
78:5

**cursing** 76:1,3
185:4

**custody** 35:3
66:1 104:8

**cut** 68:23,25
69:2,7 72:11
82:8 120:23
121:4,10,13,16
122:22 123:1
141:6

**Cyndal** 141:17
149:9

———

**D**

———

**Daisy** 151:20,
25 155:7 157:2,
7,20 158:15,17

**damn** 179:20,
21

**danger** 173:11
174:9

**dangerous**
57:22

**date** 18:10
47:15 49:9,20
50:15 114:25
115:4,7,9,11,
15,25 192:6,15
194:4,5,6

**dated** 42:11
191:14

**dates** 17:1

**David** 9:24
21:1,2 28:5,10,
15

**day** 9:5 48:7
49:6 137:23

**days** 23:22,24
143:14 144:17,
18,19

**deactivating**
60:23

**deal** 15:3
145:21,24
152:19

**dealer** 136:25
137:8,15 142:4
149:3

**dealing** 184:24

**dealt** 37:14

**death** 200:3

**debit** 93:9

**December**
17:5 137:22

**decided** 163:4

**decisions**
40:20

**declining**
194:11

**decontaminat
e** 60:16 80:13
81:2

**decontaminat
ed** 80:21 81:5

**decontaminati
on** 60:12 80:17,
20

**defendant**
37:23

**defendants**
9:19,23 37:22
110:1,10 112:2
132:12 134:20
135:7,8 139:12

**defendants'**
98:23

**defender**
108:1,2

**defense** 99:25
111:23 112:9
115:19

**defensive**
176:6,7

**defensively**
50:23

**deferred**
197:7,10

**defibrillator**
56:16

**degree** 13:20
143:9

**delivered**

71:18

**demeanor**
70:12,14

**department**
16:20 21:13,17,
23 22:4,7,20
23:4,7,8 24:6,
20,23 25:6,15
26:6,17 27:3,
10,24 28:13
30:7 52:16
54:24 66:7 67:2
68:5,9,13
107:12 118:8
119:18 130:16
132:8,16,24
133:3,8,19
134:4,12 136:9,
23 137:7,14
142:3 147:4,12,
19 148:6,14
149:1,8,13,24
173:5 190:19
198:13 200:16

**dependable**
43:14

**depending**
36:7,14 49:22
63:22

**depends** 20:7
160:10

**deploy** 46:13
125:23

**deployed**
46:22 126:17

**deponent**
154:10 177:17

**deposition** 9:7
11:7 110:7,14,
20 111:5,8
114:22 115:3
117:19 145:17
202:22 203:18,
20

**depositions**
110:21

**deputies** 30:18
47:22

**deputy** 10:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 165     Filed 10/03/25     Page 61 of 80 PageID
The Deposition of WILLIAM PORTER, taken on February 01, 2022
#: 2648
212

16:15 19:20
20:4 43:13,14
57:20 66:18
78:23 79:2,6,7,
10 80:19 91:19,
22,23 126:14,
18 129:23
144:20 151:7
152:14,17,19
158:7 159:7
160:25 162:4
175:3,9 176:16,
21

**describe** 22:18
25:4 26:6 27:1,
14 28:1 44:13
83:3,4 153:20

**describing**
34:5

**description**
34:5 173:6

**designed**
83:12

**desk** 64:1
89:20,23
108:22 109:1
129:25 130:2,4
132:4 157:21

**destroyed**
66:3

**detain** 173:1,
10,14

**detained** 35:17
36:19 174:8

**detainees** 51:5

**detective**
24:19 25:3,5,9
26:7 105:24

**detention**
16:3,14,23
17:3,15 18:6
19:13 20:1,4,
10,24 23:11,18
28:16 29:17,19,
25 30:3,5,22,24
32:10 33:20
35:15 36:16
37:24 38:3
39:19 41:17
43:18,22 44:14,

23 48:11,15
49:13 51:11,12,
13,19 52:3
55:10,12 56:18
57:11 61:8 62:6
63:19 65:12
66:9,15 71:23
73:3 79:5
103:11 109:20
118:7 119:25
120:4,15
151:19 152:9,
13 153:14
164:18 165:18,
20 170:8,14
175:3 178:7,10
187:15,23

**determine**
48:3

**determined**
23:1 45:20 62:2

**detox** 46:3
63:24 64:12

**Detroit** 113:11

**devices** 52:5

**dictionary**
165:14

**died** 104:6

**difference**
77:4 78:10
176:15

**differently**
77:10

**digital** 50:1

**dinner** 158:17

**direct** 10:24
15:21,23,25
35:21 74:9
90:22 122:16
124:20 127:24

**directed** 185:8
186:2

**direction**
126:12

**directly** 19:25
70:24 71:2,3
99:19 126:7
182:5 187:11,

12

**director**
178:14 180:12
181:15,22
183:22

**disagreed**
153:7

**disagreement**
153:5,9

**discharge**
58:5

**disciplined**
41:17 43:23
44:11 119:19
170:10

**disclosure**
38:4

**discuss**
130:19

**discussed**
22:25 80:12
130:24

**discussion**
82:1 106:10

**discussions**
82:3

**dismiss**
197:13

**dispute** 96:23

**dissimilar**
85:13

**distance** 46:14

**distress** 62:19
63:11

**distressed**
62:21

**District** 9:10
202:15,16

**divorce** 144:3

**DOC** 52:20
53:20 55:3,5

**document**
34:23 37:4
39:3,5 40:5
42:1,6,9 45:2,4,

10,13,15 47:9,
12,15 48:14
49:1,3,9 53:13,
15,23 54:13
56:1,3 117:1
154:25 155:17
156:7,14,23
157:5,8,10,16
158:13 159:1,
11,19,24 160:5,
12,13,15,18,20,
22 161:24
162:10 163:16
165:25 166:5
168:17 170:18
171:3 179:10,
24 182:13,14,
25 183:1
185:13 192:22
193:13 194:3
195:6

**documentatio
n** 34:16 36:17
48:2

**documented**
47:9 48:10
49:12 50:4

**documenting**
35:7,11 48:1

**documents**
38:8,10 114:22
117:21 154:10

**DOGC** 25:18

**DOJCT** 25:18

**Donnie** 47:14,
17,18,19 48:2

**door** 45:18,19
46:3 73:24
76:17,22,24
87:9 93:1 130:1
157:21,23
158:16,18
191:9

**doors** 69:19

**doorway** 160:3

**dope** 138:9

**double** 13:14

**doubt** 183:4,13

**downloaded**
15:9

**downplaying**
107:24

**drafted** 49:15
89:7,11 90:5

**drinking**
195:14

**drive** 46:23
50:23 72:11

**driving** 140:21,
23 163:8
172:24 176:7

**drove** 174:11

**drug** 136:24
137:8,15 142:4
149:3 188:5
196:1 197:25
198:4

**drug-related**
142:6

**drugs** 138:17
139:23 140:2,
19 141:4
142:18,19
144:22,25

**dry** 47:1

**due** 89:2 103:6
194:11

**Duncan**
153:15,18
155:8 157:22,
24 158:3,14
159:1,14,25
160:2,3,9
161:14,15

**duties** 19:17
64:7 176:20

**duty** 175:2,8

---

**E**

**e-mail** 122:12
191:12 192:24

**earlier** 21:10
37:7 50:17 51:8
52:11 107:10



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 62 of 80 PageID
#: 2649
The Deposition of WILLIAM PORTER, taken on February 01, 2022
213

121:20,25
124:7 126:1,24
129:4,10,15
132:20 149:16
151:12 154:11
161:11,17
177:22 184:11
193:16

**early** 14:1
113:15

**ears** 58:7,9

**eastbound**
173:9 174:7

**Eastern**
202:15

**eat** 158:17

**eating** 103:16
104:3

**Ed** 26:11 66:24
91:15 133:12

**Edmonds** 9:19
24:16,18,23
25:5,9 26:7
105:16,24
106:6,11,18
130:20 131:1
133:12 135:9

**education**
13:19

**Edward** 9:19

**effect** 107:17
134:24

**effected** 61:16

**effects** 57:16,
17,24 58:20
59:23,25 60:2,5
63:4 79:17

**effort** 34:20

**Eggleston**
9:20 27:17
130:21 131:2
133:13

**Eggleston's**
136:6

**EKU** 50:21 51:4

**elaborate** 77:5

**electronic**
15:8 34:13
193:19

**elicit** 83:12

**Elizabeth** 9:25

**Elliot** 145:18,
21 177:4 202:3

**else's** 122:11

**emergency**
14:14

**employ** 20:9
44:24 78:18
79:10

**employed**
14:20 16:3,4
20:23 21:22
24:22,23 25:5,
14 26:16 27:2,
11,24 28:12
29:12,18 32:10
36:18 44:23
45:3 51:12 55:9
57:10 62:14
107:11 119:17
137:10,20

**employee**
39:6,7,10 52:14
68:13 71:21
109:19

**employees**
15:16,18,21
19:21 39:18
52:12 55:12,15
56:18,24 57:1
64:16 66:15
184:18 185:7

**employer**
118:9,23 152:5

**Employer/**
**employee** 19:8

**employment**
21:12,16 22:6
23:6 28:16
29:22 30:23
41:16 43:18,21
52:17 132:7
187:14,22

**EMT** 41:10

**encounter**
124:22,25

**end** 22:6
172:17

**ended** 22:8
23:6 70:21
167:25

**enforce** 149:24

**enforcement**
21:20 63:20
169:6 176:14
190:11 198:22

**engage** 176:21

**engaged**
162:21 196:16

**ensure** 46:8
183:9

**entail** 19:17
60:14

**enter** 34:6 36:8
181:16,23
183:23 192:13

**entered** 132:3
191:22

**entire** 60:7
67:8,12 132:23
150:18,25

**entrance** 87:9

**envelope**
49:19 88:12

**episode**
103:25

**equally** 120:2

**equilibrium**
59:8

**eraser** 165:13

**essential** 41:9

**essentially**
23:23 37:22
72:23 74:15
107:19 109:13
167:2 185:5

**estimate** 67:17
129:4,17

**et al** 9:9

**ethically** 201:7

**evaluated**
39:8,18,21,23,
25 40:3

**evaluation**
39:6,11 40:16
41:2

**evening** 87:23
108:22 109:1

**event** 134:18
152:4 170:11
191:21

**events** 87:22
91:8 129:20
131:3 154:4

**everybody's**
61:18

**evidence**
37:18,21 38:1,5
51:1 65:24
66:2,3,5 68:1
80:15 88:11
92:2,4 127:1,22
128:13 131:21
143:6 190:2

**evidentiary**
94:5

**evil** 85:16

**ex-wife** 141:15
149:20 190:20

**exact** 17:23
18:10 47:20
66:20 72:23
75:15 114:7
115:25 116:19

**exam** 22:9

**EXAMINATIO**
**N** 10:24 110:4

**exchange**
124:24 163:20
190:24

**exchanged**
191:25

**exchanging**
192:15

**excited** 83:16

**exculpatory**
37:18 38:1,4

**excuse** 25:18
100:11 111:13
187:23

**executive**
183:2,6,15

**exercise**
58:16,18

**exhaling** 80:5

**exhibit** 38:15,
17 41:21,22
45:7,9 48:18,20
52:21,22 53:11
54:4 55:19,20
98:25 99:6
121:22 122:3,7
124:17 154:14,
21,22 166:2
170:24 179:7

**existed** 31:13

**existence**
31:21,24
130:20

**exit** 17:16

**exited** 70:1

**expel** 79:21

**experience**
24:21 59:13,15,
17 61:13 71:15
73:2 175:16,23

**experienced**
58:21

**experiences**
73:6

**expert** 86:5

**explain** 19:6
46:4 74:18 75:6
83:2 143:16
200:22

**explained** 43:6
200:18

**explaining**
47:17



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 63 of 80 PageID
#: 2650
The Deposition of WILLIAM PORTER, taken on February 01, 2022

214

**explanation** 43:11 63:13 82:7,11

**exposed** 61:25

**expressed** 133:18,21

**expressing** 40:19

**extended** 65:1, 14,18 67:15,24

**Extensive** 51:6

**extent** 120:17 201:13

**external** 51:22 56:16 97:16,19

**extraordinarily** 34:22 68:19,20 70:13

**extraordinary** 58:8 176:24

**eyes** 59:6 61:2 79:19 80:21

--- F ---

**face** 45:19 60:6 80:13 81:5 91:21

**facilitate** 202:19

**facility** 52:9 63:16 65:2 66:12,13 89:21 90:10 96:6 122:24 132:5

**facility-type** 118:21

**fact** 69:21 86:22,23 87:23 89:3 95:8 131:23 148:25 170:2 186:1 187:25 188:21 199:8

**facto** 191:8

**factory** 72:10 178:8

**facts** 192:17 194:2,18 195:5

**factual** 75:18 85:22 94:14 109:14

**factually** 76:6 87:24 123:11

**failed** 22:9 25:21 151:1,4

**failing** 41:18

**failure** 146:16

**fair** 119:22 120:2,7,12 133:25

**fall** 142:20

**falling** 200:4

**familiar** 24:16 26:10 28:6 29:8,13 192:17 194:3 195:1

**fashion** 163:16

**father** 12:22

**February** 9:5 39:23 41:2 49:10 98:12 178:6,13 180:10 184:17 187:15

**federal** 196:4

**feel** 78:1 148:25 175:10, 19 190:3

**feeling** 86:6 186:10

**feelings** 86:23

**fell** 142:22

**felt** 23:14 59:1 60:9 76:15 77:12 84:6 86:2,3,14 91:10 101:18 108:2 148:23

**female** 112:17

152:14,15,17, 19,20 186:1

**females** 152:17

**field** 14:12 24:21 25:1 47:21 48:6

**fight** 57:19 59:10,17,20 146:13,22 165:12,13,15

**fighting** 190:3

**figure** 201:12

**file** 49:23 50:1 93:18 109:22 154:25 166:5 171:4 179:10

**filed** 104:19,21 105:6 112:1 185:8

**filing** 93:19

**fill** 50:15

**find** 61:14 134:13 148:15, 19 194:7

**finding** 134:25

**fine** 11:2 97:14 102:6 145:23 154:19 202:9

**fines** 30:12

**fingerprints** 50:25

**fingers** 92:15

**finish** 201:21 202:22

**finished** 47:6 155:3 158:16 166:8 171:7

**fire** 60:9 84:23 85:3 95:14 120:9

**firearm** 188:12, 18 189:6,16

**firearms** 22:9 25:21 47:24

50:24 150:21 151:2

**fired** 199:5

**firm** 83:7

**fishing** 200:7

**fit** 88:19 91:13 189:16

**fixtures** 118:18

**Flonase** 191:24 195:22

**floor** 46:4 70:10 76:16,19, 24 100:12 124:10,13 142:20,22 145:1

**fluid** 58:7 61:25

**focus** 18:1 78:3

**focusing** 30:23

**fold** 88:12

**folder** 49:24

**follow** 41:18 154:18 171:24 172:3 174:15, 20,22 175:10, 22,25 176:2

**follow-up** 201:23

**food** 71:18

**foot** 159:16

**force** 35:17,22 36:3,7,11,13, 14,18,20 37:4, 7,8,9,10 43:23, 25 44:1,6,24 45:3 48:3 51:5 77:2,5,6,14,15 159:15 161:2, 20,25

**foremost** 11:11

**forget** 69:15

**forgot** 195:15, 21

**form** 24:6 25:12 31:12 37:3 41:3 114:16 121:12 123:20 126:6 129:13 131:5 135:3 145:16 147:6 148:2,10 149:4 150:9,17 151:21 153:3, 11 155:13 156:9,25 157:11 158:11 159:5,23 160:6 161:6 163:25 164:4,23 165:4 166:25 167:6 169:3,20 171:16 174:2, 17 176:1,23 180:15 181:6 182:16 183:7 184:5 185:15 186:7,25 187:10 188:14 189:12 191:2 192:16 196:18 198:11,20,25 199:18,24

**format** 111:6

**formed** 29:17

**forward** 76:14 88:6 202:20

**found** 44:20 94:7,9 116:22 131:24 142:18 144:21,24

**foundation** 199:18,25

**four-lane** 172:9

**Freeze** 58:3

**Friday** 42:18 113:8,14 114:14 117:8

**Fridays** 42:16, 22

**friend** 73:3

**friendly** 27:4, 16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 64 of 80 PageID
#: 2651
The Deposition of WILLIAM PORTER, taken on February 01, 2022
215

**friends** 161:8, 14

**front** 63:25 73:24 183:18 196:11

**fuck** 184:21 196:12

**fucker** 100:15

**fucking** 158:14 167:2,5,8,10, 12,18

**full-time** 23:22

**Fuller** 185:11 186:3

**Fullers** 186:11, 23

**furnished** 155:1

---

**G**

**G-R-A-G-G** 147:10

**Gage** 118:16 119:14,15

**gain** 57:20

**gas** 58:4 175:14

**gasping** 63:9

**gave** 36:13 41:1 57:1 99:2 102:18 107:3 110:13 115:10 122:23 129:4 140:19 141:5 161:10 162:15, 16,17 163:23

**GED** 158:19

**general** 14:19 32:24 37:5 40:11 44:13 46:9 51:1 52:8 63:14 67:21 75:25 114:10, 12 133:4,20,22 158:6 159:6 164:2

**generally** 15:19 49:16 116:20 131:13 152:22 177:25 185:4

**generic** 34:10

**gentleman** 30:12

**Georgetown** 10:11

**get along** 19:10 178:1

**Gill** 144:5

**Gingrey** 191:22 192:10, 12

**girl** 166:12,21 167:21,24

**give** 10:18 38:18,21 41:24 51:13 55:14 57:6 82:7 94:2 98:16 113:22 125:7 130:6 134:2,9 154:13 163:5 168:16

**giving** 56:9,23 86:4 148:15

**good** 11:1 22:21 23:14 25:7 40:20 41:11,13 43:13 53:3 62:20 77:16 104:22 110:16 133:15 152:22,24 177:2,7,23 179:1

**gosh** 193:4

**government** 116:13

**grab** 159:7

**grabbed** 153:25 158:21 159:9,14

**grabbing** 159:2

**grades** 24:1

**graduate** 13:4, 6,15,17 14:3 118:13 150:15

**graduated** 24:2 26:22

**Gragg** 147:10

**grain** 135:12

**grand** 86:16

**grandparents** 42:23

**gravity** 85:11 91:10

**great** 41:9 53:10 107:10 166:8

**green** 9:10 13:3 93:14 118:15 119:6,9, 10

**Gregory** 10:1, 3,5 165:17 166:11,19,24 167:1 168:10

**groceries** 190:25 191:25 192:15

**grow** 12:17

**guard** 178:14 180:12 182:10

**guess** 29:21 72:25 77:17,24 99:19 101:2 168:1 179:14

**guidance** 36:10 57:9

**guide** 19:24

**guidelines** 36:13

**guilty** 44:20 143:3,10 145:12 146:10, 14,18 188:6,9, 10 189:21 190:2,4,5 191:8 195:17,18

198:2,6

**gun** 46:15,25

**guns** 47:22

---

**H**

**habit** 34:20 35:5

**hair** 60:19

**half** 26:25

**hand** 10:16 54:3 55:18 64:1,6 89:1,11 121:19 154:1, 10 158:16 165:23 170:17 179:2 188:25

**handcuff** 196:11

**handcuffed** 67:6,8,12 73:23

**handcuffs** 67:9 73:24 196:14

**handed** 38:22 45:10 53:11 54:5 71:18

**handing** 64:4

**handle** 52:6

**handling** 33:22 145:17

**hands** 35:24 77:1 78:16 81:3 92:19,21 158:22 196:12, 13

**handwriting** 155:23 156:16

**handwritten** 37:2 50:13 89:14

**handwrote** 156:21

**happen** 33:9 75:12 79:13 137:5 139:15

142:9 144:20 165:11 170:7 172:19 187:1,7 198:18 201:14 202:7

**happened** 36:25 45:5 65:4 82:10 83:17 90:7,9 91:11 101:7 107:5 120:18 123:14 124:5 137:6 138:3 141:1,23 143:1,6 144:8 148:23 153:21 162:22 163:23 168:5 169:18 170:3 175:4 184:8 185:20 187:11,12 189:19 195:2,6 198:17

**harbor** 148:5, 11

**hard** 47:6 97:3, 5 107:25 113:10 122:10 200:20

**harm** 77:10 103:16,25

**harmed** 96:5,6

**harming** 80:14 95:18

**hassle** 190:6

**hat** 192:12

**hate** 47:2

**Hayes** 66:18 79:3,10 80:19 126:14,18 129:23

**Hayes'** 79:4

**head** 12:8 46:11 57:3 97:9 128:25 147:23

**health** 12:11 34:17 108:17 118:15

**hear** 11:17 74:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 65 of 80 PageID
#: 2652
The Deposition of WILLIAM PORTER, taken on February 01, 2022
216

75:13 82:22,23,
25 84:22 85:15
95:13 97:13,22
99:15 121:5

**heard** 74:13
82:15 84:15,18
135:5,9,15,21
195:7,9

**hearing** 28:6
85:17 97:3,5

**hearsay**
135:18

**held** 64:25
65:14,18,23
67:14,18,23
93:19 126:25
128:12 129:7,
11 154:2

**helped** 202:22

**hesitate** 11:12

**hey** 163:3
168:1

**Higgins** 9:20
26:11,13,16
27:2 66:24
67:1,5 68:6
71:6 73:11,22
74:4,6,11,14,21
75:4,9,13 76:2,
3,9,20,25 77:3,
17,21,23 78:6,
15 80:2,12
81:16,21 82:2,
7,11,16,19
83:15 84:22
85:4,16,18,23
86:9 91:4,16
93:22 94:11,24
95:5,21 96:21
99:16 100:9,14,
25 101:14
102:13,14,21,
25 104:6,11,14,
19,24 108:8,12
119:24 120:3,
14,19 124:9,12,
22 125:5,14,23
126:2,8,14
127:1 128:13
129:23 130:11,
21 131:1
133:12 151:20,

25 155:7 157:2,
7,20

**Higgins'**
73:14,19 76:14
77:12 82:23
96:11 126:12
135:21,24

**high** 13:1,4
171:18 172:2,3,
5

**higher** 13:19

**highly** 132:16
133:2,19 134:3
176:24

**highway** 138:6
172:9

**hilarious**
138:10

**hired** 20:10
22:1,3 30:21,24
31:25

**hiring** 19:3

**histories**
136:12,15

**history** 134:14
135:2 136:11,
13,19

**hit** 76:17,22
142:20 145:1
167:2 172:23

**hold** 18:11 23:8
47:13 152:15
164:3,17
192:20

**holding**
164:12,21

**holster** 188:12,
15,18 189:6

**home** 33:11
113:13,15
138:5 143:15
146:12,14

**honest** 156:15

**honestly** 17:1
57:4 126:19
201:3

**hope** 185:18

**hoped** 43:17

**horseplay**
161:20,24

**horsing** 44:9

**Hosang** 9:3

**hospital** 46:18
118:15

**hour** 67:20
126:25 128:15
129:1,4,12,15

**hours** 17:13
18:2 26:24 46:8
52:15 192:2,7

**house** 43:1
115:9

**housed** 20:1
71:23 73:2
103:11

**human** 44:20
103:18 151:13
161:5

———————

**I**

**idea** 109:3,6
113:22 114:10,
12 147:14
149:25 167:17
183:12 192:23

**IDENTIFICATI
ON** 38:17 41:22
45:9 48:20
52:22 55:20
99:6 154:22
166:2 170:24
179:7

**identify** 9:11

**IGA** 190:22
191:4,23 192:1,
8 195:13

**imagine** 18:5
58:25

**immediately**
19:23 36:23
59:19 63:23
64:11 70:6

90:23 123:1
130:6 184:4

**immoral** 86:14

**implication**
160:23

**impression**
106:8,13 108:5,
9

**improperly**
184:25

**in-between**
92:15 113:12
118:11

**inability** 58:24
70:8

**Inaudible**
180:19

**incapacitate**
57:18,23

**incarcerated**
142:16

**incidence**
134:5

**incidences**
96:4

**incident** 36:23
37:5 43:25
44:5,11 45:16
49:4,15,23
50:14 55:6
61:21 62:10
65:3,5 75:21
86:23 87:2 88:7
90:7,11,18
101:5,10 130:6
131:7,19 132:6
133:6 137:12,
25 139:2,5,15
140:5,8,21
141:8 144:20
153:17 161:19,
24 166:15
169:23 170:14
171:10 185:24
187:3 188:11
191:4 194:6
195:20,24

**incidents** 37:4
44:19 46:10

49:12 50:4,7
75:22 88:22
131:14 140:12
142:1 148:22
190:21

**include** 51:7
61:2

**included** 36:4
37:9

**including**
61:15

**incriminates**
200:5,21

**incriminating**
95:14,18,22
96:13,22
102:15,23

**indicating**
154:3

**indication**
158:2,25
197:25

**indicative** 85:6
161:7

**individual**
26:10 27:5 31:8
33:23 37:15
45:17 57:24
62:15,19 63:1,
16,19,21 64:9,
11,20,25 65:8,
13 87:14
132:22,23
138:16,19

**individuals**
51:2 64:22 96:9

**induce** 103:24

**inform** 90:5,11,
14

**information**
15:9 35:14
50:16 83:17
85:12,14 105:5
114:3,5 117:1
138:12 141:3
172:3

**informed**
31:24 90:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

initially 143:21

initials 33:6

initiate 158:7
171:12,14
172:1

initiated
170:15

injuries 34:22
35:2,9

injuring 45:24

injury 45:21
46:20 69:10
122:24

inmate 28:18
34:25 43:23
44:8,24 49:6
61:22 71:12,20
153:14 157:21,
24 158:7,8,13,
17 159:7,8,13,
25 160:1,3,9,25
161:20 163:24
164:11 165:6,7

inmate's 34:16
49:23

inmates 18:14,
16 19:20,25
27:20 30:9
34:11 44:14
48:14 61:15
62:5 64:16
96:3,4,6 151:8
152:15,20
161:5 162:5,8,
10,13,25 163:1,
14,20 164:3,17,
21 165:2,3,5
178:9 184:22,
25 185:3,19,21
186:1,10

inmates' 93:19

innocent
175:15

inquire 69:9
109:9

inquired 82:9

inquiring
73:16

inside 52:9
94:8 125:24

installing 15:8

instances 34:2

instruct 55:11

instructed
59:9 60:15

instruction
51:23 55:14
56:4,9,12,24
57:1,7,12 79:12

instructions
56:21 57:9

instructor
41:11 56:5

instructors
51:22

intake 34:25
35:10

integrity 80:14

intense 58:5,
23

intent 77:10
149:5 183:11

intention
173:13

interaction
29:16 30:2 69:5
71:14,16,19,22
72:6 74:4 85:9,
19 155:7

interactions
73:15,19
133:23 148:21

interesting
148:20

internal 51:18,
23

internally 52:3

interpret 77:10

interpretation
83:9

interrupt 97:16

intersection

138:6 172:7,11,
23 173:7

intervention
90:22

interviewed
185:20,23
186:19

intoxicated
34:22 35:1,9
45:17 46:7
68:20 70:13,15
89:3

Intro 14:11

introduced
110:7

investigation
50:25 185:16

investigative
83:21

investigator
112:25 115:18
117:9 134:10,
23 135:16,18
136:4,10,22
137:3,5 147:3
148:13

involved 19:23
24:13 90:9
106:14 137:25
138:22 139:5
141:7,12
171:10,12
175:21 190:12

involving
107:7

irritated 79:18

isolation 46:7,
10 61:22

issue 42:23
43:4 169:19
182:4 184:10

issued 144:4,7

item 34:5

items 33:22
93:23,24 94:9,
17 190:22,23,
24 191:25

192:13,15

J

J.W. 66:18
79:3,4

jail 17:7,18,19,
22,25 18:13,14
19:1 21:12
23:21 27:21
28:20 30:9
31:21 32:17
33:16 41:11
44:8,18 45:17
51:21,23 52:6,
12,14 56:7
57:2,6 58:3,18
61:14 64:10,20,
23 69:24 70:23
71:1,11,13,17
72:5 81:18
90:8,16 91:23
94:3,8 95:23
96:8 104:10
118:8 130:12
131:7,13
137:11,20
138:5,17,18
139:17 142:15
143:13 144:16
145:7 146:13,
15,20 152:5
164:5,7 165:11
167:1,11 169:8,
22 170:3
173:19

jailed 144:13

jailer 10:14
16:15 18:18,21,
25 41:13 42:18
43:7,9 57:20
79:6 129:21,25
130:4 132:3,12
151:7 158:7
159:7 162:5
173:16,17
175:3,9 176:16,
21 177:23
183:14

jailers 20:4
79:7 144:20

jails 164:2

Jaman 9:24
28:21,23,24

January 14:2
16:10

Jenkins 10:14
18:20,21,25
19:3,7 20:22
21:5 32:1,2
39:23 41:1,4,13
42:18 43:7,9
49:21 54:16
89:21 90:5
107:3,7 129:21
173:15,18
177:23 182:4,
15 183:5,14

Jenkins'
30:16,19 31:7
39:12 88:19
89:20,23
108:22 109:1
129:25 130:4
132:3,12

Jennifer 9:18
110:6 121:25
123:21 145:19
146:3 192:21
194:9 200:25
201:5,15

Jim 9:21 22:2,
17 27:25

job 16:19 17:18
18:16 22:12
40:12 41:11
57:5 107:25
117:23 118:21
133:16 152:24
168:2 176:20
178:7 179:21
188:2 199:6

jobs 119:7

jog 151:23

John 9:19
26:11

joined 174:24

joint 155:6

joking 153:22

judge 11:24
143:4 144:5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

183:2,5,15
203:6,11

**judgment**
40:20

**July** 13:25
21:18 22:1
139:19

**June** 42:11
43:17

**jurisdiction**
196:24

**jury** 86:17

**justifiable**
151:11

**justify** 159:20
160:5,14

_____

## K

**Kap** 72:10

**karate** 158:22
159:2,8

**keeping**
110:14

**Keith** 185:11
186:2

**Ken** 9:19
130:20 135:9

**Kenneth**
24:16,18
133:12

**Kenny** 153:15,
18 154:6 155:8
157:22,24
158:14,18
159:13,25
160:2,3,9
161:14,15

**Kenny's**
158:20

**Kentuckiana**
9:6

**Kentucky**
9:10,23 12:19
13:3,11,15,21
51:21 53:18,19
118:14,15

119:6,9 173:7
174:23,25
176:18 199:9

**keys** 34:3,4

**kicked** 174:10

**kicking** 45:18
159:16

**kids** 72:10,13,
22 74:17,22
82:16 84:19
100:15

**kill** 175:12

**killed** 74:16,22
82:16 84:19
85:2 100:15
175:15

**kind** 14:10
19:21,24 23:14,
23 52:2 59:8
60:20,23 62:1,
22 75:7 83:18
89:4 100:6
103:25 110:23
113:22,23,25
114:8 143:5
153:25 161:3,
25 164:21
202:17

**Klopfer** 189:23

**knew** 24:9
29:15 66:25
68:12 72:5 73:5
84:19 114:8
131:10,18
161:15 196:10

**knob** 88:5,6

**knowing** 27:19

**knowledge**
30:19 120:20,
21 132:1
144:10,12
178:12,17,21
184:16

**Kroger** 15:6

**KSP** 29:8

**KYIBRS**
191:13 192:16
193:15

_____

## L

**labor** 18:14

**lane** 172:9

**Langen** 9:18
110:3,5,6
121:18,23
122:1,6,9,13
123:22,24
145:17,21
146:1,7,9
154:9,15,19,23
156:1,4 165:22
166:1,3 170:17,
23 171:1 177:1,
3,7,16,20
179:1,6,8
191:18,20
193:1,9,11,17,
21 194:12,14,
16 201:1,16,25
202:4,9,24
203:17

**language** 36:4,
6 74:15 100:11
183:20 184:17,
19,23 185:8
186:2,5

**lapse** 14:16

**large** 43:1

**late** 98:10

**law** 13:22,24
21:19 51:1,2
63:20 107:20
139:18 147:25
149:21,25
169:6 176:14
190:11 198:22
199:8,9,13

**lawsuit** 112:2

**lawyers** 146:2

**lead** 15:15
100:18

**learn** 57:15

**learned** 57:25

**learning**
108:17

**leave** 16:18
17:25 64:18
108:8 168:23
182:9,11
192:13

**led** 150:2

**left** 16:9,16
17:15 21:11
22:19 26:5
32:23 88:2
105:23 129:25
130:2,11 138:5
158:15 182:12
186:3 189:7,15
201:15,17

**legal** 111:17
112:5,8,15
117:10,11

**legally** 151:11

**less-than-
lethal** 52:5

**lethal** 36:3
47:23

**letter** 32:22
43:8,9 161:4,12
180:3,24

**level** 36:7

**levels** 35:22

**library** 158:20

**license** 172:12

**licensed** 201:7

**life** 136:14

**lift** 33:2

**light** 172:10

**lighter** 93:8,11,
12 116:22

**lightly** 69:8

**lights** 138:8

**limited** 22:9

**Lindsey** 138:2
139:9 147:21

**lines** 50:14
122:16,20
124:20

**lip** 68:23 82:8
120:23

**list** 34:4

**litigation**
112:10

**live** 13:1 71:25

**lived** 12:19
72:2 197:19

**Living** 155:8

**LLC** 9:7

**loans** 178:7

**local** 29:14
191:4

**located** 119:4

**location**
114:25 173:6
192:9

**lock** 90:2

**locked** 89:25
93:1 129:25
200:10

**log** 36:24,25

**Logan** 10:13
16:3,22 17:15
18:6 19:13
20:3,10,23
23:11,18 30:22,
24 33:20 35:15
36:16 37:24
38:3,16 39:19
41:16,24 43:18,
21 44:23 45:8
48:14,19 49:12
51:19 52:2,21
53:12 54:1
55:10,11,18
56:18 57:11
61:8 62:5
65:11,20 66:9
109:19 118:7
119:24 120:4,
14 144:5
151:18 152:8,
13 153:13
154:12 155:1,
20 156:1 157:3
164:18 165:21
166:6,14



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 68 of 80 PageID
#: 2655
The Deposition of WILLIAM PORTER, taken on February 01, 2022

219

170:13,18,19
171:4 175:3
178:7,8,9,15,
18,23 179:3,11,
16 180:2,13
181:4,9,16,23
182:4 183:1,2,
6,23 184:18
185:7 187:14,
19,23 188:1
200:3

**logistics** 15:4

**lone** 40:19

**long** 15:11 16:8
17:21 20:16,19
21:22 25:24
39:22 59:23
67:18 80:15
116:2,4 127:17
128:7,12 154:6
177:10

**longer** 67:20
131:24 181:15,
22 183:23

**looked** 17:4
54:17 60:22
144:24 197:24

**loose** 141:6

**lose** 168:2,3

**loss** 58:5 62:22

**lost** 59:7

**lot** 12:24 19:9
25:7 28:3
123:17 126:10
132:20 165:18,
20 192:10
196:14 201:16

**loud** 102:3

**Louisville**
113:11

**LSAT** 107:20

**lying** 95:5

**Lyndsie** 9:3

**Lynn** 10:7

---
**M**

**M-O** 141:19

**M-O-H-A-M-M-A-D-I** 141:22

**machine** 87:10
118:23

**machinist**
118:16

**made** 32:9,14,
16,18 34:20
38:6 70:9,10
72:17,19 75:9
79:16 82:20
83:20 85:4 88:7
91:7 95:22
96:12,21 100:3,
6,10,25 102:14,
23 103:5 108:5
118:18 134:23
138:13,15
140:8 146:6
157:24 158:21
161:18 173:4
178:13,17,21
179:25 180:9
184:17 187:18
192:9

**magistrate**
202:8,21

**magistrates**
202:16

**maiden** 141:20

**mail** 71:18

**maintain** 59:8

**major** 13:12,14

**make** 15:22
19:21 20:13
36:9 40:20
49:18 72:14
75:14,16 95:13
97:7 99:15
100:7 110:16
132:23 136:21
148:12 159:7
164:15 177:8
178:7

**making** 91:4

95:17 101:15
145:24 158:3
159:2 202:21

**male** 61:22
185:25

**Malles** 10:10

**man** 158:14
175:12 182:10

**management**
34:9 40:15
49:25

**manager**
192:1,3,5,7

**manner** 83:8,
11 84:7,9,11
85:6 161:1

**manual** 31:1,2,
9,12,16,20,24
32:3,9,15 33:10
34:1 36:24

**manually** 33:2

**manufacturing**
118:20

**March** 105:6

**Marine** 12:22

**mark** 38:14
41:21 45:6
48:18 52:20
55:19 67:20
98:25 121:21
154:14,20
165:25 170:22
179:4

**marked** 38:17
41:22 45:9
48:20 52:22
53:11 55:18,20
99:6 121:25
124:16 154:11,
22 157:3 166:2
170:18,24
179:7

**married** 185:9

**master's** 13:20

**matches** 49:7

**material**
142:22

**materials** 90:4

**matter** 9:8
110:11 194:8

**Maureen** 10:10

**me.'** 158:15

**meals** 64:4

**meaning** 37:17

**means** 156:17
190:1

**meant** 78:7
169:24

**median**
172:14,20
173:8 174:6

**medical** 14:14
35:2

**medications**
12:14

**medicine**
44:10

**meet** 116:5,10

**member**
112:15 142:2
198:12

**memo** 33:7
184:14

**memorandum**
183:14 184:1

**memory** 11:10
12:15 31:20
33:18 40:2
101:10 124:3,5
126:22 128:17
151:23 171:19

**memory's**
101:11

**men** 152:16

**menacing**
90:25

**mental** 34:17
103:7,9 108:17

**mention**
161:19 184:10

**mentioned**

21:10 37:8
52:11 115:17
118:6,9 140:11,
18

**merchandise**
15:3,5

**mess** 25:19

**messed** 29:1

**met** 11:3 27:18,
20 28:17 36:7,
15 71:12

**meter** 149:23

**methodical**
118:1

**Microsoft**
89:12

**military** 12:19,
21

**Mills** 9:20 27:6,
8 68:11,12
91:17,25 94:16
105:9,13 127:1,
21 128:5,6,7,13
129:24 130:11,
21 131:1
133:14

**Mills'** 136:2

**mind** 67:22
74:17,20,25
76:14 77:12
110:17 153:8
202:10

**mindset** 86:7

**mine** 54:14
58:11

**minute** 16:22
26:3 42:3 67:20
91:19 134:1
166:7 168:16
171:6

**minutes** 53:3
60:1 67:21 69:3
116:5 121:4,10
125:18 127:20
128:4,6,9,15,
16,19,24,25
129:1,2,3,8,12,
15,16,18 130:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

misdemeanor 143:3

missed 116:7 119:12 143:18 144:9 166:20

missing 143:21 165:14

Mister 97:1

mixed 58:4

mode 46:23

Model 118:18

moist 60:22,24

Molly 9:16

moment 120:3 121:8,9

momentarily 57:19

months 17:24 39:20 146:14, 21

moral 151:10

morning 11:1 98:23 117:15 122:12 154:11

mother 100:14 147:5,12,19,24 148:8,14 149:1

mother's 115:9 147:9

motherfucker 74:16,22 84:16

motions 159:16

motor 176:7

motorists 173:12 174:9

mouth 58:6 68:24 79:21 80:21 167:2,5, 8,10,13,18 168:15

move 43:2,3 202:19

moved 12:24

87:13

moves 158:22 159:2,8

moving 35:25 173:23

mucus 58:6,7, 10 79:21

_____

_____

N

nails 92:16

name's 9:2,18 110:6

named 26:10 27:5 131:23 165:17

names 185:10

natural 177:6

nature 92:7 166:23

necessarily 33:10 83:24

necessity 85:1

needed 23:3, 23 32:5,6 60:17 66:2,4 71:1 89:6 117:15 130:9 168:23 173:21

neighborhood 72:12

neutral 44:17

nice 11:4

nickname 151:22

night 65:6 68:10 71:11 85:20,25 86:10 88:23 90:18 91:8 104:12,20 105:10,17 106:22 107:4, 18 108:8,12

Noble 29:19,22

nodding 12:8

normal 19:19 45:5 64:7 71:16,19 81:19

North 189:24

Northern 199:9

nose 58:6 79:21 80:21

note 146:5

Notepad 89:12

notice 69:6,12, 17

noticed 68:25 69:4 120:22 121:17 174:14

notified 173:5 174:13

November 21:24 22:7 23:7 47:16

now's 179:1

number 9:10 37:14 38:15 40:5,21,23 41:21 45:7 48:18 52:15 53:11 55:19 62:13 81:23 98:25 150:24 172:12 176:9

numbers 154:18

nurse 44:7 103:15,19

_____

O

Object 129:13 135:3 148:10 149:4 150:9,17 153:3 159:23 171:16 174:2 176:23 181:6 198:11

objection 114:16 121:12 123:20 126:6 131:5 145:16,

24 146:6 147:6 148:2 151:21 153:11 155:13 156:9,12,25 157:11 158:11 159:5 160:6 161:6 163:18, 22,25 164:4,23 165:4 166:25 167:6 169:3,20 174:17 176:1 180:15 182:16 183:7 184:5 185:15 186:7, 25 187:10 188:14 189:12 191:2 196:18 198:20,25 199:18,24

objections 11:23,25 12:1

obligated 201:12

obscene 186:2

observations 79:16

observe 30:15 68:16 70:11 73:14,19 76:12 78:14,18,21 80:4 91:25 92:4 121:10

observed 46:8 77:20 79:13 80:11 81:9,10 121:4

obtain 14:17

OC 36:1 37:11, 14 47:22 57:12 58:3 60:6 69:16,18 126:17

occasion 55:11 138:3 139:11

occasions 44:22,25 50:3 136:24

occur 140:15

occurred 49:12 104:12, 20 105:9,16 106:21 107:4, 18 126:17 131:14 140:16

occurrence 181:24 183:25 184:2,3

odd 30:10

odor 69:22 81:13

odors 69:13

off-duty 174:25

offense 142:7

offenses 147:15

offensively 50:24

offer 82:11

office 30:16,19 31:7 34:9 49:25 88:19 89:23,25 90:2 132:3,8,13 159:12 181:24 183:24 184:2 185:23

officer 23:15 25:1,8 27:9 29:8,13 47:21 57:20 63:21 64:1 66:24 67:1,5 68:6,8, 11 71:6 73:10, 22 74:4,6,11,21 75:4,8,13 76:3, 9,14,20,25 77:2,12,23 78:6,15 80:1,12 81:16,21 82:2, 7,11,15,19,23 84:22 85:4,15, 18,23 86:8 87:3 91:4,17,25 93:22 94:1,10, 16,24 95:21 96:11,21 99:16, 23 100:9,13,25 101:14 102:20,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 70 of 80 PageID
#: 2657
The Deposition of WILLIAM PORTER, taken on February 01, 2022

221

24 104:6,11,14,
19,23 105:13,
16 106:6,11,18,
21,25 108:8,11
124:9,12,22
125:5,14,23
126:2,8,12,14
127:1 128:6,7,
13 129:23,24
130:11,20,21
133:13 135:10,
21,22,24 136:1,
2,6,7 137:14,24
139:5 141:7
147:11 149:12
169:6 173:4,21,
24 174:4,23
175:1,6,9,22
176:13,14,17
190:16 192:1
196:25 197:3
198:21

**officer's** 48:6

**officers** 24:7,
13 67:25 68:2,4
70:24 91:15
102:13,18
107:11,15
110:10 116:24
131:1,22 132:7,
11,22,23
133:16,24
134:11,20,25
135:6 136:9
139:11 141:12
147:18 149:1,8
175:20,24

**offices** 9:6

**oil** 60:6

**older** 30:12
42:25

**oldest** 85:10

**online** 89:9

**open** 196:5,20,
25

**opened** 69:20,
23 73:24
188:21

**opening** 191:8

**operate** 50:23
200:9

**operates**
200:14

**operating** 31:1
131:6

**operation**
138:18

**operations**
32:21

**opinion** 48:7
59:7,12 76:13
83:10,12,14,18
84:5 85:3 86:4
107:14 133:15,
18,21 156:15,
19

**opportunity**
132:10 202:7

**opposed** 12:8

**options** 22:25

**orange** 14:25
93:8 94:23
99:23,25

**Oranges** 99:19

**order** 19:23
52:17 65:22
86:24 88:9 89:4
93:21 143:25
144:7 146:22
189:16 202:22

**ordered**
174:21

**ordinary** 34:21
35:12 44:2
48:10 91:9
131:8 175:13,
16,24 176:20

**organization**
133:20,22

**original** 84:25
129:16 142:25

**originally**
142:12

**originated**
145:6

**outline** 201:14

**outset** 110:7

**outstanding**
40:5,8,12,16
41:2

**P**

**p.m.** 17:14
203:20

**pack** 49:6
93:10

**package**
188:21,25
189:3,14

**pages** 53:22
127:4 156:16

**paid** 162:10
163:13

**pain** 58:8,24

**Pam** 185:11
186:2

**pants** 49:7

**paper** 33:3
36:25 165:13

**paperclip**
61:23

**paperwork**
93:7

**paragraph**
155:20 156:1
181:20 185:12

**paralegal**
112:23

**paraphernalia**
198:1,4

**pardon** 74:15

**parents** 12:21

**parking**
165:18,20
192:10 196:14

**part** 41:9 54:4
57:5 92:8 95:10
116:8 117:23
144:2 156:6,23

157:1,18
158:23 159:21
168:19 176:20
178:6,9 186:17

**participated**
156:23

**parties** 111:13

**parts** 118:24

**party** 111:1,3

**passed** 108:18
123:18

**passing** 44:10
150:22

**past** 96:4
156:16

**pathogens**
62:1

**patience**
193:13

**patrolman**
22:5 67:1

**pay** 143:25
146:16 162:8,
13 195:16,21

**paying** 188:13,
16,19 189:6,11
190:23 191:9
192:14 196:20

**payments**
143:19 144:10

**pencil** 165:11,
12

**Pendergraff**
9:21 22:2,17,19
27:25 28:2
130:22 131:2
133:13 136:17

**pending** 9:9
11:13

**people** 15:23
44:18 51:23
100:7 112:9,11
134:3 135:11
150:4 151:11
165:10 175:15
176:2 180:19

**pepper** 47:22
125:23 127:17
168:13,22
169:1,12

**perceived**
155:8

**percent** 31:11
35:20 39:14
56:22 64:22
66:19 74:7
75:18,25 76:6
82:13 85:21
87:24 91:18,20
94:14 96:14
109:14 113:21
126:21 141:9
147:8,22 153:6,
21 182:21
188:2

**Perfect** 10:15
122:8

**performed**
35:5

**period** 17:8
18:19 65:1,14,
19 67:15,24
125:20 127:19
128:15,24
130:7 140:17
144:6 148:23

**permission**
18:3

**permitted** 55:1
181:16,23
183:23

**person** 11:4
35:8,25 46:17
64:6 69:14
73:25 87:11
93:3 94:10
116:3,10 117:2
156:17 168:6,9
175:13

**person's** 35:7

**personal**
24:10 31:8
34:19 58:20
59:7,12,13,15,
16 108:15
133:23 136:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 71 of 80 PageID
#: 2658
The Deposition of WILLIAM PORTER, taken on February 01, 2022

222

162:5 163:11

**personally**
58:12 59:22,24
62:7,8 68:16
72:1,3 78:1
107:18 108:13
156:20

**personnel**
17:3 109:22
154:25 166:5
171:3 178:18
179:10,17,20
181:4,9 187:19

**pertain** 52:20

**pertaining**
178:22 180:2

**pertinent**
50:16 94:5

**phone** 90:15
112:16 113:6,8
114:5 173:19

**phonetic** 30:11

**physical** 33:22
34:17 35:17
36:18 44:24
57:24 63:11
64:8 65:2 66:2,
5 68:16,22 74:2
76:8 78:10
92:2,4 93:2
103:6 123:9
124:24 125:1,4,
14 153:18
157:24 158:3,8
160:1 161:2

**physically**
46:3 65:23
70:17 77:2,21,
22 78:1,14
80:16 81:8,9
82:4 104:1
114:18 119:4
156:21

**pick** 158:18

**picked** 192:6
195:14

**picking** 159:25
160:8

**piece** 33:3
165:13

**pills** 142:19

**pilot** 15:7

**place** 33:6,16,
21 34:15 36:17
46:9 63:23
64:11 101:11
113:12 130:4
143:25

**place.'** 179:22

**placing**
108:21,25

**plaintiff** 9:15,
17

**plaintiff's** 9:12
38:15 41:21
45:7 48:18
52:21 53:11
54:4 55:19
98:25 122:3,6

**plaintiffs**
145:18

**planning** 115:6

**plant** 179:18
185:20

**plate** 172:12

**players** 88:3

**playing** 153:25

**plea** 190:4
198:2

**plead** 146:10,
14 188:10
195:18

**pleaded**
145:12 188:6
189:21 190:5
198:6

**pleading**
146:18

**pled** 143:3,10
188:9 189:23
191:8 195:17

**plug** 97:16

**plugged** 97:19

**point** 45:18
53:1 67:10 70:7
77:1,16,25
80:24 81:2,8,9,
17 82:2 91:14
92:17 144:19
159:20 172:14,
25 174:5 177:6
188:2 201:20
203:3

**police** 9:23
16:19 21:13,17,
23 22:7,19
23:7,15 24:5,
19,23 25:5,15,
17 26:5,14,17,
19 27:3,9,10,24
28:8,13 29:13
50:18,23 66:6
67:2 68:4,8,13
69:19,22 70:1,
24 107:12
110:10 118:7
119:18 120:9
130:16 131:22
132:11,16,21
133:3,8,15,19
134:4,11,12,19,
25 135:6,10,22
136:2,7,9,23
137:7,14
138:18 139:11
142:3 147:4,12,
19 148:6,14
149:1,7,8,13,24
150:2,6,14
173:5,24 174:4,
23,25 175:6,9,
20,24 176:5,6,
10,12,17,21
190:19 196:24
198:13 200:16

**policies** 30:25
32:17,24 33:15

**policy** 19:22
32:4 33:21,25
34:15,19 35:6,
8,10,13,16,19
36:4,17 37:8,
13,25 38:4
41:18 96:8
131:10,13,16
164:24,25

**Political** 13:13

**population**
46:9

**port** 64:21,25
65:14,18 66:14,
16,23 67:6,9,
14,18,24 68:7,
17 69:1 70:12,
18,22 71:8
73:11,15 74:5
76:10,18 78:2,
18 81:14 82:5
85:20,25 86:9
87:8,15,18,22
88:22 90:12
91:8,15,16
92:1,18,22
94:7,10,13
95:13 100:6
104:12 105:10,
17 106:21
107:4,5 108:8
119:23 120:4,
19,24 123:2
124:23 125:17,
21 126:25
127:18,20
128:8,12,20
129:8,11,20,24
131:4

**Porter** 9:8
10:16 11:1 41:8
97:18 110:6
122:14 141:24
149:10 154:24
156:5 157:23
158:20 159:12
160:4 171:2
177:21 179:9,
18,20 181:24
183:24 184:1
186:1 188:5
191:22 192:9,
12,21 193:12,
22 203:5

**position** 15:14
17:17 18:11
23:10 60:18
175:2,8 189:5

**possession**
33:10 143:8
146:18 188:6
196:2 198:3

**possibly**
126:25 149:5,6
173:10,13
174:8

**post** 191:8

**potential** 37:10

**potentially**
38:1

**pouch** 168:22

**Pozgay** 10:4

**practice** 45:2,4
48:13 87:3
90:20 186:18

**preceding**
184:4

**precluded**
151:5

**prefer** 203:8

**pregnant**
72:20 167:25

**premised**
120:18

**premises**
170:7

**preparation**
114:22

**prepare**
117:19

**prepared**
39:16 117:1
183:14

**presence**
111:14 202:11

**present** 68:9
93:22 94:11,14,
16 139:11
140:24 148:3
185:22 186:19
187:13 200:2,
19

**presented**
128:3 173:11
174:9

**presenting**
63:8



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 72 of 80 PageID
#: 2659
The Deposition of WILLIAM PORTER, taken on February 01, 2022

223

preservation 37:25

president 18:3

press 76:16

pretty 18:4 102:20 114:7

prevent 88:9

previous 71:15 73:2 110:21 184:9 192:11

previously 115:3 119:8 133:18

Price 191:22 192:1,7

pride 151:8,9

Prilosec 191:23

primarily 66:7

primary 40:7

print 193:23

printed 31:14 38:12 39:17

prior 71:10 92:17 95:22 111:16 115:6 120:3,9

private 112:25 115:18 117:9 118:17 134:10, 23 135:16,18 136:3,10,22 137:2,5 147:3 148:13

problem 11:6 127:11 146:19 165:2

procedure 131:7 160:25

procedures 19:22 31:1 32:4 63:15,18

proceed 12:2 182:17

proceeding 125:8

PROCEEDINGS 9:1

process 33:23 49:17 60:12 64:3,8

produce 118:24

produced 98:23

productive 201:19

professional 19:8 26:9 27:15,16 28:3, 19 44:16 136:11,12,13, 15,18

professionally 108:14

program 15:7 34:6,8,10,11, 12,13 49:25 89:12 178:9

progress 202:24

promise 47:3

promoted 20:14,17,21

promoting 142:13,25 145:9

promotion 20:20

prompted 23:10,17

pronounced 28:23

pronouncing 28:22

proper 172:4

properly 57:18

property 34:4 93:15,20 142:18 144:24

169:8,21,22 170:3 181:16, 23 183:24

prosecute 194:11,24

prosecuted 111:20 194:17, 23

protect 61:18, 24

protocols 178:23 180:2

proven 41:8

provide 52:3 56:6,17,21 114:21 138:12

provided 18:14 30:25 41:4 51:22 52:12,16 114:4, 5 117:2 163:19

provision 53:17

public 108:1,2

pull 91:7 130:3 131:9,13 169:16 180:22 182:9

pulled 88:17 90:6 98:17 129:22 130:10, 16 131:3 136:23 137:8, 14 138:8 140:18 141:2 142:3 144:23 147:4 149:8 167:12,15,16 169:9,12,17 172:25 173:9 174:7,19

pulling 35:25 148:14 149:1

punched 82:4 168:14

purpose 185:23

Purposefully 58:14

purposely 58:15

purposes 183:12

pursuant 189:23

pursuing 173:25 174:4

pursuit 170:15 171:11,13 172:2,18 174:24 175:20, 25

pursuits 176:5,21

push 88:6

pushed 76:17, 20 124:9 154:2

pushing 35:25 124:12

put 33:6 49:19, 23 88:19 89:3 93:14 103:18 107:23 114:19 154:1 196:13

putting 62:19 76:25

_____

Q

qualitative 62:23

quantitative 62:17,24

quantity 62:17 81:25

quarters 62:3 168:21

question 11:13,14,18,20 51:15 69:14 95:21 96:12 100:8,16,20 104:22 108:21 114:17 118:3

122:20,21 124:25 125:19 127:16 128:3,7 129:6 145:20 164:25 176:25 177:22 186:22 199:21 200:1 201:2,6

questioned 99:23 102:12

questioning 95:1 147:2 201:9

questions 11:23 12:7 32:5 33:8,14,15 98:6 106:16 109:25 110:2,17 111:6, 13 113:23,24, 25 114:6,9,15 116:19,23 117:24 123:14 124:8 125:8 161:18 200:19 201:21,24 202:6,11,25

quick 48:17

quickly 11:10 202:2

quit 22:10 184:21

_____

R

rack 189:9

radio 70:23 71:5 173:20

raise 10:16 77:24

raises 77:16

ran 60:7

range 16:24 129:15 174:12

rank 17:8

ranked 40:8,12

ranks 20:13

rate 171:18



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 73 of 80 PageID
The Deposition of WILLIAM PORTER, taken on February 01, 2022
#: 2600
224

172:2,3,6

**reacted** 169:8

**reaction** 58:23
60:8 62:23 63:9
74:18,19,25
75:1,3,19 83:18
85:13,14

**reactivated**
60:2

**read** 98:20
99:3,8 101:24
102:3,5 122:19
124:21 127:6
128:11 155:2
157:25 158:1,
22,24 159:16,
21 160:12
183:20,21
186:6 193:15
194:2 195:5

**reading** 100:24
127:10 156:13
192:23

**reads** 157:18

**ready** 143:15
177:16,17,18
193:9

**real** 11:10
16:25 17:23
112:24 116:5,9

**realize** 98:10

**reapply** 22:14
23:4

**reason** 11:11
16:18 21:11
74:17 85:8 95:7
96:22 101:19
119:19 126:22
131:2,16,17
135:17 148:12
152:18 183:4,
13 194:6,23
197:24

**reasons** 21:11
42:21 50:11
74:24 183:16

**recall** 20:16,24
21:21 29:5,10
31:10,12 32:8,

12,14,16 35:4,
20 37:16 38:2
39:23,25 41:19
42:17 43:24
44:3 62:10,16
65:3,9,13
66:12,19 68:7,
21 69:2 70:14
74:7,8,10
75:17,23,24
76:3,25 77:1
82:13 84:24
85:8,17,21
86:11,16,18,21
90:19 91:3
94:6,12,16,19,
22 95:3,15,16,
17,20 96:14,17
98:8,9 102:20
108:10 109:13,
16,22 112:20
113:4 115:22
117:3 126:7,9,
10,11,16 127:2
130:18 134:15,
17 135:4,19
137:9,13,23
141:9 142:2
151:19 152:2,4,
7 153:14,17
165:16 178:24
182:3 187:21
194:21 198:8,9,
10,15,17,19,24
199:2,4,7,14,
17,19,20
201:18

**recalled** 101:8

**receive** 50:20
51:4 52:10
53:20 55:3
57:11 60:11
103:21

**received**
51:20,23 56:4
69:9 71:6 85:12
109:12 115:1
117:12,14,16
149:14 166:6
171:4 179:11
192:22 193:18

**receiving** 67:3
74:1

**reckless**
173:6,8

**recognize**
39:3,13 42:6,7
45:13 49:1
54:13 56:1
182:20,21

**recognized**
72:4

**recollect** 56:23

**recollection**
31:23 42:22
53:16 54:18
55:2 56:25
65:17 67:11,14
100:25 101:13
102:17 122:25
123:9 127:19
128:10,14
130:23 138:1
154:4 166:15,
18 168:6 171:9
182:6 195:3

**reconvene**
201:13

**record** 9:2,12
17:3 36:20
53:6,7,8 86:24,
25 87:6 88:3
95:10 98:2,3,4
110:16 124:21
127:7 145:25
146:4 177:12,
13,14,19 193:6,
7,8,10,24 194:9
195:5 196:1
199:16

**recorded**
86:24 87:2,10,
11,15,23,25
88:10

**recording**
87:7,13

**records**
134:11,24

**recovered**
33:22

**recycle** 18:12,
13

**recycling**
18:15 178:8
184:18 185:7,
20,22 186:3,23
187:19

**Red** 56:5 72:10

**refer** 168:16

**reference**
122:11 193:23

**referenced**
184:3 185:12

**referring** 51:20
66:5 68:3 75:1
100:9 111:4
134:8,12 160:7
161:9,10 182:1

**refresh** 11:10
54:18 100:24
101:13 102:17
122:25 128:10,
17 166:15,17
171:9

**refuse** 34:25
178:22

**refused** 180:1

**refusing** 35:10
200:1

**refute** 95:7
101:19

**regard** 63:15
85:24 123:5

**register**
195:15

**regularly**
39:18 57:6

**regulation**
53:21

**regulations**
53:18 179:19

**related** 35:6
169:25 170:3,7
184:9

**relating** 33:21
34:16 35:16
36:17 37:25
38:4 45:16
104:17

**relationship**
19:6 22:18
24:10 25:4
26:6,8 27:1,13,
14 28:1,9,19
29:16 41:13
152:23 177:23

**relationships**
24:6 25:13

**relay** 172:4

**religious**
13:13 14:11,12

**remain** 67:8

**remaining**
151:2

**remarkable**
94:24

**remarks** 100:7

**remember**
33:17 34:1,18
36:3 40:2 43:5
44:4,17 47:20
50:9,13 56:23
72:13,23 81:25
82:6,9 91:20
93:4,6,7,10
95:1,25 96:15
99:18 100:2
102:24 103:4
105:18 110:21,
24 112:18
116:11,14,16,
18,20,21 121:3
123:10 124:10,
12 126:3,13
133:6,9 139:8,
10 140:12
147:17 152:8,
10 153:7,9,21
165:19 181:19
185:10 187:24
190:17,18
194:22 196:4,7,
8,9 197:3
199:10

**remembered**
139:14

**remembering**
113:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 165   Filed 10/03/25   Page 74 of 80 PageID
#: 2661
The Deposition of WILLIAM PORTER, taken on February 01, 2022
225

remembrance 76:1

reminds 115:2

remotely 47:5

remove 46:14 132:13 189:10

removed 46:3 67:10 128:8 132:3 168:22 189:13

rented 118:23

repeat 100:20 166:20 201:5

rephrase 11:20

report 36:22 37:2,5 49:18,24 50:15 88:20,25 89:7,13 90:5,21 91:7,11 108:21, 23 109:6,15,17 130:9 134:22 171:17 172:13 173:3 182:7 183:5 187:2,5, 12 191:13 192:8,16 193:15 194:10

report's 109:9

reported 81:20 181:24 182:5 183:25 184:2,7

reporter 9:4 10:17,22 12:5 38:11,13,18,21 41:25 45:10 48:21,23 52:23 54:2,5 55:21,23 97:7,10,15 111:14 121:18, 21,24 122:4,8 154:9,13,17,20 165:22,24 170:17,21,25 177:17,19 179:2,4 193:9, 10,17,19,22

Reporters 9:7

reports 49:15, 16 50:12 99:1 140:8

represent 9:19,22 10:1 110:9 154:24 166:4 171:2 179:9

request 11:12, 25 71:6 103:21 173:15 202:21 203:6,9,12

requested 55:6 87:19 131:11 175:22 193:14

requesting 54:21 56:8

require 133:5 179:17

required 52:15 53:20 152:14 188:3

research 118:13

resentment 148:5,11,17

reservations 202:3

reserve 202:25

residual 60:2

resign 187:14, 22 199:6

resignation 22:24 187:17

resigning 23:1

resistance 196:15

resisting 196:5 197:5

resolve 146:19

respect 19:9 25:7 28:3 107:11 132:20, 22 201:12

respectful 44:16

respond 75:8 102:2 106:6

responded 85:5

response 70:4,8 83:13, 14,18 96:11 106:2 109:12 114:6 124:7 171:22 177:22

responsible 66:7 131:23

rest 119:13 172:15,20 173:9 174:6 201:18

restraint 85:19,24 86:3

restroom 49:8

result 71:7 140:4 168:12

resulted 197:13,15,18

retail 15:3,5

retaliatory 100:7

retest 151:4

retrieve 80:20

return 163:5

returned 192:5

returning 190:24

review 31:16 32:5,7 38:25 42:3 48:3 53:12 125:7 130:9 171:6 179:12

reviewed 33:7 87:25 117:4,21 179:24 192:11

reviewing 88:1 166:8

revised 53:19

176:18

rewinds 88:5

rewound 88:4, 7

Richard 21:9 191:22 192:9

Richmond 25:12,15 26:21

ride 24:20 72:17

riding 72:9

rights 51:2

ring 17:5 113:3

risk 35:1 46:18 164:21

risky 30:13

Rivendell 118:14

road 72:15 171:21 172:23

Robert 9:8,15, 17 65:10,12 74:21 78:1,14 82:4 85:16,20, 25 86:9,17 89:2 90:12,25 91:4 92:3 94:19 95:13,17 103:4, 21 104:9,15,24 107:7,17 108:12,16 112:17 126:2

Robert's 68:16 103:9 107:3 108:5

Robinson 9:14

rode 26:14

Roger 138:1 139:9 147:21

role 16:14 17:8 30:5 56:20 79:4 152:12

roles 25:2

Ron 68:11 91:17 133:14

Ronald 9:20 27:6 105:9

room 31:6 71:5 87:12 88:2 105:21 111:12 158:17

Roosevelt 12:18

routine 45:5

rude 178:18 181:3,9

rule 11:24 164:2 187:7

rules 11:10 110:13,16

rumor 168:7 169:24

rumors 135:5, 9,15,20

run 58:7,10 60:19,20,21 72:11

run-in 153:10

run-ins 152:5 153:1

running 45:19 46:11 92:25

Russellville 9:9,21 16:19 21:13,17,23 22:7,19 23:7 24:5,19,22 25:14 26:5,17, 20 27:9,24 28:12 29:13 65:20 66:6 67:2 68:4,8,13 107:12 110:9, 11 116:14 118:7 119:18 130:16 131:22 132:11,16,21 133:3,19 134:4, 12,19,25 135:6 136:9,23 137:7, 13 142:2 147:4, 12,19 148:6,14, 25 149:7,13,24 190:19,23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 75 of 80 PageID
#: 2662
The Deposition of WILLIAM PORTER, taken on February 01, 2022
226

191:23 198:13
200:4,16

**S**

**sacrifice** 23:24

**safe** 46:9 63:11
88:18

**safety** 61:18
178:22 179:18
180:2

**saliva** 58:6
79:21

**sally** 64:21,25
65:14,18 66:14,
16,22 67:6,9,
14,18,24 68:7,
17 69:1 70:12,
18,21 71:7
73:11,15 74:5
76:10,18 78:2,
17 81:14 82:5
85:20,25 86:9
87:8,15,17,22
88:22 90:12
91:8,14,16
92:1,18,22
94:7,10,13
95:12 100:6
104:12 105:10,
17 106:21
107:4,5 108:8
119:23 120:4,
19,23 123:2
124:23 125:17,
21 126:25
127:17,18,20
128:8,12,20
129:7,11,20,24
131:3

**Salmon** 13:22

**salt** 135:13

**sat** 46:4 111:12
143:13 146:23

**Saturday**
162:23

**scanned**
195:15

**scared** 200:3,
12

**scene** 50:24
120:9

**schedule**
23:21

**scheduled**
115:3

**school** 13:2,4,
24 18:1 23:19,
24 71:24 72:3
107:20 139:18
199:9,13

**Science** 13:13

**scolding** 83:5
84:12

**Scott** 10:8,9

**scream** 100:17

**screaming**
100:17

**screen** 98:15,
18 122:11

**screens** 87:7
88:3

**scuffling**
160:2,11

**seal** 88:13,14

**sealed** 32:23
88:11,17

**search** 64:13,
14,17,18 94:1
139:22 180:21
182:8 184:11

**searched** 34:2
142:17 144:21
187:4

**seat** 167:16

**secure** 65:23
67:25

**security**
164:21 178:14
179:17 180:12
181:15,22
182:10 183:22

**sedate** 103:23

**segregate**
96:8 103:4

**selected**
115:15

**selection**
115:7

**selling** 140:19
141:3

**semester** 18:1
199:16

**send** 122:12
152:16

**sense** 15:22
36:9

**sentence**
184:4

**separate** 96:3
198:3

**September**
17:4 66:8 85:11
104:10 105:8,
15 137:22
188:12

**sergeant** 17:9
19:14,18 20:3,
11 56:20 57:6
79:8 127:21
128:5

**serve** 30:10

**service** 56:6

**services**
163:20

**session** 42:9,
14 43:7,16

**set** 34:3 138:18
194:18

**setting** 37:15
62:15 84:23

**severely** 45:21
89:3

**sex** 167:21,23

**share** 98:14

**sheet** 34:2,3

**sheets** 50:14

**shelf** 189:9,13

**sheriff's** 10:9

30:7,18 34:9
49:25

**Sherry** 147:10

**shift** 17:9,10,12
19:14,17 20:7
36:24,25 41:9
56:20 162:19

**shift's** 152:14

**shock** 75:5,20
85:6

**shoplifted**
195:3

**shoplifters**
192:8

**shoplifting**
192:3,11

**shopping**
195:12

**short** 116:6,9
119:18

**shoulder**
154:2 172:15,
20 173:9 174:7

**show** 37:22
41:20 45:6
99:10 127:21
190:2 195:1

**showed** 85:23
115:8 128:5,6
167:1 192:11

**shower** 60:3,7
130:8

**showing** 33:7

**shown** 85:19
94:24 129:22

**shows** 192:14

**shut** 167:2,5,8,
9,13,18

**sic** 118:8

**side** 68:23
72:15 88:2
105:22 159:13
171:20 172:23

**Siegel** 10:2

**sign** 33:4,5
62:20 183:8

**signature**
49:14 88:14
166:10 182:18,
19,22,23
183:18

**signed** 157:12,
14 183:10

**Significance**
148:17

**significant**
62:21 63:3,10
64:15 148:16,
19,24

**significantly**
96:5,7

**similar** 75:16
84:6 85:14 95:2
114:5 116:23
139:21

**Simpkins**
118:8

**simply** 35:5

**Simpson**
17:20,21
119:10 197:2

**sink** 60:19,20
92:22

**sir** 12:10,17
14:13 16:2 17:2
18:8 23:10
26:10 27:5 28:5
30:21 33:9
37:17 38:7,25
41:20 42:4,6
44:13 48:13
50:17 53:22
55:9 56:1 66:8
71:10 73:10
85:15 94:19
95:12 98:6,17
102:3 103:2
104:9 108:20
109:24 203:16

**sit** 37:1 63:25
70:9 76:16
114:14,19
121:8 146:12,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WILLIAM PORTER, taken on February 01, 2022

24

site 186:3

sitting 35:4
67:17 100:12
146:20 157:20

situation
19:23,24 70:25
77:9 82:22,24
83:20 84:6
85:11 86:1
100:8

situations
35:23 36:11
64:9

skill 40:9,12,13

skills 41:10

skip 117:25
118:2

slaves 185:5

sleeping 104:3

slid 76:18,23,
24 124:13

slide 124:10

slit 61:22

SLOSAR
145:16,19,23
146:3 177:1,5
200:25 201:3,7
202:14

slowed 172:7

small 65:20
97:25 154:7

smell 69:17,21

smelled 81:13

smells 69:13

Smith 9:24
10:12,13 29:9,
10 52:25 53:4
202:2,5,13

smoked 49:8

Snickers
165:12

snip 146:7

sober 89:6

social 13:21

socialize 25:9

socialized
73:8

soda 191:9

soft 35:24

software 50:4,
8,10

solemnly
10:17

Solutions
14:23,24 15:2,
12

SOM 34:6,8

somebody's
77:10

someone's
60:19

sort 45:20
110:15

sound 194:3

sounds 17:6
69:14 166:15
194:25 201:17

speak 76:14
77:12,14
104:14 113:5
193:16 203:8

speaker 97:16,
19

speaking 50:5
99:20 133:20

special 131:14

specific 24:12
32:17,18,21
33:15,21 34:15
35:6,8,10,13
36:11 37:3,13
40:1 56:25
57:12 62:10
85:8 99:16
131:18 133:6
140:12 145:14
153:9

specifically
15:6 32:12
51:12 55:6 58:2
59:9 63:15
65:13 73:17
74:10 94:22
99:18 105:18
109:23 111:9
116:18 122:16
130:19 131:10,
11 137:4,10,13,
23 138:23
139:8 142:2
147:16 183:8
184:8 188:10

speculate
77:18 86:2,6

speed 171:18
172:2,3,6

spend 114:20

spirit 72:24

spit 79:24 80:1,
4 126:2,15

spitting 79:25
126:7,10,11,13,
16

split 122:10

spoke 51:8
103:19 104:16
112:16,18
113:7 134:9
136:22

spoken
111:16,18
112:14 117:10

spots 50:15

spouse
166:12,21
168:11

spray 36:1
37:11,14 47:22
57:12,13,16,25
58:2,3,13,16,22
59:18,21,24
60:6,11 61:11,
13 62:2,5,9,13,
14,19 63:1,4
69:16,18,22,24
78:18,21 79:11,

17 80:8 81:10,
13,17,24
125:23 126:17
127:17 168:13,
22 169:1,12

sprayed 58:10,
12,15,21 59:9,
18,19 61:5,20
69:23 80:8
81:10 127:16

spraying
61:23

spreading
168:7 169:24

staff 71:17
152:15

stamp 191:16

stamped 38:15
41:24 45:7
48:19 52:21
54:1

stamps 98:24

stand 56:15
70:8 196:11

standard 31:1
45:2,4 48:13
87:3 90:20
186:18

standing 70:2,
5 100:13

stands 34:9
40:5,23

stapled 89:13

Staples 9:14
10:25 11:3
28:24 29:1,7
38:9,12,14,20,
23,24 41:23
42:2 48:25
53:2,5,9,25
54:3,7,9 55:17,
25 98:5 109:24
110:13 112:16
113:5 114:16,
21 117:7,12,18,
25 121:12,25
122:3 123:20
124:8 126:6
129:13 131:5

135:3 146:4
147:6 148:2,10
149:4 150:9,17
151:21 153:3,
11 155:13,25
156:3,9,12,25
157:11 158:11
159:5,23 160:6
161:6,18
163:18,22,25
164:4,23 165:4
166:25 167:6
169:3,20
171:16 174:2,
17 176:1,23
180:15 181:6
182:16 183:7
184:5 185:15
186:7,25
187:10 188:14
189:12 191:2,
16 192:20
193:3,14 194:9,
13 196:18
198:11,20,25
199:18,24
201:5,22 203:5,
11,15

Staples'
177:22

start 64:3
127:5,9

started 13:25
16:9,25 18:9
26:18 85:3
126:23 160:1
173:23

starting 9:12
99:3,4

starts 99:15

state 9:23 12:1
28:7 76:15
77:12 105:5
138:18 149:24
174:23,25
200:6

stated 36:10
43:16 158:14
179:17 181:7
183:16 184:11
186:1,8 192:3



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 77 of 80 PageID
#: 2604
The Deposition of WILLIAM PORTER, taken on February 01, 2022
228

statement
75:14,15 78:8
84:25 85:5
100:3,20 101:1
134:9,24
136:21 138:13,
15 148:13
155:6 156:18,
21 158:2
161:10 183:9,
10,11 184:9

statements
75:16 95:14,18,
22 96:13,22
99:16 100:5,8,
9,11 101:15
102:15,23
103:5

states 95:9
184:1

stating 184:6

station 175:14

statutes 53:19
176:18

stay 42:24
44:17 70:10

steadily 59:5,
14

steal 165:5,7,
10

step 35:23,24,
25 36:1,2,8
46:6

stepped 86:15

stepping 23:14

steps 80:18
201:13

stern 84:9

Steve 91:19,
22,23 173:4

stick 72:7
88:18 116:15
126:22 129:16
147:23

sticking
128:25

sticks 67:22
72:18 74:17,24

sting 138:18

stolen 190:24

stone 9:25
23:15

stop 46:5 72:14
100:23 138:4
139:20 177:7,8

stoplight
138:6,7

stopped 86:15
88:4 172:10

stopping 53:1
177:6

store 15:10
188:21,24
189:2,10,15,22
190:24 191:24
192:13 195:12

stored 189:10

stores 15:8

straight 64:17

strike 95:4
97:2 102:13
130:15

strong 86:22

struck 171:19

stuck 46:19
49:6 75:6 85:12
153:8

studies 13:13
14:11,12

stuff 93:4 94:2,
3 135:11 193:4
195:15

stumbling
76:13

stun 46:15,23,
25 47:1

subdue 61:24
174:12

subject 83:9
150:22

subjective
77:7

subjects
150:22 192:2,5

subpoena
114:23 115:9
117:14

substance
143:8 146:19

substantial
173:11 174:9

substitute
14:6

successful
59:11

sued 199:1,3

suggest
131:21 132:2
156:5

suit 104:19,21
105:13 106:25

Suiter 152:9
155:6,21 156:2,
6,14,22 157:7

summer
162:23

summons
195:2

supervise
15:16,18 18:16
20:5

supervised
79:8

supervision
15:21,23 16:1
19:20

supervisor
21:3

supervisors
21:6

supplement
191:15 192:16

supply 15:3

support
143:19,22

144:1,9 146:16
196:10,21

suppose
129:23

supposed
34:23 197:7

supposedly
148:7

surprise
199:15,22

surprises
199:22

surrounding
61:10

suspect
173:10,14
174:8,10

suspect's
174:15

suspected
140:1

sustained 35:9

swab 92:13

swabbed
92:14

swabs 92:6,11,
17

swear 10:17

sweet 72:22

switch 87:13

switched
172:22

sworn 169:6
176:14,16

system 89:9
130:4

———————

T

tab 88:8,10

tactics 176:6,7

tags 15:8

taking 12:14

50:12 101:22
188:11,22
189:21 195:22

talk 16:21 47:2
87:1 97:1 103:8
129:19 134:2
137:12 139:4
140:12 202:7

talked 24:9
49:24 98:7
113:13 119:17
188:5 196:4,21
198:7 199:8

talking 47:6
51:18 108:12
111:11 131:1
134:5 141:5
149:9 161:21
167:17,20,23
172:16 184:2
195:11,20
199:10

tape 87:25
88:1,4,8,9
89:14,16,17
130:9,11

taped 32:24
88:13

taser 36:2
46:12,13,16,22
47:10 48:2

tasers 47:22

task 40:17,19

tasks 35:6

taught 14:6

taunting
83:22,24

teach 14:8,10

teacher 14:5

team 15:15
111:17 112:5,8,
15 115:19
117:10,11
146:1

tear 58:4

technician
14:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 78 of 80 PageID
#: 2605
The Deposition of WILLIAM PORTER, taken on February 01, 2022

229

**telling** 85:1
95:3 167:5
187:12 192:17

**tells** 116:12
201:8

**ten** 60:1 128:9

**Tennessee**
197:19,22

**tension** 82:25

**tenure** 16:14,
22 24:5

**term** 34:10

**terminated**
132:7

**termination**
22:24

**Tesla** 118:17,
18,24 119:5

**test** 25:22
150:21 151:2

**testified** 37:7
41:12 50:17
61:4 66:25
67:13 68:6
73:10 78:5
84:15,18 90:25
91:3 96:18,20
98:11 106:18
107:10 121:3
125:3 126:24
128:19 132:20
151:12 177:21

**testify** 12:12
86:16,19,20
105:23 128:18

**testifying**
94:19 98:8,9
106:12 120:22
123:25 124:4
125:13 126:3

**testimony**
10:18 12:6
70:17 78:13
99:1 100:24
107:3 111:3
119:22 123:4
125:21 128:22
129:1,7,9,11,21

**testing** 92:7,9

**text** 117:12

**That'll** 54:4

**theft** 165:2
188:11 189:21

**thing** 30:8 47:5
62:16 110:15
113:20 139:21
154:7 175:13
194:25 202:19

**things** 30:12
51:3 64:5 71:19
92:6 120:18
124:4 130:8
134:13 135:1
148:18,22
182:2 183:8

**thinking** 77:19
114:20

**thought** 29:2
35:1 43:2 44:8
84:13 85:19
98:16 108:3
138:9,24
148:20 151:10
152:24 178:4
184:24 202:8

**Thread** 118:16
119:14,15

**threat** 64:15
169:7,15,16

**threaten** 74:6

**threatened**
76:15 78:1

**threatening**
83:25 84:2
99:18 168:13,
25

**threats** 74:2,9
86:2 91:4

**three-ring**
31:14

**threw** 142:18,
22 144:25
196:13

**throw** 46:25

**Thursday**
23:20 113:14

**ticket** 140:20
141:5 147:13,
20,25 149:13,
14

**tickets** 147:5
148:7,15 149:9

**tied** 196:12

**tilt** 60:18

**time** 9:5 11:13,
17 14:5 16:7,8
18:6,11,23
19:12 21:12,20,
25 22:10 23:12
24:14 25:11,19
26:7,17 27:2,
11,23 28:2
29:1,3 30:22
32:23,24 33:1,
2,3 34:17 36:25
39:22 40:1 43:5
44:1 46:10 48:9
49:11,20 50:10,
12,16 59:4 64:6
65:1,9,11,14,19
66:16,20 67:1,
3,8,12,15,24
68:9,12 69:11
72:10,17,20
74:5 75:15,17
76:5,6 77:13
79:5 82:10
86:7,22 89:2,21
94:6 96:25 97:3
100:21 101:6,
18 113:7,10
114:13,18,20
117:9 119:18
121:9,11,17
125:9,16,20
126:15 127:19
128:24 130:7,
10 132:5,6
137:21 138:16
139:23 140:17,
18 141:23
143:5,13 144:6
146:5,21,23
147:16 148:3,
20,23 149:15,
16,23 151:18
153:5,13 154:7

159:11 163:8
169:7,22
176:15 177:2
179:1 181:17
191:11 197:11
201:19 203:15,
19

**timeframe**
17:23 198:2

**times** 11:8 14:6
16:4,5,6 19:4
27:18,20 28:17
31:17,19 37:14
46:2 56:21
62:4,14,18
75:13 79:14
81:23 100:25
118:11 123:22
126:15 137:6,9,
11 147:11
149:12 174:11

**tint** 149:23

**tinted** 140:20
141:5 149:18,
21

**tire** 169:10,17

**title** 15:14
47:20

**today** 9:3,4
11:1,2,5,11,24
12:6,12 33:11
35:4 67:17
101:11,20
109:4,7 111:16
112:3 113:23
114:2,6,14,22
116:24 119:22
121:8,20 124:5,
7,11 126:1,4,24
128:22 129:7
132:20 151:13
198:7 199:10
203:16

**today's** 117:19

**token** 187:3

**told** 27:22 32:8
43:10 74:1
76:16 94:23
96:20 100:14
102:22 104:5

106:3,7 109:16
113:18 117:17
132:15 133:1,2
134:3 137:2,4
167:1,7,18,24
168:23 173:20
180:20 181:14,
19,21 182:10
183:22 184:21,
22 188:23

**tone** 82:19
83:1,2,22,25
84:4 100:18
101:14

**top** 24:7 57:3
121:8 130:2

**total** 128:15

**totality** 184:7

**touch** 77:6,21,
22 80:16,24
160:25 203:12

**touching** 77:2,
4,6

**towelette**
60:22 80:20,22,
25

**towelettes**
60:25

**town** 71:25
72:2,4,5,8 73:1
113:10 116:13

**towns** 154:7

**traffic** 147:25

**trained** 60:10
62:12 63:1
176:2,4

**trainee** 22:5

**training** 24:21
25:1,12,15,24
47:21,24 48:6
50:20,24 51:4,
6,7,11,13,18,21
52:2,4,6,7,8,10,
12,15,18,20
53:19 54:21,24
55:3,5,7 56:18,
23 57:15 58:1,
16,18 60:11,14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 165   Filed 10/03/25   Page 79 of 80 PageID
#: 2606
The Deposition of WILLIAM PORTER, taken on February 01, 2022

230

62:13 67:4
151:6 176:4

**transcribing**
12:6

**transcript** 95:8
98:14,17,20,22
99:1,3 100:24
121:19 122:5,
15 124:16
127:5,24
128:11

**transport** 30:9

**trap** 200:4

**traveling**
172:5,9

**trays** 71:18

**treat** 44:21
151:11,13
161:5

**treated** 151:8

**treating** 85:24
86:9 185:4

**treatment**
44:14 103:22
108:7

**tremendous**
25:8

**trial** 94:20 95:9
96:18,20 98:8,9
99:2 101:6,21
104:15,17
107:4 109:11
111:4 112:17
115:24 116:1
118:11 121:19
124:1,16 125:4,
13 127:5
128:11,18
146:13,22
190:3,6

**trials** 107:22

**triple** 146:1

**trooper** 28:21

**trooper's** 29:6

**trouble** 62:22,
25 63:3,5 70:2,
5 79:19 80:7,11

100:13 103:3
143:21 197:12

**truck** 180:21
184:12

**true** 75:11
103:1 119:7,11
135:20 136:17
164:5,6 180:6
181:14

**truth** 10:19,20
96:24 99:24
106:4 113:21

**truthfulness**
43:10

**Tuesday** 23:20
47:16

**turn** 87:5,7,19
88:5,6 89:16
122:14 127:23

**turned** 87:6,20
89:14,15 97:9
129:20 158:21
159:14 182:11

**two-thirds**
179:15

**type** 12:14
15:1,5 31:4
36:10,13,14
46:15 49:22
50:7,20 52:8
55:14 56:17
63:8 71:14
72:19 83:14,16,
17

**typed** 37:2
89:12,13

**types** 37:9
50:22

**typical** 63:18

_____

**U**

**U-TURN**
171:22 175:10

**U-TURNED**
172:12

**U.S.** 12:22
138:6

**Uh-huh** 23:13
24:15 54:12
63:6 124:19
137:16,24
147:1 157:19
169:11 171:5
188:7

**Uh-uh** 73:4
106:19 115:16
152:3 186:12

**ultimately**
54:25

**unable** 43:1
89:2

**unaccompani
ed** 30:16

**uncooperative**
178:18 181:4,9

**underage**
167:21

**understand**
11:18 33:13
47:8 51:15 86:5
107:25 111:20
112:1,12,13
123:13 132:25
146:25 156:13
157:6 160:19
188:18 189:20,
25 195:16
200:20,24

**understanding**
87:22 143:20
145:14 156:22
164:20 165:1
179:25 185:6,
16,19 188:20
191:10 196:19
197:8,9,11

**understood**
33:8 128:4
129:21 157:13,
15 180:8

**unemployed**
143:19

**unethical**
163:6

**unfair** 178:4

**University**
13:11,21
118:14

**unlawful** 86:14
188:11 189:21

**unorthodox**
176:24

**unpleasant**
60:4

**UOR2** 192:16

**updated** 15:9

**upset** 82:21,24
104:4 143:5

**usual** 100:7

**utilized** 36:11
37:3

**utterance**
83:16,20

_____

**V**

**vague** 76:1

**vaguely** 42:19
75:24

**varied** 20:6

**vehicle** 162:6
163:7,8,11
170:15 171:11,
13,18,23 172:5,
14,19 173:6,8,
10,23 174:3,6,
7,10,15 175:11
176:8 182:8
187:4

**vehicles**
118:19

**verbal** 35:23
78:7,10 178:13
180:9,17

**verbally** 12:7

**Vermont**
118:16 119:12

**versus** 46:25

**VHS** 88:3

**victim** 194:11,

23

**video** 91:8 95:8
129:19,22,25
130:3,17,20
131:3,13,23
132:3,13
178:22 179:18,
21 180:1,23
192:2,4,6,10,14

**videotape**
88:16 90:6
91:11 108:21,
25 109:3 131:9

**view** 32:25
192:2

**violate** 147:25
149:21

**violence** 74:2
165:3

**virtually** 12:4

**vision** 22:10,11
58:5 79:20

**visit** 200:3,12

**vividly** 95:25

**voice** 82:19,22,
23,25 83:1,2,23
84:1,4 100:16,
17,18 101:14
110:15

**voiced** 103:15

**volume's** 97:7,
10

**voluntarily**
22:8,10 23:1

**voluntary**
17:16

_____

**W**

**wait** 72:15

**waited** 71:8

**waiting** 105:23
127:21

**walk** 59:5,14
70:8 153:23
188:24 189:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 165    Filed 10/03/25    Page 80 of 80 PageID
The Deposition of WILLIAM PORTER, taken on February 01, 2022
#: 2667
231

walked 138:8

walking 30:15
70:2,5 191:9

wall 76:23
124:9

Walmart
188:13,19
189:6

wanted 22:12,
14 23:15 48:6
61:18 65:22
67:25 73:25
108:1 113:20
117:13 122:9
127:9 146:12
150:4

wanting 86:16
160:24 180:21
184:11

warrant 30:11
158:3,9 159:1,9
167:4 196:5,10,
20 197:1

warranted
90:22 91:10

Warren 47:14
119:10

wash 92:18,20

washing
163:14,24

watch 19:21
178:22 179:18
180:1

watched 88:7

watching
179:20

water 60:17,19
92:25

ways 60:16

weapon 47:23

week 32:7
113:9,15 117:8
192:3

weekend
23:23

weeks 25:25
26:1,19 142:16
145:1,3 150:5,
10,13 151:3
176:10

weird 69:14

wellbeing
103:7,9

West 9:24 28:5,
10,15

Western 9:9
13:11,15,21
14:8 23:25
118:13 202:16

whatsoever
95:14,18
104:11

whereabouts
109:10

Whittlesey
173:5 174:13,
14,16,19

wife 72:17
140:17,21
147:4 149:8
166:13,21
167:24 195:14

wife's 42:23
141:14

William 9:7,24
29:9,10

window 138:8

windows
140:20 141:6
149:18,21

Wipe 61:1

wished 80:15

witnessed
76:8

witnesses
202:18

WKU 18:3

word 143:2
182:24

wording 35:21
160:23

words 72:24
116:19 124:24
151:14

work 13:21
15:6 17:21
19:25 21:13
23:20,21 24:11
25:13 27:19
32:7 73:23
114:25 125:24
152:22 153:2
162:8,11,14
167:23 169:23,
25 170:3,6,7
188:3

work-related
169:19

worked 17:11
18:12,19,23
19:1,13 23:12,
23 24:14 28:7
30:7 112:11
118:6,10,14,15,
17,22 119:5
166:12,22
175:14

working 15:7,
11 28:9 41:13
51:10 65:11
66:9 132:5
138:17 151:18
153:13 162:4
170:13

workplace
25:10

works 41:9
153:4

worry 182:11

worrying 60:3

would've 21:4
28:19 29:16,17
30:2 52:4 93:14
101:22 109:21,
22 115:24,25
125:11 129:22
130:24 132:8
133:1,2,6
136:19 137:21
138:24 139:14
146:23 153:8
175:13

wrists 61:22

write 34:4
36:24 37:2 64:5
89:1 91:7 130:9
157:7

writing 35:13
39:12,13 54:13
90:21 156:7

written 34:15
35:16 117:1
147:12,19
148:1,7 149:13
155:6 156:16
160:17,19,22
182:15 183:5,
14

wrong 84:13
171:20 172:9

wrote 88:13
89:8 155:10,11,
14 156:17
157:9 158:1,24

---

**Y**

year 13:25
39:20 52:14

yearly 51:21
52:12

years 13:23
15:13 101:3
123:10,17
191:8 195:1,8,
10,19 197:7,10,
12 199:13

Yell 9:8,15,17
65:10,12,18
66:10,13,17,20,
22 67:5,6,14,18
68:7,9 69:9,18
70:1,18 71:10,
15,23 73:1,8,
11,15,20,22
74:5,6,11,14,21
75:2,8,14,16
76:1,4,9,13,16,
20,22 77:1,20
78:1,5,14,17,22
79:11,17 80:1,
5,7,10,16,24
81:17,24 82:3,

16,20 83:15
84:16,19,22
85:5,15,16,20,
25 86:9 87:17
90:12,25 91:4,
15 92:1,3,18
93:13,23 94:17
95:13,17,22,23
96:12,21 99:15
100:12 101:1,
15 102:1,14
107:7 108:12
111:20 119:23,
24 120:3,8,13,
18 123:1 124:9,
12 125:5,15,24
126:2,24 128:8,
12,20 129:7,22
130:7

Yell's 69:13
70:11 75:3,19
81:2,5 82:8
86:17 93:3
94:9,19,25 98:8
99:2 104:15,24
107:17 108:16
111:17 112:8,
15 115:19
117:10 120:23
134:10 147:3

yelling 83:6

yesterday
117:13

you-all 11:2

you-all's 163:3

---

**Z**

Zellen 10:7

zip-up 93:14,
16

Zoom 11:22
111:11



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com