LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

# CASE NO. 1:20-CV-0047-GNS

# ROBERT YELL

# V.

# CITY OF RUSSELLVILLE, ET AL.

## DEPONENT:

## CHAD EGGLESTON

## DATE:

## February 25, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1                IN THE UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF KENTUCKY

3                      AT BOWLING GREEN

4                CASE NO. 1:20-CV-0047-GNS

5

6                      ROBERT YELL,

7                        Plaintiff

8

9                          V.

10

11                CITY OF RUSSELLVILLE, ET AL.,

12                       Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  CHAD EGGLESTON

24   DATE:      FEBRUARY 25, 2022

25   REPORTER:  CHLOE GILBERT



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 2

```
1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
4    Molly Campbell, Esquire
5    Amy Staples, Esquire
6    Loevy & Loevy
7    311 North Aberdeen
8    3rd Floor
9    Chicago, Illinois 60607
10   Telephone No.: (312) 243-5900
11   E-mail: campbell@loevy.com
12   amy@loevy.com
13   (Appeared via videoconference)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, OFFICER MILLS, OFFICER
4    EDMONDS, OFFICER EGGLESTON, OFFICER PENDERGRAF, OFFICER
5    HIGGINS, AND THE CITY OF RUSSELLVILLE:
6    Jennifer Langen, Esquire
7    Jeffrey Mando, Esquire
8    Adams Law
9    40 West Pike Street
10   Covington, Kentucky 41011
11   Telephone No.: (859) 495-3798
12   E-mail: jlangen@adamsattorneys.com
13   jmando@adamsattorneys.com
14   (Appeared via videoconference)
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, ALAN GREGORY:
4    Benjamin Siegel, Esquire
5    Elizabeth Stone, Esquire
6    August Pozgay, Esquire
7    Department of Housing, Buildings, and Construction
8    Public Protection Cabinet
9    500 Mero Street
10   Frankfort, Kentucky 40601
11   Telephone No.: (502) 573-0365
12   E-mail: Benjamin.siegel@ky.gov
13   betsy.stone@ky.gov
14   august.pozgay@ky.gov
15   (Appeared via videoconference)
16
17   ON BEHALF OF THE DEFENDANTS, DAVID WEST, WILLIAM SMITH,
18   AND JAMAN CHILDERS:
19   Alea A. Arnett, Esquire
20   Kentucky State Police Legal Office
21   919 Versailles Road
22   Frankfort, Kentucky 40601
23   Telephone No.: (502) 782-1800
24   E-mail: alea.arnett@ky.gov
25   (Appeared via videoconference)
```

Page 5

```
1              APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, BUSTER CANNON, AND SCOTT
4    COUNTY KENTUCKY:
5    Barry Stilz, Esquire
6    Kinkead & Stilz
7    PNC Bank Tower
8    301 East Main Street
9    Suite 800
10   Lexington, Kentucky 40507-1520
11   Telephone No.: (859) 296-2300
12   E-mail: lzellen@ksattorneys.com
13   (Appeared via videoconference)
14
15   ON BEHALF OF THE DEFENDANTS, BILL JENKINS, AND LOGAN
16   COUNTY:
17   J.A. Sowell, Esquire
18   English, Lucas, Priest & Owsley LLP
19   1101 College Street
20   P.O. Box 770
21   Bowling Green, Kentucky 42102-0770
22   Telephone No.: (270) 781-6500
23   E-mail: jasowell@elpolaw.com
24   (Appeared via videoconference)
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

APPEARANCES (CONTINUED)

1
2
3   ON BEHALF OF THE DEFENDANTS, BUSTER CANNON, AND THE CITY
4   OF GEORGETOWN:
5   Maureen Malles, Esquire
6   Sturgill, Turner, Barker & Moloney, PLLC
7   333 West Vine Street
8   Suite 1500
9   Lexington, Kentucky 40507
10  Telephone No.: (859) 255-8581
11  E-mail: mmalles@sturgillturner.com
12  (Appeared via videoconference)
13
14  Also Present: Sydney Little, Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 7

INDEX

1
2                                                    Page
3   PROCEEDINGS                                       9
4   DIRECT EXAMINATION BY MS. CAMPBELL               12
5   CROSS EXAMINATION BY MR. POZGAY                  69
6
7                    EXHIBITS
8   Exhibit                                          Page
9   1 - Employment Experience - RPD001914-1919       19
10  2 - Trial Testimony - YELL 9152-9161             41
11  3 - Case Report                                  52
12  4 - Investigation Letter - YELL 3321-3324        60
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

STIPULATION

1
2
3   The VIDEO deposition of CHAD EGGLESTON was taken at
4   KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET,
5   LOUISVILLE, KENTUCKY, 40202, via videoconference in
6   which all participants attended remotely, on FRIDAY the
7   25th day of FEBRUARY 2022 at approximately 1:31 p.m.;
8   said deposition was taken pursuant to the FEDERAL Rules
9   of Civil Procedure.  The oath in this matter was sworn
10  remotely pursuant to FRCP 30.
11
12  It is agreed that CHLOE GILBERT, being a Notary Public
13  and Court Reporter for the State of KENTUCKY, may swear
14  the witness and that the reading and signing of the
15  completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25

Page 9

PROCEEDINGS

1
2        VIDEOGRAPHER:  My name is Sydney Little.  I'm
3   the online video technician and Chloe Gilbert is the
4   court reporter today, representing Kentuckiana Court
5   Reporters, located at 730 West Main Street, Suite
6   101, Louisville, Kentucky 40202.  Today is the 25th
7   day of February 2022.  The time is 1:32 p.m.  We are
8   convened by video conference to take the deposition
9   of Sergeant Chad Eggleston in the matter of Robert
10  Yell versus City of Russellville, et al., pending in
11  the United States District Court Western District of
12  Kentucky at Bowling Green, case number 1:20-CV-0047-
13  GMS. Will everyone, but the witness, please state
14  your appearance, how you're attending, and the
15  location you are attending from, starting with
16  plaintiff's counsel?
17       MS. CAMPBELL:  Molly Campbell appearing
18  remotely from Ferry, Kansas for the plaintiff,
19  Robert Yell.
20       MS. STAPLES:  Amy Robinson-Staples appearing
21  remotely from Shelbyville, Kentucky for the
22  plaintiff, Robert Yell.
23       MR. MANDO:  Jeff Mando for the defend -- the
24  Russellville defendants and Chad Eggleston, today's
25  witness.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

```
 1        MS. LANGEN:  Jennifer Langen, also for the
 2   Russellville defendants and Chad Eggleston, today's
 3   witness, from my office in Covington, Kentucky via
 4   Zoom.
 5        MR. STILZ:  Barry Stilz on behalf of the
 6   defendant, Buster Cannon in his capacity as a Scott
 7   County deputy sheriff and for Scott County,
 8   Kentucky.  I'm appearing via Zoom from my office in
 9   Lexington, Kentucky.
10        MS. MALLES:  Maureen Malles on behalf of the
11   city of Georgetown and Buster Cannon.  Attending
12   remotely from my office in Lexington.
13        MR. SOWELL:  J.A. Sowell -- oh, go ahead.
14   Sorry.  J.A. Sowell appearing remotely for my
15   clients, the Logan County Defendants and Buster --
16   or Bill Jenkins, from our office here in Bowling
17   Green, Kentucky.
18        MR. POZGAY:  August Pozgay appearing on behalf
19   of Alan Gregory appearing via Zoom from Lexington,
20   Kentucky.
21        MS. STONE:  Elizabeth Stone also appearing
22   remotely from Lexington, Kentucky on behalf of
23   Alan Gregory.
24        MS. ARNETT:  Amber Arnett appearing on behalf
25   of the state police defendants, Childers, West, and
```

Page 11

```
 1   Smith appearing from Frankfort, Kentucky.
 2        VIDEOGRAPHER:  Thank you.  Sergeant Eggleston,
 3   will you please state your name for the record and
 4   hold your ID up to the camera?
 5        THE WITNESS:  Chad Eggleston.
 6        VIDEOGRAPHER:  Great.  Thank you.  Do all
 7   parties agree that the witness is, in fact, Chad
 8   Eggleston?
 9        MS. CAMPBELL:  Yes.
10        MS. STAPLES:  Yes.
11        MR. MANDO:  Yes.
12        MS. LANGEN:  Yes.
13        MR. STILZ:  Yes.
14        MS. MALLES:  Yes.
15        MS. STONE:  Yes.
16        MS. ARNETT:  Yes.
17        VIDEOGRAPHER:  Thank you.
18        MR. POZGAY:  Yes.
19        VIDEOGRAPHER:  Sergeant Eggleston, will you
20   please raise your right hand for the court reporter
21   to swear you in?
22        COURT REPORTER:  Do you solemnly swear or
23   affirm that the testimony you're about to give will
24   be the truth, the whole truth, and nothing but the
25   truth?
```

Page 12

```
 1        THE WITNESS:  I do.
 2        COURT REPORTER:  Thank you.  You may begin.
 3               DIRECT EXAMINATION
 4   BY MS. CAMPBELL:
 5        Q    Good afternoon, Sergeant Eggleston.  Before we
 6   get started here, I'm going to be showing you some
 7   documents on my screen.  So I'm going to have you pin my
 8   screen to your screen.  So if you hover over my photo,
 9   you'll see -- there should be three blue dot -- or a box
10   with three blue dots up here in the corner.  Do you see
11   that?
12        A    No, ma'am, I do not.  Stand by.  Trying to
13   find you on top of the screen.
14        Q    Yeah, if you just hover your cursor over me,
15   you should see it.
16        A    There it is.  Okay.
17        Q    If you click on that and hit pin, you should
18   see me on your screen.  Got it?
19        A    Okay.  Yes, ma'am.
20        Q    All right.  Mr. Eggleston, have you been
21   deposed before?
22        A    I have.
23        Q    How many times?
24        A    Two that I can recall.
25        Q    What do you -- when was the first time you
```

Page 13

```
 1   were deposed?
 2        A    Roughly 2006, '05, '06.
 3        Q    And what -- were you a party in a lawsuit?
 4        A    I was not.  It was a internal issue that was
 5   taken to court.
 6        Q    So you -- were you a witness in the case?
 7        A    I was.
 8        Q    And what were the -- what was the case
 9   pertaining to?
10        A    It was pertaining to an officer that was
11   terminated and I was a witness to some of the acts that
12   he had taken.
13        Q    And did you -- was there a trial?
14        A    There was not.  Or not that I'm -- not that
15   I'm aware of.  I wasn't involved in a trial.  It was
16   just a deposition.
17        Q    You only testified in a deposition?
18        A    Correct.
19        Q    What was -- what was the other case?
20        A    The other case was a lawsuit, I believe a
21   civil lawsuit, where a subject was killed and I was a
22   paramedic that responded.
23        Q    When was -- when did you provide that
24   testimony?
25        A    That testimony would've been in the last five
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 166    Filed 10/03/25    Page 6 of 29 PageID #:
2673
The Deposition of CHAD EGGLESTON, taken on February 25, 2022
14..17

Page 14

1  years.  Probably three or four years ago.  I couldn't
2  give you an answer to that.
3      Q     And what was the -- what were the allegations
4  in that lawsuit?
5      A     I don't have any idea what the allegations
6  were.  I was just there to give my deposition on what I
7  saw when I arrived on scene and what the scene looked
8  like.
9      Q     And you were a -- you said --
10     A     That was as a paramedic.  Not as a -- not a
11 law enforcement capacity.
12     Q     So from those depositions you may be familiar
13 with the rules here.  I'm going to have you make sure
14 you give all answers verbally so that the court reporter
15 can transcribe it.  Sound fair?
16     A     Yes, ma'am.
17     Q     And if I ask a confusing question, which I can
18 promise you that I will, just ask me to rephrase the
19 question and I can -- I can do that for you.  Okay?
20     A     Yes, ma'am.
21     Q     And if you answer the question then I will
22 assume that you understood what I'm asking.  Fair?
23     A     Yes, ma'am.
24     Q     And if you need any breaks today, just let me
25 know, we can certainly accommodate that, but I just ask

Page 15

1  that you answer the question before we take a break.
2  Fair?
3      A     Yes, ma'am.
4      Q     And attorneys -- have a lot of attorneys here.
5  You may hear some objections.  You can -- unless they
6  instruct you not to answer, you can just -- you can
7  answer the question.  Sound fair?
8      A     Yes, ma'am.
9      Q     Do you have any health conditions that would
10 affect your ability to testify competently today?
11     A     I do not.
12     Q     Are you taking any medications that might
13 affect your memory?
14     A     I am not.
15     Q     And where did you grow up, sir?
16     A     My very early childhood was in Russellville,
17 Kentucky, then in Florida, and then back to Kentucky
18 when I graduated high school.
19     Q     When did you -- when did you move to Florida?
20     A     When I was 3 or 4 years old.
21     Q     Was that for a parent's job?  Why was that?
22     A     That was because my parents divorced.
23     Q     So you spent -- you were born in Russellville
24 but spent most of your childhood in Florida, correct?
25     A     That is correct.

Page 16

1      Q     Where in Florida?
2      A     Bunnell.  Just north of Daytona.
3      Q     And did you -- and you attended high school
4  there?
5      A     I did.
6      Q     What high school did you go to?
7      A     Flagler Palm Coast High School.
8      Q     Did you graduate from Flagler Palm Coast?
9      A     Yes.
10     Q     What year did you graduate?
11     A     2000.
12     Q     Do you have any college education?
13     A     I do not.
14     Q     Any other education after high school?
15     A     Department of Criminal Justice training
16 Kentucky police academy, paramedic school, and fire
17 academy.
18     Q     All right.  We will go through that.  So after
19 you graduated high school, what did you -- what did you
20 do?
21     A     I went through Daytona Beach Community College
22 fire academy and EMT school.
23     Q     And was that immediately after you graduated
24 high school?
25     A     I believe so.  I'm not sure exactly the dates.

Page 17

1  I mean, it would've been the semester following high
2  school.
3      Q     And how long was your fire academy training?
4      A     I can't remember.  Roughly a semester.
5      Q     And what did you -- what did that training
6  entail?
7      A     Getting your firefighter level one and
8  firefighter level two certifications.
9      Q     What do those certifications mean?
10     A     Those certifications are what qualifies you to
11 be a paid career firefighter.
12     Q     So what would a level one certification
13 entail?
14     A     I don't recall what it entailed at the time.
15 That was, you know, roughly 22 years ago.
16     Q     I under -- no, I understand.  So in your
17 months of firefighting training, what kind of skills did
18 you learn during that training?
19     A     Fire attacks, water supply, air pack, rescue,
20 recovery, boat courses.
21     Q     So you learned -- would it be fair to say you
22 learned basically the basics of fighting a fire and fire
23 safety?
24     A     That's correct.
25     Q     And after you finished your -- or let me back



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1  up.  You also said you had EMT training?
2      A    I did at that time, yes.
3      Q    Was that at the same time as your fire
4  training?
5      A    No, ma'am.  I believe it was a -- it was a
6  separate course.  I don't know -- I don't know if I went
7  to EMT school or first or fire school first.  It was
8  within the same time frame.
9      Q    So same time frame, but those were two
10  separate training programs?
11     A    That's correct.
12     Q    Did all firefighters also go through the EMT
13  training?
14     A    I can't testified with other firefighters did.
15  I know I did.  I don't know that it was a requirement or
16  not.
17     Q    Okay.  So that wasn't -- it was not a standard
18  requirement that you complete both of those courses?
19     A    I don't know if it was a standard or not.
20     Q    All right.  And what did your EMT training
21  entail?
22     A    Basic life support, CPR, first aid, ambulance
23  operations, you know, bleeding control, airway.
24     Q    And I'm not sure if you testified to this
25  already, but about how long was that -- was that

Page 19

1  training?
2      A    Roughly a semester as well.
3      Q    Okay.  So that would've been around the same
4  time frame as your -- or same time frame as your fire
5  training, correct?
6      A    Yes, ma'am.
7      Q    And so after you finished these programs, did
8  you then -- what did you -- what was your next
9  employment?
10     A    I -- I don't remember what my next employment
11  would've been.
12     Q    Let me see if I can...
13     A    I did not work as a firefighter in Florida.
14     Q    Let me pull this up for you.  Are you able to
15  see my screen here?
16     A    I am.
17     Q    All right.  We'll mark this as Exhibit 1. It's
18  RPD 1914 to 1919.  It's a -- one of your employment
19  applications.  It says here that you joined the
20  Russellville Police Department in February 2004; is that
21  accurate?
22          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
23     A    It is.
24     Q    And how did you end up back in Russellville?
25     A    Family.  I moved back to Russellville because

Page 20

1  my grandfather was sick, needed taken care of.
2      Q    And that was -- would that have been
3  immediately after your training in Florida?
4      A    I don't know that it would've been
5  immediately, but it was shortly thereafter, yes.
6      Q    Did you have any -- any jobs in Florida after
7  your training?
8      A    I don't recall.
9      Q    No law enforcement positions?
10     A    No, ma'am
11     Q    And no -- you never worked as a firefighter in
12  Florida?
13     A    I did not.
14     Q    And you never worked as an EMT in Florida?
15     A    I did not.
16     Q    All right.  So you joined the Russellville
17  Police Department in 2000 -- in February 2004.  Why did
18  you become a police officer?
19     A    Just something I'd always wanted to do.
20     Q    How come you didn't join a fire department
21  given your -- your background?
22     A    Because the Russellville Fire Department is a
23  very small department, didn't have any openings at the
24  time, and I wanted to work in the town that I live.
25     Q    And so when you joined in February 2004, you

Page 21

1  mentioned that you also had training through the DOJCT,
2  I think it is.  Would that have been before you joined
3  Russellville?
4      A    No, ma'am.  When I joined Russellville, I was
5  hired in February 2004 and they sent me to DOCJT for
6  police academy.
7      Q    DOCJT.  All right.  I always mess up the
8  acronym.  So you would've attended -- and is that a 10
9  week training?
10     A    It was 16 weeks at the time.
11     Q    Okay.  16 weeks.  And what did you learn
12  during that -- during that training?
13     A    Basic law enforcement training.  Firearms,
14  arrest, search and seizure.
15     Q    And when you had -- so that would've been
16  beginning in February 2004, you had done about four
17  months of your basic academy training, correct?
18     A    Correct.
19     Q    And then -- then you would've -- then you
20  joined the Russellville Police Department as a
21  patrolman?
22     A    That is correct.
23     Q    And did they -- did Russellville police
24  provide you with any additional training?
25     A    They did.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CHAD EGGLESTON, taken on February 25, 2022

22..25

Page 22

1    Q    What kind of training did they provide you
2  with?
3    A    16 weeks of field training.
4    Q    And can you explain to me what field training
5  involved?
6    A    Day to day police operations with a field
7  training officer with you to make sure that, you know,
8  paperwork was done correctly for Russellville, all of
9  our policies, all of our procedures, how things were
10 handled in Russellville.  Learning the streets and the
11 roads, learning radio codes.
12   Q    And so you learned all of this from your field
13 training officer?
14   A    I learned how it was done in Russellville from
15 my field training officer.  The basics of law
16 enforcement was learned in the academy.
17   Q    Did the Russell Police Department provide you
18 with formal training on their policies?
19   A    They do.  You have what's called a rook book
20 and your policies and procedures are part of that book.
21   Q    And when did you receive the -- the rook book?
22   A    It would've been day one out of the academy.
23   Q    And was that all of the policy -- did that
24 contain all the policies and procedures of the police
25 department?

Page 23

1    A    I don't know if it contained all of them or
2  not.  Again, that was a long time ago.  I don't know
3  what was in it.
4    Q    Or was it something that was specific just to
5  -- I'm guessing it's called the -- rook book, was that
6  something that was only specific to new officers?
7    A    That is correct.
8    Q    Did more experienced officers have a different
9  policies and procedures manual that you're aware of?
10   A    No, ma'am.  Everybody had the same policies
11 and procedural -- procedure manual that was just
12 included in the rook book.  The rook book had your daily
13 observation and reports and stuff in it as well.  It
14 wasn't just policies.
15   Q    Understood.  And who was your supervisor in
16 your field training?
17   A    In reference to this case, it would've been
18 Robert Toombs.
19   Q    Did you have a different officer at different
20 times?
21   A    I did.
22   Q    How did that work?
23   A    I don't know how exactly it worked back then.
24 I just know that there was multiple field training
25 officers.  You switched at certain phases, but I don't

Page 24

1  remember which phases and who was what phase.
2    Q    So your supervisor depended on which -- there
3  were different -- let me strike that.  So there were
4  different phases of field training?
5    A    There was.
6    Q    Can you tell me about the different phases?
7    A    It's just broke up into certain, you know,
8  time increments to where you go to -- I mean, the phases
9  are the same.  You just go to a different field training
10 officer to get different perspectives from other
11 trainers.
12   Q    Understood.  So it wasn't -- it wasn't like
13 you were building skills, it was more just a different
14 perspective from different officers; is that fair?
15   A    Correct.
16   Q    All right.  So now when you were -- let me go
17 back to this.  When you had your fire training in
18 Florida, did you have any fire investigation training as
19 part of your training?
20   A    I don't recall what we -- any fire
21 investigations training.  No.
22   Q    So to your knowledge during that training you
23 never learned about investigating, say, the origins of a
24 fire?
25   A    No, ma'am.  I've never attended any trainings

Page 25

1  on the origins of a fire.
2    Q    And before September of 2004, did the
3  Russellville Police Department provide you any training
4  on how to draft reports?
5    A    How to what?
6    Q    How to draft reports.
7    A    Yes, we had a uniformed report that we used.
8    Q    Did they -- what did that uniform -- can you
9  describe that uniform report?
10   A    I mean, it was a fill in the blank report
11 until you got to the narrative, which included the
12 location, the offense, the person that reported the
13 offense, or not even necessarily just the offense, the
14 incident I guess would be a better term.  So you know,
15 number of people involved, locations, and then you go to
16 a narrative.
17   Q    Did they provide you training on what you
18 should include in your narrative report?
19   A    They did.
20   Q    What -- what did they train you about that?
21   A    Who, what, when, where.  And any other
22 pertinent details.
23   Q    Did they have any policy specific to written
24 reports?
25   A    I can't advise to a policy of a written report

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 166    Filed 10/03/25    Page 9 of 29 PageID #: 2670
The Deposition of CHAD EGGLESTON, taken on February 25, 2022
26..29

Page 26

1  back then.
2  Q    So you're not aware of any policy that existed
3  in 2004 about what information should be included in a
4  report?
5  A    Am I aware of a policy?
6  Q    Correct.
7  A    No, I'm not aware of a policy.  I didn't go
8  back and look at 2004 policies.
9  Q    Okay.  So after you -- am I correct, you were
10  a patrolman with the Russellville Police Department for
11  about three years?  Until 2007?
12  A    About that yes, ma'am.
13  Q    Sorry to interrupt you.
14  A    No, you're fine.
15  Q    So I think you were a patrolman from February
16  2004 to June 2007; is that correct?
17  A    That sounds correct.  Yes.
18  Q    And what were your duties as a patrolman?
19  A    Answering calls, you know, responding to
20  calls, making arrests.
21  Q    And how big was the Russellville Police
22  Department in 2004 when you joined?
23  A    I'm going to say it was in the neighborhood of
24  20, but I can't give you a direct specific answer to
25  that.

Page 27

1  Q    How many patrolmen were there?
2  A    Somewhere maybe around 15.  I can't tell you
3  that specifically.
4  Q    So as a patrolman you would respond to all
5  kinds of -- all kinds of calls, correct?
6  A    Correct.
7  Q    So whatever was called in, you were
8  responding?
9  A    If it was something dispatch sent us to, then
10  yes.
11  Q    And who was your supervisor when you were a
12  patrolman in 2004?
13  A    We rotated shifts and I was on several
14  different shifts.  I mean, I would've had multiple
15  supervisors, but I can't -- I don't remember who my
16  supervisor was in reference to this incident.
17  Q    Was Barry Dill your supervisor at some point?
18  A    Barry Dill would've been the chief of police
19  at some point, but I don't know that he was during this
20  time.
21  Q    Okay.  Okay.  And in 2007, you joined -- you
22  left the police department to join the Russellville Fire
23  Department; is that correct?
24  A    That is correct.
25  Q    And why did you make that move?

Page 28

1  A    Because of some issue between Barry Dill and
2  I.
3  Q    What were -- what were those issues?
4  A    I was trying to go to another place of
5  employment in the law enforcement sector and I don't
6  feel like I was -- it was handled correctly by Chief
7  Barry Dill at that time.
8  Q    Can you -- so you were trying to move to a
9  different agency; is that what you're saying?
10  A    That is correct.  I applied for a different
11  agency.
12  Q    And what happened with Mr. Dill?
13  A    I requested it off to go to a job offer
14  interview.  It was declined.  I called in sick, went
15  anyways, and then I was suspended for fraudulent use of
16  sick time.
17  Q    And Mr. Dill suspended you for that?
18  A    That is correct.
19  Q    What suspension did you receive?
20  A    I believe it was 15 working days.
21  Q    So you moved over to the fire department and
22  you were there until 2011; is that correct?
23  A    That sounds correct.  Yes.
24  Q    And it -- and you were a firefighter the
25  entire time you were in that department?

Page 29

1  A    In what department?  In Russellville?
2  Q    In the Russ -- sorry, in the Russellville Fire
3  -- in the Russellville Fire Department?
4  A    I was.
5  Q    And you then worked at the Hopkinsville Fire
6  Department after that?
7  A    That is correct.
8  Q    And that was from 2011 to 2016, correct?
9  A    Yes, ma'am.
10  Q    And why did you -- why did you leave the
11  Russellville Fire Department?
12  A    Because Hopkinsville Fire Department ran ALS
13  engine companies and ran the ambulance service out of
14  the fire department.  I was also a paramedic.  I wanted
15  to go make more money.
16  Q    So at the Hopkinsville Fire Department, you
17  were able to be both a firefighter and an EMT?
18  A    I was a firefighter and paramedic.  Yes,
19  ma'am.
20  Q    Firefighter and paramedic.  Sorry.  And then I
21  think in 2014 you started working at the Logan County
22  Sheriff's Department?
23  A    I did part-time for that year.
24  Q    Okay.  That would have been --
25  A    I still -- I still worked -- that was just on



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1  my days off from Hopkinsville.  I would work there
2  periodically.
3       Q    And you were working there as the sheriff's
4  deputy?
5       A    That's correct.
6       Q    So you were full-time at the Hopkinsville Fire
7  Department and on your off days working part-time as a
8  sheriff's deputy; is that accurate?
9       A    That is.
10      Q    And what were your duties as a sheriff's
11 deputy?
12      A    Answering calls, writing reports, serving
13 papers.  I did a few prisoner transports.
14      Q    Sorry, say that again?
15      A    And a few prisoner transports.
16      Q    And you're currently still at the Logan County
17 Sheriff's Department?
18      A    I am not.  I only worked there for the -- I
19 only worked there for 2014.
20      Q    Oh and then now you're currently back at
21 Russellville, correct?
22      A    Correct.
23      Q    And why did you come back to the Russellville
24 Police Department?
25      A    It was home and I wanted to work for the chief

Page 31

1  that was here at that time.
2       Q    Who's that?
3       A    It was Victor Shifflett.
4       Q    And he's no longer the chief, I take it?
5       A    He's retired.
6       Q    And what rank did you rejoin the Russellville
7  Police Department?
8       A    Patrolman.
9       Q    So that was the same -- the same job that you
10 initially had with the Russellville Police Department;
11 is that correct?
12      A    That is correct.
13      Q    And what's your -- your current -- what's your
14 current role there?
15      A    My current role is Detective Sergeant.
16      Q    And what are your -- what are your duties as a
17 Detective Sergeant?
18      A    Investigate.  We investigate all the violent
19 felonies and crimes against kids, and then, you know,
20 certain property crimes.  As far as the detective role -
21 - the sergeant role of it is just to approve vacation
22 times, payroll, and normal supervisory duties in the law
23 enforcement capacity and oversee the rest of the
24 investigations unit.
25      Q    So you work as both a detective and as a

Page 32

1  supervisor?
2       A    That is correct.  We're not a large enough
3  department to only do supervisor roles.
4       Q    And what kind of cases do you investigate?
5       A    We investigate all violent felonies, crimes
6  against kids, and some property crimes.
7       Q    And how many -- do you supervise other
8  detectives?
9       A    I do.
10      Q    How many detectives do you supervise?
11      A    There's two more general detectives, one SRO,
12 and two narcotics -- well, one narcotics guy right now.
13      Q    So are you responsible for assigning them to
14 various investigations?
15      A    Yes, ma'am.  We don't really have to do a
16 whole lot of assigning.  They just kind of come in as
17 whoever's on call.  I have a good crew.  They take it
18 upon themselves.  I don't have to assign anything.
19      Q    Are you familiar with Kenneth Edmonds?
20      A    I am.
21      Q    You know him personally?
22      A    I do.
23      Q    Have you ever socialized with him?
24      A    I work with him every day.
25      Q    Do you -- do you socialize with him outside of

Page 33

1  work?
2       A    Other than a phone call here or there.  We
3  don't hang out, if that's what you're getting at.
4       Q    So you -- you talk to him routinely in your --
5  through your work capacity?
6       A    I do.  Our offices are next to each other.
7       Q    Are you familiar with Ed Higgins?
8       A    I am.
9       Q    How do you know Mr. Higgins?
10      A    We work together at Russellville Police
11 Department.
12      Q    Do you currently work together?
13      A    No, ma'am.  He doesn't work for this agency.
14      Q    For the what?  Sorry.
15      A    He does not work for this agency anymore.
16      Q    Okay.  When was the last time you spoke with
17 him?
18      A    I don't have any idea.
19      Q    Have you ever socialized with him?
20      A    At work.
21      Q    But not outside --
22      A    No, ma'am.
23      Q    Are you familiar with Ronald Mills?
24      A    I am.
25      Q    You know him personally?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1    A    Through work.
2    Q    But you haven't socialized with him outside of
3  work?
4    A    No, ma'am.
5    Q    Jim Pendergraf, are you familiar with him?
6    A    He was the chief that hired me.
7    Q    Have you -- when was the last time you spoke
8  with him?
9    A    I would imagine when he retired from this
10  agency.
11    Q    Are you familiar with a Sergeant William Smith
12  from KSP?
13    A    I am not.
14    Q    Are you familiar with David West from KSP?
15    A    I'm familiar with who he is.  I don't know
16  that I've ever spoke to him, just in this case.
17    Q    So you're just familiar with his name from
18  this case?
19    A    Yes, ma'am.  His name and his face.  Yes
20  ma'am.
21    Q    Are you familiar with Logan County Jailer
22  Hayes, J.W. Hayes?
23    A    I am not.
24    Q    Have -- were you ever disciplined when you
25  worked for the -- I think you testified earlier, there

Page 35

1  was one disciplinary issue.  Did you have any other
2  disciplinary issues when you worked for the Russellville
3  Police Department?
4    A    No, ma'am.
5    Q    What was the -- you testified earlier that you
6  had an issue with you used sick time to go to an
7  interview; is that correct?
8    A    Yes, ma'am.
9    Q    Had -- did that violate a policy of the
10  Russellville Police Department?
11    A    It did.
12    Q    What policy was that?
13    A    I guess the sick time policy.
14    Q    When -- were you ever disciplined working for
15  the Russellville Fire Department?
16    A    No, ma'am.
17    Q    Had you ever been disciplined working for the
18  Hopkinsville Fire Department?
19    A    No, ma'am.
20    Q    Have you ever been disciplined working for the
21  Logan County -- when you were working for the Logan
22  County Sheriff's Department?
23    A    No, ma'am.
24    Q    Have you seen a copy of the civil complaint
25  filed in this case?

Page 36

1    A    Yes, I believe I have.
2    Q    When did you see that?
3    A    It's been a while back.  I can't advise when.
4    Q    Would it have been when the -- around when the
5  complaint was filed a couple years ago?
6    A    That sounds correct.
7    Q    Who provided you a copy of the complaint?
8    A    I can't advise.
9    Q    When's the last time that you read it?
10    A    Read the entire complaint?
11    Q    Read the entire complaint or parts of it?
12  When's the last time you looked at it?
13    A    Day before yesterday.
14    Q    Did you read the entire complaint?
15    A    I did not.
16    Q    What part did you read?
17    A    I believe just what was being accused of me.
18    Q    And what was your understanding of those
19  allegations?
20    A    I don't understand what you're asking.  What
21  do I understand out of the allegations?
22    Q    Yeah.  Against you.
23    A    I don't understand them at all to be honest
24  with you.
25    Q    Why -- why do you say that?

Page 37

1    A    A lot of it doesn't pertain to anything that I
2  had to do with the case.
3    Q    You're saying, generally speaking, a lot of
4  the complaint doesn't pertain to you?
5    A    Generally speaking, I wasn't involved in a lot
6  of that -- a lot of the case that the allegations are
7  of.
8    Q    And what did you to prepare for the deposition
9  today?
10    A    Just reviewed my prior testimony.
11    Q    And that was your trial testimony?
12    A    That is correct.
13    Q    And your -- I think you also testif -- strike
14  that.  Did you bring any documents with you today?
15    A    I did not.  I've reviewed them, but I do not
16  have them in front of me.
17    Q    Sorry, can you -- sorry, you said that really
18  fast.  Can you say that again?
19    A    I reviewed them, but I do not have them
20  sitting in front of me.
21    Q    What documents?  That was your trial testimony
22  that you're saying?
23    A    Yes, ma'am.
24    Q    And without getting into any conversations you
25  had with your -- with your attorney, have you talked to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  anyone about this deposition?
2      A    Other than Detective Edmonds?  No, ma'am.
3      Q    What was your conversation with Detective
4  Edmonds?
5      A    The last conversation I had with Detective
6  Edmonds about this was, "Mine is not until 12:30.  I
7  hope this doesn't run late, it's Friday."
8      Q    Was that -- was that all that you discussed
9  with Detective Edmonds?
10     A    Yes, ma'am.  He was out of the office.
11     Q    Nothing about --
12     A    No details of anything.  No, ma'am.
13     Q    Did you have any conversations with an
14  attorney?
15     A    I have had conversations with my attorney.
16  Yes.
17     Q    When was that?
18     A    The last conversation I had with my attorney?
19  It's been several days.
20     Q    Is that the only time that you've...
21     A    No, I've had two conversations with him.
22     Q    Sorry.  You had two?
23     A    I've had two conversations with him.  One was
24  very brief on the phone just to make sure that I had
25  everything I needed for this.  And then I spoke to him

Page 39

1  roughly a month ago.
2      Q    And how long did those conversations last?
3      A    The first conversation lasted several minutes.
4  The last conversation lasted three, four minutes tops.  I
5  know we spoke about whatever we needed to speak about
6  and that was it.
7      Q    All right.  On -- I'm going to bring you back
8  to September 11, 2020, you responded to a call six --
9  for a fire at 638 Bonnie Drive; is that right?
10     A    Yeah.  That's correct.
11     Q    And you were doing -- at the time you were
12  doing your field training that we talked about earlier,
13  correct?
14     A    Yes, ma'am.
15     Q    And Officer Toombs was your field training
16  lieutenant at the time?
17     A    He wasn't a lieutenant, but he was my field
18  training officer at the time.  Yes, ma'am.
19     Q    He was the field training officer?  Sorry.  Not
20  a lieutenant?
21     A    Correct.  We don't have a lieutenant rank.
22     Q    I appreciate that.  So were you -- were you
23  dispatched to the -- to the scene of the fire?
24     A    I don't know exactly who was dispatched or how
25  it was dispatched, but it came across the radio that

Page 40

1  there was an incident at that location and we did
2  respond.
3      Q    And Officer Toombs would've been with you as
4  your -- your field training officer?
5      A    Yes, ma'am.
6      Q    And when you were on a scene, what was -- what
7  was Officer Toombs' supervisory duties?
8      A    Just to assist me with my duties and to make
9  sure that my duties were carried out correctly based on
10  our policies and procedures.
11     Q    So he was providing supervision and guidance
12  to you on the scene -- on a scene; is that correct?
13     A    That's correct.  That's what his job would've
14  been to do.
15     Q    And when you arrived on the scene of the fire,
16  what did you observe?
17     A    I don't recall exactly what I observe --
18  observed.  Sorry.
19     Q    Do you recall seeing smoke?
20     A    I don't recall any of the details of what I
21  saw on the scene.  That's been a long time ago.
22     Q    So you don't recall any -- any details about
23  the trailer itself or the fire scene; is that fair?
24     A    That's fair.
25     Q    Did you observe Mr. Yell when you arrived?

Page 41

1      A    I'm sure I did, but I can't...
2      Q    Sitting here today -- sorry.  Sitting here
3  today you don't have any independent recollection of
4  seeing Mr. Yell?
5      A    No, ma'am.
6      Q    All right.  I'm going to -- I'll show you your
7  trial testimony.  We'll see if that refreshes your
8  memory on it.  We'll mark this as Exhibit 2.  This is
9  Mr. Eggleston's trial testimony.  It's Yell 9152 to Yell
10  9161.  Are you able to see my screen here?
11          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
12     A    I can.
13     Q    And if you want to just read from the
14  highlighted portion here?
15     A    You want me to start with the good morning?
16     Q    You can read it to yourself.
17     A    Oh, okay.  All right.
18     Q    Yeah.
19     A    Okay.
20     Q    Does that refresh your memory as to the scene?
21     A    Not really.  I mean, if that's what I
22  testified to, then that's what I saw, but that doesn't
23  bring back a vivid memory.
24     Q    Doesn't bring back an independent
25  recollection?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 166    Filed 10/03/25    Page 13 of 29 PageID #: 2680
The Deposition of CHAD EGGLESTON, taken on February 25, 2022
42..45

Page 42

1    A    No ma'am.
2    Q    So when you -- according to your testimony,
3  when you arrived, you observed Mr. Yell sitting on the
4  ground?
5    A    That's correct.
6    Q    And was anyone around him at the time?
7    A    I would assume someone was around him, being
8  that he was either in custody or placed under arrest.
9  Let me read further down and see if I testified to that.
10  Sergeant Mills and Officer Toombs were there.  You know,
11  obviously Officer Toombs was there and looks like
12  Officer Higgins.
13    Q    So you never saw -- did you ever see Mr. Yell
14  approach -- approach the trailer?
15    A    I did not.
16    Q    Did you observe Mr. Yell being taken away from
17  the house?
18    A    I'm trying to review this.  Not according to
19  my testimony.
20    Q    All right.  And Mr. Yell was then -- was
21  placed in Officer Higgins car?
22    A    Correct.
23    Q    And who -- who placed him there?
24    A    It says Sergeant Mills and Officer Toombs
25  according to my testimony.

Page 43

1    Q    Your assignment then was stand outside the
2  car?
3    A    That is correct.
4    Q    And Mr. Yell was -- was distraught at that
5  point; is that fair?
6    A    I'm not going to say that he was distraught. I
7  don't know what his emotional state was, but he was
8  thrashing around in the back of the car.
9    Q    So Mr. Yell -- Mr. Yell was upset at that
10  point?
11    A    He was emotional.  I can't testify whether he
12  was upset or not.
13    Q    But he was emotional?
14    A    Yes, ma'am.
15    Q    Was he intoxicated?
16    A    He appeared to be.
17    Q    And what -- what appeared to be intoxication
18  to you?
19    A    His -- I can't testify to what appeared to be
20  at that time.  I don't have a vivid recollection of what
21  he appeared to be intoxicated.  I just testified that he
22  appeared to be intoxicated.
23    Q    So you don't recall what behaviors led you to
24  that conclusion?
25    A    I do not.  It wouldn't have been just

Page 44

1  emotional behavior.
2    Q    Did you smell any substances on Mr. Yell?
3    A    I'm sorry?
4    Q    Did you smell any substances on Mr. Yell?
5    A    I don't remember.
6    Q    And Mr. Yell was in the back seat of the car?
7    A    Yes, ma'am.
8    Q    Was he the only person inside the car?
9    A    He would have been the only person in the back
10  seat of the car, yes ma'am, but I don't recall if there
11  was anybody else in the car initially.
12    Q    So there -- you don't recall whether anyone
13  was sitting in the front seat?
14    A    I don't recall.
15    Q    Were there any other officers standing with
16  you outside the car?
17    A    I'm sure at some point there were, but not,
18  you know, for the duration of him sitting in the car,
19  there was not.  They were carrying out other duties on
20  the scene and I was tasked to stand by with the car.
21    Q    And why was -- why were you given that task?
22    A    Probably due to my lack of experience with the
23  situation going on at the time.  I was best -- my
24  abilities were best served by standing by with the car.
25    Q    And was your role to make sure that nobody

Page 45

1  went in or out of the car?
2    A    To make sure nobody went in or out of the car,
3  to make sure that he didn't do anything to harm himself
4  in the car, or escape from the car.
5    Q    And you don't have any specific recollection
6  of any other officers standing with you during that time
7  period?
8    A    I don't.
9    Q    How long were you standing outside the car
10  with Mr. Yell?
11    A    I would have stood outside the car with
12  Mr. Yell until he was transported, but I don't have a
13  direct recollection of how long that would have been.
14  I believe it was in my testimony.
15    Q    Was it minutes, hours?  You know, generally,
16  what was the time frame?
17    A    I would have to review what I testified to.
18  I can't speculate on how long, you know, I stood there.
19  That was several years ago.
20    Q    All right.  And did you hear Mr. Yell say
21  anything while he was in the -- in the car?
22    A    I did.
23    Q    What did you hear?
24    A    He stated multiple times, "If she'd have done
25  to you what she did to me, you'd have done the same

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  fucking thing."
2      Q    But did you understand what Mr. -- what did
3  you understand Mr. Yell to mean by that?
4      A    I don't know what he meant by that.
5      Q    You don't know what he was referring to?
6      A    I mean, no, I can't testify to what he was
7  thinking when he said it.  No, ma'am.  I would say he
8  said --
9      Q    He never said -- sorry.  He never said what he
10  had done?
11      A    No, ma'am.  And I didn't ask.
12      Q    And he never said what, you know, what she had
13  done?
14      A    No, ma'am.
15      Q    Did you know who the "she" was that he was
16  referring to?
17      A    No, ma'am.
18      Q    How many times did he make this statement?
19      A    Numerous, but I couldn't testify to a number.
20      Q    Would you say --
21      A    I believe I testified that he said it
22  repeatedly.
23      Q    Repeatedly.  So when you say numerous, more
24  than twice?
25      A    Repeatedly, but I couldn't give you a number.

Page 47

1  I don't believe I was able to give a number during my
2  first court testimony.  I sure couldn't now.
3      Q    That's fair.  Did he say anything else?
4      A    Not that I recall.
5      Q    And were the car doors all -- the car doors
6  were all shut during this interaction?
7      A    Yes, ma'am.  That's standard practice.
8      Q    And the windows were shut?
9      A    Yes, ma'am.
10      Q    So you were hearing this from inside the -- he
11  was saying this from inside the -- well, strike that.
12  Did you say anything to Mr. Yell?
13      A    I believe I testified that I told him to quit
14  kicking the windows one time.
15      Q    Did you say anything else to him?
16      A    Not that I recall.  It would have been on my
17  (inaudible) form if I did.
18      Q    So Mr. Yell, at that point was -- was trying
19  to get out of the car?
20      A    I don't know if he was trying to get out of
21  the car or just kick the windows out.  I don't know what
22  his mindset was, I just know that he was kicking windows
23  and doors.
24      Q    And were the firefighters there at that point?
25  What was going on at the fire -- well, strike that.  What

Page 48

1  was going on at the fire at that point?
2      A    I couldn't testify what else was going on.  I
3  was focused on my task.
4      Q    And how close were you to the trailer at that
5  point?
6      A    I couldn't testify to that either.  I don't
7  recall exactly where Officer Higgins' car was parked.
8      Q    Was it parked on the street?
9      A    I can't testify to that either.  We don't make
10  common practice out of parking in yards.
11      Q    Did you observe Officer Higgins strike
12  Mr. Yell?
13      A    Did I observe Officer Higgins strike Mr. Yell?
14      Q    Correct.
15      A    No, ma'am.
16      Q    Never saw Officer Higgins strike Mr. Yell in
17  the face?
18      A    No, ma'am.  Not that I recall.
19      Q    Did you ever see Officer Higgins strike
20  Mr. Yell in the chest?
21      A    No, ma'am.
22      Q    Did you ever strike Mr. Yell?
23      A    No, ma'am.
24      Q    Did you observe anyone strike Mr. Yell?
25      A    No, ma'am.  Not that I recall.

Page 49

1      Q    And did you spray Mr. Yell with chemical
2  spray?
3      A    I can't recall if I sprayed him or not.  I
4  know that he was pepper sprayed, but I can't recall
5  who did it.  I would have to look at my testimony.
6      Q    And that is your -- your recollection is that
7  he was sprayed before he was placed in the car?
8      A    No, ma'am.  My recollection is that he was
9  sprayed, but I don't know when.
10      Q    So how do you know -- how do you know that he
11  was sprayed?
12      A    I believe I testified to it, that he was
13  pepper sprayed.
14      Q    Was that something that the --
15      A    I would -- would look at my testimony again.
16      Q    Yeah.  You did testify to that, but I'm
17  wondering, was that something that you personally
18  observed happen?
19      A    If I testified to it, then I would say yes,
20  but I can't recall.  I can only recall what I testified
21  to.  I mean, that's been a lot of years and a lot of
22  cases ago.
23      Q    I appreciate that.  Just show you this here.
24  We're at the bottom of Yell 9157.  So if you read from
25  line 18 to 24.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1    A    Uh-huh.

2    Q    So you testified that Mr. Yell had already
3    been pepper sprayed by the time that he was placed in
4    the car; is that correct?

5    A    They asked if he had already been pepper
6    sprayed at that point in time and I said, "I don't
7    recall.  I believe so."

8    Q    But sitting here today, you don't have any
9    independent recollection of personally observing any
10   chemical spray being applied to Mr. Yell?

11   A    I do not.

12   Q    Have you ever pepper sprayed -- have you ever
13   pepper sprayed someone?

14   A    Yes, ma'am.

15   Q    How many -- how many times has that happened?

16   A    I couldn't give you an answer to that.

17   Q    Is that something you routinely do?

18   A    Ma'am, I haven't carried pepper spray since
19   I've came back in 2016, so I haven't pepper sprayed
20   anybody since then.  It would have all been between the
21   2004, 2007 time frame, before we switched to a taser.

22   Q    I understand.  So in what circumstances would
23   using a chemical spray be appropriate?

24   A    Any time somebody was resisting arrest and we
25   needed to escalate our use of force.

Page 51

1    Q    Did you observe a -- a laceration on Mr.
2    Yell's lip?

3    A    Not that I recall.

4    Q    You don't recall seeing any injuries on him?

5    A    I don't recall any.

6    Q    Now, at some point, when you were standing
7    outside the car, Mr. Yell was eventually transported to
8    the Logan County Detention Center; is that correct?

9    A    Yes, ma'am.

10   Q    And roughly how long was he in the car before
11   he was transported?

12   A    Oh, like I told you a few questions ago, I
13   can't advise how long he would have been in the car.  I
14   mean, that wasn't anything that I would have documented
15   or testified to and...

16   Q    That's fair.  But you were -- you were
17   standing there the whole time that he was in the car.
18   Fair?

19   A    Yes, ma'am.

20   Q    And then Officer Higgins transported Mr. Yell
21   to the jail?

22   A    Yes, ma'am.

23   Q    And did you assist in transporting him to the
24   Logan County Detention Center?

25   A    No, ma'am.

Page 52

1    Q    And you -- so you remained at the scene?

2    A    Yes, ma'am.

3    Q    Did Officer Higgins drive to the detention
4    center by himself?

5    A    I can't testify to that, but I believe so.  I
6    don't recall anyone going with him.

7    Q    All right.  All right.  I'm going to show you
8    this document on screen.  We'll mark this as Exhibit 3.
9    It's Yell 3554.  Do you recognize this document?

10        (EXHIBIT 3 MARKED FOR IDENTIFICATION)

11   A    I do.

12   Q    Is that your signature on it?

13   A    It is.

14   Q    And that's your unit number, is 812?

15   A    Yes, ma'am.

16   Q    Is that your same unit number now as it was
17   back in 2004?

18   A    It is.

19   Q    And this is a case report supplemental,
20   correct?

21   A    Yes, ma'am.

22   Q    And what was this report supplementing?

23   A    It would have been supplementing the initial
24   report to this incident.

25   Q    And would that have been an initial report

Page 53

1    that you filled out or someone else?

2    A    It would have been someone else.  It would
3    have typically been the first arriving unit.

4    Q    So you did not fill out the initial report,
5    correct?

6    A    Correct.

7    Q    You just provided a supplemental report based
8    on your actions at the scene?

9    A    Correct.

10   Q    And when did you write this report?

11   A    It would have been following that incident.  I
12   can't advise how long after.

13   Q    And there's no -- there's no date on this
14   report, correct?

15   A    It doesn't appear to be.  No, ma'am.

16   Q    And so why wouldn't you have dated the report?

17   A    I can't advise why I would or wouldn't have
18   done anything at that point in time.

19   Q    What was your general practice in 2004 when
20   you were writing reports?

21   A    As far as what general practice are you
22   referring to?

23   Q    Well, as far as dating reports.

24   A    Most reports were -- they was auto-populated
25   on.  At that point in time we didn't have a standardized

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 166    Filed 10/03/25    Page 16 of 29 PageID #: 2608
The Deposition of CHAD EGGLESTON, taken on February 25, 2022

54..57

Page 54

1  supplemental report. They were written on a Word
2  document such as this.
3      Q    So there was no standard format that you were
4  required to follow?
5      A    Not on the supplemental report that I'm aware
6  of. On the initial uniform office report, there would
7  have been.
8      Q    And did someone instruct you to write this
9  report?
10     A    I don't recall, but...
11     Q    Who did you provide this report to?
12     A    I don't recall that either.
13     Q    Do you recall, as a general matter, when you
14  with the Ru -- when you were a new officer with the
15  Russellville Police Department what you would have done
16  with your reports?
17     A    While I was still on field training, all of my
18  reports would have been turned into my field training
19  officer for review.
20     Q    And did your field training officer provide
21  you feedback on your reports?
22     A    Typically. Yes, ma'am.
23     Q    And what kind of -- his role was to make sure
24  that you were including all the pertinent information;
25  is that correct?

Page 55

1      A    Yes. That's part of his role, yes.
2      Q    When you say it's part of his role, what --
3  can you explain that further?
4      A    I mean, his role was to train me on all
5  aspects of Russellville Police Department, you know, and
6  how they wanted us to respond to everything. Just part
7  of that role would have been to review my reports, to
8  make sure they were ready for the next -- ready to go to
9  the officer that needed it.
10     Q    And so did the patrol officer provide it
11  directly to the officer who -- provide your reports
12  directly to the officer who needed it?
13     A    You're going to have to rephrase. I don't
14  understand what you're asking.
15     Q    That was a bad question. I'll rephrase it. So
16  you submitted your reports to your field training
17  officer, correct?
18     A    Yes.
19     Q    And then, was it given back to you?
20     A    I can't advise what was done with it after
21  that or if he would have passed it up to who needed it.
22     Q    So you're not sure how this report would have
23  gotten to the appropriate officer?
24     A    Typically, on a case that is going to be
25  investigated by a detective, if they request that a

Page 56

1  report or a supplemental report is done, you complete
2  that report and it's reviewed by your supervisor and
3  then it's turned over to that detective.
4      Q    So the detective would have to request the
5  report?
6      A    Not necessarily. I mean, if it's something
7  you knew had to be completed you would have done it on
8  your own.
9      Q    Did anyone ever discuss this report with you?
10     A    No, ma'am. Not that I recall.
11     Q    So as far as you know -- well, strike that. So
12  you completed this report and turned it into your field
13  training officer, but beyond that, you don't know where
14  it went; is that fair?
15     A    I can testify that I completed this report
16  because there is my signature, but I can't even testify
17  that I gave it to my field training officer. I don't
18  know what I would have done with it at the time. That's
19  just what I should have done with it. So I can testify
20  that that is my report.
21     Q    Now what did you do after Mr. Yell was
22  transported from the scene?
23     A    Whatever I was asked of by my field training
24  officer, but I don't recall.
25     Q    Would the field training officer have been the

Page 57

1  only person who would have given you an assignment?
2      A    The sergeant on the scene could have given me
3  assignment as well, but based on the chain of command,
4  the sergeant would have told my field training officer
5  what he wanted me to do.
6      Q    And Sergeant Mills was in charge of the scene?
7      A    He was the sergeant at the scene. Yes, ma'am.
8      Q    Did he give your field training officer any
9  assignments for you to do?
10     A    Not that I recall.
11     Q    And would your field training officer have had
12  any independent assignments?
13     A    Away from me?
14     Q    Correct.
15     A    I don't recall if he did or not. He could
16  have, but I don't recall.
17     Q    And did you -- so all of your assignments
18  would have come from your field training officer,
19  correct?
20     A    It should have, yes, ma'am, but I don't recall
21  receiving any assignments.
22     Q    Did you speak with any other officers on the
23  scene?
24     A    Not that I recall. I'm sure I did, but I
25  don't recall any of them.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1    Q    You don't recall any conversations with
2  Sergeant Mills?
3    A    I don't.
4    Q    Do you recall any conversations with Officer
5  Higgins?
6    A    I don't recall any of them.
7    Q    Any conversations you recall with Officer
8  Dill?
9    A    With who?
10   Q    Dill, Barry Dill.
11   A    No, ma'am.  I don't recall any.
12   Q    Do you recall any conversations with Detective
13  Edmonds?
14   A    I do not.
15   Q    Did you speak to any witnesses on the scene?
16   A    Not that I recall.
17   Q    Did you have any further interactions with
18  Mr. Yell?
19   A    Once he left the scene?
20   Q    Correct.
21   A    No, ma'am.
22   Q    Did you ever -- you did not personally go to
23  the Logan County Detention Center?
24   A    I did not.
25   Q    Did you ever speak with any of the fire

Page 59

1  investigators?
2    A    Not that I recall, no, ma'am.
3    Q    Are you familiar with Sam Flowers, Fire
4  Marshal?
5    A    No, ma'am.
6    Q    Never had a conversation with him?
7    A    Not that I recall.  That name doesn't even
8  sound familiar.
9    Q    Are you familiar with Alan Gregory?
10   A    I'm familiar with him, yes, ma'am.
11   Q    How are you familiar with him?
12   A    Just through my work in law enforcement.
13   Q    Did you have any conversations with him about
14  this case -- in this case?
15   A    Not that I recall.
16   Q    Did you ever have any conversations with David
17  West from KSP?
18   A    No, not that I recall.
19   Q    Any conversations with Buster Cannon?
20   A    No, ma'am.  I'm not familiar with who he is.
21   Q    They never -- you never recall them asking you
22  any questions?
23   A    No, ma'am.
24   Q    And did you learn on the scene that the fire
25  was a suspected arson?

Page 60

1    A    I don't recall when I learned that.
2    Q    Did you learn that Mr. Yell was a suspect?
3    A    I don't recall when I learned that either,
4  ma'am.
5    Q    You don't recall learning that from an anyone
6  on the scene?
7    A    I don't recall that, no, ma'am.  I have very
8  little memory of that scene.  I wish I had a better one.
9    Q    I understand it's a been a -- it's been a
10  while.  Now when you were on the scene, you also
11  interacted with April Davis Carpenter; is that correct?
12   A    I don't recall if I did or not.
13   Q    You don't recall whether -- you don't recall
14  any interaction with Ms. -- with Ms. Carpenter?
15   A    I don't recall any, no, ma'am.
16   Q    Let me show you -- I'll mark this as Exhibit
17  4.  This is Yell, with it bates stamped Yell 3321 to
18  Yell 3324.  And I'm at Yell 3324 right now.  I'll give
19  you a chance to look at this document, this report.
20       (EXHIBIT 4 MARKED FOR IDENTIFICATION)
21   A    Okay, I reviewed it.
22   Q    Does that refresh your memory about your
23  interaction with April Davis Carpenter?
24   A    No, ma'am.  It does not.
25   Q    So sitting here today you don't have any

Page 61

1  independent memory of your interactions with April?
2    A    No, ma'am.
3    Q    But according to this report, you assisted an
4  emergency medical person attend -- you assisted with
5  attending to Ms. Davis?
6    A    That is correct.
7    Q    And do you recall any -- you don't recall any
8  observations that you had about April?
9    A    No, ma'am.  I do not.  I don't even recall me
10  assisting him with her.
11   Q    So you don't recall -- you don't recall when
12  Ms. -- when Ms. Davis might have -- when or -- strike
13  that.  You don't recall when Ms. Davis made these
14  statements?
15   A    I don't recall them other than based on this
16  statement that I wrote.
17   Q    But according to th -- according to this
18  report, Ms. Davis said that, "She couldn't believe he
19  fucking did this.  I never thought he would take it this
20  far."
21   A    According to this report, that's correct.
22   Q    And did you report that statement to anyone?
23   A    It would have been reported here.  I can't --
24  I don't recall if I reported it to somebody verbally at
25  that time, no.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CHAD EGGLESTON, taken on February 25, 2022

62..65

Page 62

1    Q    And when did you -- when did you write this
2 report?
3    A    It would have been following this incident,
4 but I can't testify to when I wrote it.
5    Q    And that's your signature on it there?
6    A    It is.
7    Q    And you don't recall whether anyone else was
8 around to hear Ms. Davis make this statement?
9    A    It would have appeared that Mickey Phillips
10 would have been.  I don't recall.
11    Q    You don't recall whether any other officers
12 were near you?
13    A    I do not.
14    Q    And you mentioned that -- I think you
15 testified earlier that Mr. Yell was emotional -- was the
16 -- would it be fair to say that emotions were running
17 high at the scene that evening?
18    A    For emotion, who's emotions?
19    Q    Any civilians at the scene, bystanders?
20    A    I mean, I don't want to make any assumptions,
21 but I mean, considering the situation that was going on,
22 emotions would have been high for most people.
23    Q    Did you see anyone who was upset at the scene?
24    A    I don't recall what I observed as far as
25 anyone being upset.

Page 63

1    Q    And according to your report, Ms. Davis was
2 taken away by an ambulance at some point; is that
3 correct?
4    A    According to that report, that is.
5    Q    And you did not go with her in the ambulance.
6 Correct?
7    A    Correct.
8    Q    You remained at the scene?
9    A    That's correct.
10    Q    And as far as you know, you didn't talk to
11 anyone about your interaction with April Davis at the
12 scene?
13    A    I don't recall if I did or not.
14    Q    And you also don't recall when you wrote this
15 statement, correct?
16    A    I do not.  I don't recall exactly when I wrote
17 it, no, ma'am.  It would have been following the
18 incident.
19    Q    And who did you -- who did you provide this
20 statement to?
21    A    I can't advise who I would have provided it
22 to.  Ultimately, it would have gotten to the officer who
23 was investigating it, but I was -- the practice at that
24 time would have been to have also provided that to my
25 field training officer for review.

Page 64

1    Q    But you don't have any independent memory of
2 providing it to anyone?
3    A    I do not.
4    Q    Did you have any -- were you familiar with
5 April -- April Davis at the time?
6    A    I can't advise if I was or not.
7    Q    So that -- you're not sure whether that was
8 your first interaction, whether your -- strike that.  You
9 are not sure whether you providing medical attention was
10 your first interaction with her?
11    A    I can't advise if that was my first
12 interaction with her or not.
13    Q    Did you -- were you present for any interviews
14 with her?
15    A    Not that I recall.
16    Q    So you never had any -- after Ms. Davis went
17 to the hospital, you don't recall having any further
18 interactions with her?
19    A    I do not recall.  But I didn't recall that
20 interaction with her either.
21    Q    Now were you aware that the next day Ms. Davis
22 told Mr. West and Detective Edmonds that Robert loved
23 his children?
24    A    Was I aware of that?
25    Q    Yeah.  Was that something you learned?

Page 65

1    A    No, ma'am, not that I recall.
2    Q    Did you -- were you aware that according that
3 Ms. -- well, strike that.  Were you aware that she said
4 the next day that Mr. Yell would not have hurt his
5 children?
6    A    No, ma'am, I don't recall any -- again, any
7 information on the situation after.
8    Q    So you were not involved in any followup
9 investigation after the scene; is that fair?
10    A    Not that I recall, no, ma'am.
11    Q    You never -- sorry to cut you off there.  You
12 never interviewed any witnesses?
13    A    No, ma'am.
14    Q    Did you communicate with anyone from KSP about
15 the investigation?
16    A    Not that I recall.
17    Q    Did you ever communicate with any of the fire
18 investigators?
19    A    Not that I recall.
20    Q    Did you ever communicate with Sergeant Mills?
21    A    Yeah, I've communicated with him and I'm sure
22 we communicated about this case, but I couldn't -- I
23 mean, this was a fairly tragic case.  I'm sure we
24 communicated about it, you know, amongst ourselves at
25 the PD, but I don't recall what any of those

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 166    Filed 10/03/25    Page 19 of 29 PageID #: 2686
The Deposition of CHAD EGGLESTON, taken on February 25, 2022

66..69

Page 66

1  communications would have been.
2      Q    You don't recall any specific conversations
3  about the investigation with other Russellville Police
4  Department officers?
5      A    No, no specific conversations, no, ma'am.  I
6  mean, I know it was talked about, but I know I don't
7  have -- I couldn't testify to anything that would have
8  been talked about.
9      Q    Now you testified at a suppression hearing in
10  Mr. Yell's criminal case; is that correct?
11      A    I don't remember what type of hearing I
12  testified at, but I did testify at his criminal case.
13      Q    Yeah, I understand there were a lot of --
14      A    I don't recall whether it was a trial or it
15  was a suppression hearing.
16      Q    Then you -- and you testified at his trial,
17  correct?
18      A    I did.
19      Q    And who asked you to testify in those -- in
20  that trial?
21      A    The Commonwealth attorney was Charles Orange
22  (phonetic) at the time.  I assume that's who asked me to
23  testify, but I -- that's who I would have received a
24  subpoena from.
25      Q    But do you have any independent recollection

Page 67

1  of actually having a conversation about testifying?
2      A    I do not.
3      Q    Do you have any recollection about preparing
4  your testimony?
5      A    I do not.
6      Q    Did you talk to other officers about your
7  testimony?
8      A    I don't recall talking to anybody about it.
9      Q    Did you talk to Officer Higgins about your
10  testimony?
11      A    Not that I recall, ma'am.  I'm sure we talked,
12  again, discussed the case, but I don't recall talking to
13  him about my testimony.
14      Q    And I -- I think you testified both at a
15  suppression hearing and a trial.  Do you recall giving
16  any other testimony?
17      A    I do not.
18      Q    All right.
19      A    You're making me feel like I have dementia.
20      Q    You what?
21      A    You're making me feel like I have dementia.
22      Q    Well, I apologize, I'm not trying to.  I know
23  it's been a long time and it can be difficult to
24  remember.  We're just trying to figure out what you
25  remember about it.  So if we can just -- do you mind

Page 68

1  just giving me a quick break here?
2      A    No, ma'am, I don't mind a bit.
3      MS. CAMPBELL:  All right, can we go off the
4  record?
5      VIDEOGRAPHER:  You're off the record.  The time
6  is 2:49.
7      (OFF THE RECORD)
8      VIDEOGRAPHER:  We are back on the record for
9  the deposition of Sergeant Chad Eggleston being
10  conducted by video conference.  My name is Sydney
11  Little.  Today is February 25, 2022.  The time is
12  2:56 p.m.
13  BY MS. CAMPBELL:
14      Q    Sergeant Eggleston, I don't have any further
15  questions for you at this time.  I don't know if -- if
16  anyone else does here.
17      MR. MANDO:  I have no questions this time.
18      MS. STAPLES:  None here.
19      MS. LANGEN:  I have no questions.
20      MR. STILZ:  No questions.
21      MR. MANDO:  Yep, we're done.
22      MR. SOWELL:  Yep, going once, going twice.
23      MR. POZGAY:  I do have a couple of quick
24  questions, if I may.
25      MR. SOWELL:  Okay.

Page 69

1      MR. POZGAY:  Just very briefly.  My name's
2  August Pozgay.  I'm counsel for Alan Gregory.
3          CROSS EXAMINATION
4  BY MR. POZGAY:
5      Q    Mr. Eggleston, you testified today that you
6  were familiar with Alan Gregory through your work with
7  him in law enforcement; is that right?
8      A    That's correct.
9      Q    How did you meet Alan Gregory?
10      A    I can't advise how I met him.  I just met him,
11  you know, me being in law enforcement, he was previously
12  in a law enforcement capacity.  I know his --
13      Q    Would you consider yourself friends with him?
14      A    No, I wouldn't consider myself friends with
15  him.  I know his son.
16      Q    You testified that you have not had any
17  conversations about this case with Mr. Gregory;
18  is that correct?
19      A    To the best I recall, I do not, no.
20      Q    Did you observe any part of the fire
21  investigation take place regarding 638 Bonnie Drive?
22      A    Not that I recall.
23      Q    Did you know anyone involved in the fire
24  investigation?
25      A    Knew?  I mean, Detective Ed -- Detective

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  Edmonds.

2      Q    Did you speak with anyone at the State Fire

3  Marshall's Office about the investigation?

4      A    Not that I recall.

5      Q    Thank you.  No further questions.

6          MR. SOWELL:  Any other -- any other defendants,

7  counsel, defense counsel have questions?  If not,

8  I'll go back to Molly.

9          MR. MANDO:  No.

10          MS. CAMPBELL:  All right.  I don't have any

11  followup.  Sergeant Eggleston, we appreciate your

12  time here this afternoon and I hope you have a great

13  weekend.

14          THE WITNESS:  I'm going to try my best. Thanks,

15  you too.

16          VIDEOGRAPHER:  This concludes today's

17  deposition.  The time is 2:58.  We are off the

18  record.

19          (DEPOSITION CONCLUDED AT 2:58 P.M.)

20

21

22

23

24

25

Page 71

1  CERTIFICATE OF REPORTER

2  COMMONWEALTH OF KENTUCKY AT LARGE

3

4  I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Title page hereof by me after first

7  being duly sworn to testify the truth, the whole truth,

8  and nothing but the truth; and that the said matter was

9  recorded by me and then reduced to typewritten form

10  under my direction, and constitutes a true record of the

11  transcript as taken, all to the best of my skills and

12  ability. I certify that I am not a relative or employee

13  of either counsel, and that I am in no way interested

14  financially, directly or indirectly, in this action.

15

16

17

18  *Chloe Gilbert*

19

20

21

22  CHLOE GILBERT,

23  COURT REPORTER / NOTARY

24  COMMISSION EXPIRES ON: 07/20/2029

25  SUBMITTED ON: 03/11/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_**
**Eggleston**
19:17,22

**Exhibit 2_**
**Eggleston**
41:8,11

**Exhibit 3_**
**Eggleston**
52:8,10

**Exhibit 4_**
**Eggleston**
60:16,17,20

___

**0**

**05** 13:2

**06** 13:2

___

**1**

**1** 19:17,22

**10** 21:8

**101** 9:6

**11** 39:8

**12:30** 38:6

**15** 27:2 28:20

**16** 21:10,11 22:3

**18** 49:25

**1914** 19:18

**1919** 19:18

**1:20-CV-0047-** 9:12

**1:32** 9:7

___

**2**

**2** 41:8,11

**20** 26:24

**2000** 16:11 20:17

**2004** 19:20 20:17,25 21:5, 16 25:2 26:3,8, 16,22 27:12 39:8 50:21 52:17 53:19

**2006** 13:2

**2007** 26:11,16 27:21 50:21

**2011** 28:22 29:8

**2014** 29:21 30:19

**2016** 29:8 50:19

**2022** 9:7 68:11

**22** 17:15

**24** 49:25

**25** 68:11

**25th** 9:6

**2:49** 68:6

**2:56** 68:12

**2:58** 70:17,19

___

**3**

**3** 15:20 52:8,10

**3321** 60:17

**3324** 60:18

**3554** 52:9

___

**4**

**4** 15:20 60:17, 20

**40202** 9:6

___

**6**

**638** 39:9 69:21

___

**7**

**730** 9:5

___

**8**

**812** 52:14

___

**9**

**9152** 41:9

**9157** 49:24

**9161** 41:10

___

**A**

**abilities** 44:24

**ability** 15:10

**academy** 16:16,17,22 17:3 21:6,17 22:16,22

**accommodate** 14:25

**accurate** 19:21 30:8

**accused** 36:17

**acronym** 21:8

**actions** 53:8

**acts** 13:11

**additional** 21:24

**advise** 25:25 36:3,8 51:13 53:12,17 55:20 63:21 64:6,11 69:10

**affect** 15:10,13

**affirm** 11:23

**afternoon** 12:5 70:12

**agency** 28:9, 11 33:13,15 34:10

**agree** 11:7

**ahead** 10:13

**aid** 18:22

**air** 17:19

**airway** 18:23

**Alan** 10:19,23 59:9 69:2,6,9

**allegations** 14:3,5 36:19,21 37:6

**ALS** 29:12

**Amber** 10:24

**ambulance** 18:22 29:13 63:2,5

**Amy** 9:20

**Answering** 26:19 30:12

**answers** 14:14

**anymore** 33:15

**apologize** 67:22

**appearance** 9:14

**appeared** 43:16,17,19,21, 22 62:9

**appearing** 9:17,20 10:8, 14,18,19,21,24 11:1

**applications** 19:19

**applied** 28:10 50:10

**approach** 42:14

**approve** 31:21

**April** 60:11,23 61:1,8 63:11 64:5

**Arnett** 10:24 11:16

**arrest** 21:14 42:8 50:24

**arrests** 26:20

**arrived** 14:7 40:15,25 42:3

**arriving** 53:3

**arson** 59:25

**aspects** 55:5

**assign** 32:18

**assigning** 32:13,16

**assignment** 43:1 57:1,3

**assignments** 57:9,12,17,21

**assist** 40:8 51:23

**assisted** 61:3, 4

**assisting** 61:10

**assume** 14:22 42:7 66:22

**assumptions** 62:20

**attacks** 17:19

**attend** 61:4

**attended** 16:3 21:8 24:25

**attending** 9:14,15 10:11 61:5

**attention** 64:9

**attorney** 37:25 38:14,15,18 66:21

**attorneys** 15:4

**August** 10:18 69:2

**auto-** **populated** 53:24

**aware** 13:15 23:9 26:2,5,7 54:5 64:21,24 65:2,3



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**B**

**back** 15:17
17:25 19:24,25
23:23 24:17
26:1,8 30:20,23
36:3 39:7
41:23,24 43:8
44:6,9 50:19
52:17 55:19
68:8 70:8

**background**
20:21

**bad** 55:15

**Barry** 10:5
27:17,18 28:1,7
58:10

**based** 40:9
53:7 57:3 61:15

**basic** 18:22
21:13,17

**basically**
17:22

**basics** 17:22
22:15

**bates** 60:17

**Beach** 16:21

**begin** 12:2

**beginning**
21:16

**behalf** 10:5,10,
18,22,24

**behavior** 44:1

**behaviors**
43:23

**big** 26:21

**Bill** 10:16

**bit** 68:2

**blank** 25:10

**bleeding** 18:23

**blue** 12:9,10

**boat** 17:20

**Bonnie** 39:9
69:21

**book** 22:19,20,
21 23:5,12

**born** 15:23

**bottom** 49:24

**Bowling** 9:12
10:16

**box** 12:9

**break** 15:1
68:1

**breaks** 14:24

**briefly** 69:1

**bring** 37:14
39:7 41:23,24

**broke** 24:7

**building** 24:13

**Bunnell** 16:2

**Buster** 10:6,11,
15 59:19

**bystanders**
62:19

**C**

**call** 32:17 33:2
39:8

**called** 22:19
23:5 27:7 28:14

**calls** 26:19,20
27:5 30:12

**camera** 11:4

**Campbell** 9:17
11:9 12:4 68:3,
13 70:10

**Cannon** 10:6,
11 59:19

**capacity** 10:6
14:11 31:23
33:5 69:12

**car** 42:21 43:2,
8 44:6,8,10,11,
16,18,20,24
45:1,2,4,9,11,

21 47:5,19,21
48:7 49:7 50:4
51:7,10,13,17

**care** 20:1

**career** 17:11

**Carpenter**
60:11,14,23

**carried** 40:9
50:18

**carrying** 44:19

**case** 9:12 13:6,
8,19,20 23:17
34:16,18 35:25
37:2,6 52:19
55:24 59:14
65:22,23 66:10,
12 67:12 69:17

**cases** 32:4
49:22

**center** 51:8,24
52:4 58:23

**certification**
17:12

**certifications**
17:8,9,10

**Chad** 9:9,24
10:2 11:5,7
68:9

**chain** 57:3

**chance** 60:19

**charge** 57:6

**Charles** 66:21

**chemical** 49:1
50:10,23

**chest** 48:20

**chief** 27:18
28:6 30:25 31:4
34:6

**Childers** 10:25

**childhood**
15:16,24

**children** 64:23
65:5

**Chloe** 9:3

**circumstance**
s 50:22

**city** 9:10 10:11

**civil** 13:21
35:24

**civilians** 62:19

**click** 12:17

**clients** 10:15

**close** 48:4

**Coast** 16:7,8

**codes** 22:11

**college** 16:12,
21

**command**
57:3

**common** 48:10

**Commonwealt**
h 66:21

**communicate**
65:14,17,20

**communicate**
d 65:21,22,24

**communicatio**
ns 66:1

**Community**
16:21

**companies**
29:13

**competently**
15:10

**complaint**
35:24 36:5,7,
10,11,14 37:4

**complete**
18:18 56:1

**completed**
56:7,12,15

**CONCLUDED**
70:19

**concludes**
70:16

**conclusion**
43:24

**conditions**
15:9

**conducted**
68:10

**conference**
9:8 68:10

**confusing**
14:17

**contained**
23:1

**control** 18:23

**convened** 9:8

**conversation**
38:3,5,18 39:3,
4 59:6 67:1

**conversations**
37:24 38:13,15,
21,23 39:2
58:1,4,7,12
59:13,16,19
66:2,5 69:17

**copy** 35:24
36:7

**corner** 12:10

**correct** 13:18
15:24,25 17:24
18:11 19:5
21:17,18,22
23:7 24:15
26:6,9,16,17
27:5,6,23,24
28:10,18,22,23
29:7,8 30:5,21,
22 31:11,12
32:2 35:7 36:6
37:12 39:10,13,
21 40:12,13
42:5,22 43:3
48:14 50:4 51:8
52:20 53:5,6,9,
14 54:25 55:17
57:14,19 58:20
60:11 61:6,21
63:3,6,7,9,15
66:10,17 69:8,
18

**correctly** 22:8
28:6 40:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB     Document 166     Filed 10/03/25     Page 23 of 29 PageID
The Deposition of CHAD EGGLESTON, taken on February 25, 2022
#: 2690
74

counsel 9:16
69:2 70:7

County 10:7,
15 29:21 30:16
34:21 35:21,22
51:8,24 58:23

couple 36:5
68:23

courses 17:20
18:18

court 9:4,11
11:20,22 12:2
13:5 14:14 47:2

Covington
10:3

CPR 18:22

crew 32:17

crimes 31:19,
20 32:5,6

criminal 16:15
66:10,12

CROSS 69:3

current 31:13,
14,15

cursor 12:14

custody 42:8

cut 65:11

_____

D

daily 23:12

date 53:13

dated 53:16

dates 16:25

dating 53:23

David 34:14
59:16

Davis 60:11,23
61:5,12,13,18
62:8 63:1,11
64:5,16,21

day 9:7 22:6,22
32:24 36:13
64:21 65:4

days 28:20
30:1,7 38:19

Daytona 16:2,
21

declined 28:14

defend 9:23

defendant
10:6

defendants
9:24 10:2,15,25
70:6

defense 70:7

dementia
67:19,21

department
16:15 19:20
20:17,20,22,23
21:20 22:17,25
25:3 26:10,22
27:22,23 28:21,
25 29:1,3,6,11,
12,14,16,22
30:7,17,24
31:7,10 32:3
33:11 35:3,10,
15,18,22 54:15
55:5 66:4

depended
24:2

deposed 12:21
13:1

deposition 9:8
13:16,17 14:6
37:8 38:1 68:9
70:17,19

depositions
14:12

deputy 10:7
30:4,8,11

describe 25:9

details 25:22
38:12 40:20,22

detective
31:15,17,20,25
38:2,3,5,9
55:25 56:3,4
58:12 64:22

69:25

detectives
32:8,10,11

detention
51:8,24 52:3
58:23

difficult 67:23

Dill 27:17,18
28:1,7,12,17
58:8,10

direct 12:3
26:24 45:13

directly 55:11,
12

disciplinary
35:1,2

disciplined
34:24 35:14,17,
20

discuss 56:9

discussed
38:8 67:12

dispatch 27:9

dispatched
39:23,24,25

distraught
43:4,6

District 9:11

divorced
15:22

DOCJT 21:5,7

document
52:8,9 54:2
60:19

documented
51:14

documents
12:7 37:14,21

DOJCT 21:1

doors 47:5,23

dot 12:9

dots 12:10

draft 25:4,6

drive 39:9 52:3
69:21

due 44:22

duration 44:18

duties 26:18
30:10 31:16,22
40:7,8,9 44:19

_____

E

earlier 34:25
35:5 39:12
62:15

early 15:16

Ed 33:7 69:25

Edmonds
32:19 38:2,4,6,
9 58:13 64:22
70:1

education
16:12,14

Eggleston 9:9,
24 10:2 11:2,5,
8,19 12:5,20
68:9,14 69:5
70:11

Eggleston's
41:9

Elizabeth
10:21

emergency
61:4

emotion 62:18

emotional
43:7,11,13 44:1
62:15

emotions
62:16,18,22

employment
19:9,10,18 28:5

EMT 16:22
18:1,7,12,20
20:14 29:17

end 19:24

enforcement
14:11 20:9

21:13 22:16
28:5 31:23
59:12 69:7,11,
12

engine 29:13

entail 17:6,13
18:21

entailed 17:14

entire 28:25
36:10,11,14

escalate 50:25

escape 45:4

et al 9:10

evening 62:17

eventually
51:7

EXAMINATIO
N 12:3 69:3

exhibit 19:17,
22 41:8,11
52:8,10 60:16,
20

existed 26:2

experience
44:22

experienced
23:8

explain 22:4
55:3

_____

F

face 34:19
48:17

fact 11:7

fair 14:15,22
15:2,7 17:21
24:14 40:23,24
43:5 47:3
51:16,18 56:14
62:16 65:9

fairly 65:23

familiar 14:12
32:19 33:7,23
34:5,11,14,15,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

17,21 59:3,8,9,
10,11,20 64:4
69:6

**Family** 19:25

**fast** 37:18

**February** 9:7
19:20 20:17,25
21:5,16 26:15
68:11

**feedback**
54:21

**feel** 28:6 67:19,
21

**felonies** 31:19
32:5

**Ferry** 9:18

**field** 22:3,4,6,
12,15 23:16,24
24:4,9 39:12,
15,17,19 40:4
54:17,18,20
55:16 56:12,17,
23,25 57:4,8,
11,18 63:25

**fighting** 17:22

**figure** 67:24

**filed** 35:25 36:5

**fill** 25:10 53:4

**filled** 53:1

**find** 12:13

**fine** 26:14

**finished** 17:25
19:7

**fire** 16:16,22
17:3,19,22
18:3,7 19:4
20:20,22 24:17,
18,20,24 25:1
27:22 28:21
29:2,3,5,11,12,
14,16 30:6
35:15,18 39:9,
23 40:15,23
47:25 48:1
58:25 59:3,24
65:17 69:20,23
70:2

**Firearms**
21:13

**firefighter**
17:7,8,11 19:13
20:11 28:24
29:17,18,20

**firefighters**
18:12,14 47:24

**firefighting**
17:17

**Flagler** 16:7,8

**Florida** 15:17,
19,24 16:1
19:13 20:3,6,
12,14 24:18

**Flowers** 59:3

**focused** 48:3

**follow** 54:4

**followup** 65:8
70:11

**force** 50:25

**form** 47:17

**formal** 22:18

**format** 54:3

**frame** 18:8,9
19:4 45:16
50:21

**Frankfort** 11:1

**fraudulent**
28:15

**Friday** 38:7

**friends** 69:13,
14

**front** 37:16,20
44:13

**fucking** 46:1
61:19

**full-time** 30:6

---

**G**

---

**gave** 56:17

**general** 32:11

53:19,21 54:13

**generally** 37:3,
5 45:15

**Georgetown**
10:11

**Gilbert** 9:3

**give** 11:23
14:2,6,14 26:24
46:25 47:1
50:16 57:8
60:18

**giving** 67:15
68:1

**GMS** 9:13

**good** 12:5
32:17 41:15

**graduate** 16:8,
10

**graduated**
15:18 16:19,23

**grandfather**
20:1

**great** 11:6
70:12

**Green** 9:12
10:17

**Gregory** 10:19,
23 59:9 69:2,6,
9,17

**ground** 42:4

**grow** 15:15

**guess** 25:14
35:13

**guessing** 23:5

**guidance**
40:11

**guy** 32:12

---

**H**

---

**hand** 11:20

**handled** 22:10
28:6

**hang** 33:3

**happen** 49:18

**happened**
28:12 50:15

**harm** 45:3

**Hayes** 34:22

**health** 15:9

**hear** 15:5
45:20,23 62:8

**hearing** 47:10
66:9,11,15
67:15

**Higgins** 33:7,9
42:12,21 48:11,
13,16,19 51:20
52:3 58:5 67:9

**Higgins'** 48:7

**high** 15:18
16:3,6,7,14,19,
24 17:1 62:17,
22

**highlighted**
41:14

**hired** 21:5 34:6

**hit** 12:17

**hold** 11:4

**home** 30:25

**honest** 36:23

**hope** 38:7
70:12

**Hopkinsville**
29:5,12,16
30:1,6 35:18

**hospital** 64:17

**hours** 45:15

**house** 42:17

**hover** 12:8,14

**hurt** 65:4

---

**I**

---

**ID** 11:4

**idea** 14:5 33:18

**IDENTIFICATI
ON** 19:22 41:11
52:10 60:20

**imagine** 34:9

**immediately**
16:23 20:3,5

**inaudible**
47:17

**incident** 25:14
27:16 40:1
52:24 53:11
62:3 63:18

**include** 25:18

**included** 23:12
25:11 26:3

**including**
54:24

**increments**
24:8

**independent**
41:3,24 50:9
57:12 61:1 64:1
66:25

**information**
26:3 54:24 65:7

**initial** 52:23,25
53:4 54:6

**initially** 31:10
44:11

**injuries** 51:4

**inside** 44:8
47:10,11

**instruct** 15:6
54:8

**interacted**
60:11

**interaction**
47:6 60:14,23
63:11 64:8,10,
12,20

**interactions**
58:17 61:1
64:18

**internal** 13:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

interrupt 26:13

interview 28:14 35:7

interviewed 65:12

interviews 64:13

intoxicated 43:15,21,22

intoxication 43:17

investigate 31:18 32:4,5

investigated 55:25

investigating 24:23 63:23

investigation 24:18 65:9,15 66:3 69:21,24 70:3

investigations 24:21 31:24 32:14

investigators 59:1 65:18

involved 13:15 22:5 25:15 37:5 65:8 69:23

issue 13:4 28:1 35:1,6

issues 28:3 35:2

---

**J**

J.A. 10:13,14

J.W. 34:22

jail 51:21

Jailer 34:21

Jeff 9:23

Jenkins 10:16

Jennifer 10:1

Jim 34:5

job 15:21 28:13 31:9 40:13

jobs 20:6

join 20:20 27:22

joined 19:19 20:16,25 21:2, 4,20 26:22 27:21

June 26:16

Justice 16:15

---

**K**

Kansas 9:18

Kenneth 32:19

Kentuckiana 9:4

Kentucky 9:6, 12,21 10:3,8,9, 17,20,22 11:1 15:17 16:16

kick 47:21

kicking 47:14, 22

kids 31:19 32:6

killed 13:21

kind 17:17 22:1 32:4,16 54:23

kinds 27:5

knew 56:7 69:25

knowledge 24:22

KSP 34:12,14 59:17 65:14

---

**L**

laceration 51:1

lack 44:22

Langen 10:1 11:12 68:19

large 32:2

lasted 39:3,4

late 38:7

law 14:11 20:9 21:13 22:15 28:5 31:22 59:12 69:7,11, 12

lawsuit 13:3, 20,21 14:4

learn 17:18 21:11 59:24 60:2

learned 17:21, 22 22:12,14,16 24:23 60:1,3 64:25

learning 22:10, 11 60:5

leave 29:10

led 43:23

left 27:22 58:19

level 17:7,8,12

Lexington 10:9,12,19,22

lieutenant 39:16,17,20,21

life 18:22

lip 51:2

live 20:24

located 9:5

location 9:15 25:12 40:1

locations 25:15

Logan 10:15 29:21 30:16 34:21 35:21 51:8,24 58:23

long 17:3 18:25 23:2 39:2 40:21 45:9,13,18

51:10,13 53:12 67:23

longer 31:4

looked 14:7 36:12

lot 15:4 32:16 37:1,3,5,6 49:21 66:13

Louisville 9:6

loved 64:22

---

**M**

made 61:13

Main 9:5

make 14:13 22:7 27:25 29:15 38:24 40:8 44:25 45:2,3 46:18 48:9 54:23 55:8 62:8,20

making 26:20 67:19,21

Malles 10:10 11:14

Mando 9:23 11:11 68:17,21 70:9

manual 23:9, 11

mark 19:17 41:8 52:8 60:16

MARKED 19:22 41:11 52:10 60:20

Marshal 59:4

Marshall's 70:3

matter 9:9 54:13

Maureen 10:10

meant 46:4

medical 61:4 64:9

medications 15:12

meet 69:9

memory 15:13 41:8,20,23 60:8,22 61:1 64:1

mentioned 21:1 62:14

mess 21:7

met 69:10

Mickey 62:9

Mills 33:23 42:10,24 57:6 58:2 65:20

mind 67:25 68:2

mindset 47:22

Mine 38:6

minutes 39:3,4 45:15

Molly 9:17 70:8

money 29:15

month 39:1

months 17:17 21:17

morning 41:15

move 15:19 27:25 28:8

moved 19:25 28:21

multiple 23:24 27:14 45:24

---

**N**

name's 69:1

names 25:15

narcotics 32:12

narrative 25:11,16,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**necessarily** 25:13 56:6

**needed** 20:1 38:25 39:5 50:25 55:9,12, 21

**neighborhood** 26:23

**normal** 31:22

**north** 16:2

**number** 9:12 46:19,25 47:1 52:14,16

**numerous** 46:19,23

_____

**O**

**objections** 15:5

**observation** 23:13

**observations** 61:8

**observe** 40:16, 17,25 42:16 48:11,13,24 51:1 69:20

**observed** 40:18 42:3 49:18 62:24

**observing** 50:9

**offense** 25:12, 13

**offer** 28:13

**office** 10:3,8, 12,16 38:10 54:6 70:3

**officer** 13:10 20:18 22:7,13, 15 23:19 24:10 39:15,18,19 40:3,4,7 42:10, 11,12,21,24 48:7,11,13,16, 19 51:20 52:3

**54:14,19,20** 55:9,10,11,12, 17,23 56:13,17, 24,25 57:4,8, 11,18 58:4,7 63:22,25 67:9

**officers** 23:6,8, 25 24:14 44:15 45:6 57:22 62:11 66:4 67:6

**offices** 33:6

**online** 9:3

**openings** 20:23

**operations** 18:23 22:6

**Orange** 66:21

**origins** 24:23 25:1

**oversee** 31:23

_____

**P**

**p.m.** 9:7 68:12 70:19

**pack** 17:19

**paid** 17:11

**Palm** 16:7,8

**papers** 30:13

**paperwork** 22:8

**paramedic** 13:22 14:10 16:16 29:14,18, 20

**parent's** 15:21

**parents** 15:22

**parked** 48:7,8

**parking** 48:10

**part** 22:20 24:19 36:16 55:1,2,6 69:20

**part-time** 29:23 30:7

**parties** 11:7

**parts** 36:11

**party** 13:3

**passed** 55:21

**patrol** 55:10

**patrolman** 21:21 26:10,15, 18 27:4,12 31:8

**patrolmen** 27:1

**payroll** 31:22

**PD** 65:25

**Pendergraf** 34:5

**pending** 9:10

**people** 25:15 62:22

**pepper** 49:4,13 50:3,5,12,13, 18,19

**period** 45:7

**periodically** 30:2

**person** 25:12 44:8,9 57:1 61:4

**personally** 32:21 33:25 49:17 50:9 58:22

**perspective** 24:14

**perspectives** 24:10

**pertain** 37:1,4

**pertaining** 13:9,10

**pertinent** 25:22 54:24

**phase** 24:1

**phases** 23:25 24:1,4,6,8

**Phillips** 62:9

**phone** 33:2 38:24

**phonetic** 66:22

**photo** 12:8

**pin** 12:7,17

**place** 28:4 69:21

**plaintiff** 9:18, 22

**plaintiff's** 9:16

**point** 27:17,19 43:5,10 44:17 47:18,24 48:1,5 50:6 51:6 53:18,25 63:2

**police** 10:25 16:16 19:20 20:17,18 21:6, 20,23 22:6,17, 24 25:3 26:10, 21 27:18,22 30:24 31:7,10 33:10 35:3,10 54:15 55:5 66:3

**policies** 22:9, 18,20,24 23:9, 10,14 26:8 40:10

**policy** 22:23 25:23,25 26:2, 5,7 35:9,12,13

**portion** 41:14

**positions** 20:9

**Pozgay** 10:18 11:18 68:23 69:1,2,4

**practice** 47:7 48:10 53:19,21 63:23

**prepare** 37:8

**preparing** 67:3

**present** 64:13

**previously** 69:11

**prior** 37:10

**prisoner** 30:13,15

**procedural** 23:11

**procedure** 23:11

**procedures** 22:9,20,24 23:9 40:10

**PROCEEDING S** 9:1

**programs** 18:10 19:7

**promise** 14:18

**property** 31:20 32:6

**provide** 13:23 21:24 22:1,17 25:3,17 54:11, 20 55:10,11 63:19

**provided** 36:7 53:7 63:21,24

**providing** 40:11 64:2,9

**pull** 19:14

_____

**Q**

**qualifies** 17:10

**question** 14:17,19,21 15:1,7 55:15

**questions** 51:12 59:22 68:15,17,19,20, 24 70:5,7

**quick** 68:1,23

**quit** 47:13

_____

**R**

**radio** 22:11 39:25

**raise** 11:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 166    Filed 10/03/25    Page 27 of 29 PageID
#: 2694
The Deposition of CHAD EGGLESTON, taken on February 25, 2022

78

ran 29:12,13

rank 31:6 39:21

read 36:9,10,
11,14,16 41:13,
16 42:9 49:24

ready 55:8

recall 12:24
17:14 20:8
24:20 40:17,19,
20,22 43:23
44:10,12,14
47:4,16 48:7,
18,25 49:3,4,20
50:7 51:3,4,5
52:6 54:10,12,
13 56:10,24
57:10,15,16,20,
24,25 58:1,4,6,
7,11,12,16
59:2,7,15,18,21
60:1,3,5,7,12,
13,15 61:7,9,
11,13,15,24
62:7,10,11,24
63:13,14,16
64:15,17,19
65:1,6,10,16,
19,25 66:2,14
67:8,11,12,15
69:19,22 70:4

receive 22:21
28:19

received 66:23

receiving
57:21

recognize 52:9

recollection
41:3,25 43:20
45:5,13 49:6,8
50:9 66:25 67:3

record 11:3
68:4,5,7,8
70:18

recovery
17:20

reference
23:17 27:16

referring 46:5,
16 53:22

refresh 41:20
60:22

refreshes 41:7

rejoin 31:6

remained 52:1
63:8

remember
17:4 19:10 24:1
27:15 44:5
66:11 67:24,25

remotely 9:18,
21 10:12,14,22

repeatedly
46:22,23,25

rephrase
14:18 55:13,15

report 25:7,9,
10,18,25 26:4
52:19,22,24,25
53:4,7,10,14,16
54:1,5,6,9,11
55:22 56:1,2,5,
9,12,15,20
60:19 61:3,18,
21,22 62:2
63:1,4

reported 25:12
61:23,24

reporter 9:4
11:20,22 12:2
14:14

Reporters 9:5

reports 23:13
25:4,6,24 30:12
53:20,23,24
54:16,18,21
55:7,11,16

representing
9:4

request 55:25
56:4

requested
28:13

required 54:4

requirement
18:15,18

rescue 17:19

resisting
50:24

respond 27:4
40:2 55:6

responded
13:22 39:8

responding
26:19 27:8

responsible
32:13

rest 31:23

retired 31:5
34:9

review 42:18
45:17 54:19
55:7 63:25

reviewed
37:10,15,19
56:2 60:21

roads 22:11

Robert 9:9,19,
22 23:18 64:22

Robinson-
staples 9:20

role 31:14,15,
20,21 44:25
54:23 55:1,2,4,
7

roles 32:3

Ronald 33:23

rook 22:19,21
23:5,12

rotated 27:13

roughly 13:2
17:4,15 19:2
39:1 51:10

routinely 33:4
50:17

RPD 19:18

Ru 54:14

rules 14:13

run 38:7

running 62:16

Russ 29:2

Russell 22:17

Russellville
9:10,24 10:2
15:16,23 19:20,
24,25 20:16,22
21:3,4,20,23
22:8,10,14 25:3
26:10,21 27:22
29:1,2,3,11
30:21,23 31:6,
10 33:10 35:2,
10,15 54:15
55:5 66:3

_____

S

_____

safety 17:23

Sam 59:3

scene 14:7
39:23 40:6,12,
15,21,23 41:20
44:20 52:1 53:8
56:22 57:2,6,7,
23 58:15,19
59:24 60:6,8,10
62:17,19,23
63:8,12 65:9

school 15:18
16:3,6,7,14,16,
19,22,24 17:2
18:7

Scott 10:6,7

screen 12:7,8,
13,18 19:15
41:10 52:8

search 21:14

seat 44:6,10,13

sector 28:5

seizure 21:14

semester 17:1,
4 19:2

separate 18:6,
10

September
25:2 39:8

sergeant 9:9
11:2,19 12:5
31:15,17,21
34:11 42:10,24
57:2,4,6,7 58:2
65:20 68:9,14
70:11

served 44:24

service 29:13

serving 30:12

she'd 45:24

Shelbyville
9:21

sheriff 10:7

sheriff's 29:22
30:3,8,10,17
35:22

Shifflett 31:3

shifts 27:13,14

shortly 20:5

show 41:6
49:23 52:7
60:16

showing 12:6

shut 47:6,8

sick 20:1
28:14,16 35:6,
13

signature
52:12 56:16
62:5

sir 15:15

sitting 37:20
41:2 42:3
44:13,18 50:8
60:25

situation 44:23
62:21 65:7

skills 17:17
24:13

small 20:23

smell 44:2,4

Smith 11:1
34:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

smoke 40:19

socialize 32:25

socialized 32:23 33:19 34:2

solemnly 11:22

son 69:15

sound 14:15 15:7 59:8

sounds 26:17 28:23 36:6

Sowell 10:13, 14 68:22,25 70:6

speak 39:5 57:22 58:15,25 70:2

speaking 37:3, 5

specific 23:4,6 25:23 26:24 45:5 66:2,5

specifically 27:3

speculate 45:18

spent 15:23,24

spoke 33:16 34:7,16 38:25 39:5

spray 49:1,2 50:10,18,23

sprayed 49:3, 4,7,9,11,13 50:3,6,12,13,19

SRO 32:11

stamped 60:17

stand 12:12 43:1 44:20

standard 18:17,19 47:7 54:3

standardized 53:25

standing 44:15,24 45:6,9 51:6,17

STAPLES 9:20 11:10 68:18

start 41:15

started 12:6 29:21

starting 9:15

state 9:13 10:25 11:3 43:7 70:2

stated 45:24

statement 46:18 61:16,22 62:8 63:15,20

statements 61:14

States 9:11

Stilz 10:5 11:13 68:20

Stone 10:21 11:15

stood 45:11,18

street 9:5 48:8

streets 22:10

strike 24:3 37:13 47:11,25 48:11,13,16,19, 22,24 56:11 61:12 64:8 65:3

stuff 23:13

subject 13:21

submitted 55:16

subpoena 66:24

substances 44:2,4

Suite 9:5

supervise 32:7,10

supervision 40:11

supervisor 23:15 24:2 27:11,16,17 32:1,3 56:2

supervisors 27:15

supervisory 31:22 40:7

supplemental 52:19 53:7 54:1,5 56:1

supplementing 52:22,23

supply 17:19

support 18:22

suppression 66:9,15 67:15

suspect 60:2

suspected 59:25

suspended 28:15,17

suspension 28:19

swear 11:21,22

switched 23:25 50:21

Sydney 9:2 68:10

—————

T

taking 15:12

talk 33:4 63:10 67:6,9

talked 37:25 39:12 66:6,8 67:11

talking 67:8,12

taser 50:21

task 44:21 48:3

tasked 44:20

technician 9:3

term 25:14

terminated 13:11

testif 37:13

testified 13:17 18:14,24 34:25 35:5 41:22 42:9 43:21 45:17 46:21 47:13 49:12,19,20 50:2 51:15 62:15 66:9,12, 16 67:14 69:5, 16

testify 15:10 43:11,19 46:6, 19 48:2,6,9 49:16 52:5 56:15,16,19 62:4 66:7,12, 19,23

testifying 67:1

testimony 11:23 13:24,25 37:10,11,21 41:7,9 42:2,19, 25 45:14 47:2 49:5,15 67:4,7, 10,13,16

thing 46:1

things 22:9

thinking 46:7

thought 61:19

thrashing 43:8

time 9:7 12:25 17:14 18:2,3,8, 9 19:4 20:24 21:10 23:2 24:8 27:20 28:7,16, 25 31:1 33:16 34:7 35:6,13 36:9,12 38:20 39:11,16,18 40:21 42:6 43:20 44:23 45:6,16 47:14

50:3,6,21,24 51:17 53:18,25 56:18 61:25 63:24 64:5 66:22 67:23 68:5,11,15,17 70:12,17

times 12:23 23:20 31:22 45:24 46:18 50:15

today 9:4,6 14:24 15:10 37:9,14 41:2,3 50:8 60:25 68:11 69:5

today's 9:24 10:2 70:16

told 47:13 51:12 57:4 64:22

Toombs 23:18 39:15 40:3 42:10,11,24

Toombs' 40:7

top 12:13

tops 39:4

town 20:24

tragic 65:23

trailer 40:23 42:14 48:4

train 25:20 55:4

trainers 24:11

training 16:15 17:3,5,17,18 18:1,4,10,13,20 19:1,5 20:3,7 21:1,9,12,13, 17,24 22:1,3,4, 7,13,15,18 23:16,24 24:4, 9,17,18,19,21, 22 25:3,17 39:12,15,18,19 40:4 54:17,18, 20 55:16 56:13, 17,23,25 57:4,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

8,11,18 63:25

**trainings**
24:25

**transcribe**
14:15

**transported**
45:12 51:7,11,
20 56:22

**transporting**
51:23

**transports**
30:13,15

**trial** 13:13,15
37:11,21 41:7,9
66:14,16,20
67:15

**truth** 11:24,25

**turned** 54:18
56:3,12

**type** 66:11

**typically** 53:3
54:22 55:24

_____

**U**

_____

**Uh-huh** 50:1

**Ultimately**
63:22

**understand**
17:16 36:20,21,
23 46:2,3 50:22
55:14 60:9
66:13

**understanding**
36:18

**understood**
14:22 23:15
24:12

**uniform** 25:8,9
54:6

**uniformed**
25:7

**unit** 31:24
52:14,16 53:3

**United** 9:11

**upset** 43:9,12
62:23,25

_____

**V**

_____

**vacation** 31:21

**verbally** 14:14
61:24

**versus** 9:10

**Victor** 31:3

**video** 9:3,8
68:10

**violate** 35:9

**violent** 31:18
32:5

**vivid** 41:23
43:20

_____

**W**

_____

**wanted** 20:19,
24 29:14 30:25
55:6 57:5

**water** 17:19

**week** 21:9

**weekend**
70:13

**weeks** 21:10,
11 22:3

**West** 9:5 10:25
34:14 59:17
64:22

**Western** 9:11

**When's** 36:9,
12

**whoever's**
32:17

**William** 34:11

**windows** 47:8,
14,21,22

**witnesses**
58:15 65:12

**wondering**
49:17

**Word** 54:1

**work** 19:13
20:24 23:22
30:1,25 31:25
32:24 33:1,5,
10,12,13,15,20
34:1,3 59:12
69:6

**worked** 20:11,
14 23:23 29:5,
25 30:18,19
34:25 35:2

**working** 28:20
29:21 30:3,7
35:14,17,20,21

**would've**
13:25 17:1
19:3,11 20:4
21:8,15,19
22:22 23:17
27:14,18 40:3,
13

**write** 53:10
54:8 62:1

**writing** 30:12
53:20

**written** 25:23,
25 54:1

**wrote** 61:16
62:4 63:14,16

_____

**Y**

_____

**yards** 48:10

**year** 16:10
29:23

**years** 14:1
15:20 17:15
26:11 36:5
45:19 49:21

**Yell** 9:10,19,22
40:25 41:4,9
42:3,13,16,20
43:4,9 44:2,4,6
45:10,12,20
46:3 47:12,18
48:12,13,16,20,
22,24 49:1,24
50:2,10 51:7,20

52:9 56:21
58:18 60:2,17,
18 62:15 65:4

**Yell's** 51:2
66:10

**yesterday**
36:13

_____

**Z**

_____

**Zoom** 10:4,8,
19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com