LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 1:20-CV-GNS

## ROBERT YELL

## V.

## CITY OF RUSSELLVILLE, ET AL.

## DEPONENT:

## JOHN EDWARD HIGGINS VOL. I

## DATE:

## September 13, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

1                IN THE UNITED STATES DISTRICT COURT

2                 WESTERN DISTRICT OF KENTUCKY

3                      AT BOWLING GREEN

4                   CASE NO. 1:20-CV-GNS

5

6

7

8

9                        ROBERT YELL,

10                         Plaintiff

11

12                            V.

13

14              CITY OF RUSSELLVILLE, ET AL.,

15                         Defendants

16

17

18

19

20

21

22

23   DEPONENT:  JOHN EDWARD HIGGINS VOL. I

24   DATE:      SEPTEMBER 13, 2022

25   REPORTER:  AALAYAH PURNELL



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1              APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
 4    Elliot Slosar, Esquire
 5    Amy Staples, Esquire
 6    Loevy & Loevy
 7    311 North Aberdeen
 8    Third Floor
 9    Chicago, Illinois 60607
10    Telephone No.: (312) 243-5900
11    E-mail: elliot@loevy.com
12          amy@loevy.com
13    (Appeared via videoconference)
14
15  ON BEHALF OF THE DEFENDANTS, CITY OF RUSSELLVILLE,
16  KENNETH EDMONDS, JOHN EDWARD HIGGINS, CHAD EGGLESSTON,
17  JIM PEDERGRAF, AND RONALD MILLS:
18    Jeffrey C. Mando, Esquire
19    Jennifer Langen, Esquire (Appeared via videoconference)
20    Adams Law
21    40 West Pike Street
22    Covington, Kentucky 41012
23    Telephone No.: (859) 394-6200
24    E-mail: jmando@aswdlaw.com
25    jlangen@adamsattorneys.com
```

Page 4

```
 1           APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANTS, SCOTT COUNTY AND BUSTER
 4  CANNON IN HIS INDIVUDUAL CAPACITY AS FORMER DEPUTY
 5  SHERIFF:
 6    Lynn S. Zellen, Esquire
 7    Kinkead & Stilz, PLLC
 8    301 East Main Street
 9    Suite 800
10    Lexington, Kentucky 40507
11    Telephone No.: (859) 296-2300
12    E-mail: lzellen@ksattorneys.com
13    (Appeared via videoconference)
14
15  ON BEHALF OF THE DEFENDANTS, CITY OF GEROGETOWN AND
16  BUSTER CANNON:
17    Maureen Malles, Esquire
18    Sturgill, Turner, Barker & Moloney, PLLC
19    333 West Vine Street
20    Suite 1500
21    Lexington, Kentucky 40507
22    Telephone No.: (859) 255-8581
23    E-mail: mmalles@sturgillturner.com
24    (Appeared via videoconference)
25
```

Page 3

```
 1          APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANTS, DAVID WEST, WILLIAM T.
 4  SMITH AND JAMAN CHILDERS:
 5    Alea A. Arnett, Esquire
 6    Kentucky State Police Legal Office
 7    919 Versailles Road
 8    Frankfort, Kentucky 40601
 9    Telephone No.: (502) 782-1718
10    E-mail: alea.arnett@ky.gov
11    (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANTS, BILL JENKINS AND LOGAN
14  COUNTY:
15    Aaron Smith, Esquire
16    English, Lucas, Priest & Owsley, LLP
17    1101 College Street
18    Bowling Green, Kentucky 42102
19    Telephone No.: (270) 781-6500
20    E-mail: asmith@elpolaw.com
21    (Appeared via videoconference)
22
23
24
25
```

Page 5

```
 1
 2           APPEARANCES (CONTINUED)
 3
 4  ON BEHALF OF THE DEFENDANT, ALAN GREGORY:
 5    Chris Gadansky, Esquire
 6    McBrayer Firm
 7    500 West Jefferson Street
 8    Suite 2400
 9    Louisville, Kentucky 40202
10    Telephone No.: 502-327-5400
11    E-mail: cgadansky@mcbrayerfirm.com
12    (Appeared via videoconference)
13
14  Also Present: Amy Kelley, Videographer
15
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

INDEX

| | | Page |
|---|---|---|
| 3 | PROCEEDINGS | 8 |
| 4 | DIRECT EXAMINATION BY MR. SLOSAR | 10 |

EXHIBITS

| | | Page |
|---|---|---|
| 8 | 7 - Letter Written by John Higgins | 30 |
| 9 | 11 - John Higgins File | 48 |

Page 7

STIPULATION

The VIDEO deposition of JOHN EDWARD HIGGINS was taken at BADGETT BUSINESS CENTER, 2501 CROSSINGS BOULEVARD, BOWLING GREEN, KENTUCKY 42104, on TUESDAY the 13th day of SEPTEMBER, 2022 at 9:12 a.m.; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure.

It is agreed that AALAYAH PURNELL, being a Notary Public and Court Reporter for the State of KENTUCKY, may swear the witness.

Page 8

PROCEEDINGS

VIDEOGRAPHER:  We are on record.  My name is Amy Kelley.  I'm the videographer, and Aalayah Purnell is the court reporter today, representing Kentuckiana Court Reporters.  Today is September 13, 2022.  The time is 9:12 a.m.  We're at the Badgett Business Center, 2501 Crossing Boulevard, Bowling Green, Kentucky 42104, to make the deposition of John Higgins in the matter of Robert Yell versus City of Russellville, et al., pending in the United States District Court of Kentucky at Bowling Green.  Will counsel please state your appearance for the record?

MR. SLOSAR:  Sure.  Good morning.  Elliot Slosar on behalf of the plaintiff, Robert Yell, appearing remotely from Lamont, Illinois.

MS. STAPLES:  Amy Robinson Staples appearing remotely for plaintiff, Robert Yell.

MS. LANGEN:  Didn't hear if Jeff entered his appearance or not yet.  Jennifer Langen --

MR. MANDO:  And Jeff Mando on behalf of the Russellville defendants, present today in Bowling Green, Kentucky with my client and witness, Ed Higgins.

Page 9

MS. LANGEN:  And Jennifer Langen on behalf of Russellville defendants, appearing remotely from Covington, Kentucky.

MR. GADANSKY:  Chris Gadansky, counsel for defendant Gregory, appearing remotely.

MS. ZELLEN:  Lynn Zellen on behalf of defendant Buster Cannon in his capacity as a Scott County deputy sheriff, and on behalf of Scott County, and I am appearing remotely from Lexington.

MS. MALLES:  Maureen -- I'm sorry, Amber.  Maureen Malles, also on behalf of Buster Cannon and the city of Georgetown, appearing remotely from my office in Lexington.

MS. ARNETT:  Amber Arnett, appearing remotely from Frankfort, Kentucky on behalf of the KSP defendants, Childers, West, and Smith.

MR. SMITH:  And Aaron Smith appearing remotely on behalf of Logan County and Bill Jenkins.

VIDEOGRAPHER:  Thank you.  Mr. Higgins, will you please state your full name for the record?

THE WITNESS:  John Edward Higgins.

VIDEOGRAPHER:  Thank you.  And please raise your right hand and be sworn by the court reporter.

COURT REPORTER:  Do you solemnly swear or affirm that the testimony you are about to give will



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1    be the truth, the whole truth, and nothing but the
2    truth?
3          THE WITNESS:  I do.
4          COURT REPORTER:  Thank you.  Counsel, you may
5    begin.
6               DIRECT EXAMINATION
7    BY MR. SLOSAR:
8    Q    Thank you.  Mr. Higgins, can you hear me okay?
9    A    I can.  Yes, sir.
10   Q    Great.  Have you given a deposition before?
11   A    I have.
12   Q    Okay.  When's the last time you testified at a
13   deposition, sir?
14   A    I can't remember the date.  I want to say
15   2019, possibly.
16   Q    What type of case was that in?
17   A    It was regarding an investigation that I had
18   done for the Logan County Sheriff's Department.  I was
19   an investigator at the time, and we had gotten a call
20   out at the Logan Aluminum plant.  It's where a
21   55,000-pound ingot fell on an individual and crushed
22   him, so I investigated the -- the death along with the
23   coroner.
24   Q    Was it a criminal -- was the deposition taken
25   as part of a criminal or civil proceeding?

Page 11

1    A    Civil.  I was just there as a witness.
2    Q    Were you a party in any way in that case or
3    just a witness?
4    A    Just a witness and an investigator,
5    but not -- not a -- not a party.
6    Q    So where are you currently employed, sir?
7    A    I'm at the Elkton Police Department in Elkton,
8    Kentucky.
9    Q    And how do you spell Elkton?
10   A    E-L-K-T-O-N.
11   Q    And how long have you been there?
12   A    I've been there two years.  This will be my
13   third year, going into my third year as SRO in the Todd
14   County Middle School System.
15   Q    So you're a school resource officer?
16   Is that as part of your employment with the Elkton
17   Police Department?
18   A    It is.
19   Q    Okay.  Do you have any other responsibilities
20   outside of being an SRO?
21   A    When school's out of session, I work the
22   street.
23   Q    And what's your rank?
24   A    Just a patrol officer.
25   Q    At the Elkton Police Department, have you

Page 12

1    investigated any homicides?
2    A    No, sir.
3    Q    At the Elkton Police Department, have you
4    investigated any arsons?
5    A    No, sir.
6    Q    Now, I tend to ask imperfect questions,
7    so if at any point today I ask you a question, and you
8    don't understand it, just please let me know, and I'll
9    do my best to ask it a better way; is that okay?
10   A    That's no problem.
11   Q    In that same respect, if I ask you a question
12   and you answer it, I'm going to assume that you
13   understood what was being asked; is that fair?
14   A    Yes, sir.
15   Q    Today's going to be a longer deposition,
16   so please just let me know whenever you want to take a
17   break.  I'd be happy to take one, okay?
18   A    Okay.
19   Q    The only thing that I ask is that if there's a
20   question pending, that you answer the question first
21   before taking a break, fair?
22   A    That's fair.
23   Q    And you'll see, as my voice gets raspy, I'll
24   probably ask for some breaks too to fill up my tea mug
25   over here, so don't be shy from your end.  Your counsel,

Page 13

1    Jeff Mando, is present with you in the room.  He has a
2    right to make objections.  There's no judge here to
3    decide the validity of those objections today, so unless
4    he instructs you not to answer, you're still going to
5    answer the question after he makes an objection, okay?
6    A    Yes, sir.
7    Q    And, Mr. Higgins, you understand you're a
8    defendant in the lawsuit filed by Robert Yell, correct?
9    A    I do.
10   Q    And do you understand that Mr. Yell has
11   accused you of violating his constitutional rights?
12   A    I do.
13   Q    And do you understand that Mr. Yell has
14   accused you of participating in a scheme to wrongfully
15   convict him of a crime he did not commit?
16   A    I do.
17   Q    Now, before we get into the underlying
18   allegations, you would agree that you are biased
19   regarding this particular case, correct?
20   A    Now, that's a difficult one to answer.
21   I can't say that I'm -- I'm biased in any other way than
22   a reasonable bias.
23   Q    You're biased against Mr. Yell in this case,
24   correct?
25   A    I don't feel that way.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 6 of 36 PageID #: 2702
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022

14..17

Page 14

1    Q    Is your testimony that you are not biased
2 against Mr. Yell in this case?
3    A    It's my testimony that -- yeah, that the only
4 bias that I would have would be a reasonable bias based
5 on probable cause.
6    Q    And we're going to get there later on.
7 Now, certainly, you initiated some of the charges
8 against Mr. Yell during the underlying criminal
9 investigation, correct?
10    A    That's correct.
11    Q    And I assume you're going to testify today
12 that you believe that you had probable cause to initiate
13 the different charges that you brought against Mr. Yell,
14 correct?
15    A    That's correct.
16    Q    Because you knew, at the time of the
17 underlying investigation, as a law enforcement officer,
18 it would constitute misconduct for you to initiate
19 charges against somebody without probable cause, right?
20    A    That would be correct.
21    Q    And you would agree, by 2004, it would also
22 constitute misconduct for you to not initiate charges
23 against somebody when you believe that probable cause
24 was present, correct?
25    MR. MANDO:  Objection.  Form.  If you

Page 15

1 understand it, go ahead.
2    A    That -- that's kind of a complicated question.
3 I would say that if I had probable cause to charge
4 somebody, I would have officer discretion based on the
5 type of crime.  Not that I would necessarily charge,
6 but I could.
7    Q    You would not only have officer discretion
8 based on the type of crime, but you would have officer
9 discretion based on the type of suspect, correct?
10    A    No, I -- the type of suspect doesn't matter,
11 just -- just the crime that's been committed.
12    Q    Well, Mr. Higgins, isn't it true that there
13 have been instances in your career where you believed
14 somebody -- that there was probable cause to charge
15 somebody with a crime, and you did not do it because of
16 their political stature in their community?
17    A    I don't recall anything like that.  That would
18 be unethical.
19    Q    That would constitute police misconduct,
20 right?
21    MR. MANDO:  Objection.  Form.  Go ahead.
22    A    Generally speaking, the answer to that,
23 I would say yes.
24    Q    And certainly, if that type of conduct was
25 going on at the Russellville Police Department during

Page 16

1 your time of employment there, that would tend to cast
2 out on the legitimacy of criminal investigations you
3 were conducting, correct?
4    A    Yeah, I would say so, if there were anything
5 like that going on.
6    Q    And if that type of conduct was going on while
7 you were at the Russellville Police Department, that
8 would tend to cast doubt on your integrity as a law
9 enforcement officer, correct?
10    A    It wouldn't affect my integrity.  My integrity
11 is up to me.  I can't account for what anybody else
12 does.
13    Q    All right.
14    A    I mean, I wouldn't want to work for an agency
15 like that, but it -- I can't say that what other people
16 do, I'm accountable for.
17    Q    Well, let's talk about you, though,
18 Mr. Higgins.  If you were committing that type of
19 misconduct at the Russellville Police Department while
20 you were employed there, would you agree that that would
21 cast doubt on your credibility as a law enforcement
22 officer?
23    A    I would agree that it would, but I don't --
24 yeah, I don't act without integrity.  I -- I go to work
25 every day to -- to work with a clean conscience.

Page 17

1    Q    And if you weren't charging people with crimes
2 that you believe probable cause was present in because
3 of their political status in the community, that would
4 just be against everything that you believe in as a law
5 enforcement officer, wouldn't it?
6    A    There again, generally speaking, it wouldn't
7 be good, but then it would depend on the -- on the
8 situation.  Probable cause on a misdemeanor where
9 I'd have discretion or a violation would be different
10 than probable cause on a felony or a more serious
11 crime and --
12    Q    Well --
13    A    -- if we're talking about the -- go ahead.
14    Q    Did you charge Mr. Yell with any misdemeanors?
15    A    I did.
16    Q    You would've had discretion in that situation,
17 correct?
18    A    That's correct.
19    Q    So even if you believe that there was probable
20 cause that he committed any of those misdemeanor crimes,
21 you could have used your discretion, given the
22 circumstances, and not moving forward with it, correct?
23    A    That's correct.
24    Q    And in fact, by the time you left the scene
25 with Mr. Yell, you had not come to the determination

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 7 of 36 PageID #:
2703
The Deposition of JOHN EDWARD HIGGS, VOL. I, taken on September 13, 2022
18...21

Page 18

1  that charges needed to be initiated against him for
2  alcohol intoxication, correct?
3      A    If another officer hadn't have charged him,
4  I would have.
5      Q    Well, you never put that --
6      A    So I would say --
7      Q    -- in your -- sorry.
8      A    I would -- I would say I wasn't the arresting
9  officer, no, but it -- I would have arrested him.
10 That's correct.
11     Q    You initiated those charges at the direction
12 of another officer, correct?
13     A    The first charge.  That's correct.
14     Q    Yes.  The alcohol intoxication.
15     A    That's correct.
16     Q    That was a probable cause analysis that
17 another officer committed.  You just followed through on
18 initiating the charges, correct?
19     A    The other officer initiated the charges.
20 I -- I wrote them down.  He signed the citation.
21 I wrote them down.  It was his arrest.
22     Q    Sir, isn't it true that before you even left
23 the scene of the fire, you believed Robert Yell to
24 see -- to be a suspect in the arson?
25     A    It's true.

Page 19

1      Q    And isn't it true that you were angry about
2  the fire that had been started before you even left the
3  scene?
4      A    My anger was truly about not being able to get
5  to Cameron and being able to save him, and I was angry
6  about the fire that prevented me from doing that, and
7  that was my focus.
8      Q    Well, that anger about not being able to save
9  a young child was soon directed at Mr. Yell during your
10 encounter with him, was it not?
11     A    It was, based on reasonable suspicion.
12     Q    And the -- this is something that has
13 personally frustrated you for the last 18 years of your
14 life, correct?
15     A    What's -- what has frustrated me?
16     Q    The criminal investigation that you were a
17 part of here.
18     A    What's frustrated me is not being able to save
19 Cameron.  That's been the -- it's kind of traumatic.
20     Q    Well, when you found out that Mr. Yell was
21 trying to get a new trial, you did whatever you could to
22 stop it, did you not?
23     A    I wasn't trying to stop a new trial,
24 but I wanted all the facts to be laid out there, to be
25 considered.

Page 20

1      Q    Sir, how -- how many times in your career have
2  you written a letter to a sitting judge about a criminal
3  investigation or prosecution that you were involved in?
4      A    None.
5      Q    Who did you speak to before you wrote this
6  letter to Judge Gill?
7      A    Before I wrote the letter to Judge Gill,
8  I did speak to our Commonwealth's Attorney.
9      Q    And who was that?
10     A    Gail Guiling at the time.
11     Q    And what did you speak to Gail Guiling about?
12     A    Gail was apprising me that she felt the judge
13 was coaching the -- Yell's defense in this matter.
14     Q    And what was the purpose of you speaking to
15 the prosecutor?
16     A    Because she was going to be sitting on -- she
17 was -- during that time and during the hearing, she was
18 the prosecuting attorney in reference to the case with
19 Yell.
20     Q    Had -- had you been called to testify?
21     A    No, I didn't -- I wasn't called to testify,
22 but she did let me know about this.  If I -- if
23 I hadn't -- she hadn't told me, I wouldn't have known.
24 And we --
25     Q    I'm sorry.  Keep going.

Page 21

1          MR. MANDO:  Just answer the question.
2  Go ahead.
3      A    We spoke about -- what was the question again?
4  I'm sorry.
5      Q    Yeah, I know.  That's my fault.  And, you
6  know, I apologize for doing this remotely.  I just --
7  I'm sick right now, and I -- whatever I have, I didn't
8  want you-all to potentially get.
9      A    That's fine.
10     Q    So -- so I'm sorry if I cut you off.  I'm not
11 trying to.  What prompted you to reach out to the
12 prosecutor, or what prompt -- or what prompted the
13 prosecutor to reach out to you, if you know?
14     A    I considered Gail Guiling to be a friend of
15 mine, and we spoke often, and I -- sometimes we spoke
16 about cases, my cases, but I can't tell you -- I don't
17 recall exactly how we began to talk about this case,
18 but she let me know about it.  And I was showing up to
19 testify about what I saw in the -- in the trial during
20 the time -- I guess it was 2016, during the hearing to
21 vacate charges.
22     Q    I -- is it your testimony that you testified
23 at the post-conviction hearing in 2016?
24     A    I did not.
25     Q    Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    A    I wasn't allowed to.
2    Q    Who tried to call you to testify?
3    A    Gail Guiling had -- no, I don't recall who
4  called me to testify, but I was there at the request of
5  Gail Guiling, the prosecuting attorney.
6    Q    And at some point, you were in, like, the
7  witness preparation room with Alan Gregory; is that
8  right?
9    A    That's correct.
10    Q    And in that room, you would've had an
11  opportunity to speak to Mr. Gregory about the underlying
12  investigation; is that fair?
13    A    That's fair.
14    Q    How long did you and Mr. Gregory speak for?
15    A    I don't know.  We were -- we were in the room
16  for the entirety of that hearing, where they were
17  calling witnesses.  There had been a separation of
18  witnesses, and we were in the -- I guess the attorneys'
19  room, as you say, and we spoke off and on, and I
20  couldn't tell you how long it was.  You're asking how
21  long I was sitting in there?  I don't know.  It -- it
22  was a while.
23    Q    Was it more than one day?
24    A    I just remember the one day.
25    Q    Who else was in that room with you and

Page 23

1  Mr. Gregory?
2    A    There was a bailiff that was in there, but I
3  can't recall which one it was.  I know he was there.
4    Q    Was the bailiff a witness to testify, or was
5  it just somebody who was hanging out with you and
6  Mr. Gregory?
7    A    I took it he was just hanging out with us.
8    Q    Okay.  Did you talk to Mr. Gregory about the
9  opinions that he testified to back at the time of the
10  original trial?
11    A    No, I did not.
12    Q    Did he -- did he share any of the defense
13  expert opinions with you when you were in this room?
14    A    He did.
15    Q    What did he share with you?
16    A    He told me that there was a question about
17  flashover, and he advised me that he didn't think that
18  there was a flashover, that the -- the fire only reached
19  900 and something degrees, is what he told me.  I can't
20  hear you now.
21    Q    Are -- sorry about that.  Are you aware that
22  Mr. Gregory has testified in this lawsuit that there was
23  a flashover?
24    A    No.  I'm not aware of that.
25    Q    Does that surprise you, given your

Page 24

1  conversation with him previously?
2    A    It does.
3    Q    Now, prior to -- prior to being in this
4  witness room with Mr. Gregory, you had no training
5  relating to arson investigations, did you?
6    A    No, sir.
7    Q    Prior to this meeting with Mr. Gregory, did
8  you have any understanding as to what full room
9  involvement meant?
10    A    From a layman's perspective, I did.
11    Q    Prior to speaking with Mr. Gregory, what was
12  your understanding of what full room involvement meant?
13    A    Okay.  Mr. Gregory and I didn't discuss full
14  room involvement, but -- the second part of your
15  question was what again?  What was my understanding?
16    Q    You said you -- you had a layman's
17  understanding of --
18    A    I did.
19    Q    -- full room involvement.  What -- what was
20  your understanding?
21    A    My understanding of full room involvement is
22  that the -- the fire has engulfed one room totally, and
23  I take that to be -- my understanding is from floor to
24  ceiling.
25    Q    And do you have any understanding as to how

Page 25

1  full room involvement and flashover work with one
2  another?
3    A    No.  I don't have understanding of -- of how
4  that works.
5    Q    So sitting here today, you can't -- you don't
6  know one way or the other as to whether there could be
7  flashover without full room involvement, correct?
8    A    That's correct.  I would -- not technical,
9  from a layman's perspective.
10    Q    What was -- what was your layman's
11  understanding of what flashover was before meeting with
12  Mr. Gregory?
13        MR. MANDO:  Objection.  Form.  Go ahead.
14    A    Like I -- I never discussed flashover or full
15  room involvement with Mr. Gregory.  I mean, the
16  discussion about the flashover was limited to -- the
17  only thing that he told me was that he thought
18  that -- that flashover had not occurred, that the
19  temperature wasn't high enough.  That was the only thing
20  that was discussed.
21    Q    Well, he -- he gave you quite a bit of the
22  defense expert reports in this meeting, correct?
23    A    He had a book that was provided to him,
24  or -- I won't say a book.  It was a binder, and from my
25  understanding, it was not just given to him.  I believe

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 9 of 36 PageID #: 2705
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022
26..29

Page 26

1  the Commonwealth's Attorney had that binder as well.
2      Q    Sure.
3      A    And from what I remember of that, it was -- if
4  we're talking about the book.  And I did read that book.
5  Some of it.
6      Q    You read the book?
7      A    Some of it.
8      Q    Did the Commonwealth's Attorney give you the
9  book, or was it Mr. Gregory?
10     A    It was Mr. Gregory's book or binder or
11 whatever it was, but it wasn't -- it didn't belong --
12 well, I won't say it didn't belong to him.
13 It was -- he advised that he had gotten that from the
14 defense attorneys, Project Innocence, or -- it's been a
15 while since I've --
16     Q    Sure.  Sure.  And nobody wants you to guess,
17 so if you don't remember something, you know, I'm sure
18 Jeff has -- has told you that's not a wrong answer.
19 So in terms of your conversation with Mr. Gregory,
20 what else do you recall him telling you?
21     A    That was it.  The only thing I remember was
22 the -- he made a comment about the flashover, and we
23 were -- we had a personal conversation, and I can't
24 remember -- don't recall.
25     Q    What was a personal conversation about?

Page 27

1      A    I -- I don't recall.  I just know -- I don't
2  recall what that conversation was about.
3      Q    Fair to say that at the time that you were
4  meeting with Mr. Gregory, he was defensive about the
5  original opinions he gave?
6          MR. MANDO:  Object to the form.
7      A    I would agree with that.
8      Q    And fair to say that at the time of your
9  meeting with Mr. Gregory, that he expressed to you his
10 desire that Mr. Yell's conviction stay intact?
11         MR. MANDO:  Object to the form.
12     A    He didn't say that.
13     Q    Well, certainly, you would have spoken with
14 Mr. Gregory about Mr. Yell's attempt to get a new trial,
15 would you not?
16     A    I don't recall that conversation ever
17 happening.
18     Q    You certainly wanted Robert Yell's conviction
19 to stay intact by the time of that 2017 meeting,
20 correct?
21     A    I can't say that.  I can say that I felt
22 strongly about the probable cause to believe that an
23 arson had occurred from a layman's perspective and from
24 the outcome of the trial and from the -- the
25 admittal -- statements of admittals that Yell gave to

Page 28

1  me.
2      Q    Did you watch the criminal trial?
3      A    I didn't.  I didn't watch.
4      Q    So then how do you know -- how do you know
5  what evidence came out at the trial outside of your own
6  testimony?
7      A    I don't.  I don't know.  I have trust in the
8  system, and in Judge Gill as a judge, and I trusted that
9  the outcome of the trial was a reasonable one.
10     Q    Would you agree that the judicial system is
11 supposed to be fair?
12     A    I would agree.
13     Q    Would you agree that criminal investigations
14 are supposed to be fair?
15     A    That's correct.  I agree.
16     Q    Would you agree that outside influence --
17 outside or -- let me strike that.  Would you agree that
18 it would be inappropriate for somebody to attempt to
19 influence a criminal investigation in any way?
20     A    I would agree that someone shouldn't attempt
21 to influence a -- a criminal investigation, if that
22 person has an agenda, or if it's not -- their agenda is
23 not true.
24     Q    And you would acknowledge, Mr. Higgins, that
25 you certainly had an agenda at the time you wrote this

Page 29

1  letter to Judge Gill in 2016, correct?
2      A    I did have an agenda.
3      Q    You wanted Robert Yell to remain convicted of
4  the crime that -- that you participated in
5  investigating; did you not?
6      A    No, sir.  I -- what I wanted was to not be
7  disenfranchised as a witness.  I had been in the -- in
8  the fire.  I felt like that my testimony would've been
9  important, and I felt like my agenda was for a fair
10 trial, the trial that was -- I thought was going to
11 happen after charges were vacated.
12     Q    You understand that the prosecutor was a
13 friend of yours at the time you wrote this letter,
14 right?
15     A    That's correct.
16     Q    And you would've asked the prosecutor to put
17 you on the stand at a retrial, right?
18     A    I would suspect that I would be asked to -- my
19 -- they would ask me to sit on the -- on the trial as a
20 witness, in all due fairness.
21     Q    Well, did you -- did you have that
22 conversation with your friend Gail?
23     A    I don't recall having that conversation.
24     Q    Why would you not ask Gail Guiling, who you
25 considered to be a friend of yours, to put you on the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022

30..33

Page 30

1  stand at a retrial so that you could testify to your
2  observations?
3      A    I didn't feel like I'd have to ask.  If I was
4  a witness of fact, I wouldn't think that I would have to
5  ask to be put on the -- on the stand.
6      Q    So you're saying you never had a conversation
7  with Gail about testifying to your observations?
8      A    I don't recall.
9      Q    Who helped you write this letter?
10     A    No one.
11         MR. SLOSAR:  Aalayah, will you please give
12  Mr. Higgins Plaintiff's Exhibit 7, please?
13         (EXHIBIT 7 MARKED FOR IDENTIFICATION)
14         COURT REPORTER:  Yes.
15  BY MR. SLOSAR:
16     Q    Sir, do you see the four-page letter before
17  you as Exhibit 7?
18     A    I do.
19     Q    Did you write this letter?
20     A    I did.
21     Q    Did you -- how did you get this letter to the
22  judge?  Can you tell us?
23     A    I put it in an envelope, I took it to the
24  clerk's office, and put it in his basket.
25     Q    At the time that you wrote this letter, where

Page 31

1  were you employed?
2      A    I was employed as -- at the Logan County
3  Sheriff's Department.
4      Q    Did you participate in the underlying
5  investigation in any capacity related to the Logan
6  County Sheriff's Department?
7      A    Did I participate in the investigation of
8  this?
9      Q    Yes.
10     A    I'm sorry.  I don't understand the question.
11     Q    Sorry.  At the time that you worked on the
12  underlying investigation, you were at the Russellville
13  Police Department, correct?
14     A    Oh, the -- the original investigation from
15  2004?  I was at the --
16     Q    Yeah.
17     A    I was at the Russellville Police Department.
18     Q    Did you communicate with any of your
19  supervisors or colleagues at the Loganville -- or at the
20  Logan County Sheriff's Department about communicating
21  with a judge regarding a pending criminal prosecution
22  before you sent this letter off?
23     A    I don't recall.  I -- I --
24     Q    Did you tell anybody?
25     A    I don't recall that.

Page 32

1      Q    Did you get --
2      A    This was 2016?
3      Q    Yes, sir.
4      A    I'm getting a little confused on the time.
5  At first, you said Russellville Police Department
6  underlying investigation, 2004, and then now we're
7  talking -- are we -- we're talking about the letter?
8      Q    Yeah.  Sorry, just the letter.  Sorry about
9  that.
10     A    Okay.  Okay.  Which was 2016.
11     Q    But you didn't -- 2016.  Did you seek
12  permission from anybody to write a letter to a sitting
13  Judge about a pending criminal prosecution?
14         MR. MANDO:  Objection.  Form.  Lack of
15  foundation.  Go ahead.
16     A    I didn't ask for permission.  Didn't think I'd
17  need it.
18     Q    And, now, you would've told the prosecutor,
19  Gail Guiling, that you were writing this letter,
20  correct?
21     A    I didn't tell her.
22     Q    You're telling us under oath that Ms. Guiling,
23  who was a friend of yours, who you had conversations
24  with, that you would've never told her that you were
25  writing a letter to the judge about this case?

Page 33

1      A    I didn't -- I don't recall telling her.
2      Q    Well, those are two different things.
3  So I just want to make sure the record's clear.
4  Are you telling us here today that you did not tell Gail
5  Guiling, or are you telling us that you do not remember
6  telling Gail Guiling about this letter?
7      A    I tell you I don't think that I did.  I don't
8  recall that I did.
9      Q    What about after you sent the letter to the
10  judge?  Did you tell her -- did you and Ms. Guiling have
11  a conversation at any point after about you sending it
12  to the judge?
13     A    I don't recall a conversation about this
14  letter with her.
15     Q    Did you have a conversation with anybody
16  outside of your counsel about sending this letter prior
17  to today?
18     A    I don't recall that either, other than
19  possibly my wife, who's my ex-wife now
20     Q    Did the judge -- did the judge ever respond to
21  you in any way?
22     A    He did not.
23     Q    Now, you would agree that you were attempting
24  to influence Judge Gill when you wrote this letter?
25     A    I would agree I was attempting to influence

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022

34..37

Page 34

1  him to see that I was a viable witness, and that I
2  wanted --
3      Q   Well, you were attempting to influence Judge
4  Gill not just about you being a -- a witness, but also
5  about allowing in expert theories on behalf of the
6  Commonwealth at a retrial, correct?
7      A   That's correct.
8      Q   You were trying to persuade a sitting Judge to
9  allow in experts that would back Mr. Gregory's original
10 opinion, correct?
11     A   I don't know what Mr. Gregory's original
12 opinion was, but I was --
13     Q   Well -- I'm sorry.  You keep going.
14     A   I -- I don't -- I don't know what
15 Mr. Gregory's original opinion was.  The main purpose of
16 this letter was to -- I felt disenfranchised as a
17 witness.  I wasn't allowed to testify at the -- at the
18 hearing.  Regardless of the outcome, I felt like I
19 should have been allowed to testify to -- as a witness
20 of fact about a fire that no one saw.  Well, I won't say
21 no one saw, but that I had seen.
22     Q   Mr. Higgins, you wrote a report during the
23 underlying investigation, did you not?
24     A   I did.
25     Q   And did anybody assist you in writing that

Page 35

1  report?
2      A   No, sir.
3      Q   That's a report that you wrote on your own,
4  right, sir?
5      A   I wrote on my own.  That's correct.
6      Q   This was the first time in your career that
7  you had then involved in the investigation into a
8  potential arson-related homicide, correct?
9          MR. MANDO:  Objection.  Form.
10     A   I can't -- I don't recall that.  I can't -- I
11 can't remember if I had been involved in -- as a first
12 responding officer to another fire or not.  They -- they
13 would call us to fires, but I -- I can't recall that.
14 It's a possibility.
15     Q   Okay.  By the time Mr. Yell was in the car,
16 you knew that one of the children had not been taken out
17 of that trailer, and was dead, correct?
18     A   Yeah.
19     Q   And prior to going into that trailer on
20 September 11, 2004, you had never been involved in a
21 criminal investigation as serious as this one; would you
22 agree with that?
23     A   I just don't recall.
24     Q   This is -- this particular traumatic incident
25 is something that has stayed with you since 2004,

Page 36

1  correct?
2      A   Yes, sir.
3      Q   And certainly, the loss of a child under any
4  circumstance is something that would be hard to fathom,
5  fair?
6      A   Yes, sir.
7      Q   In your letter, I see that you're a practicing
8  Catholic, and so there's also something about this
9  incident that has probably caused you to question why
10 this happened; is that fair?
11     A   Sure.  I mean, that -- I'd say that's fair.
12     Q   As a person of faith, and especially a --
13 a -- are you still a practicing Catholic, sir?
14         MR. MANDO:  You need a minute?
15     A   I apologize.  A lot of this is kind of hitting
16 me all at once.  We're talking about the child.
17 I haven't been to the Catholic church since my dad died.
18         MR. SLOSAR:  I'm sorry about that, Mr. Higgins.
19     I did not know.  Why don't we -- why don't we go off
20     the record, take a short break.  I -- I'm sorry
21     about that.
22         VIDEOGRAPHER:  Okay.  We're off the record at
23     9:53 a.m.
24             (OFF THE RECORD)
25         VIDEOGRAPHER:  We're back on the record at

Page 37

1      10:01 a.m.
2  BY MR. SLOSAR:
3      Q   Now, sir, is it fair to say that in your
4  conversation with Mr. Gregory in this room, as you were
5  waiting to potentially testify at a post-conviction
6  proceeding, that you had an opportunity to learn more
7  information about arson science?
8      A   I did.
9      Q   And prior to this -- this particular day where
10 you're in the side room, is it fair to say that you did
11 not have a very good understanding of arson science?
12     A   That's correct.
13     Q   Did you take notes while you were reading
14 through the defense expert materials?
15     A   I did not.
16     Q   Did Mr. Gregory give you a copy of those
17 materials?
18     A   He did not.
19     Q   Did the Commonwealth give you a copy of those
20 material?
21     A   She did not.
22     Q   Did you obtain a copy of those materials
23 before you wrote the letter?
24     A   I did not.
25     Q   If you did not take notes nor have a copy of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

1  the materials, how would you have been able to discuss
2  what's listed on page 3 of your letter, in particular,
3  paragraph 5?
4      A   I had read -- I forgot what his name was.
5  It was from CourtNet on the case, in reference to this
6  case.  I think it was a Richard Bieber, or Bieber.
7      Q   Okay.
8      A   And that was the -- the defense's attorney,
9  I believe.
10     Q   Or a -- you mean one of the experts?
11     A   I guess.  But anyway, in that first page of
12  his opinion, he was talking about there being a
13  disconnect between DNA science and evidence and fire
14  investigations, or forensic investigations like that,
15  and --
16     Q   And -- but when you're talking in here about
17  the margin of error and statistical probabilities and
18  scientific methodologies, how could you possibly have
19  recalled any of this information without taking notes
20  contemporaneously or obtaining a copy of the report?
21     A   So when I'm talking about margin of error,
22  hypothesis testing, I used that within my dissertation.
23     Q   What was your dissertation on?
24     A   It was on -- my dissertation was about local
25  law enforcement agencies in Kentucky and how they go

Page 39

1  about hiring and promoting police officers.
2      Q   And what was your thesis?
3      A   My hypothesis was that they preferred officers
4  with education.  It's been a while since I've even
5  considered my dissertation.
6      Q   Well, you're certainly a well-educated person;
7  is that fair?
8      A   I think that it's fair to say that I've been
9  at it for a while, yes, but I'm not going to say that
10  I'm --
11     Q   Did you --
12     A   -- I'm not going to say I'm as educated as
13  you.  I'm just saying that I've worked at it --
14     Q   Well, nobody enjoys law school, I'll tell you
15  that, but I think it's similar to other graduate schools
16  in that respect, but, you know, what's the -- you've got
17  a PhD?
18     A   I have an EdD.
19     Q   And what is that?
20     A   Educational doctorate.
21     Q   Okay.  What is the highest rank you ever
22  received in a law enforcement agency?
23     A   Detective -- or chief.  Chief of Auburn.
24  I forgot about that.
25     Q   Chief of what city?

Page 40

1      A   Auburn.  It was a small department.
2      Q   Okay.
3      A   And I was sergeant there before chief.
4  I forgot about that.
5      Q   So some of these words or phrases that you use
6  in your letter are things that you would've learned
7  during the course of your formal education; is that
8  fair?
9      A   Yes, sir.
10     Q   Is it fair to say that when you were reviewing
11  the defense expert reports in this room with
12  Mr. Gregory, that you would've understood that there was
13  a dispute between the defense experts and Mr. Gregory
14  about whether flashover occurred?
15         MR. GADANSKY:  Object to the form.
16         MR. MANDO:  Same objection.  Just answer what
17     you know.
18     A   Do you mind going over the question again?
19  That -- you were asking me if -- if -- if you could just
20  ask the question one more time, and I'll sure give you
21  an answer.
22     Q   Sure.  So earlier you testified that
23  Mr. Gregory told you in the room that he didn't believe
24  the flashover had occurred; is that right?
25     A   That's correct.

Page 41

1      Q   Okay.  And you also had an opportunity in that
2  room to review the defense expert reports, correct?
3      A   I did.  Not all of it.
4      Q   And you would've -- okay.  But you would've
5  understood from your conversation with Mr. Gregory and
6  your review of the defense expert reports that there was
7  a dispute between Mr. Gregory and the defense experts
8  about whether flashover occurred, correct?
9      A   That's correct.
10     Q   And you would've known from your conversation
11  with Mr. Gregory and from reviewing the defense expert
12  reports that if flashover occurred, it would be
13  difficult to ascertain whether there were multiple
14  points of origin for the fire, correct?
15         MR. MANDO:  Objection.  Form.
16         MR. GADANSKY:  Same.
17         MR. SMITH:  Join objection.
18     A   I don't recall that, having that
19  understanding.
20  BY MR. SLOSAR:
21     Q   Well, you certainly would've been aware by
22  reading the defense expert reports and your conversation
23  with Mr. Gregory that there was a dispute as to whether
24  there was one point of origin or multiple points of
25  origin for the fire, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 13 of 36 PageID #: 2709
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022

42..45

Page 42

1    A    That's correct.
2    Q    And so any of the information that you put in
3  this letter would've occurred after your conversation
4  with Mr. Gregory and your review of the defense expert
5  reports, correct?
6    A    That's correct.
7    Q    And one of your goals and writing this letter
8  was to encourage the judge to allow for the State, the
9  Commonwealth, to present their original theory that
10 there were multiple origins of the fire, correct?
11   A    That's correct.
12   Q    And you would agree that some of the
13 information in here about your alleged observations in
14 the fire were not contained in your original report?
15   A    I would agree with that, yes.
16   Q    Okay.  And you would agree that some of the
17 observations in here, you also did not testify to in
18 Mr. Yell's original report?
19   A    That's correct.
20   Q    Now, Mr. Gregory, he's somebody who you
21 consider to be a friend; is that fair?
22   A    That -- that's fair.
23   Q    How -- between the time of the original --
24 around the time of the original investigation, before
25 Mr. Yell's trial, how much contact did you have with

Page 43

1  Mr. Gregory about the underlying case?
2    A    None.  I didn't know Mr. Gregory at that time.
3    Q    Did you talk to him at the scene at all?
4    A    I did not.
5    Q    Did you talk to Mr. Gregory after you got to
6  the sally port at all?
7    A    No, sir.  Talking about the sally port when I
8  was there with Yell?
9    Q    Yes, sir.
10   A    Yeah, no, I didn't have any conversations with
11 anyone other than Yell and who was in the sally port,
12 and whatever was coming over the radio.
13   Q    So it's your testimony that you did not
14 communicate with Mr. Gregory at all prior to Mr. Yell's
15 original trial?
16   A    It's my testimony that I don't recall having a
17 conversation or even knowing Mr. Gregory until this
18 case.
19   Q    Was Mr. Gregory at -- do you know whether
20 Mr. Gregory was at the jail by the time you brought
21 Mr. Yell back?
22   A    I never saw Mr. Gregory at the jail.
23   Q    Ron Mills, would you consider him to be a good
24 friend of yours?
25   A    He is.

Page 44

1    Q    And he's somebody that you'd communicate to
2  about this case over the past 18 years; is that fair?
3    A    I would say that it's fair to say that we've
4  had communication, but not about this case.  Maybe a
5  couple times.
6    Q    Well, don't you and Mr. Mills do something on
7  the anniversary of the fire?
8    A    We used to.  I remember -- so I worked
9  with -- with Mills at Russellville and at Auburn,
10 and I remember one year, he actually called me,
11 and we were talking about this case.  It was on
12 September the 11th.  But our conversations were about
13 Cameron.
14   Q    And what were you and Mr. Mills do on the
15 anniversary of the fire?
16   A    Just recognize that, you know, little Cameron
17 lost his life during that time -- or on that date.
18   Q    Would you pray together?
19   A    That's something we didn't do together.
20   Q    Certainly, you've prayed for Cameron over the
21 past 18 years, fair?
22   A    I have.
23   Q    And would you agree that if somebody
24 intentionally set that fire, that that would be an evil
25 thing to do?

Page 45

1    A    I would agree.
2    Q    And, in fact, it would be consistent with
3  Catholic scripture, especially, to characterize such an
4  act as evil, fair?
5    A    That's correct.
6    Q    Now, would you believe that if somebody
7  negligently set that fire by hooking up a stove wrong,
8  by wiring something wrong, that that would also be an
9  act of evil?
10   A    I wouldn't agree.  That would be accidental,
11 I'm sure.  Unless it was intentional.
12   Q    And certainly, you would've had a strong faith
13 back on September 11, 2004, when you encountered
14 Mr. Yell; is that correct?
15   A    I'd like to think that I have a strong faith
16 now and then.
17   Q    Of course.  Of course.  September 11, 2004,
18 that wasn't the first time you encountered Robert Yell,
19 correct?
20   A    No, that was the first time.
21   Q    Sir, haven't you testified previously that
22 that -- that you were aware by September 11, 2004 that
23 Mr. Yell had three prior arrests within a year involving
24 alcohol intoxication?
25   A    I -- I do recall that from reading my

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 14 of 36 PageID #: 2710
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022
46..49

Page 46

1 testimony, in my --
2    Q    And you were involved in -- you were involved
3 some of those arrests, weren't you?
4    A    I was involved in one arrest, but I didn't
5 physically arrest him.
6    Q    You were present though, right?
7    A    No.
8    Q    And how were you involved without being
9 present?
10    A    I had to obtain a warrant for him in reference
11 to a case, and somebody else picked him up on another
12 warrant, and I -- they let me know about it, and I
13 served the warrant.  And it lists arrest on there,
14 but I -- I handed the paperwork off.  I didn't have any
15 contact with him.
16    Q    How'd you serve the warrant without seeing
17 Robert Yell?
18    A    I just -- I got the warrant, I put out the
19 citation, and -- gave it to either the jail or
20 someone else.  I don't recall who I gave it to, but...
21    Q    You would've known that Robert Yell had
22 alcohol intoxication issues before September 11, 2004,
23 fair?
24    A    That's fair.
25    Q    And April Carpenter, she wasn't unknown to you

Page 47

1 either by that time, fair?
2    A    I didn't know April Carpenter.
3    Q    You'd never run into April Carpenter at all
4 before September 11, 2004?
5    A    No, sir.  Not that I recall.
6    Q    You certainly --
7    A    If I made a traffic stop -- I made a lot of
8 those.  So I don't -- I don't recall ever...
9    Q    Russellville, back in 2004, about how big was
10 it?
11    A    8,000 population.  I'd say six -- three square
12 miles.  Not very big.
13    Q    It's a pretty small town, right?
14    A    It is.
15    Q    Get to know everybody there as a law
16 enforcement officer, fair?
17    A    It's small, but it's not like Mayberry.
18 I don't -- I didn't know everybody there then,
19 and I don't now.
20    Q    When's the last time you spoke to Gail Guiling
21 about this case?
22    A    I don't recall.  It's not in the recent --
23 anytime recent.  Last -- in 2016, I guess.
24    Q    When do you first recall speaking to
25 Mr. Gregory about this case?

Page 48

1    A    I don't recall that either, other than
2 the -- 2016, when we were in the -- in that attorneys'
3 room in the courthouse.
4    Q    Well, there are other cases that you worked on
5 with Mr. Gregory of yours, fair?
6    A    I can't say that either.  I don't recall
7 working -- it's a possibility.  Yeah.
8    Q    Sir, I'm going to ask for you to look at
9 Exhibit number 11.  Now, Mr. Higgins, there are some
10 numbers at the bottom that say RPD with a -- with a
11 number after it.  I'm going to refer to those numbers as
12 we're talking.  Do you see those?
13        (EXHIBIT 11 MARKED FOR IDENTIFICATION)
14    A    I do.
15    Q    Okay.  Before -- before we get into this,
16 can you tell me a little bit about when you first
17 applied to be a police officer?
18    A    I don't recall the -- when I first applied.
19    Q    What agency was it?
20    A    Russellville Police Department.
21    Q    Do you know what year it would've been?
22    A    2001.
23    Q    And when you applied, were you hired?
24    A    I was.
25    Q    Prior to being a police officer for the City

Page 49

1 of Russellville, where were you employed?
2    A    I was employed at my dad's grocery store,
3 and Bartlett Enterprises, I think, was the name of that
4 warehouse.
5    Q    And how long had you worked there for?
6    A    At the grocery store?
7    Q    Yes, sir.
8    A    Since I was 9 years old.
9    Q    Oh, my goodness.  What did you do before that?
10    A    Before --
11    Q    Did you work anywhere else?
12    A    Before the police work?
13    Q    Yes.
14    A    I worked at Emerson Electric.  I drove a semi
15 for JB Hunt for three months.  Worked at Russellville
16 Warehouse.  I delivered newspapers.  I've worked two or
17 three jobs for many years.
18    Q    Where'd you go to high school?
19    A    Russellville High School.
20    Q    Where'd you go to college?
21    A    Which time?  I'm --
22    Q    The first one.
23    A    -- I'm sorry.  At Western Kentucky University
24 for my undergrad, and then Indiana Wesleyan for my
25 master's, University of the Cumberlands for my

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 15 of 36 PageID
#: 2711
The Deposition of JOHN EDWARD HIGGS, VOL. I, taken on September 13, 2022

50..53

Page 50

1  doctorate, and I'm currently a student at the University
2  of Strathclyde.
3      Q    What's the name of the last one?
4      A    University of Strathclyde.  It's in Glasgow,
5  Scotland.  It's an online program.
6      Q    What are you studying there?
7      A    Applied statistics.
8      Q    What year did you graduate from Western?
9      A    1992.
10     Q    What'd you major in?
11     A    Psychology.  Minored in Government.
12     Q    What year did you graduate from Indiana
13 Wesleyan?
14     A    2012.
15     Q    What was the focus of your master's?
16     A    I obtained a master's degree in Business
17 Management.
18     Q    So an MBA?
19     A    No, it was a Master of Science in Management.
20     Q    Fair to say that when you graduated college,
21 you didn't really picture yourself as being a police
22 officer?
23     A    I didn't.
24     Q    What made you want to go into law enforcement?
25     A    It was either that or a factory where we're

Page 51

1  at, so I chose that instead.
2      Q    When you were hired in 2001, what type of
3  training did you receive from the Russellville Police
4  Department?
5      A    I had received academy training.  It was 640
6  hours between June and October.  And then I maintain my
7  certification each year by going to in-service courses.
8      Q    The academy, would that have been the -- down
9  in Richmond?
10     A    It was.
11     Q    And did you go to the academy before you
12 started working as a Russellville Police officer?
13     A    The -- the June 4th, I believe, hire date for
14 me was, I was a -- an employee of the City of
15 Russellville, but I didn't participate or enforce,
16 you know, engage in my law enforcement duties until
17 I graduated from the academy.
18     Q    And when you came back, was there any formal
19 training program in place at the Russellville Police
20 Department that you went through?
21     A    There was.
22     Q    What was it?
23     A    FOT.  It's a field officer training program.
24     Q    Okay.  So this would've been -- you would've
25 been assigned to an FTO to accompany you for a certain

Page 52

1  period of time?
2      A    That's correct.
3      Q    Who was your FTO?
4      A    My main FTO was Steve Hadden, and then I had
5  three -- three others.  Tim Burnett, I rode with Victor
6  Shifflett for a little bit, and I can't remember who the
7  other one was.  It may have been just Steve Hadden, Tim
8  Burnett, and Victor Shifflett.
9      Q    Now, would you agree that the basic training
10 that you received would have taught you the basics on
11 how to be a patrol officer?
12     A    That's correct.
13     Q    So you would've learned how to use -- when it
14 was appropriate to use force at the academy; is that
15 fair?
16     A    That's correct.
17     Q    You would've learned how to issue uniform
18 citations or issue reports; is that fair?
19     A    That's correct.
20     Q    You would've been taught what probable cause
21 is and how to apply that; is that fair?
22     A    That's fair.
23     Q    You would've been taught -- well, let me
24 strike that.  Did you receive some basic training there
25 on how to maintain a crime scene as well?

Page 53

1      A    They taught that at the academy.  I learned
2  more on the street.
3      Q    Okay.  Is it fair to say the academy would not
4  have taught you how to conduct a homicide investigation?
5      A    I didn't -- they -- they touched on that,
6  but it was not in depth.
7      Q    Is it fair to say the academy would not have
8  taught you how to conduct an arson investigation?
9      A    That's correct.
10     Q    Is it fair to say that the academy would not
11 have taught you how to disclose exculpatory evidence
12 gained during the course of a criminal investigation?
13     A    I don't recall the evidence instruction part
14 in the -- in the academy.
15     Q    Now, outside of the FTO program once you came
16 back at Russellville, would that have been primarily
17 focused on your responsibilities as a patrol officer?
18     A    It was.
19     Q    Okay.  And outside of the FTO program, was
20 there any other formal training in place at the
21 Russellville Police Department after you came back from
22 the academy in 2001?
23     A    No, sir.  Just the FTO program, and each year,
24 we were sent to DOCJT for our in-service training.
25     Q    Prior to September 11, 2004, had you ever

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB     Document 167     Filed 10/03/25     Page 16 of 36 PageID #: 2712
The Deposition of JOHN EDWARD HITCHCOCK, VOL. I, taken on September 13, 2022
54..57

Page 54

1 received any formal training on how to conduct an
2 interview or interrogation?
3     A    I did receive -- I went to an interview and
4 interrogation course.  Did you say prior to what year?
5     Q    Yeah.  Prior to 2004.
6     A    No, I -- I wouldn't say I had that course
7 then.
8     Q    I believe the course you're talking about,
9 you took it in 2005.  Does that sound correct to you?
10    A    That's probably correct.  Yes, sir.
11    Q    So there was no internal or external formal
12 training that you had on how to conduct an interview or
13 interrogation by the time that you encountered Mr. Yell
14 on September 11, 2004, correct?
15    A    Other than what we were trained in the
16 academy.
17    Q    And the academy surely would not have provided
18 you with substantive training on how to conduct an
19 interview or interrogation, would it?
20    A    I wouldn't say it was substantive, but I would
21 say that it was procedural.  Reading Miranda warnings,
22 conducting field interviews, that was a standard
23 training, and they even taught us how to stand while we
24 were conducting the interview.
25    Q    Now, is it fair to say that your encounter

Page 55

1 with Mr. Yell was not a factual encounter that you had
2 ever considered before in any of your training?
3         MR. MANDO:  Objection.  Form.
4     A    I'm sorry.  I'm lost on -- on that question.
5     Q    Yeah.  That's -- it's a bad question.
6 Let me ask it another way.  In your encounter with
7 Mr. Yell, would you agree that you lost your cool at
8 points?
9     A    No, sir.
10    Q    You're saying here today that you didn't lose
11 your cool at all with Mr. Yell?
12    A    I did not.
13    Q    Is it your testimony that Mr. Yell lost his
14 cool?
15    A    Yes, it is.  I don't -- I don't know when he
16 had his cool during that incident.
17    Q    Sure.  And you would agree Mr. Yell was
18 extremely intoxicated at the time you encountered
19 him --
20    A    He was.
21    Q    -- on September 11, 2004?
22    A    He was.
23    Q    You would agree that a fire -- a home -- your
24 trailer caught on fire is a traumatic event for anybody
25 who lived in that home or who cared about people who

Page 56

1 lived in that home; is that fair?
2     A    I would agree.
3     Q    In 2004, would you have understood that people
4 react to trauma in different ways?
5     A    I would agree.
6     Q    By 2004, did you have any formal training at
7 the Russellville Police Department on how to disclose
8 exculpatory or impeachment evidence in a criminal
9 investigation?
10    A    I did not have any formal training on that.
11    Q    By 2004, did you have any formal training at
12 the Russellville Police Department on when it was
13 appropriate to use force with somebody during the course
14 of a criminal investigation?
15    A    No formal training, but policy.
16    Q    Well, while a policy existed related to force,
17 by 2004, was there any formal training in place at the
18 department on how to effectuate the policy?
19    A    No, sir.  Not that I'm aware of.
20    Q    Now, you would agree that the best piece of
21 evidence that would demonstrate what actually happened
22 at the sally port between you and Mr. Yell would've been
23 a video recording.  You agree with that, right?
24    A    I agree.
25    Q    And, in fact, you requested that the incident

Page 57

1 be video recorded, correct?
2     A    I did request that.
3     Q    And after you made that request, did you see
4 either Officer Hayes or Office Porter take steps to make
5 sure that it was being recorded?
6     A    I did not.  Don't recall that.
7     Q    Did you ever review the video recording of the
8 incident between you and Mr. Yell in the sally port?
9     A    I did not.
10    Q    Back in September 2004, how would you go about
11 taking notes?
12        MR. MANDO:  Objection.  Form.  Go ahead.
13    A    Notepad.
14    Q    Did you always carry one on you when you were
15 in your officer -- performing your officer duties?
16    A    I would -- I would have something to write on,
17 whether it's blank sheets of paper, or notepad, or...
18    Q    Did you also have access to a recording device
19 in September 2004?
20    A    I did not have access to a recording device.
21 Depends on what we're talking about.  You talking about
22 a body camera or any type -- any type --
23    Q    Or a hand -- or anything?
24    A    I don't recall.  Yeah.  I don't recall
25 any -- any recording devices.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 17 of 36 PageID #: 2713
The Deposition of JOHN EDWARD HIGGS, VOL. I, taken on September 13, 2022
58..61

Page 58

1  Q    I'm going to ask for you to look at page 2346
2  of Exhibit 11.
3  A    Russellville Police Department training
4  records?
5  Q    Yes, sir.  So this is a table of contents of
6  sorts, it looks like, for some of the training you
7  received.  Do you see in here where it says that you
8  went to basic training June 4, 2001?
9  A    That's correct.
10  Q    Is that consistent with your recollection,
11  sir?
12  A    It is.
13  Q    And April 22, 2003, did you take a course in
14  Louisville on crime scene investigations?
15  A    I did.
16  Q    As part of that class, did you learn anything
17  relating to crime scenes that involve fire?
18  A    I don't recall anything about fire.
19  Q    It looks like, April 29, 2005, you took a
20  class on interviews and interrogations in Bowling Green;
21  is that right?
22  A    That -- that's correct.
23  Q    Prior to April 29, 2005, you would not have
24  any formal training on how to conduct an interview or
25  interrogation outside of the limited training that was

Page 59

1  provided at the academy, fair?
2  A    That's correct.  And what I learned on the
3  street in the FTO program about interviewing people.
4  Q    Now, if you -- if you go to 2367, do you
5  recognize that document, sir?
6  A    I do.  Well, I don't recognize the document,
7  but I recognize the training that's listed on it.
8  Q    And according to this training, was the first
9  time that you took formal training on conducting a
10  criminal investigation in May of 2010?
11  A    I don't recall if this is -- this would be the
12  first criminal investigation class that I -- that I had,
13  but I can't recall whether the other training that I had
14  involved criminal investigation.  It seems like all my
15  training has -- not all of it, but much of it's centered
16  around investigative type stuff, and then I try to take
17  classes or courses that were investigative in nature.
18  Q    Outside of having an FTO for a limited period
19  of time at the Russellville Police Department, would you
20  agree that between 2002 and 2004, you were not provided
21  with any additional formal internal training at the
22  department?
23  A    I would agree about the formal.
24  Q    And would you agree that between 2002 and
25  2004, that you were not provided with any additional

Page 60

1  formal supervision on top of whatever supervisory -- let
2  me strike that question.  Can you -- can you tell me,
3  in 2002, what rank you would've had at the department?
4  A    Patrol officer.
5  Q    And your supervisor would've been who in 2002
6  as a patrol officer?
7  A    Would've been Captain McDonald, who was
8  Sergeant McDonald.
9  Q    And would Sergeant Kane (phonetic) have also
10  been a supervisor of yours?
11  A    Sergeant Kane was a supervisor of mine on
12  midnights when I worked midnights, but I don't --
13  I can't recall what years or what time period that
14  I -- that I worked on midnights with him.  Because
15  mostly I worked second shift with McDonald and Officer
16  Mills.
17  Q    Officer Mills is somebody who you worked
18  alongside for a significant period of time; is that
19  fair?
20  A    That's fair to say.
21  Q    Now, Sergeant Kane, is he somebody who you
22  respected?
23  A    I did respect Sergeant Kane.  Yes, sir.
24  Q    You thought he was a good supervisor?
25  A    I didn't work with Sergeant Kane that much,

Page 61

1  so I can't really --
2  Q    Well, during the time -- what about during the
3  time that you worked with him?  Did you come to believe
4  he was a good supervisor?
5  A    I thought that he was -- he was nice to me,
6  and I -- but I can't recall how I felt.  I felt evenly
7  about him as a supervisor.  Like I said, I wasn't with
8  him -- I don't recall being with him very long.
9  Q    Did he ever give you a reason to doubt him as
10  the supervisor?
11  A    No.  I -- I always felt that he was a very
12  confident and intelligent supervisor, and he had the
13  sense that he knew what he was doing.
14  Q    You thought that he had more experience than
15  you did.  You would agree with that, right?
16  A    Oh, definitely.
17  Q    What about Mr. McDonald?  Was he a good
18  supervisor for you as well?
19  A    He was.  He was a -- a mentor of mine for a
20  couple of years.
21  Q    Somebody who you trusted and respected?
22  A    Yes.  And he --
23  Q    Took his opinion seriously?
24  A    I did.  And still do.
25  Q    Did Sergeant McDonald ever tell you that you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 18 of 36 PageID
#: 2714
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022
62..65

Page 62

1  need to do a better job evaluating cases that you were
2  investigating?
3      A    I don't recall that.
4      Q    Did he ever tell you that you need to slow
5  down and examine evidence that has been collected in
6  investigations you were working on?
7      A    I don't recall that.
8      Q    Did Sergeant McDonald ever tell you that you
9  need to look at different articles of evidence and
10  understand their relationship to one another in order to
11  build a stronger case?
12      A    I don't recall that.
13      Q    Did Sergeant McDonald ever tell you that you
14  need to study the KRS and read case law in order to
15  improve as a law enforcement officer?
16      A    There are certain things that Sergeant
17  McDonald -- I mean, at the time, he was Sergeant,
18  he's Captain now -- that -- that -- that he told me -- I
19  can't recall him telling me that.
20      Q    Let me -- I'm going to ask for you to turn to
21  page 2297.  Do you recognize your signature on that
22  page, sir?
23      A    I do.
24      Q    And do you see the suggestions for improvement
25  above your signature?

Page 63

1      A    I do.
2      Q    And this would've been things that would've
3  been suggested for you to improve upon by May of 2003;
4  is that right?
5      A    Yes, sir.
6      Q    Did the Russellville Police Department provide
7  you with any additional formal training or supervision
8  after you got this performance evaluation in May of
9  2003, prior to the September 11, 2004 arson
10  investigation?
11      A    No.  I didn't receive any formal training in
12  reference to the evaluation comments that he made here.
13      Q    And no other formal supervision either related
14  to those comments, correct?
15      A    Not that I recall.
16      MR. SLOSAR:  Now, let's take a five-minute
17  break if we can.  I've got to go get some more tea.
18      THE WITNESS:  Okay.
19      MR. SLOSAR:  Is that okay?  Thank you.
20      VIDEOGRAPHER:  We are off the record at 10:50.
21      (OFF THE RECORD)
22      VIDEOGRAPHER:  All right.  We're back on the
23  record at 11:02 a.m.
24  BY MR. SLOSAR:
25      Q    Now, Mr. Higgins, if you could turn to page

Page 64

1  2305, please.  And do you recognize this document, sir?
2      A    I don't.
3      Q    Sergeant Kane, was he a supervisor of yours
4  between June 2001 and June 2002?
5      A    That -- yeah.  Yes, sir.
6      Q    And actually, if you go back to 2301, so go
7  back a couple pages, it'll be the beginning of the
8  evaluation.  Do you see that?
9      A    2301?
10      Q    Yes, sir.
11      A    Okay.  I see.
12      Q    Does that appear to be an evaluation of yours?
13      It does.
14      Q    And during your career at the Russellville
15  Police Department, do you typically have annual
16  evaluations done by supervising officers?
17      A    We did.
18      Q    Now, if you go to page 2304, did you sign this
19  evaluation as having reviewed it on June 24, 2002?
20      A    I did.
21      Q    As a result of this evaluation, did the City
22  of Russellville provide you with any additional formal
23  training at the police department?
24      A    No.  There was no formal training after the
25  evaluation.

Page 65

1      Q    Did the City of Russellville provide you with
2  any additional form of supervision after you received
3  this evaluation?
4      A    Can I take a -- a second to read what I'm
5  supposed to be supervised for on this evaluation?
6  I don't recall this evaluation --
7      Q    Sure.
8      A    -- per se.  I'm trying to figure out what I'm
9  supposed to be supervised for.
10      Q    Sure.  If you go to 2305, look at the bottom
11  paragraph, where it says, "Suggestions."
12      A    Okay.
13      Q    Did you have a chance to review that, sir?
14      A    I did.
15      Q    And did -- were you provided with any
16  additional formal training from the department after you
17  received this evaluation?
18      A    No formal training.
19      Q    What about any additional formal supervision
20  after you received this evaluation?
21      A    I don't recall.
22      Q    Were you --
23      A    This --
24      Q    Were you aware before today that Sergeant Kane
25  recommended that if a more responsible position became

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 19 of 36 PageID
#: 2715
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022
66..69

Page 66

1   available, that he would not consider you for it at the
2   time of this evaluation?
3        A    I don't re -- recall that, but I know in 6-3
4   of 2001, I was in the academy.  I was going to the
5   academy.  So for four months of this evaluation,
6   I was in the academy.  Just -- and then the other four
7   would've been on an FTO program.  So eight months out of
8   that would've been -- I was being trained, so --
9        Q    Well --
10       A    -- being in that stage, I don't think that
11  anyone would be ready.
12       Q    Now you would've been a newer police officer
13  in 2003, correct?
14       A    Yes, sir.  Two -- two years in.
15       Q    And in 2003, do you recall having some run-ins
16  with a person by the name of Lisa Beard, or Elias Beard
17  (phonetic)?
18       A    Yes.  Elias Beard.  I -- I do.
19       Q    What do you recall those run-ins to be with
20  Elias Beard?
21       A    The only thing I recall was drug incidents.
22  He had crack cocaine on him.  I took him to jail.
23       Q    Do you recall allegations being made against
24  you by Elias Beard?
25       A    I do.

Page 67

1        Q    And at some point, did you learn that Elias
2   Beard was actually an informant for the department?
3        A    No, I never -- I never knew that.  I know he
4   was charged with falsely reporting an incident regarding
5   his complaint against me by the investigating captain.
6   May not have been captain.  We changed -- we had a -- a
7   major -- chief major, and then it went from chief to
8   captain.  So I can't remember who investigated it, but
9   this individual we were talking about that made the
10  complaint was charged with -- I was told that he was
11  charged with that, anyway.  I never looked it up.
12       Q    If you go to 2198, please, sir, is that a
13  complaint that Elias Beard made against you in 2003?
14       A    Appears to be.
15       Q    And one of the allegations that Elias makes
16  against you is that you used a racial slur against him.
17  This is on page 2199.  Do you see that?
18       A    Yes.  I see where he wrote that.  It's not
19  true.
20       Q    Did you ever use any racial slurs against
21  Elias Beard?
22       A    No, sir.
23       Q    Have you ever used a racial slur?
24       A    I can't say that I haven't in my lifetime,
25  but it's not a practice.  Most of the -- many of my -- a

Page 68

1   couple of my brothers-in-law are of color, my grandson's
2   of color.  That's now.  And then even then, the nephews
3   -- they serve on the police department now -- are of
4   color.  I don't use those words.  I'm offended by those
5   words.
6        Q    And Elias Beard at some point, did you write a
7   letter in response to Elias Beard's allegations?
8        A    I don't recall doing that.  I'm not saying I
9   didn't.  I don't recall.  I remember --
10       Q    If you go to 2205 -- 2204, I'm sorry.  Is that
11  a memo that you wrote, sir?
12       A    It appears that it is.  It's been so long ago.
13       Q    Sure.  It's about three pages; is that right?
14  Mr. Higgins, do you want to take an -- a moment to
15  review the memo you wrote?
16       A    I'm sorry.  I'm -- that's what I'm doing.
17  I apologize.
18       Q    No, go ahead.
19       A    It is a long one.  Okay.  I think I've...
20       Q    All right.  This is a memo that you wrote;
21  is that right?
22       A    It looks like it, yes, sir.
23       Q    And you wouldn't write something in a memo to
24  a supervisor if it wasn't true, correct?
25       A    I would say that would be -- yeah, I'd be as

Page 69

1   straightforward as I could if I was writing a memo to a
2   supervisor.
3        Q    And you knew that there were serious
4   allegations made against you and Mr. Beard, so you
5   wanted to come forward with your account of what
6   happened, fair?
7        A    That's correct.
8        Q    Now, looking at page 2, do you recall taking a
9   subpoena to Jonathan Collins, a violation of his
10  conditions of the lease?
11       A    I don't recall doing any -- doing that.
12  I know it's in here, but that was, what, 19 years ago?
13  It's been a long time.
14       Q    If information -- you wrote the information
15  that's contained in this paragraph, correct?
16       A    Yeah, I'm sure I did.  But even reading this,
17  I'm having a hard time recalling.  Because I've have
18  encounters with so many over the last 19 years,
19  I -- honestly, I don't...
20       Q    Well, you would agree that it's unusual for a
21  police officer to tell a person who's been charged with
22  a crime that you were sure he and others would probably
23  like to see Beard floating in a river because of what he
24  had done, correct?
25       A    I don't -- I don't recall it, and from here,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1   it looks like I'm denying saying that, so...
2       Q    No, in here, you admit that you told Collins,
3   who had already known Beard had ratted him out, "And I
4   was sure he and the others would probably like to see
5   Beard floating in a river because of what he," Beard,
6   "had done," correct?
7       A    I don't -- I don't recall saying that.
8   But in this same -- it says I advised him I did not want
9   him dead, and I certainly didn't want to see him
10  floating anywhere. I don't...
11      MR. MANDO:  Just answer what you remember.
12      THE WITNESS:  Okay.
13      Q    So my question to you is --
14      A    I just don't remember. I don't recall this
15  conversation. I don't recall most of what's in here.
16  It's been so long.
17      Q    It's been so long. I understand that.
18  But you would not have written this out if it was not
19  truthful, correct?
20      A    That's -- that's correct.
21      Q    Now, even though you don't have an independent
22  memory of this incident sitting here today, would you
23  agree that it would be unusual for a law enforcement
24  officer to tell somebody like Collins, who had been
25  charged with a crime, that he and others would probably

Page 71

1   like to see an informant floating in a river? Do you
2   agree that that would be an unusual thing for a law
3   enforcement officer to say?
4       A    I would -- I would say so. Yeah.
5       Q    And by "floating in a river," would you agree
6   that that's the implication that Beard would be dead,
7   correct?
8       A    Yes, sir.
9       Q    And certainly, you're a person who has a
10  strong faith-based conviction today, as you would've in
11  2001, when you were hired at the Russellville Police
12  Department, correct?
13      A    Yeah. Yes, sir.
14      Q    And would you agree that it would never be
15  appropriate for a law enforcement officer to even
16  jokingly state that an informant should die?
17      A    I would agree.
18      Q    Would you agree that, as a law enforcement
19  officer, it would never be appropriate to even jokingly
20  imply that a suspect charged with a crime might want to
21  see an informant dead?
22      A    That's correct.
23      Q    You would agree that the admissions that you
24  make in this paragraph aren't flattering --
25      MR. MANDO:  Objection.

Page 72

1       Q    -- to your career law enforcement?
2       MR. MANDO:  Objection. Form.
3       A    I don't -- it's hard for me to have an opinion
4   about something that I don't -- I'm having a hard time
5   recalling, but I would say that it would be
6   inappropriate to say that to anyone.
7       Q    Your -- under your version of events here that
8   you wrote to your supervisor, you would agree this is
9   something that you're not proud of today, right?
10      A    I would say I'm not proud of it, but I just
11  don't recall saying it because if it's been so long,
12  and I understand that it's -- what you're saying.
13  I just -- I don't recall saying it, and I don't -- I
14  don't agree with it or approve of it, but...
15      Q    Would you agree that you're a different person
16  today than you were in 2003?
17      A    Yes, I'm a different person, but I'm not that
18  much different.
19      Q    Well, when's the last time you told a joke
20  about an informant dying?
21      A    No, I haven't, and I don't even recall this
22  one, but I would say that it -- that it's not
23  appropriate.
24      Q    And certainly, you would've been aware of the
25  fact in 2003 that being an informant for a law

Page 73

1   enforcement agency is a dangerous thing.
2       A    I would say being an informant is a dangerous
3   thing.
4       Q    And you would agree that by 2003, you would've
5   been aware that sometimes informants could get killed
6   for cooperating against individuals in criminal
7   investigations?
8       A    Sure. I guess anything could happen, right?
9       Q    Do you have -- do you recall Mr. Beard trying
10  to ever talk to you about the comment that was made
11  about him floating in a river?
12      A    I don't recall it. I -- I know, in here,
13  I told him that I did not want to see him dead or I
14  didn't want to see him floating anywhere.
15      Q    You don't have an independent memory of that?
16      A    I don't have an independent memory of that.
17      Q    Now, after the 2003 incident that we just
18  talked about, were you provided with any additional
19  formal training or supervision at the Russellville
20  Police Department?
21      MR. MANDO:  Objection. Form. Lack of
22  foundation. Go ahead.
23      A    No, sir.
24      Q    Now, if you could turn to Page 2178, please.
25      COURT REPORTER:  Hey, Elliot, sorry to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 21 of 36 PageID #: 2717
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022
74..77

Page 74

1    interrupt, but we lost Chris on the Zoom meeting.
2         MR. SLOSAR:  Oh.  All right.  I may -- let's go
3    off the record for -- for a second, and, I guess --
4         VIDEOGRAPHER:  Okay.  Okay.  We're off the
5    record at 11:21.
6         (OFF THE RECORD)
7         VIDEOGRAPHER:  We're back on the record at
8    11:25 a.m.
9    BY MR. SLOSAR:
10        Q    Now, Mr. Higgins, in January 2004, did Robin
11   Woodward file a citizen's complaint against you alleging
12   misconduct?
13        A    She did.
14        Q    And generally, in this accusation,
15   Ms. Woodward accused you of escalating a situation;
16   is that right?
17        A    It says that I was -- she just made a
18   complaint that I was rude.
19        Q    Well, there was an allegation that she made in
20   here that you were hateful, crude, and uncompassionate;
21   is that right?
22        A    Yes, sir.
23        Q    Do you have any independent recollection of
24   the situation that prompted this complaint?
25        A    I remember going to this residence on

Page 75

1    North -- and I think the residence actually faced Second
2    Street, or maybe First Street.  It's been a while.
3    But I had gotten a complaint of people selling drugs,
4    and cars stopping and parking illegally close to the
5    intersection there, and I remember going over and
6    writing parking tickets to these cars.  But the
7    allegation was, or what I had gotten information on was
8    that they were selling drugs out of the house, and so
9    there were different cars there, and that's all I
10   remember.
11        Q    You're saying that there was an allegation
12   that people were selling drugs out of the house?
13        A    Yes, sir.  Uh-huh.
14        Q    Have you -- I didn't ask you this earlier,
15   but did you review your personnel file at all in
16   preparing for the deposition?
17        A    I saw -- at one point in time, I did.  But
18   just because of the time, it's just hard for me to
19   remember some of those --
20        Q    Sure.
21        A    -- those things.
22        Q    Why don't you go to page 2181, sir.
23        A    2181?
24        Q    Yes, and if you could read this page and the
25   next page, I'll ask you some questions when you're done.

Page 76

1        A    Okay.  I read it.
2         MR. MANDO:  Did you turn the page?
3        A    Oh, I didn't turn the page.  Sorry.
4    I -- I read it.
5        Q    Does that refresh your memory as to why you
6    were interacting with Robin Woodward's family?
7        A    Yeah, I don't recall the interaction.  I do
8    recall writing parking tickets there where people were
9    parking illegally, and I remember the allegation of
10   people were pulling up there to -- for drugs,
11   and so --
12        Q    Oh.  I'm sorry.  Keep going.
13        A    No, that's -- that's the only thing that I
14   remember, and I -- I don't recall the complaint, you
15   know, even though I've read it.  I remember --
16        Q    So you don't have an -- you know, you don't
17   have an independent recollection --
18        A    No.
19        Q    -- of the circumstances alleged in this
20   complaint?
21        A    No, I don't.  It's just too long ago.  No.
22        Q    Did you receive the formal supervision or
23   training after this complaint was made in 2004, before
24   you encountered Robert Yell in September of 2004?
25        A    No.

Page 77

1         MR. MANDO:  Objection.  Form.  Lack of
2    foundation.
3        A    This wasn't addressed --
4        Q    Did --
5        A    -- that I remember.
6        Q    Did you receive any additional formal
7    supervision after this complaint was made before you
8    encountered Robert Yell on September 11, 2004?
9         MR. MANDO:  Objection.  Form.  Lack of
10   foundation.
11        A    I don't recall that.  I don't recall any.
12        Q    Now, in December of 2004, you resigned from
13   the Russellville Police Department, correct?
14        A    December of 2004?
15        Q    Yes.
16        A    I left at one time.  That could have been it.
17        Q    If you go to page 2286, do you see that
18   document?
19        A    Oh.  I remember now.  I didn't resign.
20        Q    Well, why -- what is this memo?
21        A    I was going to.  I was going to -- had an idea
22   I was going to go and drive a truck, and I was about to
23   leave, and then the -- the chief talked me into staying,
24   so I stayed.
25        Q    Well, why were you going to leave the police

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB     Document 167     Filed 10/03/25     Page 22 of 36 PageID
#: 2718
The Deposition of JOHN EDWARD HISER, VOL. I, taken on September 13, 2022
78..81

Page 78

1  department?
2      A    I wanted to make more money, as I had, in
3  2004, three kids at that time, so I was -- and I did
4  eventually -- did eventually resign and -- and drove
5  a -- a truck for Griffin Industries, and then I came
6  back after that, after a six-month stint, but I think
7  that was in 2006.
8      Q    How did the chief get you to stay?
9      A    Well, he -- he let me know that he appreciated
10  me, and not that I really needed that, and he knew that
11  it was a money issue.  They gave us -- they gave us a
12  raise.  I remember we got a raise that year.  I think
13  people were -- were happy about that.  So that's what
14  I recall.
15     Q    Now, in 2005, do you recall being suspended
16  for three days for an unjustified pursuit?
17     A    I've never been suspended.
18     Q    Go to 2207.
19     A    2207?
20     Q    Yes.
21     A    I'm here.
22     Q    Okay.  Please review this memo.  Let me know
23  when you're done.
24     A    Okay.  I've -- I've read it.
25     Q    Do you have an independent recollection of

Page 79

1  this suspension?
2      A    I do, and I was not suspended.  There was a
3  recommendation there, but there was no suspension.
4      Q    How were you able to get out of it?
5          MR. MANDO:  Objection.  Form.
6      A    I don't -- I don't know how, and I don't -- I
7  didn't beg my way out of it or anything like that.
8  It just -- it didn't happen.
9      Q    Who did you talk to?
10     A    I remember -- I remember Captain Dill
11  (phonetic) talking to me about it, and he told me that
12  what I did was wrong, that they weren't going to -- they
13  were not going to suspend me.  So his recommendation
14  here is kind of a surprise.
15     Q    So you were not disciplined in any way for
16  this?
17     A    No, none, other than being verbally
18  reprimanded.
19     Q    Who is Rhonda Dorris?
20     A    I remember her as a -- I think she was a hair
21  stylist in Russellville.
22     Q    And isn't it true, as a law enforcement
23  officer, that you let Ms. Dorris' status be considered
24  when not initiating charges against her?
25     A    I did charge her.

Page 80

1      Q    Is it your testimony today that you charged
2  Ms. Dorris with a crime in 2007?
3      A    If it's the same incident that we're -- we're
4  talking about, it's going to -- she -- I charged her
5  with theft of services for taking a -- a garbage
6  disposal can from Edward Jones, and she had it in her
7  shop, doing cleanup.  When I told her she had to return
8  the can, she argued with me, and I was just going to
9  tell her to return the trash can, and I wrote her a
10  citation -- I didn't arrest her, but I wrote her a
11  citation for theft of services, and then that charge,
12  I know, was dismissed by the county attorney, and at
13  that time, it was Tom Noe.
14     Q    And is it -- I'm sorry.  You keep going.
15     A    I'm sorry.  It was -- Tom Noe was the attorney
16  -- the county attorney at that time.
17     Q    And isn't it true that if you had caught
18  anybody else with that stolen property, you would've
19  arrested them?
20     A    Well, I didn't know that it was stolen.
21  She was using it.  She may have had the intention of
22  returning it, but she did not get permission,
23  so -- and when she argued with me about it, I wrote her
24  a citation, which was then -- the county attorney said
25  that he wasn't going to follow through with those

Page 81

1  charges.  So they were either dismissed -- I didn't
2  squash that.  That was squashed by somebody higher than
3  my status.
4      Q    Isn't it true, if you caught anybody else with
5  stolen property, you would've arrested them?
6          MR. MANDO:  Objection.  Form.  Lack of
7      foundation.  Go ahead.
8      A    I would -- if I caught somebody stealing
9  property, I would say that I would arrest them or -- or
10  give them a -- it depends on the circumstance.  And then
11  will charge them.
12     Q    All right.  Go to page 2235, please.
13         MR. MANDO:  What page number, Elliot?  You kind
14     of cut out.
15         MR. SLOSAR:  Yeah.  2235.  Sorry.  My voice is
16     getting worse.
17         THE WITNESS:  Yeah.  This is the same case
18     that -- that we're talking about.
19  BY MR. SLOSAR:
20     Q    Yeah.  And in your letter -- you wrote this
21  letter, correct?
22     A    Well, this is a -- looks like a case report.
23  Yes.
24     Q    Yeah.  What you wrote in here was true and
25  accurate at the time that you wrote it, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 167     Filed 10/03/25     Page 23 of 36 PageID #: 2719
The Deposition of JOHN EDWARD HIGGINS, VOL. I, taken on September 13, 2022
82..85

Page 82

1    A    Yes, sir.
2    Q    And isn't it true that you wrote, "A person's
3  status in the community should not be considered when
4  law is being enforced, but it is considered, and I am
5  guilty of letting status affect my judgment sometimes."
6    A    Okay.  I'm looking for that paragraph.
7        MR. MANDO:  What page is that on, Elliot?
8        MR. SLOSAR:  36.  It's the middle paragraph of
9  36, the last couple sentences.
10        THE WITNESS:  Okay.  And -- and what was your
11  question?  I'm sorry.
12        MR. SLOSAR:  Aalayah, can you play that back
13  for me?
14        COURT REPORTER:  Yeah, I can.  Okay.
15        (COURT REPORTER PLAYS BACK REQUESTED PORTION)
16        COURT REPORTER:  And then here's the following
17  one.
18        (COURT REPORTER PLAYS BACK REQUESTED PORTION)
19        MR. MANDO:  The question is did you write that?
20    A    Yes, that's correct.
21  BY MR. SLOSAR:
22    Q    And isn't it true that, as a Russellville
23  Police officer, you were guilty of letting status affect
24  your judgment sometimes?
25    A    I would say, in this instance, it's a

Page 83

1  receiving stolen property misdemeanor charge, and she
2  was a local business owner.  I was trying to give
3  her -- give her an out and let her make the payment for
4  that can, and of course we got it back, but I felt like
5  I was giving enough -- giving enough of leeway to her in
6  this, and then I -- I did write her a summons to court.
7  Even that got squashed.
8    Q    But would you agree that you were guilty of
9  letting status impact decisions that you were making at
10  times as a Russellville Police officer?
11        MR. MANDO:  Objection.
12    A    In this instance.
13        MR. SLOSAR:  Let's -- can we take a
14  five-minute break?
15        VIDEOGRAPHER:  Okay.  We're off record at
16  11:48.
17        (OFF THE RECORD)
18        MR. SLOSAR:  As everybody can hear, my voice is
19  fading rapidly, and we're going to seek to suspend
20  the deposition and resume it at a time that's
21  convenient for -- for Mr. Higgins's counsel and
22  everyone else.  I'm really sorry.  I'm drinking a
23  lot of tea, with cough drops and everything else,
24  but I am running out of a voice over here.
25        MR. MANDO:  All right.  Obviously, we would

Page 84

1  prefer to get this done, but we can hear that you're
2  losing your voice, and we know that's out of your
3  control.
4        THE WITNESS:  Right.
5        MR. MANDO:  So we'll adjourn in progress.
6  We trust, Elliot, that you'll not re-plow old
7  ground, and we'll have our clock ticking on -- we
8  reserve the right to invoke the rule.  I don't know
9  how many hours we've - - or minutes we've gotten in
10  so far, but I just want to make sure we're keeping
11  track of that, and then I think you told me -- I
12  think Amy's going to take Ken tomorrow?
13        MR. SLOSAR:  Yes.
14        MR. MANDO:  All right.  So we're on for Ken.
15  We'll go forward with Ken tomorrow.
16        MR. SLOSAR:  Yeah.  Aalayah, will you put the
17  time that we were on the record, just as part of the
18  transcript --
19        COURT REPORTER:  Yes, we --
20        MR. SLOSAR:  -- so we know where it's leaving
21  off?
22        COURT REPORTER:  Yes.  We've been on the record
23  for two hours, 14 minutes, 48 seconds and counting.
24        MR. SLOSAR:  That's, like, a lifetime for my
25  voice.

Page 85

1        THE WITNESS:  I understand.
2        MR. SLOSAR:  Thank you.
3        THE WITNESS:  Well, I hope you get to feeling
4  better.
5        MR. SLOSAR:  Thank you.  Sorry.  I'm sorry
6  about this today.
7        THE WITNESS:  That's fine.
8        MR. SLOSAR:  Okay.
9        (DEPOSITION CONCLUDED AT 11:59 A.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 86

1                    CERTIFICATE OF REPORTER

2              COMMONWEALTH OF KENTUCKY AT LARGE

3

4     I do hereby certify that the witness in the foregoing

5     transcript was taken on the date, and at the time and

6     place set out on the Title page hereof by me after first

7     being duly sworn to testify the truth, the whole truth,

8     and nothing but the truth; and that the said matter was

9     recorded digitally by me and then reduced to typewritten

10    form under my direction, and constitutes a true record

11    of the transcript as taken, all to the best of my skills

12    and ability. I certify that I am not a relative or

13    employee of either counsel, and that I am in no way

14    interested financially, directly or indirectly, in this

15    action.

16

17

18

19

20

21

22    AALAYAH PURNELL,

23    COURT REPORTER/NOTARY

24    COMMISSION EXPIRES ON: 03/22/2025

25    SUBMITTED ON: 09/19/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB     Document 167     Filed 10/03/25     Page 25 of 36 PageID
#: 2721
The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022
87

---

### Exhibits

---

**Exhibit 7_
Higgins** 30:12,
13,17

**Exhibit 11_
Higgins** 48:9,
13 58:2

---

### 1

---

**10:01** 37:1

**10:50** 63:20

**11** 35:20 45:13,
17,22 46:22
47:4 48:9,13
53:25 54:14
55:21 58:2 63:9
77:8

**11:02** 63:23

**11:21** 74:5

**11:25** 74:8

**11:48** 83:16

**11:59** 85:9

**11th** 44:12

**13** 8:6

**14** 84:23

**18** 19:13 44:2,
21

**19** 69:12,18

**1992** 50:9

---

### 2

---

**2** 69:8

**2001** 48:22
51:2 53:22 58:8
64:4 66:4 71:11

**2002** 59:20,24
60:3,5 64:4,19

**2003** 58:13
63:3,9 66:13,15
67:13 72:16,25
73:4,17

**2004** 14:21
31:15 32:6
35:20,25 45:13,
17,22 46:22
47:4,9 53:25
54:5,14 55:21
56:3,6,11,17
57:10,19 59:20,
25 63:9 74:10
76:23,24 77:8,
12,14 78:3

**2005** 54:9
58:19,23 78:15

**2006** 78:7

**2007** 80:2

**2010** 59:10

**2012** 50:14

**2016** 21:20,23
29:1 32:2,10,11
47:23 48:2

**2017** 27:19

**2019** 10:15

**2022** 8:7

**2178** 73:24

**2181** 75:22,23

**2198** 67:12

**2199** 67:17

**22** 58:13

**2204** 68:10

**2205** 68:10

**2207** 78:18,19

**2235** 81:12,15

**2286** 77:17

**2297** 62:21

**2301** 64:6,9

**2304** 64:18

**2305** 64:1
65:10

**2346** 58:1

**2367** 59:4

**24** 64:19

**2501** 8:8

**29** 58:19,23

---

### 3

---

**3** 38:2

**36** 82:8,9

---

### 4

---

**4** 58:8

**42104** 8:9

**48** 84:23

**4th** 51:13

---

### 5

---

**5** 38:3

**55,000-pound**
10:21

---

### 6

---

**6-3** 66:3

**640** 51:5

---

### 7

---

**7** 30:12,13,17

---

### 8

---

**8,000** 47:11

---

### 9

---

**9** 49:8

**900** 23:19

**9:12** 8:7

**9:53** 36:23

---

### A

---

**a.m.** 8:7 36:23

**37:1** 63:23 74:8
85:9

**Aalayah** 8:4
30:11 82:12
84:16

**Aaron** 9:17

**academy** 51:5,
8,11,17 52:14
53:1,3,7,10,14,
22 54:16,17
59:1 66:4,5,6

**access** 57:18,
20

**accidental**
45:10

**accompany**
51:25

**account** 16:11
69:5

**accountable**
16:16

**accurate** 81:25

**accusation**
74:14

**accused**
13:11,14 74:15

**acknowledge**
28:24

**act** 16:24 45:4,
9

**additional**
59:21,25 63:7
64:22 65:2,16,
19 73:18 77:6

**addressed**
77:3

**adjourn** 84:5

**admissions**
71:23

**admit** 70:2

**admittal** 27:25

**admittals**
27:25

**advised** 23:17
26:13 70:8

**affect** 16:10
82:5,23

**affirm** 9:25

**agencies**
38:25

**agency** 16:14
39:22 48:19
73:1

**agenda** 28:22,
25 29:2,9

**agree** 13:18
14:21 16:20,23
27:7 28:10,12,
13,15,16,17,20
33:23,25 35:22
42:12,15,16
44:23 45:1,10
52:9 55:7,17,23
56:2,5,20,23,24
59:20,23,24
61:15 69:20
70:23 71:2,5,
14,17,18,23
72:8,14,15 73:4
83:8

**ahead** 15:1,21
17:13 21:2
25:13 32:15
57:12 68:18
73:22 81:7

**Alan** 22:7

**alcohol** 18:2,
14 45:24 46:22

**allegation**
74:19 75:7,11
76:9

**allegations**
13:18 66:23
67:15 68:7 69:4

**alleged** 42:13
76:19

**alleging** 74:11

**allowed** 22:1
34:17,19

**allowing** 34:5

**alongside**
60:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022

88

Aluminum 10:20

Amber 9:10,14

Amy 8:4,18

Amy's 84:12

analysis 18:16

anger 19:4,8

angry 19:1,5

anniversary 44:7,15

annual 64:15

anytime 47:23

apologize 21:6 36:15 68:17

appearance 8:13,21

appearing 8:17,18 9:2,5,9, 12,14,17

appears 67:14 68:12

applied 48:17, 18,23 50:7

apply 52:21

appreciated 78:9

apprising 20:12

approve 72:14

April 46:25 47:2,3 58:13, 19,23

argued 80:8,23

Arnett 9:14

arrest 18:21 46:4,5,13 80:10 81:9

arrested 18:9 80:19 81:5

arresting 18:8

arrests 45:23 46:3

arson 18:24 24:5 27:23 37:7,11 53:8 63:9

arson-related 35:8

arsons 12:4

articles 62:9

ascertain 41:13

assigned 51:25

assist 34:25

assume 12:12 14:11

attempt 27:14 28:18,20

attempting 33:23,25 34:3

attorney 20:8, 18 22:5 26:1,8 38:8 80:12,15, 16,24

attorneys 26:14

attorneys' 22:18 48:2

Auburn 39:23 40:1 44:9

aware 23:21,24 41:21 45:22 56:19 65:24 72:24 73:5

B

back 23:9 34:9 36:25 43:21 45:13 47:9 51:18 53:16,21 57:10 63:22 64:6,7 74:7 78:6 82:12,15, 18 83:4

bad 55:5

Badgett 8:7

bailiff 23:2,4

Bartlett 49:3

based 14:4 15:4,8,9 19:11

basic 52:9,24 58:8

basics 52:10

basket 30:24

Beard 66:16, 18,20,24 67:2, 13,21 68:6 69:4,23 70:3,5 71:6 73:9

Beard's 68:7

beg 79:7

began 21:17

begin 10:5

beginning 64:7

behalf 8:16,22 9:1,6,8,11,15, 18 34:5

believed 15:13 18:23

belong 26:11, 12

bias 13:22 14:4

biased 13:18, 21,23 14:1

Bieber 38:6

big 47:9,12

Bill 9:18

binder 25:24 26:1,10

bit 25:21 48:16 52:6

blank 57:17

body 57:22

book 25:23,24 26:4,6,9,10

bottom 48:10 65:10

Boulevard 8:8

Bowling 8:8, 12,23 58:20

break 12:17,21 36:20 63:17 83:14

breaks 12:24

brothers-in-law 68:1

brought 14:13 43:20

build 62:11

Burnett 52:5,8

business 8:8 50:16 83:2

Buster 9:7,11

C

call 10:19 22:2 35:13

called 20:20,21 22:4 44:10

calling 22:17

camera 57:22

Cameron 19:5, 19 44:13,16,20

Cannon 9:7,11

capacity 9:7 31:5

captain 60:7 62:18 67:5,6,8 79:10

car 35:15

cared 55:25

career 15:13 20:1 35:6 64:14 72:1

Carpenter 46:25 47:2,3

carry 57:14

cars 75:4,6,9

case 10:16 11:2 13:19,23 14:2 20:18 21:17 32:25 38:5,6 43:1,18 44:2,4,11 46:11 47:21,25 62:11, 14 81:17,22

cases 21:16 48:4 62:1

cast 16:1,8,21

Catholic 36:8, 13,17 45:3

caught 55:24 80:17 81:4,8

caused 36:9

ceiling 24:24

Center 8:8

centered 59:15

certification 51:7

chance 65:13

changed 67:6

characterize 45:3

charge 15:3,5, 14 17:14 18:13 79:25 80:11 81:11 83:1

charged 18:3 67:4,10,11 69:21 70:25 71:20 80:1,4

charges 14:7, 13,19,22 18:1, 11,18,19 21:21 29:11 79:24 81:1

charging 17:1

chief 39:23,25 40:3 67:7 77:23 78:8

child 19:9 36:3, 16

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Childers 9:16

children 35:16

chose 51:1

Chris 9:4 74:1

church 36:17

circumstance 36:4 81:10

circumstances 17:22 76:19

citation 18:20 46:19 80:10,11,24

citations 52:18

citizen's 74:11

city 8:11 9:12 39:25 48:25 51:14 64:21 65:1

civil 10:25 11:1

class 58:16,20 59:12

classes 59:17

clean 16:25

cleanup 80:7

clear 33:3

clerk's 30:24

client 8:24

clock 84:7

close 75:4

coaching 20:13

cocaine 66:22

colleagues 31:19

collected 62:5

college 49:20 50:20

Collins 69:9 70:2,24

color 68:1,2,4

comment 26:22 73:10

comments 63:12,14

commit 13:15

committed 15:11 17:20 18:17

committing 16:18

Commonwealth 34:6 37:19 42:9

Commonwealth's 20:8 26:1,8

communicate 31:18 43:14 44:1

communicating 31:20

communication 44:4

community 15:16 17:3 82:3

complaint 67:5,10,13 74:11,18,24 75:3 76:14,20,23 77:7

complicated 15:2

CONCLUDED 85:9

conditions 69:10

conduct 15:24 16:6 53:4,8 54:1,12,18 58:24

conducting 16:3 54:22,24 59:9

confident 61:12

confused 32:4

conscience 16:25

considered 19:25 21:14 29:25 39:5 55:2 79:23 82:3,4

consistent 45:2 58:10

constitute 14:18,22 15:19

constitutional 13:11

contact 42:25 46:15

contained 42:14 69:15

contemporaneously 38:20

contents 58:5

control 84:3

convenient 83:21

conversation 24:1 26:19,23, 25 27:2,16 29:22,23 30:6 33:11,13,15 37:4 41:5,10,22 42:3 43:17 70:15

conversations 32:23 43:10 44:12

convict 13:15

convicted 29:3

conviction 27:10,18 71:10

cool 55:7,11, 14,16

cooperating 73:6

copy 37:16,19, 22,25 38:20

coroner 10:23

correct 13:8,

19,24 14:9,10, 14,15,20,24 15:9 16:3,9 17:17,18,22,23 18:2,10,12,13, 15,18 19:14 22:9 25:7,8,22 27:20 28:15 29:1,15 31:13 32:20 34:6,7,10 35:5,8,17 36:1 37:12 40:25 41:2,8,9,14,25 42:1,5,6,10,11, 19 45:5,14,19 52:2,12,16,19 53:9 54:9,10,14 57:1 58:9,22 59:2 63:14 66:13 68:24 69:7,15,24 70:6,19,20 71:7,12,22 77:13 81:21,25 82:20

cough 83:23

counsel 8:13 9:4 10:4 12:25 33:16 83:21

counting 84:23

county 9:7,8, 18 10:18 11:14 31:2,6,20 80:12,16,24

couple 44:5 61:20 64:7 68:1 82:9

courses 51:7 59:17

court 8:5,6,12 9:23,24 10:4 30:14 73:25 82:14,15,16,18 83:6 84:19,22

courthouse 48:3

Courtnet 38:5

Covington 9:3

crack 66:22

credibility 16:21

crime 13:15 15:5,8,11,15 17:11 29:4 52:25 58:14,17 69:22 70:25 71:20 80:2

crimes 17:1,20

criminal 10:24, 25 14:8 16:2 19:16 20:2 28:2,13,19,21 31:21 32:13 35:21 53:12 56:8,14 59:10, 12,14 73:6

Crossing 8:8

crude 74:20

crushed 10:21

Cumberlands 49:25

cut 21:10 81:14

_____

D

dad 36:17

dad's 49:2

dangerous 73:1,2

date 10:14 44:17 51:13

day 16:25 22:23,24 37:9

days 78:16

dead 35:17 70:9 71:6,21 73:13

death 10:22

December 77:12,14

decide 13:3

decisions 83:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

defendant 9:5, 6 13:8

defendants 8:23 9:2,16

defense 20:13 23:12 25:22 26:14 37:14 40:11,13 41:2, 6,7,11,22 42:4

defense's 38:8

defensive 27:4

degree 50:16

degrees 23:19

delivered 49:16

demonstrate 56:21

denying 70:1

department 10:18 11:7,17, 25 12:3 15:25 16:7,19 31:3,6, 13,17,20 32:5 40:1 48:20 51:4,20 53:21 56:7,12,18 58:3 59:19,22 60:3 63:6 64:15,23 65:16 67:2 68:3 71:12 73:20 77:13 78:1

depend 17:7

depends 57:21 81:10

deposition 8:9 10:10,13,24 12:15 75:16 83:20 85:9

depth 53:6

deputy 9:8

desire 27:10

Detective 39:23

determination 17:25

device 57:18, 20

devices 57:25

die 71:16

died 36:17

difficult 13:20 41:13

Dill 79:10

DIRECT 10:6

directed 19:9

direction 18:11

disciplined 79:15

disclose 53:11 56:7

disconnect 38:13

discretion 15:4,7,9 17:9, 16,21

discuss 24:13 38:1

discussed 25:14,20

discussion 25:16

disenfranchised 29:7 34:16

dismissed 80:12 81:1

disposal 80:6

dispute 40:13 41:7,23

dissertation 38:22,23,24 39:5

District 8:12

DNA 38:13

DOCJT 53:24

doctorate 39:20 50:1

document 59:5,6 64:1 77:18

Dorris 79:19 80:2

Dorris' 79:23

doubt 16:8,21 61:9

drinking 83:22

drive 77:22

drops 83:23

drove 49:14 78:4

drug 66:21

drugs 75:3,8, 12 76:10

due 29:20

duties 51:16 57:15

dying 72:20

---

E

E-L-K-T-O-N 11:10

earlier 40:22 75:14

Ed 8:25

Edd 39:18

educated 39:12

education 39:4 40:7

Educational 39:20

Edward 9:21 80:6

effectuate 56:18

Electric 49:14

Elias 66:16,18, 20,24 67:1,13, 15,21 68:6,7

Elkton 11:7,9, 16,25 12:3

Elliot 8:15 73:25 81:13 82:7 84:6

Emerson 49:14

employed 11:6 16:20 31:1,2 49:1,2

employee 51:14

employment 11:16 16:1

encounter 19:10 54:25 55:1,6

encountered 45:13,18 54:13 55:18 76:24 77:8

encounters 69:18

encourage 42:8

end 12:25

enforce 51:15

enforced 82:4

enforcement 14:17 16:9,21 17:5 38:25 39:22 47:16 50:24 51:16 62:15 70:23 71:3,15,18 72:1 73:1 79:22

engage 51:16

engulfed 24:22

enjoys 39:14

entered 8:20

Enterprises 49:3

entirety 22:16

envelope 30:23

error 38:17,21

escalating 74:15

et al 8:11

evaluating 62:1

evaluation 63:8,12 64:8, 12,19,21,25 65:3,5,6,17,20 66:2,5

evaluations 64:16

evenly 61:6

event 55:24

events 72:7

eventually 78:4

evidence 28:5 38:13 53:11,13 56:8,21 62:5,9

evil 44:24 45:4, 9

ex-wife 33:19

EXAMINATION 10:6

examine 62:5

exculpatory 53:11 56:8

exhibit 30:12, 13,17 48:9,13 58:2

existed 56:16

experience 61:14

expert 23:13 25:22 34:5 37:14 40:11 41:2,6,11,22 42:4

experts 34:9 38:10 40:13 41:7

expressed 27:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 29 of 36 PageID
#: 2725
The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022
91

external 54:11

extremely
55:18

_____

**F**

_____

faced 75:1

fact 17:24 30:4
34:20 45:2
56:25 72:25

factory 50:25

facts 19:24

factual 55:1

fading 83:19

fair 12:13,21,22
22:12,13 27:3,8
28:11,14 29:9
36:5,10,11
37:3,10 39:7,8
40:8,10 42:21,
22 44:2,3,21
45:4 46:23,24
47:1,16 48:5
50:20 52:15,18,
21,22 53:3,7,10
54:25 56:1 59:1
60:19,20 69:6

fairness 29:20

faith 36:12
45:12,15

faith-based
71:10

falsely 67:4

family 76:6

fathom 36:4

fault 21:5

feel 13:25 30:3

feeling 85:3

fell 10:21

felony 17:10

felt 20:12 27:21
29:8,9 34:16,18
61:6,11 83:4

field 51:23

54:22

figure 65:8

file 74:11 75:15

filed 13:8

fill 12:24

fine 21:9 85:7

fire 18:23 19:2,
6 23:18 24:22
29:8 34:20
35:12 38:13
41:14,25 42:10,
14 44:7,15,24
45:7 55:23,24
58:17,18

fires 35:13

five-minute
63:16 83:14

flashover
23:17,18,23
25:1,7,11,14,
16,18 26:22
40:14,24 41:8,
12

flattering
71:24

floating 69:23
70:5,10 71:1,5
73:11,14

floor 24:23

focus 19:7
50:15

focused 53:17

follow 80:25

force 52:14
56:13,16

forensic 38:14

forgot 38:4
39:24 40:4

form 14:25
15:21 25:13
27:6,11 32:14
35:9 40:15
41:15 55:3
57:12 65:2 72:2
73:21 77:1,9
79:5 81:6

formal 40:7
51:18 53:20
54:1,11 56:6,
10,11,15,17
58:24 59:9,21,
23 60:1 63:7,
11,13 64:22,24
65:16,18,19
73:19 76:22
77:6

forward 17:22
69:5 84:15

FOT 51:23

found 19:20

foundation
32:15 73:22
77:2,10 81:7

four-page
30:16

Frankfurt 9:15

friend 21:14
29:13,22,25
32:23 42:21
43:24

frustrated
19:13,15,18

FTO 51:25
52:3,4 53:15,
19,23 59:3,18
66:7

full 9:20 24:8,
12,13,19,21
25:1,7,14

_____

**G**

_____

Gadansky 9:4
40:15 41:16

Gail 20:10,11,
12 21:14 22:3,5
29:22,24 30:7
32:19 33:4,6
47:20

gained 53:12

garbage 80:5

gave 25:21
27:5,25 46:19,
20 78:11

generally
15:22 17:6
74:14

Georgetown
9:12

Gill 20:6,7 28:8
29:1 33:24 34:4

give 9:25 26:8
30:11 37:16,19
40:20 61:9
81:10 83:2,3

giving 83:5

Glasgow 50:4

goals 42:7

good 8:15 17:7
37:11 43:23
60:24 61:4,17

goodness
49:9

Government
50:11

graduate
39:15 50:8,12

graduated
50:20 51:17

grandson's
68:1

Great 10:10

Green 8:9,12,
24 58:20

Gregory 9:5
22:7,11,14
23:1,6,8,22
24:4,7,11,13
25:12,15 26:9,
19 27:4,9,14
37:4,16 40:12,
13,23 41:5,7,
11,23 42:4,20
43:1,2,5,14,17,
19,20,22 47:25
48:5

Gregory's
26:10 34:9,11,
15

Griffin 78:5

grocery 49:2,6

ground 84:7

guess 21:20
22:18 26:16
38:11 47:23
73:8 74:3

Guiling 20:10,
11 21:14 22:3,5
29:24 32:19,22
33:5,6,10 47:20

guilty 82:5,23
83:8

_____

**H**

_____

Hadden 52:4,7

hair 79:20

hand 9:23
57:23

handed 46:14

hanging 23:5,7

happen 29:11
73:8 79:8

happened
36:10 56:21
69:6

happening
27:17

happy 12:17
78:13

hard 36:4
69:17 72:3,4
75:18

hateful 74:20

Hayes 57:4

hear 8:20 10:8
23:20 83:18
84:1

hearing 20:17
21:20,23 22:16
34:18

helped 30:9

Hey 73:25

Higgins 8:10,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 30 of 36 PageID
The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022
#: 2726
92

25 9:19,21 10:8
13:7 15:12
16:18 28:24
30:12 34:22
36:18 48:9
63:25 68:14
74:10

**Higgins's**
83:21

**high** 25:19
49:18,19

**higher** 81:2

**highest** 39:21

**hire** 51:13

**hired** 48:23
51:2 71:11

**hiring** 39:1

**hitting** 36:15

**home** 55:23,25
56:1

**homicide** 35:8
53:4

**homicides**
12:1

**honestly** 69:19

**hooking** 45:7

**hope** 85:3

**hours** 51:6
84:9,23

**house** 75:8,12

**How'd** 46:16

**Hunt** 49:15

**hypothesis**
38:22 39:3

          **I**

**idea** 77:21

**IDENTIFICATI
ON** 30:13 48:13

**illegally** 75:4
76:9

**Illinois** 8:17

**impact** 83:9

**impeachment**
56:8

**imperfect** 12:6

**implication**
71:6

**imply** 71:20

**important** 29:9

**improve** 62:15
63:3

**improvement**
62:24

**in-service**
51:7 53:24

**inappropriate**
28:18 72:6

**incident** 35:24
36:9 55:16
56:25 57:8 67:4
70:22 73:17
80:3

**incidents**
66:21

**independent**
70:21 73:15,16
74:23 76:17
78:25

**Indiana** 49:24
50:12

**individual**
10:21 67:9

**individuals**
73:6

**Industries**
78:5

**influence**
28:16,19,21
33:24,25 34:3

**informant** 67:2
71:1,16,21
72:20,25 73:2

**informants**
73:5

**information**
37:7 38:19

42:2,13 69:14
75:7

**ingot** 10:21

**initiate** 14:12,
18,22

**initiated** 14:7
18:1,11,19

**initiating** 18:18
79:24

**Innocence**
26:14

**instance** 82:25
83:12

**instances**
15:13

**instruction**
53:13

**instructs** 13:4

**intact** 27:10,19

**integrity** 16:8,
10,24

**intelligent**
61:12

**intention**
80:21

**intentional**
45:11

**intentionally**
44:24

**interacting**
76:6

**interaction**
76:7

**internal** 54:11
59:21

**interrogation**
54:2,4,13,19
58:25

**interrogations**
58:20

**interrupt** 74:1

**intersection**
75:5

**interview** 54:2,
3,12,19,24
58:24

**interviewing**
59:3

**interviews**
54:22 58:20

**intoxicated**
55:18

**intoxication**
18:2,14 45:24
46:22

**investigated**
10:22 12:1,4
67:8

**investigating**
29:5 62:2 67:5

**investigation**
10:17 14:9,17
19:16 20:3
22:12 28:19,21
31:5,7,12,14
32:6 34:23
35:7,21 42:24
53:4,8,12 56:9,
14 59:10,12,14
63:10

**investigations**
16:2 24:5 28:13
38:14 58:14
62:6 73:7

**investigative**
59:16,17

**investigator**
10:19 11:4

**invoke** 84:8

**involve** 58:17

**involved** 20:3
35:7,11,20
46:2,4,8 59:14

**involvement**
24:9,12,14,19,
21 25:1,7,15

**involving**
45:23

**issue** 52:17,18
78:11

**issues** 46:22

          **J**

**jail** 43:20,22
46:19 66:22

**January** 74:10

**JB** 49:15

**Jeff** 8:20,22
13:1 26:18

**Jenkins** 9:18

**Jennifer** 8:21
9:1

**job** 62:1

**jobs** 49:17

**John** 8:10 9:21

**Join** 41:17

**joke** 72:19

**jokingly** 71:16,
19

**Jonathan** 69:9

**Jones** 80:6

**judge** 13:2
20:2,6,7,12
28:8 29:1 30:22
31:21 32:13,25
33:10,12,20,24
34:3,8 42:8

**judgment**
82:5,24

**judicial** 28:10

**June** 51:6,13
58:8 64:4,19

          **K**

**Kane** 60:9,11,
21,23,25 64:3
65:24

**keeping** 84:10

**Kelley** 8:4

**Ken** 84:12,14,
15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Kentuckiana** 8:6

**Kentucky** 8:9, 12,24 9:3,15 11:8 38:25 49:23

**kids** 78:3

**killed** 73:5

**kind** 15:2 19:19 36:15 79:14 81:13

**knew** 14:16 35:16 61:13 67:3 69:3 78:10

**knowing** 43:17

**KRS** 62:14

**KSP** 9:15

_____

**L**

**Lack** 32:14 73:21 77:1,9 81:6

**laid** 19:24

**Lamont** 8:17

**Langen** 8:20, 21 9:1

**law** 14:17 16:8, 21 17:4 38:25 39:14,22 47:15 50:24 51:16 62:14,15 70:23 71:2,15,18 72:1,25 79:22 82:4

**lawsuit** 13:8 23:22

**layman's** 24:10,16 25:9, 10 27:23

**learn** 37:6 58:16 67:1

**learned** 40:6 52:13,17 53:1 59:2

**lease** 69:10

**leave** 77:23,25

**leaving** 84:20

**leeway** 83:5

**left** 17:24 18:22 19:2 77:16

**legitimacy** 16:2

**letter** 20:2,6,7 29:1,13 30:9, 16,19,21,25 31:22 32:7,8, 12,19,25 33:6, 9,14,16,24 34:16 36:7 37:23 38:2 40:6 42:3,7 68:7 81:20,21

**letting** 82:5,23 83:9

**Lexington** 9:9, 13

**life** 19:14 44:17

**lifetime** 67:24 84:24

**limited** 25:16 58:25 59:18

**Lisa** 66:16

**listed** 38:2 59:7

**lists** 46:13

**lived** 55:25 56:1

**local** 38:24 83:2

**Logan** 9:18 10:18,20 31:2, 5,20

**Loganville** 31:19

**long** 11:11 22:14,20,21 49:5 61:8 68:12,19 69:13 70:16,17 72:11 76:21

**longer** 12:15

**looked** 67:11

**lose** 55:10

**losing** 84:2

**loss** 36:3

**lost** 44:17 55:4, 7,13 74:1

**lot** 36:15 47:7 83:23

**Louisville** 58:14

**Lynn** 9:6

_____

**M**

**made** 26:22 47:7 50:24 57:3 63:12 66:23 67:9,13 69:4 73:10 74:17,19 76:23 77:7

**main** 34:15 52:4

**maintain** 51:6 52:25

**major** 50:10 67:7

**make** 8:9 13:2 33:3 57:4 71:24 78:2 83:3 84:10

**makes** 13:5 67:15

**making** 83:9

**Malles** 9:10,11

**Management** 50:17,19

**Mando** 8:22 13:1 14:25 15:21 21:1 25:13 27:6,11 32:14 35:9 36:14 40:16 41:15 55:3 57:12 70:11 71:25 72:2 73:21 76:2 77:1,9 79:5 81:6,13 82:7,19

83:11,25 84:5, 14

**margin** 38:17, 21

**MARKED** 30:13 48:13

**Master** 50:19

**master's** 49:25 50:15,16

**material** 37:20

**materials** 37:14,17,22 38:1

**matter** 8:10 15:10 20:13

**Maureen** 9:10, 11

**Mayberry** 47:17

**MBA** 50:18

**Mcdonald** 60:7,8,15 61:17,25 62:8, 13,17

**meant** 24:9,12

**meeting** 24:7 25:11,22 27:4, 9,19 74:1

**memo** 68:11, 15,20,23 69:1 77:20 78:22

**memory** 70:22 73:15,16 76:5

**mentor** 61:19

**methodologie** **s** 38:18

**middle** 11:14 82:8

**midnights** 60:12,14

**miles** 47:12

**Mills** 43:23 44:6,9,14 60:16,17

**mind** 40:18

**mine** 21:15 60:11 61:19

**Minored** 50:11

**minute** 36:14

**minutes** 84:9, 23

**Miranda** 54:21

**misconduct** 14:18,22 15:19 16:19 74:12

**misdemeanor** 17:8,20 83:1

**misdemeanor** **s** 17:14

**moment** 68:14

**money** 78:2,11

**months** 49:15 66:5,7

**morning** 8:15

**moving** 17:22

**mug** 12:24

**multiple** 41:13, 24 42:10

_____

**N**

**nature** 59:17

**necessarily** 15:5

**needed** 18:1 78:10

**negligently** 45:7

**nephews** 68:2

**newer** 66:12

**newspapers** 49:16

**nice** 61:5

**Noe** 80:13,15

**North** 75:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

notepad 57:13, 17

notes 37:13,25 38:19 57:11

number 48:9, 11 81:13

numbers 48:10,11

---

**O**

oath 32:22

Object 27:6,11 40:15

objection 13:5 14:25 15:21 25:13 32:14 35:9 40:16 41:15,17 55:3 57:12 71:25 72:2 73:21 77:1,9 79:5 81:6 83:11

objections 13:2,3

observations 30:2,7 42:13,17

obtain 37:22 46:10

obtained 50:16

obtaining 38:20

occurred 25:18 27:23 40:14,24 41:8, 12 42:3

October 51:6

offended 68:4

office 9:13 30:24 57:4

officer 11:15, 24 14:17 15:4, 7,8 16:9,22 17:5 18:3,9,12, 17,19 35:12 47:16 48:17,25 50:22 51:12,23

52:11 53:17 57:4,15 60:4,6, 15,17 62:15 66:12 69:21 70:24 71:3,15, 19 79:23 82:23 83:10

officers 39:1,3 64:16

online 50:5

opinion 34:10, 12,15 38:12 61:23 72:3

opinions 23:9, 13 27:5

opportunity 22:11 37:6 41:1

order 62:10,14

origin 41:14, 24,25

original 23:10 27:5 31:14 34:9,11,15 42:9,14,18,23, 24 43:15

origins 42:10

outcome 27:24 28:9 34:18

owner 83:2

---

**P**

pages 64:7 68:13

paper 57:17

paperwork 46:14

paragraph 38:3 65:11 69:15 71:24 82:6,8

parking 75:4,6 76:8,9

part 10:25 11:16 19:17 24:14 53:13 58:16 84:17

participate 31:4,7 51:15

participated 29:4

participating 13:14

party 11:2,5

past 44:2,21

patrol 11:24 52:11 53:17 60:4,6

payment 83:3

pending 8:11 12:20 31:21 32:13

people 16:15 17:1 55:25 56:3 59:3 75:3,12 76:8,10 78:13

performance 63:8

performing 57:15

period 52:1 59:18 60:13,18

permission 32:12,16 80:22

person 28:22 36:12 39:6 66:16 69:21 71:9 72:15,17

person's 82:2

personal 26:23,25

personally 19:13

personnel 75:15

perspective 24:10 25:9 27:23

persuade 34:8

Phd 39:17

phonetic 60:9 66:17 79:11

phrases 40:5

physically 46:5

picked 46:11

picture 50:21

piece 56:20

place 51:19 53:20 56:17

plaintiff 8:16, 19

Plaintiff's 30:12

plant 10:20

play 82:12

PLAYS 82:15, 18

point 12:7 22:6 33:11 41:24 67:1 68:6 75:17

points 41:14, 24 55:8

police 11:7,17, 25 12:3 15:19, 25 16:7,19 31:13,17 32:5 39:1 48:17,20, 25 49:12 50:21 51:3,12,19 53:21 56:7,12 58:3 59:19 63:6 64:15,23 66:12 68:3 69:21 71:11 73:20 77:13,25 82:23 83:10

policy 56:15, 16,18

political 15:16 17:3

population 47:11

port 43:6,7,11 56:22 57:8

Porter 57:4

PORTION 82:15,18

position 65:25

possibility 35:14 48:7

possibly 10:15 33:19 38:18

post-conviction 21:23 37:5

potential 35:8

potentially 21:8 37:5

practice 67:25

practicing 36:7,13

pray 44:18

prayed 44:20

prefer 84:1

preferred 39:3

preparation 22:7

preparing 75:16

present 8:23 13:1 14:24 17:2 42:9 46:6,9

pretty 47:13

prevented 19:6

previously 24:1 45:21

primarily 53:16

prior 24:3,7,11 33:16 35:19 37:9 43:14 45:23 48:25 53:25 54:4,5 58:23 63:9

probabilities 38:17

probable 14:5, 12,19,23 15:3, 14 17:2,8,10,19 18:16 27:22 52:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

problem 12:10

procedural 54:21

proceeding 10:25 37:6

PROCEEDINGS 8:1

program 50:5 51:19,23 53:15, 19,23 59:3 66:7

progress 84:5

Project 26:14

promoting 39:1

prompt 21:12

prompted 21:11,12 74:24

property 80:18 81:5,9 83:1

prosecuting 20:18 22:5

prosecution 20:3 31:21 32:13

prosecutor 20:15 21:12,13 29:12,16 32:18

proud 72:9,10

provide 63:6 64:22 65:1

provided 25:23 54:17 59:1,20,25 65:15 73:18

Psychology 50:11

pulling 76:10

Purnell 8:5

purpose 20:14 34:15

pursuit 78:16

put 18:5 29:16, 25 30:5,23,24 42:2 46:18

84:16

_____

**Q**

question 12:7, 11,20 13:5 15:2 21:1,3 23:16 24:15 31:10 36:9 40:18,20 55:4,5 60:2 70:13 82:11,19

questions 12:6 75:25

_____

**R**

racial 67:16,20, 23

radio 43:12

raise 9:22 78:12

rank 11:23 39:21 60:3

rapidly 83:19

raspy 12:23

ratted 70:3

re-plow 84:6

reach 21:11,13

reached 23:18

react 56:4

read 26:4,6 38:4 62:14 65:4 75:24 76:1,4,15 78:24

reading 37:13 41:22 45:25 54:21 69:16

ready 66:11

reason 61:9

reasonable 13:22 14:4 19:11 28:9

recall 15:17 21:17 22:3 23:3 26:20,24 27:1,

2,16 29:23 30:8 31:23,25 33:1, 8,13,18 35:10, 13,23 41:18 43:16 45:25 46:20 47:5,8, 22,24 48:1,6,18 53:13 57:6,24 58:18 59:11,13 60:13 61:6,8 62:3,7,12,19 63:15 65:6,21 66:3,15,19,21, 23 68:8,9 69:8, 11,25 70:7,14, 15 72:11,13,21 73:9,12 76:7,8, 14 77:11 78:14, 15

recalled 38:19

recalling 69:17 72:5

receive 51:3 52:24 54:3 63:11 76:22 77:6

received 39:22 51:5 52:10 54:1 58:7 65:2,17,20

receiving 83:1

recent 47:22, 23

recognize 44:16 59:5,6,7 62:21 64:1

recollection 58:10 74:23 76:17 78:25

recommendation 79:3,13

recommended 65:25

record 8:3,14 9:20 36:20,22, 24,25 63:20,21, 23 74:3,5,6,7 83:15,17 84:17, 22

record's 33:3

recorded 57:1, 5

recording 56:23 57:7,18, 20,25

records 58:4

refer 48:11

reference 20:18 38:5 46:10 63:12

refresh 76:5

related 31:5 56:16 63:13

relating 24:5 58:17

relationship 62:10

remain 29:3

remember 10:14 22:24 26:3,17,21,24 33:5 35:11 44:8,10 52:6 67:8 68:9 70:11,14 74:25 75:5,10,19 76:9,14,15 77:5,19 78:12 79:10,20

remotely 8:17, 19 9:2,5,9,12, 14,17 21:6

report 34:22 35:1,3 38:20 42:14 81:22

reporter 8:5 9:23,24 10:4 30:14 73:25 82:14,15,16,18 84:19,22

Reporters 8:6

reporting 67:4

reports 25:22 40:11 41:2,6, 12,22 42:5 52:18

representing 8:5

reprimanded 79:18

request 22:4 57:2,3

requested 56:25 82:15,18

reserve 84:8

residence 74:25 75:1

resign 77:19 78:4

resigned 77:12

resource 11:15

respect 12:11 39:16 60:23

respected 60:22 61:21

respond 33:20

responding 35:12

response 68:7

responsibilities 11:19 53:17

responsible 65:25

result 64:21

resume 83:20

retrial 29:17 30:1 34:6

return 80:7,9

returning 80:22

review 41:2,6 42:4 57:7 65:13 68:15 75:15 78:22

reviewed 64:19

reviewing 40:10 41:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 167     Filed 10/03/25     Page 34 of 36 PageID
#: 2730
The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022
96

Rhonda 79:19

Richard 38:6

Richmond
51:9

rights 13:11

river 69:23
70:5 71:1,5
73:11

Robert 8:10,
16,19 13:8
18:23 27:18
29:3 45:18
46:17,21 76:24
77:8

Robin 74:10
76:6

Robinson 8:18

rode 52:5

Ron 43:23

room 13:1
22:7,10,15,19,
25 23:13 24:4,
8,12,14,19,21,
22 25:1,7,15
37:4,10 40:11,
23 41:2 48:3

RPD 48:10

rude 74:18

rule 84:8

run 47:3

run-ins 66:15,
19

running 83:24

Russellville
8:11,23 9:2
15:25 16:7,19
31:12,17 32:5
44:9 47:9 48:20
49:1,15,19
51:3,12,15,19
53:16,21 56:7,
12 58:3 59:19
63:6 64:14,22
65:1 71:11
73:19 77:13
79:21 82:22
83:10

S

sally 43:6,7,11
56:22 57:8

save 19:5,8,18

scene 17:24
18:23 19:3 43:3
52:25 58:14

scenes 58:17

scheme 13:14

school 11:14,
15 39:14 49:18,
19

school's 11:21

schools 39:15

science 37:7,
11 38:13 50:19

scientific
38:18

Scotland 50:5

Scott 9:7,8

scripture 45:3

seconds 84:23

seek 32:11
83:19

selling 75:3,8,
12

semi 49:14

sending 33:11,
16

sense 61:13

sentences
82:9

separation
22:17

September 8:6
35:20 44:12
45:13,17,22
46:22 47:4
53:25 54:14
55:21 57:10,19
63:9 76:24 77:8

sergeant 40:3
60:8,9,11,21,
23,25 61:25
62:8,13,16,17
64:3 65:24

serve 46:16
68:3

served 46:13

services 80:5,
11

session 11:21

set 44:24 45:7

share 23:12,15

sheets 57:17

sheriff 9:8

Sheriff's 10:18
31:3,6,20

Shifflett 52:6,8

shift 60:15

shop 80:7

short 36:20

showing 21:18

shy 12:25

sick 21:7

side 37:10

sign 64:18

signature
62:21,25

signed 18:20

significant
60:18

similar 39:15

sir 10:9,13 11:6
12:2,5,14 13:6
18:22 20:1 24:6
29:6 30:16 32:3
35:2,4 36:2,6,
13 37:3 40:9
43:7,9 45:21
47:5 48:8 49:7
53:23 54:10
55:9 56:19
58:5,11 59:5
60:23 62:22

63:5 64:1,5,10
65:13 66:14
67:12,22 68:11,
22 71:8,13
73:23 74:22
75:13,22 82:1

sit 29:19

sitting 20:2,16
22:21 25:5
32:12 34:8
70:22

situation 17:8,
16 74:15,24

six-month
78:6

Slosar 8:15,16
10:7 30:11,15
36:18 37:2
41:20 63:16,19,
24 74:2,9
81:15,19 82:8,
12,21 83:13,18
84:13,16,20,24
85:2,5,8

slow 62:4

slur 67:16,23

slurs 67:20

small 40:1
47:13,17

Smith 9:16,17
41:17

solemnly 9:24

sorts 58:6

sound 54:9

speak 20:5,8,
11 22:11,14

speaking
15:22 17:6
20:14 24:11
47:24

spell 11:9

spoke 21:3,15
22:19 47:20

spoken 27:13

square 47:11

squash 81:2

squashed 81:2
83:7

SRO 11:13,20

stage 66:10

stand 29:17
30:1,5 54:23

standard
54:22

Staples 8:18

started 19:2
51:12

state 8:13 9:20
42:8 71:16

statements
27:25

States 8:12

statistical
38:17

statistics 50:7

stature 15:16

status 17:3
79:23 81:3
82:3,5,23 83:9

stay 27:10,19
78:8

stayed 35:25
77:24

staying 77:23

stealing 81:8

steps 57:4

Steve 52:4,7

stint 78:6

stolen 80:18,
20 81:5 83:1

stop 19:22,23
47:7

stopping 75:4

store 49:2,6

stove 45:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 35 of 36 PageID
The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022
#: 2731
97

straightforward 69:1

Strathclyde 50:2,4

street 11:22 53:2 59:3 75:2

strike 28:17 52:24 60:2

strong 45:12, 15 71:10

stronger 62:11

strongly 27:22

student 50:1

study 62:14

studying 50:6

stuff 59:16

stylist 79:21

subpoena 69:9

substantive 54:18,20

suggested 63:3

suggestions 62:24 65:11

summons 83:6

supervised 65:5,9

supervising 64:16

supervision 60:1 63:7,13 65:2,19 73:19 76:22 77:7

supervisor 60:5,10,11,24 61:4,7,10,12,18 64:3 68:24 69:2 72:8

supervisors 31:19

supervisory 60:1

supposed 28:11,14 65:5,9

surely 54:17

surprise 23:25 79:14

suspect 15:9, 10 18:24 29:18 71:20

suspend 79:13 83:19

suspended 78:15,17 79:2

suspension 79:1,3

suspicion 19:11

swear 9:24

sworn 9:23

system 11:14 28:8,10

---

**T**

---

table 58:5

taking 12:21 38:19 57:11 69:8 80:5

talk 16:17 21:17 23:8 43:3,5 73:10 79:9

talked 73:18 77:23

talking 17:13 26:4 32:7 36:16 38:12,16,21 43:7 44:11 48:12 54:8 57:21 67:9 79:11 80:4 81:18

taught 52:10, 20,23 53:1,4,8, 11 54:23

tea 12:24 63:17 83:23

technical 25:8

telling 26:20 32:22 33:1,4,5, 6 62:19

temperature 25:19

tend 12:6 16:1, 8

terms 26:19

testified 10:12 21:22 23:9,22 40:22 45:21

testify 14:11 20:20,21 21:19 22:2,4 23:4 30:1 34:17,19 37:5 42:17

testifying 30:7

testimony 9:25 14:1,3 21:22 28:6 29:8 43:13,16 46:1 55:13 80:1

testing 38:22

theft 80:5,11

theories 34:5

theory 42:9

thesis 39:2

thing 12:19 25:17,19 26:21 44:25 66:21 71:2 73:1,3 76:13

things 33:2 40:6 62:16 63:2 75:21

thought 25:17 29:10 60:24 61:5,14

tickets 75:6 76:8

ticking 84:7

Tim 52:5,7

time 8:7 10:12, 19 14:16 16:1

17:24 20:10,17 21:20 23:9 27:3,8,19 28:25 29:13 30:25 31:11 32:4 35:6,15 40:20 42:23,24 43:2, 20 44:17 45:18, 20 47:1,20 49:21 52:1 54:13 55:18 59:9,19 60:13, 18 61:2,3 62:17 66:2 69:13,17 72:4,19 75:17, 18 77:16 78:3 80:13,16 81:25 83:20 84:17

times 20:1 44:5 83:10

today 8:5,6,23 12:7 13:3 14:11 25:5 33:4,17 55:10 65:24 70:22 71:10 72:9,16 80:1 85:6

Today's 12:15

Todd 11:13

told 20:23 23:16,19 25:17 26:18 32:18,24 40:23 62:18 67:10 70:2 72:19 73:13 79:11 80:7 84:11

Tom 80:13,15

tomorrow 84:12,15

top 60:1

totally 24:22

touched 53:5

town 47:13

track 84:11

traffic 47:7

trailer 35:17,19 55:24

trained 54:15 66:8

training 24:4 51:3,5,19,23 52:9,24 53:20, 24 54:1,12,18, 23 55:2 56:6, 10,11,15,17 58:3,6,8,24,25 59:7,8,9,13,15, 21 63:7,11 64:23,24 65:16, 18 73:19 76:23

transcript 84:18

trash 80:9

trauma 56:4

traumatic 19:19 35:24 55:24

trial 19:21,23 21:19 23:10 27:14,24 28:2, 5,9 29:10,19 42:18,25 43:15

truck 77:22 78:5

true 15:12 18:22,25 19:1 28:23 67:19 68:24 79:22 80:17 81:4,24 82:2,22

trust 28:7 84:6

trusted 28:8 61:21

truth 10:1,2

truthful 70:19

turn 62:20 63:25 73:24 76:2,3

type 10:16 15:5,8,9,10,24 16:6,18 51:2 57:22 59:16

typically 64:15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 167    Filed 10/03/25    Page 36 of 36 PageID
#: 2732
The Deposition of JOHN EDWARD HIGGINS, JR., taken on September 13, 2022
98

---

**U**

---

**Uh-huh** 75:13

**uncompassio
nate** 74:20

**undergrad**
49:24

**underlying**
13:17 14:8,17
22:11 31:4,12
32:6 34:23 43:1

**understand**
12:8 13:7,10,13
15:1 29:12
31:10 62:10
70:17 72:12
85:1

**understanding**
24:8,12,15,17,
20,21,23,25
25:3,11,25
37:11 41:19

**understood**
12:13 40:12
41:5 56:3

**unethical**
15:18

**uniform** 52:17

**United** 8:11

**University**
49:23,25 50:1,4

**unjustified**
78:16

**unknown**
46:25

**unusual** 69:20
70:23 71:2

---

**V**

---

**vacate** 21:21

**vacated** 29:11

**validity** 13:3

**verbally** 79:17

**version** 72:7

**versus** 8:10

**viable** 34:1

**Victor** 52:5,8

**video** 56:23
57:1,7

**violating** 13:11

**violation** 17:9
69:9

**voice** 12:23
81:15 83:18,24
84:2,25

---

**W**

---

**waiting** 37:5

**wanted** 19:24
27:18 29:3,6
34:2 69:5 78:2

**warehouse**
49:4,16

**warnings**
54:21

**warrant** 46:10,
12,13,16,18

**watch** 28:2,3

**ways** 56:4

**well-educated**
39:6

**Wesleyan**
49:24 50:13

**West** 9:16

**Western** 49:23
50:8

**What'd** 50:10

**when's** 10:12
47:20 72:19

**Where'd**
49:18,20

**wife** 33:19

**wiring** 45:8

**witnesses**
22:17,18

**Woodward**
74:11,15

**Woodward's**
76:6

**words** 40:5
68:4,5

**work** 11:21
16:14,24,25
25:1 49:11,12
60:25

**worked** 31:11
39:13 44:8 48:4
49:5,14,15,16
60:12,14,15,17
61:3

**working** 48:7
51:12 62:6

**works** 25:4

**worse** 81:16

**would've**
17:16 22:10
29:8,16 32:18,
24 40:6,12
41:4,10,21 42:3
45:12 46:21
48:21 51:24
52:13,17,20,23
56:22 60:3,5,7
63:2 66:7,8,12
71:10 72:24
73:4 80:18 81:5

**write** 30:9,19
32:12 57:16
68:6,23 82:19
83:6

**writing** 32:19,
25 34:25 42:7
69:1 75:6 76:8

**written** 20:2
70:18

**wrong** 26:18
45:7,8 79:12

**wrongfully**
13:14

**wrote** 18:20,21
20:5,7 28:25
29:13 30:25
33:24 34:22

35:3,5 37:23
67:18 68:11,15,
20 69:14 72:8
80:9,10,23
81:20,24,25
82:2

---

**Y**

---

**year** 11:13
44:10 45:23
48:21 50:8,12
51:7 53:23 54:4
78:12

**years** 11:12
19:13 44:2,21
49:8,17 60:13
61:20 66:14
69:12,18

**Yell** 8:10,16,19
13:8,10,13,23
14:2,8,13
17:14,25 18:23
19:9,20 20:19
27:25 29:3
35:15 43:8,11,
21 45:14,18,23
46:17,21 54:13
55:1,7,11,13,17
56:22 57:8
76:24 77:8

**Yell's** 20:13
27:10,14,18
42:18,25 43:14

**you-all** 21:8

**young** 19:9

---

**Z**

---

**Zellen** 9:6

**Zoom** 74:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com