LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



**KENTUCKIANA**
— COURT REPORTERS —

## CASE NO. 1:20-CV-0047-GNS

## ROBERT YELL

## V.

## CITY OF RUSSELLVILLE, ET AL.

## DEPONENT:

## JOHN EDWARD HIGGINS

## DATE:

## January 24, 2024



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

AT BOWLING GREEN

CASE NO. 1:20-CV-0047-GNS


ROBERT YELL,

Plaintiff


V.


CITY OF RUSSELLVILLE, ET AL.,

Defendants


DEPONENT:  JOHN EDWARD HIGGINS

DATE:      JANUARY 24, 2024

REPORTER:  AMY KELLEY



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1
2
3  ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
4  Elliot Slosar, Esquire
5  Molly Campbell, Esquire
6  Amy Staples, Esquire
7  Loevy & Loevy
8  311 North Aberdeen
9  Third Floor
10 Chicago, Illinois 60607
11 Telephone No.: (312) 243-5900
12 E-mail: elliot@loevy.com
13 amy@loevy.com
14 molly@loevy.com
15 (Appeared via videoconference)
16
17
18
19
20
21
22
23
24
25

Page 3

APPEARANCES (CONTINUED)

1
2
3  ON BEHALF OF THE DEFENDANTS, CITY OF RUSSELLVILLE,
4  KENNETH EDMONDS, JOHN EDWARD HIGGINS, CHAD EGGLESSTON,
5  JIM PEDERGRAF, AND RONALD MILLS:
6  Jeffrey C. Mando, Esquire
7  Jennifer Langen, Esquire
8  (Appeared via videoconference)
9  Adams Law, PLLC
10 40 West Pike Street
11 Covington, Kentucky 41012
12 Telephone No.: (859) 394-6200
13 E-mail: jmando@aswdlaw.com
14
15 ON BEHALF OF THE DEFENDANTS, BILL JENKINS AND LOGAN
16 COUNTY:
17 J.A. Sowell, Esquire
18 Aaron Smith, Esquire
19 English, Lucas, Priest & Owsley LLP
20 1101 College Street
21 Bowling Green, Kentucky 42102
22 Telephone No.: (270) 781-6500
23 E-mail: jasowell@elpolaw.com
24 asmith@elpolaw.com
25 (Appeared via videoconference)

Page 4

APPEARANCES (CONTINUED)

1
2
3  ON BEHALF OF THE DEFENDANTS, SCOTT COUNTY AND BUSTER
4  CANNON IN HIS INDIVIDUAL CAPACITY AS A FORMER DEPUTY
5  SHERIFF:
6  Trey Yeager, Esquire
7  Kinkead & Stilz PLLC
8  301 East Main Street
9  Suite 800
10 Lexington, Kentucky 40507
11 Telephone No.: (859) 296-2300
12 E-mail: jyeager@ksattorneys.com
13 (Appeared via videoconference)
14
15 ON BEHALF OF THE DEFENDANTS, CITY OF GEORGETOWN AND
16 BUSTER CANNON:
17 Charles Cole, Esquire
18 Sturgill, Turner, Barker & Moloney, PLLC
19 333 West Vine Street
20 Suite 1500
21 Lexington, Kentucky 40507
22 Telephone No.: (859) 255-8581
23 E-mail: mmyers@sturgillturner.com
24 (Appeared via videoconference)
25

Page 5

APPEARANCES (CONTINUED)

1
2
3  ON BEHALF OF THE DEFENDANTS, DAVID WEST, WILLIAM T.
4  SMITH AND JAMAN CHILDERS:
5  Alea Amber Arnett, Esquire
6  Kentucky State Police Legal Office
7  919 Versailles Road
8  Frankfort, Kentucky 40601
9  Telephone No.: (502) 782-1718
10 E-mail: alea.arnett@ky.gov
11 (Appeared via videoconference)
12
13 ON BEHALF OF THE DEFENDANT, ALAN GREGORY:
14 Luke Morgan, Esquire
15 McBrayer Firm
16 500 West Jefferson Street
17 Suite 2400
18 Louisville, Kentucky 40202
19 Telephone No.: (502) 327-5400
20 E-mail: lmorgan@mcbrayerfirm.com
21 (Appeared via videoconference)
22
23 Also Present: Amanda Sankey, Videographer
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

INDEX

| | Page |
|---|---|
| PROCEEDINGS | 8 |
| DIRECT EXAMINATION BY MR. SLOSAR | 10 |

EXHIBITS

| Exhibit | Page |
|---|---|
| 5 - Uniform Citation - YELL 003375- YELL 003376 | 17 |
| 6 - Investigation Report - YELL 003321- YELL 003324 | 15 |
| 8 - Grand Jury Proceedings - YELL 009471- YELL 009533 | 56 |
| 12 - CAD Incident Detail - RPD00001- RPD000052 | 55 |
| 19 - Deposition of John Edward Higgins Volume 1 | 55 |

Page 7

STIPULATION

The VIDEO deposition of JOHN EDWARD HIGGINS was taken at KENTUCKIANA COURT REPORTERS, 537 EAST TENTH AVENUE, BOWLING GREEN, KENTUCKY 42101 on WEDNESDAY the 24TH day of JANUARY 2024 at 9:39 a.m. (CT); said VIDEO deposition was taken pursuant to the KENTUCKY Rules of Civil Procedure.

It is agreed that AMY KELLEY, being a Notary Public and Court Reporter for the State of KENTUCKY, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Page 8

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. My name is Amanda Sankey. I'm the videographer today, and Amy Kelley is the court reporter. Today is the 24th day of January 2024. The time is 9:40 a.m. Central Time. We're at the office of Kentuckiana Court Reporters, 537 East 10th Avenue, Bowling Green, Kentucky 42101, to take the deposition of John Edward Higgins in the matter of Robert Yell v. City of Russellville, et al., pending in the United States District Court, Western District of Kentucky at Bowling Green, Case number 1:20-CV-0047-GNS. Will Counsel please identify themselves for the record?

MR. SLOSAR: Good morning, Mr. Higgins.

THE WITNESS: Good morning.

MR. SLOSAR: My name is Elliot Slosar and I represent the plaintiff, Robert Yell. Thank you for coming today.

MR. MANDO: Jeff Mando for the defendants Ron Mills, Chad Egglesston, Chief Pedergraf, Ed Higgins, and the City of Russellville. Jennifer Langen is also -- my partner's also attending today via Zoom from Covington.

Page 9

MR. MORGAN: Good morning. My name is Luke Morgan. I represent Defendant Alan Gregory.

MR. COLE: Hello. This is Charlie Cole. I represent the City of Georgetown and Carmel R. Buster Cannon.

MR. SOWELL: This is J.A. Sowell. I represent the Logan County Detention Center Jailer Bill Jenkins and Logan County.

MR. YEAGAR: This is Trey Yeager. I represent Buster Cannon in his capacity as a Scott County Sheriff -- Deputy in Scott County.

MS. ARNETT: This is Amber Arnett. I represent the State Police Defendants West, Childers, and Smith. I'm attending remotely from Frankfort.

MS. STAPLES: Amy Robinson Staples here, appearing remotely for the plaintiff.

MS. CAMPBELL: And Molly Campbell here, also appearing remotely for the plaintiff.

THE VIDEOGRAPHER: All right. Thank you. So, Mr. Higgins, will you please raise your right hand to be sworn in by the court reporter?

THE REPORTER: Do you solemnly swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    THE REPORTER: Thank you. You may begin.
2            DIRECT EXAMINATION
3    BY MR. SLOSAR:
4    Q.   Good morning, Mr. Higgins.
5    A.   Good morning.
6    Q.   At the last deposition, we went over the
7    rules. I just want to briefly go back over them, just
8    we're -- so we're on the same page. You have an
9    attorney here, Mr. Mando. You've got another attorney,
10   Ms. Langen, on the Zoom. They have a right to make
11   objections, as do the other attorneys, so to the best
12   you can, unless your attorney instructs you not to
13   answer, you're still going to answer the question after
14   their objections are made, okay? It'll be very helpful
15   for the court reporter today when you're answering
16   questions to do so verbally, so the -- I can see you
17   nodding, but for them, it'll be helpful, you know, if
18   you say yes or no or whatever your response is going to
19   be to a question, okay?
20   A.   Okay.
21   Q.   I don't know how much you remember that last
22   deposition experience because I try to put it out of my
23   mind with my voice, but I tend to ask questions that
24   aren't perfect, and so if I ask you a question and you
25   don't understand it, please let me know. I won't take

Page 11

1    any offense. I'll just do a better job to ask the
2    question a better way, okay?
3    A.   Okay.
4    Q.   In that same respect, if I ask you a question
5    and you answer it, I'm going to assume that you
6    understood what was being asked, fair?
7    A.   That's fair.
8    Q.   I anticipate that, you know, today is going to
9    go, you know, fairly long in terms of where we're at
10   with this, and so if you want to take a break or go get
11   lunch or do whatever you need to do, just let us know
12   and we'd be happy to take a break, okay?
13   A.   Okay.
14   Q.   That same respect, if you do take a break and
15   there's a question pending, I'm going to ask you to
16   answer the question first before we take the break,
17   fair?
18   A.   That's fair.
19   Q.   Okay. Now, sir, I want to direct your
20   attention to the trailer fire on September 11, 2004. Do
21   you recall that -- arriving on the scene that day?
22   A.   I do.
23   Q.   And prior to September 11, 2004, you had never
24   been involved in a criminal investigation that was as
25   serious as the one that you encountered that day; is

Page 12

1    that fair?
2    A.   It's been so long, I don't recall. I think
3    that that's probably the most serious case that I've
4    worked in my entire career, to be honest with you, or
5    been involved in.
6    Q.   And this is a case that sticks with you to
7    this very day?
8    A.   It does.
9    Q.   And I believe you testified in your last
10   deposition that you considered Mr. Yell to be a suspect
11   in the arson before you --
12   THE VIDEOGRAPHER: I'm sorry, can we go off the
13   record for just a second? The camera just shut off.
14   MR. SLOSAR: Okay. Let's go off the record.
15   (OFF THE RECORD)
16   THE VIDEOGRAPHER: We are back on the record.
17   Time is 9:46 a.m. Central.
18   BY MR. SLOSAR:
19   Q.   All right, Mr. Higgins. Is it fair to say
20   that on September 11, 2004, you believed that Robert
21   Yell -- let me strike that. Is it fair to say that
22   before you even left the scene of the fire that you
23   believed Robert Yell to be a suspect in the arson?
24   A.   That's correct.
25   Q.   And you would have had that belief before --

Page 13

1    you would have had formed this belief that Mr. Yell was
2    a suspect in having committed an arson before you ever
3    conferred with anybody about the fire -- let me actually
4    strike that. You would have formed this belief before
5    you spoke to Defendant Cannon about the dog sniff that
6    later took place; is that fair?
7    A.   Defendant Cannon?
8    Q.   Yes. Buster Cannon. Do you remember that?
9    A.   I've never --
10   Q.   Okay. Never spoke to him?
11   A.   Never spoke to Cannon.
12   Q.   Never spoke -- did he ever -- I know you've
13   spoken to Mr. Gregory at some point, but on the scene of
14   the fire -- at the scene of the fire, was anybody even
15   there from the Fire Marshal's office that you knew at
16   the time that you left with Mr. Yell?
17   A.   No. The firefighters were there when I left
18   with Mr. Yell. That's it.
19   Q.   And is it fair to say the firefighters did not
20   provide you with any information that would have led you
21   to believe that it was an arson versus a natural
22   accidental fire; is that fair?
23   A.   That's correct.
24   Q.   Okay. So before you received any information
25   from a firefighter, a fire marshal, a dog sniff analyst,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1  you had already formed the belief that an arson had
2  committed by the time you left the scene with Mr. Yell,
3  correct?
4      A.    That's correct.
5          MR. MANDO:  Objection.  Form.  Lack of
6  foundation.  Go ahead.
7  BY MR. SLOSAR:
8      Q.    And --
9      A.    That's correct.
10     Q.    -- prior to September 11, 2004, have you ever
11 been involved in any investigations that involved fires?
12     A.    No.
13     Q.    So this was your first ever fire
14 investigation; is that fair?
15         MR. MANDO:  Objection.  Lack of foundation.
16 BY MR. SLOSAR:
17     Q.    You can answer.
18     A.    To my knowledge.
19     Q.    Okay.  Prior to September 11, 2004, did the
20 department have any policies or procedures in place that
21 gave you any guidance on how to determine whether a fire
22 was an arson or not an arson?
23     A.    No.
24     Q.    Prior to September 11, 2004, did the
25 department have any formal training that was provided to

Page 15

1  you on how to determine whether a fire was an arson or
2  not?
3      A.    No, sir.
4      Q.    Is it fair to say that there was no informal
5  training at the department by September 11, 2004 on how
6  to conduct an arson or fire investigation?
7      A.    Not to my knowledge.  I didn't receive any
8  training --
9      Q.    Okay.
10     A.    -- to that regard.
11     Q.    Okay.  Now I'm going to show you what we'll
12 mark as Exhibit number 6.
13         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
14         MR. SLOSAR:  And Counsel, I forget last time,
15 do you have access to the electronic exhibits?  I
16 have paper stuff here from Mr. Mando, but for people
17 online, is there a folder that has these that we
18 created last time?  I don't remember.  Sorry.  This
19 is for people on Zoom.
20         MR. COLE:  This is Charlie.  I don't have any
21 exhibits.  Another attorney from my office attended
22 the last deposition.
23         MR. SLOSAR:  Okay.  All right.  Let me have --
24 I'm going to text my paralegal right now and see if
25 she could create a Google Drive folder that she'll

Page 16

1  circulate.  Exhibit 6, it -- and I just sent her a
2  text, so you should get this in the next couple of
3  minutes, but just for people on the Zoom, Exhibit 6
4  is Bates stamp YELL 3321 through 3324.
5  BY MR. SLOSAR:
6      Q.    All right.  Mr. Higgins, do you see the
7  document that's in front of you?
8      A.    I do.
9      Q.    Okay.  And what do you recognize this document
10 to be, sir?
11     A.    It appears to be my case report from this --
12 the trailer fire at 638 Bonnie Drive --
13     Q.    And this --
14     A.    -- from 9-11-2004.
15     Q.    Okay.  And this case report, if you go to the
16 third page of this document, so it's got the Bates stamp
17 YELL 3323 at the bottom right, do you see your signature
18 anywhere on that document, sir?
19     A.    On the third page?
20     Q.    Yes, sir.
21     A.    I do.
22     Q.    Okay.  And is it fair to say that, at least
23 the first three pages of this document, Exhibit number
24 6, you would have created during the underlying
25 investigation?

Page 17

1      A.    I did.
2      Q.    Now from looking at the document, are you able
3  to tell when you actually typed this up?
4      A.    No.
5      Q.    Do you recall whether the information
6  contained in this report, was that information
7  originally in handwritten notes that you would've taken?
8      A.    I don't think I took any, other than the
9  citation.
10     Q.    Okay.
11     A.    And the CAD, generally what I go by.
12     Q.    Okay.  And the citation -- I'm going to show
13 you what we'll mark as Exhibit number 5.
14         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
15         MR. SLOSAR:  And for folks on Zoom, Exhibit 5,
16 it's Bates number YELL 3375 and 3376.  It's a
17 two-page citation.
18 BY MR. SLOSAR:
19     Q.    Exhibit number 5, Mr. Higgins, is that the
20 uniform citation that you were just referring to?
21     A.    It's a -- one of three.
22     Q.    So there should be two more uniform citations?
23     A.    There should be one, one more citation, that
24 was signed by Ron Mills, that I filled out.
25     Q.    Okay.  So there's -- in addition to what's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  here, there should be another uniform citation.  Do I
2  have that right?
3      A.  That's correct.
4      Q.  And it looks like -- and the uniform citation
5  that we're looking at, Exhibit number 5, this is a
6  document that you created, correct?
7      A.  That -- that's correct.
8      Q.  And fair to say -- from looking at this
9  document, can you tell us when you actually would have
10 created it?
11     A.  At the sally port in the jail at the time of -
12 - that I was there with Mr. Yell.
13     Q.  Okay.  And is it fair to say that -- well,
14 strike that.  What's the purpose of a citation?  Can you
15 tell us?
16     A.  Is to place criminal charges on suspects and
17 to get them into bookings for the jail.
18     Q.  Okay.  And would you have actually created
19 this document while you were in the sally port of the
20 jail?
21     A.  I did.
22     Q.  And is it fair to say that at the time you
23 created this citation, you understood that it would be
24 used to initiate charges against Mr. Yell?
25     A.  The charges that I put on here, correct.

Page 19

1      Q.  Yes.  Fair to say that everything you wrote in
2  the citation, you did so with the understanding that
3  that information would be used to initiate charges?
4      A.  That's correct.
5      Q.  Fair to say that nothing in here was written
6  by you by mistake, but rather every piece of information
7  you put in this citation would've been done
8  intentionally?
9      A.  Everything that I put in here was the attempt
10 to support the charges based on my observations.
11     Q.  Okay.  Now I want to go back to Exhibit number
12 6 now, sir.  So this is the typed out report.  Sitting
13 here today, do you recall when you actually created
14 this?
15     A.  I don't recall when I -- when I typed the
16 report.
17     Q.  But outside of the handwritten citations --
18 there should be two.  Outside of those handwritten
19 citations, you would not have taken any handwritten
20 notes prior to drafting the report contained in Exhibit
21 6.  Do I have that right?
22     A.  I don't recall taking any notes, but I -- I
23 could have.  But that's -- sometimes I take notes when
24 I'm taking case reports, generally speaking.  But I had
25 these citations, so -- and sometimes I don't, so I don't

Page 20

1  recall taking any notes for this.
2      Q.  Okay.  And so whatever's contained in your
3  report, if your memory is correct that you did not take
4  handwritten notes outside of what's in the citations, is
5  it fair to say that the information contained in your
6  report would've been done, to the best of your
7  recollection, at the time you typed it up?
8      A.  Yes.
9      Q.  Now, looking at your report, do you see where
10 it says 19:30 hours?
11     A.  I do.  On the first page.
12     Q.  On the first page.  And did you write in your
13 report that "just before 19:30 hours, I observed Robert
14 Yell running in front of the burning trailer hollering
15 that April had better have gotten Camron out"?
16     A.  Yes, sir.
17     Q.  And 19:30 hours, do you'd agree that's about
18 7:30 p.m.?
19     A.  That's correct.
20     Q.  And this would've been within about ten
21 minutes -- actually, strike that.  Did you arrive on
22 scene around 7:25 p.m.?  I'm looking at --
23     A.  Yeah.  That's --
24     Q.  If you want to review to yourself the two
25 paragraphs above where it says 19:25 hours.

Page 21

1      A.  I -- I would say that it'd be around that time
2  as given to me by dispatch.  Or as I radioed that I was
3  there, that would've been the CAD time.  And I can't
4  testify to the accuracy at the time.
5      Q.  So if we show you the CAD report, you would
6  defer to whatever time is on there?
7      A.  Yeah, I would -- I would suspect that the
8  19:25 would've been the time that I arrived on the CAD,
9  but I -- I don't know for sure.
10     Q.  And it would've been your practice that when
11 you arrive on scene, that you would notify dispatch; is
12 that correct?
13     A.  That's -- that's correct.
14     Q.  Now, according to the first page of your
15 report, within a few minutes of you arriving on scene,
16 did you observe Robert Yell running in front of the
17 burning trailer?
18     A.  Well, a lot happened before -- between the
19 time that I arrived and the time that Robert Yell came
20 around -- in front of the -- in front of the trailer, so
21 --
22     Q.  All right.  Let's set the scene.  That's fair.
23     A.  Yeah.  And I can't guarantee the accuracy of
24 the time.
25     Q.  From your -- do you have an independent memory

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1  of when you arrived on scene that day?
2      A.   I do.
3      Q.   Okay.  Were you -- when you arrived on scene,
4  were you in a squad car?
5      A.   I was.
6      Q.   Okay.  Was anybody in the car with you?
7      A.   No, sir.
8      Q.   When you arrived on scene, were there any
9  other officers from the Russellville Police Department
10  already there?
11      A.   Sergeant Mills, Ron Mills was there.
12      Q.   And did you know Sergeant Mills by that point?
13      A.   Oh, yes.
14      Q.   Is he a friend of yours?
15      A.   He is.
16      Q.   Okay.  Friend of yours to this day?
17      A.   To this day.
18      Q.   And fair to say that you came to respect
19  Sergeant Mills during the course of your career working
20  with him?
21      A.   I did.
22      Q.   Fair to say that you believe Sergeant Mills is
23  a person of integrity?
24      A.   I do.
25      Q.   Fair to say that you wouldn't have any reason

Page 23

1  to disbelief Sergeant Mills' observations when he was at
2  the scene on September 11th?
3      A.   That's correct.
4      Q.   Now, when you arrived on scene, Sergeant Mills
5  is already there.  Tell us what happens after you
6  arrived?
7      A.   I run from the car.  I notice that April has
8  Saralynn in her hands.
9      Q.   And --
10      A.   And they're passing Saralynn to -- she's the
11  young -- I guess she was around nine months old.  They
12  were -- I don't know whether Ron had her, but they
13  passed her to a -- a lady that was there.  And I don't
14  know who she was.  I assumed that she was the caller,
15  Charlotte.  And then do you want me to continue?
16      Q.   Are you referring to the 911 caller?
17      A.   Uh-huh.
18      Q.   Okay.
19      A.   I assumed it's who it was, but I don't know.
20      Q.   Okay.  And let me ask you this.  Did you know
21  April or Saralynn before coming to the house that day?
22      A.   No.
23      Q.   But you did know Robert Yell, correct?
24      A.   I knew Robert Yell from an investigation that
25  I'd done the year before.

Page 24

1      Q.   You understood prior to coming to the scene,
2  that Mr. Yell had alcohol intoxication issues, fair?
3      A.   I wasn't thinking that when I arrived on
4  scene.  That wasn't something that I was aware of.
5      Q.   That -- that's fair.  I -- my question is a
6  little bit different.
7      A.   I don't know -- I don't know --
8      MR. MANDO:  Let him finish his question.
9      THE WITNESS:  I'm sorry.  I'm sorry.
10  BY MR. SLOSAR:
11      Q.   Sorry.  Sorry, Mr. Higgins.  So my question is
12  a little bit different.  And we're going to ask you a
13  lot about what you were thinking, what you were doing.
14  My question is, you know, before you arrived on scene on
15  September 11, 2004 -- so let's go the day before,
16  September 10, 2004.  By September 10, 2004, you would've
17  been aware from prior investigations that      Mr. Yell
18  had alcohol intoxication issues; is that fair?
19      A.   I -- I just don't recall that, about the
20  alcohol stuff.
21      Q.   Don't recall one way or the other?
22      A.   Uh-uh.
23      Q.   Okay.
24      MR. MANDO:  You have to answer out loud.  You
25  have to say yes or no --

Page 25

1      THE WITNESS:  No.
2      MR. MANDO:  -- instead of a shake of the head.
3      THE WITNESS:  Oh, no.  No, I don't --
4      MR. SLOSAR:  I'm sorry.  I didn't catch him
5  that time, so that's fine.
6      THE WITNESS:  I don't -- I don't -- I don't
7  recall anything about the alcohol.
8  BY MR. SLOSAR:
9      Q.   Okay.  And so you would've observed who you
10  now know to be April either having her daughter,
11  Saralynn, or having passed Saralynn off to someone else;
12  is that correct?
13      A.   That's -- that's -- that's fair.
14      Q.   You didn't know their names when you arrived
15  on scene, though, right?
16      A.   That's -- that's correct.
17      Q.   Okay.  So you observed Saralynn getting passed
18  around.  What did -- what happened next?
19      A.   Sergeant Mills said that there was another
20  child inside of the trailer, and he told me to go in to
21  get the child.  I had observed fire in the window that
22  was right behind Sergeant Mills right there at the front
23  door.  I'd heard the fire, as well.  It was -- sounded
24  pretty ferocious and -- and I peered in the door and I
25  saw fire directly in -- in front.  I'm going to say

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1  directly in front of the door, but in the front door,
2  when I peered in, I saw -- I saw the fire across the
3  way.
4      Q.   And when you're saying when you peered in the
5  front door, would that be the front door to the trailer?
6      A.   Yeah, and it would -- had a -- from what I
7  remember, it had a side slant kind of opening --
8  opening.
9      Q.   Was --
10     A.   Instead of facing the street, it was -- the
11 door was facing north, the front door.
12     Q.   And was anybody with you when you peered
13 inside?
14     A.   Well, everybody was standing around, but this
15 was seconds.  You know what I'm saying?  When he asked
16 me to go in, I was quickly surveying --
17     Q.   What it looked like.
18     A.   -- what it looked like, and I didn't want to
19 go in.
20     Q.   Did -- and it's not that you didn't want to go
21 in.  You didn't believe that it would've been safe for
22 you --
23     A.   That's correct.  Yeah.
24     Q.   All right.  You certainly would've done
25 everything you could to save who was inside if it was

Page 27

1  safe for you to do so, correct?
2      A.   That's correct.
3      Q.   Yeah.  And when you looked through the door,
4  is it fair to say that the fire had engulfed the area
5  that you could see?
6      A.   It wasn't in the living room, but it was --
7  when I looked in, I could see the fire and it was -- I'd
8  say -- I'd say it was turbulent.  And I could -- from
9  that vantage point, I knew that the trailer was on fire
10 pretty good.  And so I hesitated.  I don't like fires.
11 I did want to get Camron out.  April went in in front of
12 me and I went in behind her.
13     Q.   And when you walked through the door, what
14 part of the trailer would you have entered?
15     A.   The -- the living room.
16     Q.   And when you walked in the living room, did
17 you see a fire in the living room?
18     A.   I didn't see a fire in the living room right
19 as you enter, but April had gone in and she turned
20 around and came out immediately.
21     Q.   And --
22     A.   I went behind the sofa.  I'm sorry.
23     Q.   No, you keep going.  I'm sorry I cut you off.
24 Keep going.
25     A.   Sorry.  I went to -- I went to where the sofa

Page 28

1  was, and my idea was to shoot down the hallway because I
2  didn't think that there was a fire in the hallway and
3  maybe Camron was down there.  I knew there was a fire in
4  the kitchen.  I didn't realize it was a kitchen.  I knew
5  there was fire in there.  It was fully engulfed.  There
6  was fire coming out of the -- the doorway of the -- of
7  the kitchen kind of like a line with fire -- or going
8  in.
9      Q.   Wait, sorry.  I just want to make sure I had
10 that right.  There was a fire coming out or going --
11     A.   Of the doorway.  The kitchen was totally
12 engulfed.
13     Q.   Okay.  And when you say totally engulfed --
14     A.   All I could see was fire.
15     Q.   All you could see is from floor to ceiling,
16 right?
17     A.   That's my observation.
18     Q.   Yeah.  And so the kitchen was fully engulfed
19 with the fire that you observed to be from the floor to
20 ceiling.  Can you describe -- is that right?
21     A.   That's right.
22     Q.   And then -- and can you describe what the fire
23 looked like, if there was any, in the living room area?
24     A.   Okay.  The -- I didn't see any fire in the
25 living room other than the fire that was running up the

Page 29

1  north wall, and it was on the corner of the north wall
2  on the -- in the hallway.
3      Q.   And when you say running up the north wall, do
4  you mean from the floor to the ceiling?
5      A.   That -- I had originally thought that -- that
6  the fire from the hallway ceiling, or from the bedroom,
7  I -- I couldn't tell, had came over and down.
8      Q.   Okay.  So the -- and that --
9      A.   But it was -- I'm sorry.
10     Q.   Sorry.  What room is that that you're talking
11 about now?  Is that in the living room or is that in the
12 bedroom?
13     A.   Okay.  I'm in the living room.
14     Q.   Yes, sir.
15     A.   And so the kitchen is behind me, and then
16 there's the bedroom, which is what I'd seen from outside
17 the door from that -- from the slant.  And I saw the
18 fire in the bedroom, and it was going pretty good.  And
19 then the -- it appeared that the fire in the hallway on
20 the ceiling -- and I couldn't tell whether it was going
21 in the hallway or -- or out, but it appeared that it --
22 it went down the corner of the -- the north wall of the
23 living room and the -- right there at the hallway.  And
24 there was smoke.  And then on the other side of the
25 sofa, I could see the flickering of light from what I



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 10 of 61 PageID
#: 2742
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

30..33

Page 30

1    thought was flames, just on the other side of the sofa
2    right there, near the corner of that north -- it'd been
3    the north hallway.  In my report, I listed it south
4    hallway, but it was the north hallway.  And --
5        Q.    And when you're referring to that, you're
6    talking about Page 1 of your report under 19:25 hours,
7    the second paragraph where -- the third line from the
8    bottom it says, "I noticed the fire coming from the
9    south hallway and from the kitchen," the south should
10   really be the north.  Is that what you're saying?
11       A.    Yeah.  The -- the south hallway should have
12   been the -- the north hallway.
13       Q.    Okay.  And the -- and what you observed was
14   that in the north hallway, the fire had already reached
15   the top and was coming down to the corner of the north
16   hallway; is that right?
17       A.    The way I thought that it was going, it was --
18   it was in the hallway on the ceiling and that it had
19   come down on the -- on the north hallway corner.  So
20   it's in the -- it's in the living room, but it's at that
21   corner of the north hallway.
22       Q.    And Mr. Higgins, sitting here today, you're
23   not an expert on arsons, fair?
24       A.    That's correct.
25           MR. MANDO:  Is that --

Page 31

1    BY MR. SLOSAR:
2        Q.    Back in 2004, you were similarly not trained
3    as an arson expert, fair?
4        A.    That's fair.
5        Q.    So when you're testifying today, you're
6    testifying to what you observed having been in the
7    trailer when the fire was going on?
8        A.    That's correct.
9        Q.    Back then, you wouldn't -- back in 2004, you
10   wouldn't have known the difference between a full room
11   involvement and flashover, fair?
12       A.    That's correct.
13       Q.    But you do know what you observed when you
14   were in that trailer and you're recounting that
15   accurately with us here today; is that correct?
16       A.    I'm doing the best I can to recount that
17   accurately.  Yes.
18       Q.    Now, according to your report, it says, "Then
19   it appeared it was not much longer before we could not
20   see the living room anymore due to immense smoke."  Is
21   that accurate?
22       A.    Yes.  As we were standing out -- outside --
23   there was a lot of smoke while we were standing there
24   before we went in, and this is a matter of seconds.  And
25   then after we came out, we circled the trailer, Ron and

Page 32

1    I did.  I was behind him.  And then I stood in front of
2    the -- the trailer right where we'd gone in, and then I
3    saw the fire going across the ceiling and the upper part
4    of the living room wall --
5        Q.    And that was from outside?
6        A.    -- at the back.  That was from outside after
7    we came out, after I realized that I wasn't going to go
8    down the hallway.  I thought that was a -- just a
9    one-way ticket.  I didn't think I was going to be able
10   to come back from that one.
11       Q.    And so when you and Sergeant Mill -- or strike
12   that.  You and April, did you leave the trailer
13   together, or did she leave before you?
14       A.    She exited the trailer before I did, but it
15   was close in time.  She went in, I followed her in, and
16   then when she went out.  I wasn't far behind her because
17   I didn't have a mask and it was extremely hot.  And I was
18   -- like I said, I was going to dart down the -- the
19   north hall to see if I could find Camron when I saw the
20   fire in the ceiling and the -- and the floor, it changed
21   my mind, and the heat and -- and I was holding my
22   breath.  I know I was.  So I -- I'm not going to -- I
23   didn't want to breathe the smoke in and -- and I came
24   back out.  And I remember when I came back out without
25   Camron -- give me a second.

Page 33

1        Q.    We can go off the record.
2        A.    No, I'm good.  April had collapsed.  She -- it
3    appeared to me that she had lost the strength to stand.
4    My heart, sorry.  But anyway, after Ron and I had -- I
5    followed Ron around the trailer to see if we could get
6    in any other way without -- I assumed that's what Ron
7    was doing.  I -- I was following him.  If he was going
8    to go back in the trailer, I was going to go back in
9    with him, but -- pretty hot.
10       Q.    And --
11       A.    Excuse me for getting --
12       Q.    Mr. Higgins, you, you know, witnessed a
13   horrific event, so if any point in time you want to take
14   a --
15       A.    I'm good.  I'm good.  It's just -- sometimes
16   the reality of the moment hits you, so -- and I try not
17   to think about that a whole lot.  It's not a --
18       Q.    Is it fair to say that when you were standing
19   out beside the trailer, that you and Sergeant Mills
20   observed -- were attempting to observe what was taking
21   place inside?
22       A.    That's -- that's correct.  Well, I would say
23   that -- talking about before we went in or after?
24       Q.    After, I'm sorry.
25       A.    Yeah.  After, we went around trying to find

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  another way in, trying to see where the fire was to see
2  if we could get to Camron.  I mean, that's what --
3  that's what I was doing and -- I was thinking also when
4  I was in the -- in the trailer, if we'd opened any of
5  the doors, I had seen the movie Backdraft, so I kept on
6  thinking, we're going to open the door and then there's
7  going to be some fire coming out of there.  So I just
8  remember that we did not make -- go back in after --
9  after that.  Now, Ron did attempt to -- he did go in
10 after I came back out without -- without Camron.  And
11 she had collapsed.  He went in.  I went in behind him.
12 We came out immediately.  And then we went around the
13 trailer.  That's what happened.  I forgot about that --
14 that second entry, but it was so short.
15     Q.  And when you left the trailer, and you were
16 observing what was taking in -- place inside, what do
17 you recall -- observe -- what part of the trailer were
18 you looking into?  So was it a door or a window?  And
19 what room were you able to observe?
20     A.  When we were -- we just circled around and
21 attempting to look in the windows around the trailer.
22 Really couldn't -- I couldn't make out anything.  And --
23 and we went back to the front of the trailer and stood
24 there and I -- I can't remember what Ron was doing, but
25 I stood there just looking in at the fire as it was

Page 35

1  coming into the living room and just melancholy, sad,
2  just -- I -- I just can't explain it to you. Knowing
3  that Camron was in there.
4      Q.  And in terms of the fire, when -- after you
5  left and you're looking inside circling, did you observe
6  the fire reach the ceiling of the trailer and go back
7  down in any of the rooms?
8      A.  No.  No.  The -- the -- the only thing that I
9  -- that I recall, and a lot of it was mainly because it
10 scared me so much, is when we went into the living room,
11 the fire in the kitchen, it was fully involved, like you
12 said, floor to ceiling.  All I could see is fire.  When
13 I looked into -- and -- and there was a, like, a stream
14 of fire that came out towards the bedroom or going in
15 from the bedroom.  I couldn't tell.  I could see that.
16 And then it was black smoke.  So I couldn't follow it
17 all the way to connect it to the bedroom.  And then
18 there was the -- there was the bedroom.  And it was --
19 there was a lot of fire in there that it -- I don't
20 think it was as involved as the -- the kitchen was, but
21 it was pretty involved.
22     Q.  And the hallway is what you described as -- it
23 appeared to you that the fire was actually coming down
24 from the ceiling; is that right?
25     A.  Yeah.  It almost like a -- like Christmas tree

Page 36

1  lights running down the -- down the corner.
2      Q.  Now, when you were inside --
3      A.  But it was fire, not Christmas tree lights.
4  Yeah.
5      Q.  -- when it was -- when you were inside the
6  trailer, did you ever observe anything that you believed
7  to be an accelerant?
8      A.  No.  And I wasn't looking for that.
9      Q.  Sure.  Did you smell anything that smelled
10 like an accelerant?
11     A.  All I smelled was smoke.
12     Q.  Certainly you're familiar -- in 2004, you were
13 familiar with what gasoline smelled like, correct?
14     A.  Yeah.  Yes, sir.
15     Q.  Sitting here today, you don't recall ever
16 smelling anything that smelled like gasoline as you were
17 inside the trailer; is that fair?
18     A.  That's fair.
19     Q.  Now, after you exited the trailer and you were
20 circling the trailer, at what point did you observe
21 Robert Yell?
22     A.  When I went out to the road and I was standing
23 at the road. I observed him coming across from the left
24 side in front of the trailer and --
25     Q.  And -- at the time that you observed

Page 37

1  Mr. Yell, was he running in front of the burning trailer
2  and hollering that April had better have gotten Camron
3  out?
4      A.  That's correct.
5      Q.  And to your knowledge, at that point, Camron
6  was the only person that you believed was still inside
7  the trailer, correct?
8      A.  That's correct.
9      Q.  And at the time that Mr. Yell was running in
10 front of the burning trailer, hollering that April
11 better -- had better have gotten Camron out, by that
12 point, Saralynn was already outside the trailer?
13     A.  That's correct.
14     Q.  Is it fair to say that Mr. Yell would've been
15 yelling this in close proximity to where Saralynn was
16 actually at outside the trailer?
17     A.  I don't know where Saralynn was.  At --
18 outside of the trailer.  I know there was an ambulance
19 that was there.
20     Q.  It wouldn't surprise you if Mr. Yell was able
21 to observe that Saralynn was already safe and outside
22 the trailer at the time he was hollering at April, fair?
23     MR. MANDO:  Objection.  Form.  Lack of
24 foundation.
25 BY MR. SLOSAR:



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    Q.   You can answer.
2    A.   I didn't believe that he knew that any of the
3  kids were out of the trailer at the time that he came
4  around the front of the trailer.  I don't remember
5  seeing Saralynn or April at the time that he came around
6  in front of the trailer.
7    Q.   Do you know one way or the other, as to
8  whether Mr. Yell was able to observe April or Saralynn
9  before he was hollering?
10   A.   No, and I was under the impression that he
11 hadn't seen them, but I could be wrong.
12   Q.   Fair to say that, according to your report,
13 Mr. Yell was hollering that people had better gotten
14 Camron out of the trailer, right?
15   A.   That's correct.
16   Q.   Is it fair to say that Mr. Yell seemed deeply
17 concerned that there was still a child inside the
18 trailer?
19   A.   No, that's not what I was picking up from his
20 hollering that out.  I know he -- he hollered out she'd
21 better gotten Camron out.  I wasn't picking up concern
22 as much as anguish.  He appeared to be hollering in --
23 in anger, being gruff, intoxicated, belligerent. Because
24 that wasn't the only thing that he said.  I -- but --
25   Q.   And what --

Page 39

1    A.   -- that wasn't what I was interpreting from
2  his actions.
3    Q.   Well, anguish is a fair response for a human
4  being to have encountering a horrific fire like that at
5  their trailer; is that fair?
6    A.   I'd say that would be fair if you -- if you
7  knew that the child was in there.  You see what I'm
8  saying?
9    Q.   Totally.
10   A.   Yeah.  It's like if you -- you would -- I'm
11 sure there'd be anger if your property is on fire, but
12 to be angry not knowing whether the child was in there -
13 - or emotional, what -- what you were saying, that too,
14 I wasn't picking that up.
15   Q.   And you don't know one way or the other, what
16 Mr. Yell observed before he ran in front of the burning
17 trailer, correct?
18   A.   That's correct.
19   Q.   You don't know one way or the other, as to
20 what Mr. Yell may have been informed by anybody at the
21 scene before he ran in front of the burning trailer,
22 correct?
23   A.   That's -- that's correct.
24   Q.   You did observe that Mr. Yell appeared to have
25 anguish when he was hollering at April that she better

Page 40

1  have gotten Camron out; is that fair?
2    A.   Yeah.  Yeah.
3    Q.   Is it fair to say that when Mr. Yell -- strike
4  that.  Is it fair to say that you also observed that Mr.
5  Yell appeared to be extremely intoxicated at the time?
6    A.   That's correct.
7    Q.   Now, at the time you saw Mr. Yell, you had
8  already come to the conclusion that you could not stay
9  inside the trailer safely without risking your own life,
10 fair?
11   A.   That's correct.
12   Q.   By the time Mr. Yell was running towards the
13 trailer, it was your belief that anybody who would've
14 entered that trailer would've been putting their life in
15 jeopardy?
16   A.   That's correct.
17   Q.   At some point, is it fair to say that you
18 observed Mr. Yell trying to enter the burning trailer?
19   A.   I never witnessed that.
20   Q.   Certainly you witnessed Mr. Yell being carried
21 away from the burning trailer, correct?
22   A.   I did.
23   Q.   And who was he carried away by?
24   A.   It was Sergeant McDonald.
25   Q.   And Sergeant Mills, as well, correct?

Page 41

1    A.   And Sergeant Mills.  Uh-huh.
2    Q.   And they carried Mr. Yell away from the
3  trailer as he was in close proximity to it, right?
4    A.   That's correct.  Well, I don't know how close
5  he was.  He was near the -- I remember the fire hoses on
6  the ground.  He was near that.  And --
7    Q.   At the time that they carried Mr. Yell away,
8  fair to say that he was so close to the fire that he was
9  placing himself in jeopardy?
10   A.   I can't say that either.
11   Q.   What's --
12   A.   All I -- all I know is, is -- because I was
13 standing at the road, and I honestly, I -- I remember
14 watching him and hearing him holler what he did.  And
15 then the next thing that I recall is McDonald and -- and
16 Mills carrying him to the road.
17   Q.   What else do you recall Mr. Yell hollering
18 outside of that April better have gotten Camron out of
19 the trailer?
20   A.   Explicatives.
21   Q.   So he was swearing?
22   A.   Yes.  And I remember hearing him hollering
23 that.  But when they carried him across the -- the
24 street, he was -- I don't know who he was cursing at or
25 what he was mad about, but just appeared to be typical



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

42..45

---

Page 42

1  belligerence from somebody that was intoxicated.
2      Q.   Wouldn't surprise you if he was upset about
3  the trailer being on fire, fair?
4      A.   That's fair.
5      Q.   Wouldn't surprise you if Mr. Yell was upset
6  about the trailer being on fire and a child being
7  trapped inside, fair?
8      A.   I'd say that that's fair, but he didn't give
9  an indication that he knew that anybody was inside the
10 trailer. And I'm -- when, you know, when they let go of
11 Mr. Yell, he turned around and -- and stood on the other
12 side of the roadway and was watching the fire, and
13 that's when I approached him.
14     Q.   And this is when he was -- you had already
15 come to the conclusion by that point that he was
16 extremely intoxicated?
17     A.   That's correct.
18     Q.   And when you say he didn't give any indication
19 that he knew that somebody was still in there, you would
20 agree that when Mr. Yell was hollering that April better
21 have gotten Camron out, that a reasonable person could
22 interpret that as him being concerned that Camron was
23 still trapped inside?
24     A.   I didn't interpret that because when he --
25 when McDonald and Mills let go of him, he stood there

---

Page 43

1  and watched the fire. He was not looking for Camron.
2  Did somebody get Camron out? He was not walking around
3  and asking about Camron.
4      Q.   They had already literally dragged him away
5  from the fire at that point, right?
6      A.   They did.
7      Q.   A police officer and a firefighter; is that
8  right?
9      A.   It was two police officers.
10     Q.   Two police officers?
11     A.   Uh-huh.
12     Q.   So at first, Mr. Yell, you know, is running up
13 to the trailer, which is on fire, and he has to be
14 carried away from that by two police officers. Do I
15 have that right?
16     A.   Yeah. That's --
17     Q.   He's taken across the street, correct?
18     A.   Yeah.
19     Q.   April -- where's April at?
20     A.   I don't know where she's at, at this time. I
21 didn't see her.
22     Q.   April didn't -- from what you could observe,
23 April didn't run back into that trailer, right?
24     A.   No, I didn't -- at the time that he was there,
25 I thought April was gone in the ambulance with Sara.

---

Page 44

1  Because at the time that McDonald and Mills brought them
2  across the street, I remember that they were passing
3  behind firetruck lights, and that the firetrucks were
4  there, and they were trying to -- Mills and McDonald
5  were trying to work with the fire hoses. And they got
6  him out of the way to -- so they could get back to work
7  to help the fire department with the fire hoses.
8      Q.   But according to your report, you would've
9  arrived on scene at approximately 7:25 p.m. Do I have
10 that right, Page 1?
11     A.   The CAD time.
12     Q.   Okay. And you would have observed Mr. -- do
13 you see where it says, "just before 19:30 hours, I
14 observed Robert Yell running in front of the burning
15 trailer, hollering that April had better have gotten
16 Camron out." Do you see that?
17     A.   I do.
18     Q.   So what you mean, there is sometime before
19 7:30 p.m., you observed Robert Yell running in front of
20 the burning trailer, correct?
21     A.   I think I put the 19:30 hours there because
22 the arrest time was 19:30. And I don't -- I can't
23 validate or verify the accuracy of the -- of the time.
24     Q.   He --
25     A.   Because he'd had to have done the stuff before

---

Page 45

1  he was arrested, but I don't -- I can't -- you know,
2  we're going by CAD times and I can't verify the accuracy
3  of those times.
4      Q.   But this is within several minutes of you
5  arriving on scene, that you see Mr. Yell running towards
6  the burning trailer, correct?
7      A.   I think we get there -- the firetrucks get
8  there after we try to get Camron out. And then he -- he
9  shows up while they're trying to work on putting the
10 fire out. And that's all that I -- all that I know.
11     MR. SLOSAR: I've got a quick question for
12 somebody, not you, Mr. Higgins, for actually an
13 attorney on here. Charlie, do you have the
14 exhibits? Melinda was getting a bounce back from
15 Derek Wright's e-mail, but as long as you have them,
16 that's what matters. So did you get them?
17     MR. COLE: I got the e-mail. I'm trying to
18 have someone get them for me.
19     MR. SLOSAR: Why don't we take a short couple -
20 - maybe a five-minute break? Is that okay?
21     MR. COLE: Yeah, I need to go --
22     THE VIDEOGRAPHER: All right. The time is
23 10:34 a.m. Central. We are going off record.
24     (OFF THE RECORD)
25     THE VIDEOGRAPHER: The time is 10:39 a.m.

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1    Central. We're back on record.
2    BY MR. SLOSAR:
3    Q.   Did you witness Captain McDonald and Sergeant
4    Mills, drag Mr. Yell across the street away from the
5    fire?
6    A.   I did.
7    Q.   And after Mr. Yell was dragged across the
8    street, you believed he was really upset, correct?
9    A.   At that moment in time, he didn't appear to be
10   upset at that moment in time. He -- he was -- he went
11   to the other side of the roadway, stood in the grass,
12   and was watching the fire.
13   Q.   Now is it fair to say that your memory about
14   these events would've been better at the time you
15   testified in the underlying criminal proceedings than it
16   is today?
17   A.   That's correct. I do believe that my memory
18   would've been better closer to it, but there's certain
19   things that I won't ever forget.
20   Q.   Of course. And one of the things you'll never
21   forget is that Mr. Yell did not appear to be upset to
22   you after he was dragged across the street. Is that
23   your testimony?
24   A.   At the -- at the time that -- at the time that
25   they let go of him, at that time, he was quiet and was

Page 47

1    watching the fire. And I'm not going to say he wasn't
2    upset. I just didn't observe -- like I said, he -- he
3    wasn't running around asking anybody if we'd gotten
4    Camron out, where Camron was, and wasn't looking for the
5    kids, and appeared to me to be ambivalent.
6    Q.   Ambivalent?
7    A.   Uh-huh, at that time.
8    Q.   Okay. Sir, isn't it true that after he was
9    dragged across the street away from the fire, that
10   Mr. Yell was belligerent?
11   A.   After I approached him, he became belligerent.
12   Q.   And when you say you approached him, can you
13   describe to us what do you mean by that?
14   A.   I walked up to Mr. Yell, and I told him that
15   he better not have set that fire.
16   Q.   And by the time that you said that to     Mr.
17   Yell, there was no evidence that you were aware of, that
18   would indicate to you that this was an intentionally set
19   fire, fair?
20   A.   That's fair, because --
21   Q.   So why -- you also knew by that point that Mr.
22   Yell was concerned. And what was the word you used
23   earlier about him hollering? I forget the adjective.
24   When Mr. Yell was hollering that April better have
25   gotten Camron out, how would you characterize that

Page 48

1    hollering?
2    A.   Being coarse, gruff.
3    Q.   Fair to say that Mr. Yell seemed desperate to
4    make sure that Camron was out of the trailer?
5    A.   That's not what I interpreted at all.
6    Q.   And when you -- when you're saying that's not
7    how you interpreted it, these are assumptions that
8    you're making based upon your observation of Mr. Yell?
9    A.   That's correct. That's correct.
10       MR. MANDO: Objection. Characterization. Lack
11   a foundation. Go ahead, but please let him finish
12   that answer -- that question before you start to
13   answer, just to give me an opportunity if I have to
14   make a record, okay?
15       THE WITNESS: Okay.
16       MR. MANDO: Just let him finish that question
17   first.
18       THE WITNESS: Okay. Sorry.
19       MR. MANDO: Go ahead, Elliott. I'm sorry.
20   BY MR. SLOSAR:
21   Q.   That's correct, right?
22   A.   That's correct.
23   Q.   And you certainly -- you had -- prior to that
24   day, you had never been involved in a fire
25   investigation, fair?

Page 49

1    A.   That's correct.
2    Q.   Throughout your entire career, you had never
3    been involved in an investigation that you can think of,
4    that was as serious as the one we're discussing here
5    today, fair?
6    A.   That's fair.
7    Q.   And you would agree throughout your career as
8    a law enforcement officer, that on occasion you've
9    observed people deal with stress and grief in different
10   ways?
11   A.   I have.
12   Q.   And when Mr. Yell was hollering, explicit --
13   cuss words --
14   A.   Yes, sir.
15   Q.   -- and that April better have gotten Camron
16   out, you would agree that your observation of him was
17   somebody who appeared to be very agitated and upset?
18       MR. MANDO: Objection. Asked and answered. Go
19   ahead.
20   BY MR. SLOSAR:
21   Q.   You can answer.
22   A.   He appeared to be angry to me.
23   Q.   And sitting here to this day, you're angry
24   that a child lost their life in this fire, fair?
25   A.   That's fair.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q.    And you would agree that --
2    A.    More sad.
3    Q.    Sure.  But it makes you question your faith,
4    even if only a little bit, as to how a child could be
5    taken so young in a fire like this, fair?
6    A.    Fair.
7    Q.    And you also would have observed, when
8    Mr. Yell was hollering and running towards the trailer
9    before he was carried away, you would have observed that
10   he was incredibly intoxicated at the time?
11   A.    That's correct.
12   Q.    Is it fair to say, Mr. Higgins, going back to
13   Exhibit 6, so the report that you've got in front of
14   you, that nobody limited in any way the information that
15   you put in this report?  And by that I mean, did anybody
16   ever advise you, you know, "Officer Higgins, you can
17   only write three pages of information, no more"?
18   A.    That's correct.
19   Q.    Nobody ever did that, right?
20   A.    That's correct.
21   Q.    You could have written a longer report that
22   was more detailed if you were inclined to do so, fair?
23   A.    That's fair.
24   Q.    Is it fair to say that no one limited how much
25   information you put in this report regarding your

Page 51

1    observations of the fire?
2    A.    I'm sorry.  I kind of zoned out on you for a
3    second.  It was a simple question, I know.  I just kind
4    of zoned out.
5    Q.    Why don't we --
6    A.    Not zoned out, but kind of --
7    Q.    No, no, you're good.
8    A.    Can you ask me that one more time?
9    Q.    Yeah.  But do you want to take a short break?
10   A.    No, I'm -- I'm fine.  I just kind of -- when
11   you asked the question, I guess --
12   Q.    I know --
13   A.    -- I kind of zoned out just a second.
14   Q.    No, I appreciate you saying that because
15   nobody wants you -- we all want you to know what you're
16   answering.
17   A.    Right.
18   Q.    So that's important.  We also all know that
19   Camron losing his life is something that evokes a lot of
20   emotion from you.  And so, you know, I know I told you
21   this before today, but, like, really, if something
22   happens that triggers an emotional response from you,
23   it's perfectly fine for us to take a couple of minutes
24   for you.  You know, I don't want you zoning out because
25   you're thinking about, you know, what the last question

Page 52

1    was.  So it's -- there's no judgment here and --
2    A.    I appreciate that.
3    Q.    -- we understand your feelings.  I forget what
4    the heck that question was.  Do you know what that
5    question was?
6         THE REPORTER:  Let's see.
7         (REPORTER PLAYS BACK REQUESTED QUESTION)
8    BY MR. SLOSAR:
9    Q.    Is that true?
10   A.    That's true.
11   Q.    Okay.  Nobody limited -- you know, nobody
12   said, you know, "Officer Higgins, you can only write X
13   number of sentences about what you observed at the
14   fire."  Nobody did that, correct?
15   A.    That's correct.
16   Q.    And earlier, I was looking for this adjective
17   that you had described.  I believe you had testified
18   earlier today that when Mr. Yell was running towards the
19   trailer, you know, yelling expletives and hollering at
20   April that she better have gotten Camron out of there, I
21   believe you described an observation that you had of Mr.
22   Yell as being somebody in anguish; is that fair?
23   A.    Angry.
24   Q.    Angry?
25   A.    If that's the same word that we're talking

Page 53

1    about, anguish and angry.
2    Q.    Do you recall testifying earlier today that
3    Mr. Yell was also -- it -- your observation of him
4    seemed to be that he was also in anguish?
5    A.    Well, what I'm recalling is anger.
6    Q.    That's what you recall sitting here right now?
7    A.    Yeah, but you're saying anguish.
8    Q.    Yeah.  I'm saying earlier here today --
9    A.    And I'm equating that with anger.
10   Q.    Okay.
11   A.    Am I misinterpreting the word?
12   Q.    You know what?  There's a lot of words out
13   there.  We'll keep moving forward.  Is it fair to say
14   that you could have taken additional time to draft the
15   report that's contained in Exhibit 6, if you wanted to
16   add in additional information?
17   A.    I could have.  And as a patrol officer -- I
18   believe I wrote this as a patrol officer would, as
19   opposed to an investigator.
20   Q.    By that time, you didn't --
21   A.    It's not very thorough.
22   Q.    By that you would acknowledge that it's not
23   a very thorough report, correct?
24   A.    That's correct.
25   Q.    You would acknowledge that there's information

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 16 of 61 PageID
#: 2748
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

54..57

Page 54

1  that's omitted to the report -- let me strike that. You
2  would acknowledge that some of your observations of the
3  fire are omitted from this report?
4      A.   That's correct.
5      Q.   You would acknowledge that some of your
6  observations of Mr. Yell are omitted from this report?
7      A.   That's correct.
8      Q.   You would acknowledge that some of your
9  observations of Saralynn and April are omitted from this
10 report?
11     A.   That's correct.
12     Q.   Did you and Sergeant Mills ultimately arrest
13 Mr. Yell at the scene for alcohol intoxication?
14     A.   I didn't arrest him.  Sergeant Mills did.
15     Q.   When Mr. Yell was running to the trailer, did
16 you observe anyone tackle him?
17     A.   I didn't see anybody tackle him.
18     Q.   How did Sergeant -- how did the officers get
19 Mr. Yell from the trailer?
20     A.   They -- they carried him.  I remember seeing
21 him carry him.  I remember seeing Yell run across the
22 trailer hollering, and then I remember them carrying
23 him, but I didn't see the -- anybody tackle anybody.
24     Q.   So you saw -- you were able to witness
25 Mr. Yell running to the trailer and then you saw the

Page 55

1  officers physically carrying him away; is that right?
2      A.   Yeah.
3      Q.   Did you see -- were you able to observe from
4  where you were standing, how those officers came into
5  contact with Mr. Yell?
6      A.   I don't recall how they came into contact with
7  him.  I just recall them carrying him.
8      Q.   And can you describe to us what it looked
9  like, you know, of them carrying him?  You know, did
10 they have his --
11     A.   One on each --
12     Q.   -- legs and --
13     A.   No, no.  One on each side of his arms.
14     Q.   Okay.
15     A.   One on this side and one on the other one.
16     Q.   All right.  I'm going to show you what we'll
17 mark as Exhibit 12.
18     (EXHIBIT 12 MARKED FOR IDENTIFICATION)
19     MR. MANDO:  Elliot, while you're doing that, is
20 this grand jury transcript marked as an exhibit or
21 not?
22     MR. SLOSAR:  It's -- you know, it should be.  I
23 didn't end up using it, but that should be Exhibit
24 8.
25     MR. MANDO:  All right.  Thank you.

Page 56

1      MR. SLOSAR:  So we'll mark the grand jury
2  transcript as 8.  This will be 12.  Here you go,
3  sir.
4      (EXHIBIT 8 MARKED FOR IDENTIFICATION)
5      MR. SOWELL:  Hey, Elliot, this is J.A.  While
6  he's looking at that, can we adjust your mic a bit?
7  I'm having a tough time understanding your
8  questions.
9      THE VIDEOGRAPHER:  The mic is that one there.
10     MR. SLOSAR:  Oh.  Wait, which one?
11     THE REPORTER:  It would be this one.
12     THE VIDEOGRAPHER:  Sorry.  Further down.
13     MR. SLOSAR:  Oh.
14     THE VIDEOGRAPHER:  The one in your hand is just
15 for the video.
16     MR. SLOSAR:  I got you.  Is there some -- oh, I
17 guess, but the closer it goes to me, the worse it is
18 with the witness?
19     THE REPORTER:  Right.
20     MR. SLOSAR:  Is that one of those?
21     THE REPORTER:  Uh-huh.
22     MR. SLOSAR:  All right.  J.A., you know, we're
23 going to try to -- I will try to speak up.  It's
24 placed a little bit closer to the witness than me,
25 but I'll try to do a better job.  And if I don't do

Page 57

1  a better job, you just let me know and I'll just
2  keep encroaching on the court reporter's personal
3  space over here, but --
4      MR. SOWELL:  Yeah.  Thank you.  Appreciate it,
5  Elliot.
6      MR. SLOSAR:  Yeah, I'm sorry about that.
7  BY MR. SLOSAR:
8      Q.   Sir, do you see this -- Exhibit 12, do you see
9  that, Mr. Higgins?
10     A.   I do.
11     Q.   Okay.  And I'm going to direct your attention
12 to the second page of this document.  Are you familiar
13 with looking at CAD reports, sir?
14     A.   I am.
15     Q.   And does this appear to be a CAD report
16 relating to the fire investigation that you participated
17 in on September 11, 2004?
18     A.   It is.
19     Q.   And do you recall, sitting here today, what
20 time, approximately, you arrived on scene for the fire?
21 I think if you go to Page 1 --
22     MR. MANDO:  Are you asking if he independently
23 recalls it, or are you asking based on the CAD
24 report?
25     MR. SLOSAR:  That's actually totally fair,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 17 of 61 PageID #: 2749
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

58..61

Page 58

1    Jeff.
2    BY MR. SLOSAR:
3        Q.    Let me strike that question.  If you go to
4    Page 1, according to the CAD report, does the CAD report
5    document what time you arrived on scene?
6        A.    It does.
7        Q.    What time does it document that you arrived on
8    scene?
9        A.    According to the CAD, it was 1925.
10       Q.    And is that 16 seconds?
11       A.    1925 and 47 seconds.  I'm -- my unit number is
12   834.
13       Q.    Okay.  And what page are you looking at to get
14   that information?
15       A.    Page 3.
16       Q.    Okay.
17       A.    Which is 834 1097.
18       Q.    Yes.  And what was your car number again?
19       A.    834.
20       Q.    834?
21       A.    Uh-huh.  So second from the top on Page 3.
22       Q.    Okay.  I see.  Now if you were the one -- is
23   it fair to say that the time that you arrived on scene
24   would have been done, because when you arrived on scene,
25   you would have let dispatch know that you arrived; is

Page 59

1    that fair?
2        A.    That's fair.
3        Q.    So that's -- at 7:25 p.m. and 47 seconds is
4    when you would've notified dispatch of your arrival; is
5    that fair?
6        A.    According to their CAD time, that's correct.
7        Q.    And you have no reason to dispute the accuracy
8    of the CAD time, correct?
9        A.    No, I can't say that.  I don't know whether
10   they're accurate or not.
11       Q.    Okay.
12       A.    I can't dispute it, but I can't testify to the
13   -- to the accuracy or of the time.
14       Q.    Do you know who has -- who had badge number
15   831?
16       A.    That's Ron Mills.
17       Q.    Okay.  And so if you go down to 19:27:29 where
18   it says, "one still inside," would that have been
19   Sergeant Mills advising that?
20       A.    That's correct.
21       Q.    And do you recall whether this would have
22   happened before or after you and Sergeant Mills went
23   into the trailer?
24       A.    I don't know when he -- when he had advised
25   that to dispatch.

Page 60

1        Q.    Now do you see where it says 831, and this is
2    at 19:30:52.  Do you see where it says, it's got an "X1
3    male"?
4        A.    That's a 1015, which is an indication of the
5    arrest being made.
6        Q.    So by 1930 and 52 seconds, Mr. Yell was
7    already under arrest; is that correct?
8        A.    By the CAD time, correct.
9        Q.    And prior to Mr. Yell being placed under
10   arrest, you had advised him something of the effect of,
11   "You better not have set that fire."  Is that right?
12       A.    That's correct.
13       Q.    So at least if the CAD information is
14   accurate, is it fair to say that, in less than five
15   minutes, you arrived on scene, you went inside the
16   trailer, you circled the trailer, you observed Mr. Yell
17   running and hollering.  You observed two officers carry
18   him to the other side of the street.  You would have
19   made this comment to him that he better not have set the
20   fire.  You would have observed Mr. Yell be belligerent,
21   and then you would have placed Mr. Yell under arrest?
22            MR. MANDO:  Objection.  Characterization. Mills
23       placed him under arrest.
24            MR. SLOSAR:  That's fair.
25   BY MR. SLOSAR:

Page 61

1        Q.    Sergeant Mills placed him under arrest?
2        A.    According to the -- the CAD time.  While
3    things were moving pretty quickly -- because we were in
4    a hurry, trying to get Camron or trying to get him out.
5    And while things were moving pretty fast for us, that
6    would -- that does seem like a short amount of time.
7        Q.    And you would agree that Mr. Yell was not
8    acting belligerent until you essentially accused him of
9    setting the fire?
10       A.    He became belligerent, once again, when I --
11   when I told him that he'd better not have set the fire,
12   he hollered at me, "F you," and clenched his fist and
13   came at me.
14       Q.    He was incredibly upset after you made that
15   statement, correct?
16       A.    Yes.
17       Q.    He tried attacking you, right?
18       A.    Yeah.  Yeah.
19       Q.    This is within minutes of officers having to
20   pull Mr. Yell from the trailer where a child was still
21   inside, correct?
22       A.    That's correct.
23       Q.    And you would agree that if that fire was not
24   really an arson, if this was an accidental fire, that
25   Mr. Yell would've been justified in being as upset as he


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 18 of 61 PageID
#: 2750
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

62..65

Page 62

1  was when you accused him of setting the fire?
2        MR. MANDO:  Objection.  Form.
3  BY MR. SLOSAR:
4     Q.  You can answer.  Go ahead.
5     A.  I -- I would agree with that.
6     Q.  Like, in hindsight --
7     A.  In hindsight.
8     Q.  -- if this was not really an arson, sitting
9  here today, you can understand how a father would lose
10 all self-control if somebody accused them of being
11 responsible for killing a child?
12        MR. MANDO:  Objection.  Form.
13 BY MR. SLOSAR:
14    Q.  Go ahead.
15    A.  The only thing I would say is, is he indicated
16 he didn't know that anybody was in the trailer.
17    Q.  That's fair.  That's fair.
18    A.  And that his reaction to me could have been
19 that, could have been that he was upset over that, or it
20 could have been that he was upset because I was bringing
21 light to a situation.
22    Q.  You were -- you observed -- the first thing
23 you saw with Mr. Yell was him running and screaming that
24 April better have gotten Camron from that trailer,
25 right?

Page 63

1     A.  That -- I remember that.
2     Q.  That's the first observation you had.  And you
3  certainly would not have told Mr. Yell, before he was
4  placed under arrest, you would not have told them that
5  they actually got Camron out of the trailer, right?
6     A.  No.
7     Q.  And of course, you wouldn't say that because
8  you knew that Camron was still inside?
9     A.  That's correct.
10    Q.  You didn't hear any other officer dissuade Mr.
11 Yell's fear that Camron was trapped inside the trailer,
12 fair?
13        MR. MANDO:  Objection.  Characterization.  Form.
14    Go ahead.
15 BY MR. SLOSAR:
16    Q.  You can answer it.
17    A.  I didn't hear anybody dissuade him to -- to --
18 otherwise.  Yeah.
19    Q.  So at the moment you made the statement to Mr.
20 Yell, that he better not have intentionally set that
21 fire, you had every reason to believe that he still
22 feared that Camron was inside that burning trailer?
23    A.  No.
24        MR. MANDO:  Objection.  Form.  Lack of
25    foundation.  Go ahead.

Page 64

1        THE WITNESS:  Sorry.  It was my belief that he
2     did not know that Camron was in that trailer, and by
3     his actions that he was indicating, that he didn't
4     know.
5  BY MR. SLOSAR:
6     Q.  Then why did he have to be carried away from
7  the trailer?
8     A.  Because he was getting every -- and they --
9  they -- they were trying to fight the fire.  He was
10 getting in their way.  I didn't see the -- his -- any
11 attempt on him to genuinely try to go into the trailer.
12    Q.  I mean, Mr. Higgins, the testimony from
13 earlier and your earlier trial testimony in this case,
14 is that you literally observed two officers had to carry
15 Mr. Yell from the trailer, correct?
16    A.  To get him out of the way so that they could
17 continue what they were doing.
18    Q.  You were across the street by that point,
19 right?
20    A.  I was on the road.
21    Q.  You were on the road.
22    A.  Uh-huh.
23    Q.  You were on the road because you knew that it
24 wasn't safe to be that close to the trailer, fair?
25    A.  I was on the road to stay away from the -- the

Page 65

1  firefighters while they did their jobs.  I was trying to
2  do that.  And I was on -- but I definitely wouldn't want
3  to be -- didn't want to be any closer to the trailer
4  than I had to be.
5     Q.  Of course.
6     A.  Uh-huh.
7     Q.  Where it says "Mutual aid" down here at
8  19:32:28, do you know what that is referring to?
9     A.  Is it on Page 3?
10    Q.  Yes, sir.
11        MR. MANDO:  It's right there.
12        THE WITNESS:  Oh.  The only thing that I know
13    that mutual aid is, is that it is a -- it's an off
14    channel on the radio for other, like, voluntary
15    firefighters.  A lot of times, when they have a lot
16    of first responders that are responding, they go to
17    another channel for their dispatch conversation or
18    they're -- when they're radioing in, and mutual aid
19    was a channel for them to do that.  But I don't -- I
20    don't know why they put that in here.  Yeah.
21 BY MR. SLOSAR:
22    Q.  Do you know what -- at 19:48:29, so it's
23 closer to the bottom, do you see where it says, "At 1056
24 West 1015"?
25    A.  Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

66..69

Page 66

1    Q.   Do you know what that's referring to?
2    A.   That's referring to me being at the jail with
3    Robert Yell.
4    Q.   Okay.  And from looking at this report, are
5    you able to determine at what time you actually left the
6    scene with Mr. Yell?
7    A.   Give me a second.  I'll try to find my name
8    here.
9    Q.   Yeah, sure.
10   A.   Doesn't look like there's a -- time listed
11   on there for when I left the scene that I can find right
12   now.
13   Q.   And you would agree that that should have been
14   something that was documented in a CAD report, fair?
15   A.   It should have been.
16   Q.   Now, if you look at your report, Number 6,
17   your Exhibit 6, just that three-page report that you
18   had.
19   A.   Uh-huh.
20   Q.   Do you document in there at all what time --
21   looking getting at Page 2, do you document in there what
22   time you left the scene with Mr. Yell?
23   A.   This is approximately 19:44 hours, "I began
24   transporting Yell to Logan County Detention Center."
25   Q.   How far was the detention center from the

Page 67

1    fire?
2    A.   About four or five minutes and --
3    Q.   Pretty close?
4    A.   Just at the speed limit.  I wouldn't say it's
5    close.  I'd say it's a couple of miles, but -- or maybe
6    less, but it would -- it would take about five minutes
7    to get there.
8    Q.   Going back to the CAD report, so back to 12,
9    Exhibit 12, on Page 4, at 21:04:44 seconds, do you see
10   where it says, "Assault third"?  It's about halfway down
11   the page.
12   A.   Yes.
13   Q.   What does that time reflect?
14   A.   21:04.
15   Q.   So at 9:04 p.m., is that when Mr. Yell was
16   charged with third degree assault?
17   A.   Now, when I -- I'd say that I logged in on the
18   radio that's when the assault occurred.  But I
19   don't -- I can't say that that's when I wrote the
20   citation for the assault third.
21   Q.   Okay.  So this is when the assault occurred,
22   to the best of your recollection?
23   A.   Yeah, according to the CAD time.
24   Q.   And I'm looking at 21:34:19, do you see the
25   "CD 40 X5, 831 CD 40 1X"?

Page 68

1    A.   Uh-huh.  Yes, sir.
2    Q.   What does that relate to?
3    A.   The charges.  It's showing five charges for me
4    and one charge for Ron Mills.  831 was his number.
5    Q.   Okay.
6    A.   And the 98 would admit that I was leaving the
7    jail.
8    Q.   And at 21:56:49, do you see where it says
9    "scene"?
10   A.   56:49?
11   Q.   Yeah.
12   A.   That's correct.
13   Q.   Is that when you would've returned to the
14   scene?
15   A.   It is.
16   Q.   What do you recall doing after returning to
17   the scene?
18   A.   I stayed in my car.  I went back to the scene
19   and -- and called, and I was going to be there in case
20   they needed me, but I never -- I didn't get out of my
21   car or parked.
22   Q.   Do you recall how long you stayed there?
23   A.   I don't.  I remember being exhausted.
24   Q.   Do you see on the next page where it says,
25   "23:16:38"?  Is that your badge number or your unit

Page 69

1    number?
2    A.   It is.  It is.
3    Q.   Okay.  Is that when you would've left the
4    scene?
5    A.   I may have left the scene long before and
6    forgot to -- to call that I had left.
7    Q.   Sitting here today, you have -- you don't have
8    an independent recollection of what happened at
9    23:16:38, correct?
10   A.   23:16:38?
11   Q.   Yeah.
12   A.   I can't accurately say -- or I can't say that
13   -- that -- that time is an accurate representation of
14   when I -- when I left the scene.
15   Q.   You don't know one way or the other, correct?
16   A.   I don't.  I know I sat there on Bonnie Drive
17   for a while, but I can't tell you how long.
18   Q.   Did you talk to anyone while you were in your
19   car?
20   A.   I didn't.  I was exhausted and very -- very
21   sad.
22   Q.   Now, by September 11, 2004, you had a past
23   history with Mr. Yell, correct?
24   A.   September 11th of 2004?
25   Q.   By the day of the fire.  Prior to the fire,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  you had a past history with Mr. Yell, correct?
2      A.   I had worked a case.
3      Q.   Fair to say that you thought that he was a
4  nuisance?
5      A.   It's fair to say that I thought that he was --
6  had a violent personality.
7      Q.   Had a what personality?
8      A.   Violent.
9      Q.   Violent?
10     A.   Uh-huh.  From working the case.
11     Q.   What was the case that you worked on regarding
12 Mr. Yell before this incident?
13     A.   It was from 2003 and he had assaulted a -- a
14 Black man in the street by the name of Roger Sydnor,
15 with a beer bottle, who had to go to the hospital and
16 get stitches.
17     Q.   Fair to say -- and you investigated that case?
18     A.   I did.
19     Q.   And that was approximately a year before the
20 fire; is that right?
21     A.   Pretty close to a year.
22     Q.   Now, nothing in that case had anything to do
23 with the fire --
24     A.   That's --
25     Q.   -- investigation, correct?

Page 71

1      A.   That's correct.
2      Q.   Nothing from that case would've necessarily
3  impacted your belief one way or the other, as to whether
4  Mr. Yell committed an arson on September 11, 2004,
5  correct?
6      A.   That's correct.
7      Q.   But from that case, you certainly would've
8  learned that Mr. Yell was a drunk, fair?
9          MR. MANDO:  Objection.  Asked and answered.  But
10     go ahead.
11         THE WITNESS:  I didn't think about Yell as
12     being a drunk or otherwise.  And I -- I can't say
13     that I didn't know that -- that he may have been
14     intoxicated in the past.  The only thing I knew was
15     the -- for the most part, was the case that I had
16     worked on him where he -- he hit the individual with
17     the beer bottle in the street, and I assume that was
18     his beer bottle.
19 BY MR. SLOSAR:
20     Q.   At the time that you arrived at the fire scene
21 on September 11, 2004, you knew that Mr. Yell had
22 previously attempted to kick in the door that day,
23 correct?
24     A.   That's correct.  Uh-huh.
25     Q.   Fair to say that when you arrived on scene, it

Page 72

1  was chaotic?
2      A.   It was.
3      Q.   Were -- do you recall whether the electrical
4  lines had come down at all?
5      A.   I do.
6      Q.   And what were your observations of that?
7      A.   I was out at the roadway and the electrical
8  line came down, and I ran out from under it.  There was
9  a crowd of people, and I was hollering at them to -- to
10 get back.  And that would've been in the line to the
11 trailer from the -- from the pole, that evidently
12 crossed the road because the line fell on the road.
13     Q.   Did -- do you recall whether the electrical
14 line landed on the trailer at all?
15     A.   I don't recall that.  I do recall it landing
16 in the roadway, though.
17     Q.   Fair to say it was a horrific situation that
18 you encountered?
19     A.   The totality of it all, especially with
20 Camron, yes.
21     Q.   Fair to say that you didn't necessarily agree
22 with the way that Mr. Yell was acting at the scene?
23     A.   That's correct.
24     Q.   At some point, when you were next to
25 Mr. Yell, so after he had been dragged across the -- let

Page 73

1  me strike that.  After Mr. Yell had been carried across
2  the road by these two officers, how long was he over
3  there before you made the comment to him about setting
4  the fire?
5      A.   It wasn't -- it wasn't very long.  It was a
6  matter of a few seconds.
7      Q.   And you were pretty upset at that point, fair?
8      A.   I was -- I was upset that Camron was in the
9  trailer.  And then it bothered me also that I didn't
10 feel that Yell had behaved as one would that was
11 concerned about their kid.
12     Q.   The way Mr. Yell acted in the roughly less
13 than five minutes that you had observed around that
14 time, if he was arrested at 9:30 -- or I'm sorry, 7:30,
15 and you arrived on scene around 7:25 --
16     A.   There were times that --
17     Q.   -- these observations you had of Mr. Yell were
18 less than five minutes; is that fair?
19     A.   I can't -- I can't say that it was -- I don't
20 know.  I -- I don't have a -- an orientation as to how
21 long it took or how much time it -- that it was.  And we
22 are talking about CAD times, where they're trying to get
23 all the first responders on scene and -- and get those
24 times correct.  I can't say that it was five minutes.  I
25 can't say that it was less or more.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    Q.    Don't they actually have recordings for the
2    CAD information?
3    A.    They do.
4    Q.    And you would expect that those recordings
5    were used to generate the report that we're looking at,
6    fair?
7    A.    That's -- that's fair.
8    Q.    Now, in the approximate five minutes from the
9    time you were on scene to the time Mr. Yell was
10   arrested, he -- you did not observe him become
11   belligerent and until you essentially accused him of
12   setting the fire?
13   A.    No.
14        MR. MANDO:    Objection.  Form.  Asked and
15   answered.  Go ahead.  Sorry.
16        THE WITNESS:  No, he was belligerent beforehand
17   with the explicatives [sic], and then he was
18   standing at the -- the side of the road and was
19   quiet for that moment when I approached him for how
20   many ever seconds there was there.  He was not under
21   arrest at that time, they let him go, and I
22   approached him and said what I said, and then he did
23   become belligerent again.
24   BY MR. SLOSAR:
25   Q.    Okay.  Do you know -- that's fair.  You would

Page 75

1    characterize your observation of him when he was running
2    to the scene, running to the trailer screaming, you
3    would characterize that as Mr. Yell being belligerent,
4    right?
5    A.    I would characterize the explicatives [sic]
6    and the -- and the way that he was -- it's not so much
7    what he said, it was the way he said it, and he was
8    indicating he didn't know that Camron was -- was even in
9    there, but --
10   Q.    Okay.  Without getting into all that, the --
11   from your observations, you would -- a -- I know you
12   have many descriptions of Mr. Yell, but one descriptor
13   that you could use of him yelling and screaming out this
14   stuff as he's running to the trailer is belligerent,
15   fair?
16   A.    That's correct.
17   Q.    And then after Mr. Yell was carried across the
18   street and standing on the side of the road, it was --
19   it's your recollection that he was calmer at that point
20   than how he was acting across the street; is that right?
21   A.    He was.
22   Q.    And then after you made the statement to
23   Mr. Yell about setting the fire, that is when Mr. Yell
24   became belligerent again, fair?
25   A.    That's fair.

Page 76

1    Q.    And that is the first time that you observed
2    Mr. Yell scream at a law enforcement officer and/or try
3    to attack a law enforcement officer; is that fair?
4    A.    That's fair.
5    Q.    Prior to you making a comment to Mr. Yell, you
6    had not observed him do anything inappropriate towards
7    law enforcement at the scene, fair?
8    A.    Other than just getting in the way of the
9    firefighters who were trying to do their jobs and having
10   to be carried.
11   Q.    Well, that certainly isn't -- that might be
12   inconvenient.  It may not be the smartest thing to do
13   given that there was an active fire going on, but you
14   would agree that that is not disrespectful to police
15   officers, fair?
16   A.    That's fair.
17   Q.    Okay.  The first time that you observed
18   Mr. Yell become disrespectful to the police officers is
19   in response to your comment, correct?
20   A.    That's correct.
21        MR. SLOSAR:  Let's take a ten-minute break if
22   we can.
23        THE VIDEOGRAPHER:  All right.  The time is
24   11:24 a.m. Central.  We're going off record.
25        (OFF THE RECORD)

Page 77

1        THE VIDEOGRAPHER:  Time is 11:37 a.m. Central.
2    We are back on record.
3    BY MR. SLOSAR:
4    Q.    Mr. Higgins, prior to 2004, I know that you
5    testified earlier this is the only fire investigation
6    you're a part of, but in your life, have you ever been a
7    part of any sort of fire incident where --
8        MR. MANDO:  Objection.  Characterization.  But
9    go ahead.
10       THE WITNESS:  Are you talking about before
11   then, or after, or at any time?
12   BY MR. SLOSAR:
13   Q.    Before.  So did a fire, you know, ever -- did
14   you or anybody in your family ever have to deal with a
15   fire prior to you becoming a law enforcement officer?
16   A.    Not that I recall.
17   Q.    Outside of a fireplace?
18   A.    Correct.
19   Q.    All right.  Getting back to this specific
20   incident, when you made this comment to Mr. Yell, I
21   believe you testified a few moments ago that he became
22   belligerent towards you; is that right?
23   A.    He started cussing me.  I remember he told me,
24   no disrespect to anybody, but "fuck you."  And clenched
25   his fists and started to come at me.  That's when Ron



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 22 of 61 PageID
#: 2754
The Deposition of JOHN EDWARD HUGGINS, taken on January 24, 2024

78..81

Page 78

1  Mills and another officer, they came out of my periphery
2  and did some kind of -- grabbed hold of him and placed
3  him under arrest.
4     Q.    And yeah, and that was probably a scary
5  situation for you, right?
6     A.    Oh, for him?
7     Q.    For you.
8     A.    As far as him clenching his fists?
9     Q.    Yeah.  Coming after you?
10    A.    Yeah.  No, I wasn't -- I mean, I wasn't
11 scared.
12    Q.    Yes, sir.  You had a gun, you were not
13 intoxicated?
14    A.    Right.  And it had nothing to do with the gun.
15 It was just he was intoxicated, but it was -- I think
16 that you can't take this job if you don't think that you
17 can handle yourself a little bit, right?
18    Q.    Fair enough.
19    A.    Yeah.  So wasn't -- I -- I wasn't scared, but
20 I didn't think that his behavior was appropriate.
21    Q.    Sure.  So it didn't -- when Mr. Yell clinched
22 his fists and -- what did he do?  Sorry.  He clenched
23 the fists and then what else did he yelled --
24    A.    He started to come at me.
25    Q.    Okay.  He started to come at you.

Page 79

1     A.    And he -- and he hollered F you.
2     Q.    He ever hit you?
3     A.    No.
4     Q.    Did he ever kick you?
5     A.    No.
6     Q.    Ever spit on you?
7     A.    Yes.  At the jail.
8     Q.    Okay.  Sorry.  That's a bad question by me.  At
9  the scene, did he ever spit on you?
10    A.    No.
11    Q.    Okay.  And you were not afraid when he came
12 after you given his state, fair?
13    A.    No.  I mean, I wasn't -- I wasn't afraid
14 afraid, but I did definitely didn't want to be injured.
15    Q.    For sure.
16    A.    Yeah.  So didn't want to take any risk of
17 that.
18    Q.    And Mr. Yell -- you and Mr. Yell ended up on
19 the ground together, correct?
20    A.    On the scene?
21    Q.    Yeah.
22    A.    No.
23    Q.    Sir, isn't it true that you shoved him on the
24 ground?
25    A.    After they had grabbed a hold of him, he

Page 80

1  twisted away from them and came at me, but that was --
2  when they grabbed a hold of him and they were dealing
3  with him, I had turned to look at the fire.
4     Q.    And who's the they that you're referring to?
5     A.    Ron Mills and the other officer.  In my
6  report, it says, Robert Tooms, and I have spoken to him
7  since he said that it was Chad Egglesston because he was
8  training him at the time.  So I don't know who the --
9  the person on the on the right was.
10    Q.    At some point, you shoved Mr. Yell on the
11 ground, correct?
12    A.    When he -- he twisted away from them and
13 charged me, and I was looking -- I had turned to look at
14 the fire to see what the firefighters were doing.  I --
15 I figured they had him.  And now in my periphery, I saw
16 him charging me and I did a palm heel.  And I did -- he
17 was getting into my personal space, and I did give a
18 pretty good shove.  And he, Ron Mills, and Robert Tooms
19 or Chad Egglesston, whoever it was on the right side of
20 him, they all went to the ground.  There was a bush
21 there.  And then they picked him up, took him back to
22 the cruiser, and he was kicking and yelling and cursing,
23 was screaming all the way.
24    Q.    Do you eventually pepper spray Mr. Yell?
25    A.    At the sally port.

Page 81

1     Q.    Did you -- while you were at the scene, did
2  you hit Mr. Yell in the chest?
3     A.    I did.
4     Q.    And was that with a open hand or a closed
5  fist?
6     A.    It was closed and in the manner that we were
7  taught at the academy to the chest with the -- for the
8  hard hand technique is what they trained us to -- to do.
9     Q.    And when you hit Mr. Yell on the chest, what
10 happened to Mr. Yell?
11    A.    Nothing.  He was in the cruiser at the time,
12 trying to kick the window out.
13    Q.    Well --
14    A.    Which was the reason for the -- the hard hand
15 technique.
16    Q.    Okay.  And fair to say that from the moment
17 you made the comment to Mr. Yell to the -- when he was
18 in the cruiser during that entire period, would you
19 agree that he was belligerent during that period?
20    A.    Yes.
21    Q.    He was -- would you agree that during that
22 time period -- so the comment you made to the time he
23 was in the cruiser trying to kick out the window?
24    A.    Yes.
25    Q.    Would you agree that he seemed real angry?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 23 of 61 PageID
#: 2755
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

82..85

Page 82

1    A.   Yes.
2    Q.   Would you agree that he seemed real agitated?
3    A.   Yes.
4    Q.   Would you agree that it appeared to you as if
5  during that time period that Mr. Yell was incapable of
6  controlling his emotions?
7    A.   He was in -- I would say he was incapable --
8  and that's a --
9    Q.   Yeah, let's be --
10   A.   That's an interpretation.  I --
11   Q.   Yeah.  Let me strike the question.
12   A.   Yeah.
13   Q.   How would -- during that time period, so the
14  time you made the comment to him to when he's in the
15  squad car trying to kick out the window, how would you
16  describe how Mr. Yell was acting?
17   A.   Angry and belligerent, yelling, kicking.
18   Q.   And prior to you making the comment while
19  Mr. Yell was out there on the street, you would agree
20  that Mr. Yell, just on the street, not when he was
21  running to the trailer, so after he was brought to the
22  street, that's the time period that we're looking at,
23  would you agree that after he was brought to the street
24  before you made the comment, he was not acting angry or
25  belligerent or out of control?

Page 83

1    A.   He wasn't at the time that he was out on the
2  street after as you described.
3    Q.   And when Mr. Yell was placed in the squad car,
4  did you do that or was that another officer?
5    A.   It was another officer.
6    Q.   And by then Mr. Yell had been charged, had
7  been -- sorry, strike that.  By the time he was placed
8  in the squad car, Mr. Yell was under arrest, correct?
9    A.   Officer Mills arrested him.
10   Q.   And do you recall what the arrest the charge
11  was for?
12   A.   After he was placed in the car and after I
13  realized that Mr. Yell wasn't going to calm down, I
14  remember talking to Mills telling him I was going to go
15  and take him straight on to the jail and Mills signed
16  the citation.
17   Q.   And --
18   A.   For the charge.
19   Q.   While Mr. Yell was in the squad car, can you
20  tell us, was he in the front or the back?
21   A.   He was in the back.
22   Q.   That might be the easiest question I have for
23  you today.  Was he handcuffed at the time?
24   A.   He was handcuffed.
25   Q.   Fair to say that he was in custody at the

Page 84

1  time?
2    A.   He was not in proper custody, but he was in
3  some sort of custody.  When he was in the back seat, he
4  wasn't properly secured in a seat belt.  Now, I don't
5  know whether he had been seat belted or not.  But when
6  he was kicking the window, he was out of the seatbelt
7  and had his feet towards me when I opened the door when
8  he was kicking the window.
9    Q.   So let me be a little more specific.  At the
10  time Mr. Yell was placed into the squad car, he was
11  under arrest and handcuffed, correct?
12   A.   That's correct.
13   Q.   The squad car, the back doors, would've been
14  locked so that -- from the interior so that Mr. Yell
15  could not open the doors, correct?
16   A.   From the interior, that's correct.
17   Q.   And prior to you getting to the sally port
18  with Mr. Yell, isn't it true that Mr. Yell was not given
19  a Miranda warning?
20   A.   That's correct.
21   Q.   Now, fair to say that you were angry with
22  Mr. Yell before you even drove him to the jail?
23   A.   It's fair to say that I was upset about Camron
24  being in the trailer and that we couldn't get him out.
25   Q.   You --

Page 85

1    A.   And I was upset about that.  I was.  I -- I
2  wasn't happy with Yell.
3    Q.   Okay.  And you were also -- got a text message
4  from somebody at the air patrol.  You were also -- you
5  were frustrated at the moment you got into the squad car
6  with Mr. Yell, correct?
7    A.   I was frustrated at the time that I had --
8  after Officer Mills had signed the citation for me to
9  fill out for the charge and to get in -- when I would
10  get into the cruiser.  I was -- at that time, I was
11  thinking about Camron.
12   Q.   Sure.
13   A.   And that -- that was just overwhelming.  It
14  was on my mind.  And when I sat into the cruiser,
15  I was really upset about that.  I wasn't happy with Mr.
16  Yell, but I wasn't at that time thinking about Mr. Yell.
17  I was thinking solely about Camron.
18   Q.   But you had testified earlier here today and
19  at your first deposition that before you left the scene,
20  you had come to form the opinion that Mr. Yell had
21  committed an arson, correct?
22        MR. MANDO:  Objection.  Form.
23  BY MR. SLOSAR:
24   Q.   You can answer.
25        MR. MANDO:  Characterization.  Go ahead.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1   THE WITNESS: He was an unofficial suspect
2   based on reasonable suspicion. And that is, when we
3   got the call to go over to 641 North Morgan, they
4   were saying that he was trying to kick the door in
5   and that he was trying to assault April. And then
6   before we get to the scene, we're dispatched that he
7   has left that residence and gone to Bonnie Drive, to
8   the other residence, which is where the fire had
9   happened. And then still before we get to the
10  scene, we get another dispatch saying that that
11  trailer is on fire. And so, as arrived there, I
12  thought -- my mindset was, okay, we have a fire, but
13  everything was in the context of a domestic
14  violence. And so, when I had gone into the trailer
15  trying to get Camron out and was not able to, I was
16  solely thinking about Camron. When Yell had showed
17  up, I started thinking about the fire, but it -- it
18  wasn't a long deliberation, but about what I thought
19  the fire had burned the trailer too fast for it not
20  to -- to have been anything other than arson.
21  BY MR. SLOSAR:
22      Q. And you -- prior to September 11, 2004, you
23  had no training whatsoever on fire investigations,
24  correct?
25      A. That's correct. That's correct.

Page 87

1      Q. Prior to that day, you had no training at how
2   quickly an electrical fire would burn a trailer versus a
3   trailer fire that involved accelerants, correct?
4      A. That's -- yes, that's correct.
5      Q. Okay. So the real basis that you had to
6   suspect Mr. Yell for an arson would've been the dispute
7   that he had with April Carpenter earlier that day and
8   your observations of Mr. Yell on the scene during the
9   five-minute period before you arrested -- had him
10  arrested; is that fair?
11     A. It was --
12     MR. MANDO: Objection. Form.
13  BY MR. SLOSAR:
14     Q. You can answer.
15     MR. MANDO: Lack of foundation. You can
16  answer.
17     THE WITNESS: It was -- it was not based on
18  what he'd done earlier that day. It was based on
19  what we were getting dispatched to, the -- the
20  domestic, him trying to kick the door in to get to -
21  - to April, leaving the -- leaving the residence,
22  going back to the other one, according to the
23  dispatch. And then at that -- that the trailer was
24  on fire and -- and then being in the trailer and
25  coming out, the -- speed of that fire was a main

Page 88

1   driver for it, all of it combined, for suspicion
2   that -- that he was an unofficial suspect. I knew I
3   wasn't going to be investigator on that. And
4   somebody -- you know, I knew somebody else was.
5   BY MR. SLOSAR:
6      Q. And that's because you had -- that's for
7   multiple reasons. One, you were not an investigator or
8   a detective at the department at the time, correct?
9      A. That's correct.
10     Q. And secondary to that, you had no training on
11  how to investigate an arson or a fire investigation; is
12  that fair?
13     A. That's fair.
14     Q. Now, by the time you got into the squad car
15  with Mr. Yell, you had already accused him of setting
16  the fire when you were on the side of the road; is that
17  right?
18     A. I had already --
19     MR. MANDO: Objection. Characterization. Go
20  ahead.
21     THE WITNESS: I'm sorry, Mr. Mando. I had told
22  him he'd better not have set the fire. I don't
23  think that was an accusation, but I was suspicioning
24  [sic] him.
25  BY MR. SLOSAR:

Page 89

1      Q. In the car, isn't it true that you accused Mr.
2   Yell of committing an arson at the trailer?
3      A. He was an unofficial suspect in my mind, and I
4   had reasonable suspicion to believe that he may have
5   been involved in -- in an arson stemming from the
6   domestic violence that I -- I explained. And it -- it
7   was an outburst because and I was upset that we couldn't
8   get Camron out. Why was the fire set? But even when I
9   -- I said that, I knew that I had no evidence on -- on
10  Yell for that, but I did -- he was a suspect in my mind,
11  an unofficial one.
12     Q. And this was an outburst from yourself that
13  happened in part because of how upset you were about
14  Camron being in that fire?
15     A. That's correct.
16     Q. And fair to say that you wanted to elicit a
17  confession from Mr. Yell to arson when you made that
18  comment?
19     A. No, it's not fair to say. I didn't expect an
20  answer from him.
21     Q. Oh, why was this fire set? You would agree
22  that that is a leading question.
23     A. I would agree that it would've been a leading
24  question if I had intended it for it to be that way, but
25  I was just -- I was just explaining that. It was an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 25 of 61 PageID #: 2757
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024
90..93

Page 90

1  emotional outburst.  I didn't expect a response.  I
2  didn't ask him any other questions.  I just -- I drove -
3  - I drove off and I was feeling that -- that there was a
4  heavy suspicion that he had done this.  But I knew that
5  I didn't have proof.  I knew that they would have to,
6  the investigators would have to do their investigation
7  for him to be an official suspect.
8      Q.   At the time this outburst happened, Mr. Yell
9  was handcuffed, correct?
10     A.   That's correct.
11     Q.   He was under arrest, correct?
12     A.   That's correct.
13     Q.   And at the time the comment was made,      Mr.
14 Yell had still not been given a Miranda warning,
15 correct?
16     A.   At that time, no.
17     Q.   What -- was Mr. Yell screaming and hollering
18 in the car at the time that you made the comment?
19     A.   Before?
20     Q.   Yes.
21     A.   Or after?
22     Q.   Before.
23     A.   I don't recall.
24     Q.   Do you recall what he was doing when you made
25 the outburst?

Page 91

1      A.   And about the entire trip he was thrashing
2  around, still kicking and -- and hollering.
3      Q.   How many minutes do you recall Mr. Yell
4  thrashing around and doing that before you made the
5  outburst?
6      A.   He did it -- I got in the car to leave because
7  he was doing that.  I wanted to get him to the jail
8  before he started kicking the window again.  I made the
9  outburst in-between his thrashing and yelling, and he
10 complained about his eyes hurting.  He made the comment,
11 the statement of admittal, and then he went back to
12 yelling and hollering and -- kicking and thrashing
13 around again after -- after making that statement.
14     Q.   Is that fair to say that Mr. Yell was in the
15 car for a few minutes before you made the -- let me
16 strike that.  While the car was driving, it took about
17 four to five minutes to get to the jail, right?
18     A.   That's correct.
19     Q.   And while the car was driving, is it fair to
20 say that Mr. Yell was in the car for a few minutes
21 before you made the outburst?
22     A.   He was in the car before I got in the car,
23 yes.  I don't know how long.
24     Q.   Well, let me -- so now I just want to hone in
25 on from the time you left the scene to the time you went

Page 92

1  to the jail.
2      A.   Okay.
3      Q.   How many minutes passed, while you're driving
4  with Mr. Yell, before you make the outburst?
5      A.   I made the outburst immediately when I got in
6  the car pretty much.  As soon as I got in the car to
7  drive off and I was -- had Camron on my mind and --
8      Q.   And so, at the time that you made the
9  outburst, that was immediately when you got into the
10 car?
11     A.   Pretty much.
12     Q.   And then Mr. Yell --
13     A.   I'm sure I shut the door and started to take
14 off.
15     Q.   After the outburst was made, was Mr. Yell
16 still acting unreasonably?
17     A.   No.  He was complaining about his eyes.  He
18 said that he -- his eyes were hurting from the pepper
19 spray.  Somebody had pepper sprayed him.  And then I
20 went about a half a block and then they made the
21 statement.
22     Q.   So after you accused Mr. Yell of setting the
23 fire, he didn't confess, correct?
24          MR. MANDO:  Objection.  Characterization.  But
25 go ahead.

Page 93

1          THE WITNESS:  I asked him why was the fire set,
2  and I did think that he was a -- a -- you know, a
3  suspect unofficially, but I don't think that -- I
4  didn't go continue at that point to say, "Hey, you
5  know, you set the fire."
6  BY MR. SLOSAR:
7      Q.   Sure.  But the implication in your comment to
8  Mr. Yell was an accusation that he set the fire, fair?
9          MR. MANDO:  Objection.  Form.  Go ahead.
10         THE WITNESS:  I could see how that he would
11 read it that way, and I was leaning that way, but
12 not for sure, you know.
13 BY MR. SLOSAR:
14     Q.   And after you made that comment, Mr. Yell did
15 not confess to setting the fire, correct?
16     A.   He made a statement of admittal, which I took
17 to be an answer to that outburst.  It was delayed, but I
18 don't say that I -- he did.  He wasn't in the backseat
19 saying that, yeah, I took a lighter and lit it and threw
20 an accelerant.  He didn't make a full-on confession.
21 No.
22     Q.   After you made an outburst, isn't it true that
23 Mr. Yell made complaints about his eyes hurting from the
24 pepper spray?
25     A.   That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1    Q.    And Mr. Yell complained to you that he was
2  enduring pain from the pepper spray, correct?
3    A.    Yeah.  Yeah.  I mean, he was complaining about
4  the paper spray hurting his eyes.
5    Q.    And then isn't it true that Mr. Yell asked you
6  for water so that he can put it in his eyes?
7    A.    I don't recall that.
8    Q.    Not saying it didn't happen, just don't
9  remember?
10   A.    Don't remember.
11   Q.    Fair to say that Mr. Yell never confessed to
12 you that he committed an arson while you were in the
13 police cruiser?
14   A.    He never confessed, but he did make statements
15 of admittal, and I do take that as two different things.
16   Q.    Fair to say that Mr. Yell never confessed to
17 you that he committed a murder?
18   A.    That's correct.
19   Q.    Now, prior to you making this outburst to
20 Mr. Yell in the police cruiser, prior to that happening,
21 you were aware that Mr. Yell had an altercation with
22 April Carpenter on September 11, 2004, correct?
23   A.    The only thing that I recall was the dispatch
24 that he was trying to kick the door down and that he was
25 trying to assault April.

Page 95

1    Q.    And you would agree April Carpenter was not in
2  the trailer at the time of the fire?  Well, actually,
3  let me strike that.  That's a terrible question.  You
4  would agree that April was not trapped in the trailer
5  when it was on fire?
6    A.    I didn't know where she was.
7    Q.    Well, you knew that April Carpenter, when you
8  arrived on scene, you testified earlier that you saw
9  that April had Saralynn and had passed her off either as
10 some officers or someone else at the scene?
11   A.    Yeah.  When I got to the scene, she was at the
12 trailer with --
13   Q.    Yes.
14   Q.    Okay.  Sorry.
15   Q.    No, no, no.  You're -- it's bad question, but
16 you understand what I'm talking about now?
17   A.    Yeah.
18   Q.    When you arrived on scene, you saw that April
19 Carpenter was not in the fire, fair?
20   A.    Correct.
21   Q.    Okay.  And when you first observed Mr. Yell
22 running, you heard him yelling that April better had
23 gotten Camron out of the trailer, fair?
24       MR. MANDO:  Objection.
25 BY MR. SLOSAR:

Page 96

1    Q.    That right?
2        MR. MANDO:  Asked and answered multiple times.
3  But go ahead.
4        THE WITNESS:  I think it's fair to say that
5  when he was running in -- in the front of the
6  trailer, that he was hollering roughly that April
7  had better gotten Camron out.
8  BY MR. SLOSAR:
9    Q.    And that would indicate to you as a law
10 enforcement officer, having heard that, that from the
11 moment that Mr. Yell ran to the trailer, he believed,
12 just from what you could hear, that April was not inside
13 the trailer that was burning, fair?
14   A.    That's -- that's fair.
15   Q.    And sitting here today, you don't recall
16 whether -- you don't recall observing one way or the
17 other as to whether Mr. Yell saw April on the -- at the
18 scene of the fire after he ran to the trailer, fair?
19   A.    I don't believe that he did.
20   Q.    But you don't have --
21   A.    I don't know whether he did.
22   Q.    You don't have a independent memory one way or
23 the other, fair?
24   A.    Right.  I don't.
25   Q.    Okay.  And -- but you -- let me ask you this.

Page 97

1  Sir, isn't it true -- well, let me strike that.  In your
2  citation, you allege that, and this is Exhibit number --
3  I believe it's 5.  Yeah.  So if you go to Exhibit 5,
4  Page 1.  Do you see where it says, "Terroristic
5  threatening third above advised me he wanted my name and
6  number.  He stated he was going to get me.  He stated I
7  had no idea how evil he was.  He advised if my wife did
8  this -- if my wife did to me what his girl did to him, I
9  would do the same as he did after I asked him why the
10 trailer was set fire."  Is that what you wrote there,
11 sir?
12   A.    It is.
13   Q.    Now, you omitted from this citation the fact
14 that Mr. Yell had made several other comments to you
15 after you asked him why the trailer was set on fire,
16 correct?
17   A.    That's correct.
18   Q.    For instance, when you were in the car with
19 Mr. Yell, when you told him, "Why was the trailer set on
20 fire," he did not tell you that you would do the same as
21 he did.  Strike that.  After you asked Mr. Yell why the
22 trailer was set on fire, he did not inform you that if
23 your wife did to you, what his girl did to him, that you
24 would do the same as he did, correct?
25   A.    He did say that.  He did respond.  It was a



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 27 of 61 PageID
#: 2758
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

98..101

Page 98

1  delayed response.
2      Q.   When you say delayed response --
3      A.   Yeah.
4      Q.   -- what you're really referring to is, what
5  you testified a few minutes ago, which is that Mr. Yell
6  was asking you -- he was making complaints about the
7  pepper spray in his eyes, that he was asking for medical
8  assistance for the pepper spray --
9      A.   I don't recall that.
10     Q.   -- for water.  If you don't have a
11 recollection, you're not sitting here today denying one
12 way or the other as to whether he asked you for water.
13 You said you don't remember, correct?
14     A.   That's correct.
15     Q.   If he did ask you for water, that would be
16 akin to getting medical assistance for the pepper spray,
17 correct?
18          MR. MANDO:  Objection.  Form.  Go ahead.
19 BY MR. SLOSAR:
20     Q.   You can answer.
21     A.   I -- I would say getting water would help with
22 his eyes.
23     Q.   And in terms of the complaints that Mr. Yell
24 was making to you about the pepper spray and the impact
25 that that was having on his eyes, what's your best

Page 99

1  estimate of how long he complained to you about the
2  pepper spray after you made the comment why the trailer
3  was set on fire?
4      A.   Just a couple of seconds.
5      Q.   When you say a couple, is it ten seconds?
6      A.   I mean, I have to think back and try to count
7  the -- the time.  I don't know if I can possibly do
8  that.  It wasn't he said that immediately after the
9  outburst and then immediately after that, he's -- he
10 made the statement.
11     Q.   You would agree that Mr. Yell did not make
12 that statement in direct response to your question?
13     A.   I don't agree.
14          MR. MANDO:  Objection to characterization of
15   his question.  But go on.
16 BY MR. SLOSAR:
17     Q.   You don't agree?
18     A.   I don't agree with that.
19     Q.   You would agree that your report reads as if
20 Mr. Yell told you that particular comment, "If your wife
21 had done to you what my girl did to me, you would've
22 done the same thing."  You would agree that your
23 citation reads as if Mr. Yell told you that directly
24 after you asked him why the trailer was set on fire,
25 correct?

Page 100

1      A.   I didn't put that on the citation that he
2  directly answered, did I?  Whether he did --
3      Q.   You did.
4      A.   -- he did make this answer when I stated I had
5  no idea how you -- he said, he stated, advised if my
6  wife had done to me --
7      Q.   Sir.
8      A.   I'm not -- I'm sorry.  Go ahead.
9      Q.   You said in here, last two lines, "He advised
10 if my wife did to me what his girl did to him, I would
11 do the same as he did after I asked him why the trailer
12 was set on fire."
13     A.   Yeah.
14     Q.   That's what you wrote, right?
15     A.   Yes.  That's what I wrote on there.
16     Q.   And you omitted in your citation the comments
17 that Mr. Yell made to you directly after you asked him
18 why the trailer was set on fire, you omitted those
19 comments he made to you about the pepper spray in his
20 eyes, correct?
21     A.   That's not in there, but that was his answer
22 to the question.  It was just delayed.
23     Q.   You did not write in here that his answer was
24 delayed after your question, correct?
25     A.   That's correct.

Page 101

1      Q.   And you would agree that if Mr. Yell -- well,
2  let me strike that.  You understand here today that
3  Mr. Yell denies making this comment to you?
4      A.   No, I didn't know that.
5      Q.   You didn't know that?
6      A.   No.
7      Q.   You -- you're not aware that Mr. Yell
8  maintains that this comment wasn't made?
9      A.   I'm not aware that he denies that.
10     Q.   Okay.  Let me ask you something else.  You --
11 one of the reasons why you considered Mr. Yell suspect
12 in an arson is because of the altercation that happened
13 between him and April on that date, correct?
14     A.   That and the speed at which the trailer was
15 burning down.
16     Q.   Yeah.  But you had no training one way or the
17 other on speed of fires by September 11, 2004, correct?
18     A.   I agree.
19     Q.   Okay.  So the main reason why you considered
20 Mr. Yell to be a suspect in an arson is because of this
21 altercation he had with April before the trailer caught
22 fire, fair?
23     A.   I'll say that's fair.
24     Q.   Okay.
25     A.   The main reason.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 28 of 61 PageID
#: 2700
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024
102..105

Page 102

1     Q.   Yeah.  And you would agree that altercation
2   was between Mr. Yell and April, correct?
3     A.   (No verbal response.)
4     Q.   And you would agree that if April's
5   allegations are true, that Mr. Yell kicked a door in and
6   was abusive towards her, correct?
7     A.   That was -- yes.  I mean, that's what I
8   believed that was happening.  The domestic violence
9   situation.
10    Q.   Isn't it true that if Mr. Yell told you, "If
11  your wife had done to you what my girl did to me, you
12  would've done the same thing," that he could've really
13  been referring to the domestic incident where he kicked
14  the door down and was abusive towards April?
15         MR. MANDO:  Objection, calls for speculation.
16  BY MR. SLOSAR:
17    Q.   You can answer.
18    A.   That's not the way I interpreted it -- his
19  answer.  I interpreted his answer as the answer to my
20  question.  Not that -- that he was talking about the
21  physical altercation, but I -- I took very literally
22  that this was a response to my outburst.
23    Q.   It wasn't a direct response to your outburst,
24  correct?
25    A.   It wasn't -- it wasn't directly made

Page 103

1   afterwards immediately, but it was pretty soon.
2     Q.   He literally complained about the pepper spray
3   --
4     A.   He did.
5     Q.   -- in his eyes before he made -- supposedly
6   made this comment, correct?
7     A.   He did.  But we were still in the -- it was --
8   it was -- that was made -- that comment was made, but it
9   was still close enough in time for me to believe that he
10  was given the statement of Mills by --
11    Q.   And that's an assumption --
12    A.   To my outburst.
13    Q.   -- that's an assumption that you are making.
14    A.   It is.
15         MR. MANDO:  Objection.
16  BY MR. SLOSAR:
17    Q.   Right.  And because you would agree, sitting
18  here today, it could have been just as well that
19  Mr. Yell was referring to him getting -- knocking a door
20  down and getting abusive towards April, and not
21  admitting to having started a fire, correct?
22    A.   When -- I'll say that there would be a
23  possibility that that is -- that could have happened,
24  but not probable.
25    Q.   And that's -- and that's all an assumption on

Page 104

1   your part, fair?
2     A.   It is --
3          MR. MANDO:  Objection.
4          THE WITNESS:  Well --
5   BY MR. SLOSAR:
6     Q.   Assuming the comment -- assuming Mr. Yell made
7   that comment, it would be important to ask a follow-up
8   question of Mr. Yell.  Are you talking about having this
9   domestic incident with April or you talking about
10  burning a trailer down, right?
11    A.   I wasn't -- I wasn't in the mindset at that
12  time to ask him any questions.  I made an outburst and -
13  - and I didn't ask him a bunch of questions --
14    Q.   Okay.
15    A.   -- that I should've asked him after that.
16    Q.   In hindsight --
17    A.   In hindsight, yeah.
18    Q.   -- you wish that you had asked follow-up
19  questions --
20    A.   Sure.  After that.
21    Q.   -- to learn exactly what Mr. Yell was
22  referring to, fair?
23    A.   In hindsight, I would've asked him more
24  questions regarding why he would say -- make that
25  admittal.  What prompted him -- what did she do to him

Page 105

1   that prompted him to do what he did would've been my --
2     Q.   Well, it would've --
3     A.   I mean, it's hindsight.
4     Q.   It would've been important as a law
5   enforcement officer in hindsight to actually clarify
6   what he was admitting to first, right?
7     A.   I -- I thought that was pretty clear that he
8   was admitting to what I said why was a -- was a fire
9   set.  And he -- he said, if your wife had done to you,
10  what my girl had done to me, you'd done the same thing.
11  And even though -- even though he's complained about his
12  eyes in-between, that was the way I interpret that.  And
13  I had no question about that.  I would not have asked
14  him what he meant by that.  I knew what he meant by
15  that.  But I would have asked him, what was it that
16  April did that made him so mad that he did that.
17    Q.   And you would agree, Mr. Higgins, that if
18  science proves that the fire was not a result of an
19  arson, that that would indicate that Mr. Yell was not
20  making an admission to a fire it was not intentionally
21  set?
22         MR. MANDO:  Objection.  Form.  Lack of
23  foundation.  Go ahead.
24  BY MR. SLOSAR:
25    Q.   You can answer.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

```
1       A.   I wouldn't have known that at the time we were
2   having this conversation that -- or with -- I wouldn't
3   have known that.
4       Q.   I'm saying in hindsight.
5       A.   Yeah.
6       Q.   You now are aware that experts have testified
7   that there was no scientific foundation for this to be
8   labeled as an arson.  And conversely that they've
9   identified several ways that this was more likely to
10  have been caused by accidental measures.  You're aware
11  of that, fair?
12      A.   I'm --
13          MR. MANDO:  Just what you're aware of. Outside
14      of -- let me instruct.  Independently what you're
15      aware of, not from conversations with me as your
16      attorney.
17          THE WITNESS:  Okay.  In -- in hindsight, I
18      would say that that would be important to know.  And
19      that would hold a lot of weight with me if they had
20      talked to me about what I had seen in the trailer
21      first.  And if their conclusions from their science
22      would -- that they had made, that would carry a lot
23      more weight with me if they had gotten the specifics
24      of what I had seen, as opposed to disenfranchising
25      me as -- as a witness and being inside the -- the
```

Page 107

```
1   fire.  And I think that -- and even though I'm not a
2   fire science -- fire scientist, I -- and I -- I
3   respect those guys for what they do, I would
4   definitely find their -- their conclusions a lot
5   more credible if they had at least considered what I
6   had seen.
7   BY MR. SLOSAR:
8       Q.   And, Mr. Higgins, to be fair to the experts
9   who have looked at this case, you were the person who
10  decided what information about your observations to put
11  in your three-page report that's contained Exhibit 6,
12  correct?
13      A.   I understand.
14      Q.   If you had put in this report more detail
15  about what you observed at the scene, then you would
16  agree that experts could consider that information,
17  fair?
18      A.   I think it'd be fair to say that if the
19  original investigators had gotten specifics from me,
20  then that would've been taken care of.  And I was
21  interviewed by David West, that I felt like in hindsight
22  that he had gotten just corroborating evidence to what
23  Ron Mills had seen, and -- and that he didn't dive into
24  the specifics of exactly what I had seen.  And so, I was
25  -- I did that report based on the charges that I had --
```

Page 108

```
1   that I had made and I had made the assumption that they
2   had everything else covered.
3       Q.   Now, Mr. Higgins, you not only did the report,
4   but you also testified at a grand jury, correct?
5       A.   I did.
6       Q.   You testified in Mr. Yell's criminal trial,
7   correct?
8       A.   I did.
9       Q.   Did you also testify in a -- some sort of
10  motion hearing?  Do you recall that?
11      A.   Yeah, it's a suppression hearing on the -- the
12  statement of admittal.
13      Q.   And you would agree that, at each of those
14  proceedings, you had an opportunity to testify about
15  your observations at the scene of the fire?
16          MR. MANDO:  Objection.  Form.  Lack of
17      foundation.  Go ahead.
18          THE WITNESS:  No, I wouldn't agree because --
19      and I didn't have an independent memory of my
20      testimony at the grand jury, but when I look back on
21      it, Mr. Orange had several of us testifying and he
22      only had us testifying to certain things.  So I was
23      testifying under parameters of what I was going to
24      testify to. And -- and then when I was in the trial,
25      they asked me questions, and I just answered the
```

Page 109

```
1   questions.  And then be -- I make an assumption that
2   they had all this stuff covered with Ron Mills'
3   testimony.  And of course, a lot of this is
4   hindsight, I realize.  But at the time, my testimony
5   was -- was pretty -- pretty limited.  And though I
6   didn't write all of it down, but I didn't know how
7   important that stuff was until after I started
8   reading the -- you know, in 2016, the -- the Project
9   Innocence, what they were discovering and talking
10  about.  Well, hey, you know, the small fire here on
11  the floor might be -- because the -- the thing that
12  I was mostly concerned about was what I thought
13  would kill me, which was the big fire that I had
14  seen.  So I'm like, hey, this is important.  And so,
15  this is something that I feel like the
16  investigators, old and new, should have extracted
17  from me at some point in time.
18  BY MR. SLOSAR:
19      Q.   And that's not -- you know, Mr. Higgins,
20  you're obviously a part of this lawsuit.
21      A.   Yeah.
22      Q.   Your role in this investigation was not to be
23  the fire investigator or the fire expert, so I hear what
24  you're saying.  But I'll tell you, maybe this'll make
25  you feel happy, we're going to get this transcript to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1  our experts. They're already working on reports. And
2  so, they will hear about your observations. What I'll
3  represent to you is that when Mr. Yell finally had his
4  conviction overturned, those experts had access to your
5  trial transcripts and whatever was in the record. And
6  so, my question to you about hindsight isn't necessarily
7  whether you find the opinions credible or not credible,
8  the jury's going to decide that, frankly, a judge is
9  going to decide that, not you and --
10      A.  Right.
11      Q.  -- not us. My question is a little bit
12  different. But if experts have come to the conclusion
13  that the fire was most likely not attributable to an
14  arson, and instead it was some sort of accidental fire,
15  would you agree with me in hindsight that Mr. Yell's
16  comment to you in the car is likely referring to the
17  domestic incident he had with April that day and not the
18  fire?
19          MR. MANDO: Objection. Form.
20          MS. ARNETT: Object to form.
21          MR. MANDO: You can answer.
22          THE WITNESS: Yeah. No, I -- I don't believe
23      that I think that if he -- if he didn't set a fire,
24      he shouldn't be making statements of admittal that
25      he did. I mean --

Page 111

1  BY MR. SLOSAR:
2      Q.  He never made an admittal to you that he set a
3  fire, correct?
4      A.  He answered my question.
5      Q.  He --
6      A.  Or which was an explanation, but he -- he
7  answered that. And you -- you know, being there and
8  being with him, I feel like I have a unique perspective
9  over how things were said and -- and that perspective
10  gave me an interpretation I think that's fair and true
11  and accurate. If he didn't mean that, yes. I mean, I -
12  - I would do totally agree with you if he didn't mean to
13  -- to say this in response.
14      Q.  What wasn't completely true and accurate is
15  your citation that omits the fact that Mr. Yell made
16  comments to you between the time of your question and
17  his supposed response, correct?
18          MR. MANDO: Objection. Form. Lack of
19      foundation. Characterization. Go ahead.
20  BY MR. SLOSAR:
21      Q.  You can answer.
22      A.  No, I didn't feel like it was important to put
23  in that detail in the citation that he made other
24  statements that wasn't pertinent to, you know, his
25  answer to my outburst.

Page 112

1      Q.  You didn't believe --
2      A.  I could've. I could've --
3      Q.  -- it was -- oh, of course, you could've.
4      A.  -- been there.
5      Q.  You had a lot of room on this paper, right?
6  Could've got a second page or a third page to write down
7  what he actually told you verbatim, fair?
8      A.  That's fair.
9      Q.  You decided not to do that, right?
10      A.  I don't know if I made a decision not to do it
11  or I just wrote it at the time that I wrote it in the
12  sally port and -- and handed it to them.
13      Q.  At the time that you wrote this citation,
14  specifically those last two sentences, the time you
15  wrote that, you knew that Mr. Yell had made comments to
16  you in-between the time of your question and his
17  supposed answer, correct?
18      A.  And he did, and I put that in the report. I'm
19  not trying to be argumentative, I'm saying, even though
20  it's not in the citation, it is in the report. And so,
21  that's where I documented that stuff for people to know
22  that's the way it happened.
23      Q.  And then --
24      A.  But for the uniform citation, I'm trying to
25  list the probable cause for my charges. And so, I

Page 113

1  didn't know that I needed to put extra fluff in there
2  that doesn't really belong. But if you wanted -- if you
3  read my report, which is typed at the time, it does say
4  in there that he'd made those comments about his -- his
5  eyes.
6      Q.  And you refer to those comments that he made
7  to you after your question as fluff; is that right? Did
8  I hear you right?
9      A.  I'm saying that anything that's -- that's not
10  the -- the bones of the probable cause for writing the
11  citation, generally speaking, is something that's left
12  out, but it is in a report. You know -- you know, it --
13  we'll say extra instead of fluff. Any extra stuff. But
14  -- but in my report, was --
15          MR. MANDO: Wait for a question.
16          THE WITNESS: I'm sorry.
17  BY MR. SLOSAR:
18      Q.  In -- you testified a few moments earlier that
19  you made this outburst to Mr. Yell almost immediately
20  after you got in the squad car, correct?
21      A.  I did say that. I also said that I could've
22  had the car in drive, and we were driving from the
23  scene, but it was not long after I got into the cruiser.
24      Q.  Now, according to your report, Page 6, looking
25  at page -- I'm sorry, Exhibit 6, Page 2. According to



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 31 of 61 PageID #: 2763
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

114..117

Page 114

1  your report at 1944 hours, did you write, "I began
2  transporting Yell to the Logan County Detention Center.
3  When I began to take off from Bonnie Drive, I asked Yell
4  why the trailer was set on fire.  Yell did not answer,
5  but only requested water for his eyes.  The pepper spray
6  was taking effect.  I did not say anything else to Yell
7  as we continued toward the detention center.  As we
8  reached North Morgan Street, just one block over, Yell
9  advised that if my wife had done to me what his
10 girlfriend did to him, that I would've done the same as
11 he did"; is that accurate, sir?
12     A.   That's accurate.  North Morgan is -- that's a
13 T section to Bonnie.
14     Q.   But Morgan is about a block away from the
15 fire?
16     A.   Yeah.  Well, North Morgan actually runs
17 parallel to Bonnie.
18     Q.   So after you -- according to your report,
19 after you asked Mr. Yell, why the trailer was set on
20 fire, he did not answer.  He requested water for his
21 eyes.  You testified here earlier a few -- over the last
22 hour --
23     A.   Yeah.
24     Q.   -- that Mr. Yell also made complaints about
25 the -- what the pepper spray was doing to his eyes?

Page 115

1      A.   Yes.
2      Q.   And then Mr. Yell did not say anything until
3  you got to North Morgan Street a block away?
4      A.   Yeah.  But that was in a matter of seconds.
5  And -- and I tell you that I still interpret that today
6  then and today as it as an answer to my outburst to
7  which was a -- which was a question.
8      Q.   Sir, you would agree that if the trailer fire
9  was not an arson, it's scientifically proven in this
10 trial that it is not an arson, that a reasonable person
11 could come to the belief that Mr. Yell was not making an
12 admission to setting a fire, but instead making an
13 admission to engaging in a domestic incident with April
14 that day?
15          MR. MANDO:  Objection.  Form.
16          MS. ARNETT:  Object to form.
17          THE WITNESS:  If -- if he didn't set the fire,
18     if that fire was not an arson, then he shouldn't be
19     admitting to it.
20 BY MR. SLOSAR:
21     Q.   Did he actually tell you the words, "I set a
22 fire"?
23     A.   No.  He shouldn't be making statements of
24 admittal that he -- that I would've done the same thing
25 after I'm asking about the -- the trailer getting set on

Page 116

1  fire.
2      Q.   And you never asked him what same thing are
3  you referring to, right?
4          MR. MANDO:  Let him finish his question.  He'll
5      let you finish your answer.
6          THE WITNESS:  Okay.
7          MR. MANDO:  All right.
8  BY MR. SLOSAR:
9      Q.   You never asked him what he was referring to
10 after he made that statement, correct?
11     A.   Because I knew what he was referring to.
12     Q.   That's not my question to you.  I'm not saying
13 why didn't you, I'm saying you've never actually asked
14 him, "Mr. Yell, what the heck are you referring to?"
15     A.   Didn't feel the need to.  I knew what he was
16 talking about.
17     Q.   Mr. Higgins, respectfully, I -- you've
18 testified, repeatedly now, why you didn't do it.  My
19 question to you is different.  Isn't it true that you
20 didn't ask Mr. Yell to clarify what he was referring to
21 when he'd supposedly made the statement to you?
22     A.   I didn't ask him because I didn't feel a need
23 to ask him.
24     Q.   And by that time, you had no training on how
25 to question a suspect in a serious investigation like

Page 117

1  this, fair?
2      A.   That's -- I'd say that's fair.  I wasn't an
3  investigator.
4      Q.   By that time, you had no training on how to
5  conduct a fire investigation, correct?
6      A.   That's correct.
7      Q.   By that time, you had no training on how to
8  interrogate a suspect in a arson or homicide
9  investigation, correct?
10     A.   That's correct.  Other than what I learned in
11 the academy.
12     Q.   And in the academy, they teach you the basics
13 of being a patrol officer?
14     A.   That's correct.
15     Q.   They do not teach you how to conduct homicide
16 or arson investigations, fair?
17     A.   That's fair.
18          MR. SLOSAR:  All right.  Let's take a lunch
19     break.
20          THE WITNESS:  Okay.
21          MR. SLOSAR:  Thank you, Mr. Higgins.
22          THE VIDEOGRAPHER:  Time is 12:33 p.m. Central.
23     We're going off record.
24          (OFF THE RECORD)
25          THE VIDEOGRAPHER:  The time is 1:20 p.m.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 32 of 61 PageID
#: 2764
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

118..121

Page 118

1    Central.  We are back on record.
2    BY MR. SLOSAR:
3        Q.    All right.  Mr. Higgins, I think we're about
4    at the point where you're in a car with Mr. Yell, and
5    you're going to the detention center.  Do you recall
6    driving Mr. Yell to the detention center on September
7    11, 2004?
8        A.    I do.
9        Q.    And when you pulled the cruiser up to the
10   detention center, where did you park the vehicle?
11       A.    Inside the sally port, which is a -- I know
12   you know what it is, but it's a bay where the -- the
13   door shuts -- they'll shut the door behind you when you
14   get in, and the door in front of you shut once you're
15   in.  So that was the -- hope I'm not jumping ahead.
16   That's where we were in the sally port with the -- both
17   the bay doors down.
18       Q.    Known as a secure facility; is that fair?
19       A.    It's -- yes, sir.  Yes.
20       Q.    And when you pulled into the sally port, was
21   Mr. Yell still handcuffed in the back of the squad car?
22       A.    He was.
23       Q.    And what was his temperament at that time?
24       A.    All I remember him doing was -- was, you know,
25   hollering and yelling and -- but I can't tell you when I

Page 119

1    arrived at the sally port, whether he was still doing
2    that, and I don't recall.  But the majority of the trip
3    over, I remember him doing that because I leaned forward
4    to keep the vibration of the back.  I remember that
5    because it frustrated me.
6        Q.    He was hollering, and he was kicking the
7    divider; is that fair?
8        A.    That's correct.
9        Q.    And this would've been after he was pepper
10   sprayed, fair?
11       A.    That's fair.
12       Q.    What did you do when you got to the sally port
13   with Mr. Yell?
14       A.    I remember there was a request made for the
15   deputy jailers to assist me in the sally port.  And I
16   can't remember whether I actually did that.  I remember
17   there -- there was a request for them.  I remember I
18   took radio directives from one of the supervisors to
19   hold him in the sally port until somebody came to get
20   evidence from him.  I was going to take him to the drunk
21   tank inside the jail, but we held up in the sally port
22   for that.  And then I -- I'm trying to remember, pulled
23   in, parked, got out.  You want me to continue?
24       Q.    Yes.
25       A.    Okay.  And I had -- I don't recall exactly how

Page 120

1    long he was in the back seat while we were in the sally
2    port before I let him out, but it wasn't -- it wasn't
3    long because I -- it was -- it was probably as soon as I
4    pulled up because I didn't want him to start kicking the
5    window again.  So I let him out and he had to put his
6    handcuffs up front and then he started -- he attacked me
7    several times.
8        Q.    When you say attacked you several times, can
9    you describe what happened?
10       A.    Just cussing at me, coming at me.  He would
11   raise his arms up, which were cuffed, and -- and --
12   shoot at me.
13       Q.    When you say shoot --
14       A.    Not -- not like --
15       Q.    -- not with a gun?
16       A.    No, no, no, not with a gun and not like where
17   they do it in the UFC where they're shooting for a
18   tackle, but he was coming -- he was coming at me.
19       Q.    Kind of like lunging towards you?
20       A.    Lunging.
21       Q.    Okay.
22       A.    That's a good word.  And --
23       Q.    Sorry, shoot has a different connotation.
24       A.    Yeah.
25       Q.    But he was lunging towards you, and he was

Page 121

1    cuffed in front; is that right?
2        A.    He -- he -- he had worked the cuffs to the
3    front of his body somewhere between Bonnie Drive and the
4    jail.  And I don't know at what point that he'd done
5    that.
6        Q.    How close were -- do you recall a Mr. Porter
7    or Mr. Hayes being at sally port?
8        A.    They came to sally port eventually.  I was
9    with -- I remember I was with Yell.  I don't know how
10   many minutes it was before they got there when they --
11   and Yell had lunged at me.  And --
12       Q.    Now --
13       A.    -- like I said, several times and palm heel.  I
14   kept on giving him that and he would fall down, and I
15   did shove him pretty good to get him away from me to
16   stop him.
17       Q.    And you're raising your right arm up in, like,
18   a pushing motion?
19       A.    Yeah, I would -- excuse me -- but I would --
20       Q.    If you want to stand up, you can do it.  You
21   can show us.
22       A.    Well, I don't mind.
23       Q.    Just for the camera.
24       A.    Just when he came -- when he came at me, he
25   was raising his arms up coming at me and I would go

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1  down.  This happened a couple of times and I'd just --
2  as he was coming, I'd shove his chest away from me and I
3  gave him a -- a stiff arm.
4      Q.    Did he fall down at all?
5      A.    He did.
6      Q.    Okay.
7      A.    He did.  And then he'd get back, do it again.
8  And then I -- at one point in time, I think I pepper
9  sprayed him, which would've been the second time at that
10 point.
11     Q.    Now, when he was lunging toward you, do you
12 recall if he was saying anything or yelling anything?
13     A.    I just remember him hollering and cussing me
14 and just the -- just the usual belligerent type of
15 demeanor.  And I -- I put in a report, some of the
16 things that he said to me.
17     Q.    How long did it take for Mr. Porter and
18 Mr. Hayes to come to where you and Mr. Yell were?
19     A.    I don't know.  It -- it wasn't long, but with
20 me dealing with Yell, three minutes was -- was a long
21 time because I was getting tired of the -- the repeated
22 lunges and attacks.  And I was relieved when they got
23 there, when they got into sally port to help me.  And
24 then after they took over, I can't remember doing
25 anything physically with Yell.  I read him his Miranda

Page 123

1  and I remember I -- I wanted to do that with the
2  deputies present so they would hear me give him his
3  Miranda.  I didn't have anything to record it with
4  because after he made the statement in the car, I wanted
5  to follow-up with that.  And I asked him again, if he
6  had set the fire and -- several times and it was just
7  even during the Miranda, he was yelling and -- and
8  carrying on.
9      Q.    Now, when you asked him several times if he
10 had set the fire, isn't it true that Mr. Yell did not
11 make an admission to setting the fire?
12     A.    He did not make an admission.  At one point in
13 time, he did walk -- I remember this.  He walked over to
14 the wall, and I remember him looking up the wall after
15 I'd asked him at one point in time.  And he said, "I
16 told her, I told her."
17     Q.    Now --
18     A.    And I don't know that he answered -- he was
19 answering my question.
20     Q.    The --
21     A.    I don't know what he meant by that.
22     Q.    The -- and that was later on, right?  That was
23 after Porter and Hayes were there?
24     A.    Yeah.
25     Q.    Yeah.

Page 124

1      A.    Yeah.  They were in sally port with me.
2      Q.    Now, at some point after Mr. Porter and
3  Mr. Hayes were present, according to your report, you
4  document that Mr. Yell stated, "You don't know how evil
5  I am.  You better be scared of me"; is that right?
6      A.    Yeah.  And I -- I think that's also on the
7  citation.
8      Q.    And the statement that Mr. Yell supposedly
9  made would've been -- the statement would've been made
10 after Mr. Porter and Mr. Hayes arrived in the sally
11 port, correct?
12     A.    I don't know.  I don't ever -- probably.  Did
13 I put that in the report?  I don't recall.
14     Q.    Yeah.  You can look at -- is it what --
15 Exhibit number 6, the three-page report, or is it the
16 citation, Exhibit 5?
17     A.    Yes.  I put part of that on the citation,
18 which is -- excuse me, a part of -- he stated I had no
19 idea how evil he was.  I had put that on citation as
20 part of the threatening and a lot of these threats were
21 repeated.
22     Q.    And it looks like, below on the citation, you
23 list two witnesses, Richard Porter and J.W. Hayes; is
24 that right?
25     A.    Yeah.

Page 125

1      Q.    And you note that they were jail deputies,
2  correct?
3      A.    That's correct.
4      Q.    And so, is it fair to say that given that you
5  listed them as witnesses, that that would indicate to
6  you that both of them would've been present when he made
7  those specific comments?
8      A.    I don't know if they were or not.  I did put
9  them down here.  I don't know what they witnessed, and I
10 can't honestly recall.
11     Q.    Certainly, they would not have been a witness
12 to whatever conversation took place in the car, correct?
13     A.    That's correct.
14     Q.    And the statements that you're talking about,
15 about I had no idea -- "he stated I had no idea how evil
16 he was," that would've been done after he got out of the
17 car and you were having to push him to the ground when
18 he was lunging towards you, correct?
19     A.    That's correct.
20     Q.    And at some point, after the time that he was
21 lunging towards you and you were pushing him to the
22 ground, at some time around that point is when
23 Mr. Porter and Mr. Hayes would've arrived in the sally
24 port?
25     A.    I honestly can't tell you at what point they



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 34 of 61 PageID #: 2766
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024

126..129

Page 126

1  got in there and what I was doing at the time that they
2  got in there or what they actually witnessed.  All I
3  know is I read him his Miranda and had questioned him,
4  but I don't know what they witnessed.
5      Q.   Well, how about this?  Let's go to Exhibit 6
6  and see if this refreshes your memory.  Can I ask for
7  you to read where it says, "1948 hours"?  It's --
8      A.   Okay.
9      Q.   -- should be the second page of your report.
10     A.   I got you.
11     Q.   Read that section, then let me know when
12  you're done.
13     A.   Yeah, that first -- the second paragraph.  I
14  actually believe that -- okay.  I did read it.
15     Q.   Okay.  Now, according to -- and this report
16  would've been -- you would've had a better memory then
17  as to what happened in the sally port than you do 20
18  years later, fair?
19     A.   That's correct.
20     Q.   Okay.  And according to your report, second
21  paragraph, do you see where it says, "Yell exited my
22  cruder -- cruiser and was extremely belligerent towards
23  me and two other deputy jailers" --
24     A.   Yeah.
25     Q.   -- "Richard Porter and J.W. Hayes"?  Would

Page 127

1  that -- was that sentence true?
2      A.   It's true, but I can't tell you whether -- I
3  know what the sentence looks like.  They -- he exited
4  the cruiser was belligerent towards all three of us, but
5  it was just me for -- for a minute until Porter and
6  Hayes got in there.  And when they took over, I
7  specifically remember Yell being aggressive towards J.W.
8  Hayes -- Deputy Hayes.  I remember Porter trying to talk
9  to him.  And then I started to write the -- after
10  reading the Miranda, I know I -- I wrote the citations.
11  So yeah, in that same sentence, I'm putting that he's
12  belligerent to all three of us, that I actually don't
13  think that that occurred at the same time, even though
14  it -- it does say that he exited cruiser, belligerent
15  towards me and the jailers, but it was later that --
16  because I was in the sally port with him.
17     Q.   You would agree the report reads as if
18  Mr. Porter and Mr. Hayes were there as Mr. Yell exited
19  the squad car?
20     A.   Yeah.
21     Q.   Now, one thing I'm going to ask you to do is
22  continue reading under 1948 hours on the next page.  Read
23  it to yourself.  Let me know when you're finished.  I'm
24  going to ask you some questions.
25     A.   Okay.  Okay.  I read it.  I got the -- the

Page 128

1  first -- you want me to read that?
2      Q.   Read that whole section, please.
3      A.   Okay.  Okay.  I've read it.
4      Q.   Now having read this section of your report,
5  would you agree that it's written sequentially in the
6  order that the events happened at that time?
7      A.   I -- I do believe there's an attempt to write
8  this sequentially, but I can't guarantee that all of it
9  happened sequentially.
10     Q.   Well, certainly you would've done this when
11  your memory was fresh in time, fair?
12     A.   That's fair.
13     Q.   And to the best of your ability, you would've
14  drafted this report sequentially in the order that the
15  events happened, fair?
16     A.   That's fair.
17     Q.   And is it fair to say that given that you
18  mentioned that Mr. Porter and Mr. Hayes were with you
19  and assisted you in observing Mr. Yell in the sally port
20  in the second paragraph, that those two jail deputies
21  would've been present for the events that you described
22  in Paragraphs 3 and onward in that section?
23     A.   I'll -- I'll concede to -- to that, but I'll
24  also say that there was a time that they weren't there
25  when he was out of the cruiser, and it was just me and

Page 129

1  him.
2      Q.   I understand you're -- I understand what
3  you're saying about that.  And I know -- you acknowledge
4  that if you read that first sentence of Paragraph 2
5  literally, it indicates that the deputies were there as
6  he exited the car.
7      A.   Yeah.
8      Q.   You have a different recollection of that
9  incident?
10     A.   Yeah, I do have a different recollection of
11  that.
12     Q.   But regardless of whether they were there when
13  he got out of the car or not, given how you wrote this
14  report, it would leave you to believe that Mr. Porter
15  and Mr. Hayes were present when the events happened that
16  are described in Paragraph 3 and onward, correct?
17     A.   That -- that's -- that's correct.
18     Q.   And according to your report, were you in the
19  sally port for approximately one hour and 21 minutes
20  until Officer Mills came to collect Mr. Yell's clothing?
21     A.   Yeah, that's the CAD time from time of arrival
22  to the time that Ron had gotten there.
23     Q.   In the uniform citation, so Exhibit 5, did you
24  write in the uniform citation as a basis -- as one basis
25  for the terroristic threatening charge that Mr. Yell



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1  informed you that he was going to get you?
2    A.   Uh-huh.
3    Q.   Is that a yes?
4    A.   Yes.  I'm sorry.
5    Q.   You're good.  Did you also write in here that
6  Mr. Yell stated that you had no idea how evil he was?
7    A.   Yes, that's correct.
8    Q.   Would you agree that given the order of your
9  report, so going back to Exhibit 6, that if Mr. Yell had
10  made these comments to you, that Mr. Porter and
11  Mr. Hayes would've been present with you and Mr. Yell in
12  the sally port?
13    A.   According to my report, it does appear that
14  way, yeah.
15    Q.   And did you -- do you also claim that Mr. Yell
16  spit blood on you?
17    A.   He did.
18    Q.   And where was that blood from?
19    A.   His mouth.
20    Q.   Do you know how his mouth began bleeding?
21    A.   (No verbal response.)
22    Q.   Is it fair to say that Mr. Yell's -- that you
23  did not observe any blood on Mr. Yell's mouth prior to
24  putting him in the squad car?
25    A.   No, I didn't.

Page 131

1    Q.   When you were pushing Mr. Yell to the ground
2  as he was lunging towards you, do you know whether
3  Mr. Yell's mouth got cut at all?
4    A.   No.
5    Q.   Now in the sally port -- let me strike that.
6  Is it fair to say that the events that took place in the
7  sally port should have been video recorded?
8    A.   I was under the advisement that it was because
9  I was interested in the video.  I told Porter as much.
10    Q.   And in fact, did you ask somebody to start
11  recording at the jail?
12    A.   The only thing that -- the only person I
13  remember talking to was Porter.  I wanted to make sure
14  that I made it by his engine that I wanted the -- make
15  sure that it was on.
16    Q.   And when was the first time that you saw a
17  copy of that tape?
18    A.   Never saw it.
19    Q.   Do you recall testifying at a grand jury, sir?
20    A.   I -- not -- I don't have an independent memory
21  of it, but I did read my testimony about that, yeah.
22    Q.   And you certainly acknowledge that before the
23  grand jury, when asked this question, "Do you have a
24  copy of that tape from the sally port of the jail?" You
25  responded, "Yeah, probably will have to be subpoenaed"?

Page 132

1    A.   No, I don't -- I don't know how that -- I know
2  it's in the grand jury testimony, but I never had a copy
3  of the -- of the tape.  And I don't know if the question
4  that I was asked in that regard matched what was -- what
5  my answer was, but I was going to get a subpoena to go
6  back to the jail to get the -- the video.  And I
7  remember going back to the jail to get the video and
8  being told that they didn't have it.
9    Q.   All right.  Let me direct your attention to
10  Exhibit number 8, sir, Page 12.  I'm going to read you a
11  question and answer and ask if you testified to this
12  under oath at the grand jury in this case.
13    A.   Page 12?
14    Q.   So it should be in the upper right, and it
15  should say, "Grand Jury Proceedings," at the top.  And
16  specifically, I'm going to point you to Lines 19 and 22
17  -- 19 through 22.
18
19    A.   You're on Page 22?
20    Q.   12.  Sorry.
21    MR. MANDO:  Page 12.
22    MR. SLOSAR:  Page 12.
23    MR. MANDO:  Lines 19 to 22 is where he is
24  referring to.
25    THE WITNESS:  Okay.

Page 133

1    MR. MANDO:  Down here.
2    THE WITNESS:  Okay.
3  BY MR. SLOSAR:
4    Q.   Did you testify to a grand jury in Mr. Yell's
5  criminal proceedings, sir?
6    A.   I -- I did.
7    Q.   And you were -- were you under oath at the
8  time of your testimony?
9    A.   I was.
10    Q.   Was your mind fresher -- more fresh then about
11  the series of events than it is 20 years later sitting
12  here today?
13    A.   It is, but I'm -- I know what I meant in this
14  line.
15    Q.   Well, I'm going to ask you a question answer
16  --
17    A.   Okay.
18    Q.   -- okay?  When you testified before the grand
19  jury, were you asked this question, and did you give
20  this answer?  Question, Line 19: "Do you have a copy of
21  that tape from the sally port at the jail?"  Answer:
22  "Yeah, probably will have to be subpoenaed."  Sir, when
23  you testified to the grand jury, were you asked that
24  question, did you give that answer?
25    A.   According to this, I -- I did.  I never had




Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 36 of 61 PageID #: 2768
The Deposition of JOHN EDWARD PERKINS, taken on January 24, 2024

134..137

Page 134

1  that tape. I was going to have to get a subpoena to go
2  get it.
3      Q. Well, according to your grand jury testimony,
4  you answered, "Yeah, probably will have to be
5  subpoenaed," correct?
6      A. That's -- I was acknowledging that I'll have
7  to get it. Yeah.
8      Q. And you understand sitting here today that if
9  there was a video recording that existed, that would
10 either tend to prove that what you wrote in your reports
11 about comments that Mr. Yell made and his actions in the
12 sally port that day, that if there was a video recording
13 that would either tend to prove or disprove what you
14 allege in your reports, fair?
15     A. It would prove what I'd alleged in my report.
16     Q. That's not -- my question's different. My
17 question is: You understand that if the video recording
18 existed, that would either tend to prove your story or
19 disprove your story about your interactions with
20 Mr. Yell in the sally port?
21     A. That's correct.
22     Q. Now, Deputy Hayes, was he somebody you came to
23 know as a law enforcement officer?
24     A. I -- I knew him. We weren't friends or hang
25 out buddies or anything.

Page 135

1      Q. Did you think that he was a good officer based
2  on what you knew of him?
3      A. I didn't know about his professional
4  performance, but I thought he was a good person.
5      Q. Did you work with him on occasion when you
6  brought people into the jail?
7      A. I'd have to say yes. He walked in there. I'd
8  say that he was there when I'd take people in to be
9  booked sometimes. That's where I was familiar with him.
10     Q. And Mr. Hayes assisted you during the
11 interactions with Mr. Yell that took place in the sally
12 port, correct?
13     A. He did.
14     Q. Is Mr. Hayes one of the people that you
15 would've requested to get the video recording from?
16     A. Uh-uh.
17     Q. Is that a no?
18     A. No. I'm sorry. No.
19     Q. Fair to say that sitting here today that you
20 don't have any reason to doubt Mr. Hayes's credibility?
21     A. I wouldn't know whether to doubt him or not. I
22 couldn't testify to that.
23     Q. Now, Mr. Porter was also another jail deputy;
24 is that right?
25     A. Yes, sir.

Page 136

1      Q. Did you come to form the belief that Mr.
2  Porter was a good officer from your experiences with
3  him?
4      A. Up to the -- up to that point in sally port, I
5  did.
6      Q. And up to that point in the sally port, did
7  you --
8      A. Or actually --
9      Q. -- work with him on occasion when bringing
10 people to the jail?
11     A. I did.
12     Q. And did Mr. Porter assist you with Mr. Yell in
13 the sally port at the jail on September 11, 2004?
14     A. He did.
15     Q. Would Mr. Porter have been one of the people
16 that you requested a video -- a video recording from?
17     A. I'm sorry, can you repeat that?
18     Q. Would Mr. Porter be one of the people that you
19 requested to get a video recording from?
20     A. He would've been.
21     Q. It sounds like at some point you came to not
22 have a good experience with Mr. Porter?
23     A. Just his trial testimony --
24     Q. You don't --
25     A. -- about what happened in the sally port. I

Page 137

1  don't agree with that.
2      Q. Sure. Probably frustrating for you, right; is
3  that a yes?
4      A. Yes, sir. Sorry.
5      Q. Certainly if Mr. Porter's testimony is true,
6  that would impact the credibility of your allegations
7  involving Mr. Yell; is that fair?
8      A. That it would affect?
9      Q. Yeah.
10     A. I'd hope not.
11     Q. I'm saying --
12     A. I don't think he's telling the truth.
13     Q. If a jury were to believe Mr. Porter, that
14 would tend to discredit some of the allegations that
15 you've made against Mr. Yell; is that fair?
16     A. I -- I would say it would be fair that -- that
17 -- that would happen, but it'd be unjust. Wouldn't be
18 right.
19     Q. And you would agree that it would be even more
20 unjust if Mr. Yell was wrongfully convicted of a fire
21 that was not even an arson?
22     A. I would agree.
23         MR. MANDO: Objection. Form.
24 BY MR. SLOSAR:
25     Q. You can answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1    A.    I would agree.
2    Q.    Based upon your knowledge and recollection,
3  Mr. Porter or Mr. Hayes would have been witnesses to
4  your allegation that Mr. Yell made a comment about him
5  being evil to you; is that right?
6    A.    According to my report, they should have been
7  witnesses, yes.
8    Q.    They would also be -- they should be witnesses
9  to observing Mr. Yell spit blood at you, correct?
10   A.    Yes, sir.
11   Q.    And they should also be witnesses to the tacit
12  admissions that you attribute to Mr. Yell in the sally
13  port, correct?
14   A.    Yes, sir.
15   Q.    If Mr. Porter testified that his observation
16  of Mr. Yell was that he was extremely intoxicated, would
17  that be accurate based on what you observed?
18   A.    Yes, sir.
19   Q.    If Mr. Porter testified that he observed
20  Mr. Yell have a cut on the right side of his lip near
21  the crease of the mouth, would that be accurate with
22  what you observed?
23   A.    I don't recall observing the cut, but he was
24  spitting blood, so I wouldn't contest that.
25   Q.    If Mr. Porter testified that he observed

Page 139

1  Mr. Yell handcuffed during the entire time in the sally
2  port, would that be accurate?
3    A.    That would be accurate.
4    Q.    If Mr. Porter testified that he observed
5  Mr. Yell smell like alcohol and OC spray in the sally
6  port, would that be accurate?
7    A.    I would say that would be accurate.
8    Q.    If Mr. Porter testified that he observed
9  Mr. Yell smell like OC spray as soon as the doors were
10  opened from your squad car, would that be accurate?
11   A.    It's probably accurate.
12   Q.    And in terms of the OC spray, based on your
13  recollection, is it fair to say that, when you were in
14  the sally port, that you could actually smell the pepper
15  spray from Mr. Yell's body and his face?
16   A.    I don't recall smelling it, but I know he got
17  pepper sprayed.
18   Q.    Okay.  If Mr. Porter testified that he
19  observed Mr. Yell swear at you in the sally port, would
20  that be accurate?
21   A.    If -- if -- that Yell sweared [sic] at me,
22  yes.
23   Q.    If Mr. Porter testified that he did not
24  observe Mr. Yell threaten you in the sally port, would
25  that be accurate?

Page 140

1    A.    That would not be accurate.
2    Q.    If Mr. Porter testified that he observed you
3  make a comment to Mr. Yell that, "Motherfucker, you know
4  you killed those kids," or something to that effect,
5  would that be accurate?
6    A.    That's not accurate.
7    Q.    But you agree that a jury would need to sort
8  out whether it's you or Mr. Porter who's being truthful?
9         MR. MANDO:  Objection.  Form.
10 BY MR. SLOSAR:
11   Q.    You can answer.
12        MR. MANDO:  Lack of foundation.  Go ahead.
13        THE WITNESS:  You know that I -- that I don't
14   care what anybody else says.  I know he's not being
15   truthful.  That -- that Porter's not being truthful,
16   and that I am.
17 BY MR. SLOSAR:
18   Q.    Would you agree that --
19   A.    About that.
20   Q.    -- you and Mr. Porter have -- on some
21  respects, have different versions of what happened in
22  the sally port?
23   A.    We sure do.
24   Q.    And would you agree that you and Mr. Yell have
25  different versions in some respects as to what happened

Page 141

1  in the sally port?
2         MR. MANDO:  Objection.  Form.  Lack of
3    foundation.  Go ahead.
4  BY MR. SLOSAR:
5    Q.    You can answer.
6    A.    No, I don't even know what Yell's claiming.
7    Q.    If Mr. Porter testified that he observed
8  Mr. Yell in a shocked expression after you accused him
9  of killing those kids, would that be accurate?
10   A.    I don't believe it is.
11   Q.    But you did accuse Mr. Yell of killing Camron
12  while in the sally port?
13   A.    I asked him and when he said that he would
14  kill me, I did say he'd probably done that already, or
15  something to that effect, or I think you've done that
16  already.
17   Q.    And I know you're real calm and mild-mannered
18  today, but is it fair to say that your passions were
19  much more inflamed on September 11, 2004, given what you
20  had witnessed?
21   A.    I was frustrated for sure, and I was upset
22  with having to combat with Yell, that he was being
23  combative with me, so --
24   Q.    If Mr. Porter testified that Mr. Yell
25  responded to your comment where you accused him of



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1  killing the kids by stating, "That's not true, that
2  didn't happen," would that be accurate?
3      A.   No, that's not accurate.  He never denied it.
4      Q.   Well, he never made any admissions in the
5  sally port, correct?
6      A.   He didn't make any admissions unless you
7  consider that, "I told her, I told her," an admission.
8      Q.   And you would agree that a comment like that
9  could equally be referring to things that were going
10 wrong in the trailer, you know, whether it's electrical
11 stuff or otherwise, as much as it could have been about
12 a nefarious reason?
13     A.   I agree with that.
14     Q.   If Mr. Porter testified that you pushed
15 Mr. Yell into a door in the sally port before he slid
16 down to the floor, would that be accurate?
17     A.   That's not accurate.
18     Q.   If Mr. Porter testified that he did not
19 observe Mr. Yell touch you in any way in the sally port,
20 would that be accurate?
21     A.   That I did not touch him, or he did not touch
22 me?
23     Q.   That Yell did not touch you.
24     A.   That would be in -- well, I don't know what he
25 observed.  Just depends on when it happened.

Page 143

1      Q.   Did Mr. Yell touch you in the sally port?
2      A.   He tried, so no, he didn't.  I mean, he tried
3  to -- to get me in.
4      Q.   That's when you were stiff arming him back.
5      A.   Yeah.  Yeah.
6      Q.   If Mr. Porter testified that he observed
7  Mr. Yell cough and spit after the chemical spray was
8  used on him, would that be accurate?
9      A.   I would say that's accurate.
10     Q.   If Mr. Porter testified that he observed
11 Mr. Yell spit blood, would that be accurate?
12     A.   That would be accurate.
13     Q.   If Mr. Porter testified that he observed
14 Mr. Yell have trouble breathing after the OC spray,
15 would that be accurate?
16     A.   I don't recall that.
17     Q.   If Mr. -- not saying it's not wrong or right
18 --
19     A.   Yeah.
20     Q.   -- just don't remember?
21     A.   Don't remember.
22     Q.   If Mr. Porter testified that he discussed
23 decontaminating Mr. Yell's face after the OC spray was
24 used, would that be accurate?
25     A.   Decontamination?

Page 144

1      Q.   Yes, sir.
2      A.   That's correct.
3      Q.   If Mr. Porter testified to decontaminating
4  Mr. Yell's face after the OC spray was used, would that
5  be accurate?
6      A.   If he testified to decontaminating after --
7      Q.   Yes.
8      A.   -- the OC spray, that -- I'd say that's
9  correct.
10     Q.   If Mr. Porter testified that you informed him
11 that you used OC spray at Mr. Yell prior to arriving at
12 the jail, would that be accurate?
13     A.   That would be inaccurate.  Before --
14     Q.   You didn't tell --
15     A.   -- I didn't tell him that I pepper sprayed him
16 before we got to the jail.
17     Q.   No, no, no.  I guess that -- and maybe it's a
18 bad question.  What I'm getting at is while you were in
19 the sally port, did you at any point tell Mr. Porter
20 that you had already used OC spray on Mr. Yell?
21     A.   I did use OC spray on Mr. Yell, but I don't
22 recall telling Porter that I did.  I may have.
23     Q.   Okay.  Not sure of one way or the other, fair?
24     A.   Right.  That's fair.
25     Q.   If Mr. Porter testified that he never observed

Page 145

1  Mr. Yell tell you that he was evil, would that be
2  accurate?
3      A.   He may not have observed it, or he may not
4  have been paying attention, so I can't say whether it's
5  accurate or not.
6      Q.   If Mr. Porter testified that you told him that
7  Mr. Yell had not made any incriminating statements,
8  would that be accurate?
9      A.   That would be inaccurate.
10     Q.   Certainly, in the sally port, Mr. Yell did not
11 make any incriminating statements to you, correct?
12     A.   That's correct.  Other than the one -- the one
13 thing, but -- and he didn't make -- did not make a
14 full-out confession.  No.
15     Q.   He didn't make a confession at all on the
16 sally port, correct?
17     A.   That's correct.  That's correct.
18     Q.   Now, looking at Exhibit 5, your citation, sir.
19 Do you have that handy?
20     A.   Uh-huh.
21     Q.   You filled that out completely, correct?
22     A.   I did.
23     Q.   You knew at the time you filled this out that
24 it was critical for the information in there to be
25 accurate, correct?



Kentuckiana Reporters                    502.589.2273 Phone
P.O. Box 3983                            502.584.0119 Fax
Louisville, KY 40201            schedule@kentuckianareporters.com
                                www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

1    A.   I knew that I needed to be accurate with any
2    charges and information for that, the -- the charges,
3    yes.
4         Q.   You would have known at the time that it would
5    have been misconduct for you to falsify or include
6    inaccurate information in this citation, correct?
7         MR. MANDO:  Objection.  Form.  Go ahead.
8    BY MR. SLOSAR:
9         Q.   You can answer.
10        A.   I don't recall putting anything inaccurate in
11   here.
12        Q.   That's not my question.  My question is a
13   little bit different.  My question is: You would have
14   known at the time you created this citation, that it
15   would have been misconduct for you to falsify or put in
16   any inaccurate information into the citation?
17        MR. MANDO:  Objection.  Form.
18   BY MR. SLOSAR:
19        Q.   You can answer.
20        A.   I would say that it would be unethical, yes.
21        Q.   And you would have known that back in 2004,
22   correct?
23        A.   Sure.
24        Q.   Now according to the citation, the violation
25   time was 19:19; is that right?

Page 147

1    A.   And I'm sure I've got those from the CAD or
2    maybe even estimated the violation time.
3         Q.   And the arrest time is at 19:30.
4         A.   And I believe that was from the CAD.  Not sure
5    about the -- the times.
6         Q.   What was the basis of the resisting charges
7    against Mr. Yell?
8         A.   On the scene and when -- when they went to get
9    him into -- take him from the -- the scene.  When they
10   went to cuff him, he was kicking and screaming and --
11   and he pulled away from them to attack me.  That was
12   part of the resisting.  And that was when they were
13   attempting to get him over to the cruiser to put him in.
14        Q.   What was the basis of the menacing charges
15   against Mr. Yell?
16        A.   That's when he was -- clenched his fist and
17   came at me on the scene.  And I put in here that subject
18   got his cuffed hands in front of his body, exited the
19   cruiser, and he approached me yelling and cursing that
20   he was coming at me in attack mode.
21        Q.   What was the basis of the terroristic threat
22   charges against Mr. Yell?
23        A.   The telling me that he was going to get me. He
24   told me that he was going to kill me and that I didn't -
25   -

Page 148

1         Q.   And where did that happen?
2         A.   What's that?  At the sally port.  And it was
3    something that was repeated, really.
4         Q.   So Mr. Porter or Mr. Hayes would have or
5    witnessed that, fair?
6         MR. MANDO:  Objection.  Form.
7         THE WITNESS:  Well, they wouldn't have
8    witnessed all of it.  They couldn't have witnessed
9    what was in the car on the way over what he was
10   saying or --
11   BY MR. SLOSAR:
12        Q.   I'm --
13        A.   -- a lot of it.
14        Q.   I'm saying in the sally port, though.
15        A.   Yeah.
16        Q.   Just focusing on the sally port, based upon
17   the sequential order of your report, Mr. Porter and
18   Mr. Hayes would have been present when those statements
19   were supposedly made, fair?
20        A.   And I don't know when they were present for
21   those.  I know in the report it says they were.  I can't
22   tell you whether they were present or whether they were
23   paying attention.
24        Q.   Well, certainly, I mean, you describe a
25   chaotic situation with Mr. Yell in the sally report; is

Page 149

1    that fair?
2         A.   That's -- that's fair.
3         Q.   And you requested that people help you when
4    you get there, right?
5         A.   That's right.
6         Q.   And Mr. Porter and Mays -- Mr. Mays -- Hayes
7    helped you, correct?
8         A.   That's correct.
9         Q.   What was the basis of the alcohol intoxication
10   charges against Mr. Yell?
11        A.   That he was intoxicated at the scene.
12        Q.   And in your citation, you list two people as
13   witnesses, Richard Porter and J.W. Hayes; is that right?
14        A.   Just for whatever was going on in the sally
15   port.  But the charges did not -- did not just reference
16   for the sally port.  It's from the scene to the car to
17   the sally port.
18        Q.   Understood.  But you would have listed
19   Mr. Porter and Mr. Hayes because they would have had the
20   ability to make observations between you and Mr. Yell
21   while you were in the sally port at the jail, correct?
22        A.   That's correct.
23        Q.   You believed at the time that you put them
24   down as witnesses that they could vouch for the truth of
25   what happened in the sally port with you and Mr. Yell,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 40 of 61 PageID
#: 2772
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024
150..153

Page 150

1  correct?
2      A.   I had no doubt that they would.
3      Q.   And the -- there's a third-degree assault
4  charge on here, too.  Can you please tell us what the
5  basis of that was?
6      A.   The spitting blood on me.
7      Q.   And this would have happened in the sally port
8  as well?
9      A.   Yes.
10     Q.   Did you initiate charges against Mr. Yell for
11 arson or murder?
12     A.   I did not.
13     Q.   Did you have any conversations with Defendant
14 West before he initiated charges against Mr. Yell for
15 first-degree arson?
16          MR. MANDO:  Objection.  Can you repeat that?
17     I'm not -- I -- it sounded like an "or," but you may
18     have said before.
19 BY MR. SLOSAR:
20     Q.   Did you have any conversations with Defendant
21 West before he initiated charges against Mr. Yell for
22 first-degree arson?
23     A.   I remember Mr. West interviewed me in the
24 patrol room while I was typing a report about the fire.
25     Q.   And I'll represent to you that Mr. West

Page 151

1  initiated the arson charges on September 13, 2004.  So
2  it was two days after the fire.  Do you recall whether
3  he would have interviewed you before --
4      A.   He would have interviewed me --
5      Q.   -- or after?
6      A.   He would have interviewed me before.
7      Q.   Do you recall whether anybody else was present
8  for that interview?
9      A.   I don't recall anybody else being in the
10 patrol room, except for Mr. West and myself.
11     Q.   Would you have provided Defendant West with
12 your observations from the fire?
13     A.   For the questions that he had asked and for --
14 yes.
15     Q.   In that meeting?
16     A.   Yes.
17     Q.   Okay.
18     A.   Yes.
19     Q.   And was Mr. Edmonds taking notes as he met
20 with you that day?
21     A.   Mr. Edmonds?
22     Q.   Yes.  I'm sorry.  Defendant West.  Was
23 Mr. West taking notes as he met with you that day?
24     A.   He had something in his hand.  I assumed that
25 he was taking notes, but I can't be for sure.  I was --

Page 152

1  when he was asking the questions, I thought that he was
2  documenting what I was saying.
3      Q.   The -- did you have any communication with
4  Defendant Edmonds regarding the initiation of charges
5  against Mr. Yell for first degree murder, attempted
6  murder, and fourth-degree assault?
7      A.   For the charges that I put on him, did I have
8  a discussion with admins?
9      Q.   No, no.  So Edmonds initiated some additional
10 charges, including first degree murder, attempted
11 murder --
12     A.   Oh, Edmonds.
13     Q.   -- fourth-degree assault.  Edmonds, yes.
14     A.   Oh, I thought you said admins, as in
15 administration.
16     Q.   Sorry.  No, no, no, no.  Edmonds.
17     A.   Yeah.  I -- I'm sure that we had maybe a
18 conversation, but I don't recall it, that he was
19 investigating the case, but I can't recall.  It's been a
20 long time.
21     Q.   When was the first time --
22          MS. LANGEN:  Pardon the interruption,
23     everybody.  I have lost all sound.  I can't hear
24     anything.  I can see that Ed is speaking, but I
25     cannot hear anything at all.

Page 153

1          MR. SLOSAR:  Okay.  Let's go off the record.
2          THE VIDEOGRAPHER:  All right.  The time is 2:04
3     p.m. Central.  We're going off record.
4          (OFF THE RECORD)
5          THE VIDEOGRAPHER:  The time is 2:10 p.m.
6     Central.  We are back on record.
7  BY MR. SLOSAR:
8      Q.   Mr. Higgins, sitting here today, do you have
9  any knowledge as to how the video recording was lost or
10 destroyed?
11     A.   I don't have any idea.
12     Q.   By video recording --
13     A.   Any at all.
14     Q.   -- I just want to make -- sorry.  I want to
15 make it clear I'm referring to the video recording of
16 your interactions with Mr. Yell in the sally port; do
17 you understand that?
18     A.   Right.  Yeah.  I understood.  Yes.
19     Q.   Okay.  Did you have any knowledge of how a dog
20 sniff canine handler came to be involved in the case?
21     A.   (No audible response.)
22     Q.   Is that a no?
23     A.   That -- no, I'm sorry.  No.
24     Q.   Did you ever have any conversations with
25 Mr. Cannon about the dog sniff issues?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 154

1     A.   No.  I -- I didn't know Cannon's name until
2  the 2016 -- the newspaper came out after the charges
3  were vacated and then it hit the newspaper about the
4  reasons why, and his name was in there.  And that was my
5  -- what I recall as being my first time even hearing his
6  name.  I didn't know who he was.
7     Q.   Did you ever -- prior to Mr. Yell's trial, did
8  you ever have any interactions with Mr. Gregory from the
9  fire marshal's office?
10     A.   Prior to the trial?
11     Q.   Yes, sir.
12     A.   I don't recall any interactions with Gregory.
13  We may have spoken -- we may have spoken about the case,
14  but I don't remember.  I remember talking to West and
15  giving him my statement.
16     Q.   And that was within a day or two of the
17  incident, fair?  Your meeting with --
18     A.   I -- I would say so, from what you said. Yeah.
19     Q.   After that initial meeting, did you have any
20  other conversations with Mr. West prior to trial that
21  you can recall?
22     A.   I did have one conversation with Mr. West.  He
23  -- he had presented me a picture of Camron's body that
24  wasn't burned, but it had a burn mark on Camron's leg.
25  And this was kind of in passing.  I was working the

Page 155

1  street, and he was at the -- at the PD.  And he showed
2  me that and he told me he thought that it was
3  accelerant, but he wouldn't be able to testify to it
4  because it -- he thought it was alcohol and that it had
5  burned up.
6     Q.   And you certainly -- when you say he said he
7  thought it was an accelerant, I just want to make sure
8  I'm understanding it right.  The photograph that he
9  showed you had a picture of Camron where the body was
10  not burned, but there was a burn mark somewhere on the
11  leg?
12     A.   On a leg.  And I -- I remember seeing the
13  picture.  It's been so long ago I can't remember which
14  leg it was, but I remember the burn mark on his leg. And
15  that's all I saw from that picture.
16     Q.   Do you know where he got this photograph from?
17     A.   (No audible response.)
18     Q.   Is that a no?
19     A.   No.  No.  Sorry.
20     Q.   And at that time, you still had no training in
21  fire investigations, fair?
22     A.   No.
23     Q.   You wouldn't have known whether the mark that
24  he showed you on the leg was consistent or inconsistent
25  with an arson, fair?

Page 156

1     A.   No.  That's fair.
2     Q.   Would you agree, Mr. Higgins, that the
3  wrongful conviction of an innocent -- let me strike
4  that.  Would you agree that the conviction of an
5  innocent person is a travesty of justice?
6     A.   I would agree.
7     Q.   And would you agree that if the fire at the
8  trailer was not a result of an arson, then Mr. Yell
9  would qualify as somebody who is wrongfully convicted?
10          MR. MANDO:  Objection.  Form.
11          MS. ARNETT:  Object to form.
12  BY MR. SLOSAR:
13     Q.   You can answer.
14     A.   I agree.
15     Q.   And would you agree that if Mr. Yell's
16  wrongful conviction is attributable to people who
17  committed intentional misconduct, that those individuals
18  should be held accountable?
19          MR. MANDO:  Objection.  Form.
20          MS. ARNETT:  Object to form.
21          MR. COLE:  Object to form.
22          THE WITNESS:  I would have to agree.
23  BY MR. SLOSAR:
24     Q.   And would you agree that it's hard to envision
25  a more tragic circumstance than being wrongfully

Page 157

1  convicted of killing your own child?
2          MR. MANDO:  Objection.  Form.
3          MS. ARNETT:  Object to form.
4          THE WITNESS:  I think that being accused of
5     filicide falsely would be pretty bad.
6  BY MR. SLOSAR:
7     Q.   And would you agree that we've spent a couple
8  of days together, I think maybe, actually, like, a year
9  apart, almost two years apart, apparently.  September
10  '22.  But in the two days that we've spent talking about
11  this case, you have had strong emotional reactions to
12  the tragedy that took Camron's life, fair?
13     A.   That's fair.
14     Q.   And sitting here today with 20/20 hindsight,
15  could you imagine how hard it would be as a father to
16  grieve in a jail or prison having been wrongfully
17  charged and convicted for killing a child that you did
18  not kill?
19          MR. MANDO:  Objection.  Form.
20          MS. ARNETT:  Object to form.
21  BY MR. SLOSAR:
22     Q.   You can answer.
23     A.   I -- I agree.
24     Q.   That would be an impossible circumstance to
25  deal with if that's what happened in this case, fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1    A.    It would be terrible.
2    Q.    And you would agree that if that is what
3  happened here, that Mr. Yell, if he is wrongfully
4  convicted, and was ripped away from his family and
5  unable to grieve for more than a decade of his life,
6  that a jury should give him justice for what happened?
7        MR. MANDO:  Objection.  Form.
8        MS. ARNETT:  Object to form.
9  BY MR. SLOSAR:
10   Q.    You can answer.
11   A.    I mean, I have to agree.
12   Q.    We're going to reserve all punitive damages
13  related questions after summary judgment; is that okay?
14   A.    Okay.
15       MR. SLOSAR:  I don't have any further
16  questions.  Thank you so much, Mr. Higgins.
17       THE WITNESS:  Thank you.
18       MR. MANDO:  Any of my other esteemed defense
19  counsel have any questions of Mr. Higgins -- Officer
20  Higgins?
21       MS. ARNETT:  This is Amber.  No, I do not.
22       MR. YEAGER:  This is Trey Yeager.  I do not.
23       MR. MORGAN:  Luke Morgan, no questions.  Thank
24  you.
25       MR. SMITH:  Aaron Smith.  No questions.

Page 159

1        MR. COLE:  This is Charles Cole.  No questions.
2        MR. MANDO:  I think that's it.
3        MR. SLOSAR:  So do you want to --
4        THE WITNESS:  Do you want me to leave?
5        MR. SLOSAR:  Do you want to reserve -- no.  You
6  don't have to leave.  Do you want to reserve
7  signature or waive signature?
8        MR. MANDO:  I'm going to request signature.
9        MR. SLOSAR:  Okay.
10       THE REPORTER:  Okay.
11       MR. MANDO:  Yeah.
12       MR. SLOSAR:  Let's go off the record and I got
13  a quick question for you, unrelated.
14       THE VIDEOGRAPHER:  All right.  The time is 2:17
15  p.m. Central.  We're going off record.
16       THE REPORTER:  Hi, this is Amy, the court
17  reporter.  Is there anyone on Zoom who wants to
18  order the transcript?
19       MR. SLOSAR:  Is there a case that I think I
20  should?
21       MR. COLE:  This is Charlie Cole.  Yes.
22       THE REPORTER:  Okay.  Electronic copy?
23       MR. COLE:  You can send everything to my
24  assistant.  Electronic.  M-M-Y-E-R-S,
25  mmyers@sturgillturner.com.

Page 160

1        THE REPORTER:  Okay.  Thank you.
2        MS. ARNETT:  This is Amber.  I would like
3  electronic, please.
4        THE REPORTER:  Okay.
5        MS. ARNETT:  And do you need my e-mail address?
6        THE REPORTER:  I have your e-mail.  Thank you.
7        MS. ARNETT:  Okay.  Thanks.
8        MR. YEAGER:  This is Trey Yeager.  I'll take an
9  electronic copy.
10       THE REPORTER:  All right.
11       MR. MORGAN:  Hi, Amy.  Luke Morgan.  Yes,
12  electronic, please.
13       THE REPORTER:  Okay.  Thank you.
14       MR. SLOSAR:  That's a strike out for me.
15       MR. MANDO:  Huh?
16       MR. SLOSAR:  Even on a specific --
17       THE REPORTER:  Oh, and I -- do either -- any of
18  you-all want the video?
19       MR. SLOSAR:  Not yet, but we will order it.
20       MR. MANDO:  Yeah.  I don't want it yet.
21       THE REPORTER:  Okay.
22       MR. SLOSAR:  I may want it later, but not now.
23       THE REPORTER:  All right.  Thank you-all.
24       (DEPOSITION CONCLUDED AT 2:17 P.M. CT)
25  1

Page 161

1            CERTIFICATE OF REPORTER
2        COMMONWEALTH OF KENTUCKY AT LARGE
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Stipulation page hereof by me
7   after first being duly sworn to testify the truth, the
8   whole truth, and nothing but the truth; and that the
9   said matter was recorded digitally by me and then
10  reduced to typewritten form under my direction, and
11  constitutes a true record of the transcript as taken,
12  all to the best of my skills and ability.  I certify
13  that I am not a relative or employee of either counsel,
14  and that I am in no way interested financially,
15  directly or indirectly, in this action.
16
17
18
19
20
21
22  AMY KELLEY,
23  COURT REPORTER/NOTARY
24  COMMISSION EXPIRES ON: 06/02/2026
25  SUBMITTED ON: 1/31/2024

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit5_ Higgins** 17:13, 14,15,19 18:5 97:3 124:16 129:23 145:18

**Exhibit6_ Higgins** 15:12, 13 16:1,3,23,24 19:11,12,20,21 50:13 53:15 66:17 107:11 113:25 124:15 126:5 130:9

**Exhibit8_ Higgins** 55:23, 24 56:4 132:10

**Exhibit12_ Higgins** 55:17, 18 57:8 67:9

**Exhibit19_ Higgins**

---

**1**

**1** 30:6 44:10 57:21 58:4 97:4 160:25

**10** 24:16

**1015** 60:4 65:24

**1056** 65:23

**1097** 58:17

**10:34** 45:23

**10:39** 45:25

**10th** 8:8

**11** 11:20,23 12:20 14:10,19, 24 15:5 24:15 57:17 69:22 71:4,21 86:22 94:22 101:17 118:7 136:13 141:19

**11:24** 76:24

**11:37** 77:1

**11th** 23:2 69:24

**12** 55:17,18 56:2 57:8 67:8, 9 132:10,13,20, 21,22

**12:33** 117:22

**13** 151:1

**16** 58:10

**19** 132:16,17,23 133:20

**1925** 58:9,11

**1930** 60:6

**1944** 114:1

**1948** 126:7 127:22

**19:19** 146:25

**19:25** 20:25 21:8 30:6

**19:27:29** 59:17

**19:30** 20:10,13, 17 44:13,21,22 147:3

**19:30:52** 60:2

**19:32:28** 65:8

**19:44** 66:23

**19:48:29** 65:22

**1:20** 117:25

**1:20-CV-0047-GNS** 8:13

**1X** 67:25

---

**2**

**2** 66:21 113:25 129:4

**20** 126:17 133:11

**20/20** 157:14

**2003** 70:13

**2004** 11:20,23 12:20 14:10,19,

24 15:5 24:15, 16 31:2,9 36:12 57:17 69:22,24 71:4,21 77:4 86:22 94:22 101:17 118:7 136:13 141:19 146:21 151:1

**2016** 109:8 154:2

**2024** 8:6

**21** 129:19

**21:04** 67:14

**21:04:44** 67:9

**21:34:19** 67:24

**21:56:49** 68:8

**22** 132:16,17, 19,23 157:10

**23:16:38** 68:25 69:9,10

**24th** 8:6

**2:04** 153:2

**2:10** 153:5

**2:17** 159:14 160:24

---

**3**

**3** 58:15,21 65:9 128:22 129:16

**3321** 16:4

**3323** 16:17

**3324** 16:4

**3375** 17:16

**3376** 17:16

---

**4**

**4** 67:9

**40** 67:25

**42101** 8:9

**47** 58:11 59:3

---

**5**

**5** 17:13,14,15, 19 18:5 97:3 124:16 129:23 145:18

**52** 60:6

**537** 8:8

**56:49** 68:10

---

**6**

**6** 15:12,13 16:1, 3,24 19:12,21 50:13 53:15 66:16,17 107:11 113:24, 25 124:15 126:5 130:9

**638** 16:12

**641** 86:3

---

**7**

**7:25** 20:22 44:9 59:3 73:15

**7:30** 20:18 44:19 73:14

---

**8**

**8** 55:24 56:2,4 132:10

**831** 59:15 60:1 67:25 68:4

**834** 58:12,17, 19,20

---

**9**

**9-11-2004** 16:14

**911** 23:16

**98** 68:6

**9:04** 67:15

---

**9:30** 73:14

**9:40** 8:6

**9:46** 12:17

---

**A**

**a.m.** 8:6 12:17 45:23,25 76:24 77:1

**Aaron** 158:25

**ability** 128:13 149:20

**abusive** 102:6, 14 103:20

**academy** 81:7 117:11,12

**accelerant** 36:7,10 93:20 155:3,7

**accelerants** 87:3

**access** 15:15 110:4

**accidental** 13:22 61:24 106:10 110:14

**accountable** 156:18

**accuracy** 21:4, 23 44:23 45:2 59:7,13

**accurate** 31:21 59:10 60:14 69:13 111:11, 14 114:11,12 138:17,21 139:2,3,6,7,10, 11,20,25 140:1, 5,6 141:9 142:2,3,16,17, 20 143:8,9,11, 12,15,24 144:5, 12 145:2,5,8,25 146:1

**accurately** 31:15,17 69:12

**accusation**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 44 of 61 PageID
The Deposition of JOHN EDWARD HIGDON, taken on January 24, 2024
#: 2376

163

88:23 93:8

**accuse** 141:11

**accused** 61:8
62:1,10 74:11
88:15 89:1
92:22 141:8,25
157:4

**acknowledge**
53:22,25 54:2,
5,8 129:3
131:22

**acknowledgin
g** 134:6

**acted** 73:12

**acting** 61:8
72:22 75:20
82:16,24 92:16

**actions** 39:2
64:3 134:11

**active** 76:13

**add** 53:16

**addition** 17:25

**additional**
53:14,16 152:9

**address** 160:5

**adjective**
47:23 52:16

**adjust** 56:6

**administration**
152:15

**admins** 152:8,
14

**admission**
105:20 115:12,
13 123:11,12
142:7

**admissions**
138:12 142:4,6

**admit** 68:6

**admittal** 91:11
93:16 94:15
104:25 108:12
110:24 111:2
115:24

**admitting**
103:21 105:6,8
115:19

**advise** 50:16

**advised** 59:24
60:10 97:5,7
100:5,9 114:9

**advisement**
131:8

**advising** 59:19

**affect** 137:8

**affirm** 9:22

**afraid** 79:11,
13,14

**aggressive**
127:7

**agitated** 49:17
82:2

**agree** 20:17
42:20 49:7,16
50:1 61:7,23
62:5 66:13
72:21 76:14
81:19,21,25
82:2,4,19,23
89:21,23 95:1,4
99:11,13,17,18,
19,22 101:1,18
102:1,4 103:17
105:17 107:16
108:13,18
110:15 111:12
115:8 127:17
128:5 130:8
137:1,19,22
138:1 140:7,18,
24 142:8,13
156:2,4,6,7,14,
15,22,24 157:7,
23 158:2,11

**ahead** 14:6
48:11,19 49:19
62:4,14 63:14,
25 71:10 74:15
77:9 85:25
88:20 92:25
93:9 96:3 98:18
100:8 105:23
108:17 111:19
118:15 140:12

**admitting**
141:3 146:7

**aid** 65:7,13,18

**air** 85:4

**akin** 98:16

**Alan** 9:2

**alcohol** 24:2,
18,20 25:7
54:13 139:5
149:9 155:4

**allegation**
138:4

**allegations**
102:5 137:6,14

**allege** 97:2
134:14

**alleged** 134:15

**altercation**
94:21 101:12,
21 102:1,21

**Amanda** 8:4

**Amber** 9:12
158:21 160:2

**ambivalent**
47:5,6

**ambulance**
37:18 43:25

**amount** 61:6

**Amy** 8:5 9:15
159:16 160:11

**analyst** 13:25

**and/or** 76:2

**anger** 38:23
39:11 53:5,9

**angry** 39:12
49:22,23 52:23,
24 53:1 81:25
82:17,24 84:21

**anguish** 38:22
39:3,25 52:22
53:1,4,7

**answering**
10:15 51:16
123:19

**anticipate** 11:8

**anymore**
31:20

**apparently**
157:9

**appeared**
29:19,21 31:19
33:3 35:23
38:22 39:24
40:5 41:25 47:5
49:17,22 82:4

**appearing**
9:16,18

**appears** 16:11

**approached**
42:13 47:11,12
74:19,22
147:19

**approximate**
74:8

**approximately**
44:9 57:20
66:23 70:19
129:19

**April** 20:15
23:7,21 25:10
27:11,19 32:12
33:2 37:2,10,22
38:5,8 39:25
41:18 42:20
43:19,22,23,25
44:15 47:24
49:15 52:20
54:9 62:24 86:5
87:7,21 94:22,
25 95:1,4,7,9,
18,22 96:6,12,
17 101:13,21
102:2,14
103:20 104:9
105:16 110:17
115:13

**April's** 102:4

**area** 27:4 28:23

**argumentative**
112:19

**arm** 121:17
122:3

**arming** 143:4

**arms** 55:13
120:11 121:25

**Arnett** 9:12
110:20 115:16
156:11,20
157:3,20 158:8,
21 160:2,5,7

**arrest** 44:22
54:12,14 60:5,
7,10,21,23 61:1
63:4 74:21 78:3
83:8,10 84:11
90:11 147:3

**arrested** 45:1
73:14 74:10
83:9 87:9,10

**arrival** 59:4
129:21

**arrive** 20:21
21:11

**arrived** 21:8,19
22:1,3,8 23:4,6
24:3,14 25:14
44:9 57:20
58:5,7,23,24,25
60:15 71:20,25
73:15 86:11
95:8,18 119:1
124:10 125:23

**arriving** 11:21
21:15 45:5
144:11

**arson** 12:11,23
13:2,21 14:1,22
15:1,6 31:3
61:24 62:8 71:4
85:21 86:20
87:6 88:11
89:2,5,17 94:12
101:12,20
105:19 106:8
110:14 115:9,
10,18 117:8,16
137:21 150:11,
15,22 151:1
155:25 156:8

**arsons** 30:23

**assault** 67:10,
16,18,20,21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 45 of 61 PageID
#: 2577
The Deposition of JOHN EDWARD HIGGS, taken on January 24, 2024
164

86:5 94:25
150:3 152:6,13

**assaulted**
70:13

**assist** 119:15
136:12

**assistance**
98:8,16

**assistant**
159:24

**assisted**
128:19 135:10

**assume** 11:5
71:17

**assumed**
23:14,19 33:6
151:24

**assuming**
104:6

**assumption**
103:11,13,25
108:1 109:1

**assumptions**
48:7

**attack** 76:3
147:11,20

**attacked**
120:6,8

**attacking**
61:17

**attacks** 122:22

**attempt** 19:9
34:9 64:11
128:7

**attempted**
71:22 152:5,10

**attempting**
33:20 34:21
147:13

**attended** 15:21

**attending** 8:24
9:14

**attention**
11:20 57:11
132:9 145:4

148:23

**attorney** 10:9,
12 15:21 45:13
106:16

**attorneys**
10:11

**attributable**
110:13 156:16

**attribute**
138:12

**audible** 153:21
155:17

**Avenue** 8:8

**aware** 24:4,17
47:17 94:21
101:7,9 106:6,
10,13,15

———————

**B**

**back** 10:7
12:16 19:11
31:2,9 32:6,10,
24 33:8 34:8,
10,23 35:6
43:23 44:6
45:14 46:1
50:12 52:7 67:8
68:18 72:10
77:2,19 80:21
83:20,21 84:3,
13 87:22 91:11
99:6 108:20
118:1,21 119:4
120:1 122:7
130:9 132:6,7
143:4 146:21
153:6

**Backdraft** 34:5

**backseat**
93:18

**bad** 79:8 95:15
144:18 157:5

**badge** 59:14
68:25

**based** 19:10
48:8 57:23 86:2
87:17,18
107:25 135:1

138:2,17
139:12 148:16

**basics** 117:12

**basis** 87:5
129:24 147:6,
14,21 149:9
150:5

**Bates** 16:4,16
17:16

**bay** 118:12,17

**bedroom** 29:6,
12,16,18 35:14,
15,17,18

**beer** 70:15
71:17,18

**began** 66:23
114:1,3 130:20

**begin** 10:1

**behaved** 73:10

**behavior**
78:20

**belief** 12:25
13:1,4 14:1
40:13 64:1 71:3
115:11 136:1

**believed**
12:20,23 36:6
37:6 46:8 96:11
102:8 149:23

**belligerence**
42:1

**belligerent**
38:23 47:10,11
60:20 61:8,10
74:11,16,23
75:3,14,24
77:22 81:19
82:17,25
122:14 126:22
127:4,12,14

**belong** 113:2

**belt** 84:4

**belted** 84:5

**big** 109:13

**Bill** 9:7

**bit** 24:6,12 50:4
56:6,24 78:17
110:11 146:13

**black** 35:16
70:14

**bleeding**
130:20

**block** 92:20
114:8,14 115:3

**blood** 130:16,
18,23 138:9,24
143:11 150:6

**body** 121:3
139:15 147:18
154:23 155:9

**bones** 113:10

**Bonnie** 16:12
69:16 86:7
114:3,13,17
121:3

**booked** 135:9

**bookings**
18:17

**bothered** 73:9

**bottle** 70:15
71:17,18

**bottom** 16:17
30:8 65:23

**bounce** 45:14

**Bowling** 8:8,13

**break** 11:10,
12,14,16 45:20
51:9 76:21
117:19

**breath** 32:22

**breathe** 32:23

**breathing**
143:14

**briefly** 10:7

**bringing** 62:20
136:9

**brought** 44:1
82:21,23 135:6

**buddies**

134:25

**bunch** 104:13

**burn** 87:2
154:24 155:10,
14

**burned** 86:19
154:24 155:5,
10

**burning** 20:14
21:17 37:1,10
39:16,21 40:18,
21 44:14,20
45:6 63:22
96:13 101:15
104:10

**bush** 80:20

**Buster** 9:5,10
13:8

———————

**C**

**CAD** 17:11
21:3,5,8 44:11
45:2 57:13,15,
23 58:4,9 59:6,
8 60:8,13 61:2
66:14 67:8,23
73:22 74:2
129:21 147:1,4

**call** 69:6 86:3

**called** 68:19

**caller** 23:14,16

**calls** 102:15

**calm** 83:13
141:17

**calmer** 75:19

**camera** 12:13
121:23

**Campbell** 9:17

**Camron** 20:15
27:11 28:3
32:19,25 34:2,
10 35:3 37:2,5,
11 38:14,21
40:1 41:18
42:21,22 43:1,
2,3 44:16 45:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

47:4,25 48:4
49:15 51:19
52:20 61:4
62:24 63:5,8,
11,22 64:2
72:20 73:8 75:8
84:23 85:11,17
86:15,16 89:8,
14 92:7 95:23
96:7 141:11
155:9

**Camron's**
154:23,24
157:12

**canine** 153:20

**Cannon** 9:5,10
13:5,7,8,11
153:25

**Cannon's**
154:1

**capacity** 9:10

**Captain** 46:3

**car** 22:4,6 23:7
58:18 68:18,21
69:19 82:15
83:3,8,12,19
84:10,13 85:5
88:14 89:1
90:18 91:6,15,
16,19,20,22
92:6,10 97:18
110:16 113:20,
22 118:4,21
123:4 125:12,
17 127:19
129:6,13
130:24 139:10
148:9 149:16

**care** 107:20
140:14

**career** 12:4
22:19 49:2,7

**Carmel** 9:4

**Carpenter**
87:7 94:22
95:1,7,19

**carried** 40:20,
23 41:2,7,23
43:14 50:9

54:20 64:6 73:1
75:17 76:10

**carry** 54:21
60:17 64:14
106:22

**carrying** 41:16
54:22 55:1,7,9
123:8

**case** 8:13 12:3,
6 16:11,15
19:24 64:13
68:19 70:2,10,
11,17,22 71:2,
7,15 107:9
132:12 152:19
153:20 154:13
157:11,25
159:19

**catch** 25:4

**caught** 101:21

**caused** 106:10

**CD** 67:25

**ceiling** 28:15,
20 29:4,6,20
30:18 32:3,20
35:6,12,24

**center** 9:7
66:24,25 114:2,
7 118:5,6,10

**Central** 8:7
12:17 45:23
46:1 76:24 77:1
117:22 118:1
153:3,6 159:15

**Chad** 8:22
80:7,19

**changed** 32:20

**channel** 65:14,
17,19

**chaotic** 72:1
148:25

**characterizati
on** 48:10 60:22
63:13 77:8
85:25 88:19
92:24 99:14
111:19

**characterize**
47:25 75:1,3,5

**charge** 68:4
83:10,18 85:9
129:25 150:4

**charged** 67:16
80:13 83:6
157:17

**charges** 18:16,
24,25 19:3,10
68:3 107:25
112:25 146:2
147:6,14,22
149:10,15
150:10,14,21
151:1 152:4,7,
10 154:2

**charging**
80:16

**Charles** 159:1

**Charlie** 9:3
15:20 45:13
159:21

**Charlotte**
23:15

**chemical**
143:7

**chest** 81:2,7,9
122:2

**Chief** 8:22

**child** 25:20,21
38:17 39:7,12
42:6 49:24 50:4
61:20 62:11
157:1,17

**Childers** 9:13

**Christmas**
35:25 36:3

**circled** 31:25
34:20 60:16

**circling** 35:5
36:20

**circulate** 16:1

**circumstance**
156:25 157:24

**citation** 17:9,

12,17,20,23
18:1,4,14,23
19:2,7 67:20
83:16 85:8
97:2,13 99:23
100:1,16
111:15,23
112:13,20,24
113:11 124:7,
16,17,19,22
129:23,24
145:18 146:6,
14,16,24
149:12

**citations** 17:22
19:17,19,25
20:4 127:10

**City** 8:11,23 9:4

**claim** 130:15

**claiming** 141:6

**clarify** 105:5
116:20

**clear** 105:7
153:15

**clenched**
61:12 77:24
78:22 147:16

**clenching** 78:8

**clinched** 78:21

**close** 32:15
37:15 41:3,4,8
64:24 67:3,5
70:21 103:9
121:6

**closed** 81:4,6

**closer** 46:18
56:17,24 65:3,
23

**clothing**
129:20

**coarse** 48:2

**Cole** 9:3 15:20
45:17,21
156:21 159:1,
21,23

**collapsed** 33:2
34:11

**collect** 129:20

**combat** 141:22

**combative**
141:23

**combined**
88:1

**comment**
60:19 73:3
76:5,19 77:20
81:17,22 82:14,
18,24 89:18
90:13,18 91:10
93:7,14 99:2,20
101:3,8 103:6,8
104:6,7 110:16
138:4 140:3
141:25 142:8

**comments**
97:14 100:16,
19 111:16
112:15 113:4,6
125:7 130:10
134:11

**committed**
13:2 14:2 71:4
85:21 94:12,17
156:17

**committing**
89:2

**communicatio
n** 152:3

**complained**
91:10 94:1 99:1
103:2 105:11

**complaining**
92:17 94:3

**complaints**
93:23 98:6,23
114:24

**completely**
111:14 145:21

**concede**
128:23

**concern** 38:21

**concerned**
38:17 42:22
47:22 73:11
109:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 47 of 61 PageID
The Deposition of JOHN EDWARD HIGGS, taken on January 24, 2024
#: 2779
166

**CONCLUDED**
160:24

**conclusion**
40:8 42:15
110:12

**conclusions**
106:21 107:4

**conduct** 15:6
117:5,15

**conferred** 13:3

**confess** 92:23
93:15

**confessed**
94:11,14,16

**confession**
89:17 93:20
145:14,15

**connect** 35:17

**connotation**
120:23

**considered**
12:10 101:11,
19 107:5

**consistent**
155:24

**contact** 55:5,6

**contained**
17:6 19:20
20:2,5 53:15
107:11

**contest** 138:24

**context** 86:13

**continue** 23:15
64:17 93:4
119:23 127:22

**continued**
114:7

**control** 82:25

**controlling**
82:6

**conversation**
65:17 106:2
125:12 152:18
154:22

**conversations**
106:15 150:13,
20 153:24
154:20

**conversely**
106:8

**convicted**
137:20 156:9
157:1,17 158:4

**conviction**
110:4 156:3,4,
16

**copy** 131:17,24
132:2 133:20
159:22 160:9

**corner** 29:1,22
30:2,15,19,21
36:1

**correct** 12:24
13:23 14:3,4,9
18:3,6,7,25
19:4 20:3,19
21:12,13 23:3,
23 25:12,16
26:23 27:1,2
30:24 31:8,12,
15 33:22 36:13
37:4,7,8,13
38:15 39:17,18,
22,23 40:6,11,
16,21,25 41:4
42:17 43:17
44:20 45:6
46:8,17 48:9,
21,22 49:1
50:11,18,20
52:14,15 53:23,
24 54:4,7,11
59:6,8,20 60:7,
8,12 61:15,21,
22 63:9 64:15
68:12 69:9,15,
23 70:1,25
71:1,5,6,23,24
72:23 73:24
75:16 76:19,20
77:18 79:19
80:11 83:8
84:11,12,15,16,
20 85:6,21
86:24,25 87:3,4
88:8,9 89:15
90:9,10,11,12,

15 91:18 92:23
93:15,25 94:2,
18,22 95:20
97:16,17,24
98:13,14,17
99:25 100:20,
24,25 101:13,
17 102:2,6,24
103:6,21
107:12 108:4,7
111:3,17
112:17 113:20
116:10 117:5,6,
9,10,14 119:8
124:11 125:2,3,
12,13,18,19
126:19 129:16,
17 130:7 134:5,
21 135:12
138:9,13 142:5
144:2,9 145:11,
12,16,17,21,25
146:6,22 149:7,
8,21,22 150:1

**corroborating**
107:22

**cough** 143:7

**could've**
102:12 112:2,3,
6 113:21

**counsel** 8:14
15:14 158:19

**count** 99:6

**County** 9:7,8,
10,11 66:24
114:2

**couple** 16:2
45:19 51:23
67:5 99:4,5
122:1 157:7

**court** 8:5,8,12
9:21 10:15 57:2
159:16

**covered** 108:2
109:2

**Covington**
8:25

**crease** 138:21

**create** 15:25

**created** 15:18
16:24 18:6,10,
18,23 19:13
146:14

**credibility**
135:20 137:6

**credible** 107:5
110:7

**criminal** 11:24
18:16 46:15
108:6 133:5

**critical** 145:24

**crossed** 72:12

**crowd** 72:9

**cruder** 126:22

**cruiser** 80:22
81:11,18,23
85:10,14 94:13,
20 113:23
118:9 126:22
127:4,14
128:25 147:13,
19

**CT** 160:24

**cuff** 147:10

**cuffed** 120:11
121:1 147:18

**cuffs** 121:2

**cursing** 41:24
80:22 147:19

**cuss** 49:13

**cussing** 77:23
120:10 122:13

**custody** 83:25
84:2,3

**cut** 27:23 131:3
138:20,23

_____

**D**

**damages**
158:12

**dart** 32:18

**date** 101:13

**daughter**
25:10

**David** 107:21

**day** 8:6 11:21,
25 12:7 22:1,
16,17 23:21
24:15 48:24
49:23 69:25
71:22 87:1,7,18
110:17 115:14
134:12 151:20,
23 154:16

**days** 151:2
157:8,10

**deal** 49:9 77:14
157:25

**dealing** 80:2
122:20

**decade** 158:5

**decide** 110:8,9

**decided**
107:10 112:9

**decision**
112:10

**decontaminati
ng** 143:23
144:3,6

**Decontaminati
on** 143:25

**deeply** 38:16

**Defendant** 9:2
13:5,7 150:13,
20 151:11,22
152:4

**defendants**
8:21 9:13

**defense**
158:18

**defer** 21:6

**degree** 67:16
152:5,10

**delayed** 93:17
98:1,2 100:22,
24

**deliberation**
86:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

demeanor 122:15

denied 142:3

denies 101:3,9

denying 98:11

department 14:20,25 15:5 22:9 44:7 88:8

depends 142:25

deposition 8:9 10:6,22 12:10 15:22 85:19 160:24

deputies 123:2 125:1 128:20 129:5

deputy 9:11 119:15 126:23 127:8 134:22 135:23

Derek 45:15

describe 28:20,22 47:13 55:8 82:16 120:9 148:24

descriptions 75:12

descriptor 75:12

desperate 48:3

destroyed 153:10

detail 107:14 111:23

detailed 50:22

detective 88:8

detention 9:7 66:24,25 114:2, 7 118:5,6,10

determine 14:21 15:1 66:5

difference 31:10

direct 10:2 11:19 57:11 99:12 102:23 132:9

directives 119:18

directly 25:25 26:1 99:23 100:2,17 102:25

disbelief 23:1

discovering 109:9

discredit 137:14

discussed 143:22

discussing 49:4

discussion 152:8

disenfranchising 106:24

dispatch 21:2, 11 58:25 59:4, 25 65:17 86:10 87:23 94:23

dispatched 86:6 87:19

disprove 134:13,19

dispute 59:7, 12 87:6

disrespect 77:24

disrespectful 76:14,18

dissuade 63:10,17

District 8:12

dive 107:23

divider 119:7

document 16:7,9,16,18,23 17:2 18:6,9,19

57:12 58:5,7 66:20,21 124:4

documented 66:14 112:21

documenting 152:2

dog 13:5,25 153:19,25

domestic 86:13 87:20 89:6 102:8,13 104:9 110:17 115:13

door 25:23,24 26:1,5,11 27:3, 13 29:17 34:6, 18 71:22 84:7 86:4 87:20 92:13 94:24 102:5,14 103:19 118:13, 14 142:15

doors 34:5 84:13,15 118:17 139:9

doorway 28:6, 11

doubt 135:20, 21 150:2

draft 53:14

drafted 128:14

drafting 19:20

drag 46:4

dragged 43:4 46:7,22 47:9 72:25

drive 15:25 16:12 69:16 86:7 92:7 113:22 114:3 121:3

driver 88:1

driving 91:16, 19 92:3 113:22 118:6

drove 84:22 90:2,3

drunk 71:8,12 119:20

due 31:20

---

**E**

e-mail 45:15,17 160:5,6

earlier 47:23 52:16,18 53:2,8 64:13 77:5 85:18 87:7,18 95:8 113:18 114:21

easiest 83:22

East 8:8

Ed 8:22 152:24

Edmonds 151:19,21 152:4,9,12,13, 16

Edward 8:10

effect 60:10 114:6 140:4 141:15

Egglesston 8:22 80:7,19

electrical 72:3, 7,13 87:2 142:10

electronic 15:15 159:22, 24 160:3,9,12

elicit 89:16

Elliot 8:18 55:19 56:5 57:5

Elliott 48:19

emotion 51:20

emotional 39:13 51:22 90:1 157:11

emotions 82:6

encountered 11:25 72:18

encountering

39:4

encroaching 57:2

end 55:23

ended 79:18

enduring 94:2

enforcement 49:8 76:2,3,7 77:15 96:10 105:5 134:23

engaging 115:13

engine 131:14

engulfed 27:4 28:5,12,13,18

enter 27:19 40:18

entered 27:14 40:14

entire 12:4 49:2 81:18 91:1 139:1

entry 34:14

envision 156:24

equally 142:9

equating 53:9

essentially 61:8 74:11

esteemed 158:18

estimate 99:1

estimated 147:2

et al 8:11

event 33:13

events 46:14 128:6,15,21 129:15 131:6 133:11

eventually 80:24 121:8

evidence



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 49 of 61 PageID
#:2781
The Deposition of JOHN EDWARD HIGHTOWER, taken on January 24, 2024

168

47:17 89:9
107:22 119:20

**evidently**
72:11

**evil** 97:7 124:4,
19 125:15
130:6 138:5
145:1

**evokes** 51:19

**EXAMINATIO
N** 10:2

**excuse** 33:11
121:19 124:18

**exhausted**
68:23 69:20

**exhibit** 15:12,
13 16:1,3,23
17:13,14,15,19
18:5 19:11,20
50:13 53:15
55:17,18,20,23
56:4 57:8 66:17
67:9 97:2,3
107:11 113:25
124:15,16
126:5 129:23
130:9 132:10
145:18

**exhibits** 15:15,
21 45:14

**existed** 134:9,
18

**exited** 32:14
36:19 126:21
127:3,14,18
129:6 147:18

**expect** 74:4
89:19 90:1

**experience**
10:22 136:22

**experiences**
136:2

**expert** 30:23
31:3 109:23

**experts** 106:6
107:8,16 110:1,
4,12

**explain** 35:2

**explained** 89:6

**explaining**
89:25

**explanation**
111:6

**expletives**
52:19

**explicatives**
41:20 74:17
75:5

**explicit** 49:12

**expression**
141:8

**extra** 113:1,13

**extracted**
109:16

**extremely**
32:17 40:5
42:16 126:22
138:16

**eyes** 91:10
92:17,18 93:23
94:4,6 98:7,22,
25 100:20
103:5 105:12
113:5 114:5,21,
25

—————

**F**

**face** 139:15
143:23 144:4

**facility** 118:18

**facing** 26:10,
11

**fact** 97:13
111:15 131:10

**fair** 11:6,7,17,
18 12:1,19,21
13:6,19,22
14:14 15:4
16:22 18:8,13,
22 19:1,5 20:5
21:22 22:18,22,
25 24:2,5,18
25:13 27:4

30:23 31:3,4,11
33:18 36:17,18
37:14,22 38:12,
16 39:3,5,6
40:1,3,4,10,17
41:8 42:3,4,7,8
46:13 47:19,20
48:3,25 49:5,6,
24,25 50:5,6,
12,22,23,24
52:22 53:13
57:25 58:23
59:1,2,5 60:14,
24 62:17 63:12
64:24 66:14
70:3,5,17 71:8,
25 72:17,21
73:7,18 74:6,7,
25 75:15,24,25
76:3,4,7,15,16
78:18 79:12
81:16 83:25
84:21,23 87:10
88:12,13 89:16,
19 91:14,19
93:8 94:11,16
95:19,23 96:4,
13,14,18,23
101:22,23
104:1,22
106:11 107:8,
17,18 111:10
112:7,8 117:1,
2,16,17 118:18
119:7,10,11
125:4 126:18
128:11,12,15,
16,17 130:22
131:6 134:14
135:19 137:7,
15,16 139:13
141:18 144:23,
24 148:5,19
149:1,2 154:17
155:21,25
156:1 157:12,
13,25

**fairly** 11:9

**faith** 50:3

**fall** 121:14
122:4

**falsely** 157:5

**falsify** 146:5,15

**familiar** 36:12,
13 57:12 135:9

**family** 77:14
158:4

**fast** 61:5 86:19

**father** 62:9
157:15

**fear** 63:11

**feared** 63:22

**feel** 73:10
109:15,25
111:8,22
116:15,22

**feeling** 90:3

**feelings** 52:3

**feet** 84:7

**fell** 72:12

**felt** 107:21

**ferocious**
25:24

**fight** 64:9

**figured** 80:15

**filicide** 157:5

**fill** 85:9

**filled** 17:24
145:21,23

**finally** 110:3

**find** 32:19
33:25 66:7,11
107:4 110:7

**fine** 25:5 51:10,
23

**finish** 24:8
48:11,16 116:4,
5

**finished**
127:23

**fire** 11:20 12:22
13:3,14,15,22,
25 14:13,21
15:1,6 16:12
25:21,23,25
26:2 27:4,7,9,
17,18 28:2,3,5,

6,7,10,14,19,
22,24,25 29:6,
18,19 30:8,14
31:7 32:3,20
34:1,7,25 35:4,
6,11,12,14,19,
23 36:3 39:4,11
41:5,8 42:3,6,
12 43:1,5,13
44:5,7 45:10
46:5,12 47:1,9,
15,19 48:24
49:24 50:5 51:1
52:14 54:3
57:16,20 60:17,
20 61:9,11,23,
24 62:1 63:21
64:9 67:1 69:25
70:20,23 71:20
73:4 74:12
75:23 76:13
77:5,7,13,15
80:3,14 86:8,
11,12,17,19,23
87:2,3,24,25
88:11,16,22
89:8,14,21
92:23 93:1,5,8,
15 95:2,5,19
96:18 97:10,15,
20,22 99:3,24
100:12,18
101:22 103:21
105:8,18,20
107:1,2 108:15
109:10,13,23
110:13,14,18,
23 111:3 114:4,
15,20 115:8,12,
17,18,22 116:1
117:5 123:6,10,
11 137:20
150:24 151:2,
12 154:9
155:21 156:7

**firefighter**
13:25 43:7

**firefighters**
13:17,19 65:1,
15 76:9 80:14

**fireplace** 77:17

**fires** 14:11
27:10 101:17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 168   Filed 10/03/25   Page 50 of 61 PageID
#: 2782
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024
169

firetruck 44:3

firetrucks 44:3
45:7

first-degree
150:15,22

fist 61:12 81:5
147:16

fists 77:25
78:8,22,23

five-minute
45:20 87:9

flames 30:1

flashover
31:11

flickering
29:25

floor 28:15,19
29:4 32:20
35:12 109:11
142:16

fluff 113:1,7,13

focusing
148:16

folder 15:17,25

folks 17:15

follow 35:16

follow-up
104:7,18 123:5

forget 15:14
46:19,21 47:23
52:3

forgot 34:13
69:6

form 14:5
37:23 62:2,12
63:13,24 74:14
85:20,22 87:12
93:9 98:18
105:22 108:16
110:19,20
111:18 115:15,
16 136:1
137:23 140:9
141:2 146:7,17
148:6 156:10,
11,19,20,21

157:2,3,19,20
158:7,8

formal 14:25

formed 13:1,4
14:1

forward 53:13
119:3

foundation
14:6,15 37:24
48:11 63:25
87:15 105:23
106:7 108:17
111:19 140:12
141:3

fourth-degree
152:6,13

Frankfort 9:14

frankly 110:8

fresh 128:11
133:10

fresher 133:10

friend 22:14,16

friends 134:24

front 16:7
20:14 21:16,20
25:22,25 26:1,
5,11 27:11 32:1
34:23 36:24
37:1,10 38:4,6
39:16,21 44:14,
19 50:13 83:20
96:5 118:14
120:6 121:1,3
147:18

frustrated
85:5,7 119:5
141:21

frustrating
137:2

fuck 77:24

full 31:10

full-on 93:20

full-out 145:14

fully 28:5,18
35:11

**G**

gasoline
36:13,16

gave 14:21
111:10 122:3

generally
17:11 19:24
113:11

generate 74:5

genuinely
64:11

Georgetown
9:4

girl 97:8,23
99:21 100:10
102:11 105:10

girlfriend
114:10

give 9:23 32:25
42:8,18 48:13
66:7 80:17
123:2 133:19,
24 158:6

giving 121:14
154:15

good 8:16,17
9:1 10:4,5
27:10 29:18
33:2,15 51:7
80:18 120:22
121:15 130:5
135:1,4 136:2,
22

Google 15:25

grabbed 78:2
79:25 80:2

grand 55:20
56:1 108:4,20
131:19,23
132:2,12,15
133:4,18,23
134:3

grass 46:11

Green 8:9,13

Gregory 9:2

13:13 154:8,12

grief 49:9

grieve 157:16
158:5

ground 41:6
79:19,24 80:11,
20 125:17,22
131:1

gruff 38:23
48:2

guarantee
21:23 128:8

guess 23:11
51:11 56:17
144:17

guidance
14:21

gun 78:12,14
120:15,16

guys 107:3

**H**

half 92:20

halfway 67:10

hall 32:19

hallway 28:1,2
29:2,6,19,21,23
30:3,4,9,11,12,
14,16,18,19,21
32:8 35:22

hand 9:20
56:14 81:4,8,14
151:24

handcuffed
83:23,24 84:11
90:9 118:21
139:1

handcuffs
120:6

handed 112:12

handle 78:17

handler 153:20

hands 23:8
147:18

handwritten
17:7 19:17,18,
19 20:4

handy 145:19

hang 134:24

happen 94:8
137:17 142:2
148:1

happened
21:18 25:18
34:13 59:22
69:8 81:10 86:9
89:13 90:8
101:12 103:23
112:22 120:9
122:1 126:17
128:6,9,15
129:15 136:25
140:21,25
142:25 149:25
150:7 157:25
158:3,6

happening
94:20 102:8

happy 11:12
85:2,15 109:25

hard 81:8,14
156:24 157:15

Hayes 121:7
122:18 123:23
124:3,10,23
125:23 126:25
127:6,8,18
128:18 129:15
130:11 134:22
135:10,14
138:3 148:4,18
149:6,13,19

Hayes's
135:20

He'll 116:4

head 25:2

hear 63:10,17
96:12 109:23
110:2 113:8
123:2 152:23,
25

heard 25:23
95:22 96:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 51 of 61 PageID
#: 2783
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024
170

hearing 41:14,
22 108:10,11
154:5

heart 33:4

heat 32:21

heavy 90:4

heck 52:4
116:14

heel 80:16
121:13

held 119:21
156:18

helped 149:7

helpful 10:14,
17

hesitated
27:10

hey 56:5 93:4
109:10,14

Higgins 8:10,
16,22 9:20 10:4
12:19 16:6
17:19 24:11
30:22 33:12
45:12 50:12,16
52:12 57:9
64:12 77:4
105:17 107:8
108:3 109:19
116:17 117:21
118:3 153:8
156:2 158:16,
19,20

hindsight
62:6,7 104:16,
17,23 105:3,5
106:4,17
107:21 109:4
110:6,15
157:14

history 69:23
70:1

hit 71:16 79:2
81:2,9 154:3

hits 33:16

hold 78:2 79:25
80:2 106:19

119:19

holding 32:21

holler 41:14

hollered 38:20
61:12 79:1

hollering
20:14 37:2,10,
22 38:9,13,20,
22 39:25 41:17,
22 42:20 44:15
47:23,24 48:1
49:12 50:8
52:19 54:22
60:17 72:9
90:17 91:2,12
96:6 118:25
119:6 122:13

homicide
117:8,15

hone 91:24

honest 12:4

honestly 41:13
125:10,25

hope 118:15
137:10

horrific 33:13
39:4 72:17

hoses 41:5
44:5,7

hospital 70:15

hot 32:17 33:9

hour 114:22
129:19

hours 20:10,
13,17,25 30:6
44:13,21 66:23
114:1 126:7
127:22

house 23:21

human 39:3

hurry 61:4

hurting 91:10
92:18 93:23
94:4

---

## I

idea 28:1 97:7
100:5 124:19
125:15 130:6
153:11

IDENTIFICATI
ON 15:13 17:14
55:18 56:4

identified
106:9

identify 8:14

imagine
157:15

immediately
27:20 34:12
92:5,9 99:8,9
103:1 113:19

immense
31:20

impact 98:24
137:6

impacted 71:3

implication
93:7

important
51:18 104:7
105:4 106:18
109:7,14
111:22

impossible
157:24

impression
38:10

in-between
91:9 105:12
112:16

inaccurate
144:13 145:9
146:6,10,16

inappropriate
76:6

incapable
82:5,7

incident 70:12

77:7,20 102:13
104:9 110:17
115:13 129:9
154:17

inclined 50:22

include 146:5

including
152:10

inconsistent
155:24

inconvenient
76:12

incredibly
50:10 61:14

incriminating
145:7,11

independent
21:25 69:8
96:22 108:19
131:20

independently
57:22 106:14

indicating
64:3 75:8

indication
42:9,18 60:4

individual
71:16

individuals
156:17

inflamed
141:19

inform 97:22

informal 15:4

information
13:20,24 17:5,6
19:3,6 20:5
50:14,17,25
53:16,25 58:14
60:13 74:2
107:10,16
145:24 146:2,6,
16

informed
39:20 130:1
144:10

initial 154:19

initiate 18:24
19:3 150:10

initiated
150:14,21
151:1 152:9

initiation 152:4

injured 79:14

Innocence
109:9

innocent
156:3,5

inside 25:20
26:13,25 33:21
34:16 35:5
36:2,5,17 37:6
38:17 40:9
42:7,9,23 59:18
60:15 61:21
63:8,11,22
96:12 106:25
118:11 119:21

instance 97:18

instruct 106:14

instructs
10:12

integrity 22:23

intended 89:24

intentional
156:17

intentionally
19:8 47:18
63:20 105:20

interactions
134:19 135:11
153:16 154:8,
12

interested
131:9

interior 84:14,
16

interpret
42:22,24
105:12 115:5

interpretation
82:10 111:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 52 of 61 PageID
The Deposition of JOHN EDWARD HIGDON, taken on January 24, 2024
#2784
171

**interpreted**
48:5,7 102:18, 19

**interpreting**
39:1

**interrogate**
117:8

**interruption**
152:22

**interview**
151:8

**interviewed**
107:21 150:23
151:3,4,6

**intoxicated**
38:23 40:5
42:1,16 50:10
71:14 78:13,15
138:16 149:11

**intoxication**
24:2,18 54:13
149:9

**investigate**
88:11

**investigated**
70:17

**investigating**
152:19

**investigation**
11:24 14:14
15:6 16:25
23:24 48:25
49:3 57:16
70:25 77:5
88:11 90:6
109:22 116:25
117:5,9

**investigations**
14:11 24:17
86:23 117:16
155:21

**investigator**
53:19 88:3,7
109:23 117:3

**investigators**
90:6 107:19
109:16

**involved** 11:24
12:5 14:11
35:11,20,21
48:24 49:3 87:3
89:5 153:20

**involvement**
31:11

**involving**
137:7

**issues** 24:2,18
153:25

---

**J**

---

**J.A.** 9:6 56:5,22

**J.W.** 124:23
126:25 127:7
149:13

**jail** 18:11,17,20
66:2 68:7 79:7
83:15 84:22
91:7,17 92:1
119:21 121:4
125:1 128:20
131:11,24
132:6,7 133:21
135:6,23
136:10,13
144:12,16
149:21 157:16

**Jailer** 9:7

**jailers** 119:15
126:23 127:15

**January** 8:6

**Jeff** 8:21 58:1

**Jenkins** 9:8

**Jennifer** 8:23

**jeopardy**
40:15 41:9

**job** 11:1 56:25
57:1 78:16

**jobs** 65:1 76:9

**John** 8:10

**judge** 110:8

**judgment** 52:1
158:13

**jumping**
118:15

**jury** 55:20 56:1
108:4,20
131:19,23
132:2,12,15
133:4,19,23
134:3 137:13
140:7 158:6

**jury's** 110:8

**justice** 156:5
158:6

**justified** 61:25

---

**K**

---

**Kelley** 8:5

**Kentuckiana**
8:7

**Kentucky** 8:9,
12

**kick** 71:22 79:4
81:12,23 82:15
86:4 87:20
94:24

**kicked** 102:5,
13

**kicking** 80:22
82:17 84:6,8
91:2,8,12 119:6
120:4 147:10

**kid** 73:11

**kids** 38:3 47:5
140:4 141:9
142:1

**kill** 109:13
141:14 147:24
157:18

**killed** 140:4

**killing** 62:11
141:9,11 142:1
157:1,17

**kind** 26:7 28:7
51:2,3,6,10,13
78:2 120:19
154:25

**kitchen** 28:4,7,
11,18 29:15
30:9 35:11,20

**knew** 13:15
23:24 27:9
28:3,4 38:2
39:7 42:9,19
47:21 63:8
64:23 71:14,21
88:2,4 89:9
90:4,5 95:7
105:14 112:15
116:11,15
134:24 135:2
145:23 146:1

**knocking**
103:19

**knowing** 35:2
39:12

**knowledge**
14:18 15:7 37:5
138:2 153:9,19

---

**L**

---

**labeled** 106:8

**Lack** 14:5,15
37:23 48:10
63:24 87:15
105:22 108:16
111:18 140:12
141:2

**lady** 23:13

**landed** 72:14

**landing** 72:15

**Langen** 8:23
10:10 152:22

**law** 49:8 76:2,3,
7 77:15 96:9
105:4 134:23

**lawsuit** 109:20

**leading** 89:22,
23

**leaned** 119:3

**leaning** 93:11

**learn** 104:21

**learned** 71:8
117:10

**leave** 32:12,13
91:6 129:14
159:4,6

**leaving** 68:6
87:21

**led** 13:20

**left** 12:22
13:16,17 14:2
34:15 35:5
36:23 66:5,11,
22 69:3,5,6,14
85:19 86:7
91:25 113:11

**leg** 154:24
155:11,12,14,
24

**legs** 55:12

**life** 40:9,14
49:24 51:19
77:6 157:12
158:5

**light** 29:25
62:21

**lighter** 93:19

**lights** 36:1,3
44:3

**limit** 67:4

**limited** 50:14,
24 52:11 109:5

**lines** 72:4
100:9 132:16,
23

**lip** 138:20

**list** 112:25
124:23 149:12

**listed** 30:3
66:10 125:5
149:18

**lit** 93:19

**literally** 43:4
64:14 102:21
103:2 129:5

**living** 27:6,15,
16,17,18 28:23,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25 29:11,13,23
30:20 31:20
32:4 35:1,10

**locked** 84:14

**Logan** 9:7,8
66:24 114:2

**logged** 67:17

**long** 11:9 12:2
45:15 68:22
69:5,17 73:2,5,
21 86:18 91:23
99:1 113:23
120:1,3 122:17,
19,20 152:20
155:13

**longer** 31:19
50:21

**looked** 26:17,
18 27:3,7 28:23
35:13 55:8
107:9

**lose** 62:9

**losing** 51:19

**lost** 33:3 49:24
152:23 153:9

**lot** 21:18 24:13
31:23 33:17
35:9,19 51:19
53:12 65:15
106:19,22
107:4 109:3
112:5 124:20
148:13

**loud** 24:24

**Luke** 9:1
158:23 160:11

**lunch** 11:11
117:18

**lunged** 121:11

**lunges** 122:22

**lunging**
120:19,20,25
122:11 125:18,
21 131:2

---

**M**

**M-M-Y-E-R-S**
159:24

**mad** 41:25
105:16

**made** 10:14
60:5,19 61:14
63:19 73:3
75:22 77:20
81:17,22 82:14,
24 89:17 90:13,
18,24 91:4,8,
10,15,21 92:5,
8,15,20 93:14,
16,22,23 97:14
99:2,10 100:17,
19 101:8
102:25 103:5,6,
8 104:6,12
105:16 106:22
108:1 111:2,15,
23 112:10,15
113:4,6,19
114:24 116:10,
21 119:14
123:4 124:9
125:6 130:10
131:14 134:11
137:15 138:4
142:4 145:7
148:19

**main** 87:25
101:19,25

**maintains**
101:8

**majority** 119:2

**make** 10:10
28:9 34:8,22
48:4,14 92:4
93:20 94:14
99:11 100:4
104:24 109:1,
24 123:11,12
131:13,14
140:3 142:6
145:11,13,15
149:20 153:14,
15 155:7

**makes** 50:3

---

**making** 48:8
76:5 82:18
91:13 94:19
98:6,24 101:3
103:13 105:20
110:24 115:11,
12,23

**male** 60:3

**man** 70:14

**Mando** 8:21
10:9 14:5,15
15:16 24:8,24
25:2 30:25
37:23 48:10,16,
19 49:18 55:19,
25 57:22 60:22
62:2,12 63:13,
24 65:11 71:9
74:14 77:8
85:22,25 87:12,
15 88:19,21
92:24 93:9
95:24 96:2
98:18 99:14
102:15 103:15
104:3 105:22
106:13 108:16
110:19,21
111:18 113:15
115:15 116:4,7
132:21,23
133:1 137:23
140:9,12 141:2
146:7,17 148:6
150:16 156:10,
19 157:2,19
158:7,18 159:2,
8,11 160:15,20,
22

**manner** 81:6

**mark** 15:12
17:13 55:17
56:1 154:24
155:10,14,23

**marked** 15:13
17:14 55:18,20
56:4

**marshal** 13:25

**marshal's**
13:15 154:9

**mask** 32:17

---

**matched** 132:4

**matter** 8:10
31:24 73:6
115:4

**matters** 45:16

**Mays** 149:6

**Mcdonald**
40:24 41:15
42:25 44:1,4
46:3

**meant** 105:14
123:21 133:13

**measures**
106:10

**medical** 98:7,
16

**meeting**
151:15 154:17,
19

**melancholy**
35:1

**Melinda** 45:14

**memory** 20:3
21:25 46:13,17
96:22 108:19
126:6,16
128:11 131:20

**menacing**
147:14

**mentioned**
128:18

**message** 85:3

**met** 151:19,23

**mic** 56:6,9

**mild-
mannered**
141:17

**miles** 67:5

**Mill** 32:11

**Mills** 8:22
17:24 22:11,12,
19,22 23:4
25:19,22 33:19
40:25 41:1,16
42:25 44:1,4

---

46:4 54:12,14
59:16,19,22
60:22 61:1 68:4
78:1 80:5,18
83:9,14,15 85:8
103:10 107:23
129:20

**Mills'** 23:1
109:2

**mind** 10:23
32:21 85:14
89:3,10 92:7
121:22 133:10

**mindset** 86:12
104:11

**minute** 127:5

**minutes** 16:3
20:21 21:15
45:4 51:23
60:15 61:19
67:2,6 73:13,
18,24 74:8
91:3,15,17,20
92:3 98:5
121:10 122:20
129:19

**Miranda** 84:19
90:14 122:25
123:3,7 126:3
127:10

**misconduct**
146:5,15
156:17

**misinterpretin
g** 53:11

**mistake** 19:6

**mmyers@
sturgillturner.
com.** 159:25

**mode** 147:20

**Molly** 9:17

**moment** 33:16
46:9,10 63:19
74:19 81:16
85:5 96:11

**moments**
77:21 113:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 54 of 61 PageID
#: 2786
The Deposition of JOHN EDWARD HIGHTOWER, taken on January 24, 2024
173

months 23:11

Morgan 9:1,2
86:3 114:8,12,
14,16 115:3
158:23 160:11

morning 8:16,
17 9:1 10:4,5

Motherfucker
140:3

motion 108:10
121:18

mouth 130:19,
20,23 131:3
138:21

movie 34:5

moving 53:13
61:3,5

multiple 88:7
96:2

murder 94:17
150:11 152:5,6,
10

mutual 65:7,
13,18

**N**

names 25:14

natural 13:21

necessarily
71:2 72:21
110:6

needed 68:20
113:1 146:1

nefarious
142:12

newspaper
154:2,3

nodding 10:17

north 26:11
29:1,3,22 30:2,
3,4,10,12,14,
15,19,21 32:19
86:3 114:8,12,
16 115:3

note 125:1

notes 17:7
19:20,22,23
20:1,4 151:19,
23,25

notice 23:7

noticed 30:8

notified 59:4

notify 21:11

nuisance 70:4

number 8:13
15:12 16:23
17:13,16,19
18:5 19:11
52:13 58:11,18
59:14 66:16
68:4,25 69:1
97:2,6 124:15
132:10

**O**

oath 132:12
133:7

Object 110:20
115:16 156:11,
20,21 157:3,20
158:8

Objection
14:5,15 37:23
48:10 49:18
60:22 62:2,12
63:13,24 71:9
74:14 77:8
85:22 87:12
88:19 92:24
93:9 95:24
98:18 99:14
102:15 103:15
104:3 105:22
108:16 110:19
111:18 115:15
137:23 140:9
141:2 146:7,17
148:6 150:16
156:10,19
157:2,19 158:7

objections
10:11,14

observation
28:17 48:8
49:16 52:21
53:3 63:2 75:1
138:15

observations
19:10 23:1 51:1
54:2,6,9 72:6
73:17 75:11
87:8 107:10
108:15 110:2
149:20 151:12

observe 21:16
33:20 34:17,19
35:5 36:6,20
37:21 38:8
39:24 43:22
47:2 54:16 55:3
74:10 130:23
139:24 142:19

observed
20:13 25:9,17,
21 28:19 30:13
31:6,13 33:20
36:23,25 39:16
40:4,18 44:12,
14,19 49:9
50:7,9 52:13
60:16,17,20
62:22 64:14
73:13 76:1,6,17
95:21 107:15
138:17,19,22,
25 139:4,8,19
140:2 141:7
142:25 143:6,
10,13 144:25
145:3

observing
34:16 96:16
128:19 138:9,
23

OC 139:5,9,12
143:14,23
144:4,8,11,20,
21

occasion 49:8
135:5 136:9

occurred
67:18,21
127:13

offense 11:1

office 8:7
13:15 15:21
154:9

officer 43:7
49:8 50:16
52:12 53:17,18
63:10 76:2,3
77:15 78:1 80:5
83:4,5,9 85:8
96:10 105:5
117:13 129:20
134:23 135:1
136:2 158:19

officers 22:9
43:9,10,14
54:18 55:1,4
60:17 61:19
64:14 73:2
76:15,18 95:10

official 90:7

omits 111:15

omitted 54:1,3,
6,9 97:13
100:16,18

one-way 32:9

online 15:17

onward 128:22
129:16

open 34:6 81:4
84:15

opened 34:4
84:7 139:10

opening 26:7,8

opinion 85:20

opinions 110:7

opportunity
48:13 108:14

opposed 53:19
106:24

Orange 108:21

order 128:6,14
130:8 148:17
159:18 160:19

orientation
73:20

original 107:19

originally 17:7
29:5

outburst 89:7,
12 90:1,8,25
91:5,9,21 92:4,
5,9,15 93:17,22
94:19 99:9
102:22,23
103:12 104:12
111:25 113:19
115:6

overturned
110:4

overwhelming
85:13

**P**

p.m. 20:18,22
44:9,19 59:3
67:15 117:22,
25 153:3,5
159:15 160:24

pages 16:23
50:17

pain 94:2

palm 80:16
121:13

paper 15:16
94:4 112:5

paragraph
30:7 126:13,21
128:20 129:4,
16

paragraphs
20:25 128:22

paralegal
15:24

parallel 114:17

parameters
108:23

Pardon 152:22

park 118:10

parked 68:21
119:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 55 of 61 PageID
#: 2787
The Deposition of JOHN EDWARD HIGGINS, taken on January 24, 2024
174

part 27:14 32:3
34:17 71:15
77:6,7 89:13
104:1 109:20
124:17,18,20
147:12

participated
57:16

partner's 8:24

passed 23:13
25:11,17 92:3
95:9

passing 23:10
44:2 154:25

passions
141:18

past 69:22 70:1
71:14

patrol 53:17,18
85:4 117:13
150:24 151:10

paying 145:4
148:23

PD 155:1

Pedergraf 8:22

peered 25:24
26:2,4,12

pending 8:11
11:15

people 15:16,
19 16:3 38:13
49:9 72:9
112:21 135:6,8,
14 136:10,15,
18 149:3,12
156:16

pepper 80:24
92:18,19 93:24
94:2 98:7,8,16,
24 99:2 100:19
103:2 114:5,25
119:9 122:8
139:14,17
144:15

perfect 10:24

perfectly
51:23

performance
135:4

period 81:18,
19,22 82:5,13,
22 87:9

periphery 78:1
80:15

person 22:23
37:6 42:21 80:9
107:9 115:10
131:12 135:4
156:5

personal 57:2
80:17

personality
70:6,7

perspective
111:8,9

pertinent
111:24

photograph
155:8,16

physical
102:21

physically
55:1 122:25

picked 80:21

picking 38:19,
21 39:14

picture 154:23
155:9,13,15

piece 19:6

place 13:6
14:20 18:16
33:21 34:16
125:12 131:6
135:11

placing 41:9

plaintiff 8:19
9:16,18

PLAYS 52:7

point 13:13
22:12 27:9
33:13 36:20
37:5,12 40:17
42:15 43:5

47:21 64:18
72:24 73:7
75:19 80:10
93:4 109:17
118:4 121:4
122:8,10
123:12,15
124:2 125:20,
22,25 132:16
136:4,6,21
144:19

pole 72:11

police 9:13
22:9 43:7,9,10,
14 76:14,18
94:13,20

policies 14:20

port 18:11,19
80:25 84:17
112:12 118:11,
16,20 119:1,12,
15,19,21 120:2
121:7,8 122:23
124:1,11
125:24 126:17
127:16 128:19
129:19 130:12
131:5,7,24
133:21 134:12,
20 135:12
136:4,6,13,25
138:13 139:2,6,
14,19,24
140:22 141:1,
12 142:5,15,19
143:1 144:19
145:10,16
148:2,14,16
149:15,16,17,
21,25 150:7
153:16

Porter 121:6
122:17 123:23
124:2,10,23
125:23 126:25
127:5,8,18
128:18 129:14
130:10 131:9,
13 135:23
136:2,12,15,18,
22 137:13
138:3,15,19,25
139:4,8,18,23

140:2,8,20
141:7,24
142:14,18
143:6,10,13,22
144:3,10,19,22,
25 145:6 148:4,
17 149:6,13,19

Porter's 137:5
140:15

possibility
103:23

possibly 99:7

practice 21:10

present 123:2
124:3 125:6
128:21 129:15
130:11 148:18,
20,22 151:7

presented
154:23

pretty 25:24
27:10 29:18
33:9 35:21
61:3,5 67:3
70:21 73:7
80:18 92:6,11
103:1 105:7
109:5 121:15
157:5

previously
71:22

prior 11:23
14:10,19,24
19:20 24:1,17
48:23 60:9
69:25 76:5
77:4,15 82:18
84:17 86:22
87:1 94:19,20
130:23 144:11
154:7,10,20

prison 157:16

probable
103:24 112:25
113:10

procedures
14:20

proceedings
8:1 46:15

108:14 132:15
133:5

professional
135:3

Project 109:8

prompted
104:25 105:1

proof 90:5

proper 84:2

properly 84:4

property 39:11

prove 134:10,
13,15,18

proven 115:9

proves 105:18

provide 13:20

provided
14:25 151:11

proximity
37:15 41:3

pull 61:20

pulled 118:9,
20 119:22
120:4 147:11

punitive
158:12

purpose 18:14

push 125:17

pushed 142:14

pushing
121:18 125:21
131:1

put 10:22 18:25
19:7,9 44:21
50:15,25 65:20
94:6 100:1
107:10,14
111:22 112:18
113:1 120:5
122:15 124:13,
17,19 125:8
146:15 147:13,
17 149:23
152:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

putting 40:14
45:9 127:11
130:24 146:10

---

**Q**

qualify 156:9

question
10:13,19,24
11:2,4,15,16
24:5,8,11,14
45:11 48:12,16
50:3 51:3,11,25
52:4,5,7 58:3
79:8 82:11
83:22 89:22,24
95:3,15 99:12,
15 100:22,24
102:20 104:8
105:13 110:6,
11 111:4,16
112:16 113:7,
15 115:7 116:4,
12,19,25
123:19 131:23
132:3,11
133:15,19,20,
24 134:17
144:18 146:12,
13 159:13

question's
134:16

questioned
126:3

questions
10:16,23 56:8
90:2 104:12,13,
19,24 108:25
109:1 127:24
151:13 152:1
158:13,16,19,
23,25 159:1

quick 45:11
159:13

quickly 26:16
61:3 87:2

quiet 46:25
74:19

---

**R**

radio 65:14
67:18 119:18

radioed 21:2

radioing 65:18

raise 9:20
120:11

raising 121:17,
25

ran 39:16,21
72:8 96:11,18

reach 35:6

reached 30:14
114:8

reaction 62:18

reactions
157:11

read 93:11
113:3 122:25
126:3,7,11,14
127:22,25
128:1,2,3,4
129:4 131:21
132:10

reading 109:8
127:10,22

reads 99:19,23
127:17

real 81:25 82:2
87:5 141:17

reality 33:16

realize 28:4
109:4

realized 32:7
83:13

reason 22:25
59:7 63:21
81:14 101:19,
25 135:20
142:12

reasonable
42:21 86:2 89:4
115:10

reasons 88:7
101:11 154:4

recall 11:21
12:2 17:5
19:13,15,22
20:1 24:19,21
25:7 34:17 35:9
36:15 41:15,17
53:2,6 55:6,7
57:19 59:21
68:16,22 72:3,
13,15 77:16
83:10 90:23,24
91:3 94:7,23
96:15,16 98:9
108:10 118:5
119:2,25 121:6
122:12 124:13
125:10 131:19
138:23 139:16
143:16 144:22
146:10 151:2,7,
9 152:18,19
154:5,12,21

recalling 53:5

recalls 57:23

receive 15:7

received 13:24

recognize 16:9

recollection
20:7 67:22 69:8
75:19 98:11
129:8,10 138:2
139:13

record 8:3,15
12:13,14,15,16
33:1 45:23,24
46:1 48:14
76:24,25 77:2
110:5 117:23,
24 118:1 123:3
153:1,3,4,6
159:12,15

recorded
131:7

recording
131:11 134:9,
12,17 135:15
136:16,19
153:9,12,15

recordings
74:1,4

recount 31:16

recounting
31:14

refer 113:6

reference
149:15

referring 17:20
23:16 30:5 65:8
66:1,2 80:4
98:4 102:13
103:19 104:22
110:16 116:3,9,
11,14,20
132:24 142:9
153:15

reflect 67:13

refreshes
126:6

regard 15:10
132:4

relate 68:2

related 158:13

relating 57:16

relieved
122:22

remember
10:21 13:8
15:18 26:7
32:24 34:8,24
38:4 41:5,13,22
44:2 54:20,21,
22 63:1 68:23
77:23 83:14
94:9,10 98:13
118:24 119:3,4,
14,16,17,22
121:9 122:13,
24 123:1,13,14
127:7,8 131:13
132:7 143:20,
21 150:23
154:14 155:12,
13,14

remotely 9:14,
16,18

repeat 136:17
150:16

repeated
122:21 124:21
148:3

repeatedly
116:18

report 16:11,15
17:6 19:12,16,
20 20:3,6,9,13
21:5,15 30:3,6
31:18 38:12
44:8 50:13,15,
21,25 53:15,23
54:1,3,6,10
57:15,24 58:4
66:4,14,16,17
67:8 74:5 80:6
99:19 107:11,
14,25 108:3
112:18,20
113:3,12,14,24
114:1,18
122:15 124:3,
13,15 126:9,15,
20 127:17
128:4,14
129:14,18
130:9,13
134:15 138:6
148:17,21,25
150:24

reporter 8:5
9:21,22 10:1,15
52:6,7 56:11,
19,21 159:10,
16,17,22 160:1,
4,6,10,13,17,
21,23

reporter's 57:2

Reporters 8:8

reports 19:24
57:13 110:1
134:10,14

represent 8:19
9:2,4,6,9,12
110:3 150:25

representation
69:13

request

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

119:14,17
159:8

**requested**
52:7 114:5,20
135:15 136:16,
19 149:3

**reserve** 158:12
159:5,6

**residence**
86:7,8 87:21

**resisting**
147:6,12

**respect** 11:4,
14 22:18 107:3

**respectfully**
116:17

**respects**
140:21,25

**respond** 97:25

**responded**
131:25 141:25

**responders**
65:16 73:23

**responding**
65:16

**response**
10:18 39:3
51:22 76:19
90:1 98:1,2
99:12 102:3,22,
23 111:13,17
130:21 153:21
155:17

**responsible**
62:11

**result** 105:18
156:8

**returned** 68:13

**returning**
68:16

**review** 20:24

**Richard**
124:23 126:25
149:13

**ripped** 158:4

**risk** 79:16

**risking** 40:9

**road** 36:22,23
41:13,16 64:20,
21,23,25 72:12
73:2 74:18
75:18 88:16

**roadway** 42:12
46:11 72:7,16

**Robert** 8:10,19
12:20,23 20:13
21:16,19 23:23,
24 36:21 44:14,
19 66:3 80:6,18

**Robinson** 9:15

**Roger** 70:14

**role** 109:22

**Ron** 8:21 17:24
22:11 23:12
31:25 33:4,5,6
34:9,24 59:16
68:4 77:25
80:5,18 107:23
109:2 129:22

**room** 27:6,15,
16,17,18 28:23,
25 29:10,11,13,
23 30:20 31:10,
20 32:4 34:19
35:1,10 112:5
150:24 151:10

**rooms** 35:7

**roughly** 73:12
96:6

**rules** 10:7

**run** 23:7 43:23
54:21

**running** 20:14
21:16 28:25
29:3 36:1 37:1,
9 40:12 43:12
44:14,19 45:5
47:3 50:8 52:18
54:15,25 60:17
62:23 75:1,2,14
82:21 95:22
96:5

**runs** 114:16

**Russellville**
8:11,23 22:9

———————

**S**

———————

**sad** 35:1 50:2
69:21

**safe** 26:21 27:1
37:21 64:24

**safely** 40:9

**sally** 18:11,19
80:25 84:17
112:12 118:11,
16,20 119:1,12,
15,19,21 120:1
121:7,8 122:23
124:1,10
125:23 126:17
127:16 128:19
129:19 130:12
131:5,7,24
133:21 134:12,
20 135:11
136:4,6,13,25
138:12 139:1,5,
14,19,24
140:22 141:1,
12 142:5,15,19
143:1 144:19
145:10,16
148:2,14,16,25
149:14,16,17,
21,25 150:7
153:16

**Sankey** 8:4

**Sara** 43:25

**Saralynn** 23:8,
10,21 25:11,17
37:12,15,17,21
38:5,8 54:9
95:9

**sat** 69:16 85:14

**save** 26:25

**scared** 35:10
78:11,19 124:5

**scary** 78:4

**scene** 11:21
12:22 13:13,14

14:2 20:22
21:11,15,22
22:1,3,8 23:2,4
24:1,4,14 25:15
39:21 44:9 45:5
54:13 57:20
58:5,8,23,24
60:15 66:6,11,
22 68:9,14,17,
18 69:4,5,14
71:20,25 72:22
73:15,23 74:9
75:2 76:7 79:9,
20 81:1 85:19
86:6,10 87:8
91:25 95:8,10,
11,18 96:18
107:15 108:15
113:23 147:8,9,
17 149:11,16

**science**
105:18 106:21
107:2

**scientific**
106:7

**scientifically**
115:9

**scientist** 107:2

**Scott** 9:10,11

**scream** 76:2

**screaming**
62:23 75:2,13
80:23 90:17
147:10

**seat** 84:3,4,5
120:1

**seatbelt** 84:6

**secondary**
88:10

**seconds** 26:15
31:24 58:10,11
59:3 60:6 67:9
73:6 74:20
99:4,5 115:4

**section** 114:13
126:11 128:2,4,
22

**secure** 118:18

**secured** 84:4

**self-control**
62:10

**send** 159:23

**sentence**
127:1,3,11
129:4

**sentences**
52:13 112:14

**September**
11:20,23 12:20
14:10,19,24
15:5 23:2
24:15,16 57:17
69:22,24 71:4,
21 86:22 94:22
101:17 118:6
136:13 141:19
151:1 157:9

**sequential**
148:17

**sequentially**
128:5,8,9,14

**Sergeant**
22:11,12,19,22
23:1,4 25:19,22
32:11 33:19
40:24,25 41:1
46:3 54:12,14,
18 59:19,22
61:1

**series** 133:11

**set** 21:22
47:15,18 60:11,
19 61:11 63:20
88:22 89:8,21
93:1,5,8 97:10,
15,19,22 99:3,
24 100:12,18
105:9,21
110:23 111:2
114:4,19
115:17,21,25
123:6,10

**setting** 61:9
62:1 73:3 74:12
75:23 88:15
92:22 93:15
115:12 123:11



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

shake 25:2

she'd 38:20

she'll 15:25

Sheriff 9:11

shocked 141:8

shoot 28:1
120:12,13,23

shooting
120:17

short 34:14
45:19 51:9 61:6

should've
104:15

shove 80:18
121:15 122:2

shoved 79:23
80:10

show 15:11
17:12 21:5
55:16 121:21

showed 86:16
155:1,9,24

showing 68:3

shows 45:9

shut 12:13
92:13 118:13,
14

shuts 118:13

sic 74:17 75:5
88:24 139:21

side 26:7 29:24
30:1 36:24
42:12 46:11
55:13,15 60:18
74:18 75:18
80:19 88:16
138:20

signature
16:17 159:7,8

signed 17:24
83:15 85:8

similarly 31:2

simple 51:3

sir 11:19 15:3
16:10,18,20
19:12 20:16
22:7 29:14
36:14 47:8
49:14 56:3
57:8,13 65:10
68:1 78:12
79:23 97:1,11
100:7 114:11
115:8 118:19
131:19 132:10
133:5,22
135:25 137:4
138:10,14,18
144:1 145:18
154:11

sitting 19:12
30:22 36:15
49:23 53:6
57:19 62:8 69:7
96:15 98:11
103:17 133:11
134:8 135:19
153:8 157:14

situation 62:21
72:17 78:5
102:9 148:25

slant 26:7
29:17

slid 142:15

Slosar 8:16,18
10:3 12:14,18
14:7,16 15:14,
23 16:5 17:15,
18 24:10 25:4,8
31:1 37:25
45:11,19 46:2
48:20 49:20
52:8 55:22
56:1,10,13,16,
20,22 57:6,7,25
58:2 60:24,25
62:3,13 63:15
64:5 65:21
71:19 74:24
76:21 77:3,12
85:23 86:21
87:13 88:5,25
93:6,13 95:25
96:8 98:19
99:16 102:16
103:16 104:5

105:24 107:7
109:18 111:1,
20 113:17
115:20 116:8
117:18,21
118:2 132:22
133:3 137:24
140:10,17
141:4 146:8,18
148:11 150:19
153:1,7 156:12,
23 157:6,21
158:9,15 159:3,
5,9,12,19
160:14,16,19

small 109:10

smartest
76:12

smell 36:9
139:5,9,14

smelled 36:9,
11,13,16

smelling 36:16
139:16

Smith 9:14
158:25

smoke 29:24
31:20,23 32:23
35:16 36:11

sniff 13:5,25
153:20,25

sofa 27:22,25
29:25 30:1

solely 85:17
86:16

solemnly 9:22

sort 77:7 84:3
108:9 110:14
140:7

sound 152:23

sounded 25:23
150:17

sounds 136:21

south 30:3,9,
11

Sowell 9:6
56:5 57:4

space 57:3
80:17

speak 56:23

speaking
19:24 113:11
152:24

specific 77:19
84:9 125:7
160:16

specifically
112:14 127:7
132:16

specifics
106:23 107:19,
24

speculation
102:15

speed 67:4
87:25 101:14,
17

spent 157:7,10

spit 79:6,9
130:16 138:9
143:7,11

spitting 138:24
150:6

spoke 13:5,10,
11,12

spoken 13:13
80:6 154:13

spray 80:24
92:19 93:24
94:2,4 98:7,8,
16,24 99:2
100:19 103:2
114:5,25 139:5,
9,12,15 143:7,
14,23 144:4,8,
11,20,21

sprayed 92:19
119:10 122:9
139:17 144:15

squad 22:4
82:15 83:3,8,19
84:10,13 85:5
88:14 113:20
118:21 127:19
130:24 139:10

stamp 16:4,16

stand 33:3
121:20

standing 26:14
31:22,23 33:18
36:22 41:13
55:4 74:18
75:18

Staples 9:15

start 48:12
120:4 131:10

started 77:23,
25 78:24,25
86:17 91:8
92:13 103:21
109:7 120:6
127:9

state 9:13
79:12

stated 97:6
100:4,5 124:4,
18 125:15
130:6

statement
61:15 63:19
75:22 91:11,13
92:21 93:16
99:10,12
103:10 108:12
116:10,21
123:4 124:8,9
154:15

statements
94:14 110:24
111:24 115:23
125:14 145:7,
11 148:18

States 8:12

stating 142:1

stay 40:8 64:25

stayed 68:18,
22

stemming
89:5

sticks 12:6

stiff 122:3
143:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

stitches 70:16

stood 32:1
34:23,25 42:11,
25 46:11

stop 121:16

story 134:18,
19

straight 83:15

stream 35:13

street 26:10
41:24 43:17
44:2 46:4,8,22
47:9 60:18
64:18 70:14
71:17 75:18,20
82:19,20,22,23
83:2 114:8
115:3 155:1

strength 33:3

stress 49:9

strike 12:21
13:4 18:14
20:21 32:11
40:3 54:1 58:3
73:1 82:11 83:7
91:16 95:3
97:1,21 101:2
131:5 156:3
160:14

strong 157:11

stuff 15:16
24:20 44:25
75:14 109:2,7
112:21 113:13
142:11

subject 147:17

subpoena
132:5 134:1

subpoenaed
131:25 133:22
134:5

summary
158:13

supervisors
119:18

support 19:10

supposed
111:17 112:17

supposedly
103:5 116:21
124:8 148:19

suppression
108:11

surprise 37:20
42:2,5

surveying
26:16

suspect 12:10,
23 13:2 21:7
86:1 87:6 88:2
89:3,10 90:7
93:3 101:11,20
116:25 117:8

suspects
18:16

suspicion 86:2
88:1 89:4 90:4

suspicioning
88:23

swear 9:22
139:19

sweared
139:21

swearing
41:21

sworn 9:21

Sydnor 70:14

──────────

T

──────────

tacit 138:11

tackle 54:16,
17,23 120:18

taking 19:22,
24 20:1 33:20
34:16 114:6
151:19,23,25

talk 69:18
127:8

talked 106:20

talking 29:10
30:6 33:23

52:25 73:22
77:10 83:14
95:16 102:20
104:8,9 109:9
116:16 125:14
131:13 154:14
157:10

tank 119:21

tape 131:17,24
132:3 133:21
134:1

taught 81:7

teach 117:12,
15

technique
81:8,15

telling 83:14
137:12 144:22
147:23

temperament
118:23

ten 20:20 99:5

ten-minute
76:21

tend 10:23
134:10,13,18
137:14

terms 11:9
35:4 98:23
139:12

terrible 95:3
158:1

terroristic 97:4
129:25 147:21

testified 12:9
46:15 52:17
77:5,21 85:18
95:8 98:5 106:6
108:4,6 113:18
114:21 116:18
132:11 133:18,
23 138:15,19,
25 139:4,8,18,
23 140:2 141:7,
24 142:14,18
143:6,10,13,22
144:3,6,10,25
145:6

testify 21:4
59:12 108:9,14,
24 133:4
135:22 155:3

testifying
31:5,6 53:2
108:21,22,23
131:19

testimony
9:23 46:23
64:12,13
108:20 109:3,4
131:21 132:2
133:8 134:3
136:23 137:5

text 15:24 16:2
85:3

there'd 39:11

thing 35:8
38:24 41:15
62:15,22 65:12
71:14 76:12
94:23 99:22
102:12 105:10
109:11 115:24
116:2 127:21
131:12 145:13

things 46:19,
20 61:3,5 94:15
108:22 111:9
122:16 142:9

thinking 24:3,
13 34:3,6 51:25
85:11,16,17
86:16,17

third-degree
150:3

this'll 109:24

thought 29:5
30:1,17 32:8
43:25 70:3,5
86:12,18 105:7
109:12 135:4
152:1,14 155:2,
4,7

thrashing
91:1,4,9,12

threat 147:21

threaten
139:24

threatening
97:5 124:20
129:25

threats 124:20

three-page
66:17 107:11
124:15

threw 93:19

ticket 32:9

time 8:6,7
12:17 13:16
14:2 15:14,18
18:11,22 20:7
21:1,3,4,6,8,19,
24 25:5 32:15
33:13 36:25
37:9,22 38:3,5
40:5,7,12 41:7
43:20,24 44:1,
11,22,23 45:22,
25 46:9,10,14,
24,25 47:7,16
50:10 51:8
53:14,20 56:7
57:20 58:5,7,23
59:6,8,13 60:8
61:2,6 66:5,10,
20,22 67:13,23
69:13 71:20
73:14,21 74:9,
21 76:1,17,23
77:1,11 80:8
81:11,22 82:5,
13,14,22 83:1,
7,23 84:1,10
85:7,10,16
88:8,14 90:8,
13,16,18 91:25
92:8 95:2 99:7
103:9 104:12
106:1 109:4,17
111:16 112:11,
13,14,16 113:3
116:24 117:4,7,
22,25 118:23
122:8,9,21
123:13,15
125:20,22
126:1 127:13
128:6,11,24
129:21,22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 168    Filed 10/03/25    Page 60 of 61 PageID
#: 2792
The Deposition of JOHN EDWARD HIGHTOWER, taken on January 24, 2024
179

131:16 133:8
139:1 145:23
146:4,14,25
147:2,3 149:23
152:20,21
153:2,5 154:5
155:20 159:14

**times** 45:2,3
65:15 73:16,22,
24 96:2 120:7,8
121:13 122:1
123:6,9 147:5

**tired** 122:21

**today** 8:4,5,20,
24 10:15 11:8
19:13 30:22
31:5,15 36:15
46:16 49:5
51:21 52:18
53:2,8 57:19
62:9 69:7 83:23
85:18 96:15
98:11 101:2
103:18 115:5,6
133:12 134:8
135:19 141:18
153:8 157:14

**told** 25:20
47:14 51:20
61:11 63:3,4
77:23 88:21
97:19 99:20,23
102:10 112:7
123:16 131:9
132:8 142:7
145:6 147:24
155:2

**Tooms** 80:6,18

**top** 30:15 58:21
132:15

**totality** 72:19

**totally** 28:11,
13 39:9 57:25
111:12

**touch** 142:19,
21,23 143:1

**tough** 56:7

**tragedy** 157:12

**tragic** 156:25

**trailer** 11:20
16:12 20:14
21:17,20 25:20
26:5 27:9,14
31:7,14,25
32:2,12,14
33:5,8,19 34:4,
13,15,17,21,23
35:6 36:6,17,
19,20,24 37:1,
7,10,12,16,18,
22 38:3,4,6,14,
18 39:5,17,21
40:9,13,14,18,
21 41:3,19
42:3,6,10
43:13,23 44:15,
20 45:6 48:4
50:8 52:19
54:15,19,22,25
59:23 60:16
61:20 62:16,24
63:5,11,22
64:2,7,11,15,24
65:3 72:11,14
73:9 75:2,14
82:21 84:24
86:11,14,19
87:2,3,23,24
89:2 95:2,4,12,
23 96:6,11,13,
18 97:10,15,19,
22 99:2,24
100:11,18
101:14,21
104:10 106:20
114:4,19 115:8,
25 142:10
156:8

**trained** 31:2
81:8

**training** 14:25
15:5,8 80:8
86:23 87:1
88:10 101:16
116:24 117:4,7
155:20

**transcript**
55:20 56:2
109:25 159:18

**transcripts**
110:5

**transporting**

66:24 114:2

**trapped** 42:7,
23 63:11 95:4

**travesty** 156:5

**tree** 35:25 36:3

**Trey** 9:9 158:22
160:8

**trial** 64:13
108:6,24 110:5
115:10 136:23
154:7,10,20

**triggers** 51:22

**trip** 91:1 119:2

**trouble** 143:14

**true** 47:8 52:9,
10 79:23 84:18
89:1 93:22 94:5
97:1 102:5,10
111:10,14
116:19 123:10
127:1,2 137:5
142:1

**truth** 9:24
137:12 149:24

**truthful** 140:8,
15

**turbulent** 27:8

**turned** 27:19
42:11 80:3,13

**twisted** 80:1,
12

**two-page**
17:17

**type** 122:14

**typed** 17:3
19:12,15 20:7
113:3

**typical** 41:25

**typing** 150:24

_____

**U**

**UFC** 120:17

**Uh-huh** 23:17

41:1 43:11 47:7
56:21 58:21
64:22 65:6,25
66:19 68:1
70:10 71:24
130:2 145:20

**Uh-uh** 24:22
135:16

**ultimately**
54:12

**unable** 158:5

**underlying**
16:24 46:15

**understand**
10:25 52:3 62:9
95:16 101:2
107:13 129:2
134:8,17
153:17

**understanding**
19:2 56:7 155:8

**understood**
11:6 18:23 24:1
149:18 153:18

**unethical**
146:20

**uniform** 17:20,
22 18:1,4
112:24 129:23,
24

**unique** 111:8

**unit** 58:11
68:25

**United** 8:11

**unjust** 137:17,
20

**unofficial** 86:1
88:2 89:3,11

**unofficially**
93:3

**unreasonably**
92:16

**unrelated**
159:13

**upper** 32:3
132:14

**upset** 42:2,5
46:8,10,21 47:2
49:17 61:14,25
62:19,20 73:7,8
84:23 85:1,15
89:7,13 141:21

**usual** 122:14

_____

**V**

**vacated** 154:3

**validate** 44:23

**vantage** 27:9

**vehicle** 118:10

**verbal** 102:3
130:21

**verbally** 10:16

**verbatim**
112:7

**verify** 44:23
45:2

**versions**
140:21,25

**versus** 13:21
87:2

**vibration**
119:4

**video** 56:15
131:7,9 132:6,7
134:9,12,17
135:15 136:16,
19 153:9,12,15
160:18

**violation**
146:24 147:2

**violence** 86:14
89:6 102:8

**violent** 70:6,8,
9

**voice** 10:23

**voluntary**
65:14

**vouch** 149:24



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

**W**

**Wait** 28:9 56:10 113:15

**waive** 159:7

**walk** 123:13

**walked** 27:13, 16 47:14 123:13 135:7

**walking** 43:2

**wall** 29:1,3,22 32:4 123:14

**wanted** 53:15 89:16 91:7 97:5 113:2 123:1,4 131:13,14

**warning** 84:19 90:14

**watched** 43:1

**watching** 41:14 42:12 46:12 47:1

**water** 94:6 98:10,12,15,21 114:5,20

**ways** 49:10 106:9

**weight** 106:19, 23

**West** 9:13 65:24 107:21 150:14,21,23, 25 151:10,11, 22,23 154:14, 20,22

**Western** 8:12

**whatever's** 20:2

**whatsoever** 86:23

**wife** 97:7,8,23 99:20 100:6,10 102:11 105:9 114:9

**window** 25:21

---

34:18 81:12,23 82:15 84:6,8 91:8 120:5

**windows** 34:21

**witnessed** 33:12 40:19,20 125:9 126:2,4 141:20 148:5,8

**witnesses** 124:23 125:5 138:3,7,8,11 149:13,24

**word** 47:22 52:25 53:11 120:22

**words** 49:13 53:12 115:21

**work** 44:5,6 45:9 135:5 136:9

**worked** 12:4 70:2,11 71:16 121:2

**working** 22:19 70:10 110:1 154:25

**worse** 56:17

**would've** 17:7 19:7 20:6,20 21:3,8,10 24:16 25:9 26:21,24 37:14 40:13,14 44:8 46:14,18 59:4 61:25 68:13 69:3 71:2,7 72:10 84:13 87:6 89:23 99:21 102:12 104:23 105:1,2,4 107:20 114:10 115:24 119:9 122:9 124:9 125:6,16,23 126:16 128:10, 13,21 130:11 135:15 136:20

**Wright's** 45:15

---

**write** 20:12 50:17 52:12 100:23 109:6 112:6 114:1 127:9 128:7 129:24 130:5

**writing** 113:10

**written** 19:5 50:21 128:5

**wrong** 38:11 142:10 143:17

**wrongful** 156:3,16

**wrongfully** 137:20 156:9, 25 157:16 158:3

**wrote** 19:1 53:18 67:19 97:10 100:14, 15 112:11,13, 15 127:10 129:13 134:10

---

**X**

**X1** 60:2

**X5** 67:25

---

**Y**

**YEAGAR** 9:9

**Yeager** 9:9 158:22 160:8

**year** 23:25 70:19,21 157:8

**years** 126:18 133:11 157:9

**Yell** 8:10,19 12:10,21,23 13:1,16,18 14:2 16:4,17 17:16 18:12,24 20:14 21:16,19 23:23, 24 24:2,17 36:21 37:1,9, 14,20 38:8,13, 16 39:16,20,24

---

40:3,5,7,12,18, 20 41:2,7,17 42:5,11,20 43:12 44:14,19 45:5 46:4,7,21 47:10,14,17,22, 24 48:3,8 49:12 50:8 52:18,22 53:3 54:6,13, 15,19,21,25 55:5 60:6,9,16, 20,21 61:7,20, 25 62:23 63:3, 20 64:15 66:3, 6,22,24 67:15 69:23 70:1,12 71:4,8,11,21 72:22,25 73:1, 10,12,17 74:9 75:3,12,17,23 76:2,5,18 77:20 78:21 79:18 80:10,24 81:2, 9,10,17 82:5, 16,19,20 83:3, 6,8,13,19 84:10,14,18,22 85:2,6,16,20 86:16 87:6,8 88:15 89:2,10, 17 90:8,14,17 91:3,14,20 92:4,12,15,22 93:8,14,23 94:1,5,11,16, 20,21 95:21 96:11,17 97:14, 19,21 98:5,23 99:11,20,23 100:17 101:1,3, 7,11,20 102:2, 5,10 103:19 104:6,8,21 105:19 110:3 111:15 112:15 113:19 114:2,3, 4,6,8,19,24 115:2,11 116:14,20 118:4,6,21 119:13 121:9, 11 122:18,20, 25 123:10 124:4,8 126:21 127:7,18 128:19 129:25

---

130:6,9,11,15 131:1 134:11, 20 135:11 136:12 137:7, 15,20 138:4,9, 12,16,20 139:1, 5,9,19,21,24 140:3,24 141:8, 11,22,24 142:15,19,23 143:1,7,11,14 144:11,20,21 145:1,7,10 147:7,15,22 148:25 149:10, 20,25 150:10, 14,21 152:5 153:16 156:8 158:3

**Yell's** 63:11 108:6 110:15 129:20 130:22, 23 131:3 133:4 139:15 141:6 143:23 144:4 154:7 156:15

**yelled** 78:23

**yelling** 37:15 52:19 75:13 80:22 82:17 91:9,12 95:22 118:25 122:12 123:7 147:19

**you-all** 160:18, 23

**young** 23:11 50:5

---

**Z**

**zoned** 51:2,4,6, 13

**zoning** 51:24

**Zoom** 8:24 10:10 15:19 16:3 17:15 159:17

---



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com