

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA

**CASE NO. 1:20-CV-0047-GNS**

**ROBERT YELL**

**V.**

**CITY OF RUSSELLVILLE, ET AL.**

**DEPONENT:**

**KENNETH EDMONDS**

**DATE:**

**September 14, 2022**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1        IN THE UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF KENTUCKY

3                AT BOWLING GREEN

4          CASE NO. 1:20-CV-0047-GNS

5

6

7

8                  ROBERT YELL,

9                   Plaintiff

10

11                      V.

12

13        CITY OF RUSSELLVILLE, ET AL.,

14                  Defendants

15

16

17

18

19

20

21

22

23   DEPONENT:  KENNETH EDMONDS

24   DATE:      SEPTEMBER 14, 2022

25   REPORTER:  EMILIA LOPEZ



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

1                    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, ROBERT YELL:

4    Amy Staples, Esquire

5    Elliot Slosar, Esquire (Appeared via videoconference)

6    Loevy & Loevy

7    311 North Aberdeen

8    Third Floor

9    Chicago, Illinois 60607

10   Telephone No.: (312) 243-5900

11   E-mail: amy@loevy.com

12   elliot@loevy.com

13

14   ON BEHALF OF THE DEFENDANTS, CITY OF RUSSELLVILLE,

15   KENNETH EDMONDS, JOHN EDWARD HIGGINS, CHAD EGGLESTON,

16   JIM PENDERGRAFF, AND RONALD MILLS:

17   Jeffrey C. Mando, Esquire

18   Jennifer Langen, Esquire (Appeared via videoconference)

19   Adams Law

20   40 West Pike Street

21   Covington, Kentucky 41012

22   Telephone No.: (859) 394-6200

23   E-mail: jmando@aswdlaw.com

24   jlangen@adamsattorneys.com

25

Page 4

1            APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANTS, SCOTT COUNTY AND BUSTER

4    CANNON IN HIS INDIVIDUAL CAPACITY AS FORMER DEPUTY

5    SHERIFF:

6    Lynn S. Zellen, Esquire

7    Kinkead & Stilz PLLC

8    301 East Main Street

9    Suite 800

10   Lexington, Kentucky 40507

11   Telephone No.: (859) 296-2300

12   E-mail: lzellen@ksattorneys.com

13   (Appeared via videoconference)

14

15   ON BEHALF OF THE DEFENDANTS, CITY OF GEROGETOWN AND

16   BUSTER CANNON:

17   Maureen Malles, Esquire

18   Sturgill, Turner, Barker & Moloney, PLLC

19   333 West Vine Street

20   Suite 1500

21   Lexington, Kentucky 40507

22   Telephone No.: (859) 255-8581

23   E-mail: mmalles@sturgillturner.com

24   (Appeared via videoconference)

25

Page 3

1            APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANTS, DAVID WEST, WILLIAM T.

4    SMITH AND JAMAN CHILDERS:

5    Alea A. Arnett, Esquire

6    Kentucky State Police Legal Office

7    919 Versailles Road

8    Frankfort, Kentucky 40601

9    Telephone No.: (502) 782-1718

10   E-mail: alea.arnett@ky.gov

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, BILL JENKINS AND LOGAN

14   COUNTY:

15   Aaron Smith, Esquire

16   English, Lucas, Priest & Owsley LLP

17   1101 College Street

18   Bowling Green, Kentucky 42102

19   Telephone No.: (270) 781-6500

20   E-mail: asmith@elpolaw.com

21   (Appeared via videoconference)

22

23

24

25

Page 5

1            APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, ALAN GREGORY:

4    Chris Gadansky, Esquire

5    McBrayer Firm

6    500 West Jefferson Street

7    Suite 2400

8    Louisville, Kentucky 40202

9    Telephone No.: 502-327-5400

10   E-mail: cgadansky@mcbrayerfirm.com

11   (Appeared via videoconference)

12

13

14   Also Present: Amy Kelley, Videographer

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

INDEX

|  |  | Page |
| --- | --- | --- |
| 3 | PROCEEDINGS | 9 |
| 4 | DIRECT EXAMINATION BY MS. STAPLES | 11 |
| 5 | CROSS EXAMINATION BY MS. MALLES | 308 |
| 6 | EXAMINATION BY MS. ZELLEN | 314 |
| 7 | EXAMINATION BY MS. ARNETT | 315 |
| 8 | EXAMINATION BY MR. SMITH | 319 |
| 9 | REDIRECT EXAMINATION BY MS. STAPLES | 320 |

EXHIBITS

| Exhibit |  | Page |
| --- | --- | --- |
| 1 - Personnel Documents | | 62 |
| 2 - Supplemental Report | | 17 |
| 3 - CAD - RPD000001-RPD000006 | | 117 |
| 4 - Fire Investigation Report | | 122 |
| 5 - Kenneth Edmond's Trial Testimony | | 145 |
| 6 - Defendant Edmond's Objection and Answers to Plaintiff's First Set of Interrogatories and Request's for Production of Documents | | 155 |
| 7 - Defendant's Supplemental Objections and Answers to Plaintiff's Interrogatory Nos. 4, 10, and 13 | | 155 |
| 8 - Collection of Statements | | 168 |
| 9 - Edmond's Handwritten Notes | | 19 |

Page 7

EXHIBITS (CONTINUED)

| Exhibit |  | Page |
| --- | --- | --- |
| 10 - Video of Tina Maskin | | 210 |
| 11 - Miranda Warning | | 256 |
| 12 - Citation and Criminal Complaint | | 291 |
| 13 - Lab Report 9-15-2004 | | 285 |
| 14 - Lab Report 9-27-2004 | | 285 |
| 15 - Indictment | | 296 |
| 16 - Grand Jury Proceedings | | 299 |

Page 8

STIPULATION

The VIDEO deposition of KENNETH EDMONDS was taken at BADGETT BUSINESS CENTER, 2501 CROSSINGS BOULEVARD, BOWLING GREEN, KENTUCKY 42104, via videoconference in which some participants attended remotely, on TUESDAY the 14th day of SEPTEMBER 2022 at approximately 9:03 a.m.; said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that EMILIA LOPEZ, being a Notary Public and Court Reporter, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Page 9

PROCEEDINGS

VIDEOGRAPHER:  On record.  My name is Amy Kelly.  I'm the videographer, and Amelia Lopez is court recorder today representing Kentuckiana Court Reporters.  Today is September 14, 2022.  The time is 9:03 a.m. Central Time.  We're at the Badgett Business Center, 2501 Crossing Boulevard, Bowling Green, Kentucky 42104 to take the deposition of Kenneth Edmonds in the matter of Robert Yell versus City of Russellville, et al. Pending in the United States District Court of Kentucky at Bowling Green.  Will all counsel please state your appearance for the record, starting with the plaintiff's counsel?

MS. STAPLES:  Amy Robinson Staples for the plaintiff, Robert Yell.

MR. MANDO:  Jeff Mando for the Russellville defendants, and I'm here today in Bowling Green with my client, Ken Edmonds.

MS. LANGEN:  Jennifer Langen, also for the Russellville defendants.  I'm here via Zoom from Cincinnati, Ohio.

MR. SMITH:  Aaron Smith for Logan County and Bill Jenkins.

MS. ZELLEN:  Lynn Zellen on behalf of Buster Cannon in his capacity as a former Scott County



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  Sheriff's Deputy in Scott County.
2       MR. GADANSKY:  Chris Gadansky for Alan Gregory,
3  appearing remotely.
4       MS. MALLES:  Maureen Malles in for Buster
5  Cannon and the city of Georgetown.
6       VIDEOGRAPHER:  Mr. Edmonds, will you please
7  state your full name for the record?
8       MS. ARNETT:  And also one more.  Amber Arnett
9  appearing on behalf of the KSP defendants, Childers,
10  West, and Smith.  I'm appearing remotely in
11  Frankfort, Kentucky.
12       VIDEOGRAPHER:  Thank you.  Mr. Edmonds, please
13  state your full -- full name for the record.
14       THE WITNESS:  Kenneth Lee Edmonds.
15       VIDEOGRAPHER:  And please raise your right hand
16  to be sworn by the court reporter.
17       THE WITNESS:  Yes, ma'am.
18       COURT REPORTER:  Do you solemnly swear or
19  affirm that the testimony you're about to give will
20  be the truth, the whole truth, and nothing but the
21  truth?
22       THE WITNESS:  Yes, ma'am.
23       COURT REPORTER:  Okay.  Counsel, you may
24  proceed.
25            DIRECT EXAMINATION

Page 11

1  BY MS. STAPLES:
2       Q    Good morning, sir.
3       A    Good morning.
4       Q    How are you today?
5       A    I'm fine.
6       Q    All right.  Sir, have you ever been to post
7  before?
8       A    Have I --
9       Q    Have you ever given a deposition before?
10       A    I gave one -- it wasn't quite like this, but I
11  gave one a long time ago.
12       Q    And what was it like?
13       A    It was just -- it was just a city lawyer and
14  another person there with us.  They -- it had to do with
15  a car accident.
16       Q    Were you involved in the car accident?
17       A    I wasn't involved.  I was -- there was another
18  lady involved, and we were trying to -- trying to get an
19  individual and stuff, and we were observing, and the
20  individual ran the stop light and hit the car.
21       Q    Okay, so you were involved in the deposition
22  as a part of a law enforcement officer --
23       A    Yes.  Yes, ma'am.
24       Q    -- is that correct?
25       A    Yes, ma'am.

Page 12

1       Q    It wasn't -- was it a suit that you were named
2  in?
3       A    Yes.  Yes.  Yes, ma'am.
4       Q    Okay. And were you a defendant in that case?
5       A    Yes.
6       Q    Do --
7       A    It was myself and another officer.  I was with
8  him as a drug officer.
9       Q    Okay.  And can you recall the name of that
10  case?
11       A    No.  It was -- it was actually my
12  sister-in-law that the car hit, and she's the one that -
13  - that sued us.
14       Q    Your sister-in-law sued you?
15       A    Ex -- ex-sister-in-law.  Yes.
16       Q    How long was she your sister-in-law after that
17  suit?
18       A    Oh, she was -- she -- she was already divorced
19  from my brother-in-law.  Yes, ma'am.
20       Q    Okay.  And what was her name, sir?
21       A    Bonnie.  It was -- I don't know her maiden
22  name.  Her -- her name was Bonnie Benton.  That's what
23  it is now.  I don't know what her maiden name is.
24       Q    Okay.
25       A    And they settled out of court or something.

Page 13

1       Q    Okay.  How long ago was that?
2       A    Oh, my God.  I -- I don't remember.
3       Q    Several years ago?
4       A    Yes, ma'am.  It was a long time ago.
5       Q    All right.  Well, let me go through some of
6  the rules for today.
7       A    Yes, ma'am.
8       Q    You're doing a great job already of answering
9  my questions verbally --
10       A    Yes, ma'am.
11       Q    -- but I'd ask for you to continue to do
12  that.
13       A    Oh, that's fine.
14       Q    -- so that we can make sure the record's
15  clear.
16       A    Yes, ma'am.  Yes, ma'am.
17       Q    It is very, very likely that I'm going to ask
18  a question that's confusing.  When I do, I would like
19  for you to ask me to rephrase that question.
20       A    Yes, ma'am.
21       Q    Or let me know that you don't understand.
22       A    I will.  Yes, ma'am.
23       Q    Everyone here wants to make sure that you
24  understand the question that you're answering.
25       A    Yes, ma'am.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 6 of 115 PageID #: 2799
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

14..17

Page 14

1    Q    Okay?
2    A    Yes, ma'am.
3    Q    Mr. Mando is -- does have a deadline as far as
4  when this deposition needs to end today, with that
5  said, you're entitled to breaks, and I will definitely
6  be needing some breaks during the day as well.  So
7  anytime you need a break, please just let us know and we
8  will give you that break.  I just ask that you ask any
9  pending questions that's been asked of you, okay?
10   A    Yes, ma'am.  I will.
11   Q    While we're here, it's quite likely that Mr.
12 Mando's going to object to some of the questions that I
13 ask.  Yeah.  And so what I would ask for you to do is to
14 allow him to state that objection, and then 99 percent
15 of the time you're going to be permitted to go ahead and
16 answer that question because we don't have any judge
17 here --
18   A    Yes, ma'am.
19   Q    - to rule upon whether or not it's a proper
20 question.
21   A    Yes, ma'am.
22   Q    All right.  Do you have any questions for me
23 before we get started?
24   A    No, ma'am.  I don't.
25   Q    All right.  So we just talked about the one

Page 15

1  case that you were named as a defendant in with your
2  ex-sister-in-law.  There been any other cases that
3  you've been named as a defendant?
4    A    No, ma'am.
5    Q    You've never been sued before?
6    A    No, ma'am.  I have not.
7    Q    Without getting too personal, do you have any
8  health conditions that would affect your ability to
9  testify here today confidently?
10   A    No, ma'am.
11   Q    Are you taking any medications that may affect
12 your memory?
13   A    No, ma'am.
14   Q    Okay.  It doesn't appear to me that you
15 brought any documents with you today.
16   A    No, ma'am.
17   Q    But I want to make sure, did you bring
18 anything?
19   A    I didn't bring anything.  No, ma'am.
20   Q    All right.  And without getting into any
21 substance of any conversations that you may have had
22 with Mr. Mando or any of the others -- any other of your
23 attorneys, can you tell me what you did to prepare for
24 today's deposition?
25   A    Well, I have -- I went over everything, my

Page 16

1  regular case report that -- my regular case thing that I
2  have and stuff.
3    Q    Are you talking about your investigative case
4  supplement?
5    A    Yes, the original.  Yes, ma'am.
6    Q    Were there any other documents that you
7  reviewed, sir?
8    A    No.  That's what -- just what was in -- in
9  that.  Yes, ma'am.
10   Q    I think it's a three or four-page
11 investigative report.  Is that what you're speaking of?
12   A    Yes, uh-huh.
13   Q    Did you review any of your prior testimony in
14 this case?
15   A    I -- not from videos or anything, just my --
16 my original case report outside of what we had from
17 here.
18   Q    Okay.  And I -- I don't think I'm following
19 you.  Can you explain to me what your original case
20 report is?
21   A    The original case report is the original one
22 that everybody has that -- when it first -- when the
23 incident first happened.  So that's just the original.
24 Everything that was in it, I have the same thing.
25   Q    Okay.  Let's look and see if we're talking

Page 17

1  about the same thing.  Can you look at what I've marked
2  as Exhibit 2 that's there in the stack?  There we go.
3        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
4    A    Yes.  This --
5    Q    Is that what you're speaking of?
6    A    Yes, ma'am.  Yes, ma'am.  That's what I'm
7  speaking about.
8    Q    So you're talking about the report that is BAT
9  stamp RPD53 through 56; is that correct?
10   A    Yes.  Yes, ma'am.
11   Q    Okay.  Did you review any other documents
12 besides that document?
13   A    Outside this one?
14   Q    Yes, sir.
15   A    Yes.  Like the CADs and stuff.
16   Q    You reviewed the CADs.
17   A    Uh-huh.  Uh-huh.  Okay.  What other documents
18 did you review?
19   A    Can I go through?
20   Q    Oh, sure.
21   A    Is that okay?  I have this in my original case
22 report and the State Farm marshal stuff.  Let me see --
23   Q    And you're referring to the fire marshals
24 report?
25   A    No, I -- I don't -- I don't remember looking

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 7 of 115 PageID #2800
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

18..21

Page 18

1  at this one right here.  Let me look at it a little
2  further.
3      Q   Okay.
4      A   I don't remember seeing this one.
5      Q   Okay.
6      A   Uh-huh.  This one right here.
7      Q   Okay.  And that would be the -- your trial
8  testimony in this case?
9      A   Yes, ma'am.  Uh-huh.
10     Q   So you reviewed your trial testimony.
11     A   Yes, ma'am.  I think I saw this one in there.
12         MR. MANDO:  He's referring to his discovery
13     responses that he's looking at, right?
14         THE WITNESS:  Yeah.  I think I saw that one.
15 BY MS. STAPLES:
16     Q   Yeah.  So you're speaking of the original
17 responses to the interrogatories; is that right?
18     A   I think I remember seeing it.  Yes, ma'am.
19     Q   Okay.
20     A   Yeah.  I remember this one right -- this one
21 right here also.
22     Q   All right.  And that would be the supplemental
23 objections and answers to plaintiff's interrogatory.
24     A   Yeah, I think we had to send it back in.
25 Definitely this one right here, September 12th.

Page 19

1      Q   And you're referring to typewritten
2  statements?
3      A   Yes, ma'am.
4      Q   Did you review all of those statements, or
5  just the top one that you're holding?
6      A   No.  Oh, is it -- let's see.  This one here.
7  Yes.  I reviewed all those.  Yes, ma'am.
8      Q   Anything else?
9      A   These are the -- I think my notes and stuff.  I
10 don't -- I hadn't looked at those.  I know I -- I have
11 them, but I didn't look at these.
12     Q   Okay.  You did not review the handwritten
13 notes.
14     A   No.
15     Q   That's -- I've already marked as Plaintiff's
16 Exhibit 9.
17         (EXHIBIT 9 MARKED FOR IDENTIFICATION)
18     Q   Okay.  You read -- I looked at that.
19     Q   That would be the Miranda warning.
20     A   Yes, ma'am.  And the citations here.  And --
21 and -- and the arrest warrants and stuff.
22     Q   You did review the citations and arrest
23 warrants?
24     A   Uh-huh.
25     Q   Okay.

Page 20

1      A   Yes, ma'am.  Not this one, the evidence form.
2      Q   You did not review --
3      A   I don't have --
4      Q   -- the lab reports.
5      A   I didn't see that one, uh-uh.
6      Q   Okay.
7      A   I didn't see that one, the -- where we had the
8  grand jury thing, this one right there.
9      Q   You didn't review the indictment.
10     A   Uh-uh, I didn't see it.  And this right here,
11 the grand jury.
12     Q   Did you review the grand jury testimony?
13     A   Yes, ma'am.  I'll look --
14     Q   Okay.
15     A   And I had looked at that, so --
16     Q   I'm sorry.  You have or have not?
17     A   I haven't.  I don't know --
18     Q   Okay.
19     A   I don't know what's in that.  No, ma'am.
20     Q   Were there any other documents that you
21 reviewed that I haven't supplied for you here today?
22     A   No, ma'am.  Not as I recall.  No, ma'am.
23     Q   And the documents that you just stated that
24 you did review, were those documents that you had in
25 your possession, or were those documents that were

Page 21

1  provided to you?
2      A   Some was provided, and some already have from
3  the original case report, from the original case.
4      Q   From the original case file?
5      A   Yes, ma'am.  Case file, yes, ma'am.
6      Q   Do you have the original case file in your
7  possession?  Not necessarily here with you today, but is
8  that something that you still have access to?
9      A   Yes, ma'am.  Uh-huh.
10     Q   Are you still employed with the Russellville
11 police department?
12     A   Yes, ma'am.  Uh-huh.
13     Q   Okay.  So would it be a fair statement to say
14 that, in preparation for today's deposition, you
15 reviewed the case file that's within the Russellville
16 police department?
17     A   Yes, ma'am.  I like that.  Yes, ma'am.
18     Q   Now, sir, were you served a copy of the civil
19 complaint in this case?
20     A   I don't think I was.  I don't think it was
21 that.
22     Q   Do you recall ever seeing a copy of the civil
23 complaint in this case?
24     A   Uh-uh.  That was the allegations toward me?
25     Q   Yes, sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 8 of 115 PageID
#: 2801
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

22..25

Page 22

1    A    I don't remember.

2    Q    Well, and to help you out, I think that the
3    complaint was filed in March of 2020, so it's been about
4    two and a half years ago.

5    A    I don't remember.  I don't recall.

6    Q    Are you aware of what the allegations are
7    against you, sir?

8    A    No, because I think I asked Mr. Jeff about
9    those, what it was, what I was being accused of.

10        MR. MANDO:  And I'm going to object.  Ken, any
11    conversations we've had are privileged, so you can
12    answer Ms. Staples' questions, but --

13        THE WITNESS:  Okay.

14        MR. MANDO:  And she's not going to ask you
15    about anything we talked about --

16        THE WITNESS:  Okay.

17        MR. MANDO:  -- between ourselves.

18        THE WITNESS:  Yes.

19    BY MS. STAPLES:

20    Q    So outside any conversation that you may have
21    had with your attorneys, did you have any opportunity to
22    become aware of what the specific allegations are in
23    that --

24    A    No.  No.  No, ma'am.  No, ma'am.

25    Q    When did you first become aware of the fact

Page 23

1    that a civil suit had been filed against you?

2    A    Whenever this first came about.  I don't know.
3    It was 2012, '13 maybe.  I don't know.  I don't know.

4    Q    2012 or '13?

5    A    Whenever it first came about.  I -- and I
6    don't -- I don't recall when it first came about.

7    Q    And would you be referring to the post-
8    conviction litigation that occurred within the criminal
9    case?

10   A    In Logan County?

11   Q    Yes, sir.

12   A    Yeah.  That's when -- that's when somebody
13   first told me about that.  Yes.

14   Q    Okay.

15   A    Yes, ma'am.

16   Q    And my question is more specific to the civil
17   suit that's against you that was filed in federal court.
18   Do you recall when you first became aware that a lawsuit
19   had been filed against you?

20   A    I don't remember when -- when it was.  No,
21   ma'am.

22   Q    Okay.  Sir, are you aware that there were
23   several defendants that were named in this civil suit?

24   A    I was aware of that.  Yes, ma'am.

25   Q    And I'm going to ask you about some of them

Page 24

1    specifically.

2    A    Yes, ma'am.

3    Q    And what I'd like to know is whether you had
4    any conversation with any of these individuals --

5    A    Okay.

6    Q    -- about the civil suit.

7    A    Yes, ma'am.

8    Q    Or about this deposition.

9    A    Okay.  Yes, ma'am.

10   Q    Do you -- are you familiar with Ronald Mills?

11   A    Yes, I am.

12        MR. MANDO:  Let me interject.  I think that's a
13   fair line of questioning except, Ken, don't disclose
14   any conversations that we have had together with the
15   other defendants that I represent.

16        THE WITNESS:  Yes.

17        MR. MANDO:  That's privileged.

18        THE WITNESS:  Okay.

19        MR. MANDO:  Any conversations outside of my
20   presence --

21        THE WITNESS:  Yes.

22        MR. MANDO:  -- you may have had with these
23   individuals that Ms. Staples is going to ask you
24   about -

25        -

Page 25

1        THE WITNESS:  Yes, sir.

2        MR. MANDO:  -- you can answer.

3        THE WITNESS:  Okay.

4        MR. MANDO:  Does that distinction make sense?

5        THE WITNESS:  Yes.  Yes.  It did make sense.

6        MR. MANDO:  Okay.

7        THE WITNESS:  Yes.

8    BY MS. STAPLES:

9    Q    Okay.  So you are familiar with Mr. Mills?

10   A    I know Mr. Mills, yes.

11   Q    Okay.

12   A    Yes, ma'am.

13   Q    Is it a fair statement to say that you've been
14   a colleague of Mr. Mills?

15   A    That is true.

16   Q    Is it a fair statement to say that you've been
17   a colleague of Mr. Mills for several years?

18   A    Yes, however long he was there.  I can't
19   remember how long he stayed.

20   Q    Okay.  Have you had any conversations with
21   Mr. Mills about this lawsuit?

22   A    No, ma'am.

23   Q    Have you had any conversations with Mr. Mills
24   about the deposition that he gave in this case?

25   A    I haven't talked to Mr. Mills at all.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1    Q    Okay.  Are you familiar with John Edward
2  Higgins?
3    A    Yes, I am.
4    Q    Is it a fair statement to say that you are a
5  colleague of Mr. Higgins?
6    A    I was a -- yes.  He's moved on to another
7  place, yes.
8    Q    Have you had any conversations with
9  Mr. Higgins about this lawsuit?
10    A    The only conversation I had -- not -- not as
11  far as a lawsuit -- only conversation I had with him is
12  when this first came about, he called me and asked me
13  and said, "Had you heard about what's going on?"  And
14  that -- whenever that was, a long time ago.  And I told
15  him yes, and pretty much that's all we had as far as
16  that goes.  He did tell me -- and -- and that's pretty
17  much all that he said at that point in time.
18    Q    Again, when you were talking about when this
19  first came about, are you talking about in 2020 in
20  regard to this civil lawsuit?  Are you talking about
21  earlier in time?
22    A    No.  I'm talking about the -- early in time --
23  yes, when the judge -- whatever happened with the judge
24  in this case.
25    Q    When the judge vacated Mr. Yell's conviction?

Page 27

1    A    Yes, ma'am.  Yes, ma'am.
2    Q    Okay.  So you had a conversation with
3  Mr. Higgins at that point?
4    A    He called me and asked me what was -- did I
5  know what was going on, had I heard what was going on.  I
6  told him yes.  And he said -- I don't know what else he
7  said because it's been so long ago, but I told him, you
8  know, it's just part of the process.  And that's pretty
9  much what it is, because he knows I don't conversate
10  very much on stuff like that.
11    Q    How would you describe Mr. Higgins' -- I don't
12  know if demeanor is the correct word, because this was
13  over the phone.
14    A    His demeanor?  He was very concerned, a little
15  upset.
16    Q    Did he express what his concern was?
17    A    Yeah.  His concern was why is this happening?
18  Why is he getting out?  Or why did the judge do that?
19    Q    So your conversation with Mr. Higgins was
20  after Judge Gill had vacated Mr. Yell's conviction?
21    A    It was after the fact.  Yes, after we all
22  learned about it.  Yes, ma'am.
23    Q    Okay.  Did Mr. Higgins speak with you about a
24  letter that he had sent to Judge?
25    A    Yes, ma'am.  He did tell me about the letter.

Page 28

1  He said I'm -- he told me he was going to write the
2  letter to the judge, yes.  Or he had wrote a letter to
3  the judge.
4    Q    Did he tell you what the substance of that
5  letter was?
6    A    He didn't.  No, ma'am, he didn't tell me what
7  it was about.
8    Q    Have you ever written a letter to a judge in a
9  criminal case?
10    A    No, ma'am.
11    Q    Have you ever received any training on whether
12  or not it's appropriate to contact a judge in a criminal
13  case?
14    A    No.
15    Q    Did the Russellville police department have
16  any type of policies regarding whether or not it's
17  proper to contact a -- a judge who's presiding of a
18  criminal case about that case?
19    A    I -- I don't know.  No, ma'am.
20    Q    Would you have felt comfortable writing a
21  letter to a judge in that situation?
22    A    No, I wouldn't.
23    Q    And why is that?
24    A    I just wouldn't have done -- like I said, it's
25  just part of the process that we have to go through in -

Page 29

1  - in law enforcement.
2    Q    And when you're saying it's part of the
3  process, what are you referring to?
4    A    And when you take on this job, you know,
5  things could happen.  You know, when we do cases we --
6  you know, there's a chance that something may come back
7  on an appeal or something like that.  You know, you just
8  can't let that bother you.  That's just -- just part of
9  our daily jobs and things that we have to go through.
10    Q    And while we're on this topic, were -- did you
11  ever testify at any of the post-conviction hearings in
12  Mr. Yell's criminal case?
13    A    No, ma'am, I did not.
14    Q    Were you ever called to testify?
15    A    No, ma'am.
16    Q    Did you attend any of the post-conviction
17  hearings in Mr. Yell's criminal case?
18    A    No, ma'am.
19    Q    When did you learn that Judge Gill had vacated
20  Mr. Yell's conviction?
21    A    I -- I don't -- I don't remember who called
22  me.  I don't -- I can't recall who called me and told me
23  about it.
24    Q    Uh-huh.  And what was your reaction to
25  receiving the news that Mr. Yell's conviction had been



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  vacated?
2      A    Well, it is what it is.  I can't do anything
3  about it.
4      Q    Okay.  So other than this conversation that
5  you had with Mr. Higgins where he expressed his concern
6  over the judge vacating Mr. Yell's --
7      A    Yes, ma'am.
8      Q    -- sentence, did you have any further
9  conversations with Mr. Higgins about Mr. Yell's civil
10  suit?
11     A    No, ma'am.  Not as I recall.  No, ma'am.
12     Q    Have you had any conversations with
13  Mr. Higgins about the depositions in this case?
14     A    No.
15     Q    Are you familiar with Chad Eggleston?
16     A    Yes, I am.
17     Q    And how do you know Mr. Eggleston?
18     A    Actually he -- I heard -- I heard all these
19  guys right here that I was -- I hired these guys when I
20  was -- when I was doing those type things.  Mr.
21  Eggleston is -- I've worked with him.  I re-- -- I done
22  the background for him, and he was rehired again, and
23  he's actually my s sergeant now.
24     Q    Oh, he is?
25     A    Yes, uh-huh.

Page 31

1      Q    So you hired him, but he's your sergeant?
2      A    Well, I retired.
3      Q    Okay.
4      A    Yes, ma'am.
5      Q    Now, have you had any conversations with
6  Mr. Eggleston about the civil suit?
7      A    No, we -- we never have talked about it.  No.
8      Q    Okay.  So does that mean you've had no
9  conversations with him about the deposition that he gave
10  in this case?
11     A    No, we didn't talk about that either.  No,
12  ma'am.
13     Q    Okay.  And have you had any conversation with
14  him about your deposition today?
15     A    Oh, no, ma'am.
16     Q    Okay, good.  So are you familiar with Jim
17  Pendergraff?
18     A    Yes, I'm familiar.  Mr. Pendergraff.
19     Q    And how are you familiar with Mr. Pendergraff?
20     A    He used to be my chief.
21     Q    Okay.  Did you have any -- strike that.  Have
22  you had any conversations with Chief Pendergraff about
23  the civil suit that Mr. Yell filed?
24     A    No.  Only thing he called me and asked me what
25  was going on when this came about.

Page 32

1      Q    And I -- and I'm sorry to keep repeating this
2  question
3      A    Oh, that's okay.  No, ma'am.  You're good.
4      Q    But when you say when this came about, are you
5  referring to specifically to the civil suit?
6      A    Yeah, I'm referring always -- yeah.  I'm
7  always referring back to the -- to the -- to the -- no.
8  Actually, he did call me.  He actually was the one to
9  call me and -- and said something about -- asked me
10  about what was going on with the lawsuit, what was this
11  about.  After he found out about it, yes, that's what --
12  how it happened with him.
13     Q    Did Mr. Pendergraff indicate that he had
14  received a copy of the complaint?
15     A    He did tell me.
16     Q    Okay.  And did Mr. Pendergraff discuss with
17  you the allegations that were contained within that
18  complaint?
19     A    He didn't -- he didn't say anything.  He
20  didn't really say much about it.
21     Q    Okay.  And so when he called you to ask you
22  what this was about --
23     A    Uh-huh.
24     Q    -- what was he -- what was he asking about if
25  he had received a copy of the complaint?

Page 33

1      A    He just said -- he said I don't know nothing
2  about it.  That's all he said.
3      Q    Okay.  Sir, are you familiar with David West?
4      A    Yes, ma'am.  Yes, ma'am.
5      Q    Is it an accurate statement to say that you
6  worked closely with David West on this --
7      A    Yes, ma'am.
8      Q    -- criminal case?
9      A    Yes, ma'am.  Yes, ma'am.
10     Q    Okay.  Have you had any conversations with
11  Mr. West about this civil suit?
12     A    No.  The only time -- I did talk to Mr. West
13  once, and I asked -- I called him, asked him -- I asked
14  him why was he the only one when the Logan County thing
15  come about with Mrs. Gail?  I guess the Mrs. Gail was
16  (Inaudible).  I asked him why wasn't the rest of us
17  involved in that.  That's the -- pretty much the only
18  thing that we've said to each other.
19     Q    And again, you're referring back to the
20  post-conviction litigation.
21     A    Yes.
22     Q    And Ms. Gail is Gail Guiling, who was the
23  Commonwealth's attorney at the time?
24     A    Yes, because Mr. -- Mr. Orange was the one we
25  done the criminal part on, and then Ms. Gail got it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 11 of 115 PageID #: 2804
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

34..37

Page 34

1    later.  I believe that's right.
2        Q    Yeah.  So Charles Orange was the prosecutor --
3        A    Yes, ma'am.
4        Q    -- who originally tried Mr. Yell?
5        A    Yes, ma'am.  Yes, ma'am.
6        Q    And then by the time that the case came back
7    for post-conviction proceedings, it was Ms. Guiling who
8    was the prosecutor.
9        A    Yes.
10       Q    Is that correct?
11       A    Yes.  Yes, ma'am.
12       Q    Okay.  And so you had a discussion with Mr.
13   West about why it is that only he was involved in the
14   post-conviction litigation?
15       A    Uh-huh.  Yes, ma'am.
16       Q    And what did you mean by that?
17       A    I was just -- I figured since we were all
18   involved in it, I figured we were all would be there
19   together, but I hadn't -- I guess they were concerned
20   about just the arson part at that moment, I guess.
21       Q    Okay.  Did you only have one conversation with
22   Mr. West about this case since --
23       A    Yes.
24       Q    -- Robert was originally convicted?
25       A    Yes.  I haven't talked to Mr. West since then.

Page 35

1        Q    And when you asked Mr. West why he was the
2    only one involved, did he give you a response to that?
3        A    No, I don't think he really knew at that
4    moment.
5        Q    Do you know -- Amber's going to correct me
6    when I say his name wrong, but I think it's Jaman
7    Childers.
8        A    I don't know him personally or anything, I
9    just -- first time I've saw him was during this stuff.
10       Q    What do you mean, during this stuff?
11       A    During this fire thing.
12       Q    So you met Mr. Childers during the underlying
13   criminal investigation?
14       A    The investigation, yes, ma'am.  Uh-huh.
15       Q    Okay.  Have you had any conversations with Mr.
16   Childers about the civil suit?
17       A    No, ma'am.
18       Q    Have you had any conversations with Mr.
19   Childers about the post-conviction litigation in this
20   case?
21       A    No, ma'am.  No, ma'am.
22       Q    Do you know William Smith?
23       A    Is it Tommy, KSP?
24       Q    He was KSP, but I don't -- I don't know if --
25       A    I know him as Tommy.

Page 36

1        Q    -- if William and --
2        So basically if his first name is William, he
3    used to work for KSP, I knew him as Tommy Smith.  Yes,
4    ma'am.
5        Q    Well, have you -- let me ask you this.  Have
6    you had any conversation with Thomas Smith about
7    Mr. Yell's criminal convictions?
8        A    No.  No.
9        Q    Have you had any conversations with him about
10   Mr. Yell's post-conviction litigation?
11       A    No, ma'am.  No, ma'am.
12       Q    Have you had any conversations with Thomas
13   Smith about the civil complaint in this case?
14       A    No.  No, ma'am.
15       Q    Okay.  On that note, have you had any
16   conversations with a William Smith on those topics?
17       A    If he's William, that would be correct, but I
18   don't know if his real name is William.  I've always
19   called him Tommy.
20       Q    But regardless, you've not had any
21   conversations with Mr. Smith at all about those topics?
22       A    No, ma'am.
23       Q    Is that right?  Okay.
24           MS. ARNETT:  Do you want me to clarify --
25           MS. STAPLES:  That'd be great.

Page 37

1            MS. ARNETT:  His name is William Thomas Smith
2    --
3            THE WITNESS:  Okay.
4            MS. ARNETT:  -- Tommy.
5            THE WITNESS:  Yeah.
6            MS. STAPLES:  Thank you.
7            THE WITNESS:  We call him Tommy.  Yes, ma'am.
8            MS. ARNETT:  You're welcome.
9    BY MS. STAPLES:
10       Q    Good to know.  All right.  Sir, are you
11   familiar with Buster Cannon?
12       A    Only through this investigation, briefly,
13   uh-huh.
14       Q    Have you had any conversations whatsoever with
15   Mr. Cannon about Mr. Yell's post-conviction litigation?
16       A    No, ma'am.
17       Q    Have you had any conversations with Mr. Cannon
18   about the fact that Mr. Yell's criminal conviction was
19   vacated?
20       A    No, ma'am.
21       Q    Have you had any conversations whatsoever with
22   Mr. Cannon about this civil suit?
23       A    No, ma'am.
24       Q    Have you had any conversations whatsoever with
25   Mr. Cannon about this deposition?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

```
 1    A   No, ma'am.
 2    Q   Are you familiar with Alan Gregory?
 3    A   I am.
 4    Q   Okay.  And how are you familiar with
 5  Mr. Gregory?
 6    A   I have worked on about five, six, seven,
 7  eight, nine -- eight occasions with Mr. Gregory in the
 8  past.
 9    Q   Would that include the criminal case of
10  Mr. Yell?
11    A   Yes.  He's -- yes, ma'am.  Uh-huh.
12    Q   Have you had any conversations with
13  Mr. Gregory about Mr. Yell's post-conviction litigation?
14    A   No, ma'am.
15    Q   Have you had any conversations with
16  Mr. Gregory about Mr. Yell's civil litigation?
17    A   No, ma'am.
18    Q   Have you had any conversations with
19  Mr. Gregory about his deposition?
20    A   No, ma'am.
21    Q   Have you had any conversations with him about
22  you giving a deposition today?
23    A   No, ma'am.
24    Q   Are you familiar with Bill Jenkins?
25    A   I am.
```

Page 39

```
 1    Q   And how are you familiar with Mr. Jenkins?
 2    A   He used to be the jailer.
 3    Q   Have you had any conversations with former
 4  jailer Jenkins about Mr. Yell's post-conviction
 5  litigation?
 6    A   No, ma'am.
 7    Q   Have you had any conversations with him about
 8  the civil litigation in this case?
 9    A   No, ma'am.
10    Q   Have you had any conversations with
11  Mr. Jenkins about the deposition that he's given in this
12  case?
13    A   No, ma'am.
14    Q   I know we just went through a long list of
15  individuals.  So excluding the individuals that we've
16  already discussed, and excluding your attorneys, have
17  you had a conversation with anyone else about Mr. Yell's
18  post-conviction criminal litigation?
19    A   No, ma'am.
20    Q   Have you had a conversation with anyone that
21  we have not yet discussed --
22    A   No, ma'am.
23    Q   -- about Mr. Yell's civil litigation?
24    A   No, ma'am.
25    Q   Have you had a conversation with anyone that
```

Page 40

```
 1  we have not yet discussed about Mr. -- or about your
 2  deposition today?
 3    A   No, ma'am.
 4    Q   Okay.  Have you reviewed any previous
 5  depositions that have been given in this case?
 6    A   Yes, I have.  Yes, ma'am.
 7    Q   What -- whose depositions have you reviewed?
 8    A   I looked at -- I seen one with Roger McDonald.
 9  I'm trying to think who else.  I did look at a little
10  bit of Mr. Gregory's.
11    Q   Just a little bit?
12    A   Uh-huh.
13    Q   Were there specific portions of Mr. Gregory's
14  that you were interested in?
15    A   No.  I think I fell asleep.
16        MS. STAPLES:  Well, I'm not sure what you're
17    saying about the attorneys that took that
18    deposition.
19        MR. GADANSKY:  I was not on the case when the
20    deposition was taken.
21    A   And I did see Mr. Cannon's.  I think he had a
22  paragraph or so, maybe, or something like that.
23  BY MS. STAPLES:
24    Q   Okay.  And Mr. Cannon has not yet given a
25  deposition in this case.  So did you review maybe trial
```

Page 41

```
 1  testimony or post-conviction testimony?  Do you know?
 2    A   I -- I thought it was his.  Somebody had -- it
 3  was a short one, a very short one.  But I -- I can't --
 4  I don't -- I thought it was Mr. Cannon.  But whoever it
 5  did was real short, very vague.
 6    Q   Would it have been any of the former employees
 7  of the jail?  Do you recall reading any depositions of
 8  jail employees?
 9    A   No.  I don't remember any of those.
10    Q   Okay.  How about Mr. Mills'?  Did you read
11  Mr. Mill's deposition transcript?
12    A   Yes, I did.  I did read -- I did read Mills',
13  because his was short.  And it may have been his that I
14  was -- I was -- that -- I -- maybe I had a mixed up, but
15  it could have been his.  I know his.  I knew it was his,
16  because it was short.
17    Q   Okay.  Did you review Mr. Eggleston's dep
18  transcript?
19    A   No.
20    Q   Did you review Mr. Childers' deposition
21  transcript?
22    A   Maybe it was his, because it was short, but I
23  honestly don't recall.  And so was Mr. Cannon's.  Maybe
24  it was Mr. Childers's if it was a short version, or
25  short deposition.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 13 of 115 PageID #:2806
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

42..45

Page 42

1    Q    Okay.  Did you review Mr. Smith's deposition
2  transcript?
3    A    Tommy?
4    Q    Yes, sir.
5    A    No, I haven't seen his.
6    Q    When you -- strike that.  Did you have a
7  specific purpose in reviewing the transcripts of the
8  depositions that you've just named?
9    A    Well, since I was with Mr. Gregory and I
10  worked with him, I -- I -- I wanted -- I wanted to look
11  at that one.  And pretty much I was -- no, I was just --
12  just looking just to see what was said.
13    Q    Sitting here today, was there anything that
14  you can recall that caused you concern within the
15  testimony that was given?
16    A    No, ma'am.
17    Q    Sitting here today, was there anything that
18  you can recall that caused you concern within the
19  testimony that was given?
20    A    No, ma'am.
21    Q    Sitting here today, can you recall whether
22  there was anything that you believed was incorrect or
23  that someone had given erroneous testimony in those
24  transcripts?
25    A    No, ma'am.

Page 43

1    Q    You agreed with the testimony that was given
2  that you read?
3    A    Yes.  Yes, ma'am.
4    Q    Sitting here today, is there anything specific
5  that jumped out to you in any of that testimony?
6    A    No, ma'am.
7    Q    All right, sir.  If you would, please walk me
8  through your educational background, starting with your
9  high school education.
10    A    Okay.  Well, I -- we had a grade school, so I
11  graduated from a grade school, and then I went on to
12  high school and graduated from there.
13    Q    Uh-huh.  Where did you attend high school?
14    A    Todd Central.  Todd -- Todd -- Todd County
15  Central High School in Elkton, Kentucky.
16    Q    Okay.  And when did you graduate from Todd
17  Central?
18    A    In 1978.
19    Q    Did you pursue any higher education after
20  graduating from high school?
21    A    I waited a year, and then I ended up going to
22  the Bowling Green Vocational -- that used to be called
23  Bowling Green -- it -- it was called Bowling Green
24  Vocational Technical School.
25    Q    And what did you study at the vocational

Page 44

1  technical school?
2    A    I studied -- I was -- became a mechanic.  It
3  was, I think, an 18-month, 24-month course or something
4  like that.
5    Q    Did you graduate from that program?
6    A    Yes, ma'am, I did.  Yes, ma'am.
7    Q    Did you graduate with, like, a certificate or
8  --
9    A    Yes.  Yes, ma'am.
10    Q    And what was your certificate in?
11    A    In auto -- auto mechanics.
12    Q    Auto mechanic?
13    A    Yes, ma'am.  Uh-huh.
14    Q    And after obtaining the auto mechanic
15  certificate, did you pursue any other higher education?
16    A    No, except being sent to the police academy.
17    Q    And it looked like to me that you went to the
18  police academy in 1989 to 1990.  Would that sound
19  correct?
20    A    It should have been -- I think it was November
21  -- I started in November 1989, and then I think a month
22  or two later they sent me there.
23    Q    All right.  And in November of 1989, was the
24  police academy in Richmond?
25    A    Yes, ma'am.  It was.

Page 45

1    Q    And how long a program was the police academy
2  in 1989?
3    A    It was only ten weeks.
4    Q    Would it be accurate to say that at the
5  academy, in that ten-week program, you were taught the
6  basics of how to be a police officer?
7    A    Yes, ma'am.
8    Q    Did you learn how to write reports?
9    A    Yes, ma'am.
10    Q    What did you learn in regard to writing
11  reports from the academy?
12    A    Well, we just had to -- I mean, you know, they
13  try to just make sure that you can use proper words and
14  make it as plain as you could.  I don't even think it
15  was covered like really heavy, but they -- you know, we
16  just went over it a little bit.
17    Q    And just a basic --
18    A    Basic.
19    Q    -- program on report writing?
20    A    Yes.  Yes, ma'am.
21    Q    Did you receive any training on how to
22  document witness interviews?
23    A    Probably to just a simple amount.
24    Q    Would it be safe to say that, at the academy,
25  you learned a little bit about a lot of police topics?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 14 of 115 PageID #: 2807
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

46..49

Page 46

1    Does that make sense?
2        A    In a very short period of time, yes, ma'am.
3        Q    It wasn't as though it was a ten-week program
4    simply on interviewing witnesses?
5        A    No.  No, that -- that -- no, ma'am.  It
6    wasn't.
7        Q    During that ten-week program, did you learn
8    what your legal obligations were as a police officer?
9        A    Yes, ma'am.
10       Q    And what did those legal obligations include?
11       A    I mean, it just -- as far as just to be
12   truthful, tell -- do the -- do the right things, you
13   know, protect yourself and pretty much those type
14   things.  Just to -- just to be honest.  You know, you --
15   you want to be an honest police officer and those type
16   of things.
17       Q    Were you taught the Miranda rights during --
18       A    Oh, yes, ma'am.
19       Q    -- the academy?
20       A    Yes, ma'am.
21       Q    And what was your understanding of when it was
22   necessary to give one their Miranda rights?
23       A    Mine back then -- it was -- you could -- you
24   didn't have to read it right off the bat.  You could --
25   you could -- if you -- I guess a lot of my stuff came

Page 47

1    later down the road, but then it's just like, you don't
2    -- you know, you don't have to read it off the bat, but
3    you have to know when to do it and what situations to do
4    it in.
5        Q    And when were you supposed to give someone the
6    Miranda rights, based on what you learned there at the
7    academy?
8        A    When they incriminated themselves.
9        Q    So once they'd incriminated themselves, then
10   you were supposed to give the individual the right?
11       A    Yeah.
12       Q    Did you receive any further training about
13   when it was proper to give one their Miranda rights?
14       A    Well, I've had, like, lots of interviewing
15   interrogation classes.
16       Q    Did the Russellville Police Department provide
17   you with any training specific to Miranda?
18       A    No, they don't.  No, ma'am.
19       Q    Did the Russellville Police Department have
20   any policy instructing its employees when it was proper
21   to give one the Miranda rights?
22       A    No, we got all that from the -- you know, your
23   basic trainings and those type things.
24       Q    Okay.  And your basic training was that you
25   didn't have to read an individual the Miranda rights

Page 48

1    until after they'd incriminated themselves?
2        A    Right.  Yes, ma'am.
3        Q    Did you receive any training at the academy
4    specific to disclosing exculpatory evidence?
5        A    In the -- in the -- say that again, please?
6        Q    Did you receive any training in the academy
7    specific to disclosing exculpatory evidence?
8        A    Not in basic training.  It was probably on --
9    it was down the line.
10       Q    Do you know when down the line you received
11   that training?
12       A    That would've been several -- as -- that
13   would've more likely came after -- it could have been in
14   basic.  I mean, it could have been in basic training,
15   talked about a little bit.  Mine was -- I'm thinking
16   mine, more of it when I got into investigations, it was
17   talked about a whole lot more, during the interrogation
18   classes and interviewing classes.
19       Q    And what's your understanding of your
20   obligation to turn over writing material or exculpatory
21   evidence?
22       A    Is -- my understanding is if it was -- if it
23   was -- if it has something to do with the case, as far
24   as that goes.
25       Q    What do you mean by that, sir?

Page 49

1        A    Let me see how I'm going to put this.  Let me
2    go back.  It takes me a while to go back.
3        Q    I understand.  Take your time.
4        A    It would have to do with -- like, if somebody
5    gave you some information that was pertinent to the
6    cases is -- is then when you would have to -- if it
7    added to the cases, as far as that goes.  I hope I
8    explained in a good word.
9        Q    And I don't know that I heard you, so I want
10   to make sure.  Did you say if someone gave you
11   information that was pertinent to the case?
12       A    Yes, uh-huh.
13       Q    Were you taught to document anything that was
14   conceivably pertinent or relevant to the case?
15       A    Yes, uh-huh.
16       Q    And were you taught that in the academy during
17   your basic training?
18       A    You're taught more of that after the academy,
19   when you took the interview and interrogation classes.
20       Q    And my understanding from reviewing your
21   personal file is that you took those interrogation and
22   interviewing classes also from the Department of
23   Criminal Justice training; is that correct?
24       A    Yes, uh-huh.
25       Q    Did the Russellville Police Department provide

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 15 of 115 PageID #: 2808
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
50..53

Page 50

1 you with any specific training on your obligation under
2 Brady to disclose exculpatory information?
3    A    No.  No, ma'am.
4    Q    Did the Russellville Police Department have
5 any policies in place that were specific to your
6 obligation to turn over exculpatory evidence?
7    A    Not as I recall.  I can't say it wasn't.
8    Q    And that was a very general question, so let
9 me ask you a more specific question.  Did the
10 Russellville Police Department have any specific
11 policies in place in 2004 that related to a police
12 officer's obligation to turn over exculpatory evidence?
13    A    I couldn't tell you.
14    Q    None that you're aware of?
15    A    No, ma'am.
16    Q    Sir, have you ever served in the military?
17    A    No, ma'am.
18    Q    Have you ever applied to serve in the
19 military?
20    A    No, ma'am.
21    Q    Do you have any other family members that are
22 in law enforcement?
23    A    No, ma'am.
24    Q    Now, you said earlier that you were retired;
25 is that correct?

Page 51

1    A    Well, yes, I retired in -- I -- I retired in
2 January of 2015.
3    Q    Okay.
4    A    Uh-huh.
5    Q    And did you then rejoin the Police Department
6 at some point?
7    A    About 14 months later, again they asked me to
8 come back.
9    Q    Now, are you currently employed?
10    A    I still -- yes, ma'am.  I am currently
11 employed with them.  I've been hired with them three --
12 this makes my third time.
13    Q    They must really like you there.  All right.
14 So we'll go through that history in --
15    A    Okay.
16    Q    -- in just a minute, but you're currently
17 employed with the Russellville Police Department?
18    A    Yes, ma'am.
19    Q    In what position?
20    A    I'm the SRO, so the school resource officer,
21 and I also do child abuse.
22    Q    And are you stationed at a specific school?
23    A    Yes.  Stevenson Elementary, R. E. Stevenson
24 Elementary, 1000 North Main Street in Russellville.
25    Q    What do your duties entail as a SRO at the

Page 52

1 elementary school in Russellville?
2    A    I pretty much, I just -- I'm there for the
3 security of the -- the -- the teachers and the -- and
4 mostly the students.  And I pretty much just check doors
5 and those type of things.  We talk to the kids, play
6 football.  Go to lunch --
7    Q    Play football with the kids?
8    A    Go -- sometimes I do lunch duty and I help
9 them with lunches and stuff.
10    Q    A jack of all trades.
11    A    I -- Yeah.  It -- it's fun.  It's -- it's --
12 it's different and it's fun.
13    Q    And how long have you been the SRO at
14 Stevenson Elementary?
15    A    I've been there since last year, but I've
16 actually done this stuff for a long time, because we
17 didn't have anybody to do it, so I used to do both
18 schools.
19    Q    And when you say both schools, which --
20    A    There's a Russellville High School also,
21 before I was actually named the SRO.
22    Q    Now, I think you also said in addition to
23 being the SRO, you also do --
24    A    I do child abuse.
25    Q    Child abuse cases?

Page 53

1    A    Uh-huh.  Uh-huh.
2    Q    And what do you mean by that?
3    A    I can -- I -- whenever they have a case,
4 social services, I'll do those on kids that's below the
5 age of 18.
6    Q    Do you pursue criminal charges against
7 individuals who have allegedly abused children under 18?
8    A    Yes, ma'am, if necessary.  Yes, ma'am.
9    Q    Okay.  And with your SRO duties and your child
10 abuse cases, are you considered a full-time employee at
11 the Russellville Police Department?
12    A    I am.  Yes, ma'am.
13    Q    Okay.  So now I'd like to walk through your
14 law enforcement career --
15    A    Okay.
16    Q    -- from the beginning.  So we've already
17 established that you attended the police academy in 1989
18 or so.
19    A    Uh-huh.
20    Q    Is that when you first began your employment
21 with Russellville?
22    A    Yes, uh-huh.
23    Q    Have you worked for any other law enforcement
24 agency?
25    A    No, ma'am.  No, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 16 of 115 PageID
#: 2809
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

54..57

Page 54

1  Q  And when you first began your employment with
2  Russellville Police Department in 1989, what position
3  were you hired?
4  A  I was hired as a patrolman.
5  Q  Who was the chief of police at that time?
6  A  Chief Stratton, but I can't think of his first
7  name, because I always called him Chief Stratton.  I
8  can't think of his first name right at this moment.
9  Q  Okay.  Okay.  So you were hired as a
10  patrolman.  How long did you remain in the position as a
11  patrolman with the Russellville Police Department?
12  A  You talking about after I got out of basic
13  training?
14  Q  Yes.  So I'd just like to go through your law
15  enforcement career beginning from the -- the start.
16  A  Okay.  Okay.  Well, I started in 1989, and
17  then they pulled me.  I became a -- I came -- I got into
18  investigations in 1995, I believe.
19  Q  What were your duties as a patrolman from 1989
20  to 1995?
21  A  I mean, just accidents, writing speeding
22  tickets, take just regular initial reports was from
23  burglaries and stuff.
24  Q  And then you moved to investigations in '95 or
25  so?

Page 55

1  A  I believe that's right somewhere in-between
2  there.  Yes, ma'am.
3  Q  And what was your title when you moved to
4  investigations?
5  A  Well, my title was an investigator, but I only
6  done -- for the first two years, I done -- I done
7  juveniles.  I was just a juvenile officer.
8  Q  What did your duties entail as a juvenile
9  investigator?
10  A  Any -- any type of -- any type of juvenile
11  crime that was committed.
12  Q  And how long were you a juvenile investigator
13  with the Russellville Police Department?
14  A  I done it for like two years, around there.
15  Somewhere around two years.
16  Q  What position did you next hold?
17  A  Then he moved me -- I still done juveniles
18  regardless, but then he started giving me regular cases,
19  like -- then I started doing misdemeanor -- misdemeanor
20  cases.
21  Q  And when you say regular cases, do you mean
22  misdemeanor cases involving adults?
23  A  Burglaries, yeah.  Well, it was adults.  Yes,
24  ma'am.  Burglaries and robberies or whatever it
25  consisted of at that time.  Just pretty much

Page 56

1  misdemeanors, though.
2  Q  And you said that he moved you to
3  misdemeanors.
4  A  That was my sergeant.  It was a sergeant that
5  I had.
6  Q  Okay.  And who was your sergeant?
7  A  Sergeant Len Embry.
8  Q  I'm sorry?
9  A  Sergeant Len Embry.
10  Q  Embry?
11  A  Uh-huh.
12  Q  And how long did you hold the position of
13  investigating misdemeanor offenses?
14  A  I don't know.  It was shortly after he seen
15  that I could do those really well.  I think that lasted
16  maybe a year, maybe.  So it wasn't very much.  Maybe a
17  year, year and a half.
18  Q  And what position did you next hold?
19  A  Then he -- I started doing everything.
20  Q  What do you mean by that?
21  A  I -- I started doing child abuse cases.  I was
22  still doing juvenile cases.  I started doing major
23  burglaries.  Any kind of major crime.
24  Q  And was your position still an investigator,
25  or were you called something else?

Page 57

1  A  No, it's just -- it's just investigator.  Yes,
2  ma'am.
3  Q  And how long did you investigate major crimes
4  for the Russellville Police Department?
5  A  I've been doing them every -- the whole time
6  I've been there.
7  Q  Now, you said at one point you had retired
8  from the Russellville Police Department --
9  A  I did.
10  Q  -- is that correct?
11  A  Yes, ma'am.
12  Q  When was that?
13  A  I think it was January of 2015.
14  Q  And let me back up just for a minute.
15  A  Yes, ma'am.
16  Q  In September of 2004, would you have been an
17  investigator in the misdemeanor division, or were you
18  investigating major crimes by that time?
19  A  I was doing all of it.  I was doing all major
20  crimes.  Yes, ma'am.
21  Q  Okay.  So you retired in January of 2015?
22  A  Uh-huh.
23  Q  And what was your reasoning for retiring?
24  A  Oh, I was just -- I was just ready to go.
25  Q  When you retired in January of 2015, did you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 17 of 115 PageID #: 2810
The Deposition of KENNETH EDWARDS, taken on September 14, 2022

58..61

Page 58

1  seek employment elsewhere?
2      A    Yes, ma'am.
3      Q    And where --
4      A    I was working -- I had a friend back in my
5  hometown, and I went over there and I washed cars and I
6  sold cars, because I fooled with cars and motorcycles,
7  so that's what I did.
8      Q    Was that a -- strike that.  Did that business
9  have a name?
10     A    Yes, it was -- it's North Side Auto Sales.
11     Q    And you said that was in your hometown?
12     A    Yes, ma'am.  In Elkton, Kentucky.
13     Q    And who was the owner of North Side Auto
14 Sales?
15     A    His name is Danny Jo Shemwell.
16     Q    Is that S-H-I-M?
17     A    S-H-E-M-W-E-L-L.  I think that's right.
18     Q    How long did you work for Mr. Shemwell at
19 North Side Auto Sales?
20     A    I stayed there about 14 months.  Yeah.
21     Q    And did you seek other employment after that
22 14 months?
23     A    Yes.  I was asked to come back to the Police
24 Department and -- to work there by my -- Victor
25 Shifflett, which is -- who was my chief then.

Page 59

1      Q    Victor what?
2      A    Shifflett.
3      Q    Can you spell that for me?
4      A    S-H-I-F-F-L-E-T-T.
5      Q    Thank you.  So Chief Shifflett asked you to
6  rejoin the police department?
7      A    Yeah.  He was my chief before I left, and then
8  he was my -- and then he was the chief that we -- that I
9  came back to work for.
10     Q    And you took Mr. Shifflett up on his offer?
11     A    Yes.  It had to do with -- I was only supposed
12 to work like child abuse and stuff for the city and the
13 county.
14     Q    And can you explain to me how that works?  You
15 said you were only supposed to work child abuse for the
16 city and the county?
17     A    Yes.  I started out doing -- actually working
18 child abuse for the city and the county, and then the --
19 then what happened, the detectives upstairs, one decided
20 to retire, and then one was leaving, so then I ended up
21 doing all everything back over again.
22     Q    And when you said for the city or the county,
23 is it an accurate statement to say that typically the
24 Russellville Police Department handled cases within the
25 city of Russellville?

Page 60

1      A    Yeah.  That's all we -- yes, uh-huh.
2      Q    Okay.
3      A    But they were going to do a creative thing
4  where I could go do child abuse for the -- for the
5  county also.
6      Q    And is it accurate to say that typically child
7  abuse cases would've been handled -- in the county
8  would've been handled by the sheriff's office?
9      A    Yes, that's true.
10     Q    Okay, and so this was going to be kind of a
11 joint position?
12     A    Yes.  Them and -- the sheriff and -- and the
13 chief had decided that they would do that.
14     Q    Who was the sheriff of Logan County?
15     A    It was Wallace -- Wallace Whitaker.
16     Q    Okay.  So Chief Shifflett asked you to rejoin
17 under the guise that you would be doing child that abuse
18 cases only for the city and the county; is that right?
19     A    Yes.  Yes, ma'am.  Yes, ma'am.
20     Q    And it sounded like it didn't just stick to
21 child abuse cases.
22     A    Yeah.  No, ma'am, it didn't.
23     Q    You said that you were back to doing
24 everything again?
25     A    Yes, ma'am.

Page 61

1      Q    Is that right?
2      A    Yes, ma'am.
3      Q    And does that mean investigating major crimes?
4      A    Yes, ma'am.
5      Q    Okay, and did you do that just for the city,
6  or were you also investigating --
7      A    No.  Just -- just -- just for the city.
8      Q    Okay.  All right.  Not for the -- not for the
9  county?
10     A    Yes, ma'am.
11     Q    How long did you only investigate child abuse
12 cases before you were moved back into doing major crime?
13     A    It didn't last long.  I'm going to say maybe
14 six months or so.  It could have been a year, but it
15 didn't last very long.
16          MS. STAPLES:  All right, sir.  If you don't
17     mind, we're going to take just a quick break, okay?
18          THE WITNESS:  Yes, ma'am.  Thank you.
19          VIDEOGRAPHER:  We're off the record at 10:04
20     a.m.
21          (OFF THE RECORD)
22          VIDEOGRAPHER:  We are back on record at 10:08
23     a.m.
24 BY MS. STAPLES:
25     Q    All right, sir.  Thank you for that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 18 of 115 PageID #: 2811
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

62..65

Page 62

1    A    Yes, ma'am.
2    Q    Okay.  So when we had left off, you'd said
3  that you'd been rehired in 2016 by Chief Shifflett --
4    A    Uh-huh.
5    Q    -- and you began doing major crime
6  investigations once again.
7    A    Yes, ma'am.
8    Q    Okay.  Now, is it accurate that you retired
9  from the Russellville Police Department again, or that
10  you left the employment of the Russellville Police
11  Department again?
12    A    Yes, I left when he left.  I told him I'd stay
13  until he left.
14    Q    Okay.  And when did that occur?
15    A    Around 2019, maybe.
16    Q    Let me --
17    A    Around 2019, I believe.
18    Q    Yeah.  Let's make this a little bit easier for
19  you.  If you'll turn to what we marked as Plaintiff's
20  Exhibit 1, I'm referring to that first application for
21  employment.  At the bottom, do you see the Bates stamp
22  RPD1449?
23             (EXHIBIT 1 MARKED FOR IDENTIFICATION)
24    A    Yes, ma'am.
25    Q    Okay.  If you turn to the third page of that

Page 63

1  document --
2    A    Uh-huh.
3    Q    -- there's a list of your employment
4  experience.  Do you see that?
5    A    Yes, ma'am.  Uh-huh.
6    Q    And first I should ask you, do you recognize
7  this document?
8    A    Yes, ma'am.
9    Q    And what is this document, sir?
10    A    This is an employment application.
11    Q    And is this an employment application that you
12  filled out?
13    A    Yes, ma'am.
14    Q    Okay.  And what were you applying for in this
15  application?
16    A    In this one?
17    Q    I believe it tells you there on the first
18  page.
19    A    It would've been for the police department,
20  Russellville Police Department.
21    Q    Okay.  And what was the date of this
22  application?
23    A    October 8th of 2020.
24    Q    Okay.  And the reason I called your attention
25  to this application is because on that third page it

Page 64

1  lists your employment experience, correct?
2    A    Uh-huh.  Uh-huh.
3    Q    Okay.  So I thought this might help us --
4    A    Okay.
5    Q    -- a little bit with the dates.
6    A    Okay.
7    Q    And it said that -- or you said that you were
8  hired by Chief Shifflett back in 2016; is that correct?
9    A    Uh-huh.  Yes, ma'am.
10    Q    And it looks like, according to this document,
11  you worked for the Russellville Police Department until
12  September of 2019; s that correct?
13    A    It seems -- if this was says, yes, ma'am.
14  Somewhere close.
15    Q    But then you have no reason to dispute
16  information that you put on this document?
17    A    No, ma'am.
18    Q    Okay.  All right.  So why did you leave the
19  Russellville Police Department in September of 2019?
20    A    Because he left, the chief.  I told him I'd
21  come back and work for him.
22    Q    Do you have a good working relationship with
23  Chief Shifflett?
24    A    Yes.
25    Q    And when you left the Russellville Police

Page 65

1  Department in September of 2019, did you seek employment
2  elsewhere?
3    A    Yes.  I had already been approached by the
4  Commonwealth Attorney's office.
5    Q    Okay.  And who was the Commonwealth Attorney
6  at the time?
7    A    Neil Kerr.  Neil Kerr.
8    Q    Okay.  And Mr. Kerr approached you and asked
9  you to work for his office; is that correct?
10    A    Yes, uh-huh.
11    Q    And in what capacity did Mr. Kerr want you to
12  come work for him?
13    A    As an investigator.
14    Q    Now, Mr. Kerr is the same prosecutor who moved
15  to dismiss the criminal charges against Mr. Yell; is
16  that correct?
17    A    Yeah.  I don't know what went on with that.
18    Q    You weren't familiar with the fact that
19  Mr. Kerr had moved to dismiss the case against Mr. Yell?
20    A    No, I don't -- I don't recall that.  No,
21  ma'am.
22    Q    Did you ever have any discussions with
23  Commonwealth Attorney Kerr about Robert Yell's criminal
24  case?
25    A    I don't think we had any discussion as -- I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1  don't remember us discussing as far as they go. He may
2  have said something, but I don't remember the discussion
3  about anything.
4        Q    How long did you work for Mr. Kerr?
5        A    About a year. Maybe just a tad over.
6        Q    And what did -- strike that. What was your
7  reasoning for leaving the commonwealth attorney's
8  office?
9        A    I was asked to come back to the Police
10 Department to do child abuse.
11       Q    I'm sensing a pattern here. And who --
12       A    Strictly child abuse. Yes, ma'am.
13       Q    Who asked you to come back to the police
14 department to do child abuse --
15       A    Some of my colleagues asked me would I be
16 willing to come back, which would be Detective --
17 Detective Eggleston and my Captain, Jeff Sanford
18 (phonetic).
19       Q    So if you began with the commonwealth
20 attorney's office in September of 2019, and you think
21 that you worked there for a year or so, is it accurate
22 to say that you began again with the Russellville Police
23 Department in September or October of 2020?
24       A    I think that would be close. Yes, ma'am.
25       Q    Somewhere within that --

Page 67

1        A    Yes, ma'am. Yes, ma'am.
2        Q    -- time range.
3        A    Uh-huh.
4        Q    Okay. And have you remained with the
5  Russellville Police Department since that date?
6        A    Yes, ma'am.
7        Q    There are a couple of things that I wanted to
8  ask you about regarding your applications. First --
9  well, strike that. Let's look at the set -- the
10 application for employment that's when the -- within
11 that same Exhibit 1. And I'm referring to the one that
12 begins with Bates stamp RPD1494.
13       A    Okay.
14       Q    And for the record, can you tell us what this
15 document is?
16       A    It's an application for employment.
17       Q    Is this an application for employment that you
18 filled out?
19       A    Yes, ma'am.
20       Q    And what was the date of this application for
21 employment?
22       A    3-17 of 2016.
23       Q    And again, this was an application to be a
24 police officer with the Russellville Police Department?
25       A    Yes, ma'am.

Page 68

1        Q    Okay. Specifically if you'll turn to the
2  fourth page of that document, Bates stamp 1497?
3        A    Okay.
4        Q    I wanted to ask you about the references that
5  you have listed on that page.
6        A    Uh-huh.
7        Q    Do you see there that you have Judge Tyler
8  Gill listed as a reference?
9        A    Yes, ma'am. Yes, ma'am.
10       Q    Did you consider Judge Gill to be a friend? Do
11 you consider Judge Gill to be a friend?
12       A    Yes, ma'am.
13       Q    Do you have a good working relationship with
14 Judge Gill?
15       A    We had a great one. Yes, ma'am.
16       Q    Would you -- would it be accurate to say that
17 you also have a personal friendship with Judge Gill?
18       A    Yes, uh-huh.
19       Q    Do the two of you ever socialize together?
20       A    Like what are you talking about?
21       Q    You ever go to lunch or dinner?
22       A    No.
23       Q    Do you respect Judge Gill?
24       A    Very much.
25       Q    Have you had any conversations with Judge Gill

Page 69

1  about Mr. Yell's criminal case?
2        A    No, ma'am.
3        Q    Did you have any conversations with Judge Gill
4  at all about Mr. Yell's case during the post-conviction
5  litigation?
6        A    No, ma'am.
7        Q    Did you have any conversations with Judge Gill
8  about the fact that he vacated Mr. Yell's conviction?
9        A    No, ma'am.
10       Q    Okay. And have you had any conversations with
11 Judge Gill about this civil litigation?
12       A    No, ma'am.
13       Q    How would you describe your relationship with
14 Commonwealth's Attorney Kerr?
15       A    It's a good relationship.
16       Q    You hesitated for a moment. Was there a
17 reason?
18       A    Oh, no, no, it was a good relationship.
19       Q    Okay.
20       A    Yeah. I was just trying to figure out how it
21 worked. But it was a good relationship, yes.
22       Q    Okay. Would you consider Mr. Kerr a friend?
23       A    Yes, I do. Uh-huh.
24       Q    And do you respect Mr. Kerr as the prosecutor?
25       A    Oh, yes, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1    Q    And I think I asked you this, but I'm -- I'm
2  sorry.  I'm not sure.
3    A    No, go ahead.
4    Q    So I -- I may be repeating myself.
5    A    Okay.
6    Q    But did you have any conversations whatsoever
7  with Mr. Kerr about him moving to dismiss Mr. Yell's
8  case?
9    A    No, ma'am.
10   Q    And have you had any conversations with
11 Mr. Kerr about this civil litigation Mr. Yell's case?
12   A    No, ma'am.  I didn't.  No, ma'am.
13   Q    Okay.  On that first application that we
14 talked about, you noted that you were a forensic
15 interviewer.
16   A    Uh-huh.
17   Q    Can you explain to me what a forensic
18 interviewer is?
19   A    Well, forensic interviewer -- I'm not very
20 good at explaining things.  But forensic interviewer is
21 somebody who -- who interviews -- who interviews kids,
22 who interviews adults.
23   Q    Is there a difference between a regular
24 interviewer and a forensic interviewer?
25   A    I think there is.  Yes, ma'am.

Page 71

1    Q    And can you explain to me what the difference
2  is?
3    A    Well, I think the forensic interviewing
4  applies more to -- to interviewing children.
5    Q    And are there differences in the way that a
6  forensic interviewer interviews children than they
7  interview adults?
8    A    Yes, I think so.
9    Q    And what are some of those differences?
10   A    Well, as far as forensic interviewing
11 children, you know, you -- you have to get on their
12 level.  You know, you have to -- as far as leading
13 questions and those type things, I think it runs in both
14 of the adults and kids, as far as that goes.  You're
15 more of a -- you're talking more on a child's level, as
16 far as the forensic interview, where the other
17 interview, you -- you're more of an -- you know, you're
18 talking as an adult or interviewing as more in adult
19 situation, adult language.
20   Q    Sure.  And what did you mean by leading
21 questions?  Do you use leading questions with children?
22   A    No, you're not -- no, you're not supposed to.
23   Q    Okay.  And are you -- what's the rule on using
24 leading questions with adults?
25   A    The same thing.  You're not supposed to be

Page 72

1  leading them or anything like that.
2    Q    How much of your career would you estimate
3  that you spent in specializing in working with children?
4    A    All of it.  Quite -- ever since I started in
5  1995 with the juveniles, pretty much -- well, all of it
6  since then.
7    Q    Is it safe to say that the majority of your
8  career has been --
9    A    Yes.
10   Q    -- has been spent by either working with child
11 victims or prosecuting child offenses?
12   A    Yes, uh-huh.
13   Q    So looking at that same exhibit marked Number
14 1, I'd like to turn your attention to what's Bates
15 stamped 1605.  Actually, that's the last page of the
16 document.  Begins on 1599.
17   A    Oh, 1599?
18   Q    Yes, sir.
19   A    Okay.
20   Q    Do you have that in front of you?
21   A    Uh-huh.
22   Q    Can you please tell us what this document is?
23   A    It says evaluations.
24   Q    Okay.  Would you agree that this is a
25 Russellville Police Department employee performance

Page 73

1  evaluation?
2    A    Yes, ma'am.
3    Q    For an investigator?
4    A    Yes, ma'am.
5    Q    And that the employee named is Kenneth
6  Edmonds?
7    A    Yes, ma'am.
8    Q    And the rank is detective?
9    A    Yes, ma'am.
10   Q    And that the evaluation period is from 2000
11 -- or November of 2012 through November of 2013?
12   A    Say what now?
13   Q    The evaluation period is from November of 2012
14 through November of 2013?
15   A    Oh yes, ma'am.  I was looking at the wrong --
16 yes, ma'am.
17   Q    Okay.  And specifically I wanted to ask you
18 about a comment that the reviewer made on page 1605.
19   A    1605.  Okay.
20   Q    It's actually the very last sentence on that
21 page.
22   A    Okay.
23   Q    Do you see, sir, where it says, "Detective
24 Edmonds has developed a skill for obtaining confessions,
25 which has allowed him to solve a lot of cases for the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 74

1  department"?
2      A    Yes, ma'am.
3      Q    Would you agree with that assessment?
4      A    Yes, ma'am.
5      Q    That one of your skills was obtaining
6  confessions from individuals?
7      A    Yes, ma'am.
8      Q    When did you develop that skill?
9      A    It took a long time to develop it.  I don't --
10  I can't really say when.
11      Q    Is it something that you worked out -- worked
12  on throughout your career?
13      A    That is true.  Yes, ma'am.
14      Q    By November of 2013, how many confessions
15  would you estimate that you had obtained in criminal
16  cases?
17      A    I could not even tell you.  I have no idea.
18      Q    Multiple confessions?
19      A    I would say yes.
20      Q    Let's look at the next document within the --
21  within Exhibit 1, please, sir.  On that -- starts at
22  Bates mark RPD1697.
23          MR. MANDO:  I'm sorry, 16?
24          MS. STAPLES:  1697.
25          MR. MANDO:  97?

Page 75

1          MS. STAPLES:  Yes, sir.
2      A    Okay.  Go ahead.
3  BY MS. STAPLES:
4      Q    You have that in front of you, sir?
5      A    Yes, ma'am.
6      Q    And can you tell us what this document is,
7  sir?
8      A    It's a -- it's another evaluation type.  I
9  think it's -- this is one of the older ones, probably.
10      Q    Okay.  In fact, would you agree that it says
11  it's an evaluation of Detective Kenneth Edmonds for the
12  period of 4-1-02 to 4-1-03?
13      A    Yes, ma'am.
14      Q    And that the evaluator is Detective Sergeant
15  Len Embry?
16      A    Yes, ma'am.
17      Q    And the reason I'm calling your attention to
18  this document is what is -- hold on, let me get there.
19  I'm sorry.  What is contained on page 1698.
20      A    Okay.
21      Q    You see there at the very top of the page
22  where Sergeant Embry says that you're "becoming the
23  department's leader in his abilities and interviewing
24  and interrogation techniques.  He has a high incident of
25  obtaining admissions of crimes committed by offenders

Page 76

1  that he interviews after Miranda."  So as early as ten -
2  - or as late, I guess it depends on how you look at it.
3  But ten years earlier your sergeant noted that you had a
4  high incident obtaining -- of obtaining confessions,
5  correct?
6      A    Yes, ma'am.
7      Q    Of the multiple confessions that you've
8  obtained in cases, have you had any of those cases
9  overturned?  Meaning have there been any instances in
10  which you obtained a confession, the alleged offender
11  was convicted, and then later his criminal conviction
12  was overturned?
13      A    No, ma'am, none that I can think of.
14      Q    None that you know of, sir?
15      A    No, ma'am.
16      Q    Now, we'll talk about this more specifically
17  later this afternoon, but you interrogated Mr. Yell in
18  this criminal case; is that correct?
19      A    I interviewed, it turned into interrogation.
20  Yes, ma'am.
21      Q    And you interviewed him on more than one
22  occasion; is that right?
23      A    I -- yes.  I interviewed him with Mr. Smith
24  also.
25      Q    Okay.  And can -- well, can you recall

Page 77

1  specifically how many times that you --
2      A    I think it --
3      Q    -- interviewed or interrogated Mr. Yell?
4      A    I think it would've been two times altogether.
5  Yes, ma'am.
6      Q    Okay.  And during those two interrogations,
7  you weren't successful in obtaining a confession from
8  Mr. Yell, is that correct?
9      A    Oh, no.  No, ma'am.  Uh-uh.
10      Q    Mr. Yell never admitted to intentionally
11  causing a fire in this case --
12      A    No, ma'am.
13      Q    -- is that correct?
14      A    No, ma'am.
15      Q    Now, stepping back just a little bit to
16  September of 2004, you were an investigator with the
17  department at that time; is that correct?
18      A    Yes, ma'am.  Uh-huh.
19      Q    And Chief Pendergraff was the chief, or Jim
20  Pendergraff was the chief?
21      A    Yes, ma'am, that'd be right.  Yes ma'am.
22      Q    And in September of 2004, was this one of the
23  times that you were handling major crimes, or one of the
24  times that you were specializing in child cases?
25      A    No, I was still doing all of it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 22 of 115 PageID #2815
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

78..81

Page 78

1    Q    And when you referred to handling all major
2  cases, did major cases involve arson cases?
3    A    No.  No, ma'am.
4    Q    Had you worked any arson cases before
5  September of 2004?
6    A    Before September 2004?
7    Q    Yes, sir.
8    A    I have worked -- I had worked some -- I mean,
9  some -- I had worked some cases, as far as they go.  And
10  then we had one -- I can't remember what was before or
11  what was after.  I had worked a couple of them, or some
12  of them.
13    Q    So tell me what you remember about the cases
14  that you had worked.
15    A    Okay.  There was one --
16    Q    Arson --
17    A    You're talking about arson cases?
18    Q    Yeah, I was just -- arson cases specifically.
19    A    Just arson cases?
20    Q    Yes, sir.
21    A    I did work one where I had the ATF come in and
22  -- and -- and -- and do it because there was an
23  individual, juvenile that set several things on fire.  I
24  worked -- I don't remember --
25    Q    Let me ask you about that one before you go

Page 79

1  further.
2    A    Okay.
3    Q    So you had a case in which a juvenile was
4  alleged to setting things on fire.
5    A    Uh-huh.  Uh-huh.
6    Q    And you said that you called in the ATF?
7    A    Yes.
8    Q    And why did you call in the ATF?
9    A    Because they handled fires.
10    Q    Was it standard practice to call in the ATF
11  anytime there was a potential arson involved?
12    A    I always call them, as far as that goes,
13  unless Mr. -- unless somebody else -- whoever's doing
14  the fires in our area, which Mr. Greg is usually the one
15  that does it.  There may be a reason that somebody
16  wasn't around on this and that, as far as that goes, but
17  it was so many fires.  I -- I called them that time.
18    Q    So your personal practice was to call in the
19  ATF whenever there was a potential arson?
20    A    Yes.  Well, as far as -- yes, because I had a
21  friend that worked there also.
22    Q    Who is your friend that worked there?
23    A    Terry Vance.
24    Q    Terry Vance?
25    A    Uh-huh.

Page 80

1    Q    Is Terry male or a female?
2    A    Terry's a male.
3    Q    And is Mr. Vance still with the ATF?
4    A    No, he's not.
5    Q    Okay.  So you had this one juvenile case.  Can
6  you recall -- strike that.  I know you've had more than
7  one juvenile case.  The juvenile arson case that we're
8  speaking of, can you recall whether or not that was
9  prior to 2004 or after 2004?
10    A    Let me see.  I can't remember.  I don't
11  remember when it was.
12    Q    Did that investigation result in a conviction?
13    A    Yes, it did.
14    Q    And was the juvenile convicted as a juvenile
15  or as a youthful offender?  Do you know?
16    A    I don't remember how it went with that,
17  because it ended up in -- because ATF took it for me, it
18  was federal.
19    Q    Because it was a juvenile, I don't want to ask
20  you on the record, the individual's name.  That's why I
21  asked you if it was -- if the individual was tried as a
22  youthful offender or as an adult.
23    A    Well, he was still a juvenile at the time.  So
24  I don't know how -- how we'd done that one with the ATF
25  being involved with me also.

Page 81

1    Q    Okay.  Well, I may ask you off the record
2  about what that individual's name was, okay?  The
3  juvenile.
4    A    If I can remember it.
5    Q    I understand.  Okay.  So we have this one
6  juvenile case.
7    A    Uh-huh.
8    Q    What other arson investigations do you recall
9  handling?
10    A    I worked another one.  I don't know when it
11  was.  I don't know exactly when it was.  Because they --
12  they've been quite a while, a long -- a long while back.
13    Q    Do you have any idea whether it occurred prior
14  to September of '04 or after September?
15    A    I couldn't -- I couldn't tell you.  No, ma'am.
16    Q    Okay.  Tell me the details about that case.
17    A    There was an individual that was -- I mean,
18  the individual wasn't from this area.  Don't even recall
19  his name.  There was a couple things set on fire that
20  burned up in the city.
21    Q    Was this an adult offender?
22    A    He was an adult, yes.
23    Q    And did you handle the investigation of this
24  potential arson?
25    A    No.  I -- I called in -- I don't know who was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 23 of 115 PageID #: 2816
The Deposition of KENNETH EDWARDS, taken on September 14, 2022

82..85

Page 82

1  called.  Let's see.  I don't know what fire investigator
2  came to do that one.  It -- like I said, it's normally
3  Mr. Gregory, but it -- if he wasn't -- I guess if he was
4  out or something, it would've been somebody else.
5        Q     Now, Mr. Gregory, was he with the ATF at the
6  time?
7        A     No.  Mr. Gregory wasn't with -- with the ATF.
8        Q     Did you call the ATF in that case?
9        A     No, because they had already called somebody,
10 the dispatch had.
11       Q     And what do you mean by that?  The dispatch
12 had called --
13       A     Yeah, emergency operations that gives out our
14 calls.
15       Q     Yes, sir.
16       A     They are the ones who -- they're the ones who
17 -- who calls people to come out if there's a fire and
18 stuff, in most cases.
19       Q     So are you implying the dispatch called the
20 fire marshal's office?
21       A     Yeah.  They would be calling whoever to work
22 the fires.  Yes.  Yes, ma'am.
23       Q     So earlier you testified that it was your
24 standard practice to call in the ATF to investigate
25 arson cases; is that right?

Page 83

1        A     I would call them if they were working for me.
2  Yes, ma'am.
3        Q     What do you mean, if they were working for
4  you?
5        A     No, if they were working for me.
6        Q     Okay.  But in this case you think dispatch had
7  already called a different office to the investigation?
8        A     Well, yes, they would -- they would -- they
9  would probably already -- they had -- they would call
10 the fire marshal's office or whoever works those.  Yes,
11 ma'am.
12       Q     Okay.  And just so I'm clear, because dispatch
13 had called someone already --
14       A     Yes.
15       Q     -- to investigate, this case that we're
16 speaking of is not a time in which you contacted the ATF
17 yourself?
18       A     No, this wasn't.  Uh-uh.  No, ma'am.
19       Q     And this involved an alleged offender from out
20 of town?
21       A     Well, he wasn't normally from my area, and so
22 --
23       Q     It was a male?
24       A     -- I -- I consider him an out-of-towner if
25 they're not normally from my area.

Page 84

1        Q     Okay.  Was it a male suspect.
2        A     It was a male suspect.  Yes, ma'am.
3        Q     And what was the result of that investigation?
4  Was that individual charge?
5        A     No, uh-uh.
6        Q     Did you seek an indictment against that
7  individual?
8        A     No.
9        Q     Okay.  So is this a time in which the
10 investigation resulted in a finding that it wasn't an
11 intentional fire?
12       A     Well, I can't say that without the documents
13 there as far as that.  It was -- they were -- they were
14 intentional fires, the fires that was set.
15       Q     So why didn't you seek charges against that
16 individual?
17       A     Because I didn't have enough for that.
18       Q     What evidence do you recall that you did have
19 against that individual?
20       A     That he was -- that he was -- that he was in
21 the -- that he may -- was in the area.  And I think,
22 like I said, Mr. Gregory and them worked -- I -- I don't
23 know who worked at as a fire.  I -- I don't like say
24 that, because I can't remember on that one.
25       Q     But what you can recall is that the alleged

Page 85

1  offender was in the area when the fires broke out?
2        A     From what I recall, yes, ma'am.
3        Q     Can you recall any other circumstances that
4  led you to believe that these were arsons?
5        A     Well, it was -- I mean, from the -- from the
6  fire investigator who was talking about those things,
7  because that's where it would all came from, from them -
8  - or from him.
9        Q     And is it accurate to say that you think that
10 Alan Gregory may have been the fire investigator, but
11 you're not sure?
12       A     He was usually always the one that came,
13 because he covered that area, but I can't say for sure
14 on -- on that one.
15       Q     All right.  So those are two arson cases that
16 we've talked about so far.
17       A     Uh-huh.  Uh-huh.
18       Q     The alleged juvenile offender and this adult
19 offender that no charges were sought.
20       A     Uh-huh.  Yes, ma'am.
21       Q     What other arson cases have you been involved
22 in?
23       A     I think it's only been --
24       Q     And I guess I should be a little bit more
25 specific, because apparently that first one -- or this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 24 of 115 PageID #:2817
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

86..89

Page 86

1  one didn't result in charges for arson.  So what other
2  fire investigations and cases have you been involved in?
3      A   I think we've only been, like, a couple more
4  fires, but they did -- the -- the fire marshals, they
5  took care of those also.
6      Q   And on the two other cases that you're
7  thinking about that the fire marshal's office handled,
8  did you personally seek charges against those --
9      A   No.  No, ma'am.  Uh-uh.
10     Q   -- potential offenders?
11     A   Uh-uh.
12     Q   So is it accurate to say that, sitting here
13 today, the only case that you can really recall being
14 involved in -- involving, excuse me, a fire was with the
15 juvenile offender; is that right?
16     A   Yes, ma'am.
17     Q   So is it accurate to say that, by September of
18 2004, when you became involved in Mr. Yell's case, you
19 didn't have much experience with fire investigations?
20     A   I have no -- no ma'am, I have no...
21     Q   By September of 2004, how many homicide
22 investigations had you worked?
23     A   By when now?
24     Q   September of 2004.
25     A   I don't know.

Page 87

1      Q   Well, it sounded at -- or it didn't sound
2  like.  You testified earlier that when you were first
3  hired with the Russellville Police Department, you
4  focused mainly on child cases; is that right?
5      A   For about two years.  Yes, ma'am.  Uh-huh.
6      Q   Okay.  And then I think it was in 1995 you
7  said that you moved over to other, like, felony cases.
8      A   He moved me, yes.  Uh-huh.
9      Q   Okay.  So between 1995 and 2004, how many
10 homicide cases do you think that you'd worked?
11     A   I have no -- I -- I don't remember.
12     Q   Had you worked any homicide cases?
13     A   I'm sure I probably have and I just don't
14 remember.
15     Q   Tell me, how big a city was Russellville
16 between 1995 and 2004?
17     A   Probably around -- I'm just telling you maybe
18 around 7,000.  When I first saw I did this something.
19     Q   A rather small city.  Would you agree?
20     A   Yes, we -- yes ma'am.
21     Q   Is it bigger now?
22     A   It's not much bigger.
23     Q   Kind of stayed the same?
24     A   It stayed the same.  Yes, ma'am.
25     Q   Okay.  So in a -- in a town of 7,000 or so,

Page 88

1  was it common to have homicide investigations?
2      A   It was common to have them.
3      Q   Really?
4      A   Yes, ma'am.  It was common to have -- not,
5  like, often, often, but then it become a spurt at one
6  point in time also.  But yeah, it was -- it was common
7  to -- they had already had them before I got here,
8  evidently, so...
9      Q   Could you estimate how many homicides occurred
10 in Russellville in 2004?
11     A   In 2004?  No, ma'am.  No, ma'am.  I would've
12 to go back and look at the stats.  I'm not sure.
13     Q   So sitting here today, you have no idea how
14 many homicide investigations you had worked prior to
15 September of 2004?
16     A   Not from memory.  No, ma'am.
17     Q   Was it a common occurrence for you to work
18 homicide investigations?
19     A   They would come every so often.
20     Q   Of the homicide investigations that came every
21 so often, were you named as the lead investigator on any
22 of those cases prior to 2004?
23     A   I would have to know what -- what happened
24 first, because I don't recall -- I don't remember what
25 happened between that time.  I'm sorry.

Page 89

1      Q   It's okay.
2      A   I've worked my share, but I -- I just don't
3  remember.
4      Q   Okay.  Would it be a fair statement to say
5  that you've worked more homicide cases since 2004 than
6  you had in your early career?
7      A   From 2004 and up? That would probably be true.
8      Q   Okay.  You told me earlier that you've never
9  worked for any other law enforcement agency?
10     A   No, ma'am.
11     Q   Unless you include the Commonwealth's Attorney
12 office, right?
13     A   Yes, ma'am.
14     Q   During your law enforcement career, have you
15 ever applied for any other law enforcement agency?
16     A   No, ma'am.
17     Q   So it's always been Russellville; is that
18 right?
19     A   Uh-huh.  Uh-huh.
20     Q   Now, during your career with the Russellville
21 Police Department, have you had any complaints lodged
22 against you, any citizen complaints?
23     A   Not as -- I mean, not as I know as far as that
24 -- none that I know of.  I don't know what's in my
25 personal file.  I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of KENNETH EDMONDS, taken on September 14, 2022

90..93

Page 90

1    Q    I did review one incident where someone had
2  alleged that you had told someone at church about a
3  confidential informant.  Do you recall that situation?
4    A    Oh yeah.  I recall some girls saying something
5  about something.  Really it -- they really didn't say
6  anything.  I don't know what came about or what happened
7  with it.
8    Q    You were never disciplined for that situation;
9  is that correct?
10   A    No.  Uh-uh.  No, ma'am.
11   Q    During your career with the Russellville
12 Police Department, have you ever been disciplined?
13   A    No.  I think I was late -- I remember being
14 late for work, like, oh, midnights like six, seven times
15 because I was working two jobs as far as that goes.  But
16 I think -- I think I actually told the sergeant, you
17 know, "Do what you got to do.  I just -- you know, I got
18 little two jobs."  Because I was -- you know, had kids,
19 so -- and so I think he -- he verbally warned me.
20   Q    Okay.  So you had a verbal reprimand for being
21 late to shift.
22   A    I remember that.  It was in my early -- again,
23 while I was still on the -- working the streets, uh-huh.
24   Q    And you said you were working two jobs.  What
25 was the other job that you were working?

Page 91

1    A    Oh, I used to -- I used to be a welder.  I
2  used to weld.  And I used to wash cars, too.
3    Q    Did you weld for a company?
4    A    I did.
5    Q    What company is that?
6    A    It was -- that time, it was called ProFab
7  Metals.
8    Q    And where was ProFab Metals located?
9    A    It was located on the corner of 5th and
10 Morgan.
11   Q    Is that in Russellville?
12   A    Yes, ma'am.
13   Q    How long did you work for ProFab Metals?
14   A    Oh, goodness.  I mean, because I worked in
15 there when I was working in Elkton.  I probably worked
16 for him about seven, eight, nine years maybe.
17   Q    And I think you said that you were late for
18 the midnight shift.  Is that --
19   A    Yeah, midnight's hard.  Yes, ma'am.
20   Q    So what shifts -- what shift were you working
21 in September of 2004?
22   A    Oh, I would've been straight days.
23   Q    Days?
24   A    Uh-huh.
25   Q    And what hours were day shifts at that time?

Page 92

1    A    We could have came in -- I could have been
2  working from 8:00 to 4:00, from 9:00 to 5:00.  One of
3  the two possible.
4    Q    When you worked for ProFab Metals, you were on
5  the night shift with the police department at that time?
6    A    Sometimes I were -- was and sometimes I
7  wasn't.  Like if -- it was -- depend on when, like,
8  which shift I was on.  So if I were working midnight --
9  if I worked midnight for the police department, I would
10 go work a little bit in the morning, time for ProFab.  If
11 I was working second shift, I would work on up until a
12 certain time and then -- and then go to work, get ready
13 to go to work.
14   Q    Okay.  And do you think that you were still
15 working for ProFab Metals in September of 2004?
16   A    No.  I -- I don't think I was -- I wasn't
17 working for them then.
18   Q    Did you have any
19   A    I don't think I --
20   Q    Oh, I'm sorry.
21   A    I don't think I was.
22   Q    Okay.  Did you have any outside employment in
23 September of 2004?
24   A    I may have been washing cars on the side, at
25 home or something.

Page 93

1    Q    I think we've been using the word investigator
2  a lot during this deposition.
3    A    Uh-huh.
4    Q    Would it be accurate to say that you were a
5  detective with the Russellville Police Department --
6    A    Yes, ma'am.
7    Q    -- in September of 2004?
8    A    Uh-huh.  Uh-huh.
9    Q    And as a detective with the Russellville
10 Police Department in September of 2004, can you recall
11 who your immediate supervisor was?
12   A    During that time, I think I was upstairs by
13 myself.  Now, my supervisor would've been the captain.
14   Q    And who was the captain?
15   A    I want -- I want to say chief -- it would've
16 been Barry Dill (phonetic).  Yeah, because Chief
17 Pendergraff was there, so it would've been Barry Dill.
18   Q    And so is it accurate to say that you
19 would report to Captain Dill on your shifts?
20   A    Uh-huh.  Yes, ma'am.  Uh-huh.
21   Q    Did you discuss your cases regularly with
22 Captain Dill?
23   A    He would ask me what -- he would -- he would -
24 - he would ask me what -- what did I have going and what
25 -- what I do -- or assign me cases.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 26 of 115 PageID #2819
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

94..97

Page 94

1    Q    Did you ever discuss the specifics of your
2  investigations with Captain Dill?
3    A    If he needed me to, if he needed to know what
4  was going on.
5    Q    And so that was just kind of on a need-to-know
6  basis?
7    A    Well, pretty much I would always tell them
8  what I had going on.  Yes, ma'am.  I would always tell
9  them what -- what I had going on, and they always knew.
10   Q    And when you had these discussions with
11 Captain Dill about your cases, would he give you certain
12 tasks to go perform?  Did he give you advice on how to
13 handle the investigation?
14   A    No, he didn't.  No, ma'am.
15   Q    How often did you have conversations with
16 Captain Dill about your specific cases?
17   A    I couldn't say exactly, to be honest.  I don't
18 know, but I'm -- I'm sure it was a weekly basis that --
19 that he would ask.
20   Q    Did you -- did the two of you have, like, a
21 regularly assigned time that you would meet during the
22 week to discuss cases?
23   A    Oh.  No, ma'am.  No, ma'am.
24   Q    So he would just pop in your office to ask you
25 what was going on or vice versa?

Page 95

1    A    Yes, ma'am.
2    Q    So more of an informal conversation?
3    A    Yes, ma'am.
4    Q    Now, did you ever investigate any cases
5  jointly with Captain Dill?
6    A    Oh, no.
7    Q    Did you ever conduct any interviews jointly
8  with Captain Dill?
9    A    No, ma'am.
10   Q    And you said that Jim Pendergraff was the
11 chief at the time in September of 2004, correct?
12   A    Yes, ma'am.
13   Q    What about Chief Pendergraff?  Did you have
14 any type of formal meetings that you would have with him
15 to discuss cases?
16   A    No, ma'am.
17   Q    Did Chief Pendergraff ever give you any
18 investigative tasks to go perform in your cases?
19   A    I'm sure he probably -- maybe did, but I don't
20 know -- I can't remember -- recall any -- what they
21 would be or anything, so...
22   Q    And did you have any formal meetings that were
23 scheduled with Mr. Pendergraff on a regular basis?
24   A    No, ma'am.
25   Q    Did you ever conduct any investigations with

Page 96

1  Chief Pendergraff?
2    A    No, ma'am.
3    Q    Did you ever jointly interview any witnesses
4  with the chief?
5    A    No, ma'am.
6    Q    Now, when you first joined the Russellville
7  Police Department in 1989, were you provided with a copy
8  of the policies and procedures that were in place at the
9  time?
10   A    Yes, ma'am.  I'm sure.
11   Q    In what form?
12   A    It was in paper form and probably in a binder.
13   Q    You're saying probably in a binder?
14   A    Well, I'm pretty sure it was in a binder.  Yes,
15 ma'am.
16   Q    Okay.  During your employment with the
17 Russellville Police Department, were -- the policies and
18 procedures that were in place in 1989, were they ever
19 updated?
20   A    I'm -- say that again.
21   Q    Okay.  So let me break it down a little bit.
22   A    Uh-huh.
23   Q    You said you were provided with some policies
24 when you first began in 1989.
25   A    Right.  Yes, ma'am.

Page 97

1    Q    Thereafter, were any of the policies updated?
2    A    I'm sure they were updated.  Yes, ma'am.  On
3  occasions.
4    Q    And how were you made aware of those updates?
5    A    Let me see.  I think they would make -- they
6  would make us copies, and they'd give them to us and
7  we'd have to put them into binders.
8    Q    We've discussed the training that you received
9  from the police academy.
10   A    Uh-huh.
11   Q    And we've discussed training that you'd
12 received from the Department of Criminal Justice
13 training.
14   A    Uh-huh.
15   Q    Did you receive any formal training from the
16 Russellville Police Department?
17   A    In what aspect?
18   Q    So did anyone come to the Russellville Police
19 Department and train you on anything, or was it that you
20 were always going to --
21   A    No, we always went -- we always went out.
22   Q    Okay.  And when you always went out, did you
23 always go out to Richmond for that training or --
24   A    No.  That -- sometimes we went to Louisville,
25 Kentucky, to SPI.  Paducah, Kentucky; Hopkinsville,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 27 of 115 PageID #2820
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
98..101

Page 98

1  Bowling Green, Saint Louis.  I've been to Saint Louis.
2  We had places come maybe from Florida, maybe given it
3  somewhere, some kind of conferences or something like
4  that.
5      Q    And was this through the Department of
6  Criminal Justice training that you're speaking of?
7      A    Some would be -- if you were going -- some
8  would be through the criminal justice.  Some would be --
9  oh, ROCIC is a place that gives also conferences and
10 stuff.
11     Q    And what's that stand for?
12     A    Regional -- let's see.  Regional Organized
13 Crime Information Center.
14     Q    I think earlier you said something about SPI?
15     A    Yes, that's in -- that's in Mobile, Kentucky.
16     Q    And what's SPI stand for?
17     A    Southern -- Southern Police Institute.  You're
18 taking me too far back.  I can't remember.
19     Q    I'm sorry.  You're doing a good job.  Now,
20 prior to 2004, were you given any specific training by
21 the Russellville Police Department on interviewing
22 witnesses?
23     A    No.
24     Q    The training you'd received is the training
25 that we discussed previously during your time at the

Page 99

1  police academy; is that right?
2      A    Say that again, please.
3      Q    The training that you'd received on
4  interviewing witnesses was what we had discussed earlier
5  from the police academy.
6      A    Well -- and some of it could have came from
7  the other places also.
8      Q    But none specifically from the Russellville
9  Police Department?
10     A    No.  No, ma'am.
11     Q    Okay.  And you testified earlier that you
12 didn't believe that there was a policy in place specific
13 to properly interviewing witnesses; is that right?
14     A    Not as I can remember now.
15     Q    We discussed earlier the training that you'd
16 received at the police academy --
17     A    Uh-huh.
18     Q    -- on how to properly document --
19     A    Uh-huh.
20     Q    -- information you learned during witness
21 interviews.
22     A    Uh-huh.
23     Q    Did you receive any training specific to
24 documenting information that you learned during witness
25 interviews from the Russellville Police Department prior

Page 100

1  to 2004?
2      A    No.
3      Q    And do --
4      A    I mean, I -- and -- I don't know how we -- I
5  mean, the sergeant that I had, as far as that goes, I
6  mean, he would -- you know, he would coach me and teach
7  me when I first started, so I guess -- yeah, I guess I'd
8  have to say that.
9      Q    Okay.  And how did the sergeant coach and
10 teach you when you first started?  Was there a program
11 in place?
12     A    Well, I mean, he would -- yeah, he would just
13 -- he would let me know what I needed to do and -- and
14 as far as that goes, as I went along.
15     Q    I'll be honest with you, I can't recall if
16 this has been discussed in previous depositions in this
17 case or others, but I know that some departments have
18 what are called field training officers.  Did the
19 Russellville Police Department have a program in place
20 with field training officers?
21     A    When I started -- you know, are you talking
22 about for -- are you talking about for patrolmen, or are
23 you talking about in the investigations?
24     Q    Well, I -- can you explain that to me?  Was
25 there a difference?

Page 101

1      A    Well, yeah.  In the -- in the -- in the
2  patrol, it's not like it -- it's not like it is now.  I
3  guess that -- I'd put it in that aspect.  But we did
4  have a train-- field training officer back then when I
5  was in the basic -- I mean when I was just a regular
6  patrolman.  And that's what happened with the first few
7  -- the first month or two months I was there, when I
8  first got there.  I rode with somebody for about a
9  month, I believe, maybe over a month, before I went to
10 the academy.
11     Q    So for the first couple of months that you
12 were employed with the Russellville Police Department,
13 you rode with a more experienced officer?
14     A    Yes.  They -- they would've been sergeants.
15     Q    Okay.
16     A    They would've all been sergeants, yes.
17     Q    And this was when you were a patrolman; is
18 that correct?
19     A    Yes, ma'am.  Uh-huh.
20     Q    And did the FTO just go over the basics of --
21 duties of a patrolman?
22     A    They didn't call it FTOs or nothing like that
23 --
24     Q    Okay.
25     A    -- but -- but they would go over things with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 28 of 115 PageID #: 2821
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

102..105

Page 102

1  us and -- and -- about what we should do, what we should
2  not do and things like that.
3      Q   Now, when you moved up -- or I -- I don't know
4  if moving up is the correct terminology.  When you
5  changed positions --
6      A   Uh-huh.
7      Q   -- from a patrolman to an investigator or
8  detective, did you have the same experience, where a
9  more experienced investigator kind of showed you the
10  ropes?
11      A   Yes, I did.
12      Q   Okay.  And who was that investigator?
13      A   That was Sergeant Len Embry.  He is deceased
14  now, so...
15      Q   And what kind of training did Sergeant Embry
16  give to you?
17      A   Well, as far as that type -- he would -- he
18  would show me how -- he would -- he would actually show
19  me how to write reports.  He would also correct my
20  reports.  He did show me how to start and conduct
21  interviews and how to interview witnesses.  He did show
22  me -- did teach me that also.
23      Q   What was the general practice of the
24  Russellville Police Department in 2004 when it came to
25  documenting witness interviews?

Page 103

1      A   Well, in -- in -- prior to 2004?
2      Q   Yes, sir.
3      A   Is that what you said?
4      Q   Or in 2004.
5      A   In 2004, yeah.  I guess you're assuming how we
6  would go about interviewing or talking to them.  A lot
7  of -- after I had learned, I would, you know, either
8  video, or I would -- they have volunteer sheets --
9  sheets that they could do volunteer statements on.
10      Q   You said you would video?
11      A   Sometimes I would, if it was -- you know, if I
12  could.  And then if not, then we were do it on -- they
13  had, like, volunteer statements.
14      Q   Okay.  And let's talk a little bit more about
15  the videoing process.
16      A   Uh-huh.
17      Q   What apparatus would you use to video a
18  statement?
19      A   Yeah, you can't use those big words on me.
20      Q   What type of device -- what type of device did
21  you use?
22      A   We would use -- we would either use -- I think
23  we had -- I think we had a video cam- -- we had video
24  cameras and stuff like that.
25      Q   Were they handheld video cameras?

Page 104

1      A   Some of them were.  And I think we -- we had
2  one in the interview room back then.  Yes, ma'am.
3      Q   If you were interviewing a witness at a crime
4  scene --
5      A   Uh-huh.
6      Q   -- would you video those?
7      A   No.  We would just -- well, we would take
8  documentation then.
9      Q   Okay.  And how would you take documentation?
10      A   Just on the voluntary statement.  Or most of
11  the time we would -- I would always bring them back to
12  the office and interview them in the -- at the police
13  department.
14      Q   Okay.  So you talked a couple of times about,
15  there was a voluntary statement form --
16      A   Yeah, it's called a --
17      Q   -- form?
18      A   Yeah, it's called a voluntary statement form
19  where they can fill out their selves.  And then
20  sometimes if they didn't want to fill it out, we would
21  write it and then write it out for them, and then they
22  would sign at the bottom.  We would cross out and stuff,
23  showing what the end of the statement was.  Some people
24  didn't like -- or couldn't write, maybe, the -- their
25  own statements.

Page 105

1      Q   So it was your standard practice in September
2  of 2004 to either video record witness statements or to
3  use these voluntary statements?
4      A   Oh, if we were in the field, we would take
5  them, we -- we would take it down on notes or something
6  like that also.
7      Q   If you were in the field and you would take
8  notes, would -- did you carry around of a -- a notebook
9  that you would keep --
10      A   Most of the time.
11      Q   -- your written notes in?
12      A   Yes.  Yes, ma'am.  Sometimes.
13      Q   And what would you do with those notes once
14  you got back to the station?
15      A   Those notes -- because notes is -- I would use
16  those notes to kind of remember what's going on, as far
17  as that goes.  A lot of times I would put them in the
18  file with them.
19      Q   So you would use those notes to remember what
20  was going on?
21      A   Yes.  Uh-huh.
22      Q   And would you then transfer that information
23  to a formal form?
24      A   If I had the note, yes, ma'am.  Uh-huh.
25      Q   And when you created that formal statement,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 29 of 115 PageID #2822
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
106..109

Page 106

1  did you do so -- we're talking about September of 2004.
2      A    Uh-huh.
3      Q    Was it your standard practice to do so in a
4  written -- I'm sorry, a typewritten report?
5      A    Yes.  We had to start typing by then.  Yes,
6  ma'am.
7      Q    And did -- once you had completed the
8  typewritten report --
9      A    Uh-huh.
10     Q    -- would you then just toss those notes or
11 keep them in a file at your desk or just keep them in
12 the -- in the notebook itself?  How did you handle the
13 written notes that you personally had taken to refresh
14 your memory?
15     A    I would put those in the -- in the case file.
16     Q    Did the Russellville Police Department have a
17 written policy on how to handle written notes?
18     A    I couldn't tell you.
19     Q    I'm sorry?
20     A    I couldn't -- I don't -- I don't -- I don't
21 know.
22     Q    Did the Russellville Police Department have a
23 written policy on disclosing those written notes?
24     A    I would say they probably did.
25     Q    Do you recall what the -- what that --

Page 107

1      A    Uh-uh.
2      Q    -- policy was?  So you're just guessing that
3  they did?
4      A    Yes, ma'am.
5      Q    Okay.  Once you typed up a witness statement -
6  -
7      A    Uh-huh.
8      Q    -- were you required to turn that witness
9  statement in to anyone specifically?
10     A    No.
11     Q    So what would -- what was your standard
12 practice?
13     A    It'd go in the case file.
14     Q    Okay.  So you'd type it up, print it out, and
15 then you would put it in the case file?
16     A    Yes, ma'am.
17     Q    Who was the custodian of the case files?
18     A    I think -- let's see.  It was Glenda Allen and
19 Jennifer -- well, she wasn't a Woods then, but she is
20 now.  Jennifer -- she's Jennifer Woods now.
21     Q    So were those -- are those officers within the
22 department or civilian employees?
23     A    No.  They're civilians employees.
24     Q    Okay.
25     A    Yes, ma'am.

Page 108

1      Q    And so there were civilian employees at the
2  station --
3      A    Uh-huh.
4      Q    -- that kind of physically kept the case
5  files; is that right?
6      A    Yes.
7      Q    And how were those case files stored?
8      A    I mean, they were put in -- they -- we had --
9  I think we had file cabinets and stuff.  Yeah.
10     Q    So in some departments, the lead investigator
11 on the case is in charge of keeping up -- up with the
12 case file.  Was that true of the Russellville Police
13 Department?
14     A    You're going to have to go in -- go further a
15 little bit than that.
16     Q    So it -- I know that in some departments --
17     A    Uh-huh.
18     Q    -- if you were named the lead investigator --
19     A    Right.
20     Q    -- on the case, it was your responsibility to
21 compile the case file --
22     A    Uh-huh.
23     Q    -- and to store it physically.
24     A    No.  When we finished -- when I finished --
25 well, when we finished case files back, we would give it

Page 109

1  to the -- to the records -- to the civilian record
2  keepers.
3      Q    Okay.  And when you say when you would finish
4  the case files, what do you mean?
5      A    Or even add to it.
6      Q    Okay.  So when a case file was first started -
7  -
8      A    Uh-huh
9      Q    -- was it your practice to immediately give
10 that case file to the civilian employees?
11     A    Yes, when we got to the point that we could
12 hand it -- hand it to them and stuff.
13     Q    And what was that point?
14     A    When you -- when you had finished your
15 compiling -- when you had finished and compiled your
16 investigation.
17     Q    Okay.  So prior to completing the
18 investigation, was the case file kept in the possession
19 of the investigator on the case?
20     A    You're talking about before we got finished
21 with it?
22     Q    Yeah.  So -- okay.  Let's start again.  I'm
23 sorry.  So in 2004 --
24     A    Uh-huh.
25     Q    -- if you were named the lead --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 30 of 115 PageID #: 2823
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
110..113

Page 110

1    A    Uh-huh.
2    Q    -- investigator --
3    A    Uh-huh.
4    Q    -- on the case --
5    A    As long as you --
6    Q    -- and you went out and you took witness
7    statements --
8    A    Uh-huh
9    Q    -- you came back to the station and you
10   drafted up the typewritten documents from those
11   witnesses statements --
12   A    Yes, ma'am.
13   Q    -- where would you find the case file at that
14   point, if we're in the initial stages of the
15   investigation?
16   A    That would be with me still --
17   Q    Okay.
18   A    -- or the investigator.
19   Q    The investigator --
20   A    Uh-huh
21   Q    -- would still have the case file in his or
22   her possession during the initial stages of the
23   investigation?
24   A    Yes, ma'am.
25   Q    What I'm hearing you say is that at some point

Page 111

1    you would turn over that case --
2    A    Yes, ma'am.
3    Q    -- file to the civilian employees to put in a
4    filing cabinet.
5    A    Yes, ma'am.
6    Q    Okay.  At what point did you turn the case
7    files over to be placed in those filing cabinets?
8    A    When I'm finished with it.
9    Q    Okay.  And when you say when you were
10   finished, does that mean when the case was cleared by
11   arrest, when it resulted in a conviction?  When it was
12   the finishing point that indicated the case files should
13   be turned over to the civilians?
14   A    Either when it was cleared by arrest or when
15   it was to a point that we couldn't go any further.
16   Q    Okay.  So if an investigation lasted six
17   months before it was either cleared by arrest or went
18   cold, for that six months, the case file would be in the
19   possession of the investigator; is that a fair
20   statement?
21   A    Yes, because we could still work on it.  Yes,
22   ma'am.
23   Q    If the case lasted two years, if the
24   investigation lasted two years, would it -- it would
25   remain in the possession of the investigator during that

Page 112

1    two years, until it was cleared by arrest or otherwise
2    stalled?
3    A    No, it wouldn't stay up there two years.  No.
4    Q    Did you have any cases where the investigation
5    lasted as long as two years?
6    A    I had -- yes, ma'am.  I've had one last a year
7    and a half.
8    Q    Okay.  And what did you do with the case file
9    during that year and a half?  When did you turn it over
10   to the civilians?
11   A    When I got to the point where I could -- I --
12   I -- when I got to the point where I was either stalled
13   -- but I could be stalled for just a week or maybe just
14   a few days, so I could add to it.  So I wouldn't keep it
15   in there the full two years.  I would still have to go
16   add to it.  So when I could -- got to the point where --
17   when I got to the -- to the point where I was done with
18   what I could go as far, then I would possibly turn it
19   over -- would turn it over to them, but not that the
20   whole two years, no.
21   Q    And in the cases that lasted longer and that
22   you'd already turned over the case file and they put --
23   put in the -- in the storage --
24   A    Uh-huh.
25   Q    -- did you then create, like, a -- a separate

Page 113

1    file that you kept in your possession and that you would
2    then later add to the case file in the storage?
3    A    No, if I finished them, I would just -- like,
4    if I finished the sheet or two or three sheets or pages
5    or whatever, I would just give that to them --
6    Q    Okay.
7    A    -- to put in the file.  The way -- I guess the
8    way we could do -- it -- it -- it was a different way
9    since I started than we can do them now because we
10   didn't have this system, how you could add and all that
11   kind stuff.
12   Q    Yeah.  So tell me specifically about September
13   of 2004.  What was the process back then?
14   A    I think we -- I don't know what system we had.
15   I can't remember if we had the NIBRS system where we had
16   to -- where we could add to stuff, like we could just go
17   the computer and add to it and it just goes to them, or
18   if we had to just physically type it.  I think we just
19   had to physically type it out and give it to them back
20   then.  I don't think we were in the -- the system, and I
21   can't remember when it started.
22   Q    I think there are --
23   A    Which --
24   Q    I -- I don't know if they're in the documents
25   I gave you, but I think there is a NIBRS report.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 31 of 115 PageID #: 2824
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

114..117

Page 114

1    A    I think there are NIBRS in this one.  So I
2    think we had started it then.  But now, as we went on,
3    it kept, like -- you couldn't do certain things.  It
4    kept adding -- like, they kept adding things where you
5    could do things.
6    Q    So this was the -- if it was -- if it's true
7    that by September of 2004 you were using the NIBRS
8    system --
9    A    Uh-huh.
10   Q    -- is it accurate to say that you would simply
11   type up your reports or your activities within that
12   system and it would electronically be transferred?
13   A    If -- if it was accepting it that way then.
14   And I don't know.  See, I don't know how -- if it was
15   accepting it -- if it was accepting it where you could
16   go in and do an -- an attachment.
17   Q    Okay.  If you were using the NIBRS system, and
18   you had taken handwritten notes out in the field, and
19   then you went back in and you typed in -- you know, you
20   created a formal report --
21   A    Uh-huh.
22   Q    -- would you somehow attach those notes
23   electronically to the file, or would that be a instance
24   in which you would keep those handwritten notes
25   separate?

Page 115

1    A    I maybe could have done both ways possibly.  I
2    can't say for sure on that.
3    Q    Okay.  I believe that you told me earlier
4    that, prior to September of 2004, you hadn't received
5    any specific training regarding fire investigation; is
6    that correct?
7    A    No, I -- no, ma'am.
8    Q    Have you received any training specific to
9    fire investigation since that time?
10   A    No.
11   Q    So you've never had fire investigative
12   training?
13   A    I may have had something that was entwined
14   with people, but nothing to amount to what these
15   other people have.
16        MS. STAPLES:  Yeah.  All right, sir.  I'm on a
17   good breaking point.  Let's take a small break,
18   please.
19        VIDEOGRAPHER:  Okay.  We are off the record at
20   11:17 a.m.
21        (OFF THE RECORD)
22        VIDEOGRAPHER:  All right.  We are back on
23   record at 11:24.
24   BY MS. STAPLES:
25   Q    All right, Mr. Edmonds.  Were you on duty the

Page 116

1    evening of September 11, 2004?
2    A    No, I wasn't on duty.  No, ma'am.
3    Q    Is it true that you were dispatched to Bonnie
4    Drive in Russellville that evening?
5    A    Yes, ma'am.
6    Q    And what information were you provided by the
7    dispatch when you received that dispatch?
8    A    I think they told me that there was a trailer
9    -- there was a house or -- a house on fire or something
10   like that and they were request -- were requesting me to
11   come there.
12   Q    Was it typical for you to be dispatched to
13   fires?
14   A    On occasions.  I -- I -- I -- like I said, on
15   occasions, yes.
16   Q    Were there specific circumstances under which
17   you would be dispatched to a fire?
18   A    Yes.  It would have to be something in
19   specific for that to happen most of the time.
20   Q    Like what?
21   A    If they thought something was different about
22   what had occurred or, like in this case, there was
23   children involved or maybe a body involved or something
24   like that.
25   Q    So when you were first dispatched to Bonnie

Page 117

1    Drive that night, were you told any of those specifics,
2    that there --
3    A    They -- I think --
4    Q    -- may be children involved?
5    A    Yes, ma'am.  I think they said something about
6    children were involved.  Yes, ma'am.
7    Q    Let's look at what I have marked as
8    Plaintiff's Exhibit number 3, sir.
9        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
10   A    Okay.  You want me to go through that?  Is
11   that correct?
12   Q    Yes, please.
13   A    Okay.
14   Q    Do you recognize this document, sir?
15   A    Yes, ma'am.
16   Q    What is this document?
17   A    it -- it's a -- we use -- it's a CAD.
18   Q    And what's a CAD?
19   A    It's -- it's where the dispatchers, when they
20   get a call, they document information that -- from the
21   caller that's calling in, or callers.
22   Q    And does it include information about the law
23   enforcement officers that are dispatched to a scene?
24   A    Majority of the time, yes, ma'am.
25   Q    And typically does it include, like, arrival

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 32 of 115 PageID
#: 2825
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

118..121

Page 118

1    times at the scene?
2        A    Say that again?
3        Q    Does it typically include times that law
4    enforcement --
5        A    Oh, yes, ma'am.
6        Q    -- officer arrive at a scene?
7        A    Yes, ma'am.
8        Q    Does it typically include times that a law
9    enforcement officer is en route to the scene?
10       A    Yes, ma'am.
11       Q    So it's just kind of a narrative --
12       A    Yes, ma'am.
13       Q    -- or step by step of events that occur after
14   dispatch has received a call --
15       A    Yes, ma'am.
16       Q    -- is that right?
17       A    Yes, ma'am.  Yes, ma'am.
18       Q    Okay.  Now, is it correct that in 2004, you
19   were unit 832?
20       A    That's me.
21       Q    Do you remain unit 832?
22       A    I still -- yes, ma'am.  Uh-huh.
23       Q    Okay.  So I have gone through this CAD report,
24   and it looks like to me the first time that I see your
25   unit number referenced is on page 3 of report.

Page 119

1        A    Page 3.  Okay.
2        Q    And it looks like to me it's about two thirds
3    of the way down the page.
4        A    832, a 10 -- 10-18.
5        Q    Okay.
6        A    Is that what you're talking about?
7        Q    Yes, sir.
8        A    Uh-huh.
9        Q    What does 10-18 mean?
10       A    That means I'm on my way.
11       Q    Okay.  And is it true that you were on your
12   way, according to this document, at 19:44?
13       A    Yes, ma'am.  If it's correct, yes, ma'am.
14       Q    And does that equate to 7:52 p.m. non-military
15   time?
16       A    19:00?
17       Q    Uh-huh.
18       A    It'll be -- it'll be 7:00.  Yeah.
19       Q    Okay.
20       A    7:44.  Yes, ma'am.
21       Q    Oh, yeah.  I think I said 7:52.  My apologies.
22       A    Yes.  7:44.  Yes, ma'am.
23       Q    Okay.  And I got the 7:52 from the next entry
24   that I saw relative to your badge number.
25       A    Bonnie Drive, uh-huh.

Page 120

1        Q    Okay.  And so it says 832, 10-97.  What does
2    1097 mean?
3        A    That means when I -- that's -- I arrived at
4    the scene.
5        Q    Okay.  And would you agree that it says that
6    you arrived at 19:52?
7        A    That's what it says.  Yes, ma'am.
8        Q    Okay.  So that would be 7:52?
9        A    Yes, ma'am.
10       Q    Okay.  And then if you turn to the next page,
11   looked like the next time your badge number is
12   referenced is 832, 10-18 LMH at 2023.  Do you see that?
13       A    Yes, ma'am.
14       Q    Okay.  And you said 10-18 means you're on the
15   way?
16       A    Uh-huh.  Yes, ma'am.
17       Q    LMH, what does that stand for?
18       A    That's Logan Memorial Hospital.
19       Q    So you had been at the scene since 19:52, and
20   you were leaving the scene by 20:23 to go to the
21   hospital; is that correct?
22       A    What'd you say, by 20 --
23       Q    20:23.
24       A    Okay.  Yes, ma'am.
25       Q    So that would have you being at the scene for

Page 121

1    about 30 minutes or so.
2        A    Uh-huh.
3        Q    Is that right?
4        A    Okay.
5        Q    Now, when you were first dispatched to the
6    call at Bonnie Drive on that evening, did anyone go with
7    you to that scene, or were you alone?
8        A    No, I was by myself.
9        Q    And when you left the scene, to travel to the
10   hospital, did anyone accompany you to the hospital, or
11   were you alone?
12       A    I can't say for sure.  I -- I'm almost --
13   pretty sure I'd be alone.
14       Q    What did you personally observe when you first
15   arrived at the scene that evening?
16       A    When I arrived, I -- there was -- I think
17   there were people, fire trucks, police personnel.  There
18   was smoke coming out of the -- out of the residence.  I
19   think Officer Ron Mills was at the front of the trailer,
20   maybe.  Yeah.  I'm -- I'm pretty sure he was at the
21   front of the trailer.
22       Q    When you first arrived, was the structure
23   still on fire?
24       A    It was -- it was smoking.  It was a lot of
25   smoke coming out of it.



Kentuckiana Reporters                                          502.589.2273 Phone
30 South Wacker Drive, 22nd Floor                              502.584.0119 Fax
Chicago, Illinois 60606                                schedule@kentuckianareporters.com
                                                       www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 33 of 115 PageID #: 2826
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
122..125

Page 122

1    Q    Did you notice -- you said you saw fire
2  trucks, correct?
3    A    Yes, ma'am.
4    Q    Did you see fire officials --
5    A    Oh, yes --
6    Q    -- using --
7    A    Yes, ma'am.  Yes, ma'am.
8    Q    -- hoses to try to put out the fire?
9    A    Yes, ma'am.  I would say that.  Yes, ma'am.
10   Q    Okay.  If you will, turn with me to what we've
11 marked as Plaintiff's Exhibit number 4.
12        (EXHIBIT 4 MARKED FOR IDENTIFICATION.)
13   A    Okay.  All right then.
14   Q    And I believe you testified earlier that you
15 had reviewed this fire investigative report prior to
16 today's deposition; is that correct?
17   A    I think I have.  I'm not -- maybe I'd seen it
18 one point in time, but I mean, I -- I don't know how
19 recently, as far as that goes.  I'm sorry.
20   Q    No, that's okay.  Let me show you what I'm --
21   A    Okay.
22   Q    -- really wanting to talk with you about.
23   A    Okay.
24   Q    And that's what is Bates stamped AG-00008.
25   A    AG-000 --

Page 123

1    Q    Where there's real small numbers at the bottom
2  of the pages.
3    A    Okay.
4    Q    Do you see the pictures there, sir?
5    A    Uh-huh.
6    Q    Have you seen these pictures before?
7    A    I'm sure I've seen the pictures.  Whether
8  they're mine or not, I don't know.
9    Q    Right.  Do you recognize the structure that's
10 --
11   A    I do.
12   Q    -- depicted in these --
13   A    I do.  Yes, ma'am.
14   Q    -- pictures?
15   A    Yes, ma'am.
16   Q    And what is that structure?
17   A    That is like a -- it's a house trailer.
18   Q    Okay.  Is this the trailer that you saw smoke
19 coming from on the evening of 9-11-2004?
20   A    Yes, ma'am.  Yes -- yes, ma'am.
21   Q    According to page 7 of that report, the prior
22 page, it says that picture number 1 is the front of the
23 structure.
24   A    Which one, ma'am?
25   Q    Yes.  Oh, I'm sorry.  The -- that page right

Page 124

1  here.
2    A    Oh, this right here.  Okay.
3    Q    You see it says that picture number 1 on the
4  next page is the front of the structure?
5    A    Yes, Ma'am.
6    Q    That picture number 2, it's the south end of
7  the structure.
8    A    Okay.
9    Q    And if you turn to the next page, it says that
10 number 3 is the rear of the structure, and then 4 is the
11 north end of the structure.  Do you see that?
12   A    Uh-huh.  Yes, Ma'am.
13   Q    Looking at those pictures, can you tell me at
14 which viewpoint you approached the scene?  Were you
15 looking at the front of the trailer, the back of the
16 trailer?
17        MR. MANDO:  At what point in time?
18   Q    When you first --
19   A    When I first arrived?
20   Q    -- first arrived on the scene.
21   A    I think that came -- I think I came off of
22 Clara Drive, and I would have saw the front of the house
23 trailer.
24   Q    Okay.  So Clara Drive would've taken you to
25 the front of the structure?

Page 125

1    A    Yeah, because this trailer faces -- yeah, this
2  trailer faces Clara Drive.
3    Q    Okay.
4    A    Uh-huh.
5    Q    And when you first approached the front of the
6  structure, you said that you saw smoke coming from the
7  structure; is that correct?
8    A    When I -- when I -- once I got closer.  Yes,
9  ma'am.
10   Q    Okay.  And from where specifically did you see
11 smoke?
12   A    It was at the front, because I remember
13 Officer Ron Mills being at the front of the trailer.
14   Q    Was it like at the front door?
15   A    The front door.  Yes, ma'am.  Front door.
16 Uh-huh.
17        MR. MANDO:  I'm sorry.  Can you clarify that?
18        Are you asking him whether he met Ron Mills at the
19        front door or if that's where he saw smoke coming
20        the front time?  I'm a little -- that --
21 BY MS. STAPLES:
22   Q    Yeah.  We were talking about where he -- where
23 he saw the smoke.
24   A    The smoke.  I saw the smoke coming from the --
25 in the front door area.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 34 of 115 PageID #2827
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
126..129

Page 126

1    Q    Okay.
2    A    Yes, ma'am.
3    Q    And you stated that you saw Officer Mills
4  along the front of the trailer.  Did you recognize any
5  other individuals who were standing there along the
6  front of the trailer when you first approached?
7    A    I can't remember who else I -- I can't
8  remember.
9    Q    Can you recall whether you saw any non-
10  emergency responders standing there at the front of the
11  trailer when you first arrived on scene?
12    A    And when you talk about the front, what part
13  of the front?  Are you talking about where Mr. Mills
14  were -- was?
15    Q    Well, my understanding from your testimony is
16  that when you first walked up, you walked up to the
17  front of the trailer, and that you saw smoke coming from
18  the front door; is that right?
19    A    Uh-huh.  Uh-huh.
20    Q    And that you saw Officer Mills standing there
21  in front of the trailer.
22    A    Uh-huh.
23    Q    Did you see any other individuals standing
24  there in front of the trailer when you first arrived?
25    A    Yeah.  I think there was people around.  I

Page 127

1  mean, I'm -- how close, how far, I don't remember that.
2  He was -- he got my attention for whatever reasons.
3    Q    Would it be safe to say that it was somewhat a
4  chaotic scene at the time when you first arrived?
5    A    Yes, ma'am.  I would -- I would go with that.
6  Yes, ma'am.
7    Q    And when you said that Officer Mills first got
8  your attention, do you mean that he purposely reached
9  out to get your attention or Officer Mills is who you
10  first noticed?
11    A    Yeah, because he -- the person was right there
12  by the door, and all this smoke was coming out.
13    Q    Okay.  Okay.  So after arriving at the scene
14  and observing Mr. Mills standing there at the front door
15  area, what did you do?
16    A    I -- I think I went -- I went around the
17  backside to see what was going on.
18    Q    And what caused you to go around to the
19  backside?
20    A    Because there was more people around there,
21  and I wanted to see who was all around there.
22    Q    Did you observe anyone specifically at the
23  backside of the trailer that you knew?
24    A    I mean, firefighters, and the coroner was
25  there, I believe.

Page 128

1    Q    And were the firefighters that were standing
2  along the backside of the structures to your -- still
3  attempting to extinguish the fire?
4    A    I would say yes, ma'am.  They had to be.
5    Q    And you said you believe that the coroner was
6  there along the backside of those structure?
7    A    I'm almost sure.  Yes, ma'am.
8    Q    Were there any other law enforcement -- law
9  enforcement officers there that you recognized?
10    A    I think after -- after the -- yes -- I --
11  yeah, there was some -- there was some more there.  I
12  think Officer Eddie Higgins finally came in place
13  somewhere there.  I don't remember because I didn't
14  remember him being there and then -- as far as that goes
15  and -- and everything.
16    Q    So is it your testimony that you didn't
17  personally observe Mr. Higgins at the scene initially?
18    A    I don't remember seeing him there because some
19  reason at -- when I saw Mr. -- Mr. -- officer Mills.
20    Q    Did you see Mr. Higgins at the scene at any
21  point that evening?
22    A    I'm sure eventually I did.  I just don't know
23  what point I saw him.
24    Q    Sitting here today, you have no recollection
25  of whether you saw Mr. Higgins at the scene or at what

Page 129

1  time?
2    A    Uh-uh.  Uh-uh.
3    MR. MANDO:  Hey, Ken, try and answer yes or no
4  for the record.
5    THE WITNESS:  Okay.  Yes.  I'm sorry.
6    MS. STAPLE:  Sorry.  And I --
7    THE WITNESS:  No.
8    MR. MANDO:  As opposed to uh-huh, uh-uh.
9    THE WITNESS:  No.  No more.
10  BY MS. STAPLES:
11    Q    Okay.  So you walked around the backside of
12  the trailer.  And what did you do next?
13    A    I was just standing there.  It was -- I
14  mean...
15    Q    Did you speak with anyone when you arrived?
16    A    Officer Mills was -- was the one who filled me
17  in.
18    Q    Okay.  And when you say Officer Mills filled
19  you in, what did Officer Mills say to you?
20    A    After -- I think at that moment, I know at the
21  trailer he was trying to, you know, I guess get in and
22  get somebody.  Then after the fact he filled me in more
23  that -- that the house had caught on fire.  There was
24  some children in there.
25    Q    So he told you that there were children in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 35 of 115 PageID #2828
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

130..133

Page 130

1  fire?

2      A    Yes, ma'am.

3      Q    Did he give you a number of children that were

4  in the fire?

5      A    I'm sure he did somewhere at some point in

6  time.

7      Q    Did he inform you that one child had already

8  been taken out of the fire?

9      A    Yes.

10     Q    Did he inform you at that time that there was

11  a possibility of a second child still being in the

12  structure?

13     A    Yes, uh-huh.

14     Q    Did he inform you that the child who had been

15  taken out of the fire was rescued by her mother?

16     A    Yes.

17     Q    Sir, if you will turn -- well, before I have

18  you look at the report, I do want to know your

19  recollection.  What else do you remember Sergeant Mills

20  saying to you during this conversation?

21     A    I don't -- yeah, I don't -- I don't -- I don't

22  remember.

23     Q    I know, it's been a long time ago.

24     A    Yes, ma'am.

25     Q    Do you recall how long you had been at the

Page 131

1  scene before you had this conversation with Sergeant

2  Mills?

3      A    It would have had to been after everything

4  kind of calmed down, because it's -- like I said, it was

5  kind chaotic.  It had to be after everything had calmed

6  down.

7      Q    So I think we established from the CAD report

8  that you were at the scene that first time for 30

9  minutes.  So can you estimate whether you've been there

10  five minutes, ten minutes, 25 minutes, as to when you

11  had this conversation with Officer Mills?

12     A    No, ma'am.

13     Q    Okay.  Let's turn to what I've marked as

14  Plaintiff's Exhibit number 2.

15     A    Okay.  Go ahead.

16     Q    Do you recognize this document, sir?

17     A    Yes, ma'am.

18     Q    Would you agree with me that this is a

19  supplemental report?

20     A    Yes, ma'am.

21     Q    Bates Stamps RPD 53 through 56.

22     A    Okay.

23     Q    And would you agree with me that, on the last

24  page of the report --

25     A    The last page?

Page 132

1      Q    Yes, sir.

2      A    Okay.

3      Q    It has Detective Kenneth Edmonds?

4      A    Yes, ma'am.

5      Q    Is this a report that you created, sir?

6      A    Yes, ma'am.

7      Q    Okay.  If you would, just take a minute to

8  look at that first paragraph on the first page.  You can

9  just read that to yourself for a moment, then I'll ask

10  you some questions to see if that refreshes your

11  recollection about what all you learned from Sergeant

12  Mills at the time.

13     A    Okay.

14     Q    You read it already?

15     A    Yes, ma'am.

16     Q    Quick.  All right, sir.  So would you agree

17  with me that, according to this report, that Sergeant

18  Mills had told you that one child was rescued by the

19  mother?

20     A    Yes.  Yes, ma'am.

21     Q    That there was a possibility another child was

22  in the house?

23     A    Yes.

24     Q    He stated there were a total of four kids.

25     A    Yes, ma'am.

Page 133

1      Q    That the two oldest were not at the location.

2      A    Okay.  Yes, ma'am.

3      Q    But with an aunt by the name of Kay?

4      A    Yes, ma'am.

5      Q    Did he tell you that Robert Yell was the

6  father of two of the children?

7      A    See, I don't -- I don't remember that.

8      Q    Do you see --

9      A    But if it's in here, I mean, he had to tell

10  me.  But as far as I just remember it.

11     Q    Okay.

12     A    Yeah.  I -- if he said that that's what -- if

13  that's what it says, it's what he said.

14     Q    Well, and this is a report that you typed up,

15  correct?

16     A    Yes, ma'am.  Uh-huh.  Yes, ma'am.

17     Q    Okay.  And looking at this report, can you

18  tell when you created this document?

19     A    It would have been September the 13th.

20     Q    So two days after the fire?

21     A    Uh-huh.  Uh-huh.

22     Q    So would you agree with me then that your

23  memory then is probably a little bit more clear than it

24  is all these years later?

25     A    Yes, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 36 of 115 PageID #: 2829
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

134..137

Page 134

1    Q    Okay.  And do you see where in this report you
2  stated that Mr. Mills told you that Officer Higgins had
3  taken Mr. Yell to the Logan County jail?
4    A    Yes.  Uh-huh.
5    Q    Did Mr. Mills advise you that Robert Yell was
6  very intoxicated?
7    A    He did.  Yes, ma'am.
8    Q    Did he advise you that the mother, April
9  Davis, was also intoxicated?
10   A    Yes, ma'am.
11   Q    And did he advise you that the fire might have
12 been intentionally set by Mr. Yell?
13   A    Yes, ma'am.
14   Q    So is it accurate to state that within less
15 than 30 minutes of you arriving on the scene after being
16 dispatched that Robert Yell was a suspect in the cause
17 of the fire?
18   A    A suspect for me or a suspect for Mr. Mills?
19   Q    Well, what's your answer to that?
20   A    He could have been a suspect for Mr. Mills at
21 that time.
22   Q    Well, Mr. Mills told you he was, correct?
23   A    Yes.  Uh-huh.
24   Q    Okay.  Is it also true that within -- well,
25 let me strike that.  Let me ask you a question.

Page 135

1    A    Okay.
2    Q    And that'll involve us having to look back at
3  the CAD, which was Plaintiff's Exhibit number 3.
4    A    3.  Yes, ma'am.
5    Q    And would you agree that in the middle part of
6  that page, under narrative --
7    A    On the first page?
8    Q    Yes, sir.
9    A    Okay.
10   Q    That it says, "Advise the residence behind her
11 is on fire and she believes the children might still be
12 inside the residence."  Do you see that?
13   A    I see that.
14   Q    Do you agree with me that that was at least
15 documented as having been received at 19:25 on
16 9-11-2004?
17   A    Yes, ma'am, if that's what it says.
18   Q    Okay.  And we said that you arrived at 19:52;
19 is that right?
20   A    I thought that was 19:44, but you could be
21 right.
22   Q    Oh, it is.  I keep saying -- well, no, no, no.
23 I think 19:44 is when you said you were en route.
24   A    Oh, it was 10-18.  You -- you're correct.  Yes,
25 ma'am.

Page 136

1    Q    And then you arrived --
2    A    Yes, ma'am.
3    Q    -- at 19:54?
4    A    Yes, ma'am.  Okay.  Yes, ma'am.
5    Q    Okay.  So you arrived within 25 minutes of
6  when the initial call was received saying the structure
7  was on fire; is that right?
8    A    Uh-huh.  Yes, ma'am.
9    Q    Okay.  And then you were at the scene for
10 approximately 30 minutes?
11   A    From what it shows on the CAD.
12   Q    So anywhere between 30 minutes after the fire
13 was first called in to an hour of when the first fire
14 was called in, Sergeant Mills is telling you that he
15 believed that the fire was intentionally set; is that
16 right?
17   A    Yes, ma'am.
18   Q    And he is telling you that Robert Yell is a
19 suspect in what he believed to be an intentional fire?
20   A    Yes, ma'am.
21        MR. MANDO:  Objection, characterization.
22   Q    And -- well, what did you put in your report,
23 sir, regarding what Mr. Mills told you in regard to the
24 fire and Robert Yell?
25   A    On the first page?

Page 137

1    A    Uh-huh.
2    Q    Okay.  I put in there that he said he was
3  possible suspect.
4    A    And "It was also told to me that this fire
5  might have been intentionally set by Yell," correct?
6    A    Yes.
7    Q    And that was what Sergeant Mill's
8  characterization was to you, right?
9    A    Yes, ma'am.
10   Q    So even though the structure was still on
11 fire, Sergeant Mills had already determined that this
12 was possibly an intentional fire, correct?
13   A    Yes, ma'am.
14   Q    At the time that Sergeant Mills gave you this
15 information, did he inform you that he had been inside
16 the structure?
17   A    I don't recall that.
18   Q    You don't recall having any conversation with
19 Sergeant Mills about what he may have personally
20 observed when he first entered the structure?
21   A    (No verbal response.)
22        COURT REPORTER:  There was no verbal response.
23   A    Oh.  No, ma'am.  Sorry.
24   Q    So according to this document that you
25 drafted, it appears that Mr. Yell had already been



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 138

1  arrested and transported from the scene by the time that
2  you arrived.  Does that sound right to you?
3      A    It sounds right to me.  Yes, ma'am.
4      Q    And if Officer Higgins is the one that
5  transported and arrested Mr. Yell, that would make sense
6  as to why you don't recall seeing him at the scene,
7  right?
8      A    Right.  Yes, ma'am.
9      Q    So is it safe to say then that you never
10 personally observed Robert Yell at the scene?
11     A    No, ma'am, not as I recall.  No, ma'am.  No,
12 ma'am.
13     Q    You didn't personally observe any interaction
14 that Robert Yell had with law enforcement officers at
15 the scene; is that correct?
16     A    No, ma'am.
17     Q    You didn't personally observe law enforcement
18 officers tackling Mr. Yell to the ground as he ran
19 towards the structure; is that right?
20     A    No, ma'am.
21     Q    You didn't personally observe Officer Higgins
22 strike Mr. Yell in the chest?
23     A    No, ma'am.
24          MR. MANDO:  Objections to characterizations,
25     but go ahead and answer.

Page 139

1      Q    Are you aware that Officer Higgins has
2  testified that he physically struck Mr. Yell in the
3  chest?
4      A    No.
5      Q    You didn't personally witness Officer Higgins
6  yelling and cursing at Mr. Yell; is that correct?
7      A    No.
8      Q    And you didn't personally observe Officer
9  Higgins spray Mr. Yell with pepper spray?
10     A    No.
11     Q    You didn't see any of those interactions --
12     A    No.
13     Q    -- because Mr. Yell was already gone from the
14 scene by the time that you arrived.  On that note, how
15 long did you work with Officer Higgins?
16     A    I don't know how long.  I don't remember how
17 long he was there.  I don't remember when he was first
18 hired.
19     Q    Was it months, years?
20     A    No.  It was -- it was years.
21     Q    Did Mr. Higgins have a reputation for using
22 force against suspects while he was employed with the
23 Russellville Police Department?
24     A    I couldn't tell you that, because we never
25 worked it like that.

Page 140

1      Q    You-all never worked closely together like
2  that?
3      A    No, not -- not on the streets.  We never
4  worked the streets together.
5      Q    Have you ever physically struck an individual
6  who was under arrest in the chest?
7      A    No, ma'am.
8      Q    Have you ever physically struck an individual
9  that was under arrest in -- on any part of their body?
10     A    No, ma'am.
11     Q    Have you ever personally used pepper spray --
12     A    One time.
13     Q    -- on a suspect or individual?
14     A    One time.  Yes, ma'am.
15     Q    And what were the circumstances that one time?
16     A    We had an individual -- we had a complaint.  It
17 was actually myself and -- and another chief.  I just --
18 I don't know if I happened -- I don't know what the
19 situation was, but he -- he wouldn't get in the car and
20 just kept refusing to get in the car.
21     Q    And how many times did you spray that
22 individual?
23     A    Oh, just one time.
24     Q    Did you receive training from the Russellville
25 Police Department on the proper use of pepper spray or

Page 141

1  OC spray?
2      A    I did.  Yes, ma'am.
3      Q    And what did that training involve?
4      A    It involved having to be sprayed.
5      Q    And tell me what that was like.
6      A    It was terrible.
7      Q    What reaction did you have to -- what physical
8  reaction did you have to being pepper sprayed?
9      A    It was like -- it just stopped you up and made
10 you cough.  Teary eyed, your eyes are red.  Snotty and
11 runny nose.
12     Q    Okay.  You said it made you cough?
13     A    It made me cough, I personally.
14     Q    And stopped you up?
15     A    Yes, ma'am.
16     Q    And gave you a snotty and runny nose?
17     A    Yes, ma'am.
18     Q    Did it affect your eyes?
19     A    Yes, ma'am.  My eyes were blurry, stinging,
20 and burning.
21     Q    And when you say that it made you cough, did
22 it affect, like, your throat or your air passageway in
23 any way?
24     A    I can only say for me it did.
25     Q    It did?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Page 142

1    A    Yes, ma'am. Uh-huh.
2    Q    And how many times were you pepper sprayed
3 during that encounter?
4    A    Just -- from what they've done to us?
5    Q    Yes, sir.
6    A    Just one time.
7    Q    And how long did the effects of that pepper
8 spray last for you personally?
9    A    Oh, shoot. It lasted a while. I don't know
10 exactly how long, but it lasted a while.
11    Q    And when you received this training, you said
12 you received it from the Russellville Police Department;
13 is that correct?
14    A    Yeah. I'm almost sure they sprayed -- they
15 were the one that sprayed us.
16    Q    Were you given any guidance on how many times
17 that you should spray an individual during one encounter
18 with that individual?
19    A    No. I don't think it was anything as far as
20 that goes, not as I recall.
21    Q    Were you told a maximum number of times that
22 you should use a spray on someone?
23    A    I don't remember. No, ma'am.
24    Q    Going back to the time that you had to deploy
25 your pepper spray against the individual who wouldn't

Page 143

1 get in the car, did you say that you only pepper sprayed
2 him once?
3    A    One time. Yes, ma'am.
4    Q    Now, sir, after you spoke with Sergeant Mills
5 here at the scene, do you recall what you observed?
6 Specifically do you recall what you observed in regard
7 to the child being removed from the structure?
8    A    Yes. I -- the deputy -- the coroner brought
9 the child out of the -- well, I can't say that. The
10 coroner had the child, because I was in the back. I do
11 remember that I was in the back of the house and the
12 coroner had the child.
13    Q    You physically saw the coroner carrying the
14 child?
15    A    Yes, ma'am.
16    Q    And did you speak with the coroner at that
17 time?
18    A    Yes, ma'am.
19    Q    And what did you learn?
20    A    Oh, no. I didn't speak with him in terms
21 about that. I asked him why did he remove -- I did ask
22 him why did he remove the child?
23    Q    And what did you learn?
24    A    He said, "I just couldn't leave -- see that
25 child stay in there."

Page 144

1    Q    So at the time that the coroner had the child
2 -- was it a female deputy coroner or a male deputy
3 coroner?
4    A    I thought it was Mr. Jackie Dunlap, so the --
5 the -- the regional coroner.
6    Q    Okay. I'm sorry. I thought you said earlier,
7 deputy coroner. So --
8    A    I'm sorry, coroner.
9    Q    It's your understanding -- it's your memory
10 that it was the coroner that was there at the scene.
11    A    The coroner.
12    Q    And you said that's who?
13    A    That he -- that's what?
14    Q    What was that person's name?
15    A    Oh, his name was Jackie Dunlap. He's
16 deceased.
17    Q    Jackie. Okay. Jackie's a male. Okay. And
18 that Mr. Dunlap had the child in his hands.
19    A    Uh-huh.
20    Q    And did you know at that time that the child
21 was deceased?
22    A    I was pretty sure the child was.
23    Q    And did you later learn that to be a male
24 child of the name of Cameron?
25    A    That is correct. Yes, ma'am.

Page 145

1    Q    Okay. Now, after speaking with the coroner,
2 what did you do next at the scene?
3    A    Well, I would -- because I know I went to the
4 hospitals because I always go check -- wanted to check
5 on the victims and stuff. I -- I don't really know. I
6 would say I had went to the hospital.
7    Q    Do you remember speaking with Cameron's
8 mother, April, there at the scene?
9    A    No, ma'am, I don't.
10    Q    Let's -- let me turn your attention to what
11 we've marked as Plaintiff's Exhibit number 5.
12    (EXHIBIT 5 MARKED FOR IDENTIFICATION)
13    A    Okay. You said 5?
14    Q    Yes, sir.
15    A    Okay.
16    Q    I know. I'm sorry to skip around a little
17 bit.
18    A    Oh, no. You're fine. No, ma'am.
19    Q    And earlier, when you were telling me that the
20 documents that you had reviewed prior to the deposition,
21 this was one of the documents that you said you had
22 reviewed, correct?
23    A    It'd be a trial one?
24    Q    Uh-huh.
25    A    Yes, ma'am.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 169   Filed 10/03/25   Page 39 of 115 PageID #: 2832
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
146..149

Page 146

1    Q    Okay.  And so I will purport to you that this
2  is a transcript of the testimony that you gave at the
3  trial in Mr. Yell's criminal case.
4    A    Okay.  Okay.
5    Q    And if you look there on page 160, line 20.
6    Okay.  Yes.
7    Q    Do you see where it says "By Mr. Orange"?
8    A    Yes, ma'am.
9    Q    -- "State your name, please."  "Kenneth Lee
10 Edmonds"?
11   A    Yes, ma'am.
12   Q    Okay.  So would you agree with me that this
13 reports to be the testimony that you gave?
14   A    Yes, ma'am.
15   Q    Okay.  If you turn to page 165, which is the
16 very next page in the bottom right corner.
17   A    Okay.  Uh-huh.
18   Q    Specifically what I would like for you to look
19 at are lines 21 of that page --
20   A    Yes, ma'am.
21   Q    through Line 4 of the next page.
22   A    Okay.  You said read it?
23   Q    Yes, sir.
24   A    Out loud?
25   Q    Oh, that -- yeah.  Actually you can go ahead

Page 147

1  and read it that loud.
2    A    "I also found that there was a lady there at
3  the time.  I didn't know her since -- since then.  It's
4  -- since then.  It's April Carpenter.  She was there
5  supposedly."
6    Q    Okay.  And let me just back up a little bit.
7  Mr. Orange had been asking you what was the next thing
8  you did after you saw them remove the body from the
9  structure.  Do you see that backing up a little bit?
10   A    Okay.
11   Q    Okay.  And then you answered that you found
12 that there was a lady there.  It was April Carpenter.
13 She was, you know, one of the possible victims.
14   A    Okay.
15   Q    And you go on to say, "I talked to her briefly
16 to see what she knew.  She told me about the events --
17 well, briefly about, you know, she didn't know --
18 exactly know what happened, this and that."
19   A    Okay.
20   Q    Okay.  So does that refresh your recollection
21 --
22   A    Yes, ma'am.
23   Q    -- as to speaking with April Carpenter there
24 at the scene?
25   A    Yes, ma'am.

Page 148

1    Q    Okay.  And what exactly was the substance of
2  that conversation?
3    A    What are you talking about, what the -- was
4  the substance of it?
5    Q    What did you talk with Ms. Carpenter about at
6  that time?
7    A    I guess I had found out some kind of way that
8  she was the mother or lived at that residence, and so to
9  find out what was going on.
10   Q    And what did Ms. Carpenter tell you at that
11 time?
12   A    I don't remember what she told me.
13   Q    Do you remember if you took notes about this
14 conversation?
15   A    I don't know.
16   Q    Would it have been your general practice to
17 take notes of conversations that you had with witnesses
18 at the scene?
19   A    Yes.  If I'm not in a rush or something that I
20 don't, you know, forget to take the notes, or as far as
21 that goes.
22   Q    Would it have been your general practice to
23 put the information you learned in your case supplement?
24   A    Yes, if it was pertaining to it on some
25 occasions, yes.

Page 149

1    Q    What do you mean, if it was pertaining to some
2  occasions?
3    A    I mean if it's pertaining to the case -- to
4  the case that I'm working, yes.
5    Q    Okay.  And in this instance, April Davis
6  Carpenter was a main witness in the case.  Would you
7  agree?
8    A    She ended up becoming one.  Yes.  Uh-huh.
9    Q    And I mean, even at the time, you knew her to
10 be the mother of the deceased child, right?
11   A    Yes, ma'am.
12   Q    So did you gather pretty quickly that she was
13 an important witness?
14   A    Oh, yes, ma'am.  Uh-huh.
15   Q    And so typically it would be your practice to
16 take notes about conversations that you have with
17 important witnesses, right?
18   A    If possible, if the time is permitting in the
19 situation that we're in.  I guess I would put it the
20 other way.
21   Q    And even in cases where the time wasn't
22 permitting at the time to take notes, was it your
23 general practice to include the information that you had
24 learned from important witnesses in your case
25 supplement?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1    A    Yes, ma'am.
2    Q    I'll let you look over your supplemental
3  report, but I can tell you, from my review of your
4  supplemental report, I don't see where you noted talking
5  to her at the scene.
6    A    Okay.
7    Q    So you want to take a look at that really
8  quickly just to make sure I didn't miss that?
9    A    No, I think I -- in the -- in the Exhibit
10 number 2? That the one you're talking about?
11   Q    Yes, sir. Your report.
12   A    Okay. No.
13   Q    And I'm talking specifically about the
14 conversation that you had with her while you were still
15 at the scene prior to going to the hospital.
16   A    Okay. No, I don't.
17   Q    You don't know if that in your case report; is
18 that correct?
19   A    Because that's the case report. There's an
20 attachment that says, "See statement of April
21 Carpenter."
22   Q    But you talked to Ms. Carpenter on more than
23 one occasion, right?
24   A    Yes, I did. Yes, ma'am. Uh-huh.
25   Q    Okay. So the statement that you're referring

Page 151

1  to may be the statement that you took from her at a
2  later date, right?
3    A    It's possible, yes, ma'am.
4    Q    Okay, we'll talk about that in just --
5    A    Okay.
6    Q    -- a minute. But you agree that you do not
7  note in this supplemental case report that you spoke
8  with her at the hospital?
9    A    No.
10   Q    I mean I'm sorry.
11   A    No.
12   Q    Strike that. You agree that you didn't note
13 in this supplement that you spoke with her at the scene
14 prior to leaving for the hospital?
15   A    Yes, ma'am.
16   Q    Okay. Sergeant Mills had told you that he
17 believed Robert Yell to be a suspect in this fire,
18 correct?
19   A    Yes, ma'am.
20   Q    Okay. Did he mention anything to you about
21 April Carpenter being a potential suspect in the fire?
22   A    I don't know.
23   Q    Not that you can remember?
24   A    Not that -- no, ma'am.
25   Q    When you were speaking with April Carpenter at

Page 152

1  the scene, did you consider her to a suspect in the fire
2  at that time?
3    A    Did I consider her?
4    Q    Yes, sir.
5    A    No, because I didn't really know what was all
6  still going on.
7    Q    Okay. So we noted in the CAD that you left
8  for Logan Memorial Hospital, correct?
9    A    Uh-huh, uh-huh.
10   Q    What did you do once you arrived there at the
11 hospital?
12   A    At the hospital, I probably spoke to -- I'm
13 almost -- I know I spoke to her there, at the hospital.
14 We talked -- we talked there. I think -- I'm sure I
15 took the photographs of the child.
16        MR. MANDO: (coughs) Excuse me.
17   A    I'm sorry. I'm sure I probably took photos of
18 the -- the deceased child. From there, I don't know
19 what else, whatever else was needed at that point in
20 time.
21   Q    Okay. So let's talk about Cameron first. When
22 you arrived at the hospital, you determined that the
23 had, in fact, passed away?
24   A    Yes, ma'am.
25   Q    Is that right? Okay.

Page 153

1    A    Uh-huh.
2    Q    And I believe in your report you said that you
3  took photographs of him in the morgue. Does that
4  refresh your recollection?
5    A    I did. Yes, ma'am.
6    Q    Was that something standard for you to do in
7  cases, was to take pictures of the deceased individual,
8  you know, there within the morgue?
9    A    Yes, ma'am.
10   Q    Okay. I believe, according to your report,
11 you stated that you also checked on the status of the
12 child that had been removed originally from the
13 structure, the female child, Sara Lynn. Do you recall -
14 -
15   A    I --
16   Q    -- asking about her?
17   A    Yes, ma'am, I do.
18   Q    And what did you learn at that time?
19   A    That she had burns on her body.
20   Q    And was she still there at Logan Memorial
21 Hospital when you arrived?
22   A    Shoot, I don't remember.
23   Q    According to your report, the second page of
24 your report, number RPD54 -- that's --
25   A    Which exhibit is it?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 154

1    Q    That's Exhibit 2.
2    A    Okay.  I put it up.  Okay.
3    Q    It says that when you checked on the other
4    child by the name of Sara Lynn, "I found this child to
5    have serious injuries and was to be life flighted to
6    Vanderbilt Hospital."
7    A    Okay, okay.
8    Q    Had she already been life flighted, or was she
9    awaiting that transport?  Do you recall?
10   A    No, ma'am.
11   Q    Do you recall, like, physically seeing Sara
12   Lynn there at the hospital?
13   A    I don't remember if I did or not.
14   Q    Okay.  It's okay.  And you stated a few
15   minutes ago that you do recall speaking to Ms. Carpenter
16   there at the hospital, right?
17   A    Yes, ma'am.  Uh-huh.
18   Q    So tell me what you remember about that.
19   A    I remember she was in -- she was -- she
20   smelled like alcohol.  She had a -- her eye was, like,
21   red.  I recall -- about her being intoxicated, I recall
22   asking her would she submit to a blood -- blood alcohol
23   test.
24   Q    And what was her response to that?
25   A    Yes, she -- she was agreeable.  Yes.

Page 155

1    Q    Okay.  Did she admit that she had been
2    drinking?
3    A    Yes, I believe she did.  Yes, ma'am.
4    Q    And did you feel as though she was cooperating
5    with your questions at that time?
6    A    Oh, yes, ma'am.  Uh-huh.
7    Q    And you would agree that when you spoke with
8    April Carpenter there at the hospital, we're still
9    talking about the night of the incident; is that
10   correct?
11   A    That's -- yes, ma'am, that's correct.
12   Q    So 9-11-2004.
13   A    Yes, ma'am.
14   Q    Just before we go further, if you could take a
15   look at what we've marked as Plaintiff's Exhibits 6 and
16   7.
17        (EXHIBIT 6 MARKED FOR IDENTIFICATION)
18        (EXHIBIT 7 MARKED FOR IDENTIFICATION)
19   A    6 and 7, okay.  6 and 7
20   Q    Do you have number 6 there in front of you?
21   A    Yes, ma'am, I do.
22   Q    Okay.  And correct me if I'm wrong, but I
23   think that when we were going through these documents
24   earlier, you weren't for sure if you'd seen this before?
25   A    Uh-uh, no, ma'am.

Page 156

1        MR. MANDO:  Before the deposition.
2    Q    Have you seen this before, this document, at
3    any time that you can recall?
4    A    To be honest with you, I'm really not sure.
5    Q    Well, I'll ask you this question and I'll let
6    Mr. Mando decide whether he'll let you answer it or not.
7    But --
8    A    Okay.
9    Q    -- do you recall ever going over the questions
10   that are asked in this document with your attorney?
11   A    Oh, yes.  Okay.  Okay.  Now I do.
12   Q    I thought he might let you answer that one.
13        MR. MANDO:  Did we not -- this exhibit, did we
14   not provide you with a verification?
15   A    That's true.  That's true.  Yes.
16        MS. STAPLES:  No, you did not to this exhibit.
17   And when I e-mailed you about it, you did do a
18   supplemental report that you did provide the
19   verification at that point.
20        MR. MANDO:  Okay.
21        MS. STAPLES:  But no, not on -- not on any of
22   the additional ones, Jeff.
23        MR. MANDO:  Okay.
24   BY MS. STAPLES:
25   Q    Okay, sir.  So let's look -- okay.  So you

Page 157

1    don't recall actually seeing the -- this document, but
2    do you do recall having a conversation with your
3    attorneys about the questions --
4    A    Yes.
5    Q    -- that are asked within?
6    A    Uh-huh.
7    Q    And did you understand that, when you were
8    talking with your attorneys, that these were questions
9    that were supposed to be answered as though you were
10   under oath?
11   A    Oh, yes, ma'am.  Yes, ma'am.
12   Q    Okay.  I'm sorry.  If you'll turn to page 14
13   of Exhibit 6.
14   A    14.  Okay.
15   Q    Specifically I'm looking at question 13.
16   A    Yes, ma'am.
17   Q    Okay.  And you see there where I asked you to
18   inform me of any conversations that you had on September
19   11, 2004?
20   A    Uh-huh.
21   Q    And the answer is, "I didn't have any
22   conversations with Robert Yell or April Carpenter on
23   September 11, 2004."  You see that answer.
24   A    Yes, uh-huh.
25        MR. MANDO:  Hang on a minute.  The question

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 42 of 115 PageID
#2835
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
158..161

Page 158

1  asks about conversations with the jailer --
2      THE WITNESS:  Yeah.
3      MR. MANDO:  -- or staff members at the Logan
4  County Detention Center regarding Yell.
5      MS. STAPLES:  Yeah.  I don't --
6      MR. MANDO:  I'm not sure why this answer is in
7  there, because it's not responsive to number 13 at
8  all.  So I'm not sure what happened with that, Amy.
9      MS. STAPLES:  Okay.
10     MR. MANDO:  I don't recall.  We'll go back and
11  check.  But clearly it's nonresponsive to the
12  question.
13     MS. STAPLES:  And I don't refute that.
14  BY MS. STAPLES:
15     Q   But sir, would -- I mean, you'd agree with me
16  that it says you didn't have any conversations with
17  April Carpenter on September 11th, right?
18     MR. MANDO:  That's what that answer says.  But
19  it's nonresponsive to the question, and you know,
20  obviously he did, and I'm not sure how that answer
21  ended up there or where it came from without going
22  back and checking from something we answered a year
23  and a half ago.
24  BY MS. STAPLES:
25     Q   Okay.  Well, let's turn to the next exhibit,

Page 159

1  sir, and that's Exhibit 7.
2     A   Okay.  All right.
3     Q   Now, do you recall having ever seen this
4  particular document?
5     A   Yes, because this is where we had to get a
6  notary --
7     Q   Okay.
8     A   -- to -- to sign.  Okay.  Uh-huh.
9     Q   So you do recall --
10    A   Uh-huh.
11    Q   -- signing this document in front of a notary?
12    A   Yes, because she had to send it for me,
13  because I didn't know --
14    Q   Okay.
15    A   -- how to get it to you, to them.
16    Q   So if you look at page 3.
17    A   Page 3.
18    Q   We have the same questions and the same
19  response, Jeff.
20    A   Okay.
21    MR. MANDO:  And I'm -- Jennifer?
22    MS. LANGEN:  Yes.
23    MR. MANDO:  Do you have any recollection?
24  Because, again, it's the same.  Question 13 is the
25  same, and the answer is totally unrelated to the

Page 160

1  question.
2     MS. LANGEN:  I don't know.  I can't remember
3  back that far, and I can't remember who specifically
4  worked on those.
5     MR. MANDO:  I'm going to --
6     MS. LANGEN:  Or what happened there.
7     MR. MANDO:  I think I know what happened.  We
8  were answering interrogatories for five or six
9  different defendants.  Obviously there's some
10  cutting and pasting because of objections, and I'm
11  going to assume that we took that from another
12  witness's client's discovery response and it was in
13  there by mistake.  That's what I think probably
14  happened, Amy.  You know, we should have caught it,
15  okay?  I didn't catch it.  That's on me.  Ken
16  obviously should have caught it, too, but --
17     MR. SMITH:  Yeah.
18     MR. MANDO:  -- that's what I think happened.
19     MS. STAPLES:  Well, and I will say, Jeff, this
20  has been a while ago.  I mean, these responses were
21  provided to us in February of 2008.  But the reason
22  why we got supplemental responses is because I'd
23  sent a letter about some of the nonresponsive
24  answers.
25     MR. MANDO:  And we responded to that.

Page 161

1     MS. STAPLES:  And you responded with the same
2  answers.  Although, in this case it does say -- I've
3  not -- there's an additional sentence that I've
4  never had any communication with jail staff.  But
5  here's what I would like to do.
6  BY MS. STAPLES:
7     Q   And sir, this is why this is important,
8  because these are questions that we asked of you --
9     A   Yes, ma'am.
10    Q   -- so that we could, you know, gather what
11  information that you had about the case.
12    A   Sure.
13    Q   So what I'd like to do is take a break and
14  have you look at both of these documents so that you and
15  Mr. Mando can go through it and you can tell me if
16  there's any other places within these documents that you
17  think may be in error.
18    A   Okay.
19    MS. STAPLES:  Okay?  So we can go off the
20  record and let them work through those documents.
21    VIDEOGRAPHER:  Okay, we're off the record at
22  12:22.
23    (OFF THE RECORD)
24    VIDEOGRAPHER:  We are back on record at 12:36
25  p.m.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 43 of 115 PageID #2836
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
162..165

Page 162

BY MS. STAPLES:
Q    All right, sir, I had just asked you and your
counsel to review both the initial responses to the
interrogatories we had propounded to you, as well as
your supplemental answers to the interrogatories that we
had propounded.
A    Uh-huh.
Q    And it's my understanding that you and your
counsel have discovered some errors within those
documents.  Before we get there, I do just want to make
the sure the record is clear that we did not receive
verification for the first set of interrogatories, we
did for the second.  One --
MR. MANDO:  Yeah.
MS. STAPLES:  Go ahead, Jeff.
MR. MANDO:  Go ahead.  No.  I was just saying I
apologize.  That was an oversight.  Did we not give
you verifications to any of the defendants' answers,
or just --
MS. STAPLES:  Yeah, to any of them the first
time around.
MR. MANDO:  All right.  Jennifer, make a note
that we need to get those verifications.  I know we
asked for them from the clients, but we need to get
those.

Page 163

MS. LANGEN:  Yeah, will do.
MR. MANDO:  Yeah.  The -- and you can ask Ken
about this, but to focus you on the documents and
what he's going to correct, starting with Exhibit 7,
that answer needs to be corrected, specifically
interrogatory number 13.  The first sentence is
inaccurate.  It's nonresponsive to the
interrogatory, but it's inaccurate. The second
sentence is accurate.
MS. STAPLES:  And Jeff, what -- for the record,
what you're referring to is the answer where it
says, "I did not have any conversation with Robert
Yell or April Carpenter on September 11, 2004."
That is inaccurate.
MR. MANDO:  That is inaccurate.  He obviously
had conversations with April -- a conversation -- at
least one conversation with April Carpenter at the
hospital on September 11th.  And then on the Exhibit
6, having reviewed these discovery responses, he
wants to clarify that -- and he will clarify that,
in response to Interrogatory 3, where it asks about
prior lawsuits, it's his best belief that the claim
he talked about earlier today involving an
automobile and a woman who was injured in an
accident, that that was a claim that was settled

Page 164

pre-suit, prior to a suit being filed, to the best
of his recollection.  And then on interrogatory
number 12, that answer is inaccurate.  And
interrogatory number 13 is non- -- it -- that also
is inaccurate, but it's nonresponsive to the
question.
BY MS. STAPLES:
Q    All right.  So Mr. Edmonds, let me ask you
about this.  If you'll look at Exhibit 6 and the
responses that you propounded to us --
A    Okay.
Q    It's page 13.
A    Okay.
Q    My interrogatory to you was to "Please state
whether you had any conversations with or obtained any
statements from any of the following individuals on
September 11, 2004: A, Robert Yell, B, April Carpenter.
If so, please describe with particularity the location
of the conversations/statements, the names of anyone
else who was present, and what was said and by whom."
And your answer was, "I did not."
A    Okay.
Q    Having just gone over your trial testimony --
A    Sorry about that.
Q    -- with you and your report, you would agree

Page 165

with me that that statement is inaccurate?
A    Yes, ma'am.
Q    Because, in fact, you not only had one
conversation with Ms. Carpenter on September 11th, but
you had two, correct?
A    Yes, from what you told me.  I remember the
one, I just don't remember the other one.
Q    Well, not from what I've told you, but from
what you testified to at trial, correct?
A    Yes, yes.
Q    We went over that?
A    Oh, yes, ma'am.  Yes, ma'am.  Yes, ma'am.
Q    We went over your trial testimony --
A    Yes, ma'am.
Q    -- where you testified under oath --
A    Uh-huh.
Q    -- that you spoke with Ms. Carpenter at the
scene --
A    Okay.
Q    -- correct?  And then you recalled speaking
with her again at the hospital, and that's --
A    Yes.
Q    -- noted in your --
A    Yes, ma'am.
Q    -- report?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1    A    Yes, ma'am.
2    Q    Okay.  And then, you know, your counsel
3  indicates that the next answer to number 13 is
4  nonresponsive to the question, but you'd agree with me
5  that, once again, it's stated that "I didn't have any
6  conversation with Robert Yell or April Carpenter on
7  September 11" --
8    A    Yes, ma'am.
9    Q    -- "2004"?
10    A    Yes, ma'am.
11    Q    And that is an inaccurate statement?
12    A    Yes, ma'am.
13    Q    Okay.  And the reason why I asked you about
14  all these to begin with is because it's important for me
15  to know --
16    A    I understand.
17    Q    -- exactly what you did in the case and who
18  you talked to and with.
19    A    Oh, yes, ma'am, I understand.
20    Q    So now that you have gone back through these
21  documents and the questions that I asked you, is there
22  anything else or anyone else that you can recall
23  speaking with at the scene during your initial time
24  there on 9-11-2004?  You've testified to Sergeant Mills,
25  you've testified to the coroner, we've gone over your

Page 167

1  trial testimony about speaking with April Carpenter.
2    A    Okay.
3    Q    Can you recall having any other specific
4  conversations with any other individual there at the
5  scene?
6    A    I just don't remember.  I mean -- I mean I'm -
7  - I'm -- I possibly could have talked to a firefighter,
8  but I don't -- that's the way it goes.
9    Q    And if you had spoken with anyone else there
10  at the scene, it would have been your standard practice
11  to note that in your case report, correct?
12    A    Right, uh-huh.
13    Q    Okay.  And you've read the first couple
14  paragraphs of that case report pertaining to --
15    A    Yes, ma'am.
16    Q    -- your time there at the scene, right?
17    A    Yes, ma'am.  Uh-huh.
18    Q    And you would agree that there's no one else
19  noted that you had any substantive conversation with?
20    A    That's correct.
21    Q    All right.  So after talking with
22  Ms. Carpenter at the hospital --
23    A    Uh-huh.
24    Q    -- and taking the pictures of Cameron in the
25  morgue --

Page 168

1    A    Uh-huh.
2    Q    -- and checking on Sara Lynn --
3    A    Uh-huh.
4    Q    -- is there anything more that you recall
5  doing at the hospital on the evening of 9-11-2004?
6    A    No, ma'am, I can't remember.
7    Q    What was the next thing that you did in the
8  case that night?
9    A    I would say I probably went back to the scene,
10  more than likely.
11    Q    Well, why don't you take a look at your case
12  report again, which is Exhibit 2.
13    A    Yeah.  Okay.  Uh-huh.
14    Q    And actually, sir, I told you we were going to
15  do this, and I got distracted by the interrogatory
16  responses.  You said earlier that when you had talked
17  with April Carpenter, you mentioned her statement being
18  included or attached as part of this supplement.  Do you
19  recall talking about that?
20    A    Yeah.  Yes, ma'am.
21    Q    Okay, okay.  So let's just look at that
22  statement real quickly while we're here.  And that I
23  have marked as Plaintiff's Exhibit 8.  Before we took
24  that break, you had told me what you can recall
25  regarding the substance of that conversation with her at

Page 169

1  the hospital; is that correct?
2        (EXHIBIT 8 MARKED FOR IDENTIFICATION)
3    A    Say that again, please?
4    Q    Before we took the break, you had told me what
5  you can recall about the substance of the conversation
6  with Ms. Davis at the --
7    A    Okay, yes.
8    Q    -- Ms. Carpenter at the hospital.
9    A    Yes, ma'am.
10    Q    Is that right?
11    A    Uh-huh.
12    Q    Okay.  So Plaintiff's Exhibit 8 is what's
13  Bates marked RPD537 through 544.  Just for the record,
14  this is a collection of typewritten statements.
15    A    Uh-huh.
16    Q    And sir, I'd like to turn your attention
17  specifically to RPD540.
18    A    Uh-huh.
19    Q    Are you there?
20    A    Yes, ma'am, I'm here.
21    Q    Would you agree with me that this is a
22  statement of April Davis Carpenter?
23    A    Yes, ma'am, I do.
24    Q    And this states that it was September 12,
25  2004.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 169   Filed 10/03/25   Page 45 of 115 PageID #2838
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

170..173

Page 170

1    A    Okay.

2    Q    And that Detective West was present during
3  this statement.  Is this a third time that you had
4  talked with Ms. Carpenter, or is the statement that
5  you're referring to in your supplemental report as
6  having been taken on September 11th, when you talked to
7  her at the hospital?

8    A    Say that one more time.

9    Q    Okay.  I'm trying to determine -- well, let's
10  back up.

11   A    Okay.

12   Q    Look back real quickly at your supplemental
13  report --

14   A    Uh-huh.

15   Q    -- page 54, which is the second page.

16   A    Right, go ahead.

17   Q    You're speaking of how you talked with April
18  at the hospital, correct?

19   A    Okay, uh-huh.

20   Q    And you said that "I advised I would need to
21  talk to her the next following day.  See statement of
22  April Carpenter."

23   A    Right.  Yes, ma'am.

24   Q    So what I'm trying to determine is, this
25  statement that we have here dated September 12th --

Page 171

1    A    Yes.

2    Q    -- is this the statement that you're referring
3  to here that says, "See statement --

4    A    Yes.

5    Q    -- of April Carpenter"?

6    A    Yes, ma'am.  Uh-huh.

7    Q    Okay, so you weren't talking about having
8  taken a -- you're not talking about the statement that
9  you took from her at the hospital, you're saying see the
10  statement that I took the following day?

11   A    Right.  Yes, ma'am.

12   Q    Okay, all right.  Well, we'll talk about that
13  in a minute then.

14   A    Okay.

15   Q    But do you see my confusion?  I --

16   A    Yes, ma'am.  I -- I understand.  Yes, ma'am.

17   Q    So sitting here today, there -- to your
18  knowledge, there is no indication or no document, other
19  than this case supplement report, that indicates the
20  substance of the conversation that you had with
21  Ms. Carpenter at the hospital on September 11th?

22   A    Right.

23   Q    Okay.

24   A    Okay.

25   Q    I think we're on the --

Page 172

1    MR. GADANSKY:  11?

2    MS. STAPLES:  Someone's not muted.

3    MR. GADANSKY:  Sorry about that.

4    MS. STAPLES:  Apparently, Chris, you had a
5  question about what it said, huh?

6    MR. GADANSKY:  No, no, sorry.  I --

7    MS. STAPLES:  No problem.

8    MR. GADANSKY:  You're good.

9  BY MS. STAPLES:

10   Q    Okay.  All right.  Okay.  We're going to move
11  on to the next topic then for a minute.

12   A    Okay.

13   Q    So we're back to your testimony that you
14  believe that you went back to the scene after leaving
15  the hospital.

16   A    Yes, ma'am.

17   Q    All right.  And in fact, your case report
18  indicates that you did as such.

19   A    Okay.

20   Q    In the second paragraph, when you talk about
21  how after you finished taking the pictures of Cameron in
22  the morgue that "I then returned to the crime scene."

23   A    Okay.

24   Q    "To locate witnesses to the crime.  I briefly
25  talked to Charlotte Bellar and Tina Maskin on this

Page 173

1  night."

2    A    Uh-huh.

3    Q    Okay.  Do you recall having a conversation
4  with Charlotte Bellar on 9-11-2004?

5    A    I don't remember.

6    Q    You don't recall speaking with her?  Will you
7  please -- did you -- what did you -- there was a --

8    A    Oh, I said I don't remember.  I'm sorry.

9    Q    Will you please turn to -- back to Exhibit 8,
10  which is the statements.

11   A    You said 8?

12   Q    Yes, sir.

13   A    Okay.  Okay, go ahead.

14   Q    Sorry, I know there's a lot.

15   A    I'm sorry.  I'm trying to keep it in order.

16   Q    Sure.  So if you look at Exhibit 8, RPD541.

17   A    Uh-huh.  Oh, yes, ma'am.

18   Q    Do you recognize this document, sir?

19   A    Oh, yes ma'am.  Yes, ma'am.

20   Q    What is this document?

21   A    This is Charlotte Bellar.

22   Q    It's a typewritten statement of Charlotte
23  Bellar?

24   A    Yes, ma'am.  Yes, ma'am.  Uh-huh.

25   Q    And it's dated September 12, 2004; is that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1  correct?
2      A    Yes, ma'am.
3      Q    So I have the same question for you again.  In
4  your report you state that you talked with Ms. Bellar on
5  the night of September 11 --
6      A    Uh-huh.
7      Q    -- 2004.
8      A    Right.
9      Q    This statement is dated September 12, 2004.
10     A    Uh-huh.
11     Q    Did you have more than one interview with Ms.
12 Bellar?
13     A    I don't remember.  I possibly could.  I don't
14 -- don't remember.
15     Q    If you look back at your case report, it says,
16 you know, you went back to the crime scene.  You talked
17 to Ms. Bellar and Ms. Maskin on this night.  "They're
18 two people who had contact with Robert Yell.  They can
19 describe his actions on this day.  See statements of
20 Bellar and Maskin."
21     A    Okay.
22     Q    When you say, "See statements of Bellar and
23 Maskin," are you referring to the statements that you
24 took from them on the night of 9-11-2004?
25     A    Say that again.

Page 175

1      Q    When you state in your report to see the
2  statements of Bellar and Maskin, are you referring to
3  the statements that you took from them on the night of
4  9-11-2004?
5      A    No, I'm talking about these statements here.
6      Q    Okay.
7      A    Uh-huh.  On -- on --on Exhibit 8.
8      Q    Uh-huh.  So my question to you is whether
9  there's a typo on your report and it was September 11,
10 2004 versus September 12th, or whether you had two
11 separate conversations, two separate interviews with
12 her.
13     A    It wouldn't have been no two separate
14 interviews.  I mean, I -- I may -- that I briefly spoke
15 to them, but I don't -- I could have briefly spoke to
16 them.
17     Q    And if you had briefly spoken to Ms. Bellar on
18 9-11, would you have documented that conversation?
19     A    No, not necessarily, especially if I'm in a
20 rush, in a hurry, and it's something that can wait to go
21 into the -- go into the next day, no, because it would
22 all be in the same -- from my aspect is, is that I may
23 speak to somebody briefly if they're saying something to
24 me.  But like I said, you know, there's times that we --
25 you say something to them.  We're just -- we're trying

Page 176

1  to get -- see what they're saying, then we're going to
2  move on --
3      Q    Yeah.  And that --
4      A    -- as far as that goes.
5      Q    Correct me if I'm wrong, but your testimony
6  earlier was that you would make notation and document
7  the contents of a conversation if it was an important
8  witness, correct?
9      A    Yes, ma'am.  If -- yeah.  And then, like, say
10 they -- if -- if the time allots for it or if we're --
11 you know, if for some reason we have time to do it, or
12 if we don't forget to do it.  You know, we're just like
13 human beings.  We forget sometimes and may overlook some
14 things sometimes.
15     Q    Here you say that Charlotte Bellar was someone
16 who had contact with Robert Yell shortly before the
17 fire, correct?
18     A    Uh-huh.
19     Q    And that she could also describe his actions
20 on the day in question, correct?
21     A    Yes, ma'am, uh-huh.
22     Q    And that would equate to someone who's an
23 important witness, right?
24     A    Oh, yes.  Yes, ma'am.  Uh-huh.
25     Q    Okay.  So even though Ms. Bellar was an

Page 177

1  important witness who saw Mr. Yell before the fire, is
2  it your testimony that you don't have any documentation
3  of the contents of the conversation that you had with
4  her on 9-11?
5      A    If I had that conversation.
6      Q    Well, you say in your report --
7      A    Okay.
8      Q    -- that you had a conversation.
9      A    Okay.
10     Q    Right?
11     A    Yes.
12     Q    Okay.  If you had documented that, the
13 contents of that conversation, you would have put that
14 in the report, correct?
15     A    Which would be this statement right here.
16     Q    Okay.  So I thought you just testified that
17 you talked with her next day, which is this statement
18 right here.
19     A    Okay.
20     Q    You said that could wait until the next day,
21 right?
22     A    Uh-huh.
23     Q    So my understanding from your testimony is you
24 talked to her briefly on 9-11-2004, and then you went
25 back and talked to her the following day, on the 12th of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

1  September?
2      A    And I think I said that I don't exactly
3  remember if I did or didn't.
4      Q    Well, so how are we supposed to know if
5  there's no documentation, right?  That's -- that's the
6  point to --
7      A    Yeah, sure.
8      Q    -- documenting conversations.
9      A    Right.
10     Q    And in your report, you document that you
11 talked to her, you just don't go into the details of
12 what was said, correct?
13     A    Uh-huh.
14     Q    Okay.  And then the statement that you do have
15 from her, that you'd typewritten, has the following
16 day's date.
17     A    Right.  Yes, ma'am.
18     Q    So is this refreshing your recollection of
19 having talked to her twice?
20     A    It still isn't.  I still don't remember.
21     Q    If you had made documentation of a
22 conversation that you had on 9-11-2004 with Ms. Bellar,
23 that should be contained within your case file.  Do you
24 agree?
25     A    Say that one more time, please.

Page 179

1      Q    If you had documented the contents of the
2  conversation that you had with Ms. Bellar on 9-11-2004,
3  that should be contained within the case file; is that -
4  - do you agree?
5      A    If I documented it.
6      Q    Yeah.  And do you agree that the contents of
7  the conversation that you had with Ms. Bellar on
8  9-11-2004 should have been disclosed to the prosecutor
9  in this case?
10          MR. MANDO:  Objection.  Lack of foundation,
11 form, but go ahead.
12     A    Would you repeat that for me, please?
13     Q    Uh-huh.  Would you agree with me that the
14 contents of the conversation that you had with Ms.
15 Bellar on 9-11-2004 should have been disclosed to the
16 prosecutor in this case?
17          MR. MANDO:  Same objection.  Go ahead.
18     A    I would say with the -- if it was important,
19 as far as that goes, but if it referred back to this
20 September the 12th, as far as that goes.  I'm sorry,
21 this September the 12th.
22     Q    Well, you testified earlier that she was an
23 important witness, right?
24     A    Yes, but can I go on with that?
25     Q    Okay.

Page 180

1      A    You can be an important witness, but still
2  sometimes that -- you know, we still -- we still would
3  add that into a supplemental, as far as that goes.  Or
4  you could be an important witness as far as that goes,
5  but some of the things that you're saying at that moment
6  may not have to be documented right at that moment, at
7  that point in time.  Or it's easy to forget.  I mean,
8  sometimes we just -- you know, you just -- sometimes you
9  get busy, you forget.  I'm not saying that it didn't
10 happen, as far as that -- as far as that goes, I'm just
11 saying that some of the things that you asked, I just
12 can't remember those things.  I -- and I'm not saying
13 deny, because I'm not a liar as far as that goes.  But
14 the point is is that I don't remember some of these
15 things.
16     Q    Right.  And I understand that I'm asking about
17 something that happened a long time ago.
18     A    Yes.
19     Q    And the only way that we know about what
20 happened then, and your actions, are about what you
21 documented, right?
22     A    Uh-huh.  Uh-huh.
23     Q    And you documented in your report that you had
24 a conversation with her on 9-11.
25     A    Uh-huh.

Page 181

1      Q    And the thing is none of us know what the
2  contents of that conversation were because there's no
3  report documenting the contents of that conversation,
4  correct?
5      A    Well, those contents should flow into the
6  Septem- -- September 12th.
7      Q    And when you say they should flow, what do you
8  have, sitting here today, to show us that she gave you
9  this same information on 9-11 that she gave you on 9-12?
10     A    Well, nothing but the September the 12th here.
11 Yes, ma'am.
12     Q    Yeah.  All we have is what you documented on
13 9-12?
14     A    Yes, ma'am.  Uh-huh.
15     Q    And I should have asked you this earlier.  Do
16 -- you said that the case file is still in the
17 possession of the Russellville Police Department; is
18 that right?
19     A    Well, it stays there with -- yes.  And we can
20 look -- you know, we can go and pull -- pull a case file
21 and look at it if we need to look at it and stuff.  Yes,
22 ma'am.
23     Q    Do you have any documents pertaining to the
24 criminal case against Robert Yell in your personal
25 possession?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 182

1    A    Oh, no, I don't take anything home with me.
2  No, I don't --
3    Q    You don't take anything home?
4    A    No, ma'am.  No, ma'am.
5    Q    Would you have any documents, you know, at
6  your desk, or in a file separate --
7    A    No, not in the file separate.
8    Q    -- than the case investigation?
9    A    No, ma'am.  Uh-huh.
10   Q    So if this was produced to us and purported to
11  be the entirety of the case file --
12   A    Uh-huh, uh-huh.
13   Q    -- if in fact you had documented the
14  conversation you had with Ms. Bellar on 9-11, it should
15  have been included in that case file, correct?
16   A    If that was -- yes, ma'am, because I usually
17  make copies of everything.
18   Q    Okay.
19   A    Uh-huh.
20   Q    When you spoke with Ms. Bellar on 9-11, was
21  there any other law enforcement officer present with
22  you?
23   A    See, I don't remember.  I don't know if
24  anybody was around.  I don't know if anybody -- I don't
25  remember.  I was -- I -- I don't remember.  I would say

Page 183

1  with all the -- well, there were people --
2        MR. MANDO:  Just to answer the question.
3    A    Yeah.  I don't remember.
4    Q    Okay.  Let me -- well, let's look for a minute
5  at the statement, the typewritten statement that you
6  have of Charlotte Bellar there on 9-12.  Is there any
7  indication in this typewritten document that another law
8  enforcement official was with you when you interviewed
9  Ms. Bellar?
10   A    On September 12th?
11   Q    Yes, sir.
12   A    No, uh-uh.
13   Q    All right.  Let me turn your attention quickly
14  to the next exhibit, which is marked as Plaintiff's
15  Exhibit number 9.
16   A    Oh, okay.  The notes?
17   Q    Yes, sir.
18   A    Okay.
19   Q    For the record, this collective exhibit is
20  Bates stamped RPD437 through 457.
21   A    Uh-huh.
22   Q    Sir, do you recognize that document in front
23  of you?
24   A    Yes, ma'am.  That's my handwriting.
25   Q    Okay.  And what are these documents?

Page 184

1    A    They're just -- they're notes.
2    Q    These are notes in your handwriting?
3    A    Uh-huh.  Yes, ma'am.
4    Q    Notes that you took?
5    A    Yes, ma'am.
6    Q    These notes that you took when interviewing
7  witnesses in the case?
8    A    Yes, ma'am.
9    Q    And would you agree with me that the first set
10  of notes there pertains to Charlotte Bellar on -- are
11  you looking at 437?
12   A    Yes, uh-huh.
13   Q    And would you agree with me that they pertain
14  to her?
15   A    Oh, yes, ma'am, uh-huh.
16   Q    Okay.  And at the top there, it says,
17  "Charlotte Bellar, September 12, 2004, West/Edmonds."
18   A    Uh-huh.
19   Q    Does that refresh your recollection as to
20  whether or not there was another --
21   A    Okay.
22   Q    -- law enforcement official with you when you
23  spoke with Ms. Bellar on September 12th?
24   A    Yes, ma'am.  Okay.
25   Q    Now, these notes are notes that were produced

Page 185

1  to us from your counsel.  Are these notes that you kept
2  separately from the case investigative file?
3    A    No.  They were in the file.
4    Q    They were in the file?
5    A    Yes, ma'am, uh-huh.
6    Q    Is it your testimony that these notes were
7  turned over in the criminal investigation?
8    A    Uh-huh, they should -- yeah, they should have
9  been.
10   Q    And it would have been consistent with the
11  training you'd received that notes like this should be
12  disclosed; is that correct?
13   A    Yes, if you have.  Yes, ma'am.
14   Q    Okay.
15   A    Uh-huh.
16   Q    You had told me earlier that once you turned
17  to the NIBRS system and things were transmitted
18  electronically, that it was possible that you kept your
19  handwritten notes in a different location; is that
20  correct?
21   A    Well, they would have been with the file.
22   Q    Eventually you would have put them with the
23  file?
24   A    The notes?
25   Q    Yes, sir.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1      A    Uh-huh.
2      Q    Is there a reason why you didn't document in
3  the typewritten statement of Ms. Bellar that Mr. West
4  was present?
5      A    There's no reason.
6      Q    Would it have been your standard practice to
7  document who else is present during an interview of a
8  witness?
9      A    Not always.  I -- I hadn't always done it if I
10 was in the interview and I'm doing the -- the majority
11 of the interviewing.
12     Q    So is it your testimony that you did the
13 majority of the interviewing with Ms. Bellar on
14 9-12-2004?
15     A    I would say probably so.
16     Q    Probably so?
17     A    Yeah.  I would have to say I probably did.  I
18 probably did most because -- because I knew those -- I
19 mean, I was a -- I'm from Russellville, so outside, just
20 kind of -- it's a little bit difficult for them
21 sometimes.
22     Q    Okay.  So would that have been true of all the
23 witnesses that you and Detective West spoke to jointly
24 in this case that you were the lead interviewer?
25     A    Yes, because I had the criminal case, the

Page 187

1  criminal part of it.
2      Q    Okay.
3      A    Yes, ma'am.
4      Q    All right.  Sir, if you will take a minute to
5  read over that typewritten statement of Ms. Bellar --
6      A    Yes --
7      Q    -- and -- number 8.
8      A    Ms. Bellar.  Okay.  I got you.
9      Q    541 for your reference.
10     A    Okay.  Yes, ma'am.  Okay.  Okay.
11     Q    Have a chance to read over it, sir?
12     A    Yes, ma'am.
13     Q    Okay.  Would you agree with me that in this
14 document -- or in this report you documented that
15 Ms. Bellar said that April had come to her home that
16 afternoon?
17     A    Yes, ma'am.
18     Q    And she was stumbling and had been drinking?
19     A    She was?
20     Q    Stumbling and had been drinking.
21     A    Yes, ma'am.  Uh-huh.
22     Q    That at one time four of the kids were at
23 Ms. Bellar's home?
24     A    That is correct, uh-huh.
25     Q    And that Robert came looking for them --

Page 188

1      A    Yes, ma'am.
2      Q    -- and wanted to take the kids home?
3      A    Yes, ma'am.
4      Q    And she noticed that he too had been drinking?
5      A    Yes, ma'am.
6      Q    And that when Robert left, he took Cameron and
7  Sara Lynn home with him?
8      A    Okay.
9      Q    And that April followed him home; is that
10 right?  Or she left as well.
11     A    Yes.  Uh-huh.
12     Q    There was no accusation by Ms. Bellar that
13 Robert forced April to leave Ms. Bellar's house, right?
14     A    Not as I recall.
15     Q    Well, if Ms. Bellar had made that statement,
16 you would have documented that in this report, right?
17     A    Prob-- yes, ma'am.
18     Q    Okay.  That would have been important
19 information?
20     A    Yes, ma'am.  Yes, ma'am.
21     Q    Okay.  Ms. Bellar told you that at some point
22 she sent Nicholas home to check on April.
23     A    Yes, ma'am.
24     Q    And sitting here today, can you recall the
25 ages of the other two boys, Nicholas and Zachary?

Page 189

1      A    No, ma'am.
2      Q    If there was testimony that they were 5 and 6
3  at that time, do you have -- does that refresh your
4  recollection?
5      A    That -- that sounds -- yeah, that sounds
6  right.  Yes, ma'am.
7      Q    So Ms. Bellar asked Nicholas, who was either 5
8  or 6, to go home and check on April and the kids?
9      A    Okay.
10     Q    Is that right?
11     A    Uh-huh.
12     Q    And Nicholas reported back that April and
13 Robert were fighting at the time?
14     A    Yes, ma'am.
15     Q    And that Robert later came back to
16 Ms. Bellar's to pick up the other two boys, right?
17     A    Yes, ma'am.
18     Q    She told you that he'd come to her house a
19 couple more times that day?
20     A    Uh-huh.
21     Q    And then at one point his Aunt Kay was with
22 him, right?
23     A    Yes.
24     Q    And eventually Ms. Bellar told you that she
25 asked Robert to leave her house and told him she was



Kentuckiana Reporters                    502.589.2273 Phone
30 South Wacker Drive, 22nd Floor            502.584.0119 Fax
Chicago, Illinois 60606           schedule@kentuckianareporters.com
                                   www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 50 of 115 PageID #: 2843
The Deposition of KENNETH EDWARDS, taken on September 14, 2022

190..193

Page 190

1  going to call the police?
2      A    Yes, ma'am.
3      Q    And she told you that she went back inside the
4  house; is that right?
5      A    Oh, yes, ma'am.  Okay.
6      Q    Okay.  And that when she did so, Robert left?
7      A    Yes, ma'am.
8      Q    Okay.  Now this -- in this report, there is
9  nothing documenting that Ms. Bellar said anything to you
10  at all about Robert trying to kick in her door; is that
11  right?  You didn't see that anywhere in that report?
12     A    No, ma'am.  Uh-uh.
13     Q    And if she had told you that information, that
14  would have been important information, right?
15     A    Well, yes.
16     Q    That's information that you would have
17  documented in this report?
18     A    Information.  Yes, ma'am.
19     Q    Okay.  You would have understood the
20  importance of that potential information?
21     A    Yes, ma'am.
22     Q    So Ms. Bellar told you that she did, in fact,
23  call the police --
24     A    Uh-huh.
25     Q    -- and that while she was speaking with an

Page 191

1  officer at her door, she looked over and she saw that
2  Robert's house was on fire?
3      A    Yes, ma'am.
4      Q    Okay.  And Ms. Bellar noted that when she
5  arrived at the trailer she saw April at the front of the
6  house; is that right?
7      A    Say that again?
8      Q    Yeah.  Right here in -- in the report, it
9  says, "When they arrived, she stated she saw April at
10  the front of the house."
11     A    Okay.  Yes, ma'am.
12     Q    And that she then said Robert came from the
13  driveway side of the house?
14     A    Uh-huh.
15     Q    And you noted that she said that April told us
16  that Robert and April fight and they drink all the time?
17     A    Yes, ma'am.
18     Q    Now, I want -- I want you to look real quickly
19  at those handwritten notes that you took about the
20  statement -- interview with Ms. Bellar.
21     A    Right.
22     Q    That's the next exhibit.  And it was my
23  understanding from your earlier testimony that you would
24  take the pertinent important information from your
25  handwritten notes and you would transcribe those or put

Page 192

1  those within the typewritten statement; is that right?
2      A    Yes, ma'am.  Yes, ma'am.  Yes, ma'am.
3      Q    And I get this -- these typewritten statements
4  aren't, like, transcripts of the interview you had?
5      A    Right.
6      Q    They're not word for word?
7      A    Yes.  Yes, ma'am.
8      Q    They're just your understanding of what's
9  important putting it in the document.
10     A    Uh-huh.
11     Q    So if you turn to page 3 of Ms. Bellar's
12  statement.
13     A    Page 3.  Okay.
14     Q    One of the things that you have noted in the
15  written notes is that Ms. Bellar told you that April
16  drinks so much that she forgets things.
17     A    Uh-huh.
18     Q    Is there a reason that you didn't put that
19  within the typewritten document about what Ms. Bellar
20  had told you?
21     A    No.
22     Q    Is it because you had already determined that
23  Robert was the suspect in the fire, not April?
24     A    Oh, I hadn't.  No, ma'am.
25     Q    Well, certainly Sergeant Mills with the

Page 193

1  Russellville Police Department had made that
2  determination, correct?
3      A    If that was his determination, yes, ma'am.
4      Q    At no point during this interview with
5  Ms. Bellar did she say anything to you whatsoever about
6  Robert starting the fire; is that right?
7      A    No, ma'am.
8      MR. MANDO:  And that's going to read bad.  She
9  asked you the question, is her statement correct?
10  Do you understand the -- he -- the way he answered
11  that, he refuted what you were saying.
12     MS. STAPLES:  Oh, I'm sorry.
13     MR. MANDO:  But I don't -- I think he meant to
14  agree with you.
15     MS. STAPLES:  Okay.  Let's -- let me ask that
16  another way.
17     MR. MANDO:  Go ahead.  Yes, ma'am.
18     MS. STAPLES:  Thank you, Jeff.
19  BY MS. STAPLES:
20     Q    Ms. Bellar never told you that Robert had
21  started the fire, correct?
22     A    Say that again.
23     Q    Yeah.  Did Ms. Bellar give you any information
24  about Robert starting the fire?
25     A    I don't think so.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

1      Q    And if she had told you that she had
2   information about Robert starting the fire, you would
3   have indicated that in your handwritten notes; is that
4   correct?
5      A    If at that point in time I was doing
6   handwritten notes or -- yes, possibly.
7      Q    Well, I mean, clearly you were doing
8   handwritten notes, right?
9      A    Yes.  Yes, uh-huh.
10     Q    We've got them right here.
11     A    Right.
12     Q    And if she had told you that Robert had
13  started the fire, you would have put that in the
14  typewritten statement that you took?
15     A    You're talking about April?
16     Q    Ms. Bellar.
17     A    Ms. Bellar, yes.  Yes.
18     Q    That's right.
19     A    Oh, I'm sorry.  Yes, yes, yes, yes, yes.
20     Q    All right.  Sorry.  We've been going for a
21  bit.
22     A    That's okay.  Yeah.
23     Q    It's gets a bit confusing.
24     A    That's okay.  That's okay.
25     Q    I told you I would ask some unclear questions.

Page 195

1      A    That's okay.  That's fine.  Yes, ma'am.
2      Q    All right.  Now, according to your statement,
3   you also spoke with Tina Maskin on the night of
4   9-11-2004.  You remember seeing that in your report?
5      A    Tina?
6      Q    Uh-huh.
7          MR. MANDO:  She's back to Exhibit number 2, the
8   -- your supplemental report, page 2.
9      A    Okay.  Okay.
10     Q    Yeah, on page 2 --
11     A    Okay.
12     Q    -- we had talked about this earlier, where you
13  said that, "I briefly talked to a Charlotte Bellar and a
14  Tina Maskin on" --
15     A    Okay.  Yes, ma'am.  Yes, ma'am.
16     Q    And this is when you had returned to the scene
17  from the hospital.
18     A    Okay.
19     Q    So I have some of the same questions that I
20  had about your conversation with Ms. Bellar --
21     A    Okay.
22     Q    -- regarding Ms. Maskin.  Did you document the
23  contents of the conversation that you had with
24  Ms. Maskin on 9-11-2004?
25     A    It's not here.  I don't -- no, ma'am.

Page 196

1      Q    And just so the record's clear, did you
2   document the 9-11-2004 conversation that you had with
3   Ms. Maskin?
4      A    No.
5      Q    Okay.  And if you had documented the contents
6   of the conversation that you had on 9-11-2004 with
7   Ms. Maskin, that should be included in your case file;
8   is that correct?
9      A    That's true.  In some -- yes, in some cases.
10     Q    And what do you mean in some cases?
11     A    If I'm going to bring them in, like I brought
12  them in the next day or the following day, I would just
13  go off of that and just bring them in and -- and gather
14  that information then, if possible.
15     Q    So I'm gathering that it was your standard
16  practice that you would have initial conversations with
17  individuals, and then later bring them back, and that's
18  what you would document the contents of, was the
19  follow-up interview?
20     A    Yes, ma'am.
21     Q    It wasn't your standard practice to document
22  what you learned from individuals during your initial
23  contact with them?
24     A    Well, I tried to.  Yes, ma'am.  If -- I try
25  to.  It doesn't always work out the way I want it to.

Page 197

1      Q    Okay.  And -- but if you had documented the
2   conversation that you had with Ms. Maskin, or any
3   witness --
4      A    Uh-huh.
5      Q    -- that information would be included within
6   your case file?
7      A    Yes, ma'am, if it was important.  Yes, ma'am.
8      Q    There's nowhere else that you would have kept
9   --
10     A    Oh, no, ma'am.
11     Q    -- any documents --
12     A    No, that's -- no, ma'am.
13     Q    -- regarding the conversation?
14     A    No, no.  No, no.  No personal stash.  No,
15  ma'am.
16     Q    Okay.  And just like Ms. Bellar, Ms. Maskin
17  had important information; is that correct?
18     A    Just a small piece.  Maybe a couple pieces,
19  yes, ma'am.
20     Q    Well, according to your report, Ms. Maskin was
21  one of the two people who had come into contact with
22  Robert shortly before the fire was reported.
23     A    That's true.  Yes, ma'am.
24     Q    And Ms. Maskin was one of the two people who
25  could also describe his actions on the day in question,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  correct?

2      A    Yes.  Yes, ma'am.

3      Q    So Ms. Maskin was an important witness?

4      A    Yes, ma'am.  Uh-huh.

5      Q    Okay.  Sitting here today, can you recall

6  whether any other law enforcement officer was present

7  when you spoke with Ms. Maskin initially on 9-11-2004?

8      A    Now, I think Mr. West was with me on that one.

9  I think he was there with me.

10     Q    Well, let me ask you some questions about

11  that.

12     A    Okay.

13     Q    When do you first recall speaking with David

14  West about this investigation?

15     A    I think it was -- this is 7:00 -- let's see,

16  it was 7:00 at night.  I think they all came down.  It

17  was -- and had gotten dark.  7th of September, so it was

18  getting dark, probably around 7:00, 7:30, something like

19  that.  It would have been that night I think when they

20  came in, but it was later that night.

21     Q    And when you say, "It would have been later

22  that night when they came in," who are you referring to

23  when you say they?

24     A    Oh, I'm sorry.  It was him, and as you call

25  him, William Smith, Tommy Smith, I think Mr. Gregory.  I

Page 199

1  don't remember who else came with them that night, when

2  that bunch came, when that bunch of individuals came.

3      Q    Okay, so you're referring to David West and

4  Tommy Smith?

5      A    William.  Yes, ma'am.

6      Q    William Smith from KSP?

7      A    Yes, ma'am.

8      Q    And Alan Gregory from the state fire marshal's

9  office?

10     A    Uh-huh.

11     Q    Is there anyone else that you can recall

12  interacting with on the evening or the night of

13  9-11-2004 in regard to this investigation?  And

14  specifically I should have asked you if there was any

15  other law enforcement officials.

16     A    Like Ron Mills.  I mean, Ron was there.

17     Q    Yeah, we talked about him.

18     A    And like I said, Tommy was David West's

19  sergeant, so I think a couple more people came with

20  them.  I don't -- but I don't know.

21     Q    Okay.

22     A    Yeah.

23     Q    So you believe that you and Detective West may

24  have interviewed Ms. Maskin together on the night of

25  9-11-2004?

Page 200

1      A    Yes.  We may have briefly interviewed her at

2  the -- well, I know I talk -- I know I spoke to her.  And

3  I think he was with me.  I -- I'm -- I think.  I'm not

4  for sure on it.

5      Q    And earlier you stated that you took the lead

6  on many of the local interviews -- or many of the

7  interviews with the local witnesses because you yourself

8  were local.  Would this have been an instance in which

9  you took the lead on speaking with Ms. Maskin?

10     A    Yes.  More like, yes.

11     Q    All right.  Give me just one sec.

12     A    That's okay.

13     Q    If you will, please turn back to the

14  typewritten statements, Exhibit A, RPD543.

15     MR. MANDO:  The last page.  Second to last

16  page.

17     A    Okay.  Yes, ma'am.

18     Q    And if you could review that statement to

19  yourself for just a second, please?

20     A    Okay.  Yes, ma'am.  Yes, ma'am.  Go ahead, I'm

21  ready.

22     Q    Okay.  And do you recognize this document?

23     A    Yes, ma'am.

24     Q    And what is this document?

25     A    Statement of Tina Maskin.

Page 201

1      Q    Is this the statement that you typed up?

2      A    Yes, ma'am.

3      Q    Is it dated September 12, 2004?

4      A    Yes.  Yes, ma'am.

5      Q    Okay.  Do you -- strike that.  Was any --

6  strike that.  In this statement you state that Detective

7  West was with you, right?

8      A    Yes, ma'am.

9      Q    Okay.  So you're not sure if he was with you

10  or not on 9-11, when you spoke with her, but he

11  definitely was with you on 9-12?

12     A    Yes.

13     Q    Okay.  Now, this report states that Ms. Maskin

14  said that she was at home when Robert came in?

15     A    Yes, ma'am.  Uh-huh.

16     Q    And Ms. Maskin also informed you that she had

17  invited Robert into her home after seeing him leave

18  Ms. Bellar's, right?

19     A    I don't see that, where it's supposed to say

20  that.

21     Q    Yeah.  I don't see it in your report either.

22  Did she inform you of that information?

23     A    I don't know.  That she invited him in?

24     Q    Uh-huh.

25     A    I don't recall that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 202

```
 1    Q    Okay.  Would you agree, if she had informed
 2  you of that, that would be important information to
 3  document?
 4    A    If she invited him in?
 5    Q    Yes, sir.
 6    A    Depends on what she invited him in for.
 7    Q    Would it have been important for you to
 8  document if she had told you that she invited him in
 9  after seeing him leave Ms. Bellar's?
10    A    Yes.
11    Q    I mean, you'd agree that the timing of Mr.
12  Yell's whereabouts were important --
13    A    Oh, yes, ma'am.
14    Q    -- on the night in question?
15    A    Uh-huh.
16    Q    So if any witness had given you any
17  information on his whereabouts and when, it would have
18  been important to document that, correct?
19    A    Right, yes.
20    Q    And before we go further, if you'll just look
21  briefly through those handwritten notes.  I didn't see
22  any handwritten notes about Tina Maskin, but I want to
23  make sure that I'm not missing it.  Can you look through
24  that exhibit to make sure they're not there?
25    A    Okay.  Yes, ma'am.  No.
```

Page 203

```
 1    Q    Okay.  Did you see any --
 2    A    No, ma'am.  No, ma'am.
 3    Q    -- handwritten notes about Ms. Maskin's
 4  interview?
 5    A    No, ma'am.  No, ma'am.
 6    Q    Is there a reason why you wouldn't have taken
 7  any handwritten notes about this interview?
 8    A    Because I was going to the interview her the
 9  next day.  I was going to do a -- another interview with
10  -- do an interview with her the next day.
11    Q    Well, the day that we're speaking of, right,
12  is September 12, 2004.
13    A    Yes.
14    Q    We're talking about that next day right now.
15    A    Yeah.  This is -- uh-huh.  Yes, ma'am.
16    Q    Okay.  But you took handwritten notes about
17  the statement that you took from Ms. Bellar on 9-12.  We
18  just talked about those, right?
19    A    Uh-huh.  Yes.
20    Q    Okay.  So why take handwritten notes about
21  what you learned from Ms. Bellar versus what you learned
22  from Ms. Maskin?
23    A    Ms. Bellar had more information.  And like I
24  say, it's so much going on, I probably just overlooked
25  it and had so much going on.
```

Page 204

```
 1    Q    Is there any way to tell from either your
 2  supplemental report or these typewritten statements at
 3  what time your interviews with these event individuals
 4  occurred?
 5    A    No, ma'am.  No, ma'am, uh-uh.
 6    Q    Is there any way to tell by looking at your
 7  Supplemental Report or your typewritten statements about
 8  the time that the segment started and the time that they
 9  ended, so the length of the interviews?
10    A    No, ma'am.
11    Q    And was that in line with the policies of the
12  Russellville Police Department at the time, that you
13  didn't have to note start and stop times?
14    A    Say that one more time, please.
15    Q    Was it in line with the policies of the
16  Russellville Police Department that you didn't have to
17  note the start and stop times of interviews?
18    A    I don't recall.  I don't think there's
19  anything in there about that.
20    Q    Now, your report states that Ms. Maskin said
21  that Robert went to her bedroom and tried to get under
22  her bed, correct?
23    A    Yes, ma'am.
24    Q    Ms. Maskin also informed you that he did so
25  after she told him that there was a police officer at
```

Page 205

```
 1  Ms. Bellar's house; is that correct?
 2    A    Yes, ma'am.
 3    Q    But that information isn't in this typewritten
 4  report, is it?
 5    A    No, ma'am.
 6    Q    Is there a reason why you didn't include that
 7  information in this typewritten report?
 8    A    Because it's in the main case report.  Is that
 9  what it was in?
10    Q    Yeah, I don't think so, but if -- please look
11  at it and tell me if I missed that.
12    A    Let me see.  Let me see if I missed it.  Okay.
13  Your question again was?
14    Q    My question was that the fact that Ms. Maskin
15  informed you that Robert went to hide under her bed in
16  her bedroom only after she told him there was a police
17  officer at Ms. Bellar's isn't included in this
18  typewritten report.
19    A    No, not in here.  No, ma'am.
20    Q    Do you see that information within your Case
21  Supplement Report?
22    A    No.
23    Q    And we've already established that you don't
24  have any handwritten notes --
25    A    Right.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1   Q   -- that were disclosed --
2   A   Right.
3   Q   -- about the interview with Ms. Maskin, right?
4   A   Right.
5   Q   Actually, about either time you spoke with
6   Ms. Maskin, right?
7   A   Yes, ma'am.
8   Q   None from the 9-11 or 9-12?
9   A   Right.
10  Q   Your report states that Ms. Maskin looked out
11  her window, she saw the trailer was on fire, and that
12  she informed Robert of the fire, right?
13  A   Uh-huh.
14  Q   And that the first thing he did was express
15  concern for his children; is that right?
16  A   Yes, ma'am, that's -- uh-huh.
17  Q   And she also informed you that Robert
18  immediately took off running out of her house towards
19  the trailer, right?
20  A   I don't see that.
21  Q   Okay. Do you recall Ms. Maskin giving you
22  that information, that Robert immediately took off
23  running towards the trailer?
24  A   I don't remember that.
25  Q   You don't remember that?

Page 207

1   A   I don't, uh-uh.
2   Q   Your report states that Ms. Maskin said, "As
3   Robert was leaving her house, he threw a cigarette
4   lighter in her yard." Do you see that?
5   A   In the Exhibit number 2?
6       MR. MANDO:  In the Maskin statement.
7   Q   In the --
8   A   Oh, in the Maskin statement?  Yes.
9   Q   Ms. Maskin also told you that Robert dropped
10  the lighter as he was running and fell, correct?
11  A   I don't know if she said -- I don't know about
12  that part.  I just remember her saying something about a
13  lighter.
14  Q   And the lighter you believed to be important
15  at the time, right?
16  A   Well, yes, based from -- yes.
17  Q   And so anything that she told you in regard to
18  Robert being in possession of a lighter would've been
19  important to document?
20  A   Oh, yes.  Yes, ma'am.  Uh-huh.
21  Q   And by the way, Robert smoked cigarettes,
22  right?
23  A   Well, he smoked -- yeah, he smoked one that I
24  know of.  Just one that I know of.  I --
25  Q   Okay.  And that's how you know, because --

Page 208

1   A   Yes, ma'am.
2   Q   -- he smoked -- asked to smoke a cigarette
3   before your interview with him --
4   A   Yes, ma'am.
5   Q   -- right?
6   A   Uh-huh.
7   Q   Okay.  Not unusual for an individual who
8   smoked cigarettes to have in their possession a lighter,
9   right?
10  A   I would not think so.  I don't smoke, so I
11  mean...
12  Q   Right.  Well.  Do you know other individuals
13  who smoked cigarettes that --
14  A   Yes, they usually --
15  Q   carry lighters?
16  A   Yes.  Yes, ma'am.
17  Q   Pretty typical, right?  Now, did Ms. Maskin
18  inform you how long Robert had been in her home before
19  she noticed that the trailer was on fire?
20  A   I don't recall that.
21  Q   And that would've been important information
22  to know, correct?
23  A   Uh-huh.
24  Q   Did you ask her how long he'd been there?
25  A   I don't know.  I don't -- I don't know.

Page 209

1   Q   If you had asked her and she'd given you
2   information, that would've been important information to
3   include in this typewritten report, correct?
4   A   That's true.  Yes, ma'am.
5   Q   That would've been information that was
6   exculpatory and should have been disclosed, correct?
7   A   Yes.
8   Q   Did Ms. Maskin tell you that once Robert ran
9   from her yard that she witnessed a police officer grab
10  him and tackle him to the ground?
11  A   I don't know about that.
12  Q   You don't recall having that conversation with
13  her?
14  A   No, I don't remember --
15  Q   Do you recall asking Ms. Maskin what happened
16  after Robert fell and dropped the lighter and ran to the
17  trailer?
18  A   No, ma'am.
19  Q   All right.  What I'd like to do is show you a
20  quick video clip.
21  A   Okay.
22  Q   But we're going to need just a couple minutes
23  to get that set up.
24  A   Okay, sounds good.
25      MS. STAPLES:  Go off the record.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 210

1    VIDEOGRAPHER:  Okay.  We're off the record at
2  1:36.
3         (OFF THE RECORD)
4    VIDEOGRAPHER:  Okay.  We are back on the record
5  at 1:48.
6  BY MS. STAPLES:
7    Q    Okay, Mr. Edmonds.  Sorry about that.
8    A    Yes, ma'am.
9    Q    You okay?
10   A    Yeah.  I'm fine.
11   Q    Do you need some water?
12   A    Uh-uh.  No.
13   Q    All right.  What I'd like to do is play this
14  clip that we've marked as Plaintiff's Exhibit number 10.
15  It's a clip from Mr. Yell's criminal trial.
16        (EXHIBIT 10 MARKED FOR IDENTIFICATION)
17   A    Okay.
18   Q    And if you will just watch, pay attention,
19  I'll ask you some questions about it once the clip is
20  completed.
21   A    Yes, ma'am.  Yes, ma'am.
22   Q    Thank you.
23        (VIDEO PLAYS)
24     QUESTIONING ATTORNEY:  State your name.
25     TINA MASKIN:  Tina Maskin.

Page 211

1     QUESTIONING ATTORNEY:  And Ms. Maskin, where do
2  you currently live?
3     TINA MASKIN:  Christian County.
4     QUESTIONING ATTORNEY:  And where do you work?
5     TINA MASKIN:  Lois DeBerry Special Need Prison.
6     QUESTIONING ATTORNEY:  And that's for where
7  abouts?
8     TINA MASKIN:  In Nashville.
9     QUESTIONING ATTORNEY:  How long have you worked
10  there?
11     TINA MASKIN:  Next month will be a year.
12     QUESTIONING ATTORNEY:  What kind of job
13  responsibilities do you have there?
14     TINA MASKIN:  I'm a nurse tech.
15     QUESTIONING ATTORNEY:  What kind of training do
16  you have to do that job?
17     TINA MASKIN:  Just nursing.  I tend to inmates.
18  Take their vital signs and just keep a watch on
19  them, make sure they don't try to commit suicide.
20     QUESTIONING ATTORNEY:  And are you under
21  someone?
22     TINA MASKIN:  Yes.
23     QUESTIONING ATTORNEY:  And who's that?
24     TINA MASKIN:  I work under other nurses.
25     QUESTIONING ATTORNEY:  And back in September of

Page 212

1  2004, did you live in Russellville, Kentucky?
2     TINA MASKIN:  I did.
3     QUESTIONING ATTORNEY:  Where abouts in Russell
4  did you live?
5     TINA MASKIN:  On Morgan Street, North Morgan.
6     VIDEO:  And is that out past the Red Cap
7  (phonetic) plant -- the old Red Cap plant?
8     TINA MASKIN:  Right behind it, across the
9  railroad tracks.
10     QUESTIONING ATTORNEY:  You don't recall -- you
11  don't recall the -- recall the address, do you?
12     TINA MASKIN:  Not off hand.
13     QUESTIONING ATTORNEY:  And who was your
14  next-door neighbors?
15     TINA MASKIN:  Her name was Charlotte.
16     QUESTIONING ATTORNEY:  Charlotte?
17     TINA MASKIN:  I don't know her last name.
18     QUESTIONING ATTORNEY:  And did she -- she lived
19  to you -- you're standing at your front door, and
20  did she live to your right or your left?
21     TINA MASKIN:  To my right.
22     QUESTIONING ATTORNEY:  Okay.  And --
23     JUDGE:  Which way is she facing?  She facing
24  toward or --
25     TINA MASKIN:  Front door -- front door, towards

Page 213

1  the street.
2     JUDGE:  Okay.  You're facing the street?
3     TINA MASKIN:  Uh-huh.
4     JUDGE:  Okay.  All right.
5     QUESTIONING ATTORNEY:  Okay.  You're facing the
6  street, you're on your front porch, and she would be
7  to your right?
8     TINA MASKIN:  Uh-huh.
9     QUESTIONING ATTORNEY:  Her house would be?
10     TINA MASKIN:  Yes.
11     QUESTIONING ATTORNEY:  And do you recall who
12  lived behind you?
13     TINA MASKIN:  Uh-huh.
14     QUESTIONING ATTORNEY:  And can you tell us
15  that?
16     TINA MASKIN:  Her name was April, and she had
17  kids, and she had a boyfriend named Robert.
18     QUESTIONING ATTORNEY:  Okay.  Do you know any
19  of the last names?
20     TINA MASKIN:  Robert's last name.  I didn't
21  know April's last name.
22     QUESTIONING ATTORNEY:  Okay.  You knew what
23  Robert's is?
24     TINA MASKIN:  Yell.
25     QUESTIONING ATTORNEY:  Okay.  And do you know

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1  any of the children's names?
2      TINA MASKIN:  Cameron and Sara Lynn.  And she
3  had two older boys, but I can't recall their names.
4      QUESTIONING ATTORNEY:  Okay.  And do you have
5  any children?
6      TINA MASKIN:  Yes, I do.
7      QUESTIONING ATTORNEY:  And who are your
8  children -- your children -- tell us about your
9  children.
10     TINA MASKIN:  I have six.
11     QUESTIONING ATTORNEY:  Okay.  And were any of
12  them with you back on September the 12th?
13     TINA MASKIN:  My --
14     QUESTIONING ATTORNEY:  Or excuse me, September
15  9th.
16     TINA MASKIN:  My oldest daughter was there,
17  Demetria, and my four small kids.
18     QUESTIONING ATTORNEY:  Okay.  And are there
19  some unusual events that -- that occurred on the --
20  the evening of September 9th that you recall?
21     TINA MASKIN:  Yes.
22     QUESTIONING ATTORNEY:  And can you tell us, had
23  you been somewhere that evening?
24     TINA MASKIN:  I had been to Save-A-Lot, and I
25  just got back and I was taking groceries out of my

Page 215

1  trunk to go inside the house.
2      QUESTIONING ATTORNEY:  You know approximately
3  what time it was?
4      TINA MASKIN:  It was right before dark.  It was
5  right before dark.  I don't remember what time it
6  was.  I had seen Robert next door to Charlotte's
7  house, and he was beating on the door.  And she was
8  standing out.  I don't -- I don't know if they were
9  talking or arguing, but I know there was yelling
10  going on.  And I had seen her go back in the house.
11  And then he came over the fence and I said, "Robert,
12  you drunk?"  He said, "I'm drunker than Cootie
13  Brown."  I said, "Well, you need to sit down before
14  you fall down," and I told him to come in.  And I
15  had asked him -- he had came in, sat on the couch,
16  and I had asked him where April and the kids were.
17  And he had told me that they were at Holy Tree, at
18  his aunt's house, and I was like, "Well, where is
19  that at?"  And he was like, "It's across town."  And
20  then he had said something to my daughter, and he
21  was like, "When I tell you come here, boy, you come
22  here right now."  And I was like, "That's not my
23  son.  That's my daughter.  What are you doing?"  And
24  he was flicking the lighter on the couch.  And then
25  I asked him again, where was April and the kids.

Page 216

1  Then I looked out the window and I seen policemen
2  out there talking to Charlotte.  And I asked him
3  again where April and the kids were, and I was like,
4  "Where's all these polices out here?"  Then he got
5  off the couch, he we went in my bedroom.  And he had
6  knocked pictures off my wall and a vase that was on
7  my dresser.  It fell off and broke, and he was
8  trying to get under my bed.  Then I come back out of
9  my bedroom, and I was coming through the living room
10  and I could see out my back door that the trailer
11  was on fire.  And I asked him again.  I said,
12  "Robert, where's April and the kids?  Your trailer's
13  on fire."  And he came out of the bedroom.  He said,
14  "She better got Sara Lynn and Cameron out," and we
15  both ran out the door.  I seen the police officer
16  running with Charlotte.  Charlotte had a phone in her
17  hand.  And we was coming out the door.  As he got
18  off the porch, we was running through the back, and
19  he slipped and fell and something fell.  He had
20  something and it fell in the yard.  And then by the
21  time we got over there, a police officer had grabbed
22  him and he fell to the ground again.  They knocked
23  him down or something, because he had fell when they
24  grabbed him.
25     QUESTIONING ATTORNEY:  Okay.  And where abouts

Page 217

1  -- first of all, can you describe in greater detail
2  the situation where he was sitting on your couch
3  with something in his hand?
4      TINA MASKIN:  It was flicking a lighter.
5      QUESTIONING ATTORNEY:  Do you recall anything
6  about the lighter?
7      OPPOSING ATTORNEY:  Objection, leading.
8      JUDGE:  Overruled.
9      TINA MASKIN:  Just that he was flicking.
10     QUESTIONING ATTORNEY:  And how long did this
11  take place?
12     TINA MASKIN:  What, the flicking of the
13  lighter?
14     QUESTIONING ATTORNEY:  Yes, sir.  Yes, ma'am.
15  Excuse me.
16     TINA MASKIN:  He just flicking it.  I don't
17  know how long it took place.  I mean, he was just
18  sitting there just flicking a lighter.
19     QUESTIONING ATTORNEY:  And how long was
20  Mr. Yell in your house?
21     TINA MASKIN:  From 15 to 20 minutes, maybe.
22     (VIDEO STOPS)
23  BY MS. STAPLES:
24     Q   All right, sir.  Were you able to hear and see
25  that video?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of KENNETH EDMONDS, taken on September 14, 2022

218..221

Page 218

1    A    Yes.  Yes, ma'am.
2    Q    All right.  And do you recognize that witness?
3    A    Yes, ma'am.
4    Q    That was Ms. Maskin?
5    A    Yes, ma'am.
6    Q    All right.  Did you hear Ms. Maskin testify
7  that she saw Robert as he was leaving Ms. Bellar's home?
8    A    Yes, ma'am.
9    Q    And did you hear her testify that she invited
10 him into her home?
11   A    Uh-huh.
12   Q    Did you hear her testify that Robert came in
13 and sat on her couch?
14   A    Yes, ma'am.
15   Q    And did you hear her testify that, once she
16 saw the police officer over at Charlotte's, she told
17 him, and that's when he ran back into the bedroom?
18   A    Yes, ma'am, I heard that.  Uh-huh.
19   Q    And did you hear Ms. Maskin testify that after
20 she saw the trailer was on fire, she told him that the
21 trailer was on fire?
22   A    Uh-huh.
23   Q    And that he took off running towards the
24 trailer?
25   A    Yes, ma'am.

Page 219

1    Q    And did you hear him testify -- hear her
2  testify that he slipped and fell?
3    A    Yes, ma'am.
4    Q    And that something fell out of his hand at
5  that point?
6    A    Right.
7    Q    And that once he got around to his yard, an
8  officer grabbed and tackled him and he fell to the
9  ground.
10   A    I did.  Yes, ma'am.
11   Q    Did you hear Ms. Maskin testify that Robert
12 was at her home for 15 to 20 minutes?
13   A    Yes, ma'am.
14   Q    The details that she gave in that testimony
15 that I just showed you would've been important details
16 in this investigation, correct?
17   A    Yes, ma'am.
18   Q    For instance, how long he --
19   A    Yes, ma'am.
20   Q    -- had been in her home before she noticed
21 that the trailer was on fire?
22   A    Uh-huh.
23   Q    For instance, the fact that he had came
24 directly from Ms. Bellar's home to her home?
25   A    Uh-huh.

Page 220

1    Q    For instance, the fact that she invited him
2  into her home, not that he just pushed his way into the
3  home, all that would've been important information,
4  right?
5    A    Uh-huh.  Yes, ma'am.
6    Q    As having been the last person to see Robert
7  before the fire was discovered, it would've been very
8  important to get as many details from Ms. Maskin as you
9  could have, right?
10   A    Oh, yes, ma'am.  Yes, ma'am.
11   Q    And questions like when she first saw him and
12 how long he'd been in the house are questions that you
13 would've asked her in investigating this case, right?
14   A    Uh-huh.  Uh-huh.
15   Q    And it would've been extremely important for
16 you to document those details in a written report,
17 correct?
18   A    Uh-huh.
19   Q    And it would've been important for those
20 details to be turned over to the prosecutor and the
21 defense attorney in this case?
22   A    Uh-huh.
23   Q    At no point when you were talking to
24 Ms. Maskin, did she indicate that she had seen Robert
25 Yell starting the fire, did she?

Page 221

1    A    No, ma'am.
2    Q    In fact, was there any witness that you talked
3  to on 9-11-2004 or 9-12-2004 that told you that they saw
4  Robert Yell start the fire?
5    A    Oh, no, ma'am.
6    Q    And you certainly would've documented that if
7  someone had said that.
8    A    Yes, ma'am.  Yes, ma'am.  Yes, ma'am.
9    Q    Now, after talking with Ms. Bellar and
10 Ms. Maskin, when you went back to the scene on 9-11
11 after leaving the hospital, are you with me?
12   A    Uh-huh.  Uh-huh.
13   Q    Is there anyone else that -- any other witness
14 that you spoke to on the night of 9-11-2004?
15   A    I don't recall.  I mean, I'm sure -- I don't
16 recall.
17   Q    If you had spoken with any other witness on
18 that evening, would you agree it would've been important
19 to document that you had spoken with those witnesses?
20   A    Yes, ma'am.
21   Q    Okay.  And you would've -- I'll strike that.
22 Now, the next thing that you did, according to your
23 supplemental report, which is Exhibit --
24   A    2?
25   Q    2.  You note that -- well, let me strike that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 58 of 115 PageID #2851
The Deposition of KENNETH EDWARDS, taken on September 14, 2022
222..225

Page 222

1  Before we get to 9-12, you stated that you were going to
2  wait to and talk with Robert Yell the following day; is
3  that correct?
4      A   Yes, ma'am.
5      Q   And that you -- and you note here in your
6  report that Sergeant Rod Mills collected the clothing of
7  Yell by the request of Alan Gregory?
8      A   That is correct.  Yes, ma'am.
9      Q   And what was the importance of noting that
10 Mr. Mills collected Robert's clothing?
11     A   For the fire marshal I guess to see if there
12 was anything on his clothing.
13     Q   To do forensic testing on it?
14     A   Yes, ma'am.  Uh-huh.
15     Q   Okay.  All right.  So then you note that on
16 the next day, on September 12th, Robert Yell was
17 interviewed.
18     A   Yes, ma'am.
19     Q   You said he was taken from the jail and
20 brought to the police department by Ms. Ryder
21 (phonetic)?
22     A   Yes, ma'am.  Yes, ma'am.
23     Q   So you went and picked up Mr. Yell from the
24 jail.  He had been put under arrest the night before, is
25 that correct?

Page 223

1      A   Yes, for other charges.  Yes.
2      Q   Yeah.  For alcohol intoxication and --
3      A   Yes, ma'am.  Yes, ma'am.
4      Q   -- that sort of thing?
5      A   Yes, ma'am.
6      Q   So you picked him up from the jail and you
7  transported him to the police station?
8      A   Yes, ma'am.
9      Q   Was there anyone else that was present with
10 you when you transported Mr. Yell to the police station
11 that morning?
12     A   No, I'm pretty sure I was by myself.
13     Q   Okay.  And here's where you know that you were
14 waiting for him to finish his cigarette, right?
15     A   Yes, ma'am.
16     Q   Okay.  And you got a call stating that the
17 fire marshal requested that you contact him; is that
18 right?
19     A   Yes, ma'am.
20     Q   And who was it that forwarded that information
21 to you?
22     A   I don't -- I don't -- I don't know who
23 forwarded that to me.
24     Q   Okay.  But someone alerted you to the fact
25 that you needed to call Mr. Gregory; is that right?

Page 224

1      A   Yes, ma'am.
2      Q   Okay.  And what did Mr. Gregory say to you
3  when you called him?
4      A   Say that again, ma'am.
5      Q   Well, and let me strike that.  Did you then
6  call Mr. Gregory as requested?
7      A   I either called him or I went -- went straight
8  back to -- to where he was, which is -- was at the --
9  the -- at the crime scene.
10     Q   Okay.  You know, it looks like in your report
11 you said, "When I made contact with Gregory by phone, he
12 asked me to come to the crime scene."
13     A   Okay.  Okay.
14     Q   Okay.  And when you spoke with Mr. Gregory,
15 did he tell you why he needed you to come to the crime
16 scene?
17     A   He just tell -- I think, from what I recall,
18 he wanted me to come back there and look at something.
19     Q   Okay.  Now, let me back up just a minute,
20 before you talked with Mr. Gregory.  When you
21 transported Mr. Yell to the police station, did you
22 speak with him at all during that transport?
23     A   No.  I don't think we said anything at all.
24     Q   You didn't question him in any way?
25     A   Oh, no, ma'am.  Uh-uh.

Page 225

1      Q   And Mr. Yell didn't make any statements to you
2  in any way during that transport?
3      A   No, ma'am.  None.  No, ma'am.
4      Q   If Mr. Yell had made a statement to you while
5  you were transporting him, you would've documented that
6  in a report, correct?
7      A   Say that again?
8      Q   If he had made a statement to you while you
9  were transporting him, you would've documented that in a
10 written report?
11     A   And read his Miranda right then and there,
12 yes.
13     Q   And why would you have read him Miranda right
14 then and there?
15     A   Because he would've been -- he would've been
16 making a spontaneous comment to me.  And especially if
17 had to do something with the crime scene or the fire or
18 anything.  Now, there's -- you know, if it was just
19 regular conversation, it'd be a different story.
20     Q   Okay.  I hate to do this to you, but can you
21 take a look at that CAD again?  Because I have a
22 question about it.  It's page or -- I mean, I'm sorry.
23 It's document number 3.
24     A   Let me find it.  Let me find it.  Okay.  I got
25 it here.  Right here.  Which -- which page?  3?  I'll

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

1  get that one.
2      Q    No.  Actually, I have a question about some
3  entries on page 5.
4      A    5.  Okay.
5      Q    So there -- from what I could tell, there were
6  several entries on this page in regard to your badge
7  number.  The first one that I saw is 832 10-97 LMH at
8  19:10 on 9-12.  Do you see that up towards the top of
9  the page, sir?
10     A    Yes, I got it.  Uh-huh.
11     Q    Okay.  So I think you've already told me that
12 10-97 means --
13     A    That I'm arriving somewhere.
14     Q    Arrived.
15     A    Yes.
16     Q    Okay.  And that LMH is --
17     A    Logan Memorial.
18     Q    -- Logan Memorial Hospital.
19     A    Yes, ma'am.
20     Q    And it says that you arrived there at 19:10 on
21 9-12.  Can you recall why you went back to the hospital
22 on the 12th?
23     A    All right.  Let me get right here.  I don't
24 know.
25     Q    And what does 10-98 stand for, sir?

Page 227

1      A    That means you're leaving.
2      Q    Okay.  So the next entry is at 5427 on 9-12,
3  and it says you're leaving the hospital.  You see that?
4      A    Tell me again.  Which one?
5      Q    It's 5427.
6      A    I'm off somewhere here.
7      Q    Like the middle of the page.
8      A    You said I'm leaving.  Should be -- I can't
9  see through my -- right here?  I don't know about that.
10     Q    Okay.
11         MR. MANDO:  Is he --
12     A    Yeah.  I have an explanation there, but I --
13     Q    No, I understand.  But it appears that you
14 went to the hospital twice within a close period of
15 time.  Would you agree?  You'd been there early in the
16 evening on 9-11 and real early in the morning on 9-12,
17 right?
18     A    Yes.
19     Q    Okay.
20     A    Okay.
21     Q    All right.  So then the next entries I see for
22 you are about halfway down.
23     A    Okay.
24     Q    And there's going to be several of them, but
25 there's 10-97 at 8:17?

Page 228

1      A    Yes, ma'am.
2      Q    Okay.  So I know that means you're arriving.
3  What does the information in the middle there, 10-56
4  picking up 10-15 mean?
5      A    10-56 is the jail.
6      Q    Okay.
7      A    That's what we call a jail.
8      Q    Okay.
9      A    And picking up a 10-15 is -- is a -- is a
10 person that's lodged in the jail.
11     Q    So that would've been when you arrived
12 at the Logan County Regional Jail to pick up Robert to
13 bring him back for an interview; is that right?
14     A    Yes.  Yes, ma'am.
15     Q    Okay.  And then you have a -- the next entry
16 is 10-12.  What does 10-12 mean?
17     A    That means I'm 10-12 with that 10-15.  It
18 means we're -- we're together now.
19     Q    Oh, together?  You know, I tried to Google
20 some of these police codes, but every --
21     A    Everybody's different.
22     Q    -- agency does different.  Okay.  So that
23 meant you were with Robert Yell.  And what does SIG4
24 mean?
25     A    In other words, we're back to -- to the --

Page 229

1  we're en route to the police department.
2      Q    Okay.
3      A    Where I work at, so...
4      Q    And then the next entry, what does that mean
5  where it says log, L-O-G?
6      A    That would be a question for the dispatch,
7  because that's their codes.  They put in things.
8      Q    And you see there where it says, "Request
9  chaplain for Robert Yell?"
10     A    Yes, ma'am.
11     Q    He just found out the boy passed away?
12     A    Yes, ma'am.
13     Q    Did you make that request for the chaplain,
14 sir?
15     A    I probably did.
16     Q    So at 8:39:47 on 9-12, had you had a
17 conversation with Mr. Yell that his son had passed away?
18     A    I wasn't going to tell him.
19     Q    You didn't tell him?
20     A    No.  That's why they requested the chaplain.
21 If he needed a chaplain, that was the support that I was
22 going to give him.
23     Q    Okay, so do you -- what would the log mean
24 that he just found out that the boy passed away?
25     A    L-O-G?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of KENNETH EDMONDS, taken on September 14, 2022

230..233

Page 230

1    Q    Well, no, just the content of that where he
2  says he just found out the boy passed away.  So is it
3  your testimony you didn't tell him?
4    A    I don't remember if I told him or not.  I
5  don't -- I can't remember if I told him or not, as far
6  as that goes.  If he asked me directly, I may have, but
7  I don't remember.  Let me see.
8    Q    Do you recall requesting the chaplain for him?
9    A    I think I did, because when there's a -- in a
10 situation like this, I wanted him to be good.
11   Q    Yeah.
12   A    I mean, I'm not an insensitive person.
13   Q    Right.  And whether you shared the news with
14 him, or someone else, that was tragic information for
15 him to learn?
16   A    Well, I'd rather for him to get it from
17 somebody that can support him and help him and stuff
18 like that.
19   Q    Yeah.  And I under- -- I totally understand
20 what you're saying there, but in this context, it
21 appears that at least a dispatcher thought that he'd
22 already been told that he passed away, because it says,
23 "He just found out."
24   A    And see, I don't know, because everything
25 that's on here is not always true.

Page 231

1    Q    Okay.
2    A    It could all -- it could be -- it -- it could
3  have been before, it could have been after.  Because
4  sometimes when we call things in, they don't always get
5  the times and stuff right because there's so much going
6  on.
7    Q    Okay.  Okay.
8    A    I'm not saying that they made a mistake as far
9  as that goes.  I don't know.
10   Q    But you can't recall the sequence of events,
11 whether you told them and then requested the chaplain,
12 or you requested the chaplain and then someone else told
13 him he passed away?
14   A    Yeah.  I don't remember exactly how it
15 happened without the -- yes, ma'am.
16   Q    Okay.  I understand.  Now, sir, did you know
17 Robert Yell prior to 9-11-2004?
18   A    No, ma'am, I didn't know him.
19   Q    Had you ever had any contact with him at all
20 previously?
21   A    Not with him.
22   Q    No arrests at all?
23   A    Not as I recall.
24   Q    No conversations that you can recall with --
25   A    Not as I recall.

Page 232

1    Q    -- with Robert.  I understand you don't have
2  any recollection as to whether or not you shared the
3  news or maybe the chaplain shared the news.  Do you
4  recall if you were present when Mr. Yell was given the
5  information that his son had passed away?
6    A    Say that again.
7    Q    Do you recall whether or not you were present,
8  if you were there when Mr. Yell was given the news that
9  his son had passed away?
10   A    No, ma'am, I don't.
11   Q    Just can't recall?
12   A    No, ma'am.
13   Q    Okay.  I understand.  Okay.  So Mr. Gregory
14 called, he asked you to come back to the crime scene?
15   A    Yes, ma'am.
16   Q    And did you fulfill that request?
17   A    Yes, ma'am, I did.
18   Q    Okay.  Now, you had testified earlier that you
19 had worked with Mr. Gregory on other cases; is that
20 right?
21   A    Yes, he would call.  Yes, ma'am.
22   Q    Okay.  Did you consider Mr. Gregory a friend?
23   A    He was a good person.  Yes, ma'am.
24   Q    Okay.
25   A    He's a real good person.

Page 233

1    Q    Now, when -- according to this pad, it looks
2  like that you were en route to the crime scene at 8:52
3  a.m.
4    A    Yes, ma'am.
5    Q    Is that right?
6    A    Uh-huh.
7    Q    Okay.  When you arrived at the crime scene
8  that morning, was anyone else present besides
9  Mr. Gregory?
10   A    I don't know exactly.  If anybody -- maybe
11 Mr. David West.  I don't know.  I don't -- I don't
12 recall who was there.
13   Q    What about Buster Cannon?  Do you recall if he
14 was at the scene at this time?
15   A    I don't know if that time.  I know at one
16 point in time he was there, but I don't know when.
17   Q    Do you know if he was there at one point in
18 time that morning, or is it that you're not sure if he
19 was there when you first arrived?
20   A    I'm not there -- if he was there.  I wasn't --
21 I'm -- I'm not sure if he was there when I first
22 arrived.
23   Q    Okay.  But you do believe he was there at the
24 scene at some point that morning that you were there?
25   A    Yes, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 61 of 115 PageID #: 2854
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
234..237

Page 234

1    Q    Okay.  Now, had you had any prior experience
2  working a case with Mr. Cannon?
3    A    No, ma'am.  Didn't know him.
4    Q    We talked earlier about a couple of the fire
5  investigation cases that you had worked on.  Did any of
6  those include K9 accelerant -- a dog used to detect
7  accelerant?  I can't remember their correct terminology
8  right now.
9    A    No, ma'am.
10    Q    Do you recall Mr. Cannon having had a K9 with
11  him there at the crime scene?
12    A    I do.  Yes, ma'am.
13    Q    What about Fire Marshal Samuel Flowers?  Do
14  you recall seeing him at the scene of the fire?
15    A    At one point in time.  I think he's an older
16  man.  I believe that was who -- yes, ma'am.
17    Q    And would that have been at one point in time
18  on November 12th or different dates?
19    A    I could not -- I do not remember.
20    Q    Okay.  So what is it that Mr. Gregory wanted
21  to share with you that morning?
22    A    He wanted to show me some spots in the
23  trailer, some burn spots.
24    Q    And where were those spots?
25    A    Living room maybe was one, I believe.  I don't

Page 235

1  remember where the other one was.  I think there was a
2  couple -- couple -- two or three, four places or
3  something like that.
4    Q    If you look at your supplemental report --
5    A    Hold on a second.  Let me get it right here.
6  Okay.  Go ahead.
7    Q    On the second page.
8    A    Yes, ma'am.
9    Q    It says -- at the bottom, under September 12,
10  2004, you see that paragraph?
11    A    Okay.  Yes, ma'am.
12    Q    "Because he told me, he showed me the area of
13  where the substance was poured.  The area was the living
14  room, kitchen area, and a bedroom where the other two
15  kids slept."
16    A    Okay.
17    Q    Does that refresh your recollection?
18    A    Yes.  Okay.
19    Q    What else did -- well, what did Mr. Gregory
20  tell you those areas indicated?
21    A    That -- that was, I think they called it the
22  point of origin, where something -- a fire may start.
23    Q    Did Mr. Gregory inform you of his opinion that
24  the fire wasn't an accident?
25    A    Yes, ma'am.  He did.

Page 236

1    Q    Did he tell you of his opinion that the fire
2  was intentional?
3    A    Yes, ma'am.
4    Q    And that a liquid was used to begin the fire?
5    A    Yes, ma'am.  I don't think he said what kind
6  of liquid.
7    Q    And so obviously by this time, if you're
8  walking through the trailer, looking at potential areas
9  of the trailer --
10    A    Yes, ma'am.
11    Q    -- I would conclude that the fire was out by
12  that time.  Is that an accurate assumption?
13    A    Oh, yes, ma'am.  Yes, ma'am, it is.
14    Q    Okay.
15    A    Yes, ma'am.
16    Q    Now, was there anyone else present with you
17  when Mr. Gregory took you through the trailer, showing
18  you these spots that he thought may have been the point
19  of origin?
20    A    I don't know if that -- at that point in time
21  if it was or not.  I know at one point in time we were -
22  - we were all together.
23    Q    And when you say we all, who are you referring
24  to, sir?
25    A    Mr. Gregory, David West, Mr. Cannon.  I still

Page 237

1  don't know where Mr. Flowers comes in at, to be honest
2  with you.  He's there.  I remember him being -- I just
3  don't know what part with -- with him -- he -- as far as
4  that goes.
5    Q    Okay.  Were there any other members of the
6  Russellville Police Department there at that time?
7    A    No.  I think it was just me at that point in
8  time with -- with those guys.
9    Q    Okay.  And what did you-all do there at the
10  scene after Mr. Gregory had showed you the points of
11  origin, his belief?
12    A    Now you're talking about just with Mr.
13  Gregory, or are you talking about when we all got
14  together?
15    Q    Yes, sir.  When you all got together, what was
16  the purpose?
17    A    Okay.  When we all got together, they were
18  just -- they were going -- evaluating the situation at
19  the trailer, looking at anything and everything that may
20  have caused a fire, or that may not have caused a fire.
21    Q    Now, Mr. Cannon was the K9 handler, correct?
22    A    That is correct.  Yes, ma'am.
23    Q    Okay.  And you and Mr. West and Mr. Gregory,
24  did you-all walk through the trailer with Mr. Cannon
25  while he was doing the walkthrough with the dog?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 238

1    A    That is correct.  Yes, ma'am.

2    Q    So it -- there were at least four of you there
3    at that time?

4    A    Yes, ma'am.

5    Q    Tell me, please, what you witnessed in regard
6    to the canine, whose name was PJ, I believe, what you
7    witnessed in regard to the walkthrough with PJ the dog.

8    A    Well, the dog, he, I mean, went through the
9    trailer, was sniffing I guess to find whatever.  That's
10   what he was doing, the dog was.

11   Q    Were there multiple walkthroughs with the dog?

12   A    No.  There was one walk through the whole
13   trailer, and then that was finished.

14   Q    So sitting here today, you can only recall one
15   time that Mr. Cannon took the dog through in your
16   presence?

17   A    Say that again now?

18   Q    Sitting here today, you can only recall there
19   being one time when Mr. Cannon took the dog on a
20   walkthrough in the trailer in your presence?

21   A    That's the only one I remember.  Yes, ma'am.

22   Q    There was testimony that you had video
23   recorded the walkthrough.  Do you recall doing that?

24   A    Well, what was supposed to be, yes, ma'am.

25   Q    Yeah.  So explain that to me.

Page 239

1    A    We -- I can't remember when -- when we were
2    down there.  Because I was going to leave, and -- and I
3    said, "Well, we need the video the trailer and
4    everything," because I believe I like to video.  So I was -- I
5    told Mr. Gregory, I'm going -- I know I told him.  That's
6    one part that bothered me real, real bad.  I was going
7    back to my office to get my video camera, and Mr.
8    Gregory said, "I have a video camera in the car" and
9    everything.  I said, "Well, I prefer to use mine," as
10   far as that goes, but we were pressed for time.  It was
11   -- he said, "I got a brand-new video camera in my car."
12   And so I went and looked at it.  It was just like mine
13   that I had.  And so -- he said it's charged and
14   ready to go.  So I ended up taking his video camera.  He
15   took the -- in 2004, we were using these -- it's like a
16   small VHS.  I don't know what they call them.  I forget
17   what they're called.  Like the big VHS.  This was like,
18   a small VHS.  You slap it down in there, you push it,
19   and it's just -- you can record.  It's just like a --
20   but you have to put it -- you have to take it out and
21   put it in a big VHS.  And so -- so that's what I was
22   using, exactly, it was like.  So I took it.  He said
23   it's charged, he said brand new.  So I -- I took it.  And
24   when we got ready to do the dog and stuff, I would say
25   that I done one with and without, because usually I like

Page 240

1    to try to do a video with -- mostly I'll do a video --
2    if I done one, I would've done one with the dog and
3    without, I'm thinking.  But I took the video and --
4    while the dog was doing its thing and they were pointing
5    out things, you know, this, this, this, this, this.  I
6    don't know what they were talking about, to be honest
7    with you.

8    Q    All right.  So I'm a little bit confused by
9    what you said.  You said usually you would want to do a
10   video with and without the dog is what you said?

11   A    Well, I mean with -- if it -- like, if you had
12   for -- the -- that situation, I would want it to done
13   one with the dog doing whatever he was doing, and then
14   come back and just do one other trailer itself.

15   Q    Okay.

16   A    I'm sorry.

17   Q    Okay.  No, that's okay.

18   A    I'm a little confusing sometimes.

19   Q    No.  Okay.  And so you only ended up doing one
20   video; is that right?

21   A    Of the -- with the dog doing?

22   Q    Uh-huh.

23   A    Yes.  Yes, ma'am.

24   Q    And well did -- how many videos did you take
25   total?

Page 241

1    A    See, I don't -- I don't remember because we
2    had to hand all of that over to the commonwealth, like
3    everything else we've handed over.  And I don't know,
4    because we couldn't -- there was no way for us to be
5    able to make copies back then, the way the kind of --
6    electronic stuff we had.  So we had to give everything
7    to them.  So I don't know how many videos of what,
8    because I haven't seen it in years.

9    Q    And what is your memory of what happened with
10   the video that you did with the -- involving the dog?

11   A    When I used it -- when I went back to view it,
12   which I don't know if it was hours later or the next
13   day, when I went back to view it, there was nothing on
14   that video.

15   Q    It was blank?

16   A    Yes, uh-huh.  And it was -- it was running
17   when I had it.  I know it was running.

18   Q    Okay.  Did you -- well, strike that.  After
19   you completed the video with the dog --

20   A    Yes, ma'am.

21   Q    -- what did you do with the video camera at
22   that point?

23   A    I would've took that and put it into evidence,
24   eventually.

25   Q    With the video camera?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

1    A    No, not with the video camera, just with the
2  tape itself.
3    Q    What did you do with the video camera?
4    A    I gave it back to Mr. Gregory, because it was
5  hi.
6    Q    And before giving the video camera back to
7  him, did you take out the tape, or did he take out the
8  tape?
9    A    No, I took the tape out.  Yes, ma'am, I took
10  it out.
11    Q    So you always had that tape in your
12  possession?
13    A    Yes, uh-huh.
14    Q    Now, there's testimony and the record revealed
15  that there were two different walkthroughs with the dog,
16  one time when he was on a long leash and a second time
17  when he was on a shorter leash.  Do you recall seeing
18  both of those walkthroughs?
19    A    I'm not saying it could -- I don't -- I don't
20  remember.  I remember the one because that was the one
21  that -- where they collected evidence and stuff, and the
22  cans and stuff like that.  So I don't remember -- I -- I
23  don't remember the -- the other one.
24    Q    So the only recollection that you have is of
25  the time that the dog hit on certain areas and evidence

Page 243

1  was collected; is that correct?
2    A    That's -- yes, ma'am.
3    Q    Do you have any recollection of the dog being
4  given treats within the trailer during that walkthrough?
5    A    I don't remember any.
6    Q    Sitting here today, you have no recollection
7  of the first walkthrough where the dog didn't hit on any
8  area in the trailer?
9    A    I don't remember that.  I just remember the
10  one where the cans and stuff and outside.  Yeah.
11    Q    Do you think it would've stuck out in your
12  mind if you were present when the dog didn't hit on any
13  areas in the trailer and then turned around and hit on
14  different places?
15    A    Yeah, because I -- yes, ma'am.  That probably
16  would've stuck out, because I probably -- I asked a lot
17  of questions to them.
18    Q    And at any point did Mr. Gregory or Mr. Cannon
19  or Mr. Flowers or Mr. West explain to you that they had
20  done a walkthrough and the dog hadn't hit on any places
21  within the trailer?
22    A    I don't remember anything like that.  And I'm
23  not saying did -- I just don't remember.
24    Q    Okay.  Before taking the tape out of the video
25  camera, did you review it there at the scene to see if

Page 244

1  the recording had worked?
2    A    No.  I -- I -- I usually will do it later and
3  stuff, especially if I know it was running and was
4  working.  If -- especially my equipment, you know, I
5  know it's running, it's working and stuff like that. But
6  no, I didn't.  I viewed it later.
7    Q    Once you determined that there was nothing of
8  substance on the tape that you had, did you talk with
9  Mr. Gregory about that to see if he could find the video
10  on the tape?
11    A    No, I didn't ask him, because it was just one
12  tape.  I told Mr. Wesley, whenever it happened, I said,
13  "Man, this --" I said, "It didn't -- it didn't" -- I
14  said, "I didn't capture for some reason.  It wasn't --
15  it's not on the tape."
16    Q    And just one second, sir.
17    A    Yes, ma'am.
18    Q    I'll come back to that.  Okay.  So after
19  videoing the walkthrough with the dog, did you do any
20  other investigation there at the scene of the fire?
21    A    Probably just took pictures, maybe, of the
22  rest of the exterior.  Some that -- some more pictures
23  or something like that.  I don't remember what I done
24  after that one.
25    Q    Did you speak with any witnesses while you

Page 245

1  were there?
2    A    Oh, at the trailer with all of them?
3    Q    At the trailer.
4    A    I don't think nobody was there that showed up.
5    Q    Okay.  So after concluding your investigation
6  there at the scene of the fire, did you travel back to
7  the station to complete your interview with Robert?
8    A    Yes, ma'am.
9    Q    And did any other law enforcement officer
10  participate in that interview?
11    A    On that day?
12    Q    Yes, sir.  So we're talking about September
13  12th, the day after the fire.
14    A    No.  I was just there, unless David -- I
15  know -- can't remember if David was in the viewing room
16  or not.  I don't know if he had -- I don't remember if
17  he was -- he wasn't in that room with me on that day, I
18  don't think, on that one.  There was one time we were
19  both together, or he was started and then I came in or
20  something like that.
21    Q    Sir, if you'll -- yeah.  If you'll turn to
22  those handwritten notes, RPD-440.
23    A    Okay.
24    Q    Do you recognize this page, sir?
25    A    Yes, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 64 of 115 PageID #: 2857
The Deposition of KENNETH PERDUE, taken on September 14, 2022

246..249

Page 246

1    Q    And what's this?
2    A    It's a note -- note page.
3    Q    And what -- is it in your writing,
4  handwriting?
5    A    Yes, ma'am.  Uh-huh.
6    Q    Does it purport to be notes about an interview
7  that you took at 11:11 hours -- oh, strike that.  I'm
8  looking at the wrong one.  I'm so sorry.  I jumped ahead
9  of myself.  That was the one that you did the following
10 day.
11   A    Okay.
12   Q    All right.  My apologies on that.  So it's
13 your memory that Mr. West may have been watching in the
14 viewing room but was not there with you in the room when
15 you were taking this first statement of Robert Yell; is
16 that correct?
17   A    Could have been, but I don't -- I don't
18 remember him there on the first one at all, at the
19 police department at all, I believe.
20   Q    Okay.  By the time that you got back to the
21 station on the morning of 9-12 to conduct this interview
22 with Robert, the arson investigators had already
23 informed you that they believe the fire was intentional,
24 correct?
25   A    Yes.

Page 247

1    Q    And by this time you had already determined
2  that it was Robert that set the fire; is that correct?
3    A    Say that again now?
4    Q    By the time that you went to interview Robert
5  on the morning of 9-12, after meeting with the arson
6  investigators at the trailer --
7    A    Uh-huh.  Uh-huh.
8    Q    -- you had determined that Robert was
9  responsible for setting the fire?
10   A    No, I hadn't determined that yet.  No, ma'am.
11   Q    Is there any indication in your case report,
12 or in the typewritten document that you drafted
13 regarding what time the interview with Robert actually
14 began?
15   A    No, not on that.  No, ma'am.
16   Q    And there's nothing in the report regarding
17 when the interview concluded, correct?
18   A    No, ma'am.
19   Q    Now, we already discussed that Robert had been
20 arrested the night before?
21   A    Yes, ma'am.
22   Q    And you had to go to the jail to pick him up,
23 to bring him over for this interview, correct?
24   A    Yes.  Yes, ma'am.
25   Q    So he was in custody at the time that he began

Page 248

1  the interview?
2    A    Say what now?
3    Q    He was in custody at the time you began the
4  interview?
5    A    From the jail -- yes.  From -- yeah -- from
6  the other -- from the other charges.  Yes, ma'am.
7    Q    Okay.  Did you read Robert his Miranda Rights
8  before beginning your questioning of him?
9    A    When I done the interview with him?
10   Q    Yes.
11   A    No, ma'am.  Uh-uh.
12   Q    Did any other law enforcement officer read
13 Robert his Miranda rights before you began your
14 questioning of him?
15   A    Not -- no, ma'am, not that I know of.
16   Q    I mean no other officer --
17   A    No.
18   Q    -- participated in this interview, correct?
19   A    No.  No, ma'am.  No, ma'am.
20   Q    And why didn't you read Robert his Miranda
21 rights before you began that questioning?
22   A    Because at that point it wasn't -- I didn't
23 know what I had with Robert.  Just because Officer Mills
24 said that he was a suspect -- I evaluate that myself, so
25 I -- I didn't -- I didn't -- still didn't know exactly

Page 249

1  what was going on, to be honest with you.
2    Q    Well, Sergeant mills had told you he was a
3  suspect from the jump, correct?
4    A    From his -- from his point.
5    Q    Yes, sir.  And --
6    A    And I'm not saying nothing bad about him, I
7  just said from his point.
8    Q    And Mr. Gregory had told you that the fire was
9  intentional before you began the interview?
10   A    That's true.  That is true.
11   Q    And you were -- well, what was the purpose of
12 your interview with Robert?
13   A    My purpose of in the interview was to see
14 exactly what was going on, see what -- to see what I
15 could figure out before that time, because it was -- it
16 was pretty much casual conversation as far as -- as far
17 as I'm concerned.  I hadn't accused him of anything at
18 all.
19   Q    Was Robert cooperative with you during that
20 interview?
21   A    Oh, yes, ma'am, he was.
22   Q    He answered your questions?
23   A    Yes, ma'am, he sure did.
24   Q    And he gave you the names of individuals who
25 could account for his whereabouts on the day in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 65 of 115 PageID #: 2858
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

250..253

Page 250

1  question?
2      A    Well, yeah, he gave me information to people
3  where he -- where he was.  Yes, ma'am.
4      Q    And in fact, you had already talked with a
5  couple of those individuals, right?
6      A    Oh, yes, ma'am.  Yes, ma'am.  Yes, ma'am, I
7  had.  Yes, ma'am.  Uh-huh.
8      Q    Ms. Maskin and Ms. Bellar?
9      A    Yes, ma'am.
10     Q    He admitted to you that he had consumed a lot
11 of alcohol on --
12     A    Yes, ma'am.
13     Q    -- on 9-11?
14     A    Yes, ma'am.
15     Q    He admitted to you that April had also
16 consumed a lot of alcohol on that --
17     A    Yes, ma'am.
18     Q    -- on 9-11?
19     A    Yes, ma'am.
20     Q    He admitted that he and April had argued for
21 most of the day?
22     A    Oh, yes, ma'am.
23     Q    He told you that she had admitted to having an
24 affair?
25     A    Yes, ma'am.  Yes, ma'am.

Page 251

1      Q    And he told you that he knew at one point that
2  the argument was escalating so much that he left to go
3  to his aunt's house --
4      A    Yes, ma'am.
5      Q    -- correct?  Now, eventually you did ask him
6  if he started the fire, right?
7      A    Yes, ma'am.
8      Q    Did you read him his Miranda Rights before
9  asking him that statement?
10     A    No.  After -- after he -- after he said that,
11 after he -- after I asked him, he said, "No," that's
12 when I ran him his Miranda Rights, because I know I was
13 going to go further then.
14     Q    And I don't guess I understand what you're
15 saying there.  You asked him an incriminating question,
16 right?
17     A    Well, I asked him a question, because like I
18 said, to me, he still wasn't a suspect as far as I'm
19 concerned, okay?  I'm asking him for my purpose, not for
20 Officer Mills' purpose.  I'm all -- I'm asking him did
21 he said the fire.  He said no.  So at this time did
22 he's telling me this, then you know, I'm listening to
23 him.  So now I want to ask him further questions about
24 that.  I wouldn't ask him as he -- like, he'd done it at
25 that point in time, because I was still uncertain what

Page 252

1  had actually happened.
2      Q    What if he'd said yes when you asked him that
3  question?
4      A    If he said yes?
5      Q    Uh-huh.
6      A    I'd have read him his Miranda warning, too.
7      Q    So it didn't matter what the answer was?
8      A    I was going to read him his -- yes, because I
9  knew I was going to go further.
10     Q    So you read him his Miranda rights after you
11 asked him if he was guilty of arson?
12     A    No.  I read him Miranda when I asked him --
13 when I asked him did -- did he set a fire.  And he said
14 no.  So he said no.
15     Q    And if he had set a fire, he would be guilty
16 of arson?
17     A    If he had set a fire?
18     Q    Uh-huh.
19     A    Well, yeah, if he had set a fire, he'd be
20 guilty of arson, yes.
21     Q    And that's what you were there to determine?
22     A    I was trying to clear it up.  I was trying to
23 see where we were going in this investigation.
24     Q    And was the timing of when you read Robert his
25 Miranda rights in compliance with the policies and

Page 253

1  procedures of the Russellville Police Department at that
2  time?
3      A    Yes, ma'am, I think it was.  Yes, ma'am.
4      Q    And was the timing of when you read Robert his
5  Miranda rights in compliance with the training that you
6  had received by 2004?
7      A    Yes.  Yes.  Yes, ma'am.
8      Q    And speaking of timing, if you look at those
9  handwritten notes --
10     A    Uh-huh.  Okay.  Yes, ma'am.
11     Q    Exhibit 9.
12     A    I got you.
13     Q    And at RPD443.
14     A    Okay, go ahead.
15     Q    Are these notes that you took during your
16 September 12, 2004 interview of Robert Yell?
17     A    I would say so.  Yes, ma'am.  Or somewhere
18 abouts.  I don't know exactly.  Let's see.  Because
19 sometimes when I get to talking I stop writing, so...
20     Q    Okay.  Well, that's a good -- that's a good
21 distinction.  You're pointing out the error in my
22 question.  According to this document, was it September
23 12, 2004, Sunday, at 10:17 a.m. that you took this
24 statement?
25     A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 254

1    Q    And you're looking at 443, right?
2    A    I'm looking at 443.  Yes, ma'am.
3    Q    Okay.  You see that there at the top of the
4  page, right?
5    A    Yes, ma'am.  Uh-huh.  Yes, uh-huh.
6    Q    And what does 10:17 a.m. indicate to you?
7    A    The hour.
8    Q    Does it indicate the time that the interview
9  you started?
10   A    I don't know.  I would -- I would have to look
11  at the original interview that I done with him on tape.
12   Q    Well, what was your standard practice and when
13  you would write times at the beginning of a page?
14   A    Say that again now?
15   Q    What was your -- what was your standard
16  practice in writing times at the beginning of a page of
17  handwritten notes?
18   A    Well, it's for my own purpose to kind of
19  remember what -- what I'm doing here, as far as that
20  goes.
21   Q    To remember the time that the interview
22  started?
23   A    If I could, as far as that goes.  I mean --
24   Q    What do you mean, if you could?
25   A    I mean -- well, okay.  Yeah.  So yeah, it was

Page 255

1  -- it was for the purpose for me to -- yeah, to kind of
2  keep track of what I'm doing.  Yes, ma'am.
3    Q    Okay.  And so is it -- does it make sense that
4  that's the time that the interview began, 10:17 a.m.?
5    A    Possibly.  Yes, ma'am.
6    Q    And I'm not trying to ask you a quick -- a
7  trick question, I promise.
8    A    No.
9    Q    What else would that time indicate, sir?
10   A    Well, it would -- it would indicate that I'm
11  starting somewhere around that time.  It could have been
12  before, could have been a little after.  I could not
13  have been on time with it.  But it was just give me an
14  idea of when I'm starting.
15   Q    Well, sir, as a career law enforcement officer
16  --
17   A    Uh-huh.
18   Q    -- you understand --
19   A    Oh, yes.
20   Q    -- the importance of being accurate when
21  you're detailing things such as time.
22   A    Yeah, but that doesn't always work like that.
23   Q    How does it work in potential homicide
24  investigations?
25   A    Well --

Page 256

1    Q    Are you more careful with what you documented
2  in -- during a homicide investigation?
3    A    No.  I could still be off on times.  I could
4  still be off on times a little bit.  Yeah.  I could
5  still be -- have a differential in times.
6    Q    And again, not noting the times that an
7  interview began and concluded was in accordance with the
8  policies of the Russellville Police Department at that
9  time?
10   A    Say -- say that one more time, please.
11   Q    Not noting in your reports the time that an
12  interview began and concluded was in accordance with the
13  policies of the Russellville Police Department at the
14  time?
15   A    Right.  Yes, ma'am.  Yes, ma'am.
16   Q    Let's turn to what we marked as Plaintiff's
17  Exhibit number 11.  See that?
18        (EXHIBIT 11 MARKED FOR IDENTIFICATION)
19   A    Oh, yes.  Okay.
20   Q    Do you recognize this document?
21   A    Uh-huh.  Yes, ma'am.
22   Q    And what's this document, sir?
23   A    It's a Miranda warning.
24   Q    Is that your signature at the bottom of the
25  page, under witness?

Page 257

1    A    On the witness?  Yes, ma'am, that's me.
2    Q    Okay.  And is this the Miranda warning
3  document that you've had Robert Yell sign on -- well, is
4  this a document that you had Robert Yell sign during
5  your interview with him?
6    A    Yes, ma'am.
7    Q    One thing I did want to ask you about, it says
8  the time is 10:39, correct?
9    A    Uh-huh.
10   Q    Do you have any reason to doubt the accuracy
11  of the time on this document?
12   A    No.  As far as that, I would've -- I would've
13  probably gave him the time by watch -- either by clock
14  or whatever it was in the off -- in the interview room.
15   Q    It does have a date of 10-12-04.
16   A    Okay.
17   Q    You didn't give Robert a Miranda warning a
18  month later, did you?
19   A    No.  No, no.  No.
20   Q    Would you agree with me that that's likely
21  just an error?
22   A    Yes, ma'am.  Yes, ma'am.  And I don't change
23  an error.
24   Q    Okay.  So this Miranda warning form is what
25  you presented to Robert Yell during your 9-12-04

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Page 258

1 interview with him --

2    A    Yes, ma'am.  Yes, ma'am.

3    Q    -- is that correct?

4    A    Yes, ma'am.

5    Q    Okay.  So according to this document, his
6 Miranda warning was given at 10:39, correct?

7    A    That's when I read it to him.  Yes, ma'am.
8 Uh-huh.

9    Q    And if the time at the top of your handwritten
10 notes of 10-17 --

11    A    Right.

12    Q    -- is accurate as to what time the interview
13 began, then this Miranda warning was signed
14 approximately 22 minutes later; is that right?

15    A    Okay.  Yes, ma'am.  Uh-huh.

16    Q    Okay.  Now, after Robert waived his rights,
17 you contend -- continued questioning him; is that
18 correct?

19    A    Yes, he was agreeable.  Yes, ma'am.

20    Q    Okay.  And at that point you questioned him as
21 to whether April could have been capable of committing
22 an arson; is that right?

23    A    Yes, ma'am.

24    Q    And he told you he didn't believe her to be
25 so, right?

Page 259

1    A    That is -- yes, ma'am, I believe that's right,
2 without looking at the documents.

3    Q    At any point during this interrogation of
4 Robert, did you ask him about any potential causes of
5 the fire?

6    A    I don't -- don't know if I did or not.  And
7 what are you talking about causes?  Let me -- let me
8 clear that up for you.

9    Q    Yeah.

10    A    Let's --

11    MS. STAPLES:  And actually, I just noticed that
12 we never moved the thing back over a little bit.  So
13 he's sideways in the screen.  So hopefully this
14 doesn't matter, but just in case.

15 BY MS. STAPLES:

16    Q    Well, did you talk with Robert about anything
17 that he knew that could have caused the trailer to catch
18 on fire?

19    A    In this interview with he and I?

20    Q    Yes, sir.

21    A    Yes.  I'm -- I'm sure I probably did.
22 Possibly.  Yes, ma'am.  Yes, ma'am.

23    Q    Well, you gave me a lot of different answers
24 there.

25    A    Yes.  I'm sorry.

Page 260

1    Q    Yes.

2    A    Yes.

3    Q    I'm sure.  Possibly.

4    A    Yes.

5    Q    Sitting here today, do you have any
6 independent recollection of questioning Robert about any
7 potential causes of the fire?

8    A    I -- I don't remember.  I -- I don't -- I
9 don't remember.  No, ma'am.

10    Q    If you had asked him, you know, if there were
11 electrical issues or lit --

12    A    Yes.  Yes.

13    Q    -- candles--

14    A    Yes, right.

15    Q    -- or lit cigarettes --

16    A    Yes.

17    Q    -- if you had asked him those questions, you
18 would've documented that within the typewritten
19 statement, correct?

20    A    Well, yes, because they would've been on video
21 also.

22    Q    And if they weren't in this typewritten
23 statement, then you didn't ask?

24    A    No.  More than likely, no.

25    Q    If you were to the point where you were still

Page 261

1 trying to figure out what was going on, and trying to
2 determine whether or not Robert Yell was a suspect --

3    A    Uh-huh.

4    Q    -- would it have been important to gather his
5 knowledge of potential sources, causes of the fire?

6    A    That is true.

7    Q    And yet you didn't ask him those questions?

8    MR. MANDO:  Objection.

9    A    Yeah, because I --

10    MR. MANDO:  Go ahead.

11    A    That is true.  But in my interview, I was just
12 trying to gather information, and David -- now, when it
13 came to David West's interview, which is a different
14 story.

15    Q    Yeah.  So we'll talk about that interview in a
16 minute.

17    A    Yes.  Okay.  Okay.

18    Q    But what we're talking about is this interview
19 where you told me the reason you didn't read him as
20 Miranda rights was because you were trying to determine
21 what happened?

22    A    Yes.  Yes, I was trying to find out what was
23 going on.

24    Q    Okay.  You were trying to gather information.

25    A    Yes.  Yes, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 68 of 115 PageID #: 2861
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
262..265

Page 262

1    Q    So would it have been important to gather any
2  information that was out there about potential causes of
3  the fire?
4    A    It would've been if I was doing the arson
5  part.
6    Q    So I realize that you're making a distinction
7  between the arson investigation --
8    A    And the criminal.
9    Q    -- and the criminal investigation.
10   A    Yes, ma'am.
11   Q    But isn't it true that without there being an
12 arson, there would not be a criminal case for murder or
13 attempted murder?
14   A    Not necessary.  Not necessarily.
15   Q    It's --
16   A    It could be a circumstantial evidence.  I
17 mean, I could have good witnesses, as far as that goes,
18 I mean, and set aside that there was nobody else around
19 to do anything like that.
20   Q    Well, one witness told you that April was
21 around, right?  You put it in your report.  Ms. Bellar
22 said that when she and the police officer saw the
23 trailer on fire and called it in --
24   A    Uh-huh.  Right.
25   Q    -- and ran to the trailer, April was standing

Page 263

1  in front of it, right?
2    A    Yes.
3    Q    So you did have one other person around, at
4  least according to Ms. Bellar, right?
5    A    Yeah, but I think Ms. April was -- Ms. April
6  was cleared by even Robert.  And plus, Mrs. Bellar, I --
7  as far as that goes, or either officer who was there,
8  that she was -- she was not there and came up later
9  there.
10   Q    Well, and Robert was at Ms. Bellar's,
11 according to Ms. Bellar, right?
12   A    At that moment.  Yes.  Yes, ma'am.  Uh-huh.
13   Q    And then immediately was that Ms. Maskin's,
14 according to Ms. Maskin.
15   A    Which is closer -- yes, that is true.
16   Q    According to Ms. Maskin --
17   A    Yes.
18   Q    -- Robert left Ms. Bellar's house and came
19 directly to her house and was there for 20 minutes or
20 more.  You heard the testimony, right?
21   A    Yes, ma'am.  Uh-huh.
22   Q    So again, if the fire was accidental, if it
23 was an electrical fire, then you would not have a murder
24 or attempted murder charge, right?
25   A    If it was an electrical.  That's correct.

Page 264

1    Q    So wouldn't it have been important for you to
2  ask Robert about potential electrical problems in the
3  trailer?
4    A    Well, that's -- I was leaving that up to
5  Mr. West then.
6    Q    If you were leaving everything up to the arson
7  investigators regarding the fire, why did you question
8  Robert at all at this point?  The arson investigators
9  had already told you that it was an arson, right?
10   A    Well, they didn't -- they said that it wasn't
11 -- it wasn't an accidental.  It wasn't accidental, true.
12   Q    They told you that it was an intentional fire?
13   A    Yes.
14   Q    And that it --
15   A    After it was all said and done, yes, ma'am.
16   Q    And that accelerant -- well, prior to you
17 interviewing Robert on 9-12-2004, Mr. Gregory told you
18 that the fire was intentional, correct?
19   A    Yes.  Yes.
20   Q    Okay.  And Mr. Gregory told you that an
21 accelerant had been used to start the fire, correct?
22   A    No.  He said there was -- yes, some -- some
23 type of accelerate.  Yes.
24   Q    And Mr. Cannon and Mr. Gregory walked you
25 through and showed you the potential areas that they

Page 265

1  believed an accelerant had been used to start the fire?
2    A    That's true.  Uh-huh.
3    Q    So by the time that you were interviewing
4  Robert, after this walkthrough, the investigators had
5  already determined that it was an intentional fire.
6    A    Yes.
7    Q    So what was your purpose in interviewing
8  Robert?
9    A    Because I wanted to make sure -- because I
10 wanted to make sure that's -- that's what happened.
11   Q    And --
12   A    I wanted to -- I wanted to be double sure
13 because we're talking about -- we don't want to ruin
14 nobody's life, and there was a child involved.
15   Q    Right, a very tragic --
16   A    So I'm --
17   Q    -- case.
18   A    Very tragic.  And I want to be sure and make
19 sure and give benefit of the doubt.
20   Q    Well, in making sure and giving him the
21 benefit of the doubt --
22   A    Uh-huh.
23   Q    -- wouldn't that have made more sense for you
24 to ask him about other potential sources of the fire?
25   A    It would have.  But if I'm not comfortable

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 69 of 115 PageID #: 2862
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
266..269

Page 266

1  with it, if I'm not comfortable in that aspect and not
2  knowing where I'm going, if something happens and I
3  can't explain it, then I wouldn't be comfortable with
4  that.
5      Q    I'm sorry.  I don't understand what you mean.
6      A    I mean, if he said it was an electric --
7  something about electrical fire or whatever, I wouldn't
8  know the difference if it was or how it started or those
9  type things.  I mean, I know a spark will start
10 something or something like that.
11     Q    And in a situation like that, wouldn't it have
12 made sense for you to pass that information along to the
13 arson investigators?
14     A    Well, he was coming in to interview him
15 anyway, Mr. West was.
16     Q    And in fact I think you said that he may have
17 been watching, right?
18     A    Could have bee, but I -- I don't -- I don't
19 remember.  I don't know if he was there yet or if he was
20 at the trailer or where he was at that point in time we
21 was in there.  I -- I don't remember that.
22     Q    All right, sir.  So you ended up interviewing
23 Robert a second time on the following day on September
24 13, 2004, correct?
25     A    Yes, I think that's right.

Page 267

1      Q    And that's an interview that you did with
2  Detective West?
3      A    Yes.  I don't know if I was in there from the
4  beginning or if I came in later.  I don't remember how
5  that happened without looking at the original video.
6      Q    If you'll turn to RPD539 --
7      A    I'm --
8      Q    -- please, which is part of Exhibit 8.
9      A    Okay.  Let me see.  You said 539?
10     Q    Yes, sir.
11     A    Okay.
12     Q    Would you agree with me that this is a
13 typewritten report of the interrogation that you and
14 Detective West conducted of Robert Yell --
15     A    Yes, ma'am.
16     Q    -- on September 13th?
17     A    Uh-huh.
18     Q    And in this report, you say, "On this date,
19 Detective David West interviewed Robert.  He was read
20 his rights, and he agreed to talk to him." Did Detective
21 West read Robert his rights before questioning him?
22     A    That's something you'll have to ask him.  I
23 don't know.
24     Q    Well --
25     A    I don't remember.

Page 268

1      Q    You don't remember?
2      A    No.
3      Q    I mean, according to this report, it sounds as
4  though that's what happened, right?  He was read his
5  rights and agreed to talk to him?
6      A    He may have.  He may have.  But I -- I don't
7  remember exactly.  Everybody -- every investigator does
8  things different.
9      Q    And again, Robert answered the questions that
10 were asked of him; is that right?
11     A    Yes, ma'am.  He did.
12     Q    Admitted to having an addiction problem?
13     A    I think he said something.  I remember him
14 saying something about --
15     Q    Told you he was trying his best to remember
16 everything that happened the day in question?
17     A    Yes, ma'am.
18     Q    And although you state in this document that
19 Detective West interviewed Robert, you also participated
20 in that interview; is that correct?
21     A    I think I did jump in somewhere in-between
22 that.  Yes, ma'am.
23     Q    And again, we don't know how long this
24 interview lasted, do we?
25     A    Not unless you look at the -- the actual

Page 269

1  original video.
2      Q    And you're talking about original videos of --
3  are you sure that videos exist of the interviews that
4  you did of Robert Yell?
5      A    They did the last time I saw them, which was
6  back in 2000 -- the jury trial, whenever that was.
7  Everything's there, so...
8      Q    Were there videos of your interviews with
9  Charlotte Bellar?
10     A    She -- I can't say for exactly.  I would have
11 thought I would've been doing videos of all of them or
12 either audio videos.  I don't remember audios be
13 honest with you.  But I could have.
14     Q    I mean, is that true of the interviews that
15 you did with Ms. Bellar and Ms. Maskin on 09-11, you
16 think there could be audio or video recording?
17     A    See, I don't --
18          MR. MANDO:  Objection to characterization.
19     A    Yeah.
20          MR. MANDO:  He said he briefly spoke with them.
21 He's never called them an interview.  But go ahead.
22 BY MS. STAPLES:
23     Q    Well, you put in your report that you took
24 statements from them, correct?
25     A    Yes.  And it -- yeah.  It's unfortunate, you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 70 of 115 PageID #: 2863
The Deposition of KENNETH ENGLERT, taken on September 14, 2022

270..273

Page 270

1  know, that this stuff has been there a long time, so
2  it's been through many hands.
3       Q    Uh-huh.
4       A    As far as videos, I don't -- I don't remember
5  what they done there, on those.
6       Q    And is there anything in these written reports
7  that would indicate to us that there were either video
8  or audio recordings of the interviews?
9       A    Not as I see.  No, ma'am.
10      Q    I'm sorry?
11      A    Not as I see.  No, ma'am.
12      Q    Okay.  And if there was an audio or a video
13  recording of any of the statements that were taken in
14  this case, where would those recordings have been
15  housed?
16      A    They would have all been with the case report.
17      Q    And that's something that should have been
18  turned over to --
19      A    It was all -- yeah.  Everything was made --
20  because all the stuff is made -- is made and given to
21  them.
22      Q    And you said that you hadn't seen the video
23  recording since trial; is that right?
24      A    Well, I hadn't seen noth-- -- yeah.
25      Q    Is it your recollection that the video

Page 271

1  recordings were played during the trial or that you
2  reviewed the video recordings in preparation for trial?
3       A    I know I review them for preparation because I
4  would do that.  As far as preparing for trial, I would -
5  - well, I mean, there has -- it depended on the
6  situation and the outcome of the trial and whatever the
7  judge allowed them to do then
8       Q    Sitting here today, what videos do you recall
9  reviewing prior to trial?
10      A    The interview of Robert Yell and myself and
11  David West, and whatever else may have been in there at
12  that point in time.
13      Q    Well, and that's what I'm trying to determine,
14  is what other ones exist.
15      A    I -- you know, I -- I don't -- I don't
16  remember.  I don't know what -- remember.  That's so
17  long ago.  I don't remember what was all in there.
18      Q    And the ones that you're referring to when you
19  said the interview of Robert Yell, do you recall
20  reviewing videos of both interviews, the one on the 12th
21  and the one on the 13th, or do you recall --
22      A    Of Rob-- -- of Robert?
23      Q    Yes, sir.
24      A    I was -- yeah, because I would -- I look at
25  videos better than looking at paper.  I -- I like to see

Page 272

1  what's on the videos, because it's more accurate and
2  everything's right there of whatever went on.
3       Q    Okay.  And so your answer is that, yes, you
4  recall reviewing both videos?
5       A    I'm pretty sure I reviewed both of those
6  before.  Now, whatever the time was before I -- the
7  commonwealth got them, that's a different story.  I
8  can't tell you what the times were when they got in and
9  took everything in possession, as far as that goes.
10      Q    All right.  Let's step back to September 12,
11  2004.  After you interrogated Robert the first time that
12  morning --
13      A    Uh-huh.
14      Q    -- on September 12th --
15      A    Uh-huh.
16      Q    -- you went to his Aunt Kay's home to speak
17  with her, correct?
18      A    Yes, I may have.  Yes, ma'am.  I may have.
19  Yes, ma'am.
20      Q    According to your supplemental report on RPD
21  54 --
22      A    Uh-huh.
23      Q    -- there at the bottom of the page, you said
24  that, "Yell was returned to the jail after finding out
25  about Kay and also that she had two other children of

Page 273

1  April Carpenter's by the name of Zachary and Nicholas at
2  her home."
3       A    Okay.
4       Q    "I then went to her residence."
5       A    Okay.
6       Q    Does that refresh your recollection --
7       A    Yes.  Yes, ma'am.
8       Q    -- about going to speak with Ms. Kay that
9  morning?
10      A    Yes, ma'am.
11      Q    Okay.  So you did speak with Kay?
12      A    Yes, ma'am.
13      Q    And you also spoke with Nicholas and Zachary
14  that morning as well, didn't you?
15      A    I don't know for sure.
16      Q    Well, according to your report --
17      A    If that's what it says, yes, ma'am.  If it's
18  in my report, yes, ma'am.
19      Q    You don't have any reason to refute that --
20
21      A    No, no, no.
22      Q    -- you spoke with him?
23      A    No, ma'am.  Uh-uh.  No, ma'am.
24      Q    Prior to speaking with Nicholas and Zachary,
25  which I think we testified -- said earlier were 5 and 6.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 274

1    A    Yes --

2    Q    Did you obtain permission from April to talk
3    with them?

4    A    Oh, yes.  Yes.

5    Q    You did?

6    A    Yeah.

7    Q    When did you get the permission from April to
8    interview the boys?

9    A    Well, while we was there, I just would have
10   asked her that.

11   Q    Well, was April at --

12   A    Oh, you said April.  I'm sorry.

13   Q    Yes, ma'am.

14   A    Oh.  I'm sorry.  I'm sorry.

15   Q    Or yes, sir.  I'm sorry.

16   A    I misunderstood you.  Go back -- go back -- go
17   back again.  Go back again.

18   Q    Okay.  Yeah.

19   A    Go back again.

20   Q    Prior to interviewing Nicholas and Zachary --

21   A    Uh-huh.

22   Q    -- did you obtain permission from their
23   mother, April, to interview them?

24   A    I don't know about all that.  We were doing an
25   investigation, so...

Page 275

1    Q    Was there any policy in place at the
2    Russellville Police Department regarding whether you
3    needed to obtain permission to speak with a minor before
4    interviewing them?

5    A    I -- I don't know about that.  No, ma'am.  I
6    don't think there would be any policy for that, to speak
7    to somebody in an investigation.

8    Q    And I think that I misworded my question, so
9    let me clear it up again.

10   A    Okay.

11   Q    I'm sorry.

12   A    Okay.

13   Q    Was there any policy in place at the
14   Russellville Police Department in 2004 that you had to
15   obtain permission from the minor's parent before
16   interviewing the minor?

17   A    Not as I'm aware of.  No, ma'am.

18   Q    Okay.  At any point during your conversation
19   with Nicholas and Zachary, did either indicate that
20   Robert had set the fire?

21   A    No, ma'am.

22   Q    And if they had done, so you would have
23   certainly documented that, correct?

24   A    Yes, ma'am.

25   Q    At any point in your conversation with Kay,

Page 276

1    did she indicate to you that Robert had set the fire?

2    A    No, ma'am, not as I recall.

3    Q    And if she had done so, you would've certainly
4    documented that, correct?

5    A    Yes, ma'am.

6    Q    Now, according to your report, after you
7    interviewed Kay and the boys, you again went back to the
8    scene of the fire; is that right?

9    A    Yes.  If -- yes, ma'am.  If that's what it
10   says, yes, ma'am.

11   Q    Okay.  And what was your purpose in going back
12   to the scene at that point?

13   A    Sometimes I'll go back and -- and make a final
14   check just to make sure that I hadn't missed anything.

15   Q    Okay.

16   A    And that was probably -- that was more than
17   likely to take pictures, more -- to take photographs.

18   Q    To take photographs of the trailer?

19   A    Of the outside.

20   Q    Okay.  And was that for the arson
21   investigation?

22   A    That would've been for me.  That would've been
23   for the police department, if I forgot something or if I
24   thought I needed to take some more pictures.

25   Q    According to your report, you met with

Page 277

1    Kentucky State Police Officers Tommy Smith and David
2    West when you were at the scene at that time.

3    A    Okay.

4    Q    Do you know why you were meeting with them at
5    that point?

6    A    We were probably, at that point in time,
7    that's days -- we were probably trying to make sure
8    there was a final -- final thing, what we were looking
9    at.

10   Q    Yeah.  And this was actually just the next
11   day.  This was the 12th.

12   A    Oh, this was the next day?

13   Q    Yes, sir.

14   A    I would say that, for me, retaking more
15   pictures or -- of the residence, as far as that goes.

16   Q    That they were taking pictures of the
17   residence?

18   A    No.  I would -- I may have been -- and he may
19   have been taking some too, as far as that goes.

20   Q    Okay.  Yeah.  And I think what my question
21   was, do you know why it was that you were meeting with
22   Detective West and Officer Smith at the scene of the
23   fire?

24   A    I don't know, unless we were just discussing
25   about -- just discussing about the whole situation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 72 of 115 PageID #: 2865
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

278..281

Page 278

1    Q   According to your report, Alan Gregory had
2 contacted Tommy Smith and David West.  Was that typical
3 for the fire marshal to contact KSP during a fire
4 investigation?
5    A   Yes, I don't know how -- how they work with
6 him, because that's the first time I'd ever worked with
7 the KSP on anything like that.
8    Q   Okay.  You said that it was at -- this time at
9 the scene, it was decided that you would be in charge of
10 the initial investigation, and West would be in charge
11 of arson.
12   A   Yes.  Yes, ma'am.
13   Q   And when you say that it was decided that you
14 would be in charge of the initial investigation, what do
15 you mean by that?
16   A   It means that I would take the criminal part
17 if there was anything criminal, and they would do the
18 arson.
19   Q   Who made that decision?
20   A   I think it was just all of us decided that
21 that's the way it'd work.
22   Q   Now, is it accurate that you and Detective
23 West worked closely together on the investigation?
24   A   Yes, I guess it -- I mean, yeah.  After -- not
25 knowing two individuals, but to come up on a final

Page 279

1 conclusion on it, yes.
2    Q   Well, and you at least had interrogated Robert
3 together, right?
4    A   Yes, we did.  Yes, ma'am.
5    Q   And you had talked to some other witnesses --
6    A   Yes.  Oh, yes, ma'am.  Yes, ma'am.  Yes,
7 ma'am.
8    Q   -- together.  So even though you may have been
9 charged with the criminal investigation and --
10   A   Yes.
11   Q   -- he was in charge of the arson, you were
12 kind of running a parallel investigation together.
13   A   Yeah.  We wanted to be -- we --
14   Q   Would you agree?
15   A   Yes.  We wanted to be on the same accord if we
16 -- any way possible.  Yes, ma'am.
17   Q   Yeah.  Is it accurate to say that the two of
18 you communicated a lot --
19   A   Oh, yes, ma'am.
20   Q   -- during those two or --
21   A   We did.
22   Q   -- three days of the investigation?
23   A   Yes, ma'am.  We did.
24   Q   Is it accurate to say that you and Detective
25 West shared information with each other during that two

Page 280

1 to three-day investigation?
2    A   Well, sure.  We was working the investigation
3 together.  Yes, ma'am.
4    Q   Going back to the walkthrough --
5    A   Uh-huh.
6    Q   -- that you participated with Buster Cannon
7 and Detective West and Mr. Gregory, did you -- I know
8 you said that you attempted to video record --
9    A   Yes, ma'am.
10   Q   -- the dog walking through.
11   A   Yes, ma'am.
12   Q   Did you also observe Mr. Cannon and Gregory
13 taking the samples and placing them in the canisters?
14   A   I did observe, yes, ma'am.
15   Q   Did you attempt to record the collection of
16 those samples?
17   A   Yes, ma'am.  I did.
18   Q   Did you ever receive a written report from
19 Buster Cannon regarding that walkthrough?
20   A   I don't know.  I don't know.  I don't remember
21 that.  I'm not saying it couldn't have been, I just
22 don't remember.
23   Q   Sitting here today, do -- you have no memory
24 of ever seeing a report from Buster Cannon regarding the
25 walkthrough and the samples that he collected; is that

Page 281

1 correct?
2    A   I don't -- I don't remember.  I don't
3 remember.
4        MS. STAPLES:  All right, sir.  Let's take a
5    five-minute break, please.
6        THE WITNESS:  No.  Let's not.
7        MS. STAPLES:  I'm sorry.
8        THE WITNESS:  I'm just kidding with you.
9        VIDEOGRAPHER:  All right.  We're off the record
10   at 3:14.
11       (OFF THE RECORD)
12       VIDEOGRAPHER:  All right.  We were back on
13   record at 3:19.
14 BY MS. STAPLES:
15   Q   We didn't tell you.  But you know if this
16 didn't record, you have to do this all over again,
17 right?
18   A   We're on -- we're on recording, right?
19   Q   Yes.  All right, sir.  It looks like you and
20 Detective West interviewed April Carpenter on September
21 12, 2004.  Does that seem right to you?
22   A   Uh-huh.  Yes.  That'd been the next day.  Yes,
23 ma'am.
24   Q   Okay.  And you did so after talking with
25 Nicholas and Zachary, right?

Kentuckiana Reporters
30 South Wabash Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 73 of 115 PageID
#: 2866
The Deposition of KENNETH FINKSON, taken on September 14, 2022

282..285

Page 282

1    A    Okay.  Yes.

2    Q    Okay.  And April informed you that she and
3  Robert had been together for three years?

4    A    Yes, ma'am.

5    Q    She told you that she'd had an affair the
6  month prior that had caused a lot of issues --

7    A    Yes, ma'am.

8    Q    -- is that right?

9    A    Yes, ma'am.

10    Q    She told you that the two of them had been --
11  she and Robert had been drinking more after she alerted
12  Robert to the affair; is that right?

13    A    That's correct.

14    Q    April cooperated with you?

15    A    Yes, ma'am.  Uh-huh.

16    Q    She answered the questions you asked of her;
17  is that right?

18    A    Yes, ma'am.

19    Q    April informed you of her whereabouts on the
20  day in question; is that right?

21    A    Yes, ma'am.

22    Q    She informed you of what she knew about
23  Robert's whereabouts from the day in questions?

24    A    Yes, ma'am.

25    Q    She told you that she and Robert had had a

Page 283

1  fight and Robert had choked her; is that right?

2    A    Yes, ma'am.

3    Q    And she also told you that Robert loved his
4  kids?

5    A    She did.  Yes, ma'am.

6    Q    And she told you that Robert hadn't started
7  the fire?

8    A    Yes, ma'am.

9    Q    She told you that she hadn't started the fire.

10    A    Yes, ma'am.

11    Q    Now, at no point during this interview with
12  April did you ask her about potential accidental causes
13  of the fire; is that right?

14    A    No, ma'am.

15    Q    You didn't question her about any possible
16  electrical issues that they had with the trailer?

17    A    No, ma'am.

18    Q    You didn't question her about the appliances
19  in the trailer and how they were hooked up?

20    A    No, ma'am.

21    Q    You didn't question April about any potential
22  lit candles or cigarettes that may have been in the
23  trailer at the time?

24    A    No, ma'am, not as I recall.

25    Q    Were you still trying to gather information at

Page 284

1  the time that you interviewed April Carpenter?

2    A    Yes, ma'am.

3    Q    And why didn't you ask her those questions?

4    A    Again, I would leave that to the arson
5  investigators, to the people that know about fires.

6    Q    Two days after the fire, you charged --
7  initiated charges against Robert for murder, attempted
8  murder, and assault four.

9    A    Yes, ma'am.

10    Q    Is that correct?

11    A    That is correct.

12    Q    The murder charge was in reference to Cameron
13  perishing in the fire?

14    A    Yes.  If that's there -- yeah.  Yes, ma'am.

15    Q    And the attempted murder charge was in
16  reference to Sara Lynn being burned in the fire?

17    A    That's correct.

18    Q    And the assault four was in reference to
19  Robert allegedly choking April; is that correct?

20    A    Yes, ma'am.  Yes, ma'am.

21    Q    And you'd agree that you initiated those
22  charges against Robert less than 48 hours after the
23  fire.  Is that right?

24    A    Okay.  Yes, ma'am.

25    Q    And you initiated those charges against Robert

Page 285

1  before any forensic testing results had come back; is
2  that right?

3    A    That is correct.

4    Q    You later became aware of the forensic testing
5  results, though, didn't you?

6    A    I think I was -- I was told what they were.

7    Q    If you will, sir, turn to what I've marked as
8  Plaintiff's Exhibit 13 and Plaintiff's Exhibit 14.

9        (EXHIBIT 13 MARKED FOR IDENTIFICATION)

10        (EXHIBIT 14 MARKED FOR IDENTIFICATION)

11    A    14.  Hold on a second.  13.  You said 13 and
12  who?

13    Q    And 14, the next one.  Are they maybe
14  together?  It's just --

15    A    Oh, they're together.  Okay.  Okay.

16    Q    Okay --

17    A    That's good.  It was stuck to it.

18    Q    Turning forward first to Plaintiff's Exhibit
19  13, which is Bates stamped KSP392, have you ever seen
20  this document before, sir?

21    A    Yes, I'm sure I have.

22    Q    Would you agree that this is a document
23  requesting examination of evidence?

24    A    Yes, ma'am.

25    Q    And that the evidence that was requested for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of KENNETH EDMONDS, taken on September 14, 2022

286..289

Page 286

1  examination included a metal paint can containing the
2  left brown leather work boot of Robert Yell worn at the
3  time of the fire?
4     A    Yes, ma'am.  Uh-huh.
5     Q    And a can that contained the right work boot
6  of Robert Yell?
7     A    Uh-huh.
8     Q    Would you agree that it contained -- there was
9  a metal paint can containing cotton swabs of Robert
10  Yell's hands?
11     A    Uh-huh.  Yes, ma'am.
12     Q    And that those were the swabs that Sergeant
13  Mills had taken when he collected Robert's clothing at
14  the jail, correct?
15     A    No.  Let me go back.  I'm not aware of -- I
16  mean of this -- this -- as far as this.  Now, I don't
17  know what Officer Mills collected that -- the cotton
18  swab for his fingers.
19     Q    Okay.  You did note in your report that he had
20  collected evidence from Robert at the jail, correct?
21     A    About the clothing.
22     Q    Okay.
23     A    Yes.
24     Q    You weren't aware that Sergeant Mills had also
25  collected cotton swabs of his hand?

Page 287

1     A    No.  I don't -- I don't remember that.  No,
2  ma'am.
3     Q    So you were -- you do agree that this evidence
4  also included a metal can containing a pair of khaki
5  shorts worn by Robert Yell at the time of the fire?
6     A    Whatever his clothing was.
7     Q    And the requesting officer, David West, asked
8  that all the evidence be examined for traces of
9  flammable or combustible liquids, right?
10     A    Yes, ma'am.
11     Q    And this report was dated 9-15-04?
12     A    Uh-huh.
13     Q    So this request was made or at least dated two
14  days after you had already initiated charges against
15  Robert for murder, attempted murder --
16     A    Okay.
17     Q    -- and criminal assault, correct?
18     A    Yes, ma'am.  Yes, ma'am.
19     Q    Now, the next exhibit, Plaintiff's Exhibit 14,
20  which is Bates stamped RPD --
21     A    Uh-huh.
22     Q    -- 338, have you seen this report before?
23     A    I'm sure I probably have during court, during
24  the trial or whatever.  Yeah.  I just don't remember it.
25  But I'm sure I have.

Page 288

1     Q    You don't remember seeing this report prior to
2  trial?
3     A    I can't say for sure.  No, I don't.
4     Q    Well, certainly you were made aware of the
5  results contained within this report.
6     A    Oh, I'm sure I was.  Yes, ma'am.  I'm sure I
7  was made aware of it.
8     Q    Okay.
9     A    Yes, ma'am.
10     Q    And you would have been made aware of the
11  results contained within this report close in time to
12  when the results were produced; is that correct?
13     A    Yes, ma'am, probably.  Yes, ma'am.
14     Q    Okay.  And you'd agree with me that the
15  results or the document was completed on 9-27-04?
16     A    Yes, ma'am.
17     Q    So that was a 12-day turnaround for when the
18  evidence was sent in --
19     A    Okay.
20     Q    -- for examination.
21     A    Okay.
22     Q    Correct?
23     A    Yes, ma'am.
24     Q    Okay.  In your experience now, that's a much
25  quicker turnaround than you'd get today from the lab,

Page 289

1  isn't it?
2     A    Oh, yes, ma'am.  Yes, ma'am.  Yes, ma'am.
3     Q    I was surprised to see that it happened that
4  quickly.  Regardless, this report notes that there were
5  no ignitable liquids identified in the list of exhibits.
6     A    Okay.
7     Q    Is that correct?
8     A    Okay.  Yes, ma'am.
9     Q    And those included the exhibits that we just
10  discussed, Robert's khaki shorts --
11     A    Uh-huh.
12     Q    -- Robert's work boots, the swabs of Robert's
13  hands.
14     A    Yes, ma'am.
15     Q    And it also includes the six samples that you
16  observed Detect- -- Mr. Cannon collecting from the
17  trailer, correct?
18     A    Yeah.  Him and Mr. West and them and all them.
19  Yes.
20     Q    Okay.  So in sum, this report indicates that
21  there were no ignitable liquids on Robert or on any of
22  the canisters that were examined from the trailer.
23     A    Okay.
24     Q    Is that right?
25     A    Yes, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 75 of 115 PageID #: 2868
The Deposition of KENNETH ROHN, taken on September 14, 2022

290..293

Page 290

1    MS. ARNETT:  Object to the form.
2    MS. STAPLES:  Oh, my god.  Scared me, Amber.
3    Q    So these lab results refuted the information
4  you can -- you provided within the criminal complaints
5  for murder; is that right?
6    A    Okay.
7    MS. ARNETT:  Object to form.
8    Q    Would you agree with that?
9    MR. MANDO:  Object to form, too.  Listen.
10  Listen to her question.
11    Q    Would you agree that these results refute the
12  information that you provided within the criminal
13  complaints for murder?
14    MR. MANDO:  Objection.
15    A    No.
16    MR. MANDO:  Go ahead.
17    Q    Why don't you agree with that?
18    A    Because the evidence -- just because the
19  evidence hasn't came back yet doesn't mean I can't
20  charge an individual for it.
21    Q    I didn't ask if you could charge, I asked if
22  it were refuted the information that you provided within
23  the criminal complaints for the murder charge and the
24  attempted murder charge.
25    A    Well, I just -- as far as putting this stuff

Page 291

1  in there, is that what you're asking me?
2    Q    Well, let's look at the criminal complaints.
3    A    Uh-huh.
4    Q    It's what's marked as Plaintiff's Exhibit 12.
5    (EXHIBIT 12 MARKED FOR IDENTIFICATION)
6    A    Hold on.  Hang on a second.  Let me find it.
7  Okay.  Go ahead
8    Q    Specifically, if you'll look at RPD426.
9    A    Yes.
10    Q    Have you -- well, do you recognize this
11  document, sir?
12    A    Yes.  Uh-huh.
13    Q    What is this document?
14    A    This is a criminal complaint.
15    Q    And what's this criminal complaint for?
16    A    It's for -- should be for murder.  Let me make
17  sure I'm looking at it right.  Yeah, this one's for
18  murder.
19    Q    And who drafted this criminal complaint?
20    A    At that time I probably told them, but it --
21  we may have had somebody down at the commonwealth
22  attorney's office.  I could tell them and they'd type it
23  out for me.
24    Q    Okay.
25    A    But I -- it would be in my words, though.

Page 292

1    Q    Okay.
2    A    Yes.
3    Q    And in fact, that's your signature at the
4  bottom of this page --
5    A    Oh, yes, ma'am.  That's my signature.  Yes,
6  ma'am.  Uh-huh.
7    Q    -- stating that you're the --
8    A    Yes.
9    Q    -- giving this information --
10    A    Right.
11    Q    -- is that right?
12    A    Uh-huh.
13    Q    And there, the very last sentence, "KSP arson
14  investigator and fire marshal concluded that the fire
15  was not accidental but was intentionally set by the use
16  of a fire accelerant being ignited in or on the house."
17    A    That's right.
18    Q    So the results of that lab report that we were
19  just speaking of refutes that information, doesn't it?
20    A    Yes, it -- it does refute, but that's what
21  they had told me at that point in time.
22    Q    Yeah.  And I didn't ask, you know, what they
23  told you, but that --
24    A    Yeah.
25    Q    My question was that whether the lab results

Page 293

1  refuted what you'd put in the criminal complaint, and
2  your answer is yes, it does, correct?
3    A    Yes.
4    Q    Okay.  And the same would be true for the
5  attempted murder criminal complaint, which is the next
6  page --
7    A    Uh-huh.
8    Q    -- RPD427.
9    A    Yes.
10    Q    It's the same -- it's the same language there
11  about the investigator and fire marshal concluding the
12  fire was not accidental, was the -- that was
13  intentionally set by the use of a fire accelerate.
14    A    That's correct.
15    Q    Okay.  So again, the lab results refute that
16  conclusion.
17    A    Yes, ma'am.
18    Q    Correct?
19    A    Uh-huh.
20    MR. MANDO:  Objection.
21    MS. ARNETT:  Objection.
22    MR. MANDO:  All right.
23    MS. STAPLES:  Now --
24    MR. MANDO:  I've noted.  Go ahead.
25  BY MS. STAPLES:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 294

1    Q    You testified earlier that you became aware of
2  the lab results close in time to when they were issued;
3  is that correct?
4    A    From what I can -- I can recall.  Like I said,
5  it's -- like I said, ma'am, I -- I don't remember all of
6  it.  I'm sorry.
7    Q    Who did you learn those results from?
8    A    If anybody, it would've been from Mr. David.
9    Q    And that would've been a big deal in this
10  case, right, to get a lab result like that?
11        MR. MANDO:  Objection, form.  Go ahead.
12    Q    You can answer, sir.
13    A    Yes.
14    Q    Okay.  And the reason that it's a big deal is
15  if one had based their conclusion that this was an arson
16  on an accelerant being found the six places in the home,
17  and then the lab results saying there was no accelerant
18  there, that repeats that conclusion, right?
19        MS. ARNETT:  Object to form, asked and
20    answered.
21    A    Say that again, please.
22    Q    The reason why it was important is because if
23  one had based their conclusion --
24    A    Uh-huh.
25    Q    -- that the fire was a result of an arson

Page 295

1  based on the suspected --
2    A    Uh-huh.
3    Q    -- places --
4    A    Uh-huh.
5    Q    -- of an accelerant, and then the lab result
6  says, "Oops, there was no accelerant --"
7    A    Uh-huh.
8    Q    " -- on those samples --"
9    A    Uh-huh.
10    Q    -- it refutes that original conclusion, right?
11        MR. MANDO:  Objection.
12    A    Yeah.
13        MR. MANDO:  Form, characterization.  Go ahead.
14    A    There's just more to that question as far as
15  I'm concerned.  I mean, it --
16    Q    Well, was your original answer yes?
17    A    Yes, yes.
18    Q    Now, sir, you had learned about the fact there
19  were no accelerants found on Robert's clothing or his
20  hands or those six samples before you sought an
21  indictment in this case; is that right?
22        MR. MANDO:  Objection to form, lack of
23    foundation.  Go forward.  Go ahead.
24    Q    Sir, you initiated the criminal charges
25  against Robert Yell for murder --

Page 296

1    A    Uh-huh.
2    Q    -- and attempted murder --
3    A    Yes, ma'am.
4    Q    -- correct?
5    A    Uh-huh.
6    Q    And then you later testified at the grand jury
7  in this case; is that correct?
8    A    Sure.  Yes.
9    Q    And when you testified at the grand jury in
10  this case, you were doing so to seek an indictment
11  against Mr. Yell for those charges.
12    A    Sure.
13    Q    And prior to testifying at the grand jury, you
14  had learned about these lab results indicating that no
15  accelerant was found on Robert's clothing, correct?
16    A    I don't know about that, because I don't know
17  what the timing was of the --
18    Q    Okay.  Well, let's --
19    A    -- of that and that -- I --
20    Q    Let's look at that then.  Please turn to
21  Plaintiff's Exhibit 15.
22        (EXHIBIT 15 MARKED FOR IDENTIFICATION)
23        Okay.
24        MR. MANDO:  16 or 15?
25        MS. STAPLES:  15.  Sorry.  I might have

Page 297

1  misspoke.
2    A    You said, "15?"
3  BY MS. STAPLES:
4    Q    15.  Do you recognize this document, sir?
5    A    Uh-huh.
6    Q    And what is this document?
7    A    It's a Logan County's Circuit Court Grand Jury
8  indictment.
9    Q    Against Robert Yell?
10    A    Yes, it is.  Uh-huh.
11    Q    And would you agree with me that, according to
12  the last page of that indictment --
13    A    Okay.
14    Q    -- this case was presented to the grand jury
15  on October 28, 2004?
16    A    Uh-huh.  Yes, ma'am, uh-huh.
17    Q    And we had already looked to say that those
18  results were received on September -- yeah, September
19  27th of '04?
20    A    Right.
21    Q    So a month prior to the Grand Jury in this
22  case, correct?
23    A    Uh-huh.
24    Q    And you said that you had received the news of
25  the results close in time to when the results were



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 77 of 115 PageID
#: 2870
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

298..301

Page 298

1  produced?

2      A    I don't remember saying that.

3      Q    You don't remember me asking you when you

4  received the results?

5      A    Because I wouldn't have received the results,

6  Mr. West would've received the results.

7      Q    Okay.  Point taken.  And you testified that

8  Mr. West had told you about the results close in time to

9  when they were produced; is that correct?

10     A    Yeah, but I didn't say what time.

11     Q    You're right.  Did you document when you

12  learned of these results?

13     A    No, because he's doing the arson, so he would

14  be documenting.  It should be in his -- in his stuff.

15     Q    What effect did it have on you when you found

16  out that Mr. Yell had no accelerant on his clothing or

17  his hands?

18     A    What effect did it have on me with this case?

19     Q    Uh-huh.

20     A    None.

21     Q    None at all?  Made no difference to you that

22  you had charged him with murder and attempted murder and

23  there was no evidence of an accelerant on his body or

24  his clothing?

25          MS. ARNETT:  Object to form.

Page 299

1          MR. MANDO:  Objection.  Go ahead.

2      A    Yeah because it's evidence.  I mean, evidence

3  can dissipate or disappear, or...

4      Q    Did you tell the grand jury about the results

5  of the lab testing when you testified?

6      A    I don't --

7          MR. MANDO:  Objection.  Form.  Lack of a

8  foundation.  Go ahead.

9      A    I don't remember.

10     Q    Sir, you've already testified that you

11  testified at the grand jury, correct?

12     A    Yes.  Yes, true.  Uh-huh.

13     Q    Did you inform the Grand Jurors during your

14  testimony that no accelerants were found on Robert

15  Yell's clothing or hands?

16     A    I don't know.

17         MR. MANDO:  Objection.

18         I'd have to see the document.

19     Q    Okay.  That's what's marked as Plaintiff's

20  Exhibit number --

21         (EXHIBIT 16 MARKED FOR IDENTIFICATION)

22     A    16, uh-huh.

23     Q    -- 16.  I'll tell you your testimony starts --

24     A    Started on --

25     Q    -- on page 14.

Page 300

1      A    Okay.

2      Q    You can review that and let me know when

3  you're ready.

4      A    You want me to read the whole thing, starting

5  --

6      Q    Well, I mean it -- it's up to you, sir.  Sir

7  I'm not trying to rush you, but I do want to tell you

8  that I think one of the pages of interest is page 24.

9      A    I might have missed it then.  I don't

10  remember...

11     Q    Do you see there on line 7 where a juror asked

12  if the fire marshal ever decided how the fire was

13  actually set?

14     A    Yes.

15     Q    And your response was "The fire marshal said

16  it was started by some kind of accelerant."

17     A    Right.

18     Q    And then said that Mr. West would give more

19  information.

20     A    Okay.

21     Q    You didn't tell the grand jurors specifically

22  when they asked about the accelerant that the lab

23  results had shown there was no accelerant on Mr. Yell's

24  clothing, correct?

25     A    No.

Page 301

1      Q    Okay.  You didn't tell the grand jurors when

2  they asked about how the fire was set, and you spoke of

3  an accelerant, that there was no accelerant found on Mr.

4  Yell's hands, correct?

5      A    Okay.  Yes, ma'am.

6      Q    Okay.  I just want to make sure we're getting

7  the record right.  And you didn't tell the grand jurors,

8  when they asked how the fire was set, that the samples

9  taken from the trailer indicated no accelerant; is that

10  correct?

11     A    Right.

12         MS. ARNETT:  And I have a standing objection,

13     being just easier, about the characterization of the

14     results.

15         MR. MANDO:  Same.

16  BY MS. STAPLES:

17     Q    And I hate to go back to this, but it

18  literally just came to my mind while we were viewing the

19  grand jury --

20     A    You're okay.

21     Q    -- testimony.

22         MS. STAPLES:  There's another place, Jeff, in

23     these interrogatories, that's Exhibit 6, page 15.

24         MR. MANDO:  I'll take a look at it.

25         MS. STAPLES:  You're getting --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 302

1  THE WITNESS:  This one?

2  MS. STAPLES:  No, it's the thicker one.

3  THE WITNESS:  This one?

4  MS. STAPLES:  I bet it was face down.

5  MR. MANDO:  It's this one.  Here, I'll just

6  show you mine.

7  THE WITNESS:  Oh, in there.

8  BY MS. STAPLES:

9  Q  Specifically number 15, the question was asked

10  whether he'd given any testimony.  Do you see the

11  question that I propounded, sir, where I asked if you'd

12  given any testimony?

13  A  Is Robert Yell described in the complaint?

14  Q  Uh-huh.

15  A  Number 15?

16  Q  Yes, sir.

17  A  Yes.

18  Q  And you see where your response was "I

19  testified at the jury trial in February of 2006"?

20  A  Yes, uh-huh.

21  Q  Well, obviously we've established that you

22  also testified at the grand jury proceedings in this as

23  well.

24  A  Sure.  Sure.  Yeah.

25  Q  So that's another answer that's not complete;

Page 303

1  is that right?

2  A  Yes.  Yes, ma'am.

3  Q  Okay.

4  A  Yes, ma'am.

5  Q  Sitting here today, can you recall any other

6  times that you have testified regarding the

7  investigation or the post-conviction proceeding,

8  anything regarding this case with Robert Yell, besides

9  the grand jury and besides the trial in '06?

10  A  Not as I know.  No, ma'am.

11  Q  And what I would ask you to do that -- is,

12  Jeff, if you're okay with this, if there are any other

13  errors in this --

14  MR. MANDO:  We'll file amended answers.

15  MS. STAPLES:  Okay.  Thank you.  Just to make

16  sure.

17  MR. MANDO:  Uh-huh.  Yeah.

18  MS. STAPLES:  Because I know we've -- I've

19  already asked you about a lot of stuff today, and it may

20  be that you remember on the way home, "Oh, wait, I did

21  testify."  So just let your counsel know that.

22  MR. MANDO:  And I can tell you at this time,

23  and I don't -- not -- this has nothing to do with

24  what he recalled and how he answered it, but we had

25  a hell of a time getting all of the information from

Page 304

1  the circuit court clerk, from the commonwealth

2  attorney's office.  I don't think we had half the

3  stuff that we had until later on.  You know, what

4  his recollection was at the time, I don't know, but

5  we'll file amended answers.

6  MS. STAPLES:  Okay.  Thank you.  And I mean,

7  Jeff, I know you know why.

8  MR. MANDO:  Yeah, I know.

9  MS. STAPLES:  But it's important --

10  MR. MANDO:  Right .

11  MS. STAPLES:  -- for me to just make sure that

12  I have all the information, obviously.

13  MR. MANDO:  Right.

14  BY MS. STAPLES:

15  Q  All right, sir.  Ultimately, you criminally

16  charged April Carpenter, too, in regard to this case.

17  A  Yes, ma'am.

18  Q  Is that right?

19  A  Yes, ma'am.

20  Q  And do you recall with what you charged her?

21  A  Criminal abuse, first degree, I think.

22  Q  And what were the circumstances surrounding

23  your decision to charge Ms. Carpenter with criminal

24  abuse in the first?

25  A  Her leaving the kids and putting them in

Page 305

1  danger.

2  Q  Leaving -- her leaving the kids at the

3  trailer?

4  A  Yes, ma'am.

5  Q  And you testified at the grand jury about

6  those charges as well; is that correct?

7  A  Yes, I sure did.

8  Q  Do you recall testifying at the grand jury

9  that you could have charged April with other charges,

10  but you were trying to give her a break?

11  A  Yes, I do remember that.  Yes, ma'am.

12  Q  And why is it that you were trying to give

13  April a break?

14  A  Well, it wasn't just April.  I mean, it was a

15  bad situation, as far as that goes.  It's just -- it's

16  just bad to lose a child, and it's bad to have charges.

17  Q  And you'd agree with me that Robert also lost

18  a child, right?

19  A  That's true.  Yes, ma'am, sure did.

20  Q  Sir, are you aware of the allegations in this

21  case regarding Ed Higgins' treatment of Robert Yell in

22  the sally port of the Logan County Regional Jail?

23  A  I did not know about that at all.  It was -- I

24  didn't know about that at all, as far as that goes.

25  Q  Okay.  Did you come to learn about that at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB   Document 169   Filed 10/03/25   Page 79 of 115 PageID
#: 2872
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

306..309

Page 306

1  some time?
2      A    I came to learn there was something.  Whatever
3  the true story is, I don't know, as far as that goes.
4      Q    But during the three days of this -- or two
5  days of the investigation in this case, you weren't made
6  aware of -- strike that.  While you were actively
7  investigating this case --
8      A    Uh-huh.
9      Q    -- you weren't made aware of any allegations
10 of excessive force by Mr. Higgins?
11     A    No, I didn't know anything about that.  No,
12 ma'am.
13     Q    Did you have any conversation whatsoever with
14 Mr. Higgins about his account of what occurred in the
15 sally port?
16     A    No.
17     Q    Okay.  Have you had -- ever had any
18 conversation with any employee of the jail about what
19 occurred in the sally port when Mr. Yell was being held
20 there?
21     A    Not that I recall.  No, ma'am.
22     Q    Have you had any conversation -- strike that.
23 Have you ever seen -- at any time, have you ever seen a
24 video of what occurred in the sally port that evening
25 between Mr. Higgins and Mr. Yell?

Page 307

1      A    No, ma'am, not as I recall.
2      Q    Have you had a conversation with anyone
3  whatsoever, excluding your attorney --
4      A    Yes, him excluding.
5      Q    -- about the existence of the video?
6      A    No.
7      Q    Have you ever had the video of what occurred
8  that evening in the sally port in your possession?
9      A    No, ma'am.
10     Q    When investigating this case and comprising
11 the case investigation file, did you ever request a copy
12 of that video?
13     A    No.
14     MS. STAPLES:  All right, sir.  That's the
15     questions that I have for you now.  Depending on
16     what else is asked of you, I -- I may be back with
17     you.  I appreciate your patience with me today.
18     MR. MANDO:  Defense counsel, next up.
19     MS. MALLES:  Yes.  I'm going to ask some
20     questions.  But could we take a quick break?
21     MR. MANDO:  Who was that asking that, Amber?
22     MS. STAPLES:  Maureen.  Yeah.
23     MR. MANDO:  Maureen?
24     MS. STAPLES:  Uh-huh.
25     MR. MANDO:  All right.

Page 308

1      MS. STAPLES:  Sure.
2      MR. MANDO:  Yeah.
3      VIDEOGRAPHER:  Okay.  We're off the record at
4      3:54.
5      (OFF THE RECORD)
6      VIDEOGRAPHER:  All right, we're back on the
7      record at 4:00.
8               CROSS EXAMINATION
9  BY MS. MALLES:
10     Q    And I guess I'll go first since I'm the one
11 who said that I had some questions.  Detective Edmonds,
12 my name is Maureen.  I'm an attorney, and I represent
13 Buster Cannon and the city of Georgetown.
14     A    Yes, ma'am.
15     Q    Just a few questions for you.  And thank you
16 for your patience today.  I know it's been a long day.
17 You've done a good job.  Let me -- and I apologize if I
18 jump around a little bit.  Just I'm going to try not to
19 rehash anything.
20     A    Yes, ma'am.
21     Q    I think you testified earlier today that you
22 had had no previous encounters with Robert Yell before
23 the September 2004 incident; is that right?
24     A    Yes, ma'am, not as I can remember.
25     Q    Okay.  Did you -- had you ever previously

Page 309

1  encountered April Carpenter?
2      A    No, ma'am.  No, ma'am, not as I can remember.
3      Q    Okay.  And you never responded to any calls at
4  that Bonnie Drive residence?
5      A    Not as I recall.  No, ma'am.
6      Q    Okay.  We've also talked a little bit about
7  your interviews with Robert Yell and some witnesses, and
8  I think it came up, and at least with your interview
9  with Robert Yell, he recalled that April had had an
10 affair or a relationship with a soldier from Fort
11 Campbell.  Do you recall that?
12     A    Yes, ma'am.
13     Q    Okay.  I think that individual's name was
14 David Smith.  Does that sound right?  I know it's been a
15 long time.
16     A    Not without a doubt.  I -- I can't exactly
17 remember.  No, ma'am.
18     Q    Did you ever make contact with that person who
19 April had apparently had a relationship with?
20     A    If I'm not mistaken, I think somebody else
21 contact -- I think -- I'm thinking KSP Tommy Smith may
22 have done that for us, because we were -- we were all
23 doing different things.  I think Tommy may have done
24 that.
25     Q    Okay.  So you think Tommy Smith might have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 80 of 115 PageID #: 2873
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

310..313

Page 310

1  been able to make contact --
2      A    Somebody contacted him, because the -- we --
3  somebody contacted him, if I'm not sure, if I'm not
4  mistaken.
5      Q    Okay.
6      A    It wasn't me.
7      Q    Okay.  It wasn't you?  You don't recall --
8      A    Not as I recall.  No, ma'am.
9      Q    -- having a conversation with him.  Okay.  And
10  as we've discussed, you've interviewed Charlotte Bellar,
11  and you may have spoken with her a couple of times.
12     A    Yes, ma'am.
13     Q    Do you recall that?
14     A    Yes, ma'am.
15     Q    Okay.  Do you recall Charlotte telling you
16  that, on September 11, 2004, that April had called this
17  David Smith, the soldier from Fort Campbell?
18     A    I don't remember.
19     Q    Okay.  Do you recall that Charlotte reported
20  April had called her mother?
21     A    Called --
22          MS. STAPLES:  Objection for form.
23          Called April's mother.
24     A    Yeah.  That April had called her mother; is
25  that correct?

Page 311

1      Q    Yes, yes.
2      A    I don't remember that either.
3      Q    All right.  We've discussed your interview
4  with Robert Yell and he, during that interview, gave
5  you a lot of information.  Do you recall that there were
6  periods of time on September 11, 2004 that he had no
7  memory of?
8      A    Yes, ma'am, I do remember that.
9      Q    Okay.  So and I'll call it a blackout.
10     A    Yes, ma'am.
11     Q    Is that fair?  Okay.  To your knowledge, did
12  he ever regain any memory of what happened during those
13  periods of time?
14     A    Say that again, please?
15     Q    So he had these kind of blackouts on September
16  11, 2004.  To your knowledge, did he ever -- was he ever
17  able to recall what happened during those blackout
18  periods?
19     A    No, ma'am.
20     Q    Okay.  Do you know an individual named Noble
21  Clark?
22          THE WITNESS:  What -- what did she say?
23          MS. STAPLES:  I -- I didn't catch that.
24     Q    Do you know an individual named Noble Clark?
25     A    Yes, ma'am, I know Mr. Noble.

Page 312

1      Q    Okay, and how do you know Mr. Clark?
2      A    Mr. Noble was -- Mr. Noble is married to -- is
3  married to Robert Yell's mother, and he also used to
4  work at the courthouse.
5      Q    Okay.  Did you have any kind of friendship,
6  relationship with Mr. Clark other than just kind of
7  seeing him around?
8      A    Oh, I mean, seeing him going and coming.  He
9  was -- he was a -- he was a really nice man.
10     Q    Okay.  Have you ever had any conversations
11  with Mr. Clark about Mr. Yell or about his criminal
12  case?
13     A    Not as I recall.
14     Q    Do you know an individual named Richard
15  Porter?
16     A    Yes, I know Richard Porter.
17     Q    Okay.  And how do you know Mr. Porter?
18     A    I've done a background on check -- I've done a
19  background check on him to be a police officer.
20     Q    Okay.  Did anything turn up on that background
21  check, to your recollection?
22     A    Not without the paper, I -- I don't remember.
23     Q    Do you know about when that was?
24     A    Oh, I -- no, ma'am, I sure don't.
25     Q    Was it a long time ago?

Page 313

1      A    Yes, ma'am.  It was quite a while back.
2      Q    Okay.  Do you recall Mr. Porter ever being
3  employed by the Russellville Police Department?
4      A    I don't think he made it through the
5  interview.  I don't think he made it through the
6  process.
7      Q    Okay.  Do you recall him ever going through
8  any police training?
9      A    I -- I don't remember.
10     Q    Okay.  Are you aware that he was once employed
11  by the Logan County Detention Center?
12     A    I do -- yes, ma'am, I do know that.
13     Q    Okay.  Have you ever had any occasion to
14  interact with him while he was employed there?
15     A    Yes, ma'am, I probably -- I mean, I probably
16  saw him if I took a prisoner down there.
17     Q    Okay.  Anything stand out in your memory about
18  Mr. Porter and your interactions with him?
19     A    No, I don't think we said too much to each
20  other.
21     Q    Okay.  Sounds like -- did you know him very
22  well?
23     A    Did I know him?
24     Q    Uh-huh.
25     A    I just -- I only got to know him when I done



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 81 of 115 PageID #: 2874
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

314..317

Page 314

1  his background check.  I mean -- I mean, what -- what --
2  what that consisted of.
3      Q    Okay.  So you said you think that he didn't
4  make it through the training or the interview process.
5  Are you aware that he ever, like, reapplied for
6  employment with the police department?
7      A    All I remember is the one time that I ran the
8  background check on him.  That's all I remember.  Is she
9  there?  Did she hear me?
10         MR. MANDO:  She's there.
11         THE WITNESS:  Oh, okay.
12         MS. MALLES:  Okay.  That's all I have.  Thank
13  you.
14         THE WITNESS:  Yes, ma'am.
15         MR. MANDO:  Thank you, Maureen.  Next up?
16  Aaron?  Chris?  Lynn?
17                 EXAMINATION
18  BY MS. ZELLEN:
19      Q    I have just a couple questions.  I'll follow
20  up Maureen because we both represent Buster Cannon.
21  Just, I'll be in three different agencies, if that's all
22  right.  Detective, my name is Lynn Zellen, and I
23  represent Buster Cannon --
24      A    Yes, ma'am.
25      Q    -- who's been sued in a couple different

Page 315

1  capacities, as I just said.  Do you remember -- do you
2  have any independent recollection of what agency Buster
3  Cannon was working for when he investigated this fire?
4      A    No, ma'am, I'm not -- I can't remember that.
5         MS. ZELLEN:  Okay.  That's all the questions
6  have for you then.
7         THE WITNESS:  Oh, okay.
8         MS. ZELLEN:  Thank you.
9         MS. ARNETT:  I have some questions.  Was that -
10  - is Mr. Mando leaving?
11         MS. STAPLES:  No.  He's shutting the door, so
12  we don't have to listen to "Rocky Top Tennessee"
13  playing in the background.
14                 EXAMINATION
15  BY MS. ARNETT:
16      Q    Okay.  Detective Edmonds, I'm Amber Arnett,
17  and I represent all of the State Police defendants in
18  this case --
19      A    Yes, ma'am.
20      Q    -- and David West and William Thomas Smith,
21  you refer to him as Tommy Smith, and Jaman Childers.  And
22  I have just a few questions for you.  I heard you
23  testify that this was the first time that you had worked
24  with the Kentucky State Police on an arson case?
25      A    Yes, ma'am.

Page 316

1      Q    And was this the first time that you had ever
2  worked with investigator David West?
3      A    Yes, ma'am.
4      Q    And you testified earlier about a walkthrough
5  that you tried to video.
6      A    Yes, ma'am.
7      Q    And you testified that Mr. West was present
8  during that; is that correct?
9      A    Yes, ma'am.  I'm -- I'm -- yes, ma'am.
10      Q    Do you know if David West conducted any
11  walkthroughs either before or after that?
12      A    No, ma'am.
13      Q    And there was -- of course the end there we
14  were talking a lot about those lab results --
15         THE WITNESS:  What'd did she -- what's she say?
16      Q    -- results about the accelerant?
17      A    Could -- could you repeat that?  I -- I
18  couldn't hear you for some reason.
19      Q    Okay.  Some of the questions towards the end
20  of Ms. Staples' questioning of you, she was discussing
21  those lab results from the state police.
22      A    Yes, ma'am.
23      Q    Okay.  And specifically it's Exhibit 14
24  (Inaudible) there, just the two-page lab results.
25      A    Okay.  Okay.  Yes, ma'am.  Go ahead.

Page 317

1      Q    Exhibit 14.  Now, if I understand correctly,
2  you said that you did not see these results, that they
3  were reported to you?
4      A    Yeah.  I asked -- if I remember, I asked David
5  eventually about -- or he told me about the report.
6      Q    Do you recall if you ever saw that document
7  that's Exhibit 14?
8      A    I'm sure I saw it.  It may have been doing the
9  court proceedings -- I mean the jury trial.
10      Q    And do you have any experience with that type
11  of test that was performed?
12      A    No, ma'am, I have no experience with any of
13  this.
14      Q    So I'm taking that to mean -- do you have any
15  understanding about the sensitivity or the parameters of
16  that test that was performed?
17      A    No, ma'am.
18      Q    Okay.  And if you see at the bottom of page 1,
19  where it says what the results are?
20      A    Yes, ma'am.
21      Q    It's one sentence, and at the end there's an
22  asterisk.  Do you see that?
23         THE WITNESS:  She's right here, right?
24         MR. MANDO:  Yeah.
25      A    Yeah.  Right here, yes.  Yes, ma'am, I see it.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 318

1    Q    Okay.  And do you know what that asterisk
2 means?
3    A    No, ma'am, I sure don't.
4    Q    And I'd ask you to turn the page 2.
5    A    Okay.
6    Q    And do you see an explanation of what that
7 asterisk means?
8    A    Yes, ma'am.
9    Q    And what does that asterisk mean?
10    A    It says, "This does not exclude the
11 possibility of an ignitable liquid being consumed by the
12 fire or evaporating."
13    Q    Now, and this may not be a fair question, but
14 I would preface it with I -- if I recall correctly, I
15 think you testified that you don't have any fire science
16 training, experience, or knowledge.  Is that --
17    A    That is correct.  No, ma'am.
18    Q    Okay.  So as far as what the parameters of
19 that test or the meaning of the ignitable liquid being
20 consumed, do you understand what that means, and can you
21 explain what that means?
22    A    The only thing I can say, that is -- I don't
23 know it means exactly, I just know that it's a
24 possibility that -- that it could have been there.
25         MS. ARNETT:  Thank you.  That's all the

Page 319

1 questions I have.
2         MR. MANDO:  Aaron?  Chris?
3         MR. GADANSKY:  No questions.
4         MR. SMITH:  Yeah, I'll -- Chris, go ahead.  I
5 can wait.
6         MR. GADANSKY:  I don't have any questions,
7 Aaron.
8               EXAMINATION
9 BY MR. SMITH:
10    Q    All right.  Let me say, I probably just have
11 one.
12    A    Yes, sir.
13    Q    Detective, my name's Aaron Smith.  I represent
14 Logan County and former Logan County Jailer Bill
15 Jenkins.  You were asked earlier if you'd spoken with
16 any employee of the jail about anything that occurred at
17 the jail involving Mr. Yell, and you responded that you
18 had not, correct?
19    A    Yes.  Yes, sir.
20    Q    Did you ever speak with Jailer Bill Jenkins at
21 any time about Mr. Yell?
22    A    I don't recall talking to him about it.
23    Q    Okay.  And did Jailer Jenkins have any role
24 whatsoever in the investigation of the arson and the
25 events that are at issue here?

Page 320

1    A    No, sir.  Not with this, no, sir.
2         MR. SMITH:  All right.  Thank you.  Those are
3 all my questions.
4              REDIRECT EXAMINATION
5 BY MS. STAPLES:
6    Q    I do have just two quick follow up questions,
7 sir.
8    A    Uh-huh.  Uh-huh.
9    Q    One is just cleaning up something on my
10 behalf.  I think -- I have so many cases here, I was
11 confusing the names of the jails.  So when I was asking
12 you about the Logan County Regional Jail employees, I
13 think it's called the Logan County --
14    A    County.
15    Q    -- Detention Center; is that right?
16    A    Yes, ma'am it is.
17    Q    Okay.  Does the fact that I was calling the
18 Detention Center the wrong name change any of your
19 answers to the questions that I asked you regarding
20 whether you had spoken with any of the employees at that
21 facility?
22    A    No, figured you was talking about that jail.
23    Q    Okay.  Thank you.  I realized that when
24 Maureen asked you the question.  I was getting confused
25 with the Warren County --

Page 321

1    A    Yes, ma'am.  Yes, ma'am.
2    Q    The only other question I have is that, when
3 you interviewed Robert Yell on the morning of 9-12-2004,
4 did you notice any burns on Robert Yell's body?
5    A    No, ma'am.
6         MS. STAPLES:  Thank you, sir.  That's all the
7 questions I have.
8         MR. MANDO:  Going once, going twice.  We're
9 adjourned.
10         COURT REPORTER:  Yeah.
11         MR. MANDO:  I will request signature on that
12 transcript, please.
13         COURT REPORTER:  Okay.  That works.
14         MR. MANDO:  You can do that through my office.
15         VIDEOGRAPHER:  Okay.  We're going off the
16 record at 4:15.
17         (DEPOSITION CONCLUDED AT 4:15 P.M.)
18
19
20
21
22
23
24
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 322

```
 1              CERTIFICATE OF REPORTER
 2
 3
 4    I do hereby certify that the witness in the foregoing
 5    transcript was taken on the date, and at the time and
 6    place set out on the Title page hereof, by me after
 7    first being duly sworn to testify the truth, the whole
 8    truth, and nothing but the truth; and that the said
 9    matter was recorded digitally by me and then reduced to
10    typewritten form under my direction, and constitutes a
11    true record of the transcript as taken, all to the best
12    of my skill and ability. I certify that I am not a
13    relative or employee of either counsel and that I am in
14    no way interested financially, directly or indirectly,
15    in this action.
16
17
18
19
20
21
22    EMILIA LOPEZ,
23    COURT REPORTER/NOTARY
24    MY COMMISSION EXPIRES: 03/13/2030
25    SUBMITTED ON:  09/123/2022
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**Exhibit 1_
Edmonds**
62:20,23 67:11
74:21

**Exhibit 2_
Edmonds**
17:2,3 131:14
150:9,10 154:1
168:12 195:7
207:5

**Exhibit 3_
Edmonds**
117:8,9 135:3

**Exhibit 4_
Edmonds**
122:11,12

**Exhibit 5_
Edmonds**
145:11,12

**Exhibit 6_
Edmonds**
155:17 157:13
163:18,19
164:9 301:23

**Exhibit 7_
Edmonds**
155:18 159:1
163:4

**Exhibit 8_
Edmonds**
168:23 169:2,
12 173:9,16
175:7 267:8

**Exhibit 9_
Edmonds**
19:16,17
183:15 253:11

**Exhibit 11_
Edmonds**
256:17,18

**Exhibit 12_
Edmonds**
291:4,5

**Exhibit 13_
Edmonds**
285:8,9,18,19

**Exhibit 14_
Edmonds**
285:8,10
287:19 316:23
317:1,7

**Exhibit 15_
Edmonds**
296:21,22

**Exhibit 16_
Edmonds**
299:21

---

**-**

**--on** 175:7

---

**0**

**04** 81:14 297:19

**06** 303:9

**09-11** 269:15

---

**1**

**1** 62:20,23
67:11 72:14
74:21 123:22
124:3 317:18

**10** 119:4
210:14,16

**10-12** 228:16,
17

**10-12-04**
257:15

**10-15** 228:4,9,
17

**10-17** 258:10

**10-18** 119:4,9
120:12,14
135:24

**10-56** 228:3,5

**10-97** 120:1
226:7,12
227:25

**10-98** 226:25

**1000** 51:24

**1097** 120:2

**10:04** 61:19

**10:08** 61:22

**10:17** 253:23
254:6 255:4

**10:39** 257:8
258:6

**11** 116:1
157:19,23
163:13 164:17
166:7 172:1
174:5 175:9
256:17,18
310:16 311:6,
16

**11:11** 246:7

**11:17** 115:20

**11:24** 115:23

**11th** 158:17
163:18 165:4
170:6 171:21

**12** 164:3 169:24
173:25 174:9
184:17 201:3
203:12 235:9
253:16,23
272:10 281:21
291:4,5

**12-day** 288:17

**12:22** 161:22

**12:36** 161:24

**12th** 18:25
170:25 175:10
177:25 179:20,
21 181:6,10
183:10 184:23
214:12 222:16
226:22 234:18
245:13 271:20
272:14 277:11

**13** 23:3,4
157:15 158:7
159:24 163:6
164:4,12 166:3
266:24 285:8,9,
11,19

**13th** 133:19
267:16 271:21

**14** 9:5 51:7
58:20,22
157:12,14
285:8,10,11,13
287:19 299:25
316:23 317:1,7

**1497** 68:2

**15** 217:21
219:12 296:21,
22,24,25 297:2,
4 301:23 302:9,
15

**1599** 72:16,17

**16** 74:23 296:24
299:21,22,23

**160** 146:5

**1605** 72:15
73:18,19

**165** 146:15

**1697** 74:24

**1698** 75:19

**18** 53:5,7

**18-month** 44:3

**1978** 43:18

**1989** 44:18,21,
23 45:2 53:17
54:2,16,19
96:7,18,24

**1990** 44:18

**1995** 54:18,20
72:5 87:6,9,16

**19:00** 119:16

**19:10** 226:8,20

**19:25** 135:15

**19:44** 119:12
135:20,23

**19:52** 120:6,19
135:18

**19:54** 136:3

**1:36** 210:2

**1:48** 210:5

---

**2**

**2** 17:2,3 124:6
131:14 150:10
154:1 168:12
195:7,8,10
207:5 221:24,
25 318:4

**20** 120:22 146:5
217:21 219:12
263:19

**2000** 73:10
269:6

**2004** 50:11
57:16 77:16,22
78:5,6 80:9
86:18,21,24
87:9,16 88:10,
11,15,22 89:5,7
91:21 92:15,23
93:7,10 95:11
98:20 100:1
102:24 103:1,4,
5 105:2 106:1
109:23 113:13
114:7 115:4
116:1 118:18
157:19,23
163:13 164:17
166:9 169:25
173:25 174:7,9
175:10 184:17
201:3 203:12
212:1 235:10
239:15 253:6,
16,23 266:24
272:11 275:14
281:21 297:15
308:23 310:16
311:6,16

**2006** 302:19

**2008** 160:21

**2012** 23:3,4
73:11,13

**2013** 73:11,14
74:14

**2015** 51:2
57:13,21,25

**2016** 62:3 64:8
67:22



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**2019** 62:15,17
64:12,19 65:1
66:20

**2020** 22:3
26:19 63:23
66:23

**2022** 9:5

**2023** 120:12

**20:23** 120:20,
23

**21** 146:19

**22** 258:14

**24** 300:8

**24-month** 44:3

**25** 131:10 136:5

**2501** 9:7

**27th** 297:19

**28** 297:15

_____

**3**

**3** 117:8,9
118:25 119:1
124:10 135:3,4
159:16,17
163:21 192:11,
13 225:23,25

**3-17** 67:22

**30** 121:1 131:8
134:15 136:10,
12

**338** 287:22

**3:14** 281:10

**3:19** 281:13

**3:54** 308:4

_____

**4**

**4** 122:11,12
124:10 146:21

**4-1-02** 75:12

**4-1-03** 75:12

**42104** 9:8

**437** 184:11

**443** 254:1,2

**457** 183:20

**48** 284:22

**4:00** 92:2 308:7

**4:15** 321:16,17

_____

**5**

**5** 145:11,12,13
189:2,7 226:3,4
273:25

**53** 131:21

**539** 267:9

**54** 170:15
272:21

**541** 187:9

**5427** 227:2,5

**544** 169:13

**56** 17:9 131:21

**5:00** 92:2

**5th** 91:9

_____

**6**

**6** 155:15,17,19,
20 157:13
163:19 164:9
189:2,8 273:25
301:23

_____

**7**

**7** 123:21
155:16,18,19
159:1 163:4
300:11

**7,000** 87:18,25

**7:00** 119:18
198:15,16,18

**7:30** 198:18

**7:44** 119:20,22

**7:52** 119:14,21,

23 120:8

**7th** 198:17

_____

**8**

**8** 168:23 169:2,
12 173:9,11,16
175:7 187:7
267:8

**832** 118:19,21
119:4 120:1,12
226:7

**8:00** 92:2

**8:17** 227:25

**8:39:47** 229:16

**8:52** 233:2

**8th** 63:23

_____

**9**

**9** 19:16,17
183:15 253:11

**9-11** 175:18
177:4 180:24
181:9 182:14,
20 201:10
206:8 221:10
227:16 250:13,
18

**9-11-2004**
123:19 135:16
155:12 166:24
168:5 173:4
174:24 175:4
177:24 178:22
179:2,8,15
195:4,24 196:2,
6 198:7 199:13,
25 221:3,14
231:17

**9-12** 181:9,13
183:6 201:11
203:17 206:8
222:1 226:8,21
227:2,16
229:16 246:21
247:5

**9-12-04** 257:25

**9-12-2004**
186:14 221:3
264:17 321:3

**9-15-04** 287:11

**9-27-04** 288:15

**95** 54:24

**97** 74:25

**99** 14:14

**9:00** 92:2

**9:03** 9:6

**9th** 214:15,20

_____

**A**

**a.m.** 9:6 61:20,
23 115:20
233:3 253:23
254:6 255:4

**Aaron** 9:22
314:16 319:2,7,
13

**abilities** 75:23

**ability** 15:8

**abouts** 211:7
212:3 216:25
253:18

**abuse** 51:21
52:24,25 53:10
56:21 59:12,15,
18 60:4,7,17,21
61:11 66:10,12,
14 304:21,24

**abused** 53:7

**academy**
44:16,18,24
45:1,5,11,24
46:19 47:7
48:3,6 49:16,18
53:17 97:9
99:1,5,16
101:10

**accelerant**
234:6,7 264:16,
21 265:1
292:16 294:16,
17 295:5,6
296:15 298:16,

23 300:16,22,
23 301:3,9
316:16

**accelerants**
295:19 299:14

**accelerate**
264:23 293:13

**accepting**
114:13,15

**access** 21:8

**accident**
11:15,16
163:25 235:24

**accidental**
263:22 264:11
283:12 292:15
293:12

**accidents**
54:21

**accompany**
121:10

**accord** 279:15

**accordance**
256:7,12

**account**
249:25 306:14

**accuracy**
257:10

**accurate** 33:5
45:4 59:23 60:6
62:8 66:21
68:16 85:9
86:12,17 93:4,
18 114:10
134:14 163:9
236:12 255:20
258:12 272:1
278:22 279:17,
24

**accusation**
188:12

**accused** 22:9
249:17

**actions** 174:19
176:19 180:20
197:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

actively 306:6

activities 114:11

actual 268:25

add 109:5 112:14,16 113:2,10,16,17 180:3

added 49:7

addiction 268:12

adding 114:4

addition 52:22

additional 156:22 161:3

address 212:11

adjourned 321:9

admissions 75:25

admit 155:1

admitted 77:10 250:10,15,20, 23 268:12

adult 71:18,19 80:22 81:21,22 85:18

adults 55:22, 23 70:22 71:7, 14,24

advice 94:12

advise 134:5,8, 11 135:10

advised 170:20

affair 250:24 282:5,12 309:10

affect 15:8,11 141:18,22

affirm 10:19

afternoon 76:17 187:16

AG-000 122:25

AG-00008 122:24

age 53:5

agencies 314:21

agency 53:24 89:9,15 228:22 315:2

ages 188:25

agree 72:24 74:3 75:10 87:19 120:5 131:18,23 132:16 133:22 135:5,14 146:12 149:7 151:6,12 155:7 158:15 164:25 166:4 167:18 169:21 178:24 179:4,6,13 184:9,13 187:13 193:14 202:1,11 221:18 227:15 257:20 267:12 279:14 284:21 285:22 286:8 287:3 288:14 290:8,11,17 297:11 305:17

agreeable 154:25 258:19

agreed 43:1 267:20 268:5

ahead 14:15 70:3 75:2 131:15 138:25 146:25 162:15, 16 170:16 173:13 179:11, 17 193:17 200:20 235:6 246:8 253:14 261:10 269:21 290:16 291:7 293:24 294:11 295:13,23 299:1,8 316:25 319:4

air 141:22

Alan 10:2 38:2 85:10 199:8 222:7 278:1

alcohol 154:20,22 223:2 250:11, 16

alerted 223:24 282:11

allegations 21:24 22:6,22 32:17 305:20 306:9

alleged 76:10 79:4 83:19 84:25 85:18 90:2

allegedly 53:7 284:19

Allen 107:18

allots 176:10

allowed 73:25 271:7

altogether 77:4

Amber 10:8 290:2 307:21 315:16

Amber's 35:5

Amelia 9:3

amended 303:14 304:5

amount 45:23 115:14

Amy 9:2,14 158:8 160:14

answering 13:8,24 160:8

answers 18:23 160:24 161:2 162:5,18 259:23 303:14 304:5 320:19

anytime 14:7 79:11

apologies 119:21 246:12

apologize 162:17 308:17

apparatus 103:17

apparently 85:25 172:4 309:19

appeal 29:7

appearance 9:12

appearing 10:3,9,10

appears 137:25 227:13 230:21

appliances 283:18

application 62:20 63:10,11, 15,22,25 67:10, 16,17,20,23 70:13

applications 67:8

applied 50:18 89:15

applies 71:4

applying 63:14

approached 65:3,8 124:14 125:5 126:6

approximately 136:10 215:2 258:14

April 134:8 145:8 147:4,12, 23 149:5 150:20 151:21, 25 155:8 157:22 158:17 163:13,16,17 164:17 166:6 167:1 168:17 169:22 170:17, 22 171:5

187:15 188:9, 13,22 189:8,12 191:5,9,15,16 192:15,23 194:15 213:16 215:16,25 216:3,12 250:15,20 258:21 262:20, 25 263:5 273:1 274:2,7,11,12, 23 281:20 282:2,14,19 283:12,21 284:1,19 304:16 305:9, 13,14 309:1,9, 19 310:16,20, 24

April's 213:21 310:23

area 79:14 81:18 83:21,25 84:21 85:1,13 125:25 127:15 235:12,13,14 243:8

areas 235:20 236:8 242:25 243:13 264:25

argued 250:20

arguing 215:9

argument 251:2

Arnett 10:8 36:24 37:1,4,8 290:1,7 293:21 294:19 298:25 301:12 315:9, 15,16 318:25

arrest 19:21,22 111:11,14,17 112:1 140:6,9 222:24

arrested 138:1,5 247:20

arrests 231:22

arrival 117:25

arrive 118:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 87 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022 #: 2880

326

arrived 120:3,6
121:15,16,22
124:19,20
126:11,24
127:4 129:15
135:18 136:1,5
138:2 139:14
152:10,22
153:21 191:5,9
226:14,20
228:11 233:7,
19,22

arriving
127:13 134:15
226:13 228:2

arson 34:20
78:2,4,16,17,
18,19 79:11,19
80:7 81:8,24
82:25 85:15,21
86:1 246:22
247:5 252:11,
16,20 258:22
262:4,7,12
264:6,8,9
266:13 276:20
278:11,18
279:11 284:4
292:13 294:15,
25 298:13
315:24 319:24

arsons 85:4

asks 158:1
163:21

asleep 40:15

aspect 97:17
101:3 175:22
266:1

assault 284:8,
18 287:17

assessment
74:3

assign 93:25

assigned
94:21

assume
160:11

assuming
103:5

assumption
236:12

asterisk
317:22 318:1,7,
9

ATF 78:21
79:6,8,10,19
80:3,17,24
82:5,7,8,24
83:16

attach 114:22

attached
168:18

attachment
114:16 150:20

attempt 280:15

attempted
262:13 263:24
280:8 284:7,15
287:15 290:24
293:5 296:2
298:22

attempting
128:3

attend 29:16
43:13

attended 53:17

attention
63:24 72:14
75:17 127:2,8,9
145:10 169:16
183:13 210:18

attorney 33:23
65:5,23 69:14
89:11 156:10
210:24 211:1,4,
6,9,12,15,20,
23,25 212:3,10,
13,16,18,22
213:5,9,11,14,
18,22,25 214:4,
7,11,14,18,22
215:2 216:25
217:5,7,10,14,
19 220:21
307:3 308:12

attorney's
65:4 66:7,20
291:22 304:2

attorneys
15:23 22:21
39:16 40:17
157:3,8

audio 269:12,
16 270:8,12

audios 269:12

aunt 133:3
189:21 272:16

aunt's 215:18
251:3

auto 44:11,12,
14 58:10,13,19

automobile
163:24

awaiting 154:9

aware 22:6,22,
25 23:18,22,24
50:14 97:4
139:1 275:17
285:4 286:15,
24 288:4,7,10
294:1 305:20
306:6,9 313:10
314:5

―――――――

B

―――――――

back 18:24
29:6 32:7 33:19
34:6 46:23 49:2
51:8 57:14
58:4,23 59:9,21
60:23 61:12,22
64:8,21 66:9,
13,16 77:15
81:12 88:12
98:18 101:4
104:2,11
105:14 108:25
110:9 113:13,
19 114:19
115:22 124:15
135:2 142:24
143:10,11
147:6 158:10,
22 160:3
161:24 166:20
168:9 170:10,
12 172:13,14
173:9 174:15,

16 177:25
179:19 189:12,
15 190:3 195:7
196:17 200:13
210:4 211:25
214:12,25
215:10 216:8,
10,18 218:17
221:10 224:8,
18,19 226:21
228:13,25
232:14 239:7
240:14 241:5,
11,13 242:4,6
244:18 245:6
246:20 259:12
269:6 272:10
274:16,17,19
276:7,11,13
280:4 281:12
285:1 286:15
290:19 301:17
307:16 308:6
313:1

background
30:22 43:8
312:18,19,20
314:1,8 315:13

backing 147:9

backside
127:17,19,23
128:2,6 129:11

bad 193:8
239:6 249:6
305:15,16

badge 119:24
120:11 226:6

Badgett 9:6

Barry 93:16,17

based 47:6
207:16 294:15,
23 295:1

basic 45:17,18
47:23,24 48:8,
14 49:17 54:12
101:5

basically 36:2

basics 45:6
101:20

basis 94:6,18
95:23

bat 17:8 46:24
47:2

Bates 62:21
67:12 68:2
72:14 74:22
122:24 131:21
169:13 183:20
285:19 287:20

beating 215:7

bed 204:22
205:15 216:8

bedroom
204:21 205:16
216:5,9,13
218:17 235:14

bee 266:18

began 53:20
54:1 62:5
66:19,22 96:24
247:14,25
248:3,13,21
249:9 255:4
256:7,12
258:13

begin 166:14
236:4

beginning
53:16 54:15
248:8 254:13,
16 267:4

begins 67:12
72:16

behalf 9:24
10:9 320:10

beings 176:13

belief 163:22
237:11

believed 42:22
136:15,19
151:17 207:14
265:1

believes
135:11

Bellar 172:25
173:4,21,23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 88 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2881

327

174:4,12,17,20,
22 175:2,17
176:15,25
178:22 179:2,7,
15 182:14,20
183:6,9 184:10,
17,23 186:3,13
187:5,8,15
188:12,15,21
189:7,24 190:9,
22 191:4,20
192:15,19
193:5,20,23
194:16,17
195:13,20
197:16 203:17,
21,23 221:9
250:8 262:21
263:4,6,11
269:9,15
310:10

**Bellar's** 187:23
188:13 189:16
192:11 201:18
202:9 205:1,17
218:7 219:24
263:10,18

**benefit** 265:19,
21

**Benton** 12:22

**bet** 302:4

**big** 87:15
103:19 239:17,
21 294:9,14

**bigger** 87:21,
22

**Bill** 9:23 38:24
319:14,20

**binder** 96:12,
13,14

**binders** 97:7

**bit** 40:10,11
45:16,25 48:15
62:18 64:5
77:15 85:24
92:10 96:21
103:14 108:15
133:23 145:17
147:6,9 186:20
194:21,23

240:8 256:4
259:12 308:18
309:6

**blackout**
311:9,17

**blackouts**
311:15

**blank** 241:15

**blood** 154:22

**blurry** 141:19

**body** 116:23
140:9 147:8
153:19 298:23
321:4

**Bonnie** 12:21,
22 116:3,25
119:25 121:6
309:4

**boot** 286:2,5

**boots** 289:12

**bother** 29:8

**bothered**
239:6

**bottom** 62:21
104:22 123:1
146:16 235:9
256:24 272:23
292:4 317:18

**Boulevard** 9:7

**Bowling** 9:7,
11,17 43:22,23
98:1

**boy** 215:21
229:11,24
230:2

**boyfriend**
213:17

**boys** 188:25
189:16 214:3
274:8 276:7

**Brady** 50:2

**brand** 239:23

**brand-new**
239:11

**break** 14:7,8
61:17 96:21
115:17 161:13
168:24 169:4
281:5 305:10,
13 307:20

**breaking**
115:17

**breaks** 14:5,6

**briefly** 37:12
147:15,17
172:24 175:14,
15,17,23
177:24 195:13
200:1 202:21
269:20

**bring** 15:17,19
104:11 196:11,
13,17 228:13
247:23

**broke** 85:1
216:7

**brother-in-law**
12:19

**brought** 15:15
143:8 196:11
222:20

**brown** 215:13
286:2

**bunch** 199:2

**burglaries**
54:23 55:23,24
56:23

**burn** 234:23

**burned** 81:20
284:16

**burning**
141:20

**burns** 153:19
321:4

**business** 9:7
58:8

**Buster** 9:24
10:4 37:11
233:13 280:6,
19,24 308:13
314:20,23

315:2

**busy** 180:9

_____

**C**

_____

**cabinet** 111:4

**cabinets** 108:9
111:7

**CAD** 117:17,18
118:23 131:7
135:3 136:11
152:7 225:21

**CADS** 17:15,16

**call** 32:8,9 37:7
79:8,10,12,18
82:8,24 83:1,9
101:22 117:20
118:14 121:6
136:6 190:1,23
198:24 223:16,
25 224:6 228:7
231:4 232:21
239:16 311:9

**called** 26:12
27:4 29:14,21,
22 31:24 32:21
33:13 36:19
43:22,23 54:7
56:25 63:24
79:6,17 81:25
82:1,9,12,19
83:7,13 91:6
100:18 104:16,
18 136:13,14
224:3,7 232:14
235:21 239:17
262:23 269:21
310:16,20,21,
23,24 320:13

**caller** 117:21

**callers** 117:21

**calling** 75:17
82:21 117:21
320:17

**calls** 82:14,17
309:3

**calmed** 131:4,
5

**cam-** 103:23

**camera** 239:7,
8,11,14 241:21,
25 242:1,3,6
243:25

**cameras**
103:24,25

**Cameron**
144:24 152:21
167:24 172:21
188:6 214:2
216:14 284:12

**Cameron's**
145:7

**Campbell**
309:11 310:17

**candles**
283:22

**candles--**
260:13

**canine** 238:6

**canisters**
280:13 289:22

**Cannon** 9:25
10:5 37:11,15,
17,22,25 40:24
41:4 233:13
234:2,10
236:25 237:21,
24 238:15,19
243:18 264:24
280:6,12,19,24
289:16 308:13
314:20,23
315:3

**Cannon's**
40:21 41:23

**cans** 242:22
243:10

**Cap** 212:6,7

**capable**
258:21

**capacities**
315:1

**capacity** 9:25
65:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 89 of 115 PageID
#: 2882
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

328

**captain** 66:17
93:13,14,19,22
94:2,11,16
95:5,8

**capture** 244:14

**car** 11:15,16,20
12:12 140:19,
20 143:1 239:8,
11

**care** 86:5

**career** 53:14
54:15 72:2,8
74:12 89:6,14,
20 90:11
255:15

**careful** 256:1

**Carpenter**
147:4,12,23
148:5,10 149:6
150:21,22
151:21,25
154:15 155:8
157:22 158:17
163:13,17
164:17 165:4,
17 166:6 167:1,
22 168:17
169:8,22 170:4,
22 171:5,21
281:20 284:1
304:16,23
309:1

**Carpenter's**
273:1

**carry** 105:8
208:15

**carrying**
143:13

**cars** 58:5,6
91:2 92:24

**case** 12:4,10
15:1 16:1,3,14,
16,19,21 17:21
18:8 21:3,4,5,6,
15,19,23 23:9
25:24 26:24
28:9,13,18
29:12,17 30:13
31:10 33:8
34:6,22 35:20

36:13 38:9
39:8,12 40:5,
19,25 48:23
49:11,14 53:3
65:19,24 69:1,4
70:8,11 76:18
77:11 79:3
80:5,7 81:6,16
82:8 83:6,15
86:13,18
100:17 106:15
107:13,15,17
108:4,7,11,12,
20,21,25 109:4,
6,10,18,19
110:4,13,21
111:1,6,10,12,
18,23 112:8,22
113:2 116:22
146:3 148:23
149:3,4,6,24
150:17,19
151:7 161:2,11
166:17 167:11,
14 168:8,11
171:19 172:17
174:15 178:23
179:3,9,16
181:16,20,24
182:8,11,15
184:7 185:2
186:24,25
196:7 197:6
205:8,20
220:13,21
234:2 247:11
259:14 262:12
265:17 270:14,
16 294:10
295:21 296:7,
10 297:14,22
298:18 303:8
304:16 305:21
306:5,7 307:10,
11 312:12
315:18,24

**cases** 15:2
29:5 49:6,7
52:25 53:10
55:18,20,21,22
56:21,22 59:24
60:7,18,21
61:12 73:25
74:16 76:8
77:24 78:2,4,9,

13,17,18,19
82:18,25 85:15,
21 86:2,6 87:4,
7,10,12 88:22
89:5 93:21,25
94:11,16,22
95:4,15,18
112:4,21
149:21 153:7
196:9,10
232:19 234:5
320:10

**casual** 249:16

**catch** 160:15
259:17 311:23

**caught** 129:23
160:14,16

**caused** 42:14,
18 127:18
237:20 259:17
282:6

**causing** 77:11

**Center** 9:7
98:13 158:4
313:11 320:15,
18

**Central** 9:6
43:14,15,17

**certificate**
44:7,10,15

**Chad** 30:15

**chance** 29:6
187:11

**change** 257:22
320:18

**changed** 102:5

**chaotic** 127:4
131:5

**chaplain**
229:9,13,20,21
230:8 231:11,
12 232:3

**characterizati
on** 136:21
137:8 269:18
295:13 301:13

**characterizati
ons** 138:24

**charge** 84:4
108:11 263:24
278:9,10,14
279:11 284:12,
15 290:20,21,
23,24 304:23

**charged**
239:13,23
279:9 284:6
298:22 304:16,
20 305:9

**charges** 53:6
65:15 84:15
85:19 86:1,8
223:1 248:6
284:7,22,25
287:14 295:24
296:11 305:6,9,
16

**Charles** 34:2

**Charlotte**
172:25 173:4,
21,22 176:15
183:6 184:10,
17 195:13
212:15,16
216:2,16 269:9
310:10,15,19

**Charlotte's**
215:6 218:16

**check** 52:4
145:4 158:11
188:22 189:8
276:14 312:18,
19,21 314:1,8

**checked**
153:11 154:3

**checking**
158:22 168:2

**chest** 138:22
139:3 140:6

**chief** 31:20,22
54:5,6,7 58:25
59:5,7,8 60:13,
16 62:3 64:8,
20,23 77:19,20
93:15,16 95:11,
13,17 96:1,4

140:17

**child** 51:21
52:24,25 53:9
56:21 59:12,15,
18 60:4,6,17,21
61:11 66:10,12,
14 72:10,11
77:24 87:4
130:7,11,14
132:18,21
143:7,9,10,12,
14,22,25 144:1,
18,20,22,24
149:10 152:18
153:12,13
154:4 265:14
305:16,18

**child's** 71:15

**Childers** 10:9
35:7,12,16,19
315:21

**Childers'**
41:20

**Childers's**
41:24

**children** 53:7
71:4,6,11,21
72:3 116:23
117:4,6 129:24,
25 130:3 133:6
135:11 206:15
214:5,8,9
272:25

**children's**
214:1

**choked** 283:1

**choking**
284:19

**Chris** 10:2
172:4 314:16
319:2,4

**Christian**
211:3

**church** 90:2

**cigarette**
207:3 208:2
223:14

**cigarettes**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

207:21 208:8,
13 260:15
283:22

**Cincinnati**
9:21

**circuit** 297:7
304:1

**circumstance**
**s** 85:3 116:16
140:15 304:22

**circumstantial**
262:16

**citations**
19:20,22

**citizen** 89:22

**city** 9:10 10:5
11:13 59:12,16,
18,22,25 60:18
61:5,7 81:20
87:15,19
308:13

**civil** 21:18,22
23:1,16,23 24:6
26:20 30:9
31:6,23 32:5
33:11 35:16
36:13 37:22
38:16 39:8,23
69:11 70:11

**civilian** 107:22
108:1 109:1,10
111:3

**civilians**
107:23 111:13
112:10

**claim** 163:22,
25

**Clara** 124:22,
24 125:2

**clarify** 36:24
125:17 163:20

**clarity** 163:20

**Clark** 311:21,
24 312:1,6,11

**classes** 47:15
48:18 49:19,22

**cleaning** 320:9

**clear** 13:15
83:12 133:23
162:11 196:1
252:22 259:8
275:9

**cleared**
111:10,14,17
112:1 263:6

**clerk** 304:1

**client** 9:18

**client's** 160:12

**clients** 162:24

**clip** 209:20
210:14,15,19

**clock** 257:13

**close** 64:14
66:24 127:1
227:14 288:11
294:2 297:25
298:8

**closely** 33:6
140:1 278:23

**closer** 125:8
263:15

**clothing** 222:6,
10,12 286:13,
21 287:6
295:19 296:15
298:16,24
299:15 300:24

**coach** 100:6,9

**codes** 228:20
229:7

**cold** 111:18

**colleague**
25:14,17 26:5

**colleagues**
66:15

**collected**
222:6,10
242:21 243:1
280:25 286:13,
17,20,25

**collecting**
289:16

**collection**
169:14 280:15

**collective**
183:19

**combustible**
287:9

**comfortable**
28:20 265:25
266:1,3

**comment**
73:18 225:16

**commit** 211:19

**committed**
55:11 75:25

**committing**
258:21

**common** 88:1,
2,4,6,17

**commonwealt**
**h** 65:4,5,23
66:7,19 241:2
272:7 291:21
304:1

**Commonwealt**
**h's** 33:23 69:14
89:11

**communicate**
**d** 279:18

**communicatio**
**n** 161:4

**company** 91:3,
5

**compile**
108:21

**compiled**
109:15

**compiling**
109:15

**complaint**
21:19,23 22:3
32:14,18,25
36:13 140:16
291:14,15,19
293:1,5 302:13

**complaints**
89:21,22 290:4,

13,23 291:2

**complete**
245:7 302:25

**completed**
106:7 210:20
241:19 288:15

**completing**
109:17

**compliance**
252:25 253:5

**comprising**
307:10

**computer**
113:17

**conceivably**
49:14

**concern** 27:16,
17 30:5 42:14,
18 206:15

**concerned**
27:14 34:19
249:17 251:19
295:15

**conclude**
236:11

**concluded**
247:17 256:7,
12 292:14
321:17

**concluding**
245:5 293:11

**conclusion**
279:1 293:16
294:15,18,23
295:10

**conditions**
15:8

**conduct** 95:7,
25 102:20
246:21

**conducted**
267:14 316:10

**conferences**
98:3,9

**confession**
76:10 77:7

**confessions**
73:24 74:6,14,
18 76:4,7

**confidential**
90:3

**confidently**
15:9

**confused**
240:8 320:24

**confusing**
13:18 194:23
240:18 320:11

**confusion**
171:15

**considered**
53:10

**consisted**
55:25 314:2

**consistent**
185:10

**consumed**
250:10,16
318:11,20

**contact** 28:12,
17 174:18
176:16 196:23
197:21 223:17
224:11 231:19
278:3 309:18,
21 310:1

**contacted**
83:16 278:2
310:2,3

**contained**
32:17 75:19
178:23 179:3
286:5,8 288:5,
11

**contend**
258:17

**content** 230:1

**contents** 176:7
177:3,13 179:1,
6,14 181:2,3,5
195:23 196:5,
18

**context** 230:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**continue** 13:11

**continued**
258:17

**conversate**
27:9

**conversation**
22:20 24:4
26:10,11 27:2,
19 30:4 31:13
34:21 36:6
39:17,20,25
95:2 130:20
131:1,11
137:18 148:2,
14 150:14
157:2 163:12,
16,17 165:4
166:6 167:19
168:25 169:5
171:20 173:3
175:18 176:7
177:3,5,8,13
178:22 179:2,7,
14 180:24
181:2,3 182:14
195:20,23
196:2,6 197:2,
13 209:12
225:19 229:17
249:16 275:18,
25 306:13,18,
22 307:2 310:9

**conversations**
15:21 22:11
24:14,19 25:20,
23 26:8 30:9,12
31:5,9,22 33:10
35:15,18 36:9,
12,16,21 37:14,
17,21,24 38:12,
15,18,21 39:3,
7,10 68:25
69:3,7,10 70:6,
10 94:15
148:17 149:16
157:18,22
158:1,16
163:16 164:15
167:4 175:11
178:8 196:16
231:24 312:10

**conversations
/statements**

**164:19**

**convicted**
34:24 76:11
80:14

**conviction**
23:8 26:25
27:20 29:20,25
37:18 69:8
76:11 80:12
111:11

**convictions**
36:7

**cooperated**
282:14

**cooperating**
155:4

**cooperative**
249:19

**Cootie** 215:12

**copies** 97:6
182:17 241:5

**copy** 21:18,22
32:14,25 96:7
307:11

**corner** 91:9
146:16

**coroner**
127:24 128:5
143:8,10,12,13,
16 144:1,2,3,5,
7,8,10,11 145:1
166:25

**correct** 11:24
17:9 27:12
34:10 35:5
36:17 44:19
49:23 50:25
57:10 64:1,8,12
65:9,16 76:5,18
77:8,13,17 90:9
95:11 101:18
102:4,19 115:6
117:11 118:18
119:13 120:21
122:2,16 125:7
133:15 134:22
135:24 137:5,
12 138:15
139:6 142:13

144:25 145:22
150:18 151:18
152:8 155:10,
11,22 163:4
165:5,9,20
167:11,20
169:1 170:18
174:1 176:5,8,
17,20 177:14
178:12 181:4
182:15 185:12,
20 187:24
193:2,9,21
194:4 196:8
197:17 198:1
202:18 204:22
205:1 207:10
208:22 209:3,6
219:16 220:17
222:3,8,25
225:6 234:7
237:21,22
238:1 243:1
246:16,24
247:2,17,23
248:18 249:3
251:5 257:8
258:3,6,18
260:19 263:25
264:18,21
266:24 268:20
269:24 272:17
275:23 276:4
281:1 282:13
284:10,11,17,
19 285:3
286:14,20
287:17 288:12,
22 289:7,17
293:2,14,18
294:3 296:4,7,
15 297:22
298:9 299:11
300:24 301:4,
10 305:6
310:25 316:8
318:17 319:18

**corrected**
163:5

**correctly**
317:1 318:14

**cotton** 286:9,
17,25

**couch** 215:15,
24 216:5 217:2
218:13

**cough** 141:10,
12,13,21

**coughs** 152:16

**counsel** 9:12,
13 10:23 162:3,
9 166:2 185:1
303:21 307:18

**county** 9:22,25
10:1 23:10
33:14 43:14
59:13,16,18,22
60:5,7,14,18
61:9 134:3
158:4 211:3
228:12 305:22
313:11 319:14
320:12,13,14,
25

**County's**
297:7

**couple** 67:7
78:11 81:19
86:3 101:11
104:14 167:13
189:19 197:18
199:19 209:22
234:4 235:2
250:5 310:11
314:19,25

**court** 9:4,11
10:16,18,23
12:25 23:17
137:22 287:23
297:7 304:1
317:9 321:10,
13

**courthouse**
312:4

**covered** 45:15
85:13

**create** 112:25

**created** 105:25
114:20 132:5
133:18

**creative** 60:3

**crime** 55:11
56:23 61:12
62:5 98:13
104:3 172:22,
24 174:16
224:9,12,15
225:17 232:14
233:2,7 234:11

**crimes** 57:3,
18,20 61:3
75:25 77:23

**criminal** 23:8
28:9,12,18
29:12,17 33:8,
25 35:13 36:7
37:18 38:9
39:18 49:23
53:6 65:15,23
69:1 74:15
76:11,18 97:12
98:6,8 146:3
181:24 185:7
186:25 187:1
210:15 262:8,9,
12 278:16,17
279:9 287:17
290:4,12,23
291:2,14,15,19
293:1,5 295:24
304:21,23
312:11

**criminally**
304:15

**cross** 104:22
308:8

**Crossing** 9:7

**cursing** 139:6

**custodian**
107:17

**custody**
247:25 248:3

**cutting** 160:10

---

**D**

**daily** 29:9

**danger** 305:1

**Danny** 58:15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 92 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2885
331

dark 198:17,18
215:4,5

date 63:21
67:5,20 151:2
178:16 257:15
267:18

dated 170:25
173:25 174:9
201:3 287:11,
13

dates 64:5
234:18

daughter
214:16 215:20,
23

David 33:3,6
198:13 199:3,
18 233:11
236:25 245:14,
15 261:12,13
267:19 271:11
277:1 278:2
287:7 294:8
309:14 310:17
315:20 316:2,
10 317:4

Davis 134:9
149:5 169:6,22

day 14:6 91:25
170:21 171:10
174:19 175:21
176:20 177:17,
20,25 189:19
196:12 197:25
203:9,10,11,14
222:2,16
241:13 245:11,
13,17 246:10
249:25 250:21
266:23 268:16
277:11,12
281:22 282:20,
23 308:16

day's 178:16

days 91:22,23
112:14 133:20
277:7 279:22
284:6 287:14
306:4,5

deadline 14:3

deal 294:9,14

Deberry 211:5

deceased
102:13 144:16,
21 149:10
152:18 153:7

decide 156:6

decided 59:19
60:13 278:9,13,
20 300:12

decision
278:19 304:23

defendant
12:4 15:1,3

defendants
9:17,20 10:9
23:23 24:15
160:9 315:17

defendants'
162:18

defense
220:21 307:18

degree 304:21

demeanor
27:12,14

Demetria
214:17

deny 180:13

dep 41:17

department
21:11,16 28:15
47:16,19 49:22,
25 50:4,10
51:5,17 53:11
54:2,11 55:13
57:4,8 58:24
59:6,24 62:9,11
63:19,20 64:11,
19 65:1 66:10,
14,23 67:5,24
72:25 74:1
77:17 87:3
89:21 90:12
92:5,9 93:5,10
96:7,17 97:12,
16,19 98:5,21
99:9,25 100:19
101:12 102:24

104:13 106:16,
22 107:22
108:13 139:23
140:25 142:12
181:17 193:1
204:12,16
222:20 229:1
237:6 246:19
253:1 256:8,13
275:2,14
276:23 313:3
314:6

department's
75:23

departments
100:17 108:10,
16

depend 92:7

depended
271:5

Depending
307:15

depends 76:2
202:6

depicted
123:12

deploy 142:24

deposition 9:8
11:9,21 14:4
15:24 21:14
24:8 25:24
31:9,14 37:25
38:19,22 39:11
40:2,18,20,25
41:11,20,25
42:1 93:2
122:16 145:20
156:1 321:17

depositions
30:13 40:5,7
41:7 42:8
100:16

deputy 10:1
143:8 144:2,7

describe 27:11
69:13 164:18
174:19 176:19
197:25 217:1

desk 106:11
182:6

detail 217:1

detailing
255:21

details 81:16
178:11 219:14,
15 220:8,16,20

detect 234:6

Detect- 289:16

detective
66:16,17 73:8,
23 75:11,14
93:5,9 102:8
132:3 170:2
186:23 199:23
201:6 267:2,14,
19,20 268:19
277:22 278:22
279:24 280:7
281:20 308:11
314:22 315:16
319:13

detectives
59:19

Detention
158:4 313:11
320:15,18

determination
193:2,3

determine
170:9,24
252:21 261:2,
20 271:13

determined
137:11 152:22
192:22 244:7
247:1,8,10
265:5

develop 74:8,9

developed
73:24

device 103:20

difference
70:23 71:1
100:25 266:8
298:21

differences
71:5,9

differential
256:5

difficult 186:20

Dill 93:16,17,
19,22 94:2,11,
16 95:5,8

dinner 68:21

DIRECT 10:25

directly 219:24
230:6 263:19

disappear
299:3

disciplined
90:8,12

disclose 24:13
50:2

disclosed
179:8,15
185:12 206:1
209:6

disclosing
48:4,7 106:23

discovered
162:9 220:7

discovery
18:12 160:12
163:19

discuss 32:16
93:21 94:1,22
95:15

discussed
39:16,21 40:1
97:8,11 98:25
99:4,15 100:16
247:19 289:10
310:10 311:3

discussing
66:1 277:24,25
316:20

discussion
34:12 65:25
66:2

discussions
65:22 94:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 93 of 115 PageID
#: 2806
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

332

dismiss 65:15,
19 70:7

dispatch
82:10,11,19
83:6,12 116:7
118:14 229:6

dispatched
116:3,12,17,25
117:23 121:5
134:16

dispatcher
230:21

dispatchers
117:19

dispute 64:15

dissipate
299:3

distinction
25:4 253:21
262:6

distracted
168:15

District 9:11

division 57:17

divorced
12:18

document
17:12 45:22
49:13 63:1,7,9
64:10,16 67:15
68:2 72:16,22
74:20 75:6,18
99:18 117:14,
16,20 119:12
131:16 133:18
137:24 156:2,
10 157:1 159:4,
11 171:18
173:18,20
176:6 178:10
183:7,22 186:2,
7 187:14 192:9,
19 195:22
196:2,18,21
200:22,24
202:3,8,18
207:19 220:16
221:19 225:23
247:12 253:22

256:20,22
257:3,4,11
258:5 268:18
285:20,22
288:15 291:11,
13 297:4,6
298:11 299:18
317:6

documentatio
n 104:8,9 177:2
178:5,21

documented
135:15 175:18
177:12 179:1,5
180:6,21,23
181:12 182:13
187:14 188:16
190:17 196:5
197:1 221:6
225:5,9 256:1
260:18 275:23
276:4

documenting
99:24 102:25
178:8 181:3
190:9 298:14

documents
15:15 16:6
17:11,17 20:20,
23,24,25 84:12
110:10 113:24
145:20,21
155:23 161:14,
16,20 162:10
163:3 166:21
181:23 182:5
183:25 197:11
259:2

dog 234:6
237:25 238:7,8,
10,11,15,19
239:24 240:2,4,
10,13,21
241:10,19
242:15,25
243:3,7,12,20
244:19 280:10

door 125:14,
15,19,25
126:18 127:12,
14 190:10
191:1 212:19,

25 215:6,7
216:10,15,17
315:11

doors 52:4

double 265:12

doubt 257:10
265:19,21
309:16

drafted 110:10
137:25 247:12
291:19

dresser 216:7

drink 191:16

drinking 155:2
187:18,20
188:4 282:11

drinks 192:16

Drive 116:4
117:1 119:25
121:6 124:22,
24 125:2 309:4

driveway
191:13

dropped 207:9
209:16

drug 12:8

drunk 215:12

drunker
215:12

Dunlap 144:4,
15,18

duties 51:25
53:9 54:19 55:8
101:21

duty 52:8
115:25 116:2

———————

E

———————

e-mailed
156:17

earlier 26:21
50:24 76:3
82:23 87:2 89:8
98:14 99:4,11,
15 115:3

122:14 144:6
145:19 155:24
163:23 168:16
176:6 179:22
181:15 185:16
191:23 195:12
200:5 232:18
234:4 273:25
294:1 308:21
316:4 319:15

early 26:22
76:1 89:6 90:22
227:15,16

easier 62:18
301:13

easy 180:7

Ed 305:21

Eddie 128:12

Edmonds 9:9,
18 10:6,12,14
73:6,24 75:11
115:25 132:3
146:10 164:8
210:7 308:11
315:16

education
43:9,19 44:15

educational
43:8

Edward 26:1

effect 298:15,
18

effects 142:7

Eggleston
30:15,17,21
31:6 66:17

Eggleston's
41:17

electric 266:6

electrical
260:11 263:23,
25 264:2 266:7
283:16

electronic
241:6

electronically
114:12,23

185:18

elementary
51:23,24 52:1,
14

Elkton 43:15
58:12 91:15

Embry 56:7,9,
10 75:15,22
102:13,15

emergency
82:13 126:10

employed
21:10 51:9,11,
17 101:12
139:22 313:3,
10,14

employee
53:10 72:25
73:5 306:18
319:16

employees
41:6,8 47:20
107:22,23
108:1 109:10
111:3 320:12,
20

employment
53:20 54:1
58:1,21 62:10,
21 63:3,10,11
64:1 65:1
67:10,16,17,21
92:22 96:16
314:6

en 118:9
135:23 229:1
233:2

encounter
142:3,17

encountered
309:1

encounters
308:22

end 14:4
104:23 124:6,
11 316:13,19
317:21

ended 43:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 94 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2687
333

59:20 80:17
149:8 158:21
204:9 239:14
240:19 266:22

**enforcement**
11:22 29:1
50:22 53:14,23
54:15 89:9,14,
15 117:23
118:4,9 128:8,9
138:14,17
182:21 183:8
184:22 198:6
199:15 245:9
248:12 255:15

**entail** 51:25
55:8

**entered** 137:20

**entirety** 182:11

**entitled** 14:5

**entries** 226:3,6
227:21

**entry** 119:23
227:2 228:15
229:4

**entwined**
115:13

**equate** 119:14
176:22

**equipment**
244:4

**erroneous**
42:23

**error** 161:17
253:21 257:21,
23

**errors** 162:9
303:13

**escalating**
251:2

**established**
53:17 131:7
205:23 302:21

**estimate** 72:2
74:15 88:9
131:9

**et al** 9:10

**evaluate**
248:24

**evaluating**
237:18

**evaluation**
73:1,10,13
75:8,11

**evaluations**
72:23

**evaluator**
75:14

**evaporating**
318:12

**evening** 116:1,
4 121:6,15
123:19 128:21
168:5 199:12
214:20,23
221:18 227:16
306:24 307:8

**event** 204:3

**events** 118:13
147:16 214:19
231:10 319:25

**eventually**
128:22 185:22
189:24 241:24
251:5 317:5

**Everybody's**
228:21

**everything's**
269:7 272:2

**evidence** 20:1
48:4,7,21 50:6,
12 84:18
241:23 242:21,
25 262:16
285:23,25
286:20 287:3,8
288:18 290:18,
19 298:23
299:2

**evidently** 88:8

**ex-sister-in-
law** 12:15 15:2

**examination**

10:25 285:23
286:1 288:20
308:8 314:17
315:14 319:8
320:4

**examined**
287:8 289:22

**excessive**
306:10

**exclude**
318:10

**excluding**
39:15,16 307:3,
4

**exculpatory**
48:4,7,20 50:2,
6,12 209:6

**excuse** 86:14
152:16 214:14
217:15

**exhibit** 17:2,3
19:16,17 62:20,
23 67:11 72:13
74:21 117:8,9
122:11,12
131:14 135:3
145:11,12
150:9 153:25
154:1 155:17,
18 156:13,16
157:13 158:25
159:1 163:4,18
164:9 168:12,
23 169:2,12
173:9,16 175:7
183:14,15,19
191:22 195:7
200:14 202:24
207:5 210:14,
16 221:23
253:11 256:17,
18 267:8 285:8,
9,10,18 287:19
291:4,5 296:21,
22 299:20,21
301:23 316:23
317:1,7

**exhibits**
155:15 289:5,9

**exist** 269:3
271:14

**existence**
307:5

**experience**
63:4 64:1 86:19
102:8 234:1
288:24 317:10,
12 318:16

**experienced**
101:13 102:9

**explain** 16:19
59:14 70:17
71:1 100:24
238:25 243:19
266:3 318:21

**explained** 49:8

**explaining**
70:20

**explanation**
227:12 318:6

**express** 27:16
206:14

**expressed**
30:5

**exterior**
244:22

**extinguish**
128:3

**extremely**
220:15

**eye** 154:20

**eyed** 141:10

**eyes** 141:10,
18,19

─────

**F**

─────

**face** 302:4

**faces** 125:1,2

**facility** 320:21

**facing** 212:23
213:2,5

**fact** 22:25
27:21 37:18
65:18 69:8
75:10 129:22
152:23 165:3

172:17 182:13
190:22 205:14
219:23 220:1
221:2 223:24
250:4 266:16
292:3 295:18
320:17

**fair** 21:13 24:13
25:13,16 26:4
89:4 111:19
311:11 318:13

**fall** 215:14

**familiar** 24:10
25:9 26:1 30:15
31:16,18,19
33:3 37:11
38:2,4,24 39:1
65:18

**family** 50:21

**Farm** 17:22

**father** 133:6

**February**
160:21 302:19

**federal** 23:17
80:18

**feel** 155:4

**fell** 40:15
207:10 209:16
216:7,19,20,22,
23 219:2,4,8

**felony** 87:7

**felt** 28:20

**female** 80:1
144:2 153:13

**fence** 215:11

**field** 100:18,20
101:4 105:4,7
114:18

**fight** 191:16
283:1

**fighting** 189:13

**figure** 69:20
249:15 261:1

**figured** 34:17,
18 320:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 95 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2808
334

**file** 21:4,5,6,15
49:21 89:25
105:18 106:11,
15 107:13,15
108:9,12,21
109:6,10,18
110:13,21
111:3,18 112:8,
22 113:1,2,7
114:23 178:23
179:3 181:16,
20 182:6,7,11,
15 185:2,3,4,
21,23 196:7
197:6 303:14
304:5 307:11

**filed** 22:3 23:1,
17,19 31:23
164:1

**files** 107:17
108:5,7,25
109:4 111:7,12

**filing** 111:4,7

**fill** 104:19,20

**filled** 63:12
67:18 129:16,
18,22

**final** 276:13
277:8 278:25

**finally** 128:12

**find** 110:13
148:9 225:24
238:9 244:9
261:22 291:6

**finding** 84:10
272:24

**fine** 11:5 13:13
145:18 195:1
210:10

**fingers** 286:18

**finish** 109:3
223:14

**finished**
108:24,25
109:14,15,20
111:8,10 113:3,
4 172:21
238:13

**finishing**
111:12

**fire** 17:23 35:11
77:11 78:23
79:4 81:19
82:1,17,20
83:10 84:11,23
85:6,10 86:2,4,
7,14,19 115:5,
9,11 116:9,17
121:17,23
122:1,4,8,15
128:3 129:23
130:1,4,8,15
133:20 134:11,
17 135:11
136:7,12,13,15,
19,24 137:4,11,
12 151:17,21
152:1 176:17
177:1 191:2
192:23 193:6,
21,24 194:2,13
197:22 199:8
206:11,12
208:19 216:11,
13 218:20,21
219:21 220:7,
25 221:4
222:11 223:17
225:17 234:4,
13,14 235:22,
24 236:1,4,11
237:20 244:20
245:6,13
246:23 247:2,9
249:8 251:6,21
252:13,15,17,
19 259:5,18
260:7 261:5
262:3,23
263:22,23
264:7,12,18,21
265:1,5,24
266:7 275:20
276:1,8 277:23
278:3 283:7,9,
13 284:6,13,16,
23 286:3 287:5
292:14,16
293:11,12,13
294:25 300:12,
15 301:2,8
315:3 318:12,
15

**firefighter**
167:7

**firefighters**
127:24 128:1

**fires** 79:9,14,17
82:22 84:14
85:1 86:4
116:13 284:5

**five-minute**
281:5

**flammable**
287:9

**flicking** 215:24
217:4,9,12,16,
18

**flighted** 154:5,
8

**Florida** 98:2

**flow** 181:5,7

**Flowers**
234:13 237:1
243:19

**focus** 163:3

**focused** 87:4

**follow** 314:19
320:6

**follow-up**
196:19

**fooled** 58:6

**football** 52:6,7

**force** 139:22
306:10

**forced** 188:13

**forensic** 70:14,
17,19,20,24
71:3,6,10,16
222:13 285:1,4

**forget** 148:20
176:12,13
180:7,9 239:16

**forgets** 192:16

**forgot** 276:23

**form** 20:1
96:11,12

**104:15,17,18**
105:23 179:11
257:24 290:1,7,
9 294:11,19
295:13,22
298:25 299:7
310:22

**formal** 95:14,
22 97:15
105:23,25
114:20

**Fort** 309:10
310:17

**forward** 285:18
295:23

**forwarded**
223:20,23

**found** 32:11
147:2,11 148:7
154:4 229:11,
24 230:2,23
294:16 295:19
296:15 298:15
299:14 301:3

**foundation**
179:10 295:23
299:8

**four-page**
16:10

**fourth** 68:2

**Frankfort**
10:11

**friend** 58:4
68:10,11 69:22
79:21,22
232:22

**friendship**
68:17 312:5

**front** 72:20
75:4 121:19,21
123:22 124:4,
15,22,25 125:5,
12,13,14,15,19,
20,25 126:4,6,
10,12,13,17,18,
21,24 127:14
155:20 159:11
183:22 191:5,
10 212:19,25

**213:6 263:1**

**FTO** 101:20

**FTOS** 101:22

**fulfill** 232:16

**full** 10:7,13
112:15

**full-time** 53:10

**fun** 52:11,12

_____

**G**

**Gadansky**
10:2 40:19
172:1,3,6,8
319:3,6

**Gail** 33:15,22,
25

**gather** 149:12
161:10 196:13
261:4,12,24
262:1 283:25

**gathering**
196:15

**gave** 11:10,11
25:24 31:9
49:5,10 113:25
137:14 141:16
146:2,13 181:8,
9 219:14 242:4
249:24 250:2
257:13 259:23
311:4

**general** 50:8
102:23 148:16,
22 149:23

**Georgetown**
10:5 308:13

**Gill** 27:20 29:19
68:8,10,11,14,
17,23,25 69:3,
7,11

**girls** 90:4

**give** 10:19 14:8
35:2 46:22
47:5,10,13,21
94:11,12 95:17
97:6 102:16

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 96 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2889
335

108:25 109:9
113:5,19 130:3
162:17 193:23
200:11 229:22
241:6 255:13
257:17 265:19
300:18 305:10,
12

**giving** 38:22
55:18 206:21
242:6 265:20
292:9

**Glenda** 107:18

**god** 13:2 290:2

**good** 11:2,3
31:16 32:3
37:10 49:8
64:22 68:13
69:15,18,21
70:20 98:19
115:17 172:8
209:24 230:10
232:23,25
253:20 262:17
285:17 308:17

**goodness**
91:14

**Google** 228:19

**grab** 209:9

**grabbed**
216:21,24
219:8

**grade** 43:10,11

**graduate**
43:16 44:5,7

**graduated**
43:11,12

**graduating**
43:20

**grand** 20:8,11,
12 296:6,9,13
297:7,14,21
299:4,11,13
300:21 301:1,7,
19 302:22
303:9 305:5,8

**great** 13:8
36:25 68:15

**greater** 217:1

**Green** 9:8,11,
17 43:22,23
98:1

**Greg** 79:14

**Gregory** 10:2
38:2,5,7,13,16,
19 42:9 82:3,5,
7 84:22 85:10
198:25 199:8
222:7 223:25
224:2,6,11,14,
20 232:13,19,
22 233:9
234:20 235:19,
23 236:17,25
237:10,13,23
239:5,8 242:4
243:18 244:9
249:8 264:17,
20,24 278:1
280:7,12

**Gregory's**
40:10,13

**groceries**
214:25

**ground** 138:18
209:10 216:22
219:9

**guess** 33:15
34:19,20 46:25
76:2 82:3 85:24
100:7 101:3
103:5 113:7
129:21 148:7
149:19 222:11
238:9 251:14
278:24 308:10

**guessing**
107:2

**guidance**
142:16

**Guiling** 33:22
34:7

**guilty** 252:11,
15,20

**guise** 60:17

**guys** 30:19
237:8

---

## H

**half** 22:4 56:17
112:7,9 158:23
304:2

**halfway**
227:22

**hand** 10:15
109:12 212:12
216:17 217:3
219:4 241:2
286:25

**handed** 241:3

**handheld**
103:25

**handle** 81:23
94:13 106:12,
17

**handled** 59:24
60:7,8 79:9
86:7

**handler** 237:21

**handling** 77:23
78:1 81:9

**hands** 144:18
270:2 286:10
289:13 295:20
298:17 299:15
301:4

**handwriting**
183:24 184:2
246:4

**handwritten**
19:12 114:18,
24 185:19
191:19,25
194:3,6,8
202:21,22
203:3,7,16,20
205:24 245:22
253:9 254:17
258:9

**Hang** 157:25
291:6

**happen** 29:5
116:19 180:10

**happened**

16:23 26:23
32:12 59:19
88:23,25 90:6
101:6 140:18
147:18 158:8
160:6,7,14,18
180:17,20
209:15 231:15
241:9 244:12
252:1 261:21
265:10 267:5
268:4,16 289:3
311:12,17

**happening**
27:17

**hard** 91:19

**hate** 225:20
301:17

**he'll** 156:6

**health** 15:8

**hear** 217:24
218:6,9,12,15,
19 219:1,11
314:9 316:18

**heard** 26:13
27:5 30:18 49:9
218:18 263:20
315:22

**hearing** 110:25

**hearings**
29:11,17

**heavy** 45:15

**held** 306:19

**hell** 303:25

**hesitated**
69:16

**Hey** 129:3

**hide** 205:15

**Higgins** 26:2,5,
9 27:3,19,23
30:5,9,13
128:12,17,20,
25 134:2 138:4,
21 139:1,5,9,
15,21 306:10,
14,25

**Higgins'** 27:11
305:21

**high** 43:9,12,
13,15,20 52:20
75:24 76:4

**higher** 43:19
44:15

**hired** 30:19
31:1 51:11
54:3,4,9 64:8
87:3 139:18

**history** 51:14

**hit** 11:20 12:12
242:25 243:7,
12,13,20

**hold** 55:16
56:12,18 75:18
235:5 285:11
291:6

**holding** 19:5

**Holy** 215:17

**home** 92:25
182:1,3 187:15,
23 188:2,7,9,22
189:8 201:14,
17 208:18
218:7,10
219:12,20,24
220:2,3 272:16
273:2 294:16
303:20

**hometown**
58:5,11

**homicide**
86:21 87:10,12
88:1,14,18,20
89:5 255:23
256:2

**homicides**
88:9

**honest** 46:14,
15 94:17
100:15 156:4
237:1 240:6
249:1 269:13

**honestly** 41:23

**hooked** 283:19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 97 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2890
336

hope 49:7

Hopkinsville 97:25

hoses 122:8

hospital 120:18,21 121:10 145:6 150:15 151:8, 14 152:8,11,12, 13,22 153:21 154:6,12,16 155:8 163:18 165:21 167:22 168:5 169:1,8 170:7,18 171:9, 21 172:15 195:17 221:11 226:18,21 227:3,14

hospitals 145:4

hour 136:13 254:7

hours 91:25 241:12 246:7 284:22

house 116:9 123:17 124:22 129:23 132:22 143:11 188:13 189:18,25 190:4 191:2,6, 10,13 205:1 206:18 207:3 213:9 215:1,7, 10,18 217:20 220:12 251:3 263:18,19 292:16

housed 270:15

human 176:13

hurry 175:20

—————————
I
—————————

idea 74:17 81:13 88:13 255:14

IDENTIFICATI ON 17:3 19:17 62:23 117:9 122:12 145:12 155:17,18 169:2 210:16 256:18 285:9, 10 291:5 296:22 299:21

identified 289:5

ignitable 289:5,21 318:11,19

ignited 292:16

immediately 109:9 206:18, 22 263:13

implying 82:19

importance 190:20 222:9 255:20

important 149:13,17,24 161:7 166:14 176:7,23 177:1 179:18,23 180:1,4 188:18 190:14 191:24 192:9 197:7,17 198:3 202:2,7, 12,18 207:14, 19 208:21 209:2 219:15 220:3,8,15,19 221:18 261:4 262:1 264:1 294:22 304:9

in-between 55:1 268:21

inaccurate 163:7,8,14,15 164:3,5 165:1 166:11

Inaudible 33:16 316:24

incident 16:23 75:24 76:4 90:1 155:9 308:23

include 38:9 46:10 89:11 117:22,25 118:3,8 149:23 205:6 209:3 234:6

included 168:18 182:15 196:7 197:5 205:17 286:1 287:4 289:9

includes 289:15

incorrect 42:22

incriminated 47:8,9 48:1

incriminating 251:15

independent 260:6 315:2

indicating 296:14

indication 171:18 183:7 247:11

indictment 20:9 84:6 295:21 296:10 297:8,12

individual 11:19,20 47:10, 25 78:23 80:21 81:17,18 84:4, 7,16,19 140:5, 8,13,16,22 142:17,18,25 153:7 167:4 208:7 290:20 311:20,24 312:14

individual's 80:20 81:2 309:13

individuals 24:4,23 39:15 53:7 74:6 126:5,23 164:16 196:17,

22 199:2 204:3 208:12 249:24 250:5 278:25

inform 130:7, 10,14 137:15 157:18 201:22 208:18 235:23 299:13

informal 95:2

informant 90:3

information 49:5,11 50:2 64:16 98:13 99:20,24 105:22 116:6 117:20,22 137:15 148:23 149:23 161:11 181:9 188:19 190:13,14,16, 18,20 191:24 193:23 194:2 196:14 197:5, 17 201:22 202:2,17 203:23 205:3,7, 20 206:22 208:21 209:2,5 220:3 223:20 228:3 230:14 232:5 250:2 261:12,24 262:2 266:12 279:25 283:25 290:3,12,22 292:9,19 300:19 303:25 304:12 311:5

informed 201:16 202:1 204:24 205:15 206:12,17 246:23 282:2, 19,22

initial 54:22 110:14,22 136:6 162:3 166:23 196:16, 22 278:10,14

initially 128:17 198:7

initiated 284:7, 21,25 287:14 295:24

injured 163:24

injuries 154:5

inmates 211:17

insensitive 230:12

inside 135:12 137:15 190:3 215:1

instance 114:23 149:5 200:8 219:18, 23 220:1

instances 76:9

Institute 98:17

instructing 47:20

intentional 84:11,14 136:19 137:12 236:2 246:23 249:9 264:12, 18 265:5

intentionally 77:10 134:12 136:15 137:5 292:15 293:13

interact 313:14

interacting 199:12

interaction 138:13

interactions 139:11 313:18

interest 300:8

interested 40:14

interject 24:12

interrogated 76:17 77:3 272:11 279:2

interrogation

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 98 of 115 PageID
#: 2891
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

337

47:15 48:17
49:19,21 75:24
76:19 259:3
267:13

**interrogations**
77:6

**interrogatorie
s** 18:17 160:8
162:4,5,12
301:23

**interrogatory**
18:23 163:6,8,
21 164:2,4,14
168:15

**interview**
49:19 71:7,16,
17 96:3 102:21
104:2,12
174:11 186:7,
10 191:20
192:4 193:4
196:19 203:4,7,
8,9,10 206:3
208:3 228:13
245:7,10 246:6,
21 247:4,13,17,
23 248:1,4,9,18
249:9,12,13,20
253:16 254:8,
11,21 255:4
256:7,12 257:5,
14 258:1,12
259:19 261:11,
13,15,18
266:14 267:1
268:20,24
269:21 271:10,
19 274:8,23
283:11 309:8
311:3,4 313:5
314:4

**interviewed**
76:19,21,23
77:3 183:8
199:24 200:1
222:17 267:19
268:19 276:7
281:20 284:1
310:10 321:3

**interviewer**
70:15,18,19,20,
24 71:6 186:24

**interviewing**
46:4 47:14
48:18 49:22
71:3,4,10,18
75:23 98:21
99:4,13 103:6
104:3 184:6
186:11,13
264:17 265:3,7
266:22 274:20
275:4,16

**interviews**
45:22 70:21,22
71:6 76:1 95:7
99:21,25
102:21,25
175:11,14
200:6,7 204:3,
9,17 269:3,8,14
270:8 271:20
309:7

**intoxicated**
134:6,9 154:21

**intoxication**
223:2

**investigate**
57:3 61:11
82:24 83:15
95:4

**investigated**
315:3

**investigating**
56:13 57:18
61:3,6 220:13
306:7 307:10

**investigation**
35:13,14 37:12
80:12 81:23
83:7 84:3,10
94:13 109:16,
18 110:15,23
111:16,24
112:4 115:5,9
182:8 185:7
198:14 199:13
219:16 234:5
244:20 245:5
252:23 256:2
262:7,9 274:25
275:7 276:21
278:4,10,14,23
279:9,12,22

280:1,2 303:7
306:5 307:11
319:24

**investigations**
48:16 54:18,24
55:4 62:6 81:8
86:2,19,22
88:1,14,18,20
94:2 95:25
100:23 255:24

**investigative**
16:3,11 95:18
115:11 122:15
185:2

**investigator**
55:5,9,12 56:24
57:1,17 65:13
73:3 77:16 82:1
85:6,10 88:21
93:1 102:7,9,12
108:10,18
109:19 110:2,
18,19 111:19,
25 268:7
292:14 293:11
316:2

**investigators**
246:22 247:6
264:7,8 265:4
266:13 284:5

**invited** 201:17,
23 202:4,6,8
218:9 220:1

**involve** 78:2
135:2 141:3

**involved**
11:16,17,18,21
33:17 34:13,18
35:2 79:11
80:25 83:19
85:21 86:2,14,
18 116:23
117:4,6 141:4
265:14

**involving**
55:22 86:14
163:23 241:10
319:17

**issue** 319:25

**issued** 294:2

**issues** 260:11
282:6 283:16

___

**J**

**jack** 52:10

**Jackie** 144:4,
15,17

**Jackie's**
144:17

**jail** 41:7,8 134:3
161:4 222:19,
24 223:6 228:5,
7,10,12 247:22
248:5 272:24
286:14,20
305:22 306:18
319:16,17
320:12,22

**jailer** 39:2,4
158:1 319:14,
20,23

**jails** 320:11

**Jaman** 35:6
315:21

**January** 51:2
57:13,21,25

**Jeff** 9:16 22:8
66:17 156:22
159:19 160:19
162:15 163:10
193:18 301:22
303:12 304:7

**Jenkins** 9:23
38:24 39:1,4,11
319:15,20,23

**Jennifer** 9:19
107:19,20
159:21 162:22

**Jim** 31:16
77:19 95:10

**Jo** 58:15

**job** 13:8 29:4
90:25 98:19
211:12,16
308:17

**jobs** 29:9
90:15,18,24

**John** 26:1

**joined** 96:6

**joint** 60:11

**jointly** 95:5,7
96:3 186:23

**judge** 14:16
26:23,25 27:18,
20,24 28:2,3,8,
12,17,21 29:19
30:6 68:7,10,
11,14,17,23,25
69:3,7,11
212:23 213:2,4
217:8 271:7

**jump** 249:3
268:21 308:18

**jumped** 43:5
246:8

**juror** 300:11

**jurors** 299:13
300:21 301:1,7

**jury** 20:8,11,12
269:6 296:6,9,
13 297:7,14,21
299:4,11
301:19 302:19,
22 303:9 305:5,
8 317:9

**justice** 49:23
97:12 98:6,8

**juvenile** 55:7,
8,10,12 56:22
78:23 79:3
80:5,7,14,19,23
81:3,6 85:18
86:15

**juveniles** 55:7,
17 72:5

___

**K**

**K9** 234:6,10
237:21

**Kay** 133:3
189:21 272:25
273:8,11
275:25 276:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kay's 272:16

keepers 109:2

keeping 108:11

Kelly 9:3

Ken 9:18 22:10 24:13 129:3 160:15 163:2

Kenneth 9:9 10:14 73:5 75:11 132:3 146:9

Kentuckiana 9:4

Kentucky 9:8, 11 10:11 43:15 58:12 97:25 98:15 212:1 277:1 315:24

Kerr 65:7,8,11, 14,19,23 66:4 69:14,22,24 70:7,11

khaki 287:4 289:10

kick 190:10

kidding 281:8

kids 52:5,7 53:4 70:21 71:14 90:18 132:24 187:22 188:2 189:8 213:17 214:17 215:16,25 216:3,12 235:15 283:4 304:25 305:2

kind 56:23 60:10 87:23 94:5 98:3 102:9,15 105:16 108:4 113:11 118:11 131:4,5 148:7 186:20 211:12, 15 236:5 241:5 254:18 255:1 279:12 300:16 311:15 312:5,6

kitchen 235:14

knew 35:3 36:3 41:15 94:9 127:23 147:16 149:9 186:18 213:22 251:1 252:9 259:17 282:22

knocked 216:6,22

knowing 266:2 278:25

knowledge 171:18 261:5 311:11,16 318:16

KSP 10:9 35:23,24 36:3 199:6 278:3,7 292:13 309:21

KSP392 285:19

———————

L

———————

L-O-G 229:5,25

lab 20:4 288:25 290:3 292:18, 25 293:15 294:2,10,17 295:5 296:14 299:5 300:22 316:14,21,24

lack 179:10 295:22 299:7

lady 11:18 147:2,12

Langen 9:19 159:22 160:2,6 163:1

language 71:19 293:10

lasted 56:15 111:16,23,24 112:5,21 142:9, 10 268:24

late 76:2 90:13, 14,21 91:17

law 11:22 29:1 50:22 53:14,23 54:14 89:9,14, 15 117:22 118:3,8 128:8 138:14,17 182:21 183:7 184:22 198:6 199:15 245:9 248:12 255:15

lawsuit 23:18 25:21 26:9,11, 20 32:10

lawsuits 163:22

lawyer 11:13

lead 88:21 108:10,18 109:25 186:24 200:5,9

leader 75:23

leading 71:12, 20,21,24 72:1 217:7

learn 29:19 45:8,10 46:7 143:19,23 144:23 153:18 230:15 294:7 305:25 306:2

learned 27:22 45:25 47:6 99:20,24 103:7 132:11 148:23 149:24 196:22 203:21 295:18 296:14 298:12

leash 242:16, 17

leather 286:2

leave 64:18 143:24 188:13 189:25 201:17 202:9 239:2 284:4

leaving 59:20 66:7 120:20 151:14 172:14 207:3 218:7

221:11 227:1,3, 8 264:4,6 304:25 305:2 315:10

led 85:4

Lee 10:14 146:9

left 59:7 62:2, 10,12,13 64:20, 25 121:9 152:7 188:6,10 190:6 212:20 251:2 263:18 286:2

legal 46:8,10

Len 56:7,9 75:15 102:13

length 204:9

letter 27:24,25 28:2,5,8,21 160:23

level 71:12,15

liar 180:13

life 154:5,8 265:14

light 11:20

lighter 207:4, 10,13,14,18 208:8 209:16 215:24 217:4,6, 13,18

lighters 208:15

lines 146:19

liquid 236:4,6 318:11,19

liquids 287:9 289:5,21

list 39:14 63:3 289:5

listed 68:5,8

listen 290:9,10 315:12

listening 251:22

lists 64:1

lit 260:11,15 283:22

literally 301:18

litigation 23:8 33:20 34:14 35:19 36:10 37:15 38:13,16 39:5,8,18,23 69:5,11 70:11

live 211:2 212:1,4,20

lived 148:8 212:18 213:12

living 216:9 234:25 235:13

LMH 120:12,17 226:7,16

local 200:6,7,8

locate 172:24

located 91:8,9

location 133:1 164:18 185:19

lodged 89:21 228:10

log 229:5,23

Logan 9:22 23:10 33:14 60:14 120:18 134:3 152:8 153:20 158:3 226:17,18 228:12 297:7 305:22 313:11 319:14 320:12, 13

Lois 211:5

long 11:11 12:16 13:1,4 25:18,19 26:14 27:7 39:14 45:1 52:13,16 54:10 55:12 56:12 57:3 58:18 61:11,13,15 66:4 74:9 81:12 91:13 112:5 130:23,25 139:15,16,17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 100 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2893

339

142:7,10
180:17 208:18,
24 211:9
217:10,17,19
219:18 220:12
242:16 268:23
270:1 271:17
308:16 309:15
312:25

**longer** 112:21

**looked** 19:10,
18 20:15 40:8
44:17 120:11
191:1 206:10
216:1 239:12
297:17

**Lopez** 9:3

**lose** 305:16

**lost** 305:17

**lot** 45:25 46:25
48:17 73:25
93:2 103:6
105:17 121:24
173:14 243:16
250:10,16
259:23 279:18
282:6 303:19
311:5 316:14

**lots** 47:14

**loud** 146:24
147:1

**Louis** 98:1

**Louisville**
97:24

**loved** 283:3

**lunch** 52:6,8
68:21

**lunches** 52:9

**Lynn** 9:24
153:13 154:4,
12 168:2 188:7
214:2 216:14
284:16 314:16,
22

---

**M**

---

**made** 73:18

97:4 141:9,12,
13,21 178:21
188:15 193:1
224:11 225:4,8
231:8 265:23
266:12 270:19,
20 278:19
287:13 288:4,7,
10 298:21
306:5,9 313:4,5

**maiden** 12:21,
23

**main** 51:24
149:6 205:8

**major** 56:22,23
57:3,18,19
61:3,12 62:5
77:23 78:1,2

**majority** 72:7
117:24 186:10,
13

**make** 13:14,23
15:17 25:4,5
45:13,14 46:1
49:10 62:18
97:5,6 138:5
150:8 162:10,
22 176:6
182:17 202:23,
24 211:19
225:1 229:13
241:5 255:3
265:9,10,18
276:13,14
277:7 291:16
301:6 303:15
304:11 309:18
310:1 314:4

**makes** 51:12

**making** 225:16
262:6 265:20

**male** 80:1,2
83:23 84:1,2
144:2,17,23

**Malles** 10:4
307:19 308:9
314:12

**man** 234:16
244:13 312:9

**Mando** 9:16
14:3 15:22
18:12 22:10,14,
17 24:12,17,19,
22 25:2,4,6
74:23,25
124:17 125:17
129:3,8 136:21
138:24 152:16
156:1,6,13,20,
23 157:25
158:3,6,10,18
159:21,23
160:5,7,18,25
161:15 162:14,
16,22 163:2,15
179:10,17
183:2 193:8,13,
17 195:7
200:15 207:6
227:11 261:8,
10 269:18,20
290:9,14,16
293:20,22,24
294:11 295:11,
13,22 296:24
299:1,7,17
301:15,24
302:5 303:14,
17,22 304:8,10,
13 307:18,21,
23,25 308:2
314:10,15
315:10 317:24
319:2 321:8,11,
14

**Mando's** 14:12

**March** 22:3

**mark** 74:22

**marked** 17:1,3
19:15,17 62:19,
23 72:13 117:7,
9 122:11,12
131:13 145:11,
12 155:15,17,
18 168:23
169:2,13
183:14 210:14,
16 256:16,18
285:7,9,10
291:4,5 296:22
299:19,21

**married** 312:2,

3

**marshal** 17:22
222:11 223:17
234:13 278:3
292:14 293:11
300:12,15

**marshal's**
82:20 83:10
86:7 199:8

**marshals**
17:23 86:4

**Maskin** 172:25
174:17,20,23
175:2 195:3,14,
22,24 196:3,7
197:2,16,20,24
198:3,7 199:24
200:9,25
201:13,16
202:22 203:22
204:20,24
205:14 206:3,6,
10,21 207:2,6,
8,9 208:17
209:8,15
210:25 211:1,3,
5,8,11,14,17,
22,24 212:2,5,
8,12,15,17,21,
25 213:3,8,10,
13,16,20,24
214:2,6,10,13,
16,21,24 215:4
217:4,9,12,16,
21 218:4,6,19
219:11 220:8,
24 221:10
250:8 263:14,
16 269:15

**Maskin's**
203:3 263:13

**material** 48:20

**matter** 9:9
252:7 259:14

**Maureen** 10:4
307:22,23
308:12 314:15,
20 320:24

**maximum**
142:21

3

**Mcdonald** 40:8

**meaning** 76:9
318:19

**means** 119:10
120:3,14
226:12 227:1
228:2,17,18
278:16 318:2,7,
20,21,23

**meant** 193:13
228:23

**mechanic**
44:2,12,14

**mechanics**
44:11

**medications**
15:11

**meet** 94:21

**meeting** 247:5
277:4,21

**meetings**
95:14,22

**members**
50:21 158:3
237:5

**Memorial**
120:18 152:8
153:20 226:17,
18

**memory** 15:12
88:16 106:14
133:23 144:9
241:9 246:13
280:23 311:7,
12 313:17

**mention**
151:20

**mentioned**
168:17

**met** 35:12
125:18 276:25

**metal** 286:1,9
287:4

**Metals** 91:7,8,
13 92:4,15

**middle** 135:5



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

227:7 228:3

**midnight** 91:18 92:8,9

**midnight's** 91:19

**midnights** 90:14

**military** 50:16, 19

**Mill's** 41:11 137:7

**mills** 24:10 25:9,10,14,17, 21,23,25 121:19 125:13, 18 126:3,13,20 127:7,9,14 128:19 129:16, 18,19 130:19 131:2,11 132:12,18 134:2,5,18,20, 22 136:14,23 137:11,14,19 143:4 151:16 166:24 192:25 199:16 222:6, 10 248:23 249:2 286:13, 17,24

**Mills'** 41:10,12 251:20

**mind** 61:17 243:12 301:18

**mine** 46:23 48:15,16 123:8 239:9,12 302:6

**minor** 275:3,16

**minor's** 275:15

**minute** 51:16 57:14 132:7 151:6 157:25 171:13 172:11 183:4 187:4 224:19 261:16

**minutes** 121:1 131:9,10 134:15 136:5, 10,12 154:15

209:22 217:21 219:12 258:14 263:19

**Miranda** 19:19 46:17,22 47:6, 13,17,21,25 76:1 225:11,13 248:7,13,20 251:8,12 252:6, 10,12,25 253:5 256:23 257:2, 17,24 258:6,13 261:20

**misdemeanor** 55:19,22 56:13 57:17

**misdemeanors** 56:1,3

**missed** 205:11,12 276:14 300:9

**missing** 202:23

**misspoke** 297:1

**mistake** 160:13 231:8

**mistaken** 309:20 310:4

**misunderstood** 274:16

**misworded** 275:8

**mixed** 41:14

**Mobile** 98:15

**moment** 34:20 35:4 54:8 69:16 129:20 132:9 180:5,6 263:12

**month** 44:21 101:7,9 211:11 257:18 282:6 297:21

**months** 51:7 58:20,22 61:14 101:7,11 111:17,18 139:19

**Morgan** 91:10 212:5

**morgue** 153:3, 8 167:25 172:22

**morning** 11:2, 3 92:10 223:11 227:16 233:8, 18,24 234:21 246:21 247:5 272:12 273:9, 14 321:3

**mother** 130:15 132:19 134:8 145:8 148:8 149:10 274:23 310:20,23,24 312:3

**motorcycles** 58:6

**move** 172:10 176:2

**moved** 26:6 54:24 55:3,17 56:2 61:12 65:14,19 87:7,8 102:3 259:12

**moving** 70:7 102:4

**multiple** 74:18 76:7 238:11

**murder** 262:12,13 263:23,24 284:7,8,12,15 287:15 290:5, 13,23,24 291:16,18 293:5 295:25 296:2 298:22

**muted** 172:2

───────────

**N**

───────────

**name's** 319:13

**named** 12:1 15:1,3 23:23 42:8 52:21 73:5 88:21 108:18

109:25 213:17 311:20,24 312:14

**names** 164:19 213:19 214:1,3 249:24 320:11

**narrative** 118:11 135:6

**Nashville** 211:8

**necessarily** 21:7 175:19 262:14

**need-to-know** 94:5

**needed** 94:3 100:13 152:19 223:25 224:15 229:21 275:3 276:24

**needing** 14:6

**neighbors** 212:14

**Neil** 65:7

**news** 29:25 230:13 232:3,8 297:24

**next-door** 212:14

**NIBRS** 113:15, 25 114:1,7,17 185:17

**nice** 312:9

**Nicholas** 188:22,25 189:7,12 273:1, 13,24 274:20 275:19 281:25

**night** 92:5 117:1 155:9 168:8 173:1 174:5,17,24 175:3 195:3 198:16,19,20, 22 199:1,12,24 202:14 221:14 222:24 247:20

**Noble** 311:20, 24,25 312:2

**nobody's** 265:14

**non-** 126:9 164:4

**non-military** 119:14

**nonresponsive** 158:11,19 160:23 163:7 164:5 166:4

**north** 51:24 58:10,13,19 124:11 212:5

**nose** 141:11,16

**notary** 159:6, 11

**notation** 176:6

**note** 36:15 105:24 139:14 151:7,12 162:22 167:11 204:13,17 221:25 222:5, 15 246:2 286:19

**notebook** 105:8 106:12

**noted** 70:14 76:3 150:4 152:7 165:23 167:19 191:4, 15 192:14 293:24

**notes** 19:9,13 105:5,8,11,13, 15,16,19 106:10,13,17, 23 114:18,22, 24 148:13,17, 20 149:16,22 183:16 184:1,2, 4,6,10,25 185:1,6,11,19, 24 191:19,25 192:15 194:3,6, 8 202:21,22 203:3,7,16,20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 102 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2895

341

205:24 245:22
246:6 253:9,15
254:17 258:10
289:4

**noth-** 270:24

**notice** 122:1
321:4

**noticed** 127:10
188:4 208:19
219:20 259:11

**noting** 222:9
256:6,11

**November**
44:20,21,23
73:11,13,14
74:14 234:18

**number** 72:13
117:8 118:25
119:24 120:11
122:11 123:22
124:3,6,10
130:3 131:14
135:3 142:21
145:11 150:10
153:24 155:20
158:7 163:6
164:3,4 166:3
183:15 187:7
195:7 207:5
210:14 225:23
226:7 256:17
299:20 302:9,
15

**numbers**
123:1

**nurse** 211:14

**nurses** 211:24

**nursing** 211:17

———————

**O**

———————

**oath** 157:10
165:15

**object** 14:12
22:10 290:1,7,9
294:19 298:25

**objection**
14:14 136:21
179:10,17

217:7 261:8
269:18 290:14
293:20,21
294:11 295:11,
22 299:1,7,17
301:12 310:22

**objections**
18:23 138:24
160:10

**obligation**
48:20 50:1,6,12

**obligations**
46:8,10

**observe**
121:14 127:22
128:17 138:13,
17,21 139:8
280:12,14

**observed**
137:20 138:10
143:5,6 289:16

**observing**
11:19 127:14

**obtain** 274:2,
22 275:3,15

**obtained** 74:15
76:8,10 164:15

**obtaining**
44:14 73:24
74:5 75:25 76:4
77:7

**OC** 141:1

**occasion**
76:22 150:23
313:13

**occasions**
38:7 97:3
116:14,15
148:25 149:2

**occur** 62:14
118:13

**occurred** 23:8
81:13 88:9
116:22 204:4
214:19 306:14,
19,24 307:7
319:16

**occurrence**
88:17

**October** 63:23
66:23 297:15

**offender** 76:10
80:15,22 81:21
83:19 85:1,18,
19 86:15

**offenders**
75:25 86:10

**offenses** 56:13
72:11

**offer** 59:10

**office** 60:8
65:4,9 66:8,20
82:20 83:7,10
86:7 89:12
94:24 104:12
199:9 239:7
291:22 304:2
321:14

**officer** 11:22
12:7,8 45:6
46:8,15 51:20
55:7 67:24
101:4,13 118:6,
9 121:19
125:13 126:3,
20 127:7,9
128:12,19
129:16,18,19
131:11 134:2
138:4,21 139:1,
5,8,15 182:21
191:1 198:6
204:25 205:17
209:9 216:15,
21 218:16
219:8 245:9
248:12,16,23
251:20 255:15
262:22 263:7
277:22 286:17
287:7 312:19

**officer's** 50:12

**officers**
100:18,20
107:21 117:23
128:9 138:14,
18 277:1

**official** 183:8
184:22

**officials** 122:4
199:15

**Ohio** 9:21

**older** 75:9
214:3 234:15

**oldest** 133:1
214:16

**one's** 291:17

**Oops** 295:6

**operations**
82:13

**opinion** 235:23
236:1

**opportunity**
22:21

**opposed** 129:8

**OPPOSING**
217:7

**Orange** 33:24
34:2 146:7
147:7

**order** 173:15

**Organized**
98:12

**origin** 235:22
236:19 237:11

**original** 16:5,
16,19,21,23
17:21 18:16
21:3,4,6 254:11
267:5 269:1,2
295:10,16

**originally**
34:4,24 153:12

**out-of-towner**
83:24

**outcome** 271:6

**overlook**
176:13

**overlooked**
203:24

**Overruled**

217:8

**oversight**
162:17

**overturned**
76:9,12

**owner** 58:13

———————

**P**

———————

**p.m.** 119:14
161:25 321:17

**pad** 233:1

**Paducah**
97:25

**pages** 113:4
123:2 300:8

**paint** 286:1,9

**pair** 287:4

**paper** 96:12
271:25 312:22

**paragraph**
40:22 132:8
172:20 235:10

**paragraphs**
167:14

**parallel** 279:12

**parameters**
317:15 318:18

**parent** 275:15

**part** 11:22 27:8
28:25 29:2,8
33:25 34:20
126:12 135:5
140:9 168:18
187:1 207:12
237:3 239:6
262:5 267:8
278:16

**participate**
245:10

**participated**
248:18 268:19
280:6

**particularity**
164:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 103 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2696

342

pass 266:12

passageway 141:22

passed 152:23 229:11,17,24 230:2,22 231:13 232:5,9

past 38:8 212:6

pasting 160:10

patience 307:17 308:16

patrol 101:2

patrolman 54:4,10,11,19 101:6,17,21 102:7

patrolmen 100:22

pattern 66:11

pay 210:18

Pendergraff 31:17,18,19,22 32:13,16 77:19, 20 93:17 95:10, 13,17,23 96:1

pending 9:10 14:9

people 82:17 104:23 115:15 121:17 126:25 127:20 174:18 183:1 197:21, 24 199:19 250:2 284:5

pepper 139:9 140:11,25 141:8 142:2,7, 25 143:1

percent 14:14

perform 94:12 95:18

performance 72:25

performed 317:11,16

period 46:2 73:10,13 75:12 227:14

periods 311:6, 13,18

perishing 284:13

permission 274:2,7,22 275:3,15

permitted 14:15

permitting 149:18,22

person 11:14 127:11 220:6 228:10 230:12 232:23,25 263:3 309:18

person's 144:14

personal 15:7 49:21 68:17 79:18 89:25 181:24 197:14

personally 35:8 86:8 106:13 121:14 128:17 137:19 138:10,13,17, 21 139:5,8 140:11 141:13 142:8

personnel 121:17

pertain 184:13

pertaining 148:24 149:1,3 167:14 181:23

pertains 184:10

pertinent 49:5, 11,14 191:24

phone 27:13 216:16 224:11

phonetic 66:18 93:16 212:7

222:21

photographs 152:15 153:3 276:17,18

photos 152:17

physical 141:7

physically 108:4,23 113:18,19 139:2 140:5,8 143:13 154:11

pick 189:16 228:12 247:22

picked 222:23 223:6

picking 228:4, 9

picture 123:22 124:3,6

pictures 123:4, 6,7,14 124:13 153:7 167:24 172:21 216:6 244:21,22 276:17,24 277:15,16

piece 197:18

pieces 197:18

PJ 238:6,7

place 26:7 50:5,11 96:8,18 98:9 99:12 100:11,19 128:12 217:11, 17 275:1,13 301:22

places 98:2 99:7 161:16 235:2 243:14, 20 294:16 295:3

placing 280:13

plain 45:14

plaintiff 9:15

plaintiff's 9:13 18:23 19:15

62:19 117:8 122:11 131:14 135:3 145:11 155:15 168:23 169:12 183:14 210:14 256:16 285:8,18 287:19 291:4 296:21 299:19

plant 212:7

play 52:5,7 210:13

played 271:1

playing 315:13

PLAYS 210:23

point 26:17 27:3 51:6 57:7 88:6 109:11,13 110:14,25 111:6,12,15 112:11,12,16, 17 115:17 122:18 124:17 128:21,23 130:5 152:19 156:19 178:6 180:7,14 188:21 189:21 193:4 194:5 219:5 220:23 233:16,17,24 234:15,17 235:22 236:18, 20,21 237:7 241:22 243:18 248:22 249:4,7 251:1,25 258:20 259:3 260:25 264:8 266:20 271:12 275:18,25 276:12 277:5,6 283:11 292:21 298:7

pointing 240:4 253:21

points 237:10

police 21:11,16 28:15 44:16,18, 24 45:1,6,25 46:8,15 47:16,

19 49:25 50:4, 10,11 51:5,17 53:11,17 54:2, 5,11 55:13 57:4,8 58:23 59:6,24 62:9,10 63:19,20 64:11, 19,25 66:9,13, 22 67:5,24 72:25 87:3 89:21 90:12 92:5,9 93:5,10 96:7,17 97:9, 16,18 98:17,21 99:1,5,9,16,25 100:19 101:12 102:24 104:12 106:16,22 108:12 121:17 139:23 140:25 142:12 181:17 190:1,23 193:1 204:12,16,25 205:16 209:9 216:15,21 218:16 222:20 223:7,10 224:21 228:20 229:1 237:6 246:19 253:1 256:8,13 262:22 275:2, 14 276:23 277:1 312:19 313:3,8 314:6 315:17,24 316:21

policemen 216:1

polices 216:4

policies 28:16 50:5,11 96:8, 17,23 97:1 204:11,15 252:25 256:8, 13

policy 47:20 99:12 106:17, 23 107:2 275:1, 6,13

pop 94:24

porch 213:6 216:18


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**port** 305:22
306:15,19,24
307:8

**Porter** 312:15,
16,17 313:2,18

**portions** 40:13

**position** 51:19
54:2,10 55:16
56:12,18,24
60:11

**positions**
102:5

**possession**
20:25 21:7
109:18 110:22
111:19,25
113:1 181:17,
25 207:18
208:8 242:12
272:9 307:8

**possibility**
130:11 132:21
318:11,24

**possibly**
112:18 115:1
137:12 167:7
174:13 194:6
255:5 259:22
260:3

**post** 11:6

**post-** 23:7

**post-
conviction**
29:11,16 33:20
34:7,14 35:19
36:10 37:15
38:13 39:4,18
41:1 69:4 303:7

**potential**
79:11,19 81:24
86:10 151:21
190:20 236:8
255:23 259:4
260:7 261:5
262:2 264:2,25
265:24 283:12,
21

**poured** 235:13

**practice** 79:10,
18 82:24
102:23 105:1
106:3 107:12
109:9 148:16,
22 149:15,23
167:10 186:6
196:16,21
254:12,16

**pre-suit** 164:1

**preface** 318:14

**prefer** 239:9

**preparation**
21:14 271:2,3

**prepare** 15:23

**preparing**
271:4

**presence**
24:20 238:16,
20

**present** 164:20
170:2 182:21
186:4,7 198:6
223:9 232:4,7
233:8 236:16
243:12 316:7

**presented**
257:25 297:14

**presiding**
28:17

**pressed**
239:10

**pretty** 26:15,16
27:8 33:17
42:11 46:13
52:2,4 55:25
72:5 94:7 96:14
121:13,20
144:22 149:12
208:17 223:12
249:16 272:5

**previous** 40:4
100:16 308:22

**previously**
98:25 231:20
308:25

**print** 107:14

**prior** 16:13
80:9 81:13
88:14,22 98:20
99:25 103:1
109:17 115:4
122:15 123:21
145:20 150:15
151:14 163:22
164:1 231:17
234:1 264:16
271:9 273:24
274:20 282:6
288:1 296:13
297:21

**Prison** 211:5

**prisoner**
313:16

**privileged**
22:11 24:17

**Prob-** 188:17

**problem** 172:7
268:12

**problems**
264:2

**procedures**
96:8,18 253:1

**proceed** 10:24

**proceeding**
303:7

**proceedings**
9:1 34:7 302:22
317:9

**process** 27:8
28:25 29:3
103:15 113:13
313:6 314:4

**produced**
182:10 184:25
288:12 298:1,9

**Profab** 91:6,8,
13 92:4,10,15

**program** 44:5
45:1,5,19 46:3,
7 100:10,19

**promise** 255:7

**proper** 14:19
28:17 45:13

47:13,20
140:25

**properly**
99:13,18

**propounded**
162:4,6 164:10
302:11

**prosecuting**
72:11

**prosecutor**
34:2,8 65:14
69:24 179:8,16
220:20

**protect** 46:13

**provide** 47:16
49:25 156:14,
18

**provided** 21:1,
2 96:7,23 116:6
160:21 290:4,
12,22

**pull** 181:20

**pulled** 54:17

**purport** 146:1
246:6

**purported**
182:10

**purpose** 42:7
237:16 249:11,
13 251:19,20
254:18 255:1
265:7 276:11

**purposely**
127:8

**pursue** 43:19
44:15 53:6

**push** 239:18

**pushed** 220:2

**put** 49:1 64:16
97:7 101:3
105:17 106:15
107:15 108:8
111:3 112:22,
23 113:7 122:8
136:22 137:2
148:23 149:19
154:2 177:13

185:22 191:25
192:18 194:13
222:24 229:7
239:20,21
241:23 262:21
269:23 293:1

**putting** 192:9
290:25 304:25

_____

**Q**

_____

**question**
13:18,19,24
14:16,20 23:16
32:2 50:8,9
134:25 156:5
157:15,25
158:12,19
159:24 160:1
164:6 166:4
172:5 174:3
175:8 176:20
183:2 193:9
197:25 202:14
205:13,14
224:24 225:22
226:2 229:6
250:1 251:15,
17 252:3
253:22 255:7
264:7 268:16
275:8 277:20
282:20 283:15,
18,21 290:10
292:25 295:14
302:9,11
318:13 320:24
321:2

**questioned**
258:20

**questioning**
24:13 210:24
211:1,4,6,9,12,
15,20,23,25
212:3,10,13,16,
18,22 213:5,9,
11,14,18,22,25
214:4,7,11,14,
18,22 215:2
216:25 217:5,
10,14,19 248:8,
14,21 258:17
260:6 267:21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 105 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2698

344

316:20

**questions**
13:9 14:9,12,22
22:12 71:13,21,
24 132:10
155:5 156:9
157:3,8 159:18
161:8 166:21
194:25 195:19
198:10 210:19
220:11,12
243:17 249:22
251:23 260:17
261:7 268:9
282:16,23
284:3 307:15,
20 308:11,15
314:19 315:5,9,
22 316:19
319:1,3,6
320:3,6,19
321:7

**quick** 61:17
132:16 209:20
255:6 307:20
320:6

**quicker** 288:25

**quickly** 149:12
150:8 168:22
170:12 183:13
191:18 289:4

---

**R**

---

**railroad** 212:9

**raise** 10:15

**ran** 11:20
138:18 209:8,
16 216:15
218:17 251:12
262:25 314:7

**range** 67:2

**rank** 73:8

**re-** 30:21

**reached** 127:8

**reaction** 29:24
141:7,8

**read** 19:18
41:10,12 43:2

46:24 47:2,25
132:9,14
146:22 147:1
167:13 187:5,
11 193:8
225:11,13
248:7,12,20
251:8 252:6,8,
10,12,24 253:4
258:7 261:19
267:19,21
268:4 300:4

**reading** 41:7

**ready** 57:24
92:12 200:21
239:14,24
300:3

**real** 36:18 41:5
123:1 168:22
170:12 191:18
227:16 232:25
239:6

**realize** 262:6

**realized**
320:23

**reapplied**
314:5

**rear** 124:10

**reason** 63:24
64:15 69:17
75:17 79:15
128:19 160:21
166:13 176:11
186:2,5 192:18
203:6 205:6
244:14 257:10
261:19 273:19
294:14,22
316:18

**reasoning**
57:23 66:7

**reasons** 127:2

**recall** 12:9
20:22 21:22
22:5 23:6,18
29:22 30:11
41:7,23 42:14,
18,21 50:7
65:20 76:25
80:6,8 81:8,18

84:18,25 85:2,3
86:13 88:24
90:3,4 93:10
95:20 100:15
106:25 126:9
130:25 137:17,
18 138:6,11
142:20 143:5,6
153:13 154:9,
11,15,21 156:3,
9 157:1,2
158:10 159:3,9
166:22 167:3
168:4,19,24
169:5 173:3,6
188:14,24
198:5,13
199:11 201:25
204:18 206:21
208:20 209:12,
15 212:10,11
213:11 214:3,
20 217:5
221:15,16
224:17 226:21
230:8 231:10,
23,24,25 232:4,
7,11 233:12,13
234:10,14
238:14,18,23
242:17 271:8,
19,21 272:4
276:2 283:24
294:4 303:5
304:20 305:8
306:21 307:1
309:5,11 310:7,
8,13,15,19
311:5,17
312:13 313:2,7
317:6 318:14
319:22

**recalled**
165:20 303:24
309:9

**receive** 45:21
47:12 48:3,6
97:15 99:23
140:24 162:11
280:18

**received** 28:11
32:14,25 48:10
97:8,12 98:24
99:3,16 115:4,8

116:7 118:14
135:15 136:6
142:11,12
185:11 253:6
297:18,24
298:4,5,6

**receiving**
29:25

**recently**
122:19

**recognize** 63:6
117:14 123:9
126:4 131:16
173:18 183:22
200:22 218:2
245:24 256:20
291:10 297:4

**recognized**
128:9

**recollection**
128:24 130:19
132:11 147:20
153:4 159:23
164:2 178:18
184:19 189:4
232:2 235:17
242:24 243:3,6
260:6 270:25
273:6 304:4
312:21 315:2

**record** 9:2,13
10:7,13 61:19,
21,22 67:14
80:20 81:1
105:2 109:1
115:19,21,23
129:4 161:20,
21,23,24
162:11 163:10
169:13 183:19
209:25 210:1,3,
4 239:19
242:14 280:8,
15 281:9,11,13,
16 301:7 308:3,
5,7 321:16

**record's** 13:14
196:1

**recorded**
238:23

**recorder** 9:4

**recording**
244:1 269:16
270:13,23
281:18

**recordings**
270:8,14 271:1,
2

**records** 109:1

**red** 141:10
154:21 212:6,7

**REDIRECT**
320:4

**refer** 315:21

**reference** 68:8
187:9 284:12,
16,18

**referenced**
118:25 120:12

**references**
68:4

**referred** 78:1
179:19

**referring** 17:23
18:12 19:1 23:7
29:3 32:5,6,7
33:19 62:20
67:11 150:25
163:11 170:5
171:2 174:23
175:2 198:22
199:3 236:23
271:18

**refresh** 106:13
147:20 153:4
184:19 189:3
235:17 273:6

**refreshes**
132:10

**refreshing**
178:18

**refusing**
140:20

**refute** 158:13
273:19 290:11
292:20 293:15

**refuted** 193:11
290:3,22 293:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

refutes 292:19
295:10

regain 311:12

regard 26:20
45:10 136:23
143:6 199:13
207:17 226:6
238:5,7 304:16

regional 98:12
144:5 228:12
305:22 320:12

regular 16:1
54:22 55:18,21
70:23 95:23
101:5 225:19

regularly
93:21 94:21

rehash 308:19

rehired 30:22
62:3

rejoin 51:5
59:6 60:16

related 50:11

relationship
64:22 68:13
69:13,15,18,21
309:10,19
312:6

relative 119:24

relevant 49:14

remain 54:10
111:25 118:21

remained 67:4

remember
13:2 17:25
18:4,18,20
22:1,5 23:20
25:19 29:21
41:9 66:1,2
78:10,13,24
80:10,11,16
81:4 84:24
87:11,14 88:24
89:3 90:13,22
95:20 98:18
99:14 105:16,
19 113:15,21
125:12 126:7,8

127:1 128:13,
14,18 130:19,
22 133:7,10
139:16,17
142:23 143:11
145:7 148:12,
13 151:23
153:22 154:13,
18,19 160:2,3
165:6,7 167:6
168:6 173:5,8
174:13,14
178:3,20
180:12,14
182:23,25
183:3 195:4
199:1 206:24,
25 207:12
209:14 215:5
230:4,5,7
231:14 234:7,
19 235:1 237:2
238:21 239:1
241:1 242:20,
22,23 243:5,9,
22,23 244:23
245:15,16
246:18 254:19,
21 260:8,9
266:19,21
267:4,25 268:1,
7,13,15 269:12
270:4 271:16,
17 280:20,22
281:2,3 287:1,
24 288:1 294:5
298:2,3 299:9
300:10 303:20
305:11 308:24
309:2,17
310:18 311:2,8
312:22 313:9
314:7,8 315:1,4
317:4

remotely 10:3,
10

remove
143:21,22
147:8

removed
143:7 153:12

repeat 179:12
316:17

repeating 32:1
70:4

repeats 294:18

rephrase
13:19

report 16:1,11,
16,20,21 17:8,
22,24 21:3
45:19 93:19
106:4,8 113:25
114:20 118:23,
25 122:15
123:21 130:18
131:7,19,24
132:5,17
133:14,17
134:1 136:22
150:3,4,11,17,
19 151:7 153:2,
10,23,24
156:18 164:25
165:25 167:11,
14 168:12
170:5,13
171:19 172:17
174:4,15 175:1,
9 177:6,14
178:10 180:23
181:3 187:14
188:16 190:8,
11,17 191:8
195:4,8 197:20
201:13,21
204:2,7,20
205:4,7,8,18,21
206:10 207:2
209:3 220:16
221:23 222:6
224:10 225:6,
10 235:4
247:11,16
262:21 267:13,
18 268:3
269:23 270:16
272:20 273:16,
18 276:6,25
278:1 280:18,
24 286:19
287:11,22
288:1,5,11
289:4,20
292:18 317:5

reported
189:12 197:22

310:19 317:3

reporter 10:16,
18,23 137:22
321:10,13

Reporters 9:5

reports 20:4
45:8,11 54:22
102:19,20
114:11 146:13
256:11 270:6

represent
24:15 308:12
314:20,23
315:17 319:13

representing
9:4

reprimand
90:20

reputation
139:21

request 116:10
222:7 229:8,13
232:16 287:13
307:11 321:11

requested
223:17 224:6
229:20 231:11,
12 285:25

requesting
116:10 230:8
285:23 287:7

required 107:8

rescued
130:15 132:18

residence
121:18 135:10,
12 148:8 273:4
277:15,17
309:4

resource
51:20

respect 68:23
69:24

responded
160:25 161:1
309:3 319:17

responders
126:10

response 35:2
137:21,22
154:24 159:19
160:12 163:21
300:15 302:18

responses
18:13,17
160:20,22
162:3 163:19
164:10 168:16

responsibilitie
s 211:13

responsibility
108:20

responsible
247:9

responsive
158:7

rest 33:16
244:22

result 80:12
84:3 86:1
294:10,25
295:5

resulted 84:10
111:11

results 285:1,5
288:5,11,12,15
290:3,11
292:18,25
293:15 294:2,7,
17 296:14
297:18,25
298:4,5,6,8,12
299:4 300:23
301:14 316:14,
16,21,24 317:2,
19

retaking
277:14

retire 59:20

retired 31:2
50:24 51:1
57:7,21,25 62:8

retiring 57:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**returned** 172:22 195:16 272:24

**revealed** 242:14

**review** 16:13 17:11,18 19:4, 12,22 20:2,9, 12,24 40:25 41:17,20 42:1 90:1 150:3 162:3 200:18 243:25 271:3 300:2

**reviewed** 16:7 17:16 18:10 19:7 20:21 21:15 40:4,7 122:15 145:20, 22 163:19 271:2 272:5

**reviewer** 73:18

**reviewing** 42:7 49:20 271:9,20 272:4

**Richard** 312:14,16

**Richmond** 44:24 97:23

**rights** 46:17,22 47:6,13,21,25 248:7,13,21 251:8,12 252:10,25 253:5 258:16 261:20 267:20, 21 268:5

**road** 47:1

**Rob-** 271:22

**robberies** 55:24

**Robert** 9:9,15 34:24 65:23 133:5 134:5,16 136:18,24 138:10,14 151:17 157:22 163:12 164:17 166:6 174:18

176:16 181:24 187:25 188:6, 13 189:13,15, 25 190:6,10 191:12,16 192:23 193:6, 20,24 194:2,12 197:22 201:14, 17 204:21 205:15 206:12, 17,22 207:3,9, 18,21 208:18 209:8,16 213:17 215:6, 11 216:12 218:7,12 219:11 220:6, 24 221:4 222:2, 16 228:12,23 229:9 231:17 232:1 245:7 246:15,22 247:2,4,8,13,19 248:7,13,20,23 249:12,19 252:24 253:4, 16 257:3,4,17, 25 258:16 259:4,16 260:6 261:2 263:6,10, 18 264:2,8,17 265:4,8 266:23 267:14,19,21 268:9,19 269:4 271:10,19,22 272:11 275:20 276:1 279:2 282:3,11,12,25 283:1,3,6 284:7,19,22,25 286:2,6,9,20 287:5,15 289:21 295:25 297:9 299:14 302:13 303:8 305:17,21 308:22 309:7,9 311:4 312:3 321:3,4

**Robert's** 191:2 213:20,23 222:10 282:23 286:13 289:10, 12 295:19 296:15

**Robinson** 9:14

**ROCIC** 98:9

**Rocky** 315:12

**Rod** 222:6

**rode** 101:8,13

**Roger** 40:8

**role** 319:23

**Ron** 121:19 125:13,18 199:16

**Ronald** 24:10

**room** 104:2 216:9 234:25 235:14 245:15, 17 246:14 257:14

**ropes** 102:10

**route** 118:9 135:23 229:1 233:2

**RPD** 131:21 272:20 287:20

**RPD-440** 245:22

**RPD1449** 62:22

**RPD1494** 67:12

**RPD1697** 74:22

**RPD426** 291:8

**RPD427** 293:8

**RPD437** 183:20

**RPD443** 253:13

**RPD53** 17:9

**RPD537** 169:13

**RPD539** 267:6

**RPD54** 153:24

**RPD540** 169:17

**RPD541** 173:16

**RPD543** 200:14

**ruin** 265:13

**rule** 14:19 71:23

**rules** 13:6

**running** 206:18,23 207:10 216:16, 18 218:23 241:16,17 244:3,5 279:12

**runny** 141:11, 16

**runs** 71:13

**rush** 148:19 175:20 300:7

**Russell** 212:3

**Russellville** 9:10,16,20 21:10,15 28:15 47:16,19 49:25 50:4,10 51:17, 24 52:1,20 53:11,21 54:2, 11 55:13 57:4,8 59:24,25 62:9, 10 63:20 64:11, 19,25 66:22 67:5,24 72:25 87:3,15 88:10 89:17,20 90:11 91:11 93:5,9 96:6,17 97:16, 18 98:21 99:8, 25 100:19 101:12 102:24 106:16,22 108:12 116:4 139:23 140:24 142:12 181:17 186:19 193:1 204:12,16 212:1 237:6 253:1 256:8,13 275:2,14 313:3

**Ryder** 222:20

---

## S

**S-H-E-M-W-E-L-L** 58:17

**S-H-I-F-F-L-E-T-T** 59:4

**S-H-I-M** 58:16

**safe** 45:24 72:7 127:3 138:9

**Saint** 98:1

**Sales** 58:10,14, 19

**sally** 305:22 306:15,19,24 307:8

**samples** 280:13,16,25 289:15 295:8, 20 301:8

**Samuel** 234:13

**Sanford** 66:17

**Sara** 153:13 154:4,11 168:2 188:7 214:2 216:14 284:16

**sat** 215:15 218:13

**Save-a-lot** 214:24

**Scared** 290:2

**scene** 104:4 117:23 118:1,6, 9 120:4,19,20, 25 121:7,9,15 124:14,20 126:11 127:4, 13 128:17,20, 25 131:1,8 134:15 136:9 138:1,6,10,15 139:14 143:5 144:10 145:2,8 147:24 148:18 150:5,15 151:13 152:1 165:18 166:23 167:5,10,16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

168:9 172:14,
22 174:16
195:16 221:10
224:9,12,16
225:17 232:14
233:2,7,14,24
234:11,14
237:10 243:25
244:20 245:6
276:8,12 277:2,
22 278:9

**scheduled**
95:23

**school** 43:9,
10,11,12,13,15,
20,24 44:1
51:20,22 52:1,
20

**schools** 52:18,
19

**science**
318:15

**Scott** 9:25 10:1

**screen** 259:13

**sec** 200:11

**security** 52:3

**seek** 58:1,21
65:1 84:6,15
86:8 296:10

**segment** 204:8

**send** 18:24
159:12

**sense** 25:4,5
46:1 138:5
255:3 265:23
266:12

**sensing** 66:11

**sensitivity**
317:15

**sentence** 30:8
73:20 161:3
163:6,9 292:13
317:21

**separate**
112:25 114:25
175:11,13
182:6,7

**separately**
185:2

**Septem-** 181:6

**September** 9:5
18:25 57:16
64:12,19 65:1
66:20,23 77:16,
22 78:5,6 81:14
86:17,21,24
88:15 91:21
92:15,23 93:7,
10 95:11 105:1
106:1 113:12
114:7 115:4
116:1 133:19
157:18,23
158:17 163:13,
18 164:17
165:4 166:7
169:24 170:6,
25 171:21
173:25 174:5,9
175:9,10 178:1
179:20,21
181:6,10
183:10 184:17,
23 198:17
201:3 203:12
211:25 214:12,
14,20 222:16
235:9 245:12
253:16,22
266:23 267:16
272:10,14
281:20 297:18
308:23 310:16
311:6,15

**sequence**
231:10

**sergeant**
30:23 31:1
56:4,6,7,9
75:14,22 76:3
90:16 100:5,9
102:13,15
130:19 131:1
132:11,17
136:14 137:7,
11,14,19 143:4
151:16 166:24
192:25 199:19
222:6 249:2
286:12,24

**sergeants**
101:14,16

**serve** 50:18

**served** 21:18
50:16

**services** 53:4

**set** 67:9 78:23
81:19 84:14
134:12 136:15
137:5 162:12
184:9 209:23
247:2 252:13,
15,17,19
262:18 275:20
276:1 292:15
293:13 300:13
301:2,8

**setting** 79:4
247:9

**settled** 12:25
163:25

**share** 89:2
234:21

**shared** 230:13
232:2,3 279:25

**she'd** 209:1
282:5

**sheet** 113:4

**sheets** 103:8,9
113:4

**Shemwell**
58:15,18

**sheriff** 60:12,
14

**sheriff's** 10:1
60:8

**Shifflett** 58:25
59:2,5,10 60:16
62:3 64:8,23

**shift** 90:21
91:18,20 92:5,
8,11

**shifts** 91:20,25
93:19

**shoot** 142:9
153:22

**short** 41:3,5,
13,16,22,24,25
46:2

**shorter** 242:17

**shortly** 56:14
176:16 197:22

**shorts** 287:5
289:10

**show** 102:18,
20,21 122:20
181:8 209:19
234:22 302:6

**showed** 102:9
219:15 235:12
237:10 245:4
264:25

**showing**
104:23 236:17

**shown** 300:23

**shows** 136:11

**shutting**
315:11

**side** 58:10,13,
19 92:24
191:13

**sideways**
259:13

**SIG4** 228:23

**sign** 104:22
159:8 257:3,4

**signature**
256:24 292:3,5
321:11

**signed** 258:13

**signing** 159:11

**signs** 211:18

**simple** 45:23

**simply** 46:4
114:10

**sir** 11:2,6 12:20
16:7 17:14
21:18,25 22:7
23:11,22 25:1
33:3 37:10 42:4
43:7 48:25

50:16 61:16,25
63:9 72:18
73:23 74:21
75:1,4,7 76:14
78:7,20 82:15
103:2 115:16
117:8,14 119:7
123:4 130:17
131:16 132:1,5,
16 135:8
136:23 142:5
143:4 145:14
146:23 150:11
152:4 156:25
158:15 159:1
161:7 162:2
168:14 169:16
173:12,18
183:11,17,22
185:25 187:4,
11 202:5
217:14,24
226:9,25
229:14 231:16
236:24 237:15
244:16 245:12,
21,24 249:5
255:9,15
256:22 259:20
266:22 267:10
271:23 274:15
277:13 281:4,
19 285:7,20
291:11 294:12
295:18,24
297:4 299:10
300:6 302:11,
16 304:15
305:20 307:14
319:12,19
320:1,7 321:6

**sister-in-law**
12:12,14,16

**sit** 215:13

**sitting** 42:13,
17,21 43:4
86:12 88:13
128:24 171:17
181:8 188:24
198:5 217:2,18
238:14,18
243:6 260:5
271:8 280:23
303:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 109 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2902
348

**situation** 28:21
71:19 90:3,8
140:19 149:19
217:2 230:10
237:18 240:12
266:11 271:6
277:25 305:15

**situations**
47:3

**skill** 73:24 74:8

**skills** 74:5

**skip** 145:16

**slap** 239:18

**slept** 235:15

**slipped** 216:19
219:2

**small** 87:19
115:17 123:1
197:18 214:17
239:16,18

**smelled**
154:20

**Smith** 9:22
10:10 35:22
36:3,6,13,16,21
37:1 76:23
160:17 198:25
199:4,6 277:1,
22 278:2
309:14,21,25
310:17 315:20,
21 319:4,9,13
320:2

**Smith's** 42:1

**smoke** 121:18,
25 123:18
125:6,11,19,23,
24 126:17
127:12 208:2,
10

**smoked**
207:21,23
208:2,8,13

**smoking**
121:24

**sniffing** 238:9

**snotty** 141:10,

16

**social** 53:4

**socialize**
68:19

**sold** 58:6

**soldier** 309:10
310:17

**solemnly**
10:18

**solve** 73:25

**Someone's**
172:2

**son** 215:23
229:17 232:5,9

**sort** 223:4

**sought** 85:19
295:20

**sound** 44:18
87:1 138:2
309:14

**sounded** 60:20
87:1

**sounds** 138:3
189:5 209:24
268:3 313:21

**sources** 261:5
265:24

**south** 124:6

**Southern**
98:17

**spark** 266:9

**speak** 27:23
129:15 143:16,
20 175:23
224:22 244:25
272:16 273:8,
11 275:3,6
319:20

**speaking**
16:11 17:5,7
18:16 80:8
83:16 98:6
145:1,7 147:23
151:25 154:15
165:20 166:23
167:1 170:17

173:6 190:25
198:13 200:9
203:11 253:8
273:24 292:19

**Special** 211:5

**specializing**
72:3 77:24

**specific** 22:22
23:16 40:13
42:7 43:4 47:17
48:4,7 50:1,5,9,
10 51:22 85:25
94:16 98:20
99:12,23 115:5,
8 116:16,19
167:3

**specifically**
24:1 32:5 68:1
73:17 76:16
77:1 78:18 99:8
107:9 113:12
125:10 127:22
143:6 146:18
150:13 157:15
160:3 163:5
169:17 199:14
291:8 300:21
302:9 316:23

**specifics** 94:1
117:1

**speeding**
54:21

**spell** 59:3

**spent** 72:3,10

**SPI** 97:25
98:14,16

**spoke** 143:4
151:7,13
152:12,13
155:7 165:17
175:14,15
182:20 184:23
186:23 195:3
198:7 200:2
201:10 206:5
221:14 224:14
269:20 273:13,
22 301:2

**spoken** 167:9
175:17 221:17,

19 310:11
319:15 320:20

**spontaneous**
225:16

**spots** 234:22,
23,24 236:18

**spray** 139:9
140:11,21,25
141:1 142:8,17,
22,25

**sprayed** 141:4,
8 142:2,14,15
143:1

**spurt** 88:5

**SRO** 51:20,25
52:13,21,23
53:9

**stack** 17:2

**staff** 158:3
161:4

**stages** 110:14,
22

**stalled** 112:2,
12,13

**stamp** 17:9
62:21 67:12
68:2

**stamped** 72:15
122:24 183:20
285:19 287:20

**Stamps** 131:21

**stand** 98:11,16
120:17 226:25
313:17

**standard**
79:10 82:24
105:1 106:3
107:11 153:6
167:10 186:6
196:15,21
254:12,15

**standing**
126:5,10,20,23
127:14 128:1
129:13 212:19
215:8 262:25
301:12

**STAPLE** 129:6

**Staples** 9:14
11:1 18:15
22:19 24:23
25:8 36:25
37:6,9 40:16,23
61:16,24 74:24
75:1,3 115:16,
24 125:21
129:10 156:16,
21,24 158:5,9,
13,14,24
160:19 161:1,6,
19 162:1,15,20
163:10 164:7
172:2,4,7,9
193:12,15,18,
19 209:25
210:6 217:23
259:11,15
269:22 281:4,7,
14 290:2
293:23,25
296:25 297:3
301:16,22,25
302:2,4,8
303:15,18
304:6,9,11,14
307:14,22,24
308:1 310:22
311:23 315:11
320:5 321:6

**Staples'** 22:12
316:20

**start** 54:15
102:20 106:5
109:22 204:13,
17 221:4
235:22 264:21
265:1 266:9

**started** 14:23
44:21 54:16
55:18,19 56:19,
21,22 59:17
72:4 100:7,10,
21 109:6 113:9,
21 114:2
193:21 194:13
204:8 245:19
251:6 254:9,22
266:8 283:6,9
299:24 300:16

**starting** 9:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 110 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2903

349

43:8 163:4
193:6,24 194:2
220:25 255:11,
14 300:4

**starts** 74:21
299:23

**stash** 197:14

**state** 9:12 10:7,
13 14:14 17:22
134:14 146:9
164:14 174:4
175:1 199:8
201:6 210:24
268:18 277:1
315:17,24
316:21

**stated** 20:23
126:3 132:24
134:2 153:11
154:14 166:5
191:9 200:5
222:1

**statement**
21:13 25:13,16
26:4 33:5 59:23
89:4 103:18
104:10,15,18,
23 105:25
107:5,9 111:20
150:20,25
151:1 165:1
166:11 168:17,
22 169:22
170:3,4,21,25
171:2,3,8,10
173:22 174:9
177:15,17
178:14 183:5
186:3 187:5
188:15 191:20
192:1,12 193:9
194:14 195:2
200:18,25
201:1,6 203:17
207:6,8 225:4,8
246:15 251:9
253:24 260:19,
23

**statements**
19:2,4 103:9,13
104:25 105:2,3
110:7,11
164:16 169:14

173:10 174:19,
22,23 175:2,3,5
192:3 200:14
204:2,7 225:1
269:24 270:13

**states** 9:11
169:24 201:13
204:20 206:10
207:2

**stating** 223:16
292:7

**station** 105:14
108:2 110:9
223:7,10
224:21 245:7
246:21

**stationed**
51:22

**stats** 88:12

**status** 153:11

**stay** 62:12
112:3 143:25

**stayed** 25:19
58:20 87:23,24

**stays** 181:19

**step** 118:13
272:10

**stepping** 77:15

**Stevenson**
51:23 52:14

**stick** 60:20

**stinging**
141:19

**stop** 11:20
204:13,17
253:19

**stopped** 141:9,
14

**STOPS** 217:22

**storage** 112:23
113:2

**store** 108:23

**stored** 108:7

**story** 225:19
261:14 272:7

306:3

**straight** 91:22
224:7

**Stratton** 54:6,7

**street** 51:24
212:5 213:1,2,6

**streets** 90:23
140:3,4

**Strictly** 66:12

**strike** 31:21
42:6 58:8 66:6
67:9 80:6
134:25 138:22
151:12 201:5,6
221:21,25
224:5 241:18
246:7 306:6,22

**struck** 139:2
140:5,8

**structure**
121:22 123:9,
16,23 124:4,7,
10,11,25 125:6,
7 128:6 130:12
136:6 137:10,
16,20 138:19
143:7 147:9
153:13

**structures**
128:2

**stuck** 243:11,
16 285:17

**students** 52:4

**studied** 44:2

**study** 43:25

**stuff** 11:19 16:2
17:15,22 19:9,
21 27:10 35:9,
10 46:25 52:9,
16 54:23 59:12
82:18 98:10
103:24 104:22
108:9 109:12
113:11,16
145:5 181:21
230:17 231:5
239:24 241:6
242:21,22

243:10 244:3,5
270:1,20
290:25 298:14
303:19 304:3

**stumbling**
187:18,20

**submit** 154:22

**substance**
15:21 28:4
148:1,4 168:25
169:5 171:20
235:13 244:8

**substantive**
167:19

**successful**
77:7

**sued** 12:13,14
15:5 314:25

**suicide** 211:19

**suit** 12:1,17
23:1,17,23 24:6
30:10 31:6,23
32:5 33:11
35:16 37:22
164:1

**sum** 289:20

**Sunday** 253:23

**supervisor**
93:11,13

**supplement**
16:4 148:23
149:25 151:13
168:18 171:19
205:21

**supplemental**
18:22 131:19
150:2,4 151:7
156:18 160:22
162:5 170:5,12
180:3 195:8
204:2,7 221:23
235:4 272:20

**supplied** 20:21

**support**
229:21 230:17

**supposed**
47:5,10 59:11,

15 71:22,25
157:9 178:4
201:19 238:24

**supposedly**
147:5

**surprised**
289:3

**surrounding**
304:22

**suspect** 84:1,2
134:16,18,20
136:19 137:3
140:13 151:17,
21 152:1
192:23 248:24
249:3 251:18
261:2

**suspected**
295:1

**suspects**
139:22

**swab** 286:18

**swabs** 286:9,
12,25 289:12

**swear** 10:18

**sworn** 10:16

**system**
113:10,14,15,
20 114:8,12,17
185:17

---

T

---

**tackle** 209:10

**tackled** 219:8

**tackling**
138:18

**tad** 66:5

**takes** 49:2

**taking** 15:11
98:18 167:24
172:21 214:25
239:14 243:24
246:15 277:16,
19 280:13
317:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 169   Filed 10/03/25   Page 111 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2904

350

talk 31:11
33:12 52:5
76:16 103:14
122:22 126:12
148:5 151:4
152:21 170:21
171:12 172:20
200:2 222:2
244:8 259:16
261:15 267:20
268:5 274:2

talked 14:25
22:15 25:25
31:7 34:25
48:15,17 70:14
85:16 104:14
147:15 150:22
152:14 163:23
166:18 167:7
168:16 170:4,6,
17 172:25
174:4,16
177:17,24,25
178:11,19
195:12,13
199:17 203:18
221:2 224:20
234:4 250:4
279:5 309:6

talking 16:3,25
17:8 26:18,19,
20,22 54:12
68:20 71:15,18
78:17 85:6
100:21,22,23
103:6 106:1
109:20 119:6
125:22 126:13
148:3 150:4,10,
13 155:9 157:8
167:21 168:19
171:7,8 175:5
194:15 203:14
215:9 216:2
220:23 221:9
237:12,13
240:6 245:12
253:19 259:7
261:18 265:13
269:2 281:24
316:14 319:22
320:22

tape 242:2,7,8,
9,11 243:24

244:8,10,12,15
254:11

tasks 94:12
95:18

taught 45:5
46:17 49:13,16,
18

teach 100:6,10
102:22

teachers 52:3

Teary 141:10

tech 211:14

technical
43:24 44:1

techniques
75:24

telling 87:17
136:14,18
145:19 251:22
310:15

tells 63:17

ten 45:3 76:1,3
131:10

ten-week 45:5
46:3,7

tend 211:17

Tennessee
315:12

terminology
102:4 234:7

terms 143:20

terrible 141:6

Terry 79:23,24
80:1

Terry's 80:2

test 154:23
317:11,16
318:19

testified 82:23
87:2 99:11
122:14 139:2
165:9,15
166:24,25
177:16 179:22
232:18 273:25

294:1 296:6,9
298:7 299:5,10,
11 302:19,22
303:6 305:5
308:21 316:4,7
318:15

testify 15:9
29:11,14 218:6,
9,12,15,19
219:1,2,11
303:21 315:23

testifying
296:13 305:8

testimony
10:19 16:13
18:8,10 20:12
41:1 42:15,19,
23 43:1,5
126:15 128:16
146:2,13
164:23 165:13
167:1 172:13
176:5 177:2,23
185:6 186:12
189:2 191:23
219:14 230:3
238:22 242:14
263:20 299:14,
23 301:21
302:10,12

testing 222:13
285:1,4 299:5

that'd 36:25
77:21 281:22

that'll 135:2

thicker 302:2

thing 16:1,24
17:1 20:8 31:24
33:14,18 35:11
60:3 71:25
147:7 168:7
181:1 206:14
221:22 223:4
240:4 257:7
259:12 277:8
300:4 318:22

things 29:5,9
30:20 46:12,14,
16 47:23 52:5
67:7 70:20
71:13 78:23

79:4 81:19 85:6
101:25 102:2
114:3,4,5
176:14 180:5,
11,12,15
185:17 192:14,
16 229:7 231:4
240:5 255:21
266:9 268:8
309:23

thinking 48:15
86:7 240:3
309:21

thirds 119:2

Thomas 36:6,
12 37:1 315:20

thought 41:2,4
64:3 116:21
135:20 144:4,6
156:12 177:16
230:21 236:18
269:11 276:24

three-day
280:1

threw 207:3

throat 141:22

tickets 54:22

time 9:5,6
11:11 13:4
14:15 26:14,17,
21,22 33:12,23
34:6 35:9 46:2
49:3 51:12
52:16 54:5
55:25 57:5,18
65:6 67:2 74:9
77:17 79:17
80:23 82:6
83:16 84:9
88:6,25 91:6,25
92:5,10,12
93:12 94:21
95:11 96:9
98:25 104:11
105:10 115:9
116:19 117:24
118:24 119:15
120:11 122:18
124:17 125:20
127:4 129:1
130:6,10,23

131:8 132:12
134:21 137:14
138:1 139:14
140:12,14,15,
23 142:6,24
143:3,17 144:1,
20 147:3 148:6,
11 149:9,18,21,
22 152:2,20
153:18 155:5
156:3 162:21
166:23 167:16
170:3,8 176:10,
11 178:25
180:7,17
187:22 189:3,
13 191:16
194:5 204:3,8,
12,14 206:5
207:15 215:3,5
216:21 227:15
233:14,15,16,
18 234:15,17
236:7,12,20,21
237:6,8 238:3,
15,19 239:10
242:16,25
245:18 246:20
247:1,4,13,25
248:3 249:15
251:21,25
253:2 254:8,21
255:4,9,11,13,
21 256:9,10,11,
14 257:8,11,13
258:9,12 265:3
266:20,23
269:5 270:1
271:12 272:6,
11 277:2,6
278:6,8 283:23
284:1 286:3
287:5 288:11
291:20 292:21
294:2 297:25
298:8,10
303:22,25
304:4 306:1,23
309:15 311:6,
13 312:25
314:7 315:23
316:1 319:21

times 77:1,4,
23,24 90:14
104:14 105:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 112 of 115 PageID
The Deposition of KENNETH EDMONDS, taken on September 14, 2022
#: 2905
351

118:1,3,8
140:21 142:2,
16,21 175:24
189:19 204:13,
17 231:5
254:13,16
256:3,4,5,6
272:8 303:6
310:11

timing 202:11
252:24 253:4,8
296:17

Tina 172:25
195:3,5,14
200:25 202:22
210:25 211:3,5,
8,11,14,17,22,
24 212:2,5,8,
12,15,17,21,25
213:3,8,10,13,
16,20,24 214:2,
6,10,13,16,21,
24 215:4 217:4,
9,12,16,21

title 55:3,5

today 9:4,5,17
11:4 13:6 14:4
15:9,15 20:21
21:7 31:14
38:22 40:2
42:13,17,21
43:4 86:13
88:13 128:24
163:23 171:17
181:8 188:24
198:5 238:14,
18 243:6 260:5
271:8 280:23
288:25 303:5,
19 307:17
308:16,21

today's 15:24
21:14 122:16

Todd 43:14,16

told 23:13
26:14 27:6,7
28:1 29:22
62:12 64:20
89:8 90:2,16
115:3 116:8
117:1 129:25
132:18 134:2,

22 136:23
137:4 142:21
147:16 148:12
151:16 165:6,8
168:14,24
169:4 185:16
188:21 189:18,
24,25 190:3,13,
22 191:15
192:15,20
193:20 194:1,
12,25 202:8
204:25 205:16
207:9,17
215:14,17
218:16,20
221:3 226:11
230:4,5,22
231:11,12
235:12 239:5
244:12 249:2,8
250:23 251:1
258:24 261:19
262:20 264:9,
12,17,20
268:15 282:5,
10,25 283:3,6,9
285:6 291:20
292:21,23
298:8 317:5

Tommy 35:23,
25 36:3,19
37:4,7 42:3
198:25 199:4,
18 277:1 278:2
309:21,23,25
315:21

top 19:5 75:21
184:16 226:8
254:3 258:9
315:12

topic 29:10
172:11

topics 36:16,
21 45:25

toss 106:10

total 132:24
240:25

totally 159:25
230:19

town 83:20
87:25 215:19

traces 287:8

track 255:2

tracks 212:9

trades 52:10

tragic 230:14
265:15,18

trailer 116:8
121:19,21
123:17,18
124:15,16,23
125:1,2,13
126:4,6,11,17,
21,24 127:23
129:12,21
191:5 206:11,
19,23 208:19
209:17 216:10
218:20,21,24
219:21 234:23
236:8,9,17
237:19,24
238:9,13,20
239:3 240:14
243:4,8,13,21
245:2,3 247:6
259:17 262:23,
25 264:3
266:20 276:18
283:16,19,23
289:17,22
301:9 305:3

trailer's 216:12

train 97:19

train- 101:4

training 28:11
45:21 47:12,17,
24 48:3,6,8,11,
14 49:17,23
50:1 54:13
97:8,11,13,15,
23 98:6,20,24
99:3,15,23
100:18,20
101:4 102:15
115:5,8,12
140:24 141:3
142:11 185:11
211:15 253:5
313:8 314:4
318:16

trainings
47:23

transcribe
191:25

transcript
41:11,18,21
42:2 146:2
321:12

transcripts
42:7,24 192:4

transfer
105:22

transferred
114:12

transmitted
185:17

transport
154:9 224:22
225:2

transported
138:1,5 223:7,
10 224:21

transporting
225:5,9

travel 121:9
245:6

treatment
305:21

treats 243:4

Tree 215:17

trial 18:7,10
40:25 145:23
146:3 164:23
165:9,13 167:1
210:15 269:6
270:23 271:1,2,
4,6,9 287:24
288:2 302:19
303:9 317:9

trick 255:7

trucks 121:17
122:2

true 25:15 60:9
74:13 89:7
108:12 114:6
116:3 119:11
134:24 156:15

186:22 196:9
197:23 209:4
230:25 249:10
261:6,11
262:11 263:15
264:11 265:2
269:14 293:4
299:12 305:19
306:3

trunk 215:1

truth 10:20,21

truthful 46:12

turn 48:20
50:6,12 62:19,
25 68:1 72:14
107:8 111:1,6
112:9,18,19
120:10 122:10
124:9 130:17
131:13 145:10
146:15 157:12
158:25 169:16
173:9 183:13
192:11 200:13
245:21 256:16
267:6 285:7
296:20 312:20
318:4

turnaround
288:17,25

turned 76:19
111:13 112:22
185:7,16
220:20 243:13
270:18

Turning
285:18

two-page
316:24

Tyler 68:7

type 28:16
30:20 46:13,15
47:23 52:5
55:10 71:13
75:8 95:14
102:17 103:20
107:14 113:18,
19 114:11
264:23 266:9
291:22 317:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 169    Filed 10/03/25    Page 113 of 115 PageID
#: 2906
The Deposition of KENNETH EDMONDS, taken on September 14, 2022

352

typed 107:5
114:19 133:14
201:1

typewritten
19:1 106:4,8
110:10 169:14
173:22 178:15
183:5,7 186:3
187:5 192:1,3,
19 194:14
200:14 204:2,7
205:3,7,18
209:3 247:12
260:18,22
267:13

typical 116:12
208:17 278:2

typically 59:23
60:6 117:25
118:3,8 149:15

typing 106:5

typo 175:9

___ U ___

uh-huh 16:12
17:17 18:6,9
19:24 21:9,12
29:24 30:25
32:23 34:15
35:14 37:13
38:11 40:12
43:13 44:13
49:12,15,24
51:4 53:1,19,22
56:11 57:22
60:1 62:4 63:2,
5 64:2,9 65:10
67:3 68:6,18
69:23 70:16
72:12,21 77:18
79:5,25 81:7
85:17,20 87:5,8
89:19 90:23
91:24 93:3,8,20
96:22 97:10,14
99:17,19,22
101:19 102:6
103:16 104:5
105:21,24
106:2,9 107:7
108:3,17,22

109:8,24 110:1,
3,5,8,20 112:24
114:9,21
118:22 119:8,
17,25 120:16
121:2 123:5
124:12 125:4,
16 126:19,22
129:8 130:13
133:16,21
134:4,23 136:8
137:1 142:1
144:19 145:24
146:17 149:8,
14 150:24
152:9 153:1
154:17 155:6
157:6,20,24
159:8,10 162:7
165:16 167:12,
17,23 168:1,3,
13 169:11,15,
18 170:14,19
171:6 173:2,17,
24 174:6,10
175:7,8 176:18,
21,24 177:22
178:13 179:13
180:22,25
181:14 182:9,
12,19 183:21
184:3,12,15,18
185:5,8,15
186:1 187:21,
24 188:11
189:11,20
190:24 191:14
192:10,17
194:9 195:6
197:4 198:4
199:10 201:15,
24 202:15
203:15,19
206:13,16
207:20 208:6,
23 213:3,8,13
218:11,18,22
219:25 220:5,
14,18,22
221:12 222:14
226:10 233:6
240:22 241:16
242:13 246:5
247:7 250:7
252:5,18
253:10 254:5

255:17 256:21
257:9 258:8,15
261:3 262:24
263:12,21
265:2,22
267:17 270:3
272:13,15,22
274:21 280:5
281:22 282:15
286:4,7,11
287:12,21
289:11 291:3,
12 292:6,12
293:7,19
294:24 295:2,4,
7,9 296:1,5
297:5,10,16,23
298:19 299:12,
22 302:14,20
303:17 306:8
307:24 313:24
320:8

uh-uh 20:5,10
21:24 77:9
83:18 84:5
86:9,11 90:10
107:1 129:2,8
155:25 183:12
190:12 204:5
207:1 210:12
224:25 248:11
273:23

Ultimately
304:15

uncertain
251:25

unclear 194:25

under- 230:19

underlying
35:12

understand
13:21,24 49:3
81:5 157:7
166:16,19
171:16 180:16
193:10 227:13
230:19 231:16
232:1,13
251:14 255:18
266:5 317:1
318:20

understanding
46:21 48:19,22
49:20 126:15
144:9 162:8
177:23 191:23
192:8 317:15

understood
190:19

unfortunate
269:25

unit 118:19,21,
25

United 9:10

unrelated
159:25

unusual 208:7
214:19

updated 96:19
97:1,2

updates 97:4

upset 27:15

upstairs 59:19
93:12

___ V ___

vacated 26:25
27:20 29:19
30:1 37:19 69:8

vacating 30:6

vague 41:5

Vance 79:23,
24 80:3

Vanderbilt
154:6

vase 216:6

verbal 90:20
137:21,22

verbally 13:9
90:19

verification
156:14,19
162:12

verifications
162:18,23

versa 94:25

version 41:24

versus 9:9
175:10 203:21

VHS 239:16,17,
18,21

vice 94:25

victims 72:11
145:5 147:13

Victor 58:24
59:1

video 103:8,10,
17,23,25 104:6
105:2 209:20
210:23 212:6
217:22,25
238:22 239:3,4,
7,8,11,14
240:1,3,10,20
241:10,14,19,
21,25 242:1,3,6
243:24 244:9
260:20 267:5
269:1,16 270:7,
12,22,25 271:2
280:8 306:24
307:5,7,12
316:5

videoing
103:15 244:19

videos 16:15
240:24 241:7
269:2,3,8,11,12
270:4 271:8,20,
25 272:1,4

view 241:11,13

viewed 244:6

viewing
245:15 246:14
301:18

viewpoint
124:14

vital 211:18

vocational
43:22,24,25

voluntary
104:10,15,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

105:3

**volunteer**
103:8,9,13

—————

**W**

—————

**wait** 175:20
177:20 222:2
303:20 319:5

**waited** 43:21

**waiting** 223:14

**waived** 258:16

**walk** 43:7
53:13 237:24
238:12

**walked** 126:16
129:11 264:24

**walking** 236:8
280:10

**walkthrough**
237:25 238:7,
20,23 243:4,7,
20 244:19
265:4 280:4,19,
25 316:4

**walkthroughs**
238:11 242:15,
18 316:11

**wall** 216:6

**Wallace** 60:15

**wanted** 42:10
67:7 68:4 73:17
127:21 145:4
188:2 224:18
230:10 234:20,
22 265:9,10,12
279:13,15

**wanting**
122:22

**warned** 90:19

**warning** 19:19
252:6 256:23
257:2,17,24
258:6,13

**warrants**
19:21,23

**Warren** 320:25

**wash** 91:2

**washed** 58:5

**washing** 92:24

**watch** 210:18
211:18 257:13

**watching**
246:13 266:17

**water** 210:11

**ways** 115:1

**week** 94:22
112:13

**weekly** 94:18

**weeks** 45:3

**weld** 91:2,3

**welder** 91:1

**Wesley** 244:12

**West** 10:10
33:3,6,11,12
34:13,22,25
35:1 170:2
186:3,23 198:8,
14 199:3,23
201:7 233:11
236:25 237:23
243:19 246:13
264:5 266:15
267:2,14,19,21
268:19 271:11
277:2,22 278:2,
10,23 279:25
280:7 281:20
287:7 289:18
298:6,8 300:18
315:20 316:2,7,
10

**West's** 199:18
261:13

**West/
edmonds**
184:17

**What'd** 120:22
316:15

**whatsoever**
37:14,21,24
70:6 193:5

306:13 307:3
319:24

**whereabouts**
202:12,17
249:25 282:19,
23

**Whitaker**
60:15

**whoever's**
79:13

**William** 35:22
36:1,2,16,17,18
37:1 198:25
199:5,6 315:20

**window** 206:11
216:1

**witness's**
160:12

**witnessed**
209:9 238:5,7

**witnesses**
46:4 96:3 98:22
99:4,13 102:21
110:11 148:17
149:17,24
172:24 184:7
186:23 200:7
221:19 244:25
262:17 279:5
309:7

**woman** 163:24

**Woods** 107:19,
20

**word** 27:12
49:8 93:1 192:6

**words** 45:13
103:19 228:25
291:25

**work** 36:3
58:18,24 59:9,
12,15 64:21
65:9,12 66:4
78:21 82:21
88:17 90:14
91:13 92:10,11,
12,13 111:21
139:15 161:20
196:25 211:4,
24 229:3

255:22,23
278:5,21 286:2,
5 289:12 312:4

**worked** 30:21
33:6 38:6 42:10
53:23 64:11
66:21 69:21
74:11 78:4,8,9,
11,14,24 79:21,
22 81:10 84:22,
23 86:22 87:10,
12 88:14 89:2,
5,9 91:14,15
92:4,9 139:25
140:1,4 160:4
211:9 232:19
234:5 244:1
278:6,23
315:23 316:2

**working** 58:4
59:17 64:22
68:13 72:3,10
83:1,3,5 90:15,
23,24,25 91:15,
20 92:2,8,11,
15,17 149:4
234:2 244:4,5
280:2 315:3

**works** 59:14
83:10 321:13

**worn** 286:2
287:5

**would've**
48:12,13 60:7,8
63:19 77:4 82:4
88:11 91:22
93:13,15,17
101:14,16
124:24 207:18
208:21 209:2,5
219:15 220:3,7,
13,15,19 221:6,
18,21 225:5,9,
15 228:11
240:2 241:23
243:11,16
257:12 260:18,
20 262:4
269:11 276:3,
22 294:8,9
298:6

**write** 28:1 45:8
102:19 104:21,

24 254:13

**writing** 28:20
45:10,19 48:20
54:21 246:3
253:19 254:16

**written** 28:8
105:11 106:4,
13,17,23
192:15 220:16
225:10 270:6
280:18

**wrong** 35:6
73:15 155:22
176:5 246:8
320:18

**wrote** 28:2

—————

**Y**

—————

**yard** 207:4
209:9 216:20
219:7

**year** 43:21
52:15 56:16,17
61:14 66:5,21
112:6,9 158:22
211:11

**years** 13:3 22:4
25:17 55:6,14,
15 76:3 87:5
91:16 111:23,
24 112:1,3,5,
15,20 133:24
139:19,20
241:8 282:3

**Yell** 9:9,15
31:23 34:4
38:10 65:15,19
76:17 77:3,8,10
133:5 134:3,5,
12,16 136:18,
24 137:5,25
138:5,10,14,18,
22 139:2,6,9,13
151:17 157:22
158:4 163:13
164:17 166:6
174:18 176:16
177:1 181:24
213:24 217:20
220:25 221:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

222:2,7,16,23
223:10 224:21
225:1,4 228:23
229:9,17
231:17 232:4,8
246:15 253:16
257:3,4,25
261:2 267:14
269:4 271:10,
19 272:24
286:2,6 287:5
295:25 296:11
297:9 298:16
302:13 303:8
305:21 306:19,
25 308:22
309:7,9 311:4
312:11 319:17,
21 321:3

**Yell's** 26:25
27:20 29:12,17,
20,25 30:6,9
36:7,10 37:15,
18 38:13,16
39:4,17,23
65:23 69:1,4,8
70:7,11 86:18
146:3 202:12
210:15 286:10
299:15 300:23
301:4 312:3
321:4

**yelling** 139:6
215:9

**you-all** 140:1
237:9,24

**youthful**
80:15,22

————————

**Z**

————————

**Zachary**
188:25 273:1,
13,24 274:20
275:19 281:25

**Zellen** 9:24
314:18,22
315:5,8

**Zoom** 9:20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com