

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 1:20-CV-0047-GNS

# ROBERT YELL

# V.

# THE CITY OF RUSSELLVILLE, KY, ET AL.

## DEPONENT:

## ROBERT YELL

## DATE:

## September 30, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

AT BOWLING GREEN

CASE NO. 1:20-CV-0047-GNS


ROBERT YELL

PLAINTIFF


v.


THE CITY OF RUSSELLVILLE, KY, et al.

DEFENDANTS


DEPONENT:  ROBERT YELL

DATE:      SEPTEMBER 30, 2022

REPORTER:  SANDRA VENTURA

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1
2
3    ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
4    Amy Robinson Staples, Esquire
5    Elliot Slosar, Esquire (VIDEOCONFERENCE)
6    Molly Campbell, Esquire (VIDEOCONFERENCE)
7    Loevy & Loevy
8    311 North Aberdeen
9    Third Floor
10   Chicago, Illinois 60607
11   Telephone No.: (312) 243-5900
12   E-mail: amy@loevy.com
13        elliot@loevy.com
14        jon@loevy.com
15
16   ON BEHALF OF THE DEFENDANTS, JOHN HIGGINS, CHAD
17   EGGLESTON, JIM PENDERGRAF, KENNETH EDMONDS, RONALD MILLS
18   AND THE CITY OF RUSSELLVILLE:
19   Jennifer L. Langen, Esquire
20   Adams Law PLLC
21   40 West Pike Street
22   Covington, Kentucky 41011
23   Telephone No.: (859) 495-3798
24   E-mail: jlangen@adamsattorneys.com
25

Page 4

APPEARANCES (CONTINUED)

1
2
3    ON BEHALF OF THE DEFENDANTS, SCOTT COUNTY SHERIFF'S
4    DEPARTMENT AND SCOTT COUNTY DEPUTY SHERIFF BUSTER
5    CANNON:
6    D. Barry Stilz, Esquire
7    Kinkead & Stilz, PLLC
8    301 East Main Street
9    Suite 800
10   Lexington, Kentucky 40507
11   Telephone No.: (859) 296-2300
12   E-mail: bstilz@ksattorneys.com
13   (Appeared via videoconference)
14
15   ON BEHALF OF THE DEFENDANTS, CITY OF GEORGETOWN AND
16   BUSTER CANNON:
17   Charles D. Cole, Esquire
18   Sturgill, Turner, Barker & Moloney, PLLC
19   333 West Vine Street
20   Suite 1500
21   Lexington, Kentucky 40507
22   Telephone No.: (859) 255-8581
23   E-mail: ccole@sturgillturner.com
24   (Appeared via videoconference)
25

Page 3

APPEARANCES (CONTINUED)

1
2
3    ON BEHALF OF THE KENTUCKY STATE POLICE DEFENDANTS, DAVID
4    WEST, JAMAN CHILDERS AND WILLIAM SMITH:
5    Alea A. Arnett, Esquire
6    Kentucky State Police Legal Office
7    919 Versailles Road
8    Frankfort, Kentucky 40601
9    Telephone No.: (502) 782-1800
10   E-mail: alea.arnett@ky.gov
11
12
13   ON BEHALF OF THE LOGAN COUNTY DEFENDANTS:
14   J.A. Sowell, Esquire
15   ELPO Law
16   1101 College Street
17   Bowling Green, Kentucky 42101
18   Telephone No.: (270) 781-6500
19   E-mail: jasowell@elpolaw.com
20
21
22
23
24
25

Page 5

APPEARANCES (CONTINUED)

1
2
3    ON BEHALF OF THE DEFENDANT, ALAN GREGORY:
4    Chris J. Gadansky, Esquire
5    McBrayer, PLLC
6    500 West Jefferson Street
7    Suite 2400
8    Louisville, Kentucky 40507
9    Telephone No.: (502) 327-5400
10   E-mail: cgadansky@mcbrayerfirm.com
11   (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1                    INDEX
2                                    Page
3    PROCEEDINGS                       8
4    DIRECT EXAMINATION BY MS. LANGEN  9
5    EXAMINATION BY MS. ARNETT         182
6    EXAMINATION BY MR. SOWELL         189
7    EXAMINATION BY MR. COLE           195
8    EXAMINATION BY MR. GADANSKY       197
9    CROSS-EXAMINATION BY MS. STAPLES  198
10
11                   EXHIBITS
12   Exhibit                          Page
13   1 - Portion of Trial Transcript   101
14   2 - Diagram                       106
15   3 - Rejected Plea Agreement       181
16
17               CERTIFIED QUESTIONS
18                                    Page
19   1 - Do you have any arrangement with a company
20       that has given you money in exchange for the
21       proceeds of this lawsuit?     177
22   2 - When were you arrested most recently?  178
23   3 - How many times have you been arrested since
24       your release from prison in early 2016 --
25       or '17?                       179

Page 7

1                  STIPULATION
2
3    The video deposition of ROBERT YELL was taken at
4    Kentuckiana Reporters, 730 West Main Street, Suite 101,
5    Louisville, Kentucky 40202, via videoconference in which
6    all participants attended remotely, on Friday, the 30th
7    day of October, 2022 at approximately 9:39 a.m. EST;
8    said video deposition was taken pursuant to the Federal
9    Rules of Civil Procedure.
10
11   It is agreed that Sandra Ventura, being a Notary Public
12   and Court Reporter for the State of Kentucky, may swear
13   the witness and that the reading and signing of the
14   transcript is not waived.
15
16
17
18
19
20
21
22
23
24
25

Page 8

1                  PROCEEDINGS
2        VIDEOGRAPHER:  We are now on the record.  My
3    name is Maggie Patterson.  I'm the videographer
4    today and Sandra Ventura is the court reporter.
5    Today is the 30th day of September 2022.  The time
6    is 9:39 a.m.  We are at the offices of Kentuckiana
7    Reporters located in Louisville, Kentucky to take
8    the deposition of Robert Yell in the matter of
9    Robert Yell versus the City of Russellville,
10   Kentucky, et al., pending in the US District Court,
11   Western District of Kentucky, Bowling Green
12   Division, Case number 1:20-CV-0047-GNS.
13       Will counsel please identify themselves for the
14   record?
15       MS. STAPLES:  Amy Robinson Staples for the
16   plaintiff, Robert Yell.
17       MS. LANGEN:  Jennifer Langen for the
18   Russellville defendants, Higgins, Eggleston,
19   Pendergraf, Edmonds, Mills and the City of
20   Russellville.
21       MS. ARNETT:  Amber Arnett for the Kentucky
22   State Police defendants, West, Childers and Smith.
23       MR. SOWELL:  J.A. Sowell for the Logan County
24   defendants.
25       MR. STILZ:  Barry Stilz on behalf of Scott

Page 9

1    County Sheriff's Department and Scott County Deputy
2    Sheriff Buster Cannon.
3        MR. COLE:  This is Charles Cole for the City of
4    Georgetown, and its employee Carl R. Buster Cannon.
5        MR. GADANSKY:  Chris Gadansky for defendant,
6    Gregory.
7        MR. SLOSAR:  Elliott Slosar, appearing
8    remotely, also on behalf of the plaintiff, Robert
9    Yell.
10       MS. CAMPBELL:  Molly Campbell, appearing
11   remotely for the plaintiff, Robert Yell.
12       VIDEOGRAPHER:  Thank you.
13       And, sir, will you please raise your right hand
14   for the court reporter?
15       THE WITNESS:  (Raises hand).
16       COURT REPORTER:  Do you solemnly swear or
17   affirm the testimony you're about to give in this
18   case will be the truth, the whole truth, nothing but
19   the truth so help you God?
20       THE WITNESS:  Yes, ma'am.
21       COURT REPORTER:  Thank you.
22       DIRECT EXAMINATION
23   BY MS. LANGEN:
24       Q.  Good morning, Mr. Yell.
25       A.  Good morning.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    Q.   How are you today?
2    A.   Doing well.  Thank you.
3    Q.   Good.  Thank you for agreeing to come to
4 Louisville.  That certainly makes it a lot easier for
5 those of us who were appearing in person.  Mr. Yell, have
6 you ever given a deposition before?
7    A.   No, ma'am.
8    Q.   Okay.  I'm sure you've probably had some
9 discussions about this, but I'm going to just -- I want
10 to make sure we're on the same page as far as knowing
11 what to expect today, okay?  So a deposition is
12 basically a question-and-answer session.  I'm going to
13 ask you questions, and you'll answer them unless your
14 attorney instructs you not to.  We're trying to make a
15 record today, and so we can make that record clear, we
16 need to do a few things.  One of which is speak up.
17 That's easy enough, right?
18    A.   Yes, ma'am.
19    Q.   Okay.  The other thing is, to make the record
20 clear, we need to say yes or no instead of things like
21 uh-huh or huh-uh or gesturing.  Although we have video
22 today, but sometimes gesturing just doesn't get picked
23 up on a record.
24    A.   Yes, ma'am.
25    Q.   Okay.  So that we can keep the record clear,

Page 11

1 if you can let me finish my question before you start
2 your answer, and I'll do the same thing and try to let
3 you finish your answer before I start my question.
4    A.   Okay.
5    Q.   Does that sound fair?
6    A.   Yes, ma'am.
7    Q.   Okay.  But the most important thing is if I
8 can -- the odds are pretty good that I'm going to ask
9 you a confusing question today.  It -- it just happens
10 when you're trying to make up questions on the fly, so
11 if I do that and you don't understand what I'm asking
12 you, please stop me and ask me to rephrase it or, you
13 know, use another word or whatever it is that is -- is
14 having -- is keeping us from understanding each other --
15    A.   Okay.
16    Q.   -- okay?  Sound fair?
17    A.   Yes, ma'am.
18    Q.   Okay.  Great.  Mr. Yell, have you ever sued
19 anybody before?
20    A.   No, ma'am.
21    Q.   Has anybody sued you before?
22    A.   No, ma'am.
23    Q.   Okay.  Have you consumed any prescription
24 medications in the last 24 hours?
25    A.   No, ma'am.

Page 12

1    Q.   Okay.  Have you consumed any alcohol in the
2 last 24 hours?
3    A.   I think I had a small beer last night with
4 some pizza.
5    Q.   Okay.  So just a beer, like, a 12-ounce beer
6 or...
7    A.   I think it was a 16.  Yes, ma'am.
8    Q.   What time did you finish your last serving of
9 alcohol?
10    A.   7:30, 8:00.
11    Q.   In the evening last night?
12    A.   Yes, ma'am.
13    Q.   Did you have more than just that one serving
14 of beer?
15    A.   No, ma'am, just a single serving.
16    Q.   Okay.  Have you consumed or used any other
17 substance in the last 24 hours that might impair your
18 ability to understand questions or to answer the
19 questions that I pose to you today?
20    A.   No, ma'am.
21    Q.   Okay.  What did you do to prepare for your
22 deposition?
23         MS. STAPLES:  Robert, before you answer,
24    anything that you and I have discussed or that you
25    discussed with any member of the legal team is

Page 13

1    privileged.  So I don't want you talking about any
2    conversations that we had.  So outside of any
3    conversations or meetings that we had, you can
4    answer that question.
5         MS. LANGEN:  And that -- that raises a good
6    point.  Thank you, Amy.
7 BY MS. LANGEN:
8    Q.   I -- I don't mean to intrude on anything that
9 you talk about with either Ms. Staples or Mr. Slosar or
10 Ms. Campbell or anybody that they work with, okay?
11    A.   Okay.
12    Q.   Okay.  So, with that in mind, can you tell me
13 what you did to prepare for your deposition today?
14    A.   I read over my trial testimony.
15    Q.   Okay.  Did you read over any other transcripts
16 in your criminal -- from your criminal trial?
17    A.   No, ma'am.
18    Q.   Did you read over any of the transcripts from
19 the depositions that have been taken so far in this
20 case?
21    A.   No, ma'am.
22    Q.   Okay.  Without telling me anything that you
23 may have discussed with your attorneys, did you meet
24 with them to discuss the deposition today?
25         MS. STAPLES:  And, again, don't go into

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1   anything that we talked about.  I'll allow -- I'll
2   allow you to answer whether or not we've met to
3   prepare.
4        MS. LANGEN:  Right.
5        MS. STAPLES:  But no other details than that.
6   BY MS. LANGEN:
7        Q.   And that's all I'm asking, is just:  Did you
8   meet?
9        A.   Yes.
10       Q.   Okay.  And how many meetings did you have with
11  your attorneys to prepare for your deposition?
12       A.   Just one.
13       Q.   Okay.  Other than your attorneys or people who
14  work for them, was anybody else present during those
15  meetings?
16       A.   No, ma'am.
17       Q.   Okay.  Mr. Yell, did you graduate from high
18  school?
19       A.   I got my GED.
20       Q.   Okay.  Did you do that in prison?
21       A.   Yes, ma'am.
22       Q.   Okay.  We'll -- we'll talk about that a little
23  bit later on, but I just want to focus on whether or not
24  you attended high school.
25       A.   Okay.  Yes, ma'am.

Page 15

1        Q.   Like, in the traditional high school setting.
2        A.   Yes.
3        Q.   You did.  Okay.  Did you graduate?
4        A.   No, ma'am.
5        Q.   Okay.  What was the name of the high school
6   you attended?
7        A.   I think one year was Russellville High School
8   and the other one was Logan County High School.  Same
9   county, just county and city schools.
10       Q.   Which was the last one that you attended?
11       A.   Logan County.
12       Q.   Okay.  What was the last grade that you
13  attended?
14       A.   Tenth.
15       Q.   Did you attend for any part of the 11th grade
16  or just --
17       A.   No, ma'am.
18       Q.   -- just finished -- at summer break for tenth
19  grade you finished?
20       A.   Yes, ma'am.
21       Q.   Okay.  Why did you decide to stop going to
22  school?
23            MS. STAPLES:  Object to form.  You may answer.
24       A.   Just needed to go to work.  Wasn't doing that
25  well in school.

Page 16

1        Q.   Okay.  How old were you when you stopped going
2   to high school?
3        A.   I'm not sure the exact dates.
4        Q.   Okay.  Between the time that you left high
5   school and September the 11th of 2004, did you seek any
6   other formal education?
7        A.   I got my GED, and then I took some carpentry
8   classes while I was at Eddyville and graduated those.
9        Q.   Okay.
10       A.   KTCS, maybe.
11       Q.   Okay.
12       A.   Something like that.
13       Q.   Okay.  I appreciate that information, but I'm
14  going to focus on the -- what you did after you got out
15  of prison later on in this deposition.
16       Q.   Okay.
17       Q.   So right now I'm just asking you questions
18  about what you did between the time you got out of high
19  school and the date of the fire, basically --
20       A.   Okay.  I understand.
21       Q.   -- September the 11th, 2004.  So with that in
22  mind, do you have any other formal education in that
23  time frame?
24       A.   No, ma'am.
25       Q.   Okay.  Between the time that you left high

Page 17

1   school and September the 11th of 2004, did you take any
2   formal vocational school?
3        A.   No, ma'am.
4        Q.   Between the time that you left high school and
5   September the 11th of 2004, did you have any military
6   service?
7        A.   No, ma'am.
8        Q.   Did you become employed at some point after
9   you left high school but before September the 11th of
10  2004?
11       A.   Yes, ma'am.
12       Q.   Okay.  What was the first job that you had
13  after you left high school?
14       A.   I believe it was Huey Coots, laying brick and
15  block.
16       Q.   I'm sorry.  Can you say that again?
17       A.   Huey Coots.
18       Q.   Hued Coots?
19       A.   Huey Coots.
20       Q.   Oh, Huey Coots.  Okay.
21       A.   Yes, ma'am.  Laying brick and block.
22       Q.   Can you spell his last name?
23       A.   I cannot.
24       Q.   Okay.  We'll do the best we can, then.
25            MS. STAPLES:  Robert, I think, if you could

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1    speak up a little bit.  I'm --
2        THE WITNESS:  Okay.
3        MS. STAPLES:  -- I'm betting that people are
4    having a hard time hearing --
5        THE WITNESS:  All right.
6        MS. STAPLES:  -- online, okay.
7        THE WITNESS:  Yes, ma'am.
8        MS. LANGEN:  Thank you.  I was just about to
9    say the same thing.
10        THE WITNESS:  All right.
11   BY MS. LANGEN:
12       Q.   Okay.  Is -- was -- Huey Coots is the name of
13   the person who was your supervisor?
14       A.   Yeah, the owner.
15       Q.   The owner.  What was the name of his company?
16       A.   Coots Masonary, perhaps.  I'm not sure.
17       Q.   Okay.  Something connected to his last name?
18       A.   Yes.
19       Q.   Okay.  And you did mason work, it sounds like?
20       A.   Yes.
21       Q.   When -- when did you start doing that job?
22       A.   Not long after I left high school, maybe
23   within the same year.
24       Q.   Okay.  Can you put a year on that or
25   approximately?

Page 19

1        A.   '94'ish.
2        Q.   Okay.
3        A.   Somewhere along in those --
4        Q.   From.
5        A.   Summer of '94, perhaps.
6        Q.   Okay.  Were you paid hourly or did you receive
7    a salary by Mr. Coots?
8        A.   Hourly.
9        Q.   And what was that hourly rate?
10       A.   I want to say it was, like, 11 bucks, 12 bucks
11   when I first started.
12       Q.   Okay.  Did you work -- was that a full-time
13   job?
14       A.   Yes, ma'am.
15       Q.   Okay.  So 40 or more hours a week?
16       A.   Yes, ma'am.
17       Q.   Was it year around or seasonal?
18       A.   Winters was kind of tough but we tried to work
19   all year.
20       Q.   Okay.  Okay.  For how long of a period of time
21   did you work for Mr. Coots?
22       A.   For the lack of knowing the exact dates, maybe
23   a year and a half, two years.
24       Q.   Okay.  Okay.  And that's all I'm looking for
25   is a ballpark like that.

Page 20

1        A.   Okay.
2        Q.   Okay.  After you worked for Mr. Coots -- or
3    strike that.
4             When did -- why did you stop working for
5    Mr. Coots?
6        A.   I'm trying to remember back.  It's been so
7    long ago.
8        Q.   I know it.  I know it.  Do the best you can.
9        A.   Yes, ma'am.  I think I started doing kind of a
10   handyman here and there, construction.
11       Q.   On your own?
12       A.   A friend of mine had a little handyman side
13   thing going and I helped him a lot.
14       Q.   Okay.  What was the name of your friend with
15   the handyman business?
16       A.   I'm trying to remember his first name.  We
17   always just called him Jefferson.
18       Q.   You called him Jefferson?
19       A.   Yes, ma'am.
20       Q.   Okay.  So if I -- if I understand correctly,
21   and tell me if I don't, you sort of transitioned away
22   from working with Mr. Coots to work with Jefferson?
23       A.   Yes.
24       Q.   Okay.
25       A.   Make more money.

Page 21

1        Q.   For more money?
2        A.   Yes, ma'am.
3        Q.   How much an hour were you making for him?
4        A.   From --
5        Q.   I'm sorry.  Were you working hourly for him?
6        A.   Yes, ma'am.
7        Q.   Okay.
8        A.   Well, yes.
9        Q.   How much per hour?
10       A.   Fifteen bucks.
11       Q.   Okay.
12       A.   It was kind of a cash thing.
13       Q.   Uh-huh.  And was that also full time?
14       A.   Yes, ma'am.
15       Q.   Okay.  Was it year around or seasonal?
16       A.   Year around.
17       Q.   Okay.  Did you file any taxes -- any tax
18   returns in connection with either your work for Mr.
19   Coots or your work for Jefferson?
20       A.   No.
21       Q.   Okay.  How long a period of time did you work
22   for Jefferson?
23       A.   A year'ish or so.
24       Q.   Okay.
25       A.   Til '98.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    Q.    Okay.
2    A.    Somewhere along in there.
3    Q.    Okay.  And I don't think I asked you this when
4  we were talking about Mr. Coots, what part -- where was
5  that job located?
6    A.    Bowling Green, Kentucky.
7    Q.    Okay.
8    A.    And the surrounding little bit.
9    Q.    Okay.
10    A.    The towns and stuff around Bowling Green.
11    Q.    Okay.  How about Jefferson, same thing?
12    A.    Yes, ma'am.
13    Q.    Same place?
14    A.    Bowling Green.
15    Q.    Bowling Green?  Thank you.
16          Can't remember if I asked you, so if I did,
17  I'm sorry.  But how long a period of time did you work
18  for Jefferson?
19    A.    A year, a year and a little bit, you know.
20    Q.    Okay.
21    A.    Maybe a year and a half.
22    Q.    Okay.  So that -- so what was the next job
23  after that that you had before the fire?
24    A.    I think maybe my step dad, Jeff Carlisle.
25    Q.    Okay.

Page 23

1    A.    I worked with him less than a year.
2    Q.    And what did you do for Mr. Carlisle?
3    A.    Brick and block.
4    Q.    Has that always sort of been your area of work
5  --
6          MS. STAPLES:  Objection to form.
7    Q.    -- before -- before the fire?
8          MS. STAPLES:  Objection to form.
9    A.    At that time, yes.
10    Q.    So mason work is what I'm --
11    A.    Yeah.
12    Q.    Okay.  And did you always make approximately
13  the same amount of money?  I think you've said 12 to $15
14  an hour?
15    A.    Somewhere along those, yeah.
16    Q.    Doing mason work?
17    A.    Yes, ma'am.
18    Q.    Up til -- up til the fire?
19          MS. STAPLES:  Objection to form.
20    A.    Yes.
21    Q.    Okay.  Okay.  Do you recognize the name
22  Clifford Price or Paradise Homes?
23    A.    Yes, ma'am.
24    Q.    Is that somebody who employed you?
25    A.    Yes, ma'am.

Page 24

1    Q.    Okay.  What did you do for Paradise Homes?
2    A.    We built homes, carpentry work.
3    Q.    And when did you start working for Paradise
4  Homes?
5    A.    2002'ish.
6    Q.    For what period of time did you work for
7  Paradise Homes?
8    A.    Until the fire.
9    Q.    Okay.  How much did you make per hour for
10  Paradise Homes?
11    A.    I think starting off was around 15.
12    Q.    Okay.  Did you end up making more than 15 at
13  some point?
14    A.    Some jobs paid more, some a little less, you
15  know, it all depended on what needed to be done.
16    Q.    Okay.  But on average about $15 an hour I
17  think you said?
18    A.    Yes, ma'am.
19    Q.    Okay.  Were you employed by Paradise Homes at
20  the time of the fire?
21    A.    Yes, ma'am.
22    Q.    Okay.  Was that full-time work?
23    A.    Yes, ma'am.
24    Q.    Okay.  Approximately how much was the most
25  money you think you earned in any given year prior to

Page 25

1  the fire?
2    A.    I'm not sure.  25, 30,000, somewhere along in
3  those lines.  It all depended on, like I said, the job
4  and what needed to be done.
5    Q.    Okay.
6    A.    I don't have an exact number, no.
7    Q.    Is there anything that you have, any record or
8  any document somewhere that would help you determine how
9  much you made in any given year before the fire?
10    A.    I think my step dad, Jeff Carlisle, took out
11  taxes, but other than that, I've always worked, I think
12  they referred to as under the table, you know, it was
13  cash money.
14    Q.    Is Jeff Carlisle still alive?
15    A.    No, ma'am.
16    Q.    When did he pass?
17    A.    March 5th, 2017.
18    Q.    Before the fire, did you have any other source
19  of income other than what you earned through working?
20    A.    No, ma'am.
21    Q.    And I think you said you've never filed a tax
22  -- a federal tax return?
23          MS. STAPLES:  Object to form.
24    A.    Just with Jeff, I think --
25    Q.    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    A.    -- prior to the fire.
2    Q.    Okay.  So when you worked for Mr. Carlisle,
3  you did --
4    A.    Take out taxes and stuff like that, yes.
5    Q.    And you did file a federal tax return that --
6  when you worked for him?
7    A.    Yes, ma'am.
8    Q.    Okay.  Did you also file state tax returns
9  when you worked for Mr. Carlisle?
10   A.    Yes, ma'am.
11   Q.    Okay.  And where was Mr. Carlisle's business
12  located?
13   A.    Jackson, Tennessee around about Crockett
14  County I think is where we lived.
15   Q.    How about Paradise Homes, was that -- where
16  was that?
17   A.    Russellville, Kentucky.
18   Q.    So you said you had attended high school in
19  Logan County at some point?
20   A.    Yes, ma'am.
21   Q.    And you worked at some point in Jackson
22  County, Tennessee, correct?
23   A.    I think it's Madison County, but, yes.
24   Q.    Madison County, Tennessee.  Is that --
25   A.    The city is Jackson, but, yes --

Page 27

1    Q.    Okay.
2    A.    -- Tennessee.
3    Q.    Gotcha.  So what other towns have you lived in
4  as an adult prior to the fire?
5    A.    None.  I've never really moved off for
6  anything like that.  It's always been right around Logan
7  County, Bowling Green or in Crockett County.
8    Q.    Okay.
9    A.    Tennessee.
10   Q.    Okay.  Was there a period of time where you
11  lived in Oklahoma ever?
12   A.    No, ma'am.
13   Q.    Did you ever pass through Oklahoma for any
14  reason?
15   A.    Yes, ma'am.
16   Q.    Okay.  So if you attended high school in Logan
17  County, how did you end up in Jackson, Tennessee or
18  Crockett County, Tennessee?
19        MS. STAPLES:  Objection to form.
20   A.    My step dad lived down there.
21   Q.    So did you move with family?
22   A.    Yes.
23   Q.    Okay.  What was your mother's name?
24   A.    Virginia Lynn Thompson.
25   Q.    Did you have any stepfathers besides Jeff

Page 28

1  Carlisle?
2    A.    She was married once prior -- they was
3  married, separated.  She married Michael Bratten, and
4  then they got a divorce and she was back with Jeff when
5  he passed.
6    Q.    You said she was back with Jeff, was there a
7  period of time where she wasn't with Jeff?
8    A.    Yes.  She was married to Michael Bratten.
9    Q.    Oh.  And then -- but Jeff was never before
10  Michael?
11   A.    Yes.
12        MS. STAPLES:  Objection to form.
13   A.    When we was kids, Jeff raised us.  They had a
14  parting of the ways and got a divorce.  Then she met
15  Michael, married him.  I don't recall how long, ten, 12,
16  15 years.  They separated, and, I guess, her and Jeff
17  reconnected and she was living with him when he passed.
18   Q.    Okay.  Thank you for clarifying that.  I
19  appreciate that.
20        Do you know April Davis who sometimes went by,
21  or maybe still goes by, April Carpenter?
22        MS. STAPLES:  Objection to form.
23   A.    Yes, ma'am.
24   Q.    Okay.  How did you first meet April?
25   A.    I think the very first time she was working at

Page 29

1  a convenient store there in Crockett County.
2    Q.    Approximately when did you meet April?
3    A.    2001'ish, the beginning of maybe 2002.
4  Somewhere along in those lines.
5    Q.    Okay.  Okay.  Where were you living when you
6  first met April?
7    A.    With my step dad, Jeff.
8    Q.    Were you also living with your mom at that
9  time?
10   A.    They wasn't together at that time, no.
11   Q.    Okay.  So you were just living with Jeff
12  Carlisle at that time?
13   A.    Yes.
14        MS. STAPLES:  Objection to form.
15   Q.    In Crockett County?
16   A.    Yes, ma'am.
17   Q.    Okay.  Where were -- do you know where April
18  was living at the time that you and she first met?
19   A.    I want to think the town was called Alamo,
20  maybe.
21   Q.    Is that also in Crockett County --
22   A.    In Tennessee.
23   Q.    -- Tennessee; do you know?
24   A.    Yes, ma'am, Tennessee.
25   Q.    Okay.  Was April married when you first met

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 10 of 77 PageID #: 2918
The Deposition of ROBERT TYREE, taken on September 30, 2022

30..33

Page 30

1  her?
2      A.   I'm not exactly sure if they was married or
3  just living together but...
4      Q.   So is it your understanding that she was
5  living with -- who -- who is it your understanding that
6  she was living with?
7          MS. STAPLES:  Objection to form.
8      A.   Another man.
9      Q.   Do you know his name?
10     A.   Yes.
11     Q.   What is that?
12     A.   Lester Carpenter.
13     Q.   Okay.  But at the time that you and she -- you
14  and April met, you don't know whether or not April and
15  Lester was married; is that -- or were married --
16     A.   Yeah.
17     Q.   -- is that true?
18     A.   I -- yes.
19     Q.   Do you have an understanding of how long April
20  and Lester Carpenter were married regardless of --
21     A.   No, ma'am.
22         MS. STAPLES:  Objection to form.
23     Q.   Okay.  You don't know when -- like, what date
24  they were married?
25     A.   Of course not.

Page 31

1      Q.   Okay.  Do you know if April and Mr. Carpenter
2  were ever divorced?
3      A.   I don't -- I don't know if she ever -- I don't
4  know her marital history, no.
5      Q.   Okay.  And I may have asked you this, if I
6  did, bear with me.
7      A.   Yes, ma'am.
8      Q.   When you and April still living with Mr. Carpenter when
9  you and she met?
10     A.   I think so, yes.
11     Q.   Was there a period of time after you and April
12  met before you started dating?
13         MS. STAPLES:  Objection to form.  You can --
14     Q.   Can you repeat that?
15     Q.   Yeah.  I'm sorry.
16     A.   Yeah.  It was --
17     Q.   I'm sorry.
18     A.   Yeah.
19     Q.   Eventually you and April started dating,
20  correct?
21     A.   Yes.
22     Q.   Okay.  So you said you met April, I think you
23  said, that you met April, like 2001'ish, 2002; is that
24  correct?
25     A.   That's correct.

Page 32

1      Q.   Okay.  So after the point in time at which you
2  met April and before you started dating, was there some
3  period of time -- you didn't just immediately meet her
4  and start dating, correct?
5          MS. STAPLES:  Objection to form and foundation.
6      A.   No, ma'am.
7      Q.   Okay.  So how long did you know April before
8  you started dating?  Maybe that's a better way to ask
9  that.
10     A.   What do you call dating?  Like, going out on
11  dates and spending time with each other or...
12     Q.   Well, you said before that you and April were
13  dating at some point.
14     A.   Yes.
15     Q.   Okay.  What do you consider dating?
16     A.   We went out a few times, but I think she was
17  still with -- I don't know their relationship, but I
18  don't think it was too good and she was getting away
19  from him.  And, you know, we went out a few times, yes,
20  prior to Cameron being born.
21     Q.   Okay.  We're not quite to Cameron yet.
22     A.   Getting close.
23     Q.   We will get there.  We will get there.
24     A.   Yes.
25     Q.   So I'm just wondering how long you knew April

Page 33

1  before you started taking her out on dates or doing what
2  you consider dating?
3      A.   A few months, perhaps.
4      Q.   Okay.  Was April pregnant when you first met
5  her?
6      A.   No.
7          MS. STAPLES:  Objection to form and foundation.
8      Q.   When you and April first met, did she have
9  children from a -- any previous relationship?
10     A.   Yes.
11     Q.   Who were those children?
12     A.   Zachary and Nicholas.
13     Q.   Okay.  Do you know who the biological father
14  of Zachary was?
15         MS. STAPLES:  Objection to form and foundation.
16     A.   I don't know.  I've never seen a DNA test
17  or...
18     Q.   Okay.  Do you know who was the biological
19  father of Nicholas?
20         MS. STAPLES:  Objection to form and foundation.
21     A.   No.
22     Q.   Okay.  When did you -- strike that.
23         At some point after you and April began
24  dating, did you decide to move in together?
25     A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 11 of 77 PageID #: 2919
The Deposition of ROBERT TYREE, taken on September 30, 2022

34..37

Page 34

1    Q.    Okay.  When was that?
2    A.    Right after Cameron was born.
3    Q.    And do you know off the top of your head
4  Cameron's birth date?
5    A.    Yes.
6    Q.    What was that?
7    A.    [Redacted.]
8    Q.    I noticed that you did not name Cameron as one
9  of April's children from a previous relationship, is it
10 your contention that Cameron is biologically your child?
11        MS. STAPLES:  Objection to form and foundation.
12   A.    Yes.
13   Q.    Where was Cameron born?
14   A.    Jackson, Tennessee.
15   Q.    Do you know if there's ever been any DNA test
16 to determine Cameron's parentage?
17   A.    Not that I know of.
18   Q.    Do you know what Cameron's last name is on his
19 birth certificate?
20   A.    I think it's Carpenter.  Lester was there.
21   Q.    I'm sorry.  Say that again?
22   A.    Lester was there when he was born.
23   Q.    So --
24   A.    He signed the birth certificate.
25   Q.    Okay.  So Lester was present when Cameron was

Page 35

1  born as -- to your knowledge?
2    A.    To my best of knowledge, yes.
3    Q.    Okay.  And when you say "there," do you mean
4  at the hospital?
5    A.    Yes.
6    Q.    Okay.  And I think you just said that Lester's
7  the one that signed the birth certificate?
8    A.    If I'm not mistook.
9    Q.    Okay.  Were you present when Cameron was born
10 at the hospital?
11   A.    No.
12   Q.    What hospital was Cameron born at?
13   A.    For the lack of knowing, I want to say Jackson
14 General, if I'm not mistook.
15   Q.    Do you know who was listed as Cameron's father
16 on Cameron's birth certificate?
17        MS. STAPLES:  Objection to form.  Asked and
18     answered.
19   Q.    I don't think I asked that particular one, but
20 you can answer it.
21   A.    I think it was Lester.
22   Q.    Have you ever seen a copy of Cameron's birth
23 certificate?
24   A.    No.
25   Q.    Do you know what last name is listed on

Page 36

1  Cameron's death certificate?
2    A.    Maybe Yell or Carpenter.  I'm not sure.  I've
3  never seen the death certificate.
4    Q.    Okay.  Would it surprise you to know that some
5  of the records from the Logan County coroner list
6  Cameron's last name as Carpenter?
7        MS. STAPLES:  Objection to form and foundation.
8    A.    No.
9    Q.    It wouldn't surprise you?
10        MS. STAPLES:  Objection.  Asked and answered.
11   Q.    You can answer.
12   A.    I did.
13        No.
14   Q.    Okay.  Would it surprise you to know that some
15 of the records from Logan County Memorial Hospital list
16 Cameron's last name as Carpenter?
17   A.    No.
18        MS. STAPLES:  Objection.
19   Q.    You can answer.
20   A.    No.
21   Q.    Okay.  Why would that not surprise you?
22   A.    Because I think Lester was there when he was
23 born and he signed the birth certificate as Carpenter.
24   Q.    Okay.  So you think that information is based
25 on the birth certificate?

Page 37

1    A.    Yes.
2    Q.    Were you and April ever married to each other?
3    A.    No.
4    Q.    Okay.  Do you and April have any biological
5  children together other than I understand you're saying
6  Cameron is?
7    A.    Yes.
8        MS. STAPLES:  Objection to form.
9    Q.    Who is that?
10   A.    Saralynn.
11   Q.    Do you need to take a break so you can --
12   A.    No, ma'am.
13   Q.    Okay.  You said that you and April had moved
14 in together shortly after Cameron's birth, correct?
15   A.    Yes, ma'am.
16   Q.    Okay.  How long a period of time had you and
17 April been seeing each other prior to moving in at that
18 point?
19        MS. STAPLES:  Objection to form.  Asked and
20     answered.
21   Q.    You can answer.  Just so you know, there's not
22 a judge here today.  So when -- when she objects, she's
23 basically making a record so that we can have a dispute
24 about that later, if we need to.  But since there's not
25 a judge here, you're going to answer just about every



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  question even though she objects.
2          MS. STAPLES:  Unless I instruct you not to.
3      Q.   Unless she tells you not to.
4      A.   Okay.
5      Q.   Okay.
6      A.   All right.  Could you repeat it?
7      Q.   Yeah.
8      Q.   Okay.  So how long had you and April been
9  seeing each other before you decided to live together?
10     A.   Maybe on again/off again, a few months.
11     Q.   Okay.  So you and April had an on again/off
12  again, relationship I think were your words; is that
13  true?
14     A.   (Witness nods head.)
15     Q.   Okay.
16     A.   Yes.
17     Q.   Between the time that you met -- first met
18  April and the time you lived -- you started living
19  together, do you know whether or not April dated any
20  other men?
21     A.   No.
22     Q.   Okay.  And during that time, was she living
23  with Lester Carpenter?
24     A.   I'm not sure exactly how or where she was
25  living all the time, no.

Page 39

1      Q.   Okay.  So you and she had an on again/off
2  again relationship, so between the time that you met
3  April and the time that you and she started living
4  together, did you date other women?
5      A.   I had a on again/off again relationship, yes.
6      Q.   Who's that with?
7      A.   Joanne Crutchfield.
8      Q.   Where does Ms. Crutchfield live?
9          MS. STAPLES:  Objection to form and foundation.
10     A.   Crockett County.
11     Q.   So when you and April first moved in together
12  after Cameron's birth, where did you first move to?
13     A.   We lived in Crockett County.
14     Q.   Do you happen to remember the address?
15     A.   No, ma'am.
16     Q.   Okay.  At some point, while you and April were
17  living in that first place in Tennessee, did you and she
18  decide to move to Russellville?
19     A.   I don't think we moved from Russellville from
20  -- when we moved from the initial home, no, or that
21  home, after we started living together.  I think we went
22  and lived with Jeff and my mother.  They had done got
23  back together by that time.
24     Q.   And where were Jeff and your mother living?
25     A.   Gibson County.

Page 40

1      Q.   Okay.  So you -- if I understand correctly --
2  and tell me if I don't -- you and April lived together
3  in Crockett County, then you moved in with your mom and
4  step dad, Jeff, who also lived in --
5      A.   The next county over.
6      Q.   The next county over.  Okay.
7      A.   In Tennessee, yes.
8      Q.   Okay.  Then after that, did you move to
9  Russellville at some point?
10     A.   I think so, yes.
11     Q.   Okay.  And was this to a house other than 638
12  Bonnie?
13     A.   Yes.
14     Q.   Okay.  Do you -- do you remember the address
15  of that one?
16     A.   It was on Second Street.  I -- I want to say
17  five -- I don't recall.
18     Q.   That's what I was just going to ask you, was
19  it 582 --
20     A.   That sounds very --
21     Q.   -- East Second Street?
22     A.   That sounds very familiar, yes.
23     Q.   Why did you decide to move away from Tennessee
24  back -- to Russellville?
25         MS. STAPLES:  Objection to form.

Page 41

1      A.   Work.
2      Q.   And that was when you were working with who?
3          MS. STAPLES:  Objection to form.  Do you mean
4      at the --
5          MS. LANGEN:  Let me start over.
6          MS. STAPLES:  Thank you.
7  BY MS. LANGEN:
8      Q.   Okay.  So when you were in Tennessee, where
9  were you working?
10     A.   With Jeff.
11     Q.   Okay.  And so, when you decided to move to
12  Russellville, how did that involve work?
13     A.   A little bit more money and Jeff wasn't -- he
14  was kind of getting older and he didn't do as much work.
15     Q.   Okay.  So Jeff was getting less and less
16  business which meant you were getting less and less
17  business, correct?
18     A.   Yes, ma'am.
19     Q.   Fewer hours anyway, correct?
20     A.   Yes, ma'am.
21     Q.   Okay.  So then you moved to Russellville to
22  seek new work?
23     A.   I think that's when I first started working
24  with Clifford.
25     Q.   Okay.  How did you get in touch with Clifford?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1    A.   He was a family friend with my dad and I grew
2  up knowing him.  We used to go hunting and stuff.
3    Q.   Okay.  So if I'm understanding correctly, when
4  you moved from Tennessee to Russellville, when you --
5  the first time, when you lived at -- on Second Street,
6  you did that to work for Clifford Price?
7       MS. STAPLES:  Objection to form.
8    Q.   Is that -- am I correct?
9    A.   Yes, ma'am.
10    Q.   Had you and April had any calls or visits from
11 child welfare authorities when you lived in your first
12 place together in Tennessee?
13       MS. STAPLES:  Objection to form and foundation.
14    A.   Not that I'm aware of.
15    Q.   When you decided to move away from Tennessee
16 to Russellville the first time, why did you choose
17 Russellville as opposed to somewhere else?
18    A.   That's where I grew up.  I felt comfortable
19 there.  I felt like we could have a better -- or a good
20 start.
21    Q.   Okay.  Okay.  And while you were living on
22 Second Street in Russellville, did you have any -- did
23 you have the police at your residence for any reason?
24       MS. STAPLES:  Objection to form and foundation.
25    A.   Not that I recall.

Page 43

1    Q.   Okay.  So how long did you live on Second
2  Street in Russellville before you decided to move back
3  to Tennessee?
4    A.   I'm not the -- sure the exact date, maybe less
5  than a year.
6    Q.   Okay.  After Second Street, where did you live
7  next?
8    A.   I want to say Dyersburg.  She moved to
9  Dyersburg and got an apartment there.
10    Q.   Is Dyersburg in Tennessee?
11    A.   Yes, ma'am.
12    Q.   Okay.  Why did you decide to leave
13 Russellville for Dyersburg?
14    A.   Just seemed like the right thing to do.
15    Q.   Okay.  Had you had any visits or calls from
16 child protective agencies when you were in -- living on
17 Second Street in Russellville?
18       MS. STAPLES:  Objection to form and foundation.
19    A.   I think there may have been one welfare call.
20    Q.   Okay.
21    A.   And everything was fine and kids was good, but
22 I think Lester may have called just to check on his kids
23 if I'm not mistook, the way that I understood it.
24    Q.   And so, do you remember timeframe-wise when
25 that happened?

Page 44

1    A.   No.
2    Q.   But child welfare visited you at the Second
3  Street address; is that true?
4       MS. STAPLES:  Objection.  Asked and answered.
5    A.   You can answer it.
6    A.   I'm not sure if it was, like, a social worker
7  or just the police.
8    Q.   Were you home when they came?
9    A.   Yeah.
10    Q.   Okay.  Did you speak with them?
11    A.   I think I was there but April may have talked
12 with them.
13    Q.   Okay.  Do you have any recollection of any
14 conversation that occurred when they came to investigate
15 what you said you thought was Lester's call?
16    A.   No.
17    Q.   Okay.  So in Russellville, you had been
18 working for Clifford Price, did you stop working for him
19 when you moved to Dyersburg?
20    A.   Yes.
21    Q.   Okay.  Did you pick up another job when you
22 were in Dyersburg?
23    A.   I think I went back to Jeff, my step dad.
24    Q.   How long did you live in Dyersburg, Tennessee?
25    A.   I don't recall.  Less than a year.

Page 45

1    Q.   Did -- we know, because of this case, that you
2  at some point lived at 638 Bonnie Drive, correct?
3       MS. STAPLES:  Objection to form.
4    A.   Yes.
5    Q.   Did you move directly from Dyersburg to 638
6  Bonnie Drive or was there somewhere in between?
7    A.   I think we moved from Dyersburg to Bonnie
8  Drive.
9    Q.   Okay.  Do you recall when that was?
10    A.   For the lack of the exact date, I want to say
11 the beginning of 2004.
12    Q.   Okay.  And I understand this goes back aways.
13 I'm not trying to -- if you remember an exact date,
14 that's great, but I don't really expect that you will.
15 So when I ask you for time frames or dates, I'm really
16 just looking for a ballpark unless you know the exact,
17 okay?
18    A.   Yes, ma'am.
19    Q.   Okay.
20       MS. STAPLES:  And to add to that, I believe
21 Jennifer would agree, nobody wants you guessing at
22 things, too, so if you don't know, it's okay to say
23 you don't know.
24       THE WITNESS:  Okay.
25 BY MS. LANGEN:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1    Q.    That is correct.
2    A.    Okay.
3    Q.    Nobody -- I don't think anybody does.
4          Why did you decide to leave Tennessee to go to
5    Russellville for the second time?
6    A.    We was living in the projects, and it was kind
7    -- I don't want to say a bad project but it wasn't the
8    best environment.
9    Q.    This is in Dyersburg?
10   A.    Yes, ma'am.
11   Q.    And so, did you decide -- if I'm understanding
12   you correctly, did you decide to move to Russellville
13   the second time to get away from the projects?
14   A.    Yes, ma'am.
15   MS. STAPLES:  Objection to form.
16   Q.    Okay.  Was there any job-connected reason to
17   move back to Russellville?
18   A.    I think I started back with Clifford.
19   Q.    Okay.  While you were living in the projects
20   in Dyersburg, did you and April receive any visits from
21   child welfare authorities?
22   A.    Not that I'm aware of.
23   Q.    Other than the places we've already talked
24   about, did you and April live together at any other
25   place before you moved to 638 Bonnie?

Page 47

1    A.    Not that I can recall, no.
2    Q.    How would you describe your relationship with
3    April from the time you and she met until September the
4    11th of 2004?
5    A.    For the most part, good.
6    Q.    Once you -- once Cameron was born -- I know
7    before Cameron was born, you said it was on again/off
8    again relationship, but after he was born, was it also
9    an on again/off again, or was it pretty steady?
10   A.    Pretty steady.
11   Q.    Okay.  Did you and April have any
12   disagreements during your relationship?
13   A.    I'm sure.
14   Q.    Okay.  Were you completely faithful to April
15   during your relationship with her?
16   MS. STAPLES:  Objection to form and foundation.
17   A.    That I recall, yes.  That I can remember, yes.
18   Q.    Do you remember testifying at your criminal
19   trial?
20   A.    Yes.
21   Q.    Okay.
22   MS. LANGEN:  Amy, I've got one for you.
23   MS. STAPLES:  Thank you.
24   MS. LANGEN:  And I've got one -- this is --
25   just for the record, what I'm handing you is a

Page 48

1    transcript from your criminal trial.
2    THE WITNESS:  Okay.  Thank you.
3    MS. LANGEN:  And this -- you can share this, if
4    you'd like.  I only have the one.  Sorry.  For
5    everybody else, this is the transcript of Mr. Yell's
6    testimony at his criminal trial on, I believe, it
7    was February the 8th of 2006, if I'm correct.
8    Sorry.  February 17th of 2006.
9    BY MS. LANGEN:
10   Q.    Okay.  If you can turn to page 211 and look at
11   line six to 11.
12   MS. STAPLES:  And, Robert, the -- do you see
13   the page numbers are on the --
14   MS. LANGEN:  The page --
15   MS. STAPLES:  -- top square --
16   MS. LANGEN:  Yes.  Thank you.
17   MS. STAPLES:  -- of the --
18   THE WITNESS:  Okay.
19   BY MS. LANGEN:
20   Q.    So, like, right there is page 212; do you see
21   that?
22   A.    Yes, ma'am.
23   Q.    If you can go to -- look for page 211; do you
24   see?
25   A.    211, yes.

Page 49

1    Q.    Okay.  Those little numbers along the side on
2    the left, those are line numbers.  Can you look at line
3    number six and read from there to line number 11?
4    A.    "Now, did -- now, we're talking about you and
5    April.  Did that -- the fact that she cheated on you
6    have a --
7    MS. STAPLES:  Do you want him to read it out
8    loud?  I'm sorry or just to himself?
9    A.    -- have an effect --
10   MS. LANGEN:  He's doing fine.
11   A.    -- on your relationship?  Yeah, but I didn't -
12   - it on her once before, and I swore to put myself in
13   her shoes, I guess, if you will.  Nobody is perfect."
14   Q.    Okay.  So did you see where you read, "But I
15   did it to her once before?"  Do you see that?
16   A.    Okay.
17   Q.    So, is that -- so, at your criminal trial, is
18   it fair to say that you conceded that you had cheated on
19   April once before?
20   MS. STAPLES:  Objection to form.
21   A.    I'm not sure what the previous -- may have to
22   go back before line six, what the content was.
23   Q.    Well, line six says, "Now, did -- now, we're
24   talking about you and April."
25   A.    Uh-huh.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 15 of 77 PageID #: 1923
The Deposition of ROBERT TYREE, taken on September 30, 2022

50..53

Page 50

1    Q.   "Did that, the fact that she cheated on you,
2  have an effect on your relationship?"  And you said
3  "Yeah, but I did it to her once before."
4    A.   Okay.
5    Q.   Okay.  Does that not suggest to you that you
6  were -- when you -- when you gave that answer, weren't
7  you saying that you had cheated on April once before?
8       MS. STAPLES:  Objection to form.
9    A.   Okay.  Yes.
10   Q.   Okay.  So how many women did you cheat on
11 April with?
12   A.   One.
13   Q.   Just the one?
14   A.   I think.
15   Q.   And who was that?
16   A.   Joanne Crutchfield.
17   Q.   Okay.  Had you and April -- had you and April
18 been seeing each other for at least a year before the
19 fire?
20   A.   Yes.
21   Q.   Okay.  So you and April were a couple in
22 September of 2003, then, right?
23   A.   That I can remember, yes.
24   Q.   Do you recognize the name Sarah Wolfe?
25   A.   Yes.  She was a neighbor.

Page 51

1    Q.   Okay.  What was the nature of your
2  relationship with Sarah Wolfe in September of 2003?
3    A.   She was a neighbor there when we lived on
4  Second Street in Russellville.  She lived, I think,
5  behind us.
6    Q.   Okay.  Did you have a romantic relationship
7  with Sarah Wolfe?
8    A.   No.
9       MS. STAPLES:  Objection to form.  Foundation.
10   Q.   So you never dated Ms. Wolfe?
11   A.   No.
12   Q.   Okay.  In the summer of 2003, were you staying
13 on and off at Ms. Wolfe's home on North -- North Morgan
14 Street in Russellville?
15   A.   I slept on the trampoline a few times, yes.
16   Q.   Okay.  Why were you staying Ms. Wolfe off and
17 on if you and April were seeing each other at the time?
18      MS. STAPLES:  Objection to form.
19   A.   I think she moved back to Tennessee, and I
20 stayed up for -- in Kentucky for a little while.
21   Q.   Was that when you were living on Bonnie
22 Drive in Russellville; that was your address?
23      MS. STAPLES:  Objection to form and foundation.
24   Q.   In September of 2003?
25      You said you moved -- okay.  Let's -- you said

Page 52

1  you moved -- she moved to Tennessee and you stayed on
2  the couch in Ms. Wolfe's house on North Morgan Street,
3  correct?
4       MS. STAPLES:  Objection to form.  I think that
5  misstates his testimony.
6    Q.   What did you say?  Couch or trampoline, I
7  think.
8    A.   Yes.
9    Q.   Okay.  So you said during -- in that time
10 frame, April had moved back to Tennessee, correct?
11   A.   Yes.
12   Q.   Okay.  Where had you and April lived before
13 April moved back to Tennessee?
14   A.   On Second Street.
15   Q.   Okay.  Oh, second Street.  Okay.  So why, when
16 April moved to Tennessee, did that necessitate you're
17 staying on the couch or trampoline at Ms. Wolfe's house
18 in North Morgan Street?
19   A.   I think there -- I'm not sure of the date, I
20 went to jail and maybe I got out and I hadn't moved to
21 Tennessee yet.
22   Q.   Well, did you still have the residence at
23 Second Street?
24   A.   No, ma'am.
25   Q.   So -- okay.  So you were in jail in -- around

Page 53

1  the summer of 2003; is that what you just said?
2       MS. STAPLES:  Objection to form.  I think you
3     were asking him about September of 2003, right?
4       MS. LANGEN:  Isn't that -- I didn't say just
5     September 2003?
6    A.   I'm not sure the exact dates, but I do
7  remember going to jail, yes.
8  BY MS. LANGEN:
9    Q.   Okay.  What did you go to jail for?
10   A.   I want to -- for the lack of knowing the exact
11 charge, maybe a PI and nonpayment of fine, perhaps.
12   Q.   And do you remember the dates on that?
13   A.   No, ma'am.
14   Q.   Okay.  Was it the Logan County jail?
15   A.   If I'm -- I believe so, yes.
16   Q.   Okay.  Were you arrested in September of 2003
17 for taking a car that Ms. Wolfe had borrowed from her
18 father and driving that car to Tennessee without
19 permission?
20   A.   I do recall something like that, yes.
21   Q.   Okay.  Do you recall -- what do you recall
22 about it?
23   A.   It was her brother's car, if I'm not mistook.
24   Q.   Okay.  And why did you take it to Tennessee?
25   A.   She gave me permission the previous day to use

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB     Document 170     Filed 10/03/25     Page 16 of 77 PageID #: 2924
The Deposition of ROBERT TYREE, taken on September 30, 2022

54..57

Page 54

1  the car but not to go to Tennessee.
2       Q.   Do you recall pleading guilty to the charge of
3  unauthorized use of a motor vehicle in October of 2003
4  in connection with that incident?
5       A.   That sounds familiarable (phonetic), yes.
6       Q.   Okay.  How long were you -- or what was your
7  sentence, sorry, for -- for that guilty plea?
8       A.   I don't recall.
9       Q.   Did you go to jail for it?
10      A.   I think I did.
11      Q.   Okay.  Which jail were you in for that?
12      A.   I want to say I was arrested in Crockett
13  County and transported to Logan County.
14      Q.   We talked about Joanne Crutchfield.  So, when
15  did you start seeing Ms. Crutchfield?
16      A.   The middle of 2002 to initial relationship.
17  No, no.  Excuse me.  2000.
18      Q.   2000?
19      A.   Yes, ma'am.
20      Q.   Okay.  And when did your relationship with
21  Ms. Crutchfield end?
22      A.   Romantically --
23      Q.   If it ended.
24      A.   I talk with her all the time.  I talked with
25  her last night.

Page 55

1       Q.   Okay.  And romantically when did it end?
2       A.   For the exact date, I couldn't tell you.  I
3  want to say 2002'ish, beginning of 2003.  I -- I want to
4  say 2002.
5       Q.   Okay.  So, you said you spoke with Ms.
6  Crutchfield last night?
7       A.   Text, yes.
8       Q.   Okay.  What did you text her about?
9       A.   She's going through breast cancer.  I asked
10  how she was doing, just general questions.
11      Q.   Okay.  Did anything about this case come up?
12      A.   No, ma'am.
13      Q.   Okay.  So other than Ms. Crutchfield, you
14  talked about, did you have any affairs with any other
15  women at the same time that you and April were seeing
16  each other?
17           MS. STAPLES:  Objection to form.
18      A.   Not that I can recall, no.
19      Q.   Was April completely faithful to you during
20  your relationship with her?
21           MS. STAPLES:  Objection to form.  You can
22      answer, if you know.
23      A.   I don't know exactly.
24      Q.   Was there a time during your relationship with
25  April that she cheated on you with a soldier from Fort

Page 56

1  Campbell?
2       A.   I think in the beginning of 2004'ish.
3  Something like that, maybe.
4       Q.   So do you know the name of the soldier?
5       A.   Maybe Green comes to mind but I'm not sure.
6       Q.   Okay.  I think you said that -- you put the
7  time frame of beginning 2004'ish that April was involved
8  with that soldier, was it before, to your knowledge, or
9  after Cameron was born?
10      A.   After.
11      Q.   Do you know how long April and the soldier
12  were involved with each other?
13      A.   I don't know.
14      Q.   Okay.  How did you find out about April's
15  relationship with the soldier?
16      A.   She told me.
17      Q.   Okay.  Tell me about that conversation.
18      A.   I don't remember the exact --
19      Q.   Uh-huh.
20      A.   -- conversation, you know, everything that was
21  said.  Just the highlights, if you will.
22      Q.   Well, tell me the highlights.
23      A.   She was -- I think her and one of her friends
24  went to a bar and met -- I'm not sure how long or
25  anything like that.

Page 57

1       Q.   Okay.  Were you in jail at the time that April
2  was having the affair with the soldier?
3           MS. STAPLES:  Objection to form.  You can
4      answer, if you know.
5       A.   I think so.
6       Q.   What jail were you in at the time?
7       A.   Logan County.  I was on jail release.
8       Q.   You were on --
9       A.   Work release --
10      Q.   Okay.
11      A.   -- for nonpayment of fines.
12      Q.   Okay.  So were you back and forth between the
13  jail and your house on Bonnie?
14      A.   I had to -- Clifford would come pick me up in
15  the mornings, I would go to work, and bring me back to
16  the jail, yes.
17      Q.   Okay.  So what charge were you convicted of
18  that took you to jail -- oh, you said nonpayment of
19  fines.  Got it.
20      A.   If I'm not mistook, yes.
21      Q.   What -- how long of a sentence did you receive
22  for that conviction?
23      A.   It -- I don't think it was -- I don't remember
24  the exact amount.  They give you so much a day credit
25  for being in jail, you know, and you pay, I don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 170   Filed 10/03/25   Page 17 of 77 PageID #:2925
The Deposition of ROBERT YELL, taken on September 30, 2022

58..61

Page 58

1  remember exactly how much, to be on work release.
2      Q.   Okay.
3          MS. STAPLES:  Jennifer, when you get to a
4  stopping point, can we take a break, please?
5          MS. LANGEN:  Yeah.  I won't be too much longer
6  before I get to a good stopping point.
7  BY MS. LANGEN:
8      Q.   To your knowledge, did April cheat on you with
9  anyone other than the Fort Campbell soldier?
10     A.   Not that I know of.
11     Q.   Did infidelity cause fights between you and
12 April?
13     A.   I don't know if it was a spark of an argument
14 or a fight, but I'm sure it was a topic of conversation,
15 other things, you know, we was...
16     Q.   So is it your contention that you -- you
17 weren't upset about this fight -- this affair that she
18 was having with the Fort Campbell soldier?
19         MS. STAPLES:  Objection to form.
20     A.   I've never really been a jealous person, you
21 know.  I -- I wasn't there, you know, and it bothered
22 me, but, you know, people do crazy things, they are --
23 feel lonely.  I -- was I upset?  Sure.  Was I mad and
24 irate?  No.
25         MS. LANGEN:  Okay.  Let's go ahead and take a

Page 59

1  break right now?
2          THE WITNESS:  Okay.
3          VIDEOGRAPHER:  The time is 10:37.  We are off
4  the record.
5          (OFF THE RECORD)
6          VIDEOGRAPHER:  Time is 10:48, and we are back
7  on the record.
8  BY MS. LANGEN:
9      Q.   Mr. Yell, before the break, we were talking
10 about, I guess, your reaction or response to the
11 knowledge that April would have had this affair with the
12 Fort Campbell soldier, and I want to just get back to
13 that one more question.
14     A.   Okay.
15     Q.   Can you pick up the trial transcript and again
16 look at page 211?
17     A.   Okay.
18     Q.   That's where we were before and fall -- we
19 talked about line six through 11 before where you were
20 being questioned about your -- again, your -- a similar
21 topic, your response to April -- the knowledge that
22 April had been cheating on you.
23     A.   Uh-huh.
24     Q.   So line 12 to 15, I'm going to read those.
25     A.   Okay.

Page 60

1      Q.   The question was:  Did you-all have fights
2  about or arguments about the -- what she had done to
3  you?  And you said, maybe loud discussions sometimes but
4  we fought about everything.  So does that inform your
5  response to my previous questions about your -- your
6  reaction to the knowledge that April was cheating on you
7  with a soldier?
8          MS. STAPLES:  Objection to form.
9      A.   Your question is?
10     Q.   Does the knowledge that you previously
11 testified about that you'd had at least loud discussions with
12 April about the affair --
13     A.   Okay.
14     Q.   -- does that know -- does the knowledge that
15 you testified about that, that way previously, does that
16 inform or change or otherwise affect the answers you
17 previously gave me about your response to the knowledge
18 that April was cheating on you with a soldier?
19         MS. STAPLES:  Objection to form.
20     A.   No.
21     Q.   Okay.  Did you and April have fights about
22 anything other than infidelities in the relationship?
23     A.   I'm sure we did.
24     Q.   Okay.  Do you remember an occasion on which
25 April called the police and told them that you had taken

Page 61

1  her to -- to Logan County, Kentucky from Tennessee
2  against her will?
3      A.   No.
4      Q.   Are you saying she never made that kind of a
5  report or are you just saying you just don't know or
6  recall if she did or didn't?
7      A.   I --
8          MS. STAPLES:  Objection to form.
9      A.   I don't know if she did or didn't.
10     Q.   Did you and April have fights about money?
11     A.   I'm sure.
12     Q.   Can you tell me about those?
13     A.   Money was tight.  She didn't work.  I did.  You
14 know, a couple kids.  It was rough.
15     Q.   Okay.  How did that lead to fights between the
16 two of you?
17     A.   Just the stress of trying to keep everything
18 together and stuff, it was kind of hard and it didn't
19 take a whole lot, you know.
20     Q.   Do you recall any specific arguments about
21 money with April?
22     A.   No.
23     Q.   Okay.  Did you and April have any fights about
24 the children ever?
25     A.   Could you be more specific?  Just...



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 18 of 77 PageID #: 2926
The Deposition of ROBERT TYREE, taken on September 30, 2022
62..65

Page 62

1    Q.   Well, raising a family is stressful; would you
2  agree?
3    A.   Yes.
4    Q.   Okay.  And sometimes, you know, there's all
5  kinds of things that come up with kids that can cause
6  conflict between a couple.
7    A.   Okay.
8    Q.   Did that ever happen between you and April?
9       MS. STAPLES:  Objection to form.
10   A.   Without -- I can't think of a specific
11  incident, but I'm sure we argued over things, yes.
12   Q.   To do with the children?
13   A.   I think the morning of the fire we argued over
14  bacon --
15   Q.   Uh-huh.
16   A.   -- you know, stuff like that, but --
17   Q.   Okay.
18   A.   -- I can't recall just a specific incident
19  where the kids done something or anything like that and
20  we argued and fight over, no.
21   Q.   Okay.  When did you come to find out that
22  Lester Carpenter had signed the birth certificate for
23  Cameron?
24       MS. STAPLES:  Objection to form and foundation.
25   A.   I knew from the beginning, I suppose.

Page 63

1    Q.   Did that cause any conflict between you and
2  April?
3    A.   No.
4    Q.   You -- it didn't bother you that Lester
5  Carpenter was signing Cameron's birth certificate even
6  though you thought you were Cameron's biological father?
7       MS. STAPLES:  Objection to form.  Asked and
8  answered.
9    A.   No.
10   Q.   Okay.  Okay.  Did you and April ever have any
11  conflict about the fact that Cameron was using the last
12  name Carpenter?
13   A.   No.
14   Q.   Did you and April have fights about
15  alcohol or drug use?
16   A.   Could you be more specific?  Like, when we was
17  drinking or over drugs or what -- I don't understand the
18  exact...
19   Q.   Okay.  Prior to September the 11th of 2004,
20  did you use alcohol to excess?
21       MS. STAPLES:  Objection to form.
22   A.   I drank, yes.
23   Q.   To excess?
24   A.   Upon occasions, I'm sure.
25   Q.   Okay.  How often would you say you drank to

Page 64

1  excess prior to September the 11th of 2004?
2       MS. STAPLES:  Objection to form.
3    A.   The excess, I'm not sure.
4    Q.   Okay.  Well, how often would you say you drank
5  alcohol prior to September the 11th of 2004?
6    A.   Maybe there was spurts when I would drink a
7  lot, every day, you know.  Then there was sometimes I
8  wouldn't drink as much, you know, it -- all depended, I
9  suppose, on what was going on.
10   Q.   Okay.  Can you pick up that transcript again?
11   A.   Okay.
12   Q.   Look at page 212.  Do you see 212?
13   A.   Yes, ma'am.
14   Q.   I want you to read line 14.
15   A.   "I pretty much drank every day."
16   Q.   Okay.  So does that inform your response about
17  how often or how frequently you drank or were drinking
18  prior to September the 11th of 2004?
19       MS. STAPLES:  Objection.  I may have misheard
20    you.  But I thought you were asking him how many
21    times he drank to excess, so...
22       MS. LANGEN:  I initially did --
23       MS. STAPLES:  Okay.
24       MS. LANGEN:  -- and then I asked:  How often do
25    you drink?

Page 65

1       MS. STAPLES:  Okay.  My apologies.
2    A.   When I -- if I recall right, that was right
3  before the fire, but before, you know, I don't think it
4  was to an excess like it reads here.
5  BY MS. LANGEN:
6    Q.   Okay.  So you said when -- if I understood you
7  correctly, what you just said was, when you testified
8  that you pretty much drank every day, you were referring
9  to the time right before the fire?
10   A.   Yes.
11   Q.   How long before the fire had you been drinking
12  every day?
13   A.   I don't recall the exact time period where I
14  started drinking a lot every day, you know.
15   Q.   Okay.  What kind of alcohol did you typically
16  drink before September the 11th of 2004?
17       MS. STAPLES:  Objection to form.  Do you want
18    to give a more specific -- are you talking about his
19    entire life or the month of September --
20       MS. LANGEN:  So --
21       MS. STAPLES:  -- I mean, that's a very broad
22    question.
23  BY MS. LANGEN:
24   Q.   So we'll say, in your adult life what did you
25  typically -- what type of alcohol did you typically

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

1  drink before the fire?
2      A.   Mostly beer, but I kind of got away from it
3  and started drinking a little whiskey.
4      Q.   How about vodka?
5      A.   April kind of drunk the vodka and it was there
6  and I drunk vodka also, yes.
7      Q.   Okay.  Looking back on the time immediately
8  before the fire, do you think you had a problem with
9  alcohol back then?
10         MS. STAPLES:  Objection to form.
11     A.   Sure.
12     Q.   Okay.  Looking back, can you pinpoint a time
13  or an event when your problem with alcohol began?
14     A.   I've always, I would say, drank, you know,
15  ever since I was maybe a teenager.
16     Q.   Uh-huh.  Okay.  My question was a little more
17  specific, I guess.  How long -- looking back, how long
18  before September the 11th of 2004 do you think you had a
19  problem with alcohol?
20         MS. STAPLES:  Objection to the form.
21     A.   What do you say a problem, causing work
22  issues, not getting up and going to work or --
23     Q.   Whatever you consider --
24     A.   -- relationship --
25     Q.   Whatever you consider to be a problem with

Page 67

1  alcohol.
2      A.   It never really caused a lot as far as work or
3  relationship issues, you know, when you get drunk and
4  someone else gets drunk, you argue and stuff like that
5  but as far as -- you want a time frame of when I think
6  alcohol was an issue in my life?
7      Q.   Uh-huh.
8      A.   Years before the fire.
9      Q.   Okay.  Prior -- or, I'm sorry, did your use of
10  alcohol ever cause any fights with April before the
11  fire?
12         MS. STAPLES:  Objection to form.
13     A.   Like fighting over the alcohol or --
14     Q.   Yeah.
15     A.   -- fighting while we was drunk or --
16     Q.   Well, let's start with fighting over the use
17  of alcohol.
18     A.   I'm sure I drunk when she didn't think it was
19  appropriate and she drunk when I didn't think it was
20  appropriate, you know.
21     Q.   Okay.  Did the fact that -- I'll ask that
22  later.  Sorry.  Strike that.
23         Prior to September the 11th of 2004, did you
24  ever see or hear about a situation in which April used
25  alcohol and I'm going to say to excess?

Page 68

1         MS. STAPLES:  Objection to form.
2      A.   Like getting drunk?
3      Q.   Yeah.
4      A.   Sure.
5      Q.   Okay.  How often did you see or hear about
6  April drinking alcohol to excess prior to the fire?
7      A.   I don't recall by specific amount of dates or
8  incidences.
9      Q.   Okay.  Can you pick up the transcript and look
10  at page 212?
11     A.   Okay.
12     Q.   Okay.  And I'm going to read from lines 10 to
13  15.  You tell me if I don't read it correctly, okay?
14     A.   Okay.
15     Q.   The question was:  Did you and April drink a
16  lot?  And you said, on occasions.  Then the question
17  was:  When you say on occasions, what do you mean by
18  that?  And then you answered, I pretty much drunk every
19  day.  She would maybe drink three or four nights a week.
20         Does that refresh your recollection at all
21  about how often you saw April drink?
22     A.   Okay.  Drinking and getting drunk and stuff is
23  two different things.  We may drink a few beers and be
24  done for the night.  It wasn't like we was falling down
25  sloppy drank everyday, you know, it was just more, after

Page 69

1  work drank a few beers --
2      Q.   Okay.
3      A.   -- every day.
4      Q.   So I asked you about April, and your testimony
5  back then was, she'd maybe drink three or four nights a
6  week.  And if I understand you correctly, now you're
7  telling me that she would drink that often but maybe not
8  be drunk that often; is that what I'm understanding?
9          MS. STAPLES:  Objection to form.
10     A.   Her?
11     Q.   Is that what you're saying?  Sorry.
12     A.   Her or me?
13     Q.   Her.
14     A.   Okay.  Yeah.
15     Q.   Okay.  I think you told me just before that
16  April tended to drink vodka; is that what you said?
17     A.   Yes.
18     Q.   Did you know her to drink anything other than
19  vodka?
20     A.   Yes.
21     Q.   What else did she drink?
22     A.   Maybe beer.
23     Q.   Okay.  And maybe in a typical night where you
24  guys were drinking but you didn't consider her drunk,
25  how much did you see her drink vodka or beer?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    A.    I don't re --
2         MS. STAPLES:  Objection to form.
3    A.    I don't recall an exact amount.
4    Q.    Do you have a feel for what was typical for
5    her to drink?
6    A.    No.
7    Q.    Without getting drunk?
8    A.    No, I don't know her tolerance or anything
9    like that.
10   Q.    Okay.  How about you?  In a typical sitting,
11   in that time frame before the fire, how much beer or
12   whiskey, I think you said, or maybe vodka, how much
13   would you drink in a sitting without getting drunk?
14        MS. STAPLES:  Objection to form.
15   A.    A few drinks, six pack-ish, maybe.
16   Q.    Six pack of beer?
17   A.    Yeah.
18   Q.    Okay.  How much alcohol would -- or how -- I'm
19   sorry.  How much vodka would you drink in a sitting?
20   A.    Maybe a mixed drink, you know.
21   Q.    Just one?
22   A.    One normally, very rarely two-ish.
23   Q.    And what would you mix it with when you were
24   mixing a mixed drink?
25   A.    Coke or if it was vodka maybe some orange

Page 71

1    juice.
2    Q.    Okay.  So if you're mixing vodka and orange
3    juice in a -- like, I don't know, eight -- what kind of
4    container would you mix it in to drink it out of?
5    A.    Just a regular glass.
6    Q.    Would you say 8 ounces, 16 ounces, 12 ounces;
7    do you know?
8    A.    I don't know the exact ounces of the cups we
9    used.  Normally a glass-glass.
10   Q.    Okay.
11   A.    You know, just a regular kitchen glass.
12   Q.    Okay.
13   A.    Nothing -- a big slurpee or anything like
14   that, no.
15   Q.    Okay.  What -- in a typical glass that you
16   would use in the kitchen, how much of that glass would
17   you fill with vodka before putting orange juice in or
18   vice versa?
19        MS. STAPLES:  Objection to form.
20   A.    I don't recall the amount ratio per drink, no.
21   Q.    Just eyeballed it?
22   A.    (Witness nods head.)
23   Q.    Gotcha.  Looking back on the time before the
24   fire, do you now think April had a problem with alcohol
25   back then?

Page 72

1    A.    I'm no alcohol therapist but I'd say yes.
2    Q.    Okay.  Okay.  Prior to the fire, did you ever
3    know April to take any steps to try and address her
4    problem with alcohol?
5    A.    Like a rehab or something?
6    Q.    Like rehab or a 12-step program, alcohol --
7    Alcoholics Anonymous or anything like that?
8    A.    I'm not sure.
9    Q.    Okay.  Did you ever participate in anything
10   like that, rehab or Alcoholics Anonymous or anything
11   like that?
12        MS. STAPLES:  Objection to form.
13   A.    I --
14   Q.    Prior to the fire I'm talking about.
15   A.    I've been to a few AA meetings.
16   Q.    Prior to the fire?
17   A.    Yes.
18   Q.    Okay.  When did you go to AA meetings?
19   A.    I began in 2000, I think it was part of my
20   probation.
21   Q.    Okay.
22   A.    Or parole.
23   Q.    Okay.  How many of those did you go to as part
24   of your probation?
25   A.    I think it was once a week they would meet.

Page 73

1    Q.    For how long a period of time?
2    A.    I'm not sure.
3    Q.    I'm sorry.  Say that again.  I didn't --
4    A.    I'm not sure.
5    Q.    Okay.  Did you have a sponsor ever at
6    Alcoholics Anonymous?
7    A.    No.
8    Q.    Okay.  Once your probation was up, did you
9    continue at Alcoholics Anonymous?
10   A.    No.
11   Q.    Okay.  Prior to September the 11th of 2004,
12   did you abuse any prescription drugs?  And when I say,
13   "abuse," I mean, use them in a manner other than
14   prescribed for you by a doctor?
15   A.    Yes.
16   Q.    Okay.  What -- what prescription drugs did you
17   abuse?
18   A.    I want to say Xanaxes, maybe Valiums.
19   Q.    Anything else besides those two?
20   A.    Not that I can recall.
21   Q.    Okay.  And tell me what you did to abuse
22   Xanax.
23        MS. STAPLES:  Objection to form.
24   A.    Take a few, you know, hard day at work, help
25   you relax, stuff like that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 21 of 77 PageID #: 2929
The Deposition of ROBERT TYREE, taken on September 30, 2022

74..77

Page 74

1   Q.   Okay.  How often did that happen?
2   A.   Not often.  You know, I...
3   Q.   Okay.  And you never had a prescription for
4  Xanax?
5        MS. STAPLES:  Objection to form.
6   A.   Not that I can recall.
7   Q.   Okay.  What did you do to abuse Valium?
8  Considering the definition of abuse I gave you before.
9        MS. STAPLES:  Objection to form.
10  A.   Same thing, you know, after work, relax.
11  Q.   Uh-huh.  How often did you take Valium to
12 relax after work?
13  A.   Not many.
14  Q.   More or less than five?
15  A.   At one time?
16  Q.   No.  I'm sorry.  I didn't mean that at all.
17 Okay.  So in the time prior to the fire --
18  A.   Okay.
19  Q.   -- did you take Valium after work to relax
20 more or less than five times?
21       MS. STAPLES:  Objection to form.
22  A.   Okay.  Right before the fire, I'm going to say
23 not, but maybe the timeline I'm thinking of is a little
24 bit longer than what you're asking.
25  Q.   Okay.

Page 75

1   A.   I'm looking at my whole drug use --
2   Q.   Okay.
3   A.   -- as the timeline there, but as far as
4  leading up to the fire within a year or so, not many.
5  Maybe once within the year, somewhere along in there.
6   Q.   Okay.  Going back further than the year before
7  the fire, how often would you say that you used either
8  Valium or Xanax after work to relax?
9        MS. STAPLES:  Objection to form.  These are so
10      general, are you talking about his entire lifetime
11      or the year before, two years before?  I think it's
12      --
13  Q.   In your adult life.
14       MS. STAPLES:  -- it's difficult for him to
15      answer this question accurately.
16  A.   It is very difficult, but I never really was a
17 pill popper, if you will, like that, but I have
18 experienced and ate them on occasion, yes.
19 BY MS. LANGEN:
20  Q.   Okay.  Have you ever been arrested in
21 connection with your use of Xanax or Valium or any other
22 prescription drug in a way other than prescribed for
23 you?
24       MS. STAPLES:  Objection to form.
25  A.   Not that I can recall.

Page 76

1   Q.   Okay.  Prior to September the 11th of 2004,
2  did April, to your knowledge, abuse any prescription
3  drugs?
4   A.   Not that I can recall.  Nothing stands out,
5  no.
6   Q.   Okay.  Prior to September the 11th of 2004,
7  did either you or, to your knowledge, April, use any
8  illegal drugs such as marijuana or cocaine or
9  methamphetamine or anything else illegal?
10       MS. STAPLES:  Objection to form.  My same
11      concern, that there's no set time period.
12  Q.   Well, let's start with the year before the
13 fire.
14  A.   I've smoked pot, yes.
15  Q.   Okay.  On -- with what kind of frequency did
16 you smoke pot in the year prior to the fire?
17  A.   Not every day, you know, but maybe a little
18 bit every week, once or twice, something like that a
19 week, perhaps.
20  Q.   Uh-huh.  Okay.  And, then, before the time
21 frame of a year before the fire, were you a user of
22 drugs that were not legal?
23  A.   Yes.
24  Q.   Okay.  And with what frequency in your adult
25 life did you do that starting with the time you got out

Page 77

1  of high school until the year before the fire, that
2  one-year mark?
3   A.   Maybe a few -- a little of the time span, I
4  smoked pot quite a bit, then maybe not so much.  You
5  know, it's hard to say, I smoked pot for this long and
6  then, you know.
7   Q.   Okay.  Other than marijuana, have you used any
8  other illegal drug in your adult -- in your adult life?
9   A.   Yes.
10  Q.   Okay.  And which other drugs?
11  A.   Cocaine.
12  Q.   Okay.  And what time frame would you say you
13 used that?
14  A.   I smoked crack for a few years, perhaps.  I'm
15 not sure the exact dates.
16  Q.   Is there, like, an event that you associate
17 with that?  Like, right after you got out of high -- or
18 you quit high school or right before something else
19 happened?
20  A.   No.
21       MS. STAPLES:  Objection to form.
22  Q.   No?  Okay.  Did the use of drugs by either you
23 or April ever cause fights between you prior to the
24 fire?
25       MS. STAPLES:  Objection to form.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1    A.  I'm not sure if we ever fought over drugs, but
2  I'm sure when we was using drugs, it was a catalyst for
3  an argument, you know.
4    Q.  Okay.  Other than things we've already talked
5  about, were there any -- was there anything else that
6  you and April commonly fought about?
7    MS. STAPLES:  Objection to form.
8    A.  Not that I can recall right off.
9    Q.  Okay.  When you and April fought prior to the
10  fire, did your fights ever become physical?
11    A.  When we argued, she liked to get up in your
12  face and mouth, and I'm not really a confrontation
13  person.  I just wanted to, maybe, leave and talk about
14  it later and she was the exact opposite.  She wanted to
15  get to the bottom of it right then and there regardless
16  of who was drinking or not.  And I think I would push
17  her or get her out of the way so I could leave.
18    Q.  Okay.  Other than pushing her or whatever to
19  get her out of the way so you could leave, had you --
20  had your fights ever otherwise become physical?
21    A.  I think, I grabbed her by the throat once and
22  shoved her out of the way.
23    Q.  Okay.  Tell me what you recall about that
24  occasion.
25    A.  That we was just arguing and I was trying to

Page 79

1  leave and she just kept jumping up in my face, and I
2  grabbed her, and, you know, it wasn't no long incident
3  or anything like that, more just grabbed her and hold
4  her and push her away, then I would leave.
5    Q.  Do you remember when that happened?
6    A.  It was prior to the fire, a little bit.  I
7  don't -- I think that was the only time I ever really
8  grabbed her like that.
9    Q.  Okay.  Before September the 11th of 2004, I'm
10  going to be a little bit more specific here in terms of
11  the actions.
12    A.  Okay.
13    Q.  Had you ever punched or slapped or choked or
14  struck or kicked or otherwise touch April in violent way
15  for any reason?
16    MS. STAPLES:  Objection to form.
17    A.  The punching and kicking and slapping, never.
18  I think the only time it ever become physical was when I
19  choked her.
20    Q.  What you just described before?
21    A.  Yeah.
22    Q.  Okay.  Would you pick up the transcript,
23  please, and turn to page 232, and we're going to also
24  spill onto 233.
25    A.  Okay.

Page 80

1    Q.  Okay.  So, the first one is -- or; the
2  question is:  Mr. Yell, do you remember interviewing
3  with Detective West and Detective Edmonds?  And your
4  answer was:  Yes, ma'am.  And then the question was:  Do
5  you remember stating in your interview that you had
6  previously choked April?  And the answer was:  I think I
7  did on the -- and then something was inaudible.  And
8  then the question was:  You choked her on the couch?
9  And then line ten:  The counter in the kitchen.  Does --
10  is that a separate incident than what you were
11  describing before where you grabbed her by the throat
12  and pushed her out of the way?
13    A.  I think I would push her -- it started in the
14  kitchen and I pushed her or had her and put her on the
15  counter so I could leave.  It's the same incident.
16    Q.  So you're saying that's the same incident?
17    A.  Yes.
18    Q.  Okay.
19    VIDEOGRAPHER:  Sir, you've got to stop playing
20  with your mic.
21    THE WITNESS:  I apologize.
22    VIDEOGRAPHER:  It's okay.
23  BY MS. LANGEN:
24    Q.  Let's go to lines 21 of page 232, and I'm
25  going to read from there, okay?

Page 81

1    A.  Okay.
2    Q.  Do you remember telling the detectives that
3  you choked April in reference to a phone bill that you
4  had received in the mail for phone calls to her, the
5  gentleman that she had an affair with.  And your answer
6  was:  We was arguing and fighting over it and she kept
7  getting up in my face.  Question was:  And then you
8  choked her?  And the answer was:  Yes.  The question:
9  Why did you choke her?  The answer:  Because we was
10  arguing and fighting.  And then the question was:  What
11  happens when you choke somebody?  And the answer was:  I
12  didn't strangle her nothing like that.  I just had my
13  hands around her throat for -- and then the question
14  was:  Were your hands tight around her throat?  And the
15  answer was:  Four or five.  It didn't leave no marks or
16  bruises or nothing.  No more than four or five seconds.
17  And then the question:  But you did choke her?  And the
18  answer:  I did put my hands around her throat, yes.
19    What I just read there, did you see that?
20    A.  Uh-huh.
21    Q.  Did I read it correctly?
22    A.  Yes, ma'am.
23    Q.  Okay.  Is that the same incident that you're
24  talking about, all --
25    A.  Yes, ma'am.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ROBERT TYREE, taken on September 30, 2022

82..85

Page 82

1    Q.  -- both those passages we just recently read -
2    -
3    A.  Yes.
4    Q.  -- relate to the same incident you described
5  where April was in your face and you grabbed her around
6  the throat and pushed her aside?
7    A.  Yes.
8    Q.  Okay.  And all that took place on the kitchen
9  counter?
10    MS. STAPLES:  Objection to form.
11    A.  I'm not sure.  I think she ended up on the --
12  leaned up against the counter, yes.
13    Q.  Okay.  To your knowledge, before September the
14  11th of 2004, did anyone ever call the police to respond
15  to 638 Bonnie to a fight between you and April?
16    MS. STAPLES:  Objection to form.
17    A.  I think -- I want to say yes.
18    Q.  Tell me what you remember about that.
19    A.  We was arguing, and I think the neighbor may
20  have called.
21    Q.  Do you remember how -- I'm sorry.  Go ahead.
22    A.  I think maybe the neighbor had called.
23    Q.  Okay.  And how long before the fire was that?
24    A.  I'm not sure.
25    Q.  Okay.  Do you remember an occasion on August

Page 83

1  the 7th of 2004 when Amanda Bellar called to report a
2  domestic situation in progress at 638 Bonnie?
3    MS. STAPLES:  Objection to form and foundation.
4    A.  No.
5    Q.  Okay.  Okay.  Do you think that might be the
6  situation that you just described where some -- where
7  the neighbor called the police?
8    A.  I don't know.
9    Q.  Okay.  So you don't know if those are the same
10  thing or not?
11    MS. STAPLES:  Objection to form.  Asked and
12    answered.
13    A.  No.
14    Q.  Okay.  So let's go back to the situation you
15  did -- you described before that you did remember.  What
16  were you and April doing when the police responded to
17  your home?
18    A.  I don't recall what exactly we was doing, no.
19    Q.  You -- do you remember what you were fighting
20  about?
21    A.  No.
22    Q.  Do you remember whether you used any type of
23  physical -- do you remember if you touched her in any
24  sort of violent physical way during that -- the course
25  of that argument?

Page 84

1    MS. STAPLES:  Objection to form.
2    A.  No.
3    Q.  You don't remember or you didn't?
4    A.  I want to say I didn't.
5    Q.  You didn't do that?
6    A.  Yeah.
7    Q.  Okay.  Other than April, have you ever pushed
8  or punched or slapped or choked or struck or kicked or
9  otherwise touched any other woman in a violent way prior
10  to September the 11th of 2004?
11    MS. STAPLES:  Objection to form and foundation.
12    A.  No, ma'am.
13    Q.  Okay.  Have you ever pushed, punched, slapped,
14  choked, struck, kick or otherwise touched anyone in a
15  violent way for any reason prior to September the 11th
16  of 2003?
17    MS. STAPLES:  Objection to form and foundation.
18    A.  As far as, like, a fight?
19    Q.  Sure.
20    A.  Yeah.
21    Q.  A fight, anything like that.
22    A.  Sure.
23    Q.  Okay.  How many occasions do you recall doing
24  that?
25    MS. STAPLES:  Objection to form.

Page 85

1    A.  Oh, goodness.  Are you talking about, like, in
2  school or my adult life or --
3    Q.  Your adult life.  Let's talk about your adult
4  life.
5    A.  Okay.  Repeat the question for me.
6    Q.  Okay.  Sure.  I just want to know if you've
7  ever pushed or punched or slapped or choked or kicked or
8  struck or otherwise touched anyone in a violent way for
9  any reason --
10    MS. STAPLES:  Objection to form.
11    Q.  -- prior to the fire?
12    MS. STAPLES:  Sorry.  Objection to form.
13    A.  Yes.
14    Q.  Okay.  Tell me how many times you remember
15  doing that.
16    A.  One incident that comes to mind was -- was
17  over a friend's house, and the guy was drunk and
18  wouldn't leave, and I think I pushed him and maybe ended
19  up pushing him out in the road, you know.
20    Q.  Uh-huh.  Okay.  Do you remember when that
21  happened?
22    A.  No.  Not the exact time.
23    Q.  Okay.  Do you remember if police responded to
24  that situation at all?
25    A.  I don't think they did.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 24 of 77 PageID #: 2932
The Deposition of ROBERT TYLER, taken on September 30, 2022

86..89

Page 86

1    Q.    Okay.  Was the person injured?
2    A.    Not that I can recall at the time, no.
3    Q.    Do you remember the person's name?
4    A.    Maybe a nickname?
5    Q.    Yeah.  What do you remember about what you
6    called him or what his name was or --
7         MS. STAPLES:  Objection to form.
8    Q.    -- who he was?
9    A.    It was some kind of crazy nickname.  I didn't
10   know his name and I wasn't friends with him.  Stick,
11   maybe, somewhere along those lines, something begins
12   with an "S."  I'm not sure.
13   Q.    Okay.  Do you remember being arrested and
14   charged with assault on May the 4th of 1997 in Bowling
15   Green, Kentucky?
16        MS. STAPLES:  Objection to form and foundation.
17   A.    It does not come to mind, no.
18   Q.    Okay.  So you don't -- do you know whether or
19   not that May 4th, 1997 incident is the one you're
20   describing or could that --
21   A.    It's -- it's -- that's not the incident I was
22   thinking of, no.
23   Q.    Okay.  But, in any event, you don't remember
24   anything about the May 4th of 1997 incident in Bowling
25   Green, true?

Page 87

1    A.    I'm trying to think back.
2    Q.    I know it's back aways.
3    A.    That was a long time ago.  I think my cousin's
4    boyfriend may have -- may have been involving him but
5    I'm not sure.
6    Q.    In that May 1997 --
7    A.    Yes, ma'am.
8    Q.    -- situation?  What was your cousin's
9    boyfriend's name?
10   A.    I don't recall.
11   Q.    Okay.  What was your cousin's name?
12   A.    Miranda.
13   Q.    Miranda what?
14   A.    Gerwall (phonetic.)
15   Q.    Can you spell that?
16   A.    No, ma'am.  She's Cajun.
17   Q.    Oh, could you say it again?
18   A.    Gerwall.
19   Q.    Gerwall?  Okay.  I just wanted to make sure I
20   heard it the right way.
21   A.    Yes, ma'am.
22   Q.    Okay.  Do you remember being arrested and
23   charged with assault on August the 19th in 2000 in
24   Crockett County, Tennessee?
25        MS. STAPLES:  Objection to form and foundation.

Page 88

1    A.    2000, no.
2    Q.    Okay.  Do you think that's the same incident
3    that you described before -- before we started talking
4    about the May 1997 incident?
5    A.    No.
6    Q.    Okay.  Do you recall pleading guilty to
7    assault in connection with an August 29th, 2003 incident
8    in which you struck -- allegedly struck a man named
9    Roger Snider in Russellville, Kentucky?
10   A.    I think that may have been the incident I was
11   previously --
12   Q.    You --
13   A.    -- thinking --
14   Q.    You think --
15   A.    -- about.
16   Q.    Okay.  You think that Roger Snider is the guy
17   you talked about as Stick?
18   A.    Yes.
19   Q.    What happened that led to that -- that
20   charge?
21   A.    He wouldn't leave.
22   Q.    He wouldn't leave where?
23   A.    The friend's house.  He was on the porch and
24   maybe trying to get in the house and being loud and just
25   drunk.

Page 89

1    Q.    Okay.  Do you recall if you were drunk on that
2    occasion?
3    A.    I don't think I was drunk, no.
4    Q.    Okay.  Had you been drinking before you struck
5    Mr. Snider?
6         MS. STAPLES:  Objection to form.
7    A.    Not that I can recall, no.
8    Q.    Okay.  Do you recall what you struck Mr.
9    Snider with?
10        MS. STAPLES:  Objection to form.
11   A.    I don't think I struck him with an object.  I
12   think, maybe, pushed him, and I don't recall hitting
13   him, but I remember pushing him off the porch and
14   telling him to leave.
15   Q.    Okay.  But you don't remember striking him
16   with a beer bottle?
17   A.    No, ma'am.
18   Q.    Okay.  Other than the situations we've talked
19   about, the -- three arrests and the fight with the --
20   - or wait.  Other than the -- and the fight with your
21   cousin's boyfriend?
22   A.    Yes.
23   Q.    Other than those, can you think of a situation
24   in which you touched someone in a violent way?
25   A.    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1    MS. STAPLES: Objection to form.
2    Q.    Okay. Up until the day of the fire at 638
3  Bonnie, did anyone ever have an emergency protective
4  order or a domestic violence order against you that you
5  knew about?
6    A.    I think April had one against her from me.
7    Q.    Repeat that. April had one against --
8    A.    Or Sue Carol Browning may have issued one on
9  her.
10   Q.    So there was a -- if I'm understanding you
11  correctly, either an emergency protective order or a
12  domestic violence order against April?
13   A.    Yes, ma'am.
14   Q.    And what was -- do you know what that was
15  supposed to --
16   A.    I don't --
17   Q.    -- keep her from doing?
18   A.    I don't recall, no.
19   Q.    Okay. Do you recall how that arose?
20   A.    No.
21   Q.    Do you remember anything else at all about the
22  possibility that April had a domestic violence order
23  against her?
24   A.    Just that Sue Carol Browning, the judge in
25  Logan County there issued.

Page 91

1    Q.    Okay. Did -- are you the one that asked for
2  it?
3    A.    No, I did not.
4    Q.    Okay. Do you know who asked for it?
5    A.    No.
6    Q.    Okay. But that was in Logan County, as you
7  recall?
8    A.    Yes, ma'am.
9    Q.    You don't recall when?
10   A.    We was living on Bonnie Drive.
11   Q.    Okay. Earlier, when we were talking about
12  alcohol and drug use, you alluded to the thing -- to the
13  possibility that when you and April had been drinking,
14  you and she fought about things that made it more -- I
15  can't remember what words you used, intense or something
16  like that. Is that -- do you remember saying that?
17   MS. STAPLES: Objection to form.
18   A.    That alcohol played a role in it or --
19   Q.    Yes, yes, played a role in the fights.
20   A.    Okay.
21   Q.    From your perspective, were your fights
22  more heated or intense when one of you was under the
23  influence of alcohol than the fights that you had when
24  neither of you was under the influence of alcohol?
25   A.    Okay.

Page 92

1    Q.    Do you -- from your perspective --
2    A.    Yes.
3    Q.    -- is that true?
4    A.    Yes.
5    Q.    Okay. And from your perspective, do you
6  believe that you became more prone to physical violence
7  when you used alcohol?
8    MS. STAPLES: Objection to form.
9    A.    No.
10   Q.    Okay. Were -- are you and April still
11  together as a couple?
12   A.    No.
13   Q.    When was the last time you saw April in
14  person?
15   A.    When my mother passed away the 8th of August
16  this year.
17   Q.    The 8th of August?
18   A.    Yes, ma'am.
19   Q.    Was she at your mom's funeral?
20   A.    She stayed the night at my mom's house where I
21  was staying.
22   Q.    Okay.
23   A.    With her husband.
24   Q.    Oh, who is she married to now?
25   A.    His name is Chris. I'm not sure the last

Page 93

1  name.
2    Q.    Did you have any conversations with April at
3  that time?
4    A.    Sure.
5    Q.    What did you talk about?
6    A.    My mother.
7    Q.    Okay. Anything besides your mother?
8    A.    We didn't talk about what had happened or
9  anything like that, no.
10   Q.    When you say "what had happened," what do you
11  mean?
12   A.    September the 11th.
13   Q.    So you didn't talk about the fire at all?
14   A.    No.
15   Q.    Okay.
16   A.    I wasn't talking with her about any of that.
17   Q.    Did you talk -- did you talk with her at your
18  mom's funeral about this case at all?
19   A.    It wasn't a funeral. It was just the day that
20  she had passed and the next day.
21   Q.    Okay. So in connection with the time that
22  your mom passed and you saw April, did you speak with
23  April about this case at all?
24   A.    No.
25   Q.    Okay. When was the last time that you



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  communicated with April by telephone or e-mail or text?
2      MS. STAPLES:  Objection to form.
3      A.  She sent me some friend requests, but I've not
4  -- I don't remember accepting any of them, and I'm not -
5  - I think we talked once on the phone about Saralynn and
6  how she was doing and maybe some school issues, but that
7  was the gist of it.
8      Q.  Okay.  So when you spoke with her, with April,
9  about Saralynn's school issues, when was that?
10     A.  I'm not sure the exact year.  It was after I
11 had gotten out of prison.
12     Q.  Okay.  And how old is Saralynn by now?
13     A.  She just turned 19.
14     Q.  Okay.  So she is not in school anymore?
15     A.  No.  She graduated.
16     Q.  Okay.  Where did you graduate from school?
17     A.  Crockett County.
18     Q.  High school?
19     A.  Yes, ma'am.
20     Q.  Okay.  And I think you said that April had
21 sent you some friend requests?
22     A.  Sure.
23     Q.  Is that through Facebook?
24     A.  If I'm not mistook, yes.
25     Q.  Okay.  So are you on Facebook?

Page 95

1      A.  Yeah.
2      Q.  Okay.  Under your name Robert Yell?
3      A.  Yes.
4      Q.  Okay.  I asked you if you had ever been
5  married to April and you said no.  Have you ever been
6  married to anyone at all?
7      A.  Never been married.
8      Q.  Okay.  Are you the biological father of anyone
9  other than Saralynn Yell?  And I know you contend that
10 you're also Cameron's.
11     MS. STAPLES:  Objection to form.
12     Q.  Anyone besides that?
13     MS. STAPLES:  Sorry.  Objection to form.
14     A.  Not that I know of.
15     Q.  Okay.  Have you ever been convicted or pleaded
16 guilty to any theft-related crimes prior to September
17 the 11th of 2004?
18     A.  Yes.
19     Q.  Okay.  What's the first one you recall?
20     MS. STAPLES:  Objection to the form.
21     A.  Maybe '98.
22     Q.  Okay.  What do you recall about that one?
23     A.  I snatched a purse.
24     Q.  And where did you do that?
25     A.  Bowling Green, Kentucky.

Page 96

1      Q.  And do you remember the name of the victim in
2  that case?
3      A.  No, ma'am.
4      Q.  Were you convicted by a jury or did you plead
5  guilty?
6      A.  I pled.
7      Q.  Okay.  What -- what sentence did you receive
8  for that?
9      A.  Six years.
10     Q.  And where did you serve that time?
11     A.  At Marion County Adjustment Center.
12     Q.  I'm not a Kentucky native, so you're going to
13 have to tell me this.  You said Marion Correctional --
14     A.  Marion County.
15     Q.  Marion County.
16     A.  It's a CCA prison.
17     Q.  Okay.  So is -- what county is Bowling Green
18 in?
19     A.  Warren.
20     Q.  Warren.  Okay.  That's what I thought.  That's
21 why Marion threw me.
22     A.  Uh-huh.
23     Q.  Okay.  So after the 1998 conviction for -- or
24 pleading guilty for snatching a purse, what's the next
25 theft-related crime that you recall pleading guilty to

Page 97

1  or being convicted of?
2      MS. STAPLES:  Objection to form and foundation.
3      A.  I don't recall any theft-related issues.
4      Q.  Did you have a theft-related conviction in
5  Oklahoma?
6      A.  Oh, stole gas, yes.
7      Q.  Okay.  When did that happen?
8      A.  Oh, '96, '97, something like that.  I think it
9  was $18.
10     Q.  Okay.  And did you plead or were you convicted
11 by a jury or...
12     A.  I think I pled out and paid some fines and
13 stuff.
14     Q.  Did you serve any time at all in jail?
15     A.  Just the initial, go to jail and -- maybe a
16 day.
17     Q.  Okay.
18     A.  And bonded out.
19     Q.  Did you have a conviction for robbery or
20 something along those lines?
21     MS. STAPLES:  Objection to form.
22     A.  Not that I can...
23     Q.  Okay.  So other than these two -- this
24 incident in which you snatched a purse and were
25 convicted in 1998, and this incident where you stole



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 27 of 77 PageID #: 2935
The Deposition of ROBERT TYREE, taken on September 30, 2022

98..101

Page 98

1  some gas in Oklahoma, do you have any other
2  theft-related crimes prior to September the 11th of
3  2004?
4      A.  Not that I can recall.
5      Q.  Have you been convicted of assault or any
6  other type of violent crime prior to September the 11th
7  of 2004?
8      A.  I'm not sure.  I think I pled out to the one
9  issue that we talked about earlier.  I think I pled out
10 to that, but --
11     Q.  From 1997 I think we talked about?
12     A.  The other one, where the guy was on the porch,
13 maybe.
14     Q.  Okay.  The Stick's one?
15     A.  Yeah.
16     Q.  Okay.  Anything else that you can recall?
17     A.  Not that stands out, no.
18     Q.  Okay.  Prior to September the 11th of 2004,
19 did you know who Ken Edmonds was?
20     A.  No.
21     Q.  Prior to the fire, did you know who Chad
22 Eggleston was?
23     A.  No.
24     Q.  Prior to the fire, did you know who Ed Higgins
25 was?

Page 99

1      A.  No.
2      Q.  Prior to the fire, did you know who Ron Mills
3  was?
4      A.  No.
5      Q.  What about Jim Pendergraf?
6      A.  No.
7      Q.  To your knowledge or recollection, had any of
8  those gentlemen I just named arrested you for any reason
9  prior to September the 11th of 2004?
10     A.  Not that I can recall, no.
11     Q.  To your recollection or knowledge, had you had
12 any interaction with -- of any kind, with any of those
13 five gentlemen that I just named --
14     A.  Not that I can recall.
15     Q.  -- prior to the fire?
16     A.  No.
17     Q.  Okay.  Okay.  Let's turn our attention now to
18 September the 11th of 2004 the day of -- which was the
19 day of fire, as I'm sure you recall, at 638 Bonnie
20 Drive.  Do you remember what day of the week that was?
21     A.  I think it was a Saturday.
22     Q.  Okay.  Were you scheduled to work anywhere on
23 that day?
24     A.  No.
25     Q.  Was April scheduled to work anywhere that day?

Page 100

1      A.  Not that I can recall.
2      Q.  Okay.  Given that it was a Saturday, were any
3  of the school age children living with you off of
4  school?
5          MS. STAPLES:  Objection to form.
6      A.  All four of them stayed there with us, lived
7  with us.
8      Q.  Okay.  So you had the whole family in the
9  trailer when you woke up on the morning of September the
10 11th of 2004?
11     A.  And a neighbor kid.
12     Q.  Okay.  I was going to get to that.  So -- and
13 I will.  So the whole family consisted of you, April,
14 Zachary, Nicholas, Cameron and Saralynn; is that right?
15     A.  Yes, ma'am.
16         MS. STAPLES:  Objection to form.
17     Q.  On September the 11th of 2004?
18     A.  Yes, ma'am.
19     Q.  Okay.  And was anyone else in the house that
20 morning as the day got started?
21     A.  I cannot recall the little girl's name, but it
22 was the neighbor girl that come over and played with
23 them.
24     Q.  Does the name Kianna (phonetic) sound familiar
25 or Keyanna (phonetic)?

Page 101

1      A.  I don't recall.  I -- it could have been, yes.
2      Q.  Okay.  It's in here somewhere.  I know it is.
3  There it is.  Okay.  While we're getting started here on
4  this topic, I just want to get this --
5          MS. STAPLES:  Jennifer, do you think -- is this
6  transcript marked?
7          MS. LANGEN:  Well, we'll mark that.  I'm sorry.
8  Yeah.  We'll mark that.
9          MS. STAPLES:  It's okay.  So that the
10 transcript is Exhibit 1?
11         MS. LANGEN:  One.  Yeah.
12         MS. STAPLES:  Okay.
13         MS. LANGEN:  I've not marked anything else yet.
14         (EXHIBIT 1 MARKED FOR IDENTIFICATION)
15 BY MS. LANGEN:
16     Q.  Okay.  So while we're getting started on this
17 topic, let's talk about the structure at 683 Bonnie.
18         That was actually a trailer, wasn't it?
19     A.  Yes, ma'am.
20     Q.  Okay.  And did you own the trailer or did you
21 rent it from someone?
22     A.  Rented.
23     Q.  Okay.  Who did you rent it from?
24     A.  Carroll Rambo (phoentic.)
25     Q.  Carroll Rambo?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 28 of 77 PageID #: 2936
The Deposition of ROBERT TYREE, taken on September 30, 2022

102..105

Page 102

1     A.    Yes, ma'am.
2     Q.    Okay.  Looking at this document, which I think
3  is Bates labeled, if you look at that lower right-hand
4  corner, it says RPD001355, that's just for everybody
5  who's on the video, so they can find the right document.
6     A.    Okay.
7     Q.    You didn't prepare this document, did you?
8     A.    No, ma'am.
9     Q.    Okay.  But do you recall having seen this
10  document before, maybe at your criminal trial in 2006?
11     MS. STAPLES:  Objection to form.
12     A.    I'm not -- I've have seen diagrams of the
13  trailer but I'm not sure if this is the one that I seen.
14     Q.    Okay.  Okay.  But does this document appear to
15  you to generally depict the layout of the trailer?
16     A.    Yes, ma'am.
17     Q.    Okay.  Do you see the room labeled bedroom
18  that also has a 35 and a 34 written on it?
19     A.    Yes, ma'am.
20     Q.    Okay.  Did you, in fact, use that room as a
21  bedroom?
22     A.    Yes, ma'am.
23     Q.    And who slept in that one?
24     A.    Zachary and Nicholas.
25     Q.    Okay.  Do you see the room labeled east room?

Page 103

1     A.    Yes, ma'am.
2     Q.    What did you use that room for?
3     A.    It was more of a storage, bedroom.  You know,
4  it had a sliding door here on the -- I guess, it would
5  be the east end.
6     Q.    Okay.  Okay.  Do you see the room labeled --
7  I'm sorry.  Did you finish your answer on that?
8     A.    Yes, ma'am.
9     Q.    Okay.  I just wanted to make sure I wasn't
10  cutting you off.
11        Do you see the room labeled kitchen?
12     A.    Yes, ma'am.
13     Q.    And you, in fact, used that as a kitchen?
14     A.    (Witness nods head.)
15     Q.    Okay.
16        MS. STAPLES:  Objection to form.
17     Q.    Okay.  Do you see the room labeled living?
18     A.    Yes, ma'am.
19     Q.    What did you use that room for?
20     A.    Living room.
21     Q.    Okay.  And what did you do in the living room?
22  Like, did you have a TV or a couch or anything?
23     A.    Sure.  Yeah.
24     Q.    Okay.  So just a gathering spot for your
25  family?

Page 104

1     A.    Yes.
2     Q.    Okay.  Do you see the shape drawn under --
3  drawn next to the word living and under the 32?
4     A.    Okay.
5     Q.    You see it, right?
6     A.    Yes, ma'am.
7     Q.    Okay.  Based on your recollection of the
8  trailer and its furniture, do you know what that shape
9  represents?
10     A.    Maybe the couch, loveseat.
11     Q.    Okay.  Under that shape, there's another
12  shape, it's a rectangle that appears to have the outline
13  of a person drawn on it?
14     A.    Yes.
15     Q.    Do you see that rectangle?
16     A.    Yes.
17     Q.    Based on your recollection of the trailer and
18  its furnishings, do you know what that rectangle
19  represents?
20     A.    A baby bed.
21     Q.    And who -- who slept there?
22     A.    Saralynn.
23     Q.    Okay.  Near the bottom right corner of the
24  living room, there's a square with two vertical lines in
25  it?  Do you see what I'm referring to there?  I can

Page 105

1  point to it, if it helps you.  This part here.
2     A.    Yes.
3     Q.    Do you see that?
4     A.    Yeah, yeah.
5     Q.    Okay.  Based on your recollection of the
6  trailer, does that square with the two vertical lines in
7  it appear to represent the steps leading to the front
8  door of the trailer?
9     A.    Yes, ma'am.
10     MS. STAPLES:  Objection to form.
11     Q.    Okay.  Can you write -- here, I'll give you a
12  pen.
13     A.    All right.  Thank you.
14     Q.    Can you write in Bonnie Drive, wherever Bonnie
15  Drive was, in relation to those steps?  Okay.  Can you
16  just write Bonnie on there?
17     A.    (Witness complies.)
18     Q.    Okay.  Okay.  Was there another cross street
19  or anything near your trailer?
20     A.    I think there was a church here and another
21  home here (indicating.)
22     Q.    Okay.
23     MS. STAPLES:  Jennifer, just for purposes of
24  the record, can we maybe have him, also, verbally
25  describe where he just put that line, because we're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

```
1    not going to be able to figure that out when me look
2    back at this, I don't think.
3         MS. LANGEN:  Well, he wrote Bonnie Drive on
4    that line, so I'm not sure what you're confused
5    about.
6         MS. STAPLES:  I would like for people that are
7    on the -- who are appearing remotely --
8         MS. LANGEN:  The Zoom.
9         MS. STAPLES:  -- to be able to -- for him to
10   verbally say where he wrote that line.
11        MS. LANGEN:  Okay.  Sure.
12        MS. STAPLES:  So it's clear to them and also
13   clear on the record.
14        MS. LANGEN:  Gotcha.  Gotcha.  I forgot about
15   Zoom.
16        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
17   BY MS. LANGEN:
18        Q.  Go ahead.  Tell everybody where you drew that
19   line.
20        A.  Underneath where it says, April picking up
21   Saralynn, toward the bottom of the page.
22        Q.  So is the line that you just drew and labeled
23   Bonnie Drive, is that parallel with the bottom edge,
24   like, the short edge of the paper?
25        A.  Yes, ma'am.
```

Page 107

```
1        Q.  And it's on the -- like, underneath where the
2    trailer appears?
3        A.  Yes, ma'am.
4        Q.  Okay.  And you just drew something that I
5    think it looks like a cross but you said it was a
6    church?
7        A.  Yes.
8        Q.  Can you label that church?
9        A.  Yes.
10       Q.  And can you -- can you just verbalize where
11   you drew that on the picture?
12       A.  On the left-hand margin of the paper.
13       Q.  Okay.  And, then, you drew one on the opposite
14   side, correct?
15       A.  There was another home here.
16       Q.  Okay.  Do you know -- or remember whose home
17   that was?
18       A.  No.
19       Q.  Okay.  But that -- in any event, that's on --
20   like, to the right of the trailer as you look on this
21   paper --
22       A.  Yes, ma'am.
23       Q.  -- correct?
24        MS. LANGEN:  Is that good?
25        MS. STAPLES:  Yes.  Thank you.
```

Page 108

```
1        MS. LANGEN:  All right.  I forgot about Zoom.
2        MS. STAPLES:  I understand.
3    BY MS. LANGEN:
4        Q.  Okay.  So to the left of the living room,
5    there's another room labeled bedroom --
6        A.  Yes.
7        Q.  -- with the words blanket/sheet in it.
8        A.  Okay.
9        Q.  Do you see what I'm referring to?
10       A.  Yes, ma'am.
11       Q.  Did you, in fact, use that room as a bedroom?
12       A.  That was Cameron's bedroom.
13       Q.  Okay.  Cameron.  That was my next question.
14   Under the word bedroom and above the words
15   blanket/sheet, there's a rectangle with a person on it;
16   do you see what I'm describing?
17       A.  Yes, ma'am.
18       Q.  Is that the bed you're talking about?
19       A.  Yes, ma'am.
20       Q.  And that's Cameron's?
21       A.  (Witness nods head.)
22       Q.  Okay.  To the left of the bedroom, we were
23   just talking about, there's a room labeled bath.  Can I
24   have my pen back?  I'm not going to ask you to draw --
25       A.  I apologize.
```

Page 109

```
1        Q.  -- anything else.
2        Okay.  Thank you.
3        Q.  Okay.  Do you see where the room labeled bath
4    is?
5        A.  Yes, ma'am.
6        Q.  Okay.  And you used that room for a bathroom;
7    is that right?
8        A.  Yes, ma'am.
9        Q.  Okay.  Finally, to the left of the bathroom,
10   there's another room labeled bedroom; do you see that
11   one?
12       A.  Yes, ma'am.
13       Q.  Do you see what I'm referencing?
14       A.  Yes, ma'am.
15       Q.  Okay.  And did you, in fact, use that as a
16   bedroom?
17       A.  Yes, ma'am.
18       Q.  And who slept in that one?
19       A.  April and I.
20       Q.  Okay.  So -- okay.  So you've got the whole
21   family in the trailer on the morning of September the
22   11th of 2004, plus you have a little girl who may or may
23   not be named Kianna, correct?
24       A.  Yes.
25        MS. STAPLES:  Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 110

1    Q.    Okay.  At some point, did you leave the
2  trailer and go to the home of that little girl, her
3  parents?
4    A.    When?
5    Q.    Just at some point on -- during the morning on
6  September the 11th or the afternoon, September the 11th?
7    A.    Yes, ma'am.
8    Q.    Which was it, morning or afternoon?
9    A.    Late morning.
10   Q.    Okay.  And what are the names of the little
11 girl's parents?
12   A.    Donald and Lindsey Powell, maybe.
13   Q.    Okay.
14   A.    Or -- I don't know if they was married or...
15   Q.    If they had two different names; is that what
16 you're saying?
17   A.    Yeah.  I'm not sure of that.
18   Q.    Okay.  Where did they live in relation to your
19 trailer?
20   A.    Bonnie Drive goes left and it dead ends on
21 another street.  Take a left on there, and it was maybe
22 two houses down on that street.
23   Q.    Okay.  You don't happen to remember the name
24 of the street, do you?
25   A.    No.

Page 111

1    Q.    Okay.  Not trying to test your memory, but if
2  you could remember, it would be important.  And what
3  time did you say you left to go to Donald and Lyndsie's
4  house?
5    A.    Late morning.
6    Q.    Okay.  Did your whole family go to Donald and
7  Lyndsie's or did anybody stay about in the trailer?
8          (BEEPING)
9          MS. STAPLES:  Objection to form.
10   A.    Everyone went.
11   Q.    Okay.  Before you left the --
12         MS. LANGEN:  Did that beep mean we need to do
13   something?
14         COURT REPORTER:  It's okay.
15         MS. LANGEN:  Okay.
16 BY MS. LANGEN:
17   Q.    Okay.  Before you left the trailer to go to
18 Donald and Lyndsie's house, what had you been doing that
19 morning?
20   A.    I think we watched some cartoons and ate
21 breakfast, you know, just played around the house,
22 nothing out of the ordinary from a Saturday morning.
23   Q.    Okay.  So that was a pretty typical Saturday
24 morning for you up to that point?
25   A.    Yes, ma'am.

Page 112

1    Q.    Okay.  Before you-all left to go to Donald and
2  Lyndsie's house, did you or any other member of the
3  household leave the trailer for any other reason?
4          MS. STAPLES:  Objection to form.
5    A.    Not that I can recall, no.
6    Q.    Okay.  Before you-all went to Donald and
7  Lyndsie's house, had you consumed any alcohol?
8    A.    Not before we left, no.
9    Q.    Okay.  Before you-all went to Donald and
10 Lyndsie's house, had you seen or did you know of April
11 drinking any alcohol?
12   A.    Not that I was aware of, no.
13   Q.    Okay.  Before you went to Donald and Lyndsie's
14 house, did you and April fight about anything?
15   A.    I think we had an argument over breakfast.
16   Q.    Okay.  Tell me about that.
17   A.    I think it was over bacon.
18   Q.    And why were you fighting over bacon, if you
19 remember?
20   A.    Because she didn't want the kids to have any.
21   Q.    Okay.  Was it she that didn't want the kids to
22 have any or you?
23   A.    She.
24   Q.    Okay.  Did you and April fight about anything
25 else that morning before you left the trailer to go to

Page 113

1  Donald and Lyndsie's?
2    A.    I'm not sure if it was a fight or just a
3  disagreement that I thought the kids should have some
4  bacon and she didn't.
5    Q.    Okay.
6    A.    So...
7    Q.    Okay.  Did you have any other disagreements
8  before you -- before you and everybody went to Donald
9  and Lyndsie's?
10   A.    Not that I can recall, no.
11   Q.    Okay.  Did that disagreement become violent in
12 any way?
13   A.    No.
14   Q.    Okay.  Were there raised voices or anything
15 along those lines?
16         MS. STAPLES:  Objection to form.
17   A.    Not that I can recall, no.
18   Q.    Okay.  So you leave to go to Donald and
19 Lyndsie's.  How did you get there?
20   A.    We walked.
21   Q.    Okay.  And how long did it take you to get
22 there?
23   A.    Minutes.
24   Q.    Did you stop anywhere along the way?
25   A.    Not that I recall.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 31 of 77 PageID #: 2939
The Deposition of ROBERT TYLER, taken on September 30, 2022

114..117

Page 114

1  Q.  Okay.  What was going on at Donald and
2  Lyndsie's when you got there?
3  A.  I think he was working on a car or maybe a
4  lawn mower or something like that.
5  Q.  Uh-huh.
6  A.  Mechanicing.
7  Q.  Uh-huh.  And did he have any alcohol out, you
8  know, that you could see at the time?
9  A.  I don't know if it was out or if he was just
10 making a drink and going in and out of the house, but,
11 yes, there was some alcohol.
12 Q.  What kind of alcohol did he have at the -- at
13 that time?
14 A.  Maybe -- I don't recall the kind but it was
15 whiskey.
16 Q.  Okay.  What did you guys do when you were over
17 at Donald and Lyndsie's house?
18 A.  The kids was playing.
19     MS. STAPLES:  Objection to form.
20     THE WITNESS:  Oh, excuse me.
21        The kids was playing, and I started helping --
22 I want to say it was a car that I started helping
23 him work on.
24 BY MS. LANGEN:
25 Q.  Okay.  Did you consume any alcohol while you

Page 115

1  were at Donald and Lyndsie's?
2  A.  Yes, ma'am.
3  Q.  Okay.  What kind?
4  A.  To start with, the whiskey.
5  Q.  Okay.  To start with.  Okay.  And how much of
6  the whiskey did you consume?
7  A.  I don't recall the exact amount.
8  Q.  Okay.  Was it more than you typically would
9  drink of whiskey?
10     MS. STAPLES:  Objection to form.
11 A.  I don't recall the amount.
12 Q.  Okay.  So you said you started with whiskey.
13 What else did you drink that day at Donald and
14 Lyndsie's?
15 A.  I think April went and got some vodka.
16 Q.  And did you have some of the vodka?
17 A.  Yes.
18 Q.  Do you recall how much vodka you had?
19 A.  No.
20 Q.  Okay.  But in any event, you had some whiskey
21 and some vodka, you just don't remember how much?
22 A.  Yes, ma'am.
23 Q.  Okay.  Are you aware of whether or not April
24 consumed alcohol while you-all were at Donald and
25 Lyndsie's?

Page 116

1  A.  I don't know if she drunk any of the whiskey,
2  but I think she may have drunk some of the vodka.
3  Q.  Okay.  In fact, did she have Lindsey take her
4  to the store to get vodka?
5  A.  I think so, yes.
6  Q.  Okay.  Did you-all use any kind of drug while
7  you were at their house?
8  A.  I think that's -- we smoked some pot.
9  Q.  Okay.  You and April both or just you, or just
10 her?
11 A.  I'm not sure if she did or not.  Me and Donald
12 did.
13 Q.  Okay.  Did you and April have any arguments
14 while you were at Donald and Lyndsie's?
15 A.  Not that I can recall, no.
16 Q.  Okay.  About how long did you stay at Donald
17 and Lyndsie's house?
18 A.  I'm not sure.  It was a few hours.
19 Q.  Okay.  Why did you leave Donald and Lyndsie's?
20 A.  I don't remember an exact reason.  It was --
21 we had done been there a little bit, and I think we got
22 done working on the car and just going back to the
23 house.
24 Q.  Did you and Donald get in an argument of some
25 kind?

Page 117

1  A.  Not sure.  I don't think -- I don't remember
2  if...
3  Q.  Okay.  Would you pick up Exhibit 1 which is
4  the trial transcript?
5  A.  Okay.
6  Q.  Okay.  And go to page 216, and let me know
7  when you're there.
8  A.  Yes, ma'am.
9  Q.  Okay.  Look at line 11.  I'm going to read
10 from there, okay?
11 A.  Okay.
12 Q.  It says, "Now, do you remember why you-all
13 decided to leave?"
14        And your answer was:  "By that time me and
15 Donald was pretty -- well, I don't know if you'd call us
16 drunk, but we was well on our way, and we started
17 disagreeing like two drunks do on occasion.  And I
18 thought it was time for us to leave before me and him
19 got into a fight."
20        Did I read that correctly?
21 A.  Yes, ma'am.
22 Q.  Okay.  And does that refresh your recollection
23 at all about why you left Donald and Lyndsie's on that
24 day?
25 A.  It very well may have.  I don't remember what

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  we was disagreeing of, but it could have been, yes.
2      Q.   Do you have any reason to dispute what you
3  testified to back in 2006?
4      A.   No.  I'm sure my memory was a whole lot better
5  then --
6      Q.   Okay.
7      A.   -- than it is today.
8      Q.   Okay.  Where did you go when you left Donald
9  and Lyndsie's?
10     A.   Back to the trailer.
11     Q.   Okay.  When you left Donald and Lyndsie's, did
12 you take any alcohol with you?
13     A.   I'm not sure if April put the little bottle --
14 the little small flavored bottles of vodka in the top
15 part of the stroller or not --
16     Q.   Uh-huh.
17     A.   -- but I didn't pack any or carry any, no.
18     Q.   Can I ask what it is you're taking there?
19     A.   Nicorette --
20     Q.   Okay.
21     A.   -- lozenges.
22     Q.   I just wanted to make sure it wasn't going to
23 be anything that might affect your answers.
24     A.   Oh, no.  It's just...
25     Q.   Okay.  Did you and April get into any

Page 119

1  arguments or fights on the way back to the trailer?
2      A.   No, not that I can recall.
3      Q.   Okay.  You got Exhibit 1 out there, so would
4  you turn to page 235, please.  Okay.  Go to line 7, and
5  I'm going to go ahead and read that.  Or I'm -- I'm
6  sorry.  Start with four.
7      A.   Okay.
8      Q.   It says: "Okay.  So you go back to your
9  residence and then tell me what happened again when you
10 were there." And the -- and the answer you gave at that
11 time was: "Me and April had words, but I don't think
12 April wanted to leave.  Her and Lindsey was drinking and
13 having a good time, and me and the kids and Donald was
14 out in the yard.  And I got the kids all rounded up and
15 on their bikes and Cameron settled into the stroller.
16 And April, I had to go in and get her.  She didn't want
17 to leave.  So we -- I'm -- if I'm not mistaken, that's
18 what we argued about on the way back to the trailer."
19 So then the question is: "So you argued while you were
20 walking back to the trailer?" And the answer was: "Yes,
21 ma'am." Did I read that correctly?
22     A.   Yes.
23     Q.   Okay.  So does that refresh your recollection
24 at all about whether or not you and April fought on the
25 way back to the trailer?

Page 120

1      A.   I don't remember arguing and fighting with her
2  on the way back, but, like I said, my memory was a whole
3  lot better then.  And if I testified to it, it would
4  probably be true, yes.
5      Q.   Okay.  Okay.  After you and April got back to
6  the trailer, did you get in any arguments?
7      A.   Not that I can -- a specific argument or
8  anything, no.
9      Q.   Okay.  So you don't remember getting in any
10 arguments when you got back to the trailer; is that
11 true?
12     A.   No.
13     Q.   Okay.  Would you turn to page 217 of Exhibit
14 1., and let's start with line three.
15     A.   Okay.
16     MS. STAPLES:  Did you say 217?
17     MS. LANGEN:  Yes.
18     MS. STAPLES:  Okay.  Thank you.
19 BY MS. LANGEN:
20     Q.   And -- okay.  Well, I'm sorry.  Let's start on
21 216, page -- or line 25.  "Do you remember what you-all
22 did next where you all went?"
23          And the answer was: "We went back to the
24 trailer."
25          So -- so you're back at the trailer and the

Page 121

1  question is: "What happened next, when you-all got back
2  to the trailer?"
3          Answer was, "April was mad at me for some
4  reason and we started arguing and I left and I went to
5  my Aunt Kay's house."
6          So does that refresh your memory about whether
7  or not you and April got into any arguments when you got
8  back to the trailer?
9      A.   Like I said, I don't remember arguing with
10 her, but, like I said, my memory was a whole lot better
11 then I'm sure.
12     Q.   Okay.  So your memory was better when you
13 testified in 2006 at your criminal trial?
14     A.   Yes, ma'am.
15     Q.   Okay.  And so if you said, when you testified in your
16 criminal trial what you did, that April -- you and April
17 got into a fight once you got back to the trailer, you
18 don't have any reason to dispute that that's true,
19 correct?
20     A.   Yes, ma'am.
21     Q.   You don't have any --
22     A.   No discrepancies, no.
23     Q.   Okay.  And so, the passage I just read from
24 your criminal trial alluded to that but I want to ask
25 you:  Did -- did you eventually go to your Aunt Kay's?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1    A.   Yes, ma'am.
2    Q.   Okay.  Now, by the time you left the trailer
3    to go to Kay's house, you were pretty drunk, weren't
4    you?
5         MS. STAPLES:  Objection to form.
6    A.   Yes, ma'am.
7    Q.   Okay.  And do you remember speaking with
8    Detective Edmonds the day after the fire?
9    A.   Yes.
10   Q.   And do you remember telling him you were,
11   quote, drunk, drunk, drunk by the time you left the
12   trailer to go to Kay's house?
13        MS. STAPLES:  Objection to form.
14   A.   I don't remember the exact phrase or -- when I
15   told him that I was "drunk, drunk, drunk," you know, but
16   I was well on my way by then, I'm sure.
17   Q.   Do you have any reason to dispute that you
18   were drunk, drunk, drunk?
19   A.   No.
20   Q.   Okay.  And, then, once you got to Kay's house,
21   she took you to the liquor store, right?
22   A.   Not right off.  I think we sat there and
23   talked a little while and then went to the -- I don't
24   remember going to the liquor store.  I remember going to
25   the Dollar Store, but the liquor is right across the

Page 123

1    road from the Dollar Store, so we very well probably
2    did.
3    Q.   Okay.  Well, you've got the transcript out, so
4    take a look at page 218.  Okay.  And I'm going to read
5    lines 12 and 13.
6    A.   Okay.
7    Q.   Okay.  "And, then, where did you go from
8    there?"  And you said, "To Logan's Square Liquor."
9         Did I read that correctly?
10   A.   Yes, ma'am.
11   Q.   So she did take you to the liquor store?
12   A.   Yes, ma'am.
13        MS. STAPLES:  Objection to form.
14   Q.   Okay.  So you just testified earlier that you
15   didn't recall going to the liquor store but we read this
16   portion of your transcript from 2006, correct?
17   A.   Yes, ma'am.
18   Q.   And your memory was better in 2006?
19   A.   Yes.
20   Q.   Okay.  As you've said a couple times?
21   A.   Yes.
22   Q.   Okay.  So if you testified in 2006 that Kay
23   took you to the liquor store, you don't have any reason
24   to dispute that now, do you?
25   A.   No, ma'am.

Page 124

1    Q.   Okay.  And at the liquor store, you bought ten
2    more bottles of vodka and a beer, true?
3         MS. STAPLES:  Objection to form.
4    A.   I testified to it, yes.
5    Q.   You testified to that at your criminal trial?
6    A.   Yes, ma'am.
7    Q.   Okay.  And how big was that beer?  Was it a 12
8    ouncer or was it bigger?
9    A.   I think I testified to a 40 ounce.
10   Q.   Okay.  So at your criminal trial you said it
11   was a 40-ounce beer?
12   A.   Yes, ma'am.
13   Q.   And your memory was better then, right?
14   A.   Yes, ma'am.
15   Q.   Okay.  Eventually, Kay took you back to the
16   trailer, correct?
17   A.   Yes, ma'am.
18   Q.   Okay.  How much alcohol would you estimate
19   that you consumed from the time you woke up on September
20   the 11th of 2004 until the point at which Kay dropped
21   you back off at the trailer?
22   A.   More than normal.
23   Q.   More than normal?
24   A.   Yes, ma'am.
25   Q.   Okay.  Did you continue to drink more alcohol

Page 125

1    once Kay dropped you back at the trailer?
2    A.   I don't remember drinking after Kay had
3    dropped me off.
4    Q.   You don't remember that?
5    A.   No.
6    Q.   Okay.  Would you look at page 220 of the
7    transcript?
8    A.   Okay.
9    Q.   I'm going to read from lines seven to 11.  And
10   the question was:  "Okay.  And what do you remember
11   happening next?"
12        And the answer was:  "Sitting the kids down.
13   They ran off to play and sitting down into my chair and
14   started drinking some more and arguing with April."
15        And then let's also look at, while we're at
16   it, page 221.
17   A.   Okay.
18   Q.   Lines four and five where you said:  "I just
19   remember opening up another bottle of vodka."
20   A.   Okay.
21   Q.   Okay.  Do you recall that testimony?
22   A.   I'm sure -- like I said, my memory was a whole
23   lot better then, yeah.
24   Q.   Do those two passages that we just read
25   refresh your recollection as to whether or not you drank

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 34 of 77 PageID #: 2942
The Deposition of ROBERT TYREE, taken on September 30, 2022

126..129

Page 126

1  any more after Kay dropped you back off at the trailer?
2      A.   As far as remembering it, no, but I'm sure it
3  was the truth then.  You know, which is still the truth
4  today.  You know, I just can't remember.
5      Q.   Okay.  So you don't -- you don't dispute that
6  at all, then?
7      A.   No, no.
8      Q.   Okay.  So at some point after Kay dropped you
9  off at the trailer, you and April got into an argument,
10  again, didn't you?
11          MS. STAPLES:  Objection to form.
12      A.   I don't remember arguing with April.
13      Q.   Well, in the passage that we just read, did it
14  not just say that you started drinking some more and
15  arguing with April?
16      A.   Yes.
17      Q.   Okay.  Does that refresh your recollection
18  about whether or not you started arguing with April
19  after Kay had dropped you off at the trailer?
20      A.   I -- it doesn't bring back memories of me
21  sitting there arguing with her, no.  But, like I said,
22  back then I'm sure it was a whole lot better.
23      Q.   Okay.  So you don't dispute what you testified
24  to earlier, correct?
25      A.   No, ma'am.

Page 127

1      Q.   Okay.  Do you remember, I think I know answer,
2  but I have to ask the question anyway, okay?
3      A.   Sure.
4      Q.   Do you remember what you and April were
5  fighting about on that occasion?
6      A.   No.
7      Q.   Okay.  Do you remember whether that fight
8  turned physical?
9      A.   No.
10      Q.   Okay.  So you don't remember if it turned
11  physical but does that mean that you can't say one way
12  or the other whether it turned physical?
13          MS. STAPLES:  Objection to form.
14      A.   One way --
15      Q.   If you don't recall --
16      A.   I don't.
17      Q.   I'm assuming that you can't say one way or the
18  other whether you did or didn't --
19      A.   Yes, ma'am.
20      Q.   -- is that true?
21          MS. STAPLES:  Objection to form.
22      A.   Yes, ma'am.
23      Q.   Okay.  Do you remember whether you put your
24  hands to April's throat and choked her in the course of
25  an argument after Kay dropped you back off at the

Page 128

1  trailer?
2      A.   I do not remember that.
3      Q.   So does that mean you cannot say one way or
4  the other whether you choked April or does that mean
5  you're disputing that it ever happened?
6          MS. STAPLES:  Objection to form.
7      A.   I'm not disputing it if I testified at trial.
8  Like I said, my memory was a whole lot better then.
9      Q.   Okay.  Do you remember April eventually
10  leaving the trailer?
11      A.   No.
12      Q.   Okay.  Do you remember Zachary and Nicholas
13  leaving the trailer behind April?
14      A.   No.
15      Q.   Do you remember being alone in the trailer
16  with Cameron and Saralynn for a period of time?
17      A.   No.
18      Q.   Okay.  Do you recall anything else about what
19  happened between the last fight you had with April on
20  September the 11th of 2004 and seeing the trailer in
21  flames?
22      A.   I don't remember anything past the Dollar
23  Store and my aunt bringing me back to the trailer.
24      Q.   Okay.  So are you -- are you aware that your
25  neighbor, Charlotte Bellar, called the police at around

Page 129

1  seven -- 7:20 on September the 11th of 2004 to report
2  that you were kicking the door to her residence to try
3  to get in?
4          MS. STAPLES:  Objection to form and foundation.
5      A.   I -- I don't remember doing that or -- I
6  remember seeing her statement, maybe.
7      Q.   Uh-huh.
8      A.   But as far as remembering her -- I don't think
9  she testified.  It was more, like, a statement --
10      Q.   Okay.
11      A.   -- that I was at her house, yes.
12      Q.   Okay.  So you're aware that she said that but
13  you aren't -- you don't recall doing it; is that true?
14  Is that fair?
15      A.   Yes, ma'am.
16          MS. STAPLES:  Objection to form.
17      Q.   Okay.  So do you have any recollection at all
18  of being at Charlotte Bellar's house that night?
19      A.   No, ma'am.
20      Q.   Okay.  All right.  Do you recall being at the
21  home of someone named Tina Maskin on September the 11th
22  of 2004?
23      A.   No, ma'am.
24      Q.   In any event, you were not inside your trailer
25  when you learned it was on fire, were you?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 35 of 77 PageID #: 2943
The Deposition of ROBERT TYLER, taken on September 30, 2022
130..133

Page 130

1    MS. STAPLES:  Objection to form.
2    A.    No.
3    Q.    Okay.  Do you have a recollection at all of
4  where you were when you learned the trailer was on fire?
5    A.    No.
6    Q.    Okay.  What do you recall about finding out
7  your trailer was on fire?
8    A.    Well, Kenneth Edmonds told me that there was a
9  fire the next day.
10    Q.    And you don't recall actually seeing the
11  flames or anything?
12    A.    No, ma'am.
13    Q.    Okay.  Between the time that you woke up on
14  September the 11th of 2004 and the time that you found
15  out your trailer was on fire, do you know how much
16  alcohol you might have -- you -- how much alcohol you
17  estimate you consumed?
18    A.    More than normal.
19    Q.    Okay.  Is it fair to say that you were pretty
20  well intoxicated by the time you learned your trailer
21  was on fire?
22    MS. STAPLES:  Objection to form.
23    A.    I didn't learn until the next day that the
24  trailer was on -- had burnt.
25    Q.    Okay.

Page 131

1    A.    I don't remember.
2    Q.    Okay.  So is it fair to say that you were
3  pretty well intoxicated on the evening of September the
4  11th of 2004?
5    A.    Yes, ma'am.
6    Q.    Okay.  Is it fair to say that because of the
7  level of your intoxication that your memory is pretty
8  fuzzy as to what was going on around the -- around that
9  time?
10    MS. STAPLES:  Objection to form.
11    A.    Yes, ma'am.
12    Q.    Okay.  In fact, do you remember testifying at
13  your criminal trial in 2006?
14    A.    Yes.  I remember testifying.
15    Q.    Okay.  And do you remember testifying about
16  the moments after you heard your trailer was on fire?
17    A.    I read over it and, like I said, I'm sure my
18  memory was better then but I don't recall.
19    Q.    Okay.  Okay.  Can you -- you still are paging
20  through that, can you look at page 222?  Go to lines
21  three to seven.
22    A.    Okay.
23    Q.    Okay.  And this is part of what you said in
24  that response.  It says: "But it seems like I was in
25  and out of remembering right then but I remember seeing

Page 132

1  the flames but I don't remember talking to Tina about it
2  or following her out of her trailer like she said or
3  nothing like that."
4    Is that a -- did I read that correctly?
5    A.    Yes, ma'am.
6    Q.    Okay.
7    A.    (Clears throat.)  Excuse me.
8    Q.    And that was your testimony at your criminal
9  trial?
10    A.    Yes, ma'am.
11    Q.    And you don't dispute any of that; is that --
12    A.    No, ma'am.
13    Q.    Okay.  Didn't you testify that the next thing
14  you remembered after seeing the flames, was being pepper
15  sprayed at the sally port of the jail?
16    MS. STAPLES:  Objection to form.
17    A.    I remember reading it and -- but I don't
18  remember the sally port or what had happened in there,
19  no.
20    Q.    You don't remember anything that happened in
21  the sally port at all?
22    A.    No, ma'am.
23    Q.    Okay.
24    MS. STAPLES:  And, Jennifer, just for sake of
25    the record.  I think his testimony is a little bit

Page 133

1  different than that.  If you look at --
2    MS. LANGEN:  Did I misread it?
3    MS. STAPLES:  -- line eight and nine.
4    MS. LANGEN:  Oh, yeah.  Okay.  Let's go back.
5  BY MS. LANGEN:
6    Q.    Let's go a little further.
7    A.    Okay.
8    Q.    Line eight: "What is the next thing you
9  remember?" And the answer was:  "Getting pulled out of
10  the cop car at the sally port."
11    Q.    Okay.  Do you -- did I read that correctly?
12    A.    Yes, ma'am.
13    Q.    Okay.  So, then, didn't you testify, then that
14  the next thing that you remembered after seeing the
15  flames was being pepper sprayed at the sally port of the
16  jail?
17    A.    I remember, yes, testifying --
18    Q.    Okay.  Being --
19    A.    -- to that, but as far as today, I don't
20  remember any incidents in the sally port or any
21  interactions with the deputies or the officer that took
22  me there.
23    Q.    Okay.  So as you sit here today, you don't
24  have any recollection of what happened in the sally
25  port?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 36 of 77 PageID
#: 2944
The Deposition of ROBERT YELL, taken on September 30, 2022

134..137

Page 134

```
1       A.  No, ma'am.
2       Q.  Okay.  So is it fair to say that you rely
3   exclusively on your testimony in your criminal trial as
4   far as what happened after -- after you -- you just
5   learned about the flames in the trailer?
6       MS. STAPLES:  Objection to form.
7       A.  I don't remember anything after my aunt brung
8   me back.  I don't remember -- I -- and I don't dispute
9   anything that I testified to at trial, but I just don't
10  remember the events.
11      Q.  Okay.  Okay.
12      MS. STAPLES:  Jennifer, when you're at a good
13  stopping point, can we take a break, please?
14      MS. LANGEN:  I was just thinking this was a
15  good stopping point.  So we're on -- on the same
16  page here.  All right.  Let's take a break.
17      MS. STAPLES:  Before we go off the record, can
18  I say this, though, I forgot to say this earlier.
19  We're obviously going to be invoking the seven-hour
20  rule.  There's a lot of attorneys.  So I'm assuming
21  you-all have, you know, divided up the time period,
22  but I just wanted to note for the record we'll be
23  invoking that.
24      MS. LANGEN:  Yeah.  I -- I figured you would --
25      MS. STAPLES:  Okay.
```

Page 135

```
1       MS. LANGEN:  -- and obviously that's not a
2   problem.
3       VIDEOGRAPHER:  The time is 12:14.  We're off
4   record.
5       (OFF THE RECORD)
6       VIDEOGRAPHER:  The time is 12:27.  We're back
7   on the record.
8   BY MS. LANGEN:
9       Q.  Okay.  Mr. Yell, before we took our break, we
10  were talking about your recollection of the events of
11  the evening of September the 11th of 2004, and I
12  understood you to say that you can't really remember
13  anything after Kay dropped you back off at the trailer;
14  is that true?
15      A.  Yes, ma'am.
16      Q.  Up until the point where you were brought out
17  of the police car?
18      A.  The next morning when Kenneth Edmonds come and
19  got me out of the drunk tank.
20      Q.  Okay.  So you don't remember anything at all
21  from the time Kay dropped you off until -- until
22  September the 12th when Ken Edmonds came to get you,
23  correct?
24      A.  Out of the drunk tank, yes, ma'am.
25      Q.  Okay.  Okay.  So is it fair to say you don't
```

Page 136

```
1   remember anything that you may have said or done that --
2   in that time frame?
3       A.  Yes.
4       Q.  And it's fair to say you don't remember
5   anything that anybody else said or did in that time
6   frame?
7       A.  Yes.
8       Q.  Okay.  That actually cuts out a lot of
9   questions --
10      A.  Okay.
11      Q.  -- so bear with me here.
12      Do you know who Billy Porter is?
13      A.  I think he was the jailer.
14      Q.  Okay.  Have you ever spoken with Billy Porter
15  outside of times when you were in the jail at the Logan
16  County Detention Center?
17      A.  No, ma'am.
18      Q.  Okay.  Do you recall Billy Porter being
19  present in the sally port while you were there?
20      A.  No, ma'am.
21      Q.  Okay.  That's part of what you don't remember
22  --
23      A.  (Witness nods head.)
24      Q.  -- if it happened?
25      A.  (Witness nods head.)
```

Page 137

```
1       MS. STAPLES:  Objection to form.
2       Q.  Okay.  Have you ever personally watched a
3   video of the events that occurred in the sally port on
4   September the 11th of 2004?
5       A.  No.
6       Q.  Okay.  Did you ever hear anyone, other than
7   your attorneys, talk about the existence of such a
8   video?
9       MS. STAPLES:  And just to be clear, we're
10  talking about all your legal counsel throughout your
11  proceedings, okay?
12      A.  No.
13  BY MS. LANGEN:
14      Q.  Okay.  Did you ever personally see any report
15  made by Billy Porter or anyone else that worked at the
16  jail about events relating to what happened on the sally
17  port in -- on September the 11th of 2004?
18      A.  No, ma'am.
19      Q.  Do you have any evidence that Officer Higgins
20  was ever in possession of video of the events that
21  occurred in the sally port?
22      A.  No.
23      Q.  Okay.  Do you have any evidence that Officer
24  Higgins destroyed any video like that?
25      A.  No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 37 of 77 PageID #: 2945
The Deposition of ROBERT TYREE, taken on September 30, 2022

138..141

Page 138

1    Q.    Okay.  Do you have any evidence that Officer
2  Higgins was ever in possession of a report by a jail
3  employee about the events in the sally port?
4    A.    No.
5    Q.    Do you have any evidence that Officer Higgins
6  destroyed or hid that report?
7    A.    No.
8    Q.    Okay.  Assuming such a report existed.
9        MS. STAPLES:  Objection to form.
10        MS. LANGEN:  Okay.
11        MS. STAPLES:  I don't know if there was a
12  question.
13        MS. LANGEN:  Yeah.
14  BY MS. LANGEN:
15    Q.    Do you have any evidence that Officer Higgins
16  had any conversations with Bill Jenkins about destroying
17  or hiding any video or report about what happened in the
18  sally port?
19        MS. STAPLES:  Objection to form.
20    A.    I don't know if they ever talked.  I wasn't
21  privileged to anything, no.
22    Q.    Okay.  Do you have any evidence that Officer
23  Higgins had any conversation with any other jail
24  employee about destroying or hiding video or reports
25  about what happened in the sally port on September the

Page 139

1  11th of 2004?
2    A.    No, but I think he wrote a letter at the end
3  of the trial, maybe, but other than -- no.
4    Q.    Okay.  Do you have any evidence that Ron Mills
5  was ever in possession of a video or a report by a jail
6  employee about the events in the sally port on September
7  the 11th of 2004?
8    A.    No.
9    Q.    Do you have any evidence that Mr. Mills
10  destroyed any such video or report?
11    A.    No.
12    Q.    Do you have any evidence that Mr. Mills had
13  any conversations with Bill Jenkins or any other jail
14  employees about hiding or destroying any video or any
15  report pertaining to the events of the sally port?
16        MS. STAPLES:  Objection to form.
17    A.    No.
18    Q.    Okay.  Do you have any evidence that Mr. Mills
19  had any conversation with any other jail employee about
20  destroying or hiding any video or report about what
21  happened in the jail, in the sally port?
22    A.    No.
23    Q.    Do you have any evidence that Chad Eggleston
24  was ever in possession of any video or any report done
25  by a jail employee about the events that happened in the

Page 140

1  sally port?
2    A.    No.
3    Q.    Do you have any evidence that Mr. Eggleston
4  destroyed any such video or report?
5    A.    No.
6    Q.    Do you have any evidence that Mr. Eggleston
7  had any conversations with Bill Jenkins or with any
8  other jail employee about destroying or hiding any such
9  video or report?
10        MS. STAPLES:  Objection to form.
11    A.    No.
12    Q.    Do you have any evidence that Mr. Eggleston
13  arranged for any other jail employee to destroy or hide
14  any video or report about that events in the sally port?
15        MS. STAPLES:  Objection to form.
16    A.    No.
17    Q.    Do you have any evidence that Detective
18  Edmonds was ever in possession of a video or report that
19  was done by a jail employee about the events in the
20  sally port on -- of September the 11th of 2004?
21    A.    No.
22    Q.    Do you have any evidence that Detective
23  Edmonds destroyed any such video or report?
24        MS. STAPLES:  Objection to form.
25    A.    The sally port or the trailer?

Page 141

1    Q.    The sally port.
2    A.    No.
3    Q.    Okay.  Do you have any evidence that Detective
4  Edmonds destroyed any evidence having to do with the
5  trailer?
6    A.    I think there was a videotape that he done
7  when the dog was there.
8    Q.    Okay.  Do you have any evidence that he
9  destroyed that?
10    A.    I don't know what happened to it.  They never
11  did turn it over to the -- my defense.
12    Q.    Okay.  But you don't have any evidence that he
13  actively destroyed it, do you?
14    A.    No, ma'am.
15    Q.    Do you have any evidence that Detective
16  Edmonds spoke with Bill Jenkins or anyone else at the
17  Logan County Detention Center about destroying or hiding
18  any video or any report pertaining to the events at the
19  sally port?
20    A.    No.
21    Q.    Okay.  Do you have any evidence that Jim
22  Pendergraf was ever in possession of a video or a report
23  done by a jail employee pertaining to the events of the
24  sally port?
25        MS. STAPLES:  Objection to form.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 38 of 77 PageID
#: 2946
The Deposition of ROBERT TYREE, taken on September 30, 2022

142..145

Page 142

1   A.   No.
2   Q.   Okay.  Do you have any evidence that
3   Mr. Pendergraf destroyed any such video or report?
4       MS. STAPLES:  Objection to form.
5   A.   No.
6   Q.   Do you have any evidence that Mr. Pendergraf
7   spoke with Bill Jenkins or any other employee at the
8   Logan County Detention Center about destroying or hiding
9   such a video or report?
10  A.   No.
11      MS. STAPLES:  Objection to form.
12  Q.   Okay.  I want to turn your attention to the
13  day after the fire, okay, which would have been Sunday,
14  September the 12th.  Do you remember speaking with a
15  police officer about the fire on September the 12th?
16      MS. STAPLES:  Objection to form.
17  A.   Kenneth Edmonds come and got me from the drunk
18  tank; is that who you're referring to as a police
19  officer?
20  Q.   That's what I wanted to see if you -- I was
21  going to see if you remembered his name.
22  A.   Yeah.
23  Q.   Okay.
24  A.   Kenneth Edmonds.
25  Q.   Okay.  Tell me what you remember about your

Page 143

1   discussion with Detective Edmonds.
2   A.   Just, he eventually told me that there was a
3   fire and that Cameron had died and Saralynn was burnt
4   and was at the hospital.
5   Q.   Okay.  Do you recall where the conversation
6   took place?
7   A.   At the police station.
8   Q.   The Russellville police station?
9   A.   Yes, ma'am.
10  Q.   Okay.  Do you recall how the conversation
11  began?
12  A.   He was asking me about the day, and -- not --
13  not a -- specific questions, no.
14  Q.   You don't remember any specific questions?
15  A.   That -- well, he asked me if I -- after he
16  said that there was a fire, if I had started it or if I
17  knew of anyone that may have done it or something like
18  that.
19  Q.   Okay.  Is that the best you can remember about
20  what he said or asked of you?
21  A.   Yes.
22  Q.   Okay.  Do you recall anything that you said
23  during the conversation?
24  A.   No, not right off.
25  Q.   Okay.  Do you understand what it means to say

Page 144

1   a police officer reads someone their rights?
2   A.   Yes.
3   Q.   What does that mean to you?
4   A.   That you have certain rights under the
5   constitution.
6   Q.   Do you know what those rights are, in the
7   context of an arrest or an interview with a police
8   officer?
9   A.   Yes.
10  Q.   Tell me what you -- your understanding is.
11  A.   That, if I'm not mistooken, it's Miranda
12  rights.  You have the right to remain silent and you
13  don't have to answer their questions and stuff like
14  that.
15  Q.   Okay.  Do you recall whether or not Detective
16  Edmonds told you about those rights during your
17  conversation of September the 12th?
18  A.   I think I was there in the police station for
19  a little while, and then he advised me of them, yes.
20  Q.   Okay.  So at some point he did, correct?
21  A.   Yeah.
22  Q.   Okay.  So do you recall about how long you and
23  he had been talking before he told you about those
24  rights?
25  A.   For the lack of knowing, maybe 30 minutes or

Page 145

1   so.
2   Q.   30 minutes?  Okay.
3   A.   I remember I was there and I think I smoked
4   some cigarettes, so it was a little bit.
5   Q.   Okay.  So you were speaking off and on over
6   the course of that 30 minutes?
7   A.   They let me smoke there inside the building.
8   Q.   Okay.  But the 30 minutes that you described
9   included periods of time where you were going to smoke?
10  A.   No.
11  Q.   Okay.
12  A.   No.  I would just, like we are here and I
13  would smoke, you know.
14  Q.   And take -- take breaks during the
15  conversation --
16  A.   There --
17  Q.   -- so you could smoke?
18  A.   There was no --
19      MS. STAPLES:  Objection to form.
20  A.   There was no breaks.  It was just him and I in
21  a little room talking back and forth and I would smoke
22  cigarettes.
23  Q.   Oh.  You were smoking while you were having
24  the discussion?
25  A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 39 of 77 PageID #: 2947
The Deposition of ROBERT TYREE, taken on September 30, 2022

146..149

Page 146

1    Q.    Okay.  I understand.
2          Okay.  Do you remember what you had said
3    during the conversation up to the point at which
4    Detective Edmonds told you about your rights?
5    A.    I don't recall.
6    Q.    You don't remember what you said?
7    A.    No, ma'am.
8    Q.    Okay.  Is it true that you did not tell
9    Detective Edmonds on September the 12th that you had
10   intentionally set the fire?
11   A.    Once he started asking me if I set the fire or
12   if I knew of anyone that could have, I remember saying
13   that I didn't, yes.
14   Q.    That you did not?
15   A.    I did not.
16   Q.    You told him you did not set that fire?
17   A.    Yes, ma'am.
18   Q.    Okay.  Is it true that you did not otherwise
19   admit to Detective Edmonds on September the 12th, that
20   you were guilty of any crimes in connection with the
21   fire?
22   A.    My mind is going a million miles an hour.
23   Q.    Okay.
24   A.    Could you repeat that, please?
25   Q.    Okay.  Sure.  Is it true that you did not

Page 147

1    admit that you were guilty of any crimes in connection
2    with the fire?
3    A.    I did not admit setting to the fire --
4    Q.    Okay.
5    A.    -- or anything like that.
6    Q.    Yeah.  In other words, you didn't say anything
7    incriminating during that conversation, did you?
8    A.    Not that I can recall, no.
9    Q.    Okay.  Do you recall whether or not anyone
10   else was present when you spoke with Detective Edmonds
11   on the 12th?
12   A.    It was just him and I.
13   Q.    The two of you?  Okay.  Now, you contend that
14   you did not intentionally set the fire that occurred at
15   your trailer on September the 11th, 2004, correct?
16   A.    Yes.
17   Q.    At one point were you prepared to admit that
18   you were guilty of some crimes related to that fire?
19   A.    Are you referring to the plea that the judge
20   didn't accept at --
21   Q.    Yeah.
22   A.    -- right before trial?
23   Q.    Yeah.
24   A.    Okay.
25   Q.    Just in case I need them, I'm going to try to

Page 148

1    grab it.
2    A.    Okay.
3    Q.    Okay.  Do you recall attempting to plead
4    guilty to a charge of arson in the third degree?
5    A.    I think that was one of the charges, yes.
6    Q.    Okay.  So you were prepared to admit that you
7    had -- that you were guilty of arson in the third degree
8    related to the fire that occurred at the trailer, right?
9          MS. STAPLES:  Objection to form.
10   A.    I think my lawyers had --
11   Q.    I don't want to know what your lawyers said --
12   A.    Oh, okay.
13   Q.    -- okay?
14         MS. LANGEN:  Amy --
15         MS. STAPLES:  I agree.
16         MS. LANGEN:  Okay.
17   BY MS. LANGEN:
18   Q.    So -- but I'm just asking you, you were ready
19   to plead guilty to arson in the third degree, right?
20   A.    Yes.
21   Q.    Okay.  Do you recall attempting to plead
22   guilty to two counts of assault in the first degree?
23   A.    Yes.
24   Q.    Okay.  Do you recall also attempting to plead
25   guilty to assault in the third degree on a police

Page 149

1    officer?
2    A.    If that was part of the same plea, yes.
3    Q.    Okay.  Well, let's look at it just -- it
4    sounds like you don't specifically remember that one.
5    A.    I don't remember the exact charges, no.  But
6    I...
7          MS. LANGEN:  Okay.  Here's one for you, Amy.
8    For you guys.  Sorry.  Just have the one.
9          (DOCUMENTS PASSED)
10         THE WITNESS:  Okay.  Thank you.
11   BY MS. LANGEN:
12   Q.    One for you.  You're welcome.
13         Okay.  So this is, just for the record, a
14   transcript from the rejected plea agreement of February
15   the 8th of 2006.  Can you flip to page 22 and look at
16   lines 17 through 20, and I'm going to read those to you
17   when you get there, so let me know.
18   A.    Okay.  22?
19   Q.    22.
20   A.    Yes, ma'am.
21   Q.    And line -- line 17 is where I'm going to
22   start.
23   A.    Okay.
24   Q.    Okay.  "And to the charge under count nine of
25   assault in the third degree on a police officer, how do

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1  you plead?"
2          And you said:  "Guilty."
3      A.   Yes, ma'am.
4      Q.   Okay.  You -- did I read that right?
5      A.   Yes, ma'am.
6      Q.   Okay.  So does that refresh your recollection
7  as to whether or not you attempted to enter a plea of
8  guilty to assault in the third degree on a police
9  officer?
10     A.   Yes, ma'am.
11     Q.   Okay.  Without telling me anything that your
12 lawyers may have discussed with you, okay?
13     A.   Okay.
14     Q.   Why were you prepared to enter those pleas if
15 you did not set fire to the house?
16     A.   It was very stressful, emotional, devastating,
17 and I just wanted it to be over.
18     Q.   Okay.  What did you do that you believed
19 constituted arson in the third degree?
20     A.   I think there was a cigarette maybe that could
21 have been left over or the stove wasn't so great, it
22 could have been that.  I didn't know at the time but I
23 didn't know at the time.  But I think, since then, the
24 fire science proved that it was an accidental fire.
25     Q.   Okay.  Are -- I'll get to that.

Page 151

1          What did you do that you believe constituted
2  assault in the first degree?
3      A.   I don't -- I don't remember the exact -- the
4  thing.  I don't remember.
5      Q.   Okay.  What did you do that you believe
6  constituted assault on a police officer?
7          Let me ask it this way.
8      A.   Okay.
9      Q.   Okay.  Since you can't recall anything that
10 happened after Kay dropped you off and before Ken
11 Edmonds came to get you to talk to you about the fire --
12     A.   Uh-huh.
13     Q.   -- is it fair to say that you really don't
14 know what you -- what happened between you and the
15 police officer in the sally port?
16         MS. STAPLES:  Objection to form.
17     A.   I do not remember, no.
18     Q.   Okay.  Do you know who Jim Pendergraf is?
19     A.   No.
20     Q.   To your knowledge, have you ever met him?
21     A.   Not that I can remember, no.
22     Q.   To your knowledge, have you ever had a
23 conversation with him?
24     A.   No.
25     Q.   Okay.  Do you have a recollection of having

Page 152

1  seen Mr. Pendergraf at the fire on September the 11th of
2  2004?
3      A.   No.
4      Q.   Okay.  Do you have any reason to believe that
5  Mr. Pendergraf performed any tasks in investigating the
6  cause of the fire?
7      A.   I don't know who or what actions he may or may
8  not have done.  I don't remember.
9      Q.   As best you understand, because I know
10 you're not a lawyer, but as best as you understand, why
11 did you sue Mr. Pendergraf?
12     A.   You would have to ask my lawyers that.  I'm --
13 I don't know.
14     Q.   Okay.  Do you know who Chad Eggleston is?
15     A.   Maybe the KSP officer or the Russellville
16 Police Department.
17     Q.   So it's your understanding he's with the
18 Russellville Police Department?
19     A.   Yes, ma'am.
20     Q.   Okay.  To your knowledge, have you ever met
21 him?
22     A.   Not that I can recall.
23     Q.   Do you have -- have any reason to believe that
24 Mr. Eggleston performed any tasks in investigating the
25 fire, the cause of it?

Page 153

1          MS. STAPLES:  Objection to form.  Go ahead.
2      A.   That he --
3          MS. STAPLES:  Well, actually, before you
4      answer, I just want to be sure that you're -- when
5      you're answering you're not divulging any
6      conversations that we've had.  So do you have any
7      independent knowledge, not anything that we told
8      you.
9  BY MS. LANGEN:
10     Q.   I don't want to know anything that you talked
11 to about --
12     A.   Okay.
13     Q.   -- with Ms. Staples or Mr. Slosar or
14 Ms. Campbell, okay?
15     A.   Okay.
16     Q.   Okay.  So do you have any -- so with that in
17 mind, do you have any reason to believe that
18 Mr. Eggleston performed any tasks in investigating the
19 cause of the fire?
20     A.   No.
21         MS. STAPLES:  Same objection.
22     Q.   Okay.  Do you have any recollection of
23 Mr. Eggleston saying or doing anything that you felt was
24 inappropriate?
25     A.   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 41 of 77 PageID #: 2949
The Deposition of ROBERT TYREE, taken on September 30, 2022

154..157

Page 154

1    Q.   Okay.  As best you understand, and, again, I
2  know you're not a lawyer but as best as you understand,
3  why did you sue Mr. Eggleston?
4        MS. STAPLES:  And, Robert, same admonition.
5        THE WITNESS:  Okay.
6        MS. STAPLES:  Don't discuss anything that we've
7  talked about.
8  BY MS. LANGEN:
9    Q.   And that goes for all my questions.
10   A.   Okay.
11   Q.   I don't ever want to know anything you talked
12 about with your attorney.
13   A.   Okay.
14   Q.   So, can -- do you need me to repeat the
15 question?
16   A.   Please.
17   Q.   As best you understand it, because I know
18 you're not a lawyer, why did you sue Mr. Eggleston?
19   A.   I don't know.
20   Q.   Okay.  Do you have any reason to believe that
21 Ron Mills -- or first of all, do you know who Ron Mills
22 is?
23   A.   I think he's a Russellville police officer.
24   Q.   Okay.  And do you have any reason to believe
25 that Ron Mills performed any tasks in investigating the

Page 155

1  cause of the fire?
2    A.   No.
3    Q.   Okay.  Do you have any recollection of
4  Mr. Mills saying or doing anything that you feel -- felt
5  then or feel now was inappropriate?
6    A.   No.
7        MS. STAPLES:  Objection to form.
8    Q.   As best as you understand, same thing,
9  I know you're not a lawyer, but why did you sue
10 Mr. Mills?
11   A.   Not sure.
12   Q.   Do you have any reason to believe that Officer
13 Higgins performed any tasks associated with
14 investigating the cause of the fire?
15   A.   No.
16   Q.   Okay.  Do you know the names of all the people
17 whom you have sued in connection with the events of
18 September the 11th of 2004?
19       MS. STAPLES:  Objection to form.
20   A.   I can recall a few of their names, yes.
21   Q.   Okay.  Just because it's important to some of
22 the questions I'm going to ask you, I'm just going to
23 tell you who they are --
24   A.   Okay.
25   Q.   -- okay?

Page 156

1        MS. LANGEN:  Amy, if I miss one, let me know.
2    Q.   Ken Edmonds, John Edward Higgins, who goes by
3  Ed, Chad Eggleston, Ronald Mills, Jim Pendergraf, David
4  West, Jaman Childers, William Smith, who I think goes by
5  Tommy Smith, at least -- at least some of the time he
6  does.  Buster Cannon, Alan Gregory, Samuel Jack Flowers
7  and Bill Jenkins.
8        MS. LANGEN:  Did I get them all?
9        MS. STAPLES:  I believe so.
10   Q.   Okay.  In paragraph 133 of your lawsuit,
11 you've alleged that after the trailer fire, the
12 defendants reached an agreement amongst themselves to
13 frame you for the crime.  So, do you recall making that
14 allegation?
15   A.   Yes.
16   Q.   Okay.  What facts do you rely on to suggest
17 that any of these defendants reached an agreement to
18 frame you for the crimes in connection with the trailer
19 fire?
20       MS. STAPLES:  And remember, the same admonition
21 applies.
22   A.   Okay.  Just what they testified to at trial,
23 and other than that, no.
24   Q.   Well, what did they testify to at trial that
25 you -- that leads you to believe that there was some

Page 157

1  agreement amongst them to frame you for trial -- for the
2  crime?
3    A.   They -- before they even went to the trailer,
4  I think they had breakfast and discussed, I don't know
5  what, but they -- I'm not sure.
6    Q.   So you don't know what they discussed at the
7  breakfast?
8    A.   No.
9    Q.   Okay.  Other than the breakfast, do you know
10 of any meetings that any two or more of those people I
11 just named attended where they talked about what they
12 could do to make it look like you had --
13   A.   No.
14   Q.   -- committed the crime?
15       MS. STAPLES:  Objection to form.
16   Q.   You don't?
17   A.   No.
18   Q.   Okay.  Do you know about any phone
19 conversations or texts or e-mails, any kind of
20 communications like that between any two or more of the
21 defendants that I just listed for you where they talked
22 about how to make it look like you had set fire to that
23 trailer?
24   A.   No.
25       MS. STAPLES:  Objection to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1    Q.   Do you have any evidence to support a
2  conclusion that any two or more of those two defendants,
3  who we just listed at length, came up with a plan to lie
4  about that cause of the fire?
5    A.   No.
6    Q.   Okay.  Do you know why any of these defendants
7  would want to frame you for a crime in connection with
8  the trailer fire?
9        MS. STAPLES:  Objection to form.  Calls for
10 speculation.
11   Q.   I just want to know if you know.
12   A.   No.
13   Q.   I'm not asking you to say what -- what they
14 knew that you don't know about.
15   A.   No.
16   Q.   Okay.  As you sit here today, do you know
17 which of the defendants testified at the grand jury
18 proceedings related to the fire?
19   A.   Yes.
20   Q.   Who?
21       (CELL PHONE RINGS)
22   Q.   Do you need to take a break to answer that?
23   A.   No.  I just forgot to turn it off.  I
24 apologize for that.
25   Q.   Uh-huh.

Page 159

1    A.   I want to say Kenneth and Higgins.
2    Q.   Okay.
3    A.   If I remember, it's in the --
4    Q.   Are you certain of that or is that just --
5    A.   I'm trying to remember.  It's been so long ago
6  but I want to say it was Kenneth Edmonds that I can
7  remember for sure and if I'm not mistook, Higgins.
8    Q.   Okay.  Do you recall what specifically they
9  said?
10   A.   No.
11   Q.   Okay.  Have you personally reviewed the
12 transcript of the jury proceedings?
13   A.   No.
14   Q.   Is it -- if you don't know what the defendant
15 specifically said, is it fair to say that you also don't
16 know if anything they said was false?
17       MS. STAPLES:  Objection to form.
18   A.   No.
19   Q.   It's not fair to say that or it is fair to say
20 that?
21   A.   I don't have any personal knowledge of it, no.
22   Q.   Okay.  Do you contend that any of the
23 defendants failed to provide your defense counsel with
24 evidence that was favorable to you?
25   A.   Exculpatory evidence?  I don't think Kenneth

Page 160

1  Edmonds ever turned over the video that he took, and I
2  can't think of anything else right off.
3    Q.   Okay.  Do you have an understanding of how
4  that video -- I assume you're talking about the video of
5  the walk around of the trailer?
6    A.   While the dog was there?
7        MS. STAPLES:  Objection to form.
8    Q.   With the dog.
9    A.   With the dog?  Yes, ma'am.
10   Q.   Okay.  Do you have an understanding of how
11 that video may have been favorable to you?
12   A.   Yes.
13   Q.   What do you think was on it that was favorable
14 to you?
15   A.   The -- the way the dog was handled and what
16 was said amongst themselves.
17   Q.   Okay.  Do you know what was said amongst
18 themselves?
19   A.   No.
20   Q.   Okay.  Do you have any expertise in discerning
21 the cause of a fire?
22   A.   No.
23   Q.   Okay.  Do you have any knowledge about the
24 evolution of fire science between 2004 and 2016?
25   A.   No.

Page 161

1    Q.   Okay.  Do you have any expertise in
2  interpreting the behavior of an accelerant detection
3  canine?
4    A.   No.
5    Q.   Okay.  Are you aware of the existence of any
6  evidence that you believe shows Officer Higgins knew you
7  did not start the fire at your trailer?
8    A.   No.
9    Q.   Are you aware of the existence of any evidence
10 that suggests that Officer Mills knew you did not start
11 the fire at your trailer?
12   A.   No.
13   Q.   Are you aware of the existence of any evidence
14 that you believe shows that Mr. Eggleston knew you did
15 not set the fire at your trailer?
16   A.   No.
17   Q.   Are you aware of the existence of any evidence
18 that you believe shows Detective Edmonds knew you didn't
19 set that fire?
20   A.   No.
21   Q.   Are you aware of the existence of any evidence
22 that you believe shows Mr. Pendergraf knew that you did
23 not set that fire?
24   A.   No.
25   Q.   Have you ever undergone any training to be a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 162

1  police officer?
2      A.   No.
3      Q.   Do you have any knowledge about the policies
4  and procedures of the Russellville Police Department?
5      A.   No.
6      Q.   Do you have any knowledge as to what kind of
7  training police officers in Russellville undergo to
8  become police officers?
9      A.   No.
10     Q.   Okay.  Are there any other persons who you
11 believe could have been responsible for setting the fire
12 at your trailer?
13     A.   No.
14     Q.   Okay.  So after your arrest at the scene of
15 the trailer fire, you were brought to the Logan County
16 Detention Center; do you remember that or --
17     A.   No.
18     Q.   -- are you aware that it happened?
19     A.   Yes.
20     Q.   Okay.  Did you stay there until your
21 conviction in February of 2006?
22     A.   A little while after, and then I went to the
23 penitentiary.
24     Q.   Okay.  Did you have any trouble with any other
25 inmates or guards when you were at the Logan County

Page 163

1  Detention Center between September the 11th of 2004 and
2  the time of your conviction?
3      A.   No.
4      MS. STAPLES:  Objection to form.
5      Q.   Okay.  Did you get in any fights while you
6  were in there?
7      A.   Not that I can recall, no.
8      Q.   Were you disciplined for anything while you
9  were in there?
10     A.   No.
11     Q.   Okay.  Did you participate in any programs
12 while you were at the Logan County Detention Center?
13     MS. STAPLES:  Objection to form.
14     A.   No.
15     Q.   Okay.  Did you any interactions or with a
16 guard named Billy Porter when you were in the Logan
17 County Detention Center after your September 11th of
18 2004 arrest?
19     A.   No.
20     Q.   Okay.  None with Billy Porter?
21     A.   No.
22     MS. STAPLES:  Objection.  Asked and answered.
23     Q.   Had you been in the Logan County Detention
24 Center prior to September the 11th of 2004?
25     A.   Yes.

Page 164

1      Q.   Okay.  Did you ever have any interactions with
2  Billy Porter during any of those periods of
3  incarceration?
4      A.   No.
5      Q.   Okay.  When you were convicted in 2006, remind
6  me, what was your sentence?
7      A.   52 years at 85 percent.
8      Q.   Okay.  And your conviction was ultimately
9  vacated in 2016, correct?
10     A.   Yes.
11     Q.   Okay.  So where did you serve the time prior
12 to 2016 before your conviction was vacated?
13     MS. STAPLES:  Objection to form.
14     A.   Okay.  I left the Logan County jail and went
15 to the rotator farm where they gave you your prison
16 number.
17     Q.   Uh-huh.
18     A.   Then I went to Luther Luckett Correctional
19 facility and I put in for a transfer to try to get
20 closer to Logan County for visits and stuff like that,
21 but they sent me to Eastern.  And I think you got to do
22 a year, clear conduct there, and you can put in for a
23 transfer.  I done no problem, put in for a transfer, and
24 they transferred me to Eddyville in the beginning of
25 '09.  That's where I stayed until I got out.

Page 165

1      Q.   Okay.  Did you participate in any programs
2  while you were in any of those places?
3      A.   Yes.
4      Q.   Okay.  Tell me about those.
5      A.   I got my GED while I was at Luther Luckett.
6      Q.   Okay.
7      A.   I didn't participate any in Eastern.  I worked
8  in the kitchen and that takes up a lot of your time, you
9  know.
10     Q.   Uh-huh.
11     A.   But in Eddyville, I graduated the carpentry
12 class, KTCS, maybe, something like that and that's it.
13     Q.   Okay.  Did you have any disputes or
14 altercations with any inmates while you were in any of
15 those places you named in the state?
16     MS. STAPLES:  Objection to form.
17     A.   I think I was in a fight at Eddyville.
18     Q.   What was that about?
19     A.   For a sewing machine, actually.  They made the
20 clothes for the inmates and he wanted it.  It was mine
21 and he just ran his mouth and it was just an
22 altercation.
23     Q.   Okay.  Did it become physical?
24     A.   Yes.
25     Q.   Who struck the first blow?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1    A.  I want to say it was a pushing match and then
2  it was punches.
3    Q.  Okay.  Who would you say was the aggressor in
4  the physical part of that?
5    A.  He was.
6    Q.  He was?  Okay.  Were you disciplined as a
7  result of that?
8    A.  Yes.
9    Q.  What kind of discipline did you receive?
10    A.  15 days in the hole.
11    Q.  Other than that one, any other
12  altercations or incidents with other inmates?
13      MS. STAPLES:  Objection to form.
14    A.  Not physical or anything like that, no.
15    Q.  Okay.  But some verbal altercations?
16    A.  Yeah.
17      MS. STAPLES:  Objection to form.
18    A.  Yes.
19    Q.  Okay.  Tell me, how many?
20    A.  I don't have a number, no.
21    Q.  Okay.  Any for which you were disciplined?
22    A.  No.
23    Q.  Okay.  Did you have any problems with any of
24  the guards while you were in any of the state
25  facilities?

Page 167

1    A.  No.
2    Q.  Okay.  Did April come to visit you at all
3  while you were in any of those state facilities?
4    A.  I think the Logan County jail but not while I
5  was in prison, no.
6    Q.  Okay.  How many times did she come to visit
7  you when you were at Logan?
8    A.  Without an exact number, once or twice.  I'm
9  not sure.
10    Q.  Once or twice the whole time you were in
11  there?
12    A.  Yes.
13    Q.  Okay.  Did she bring Saralynn at any point?
14    A.  No.
15    Q.  Okay.
16    A.  My mother did.
17    Q.  She -- your mother brought Saralynn to the
18  Logan County?
19    A.  After she got out of the hospital, yes.
20    Q.  Okay.  Okay.  How many times did that happen?
21    A.  Without the exact number, a few.
22    Q.  A few?  Okay.  Who has custody of Saralynn
23  now?
24      MS. STAPLES:  Objection to form.
25    A.  She's --

Page 168

1    Q.  Oh, she's 19.  I'm sorry.  She's 19.  I forgot
2  you said that.
3      Who had custody of Saralynn while you were in
4  prison?
5    A.  My mother, the entire time.
6    Q.  Okay.  All the way up until she turned 19 or
7  18, I guess?
8    A.  Yes, ma'am.
9    Q.  Okay.  Did your mother ever bring Saralynn to
10  see you while you were in any of the state prisons?
11    A.  Yes.
12    Q.  How many times did that happen?
13    A.  Like I said, without the exact number, more
14  than a few.
15    Q.  Okay.  Okay.  Did you receive mail from April
16  or Saralynn or your mom while you were in jail --
17      MS. STAPLES:  Objection to form.
18    Q.  -- or in prison?  Sorry.
19    A.  Yes.
20    Q.  Okay.  With respect to the mail that you
21  received from April, what was -- what were the subjects
22  of that?  What did she write you about?
23      MS. STAPLES:  Objection to form.
24    A.  I'm not sure if April wrote me.  I thought you
25  was more talking about my mom and Saralynn.

Page 169

1    Q.  Okay.
2    A.  I don't know if April has ever wrote me.
3    Q.  Okay.  Okay.
4    A.  In prison.
5    Q.  So what about the content that you received
6  from Saralynn or your mom?
7      MS. STAPLES:  Objection to form.  Do you want
8    to ask him one at a time because I think it's
9    confusing asking him the compound questions.
10    A.  Okay.  Maybe just a little update of how she
11  was doing and what was going on with the doctors and
12  stuff.
13  BY MS. LANGEN:
14    Q.  Okay.  Other than April or Saralynn or your
15  mom, did you receive any visits from any of your other
16  family members?
17    A.  My grandparents.
18    Q.  Okay.  And they are?
19    A.  Noble and Sarah Clark.
20    Q.  Okay.  And which side of the family are they
21  your grandparents?
22    A.  My father's.
23    Q.  Okay.  And your father's name was?
24    A.  Andy Yell.
25    Q.  Spell the first name.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1      A.    Andy.
2      Q.    Oh, Andy.  Andy Yell.
3            Okay.  How often did Mr. and/or Mrs. Clark
4    visit you?
5      A.    I think just the once.
6      Q.    Okay.  Was that more towards the beginning of
7    your time or more towards the end of your time?
8      A.    It wasn't long after I got to Eddyville, if
9    I'm not mistook.
10     Q.    Okay.  What was the date that you were
11   ultimately released from prison?
12     A.    I left prison in December of 2016 and was
13   released January 24th, 26th of 2017 on a $15,000 bond.
14     Q.    Okay.  So if I'm understanding correctly, and
15   tell me if I'm not, you were released from prison, a
16   state facility, in December of 2016 and then did you go
17   back to Logan County?
18     A.    Uh-huh.
19     Q.    Okay.  And then from Logan County, you were
20   released sometime in January of 2017, correct?
21     A.    Uh-huh.
22     Q.    Okay.  During that last stint in Logan County,
23   did you any problems, any altercations or anything of
24   that nature with another inmate or --
25     A.    No.

Page 171

1      Q.    Okay.  Any problems with a guard at all --
2      A.    No.
3      Q.    -- during that last stint?
4      A.    No.
5      Q.    Okay.  In discussing your damages, paragraph
6    89 of your complaint -- and the complaint is the
7    document that initiates your lawsuit, just in case you
8    didn't know.  But that says that you were unable to
9    attend the funerals of your grandmother and your
10   stepfather; is that true?
11         MS. STAPLES:  Objection to form.
12     A.    I don't know it was my stepfather because he
13   died in March of 2017 and I did attend that, but it was
14   some other family members that had passed.
15     Q.    Okay.  Was -- was your grandmother one of
16   those family members?
17     A.    Yes.
18     Q.    Okay.  And what was her name?
19     A.    Rowsella Keltner (phonetic.)
20     Q.    Rowsella Keltner.  Okay.  And was she a
21   biological relation or step relation?
22     A.    She was a step, Jeff's mother.
23     Q.    Jeff's mother.  Okay.  What year did she pass?
24     A.    2016, the beginning, maybe 2015.  I'm not --
25     Q.    Okay.

Page 172

1      A.    -- sure of the exact date.
2      Q.    Let me make a note here real quick.
3            How would you describe your relationship with
4    Jeff's mom --
5      A.    It was good.
6      Q.    -- Ms. Keltner?
7      A.    It was good.
8      Q.    Okay.  Did were -- were there specific
9    activities or things that you did with her?
10     A.    She would make me a buttermilk pie every year
11   for my birthday.
12     Q.    Okay.  And so you -- if I remember correctly
13   what you said at the earlier part of your deposition,
14   you had lived with Jeff and your mom for some time while
15   you were, again, in high school and just out of high
16   school; is that right?
17     A.    My mom and Jeff was together all my younger
18   years, I guess.
19     Q.    Oh, okay.
20     A.    But maybe my early teens they had split up.
21     Q.    Okay.
22     A.    But he was always a part of my life, you know.
23     Q.    Okay.
24     A.    He was a good guy.
25     Q.    Okay.

Page 173

1      A.    I was fortunate to have him.
2      Q.    So you knew Rowsella, I guess, that same frame
3    of time; is that right?
4      A.    Yes.
5      Q.    Okay.  Did she ever come to visit you in any
6    of the state facilities?
7      A.    No.
8      Q.    Okay.
9      A.    She lived in Tennessee.
10     Q.    Which part?
11     A.    Crockett County.
12     Q.    Crockett County.  Is Robert Carlisle some
13   relation to you?
14     A.    I do not know a Robert Carlisle.
15     Q.    Okay.  How often have you seen Saralynn since
16   you're -- since you've been out of prison?
17     A.    A bunch.
18     Q.    Not much or --
19     A.    A bunch.
20     Q.    A bunch.  Okay.  Does Saralynn have any
21   children?
22     A.    Yes.
23     Q.    Is she married?
24     A.    No.
25     Q.    No?  Okay.  Do you see Saralynn's children?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 46 of 77 PageID
#:2954
The Deposition of ROBERT TIPTON, taken on September 30, 2022

174..177

Page 174

```
 1    A.   Yes.
 2    Q.   Okay.  How many children does she have?
 3    A.   One.
 4    Q.   How old is that child?
 5    A.   Maybe a year this month, yeah, the 26th.
 6    Q.   Okay.  When you say, "a bunch," can you
 7  quantify it any better than that, that...
 8    A.   She come up when she was still in school and
 9  spent the summer with me and holidays and stuff like
10  that.  I couldn't put an exact number on it.  It was
11  whenever she had the opportunity.
12    Q.   Okay.  Would -- how would you characterize
13  your relationship with Saralynn?
14    A.   Strained, you know.  She -- it's hard to meet
15  somebody that just got out of prison that you really
16  don't know and have a relationship like a father and
17  daughter should.
18    Q.   Okay.  Are you currently dating anybody?
19    A.   Right now, no.
20    Q.   Okay.  Where are you currently living?
21    A.   3066 Franklin Road, Russellville.
22    Q.   Who lives there with you?
23    A.   I live by myself.  Well --
24    Q.   Is that in Russellville?
25    A.   Yes, it is.
```

Page 175

```
 1    Q.   Okay.  And you started to say something.  I'm
 2  sorry.  What...
 3    A.   Saralynn, when my mother had passed, she moved
 4  up here and is saying with me.
 5    Q.   Oh, she's staying with you at --
 6    A.   Right now.
 7    Q.   -- 3066 Franklin?
 8    A.   Yes, ma'am.
 9    Q.   Okay.  Are you -- do you own that or are
10  renting that or is somebody else renting that?
11         MS. STAPLES:  Objection to form.
12    A.   It was -- people I worked for, it's kind of,
13  like, their place and I live in a camper in the back lot
14  of the parking lot where they park the trailers and
15  stuff like that.
16    Q.   Okay.  Are you currently employed?
17    A.   No.
18    Q.   Okay.  When was the last time that you were
19  employed?
20    A.   As far as taking out taxes and stuff, 2019 but
21  I do handyman stuff, mow yards and stuff like that.
22    Q.   Okay.  So is that -- are you self-employed?
23    A.   I wouldn't go as far as to say that, but, like
24  I said, just handyman stuff around the -- the shop.
25    Q.   What shop?
```

Page 176

```
 1    A.   Where I used to work, Steve Miller and Kevin
 2  Yates, pouring concrete.  They have a shop and they live
 3  off -- Ken and Steve live off to the side, and it's, I
 4  think, 50-some-odd acres and I just do yard work and
 5  stuff like that.
 6    Q.   How frequently do you do that kind of work?
 7    A.   All the time.
 8    Q.   Are you -- are you paid for it?
 9    A.   Kind of, yeah.  You know, they let me keep the
10  camper there.  I got it plugged into the electric but as
11  far as getting wages and stuff like that, no.
12    Q.   Oh, I see.  Okay.  Aside from whatever you
13  might earn through -- well, strike that.  Do you have any
14  -- any other source of income besides what traditionally
15  people pay wages or salary for?
16    A.   No.
17         MS. STAPLES:  Objection to form.
18    Q.   Okay.  Do you receive any government
19  entitlements such as disability income or welfare or
20  anything like that?
21    A.   No.
22    Q.   Do you have any annuities?  Do you know what
23  that is?
24    A.   No.
25    Q.   Okay.  Do you have any arrangement with a
```

Page 177

```
 1  company that has given you money in exchange for the
 2  proceeds of this lawsuit?
 3         MS. STAPLES:  Objection to form.  I'll instruct
 4    you not to answer that.
 5         MS. LANGEN:  On what basis?
 6         MS. STAPLES:  On the basis that it's
 7    privileged?
 8         MS. LANGEN:  Certify that, please.
 9  BY MS. LANGEN:
10    Q.   Have you used alcohol since your release from
11  prison?
12         MS. STAPLES:  Objection to the form.
13    Q.   Other than --
14         MS. STAPLES:  Asked and answered.
15    Q.   Other than within the 24 hour -- last night,
16  what you talked about in the beginning.
17    A.   Maybe at the Super Bowl something like that,
18  but as far as daily drinking, not much.
19    Q.   Uh-huh.  Have you used any type of drug other
20  than prescription drugs under the supervision of a
21  physician since your release from prison?
22         MS. STAPLES:  Objection to form.  I'm going to
23    also instruct you to not answer that.  I'm not going
24    to allow him to answer any questions that could put
25    him at criminal liberty.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 47 of 77 PageID #: 2955
The Deposition of ROBERT YELL, taken on September 30, 2022

178..181

Page 178

```
1   BY MS. LANGEN:
2       Q.   Have you been arrested since your release from
3   prison in 2017?
4       A.   Yes.
5       Q.   Okay.  Tell me about that.  When did that
6   happen?
7            MS. STAPLES:  I'm not going to allow him to go
8       into any facts about any pending charges that would
9       put him at liberty.
10           MS. LANGEN:  I'm just asking:  When did that
11      arrest occur?
12           MS. STAPLES:  Well, you said, "tell me about
13      that."  So my instruction to you is, that I don't
14      want you to answer any questions regarding any
15      pending charges that you have.
16  BY MS. LANGEN:
17      Q.   When were you arrested most recently?
18           MS. STAPLES:  I'm going to instruct you not to
19      answer that question.
20           MS. LANGEN:  When were you arrested most
21      recently?
22           MS. STAPLES:  Correct.
23           MS. LANGEN:  Certify that, please.
24  BY MS. LANGEN:
25      Q.   How many times have you been arrested since
```

Page 179

```
1   your release from prison in early 2016 -- or '17?  Sorry.
2            MS. STAPLES:  I don't want you to answer any
3       question about any pending charges or arrests.
4            MS. LANGEN:  Certify that, please.
5   BY MS. LANGEN:
6       Q.   Do you participate in any therapies or support
7   groups for persons with addiction issues?
8       A.   No.
9       Q.   Have you seen a mental health therapist for
10  any reason since your release from prison?
11      A.   Once.
12      Q.   Who did you see?
13      A.   I do not recall their name.  It was just one
14  session and I never went back.
15      Q.   Where was she located?
16      A.   Bowling Green, Kentucky.
17      Q.   Do you know whether she was, like, a licensed
18  social worker or a psychiatrist or what her title or
19  designation was?
20      A.   I'm not sure.
21      Q.   Okay.  Do you know, like, what street she was
22  on in Bowling Green?
23      A.   Scottsville Road.
24      Q.   Scottsville Road?  Okay.
25           How is your physical health since you were
```

Page 180

```
1   released from prison?
2       A.   I think I'm in pretty good shape.
3       Q.   Okay.  Do you take any, like, prescription
4   medicine for any chronic conditions or anything of that
5   nature?
6       A.   I got a bad stomach, heartburn, ulcers, stuff
7   like that.
8       Q.   Okay.  Other than that, are you in pretty good
9   shape?
10           MS. STAPLES:  Objection to form.
11      A.   I got bad teeth.
12      Q.   Okay.  Do you have a dentist you see on a
13  regular basis?
14      A.   No.
15      Q.   Okay.  Do you have a -- like, a family doctor
16  or a doctor that you go to for, like, an annual physical
17  or if you get a, you know, cold or an earache or
18  whatever?
19      A.   I think his name is Dr. Zeller.
20      Q.   Dr. Zeller?  Okay.  Where is he located?
21      A.   Russellville.
22      Q.   Okay.  Do you know what street in
23  Russellville?
24      A.   No.
25      Q.   Okay.  Are you still in touch with either
```

Page 181

```
1   Lindsey Brawn or Don Powell?
2       A.   No.
3            MS. STAPLES:  Objection to form.
4            MS. LANGEN:  Okay.  If you give me a minute, I
5       may be done.  Can we take a quick break?
6            MS. STAPLES:  Of course.
7            MS. LANGEN:  Okay.
8            VIDEOGRAPHER:  The time is 1:16.  We're off the
9       record.
10           (OFF THE RECORD)
11           VIDEOGRAPHER:  The time is 1:27.  We are back
12      on the record.
13           MS. LANGEN:  Mr. Yell, I don't have any further
14      questions of you.  I do want to mark that plea
15      agreement that we read a question or two out of as
16      an exhibit, and other than that, I don't have any
17      more questions.  I thank you for your time.  These
18      other attorneys may have more.
19           THE WITNESS:  Thank you.
20           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
21           MS. STAPLES:  And at this time we are -- the
22      plaintiff would like to take a lunch break, so we'd
23      like to reconvene in an hour.
24           MS. LANGEN:  Okay.
25           VIDEOGRAPHER:  The time is 1:28.  We're off the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 48 of 77 PageID #: 2956
The Deposition of ROBERT YELL, taken on September 30, 2022

182..185

Page 182

1    record.
2              (OFF THE RECORD)
3              VIDEOGRAPHER:  The time is 2:35, and we are
4    back on the record.
5              EXAMINATION
6    BY MS. ARNETT:
7    Q.    Okay.  I guess, it's being handed over to me.
8    Mr. Yell, I introduced myself earlier.  I'm Amber
9    Arnett.  I'm an attorney for the Kentucky State Police
10   defendants.  Those are David West, Jaman Childers and
11   William Thomas Smith.  He goes by Tommy Smith.  So I
12   have a few questions for you.  I'm -- I'm going to try
13   not to repeat any questions that Ms. Langen asked you.
14   So if I do, please forgive me.  But all the same rules
15   apply, and if you need a break at any time, just let us
16   know, okay?
17   A.    Thank you.
18   Q.    You're welcome.
19         Do you know Jaman Childers?
20   A.    No, not personally.
21   Q.    Okay.  Do you know William Tommy Smith,
22   William Thomas Smith?
23   A.    No.
24   Q.    And do you know David West?
25   A.    No.

Page 183

1    Q.    Have you ever had a conversation with Jaman
2    Childers?
3    A.    Not that I am aware of, no.
4    Q.    Have you ever had a conversation with William
5    Thomas Smith?
6    A.    No, not that I'm aware of.
7    Q.    And do you know if you've ever had a
8    conversation with David West?
9    A.    I think he interrogated me.
10   Q.    Okay.  Do you know when that was?
11   A.    Maybe a day or so after the fire.
12   Q.    Okay.  Where was that?
13   A.    I want to say Russellville Police Department.
14   Q.    Okay.  Was there anyone else present?
15   A.    Kenneth Edmonds.
16   Q.    Okay.  And do you recall what the discussion
17   was?
18   A.    About the fire.
19   Q.    Okay.  So are you -- do you have any personal
20   knowledge of any task that -- I'm jumping around a
21   little bit -- that Jaman Childers did to investigate the
22   cause of the fire?
23   A.    No.
24   Q.    And do you have any personal knowledge of any
25   actions or activities that Tommy Smith or William Thomas

Page 184

1    Smith performed to investigate the fire?
2    A.    No.
3    Q.    And, then, what about David West?
4    A.    I believe he went around with Buster and the
5    arson dog at the trailer.
6    Q.    Okay.  And I don't want to know anything
7    you've discussed with your attorneys or that your
8    attorneys told you, but how do you know that?
9    A.    I believe he testified to it at trial.
10   Q.    Okay.  Okay.  Earlier when Ms. Langen was
11   asking you questions, you mentioned that there was a
12   breakfast?
13   A.    Yes.
14   Q.    Tell me what you know about that breakfast.
15   A.    Just that they met at Colonial Inn, maybe.
16   Q.    Okay.  Who is "they"?
17   A.    David West and Buster Cannon.  I'm not sure
18   what they talked about or anything.
19   Q.    Okay.  And what is your basis for saying that?
20   How do you know that?
21   A.    I believe they testified to it at trial.
22   Q.    And if their testimony at trial was contrary
23   to that or disputed that in any way, would you have
24   reasons to disagree with that?
25         MS. STAPLES:  Objection to form.

Page 185

1    A.    No.
2    Q.    Okay.  In the complaint in this case, the
3    allegations against David West and Tommy Smith and I'm
4    going to refer to him as Tommy going forward.  You
5    understand I'm talking about William Thomas Smith --
6    A.    Yes.
7    Q.    -- and Jaman Childers.  The allegations are
8    that they framed you or -- yeah, they framed you for
9    arson.  So what are the facts that you're relying on or
10   the evidence that you're relying on for your allegation
11   that they framed you?
12         MS. STAPLES:  And the same admonition applies,
13   Robert.  If you know facts outside of what your
14   attorneys have discussed with you, then you can
15   testify to those.
16   A.    I don't.
17   Q.    Okay.  Is that your response?
18   A.    Yes.
19   Q.    Okay.  Another allegation is that evidence was
20   fabricated.  Do you have evidence that evidence was
21   fabricated?
22         MS. STAPLES:  Same.
23   A.    Not outside of what me and my lawyers talked
24   about.
25   Q.    And with the same objection, do you have any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1  facts that you're relying on --
2      A.  No.
3      Q.  -- to make that allegations?
4          Another allegation is that there was a
5  conspiracy to frame you.
6          MS. STAPLES:  Same admonition.
7      A.  Yes.
8      Q.  Do you have any facts or evidence to support
9  that allegation?
10      A.  Not outside, no.
11      Q.  Are you aware of any conversations that any of
12  my three defendants had that would support your
13  allegation?
14          MS. STAPLES:  Same admonition.
15      A.  Not outside of what me and my lawyer
16  discussed.
17      Q.  Okay.  And this is similar to a question that
18  Ms. Langen asked you, but I want to ask it specific to
19  my clients.
20      A.  All right.
21      Q.  And so I apologize for the repetition.  But
22  are you aware of any evidence that exists that would
23  show that David West knew you did not set the fire?
24          MS. STAPLES:  Same admonition.
25      A.  Not outside of what me and my lawyer has

Page 187

1  discussed.
2      Q.  Okay.  Are you aware of any evidence that
3  exists that Mr. Smith knew you did not set the fire?
4          MS. STAPLES:  Same admonition.
5      A.  Not outside of what we've discussed previously
6  with my lawyer.
7      Q.  And the same question for Tommy Smith.
8          MS. STAPLES:  Same admonition.
9      A.  Same answer.
10      Q.  Okay.  Now, earlier in your testimony you
11  mentioned you were not able to attend your grandmother's
12  funeral because you were in prison.
13      A.  Uh-huh.
14      Q.  And you clarified that that was Jeff's mother.
15  Did you make a request to the warden or any prison
16  authority to attend that funeral?
17      A.  I think it's a standing order that it's got to
18  be, like, a parent or a child before they grant a leave.
19      Q.  Okay.  So there wasn't a request made and it
20  was denied?
21      A.  Not a written request, no.  They don't grant
22  requests like that --
23      Q.  Okay.
24      A.  -- in CPP, if I'm not mistook.
25      Q.  Okay.  And my last question -- well, maybe my

Page 188

1  last question:  Do you smoke currently?
2      A.  Yes.
3      Q.  And how long have you smoked?
4      A.  Since I got out, I dipped and then maybe
5  switched to vaping a year or so ago, two years, maybe.
6      Q.  Okay.  And did you smoke before you went to
7  prison?
8      A.  Yes.
9      Q.  Okay.  And when did you start smoking I guess
10  is my question?
11      A.  When I was a teenager, 14-ish.
12      Q.  And -- and I know we've had this issue as far
13  as -- as far as nailing down a time, but in your adult
14  life, how often would you say you smoked before going to
15  prison?
16          MS. STAPLES:  Objection to form.  You're not
17      asking each individual time he smoked?
18          MS. ARNETT:  No.  Just like if --
19      A.  I've smoked constantly my whole entire adult
20  life.
21  BY MS. ARNETT:
22      Q.  Like a pack a day?
23      A.  That would be a fair estimate.
24          MS. ARNETT:  Okay.  That's all the questions I
25      have.

Page 189

1          EXAMINATION
2  BY MR. SOWELL:
3      Q.  Mr. Yell, my name the J.A Sowell.  I'm an
4  attorney in Bowling Green, Kentucky.  I represent Bill
5  Jenkins, the jailer from Logan County, and the Logan
6  County as an entity, okay?
7      A.  Okay.
8      Q.  I'm going to be brief, but I'm going to ask
9  you some questions related to my clients.  I'm going to
10  try not to repeat any ground that's already been
11  covered, okay?
12      A.  Yes.
13      Q.  If I ask you a question, you don't understand,
14  please request me to rephrase it, okay?
15      A.  Yes, sir.
16      Q.  I believe from your testimony earlier you
17  stated that you had never actually reviewed or seen the
18  video footage from the sally port at Logan County
19  Detention Center on the night that you were brought in;
20  is that fair?
21      A.  Yes, sir.
22      Q.  Okay.  So is it fair to say you do not
23  personally know what was captured on the video footage
24  from the Logan County Detention Center of the sally port
25  on that night?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1    A.    That's right.
2    Q.    Okay.  Have you ever personally reviewed the
3 report by Mr. Porter that he claims he prepared
4 following your arrival at the sally port at Logan County
5 Detention Center on the night of the fire?
6    A.    I have not.
7    Q.    So is it fair to say you -- you do not
8 personally know what was contained in Mr. Porter's
9 report that he prepared after your arrival at Logan
10 County Detention Center on the night of the fire?
11    A.    I do not.
12    Q.    Okay.  Do you have any knowledge regarding
13 where Mr. Porter supposedly left or placed that -- or
14 when -- when, where or how he placed that video footage
15 and/or report --
16    A.    I do not.
17    Q.    -- and that -- on the night of fire?
18    A.    I don't know.
19    Q.    Okay.  There's some allegations in your
20 complaint regarding where he put the -- the video
21 footage in the report.  Do you have any personal
22 knowledge about that?
23    A.    No.
24    Q.    Okay.  Do you know what that's based upon,
25 other than what you discussed with your attorneys?

Page 191

1    A.    I do not.
2    Q.    Okay.  So is it fair to say you will not be
3 offering any testimony at trial regarding what is
4 supposedly depicted in the video footage from the sally
5 port?
6    A.    Outside of what me and my lawyers talked
7 about, no.
8    Q.    Okay.  Is it fair to say you will not be
9 offering testimony at trial regarding the contents of
10 Mr. Porter's report regarding the sally port at Logan
11 County Detention Center?
12    A.    Outside of what me and my lawyers talked
13 about, no.
14    Q.    Okay.  What information do you have that
15 supports your allegations that Logan County and Jailer
16 Bill Jenkins conspired with the other defendants to
17 frame you or harm you in any way?
18    MS. STAPLES:  The same admonishment that I've
19 given you throughout the deposition.
20    A.    Okay.  Outside of what me and my lawyers has
21 talked about, none.
22    Q.    Okay.  What documentation do you have that
23 supports your allegations that Logan County and Bill
24 Jenkins conspired with the other named defendants to
25 harm you?

Page 192

1    MS. STAPLES:  Same admonishment.
2    A.    Same answer as previous.
3    Q.    Okay.  Do you have any evidence, knowledge or
4 information or documentation that Bill Jenkins withheld
5 or destroyed the video footage?
6    MS. STAPLES:  Objection to form and the same
7 admonishment.
8    A.    Not outside of what me and my lawyers has
9 discussed.
10    Q.    Do you have any evidence, documentation,
11 information or other knowledge that Bill Jenkins
12 withheld or destroyed Mr. Porter's report?
13    MS. STAPLES:  Objection to form and same
14 admonishment.
15    A.    No.
16    Q.    Do you have any evidence that any other Logan
17 County employee representative withheld or destroyed the
18 video footage?
19    MS. STAPLES:  Same admonishment.
20    A.    No.
21    Q.    Do you have any evidence that any other Logan
22 County employee or representative withheld or destroyed
23 the report for Mr. Porter?
24    MS. STAPLES:  Same admonishment.
25    A.    Not outside what me and my lawyers talked

Page 193

1 about.
2    Q.    Do you have any evidence, documentation,
3 knowledge, or other information that Bill Jenkins in
4 Logan County knew you did not commit the crime subject
5 to the complaint?
6    MS. STAPLES:  Objection to form and same
7 admonishment.
8    A.    Not outside of what we've discussed previously
9 with my lawyer.
10    Q.    Okay.  Do you know Bill Jenkins?
11    A.    Not personally, no.
12    Q.    Have you ever had any personal interaction
13 with Mr. Jenkins?
14    A.    No.
15    Q.    No conversations or anything like that with
16 Mr. Jenkins?
17    A.    I think I waved at him once when my mother and
18 Saralynn come up and that may have been the only
19 interaction whatsoever.  It was just, like, a, hi, how
20 are you doing?  And they was coming in, and I think he
21 was passing in the hallway.  But other than that, no.
22    Q.    And that was when you were incarcerated
23 following the fire?
24    A.    Yes, sir, Logan County Jail.
25    Q.    And does that include all your interactions

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 170     Filed 10/03/25     Page 51 of 77 PageID
#: 2959
The Deposition of ROBERT YELL, taken on September 30, 2022

194..197

Page 194

1  with Bill Jenkins over your entire life?
2      A.   Yes.
3      Q.   Okay.  Did you have any conversations with any
4  other Logan County employee or jail employee regarding
5  the allegations in your lawsuit against Logan County or
6  Bill Jenkins?
7      A.   No.
8      MS. STAPLES:  Objection to form.  Same
9  admonishment.
10     Q.   None whatsoever?
11     A.   No.
12     Q.   Okay.  Your complaint says that Sergeant
13 Porter called defendant Jenkins and informed him of what
14 occurred and the whereabouts of the tape and the report,
15 paragraph 73 in your complaint.  Other than what you
16 discussed with your attorneys, do you have any knowledge
17 about that?
18     A.   No.
19     Q.   Paragraph 74 says, "The defendants conspired
20 to withhold and/or destroy the exculpatory evidence,
21 slash, losing the tape and report before it could be
22 disclosed to Mr. Yell."  Other than what you've
23 discussed with your attorneys, do you have any
24 knowledge, documentation or information about that?
25     MS. STAPLES:  Objection to form.

Page 195

1      A.   No.
2      Q.   The paragraph goes on to read, "This evidence
3  would have proved that the defendants lied and were
4  framing plaintiff for crimes he did not commit."  Do you
5  have any personal knowledge, information, documentation
6  or information regarding that statement?
7      MS. STAPLES:  Objection to form.  Same
8  admonishment.
9      A.   Not outside of what me and my lawyers
10 discussed.
11     Q.   Okay.  And I believe in your discovery
12 responses you stated you never had any personal
13 interactions with Jailer Jenkins or any Logan County
14 defendant and, I believe, you testified consistent with
15 that, but is that still true?
16     A.   Yes, sir.
17     MR. SOWELL:  Okay.  I believe that's all I have
18 for right now.  I'll pass the witness.
19     MS. STAPLES:  Chris, Barry, Charlie, anyone?
20     MR. STILZ:  Charlie, do you have any questions?
21          EXAMINATION
22 BY MR. COLE:
23     Q.   I just have a quick question.
24     Mr. Yell, this is Charles Cole.  I represent
25 the city of Georgetown, and Carl R. Buster Cannon.  Can

Page 196

1  you hear me all right?
2      A.   Yes, sir.
3      Q.   All right.  Is your -- do you -- do you recall
4  referring a couple times a breakfast that occurred after
5  the fire?  Do you recall testifying to that on a couple
6  of occasions?
7      A.   Yes, sir.
8      Q.   Is your knowledge of that breakfast outside of
9  any communications with your attorneys based upon the
10 trial testimony that you heard in your criminal trial?
11     A.   Outside of my lawyer, no.
12     Q.   I -- I didn't get your answer.  Outside of
13 your lawyer, no.  Is your knowledge outside of
14 communications with your lawyer about this breakfast
15 based upon the testimony you heard at trial?
16     A.   I'm not sure if it was at trial or in
17 evidentiary hearing.
18     Q.   Would have been one of the two; is that
19 correct?
20     A.   Yes, sir.
21     Q.   When you testified about the way the dog was
22 handled, is your knowledge outside of any communications
23 with your attorney about how the canine dog was handled
24 at the trailer based upon your hearing testimony at
25 trial or another pretrial hearing?

Page 197

1      MS. STAPLES:  Objection to form.
2      A.   No, not outside of what me and my lawyer had
3  discussed.
4      Q.   So you didn't hear any testimony at trial
5  about the way the dog was handled?
6      A.   Yes.  I -- I misunderstood your question.  Yes.
7      Q.   Let me ask it again.  Is your testimony, you
8  said you had an issue about the way the dog was handled;
9  do you recall mentioning that, sir?
10     A.   Yes.
11     Q.   All right.  And my question is:  Outside of
12 any communications with your attorneys, is your
13 understanding the way the dog was handled, is that based
14 exclusively on testimony that you heard at trial,
15 evidentiary hearing or any other pretrial hearing?
16     A.   Yes.
17     Q.   Isn't it true that you've never seen or heard
18 Buster Cannon except for seeing or hearing him at trial?
19     A.   That's the only time.
20     MR. COLE:  That's all the questions I have at
21 this time.
22     MR. STILZ:  I have no questions at this time.
23          EXAMINATION
24 BY MR. GADANSKY:
25     Q.   I've just got one.  Mr. Yell, do you know Alan

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  Gregory?
2      A.   I know the name, yes.
3      Q.   Do you know where you know the name from?
4      A.   Trial and me and my lawyer has discussed it.
5      Q.   Have you ever met Mr. Gregory or spoken with
6  him?
7      A.   No.
8      Q.   Do you have any information with respect to
9  Mr. Gregory's involvement or investigation in the
10  underlying criminal case against you?
11      A.   No.
12          MR. GADANSKY:  That's all I've got.
13              CROSS-EXAMINATION
14  BY MS. STAPLES:
15      Q.   All right.  Robert, I've got a few questions
16  for you.
17      A.   Yeah.
18      Q.   During Ms. Langen's examination of you earlier
19  today, she asked you what you told Detective Edmonds
20  during your initial interrogation with him.  Do you
21  recall that part of the examination?
22      A.   Yes.
23      Q.   Okay.  Now, isn't it true that you told
24  Detective Edmonds on 9-12 of 2004 that you did not set
25  fire to your home?

Page 199

1      A.   Yes.
2      Q.   Isn't it true that you told Detective Edmonds
3  on 9-12-2004 that you didn't know how the fire might
4  have started?
5      A.   Yes.
6      Q.   Do you recall being asked some questions
7  earlier today regarding the second interrogation that
8  Detective Edmonds and Detective West conducted of you on
9  September 13th of 2004?
10      A.   Yes.
11      Q.   And isn't it true that you told both Detective
12  West and Detective Edmonds on that day that you did not
13  intentionally set a fire at your home?
14      A.   Yes.
15      Q.   Robert, isn't it true that you've always told
16  anyone that asked that you did not intentionally set a
17  fire to your home?
18      A.   Yes.
19      Q.   And that would include Judge Gill during what
20  was referred to as the rejected plea in this case; isn't
21  that correct?
22      A.   Yes.
23      Q.   Never once during the proceeding in which you
24  attempted to enter a guilty plea, did you admit to
25  intentionally setting a fire at your home on 9-11-2004,

Page 200

1  correct?
2      A.   Absolutely not.
3      Q.   And that's the reason why Judge Gill would not
4  accept your plea on that day; isn't that right?
5      A.   That is correct.
6      Q.   Now, during the examination before lunch
7  today, you testified that sitting here today you have no
8  independent memory of any communication between you and
9  Officer Eggleston; is that correct?
10      A.   Yes.
11      Q.   And before lunch today, you testified that you
12  have no independent memory of any communication between
13  you and Officer Higgins either at the scene -- at the
14  scene; is that correct?
15      A.   Yes, ma'am.
16      Q.   You have no independent memory of any
17  communication with Detective -- or Officer Higgins in
18  the police cruiser?
19      A.   That's correct.
20      Q.   And you -- and you testified that you have no
21  independent memory of any communication with Officer
22  Higgins in the sally port of the jail on 9-11-2004; is
23  that correct?
24      A.   That's right.
25      Q.   You're aware that both Defendant Eggleston and

Page 201

1  Defendant Higgins have alleged that you made a statement
2  that, quote, if your wife had done to me what his
3  girlfriend did to him, that I would have done the same
4  thing as he did, correct?
5      A.   Yes.
6      Q.   Did you make that statement?
7      A.   No.  I never made the statement.
8      Q.   And if you can't recall every detail of what
9  happened that evening, how is it that you're so sure you
10  didn't make that statement?
11      A.   I didn't make the statement.  I've never made
12  any kind of statement like that before, drinking or not
13  drinking, to anyone about anything, you know.  It's just
14  ludicrous that he could come up with something like
15  that.
16      Q.   Robert, you're aware that Defendant Higgins
17  also alleged that you made a statement that he, quote,
18  didn't know how evil you were, end quote, correct?
19  You're aware that he made that statement?
20      A.   I am.
21      Q.   Did you make that statement to Detective --
22  I'm sorry, to Defendant Higgins?
23      A.   No.  I never made any kind of statement.
24      Q.   And how can you be sure of that sitting here
25  today?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 53 of 77 PageID #: 2961
The Deposition of ROBERT TAYLOR, taken on September 30, 2022

202..205

Page 202

1    A.   I didn't make the statement.  I'm not an evil
2  person.  I love the kids more than myself, and it's just
3  not possible that I could -- anything like that, no.
4    Q.   Have you made some mistakes in your life?
5    A.   Well, sure.
6    Q.   Are you proud of putting your hands on April?
7    A.   No.  Who would be?
8    Q.   Are you proud of your criminal history?
9    A.   No.
10    Q.   Are you proud of drinking to excess?
11    A.   No.
12    Q.   Does that make an evil -- make you an evil
13  person?
14    A.   No.
15    Q.   Now, earlier you were asked some questions
16  about the damages that are discussed in your complaint;
17  do you recall being asked questions about that?
18    A.   Yes, ma'am.
19    Q.   Do you recall being asked some questions about
20  your time in prison?
21    A.   Yes, ma'am.
22    Q.   Okay.  Do you recall testifying about the
23  years that you spent in Eddyville?
24    A.   Yes, ma'am.
25    Q.   And Eddyville is the maximum security prison

Page 203

1  in the state of Kentucky; is that correct?
2    A.   The only one.
3    Q.   Tell me what it was like for you being accused
4  of murdering your son to be housed in the maximum
5  security prison in Kentucky.
6    A.   It was very, very hard, you know, people
7  always look at people with a child victim case, you
8  know, as someone that they can prey upon, take advantage
9  of, so you always are on the defensive, stay in your
10  cell a bunch.  It's a lot of lonely time.  You know, you
11  don't just go out and make a bunch of friends.  It's
12  kind of rough.
13    Q.   Would it be an accurate statement to say that
14  those who are accused of harming children are looked at
15  differently within the --
16    A.   Hierarchy?
17    Q.   -- inmate population?
18    A.   Yes, ma'am.
19    Q.   And you just mentioned a hierarchy.  What do
20  you mean by that?
21    A.   It's kind of like a -- a status of why you're
22  in prison, you know, people with a murder or robbery are
23  kind of looked as bad asses for the lack of proper term
24  and people with a pedophile or a sex crime or something,
25  it's kind of looked like an easy victim, somebody that

Page 204

1  is weak.  Somebody that they can exploit.
2    Q.   And what about those who have been accused of
3  killing their children?
4    A.   They are kind of at the very bottom of the
5  cesspool.
6    Q.   Robert, you testified earlier that Detective
7  Edmonds informed you of Cameron's death during that
8  initial interrogation you had with him on September 12th
9  of 2004, correct?
10    A.   Yes, ma'am.
11    Q.   And at the time that Detective Edmonds
12  informed you of your son's death, you were already in
13  custody, correct?
14    A.   Yes, ma'am.
15    Q.   You'd been arrested the night before?
16    A.   And I was arraigned that morning or the next
17  morning, I think.
18    Q.   And you testified that after you were arrested
19  on September 11th of 2004, that you didn't leave
20  incarceration until January of 20 --
21    A.   '17.
22    Q.   -- 17; is that right?
23    A.   Yes, ma'am.
24    Q.   Tell me what it was like learning from
25  Detective -- Detective Edmonds on September 12th of 2004

Page 205

1  that your son had died in a fire?
2    A.   It was very, very heart wrenching, you know.
3  It felt like some part of you, your soul was just ripped
4  out, you know.  He was my first born son.
5    Q.   What effect has Cameron's death had on you
6  since that day?
7    A.   It's been very, very hard to understand.
8  You feel like -- I don't know how to describe it.  It's
9  very, very hard.
10    Q.   While you were in prison for those 12 years,
11  were you able to fully mourn the death of your son?
12    A.   No.  I don't think I know how or understand
13  even the grieving process.  You know, they snatched me
14  up and threw me in jail and accused me of it and you
15  automatically go on the defensive.  You know, they tried
16  to take my life, you know, tried to give me the death
17  penalty.  And it was very, very emotional, you know, and
18  you really can't show too many soft emotions in prison.
19    Q.   And why is that?  Why can't you show emotion
20  in prison?
21    A.   I think they have a term:  A Viking or a
22  victim.  You know, any kind of weakness, they look for a
23  way to exploit it, you know.  So you always have to be
24  on guard or be aware of your surroundings and make sure
25  that no one can hurt you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 54 of 77 PageID #: 2962
The Deposition of ROBERT TAYLOR, taken on September 30, 2022

206..209

Page 206

1    Q.    And you mentioned that you were fighting for
2  your life because they had sought the death penalty
3  against you?
4    A.    It was death penalty qualified jury, yes.
5    Q.    Robert, have you yet to this day been able to
6  fully mourn the death of your son?
7    A.    No.  It's kind of overwhelming.  You know, you
8  look for something else to numb it.  You know, where you
9  don't have to deal with it because you have absolutely
10 no idea how to deal with the emotions or the sadness of
11 the whole situation.
12   Q.    Even though your conviction has been
13 overturned, you've been exonerated, are you still
14 fighting to clear your name to this day?
15   A.    Yes.
16   Q.    How so?
17   A.    I still live in Russellville, and I deal with
18 the effects of it a lot.  I was talking with a lady at
19 church and I think she believes I was innocent and her
20 husband believe I didn't, you know, you can just tell in
21 people's -- I don't know how to describe it.  They are
22 standoffish.  They look at you like you are guilty of
23 that regardless of what the experts have said and
24 everything and proving that it was an accidental fire.
25 They still have the concept of what Charles Owens said

Page 207

1  and made them believe.  It's...
2    Q.    You were asked some questions earlier about
3  your employment status, and you testified that you're a
4  handyman.  Is there a reason why you don't have formal
5  employment outside of being a handyman at this time?
6    A.    I've tried to work around people or be a
7  productive member of society.  I had a factory job for a
8  month and that didn't go over so well at all.  I've
9  poured concrete, and it's -- it just seems like
10 everybody looks at you, like, you would do something
11 like that and, you know, it's -- I -- prison makes you
12 very aware of other people's body language and the way
13 they interact with you and it kind of makes you overstep
14 or over anticipate things and sometimes I'm sure that it
15 didn't.  But the way that you perceive it, it's very,
16 very hard to deal with.
17   Q.    Do you still feel as though there are people
18 judging you and treating you as though you're guilty?
19   A.    Yes.
20      MS. STAPLES:  No further questions of you right
21 now, Robert.
22      THE WITNESS:  Okay.
23      MS. LANGEN:  I have nothing further.
24      MS. STAPLES:  Anything further, anyone?
25      MR. STILZ:  Nothing here.

Page 208

1      MR. COLE:  Charles Cole, no further questions.
2      MS. STAPLES:  Chris, any further questions?
3  Going once.
4      MR. GADANSKY:  Sorry about that.  No, I have no
5  questions.
6      MS. STAPLES:  Okay.  Thank you.
7      VIDEOGRAPHER:  The time is 3:07.  We are off
8  the record.
9      (DEPOSITION CONCLUDED AT 3:07 P.M.)

Page 209

1          CERTIFICATE OF REPORTER
2       COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded stenographically and mechanically by me and
10 then reduced to typewritten form under my direction, and
11 constitutes a true record of the transcript as taken,
12 all to the best of my skill and ability.  I certify that
13 I am not a relative or employee of either counsel, and
14 that I am in no way interested financially, directly or
15 indirectly, in this action.
16
17
18
19
20
21  
22 SANDRA VENTURA
23 COURT REPORTER/NOTARY
24 MY COMMISSION EXPIRES ON: 08/15/2025
25 SUBMITTED ON: 11/16/2022

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**Exhibit 1_Yell**
101:10,14
117:3 119:3
120:13,14

**Exhibit 2_Yell**
106:16

**Exhibit 3_Yell**
181:20

### $

**$15** 23:13
24:16

**$15,000** 170:13

**$18** 97:9

### 0

**09** 164:25

### 1

**1** 101:10,14
117:3 119:3
120:14

**10** 68:12

**10:37** 59:3

**10:48** 59:6

**11** 19:10 48:11
49:3 59:19
117:9 125:9

**11th** 15:15
16:5,21 17:1,5,
9 47:4 63:19
64:1,5,18 65:16
66:18 67:23
73:11 76:1,6
79:9 82:14
84:10,15 93:12
95:17 98:2,6,18
99:9,18 100:10,
17 109:22
110:6 124:20
128:20 129:1,
21 130:14

131:4 135:11
137:4,17 139:1,
7 140:20
147:15 152:1
155:18 163:1,
17,24 204:19

**12** 19:10 23:13
28:15 59:24
71:6 123:5
124:7 205:10

**12-ounce** 12:5

**12-step** 72:6

**12:14** 135:3

**12:27** 135:6

**12th** 135:22
142:14,15
144:17 146:9,
19 147:11
204:8,25

**13** 123:5

**133** 156:10

**13th** 199:9

**14** 64:14

**14-ish** 188:11

**15** 24:11,12
28:16 59:24
68:13 166:10

**16** 12:7 71:6

**17** 149:16,21
179:1 204:21,
22

**17th** 48:8

**18** 168:7

**19** 94:13 168:1,
6

**1997** 86:14,19,
24 87:6 88:4
98:11

**1998** 96:23
97:25

**19th** 87:23

**1:16** 181:8

**1:20-CV-0047-
GNS** 8:12

**1:27** 181:11

**1:28** 181:25

### 2

**2** 106:16

**20** 149:16
204:20

**2000** 54:17,18
72:19 87:23
88:1

**2001'ish** 29:3
31:23

**2002** 29:3
31:23 54:16
55:4

**2002'ish** 24:5
55:3

**2003** 50:22
51:2,12,24
53:1,3,5,16
54:3 55:3 84:16
88:7

**2004** 16:5,21
17:1,5,10 45:11
47:4 63:19
64:1,5,18 65:16
66:18 67:23
73:11 76:1,6
79:9 82:14 83:1
84:10 95:17
98:3,7,18 99:9,
18 100:10,17
109:22 124:20
128:20 129:1,
22 130:14
131:4 135:11
137:4,17 139:1,
7 140:20
147:15 152:2
155:18 160:24
163:1,18,24
198:24 199:9
204:9,19,25

**2004'ish** 56:2,
7

**2006** 48:7,8
102:10 118:3
121:13 123:16,
18,22 131:13

**149:15 162:21
164:5**

**2015** 171:24

**2016** 160:24
164:9,12
170:12,16
171:24 179:1

**2017** 25:17
170:13,20
171:13 178:3

**2019** 175:20

**2022** 8:5

**21** 80:24

**211** 48:10,23,
25 59:16

**212** 48:20
64:12 68:10

**216** 117:6
120:21

**217** 120:13,16

**218** 123:4

**22** 149:15,18,19

**220** 125:6

**221** 125:16

**222** 131:20

**232** 79:23
80:24

**233** 79:24

**235** 119:4

**24** 11:24 12:2,
17 177:15

**24th** 170:13

**25** 25:2 120:21

**26th** 170:13
174:5

**29th** 88:7

**2:35** 182:3

### 3

**3** 181:20

**30** 144:25
145:2,6,8

**30,000** 25:2

**3066** 174:21
175:7

**30th** 8:5

**32** 104:3

**34** 102:18

**35** 102:18

**3:07** 208:7,9

### 4

**40** 19:15 124:9

**40-ounce**
124:11

**4th** 86:14,19,24

### 5

**50-some-odd**
176:4

**52** 164:7

**582** 40:19

**5th** 25:17

### 6

**638** 40:11 45:2,
5 46:25 82:15
83:2 90:2 99:19

**683** 101:17

### 7

**7** 119:4

**73** 194:15

**74** 194:19

**7:20** 129:1

**7:30** 12:10

**7th** 83:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**8**

**8** 71:6

**85** 164:7

**89** 171:6

**8:00** 12:10

**8th** 48:7 92:15, 17 149:15

**9**

**9-11-2004** 199:25 200:22

**9-12** 198:24

**9-12-2004** 199:3

**94** 19:5

**94'ish** 19:1

**96** 97:8

**97** 97:8

**98** 21:25 95:21

**9:39** 8:6

**A**

**a.m.** 8:6

**AA** 72:15,18

**ability** 12:18

**absolutely** 200:2 206:9

**abuse** 73:12, 13,17,21 74:7,8 76:2

**accelerant** 161:2

**accept** 147:20 200:4

**accepting** 94:4

**accidental** 150:24 206:24

**accurate** 203:13

**accurately** 75:15

**accused** 203:3,14 204:2 205:14

**acres** 176:4

**actions** 79:11 152:7 183:25

**actively** 141:13

**activities** 172:9 183:25

**add** 45:20

**addiction** 179:7

**address** 39:14 40:14 44:3 51:22 72:3

**Adjustment** 96:11

**admit** 146:19 147:1,3,17 148:6 199:24

**admonishment** 191:18 192:1, 7,14,19,24 193:7 194:9 195:8

**admonition** 154:4 156:20 185:12 186:6, 14,24 187:4,8

**adult** 27:4 65:24 75:13 76:24 77:8 85:2,3 188:13, 19

**advantage** 203:8

**advised** 144:19

**affair** 57:2 58:17 59:11 60:12 81:5

**affairs** 55:14

**affect** 60:16

**118**:23

**affirm** 9:17

**afternoon** 110:6,8

**again/off** 38:10,11 39:1,5 47:7,9

**age** 100:3

**agencies** 43:16

**aggressor** 166:3

**agree** 45:21 62:2 148:15

**agreeing** 10:3

**agreement** 149:14 156:12, 17 157:1 181:15

**ahead** 58:25 82:21 106:18 119:5 153:1

**Alamo** 29:19

**Alan** 156:6 197:25

**alcohol** 12:1,9 63:15,20 64:5 65:15,25 66:9, 13,19 67:1,6, 10,13,17,25 68:6 70:18 71:24 72:1,4,6 91:12,18,23,24 92:7 112:7,11 114:7,11,12,25 115:24 118:12 124:18,25 130:16 177:10

**Alcoholics** 72:7,10 73:6,9

**alive** 25:14

**allegation** 156:14 185:10, 19 186:4,9,13

**allegations** 185:3,7 186:3 190:19 191:15,

**23** 194:5

**alleged** 156:11 201:1,17

**allegedly** 88:8

**alluded** 91:12 121:24

**altercation** 165:22

**altercations** 165:14 166:12, 15 170:23

**Amanda** 83:1

**Amber** 8:21 182:8

**amount** 23:13 57:24 68:7 70:3 71:20 115:7,11

**Amy** 8:15 13:6 47:22 148:14 149:7 156:1

**and/or** 170:3 190:15 194:20

**Andy** 169:24 170:1,2

**annual** 180:16

**annuities** 176:22

**Anonymous** 72:7,10 73:6,9

**answering** 153:5

**answers** 60:16 118:23

**anticipate** 207:14

**anymore** 94:14

**apartment** 43:9

**apologies** 65:1

**apologize** 80:21 108:25 158:24 186:21

**appearing** 9:7,

**10** 10:5 106:7

**appears** 104:12 107:2

**applies** 156:21 185:12

**apply** 182:15

**approximately** 18:25 23:12 24:24 29:2

**April** 28:20,21, 24 29:2,6,17,25 30:14,19 31:1, 8,11,19,22,23 32:2,7,12,25 33:4,8,23 37:2, 4,13,17 38:8, 11,18,19 39:3, 11,16 40:2 42:10 44:11 46:20,24 47:3, 11,14 49:5,19, 24 50:7,11,17, 21 51:17 52:10, 12,13,16 55:15, 19,25 56:7,11 57:1 58:8,12 59:11,21,22 60:6,12,18,21, 25 61:10,21,23 62:8 63:2,10,14 66:5 67:10,24 68:6,15,21 69:4,16 71:24 72:3 76:2,7 77:23 78:6,9 79:14 80:6 81:3 82:5,15 83:16 84:7 90:6,7,12, 22 91:13 92:10, 13 93:2,22,23 94:1,8,20 95:5 99:25 100:13 106:20 109:19 112:10,14,24 115:15,23 116:9,13 118:13,25 119:11,12,16, 24 120:5 121:3, 7,16 125:14 126:9,12,15,18 127:4 128:4,9, 13,19 167:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 57 of 77 PageID
#: 2965
The Deposition of ROBERT YELL, taken on September 30, 2022
212

168:15,21,24
169:2,14 202:6

**April's** 34:9
56:14 127:24

**area** 23:4

**argue** 67:4

**argued** 62:11,
13,20 78:11
119:18,19

**arguing** 78:25
81:6,10 82:19
120:1 121:4,9
125:14 126:12,
15,18,21

**argument**
58:13 78:3
83:25 112:15
116:24 120:7
126:9 127:25

**arguments**
60:2 61:20
116:13 119:1
120:6,10 121:7

**Arnett** 8:21
182:6,9 188:18,
21,24

**arose** 90:19

**arraigned**
204:16

**arranged**
140:13

**arrangement**
176:25

**arrest** 144:7
162:14 163:18
178:11

**arrested** 53:16
54:12 75:20
86:13 87:22
99:8 178:2,17,
20,25 204:15,
18

**arrests** 89:19
179:3

**arrival** 190:4,9

**arson** 148:4,7,
19 150:19

184:5 185:9

**assault** 86:14
87:23 88:7 98:5
148:22,25
149:25 150:8
151:2,6

**asses** 203:23

**associate**
77:16

**assume** 160:4

**assuming**
127:17 134:20
138:8

**ate** 75:18
111:20

**attempted**
150:7 199:24

**attempting**
148:3,21,24

**attend** 15:15
171:9,13
187:11,16

**attended** 14:24
15:6,10,13
26:18 27:16
157:11

**attention**
99:17 142:12

**attorney** 10:14
154:12 182:9
189:4 196:23

**attorneys**
13:23 14:11,13
134:20 137:7
181:18 184:7,8
185:14 190:25
194:16,23
196:9 197:12

**August** 82:25
87:23 88:7
92:15,17

**aunt** 121:5,25
128:23 134:7

**authorities**
42:11 46:21

**authority**
187:16

**automatically**
205:15

**average** 24:16

**aware** 42:14
46:22 112:12
115:23 128:24
129:12 161:5,9,
13,17,21
162:18 183:3,6
186:11,22
187:2 200:25
201:16,19
205:24 207:12

**aways** 45:12
87:2

_____

**B**

**baby** 104:20

**back** 20:6 28:4,
6 39:23 40:24
43:2 44:23
45:12 46:17,18
49:22 51:19
52:10,13 57:12,
15 59:6,12
66:7,9,12,17
69:5 71:23,25
75:6 83:14
87:1,2 106:2
108:24 116:22
118:3,10 119:1,
8,18,20,25
120:2,5,10,23,
25 121:1,8,17
124:15,21
125:1 126:1,20,
22 127:25
128:23 133:4
134:8 135:6,13
145:21 170:17
175:13 179:14
181:11 182:4

**bacon** 62:14
112:17,18
113:4

**bad** 46:7 180:6,
11 203:23

**ballpark** 19:25
45:16

**bar** 56:24

**Barry** 8:25
195:19

**based** 36:24
104:7,17 105:5
190:24 196:9,
15,24 197:13

**basically**
10:12 16:19
37:23

**basis** 177:5,6
180:13 184:19

**Bates** 102:3

**bath** 108:23
109:3

**bathroom**
109:6,9

**bear** 31:6
136:11

**bed** 104:20
108:18

**bedroom**
102:17,21
103:3 108:5,11,
12,14,22
109:10,16

**beep** 111:12

**BEEPING**
111:8

**beer** 12:3,5,14
66:2 69:22,25
70:11,16 89:16
124:2,7,11

**beers** 68:23
69:1

**began** 33:23
66:13 72:19
143:11

**beginning**
29:3 45:11 55:3
56:2,7 62:25
164:24 170:6
171:24 177:16

**begins** 86:11

**behalf** 8:25 9:8

**behavior**
161:2

**believed**
150:18

**believes**
206:19

**Bellar** 83:1
128:25

**Bellar's** 129:18

**betting** 18:3

**big** 71:13 124:7

**bigger** 124:8

**bikes** 119:15

**bill** 81:3 138:16
139:13 140:7
141:16 142:7
156:7 189:4
191:16,23
192:4,11 193:3,
10 194:1,6

**Billy** 136:12,14,
18 137:15
163:16,20
164:2

**biological**
33:13,18 37:4
63:6 95:8
171:21

**biologically**
34:10

**birth** 34:4,19,
24 35:7,16,22
36:23,25 37:14
39:12 62:22
63:5

**birthday**
172:11

**bit** 14:23 18:1
22:8,19 41:13
74:24 76:18
77:4 79:6,10
116:21 132:25
145:4 183:21

**blanket/sheet**
108:7,15

**block** 17:15,21
23:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 58 of 77 PageID
#: 2966
The Deposition of ROBERT YELL, taken on September 30, 2022

213

blow 165:25

body 207:12

bond 170:13

bonded 97:18

Bonnie 40:12
45:2,6,7 46:25
51:21 57:13
82:15 83:2 90:3
91:10 99:19
101:17 105:14,
16 106:3,23
110:20

born 32:20
34:2,13,22
35:1,9,12 36:23
47:6,7,8 56:9
205:4

borrowed
53:17

bother 63:4

bothered
58:21

bottle 89:16
118:13 125:19

bottles 118:14
124:2

bottom 78:15
104:23 106:21,
23 204:4

bought 124:1

Bowl 177:17

Bowling 8:11
22:6,10,14,15
27:7 86:14,24
95:25 96:17
179:16,22
189:4

boyfriend 87:4
89:21

boyfriend's
87:9

Bratten 28:3,8

Brawn 181:1

break 15:18
37:11 58:4
59:1,9 134:13,

16 135:9
158:22 181:5,
22 182:15

breakfast
111:21 112:15
157:4,7,9
184:12,14
196:4,8,14

breaks 145:14,
20

breast 55:9

brick 17:14,21
23:3

bring 57:15
126:20 167:13
168:9

bringing
128:23

broad 65:21

brother's
53:23

brought
135:16 162:15
167:17 189:19

Browning
90:8,24

bruises 81:16

brung 134:7

bucks 19:10
21:10

building 145:7

built 24:2

bunch 173:17,
19,20 174:6
203:10,11

burnt 130:24
143:3

business
20:15 26:11
41:16,17

Buster 9:2,4
156:6 184:4,17
195:25 197:18

buttermilk
172:10

---

**C**

Cajun 87:16

call 32:10
43:19 44:15
82:14 117:15

called 20:17,18
29:19 43:22
60:25 82:20,22
83:1,7 86:6
128:25 194:13

calls 42:10
43:15 81:4
158:9

Cameron
32:20,21 34:2,
8,10,13,25
35:9,12 37:6
47:6,7 56:9
62:23 63:11
100:14 108:13
119:15 128:16
143:3

Cameron's
34:4,16,18
35:15,16,22
36:1,6,16 37:14
39:12 63:5,6
95:10 108:12,
20 204:7 205:5

Campbell 9:10
13:10 56:1
58:9,18 59:12
153:14

camper 175:13
176:10

cancer 55:9

canine 161:3
196:23

Cannon 9:2,4
156:6 184:17
195:25 197:18

captured
189:23

car 53:17,18,23
54:1 114:3,22
116:22 133:10
135:17

---

Carl 9:4 195:25

Carlisle 22:24
23:2 25:10,14
26:2,9 28:1
29:12 173:12,
14

Carlisle's
26:11

Carol 90:8,24

Carpenter
28:21 30:12,20
31:1,8 34:20
36:2,6,16,23
38:23 62:22
63:5,12

carpentry 16:7
24:2 165:11

Carroll 101:24,
25

carry 118:17

cartoons
111:20

case 8:12 9:18
13:20 45:1
55:11 93:18,23
96:2 147:25
171:7 185:2
198:10 199:20
203:7

cash 21:12
25:13

catalyst 78:2

caused 67:2

causing 66:21

CCA 96:16

cell 158:21
203:10

Center 96:11
136:16 141:17
142:8 162:16
163:1,12,17,24
189:19,24
190:5,10
191:11

certificate
34:19,24 35:7,
16,23 36:1,3,

---

23,25 62:22
63:5

Certify 177:8
178:23 179:4

cesspool
204:5

Chad 98:21
139:23 152:14
156:3

chair 125:13

change 60:16

characterize
174:12

charge 53:11
54:2 57:17
88:20 148:4
149:24

charged 86:14
87:23

charges 148:5
149:5 178:8,15
179:3

Charles 9:3
195:24 206:25
208:1

Charlie 195:19,
20

Charlotte
128:25 129:18

cheat 50:10
58:8

cheated 49:5,
18 50:1,7 55:25

cheating 59:22
60:6,18

check 43:22

child 34:10
42:11 43:16
44:2 46:21
174:4 187:18
203:7

Childers 8:22
156:4 182:10,
19 183:2,21
185:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

children 33:9,
11 34:9 37:5
61:24 62:12
100:3 173:21,
25 174:2
203:14 204:3

choke 81:9,11,
17

choked 79:13,
19 80:6,8 81:3,
8 84:8,14 85:7
127:24 128:4

choose 42:16

Chris 9:5 92:25
195:19 208:2

chronic 180:4

church 105:20
107:6,8 206:19

cigarette
150:20

cigarettes
145:4,22

city 8:9,19 9:3
15:9 26:25
195:25

claims 190:3

clarified
187:14

clarifying
28:18

Clark 169:19
170:3

class 165:12

classes 16:8

clear 10:15,20,
25 106:12,13
137:9 164:22
206:14

clears 132:7

clients 186:19
189:9

Clifford 23:22
41:24,25 42:6
44:18 46:18
57:14

close 32:22

closer 164:20

clothes 165:20

cocaine 76:8
77:11

Coke 70:25

cold 180:17

Cole 9:3
195:22,24
197:20 208:1

Colonial
184:15

comfortable
42:18

commit 193:4
195:4

committed
157:14

commonly
78:6

communicate
d 94:1

communicatio
n 200:8,12,17,
21

communicatio
ns 157:20
196:9,14,22
197:12

company
18:15 177:1

complaint
171:6 185:2
190:20 193:5
194:12,15
202:16

completely
47:14 55:19

complies
105:17

compound
169:9

conceded
49:18

concept
206:25

concern 76:11

CONCLUDED
208:9

conclusion
158:2

concrete
176:2 207:9

conditions
180:4

conduct
164:22

conducted
199:8

conflict 62:6
63:1,11

confrontation
78:12

confused
106:4

confusing
11:9 169:9

connected
18:17

connection
21:18 54:4
75:21 88:7
93:21 146:20
147:1 155:17
156:18 158:7

consisted
100:13

consistent
195:14

conspiracy
186:5

conspired
191:16,24
194:19

constantly
188:19

constituted
150:19 151:1,6

constitution

144:5

construction
20:10

consume
114:25 115:6

consumed
11:23 12:1,16
112:7 115:24
124:19 130:17

contained
190:8

container 71:4

contend 95:9
147:13 159:22

content 49:22
169:5

contention
34:10 58:16

contents 191:9

context 144:7

continue 73:9
124:25

contrary
184:22

convenient
29:1

conversation
44:14 56:17,20
58:14 138:23
139:19 143:5,
10,23 144:17
145:15 146:3
147:7 151:23
183:1,4,8

conversations
13:2,3 93:2
138:16 139:13
140:7 153:6
157:19 186:11
193:15 194:3

convicted
57:17 95:15
96:4 97:1,10,25
98:5 164:5

conviction
57:22 96:23
97:4,19 162:21

163:2 164:8,12
206:12

Coots 17:14,
17,18,19,20
18:12,16 19:7,
21 20:2,5,22
21:19 22:4

cop 133:10

copy 35:22

corner 102:4
104:23

coroner 36:5

correct 26:22
31:20,24,25
32:4 37:14
41:17,19 42:8
45:2 46:1 48:7
52:3,10 107:14,
23 109:23
121:19 123:16
124:16 126:24
135:23 144:20
147:15 164:9
170:20 178:22
196:19 199:21
200:1,5,9,14,
19,23 201:4,18
203:1 204:9,13

Correctional
96:13 164:18

correctly
20:20 40:1 42:3
46:12 65:7
68:13 69:6
81:21 90:11
117:20 119:21
123:9 132:4
133:11 170:14
172:12

couch 52:2,6,
17 80:8 103:22
104:10

counsel 8:13
137:10 159:23

count 149:24

counter 80:9,
15 82:9,12

counts 148:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

county 8:23
9:1 15:8,9,11
26:14,19,22,23,
24 27:7,17,18
29:1,15,21
36:5,15 39:10,
13,25 40:3,5,6
53:14 54:13
57:7 61:1 87:24
90:25 91:6
94:17 96:11,14,
15,17 136:16
141:17 142:8
162:15,25
163:12,17,23
164:14,20
167:4,18
170:17,19,22
173:11,12
189:5,6,18,24
190:4,10
191:11,15,23
192:17,22
193:4,24 194:4,
5 195:13

couple 50:21
61:14 62:6
92:11 123:20
196:4,5

court 8:4,10
9:14,16,21
111:14

cousin's 87:3,
8,11 89:21

covered
189:11

CPP 187:24

crack 77:14

crazy 58:22
86:9

credit 57:24

crime 96:25
98:6 156:13
157:2,14 158:7
193:4 203:24

crimes 95:16
98:2 146:20
147:1,18
156:18 195:4

criminal 13:16
47:18 48:1,6
49:17 102:10
121:13,16,24
124:5,10
131:13 132:8
134:3 177:25
196:10 198:10
202:8

Crockett 26:13
27:7,18 29:1,
15,21 39:10,13
40:3 54:12
87:24 94:17
173:11,12

cross 105:18
107:5

CROSS-
EXAMINATIO
N 198:13

cruiser 200:18

Crutchfield
39:7,8 50:16
54:14,15,21
55:6,13

cups 71:8

custody
167:22 168:3
204:13

cuts 136:8

cutting 103:10

_____

D

_____

dad 22:24
25:10 27:20
29:7 40:4 42:1
44:23

daily 177:18

damages
171:5 202:16

date 16:19
30:23 34:4 39:4
43:4 45:10,13
52:19 55:2
170:10 172:1

dated 38:19
51:10

dates 16:3
19:22 32:11
33:1 45:15
53:6,12 68:7
77:15

dating 31:12,
19 32:2,4,8,10,
13,15 33:2,24
174:18

daughter
174:17

David 156:3
182:10,24
183:8 184:3,17
185:3 186:23

Davis 28:20

day 8:5 53:25
57:24 64:7,15
65:8,12,14
68:19 69:3
73:24 76:17
90:2 93:19,20
97:16 99:18,19,
20,23,25
100:20 115:13
117:24 122:8
130:9,23
142:13 143:12
183:11 188:22
199:12 200:4
205:6 206:5,14

days 166:10

dead 110:20

deal 206:9,10,
17 207:16

death 36:1,3
204:7,12 205:5,
11,16 206:2,4,6

December
170:12,16

decide 15:21
33:24 39:18
40:23 43:12
46:4,11,12

decided 38:9
41:11 42:15
43:2 117:13

defendant 9:5
159:14 194:13

195:14 200:25
201:1,16,22

defendants
8:18,22,24
156:12,17
157:21 158:2,6,
17 159:23
182:10 186:12
191:16,24
194:19 195:3

defense
141:11 159:23

defensive
203:9 205:15

definition 74:8

degree 148:4,
7,19,22,25
149:25 150:8,
19 151:2

denied 187:20

dentist 180:12

Department
9:1 152:16,18
162:4 183:13

depended
24:15 25:3 64:8

depict 102:15

depicted 191:4

deposition 8:8
10:6,11 12:22
13:13,24 14:11
16:15 172:13
191:19 208:9

depositions
13:19

deputies
133:21

Deputy 9:1

describe 47:2
105:25 172:3
205:8 206:21

describing
80:11 86:20
108:16

designation
179:19

destroy 140:13
194:20

destroyed
137:24 138:6
139:10 140:4,
23 141:4,9,13
142:3 192:5,12,
17,22

destroying
138:16,24
139:14,20
140:8 141:17
142:8

detail 201:8

details 14:5

detection
161:2

Detective 80:3
122:8 140:17,
22 141:3,15
143:1 144:15
146:4,9,19
147:10 161:18
198:19,24
199:2,8,11,12
200:17 201:21
204:6,11,25

detectives
81:2

Detention
136:16 141:17
142:8 162:16
163:1,12,17,23
189:19,24
190:5,10
191:11

determine
25:8 34:16

devastating
150:16

diagrams
102:12

died 143:3
171:13 205:1

differently
203:15

difficult 75:14,
16



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

dipped 188:4

DIRECT 9:22

directly 45:5

disputed
176:19

disagree
184:24

disagreeing
117:17 118:1

disagreement
113:3,11

disagreements 47:12 113:7

discerning
160:20

discipline
166:9

disciplined
163:8 166:6,21

disclosed
194:22

discovery
195:11

discrepancies
121:22

discuss 13:24
154:6

discussed
12:24,25 13:23
150:12 157:4,6
184:7 185:14
186:16 187:1,5
190:25 192:9
193:8 194:16,
23 195:10
197:3 198:4
202:16

discussing
171:5

discussion
143:1 145:24
183:16

discussions
10:9 60:3,11

dispute 37:23
118:2 121:18

122:17 123:24
126:5,23
132:11 134:8

disputed
184:23

disputes
165:13

disputing
128:5,7

District 8:10,
11

divided 134:21

Division 8:12

divorce 28:4,
14

divorced 31:2

divulging
153:5

DNA 33:16
34:15

doctor 73:14
180:15,16

doctors 169:11

document
25:8 102:2,5,7,
10,14 171:7

documentatio
n 191:22 192:4,
10 193:2
194:24 195:5

DOCUMENTS
149:9

dog 141:7
160:6,8,9,15
184:5 196:21,
23 197:5,8,13

Dollar 122:25
123:1 128:22

domestic 83:2
90:4,12,22

Don 181:1

Donald 110:12
111:3,6,18
112:1,6,9,13
113:1,8,18

114:1,17 115:1,
13,24 116:11,
14,16,19,24
117:15,23
118:8,11
119:13

door 103:4
105:8 129:2

drank 63:22,25
64:4,15,17,21
65:8 66:14
68:25 69:1
125:25

draw 108:24

drawn 104:2,3,
13

drew 106:18,22
107:4,11,13

drink 64:6,8,25
65:16 66:1
68:15,19,21,23
69:5,7,16,18,
21,25 70:5,13,
19,20,24 71:4,
20 114:10
115:9,13
124:25

drinking 63:17
64:17 65:11,14
66:3 68:6,22
69:24 78:16
89:4 91:13
112:11 119:12
125:2,14
126:14 177:18
201:12,13
202:10

drinks 70:15

Drive 45:2,6,8
51:22 91:10
99:20 105:14,
15 106:3,23
110:20

driving 53:18

dropped
124:20 125:1,3
126:1,8,19
127:25 135:13,
21 151:10

drug 63:15
75:1,22 77:8
91:12 116:6
177:19

drugs 63:17
73:12,16 76:3,
8,22 77:10,22
78:1,2 177:20

drunk 66:5,6
67:3,4,15,18,19
68:2,18,22
69:8,24 70:7,13
85:17 88:25
89:1,3 116:1,2
117:16 122:3,
11,15,18
135:19,24
142:17

drunks 117:17

Dyersburg
43:8,9,10,13
44:19,22,24
45:5,7 46:9,20

---

E

---

e-mail 94:1

e-mails 157:19

earache
180:17

earlier 91:11
98:9 123:14
126:24 134:18
172:13 182:8
184:10 187:10
189:16 198:18
199:7 202:15
204:6 207:2

early 172:20
179:1

earn 176:13

earned 24:25
25:19

easier 10:4

east 40:21
102:25 103:5

Eastern
164:21 165:7

easy 10:17
203:25

Ed 98:24 156:3

Eddyville 16:8
164:24 165:11,
17 170:8
202:23,25

edge 106:23,24

Edmonds 8:19
80:3 98:19
122:8 130:8
135:18,22
140:18,23
141:4,16
142:17,24
143:1 144:16
146:4,9,19
147:10 151:11
156:2 159:6
160:1 161:18
183:15 198:19,
24 199:2,8,12
204:7,11,25

education
16:6,22

Edward 156:2

effect 49:9
50:2 205:5

effects 206:18

Eggleston
8:18 98:22
139:23 140:3,6,
12 152:14,24
153:18,23
154:3,18 156:3
161:14 200:9,
25

electric 176:10

Elliott 9:7

emergency
90:3,11

emotion
205:19

emotional
150:16 205:17

emotions
205:18 206:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**employed** 17:8
23:24 24:19
175:16,19

**employee** 9:4
138:3,24 139:6,
19,25 140:8,13,
19 141:23
142:7 192:17,
22 194:4

**employees**
139:14

**employment**
207:3,5

**end** 24:12
27:17 54:21
55:1 103:5
139:2 170:7
201:18

**ended** 54:23
82:11 85:18

**ends** 110:20

**enter** 150:7,14
199:24

**entire** 65:19
75:10 168:5
188:19 194:1

**entitlements**
176:19

**entity** 189:6

**environment**
46:8

**estimate**
124:18 130:17
188:23

**et al** 8:10

**evening** 12:11
131:3 135:11
201:9

**event** 66:13
77:16 86:23
107:19 115:20
129:24

**events** 134:10
135:10 137:3,
16,20 138:3
139:6,15,25
140:14,19

141:18,23
155:17

**eventually**
31:19 121:25
124:15 128:9
143:2

**everyday**
68:25

**evidence**
137:19,23
138:1,5,15,22
139:4,9,12,18,
23 140:3,6,12,
17,22 141:3,4,
8,12,15,21
142:2,6 158:1
159:24,25
161:6,9,13,17,
21 185:10,19,
20 186:8,22
187:2 192:3,10,
16,21 193:2
194:20 195:2

**evidentiary**
196:17 197:15

**evil** 201:18
202:1,12

**evolution**
160:24

**exact** 16:3
19:22 25:6 43:4
45:10,13,16
53:6,10 55:2
56:18 57:24
63:18 65:13
70:3 71:8 77:15
78:14 85:22
94:10 115:7
116:20 122:14
149:5 151:3
167:8,21
168:13 172:1
174:10

**examination**
9:22 182:5
189:1 195:21
197:23 198:18,
21 200:6

**excess** 63:20,
23 64:1,3,21
65:4 67:25 68:6

202:10

**exchange**
177:1

**exclusively**
134:3 197:14

**exculpatory**
159:25 194:20

**excuse** 54:17
114:20 132:7

**exhibit** 101:10,
14 106:16
117:3 119:3
120:13 181:16,
20

**existed** 138:8

**existence**
137:7 161:5,9,
13,17,21

**exists** 186:22
187:3

**exonerated**
206:13

**expect** 10:11
45:14

**experienced**
75:18

**expertise**
160:20 161:1

**experts** 206:23

**exploit** 204:1
205:23

**eyeballed**
71:21

———

**F**

———

**fabricated**
185:20,21

**face** 78:12 79:1
81:7 82:5

**Facebook**
94:23,25

**facilities**
166:25 167:3
173:6

**facility** 164:19
170:16

**fact** 49:5 50:1
63:11 67:21
102:20 103:13
108:11 109:15
116:3 131:12

**factory** 207:7

**facts** 156:16
178:8 185:9,13
186:1,8

**failed** 159:23

**fair** 11:5,16
49:18 129:14
130:19 131:2,6
134:2 135:25
136:4 151:13
159:15,19
188:23 189:20,
22 190:7 191:2,
8

**faithful** 47:14
55:19

**fall** 59:18

**falling** 68:24

**false** 159:16

**familiar** 40:22
100:24

**familiarable**
54:5

**family** 27:21
42:1 62:1
100:8,13
103:25 109:21
111:6 169:16,
20 171:14,16
180:15

**farm** 164:15

**father** 33:13,19
35:15 53:18
63:6 95:8
174:16

**father's**
169:22,23

**favorable**
159:24 160:11,
13

**facility** ... (see above)

**February** 48:7,
8 149:14
162:21

**federal** 25:22
26:5

**feel** 58:23 70:4
155:4,5 205:8
207:17

**felt** 42:18,19
153:23 155:4
205:3

**Fewer** 41:19

**Fifteen** 21:10

**fight** 58:14,17
62:20 82:15
84:18,21 89:19,
20 112:14,24
113:2 117:19
121:17 127:7
128:19 165:17

**fighting** 67:13,
15,16 81:6,10
83:19 112:18
120:1 127:5
206:1,14

**fights** 58:11
60:1,21 61:10,
15,23 63:14
67:10 77:23
78:10,20 91:19,
21,23 119:1
163:5

**figure** 106:1

**figured** 134:24

**file** 21:17 26:5,
8

**filed** 25:21

**fill** 71:17

**Finally** 109:9

**find** 56:14
62:21 102:5

**finding** 130:6

**fine** 43:21
49:10 53:11

**fines** 57:11,19
97:12



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**finish** 11:1,3 12:8 103:7

**finished** 15:18, 19

**fire** 16:19 22:23 23:7,18 24:8,20 25:1,9,18 26:1 27:4 50:19 62:13 65:3,9,11 66:1,8 67:8,11 68:6 70:11 71:24 72:2,14, 16 74:17,22 75:4,7 76:13, 16,21 77:1,24 78:10 79:6 82:23 85:11 90:2 93:13 98:21,24 99:2, 15,19 122:8 129:25 130:4,7, 9,15,21 131:16 142:13,15 143:3,16 146:10,11,16, 21 147:2,3,14, 18 148:8 150:15,24 151:11 152:1,6, 25 153:19 155:1,14 156:11,19 157:22 158:4,8, 18 160:21,24 161:7,11,15,19, 23 162:11,15 183:11,18,22 184:1 186:23 187:3 190:5,10, 17 193:23 196:5 198:25 199:3,13,17,25 205:1 206:24

**flames** 128:21 130:11 132:1, 14 133:15 134:5

**flavored** 118:14

**flip** 149:15

**Flowers** 156:6

**fly** 11:10

**focus** 14:23 16:14

**footage** 189:18,23 190:14,21 191:4 192:5,18

**forgive** 182:14

**forgot** 106:14 108:1 134:18 158:23 168:1

**form** 15:23 23:6,8,19 25:23 27:19 28:12,22 29:14 30:7,22 31:13 32:5 33:7,15,20 34:11 35:17 36:7 37:8,19 39:9 40:25 41:3 42:7,13,24 43:18 45:3 46:15 47:16 49:20 50:8 51:9,18,23 52:4 53:2 55:17,21 57:3 58:19 60:8,19 61:8 62:9,24 63:7,21 64:2 65:17 66:10,20 67:12 68:1 69:9 70:2, 14 71:19 72:12 73:23 74:5,9,21 75:9,24 76:10 77:21,25 78:7 79:16 82:10,16 83:3,11 84:1, 11,17,25 85:10, 12 86:7,16 87:25 89:6,10 90:1 91:17 92:8 94:2 95:11,13, 20 97:2,21 100:5,16 102:11 103:16 105:10 109:25 111:9 112:4 113:16 114:19 115:10 122:5, 13 123:13 124:3 126:11 127:13,21 128:6 129:4,16 130:1,22

131:10 132:16 134:6 137:1 138:9,19 139:16 140:10, 15,24 141:25 142:4,11,16 145:19 148:9 151:16 153:1 155:7,19 157:15,25 158:9 159:17 160:7 163:4,13 164:13 165:16 166:13,17 167:24 168:17, 23 169:7 171:11 175:11 176:17 177:3, 12,22 180:10 181:3 184:25 188:16 192:6, 13 193:6 194:8, 25 195:7 197:1

**formal** 16:6,22 17:2 207:4

**Fort** 55:25 58:9,18 59:12

**fortunate** 173:1

**forward** 185:4

**fought** 60:4 78:1,6,9 91:14 119:24

**found** 130:14

**foundation** 32:5 33:7,15,20 34:11 36:7 39:9 42:13,24 43:18 47:16 51:9,23 62:24 83:3 84:11,17 86:16 87:25 97:2 129:4

**frame** 16:23 52:10 56:7 67:5 70:11 76:21 77:12 136:2,6 156:13,18 157:1 158:7 173:2 186:5 191:17

**framed** 185:8, 11

**frames** 45:15

**framing** 195:4

**Franklin** 174:21 175:7

**frequency** 76:15,24

**frequently** 64:17 176:6

**friend** 20:12,14 42:1 94:3,21

**friend's** 85:17 88:23

**friends** 56:23 86:10 203:11

**front** 105:7

**full** 21:13

**full-time** 19:12 24:22

**fully** 205:11 206:6

**funeral** 92:19 93:18,19 187:12,16

**funerals** 171:9

**furnishings** 104:18

**furniture** 104:8

**fuzzy** 131:8

--- **G** ---

**Gadansky** 9:5 197:24 198:12 208:4

**gas** 97:6 98:1

**gathering** 103:24

**gave** 50:6 53:25 60:17 74:8 119:10 164:15

**GED** 14:19 16:7 165:5

**general** 35:14 55:10 75:10

**generally** 102:15

**gentleman** 81:5

**gentlemen** 99:8,13

**Georgetown** 9:4 195:25

**Gerwall** 87:14, 18,19

**gesturing** 10:21,22

**Gibson** 39:25

**Gill** 199:19 200:3

**girl** 100:22 109:22 110:2

**girl's** 100:21 110:11

**girlfriend** 201:3

**gist** 94:7

**give** 9:17 57:24 65:18 105:11 181:4 205:16

**glass** 71:5,11, 15,16

**glass-glass** 71:9

**God** 9:19

**good** 9:24,25 10:3 11:8 13:5 32:18 42:19 43:21 47:5 58:6 107:24 119:13 134:12,15 172:5,7,24 180:2,8

**goodness** 85:1

**Gotcha** 27:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 170     Filed 10/03/25     Page 64 of 77 PageID
#: 2972
The Deposition of ROBERT YELL, taken on September 30, 2022

219

71:23 106:14

**government**
176:18

**grab** 148:1

**grabbed** 78:21
79:2,3,8 80:11
82:5

**grade** 15:12,
15,19

**graduate**
14:17 15:3
94:16

**graduated**
16:8 94:15
165:11

**grand** 158:17

**grandmother**
171:9,15

**grandmother's** 187:11

**grandparents**
169:17,21

**grant** 187:18,
21

**great** 11:18
45:14 150:21

**Green** 8:11
22:6,10,14,15
27:7 56:5
86:15,25 95:25
96:17 179:16,
22 189:4

**Gregory** 9:6
156:6 198:1,5

**Gregory's**
198:9

**grew** 42:1,18

**grieving**
205:13

**ground** 189:10

**groups** 179:7

**guard** 163:16
171:1 205:24

**guards** 162:25
166:24

**guess** 28:16
49:13 59:10
66:17 103:4
168:7 172:18
173:2 182:7
188:9

**guessing**
45:21

**guilty** 54:2,7
88:6 95:16
96:5,24,25
146:20 147:1,
18 148:4,7,19,
22,25 150:2,8
199:24 206:22
207:18

**guy** 85:17
88:16 98:12
172:24

**guys** 69:24
114:16 149:8

———————

**H**

**half** 19:23
22:21

**hallway** 193:21

**hand** 9:13,15

**handed** 182:7

**handing** 47:25

**handled**
160:15 196:22,
23 197:5,8,13

**hands** 81:13,
14,18 127:24
202:6

**handyman**
20:10,12,15
175:21,24
207:4,5

**happen** 39:14
62:8 74:1 97:7
110:23 167:20
168:12 178:6

**happened**
43:25 77:19
79:5 85:21
88:19 93:8,10

119:9 121:1
128:5,19
132:18,20
133:24 134:4
136:24 137:16
138:17,25
139:21,25
141:10 151:10,
14 162:18
201:9

**happening**
125:11

**hard** 18:4
61:18 73:24
77:5 174:14
203:6 205:7,9
207:16

**harm** 191:17,
25

**harming**
203:14

**head** 34:3
38:14 71:22
103:14 108:21
136:23,25

**health** 179:9,
25

**hear** 67:24 68:5
137:6 196:1
197:4

**heard** 87:20
131:16 196:10,
15 197:14,17

**hearing** 18:4
196:17,24,25
197:15,18

**heart** 205:2

**heartburn**
180:6

**heated** 91:22

**helped** 20:13

**helping**
114:21,22

**helps** 105:1

**hid** 138:6

**hide** 140:13

**hiding** 138:17,
24 139:14,20
140:8 141:17
142:8

**hierarchy**
203:16,19

**Higgins** 8:18
98:24 137:19,
24 138:2,5,15,
23 155:13
156:2 159:1,7
161:6 200:13,
17,22 201:1,16,
22

**high** 14:17,24
15:1,5,7,8 16:2,
4,18,25 17:4,9,
13 18:22 26:18
27:16 77:1,17,
18 94:18
172:15

**highlights**
56:21,22

**history** 31:4
202:8

**hitting** 89:12

**hold** 79:3

**hole** 166:10

**holidays** 174:9

**home** 39:20,21
44:8 51:13
83:17 105:21
107:15,16
110:2 129:21
198:25 199:13,
17,25

**homes** 23:22
24:1,2,4,7,10,
19 26:15

**hospital** 35:4,
10,12 36:15
143:4 167:19

**hour** 21:3,9
23:14 24:9,16
146:22 177:15
181:23

**hourly** 19:6,8,9
21:5

**hours** 11:24
12:2,17 19:15
41:19 116:18

**house** 40:11
52:2,17 57:13
85:17 88:23,24
92:20 100:19
111:4,18,21
112:2,7,10,14
114:10,17
116:7,17,23
121:5 122:3,12,
20 129:11,18
150:15

**housed** 203:4

**household**
112:3

**houses** 110:22

**Hued** 17:18

**Huey** 17:14,17,
19,20 18:12

**huh-uh** 10:21

**hunting** 42:2

**hurt** 205:25

**husband** 92:23
206:20

———————

**I**

**idea** 206:10

**IDENTIFICATION** 101:14
106:16 181:20

**identify** 8:13

**illegal** 76:8,9
77:8

**immediately**
32:3 66:7

**impair** 12:17

**important** 11:7
111:2 155:21

**inappropriate**
153:24 155:5

**inaudible** 80:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

incarcerated 193:22

incarceration 164:3 204:20

incidences 68:8

incident 54:4 62:11,18 79:2 80:10,15,16 81:23 82:4 85:16 86:19,21, 24 88:2,4,7,10 97:24,25

incidents 133:20 166:12

include 193:25 199:19

included 145:9

income 25:19 176:14,19

incriminating 147:7

independent 153:7 200:8,12, 16,21

indicating 105:21

individual 188:17

infidelities 60:22

infidelity 58:11

influence 91:23,24

inform 60:4,16 64:16

information 16:13 36:24 191:14 192:4, 11 193:3 194:24 195:5,6 198:8

informed 194:13 204:7, 12

initial 39:20

54:16 97:15 198:20 204:8

initially 64:22

initiates 171:7

injured 86:1

inmate 170:24 203:17

inmates 162:25 165:14, 20 166:12

Inn 184:15

innocent 206:19

inside 129:24 145:7

instruct 38:2 177:3,23 178:18

instruction 178:13

instructs 10:14

intense 91:15, 22

intentionally 146:10 147:14 199:13,16,25

interact 207:13

interaction 99:12 193:12, 19

interactions 133:21 163:15 164:1 193:25 195:13

interpreting 161:2

interrogated 183:9

interrogation 198:20 199:7 204:8

interview 80:5 144:7

interviewing 80:2

intoxicated 130:20 131:3

intoxication 131:7

introduced 182:8

intrude 13:8

investigate 44:14 183:21 184:1

investigating 152:5,24 153:18 154:25 155:14

investigation 198:9

invoking 134:19,23

involve 41:12

involved 56:7, 12

involvement 198:9

involving 87:4

irate 58:24

issue 67:6 98:9 188:12 197:8

issued 90:8,25

issues 66:22 67:3 94:6,9 97:3 179:7

_____

J

J.a 189:3

J.A. 8:23

Jack 156:6

Jackson 26:13,21,25 27:17 34:14 35:13

jail 52:20,25

53:7,9,14 54:9, 11 57:1,6,7,13, 16,18,25 97:14, 15 132:15 133:16 136:15 137:16 138:2, 23 139:5,13,19, 21,25 140:8,13, 19 141:23 164:14 167:4 168:16 193:24 194:4 200:22 205:14

jailer 136:13 189:5 191:15 195:13

Jaman 156:4 182:10,19 183:1,21 185:7

January 170:13,20 204:20

jealous 58:20

Jeff 22:24 25:10,14,24 27:25 28:4,6,7, 9,13,16 29:7,11 39:22,24 40:4 41:10,13,15 44:23 172:14, 17

Jeff's 171:22, 23 172:4 187:14

Jefferson 20:17,18,22 21:19,22 22:11, 18

Jenkins 138:16 139:13 140:7 141:16 142:7 156:7 189:5 191:16, 24 192:4,11 193:3,10,13,16 194:1,6,13 195:13

Jennifer 8:17 45:21 58:3 101:5 105:23 132:24 134:12

Jim 99:5 141:21 151:18 156:3

Joanne 39:7 50:16 54:14

job 17:12 18:21 19:13 22:5,22 25:3 44:21 207:7

job-connected 46:16

jobs 24:14

John 156:2

judge 37:22,25 90:24 147:19 199:19 200:3

judging 207:18

juice 71:1,3,17

jumping 79:1 183:20

jury 96:4 97:11 158:17 159:12 206:4

_____

K

Kay 123:22 124:15,20 125:1,2 126:1, 8,19 127:25 135:13,21 151:10

Kay's 121:5,25 122:3,12,20

keeping 11:14

Keltner 171:19,20 172:6

Ken 98:19 135:22 151:10 156:2 176:3

Kenneth 130:8 135:18 142:17, 24 159:1,6,25 183:15

Kentuckiana 8:6



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentucky 8:7,
10,11,21 22:6
26:17 51:20
61:1 86:15 88:9
95:25 96:12
179:16 182:9
189:4 203:1,5

Kevin 176:1

Keyanna
100:25

Kianna 100:24
109:23

kick 84:14

kicked 79:14
84:8 85:7

kicking 79:17
129:2

kid 100:11

kids 28:13
43:21,22 61:14
62:5,19 112:20,
21 113:3
114:18,21
119:13,14
125:12 202:2

killing 204:3

kind 19:18 20:9
21:12 41:14
46:6 61:4,18
65:15 66:2,5
71:3 76:15 86:9
99:12 114:12,
14 115:3 116:6,
25 157:19
162:6 166:9
175:12 176:6,9
201:12,23
203:12,21,23,
25 204:4
205:22 206:7
207:13

kinds 62:5

kitchen 71:11,
16 80:9,14 82:8
103:11,13
165:8

knew 32:25
62:25 90:5
143:17 146:12

158:14 161:6,
10,14,18,22
173:2 186:23
187:3 193:4

knowing 10:10
19:22 35:13
42:2 53:10
144:25

knowledge
35:1,2 56:8
58:8 59:11,21
60:6,10,14,17
76:2,7 82:13
99:7,11 151:20,
22 152:20
153:7 159:21
160:23 162:3,6
183:20,24
190:12,22
192:3,11 193:3
194:16,24
195:5 196:8,13,
22

KSP 152:15

KTCS 16:10
165:12

———————

L

label 107:8

labeled 102:3,
17,25 103:6,11,
17 106:22
108:5,23 109:3,
10

lack 19:22
35:13 45:10
53:10 144:25
203:23

lady 206:18

Langen 8:17
9:23 13:5,7
14:4,6 18:8,11
41:5,7 45:25
47:22,24 48:3,
9,14,16,19
49:10 53:4,8
58:5,7,25 59:8
64:22,24 65:5,
20,23 75:19
80:23 101:7,11,

13,15 106:3,8,
11,14,17
107:24 108:1,3
111:12,15,16
114:24 120:17,
19 133:2,4,5
134:14,24
135:1,8 137:13
138:10,13,14
148:14,16,17
149:7,11 153:9
154:8 156:1,8
169:13 177:5,8,
9 178:1,10,16,
20,23,24 179:4,
5 181:4,7,13,24
182:13 184:10
186:18 207:23

Langen's
198:18

language
207:12

Late 110:9
111:5

lawn 114:4

lawsuit 156:10
171:7 177:2
194:5

lawyer 152:10
154:2,18 155:9
186:15,25
187:6 193:9
196:11,13,14
197:2 198:4

lawyers
148:10,11
150:12 152:12
185:23 191:6,
12,20 192:8,25
195:9

laying 17:14,21

layout 102:15

lead 61:15

leading 75:4
105:7

leads 156:25

leaned 82:12

learn 130:23

learned 129:25
130:4,20 134:5

learning
204:24

leave 43:12
46:4 78:13,17,
19 79:1,4 80:15
81:15 85:18
88:21,22 89:14
110:1 112:3
113:18 116:19
117:13,18
119:12,17
187:18 204:19

leaving
128:10,13

led 88:19

left 16:4,25
17:4,9,13 18:22
49:2 108:4,22
109:9 110:20,
21 111:3,11,17
112:1,8,25
117:23 118:8,
11 121:4 122:2,
11 150:21
164:14 170:12
190:13

left-hand
107:12

legal 12:25
76:22 137:10

length 158:3

Lester 30:12,
15,20 34:20,22,
25 35:21 36:22
38:23 43:22
62:22 63:4

Lester's 35:6
44:15

letter 139:2

level 131:7

liberty 177:25
178:9

licensed
179:17

lie 158:3

lied 195:3

life 65:19,24
67:6 75:13
76:25 77:8
85:2,3,4 172:22
188:14,20
194:1 202:4
205:16 206:2

lifetime 75:10

Lindsey
110:12 116:3
119:12 181:1

lines 25:3 29:4
68:12 80:24
86:11 97:20
104:24 105:6
113:15 123:5
125:9,18
131:20 149:16

liquor 122:21,
24,25 123:8,11,
15,23 124:1

list 36:5,15

listed 35:15,25
157:21 158:3

live 38:9 39:8
43:1,6 44:24
46:24 110:18
174:23 175:13
176:2,3 206:17

lived 26:14
27:3,11,20
38:18 39:13,22
40:2,4 42:5,11
45:2 51:3,4
52:12 100:6
172:14 173:9

lives 174:22

living 28:17
29:5,8,11,18
30:3,5,6 31:8
38:18,22,25
39:3,17,21,24
42:21 43:16
46:6,19 51:21
91:10 100:3
103:17,20,21
104:3,24 108:4
174:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

located 8:7
22:5 26:12
179:15 180:20

Logan 8:23
15:8,11 26:19
27:6,16 36:5,15
53:14 54:13
57:7 61:1 90:25
91:6 136:15
141:17 142:8
162:15,25
163:12,16,23
164:14,20
167:4,7,18
170:17,19,22
189:5,18,24
190:4,9 191:10,
15,23 192:16,
21 193:4,24
194:4,5 195:13

Logan's 123:8

lonely 58:23
203:10

long 18:22
19:20 20:7
21:21 22:17
28:15 30:19
32:7,25 37:16
38:8 43:1 44:24
54:6 56:11,24
57:21 65:11
66:17 73:1 77:5
79:2 82:23 87:3
113:21 116:16
144:22 159:5
170:8 188:3

longer 58:5
74:24

looked 203:14,
23,25

losing 194:21

lot 10:4 20:13
61:19 64:7
65:14 67:2
68:16 118:4
120:3 121:10
125:23 126:22
128:8 134:20
136:8 165:8
175:13,14
203:10 206:18

loud 49:8 60:3,
11 88:24

Louisville 8:7
10:4

love 202:2

loveseat
104:10

lower 102:3

lozenges
118:21

Luckett 164:18
165:5

ludicrous
201:14

lunch 181:22
200:6,11

Luther 164:18
165:5

Lyndsie's
111:3,7,18
112:2,7,10,13
113:1,9,19
114:2,17 115:1,
14,25 116:14,
17,19 117:23
118:9,11

Lynn 27:24

—————

M

machine
165:19

mad 58:23
121:3

made 25:9 61:4
91:14 137:15
165:19 187:19
201:1,7,11,17,
19,23 202:4
207:1

Madison
26:23,24

Maggie 8:3

mail 81:4
168:15,20

make 10:10,14,

15,19 11:10
20:25 23:12
24:9 87:19
103:9 118:22
157:12,22
172:2,10 186:3
187:15 201:6,
10,11,21 202:1,
12 203:11
205:24

makes 10:4
207:11,13

making 21:3
24:12 37:23
114:10 156:13

man 30:8 88:8

manner 73:13

March 25:17
171:13

margin 107:12

marijuana
76:8 77:7

Marion 96:11,
13,14,15,21

marital 31:4

mark 77:2
101:7,8 181:14

marked 101:6,
13,14 106:16
181:20

marks 81:15

married 28:2,
3,8,15 29:25
30:2,15,20,24
37:2 92:24
95:5,6,7 110:14
173:23

Maskin 129:21

mason 18:19
23:10,16

Masonary
18:16

match 166:1

matter 8:8

maximum
202:25 203:4

means 143:25

meant 41:16

Mechanicing
114:6

medications
11:24

medicine
180:4

meet 13:23
14:8 28:24 29:2
32:3 72:25
174:14

meetings 13:3
14:10,15 72:15,
18 157:10

member 12:25
112:2 207:7

members
169:16 171:14,
16

Memorial
36:15

memories
126:20

memory 111:1
118:4 120:2
121:6,10,12
123:18 124:13
125:22 128:8
131:7,18 200:8,
12,16,21

men 38:20

mental 179:9

mentioned
184:11 187:11
203:19 206:1

mentioning
197:9

met 14:2 28:14
29:6,18,25
30:14 31:9,12,
22,23 32:2
33:4,8 38:17
39:2 47:3 56:24
151:20 152:20
184:15 198:5

methampheta
mine 76:9

mic 80:20

Michael 28:3,
8,10,15

middle 54:16

miles 146:22

military 17:5

Miller 176:1

million 146:22

Mills 8:19 99:2
139:4,9,12,18
154:21,25
155:4,10 156:3
161:10

mind 13:12
16:22 56:5
85:16 86:17
146:22 153:17

mine 20:12
165:20

minute 181:4

minutes
113:23 144:25
145:2,6,8

Miranda 87:12,
13 144:11

misheard
64:19

misread 133:2

misstates 52:5

mistaken
119:17

mistakes
202:4

mistook 35:8,
14 43:23 53:23
57:20 94:24
159:7 170:9
187:24

mistooken
144:11

misunderstoo
d 197:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

mix 70:23 71:4

mixed 70:20,24

mixing 70:24 71:2

Molly 9:10

mom 29:8 40:3 93:22 168:16, 25 169:6,15 172:4,14,17

mom's 92:19, 20 93:18

moments 131:16

money 20:25 21:1 23:13 24:25 25:13 41:13 61:10,13, 21 177:1

month 65:19 174:5 207:8

months 33:3 38:10

Morgan 51:13 52:2,18

morning 9:24, 25 62:13 100:9, 20 109:21 110:5,8,9 111:5,19,22,24 112:25 135:18 204:16,17

mornings 57:15

mother 39:22, 24 92:15 93:6,7 167:16,17 168:5,9 171:22, 23 175:3 187:14 193:17

mother's 27:23

motor 54:3

mourn 205:11 206:6

mouth 78:12 165:21

move 27:21 33:24 39:12,18 40:8,23 41:11 42:15 43:2 45:5 46:12,17

moved 27:5 37:13 39:11,19, 20 40:3 41:21 42:4 43:8 44:19 45:7 46:25 51:19,25 52:1, 10,13,16,20 175:3

moving 37:17

mow 175:21

mower 114:4

murder 203:22

murdering 203:4

_____

N

nailing 188:13

named 88:8 99:8,13 109:23 129:21 157:11 163:16 165:15 191:24

names 110:10, 15 155:16,20

native 96:12

nature 51:1 170:24 180:5

necessitate 52:16

needed 15:24 24:15 25:4

neighbor 50:25 51:3 82:19,22 83:7 100:11,22 128:25

Nicholas 33:12,19 100:14 102:24 128:12

nickname

86:4,9

Nicorette 118:19

night 12:3,11 54:25 55:6 68:24 69:23 92:20 129:18 177:15 189:19, 25 190:5,10,17 204:15

nights 68:19 69:5

Noble 169:19

nods 38:14 71:22 103:14 108:21 136:23, 25

nonpayment 53:11 57:11,18

normal 124:22, 23 130:18

North 51:13 52:2,18

note 134:22 172:2

noticed 34:8

numb 206:8

number 8:12 25:6 49:3 164:16 166:20 167:8,21 168:13 174:10

numbers 48:13 49:1,2

_____

O

object 15:23 25:23 89:11

objection 23:6,8,19 27:19 28:12,22 29:14 30:7,22 31:13 32:5 33:7,15,20 34:11 35:17 36:7,10,18 37:8,19 39:9 40:25 41:3

42:7,13,24 43:18 44:4 45:3 46:15 47:16 49:20 50:8 51:9,18,23 52:4 53:2 55:17,21 57:3 58:19 60:8,19 61:8 62:9,24 63:7,21 64:2,19 65:17 66:10,20 67:12 68:1 69:9 70:2, 14 71:19 72:12 73:23 74:5,9,21 75:9,24 76:10 77:21,25 78:7 79:16 82:10,16 83:3,11 84:1, 11,17,25 85:10, 12 86:7,16 87:25 89:6,10 90:1 91:17 92:8 94:2 95:11,13, 20 97:2,21 100:5,16 102:11 103:16 105:10 109:25 111:9 112:4 113:16 114:19 115:10 122:5, 13 123:13 124:3 126:11 127:13,21 128:6 129:4,16 130:1,22 131:10 132:16 134:6 137:1 138:9,19 139:16 140:10, 15,24 141:25 142:4,11,16 145:19 148:9 151:16 153:1, 21 155:7,19 157:15,25 158:9 159:17 160:7 163:4,13, 22 164:13 165:16 166:13, 17 167:24 168:17,23 169:7 171:11 175:11 176:17 177:3,12,22 180:10 181:3 184:25 185:25

188:16 192:6, 13 193:6 194:8, 25 195:7 197:1

objects 37:22 38:1

occasion 60:24 75:18 78:24 82:25 89:2 117:17 127:5

occasions 63:24 68:16,17 84:23 196:6

occur 178:11

occurred 44:14 137:3,21 147:14 148:8 194:14 196:4

October 54:3

odds 11:8

offering 191:3, 9

officer 133:21 137:19,23 138:1,5,15,22 142:15,19 144:1,8 149:1, 25 150:9 151:6, 15 152:15 154:23 155:12 161:6,10 162:1 200:9,13,17,21

officers 162:7, 8

offices 8:6

Oklahoma 27:11,13 97:5 98:1

older 41:14

one-year 77:2

online 18:6

opening 125:19

opportunity 174:11

opposed 42:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

opposite 78:14
107:13

orange 70:25
71:2,17

order 90:4,11,
12,22 187:17

ordinary
111:22

ounce 124:9

ouncer 124:8

ounces 71:6,8

outline 104:12

overstep
207:13

overturned
206:13

overwhelming
206:7

Owens 206:25

owner 18:14,
15

_____

**P**

P.M. 208:9

pack 70:16
118:17 188:22

pack-ish 70:15

paging 131:19

paid 19:6 24:14
97:12 176:8

paper 106:24
107:12,21

Paradise
23:22 24:1,3,7,
10,19 26:15

paragraph
156:10 171:5
194:15,19
195:2

parallel 106:23

parent 187:18

parentage

34:16

parents 110:3,
11

park 175:14

parking 175:14

parole 72:22

part 15:15 22:4
47:5 72:19,23
105:1 118:15
131:23 136:21
149:2 166:4
172:13,22
173:10 198:21
205:3

participate
72:9 163:11
165:1,7 179:6

parting 28:14

pass 25:16
27:13 171:23
195:18

passage
121:23 126:13

passages 82:1
125:24

passed 28:5,
17 92:15 93:20,
22 149:9
171:14 175:3

passing
193:21

past 128:22

Patterson 8:3

pay 57:25
176:15

pedophile
203:24

pen 105:12
108:24

penalty 205:17
206:2,4

Pendergraf
8:19 99:5
141:22 142:3,6
151:18 152:1,5,
11 156:3

161:22

pending 8:10
178:8,15 179:3

penitentiary
162:23

people 14:13
18:3 58:22
106:6 155:16
157:10 175:12
176:15 203:6,7,
22,24 207:6,17

people's
206:21 207:12

pepper 132:14
133:15

perceive
207:15

percent 164:7

perfect 49:13

performed
152:5,24
153:18 154:25
155:13 184:1

period 19:20
21:21 22:17
24:6 27:10 28:7
31:11 32:3
37:16 65:13
73:1 76:11
128:16 134:21

periods 145:9
164:2

permission
53:19,25

person 10:5
18:13 58:20
78:13 86:1
92:14 104:13
108:15 202:2,
13

person's 86:3

personal
159:21 183:19,
24 190:21
193:12 195:5,
12

personally

137:2,14
159:11 182:20
189:23 190:2,8
193:11

persons
162:10 179:7

perspective
91:21 92:1,5

pertaining
139:15 141:18,
23

phoentic
101:24

phone 81:3,4
94:5 157:18
158:21

phonetic 54:5
87:14 100:24,
25 171:19

phrase 122:14

physical
78:10,20 79:18
83:23,24 92:6
127:8,11,12
165:23 166:4,
14 179:25
180:16

physician
177:21

PI 53:11

pick 44:21
57:14 59:15
64:10 68:9
79:22 117:3

picked 10:22

picking 106:20

picture 107:11

pie 172:10

pill 75:17

pinpoint 66:12

pizza 12:4

place 22:13
39:17 42:12
46:25 82:8
143:6 175:13

places 46:23
165:2,15

plaintiff 8:16
9:8,11 181:22
195:4

plan 158:3

play 125:13

played 91:18,
19 100:22
111:21

playing 80:19
114:18,21

plea 54:7
147:19 149:2,
14 150:7
181:14 199:20,
24 200:4

plead 96:4
97:10 148:3,19,
21,24 150:1

pleaded 95:15

pleading 54:2
88:6 96:24,25

pleas 150:14

pled 96:6 97:12
98:8,9

plugged
176:10

point 13:6 17:8
24:13 26:19,21
32:1,13 33:23
37:18 39:16
40:9 45:2 58:4,
6 105:1 110:1,5
111:24 124:20
126:8 134:13,
15 135:16
144:20 146:3
147:17 167:13

police 8:22
42:23 44:7
60:25 82:14
83:7,16 85:23
128:25 135:17
142:15,18
143:7,8 144:1,
7,18 148:25
149:25 150:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

151:6,15
152:16,18
154:23 162:1,4,
7,8 182:9
183:13 200:18

**policies** 162:3

**popper** 75:17

**population**
203:17

**porch** 88:23
89:13 98:12

**port** 132:15,18,
21 133:10,15,
20,25 136:19
137:3,17,21
138:3,18,25
139:6,15,21
140:1,14,20,25
141:1,19,24
151:15 189:18,
24 190:4 191:5,
10 200:22

**Porter** 136:12,
14,18 137:15
163:16,20
164:2 190:3,13
192:23 194:13

**Porter's** 190:8
191:10 192:12

**portion** 123:16

**pose** 12:19

**possession**
137:20 138:2
139:5,24
140:18 141:22

**possibility**
90:22 91:13

**pot** 76:14,16
77:4,5 116:8

**poured** 207:9

**pouring** 176:2

**Powell** 110:12
181:1

**pregnant** 33:4

**prepare** 12:21
13:13 14:3,11
102:7

**prepared**
147:17 148:6
150:14 190:3,9

**prescribed**
73:14 75:22

**prescription**
11:23 73:12,16
74:3 75:22 76:2
177:20 180:3

**present** 14:14
34:25 35:9
136:19 147:10
183:14

**pretrial** 196:25
197:15

**pretty** 11:8
47:9,10 64:15
65:8 68:18
111:23 117:15
122:3 130:19
131:3,7 180:2,8

**previous** 33:9
34:9 49:21
53:25 60:5
192:2

**previously**
60:10,15,17
80:6 88:11
187:5 193:8

**prey** 203:8

**Price** 23:22
42:6 44:18

**prior** 24:25
26:1 27:4 28:2
32:20 37:17
63:19 64:1,5,18
67:9,23 68:6
72:2,14,16
73:11 74:17
76:1,6,16 77:23
78:9 79:6 84:9,
15 85:11 95:16
98:2,6,18,21,24
99:2,9,15
163:24 164:11

**prison** 14:20
16:15 94:11
96:16 164:15
167:5 168:4,18
169:4 170:11,

12,15 173:16
174:15 177:11,
21 178:3 179:1,
10 180:1
187:12,15
188:7,15
202:20,25
203:5,22
205:10,18,20
207:11

**prisons** 168:10

**privileged**
13:1 138:21
177:7

**probation**
72:20,24 73:8

**problem** 66:8,
13,19,21,25
71:24 72:4
135:2 164:23

**problems**
166:23 170:23
171:1

**procedures**
162:4

**proceeding**
199:23

**proceedings**
8:1 137:11
158:18 159:12

**proceeds**
177:2

**process**
205:13

**productive**
207:7

**program** 72:6

**programs**
163:11 165:1

**progress** 83:2

**project** 46:7

**projects** 46:6,
13,19

**prone** 92:6

**proper** 203:23

**protective**
43:16 90:3,11

**proud** 202:6,8,
10

**proved** 150:24
195:3

**provide** 159:23

**proving** 206:24

**psychiatrist**
179:18

**pulled** 133:9

**punched** 79:13
84:8,13 85:7

**punches** 166:2

**punching**
79:17

**purposes**
105:23

**purse** 95:23
96:24 97:24

**push** 78:16
79:4 80:13

**pushed** 80:12,
14 82:6 84:7,13
85:7,18 89:12

**pushing** 78:18
85:19 89:13
166:1

**put** 18:24 49:12
56:6 80:14
81:18 105:25
118:13 127:23
164:19,22,23
174:10 177:24
178:9 190:20

**putting** 71:17
202:6

**Q**

**qualified** 206:4

**quantify** 174:7

**question** 11:1,
3,9 13:4 38:1
59:13 60:1,9
65:22 66:16

68:15,16 75:15
80:2,4,8 81:7,8,
10,13,17 85:5
108:13 119:19
121:1 125:10
127:2 138:12
154:15 178:19
179:3 181:15
186:17 187:7,
25 188:1,10
189:13 195:23
197:6,11

**question-and-**
**answer** 10:12

**questioned**
59:20

**questions**
10:13 11:10
12:18,19 16:17
55:10 60:5
136:9 143:13,
14 144:13
154:9 155:22
169:9 177:24
178:14 181:14,
17 182:12,13
184:11 188:24
189:9 195:20
197:20,22
198:15 199:6
202:15,17,19
207:2,20 208:1,
2,5

**quick** 172:2
181:5 195:23

**quit** 77:18

**quote** 122:11
201:2,17,18

**R**

**raise** 9:13

**raised** 28:13
113:14

**raises** 9:15
13:5

**raising** 62:1

**Rambo** 101:24,
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ran 125:13
165:21

rarely 70:22

rate 19:9

ratio 71:20

reached
156:12,17

reaction 59:10
60:6

read 13:14,15,
18 49:3,7,14
59:24 64:14
68:12,13 80:25
81:19,21 82:1
117:9,20 119:5,
21 121:23
123:4,9,15
125:9,24
126:13 131:17
132:4 133:11
149:16 150:4
181:15 195:2

reading 132:17

reads 65:4
144:1

ready 148:18

real 172:2

reason 27:14
42:23 46:16
79:15 84:15
85:9 99:8 112:3
116:20 118:2
121:4,18
122:17 123:23
152:4,23
153:17 154:20,
24 155:12
179:10 200:3
207:4

reasons
184:24

recall 28:15
40:17 42:25
44:25 45:9
47:1,17 53:20,
21 54:2,8 55:18
61:6,20 62:18
65:2,13 68:7
70:3 71:20

73:20 74:6
75:25 76:4
78:8,23 83:18
84:23 86:2
87:10 88:6
89:1,7,8,12
90:18,19 91:7,9
95:19,22 96:25
97:3 98:4,16
99:10,14,19
100:1,21 101:1
102:9 112:5
113:10,17,25
114:14 115:7,
11,18 116:15
119:2 123:15
125:21 127:15
128:18 129:13,
20 130:6,10
131:18 136:18
143:5,10,22
144:15,22
146:5 147:8,9
148:3,21,24
151:9 152:22
155:20 156:13
159:8 163:7
179:13 183:16
196:3,5 197:9
198:21 199:6
201:8 202:17,
19,22

receive 19:6
46:20 57:21
96:7 166:9
168:15 169:15
176:18

received 81:4
168:21 169:5

recently 82:1
178:17,21

recognize
23:21 50:24

recollection
44:13 68:20
99:7,11 104:7,
17 105:5
117:22 119:23
125:25 126:17
129:17 130:3
133:24 135:10
150:6 151:25
153:22 155:3

reconnected
28:17

reconvene
181:23

record 8:2,14
10:15,19,23,25
25:7 37:23
47:25 59:4,5,7
105:24 106:13
132:25 134:17,
22 135:4,5,7
149:13 181:9,
10,12 182:1,2,4
208:8

records 36:5,
15

rectangle
104:12,15,18
108:15

Redacted 34:7

refer 185:4

reference 81:3

referencing
109:13

referred 25:12
199:20

referring 65:8
104:25 108:9
142:18 147:19
196:4

refresh 68:20
117:22 119:23
121:6 125:25
126:17 150:6

regular 71:5,11
180:13

rehab 72:5,6,
10

rejected
149:14 199:20

relate 82:4

related 147:18
148:8 158:18
189:9

relating 137:16

relation 105:15

110:18 171:21
173:13

relationship
32:17 33:9 34:9
38:12 39:2,5
47:2,8,12,15
49:11 50:2
51:2,6 54:16,20
55:20,24 56:15
60:22 66:24
67:3 172:3
174:13,16

relax 73:25
74:10,12,19
75:8

release 57:7,9
58:1 177:10,21
178:2 179:1,10

released
170:11,13,15,
20 180:1

rely 134:2
156:16

relying 185:9,
10 186:1

remain 144:12

remember
20:6,16 22:16
39:14 40:14
43:24 45:13
47:17,18 50:23
53:7,12 56:18
57:23 58:1
60:24 79:5
80:2,5 81:2
82:18,21,25
83:15,19,22,23
84:3 85:14,20,
23 86:3,5,13,23
87:22 89:13,15
90:21 91:15,16
94:4 96:1 99:20
107:16 110:23
111:2 112:19
115:21 116:20
117:1,12,25
120:1,9,21
121:9 122:7,10,
14,24 125:2,4,
10,19 126:4,12
127:1,4,7,10,23
128:2,9,12,15,

22 129:5,6
131:1,12,14,15,
25 132:1,17,18,
20 133:9,17,20
134:7,8,10
135:12,20
136:1,4,21
142:14,25
143:14,19
145:3 146:2,6,
12 149:4,5
151:3,4,17,21
152:8 156:20
159:3,5,7
162:16 172:12

remembered
132:14 133:14
142:21

remembering
126:2 129:8
131:25

remind 164:5

remotely 9:8,
11 106:7

rent 101:21,23

Rented 101:22

renting 175:10

repeat 31:14
38:6 85:5 90:7
146:24 154:14
182:13 189:10

repetition
186:21

rephrase
11:12 189:14

report 61:5
83:1 129:1
137:14 138:2,6,
8,17 139:5,10,
15,20,24 140:4,
9,14,18,23
141:18,22
142:3,9 190:3,
9,15,21 191:10
192:12,23
194:14,21

reporter 8:4
9:14,16,21
111:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Reporters 8:7

reports 138:24

represent 105:7 189:4 195:24

representative 192:17,22

represents 104:9,19

request 187:15,19,21 189:14

requests 94:3, 21 187:22

residence 42:23 52:22 119:9 129:2

respect 168:20 198:8

respond 82:14

responded 83:16 85:23

response 59:10,21 60:5, 17 64:16 131:24 185:17

responses 195:12

responsible 162:11

result 166:7

return 25:22 26:5

returns 21:18 26:8

reviewed 159:11 189:17 190:2

right-hand 102:3

rights 144:1,4, 6,12,16,24 146:4

RINGS 158:21

ripped 205:3

road 85:19 123:1 174:21 179:23,24

robbery 97:19 203:22

Robert 8:8,9, 16 9:8,11 12:23 17:25 48:12 95:2 154:4 173:12,14 185:13 198:15 199:15 201:16 204:6 206:5 207:21

Robinson 8:15

Roger 88:9,16

role 91:18,19

romantic 51:6

romantically 54:22 55:1

Ron 99:2 139:4 154:21,25

Ronald 156:3

room 102:17, 20,25 103:2,6, 11,17,19,20,21 104:24 108:4,5, 11,23 109:3,6, 10 145:21

rotator 164:15

rough 61:14 203:12

rounded 119:14

Rowsella 171:19,20 173:2

RPD001355 102:4

rule 134:20

rules 182:14

Russellville 8:9,18,20 15:7 26:17 39:18,19 40:9,24 41:12,

21 42:4,16,17, 22 43:2,13,17 44:17 46:5,12, 17 51:4,14,22 88:9 143:8 152:15,18 154:23 162:4,7 174:21,24 180:21,23 183:13 206:17

───────

S

sadness 206:10

sake 132:24

salary 19:7 176:15

sally 132:15, 18,21 133:10, 15,20,24 136:19 137:3, 16,21 138:3,18, 25 139:6,15,21 140:1,14,20,25 141:1,19,24 151:15 189:18, 24 190:4 191:4, 10 200:22

Samuel 156:6

Sandra 8:4

Sarah 50:24 51:2,7 169:19

Saralynn 37:10 94:5,12 95:9 100:14 104:22 106:21 128:16 143:3 167:13,17,22 168:3,9,16,25 169:6,14 173:15,20 174:13 175:3 193:18

Saralynn's 94:9 173:25

sat 122:22

Saturday 99:21 100:2 111:22,23

scene 162:14 200:13,14

scheduled 99:22,25

school 14:18, 24 15:1,5,7,8, 22,25 16:2,5,19 17:1,2,4,9,13 18:22 26:18 27:16 77:1,18 85:2 94:6,9,14, 16,18 100:3,4 172:15,16 174:8

schools 15:9

science 150:24 160:24

Scott 8:25 9:1

Scottsville 179:23,24

seasonal 19:17 21:15

seconds 81:16

security 202:25 203:5

seek 16:5 41:22

self-employed 175:22

sentence 54:7 57:21 96:7 164:6

separate 80:10

separated 28:3,16

September 8:5 16:5,21 17:1,5, 9 47:3 50:22 51:2,24 53:3,5, 16 63:19 64:1, 5,18 65:16,19 66:18 67:23 73:11 76:1,6 79:9 82:13 84:10,15 93:12 95:16 98:2,6,18 99:9,18 100:9, 17 109:21

110:6 124:19 128:20 129:1, 21 130:14 131:3 135:11, 22 137:4,17 138:25 139:6 140:20 142:14, 15 144:17 146:9,19 147:15 152:1 155:18 163:1, 17,24 199:9 204:8,19,25

Sergeant 194:12

serve 96:10 97:14 164:11

service 17:6

serving 12:8, 13,15

session 10:12 179:14

set 76:11 146:10,11,16 147:14 150:15 157:22 161:15, 19,23 186:23 187:3 198:24 199:13,16

setting 15:1 147:3 162:11 199:25

settled 119:15

seven-hour 134:19

sewing 165:19

sex 203:24

shape 104:2,8, 11,12 180:2,9

share 48:3

she'd 69:5

Sheriff 9:2

Sheriff's 9:1

shoes 49:13

shop 175:24,25 176:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

short 106:24

shortly 37:14

shoved 78:22

show 186:23
205:18,19

shows 161:6,
14,18,22

side 20:12 49:1
107:14 169:20
176:3

signed 34:24
35:7 36:23
62:22

signing 63:5

silent 144:12

similar 59:20
186:17

single 12:15

sir 9:13 80:19
189:15,21
193:24 195:16
196:2,7,20
197:9

sit 133:23
158:16

sitting 70:10,
13,19 125:12,
13 126:21
200:7 201:24

situation 67:24
83:2,6,14 85:24
87:8 89:23
206:11

situations
89:18

slapped 79:13
84:8,13 85:7

slapping 79:17

slash 194:21

slept 51:15
102:23 104:21
109:18

sliding 103:4

sloppy 68:25

Slosar 9:7 13:9
153:13

slurpee 71:13

small 12:3
118:14

Smith 8:22
156:4,5 182:11,
21,22 183:5,25
184:1 185:3,5
187:3,7

smoke 76:16
145:7,9,13,17,
21 188:1,6

smoked 76:14
77:4,5,14 116:8
145:3 188:3,14,
17,19

smoking
145:23 188:9

snatched
95:23 97:24
205:13

snatching
96:24

Snider 88:9,16
89:5,9

social 44:6
179:18

society 207:7

soft 205:18

soldier 55:25
56:4,8,11,15
57:2 58:9,18
59:12 60:7,18

solemnly 9:16

son 203:4
205:1,4,11
206:6

son's 204:12

sort 20:21 23:4
83:24

sought 206:2

soul 205:3

sound 11:5,16
100:24

sounds 18:19
40:20,22 54:5
149:4

source 25:18
176:14

Sowell 8:23
189:2,3 195:17

span 77:3

spark 58:13

speak 10:16
18:1 44:10
93:22

speaking
122:7 142:14
145:5

specific 61:20,
25 62:10,18
63:16 65:18
66:17 68:7
79:10 120:7
143:13,14
172:8 186:18

specifically
149:4 159:8,15

speculation
158:10

spell 17:22
87:15 169:25

spending
32:11

spent 174:9
202:23

spill 79:24

split 172:20

spoke 55:5
94:8 141:16
142:7 147:10

spoken 136:14
198:5

sponsor 73:5

spot 103:24

sprayed
132:15 133:15

spurts 64:6

square 48:15
104:24 105:6
123:8

standing
187:17

standoffish
206:22

stands 76:4
98:17

Staples 8:15
12:23 13:9,25
14:5 15:23
17:25 18:3,6
23:6,8,19 25:23
27:19 28:12,22
29:14 30:7,22
31:13 32:5
33:7,15,20
34:11 35:17
36:7,10,18
37:8,19 38:2
39:9 40:25
41:3,6 42:7,13,
24 43:18 44:4
45:3,20 46:15
47:16,23 48:12,
15,17 49:7,20
50:8 51:9,18,23
52:4 53:2
55:17,21 57:3
58:3,19 60:8,19
61:8 62:9,24
63:7,21 64:2,
19,23 65:1,17,
21 66:10,20
67:12 68:1 69:9
70:2,14 71:19
72:12 73:23
74:5,9,21 75:9,
14,24 76:10
77:21,25 78:7
79:16 82:10,16
83:3,11 84:1,
11,17,25 85:10,
12 86:7,16
87:25 89:6,10
90:1 91:17 92:8
94:2 95:11,13,
20 97:2,21
100:5,16 101:5,
9,12 102:11
103:16 105:10,
23 106:6,9,12
107:25 108:2

109:25 111:9
112:4 113:16
114:19 115:10
120:16,18
122:5,13
123:13 124:3
126:11 127:13,
21 128:6 129:4,
16 130:1,22
131:10 132:16,
24 133:3 134:6,
12,17,25 137:1,
9 138:9,11,19
139:16 140:10,
15,24 141:25
142:4,11,16
145:19 148:9,
15 151:16
153:1,3,13,21
154:4,6 155:7,
19 156:9,20
157:15,25
158:9 159:17
160:7 163:4,13,
22 164:13
165:16 166:13,
17 167:24
168:17,23
169:7 171:11
175:11 176:17
177:3,6,12,14,
22 178:7,12,18,
22 179:2
180:10 181:3,6,
21 184:25
185:12,22
186:6,14,24
187:4,8 188:16
191:18 192:1,6,
13,19,24 193:6
194:8,25 195:7,
19 197:1
198:14 207:20,
24 208:2,6

start 11:1,3
18:21 24:3 32:4
41:5 42:20
54:15 67:16
76:12 115:4,5
119:6 120:14,
20 149:22
161:7,10 188:9

started 19:11
20:9 31:12,19
32:2,8 33:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

38:18 39:3,21
41:23 46:18
65:14 66:3
80:13 88:3
100:20 101:3,
16 114:21,22
115:12 117:16
121:4 125:14
126:14,18
143:16 146:11
175:1 199:4

**starting** 24:11
76:25

**state** 8:22 26:8
165:15 166:24
167:3 168:10
170:16 173:6
182:9 203:1

**stated** 189:17
195:12

**statement**
129:6,9 195:6
201:1,6,7,10,
11,12,17,19,21,
23 202:1
203:13

**stating** 80:5

**station** 143:7,8
144:18

**status** 203:21
207:3

**stay** 111:7
116:16 162:20
203:9

**stayed** 51:20
52:1 92:20
100:6 164:25

**staying** 51:12,
16 52:17 92:21
175:5

**steady** 47:9,10

**step** 22:24
25:10 27:20
29:7 40:4 44:23
171:21,22

**stepfather**
171:10,12

**stepfathers**

27:25

**steps** 72:3
105:7,15

**Steve** 176:1,3

**Stick** 86:10
88:17

**Stick's** 98:14

**Stilz** 8:25
195:20 197:22
207:25

**stint** 170:22
171:3

**stole** 97:6,25

**stomach** 180:6

**stop** 11:12
15:21 20:4
44:18 80:19
113:24

**stopped** 16:1

**stopping** 58:4,
6 134:13,15

**storage** 103:3

**store** 29:1
116:4 122:21,
24,25 123:1,11,
15,23 124:1
128:23

**stove** 150:21

**Strained**
174:14

**strangle** 81:12

**street** 40:16,21
42:5,22 43:2,6,
17 44:3 51:4,14
52:2,14,15,18,
23 105:18
110:21,22,24
179:21 180:22

**stress** 61:17

**stressful** 62:1
150:16

**strike** 20:3
33:22 67:22
176:13

**striking** 89:15

**stroller** 118:15
119:15

**struck** 79:14
84:8,14 85:8
88:8 89:4,8,11
165:25

**structure**
101:17

**stuff** 22:10 26:4
42:2 61:18
62:16 67:4
68:22 73:25
97:13 144:13
164:20 169:12
174:9 175:15,
20,21,24 176:5,
11 180:6

**subject** 193:4

**subjects**
168:21

**substance**
12:17

**sue** 90:8,24
152:11 154:3,
18 155:9

**sued** 11:18,21
155:17

**suggest** 50:5
156:16

**suggests**
161:10

**summer** 15:18
19:5 51:12 53:1
174:9

**Sunday** 142:13

**Super** 177:17

**supervision**
177:20

**supervisor**
18:13

**support** 158:1
179:6 186:8,12

**supports**
191:15,23

**suppose** 62:25
64:9

**supposed**
90:15

**supposedly**
190:13 191:4

**surprise** 36:4,
9,14,21

**surrounding**
22:8

**surroundings**
205:24

**swear** 9:16

**switched**
188:5

**swore** 49:12

———

**T**

———

**table** 25:12

**takes** 165:8

**taking** 33:1
53:17 118:18
175:20

**talk** 13:9 14:22
54:24 78:13
85:3 93:5,8,13,
17 101:17
137:7 151:11

**talked** 14:1
44:11 46:23
54:14,24 55:14
59:19 78:4
88:17 89:18
94:5 98:9,11
122:23 138:20
153:10 154:7,
11 157:11,21
177:16 184:18
185:23 191:6,
12,21 192:25

**talking** 13:1
22:4 49:4,24
59:9 65:18
72:14 75:10
81:24 85:1 88:3
91:11 93:16
108:18,23

132:1 135:10
137:10 144:23
145:21 160:4
168:25 185:5
206:18

**tank** 135:19,24
142:18

**tape** 194:14,21

**task** 183:20

**tasks** 152:5,24
153:18 154:25
155:13

**tax** 21:17
25:21,22 26:5,8

**taxes** 21:17
25:11 26:4
175:20

**team** 12:25

**teenager**
66:15 188:11

**teens** 172:20

**teeth** 180:11

**telephone**
94:1

**telling** 13:22
69:7 81:2 89:14
122:10 150:11

**tells** 38:3

**ten** 28:15 80:9
124:1

**tended** 69:16

**Tennessee**
26:13,22,24
27:2,9,17,18
29:22,23,24
34:14 39:17
40:7,23 41:8
42:4,12,15
43:3,10 44:24
46:4 51:19
52:1,10,13,16,
21 53:18,24
54:1 61:1 87:24
173:9

**tenth** 15:14,18

**term** 203:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

205:21

**terms** 79:10

**test** 33:16
34:15 111:1

**testified** 60:11,
15 65:7 118:3
120:3 121:13,
15 123:14,22
124:4,5,9
126:23 128:7
129:9 134:9
156:22 158:17
184:9,21
195:14 196:21
200:7,11,20
204:6,18 207:3

**testify** 132:13
133:13 156:24
185:15

**testifying**
47:18 131:12,
14,15 133:17
196:5 202:22

**testimony**
9:17 13:14 48:6
52:5 69:4
125:21 132:8,
25 134:3
184:22 187:10
189:16 191:3,9
196:10,15,24
197:4,7,14

**text** 55:7,8 94:1

**texts** 157:19

**theft-related**
95:16 96:25
97:3,4 98:2

**therapies**
179:6

**therapist** 72:1
179:9

**thing** 10:19
11:2,7 18:9
20:13 21:12
22:11 43:14
74:10 83:10
91:12 132:13
133:8,14 151:4
155:8 201:4

**things** 10:16,
20 45:22 58:15,
22 62:5,11
68:23 78:4
91:14 172:9
207:14

**thinking** 74:23
86:22 88:13
134:14

**Thomas**
182:11,22
183:5,25 185:5

**Thompson**
27:24

**thought** 44:15
63:6 64:20
96:20 113:3
117:18 168:24

**threw** 96:21
205:14

**throat** 78:21
80:11 81:13,14,
18 82:6 127:24
132:7

**tight** 61:13
81:14

**til** 21:25 23:18

**time** 8:5 12:8
16:4,18,23,25
17:4 18:4 19:20
21:13,21 22:17
23:9 24:6,20
27:10 28:7,25
29:9,10,12,18
30:13 31:11
32:1,3,11 37:16
38:17,18,22,25
39:2,3,23 42:5,
16 45:15 46:5,
13 47:3 51:17
52:9 54:24
55:15,24 56:7
57:1,6 59:3,6
65:9,13 66:7,12
67:5 70:11
71:23 73:1
74:15,17 76:11,
20,25 77:3,12
79:7,18 85:22
86:2 87:3 92:13
93:3,21,25

96:10 97:14
111:3 114:8,13
117:14,18
119:11,13
122:2,11
124:19 128:16
130:13,14,20
131:9 134:21
135:3,6,21
136:2,5 145:9
150:22,23
156:5 163:2
164:11 165:8
167:10 168:5
169:8 170:7
172:14 173:3
175:18 176:7
181:8,11,17,21,
25 182:3,15
188:13,17
197:19,21,22
202:20 203:10
204:11 207:5
208:7

**timeframe-
wise** 43:24

**timeline** 74:23
75:3

**times** 32:16,19
51:15 64:21
74:20 85:14
123:20 136:15
167:6,20
168:12 178:25
196:4

**Tina** 129:21
132:1

**title** 179:18

**today** 8:4,5
10:1,11,15,22
11:9 12:19
13:13,24 37:22
118:7 126:4
133:19,23
158:16 198:19
199:7 200:7,11
201:25

**told** 56:16
60:25 69:15
122:15 130:8
143:2 144:16,
23 146:4,16

153:7 184:8
198:19,23
199:2,11,15

**tolerance** 70:8

**Tommy** 156:5
182:11,21
183:25 185:3,4
187:7

**top** 34:3 48:15
118:14

**topic** 58:14
59:21 101:4,17

**touch** 41:25
79:14 180:25

**touched** 83:23
84:9,14 85:8
89:24

**tough** 19:18

**town** 29:19

**towns** 22:10
27:3

**traditional**
15:1

**traditionally**
176:14

**trailer** 100:9
101:18,20
102:13,15
104:8,17 105:6,
8,19 107:2,20
109:21 110:2,
19 111:7,17
112:3,25
118:10 119:1,
18,20,25 120:6,
10,24,25 121:2,
8,17 122:2,12
124:16,21
125:1 126:1,9,
19 128:1,10,13,
15,20,23
129:24 130:4,7,
15,20,24
131:16 132:2
134:5 135:13
140:25 141:5
147:15 148:8
156:11,18
157:3,23 158:8

160:5 161:7,11,
15 162:12,15
184:5 196:24

**trailers** 175:14

**training** 161:25
162:7

**trampoline**
51:15 52:6,17

**transcript**
48:1,5 59:15
64:10 68:9
79:22 101:6,10
117:4 123:3,16
125:7 149:14
159:12

**transcripts**
13:15,18

**transfer**
164:19,23

**transferred**
164:24

**transitioned**
20:21

**transported**
54:13

**treating** 207:18

**trial** 13:14,16
47:19 48:1,6
49:17 59:15
102:10 117:4
121:13,16,24
124:5,10 128:7
131:13 132:9
134:3,9 139:3
147:22 156:22,
24 157:1 184:9,
21,22 191:3,9
196:10,15,16,
25 197:4,14,18
198:4

**trouble** 162:24

**true** 30:17
38:13 44:3
86:25 92:3
120:4,11
121:18 124:2
127:20 129:13
135:14 146:8,
18,25 171:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

195:15 197:17
198:23 199:2,
11,15

**truth** 9:18,19
126:3

**turn** 48:10
79:23 99:17
119:4 120:13
141:11 142:12
158:23

**turned** 94:13
127:8,10,12
160:1 168:6

**TV** 103:22

**two-ish** 70:22

**type** 65:25
83:22 98:6
177:19

**typical** 69:23
70:4,10 71:15
111:23

**typically**
65:15,25 115:8

——————

**U**

——————

**uh-huh** 10:21
21:13 49:25
56:19 59:23
62:15 66:16
67:7 74:11
76:20 81:20
85:20 96:22
114:5,7 118:16
129:7 151:12
158:25 164:17
165:10 170:18,
21 177:19
187:13

**ulcers** 180:6

**ultimately**
164:8 170:11

**unable** 171:8

**unauthorized**
54:3

**undergo** 162:7

**undergone**
161:25

**underlying**
198:10

**underneath**
106:20 107:1

**understand**
11:11 12:18
16:20 20:20
37:5 40:1 45:12
63:17 69:6
108:2 143:25
146:1 152:9,10
154:1,2,17
155:8 185:5
189:13 205:7,
12

**understanding**
11:14 30:4,5,19
42:3 46:11 69:8
90:10 144:10
152:17 160:3,
10 170:14
197:13

**understood**
43:23 65:6
135:12

**update** 169:10

**upset** 58:17,23

**user** 76:21

——————

**V**

——————

**vacated** 164:9,
12

**Valium** 74:7,
11,19 75:8,21

**Valiums** 73:18

**vaping** 188:5

**vehicle** 54:3

**Ventura** 8:4

**verbal** 166:15

**verbalize**
107:10

**verbally**
105:24 106:10

**versa** 71:18

**versus** 8:9

**vertical** 104:24
105:6

**vice** 71:18

**victim** 96:1
203:7,25
205:22

**video** 10:21
102:5 137:3,8,
20,24 138:17,
24 139:5,10,14,
20,24 140:4,9,
14,18,23
141:18,22
142:3,9 160:1,
4,11 189:18,23
190:14,20
191:4 192:5,18

**videotape**
141:6

**Viking** 205:21

**violence** 90:4,
12,22 92:6

**violent** 79:14
83:24 84:9,15
85:8 89:24 98:6
113:11

**Virginia** 27:24

**visit** 167:2,6
170:4 173:5

**visited** 44:2

**visits** 42:10
43:15 46:20
164:20 169:15

**vocational**
17:2

**vodka** 66:4,5,6
69:16,19,25
70:12,19,25
71:2,17 115:15,
16,18,21 116:2,
4 118:14 124:2
125:19

**voices** 113:14

——————

**W**

——————

**wages** 176:11,
15

**wait** 89:20

**walk** 160:5

**walked** 113:20

**walking**
119:20

**wanted** 78:13,
14 87:19 103:9
118:22 119:12
134:22 142:20
150:17 165:20

**warden** 187:15

**Warren** 96:19,
20

**watched**
111:20 137:2

**waved** 193:17

**ways** 28:14

**weak** 204:1

**weakness**
205:22

**week** 19:15
68:19 69:6
72:25 76:18,19
99:20

**welfare** 42:11
43:19 44:2
46:21 176:19

**West** 8:22 80:3
156:4 182:10,
24 183:8 184:3,
17 185:3
186:23 199:8,
12

**Western** 8:11

**whatsoever**
193:19 194:10

**whereabouts**
194:14

**whiskey** 66:3
70:12 114:15
115:4,6,9,12,20
116:1

**wife** 201:2

**William** 156:4
182:11,21,22

**183:4,25 185:5**

**Winters** 19:18

**withheld**
192:4,12,17,22

**withhold**
194:20

**woke** 100:9
124:19 130:13

**Wolfe** 50:24
51:2,7,10,16
53:17

**Wolfe's** 51:13
52:2,17

**woman** 84:9

**women** 39:4
50:10 55:15

**wondering**
32:25

**word** 11:13
104:3 108:14

**words** 38:12
91:15 108:7,14
119:11 147:6

**work** 13:10
14:14 15:24
18:19 19:12,18,
21 20:22 21:18,
19,21 22:17
23:4,10,16
24:2,6,22 41:1,
12,14,22 42:6
57:9,15 58:1
61:13 66:21,22
67:2 69:1 73:24
74:10,12,19
75:8 99:22,25
114:23 176:1,4,
6 207:6

**worked** 20:2
23:1 25:11
26:2,6,9,21
137:15 165:7
175:12

**worker** 44:6
179:18

**working** 20:4,
22 21:5 24:3
25:19 28:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 170    Filed 10/03/25    Page 77 of 77 PageID #: 2985
The Deposition of ROBERT YELL, taken on September 30, 2022
232

41:2,9,23 44:18
114:3 116:22

**wrenching**
205:2

**write** 105:11,
14,16 168:22

**written** 102:18
187:21

**wrote** 106:3,10
139:2 168:24
169:2

_____

**X**
_____

**Xanax** 73:22
74:4 75:8,21

**Xanaxes** 73:18

_____

**Y**
_____

**yard** 119:14
176:4

**yards** 175:21

**Yates** 176:2

**year** 15:7
18:23,24 19:17,
19,23 21:15,16
22:19,21 23:1
24:25 25:9 43:5
44:25 50:18
75:4,5,6,11
76:12,16,21
77:1 92:16
94:10 164:22
171:23 172:10
174:5 188:5

**year'ish** 21:23

**years** 19:23
28:16 67:8
75:11 77:14
96:9 164:7
172:18 188:5
202:23 205:10

**Yell** 8:8,9,16
9:9,11,24 10:5
11:18 14:17
36:2 59:9 80:2
95:2,9 135:9

169:24 170:2
181:13 182:8
189:3 194:22
195:24 197:25

**Yell's** 48:5

**you-all** 60:1
112:1,6,9
115:24 116:6
117:12 120:21,
22 121:1
134:21

**younger**
172:17

_____

**Z**
_____

**Zachary** 33:12,
14 100:14
102:24 128:12

**Zeller** 180:19,
20

**Zoom** 106:8,15
108:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com