

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 1:20-CV-0047-GNS

# ROBERT YELL

# V.

# CITY OF RUSSELLVILLE, ET AL.

## DEPONENT:

## ROGER MCDONALD

## DATE:

## February 25, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1              IN THE UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF KENTUCKY

3                    AT BOWLING GREEN

4              CASE NO. 1:20-CV-0047-GNS

5

6                     ROBERT YELL,

7                        Plaintiff

8

9                          V.

10

11              CITY OF RUSSELLVILLE, ET AL.,

12                      Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  ROGER MCDONALD

24   DATE:       FEBRUARY 25, 2022

25   REPORTER:  CHLOE GILBERT



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
—— COURT REPORTERS ——

Page 2

```
                    APPEARANCES
 1
 2
 3    ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
 4    Molly Campbell, Esquire
 5    Amy Staples, Esquire
 6    Loevy & Loevy
 7    311 North Aberdeen
 8    3rd Floor
 9    Chicago, Illinois 60607
10    Telephone No.: (312) 243-5900
11    E-mail: campbell@loevy.com
12    amy@loevy.com
13    (Appeared via videoconference)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
                APPEARANCES (CONTINUED)
 1
 2
 3    ON BEHALF OF THE DEFENDANT, ALAN GREGORY:
 4    Benjamin Siegel, Esquire
 5    Elizabeth Stone, Esquire
 6    August Pozgay, Esquire
 7    Department of Housing, Buildings, and Construction
 8    Public Protection Cabinet
 9                500 Mero Street
10    Frankfort, Kentucky 40601
11    Telephone No.: (502) 573-0365
12    E-mail: benjamin.siegel@ky.gov
13    betsy.stone@ky.gov
14    august.pozgay@ky.gov
15    (Appeared via videoconference)
16
17    ON BEHALF OF THE DEFENDANTS, DAVID WEST, WILLIAM SMITH,
18    AND JAMAN CHILDERS:
19    Alea A. Arnett, Esquire
20    Kentucky State Police Legal Office
21    919 Versailles Road
22    Frankfort, Kentucky 40601
23    Telephone No.: (502) 782-1800
24    E-mail: alea.arnett@ky.gov
25    (Appeared via videoconference)
```

Page 4

```
                APPEARANCES (CONTINUED)
 1
 2
 3    ON BEHALF OF THE DEFENDANTS, OFFICER MILLS, OFFICER
 4    EDMONDS, OFFICER EGGLESTON, OFFICER PENDERGRAF, OFFICER
 5    HIGGINS, AND THE CITY OF RUSSELLVILLE:
 6    Jennifer Langen, Esquire
 7    Jeffry Mando, Esquire
 8    Adams Law
 9    40 West Pike Street
10    Covington, Kentucky 41011
11    Telephone No.: (859) 495-3798
12    E-mail: jlangen@adamsattorneys.com
13    jmando@adamsattorneys.com
14    (Appeared via videoconference)
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
                APPEARANCES (CONTINUED)
 1
 2
 3    ON BEHALF OF THE DEFENDANTS, BUSTER CANNON, AND SCOTT
 4    COUNTY KENTUCKY:
 5    Barry Stilz, Esquire
 6    Kinkead & Stilz
 7    PNC Bank Tower
 8    301 East Main Street
 9    Suite 800
10    Lexington, Kentucky 40507-1520
11    Telephone No.: (859) 296-2300
12    E-mail: lzellen@ksattorneys.com
13    (Appeared via videoconference)
14
15    ON BEHALF OF THE DEFENDANTS, BILL JENKINS, AND LOGAN
16    COUNTY:
17    J.A. Sowell, Esquire
18    English, Lucas, Priest & Owsley LLP
19    1101 College Street, P.O. Box 770
20    Bowling Green, Kentucky 42102-0770
21    Telephone No.: (270) 781-6500
22    E-mail: jasowell@elpolaw.com
23    (Appeared via videoconference)
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
 1              APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANTS, BUSTER CANNON, AND THE CITY
 4   OF GEORGETOWN:
 5   Maureen Malles, Esquire
 6   Sturgill, Turner, Barker & Moloney, PLLC
 7   333 West Vine Street
 8   Suite 1500
 9   Lexington, Kentucky 40507
10   Telephone No.: (859) 255-8581
11   E-mail: mmalles@sturgillturner.com
12   (Appeared via videoconference)
13
14   Also Present: Sydney Little, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1                    INDEX
 2                                                  Page
 3   PROCEEDINGS                                      9
 4   DIRECT EXAMINATION BY MS. CAMPBELL              11
 5   CROSS EXAMINATION BY MS. LANGEN                 79
 6   CROSS EXAMINATION BY MR. SIEGEL                 87
 7   REDIRECT EXAMINATION BY MS. CAMPBELL            89
 8
 9                   EXHIBITS
10   Exhibit                                         Page
11   1 - Layout of Trailer - RDP001355               42
12   2 - Deposition Transcript                       53
13   3 - Picture of Burnt Trailer - AG00008          43
14   4 - Police Log - RDP000001-000007               47
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1                   STIPULATION
 2
 3   The VIDEO deposition of ROGER MCDONALD was taken at
 4   KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET,
 5   LOUISVILLE, KENTUCKY, 40202, via videoconference in
 6   which all participants attended remotely, on FRIDAY the
 7   25th day of FEBRUARY 2022 at approximately 10:01 a.m.;
 8   said deposition was taken pursuant to the FEDERAL RULES
 9   of Civil Procedure.  The oath in this matter was sworn
10   remotely pursuant to FRCP 30.
11
12   It is agreed that CHLOE GILBERT, being a Notary Public
13   and Court Reporter for the State of KENTUCKY, may swear
14   the witness.
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1                   PROCEEDINGS
 2       VIDEOGRAPHER:  On record.  My name is Sydney
 3   Little.  I'm the online video technician and Chloe
 4   Gilbert is the court reporter today, representing
 5   Kentuckiana Court Reporters, located at 730 West
 6   Main Street, Suite 101, Louisville, Kentucky 40202.
 7   Today is the 25th day of February 2022.  The current
 8   time is 10:01 a.m.  We are convened by video
 9   conference to take the deposition of Deputy Roger
10   McDonald in the matter of Robert Yell versus City of
11   Russellville at al., pending in the United States
12   District Court, Western District of Kentucky at
13   Bowling Green.  Case number 1:20-CV-0047- GNS.  Will
14   everyone, but the witness, please state your
15   appearance, how you're attending, and the location
16   you are attending from, starting with plaintiff's
17   counsel?
18       MS. CAMPBELL:  Molly Campbell, attending
19   remotely from Fairway, Kansas for the plaintiff,
20   Robert Yell.
21       MS. STAPLES:  Amy Robinson-Staples, appearing
22   remotely for the plaintiff, Robert Yell.
23       MR. STILZ:  Barry Stilz, appearing on behalf of
24   the defendant, Buster Cannon, whose capacity as a
25   Scott County Deputy Sheriff, and for Scott County
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 5 of 37 PageID #:
2990
The Deposition of ROGER McDONALD, taken on February 25, 2022
10..13

Page 10

1  Deputy Sheriff's part -- or Scott County Sheriff's
2  Department appearing remotely via Zoom from my
3  office in Lexington, Kentucky.
4       MS. MALLES:  Maureen Malles on behalf of the
5  City of Georgetown and Buster Cannon, attending
6  remotely from my office in Lexington.
7       MS. LANGEN:  Jennifer Langen attending on
8  behalf of the Russellville Police Officer defendants
9  and the City of Russellville, also attending
10  remotely via Zoom from my office in Covington,
11  Kentucky.
12       MS. ARNETT:  Amber Arnett, attending remotely
13  from Frankfort, Kentucky, and I represent the
14  Kentucky State Police defendants, Childers, West,
15  and Smith.
16       MR. SOWELL:  J.A. Sowell on behalf of the Logan
17  County Defendants, Bill Jenkins, attending via Zoom
18  remotely from our office in Bowling Green, Kentucky.
19       MR. SIEGEL:  Benjamin Siegel on behalf of Allen
20  Gregory.  I'm attending remotely from Louisville,
21  Kentucky.
22       VIDEOGRAPHER:  Great.  Thank you.  Deputy
23  McDonald, will you please state your name for the
24  record and hold your ID up to the camera?
25       THE WITNESS:  Roger McDonald.

Page 11

1       VIDEOGRAPHER:  Can you push -- pull it back
2  just a little bit?  All right.  Thank you.  Do all
3  parties agree that the witness is, in fact, Roger
4  McDonald?
5       MS. CAMPBELL:  Yes.
6       MS. STAPLES:  Yes.
7       MS. LANGEN:  Yes.
8       MR. SOWELL:  Yes.
9       MS. ARNETT:  Yes.
10       VIDEOGRAPHER:  Thank you.  Deputy McDonald,
11  will you please raise your right hand for the court
12  reporter to swear you in?
13       COURT REPORTER:  Do you solemnly swear or
14  affirm that the testimony you're about to give will
15  be the truth, the whole truth, and nothing but the
16  truth?
17       THE WITNESS:  I do.
18       COURT REPORTER:  Thank you.  You may begin.
19            DIRECT EXAMINATION
20  BY MS. CAMPBELL:
21       Q    Good morning, Deputy McDonald.  My name is
22  Molly Campbell.  I represent the plaintiff, Robert Yell,
23  in this action.  So if you're ready we'll get started.
24  I'm going to show you some documents today on my
25  computer screen, so I don't know if you're able to pin

Page 12

1  my video before we start.  If you just hover your cursor
2  over my picture, you should see three dots appear.
3       A    I do.
4       Q    Okay.  And then if you hit that, you'll click
5  the pin video button, and then you'll see me in full
6  screen.
7       A    Okay.
8       Q    Okay.  Deputy McDonald, have you been deposed
9  before?
10       A    On this case?
11       Q    Just generally.
12       A    Once before.
13       Q    And how long ago was that?
14       A    12, 15 years.
15       Q    What case was that in?
16       A    That was a employee case with the City of
17  Russellville.
18       Q    Were you defendant in that action?
19       A    No.
20       Q    Were you a party in that case?
21       A    I just had to give a deposition.
22       Q    Okay.  So you were a witness in that case?
23       A    That's right.
24       Q    Was there a trial?
25       A    No.

Page 13

1       Q    Okay.  So before, as you may recall from that
2  deposition, we'll want you to answer all questions
3  verbally so that the court reporter can transcribe it.
4  And second, if I ask a confusing question, which
5  probably will happen, just ask me to rephrase it and I
6  will do that for you.  Does that sound fair?
7       A    Absolutely.
8       Q    And also, if you need a break just let me know
9  and we can do that.  Sound fair?
10       A    Okay.
11       Q    And also, attorneys may object and unless they
12  instruct you not to answer, you can go ahead and answer
13  the question.  Sound fair?
14       A    It does.
15       Q    All right.  Do you have any health conditions
16  that would affect your ability to testify today?
17       A    No.
18       Q    Are you taking any medications that might
19  affect your memory?
20       A    No.
21       Q    Sir, where did you grow up?
22       A    Logan County, Kentucky.
23       Q    Did you go to high school there?
24       A    I did.
25       Q    What high school did you go to?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    A    The Adairville High School.
2    Q    Did you graduate?
3    A    I did.
4    Q    What year did you graduate?
5    A    1975.
6    Q    Did you attend any college?
7    A    I have some college, not much.
8    Q    Where did you -- where is your college
9    education from?
10   A    Bill Kemp out of Louisville.
11   Q    And what -- how many years of college
12   education do you have from there?
13   A    It was about 13 weeks.
14   Q    All right.  Any other education after high
15   school?
16   A    Just policing education.
17   Q    Did you go to the police academy right after
18   your 13 weeks of college?
19   A    No, actually I went -- I was already hired by
20   the City of Russellville when they sent me to the
21   college.
22   Q    Okay.  Why did they send you to that college?
23   A    It was a supervision class.
24   Q    Can you walk me through your law enforcement
25   career?

Page 15

1    A    I was hired in 1995, started in patrol, then
2    become a detective a few years later.  Moved up to
3    sergeant, then got promoted to patrol captain, and then
4    administrative captain.
5    Q    So you were hired in 1995, that was your first
6    law enforcement job?
7    A    I'd actually worked a few months in
8    Adairville, Kentucky, part-time as a law enforcement
9    officer.
10   Q    And then in 1995, you were hired by the
11   Russellville Police Department; is that right?
12   A    That's correct.
13   Q    And how long were you a patrol officer?
14   A    I would say maybe three years.
15   Q    And then you became a detective around 1998?
16   A    Somewhere in that range, yes.
17   Q    And how long were you a detective?
18   A    I think for a year, year and a half.
19   Q    And that was all with the Russellville Police
20   Department?
21   A    That is correct.
22   Q    And then you became a sergeant with the
23   Russellville Police Department?
24   A    I did.
25   Q    And about when was that?

Page 16

1    A    I would say maybe 1999, 2000.
2    Q    And around 1998 or 2000 you were promoted to
3    patrol captain with the Russellville Police Department?
4    A    I think 2003 is when I moved up to patrol
5    captain.
6    Q    And why did you leave the first department
7    that you were with?
8    A    Are you speaking of the Adairville part-time
9    job?
10   Q    Correct.
11   A    They didn't have a need for me anymore.
12   Q    And what -- after you were a patrol captain,
13   what did you -- how long were you patrol captain?
14   A    I think that I moved into administrative
15   captain about maybe 2015.  I'm not sure.  I just really
16   can't remember all the dates.
17   Q    And what's the difference between a patrol
18   captain and administrative captain?
19   A    Patrol captain takes care of all the needs in
20   the patrol division, fleet maintenance, staffing, just
21   general needs.  And administrative captain, basically,
22   you just pay the bills and make sure everything runs
23   smoothly.
24   Q    Do you supervise -- as a patrol captain did
25   you supervise other officers?

Page 17

1    A    It was more or less the -- the sergeants is
2    what I supervised at that point in time.
3    Q    And do you supervise as an administrative
4    captain?
5    A    No.  No one was under me.
6    Q    And after -- and that's all with the
7    Russellville Police Department, correct?
8    A    That's correct.
9    Q    And then in -- you were an administrative
10   captain until 2015.  What happened -- what was your job
11   after that?
12   A    I was lucky enough to retire.
13   Q    And it looks like you are no longer
14   permanently retired.  Have you since taken another job?
15   A    Yes, I now work part-time at the Logan County
16   Sheriff's Office.  Retirement was boring.
17   Q    When did you join the Logan County Sheriff's
18   Department?
19   A    I think I've been here about two years this
20   month.
21   Q    Did you -- were you employed between leaving
22   the Russellville Police Department and joining the Logan
23   County Sheriff's Department?
24   A    Just with my wife.
25   Q    What were you doing with your wife?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  A    Honey do jobs.  Getting everything caught back
2  up.
3  Q    So not -- not formal employment, but informal
4  employment?
5  A    Yes.  It didn't pay anything, but the love was
6  there.
7  Q    Now you mentioned earlier you left the
8  Adairaville Police Department because they didn't have a
9  need for you.  What did you mean by that?
10  A    They decided that they was going to pay the --
11  the police chief there, which there was only a one
12  officer department and they decided he was -- they was
13  going to pay him overtime and then cut my position out.
14  Q    So you didn't leave due to any disciplinary
15  issues?
16  A    No, I've actually been really lucky.  I've
17  never had any disciplinary actions during my entire
18  careers.
19  Q    All right.  So I'm going to take you back to
20  September 11, 2004.  At that point, you're a patrol
21  captain with the Russellville Police Department,
22  correct?
23  A    I think I was a sergeant then.  I can't keep
24  all those dates straight.  I'm sorry.
25  Q    And as a sergeant, you would've been a

Page 19

1  supervisor in the -- in the department?
2  A    That's correct.
3  Q    And who -- who were you supervising at that
4  time?
5  A    I -- I can't tell you who all the officers
6  were.  I remember that we were on a second shift time at
7  that moment.
8  Q    And second shift, does that refer to the hours
9  that you were working?
10  A    Yes, that would be 2:00 p.m. to 10:00 p.m.
11  shift.
12  Q    So would you supervise the officers that were
13  working the -- the second shift?
14  A    That's correct.
15  Q    And are you able to name -- can you name any
16  of those officers that you were supervising?
17  A    I remember Ron Mills and his last name was
18  Higgins.
19  Q    Ed Higgins?
20  A    There you go.  Yeah, Ed Higgins.
21  Q    Who was your supervisor at that time?
22  A    I think Larry Jones was the assistant chief
23  and Jim Pendergraf was the chief.
24  Q    So was Mr. Jones your supervisor?
25  A    That's correct.

Page 20

1  Q    And what were your duties as a supervisor in
2  2004?
3  A    I tried to keep everyone safe, make sure all
4  the calls got answered, and everyone did their reports
5  and kept the city safe.
6  Q    Did you assign officers to particular cases?
7  A    No.  No, they just, in sort of a rotation type
8  thing, when a call comes out it sort of rotated through
9  the officers.
10  Q    Did you discuss the cases that officers --
11  that your officers were investigating with them?
12  A    If they needed help with it, I would speak
13  with them.
14  Q    Did you have regularly -- regularly scheduled
15  me with them?
16  A    I did.
17  Q    How -- how did those regularly scheduled
18  meetings work?
19  A    Every day at the beginning of the shift we
20  would have a shift meeting and discuss events and who
21  needed help and which way we needed to work for the day.
22  Q    Did the officers update you on what was
23  happening in their cases?
24  A    I'm sorry, would you ask that question again?
25  Q    Sure.  Did the officers provide you daily

Page 21

1  updates with their investigations?
2  A    Yes.  Usually we didn't go into any kind of
3  deep investigations that was passed on to the
4  detectives.  Just small cases that we could work
5  through.
6  Q    And you mentioned that you supervised
7  Mr. Mills and Mr. Higgins, did you supervise Detective
8  Edmonds in 2004?
9  A    No.  No, I never supervised any of the
10  detectives.
11  Q    Did you supervise Officer Eggleston in 2004?
12  A    I'm sorry, I can't remember.  I'm sure that at
13  some given point in time, I probably did, but as far as
14  this case, I can't remember him being there just Mills
15  and Higgins is actually the only ones I remember.  I'm
16  sorry, it's just been a long, long time.
17  Q    Is there a reason that those officers stand
18  out to you?
19  A    I think Officer Mills or Higgins may have
20  transported Mr. Yell to the -- to the facility, the jail
21  facility, but I just remember them being there.  They
22  were in close proximity to me sometimes.
23  Q    So Mr. Mills transporting Mr. Yell to the
24  detention center that stands out to you?
25  A    Yeah.  I'm not sure if it was Mr. Mills or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 8 of 37 PageID #:
2993
The Deposition of ROGER MCDONALD, taken on February 25, 2022

22..25

Page 22

Mr. Higgins.
2    Q    Excuse me, I meant Mr. Higgins.
3    A    And I really can't remember which one it was.
4  I just remembered that they were in close proximity to
5  me and I could see them a lot.  But nothing really
6  stands out, you know, for any reason for me to remember
7  those two, but they were in my area.
8    Q    What do you mean by in your area?
9    A    In my area of vision, trying to watch
10  everything and make sure that everybody was staying safe
11  and...
12   Q    And so your goal was to keep the officers
13  safe?
14   A    Everyone safe.
15   Q    And also anyone on the scene, you wanted to
16  keep them safe as well?
17   A    Absolutely.
18   Q    Now, what training did you receive as a law
19  enforcement officer?
20   A    I had my basic training of -- went to the
21  Louisville College.  Every year I had at least 40 hours
22  of training from the Department of Criminal Justice.
23  I've been to the FBINA Academy and just pretty general
24  stuff.
25   Q    And when you say basic training, is that the

Page 23

Police Academy?
2    A    That's correct.
3    Q    When did you attend the Police Academy?
4    A    I think I started in September of 1995.
5    Q    And when did you graduate from the Police
6  Academy?
7    A    It was 10 weeks later, ever what that date
8  would be, December something, maybe.
9    Q    So the Police Academy was 10 weeks of
10  training?
11   A    At that point in time, yes.
12   Q    And at the academy you learned the basics of
13  becoming a police officer, correct?
14   A    That's correct.
15   Q    You learned how to write reports?
16   A    Correct.
17   Q    You learned how to document witness
18  interviews?
19   A    Correct.
20   Q    You learned how to conduct crime scene
21  investigations, correct?
22   A    Correct.
23   Q    And you learned your legal obligations as a
24  police officer; is that correct?
25   A    That would be correct.

Page 24

Q    For example, you learned about Miranda Rights;
2  is that correct?
3    A    That's correct.
4    Q    Did you learn about your Brady obligation to
5  turn over exculpatory evidence?
6    A    Probably not at that.  It was pretty basic
7  training, but I guess that would say part of it.
8    Q    You were taught to document anything that
9  could be conceivably relevant, correct?
10   A    That's correct.
11   Q    And you were taught to not just document
12  inculpatory information, but also exculpatory evidence?
13   A    Ever what happened that's usually what we put
14  in the report.
15   Q    What in-service training did you receive from
16  the Russellville Police Department?  Well, let me strike
17  that.  What in-service training did you receive while
18  you were working for the Russellville Police Department?
19   A    Every year, we're to have 40 hours that we
20  would have to complete, got DUI training in -- to tell
21  you the truth, I can't remember exactly what all kinds
22  of training that I had, but every 40 hours was basic
23  training.  Like this last year, I took photography, and
24  evidence collection, and fingerprinting, and just
25  general policing things, driving.

Page 25

Q    And when you said that you learned to document
2  everything that happened in a report, what kind of
3  information would that include?
4    A    Locations, who you talked with, what was said,
5  what you saw, any relevant evidence or anything that was
6  collected.
7    Q    How did you decide what was relevant?
8    A    I guess everybody's human nature is different
9  and what's relevant to one is not to another, but just
10  what I thought was important.
11   Q    Were you taught to document both inculpatory
12  and exculpatory evidence?
13   A    That one is a little bit deep for me.  Can you
14  rephrase that one?
15   Q    Meaning were you taught to document saying
16  both evidence that would be against the suspect and
17  evidence that would show the suspect's innocence?
18   A    Oh, yeah.  Of course.
19   Q    Were you taught to disclose that information?
20   A    It was always in the reports.
21   Q    Did you provide those reports to the lead
22  investigator?
23   A    They were turned into the clerk and the
24  investigators would pull the files and get their
25  information that way.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of ROGER MCDONALD, taken on February 25, 2022

26..29

Page 26

1    Q    Have you ever received any fire investigation
2  training?
3    A    I have a small amount.  I took a class once
4  when I worked as a volunteer fireman on fire
5  investigation.
6    Q    And can you tell me a little bit more about
7  that class?
8    A    It was only a few hours and just very, very
9  basic.
10    Q    And by very basic, what do you mean by that?
11    A    Look for hotspots, things that's unusual.  If
12  you think it's arson, you should get someone that's got
13  more experience to look into it.
14    Q    What is a -- what's a hotspot?
15    A    Where a fire starts.
16    Q    So did you learn -- did you learn how to
17  detect the origin of a fire?
18    A    No, nothing that deep.
19    Q    Can you tell me more about your volunteer fire
20  experience -- your volunteer fire experience?
21    A    I worked with the City of Adairville as a
22  volunteer.  I was there about 20 years and basically, it
23  was just when the fire whistle blew, you went out and
24  helped put out a fire, or work a wreck, or that was
25  pretty much it.

Page 27

1    Q    What 20 year period was that?
2    A    That's -- I stopped in 1995 when I went to
3  work for the City of Russellville.  So I probably
4  started some time right after I graduated high school in
5  1975.
6    Q    And what kind of training did they provide you
7  to be a volunteer firefighter?
8    A    It was just driver's training, where to spray
9  water, keeping people safe, just basic things, nothing
10  deep.  No academy or anything.  Just an hour or two,
11  maybe a month, that the State provided that training.
12    Q    What did they -- what kind of training did
13  they provide you about keeping people safe?
14    A    Where to park the trucks.  Stay away from
15  collapsing buildings, things like that.
16    Q    Did you have another job while you were a
17  volunteer firefighter?
18    A    I did.  Volunteer don't pay much.
19    Q    What were you doing at the same time?
20    A    I drove a truck.
21    Q    Drove a truck, was this for a company?
22    A    Yeah.  I drove for some farmers for several
23  years and then I went to work for a company out of
24  Goodlettsville, Tennessee.
25    Q    And what was your interest in being a

Page 28

1  volunteer firefighter?
2    A    I was interested in the community, just trying
3  to make our community a better place.
4    Q    So from that experience you had some basic
5  firefighting knowledge and skills; is that correct?
6    A    That's correct.  Very basic.
7    Q    And when you first joined the Russellville
8    Police Department -- actually, let me ask you
9  this first: How many fires did you fight at -- or how --
10  let's -- let me strike that.  How many fires did you
11  respond to during your tenure as a firefighter?
12    A    That one's going to be really hard to answer.
13  We were lucky, in the City of Mederville, there wasn't a
14  lot of fires that end of the county.  So I'm going to
15  guesstimate maybe one a year, 20.
16    Q    And were those -- what kind of fires were
17  those?
18    A    Could have been something as simple as maybe a
19  kitchen fire, or a heater overheating, or an entire
20  house just burning up.
21    Q    So you did have some residential firefighting
22  experience?
23    A    Yes.
24    Q    About how many of the let's say 20 fires that
25  you were involved with involved a residential home?

Page 29

1    A    I can remember two.
2    Q    Did you say two of the 20?
3    A    Yeah, that -- that's what I can remember.  It
4  just doesn't stick in my mind.  It's -- there's a lot of
5  things that has passed through this old mind.
6    Q    I understand.  And when you first joined the
7  Russellville Police Department, were you provided in
8  their policies and procedures?
9    A    I was.
10    Q    In what form?
11    A    In a booklet.
12    Q    Were any of those policies updated during your
13  tenure?
14    A    They were.  They were just about updated every
15  year.
16    Q    And how did they make you aware of those
17  updates?
18    A    They would put out the -- the new updates and
19  you would have to pull the old policies out of the book
20  and put the new ones in, read it, and understand it. And
21  there was training on it if you didn't understand it
22  and...
23    Q    How did they verify that you had read the new
24  policies?
25    A    That one can't really remember.  It seems like

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1   we had to sign off on them, but I can't remember.
2       Q    And you mentioned that if you didn't
3   understand the policy, they would provide training.  How
4   did you -- how would you communicate that you didn't
5   understand something?
6       A    Usually it was just the moment of, "Can you
7   explain this to me and how it should work?"
8       Q    Do you ever recall -- did you ever -- let me
9   strike that.  Did you ask for clarification on any
10  policies during your time at the Russellville Police
11  Department?
12      A    Not that I can remember.
13      Q    And did the Russellville Police Department
14  provide you a specific training when you joined the
15  department?
16      A    Besides the training from the Department of
17  Criminal Justice?
18      Q    Correct.
19      A    I -- I can't remember.  I know we had lots and
20  lots of training, but I'm pretty sure that the
21  Department of Criminal Justice is the one that put all
22  those on.
23      Q    So the Russellville Police Department did not
24  provide you with any training when you joined the
25  department?

Page 31

1       A    I did go through a field training period,
2   which I think was about 10 weeks.  So I guess that was
3   sort of one-on-one training kind of a thing.
4       Q    Was that -- would that be on-the-job training?
5       A    Yeah.  Yeah, I guess that would be on-the-job
6   training.
7       Q    So explain to me how that worked.
8       A    You're assigned to a senior officer and for 10
9   weeks they ride with you and watch what you're doing and
10  advise you on how to maybe do it better or differently.
11      Q    So that was -- fair to say that was more
12  informal training?
13      A    Yeah, I would say so.  Yeah.
14      Q    Did the Russellville Police Department have
15  any formal classes on their policies?
16      A    I can't remember.  As far as the entire
17  department getting together for those, I don't remember
18  that, but I'm thinking that each shift that did their
19  training on policy.
20      Q    Sorry.  You're thinking that each shift did
21  what on policy?
22      A    Did training on policy.
23      Q    And what form did that training take?
24      A    Going over the policies, reading them, making
25  sure that everyone was on the same standard, understood

Page 32

1   it.
2       Q    So it was -- fair to say it was more, I guess,
3   oral communications from supervisors?
4       A    I would say so, yeah.
5       Q    And you don't recall that you required to have
6   any formal training on those policies, correct?
7       A    I don't recall.
8       Q    Now before September 2004, were you given any
9   training by the Russellville Police Department on
10  interviewing witnesses?
11      A    Yeah, I can't remember.  It's been so much
12  training.  It seems like that I had taken a detective's
13  class for one of my 40-hour trainings through the
14  Department of Criminal Justice, but I'm sorry, it's just
15  been so long.
16      Q    No, I understand.  It's been a long time and
17  we certainly don't want you to guess at what, you know,
18  what training you may or may not have.  So I've -- I
19  guess it's fair to say you don't recall any specific
20  training from the Russellville Police Department on
21  interviewing subjects?
22      A    Yeah.  At this point in time, it all just sort
23  of blends together for me, you know, it -- I'm sorry.  I
24  can't give you any specific trainings that really stood
25  out for me or anything.  It just sort of done and over

Page 33

1   with.
2       Q    And would you say -- were you given any
3   specific training before September 2004 by the
4   Russellville Police Department on properly documenting
5   interviews?
6       A    I can't remember.  I'm sorry.
7       Q    Did you ever audio record interviews?
8       A    Not that I can remember.
9       Q    Why not?
10      A    I don't know.  I don't know if we just didn't
11  have a recorder or what that situation was, but I can't
12  remember using a -- a recorder.
13      Q    How did you document notes?
14      A    Just took notes and wrote down the questions
15  and the responses.  Now I do know later on, I don't --
16  can't tell you when, but they did set up an interview
17  room that was video recorded, but that was well after my
18  time of taking interviews and doing those type things.
19      Q    But if you were just out on a scene, say
20  interviewing somebody, you didn't have -- you never had
21  a recording device?
22      A    No, no.  The -- at one point in time, the cars
23  had recording devices.  Then of course, they moved over
24  to the personal recorders.  I can't tell you what years
25  or anything else that was.  And I do know that that was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ROGER McDONALD, taken on February 25, 2022

34..37

Page 34

1 moved to at some given point in time, but I don't know
2 when.
3      Q    But you never had a practice of audio
4 recording interviews?
5      A    No.  I never really did that many interviews.
6      Q    Do you recall other officers who had audio
7 recorded interviews?
8      A    I can't recall it.  I didn't sit in and listen
9 to interviews and things, so I can't say what others
10 did.  I don't know.
11      Q    So if you were just out on a scene, did you
12 carry a notebook with you?
13      A    Yeah.  I always had a paper notebook, things
14 that I could write things down on.
15      Q    And you would document in those notes all the
16 information you believed to be relevant?
17      A    That would be correct.
18      Q    And were you required to turn in your reports?
19      A    Yeah.  Everyone had to turn in their reports.
20      Q    Who did you -- or -- let me strike that.  How
21 did that process work?
22      A    We filled the reports out on the computers,
23 and then they were printed off, and then there was a
24 hard copy.  And then the -- the electronic copy actually
25 goes to the state and it's stored somewhere within all

Page 35

1 their computer things.
2      Q    And is that how the process worked in 2004?
3      A    I don't think that they were quite that far
4 along with the state keeping those.  I don't remember
5 what year all that happened.  But before we had
6 computers, we hand wrote all the reports, and then when
7 we moved into the computer age that's when we started --
8 I think we started out keeping it on a floppy drive,
9 maybe.  You remember those?
10      Q    I do.  I do.  And so in 2004, what -- what
11 would you then do with your handwritten report?
12      A    It would go into a folder, then it goes to the
13 clerk, the secretary, and then it gets filed.
14      Q    And where would the clerk -- who did the clerk
15 file it?  Where -- who did that go to?
16      A    The city had filing cabinets that were secure
17 in the clerk's office and that's where you would find
18 all the reports.
19      Q    Were your notes attached to those reports?
20      A    Mine was, when I had notes to attach.
21      Q    And how did you decide whether to attach those
22 notes?
23      A    If I had notes, it went in there.
24      Q    So all -- you would attach all of your notes
25 to your report?

Page 36

1      A    Yes, but sometimes there were no notes.  You
2 know, nothing that I had written down on the pad.
3      Q    Was that a requirement that you attach your
4 notes?
5      A    It's just something that I always did.  I
6 don't remember if it was a requirement or not, but it
7 was the right thing to do.
8      Q    And why do you say it was the right thing to
9 do?
10      A    Well, it could be something in there that you
11 would want to go back and take another look at it to
12 either prove the innocence or guilt of someone.
13      Q    But you don't recall that there was any -- and
14 there was -- strike that.  You don't recall any specific
15 policy requiring officers to attach their notes to their
16 reports?
17      A    No, I'm pretty sure that that was part of the
18 -- just basic training that you got to make sure that
19 everything was put into your reports, even your notes.
20      Q    And so once the clerk had filed those, how
21 would you -- could you access those again?
22      A    Yeah.  You would have to go into the clerk's
23 office and manually pull the -- the report.  And there
24 was a -- like a sign in and out log at that point in
25 time.  If you pulled a report, you signed it out and

Page 37

1 then when you brought it back, it was signed back in.
2      Q    In 2004 would any officer have access to those
3 reports?
4      A    Sorry.  I -- I can't remember.  There was so
5 many changes through the 24 years I was there.  It's --
6 it's hard to put all that together.  When the changes
7 came, who had access, who didn't.  I know from -- the --
8 the clerk's office, she just worked like from 8:00 to
9 5:00 and that was the only time that you could really
10 access getting to the reports.
11      Q    But you don't recall any restrictions on which
12 officers could access certain reports?
13      A    I don't recall.  I'm sorry.  I'm -- I'm just
14 getting old.  And once again, my mind is just so full of
15 stuff.  I just don't remember anymore.
16      Q    I understand.  I know it's been a long time
17 and it's been a long career.  So I'm just seeing what
18 you remember.  Deputy McDonald, are you familiar with
19 Brady versus Maryland?
20      A    That's a Supreme Court case, I'd say, but I'm
21 not familiar with it.  I'm sorry.
22      Q    You don't know what it requires police
23 officers to do?
24      A    I may have studied it at one given point in
25 time, but I can't remember what the basics of the case

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of ROGER MCDONALD, taken on February 25, 2022

38..41

---

Page 38

1  was and...
2      Q    So in 2004, did the Russellville Police
3  Department have a policy in place about what information
4  should be disclosed to prosecutors?
5      A    I don't know.  I can't remember.  I'm sure
6  that -- we always gave them everything that we had.  We
7  -- you know, I cannot remember a single time that I
8  didn't give them everything I had.  But I can't speak
9  for anyone else, you know, it's just what I did.
10      Q    So fair to say you don't recall any specific
11  policies about what information needed to be disclosed?
12      A    No, I don't recall it.
13      Q    So you responded to the scene of a fire at 638
14  Bonnie Drive on September 11, 2004; is that correct?
15      A    That's correct.
16      Q    Who called you to the scene?
17      A    It was dispatched over the radio.
18
19
20      Q    What do you remember about that dispatch?
21      A    It was a structure fire maybe or someone
22  calling for assistance, help.  I can't remember.
23      Q    What information were you provided in the
24  dispatch?
25      A    Usually it was the location that we needed to

---

Page 39

1  go and the general nature of the complaint that we were
2  answering.
3      Q    So you don't recall specifically the dispatch
4  that you received in this case?  You're just saying,
5  generally, that's how the dispatch would've worked?
6      A    Yeah, that's correct.  This -- I'm sorry.  This
7  case is not like implanted in my brain or anything.  It's
8  just -- just another call that was answered for me.
9      Q    Yeah.  I'm just trying to make sure we, you
10  know, understand what you are, you know, specifically
11  remembering versus how things, you know, typically
12  worked.  So I'm just trying to make sure we're clear on
13  that.  Now, you were a supervisor at the time.  Was it
14  unusual for you to be called to respond to a scene?
15      A    No, it was just a small department.  You
16  basically responded to most everything to see if you
17  could help the officers.  And if they needed help, you'd
18  help them, and if not, you'd move on to the next call.
19      Q    How many officers were in the Russellville
20  Police Department in September of 2004?
21      A    That's a really hard question.  I don't know.
22  I've seen them as low as maybe 14 officers and as high
23  as maybe 26, but I can't tell you at that given point in
24  time how many officers that they had.
25      Q    So somewhere -- in 2004, it would've been

---

Page 40

1  somewhere between 14 and 26?
2      A    Somewhere in that range.  Yes.
3      Q    So how did -- how did the dispatch in turn --
4  let me strike that.  How was it determined who to
5  dispatch to a scene?
6      A    Usually they -- of course each officer had a
7  unit number and they would -- dispatch would pick out
8  one number and say, "We got a call here, there, or
9  somewhere else."  And usually there was more than one
10  officer -- excuse me.  That would answer the calls.  We
11  tried to send at least two officers to each call for
12  safety.  And if it was a -- larger call that needed
13  more help, you know, the officers would just respond.
14      Q    What was your unit number?
15      A    820.  8-2-0.
16      Q    And that was a number that's -- every officer
17  had their own unit number?
18      A    That's correct.  820, 821, 819.  Every officer
19  has its own individual unit number.
20      Q    Now, do you recall, was this fire one that
21  would have -- they would've called all officers to the
22  scene?
23      A    I don't remember.  Usually, that -- at that
24  point in time, if it was like a bigger type emergency,
25  they would like do a tone before they dispatched it that

---

Page 41

1  got everyone's attention and let them know that,
2  "Hey, this is a bigger type call." But as far as
3  individually dispatching multiple units, I don't think
4  that usually happened.  If you needed more help on the
5  scene, you would just ask for more help and more
6  officers would come.
7      Q    So would a fire -- would this fire qualify as
8  a what you're describing as a bigger scene?
9      A    Yeah.  With the people on the inside of a
10  burning building, that's a pretty good scene.  And then
11  of course you got tons of onlookers and you have to try
12  to keep them safe, keep them away from everything.  And
13  it just gets pretty chaotic.
14      Q    And so when you arrived on this scene, what
15  did you observe?
16      A    I remember a single wide house trailer.  Seems
17  it had maybe heavy smoke coming out of it, maybe flame.
18  I don't remember.  And I remember the fire department
19  getting there, other officers.  That's pretty much what
20  I remember.
21      Q    What -- where did you approach the trailer
22  from?
23      A    From the front side off of Bonnie Drive.
24      Q    I'm going to show you -- let me pull up this
25  image for you.  Are you able to see this image on my

---

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

1   screen here?
2       A    (No verbal response.)
3       Q    Sorry, I didn't catch that.  Can you say that
4   again?
5       A    Oh, I'm sorry.  I forgot to push the button.  I
6   do see the screen.
7       Q    And we'll mark this, this will be Exhibit 1.
8   It's RPD 1355.  And so when you were saying you were on
9   the front of Bonnie drive, where was Bonnie Drive
10  located in this image?
11       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
12      A    I believe it would be down at the lower part
13  of the screen.
14      Q    So down over here?
15      A    I believe that's correct.
16      Q    Okay.  And do I have that street running the
17  correct way?
18      A    Yes, you do.
19      Q    And the -- is the front door right here?
20      A    I think so.  I think the -- there was a small
21  porch or something on -- attached to the trailer.
22      Q    Okay.  But that's generally what you recall is
23  being Bonnie Drive in the front of the house?
24      A    Yeah.  That's right.
25      Q    And you approached from Bonnie Drive?

Page 43

1       A    Yes --
2       Q    Correct?
3       A    -- yes.  That's correct.
4       Q    Do you remember which direction?
5       A    I don't -- I don't know.  It -- Bonnie Drive
6   you could approach from either end, but I don't remember
7   which way I came in and I don't remember exactly where I
8   parked.  I just remember it was on the Bonnie Drive area
9   there.
10      Q    So let me show you Exhibit 3 here, which is
11  AG8.  Do you recognize this?
12       (EXHIBIT 3 MARKED FOR IDENTIFICATION)
13      A    That looks like the trailer on Bonnie Drive.
14      Q    And that is -- Bonnie Drive is this road
15  running along here?
16      A    That's correct.
17      Q    And that's where -- so you pulled up -- drove
18  up somewhere on Bonnie Drive here?
19      A    That's correct.
20      Q    All right.  And you mentioned that you saw
21  smoke.  Was there somewhere specific that the smoke was
22  coming from?
23      A    I don't remember if it was like coming out of
24  doors or windows or if it was just smoke.  I just
25  remember heavy smoke.

Page 44

1       Q    And you mentioned that you also saw flames.
2   Was there somewhere specific that you saw flames coming
3   from?
4       A    I don't remember saying I saw any flames, but
5   I -- once again, I -- I -- I can't remember if -- it was
6   just heavy smoke.  I don't remember flames -- no flames.
7   I'm sorry, it's just been so long.
8       Q    I -- I understand.  It's -- its -- it's been a
9   long time.  So you saw -- fair to say, you're sure you
10  saw heavy -- heavy smoke at that -- by the point that
11  you arrived?
12      A    Yes.  I -- I'm -- I'm pretty sure that I
13  remember the -- the heavy smoke.
14      Q    And did you approach the trailer when you
15  arrived?
16      A    No, I -- I didn't.
17      Q    Where were you physically located?
18      A    Somewhere there on Bonnie Drive.  I -- I can't
19  remember if I was closer down to the church or further
20  up the street.  At that point in time, I was probably
21  more worried about keeping access for the fire
22  department to get in and do their job.
23      Q    So you remained on the street when you
24  arrived?
25      A    That's what I remember -- I -- I don't

Page 45

1   remember going per se up to the trailer.  I'm pretty
2   sure I never went inside.  Matter of fact, I'm almost
3   positive I -- I never went inside.  Once again, I -- I'm
4   sorry.  I just -- I don't remember a lot about it.
5       Q    Do you recall about how far away you would --
6   you were from the trailer?
7       A    I would say that -- depending on -- on points
8   in times, I didn't just stand in one spot.  I -- I was
9   moving up and down Bonnie Drive and trying to take care
10  of everyone that was around, make sure that the
11  bystanders stay back and all the officers stayed as safe
12  as they could and let the fire department do their job.
13      Q    What do you recall about bystanders being
14  there?
15      A    With -- a lot of things, especially fire.
16  There's a lot of people that come out of the
17  neighborhoods and like to stand around and watch
18  everything that's going on.
19      Q    How many people would you estimate were --
20  were there?
21      A    20, 30, it could have been more, but it wasn't
22  a large, large crowd, but for the city of Russellville,
23  it looked pretty large especially with everything else
24  going on with firefighters, officers, trucks,
25  everything.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 14 of 37 PageID
#: 2999
The Deposition of ROGER McDONALD, taken on February 25, 2022
46..49

Page 46

1    Q   And how long after you received the dispatch
2 did it take you to arrive at the scene?
3    A   Honestly, I -- I have no clue.  It could've
4 been just a few minutes or it could've been five minutes
5 depending on where I was located, how heavy the traffic
6 was.  I -- I'm sorry, I can't really tell you how long
7 it took me to get there.
8    Q   That's okay.  When you arrived what officers
9 were already at the scene?
10   A   That's another one that I -- I don't remember.
11 I can't tell you specifically who was there, what order
12 they got there in.  That's just another thing that's
13 faded in my memory.  I -- I don't remember.
14   Q   Was Officer Mills there?
15   A   Officer Mills was there, yeah.
16   Q   Was Officer Higgins there?
17   A   Yes.  And I'm speaking on the scene that --
18 not when I got there, I -- I don't remember.  But yes,
19 Officer Mills, Officer Higgins, I do remember them being
20 there.
21   Q   Did you speak to either of them?
22   A   I probably spoke to everybody on the scene at
23 some given point in time.
24   Q   Did -- can we take a -- maybe a ten-minute
25 break here?  Is that all right with you, Deputy?

Page 47

1    A   It is.  I'm okay with that.
2   Q   Okay.  Let's go off the record.
3    VIDEOGRAPHER:  We are off the record, the time
4 is 11:05 a.m.
5    (OFF THE RECORD)
6    VIDEOGRAPHER:  We are back on the record for
7 the deposition of deputy Roger McDonald, being
8 conducted by video conference.  My name is Sydney
9 Little.  Today is February 25, 2022 and the time is
10 11:18 a.m.
11 BY MS. CAMPBELL:
12   Q   All right, Deputy.  Now, you testified earlier
13 that you could not recall which officers were on the
14 scene before you arrived; is that correct?
15   A   Yeah, that's correct.
16   Q   And you weren't -- you could not recall which
17 -- what time you arrived; is that correct?
18   A   That's correct.
19   Q   All right.  I'm going to show you a document,
20 hopefully that can -- that may refresh your
21 recollection.  Are you able to see this on my screen?
22   A   I can see it.
23   Q   Okay.  We'll mark this Exhibit 4.  It's RPD1
24 through 7.  Deputy, do you recognize this document?
25    (EXHIBIT 4 MARKED FOR IDENTIFICATION)

Page 48

1    A   That looks like the -- the old CAD document.
2   Q   And you're familiar with those from in your
3 experience as a -- as an experienced law enforcement
4 officer?
5   A   Yes.
6   Q   All right.  And if we go down to RPD3, what
7 information does this page provide here?
8   A   Well, it seems that I went on the scene at
9 19:38 and looks like the first unit arrived at 19:25.
10   Q   And I apologize, it was scanned into us very
11 crooked, so it's a little bit hard to read, but you're
12 seeing -- when you say you're arriving at 19:38, you're
13 looking at your unit number 820 here?
14   A   Yes, that's correct.
15   Q   And 19:38 would be 7:38 p.m., correct?
16   A   That's correct.
17   Q   And what does 1097 mean?
18   A   You've arrived on the scene.
19   Q   All right.  And according to this document,
20 unit 831 arrived at 19:25?
21   A   Uh-huh.  That's correct.
22   Q   And that -- 831 is Officer Mills, correct?
23   A   I think that's correct.  There's so many
24 numbers and so many people.  I -- I -- I can't really
25 tell you anyone's number anymore, but mine.

Page 49

1    Q   I -- I'll represent to you that Officer Mills
2 is unit 831.  So it appears from this CAD sheet that he
3 arrived at 19:25, correct?
4   A   That's correct.
5   Q   And that'd be 7:25 p.m., correct?
6   A   Uh-huh.
7   Q   So that's about 13 minutes before you arrived
8 on the scene, correct?
9   A   Yes, if my math is right, that's about right.
10   Q   And then unit 834 -- let me see if I can --
11 it's right here.  834 arrived -- unit 834 arrived at
12 19:34; is that correct?
13   A   No.  I think if you go up underneath 831, it
14 shows he 1097, right there, yeah, at 17:25 also.
15   Q   You're right.  I appreciate that.  I was
16 looking at -- what does LOG mean?
17   A   That -- that's -- they logged it into the --
18 the system and the request for EPB, I think that was for
19 the electric plant board.
20   Q   Understood.  So 834 was Officer Higgins?
21   A   I believe that's correct, but once again, I'm
22 not positive.  So many names and numbers and -- and it's
23 just been a while.
24   Q   So yeah, I'll represent to you that 834 is
25 Officer Higgins.  So both -- according to this sheet,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1  both Mills and Higgins had arrived on the scene about 13
2  minutes before you did.
3       A    Right.
4       Q    All right.
5       A    Thank you for the break.
6       Q    No problem.  Just let me know if you need one.
7  And I think you testified earlier -- do you recall any
8  specific conversations with Officers Mills or Higgins
9  when you arrived?
10      A    No, I -- I'm sorry.  I -- I don't recall any
11 conversations.  I remember being there, but that's about
12 all I really remember.
13      Q    Did you see anyone enter the structure?
14      A    The -- the fire department was there.  I'm --
15 I'm pretty sure.  Of course, the -- the -- they would've
16 entered, but I cannot give you any person that -- that I
17 remember going in or not going in or...
18      Q    What do you remember the -- what do you
19 remember the fire department doing at that point?
20      A    Lots of firemen spraying water.  I don't
21 remember them entering the -- the -- the trailer, but
22 I'm -- I'm sure they did because that -- that's how that
23 they -- you -- you fight fires.  You have to go in and
24 spray water on the fire.  But I'm not sure what firemen
25 went in.  I don't know.

Page 51

1       Q    So you don't recall seeing anybody -- you
2  don't specifically recall seeing anyone actually enter
3  at the trailer?
4       A    No.  No, I -- I don't, I'm sorry that -- it's
5  been so long and my memory is just bad.  It's...
6       Q    No need to apologize.  I know you've been --
7  been to a lot of scenes.  So did you --
8       A    After a while, they just seem to blend
9  together, if -- sorry.
10      Q    -- did you see a -- a child on the scene that
11 may have been taken from the home?
12      A    I -- I do remember a -- a small child being
13 brought out in a blanket.  And I can't remember who
14 brought the child out, but I do remember that they
15 seemed like they laid the child on -- on the ground.  And
16 I -- I'm not sure what happened after that EMS or who
17 came and -- and gave -- you know, tried to take care of
18 the child.  But I do remember a small child in -- coming
19 out in a blanket and being laid down.
20      Q    Was that the baby, SaraLynn?  Do you know?
21      A    No, I -- I don't know.  I can't remember
22 how many children was -- or was in the trailer house.
23 Names I don't even know and -- and Mr. Yell, I -- I
24 can't even remember his first name and the only way I
25 know Mr. Yell is when I got notice of the deposition.

Page 52

1       Q    So did that -- did you see -- are you familiar
2  with April Carpenter, the mother?
3       A    Seemed that we had answered some calls over
4  there, within the last week or two or three, but I --
5  I'm not familiar with her.  And if she was sitting in --
6  in -- three people here, I couldn't pick her out.
7       Q    Did you recognize -- did you see her on the
8  scene that you recognized?
9       A    I can't remember.  I'm sorry.
10      Q    That's okay.  So you've testified that you saw
11 smoke -- heavy smoke and firefighters on the scene.  Was
12 the fire still growing at the point that you arrived?
13      A    Once again, I -- I don't remember.  I just
14 don't know.
15      Q    Do you -- did you see any windows blow out of
16 the house?
17      A    I -- I saw no explosion, no flash over that I
18 can remember.  Nothing that, you know, would set that
19 memory in my mind.  I just don't -- don't remember.
20      Q    Now, at some point you saw Mr. Yell come
21 around from the side of the trailer to the front of the
22 trailer; is that correct?
23      A    Maybe.  I can't say yes or no.  I don't -- I -
24 - I -- I don't remember.  I do -- I do remember Mr. Yell
25 was arrested and -- because he was very intoxicated.  But

Page 53

1  as -- as far as seeing him come around the trailer, I
2  don't remember.
3       Q    All right.  Let me -- do -- do you remember
4  seeing Mr. Yell on the -- did you see Mr. Yell on the
5  scene before -- before he was later arrested?
6       A    I can't remember.  I'm sorry.
7       Q    Let me show you -- are you able to see this on
8  my screen?
9       A    Yes.
10      Q    All right.  We'll mark this as exhibit -- oh,
11 I think I might've made a mistake on the exhibits, but -
12 - I think this will be Exhibit 3 and it is Yell 9162
13 through 9172.
14           COURT REPORTER:  Molly, I think you've already
15      marked Exhibit 3.  I think it was number two that
16      you skipped.
17           MS. CAMPBELL:  Okay.  We'll mark this as
18      Exhibit 2, thank you.
19 BY MS. CAMPBELL:
20      Q    All right.  Let me have you -- let me go down
21 to this page here.  Do you recall testifying at
22 Mr. Yell's trial?
23           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
24      A    I'm sorry, I don't.  I do see that I was a
25 patrol captain at that point in time though.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

```
1    Q    But you don't have any independent -- you have
2  no independent recollection of testifying at Mr. Yell's
3  trial?
4    A    I don't.
5    Q    All right.  And according to -- to this
6  transcript -- this is your testimony from the trial.
7  I'll let you read from line 14 here through 22.
8    A    Okay.  "And when you arrived, did you see a
9  person walking around the residence?  After I was there
10 a few minutes, I did see a person walk around the mobile
11 home.  The fire was coming out the window.  I commanded
12 that person to come away from the mobile home.  And he
13 took" -- he took "a step or two and he stopped.  And I
14 approached that subject and took him by the arm and
15 started to lead him away from the mobile home."
16   Q    So according to this -- this document, you saw
17 Mr. Yell coming around the side of the trailer, correct?
18   A    Now that is correct.
19   Q    And you commanded him to step away?
20   A    Uh-huh.
21   Q    And Mr. Yell took a step or two and stopped,
22 correct?
23   A    Uh-huh.  That's what I testified to, yes.
24   Q    And you approached him, correct?
25   A    Uh-huh.  Uh-huh.
```

Page 55

```
1    Q    And you took him by the arm and started to
2  lead him away from the trailer, correct?
3    A    That's correct.
4    Q    And Mr. Yell did not want to leave the area of
5  the home; is that correct?
6    A    I would say so.  If he -- if he stopped and I
7  would say he didn't want to leave, yeah.
8    Q    And your concern at this point was the safety
9  of the scene, correct?
10   A    Uh-huh.  The safety of --
11   Q    But you were -- you were concerned about
12 Mr. Yell's -- Mr. Yell's safety?
13   A    Uh-huh.
14   Q    Because at that point there was -- you know,
15 the -- there was fire and smoke -- heavy smoke, correct?
16   A    Right, right.
17   Q    So you were concerned that he might injure
18 himself if he got any closer to the home, correct?
19   A    Correct.
20   Q    And you were concerned that he might be trying
21 to enter the home?
22   A    I just knew that the -- the -- the fire was
23 going on and he was very close to that proximity and in
24 a place that he didn't need to be.
25   Q    And when you say very close to that proximity,
```

Page 56

```
1  what do you mean by that?
2    A    Very close to where the fire was -- the -- the
3  -- the trailer.  That proximity it -- I don't remember
4  how many feet away he was from the trailer, but it
5  wasn't 40 feet away.  It -- it -- he was pretty close, I
6  think.
7    Q    So by pretty close, he was less than 40 feet
8  from the trailer when you stopped him?
9    A    Uh-huh.
10   Q    Was he maybe more -- more or less than 20
11 feet?
12   A    Once again, I can't remember exactly how close
13 it was, but it was close enough to catch my attention
14 and need to move him from the area.
15   Q    Was he -- was there a front door that he -- a
16 door that he was approaching?
17   A    I -- I -- I -- I can't remember.  I just know
18 the trailer was on fire and he didn't need to be there,
19 so...
20   Q    You were -- you were -- you were concerned
21 that he -- as the owner of a structure that was on fire
22 of the child inside that he might be trying to get into
23 the home?
24   A    Well, I honestly didn't know who he was.
25   Q    When you stopped him, could you feel the heat
```

Page 57

```
1  from the fire?
2    A    I don't remember.  I'm sorry.
3    Q    Do you -- do you remember breathing in smoke
4  at that point?
5    A    I don't remember that either.  I don't
6  remember.
7    Q    So at trial you testified that Mr. Yell
8  passively -- was passively resisting when you stopped
9  him.  What does that mean?
10   A    That he -- he wasn't complying with the
11 request.  He was not fighting, but yet when -- evidently
12 when I took him by the arm, it was that moment of not
13 moving with me.
14   Q    And that -- that testimony was accurate?  That
15 Mr. Yell was passively resisting you?
16   A    Hang on just a second.  Let me read.
17   Q    Okay.
18   A    Okay.  Yes, according to my testimony, that --
19 that is -- I -- I tried to move him away and he wouldn't
20 move.
21   Q    So he -- he wasn't trying to fight you at that
22 point, correct?
23   A    Right, right.
24   Q    He just -- he just didn't move -- he didn't
25 move with you; --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 17 of 37 PageID
#: 3002
The Deposition of ROGER MCDONALD, taken on February 25, 2022

58..61

Page 58

1    A    Right.
2    Q    -- is that fair to say?
3    A    Yes.  And I -- I -- I don't remember having to
4  actually fight with Mr. Yell that night.
5    Q    So you never -- you never experienced any
6  active resistance from him, correct?
7    A    Right.  No -- no punching, no pulling away, no
8  -- nothing like that, that I can remember.
9    Q    And Officer Mills helped you move away --
10 helped you move Mr. Yell away from the trailer, correct?
11   A    I'll -- I'll have to see more testimony.  I --
12 I can't remember.
13   Q    I think if you look -- starting at line 15
14 here.
15   A    Uh-huh.  Okay.
16   Q    So according to your testimony, you and
17 Officer Mills helped move Mr. Yell away from the
18 trailer, correct?
19   A    That is correct.
20   Q    And you dragged him -- or you -- I guess you
21 took him to the -- took him to the side of the street?
22   A    That one, I can't remember either.  I don't
23 see the tree.
24   Q    Let's highlight that for you.  Or at least you
25 dragged him -- sorry.  You dragged him away from the

Page 59

1  trailer.
2    A    Yeah.  Yeah.  We moved him.  I don't remember
3  dragging.  But I honestly don't remember putting him
4  down on the ground either.
5    Q    So you have no independent recollection of --
6  recollection of putting Mr. Mills to the ground -- or
7  sorry, putting Mr. Yell to the ground?
8    A    No, I don't remember it.
9    Q    You were just trying -- you were just trying
10 to get him away from the trailer for his own -- his own
11 safety, correct?
12   A    Correct.  Correct.
13   Q    And that's because, if we look down here on
14 Yell 9171, you were in close proximity to the trailer,
15 the heat was extensive, and it was an exigent
16 circumstance; is that correct?
17   A    That's correct.  Yes.  Once again, I'm sorry
18 that I can't remember it, but it's just been so, so long
19 and so many things.
20   Q    No need to apologize.  Now, Mr. Yell, I think
21 you mentioned earlier was intoxicated when you observed
22 him at the scene?
23   A    Yeah.  I think my testimony was that he was
24 unsteady on his feet and smelled of alcohol.
25   Q    Did you smell anything else on Mr. Yell?

Page 60

1    A    Not that I can remember, but...
2    Q    You never smelled any gasoline, correct?
3    A    No.  At that point in time, I don't remember
4  even -- without the testimony, smelling the alcohol or
5  anything.
6    Q    So you have no -- no recollection of smelling
7  any substances on Mr. Yell other than the alcoholic
8  beverages, correct?
9    A    Yeah.  I just don't remember it.  At this
10 point, I don't remember smelling gasoline, or alcohol,
11 or anything else.
12   Q    And if you had smelled anything on Mr. Yell,
13 you would've testified to that, correct?
14   A    I should have, yes.
15   Q    After you got Mr. Yell away from the trailer,
16 he was placed under arrest at that point?
17   A    I can't remember.
18   Q    Did you have any further interactions with
19 Mr. Yell?
20   A    Not that I can remember.
21   Q    What happened -- what happened after you moved
22 to Mr. Yell away from the trailer?
23   A    Honestly, I can't tell you.  I don't remember.
24 I just don't.
25   Q    Did you hear -- did you ever hear Mr. Yell

Page 61

1  make any statements?
2    A    It's not in my -- my memory.  I don't know.
3  Without seeing some documents to, you know, maybe jar my
4  memory.  It's just really blank.
5    Q    You never heard him make any threats, correct?
6    A    Not that I -- I remember.  And once again,
7  it's just, I don't remember.  It's just not there.
8    Q    And if you had heard him make any threats to
9  anyone, you would've documented that, correct?
10   A    That would've been my procedure, yes.
11   Q    Did you hear -- did you say anything to Mr.
12 Yell during this interaction?
13   A    Besides move away from the trailer?  And I
14 don't even remember saying that.  I just read it in a
15 testimony.  I don't remember having conversation with
16 him or anything.  I just don't remember.  I don't even
17 remember having conversation with the officers what were
18 said or anything.  It just --
19   Q    Sorry to interrupt you.  Do you recall
20 learning -- you mentioned earlier, you didn't know --
21 hold on.  Give me one second here.
22   A    Okay.
23   Q    Let me show you -- this is your trial
24 testimony at Yell 9171.  If you look at this highlighted
25 part here.  According to this testimony, did Mr. Yell

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  make any statements to you?

2      A    It doesn't look like he made any statements to

3  me.

4      Q    And if he had made some statement -- if you

5  had heard him make any statement, you would've testified

6  accordingly, correct?

7      A    Absolutely.

8      Q    And your testimony is that Mr. Yell never --

9  never was resisting you, correct?

10     A    Only passive resistance, but not moving away.

11     Q    So you never -- you never sprayed Mr. Yell

12  with any -- let me stop sharing this.  You never sprayed

13  Mr. Yell with any chemical spray, correct?

14     A    That's correct.  Luckily, during my whole

15  career I've never used chemical sprays on anyone.

16     Q    Never in your whole career?  That's

17  impressive.

18     A    I have just been able to talk people down.  I

19  try not to be violent.

20     Q    So in your view, chemical spray is only used

21  in an extreme situation, correct?

22     A    That would be for me, yes.

23     Q    Did you observe anyone else spray Mr. Yell?

24     A    I did not.

25     Q    Did you tase Mr. Yell?

Page 63

1      A    I've never packed a taser in my whole career.

2      Q    Did you observe anyone else tase him?

3      A    No.  I'm not even sure if we had tasers at

4  that point in time.  But no, I don't remember anyone

5  tasing him.

6      Q    Did you strike Mr. Yell in any way when you

7  were on the scene?

8      A    No, not that I'm aware of.  I'm not the

9  striking type.

10     Q    Did you observe Officer Higgins strike

11  Mr. Yell?

12     A    Not that I can remember.

13     Q    Did you observe anyone strike Mr. Yell in any

14  way?

15     A    Not that I can remember.

16     Q    Did you observe a cut on Mr. Yell's lip on the

17  scene?

18     A    And once again, I'm sorry.  I can't even think

19  of what Mr. Yell looked like, what he was wearing.  I

20  may have testified to that.  If you can show me the

21  document, but I don't remember.

22     Q    No, I'm just asking from your memory.  You

23  have no recollection of any -- any injuries to Mr.

24  Yell's face?

25     A    No, I don't remember any injuries whatsoever.

Page 64

1      Q    And Officer Mills later char -- I think you

2  testified to this earlier that Mr. Yell was charged with

3  alcohol intoxication and disorderly conduct.  Did you

4  approve those charges?

5      A    No, I didn't have to approve them.

6      Q    So Officer Mills would have authority to do

7  those charges without seeking your approval?

8      A    Correct.

9      Q    Did you review those charges?  Meaning, I

10  guess let me strike that.  Were you aware that he was

11  bringing those charges against him?

12     A    I can't remember.  We didn't discuss it, I

13  don't think, but I'm not sure.

14     Q    So you never discussed the alcohol

15  intoxication charges -- charge with Officer Mills to

16  your recollection?

17     A    Not that I can remember.

18     Q    Now, did you remain on the scene after dealing

19  with Mr. Yell?

20     A    I don't remember.  I would have to look at the

21  -- the CAD to see when I left, but I don't think that I

22  left the scene until everything was pretty much over.

23     Q    And when you say pretty much over, what does

24  that mean?

25     A    The -- the fire was put out.  The -- the on-

Page 65

1  call detective was on scene.  At the point in time, we

2  could go back to our normal patrol duties.

3      Q    Now, did you secure Mr. Yell in the patrol

4  car?

5      A    No, I don't think I did.  I can't remember

6  putting him in my car.  I don't even know how close my

7  car was to the proximity of the trailer.  I don't

8  remember putting him in my car.

9      Q    Do you recall putting him in Mr. Higgins' car?

10     A    I don't recall.

11     Q    Now, when did you learn that the fire was a

12  suspected arson?

13     A    I'm not sure.  I don't know if some of the

14  firemen on the scene may have said it was possible

15  arson.

16     Q    You may have learned that information on the

17  scene, correct?

18     A    Maybe.  Yes.

19     Q    Do you recall any officers telling you that?

20     A    No.  Once again, I can't remember any

21  conversations between any of the officers or anything.

22     Q    Sorry, I didn't mean to interrupt you.  So you

23  recall that you may have learned it could have been an

24  arson on the scene, but you don't recall specifically

25  who you learned that from; is that fair?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

```
 1      A    No.
 2      Q    No, meaning that is -- that is a fair
 3  characterization?
 4      A    I'm sorry.  Say again.
 5      Q    So you -- so fair to say that you recall you
 6  may have learned that it was an arson on the scene, but
 7  you don't recall how you might have learned that
 8  information; is that fair?
 9      A    I would say that was fair.  I just don't
10  remember.
11      Q    Did you learn that Mr. Yell was a suspect?
12      A    I don't remember that either.
13      Q    Did you speak to any witnesses on the scene?
14      A    Sorry, I just -- I don't remember.
15      Q    Did you ever speak with any fire
16  investigators?
17      A    I know I had conversation with some of the
18  investigators, but I can't tell you what that was.  And
19  I can't even tell you if it was the night of the fire.
20      Q    And maybe if I give you a few names.  Are you
21  familiar with Sam Flowers?
22      A    No.
23      Q    Alan Gregory?
24      A    I think he was the state fire marshal.
25      Q    Yeah.  Did you have any conversations with
```

Page 67

```
 1  him?
 2      A    I'm sure I did, but I don't remember them.
 3      Q    And you would've documented any conversations
 4  that you did have with the fire marshals, correct?  Or
 5  with -- sorry, with the fire investigators, correct?
 6      A    If it was relevant, yes.
 7      Q    And you would've communicated your interaction
 8  with Mr. Yell, correct?
 9      A    Could you rephrase that one?
10      Q    Well, you would've communicated -- the
11  relevant information would've included your interaction
12  with Mr. Yell, correct?
13      A    Yes.
14      Q    Are you familiar with David West?
15      A    I think that he may have been a state fire
16  arson investigator, maybe?
17      Q    Yeah.  Did you have any conversations with
18  him?
19      A    Nothing that sticks in my mind.  I probably
20  met him, but -- and there may have been some type of
21  conversation, but I can't remember it.
22      Q    And if you had spoke with any witnesses on the
23  scene, you would've documented that, correct?
24      A    Yes.  Yes.  That would've been documented that
25  way.  The detectives could follow up and do what they
```

Page 68

```
 1  needed to do.
 2      Q    So if -- if you had spoken with someone at the
 3  scene you would've documented that, correct?
 4      A    That's yeah.  Yeah.
 5      Q    Did you ever enter the structure, the trailer,
 6  after the fire had been put out?
 7      A    I can't remember.  I may have went to the door
 8  the next day when the fire investigators were there,
 9  maybe, but I don't remember.
10      Q    You never -- to your recollection, you never
11  walked through the structure with anyone?
12      A    No.  As I remember, it was pretty heavily
13  damaged.  But no, I just don't remember.
14      Q    Now, when did you leave the scene?
15      A    Can you put the CAD sheet back up?
16      Q    I can.  Let's see here.  Now, remind me,
17  you're 820, correct?
18      A    Correct.  It should be down closer to the end.
19      Q    I don't see it, but it could be one of these
20  that is cut off.
21      A    I don't see any zeros down there where it was
22  cut off at.
23      Q    Here you are.  820.
24      A    1028.  Yes.  I left at 10:19, it looks like.
25           22:19.
```

Page 69

```
 1      Q    All right.  So you left the scene at 10:19
 2  p.m.  What tasks do you recall were you doing after
 3  dealing with Mr. Yell before you left?
 4      A    Sorry, I just, I can't recall.  I don't know
 5  what I was...
 6      Q    Did you ever -- after you left, did you ever
 7  return to the scene?
 8      A    That night?
 9      Q    Just generally.  That night or the next day.
10      A    Not that I can remember.  Maybe the next day
11  to just check on the fire investigators to see if they,
12  you know, needed anything, but I can't remember just
13  going back.
14      Q    You never -- you don't recall taking any
15  investigative actions the next day?
16      A    I don't, no.  It was the detective's scene
17  after that.  But I don't remember doing anything.
18      Q    Did you ever document your observations or
19  actions in a report?
20      A    Don't know.  I can't remember.
21      Q    Would it have been your general practice to
22  document something like that?
23      A    If I had interaction there, I'm sure that I
24  would've done something to document it.  Yeah.
25  Supplemental or -- or something.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 20 of 37 PageID
#: 3005
The Deposition of ROGER MCDONALD, taken on February 25, 2022

70..73

Page 70

1    Q    Did you provide a verbal report to anyone?
2    A    Once again, I don't remember.  I'm sure I
3  updated the chief of police, but I don't remember.
4    Q    Did you review any written reports about --
5  about the fire that anyone submitted to you?
6    A    I can't remember that either.  At one point in
7  time I checked all the reports, but I can't remember
8  when I took that duty on or when it came off of me.
9    Q    So you're saying in your capacity as a
10  captain, you at some point reviewed reports, but you're
11  not sure whether that was in 2004?
12    A    Right.  Right.
13    Q    Did you approve murder charges against
14  Mr. Yell?
15    A    No.  Once again, I had nothing to approve or
16  disapprove of for the charges.
17    Q    So your -- your testimony is that you had
18  nothing to do with any charges against Mr. Yell; is that
19  fair?
20    A    Yeah, I think that's pretty fair.  I never put
21  pen to paper that I can remember together for Mr. Yell
22  as far as charges.
23    Q    Now, you testified at trial as we've
24  established, correct?
25    A    I'm sorry.  Say again.

Page 71

1    Q    You testified at Mr. Yell's criminal trial,
2  correct?
3    A    Evidently I did.  I just don't remember it.
4  But yeah, evidently there's documentations showing that
5  I did.
6    Q    Did you testify in any other proceedings in
7  Mr. Yell's case?
8    A    If I can't remember the trial, I surely can't
9  remember anything else.  I'm sorry.
10    Q    So you don't have any recollection of
11  testifying at anything else; is that fair?
12    A    No, I'm just for anything, any better, I'm
13  just old.  I can't remember.
14    Q    Well, I appreciate you doing your best to
15  remember here.  Now, did you ever speak with Higgins --
16  with Officer Higgins about what happened with Mr. Yell
17  in the Sally Port at the Logan County Detention Center?
18    A    I can't recall.  I don't know.  I just -- I
19  don't know.
20    Q    Did you -- did Higgins ever inform you that he
21  pushed Mr. Yell to the ground?
22    A    I don't remember.
23    Q    Did Higgins tell you that he accused Robert,
24  Mr. Yell, of killing his children?
25    A    I don't remember that either.  It looked like

Page 72

1  that would --
2    Q    You don't recall hearing that from anyone?
3    A    I can't recall it.  No.  And honestly, I think
4  that may have -- would've stuck in my mind, but I don't
5  remember it.
6    Q    Did Higgins inform you that he antagonized
7  Mr. Yell?
8    A    I don't remember that he would've said that.
9  But knowing me, I wouldn't allow any antagonizing.
10  That's just not who I am.
11    Q    Now, did Officer Higgins inform you that
12  Mr. Yell was sprayed with chemical spray?
13    A    I don't remember.
14    Q    Did Officer Higgins inform you that his
15  interactions with Mr. Yell were videotaped in the Sally
16  Port?
17    A    I don't remember that either.  I don't even
18  know if they had video at that point in time.
19    Q    So you -- and you personally never went to the
20  Logan County Detention Center when Mr. Yell was there
21  after this fire, correct?
22    A    Not that I can recall.  I really had no reason
23  to be there.
24    Q    So you personally can't testify to what
25  happened at the -- in the Sally Port, correct?

Page 73

1    A    Yeah, that is correct.  I cannot testify to
2  anything that didn't happen in my presence.  And I -- I
3  feel bad that I can't even remember what did happen in
4  my presence.
5    Q    But you never -- you never went to the Logan
6  County Detention Center personally?
7    A    Not that I'm aware of.  And once again, I
8  don't think I would've had a reason to go.
9    Q    Are you familiar with -- well, let me ask
10  this: Did you ever speak with Jailer Bill Jenkins about
11  what happened in the Sally Port between Officer Higgins
12  and Mr. Yell?
13    A    No, I don't recall any conversation with
14  Jailer Jenkins on any of that.
15    Q    Did you ever speak with anyone, any member of
16  the Logan County Detention Center, about what had
17  occurred?
18    A    Not that I can recall.  And I'm sorry, once
19  again, I don't recall speaking to really anyone.
20    Q    And did you ever speak with anyone about a
21  videotape that existed documenting an interaction
22  between Mr. Yell and Officer Higgins?
23    A    I don't remember.
24    Q    And you've never seen any video recording of
25  Mr. Yell at the Logan County Detention Center.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 21 of 37 PageID #:3006
The Deposition of ROGER McDONALD, taken on February 25, 2022

74..77

Page 74

1    A    Not that I can remember, no.  I'm sorry again.
2    Q    I think you testified earlier that you --
3  well, give me one second here.  That you saw April
4  Davis, the children's mother, at the scene; is that
5  correct?
6    A    I can't remember if I saw her or not.  I
7  couldn't pick her out if she was here now.  I don't -- I
8  don't recall.
9    Q    So you never -- to your recollection, you
10  never had any interactions with April at the scene?
11    A    Yeah, as far as I recollect, but once again,
12  my memory is just...
13    Q    You never -- you never collected any evidence
14  from Ms. Davis, correct?
15    A    Not that I can remember.
16    Q    Did you bring any documents with you today to
17  the deposition?
18    A    No, I have nothing.
19    Q    What did you do to prepare for today's
20  deposition?
21    A    I talked to an attorney that advised me we
22  were going to have one.
23    Q    Okay.  And I don't -- I've not -- I don't want
24  any -- well, I guess never mind.  Strike that.  Did you
25  review any documents before today?

Page 75

1    A    No, I don't have any documents to -- to
2  review.
3    Q    Which attorney did you speak with?
4    A    It -- it was a female and I would have to look
5  at the -- my e-mail to see which one it was, but maybe
6  her name was Jennifer, maybe, but I'm not sure.
7    Q    Was it Ms. Langen?
8    A    I think that sounds right for the last name.
9    Q    All right.    And what did you -- what did
10  you discuss with her?
11    A    That we were going to have a deposition over
12  this case and that was really about it.  At 9:00.
13    Q    How many -- when did you speak with Ms.
14  Langen?
15    A    Let's see.  I think it was last Thursday, a
16  week ago Thursday.
17    Q    Is that the only time that you've spoken with
18  Ms. Langen?
19    A    Yeah.  I got an e-mail with the address for
20  the Zoom meeting, but it was just basically, "Here's the
21  address and it'll be at 9:00 my time, 10:00 eastern.
22    Q    Did you discuss anything about the case with
23  Ms. Langen?
24    A    No, I just -- when she told me that it was the
25  Yell case and I said -- I told her that I really can't

Page 76

1  remember much about it, it's just been so long.
2    Q    Did Ms. Langen provide you any information
3  about the case?
4    A    No.  No, I've seen no documents or anything.
5  The only documents I've seen is the one that you
6  furnished me today.
7    Q    Have you had any conversations with -- well,
8  strike that.  Have you had any conversations with any of
9  the defendants in this case about -- about your
10  testimony?
11    A    No.
12    Q    Have you had any conversations with
13  Mr. Edmonds about this case?
14    A    No.
15    Q    Any conversations with Ed Higgins about this
16  case?
17    A    No.
18    Q    Any conversations with Officer Eggleston?
19    A    No.
20    Q    Any conversations with Jim Pendergraf?
21    A    No.
22    Q    Any conversations with David West?
23    A    No.
24    Q    Any conversations with Jaman Childers?
25    A    No

Page 77

1    Q    Conversations with William Smith?
2    A    No.
3    Q    Any conversations with Buster Cannon?
4    A    No.
5    Q    Any conversations with Alan Gregory?
6    A    No.
7    Q    Any conversations with Bill Jenkins?
8    A    No.  I did see him at the dollar store the
9  other day and we just was glad to see each other.
10    Q    Is he a friend of yours?
11    A    I know Bill Jenkins.  He is from the area that
12  I live in.  That's probably the first time that I just
13  ran into him in -- since he retired from being jailer,
14  which I guess was eight or ten years ago.
15    Q    How long have you known Mr. Jenkins?
16    A    I knew him when he was a state trooper and I
17  knew him when he was at the jail.  We're not like
18  personal friends that hang out together or anything,
19  it's just courtesy kind of a I know who you are.  And I
20  would say, let's see, probably 20 years is when I first
21  met him, maybe.
22    Q    So -- so you're a long-term acquaintance of
23  Mr. Jenkins?
24    A    Uh-huh, I am.
25    Q    Have you ever discussed any cases with him?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 22 of 37 PageID
#: 3007
The Deposition of ROGER McDONALD, taken on February 25, 2022
78..81

Page 78

1    A    No.  I try not to talk work with people.
2    Q    Are you -- have you had any conversations with
3  Officer Mills?
4    A    No.
5    Q    Have you stayed in touch with Officer Higgins
6  since leaving the Russellville Police Department?
7    A    I ran into him in Elkton one day, where he is
8  employed at now, and we just had a moment of, "Hey, how
9  you doing" kind of a thing.  And we both moved about our
10 way.
11   Q    Has he ever been a friend of yours?
12   A    We never hung out together or anything.  You
13 know, we were work associates and -- but as far as being
14 really good friends, no.  I'm not really good friends
15 with many people.
16   Q    What about Officer Higgins?  Is he a friend of
17 yours?
18   A    I think that's the one we just discussed.
19   Q    Oh, sorry.
20   A    That's okay.
21   Q    I meant Mill -- (inaudible).
22   A    Officer --
23   Q    Yes.
24   A    Yes.  He was just basically an associate too.
25 You know, you have friendships with associates at work

Page 79

1  but as far as hanging out together, no I didn't do that.
2    Q    All right.  If we could just take a quick
3  break here and go off the record.
4        VIDEOGRAPHER:  We are off the record.  The time
5    is 12:18.
6        (OFF THE RECORD)
7        VIDEOGRAPHER:  We are back on the record for
8    the deposition of Deputy Roger McDonald, being
9    conducted by video conference.  My name is Sydney
10   Little.  Today is February 25, 2022.  The time is
11   12:23 a.m.
12 BY MS. CAMPBELL:
13   Q    Deputy McDonald, I don't have any further
14 questions for you at this point.  I don't know if any
15 other attorneys have questions that they want to ask.
16   A    Thank you.
17        CROSS EXAMINATION
18 BY MS. LANGEN:
19   Q    Mr. McDonald, I do have some questions I would
20 like to ask you.  This is Jennifer Langen, I represent
21 Officer Mills, Officer Edmonds, Officer Eggleston,
22 Officer Pendergraf, Officer Higgins, and the City of
23 Russellville, just so you know who I'm affiliated with.
24   A    Yes, ma'am.
25   Q    That was me that we spoke on the phone the

Page 80

1  other week, didn't we?
2    A    We did.  I'm sorry my memory is so bad and I'm
3  not good with names.
4    Q    That's okay.  I'm not usually either.  I
5  appreciate you being available today for us to ask you
6  questions and I have just a few.
7    A    Thank you.
8    Q    You testified in response to Ms. Campbell's
9  questions that Robert Yell offered passive resistance
10 when you first encountered him and tried to drag him
11 away, or take him away from the burning trailer, isn't
12 that what you said?
13   A    Yes, ma'am it -- what I read from my testimony
14 at the trial, yes.
15   Q    Okay.  Okay.  And do you recall whether or not
16 Mr. Yell's resistance ever escalated at any point after
17 that?
18   A    Not with me.  There was so much going on
19 there, I...
20   Q    You don't recall?
21   A    No.  I can only testify to what I know and
22 what I did and for me, no it -- he never was in that
23 position that we needed to move up the ladder of the
24 force continuum.
25   Q    Okay.

Page 81

1        MS. LANGEN:  Molly, can you pull up the trial
2    testimony and share the screen again?  Can you put
3    that to page 153?
4  BY MS. LANGEN:
5    Q    Okay, Deputy McDonald can you see that screen?
6    A    I can.
7    Q    Okay.  Can you go to line 15 and read that all
8  the way to line 21?
9    A    Oh, 15.  "Now, did you drag him or" did --
10 "was it you and Officer Mills or you and another officer
11 that had to drag Robert away from the fire?  At that
12 point that he began to resist, I did put him down on the
13 ground, then Sergeant Mills came and took him by the
14 other arm and then we did move him away."
15   Q    Okay.  Thank you.  I want to focus on the part
16 of your testimony that says, "At the point that he began
17 to resist I did put him on the ground."
18   A    Uh-huh.
19   Q    Okay.  What kind of resistance did Robert Yell
20 offer that caused you to put him to the ground?
21   A    Honestly, I can't remember if -- if I had to
22 put him to the ground.  It was a moment that for his
23 safety and mine that's what needed to be done, but the
24 actual resistance it's like everything else on this
25 case, it's been so long and I just can't remember.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 23 of 37 PageID
#:3008
The Deposition of ROGER McDONALD, taken on February 25, 2022

82..85

Page 82

1    Q    Okay.  Well in general, not specific to this
2 case, but in general, would you take somebody to the
3 ground if they're only offering you passive resistance?
4    A    Me being the person I am, I'm not a violent
5 person and only do what needs to be done.  If I took him
6 to the ground there was a reason for it, but I can't
7 remember the resistance, I can't remember if he tried to
8 pull away.  I just can't remember.  I'm sorry.
9    Q    That's okay, but in general you don't take
10 somebody to the ground just for offering passive
11 assistance; is that right?
12    A    No.  During my entire career I have been very
13 lucky that I haven't had to use any -- many techniques
14 as far as having to put people on the ground or become
15 violent during an arrest or any other situations I'm
16 with.
17    Q    Okay.  And -- but it would take more than just
18 passive resistance for you to put somebody on the
19 ground; is that true?
20    A    That is totally true.
21    Q    Okay.
22    MS. LANGEN:  Molly, can I trouble you to put
23    that back up on the screen again and go to page 155.
24    Q    Deputy McDonald, can you see that on the
25 screen, the transcript?

Page 83

1    A    I can, ma'am.
2    Q    Okay.  Can you go to line 16 and read -- read
3 the transcript starting at line 16 through line 18?
4    A    Yes.  "The witness, he didn't make any
5 statements to me.  Once that I did turn Mr. Yell over to
6 the other officers I did notice that he became
7 belligerent."
8    Q    Okay.  Thank you.  What did you mean when you
9 said he became belligerent?
10    A    Usually belligerent is raising your voice,
11 foul language, cussing, yelling, not wanting to comply
12 with any officers' orders that they're asking you to do.
13    Q    Okay.  And do you recall as we sit here today
14 what it was that Mr. Yell did that caused you to say at
15 trial that he had been belligerent?
16    A    I cannot.  I'm sorry.  It's just -- just been
17 too long.
18    Q    I totally understand.  I appreciate that.  But
19 if you described him at trial as having been belligerent
20 when he was at the scene then the things you just
21 described about, you know, how you -- how you defined
22 belligerent, he was engaging in that sort of behavior,
23 is that true?
24    MS. CAMPBELL:  Objection to form.
25    Q    You can still answer.  Deputy McDonald, you

Page 84

1 can still answer.
2    A    Oh, okay.  Yes, if I testified he was
3 belligerent, in my mind, in my environment, in my
4 history of policing, something was going on that was out
5 of the normal.
6    Q    Such as what you described just a couple of
7 minutes ago, right?
8    A    Correct.  Correct.
9    Q    And your memory -- you were testifying at the
10 criminal trial in 2006; is that right?
11    A    I'm sorry, I don't remember.
12    Q    Okay.  I get that.  I know -- and I remember
13 that you don't recall specifically testifying at the
14 criminal trial, but I'll represent to you that the
15 criminal trial occurred in 2006, okay?
16    A    Uh-huh.
17    Q    So would you say that your memory as far as
18 things that happened in 2004, 2003 was better in 2006
19 than it is today?
20    A    Oh, absolutely.  I was a much younger man and
21 my mind was much, much sharper than it is today.
22    Q    Okay.  And when you do test -- you've
23 testified in criminal trials before, not just the Yell
24 matter, right?
25    A    Yes, ma'am, I have.

Page 85

1    Q    Okay.  And when you are serving as a witness
2 at a trial you're basically just answering the questions
3 that are asked of you, is that right?
4    A    That's correct.
5    MS. CAMPBELL:  Objection to form.
6    Q    Is that -- that's right?
7    A    That's -- that's correct.
8    Q    Okay.  You testified in response to one of
9 Ms. Campbell's questions that you -- let's see how --
10 that you don't remember smelling gasoline on Mr. Yell
11 and that if you had remembered that you would have
12 testified to it at trial.  Do you remember saying that
13 earlier?
14    A    I do.  I do.
15    Q    Do you remember being asked at trial whether
16 or not you smelled gasoline on Mr. Yell?
17    MS. CAMPBELL:  Objection to form.
18    A    I -- I do not.  Sadly, I don't even remember
19 testifying at the trial.
20    Q    Okay.  Would you have volunteered whether or
21 not you smelled gasoline on Mr. Yell if you had not been
22 asked that question?
23    MS. CAMPBELL:  Objection to form.
24    A    I'm not sure.  I don't think that I would have
25 just blurted it out, but -- I don't think I would have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 24 of 37 PageID
#3009
The Deposition of ROGER MCDONALD, taken on February 25, 2022
86..89

Page 86

1  just put it out there, you know, it would have been a
2  moment of if I was asked or...
3      Q    You were only there to answer the questions
4  that you were asked, is that right?
5      A    That's right.  I -- I testified to --
6      Q    So if no -- sorry, go ahead.
7      A    -- knowledge that I had, yeah.
8      Q    Okay.  So if nobody asked you at trial whether
9  or not you smelled gasoline on Mr. Yell, you would not
10 have provided that information; is that true?
11     A    Well that's a hard one, especially with me not
12 being able to remember if it was -- if I had smelled
13 gasoline I would have probably had documented it or put
14 it in a report or something, but once again I've seen no
15 documentation.  I can't recall anything about it and in
16 my mind at the moment I can't recall smelling gasoline.
17     Q    Sure.  But I'm just asking you about testimony
18 at trial.  If you were not asked a question that called
19 for a response about whether or not you smelled gasoline
20 on Mr. Yell, would you have provided that information?
21         MS. CAMPBELL:  Objection to form.  Asked and
22 answered.
23     A    I wouldn't have just blurted it out I don't
24 think.
25     Q    Okay.  I think those are all the questions I

Page 87

1  have for you today, Deputy McDonald.  Thank you very
2  much for your time, I appreciate it.
3      A    Thank you, ma'am.
4              CROSS EXAMINATION
5  BY MR. SIEGEL:
6      Q    I have just a few questions as well for you.
7      A    All right, sir.
8      Q    Thank you for being here.  My name is Benjamin
9  Siegel, I represent Alan Gregory in this matter.
10     A    Yes, sir.
11     Q    And am I correct that you testified today that
12 you do remember Mr. Gregory?
13     A    Yes.  Yes, I do remember Mr. Gregory, yes.
14     Q    Do you remember any specifics as to any
15 interactions you had with him?
16     A    No specifics, no.
17     Q    Okay.  And you don't remember when it was
18 exactly that you talked to him, whether it was that
19 night or the following day?
20     A    No, I don't remember.
21     Q    Do you remember any other interactions with
22 anyone else from the state fire marshal's office
23 specifically?
24     A    I don't remember any specific -- I'm sure that
25 I probably had spoken with them, but nothing that like

Page 88

1  pops up in my mind.
2      Q    Okay.  And did you know Mr. Gregory separately
3  from this case?
4      A    I'm pretty sure that he was an instructor for
5  the state of Kentucky for fire training and I think I
6  may have taken a class or two with him.  And I have
7  known Mr. Gregory throughout the years in that capacity,
8  but you know, we're not like best friends or anything.
9  We don't hang out together, we don't make phone calls.
10     Q    Okay.  Do you happen to remember when in
11 relation to this -- this fire investigation or this
12 investigation that you would have taken one of those
13 classes with Mr. Gregory as an instructor?
14     A    Oh, that would have been way before.  That
15 would have been in the 1975 range to the 1995 range.
16 In 1975 when I started my police career I gave up the
17 volunteer fire department.
18     Q    Okay.  Thank you sir, that's all I have.
19     A    Thank you.
20         MS. CAMPBELL:  I've got a few more questions.
21 I don't know if any other -- anyone else has any
22 before
23 I...?
24         MR. STILZ:  I have no questions, Mr. McDonald.
25         THE WITNESS:  Thank you.

Page 89

1          MR. SOWELL:  No questions here.
2          THE WITNESS:  Thank you.
3          MS. LANGEN:  No questions from me either.
4          THE WITNESS:  Thank you.
5              REDIRECT EXAMINATION
6  BY MS. CAMPBELL:
7      Q    All right.  Deputy McDonald, when you had to
8  take Mr. Yell away from the trailer, your -- your
9  primary concern was his safety, correct?
10     A    That's correct.
11     Q    And you were trying to get him away from the
12 fire for his safety, correct?
13     A    That's correct.
14     Q    And I think you testified earlier that he was
15 within about 40 feet of the -- or he was less than 40
16 feet from the trailer when you encountered him, correct?
17     A    That's correct.
18     Q    So you -- given his proximity to a burning
19 structure you needed to move him away quickly, correct?
20     A    That's correct.
21     Q    And that was -- this was an emergency
22 situation, correct?
23     A    Correct.
24     Q    And your primary goal on the scene was to
25 minimize any injuries, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ROGER MCDONALD, taken on February 25, 2022

90..93

Page 90

1     A     Correct. Trying to keep everyone safe.
2     Q     Both officers and civilians on the scene?
3     A     Yes, ma'am.
4     Q     And fair to say that emotions were running
5     high that night?
6     A     I would -- that's one of those moments that I
7     can only testify for my emotions. I'm a pretty calm
8     guy. I don't usually let my emotions get involved with
9     anything that's going on. Someone has to keep a level
10    head. Now, the rest of the guys I can't tell you what
11    their emotions were.
12    Q     But given the situation, it was an emergency
13    situation, correct?
14    A     Yes, ma'am.
15    Q     And you needed to do whatever -- whatever you
16    could to make sure everyone was safe, correct?
17    A     Correct.
18    Q     And that might mean pulling somebody away from
19    a fire, fair?
20    A     Yes, ma'am.
21    Q     And you also testified earlier that you had no
22    independent recollection of Mr. Yell behaving in a
23    belligerent fashion, is that fair?
24    A     That -- that is correct, until I saw the
25    testimony from the trial. But at -- at this moment I

Page 91

1     still can't recall what it was, no.
2     Q     So you don't have any personal knowledge of
3     Mr. Yell's specific behavior, correct?
4     A     No, only what I read and I testified that he
5     was belligerent.
6     Q     But no -- no recollection of what his -- how
7     he was actually acting, fair?
8     A     Fair.
9     Q     And you also testified earlier that you didn't
10    recall smelling any substances, including -- well, let
11    me strike that. You testified earlier that you didn't
12    recall smelling any gasoline on Mr. Yell, correct?
13    A     That's correct. I can't even recall the smell
14    of the smoke from that night.
15    Q     But if you had smelled gasoline on Mr. Yell,
16    you would have documented that information in a report,
17    correct?
18    A     And that would have been very pertinent, I
19    think.
20    Q     And you would have informed a fire -- you
21    would have informed a detective about that, correct?
22    A     Correct.
23    Q     And you would have informed a fire
24    investigator about that information, correct?
25    A     Correct.

Page 92

1     Q     As an experienced law enforcement officer, you
2     would know that the -- an odor of gasoline would be
3     important in an arson investigation, correct?
4     A     Correct.
5     Q     And to your knowledge you never reported any
6     smell of gasoline to anybody, correct?
7     A     Not to my knowledge. I can't recall that, no.
8     Q     All right. I don't have any further
9     questions.
10        MS. LANGEN: None for me either.
11        MR. SIEGEL: Nothing further. Thank you.
12        MR. STILZ: Is everyone done?
13        VIDEOGRAPHER: All right. That concludes
14    today's deposition. We are off the record. The
15    time is
16    12:43.
17        (DEPOSITION CONCLUDED AT 12:43 P.M.)

Page 93

1     CERTIFICATE OF REPORTER
2     COMMONWEALTH OF KENTUCKY AT LARGE
3
4     I do hereby certify that the witness in the foregoing
5     transcript was taken on the date, and at the time and
6     place set out on the Title page hereof by me after first
7     being duly sworn to testify the truth, the whole truth,
8     and nothing but the truth; and that the said matter was
9     recorded by me and then reduced to typewritten form
10    under my direction, and constitutes a true record of the
11    transcript as taken, all to the best of my skills and
12    ability. I certify that I am not a relative or employee
13    of either counsel, and that I am in no way interested
14    financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22    CHLOE GILBERT,
23    COURT REPORTER / NOTARY
24    COMMISSION EXPIRES ON: 07/20/2029
25    SUBMITTED ON: 03/11/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Exhibits**

**Exhibit 1_ Mcdonald** 42:7,11

**Exhibit 2_ Mcdonald** 53:18,23

**Exhibit 3_ Mcdonald** 43:10,12 53:12, 15

**Exhibit 4_ Mcdonald** 47:23,25

**1**

**1** 42:7,11
**10** 23:7,9 31:2,8
**101** 9:6
**1028** 68:24
**1097** 48:17 49:14
**10:00** 19:10 75:21
**10:01** 9:8
**10:19** 68:24 69:1
**11** 18:20 38:14
**11:05** 47:4
**11:18** 47:10
**12** 12:14
**12:18** 79:5
**12:23** 79:11
**12:43** 92:16,17
**13** 14:13,18 49:7 50:1
**1355** 42:8
**14** 39:22 40:1 54:7
**15** 12:14 58:13

81:7,9
**153** 81:3
**155** 82:23
**16** 83:2,3
**17:25** 49:14
**18** 83:3
**1975** 14:5 27:5 88:15,16
**1995** 15:1,5,10 23:4 27:2 88:15
**1998** 15:15 16:2
**1999** 16:1
**19:25** 48:9,20 49:3
**19:34** 49:12
**19:38** 48:9,12, 15
**1:20-CV-0047-** 9:13

**2**

**2** 53:18,23
**20** 26:22 27:1 28:15,24 29:2 45:21 56:10 77:20
**2000** 16:1,2
**2003** 16:4 84:18
**2004** 18:20 20:2 21:8,11 32:8 33:3 35:2, 10 37:2 38:2,14 39:20,25 70:11 84:18
**2006** 84:10,15, 18
**2015** 16:15 17:10
**2022** 9:7 47:9 79:10

**21** 81:8
**22** 54:7
**22:19** 68:25
**24** 37:5
**25** 47:9 79:10
**25th** 9:7
**26** 39:23 40:1
**2:00** 19:10

**3**

**3** 43:10,12 53:12,15
**30** 45:21

**4**

**4** 47:23,25
**40** 22:21 24:19, 22 56:5,7 89:15
**40-hour** 32:13
**40202** 9:6

**5**

**5:00** 37:9

**6**

**638** 38:13

**7**

**7** 47:24
**730** 9:5
**7:25** 49:5
**7:38** 48:15

**8**

**8-2-0** 40:15
**819** 40:18

**820** 40:15,18 48:13 68:17,23
**821** 40:18
**831** 48:20,22 49:2,13
**834** 49:10,11, 20,24
**8:00** 37:8

**9**

**9162** 53:12
**9171** 59:14 61:24
**9172** 53:13
**9:00** 75:12,21

**A**

**a.m.** 9:8 47:4, 10 79:11
**ability** 13:16
**absolutely** 13:7 22:17 62:7 84:20
**academy** 14:17 22:23 23:1,3,6,9,12 27:10
**access** 36:21 37:2,7,10,12 44:21
**accurate** 57:14
**accused** 71:23
**acquaintance** 77:22
**acting** 91:7
**action** 11:23 12:18
**actions** 18:17 69:15,19
**active** 58:6
**actual** 81:24

**Adairaville** 18:8
**Adairville** 14:1 15:8 16:8 26:21
**address** 75:19, 21
**administrative** 15:4 16:14,18, 21 17:3,9
**advise** 31:10
**advised** 74:21
**affect** 13:16,19
**affiliated** 79:23
**affirm** 11:14
**AG8** 43:11
**age** 35:7
**agree** 11:3
**ahead** 13:12 86:6
**Alan** 66:23 77:5 87:9
**alcohol** 59:24 60:4,10 64:3,14
**alcoholic** 60:7
**Allen** 10:19
**Amber** 10:12
**amount** 26:3
**Amy** 9:21
**answering** 39:2 85:2
**antagonized** 72:6
**antagonizing** 72:9
**anymore** 16:11 37:15 48:25
**anyone's** 48:25
**apologize** 48:10 51:6 59:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

appearance 9:15

appearing 9:21,23 10:2

appears 49:2

approach 41:21 43:6 44:14

approached 42:25 54:14,24

approaching 56:16

approval 64:7

approve 64:4,5 70:13,15

April 52:2 74:3, 10

area 22:7,8,9 43:8 55:4 56:14 77:11

arm 54:14 55:1 57:12 81:14

Arnett 10:12 11:9

arrest 60:16 82:15

arrested 52:25 53:5

arrive 46:2

arrived 41:14 44:11,15,24 46:8 47:14,17 48:9,18,20 49:3,7,11 50:1, 9 52:12 54:8

arriving 48:12

arson 26:12 65:12,15,24 66:6 67:16 92:3

assign 20:6

assigned 31:8

assistance 38:22 82:11

assistant 19:22

associate 78:24

associates 78:13,25

attach 35:20, 21,24 36:3,15

attached 35:19 42:21

attend 14:6 23:3

attending 9:15,16,18 10:5,7,9,12,17, 20

attention 41:1 56:13

attorney 74:21 75:3

attorneys 13:11 79:15

audio 33:7 34:3,6

authority 64:6

aware 29:16 63:8 64:10 73:7

——————

B

baby 51:20

back 11:1 18:1, 19 36:11 37:1 45:11 47:6 65:2 68:15 69:13 79:7 82:23

bad 51:5 73:3 80:2

Barry 9:23

basic 22:20,25 24:6,22 26:9,10 27:9 28:4,6 36:18

basically 16:21 26:22 39:16 75:20 78:24 85:2

basics 23:12

37:25

began 81:12, 16

begin 11:18

beginning 20:19

behalf 9:23 10:4,8,16,19

behaving 90:22

behavior 83:22 91:3

believed 34:16

belligerent 83:7,9,10,15, 19,22 84:3 90:23 91:5

Benjamin 10:19 87:8

beverages 60:8

bigger 40:24 41:2,8

Bill 10:17 14:10 73:10 77:7,11

bills 16:22

bit 11:2 25:13 26:6 48:11

blank 61:4

blanket 51:13, 19

blend 51:8

blends 32:23

blew 26:23

blow 52:15

blurted 85:25 86:23

board 49:19

Bonnie 38:14 41:23 42:9,23, 25 43:5,8,13, 14,18 44:18 45:9

book 29:19

booklet 29:11

boring 17:16

Bowling 9:13 10:18

Brady 24:4 37:19

brain 39:7

break 13:8 46:25 50:5 79:3

breathing 57:3

bring 74:16

bringing 64:11

brought 37:1 51:13,14

building 41:10

buildings 27:15

burning 28:20 41:10 80:11 89:18

Buster 9:24 10:5 77:3

button 12:5 42:5

bystanders 45:11,13

——————

C

cabinets 35:16

CAD 48:1 49:2 64:21 68:15

call 20:8 39:8, 18 40:8,11,12 41:2 65:1

called 38:16 39:14 40:21 86:18

calling 38:22

calls 20:4 40:10 52:3 88:9

calm 90:7

camera 10:24

Campbell 9:18 11:5,20,22 47:11 53:17,19 79:12 83:24 85:5,17,23 86:21 88:20 89:6

Campbell's 80:8 85:9

Cannon 9:24 10:5 77:3

capacity 9:24 70:9 88:7

captain 15:3,4 16:3,5,12,13, 15,18,19,21,24 17:4,10 18:21 53:25 70:10

car 65:4,6,7,8,9

care 16:19 45:9 51:17

career 14:25 37:17 62:15,16 63:1 82:12 88:16

careers 18:18

Carpenter 52:2

carry 34:12

cars 33:22

case 9:13 12:10,15,16,20, 22 21:14 37:20, 25 39:4,7 71:7 75:12,22,25 76:3,9,13,16 81:25 82:2 88:3

cases 20:6,10, 23 21:4 77:25

catch 42:3 56:13

caught 18:1

caused 81:20 83:14

center 21:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

71:17 72:20
73:6,16,25

**chaotic** 41:13

**char** 64:1

**characterizati
on** 66:3

**charge** 64:15

**charged** 64:2

**charges** 64:4,
7,9,11,15
70:13,16,18,22

**check** 69:11

**checked** 70:7

**chemical**
62:13,15,20
72:12

**chief** 18:11
19:22,23 70:3

**child** 51:10,12,
14,15,18 56:22

**Childers** 10:14
76:24

**children** 51:22
71:24

**children's**
74:4

**Chloe** 9:3

**church** 44:19

**circumstance**
59:16

**city** 9:10 10:5,9
12:16 14:20
20:5 26:21 27:3
28:13 35:16
45:22 79:22

**civilians** 90:2

**clarification**
30:9

**class** 14:23
26:3,7 32:13
88:6

**classes** 31:15
88:13

**clear** 39:12

**clerk** 25:23
35:13,14 36:20

**clerk's** 35:17
36:22 37:8

**click** 12:4

**close** 21:22
22:4 55:23,25
56:2,5,7,12,13
59:14 65:6

**closer** 44:19
55:18 68:18

**clue** 46:3

**collapsing**
27:15

**collected** 25:6
74:13

**collection**
24:24

**college** 14:6,7,
8,11,18,21,22
22:21

**commanded**
54:11,19

**communicate**
30:4

**communicate
d** 67:7,10

**communicatio
ns** 32:3

**community**
28:2,3

**company**
27:21,23

**complaint**
39:1

**complete**
24:20

**comply** 83:11

**complying**
57:10

**computer**
11:25 35:1,7

**computers**

34:22 35:6

**conceivably**
24:9

**concern** 55:8
89:9

**concerned**
55:11,17,20
56:20

**CONCLUDED**
92:17

**concludes**
92:13

**conditions**
13:15

**conduct** 23:20
64:3

**conducted**
47:8 79:9

**conference**
9:9 47:8 79:9

**confusing**
13:4

**continuum**
80:24

**convened** 9:8

**conversation**
61:15,17 66:17
67:21 73:13

**conversations**
50:8,11 65:21
66:25 67:3,17
76:7,8,12,15,
18,20,22,24
77:1,3,5,7 78:2

**copy** 34:24

**correct** 15:12,
21 16:10 17:7,8
18:22 19:2,14,
25 23:2,13,14,
16,19,21,22,24,
25 24:2,3,9,10
28:5,6 30:18
32:6 34:17
38:14,15 39:6
40:18 42:15,17
43:2,3,16,19
47:14,15,17,18

48:14,15,16,21,
22,23 49:3,4,5,
8,12,21 52:22
54:17,18,22,24
55:2,3,5,9,15,
18,19 57:22
58:6,10,18,19
59:11,12,16,17
60:2,8,13 61:5,
9 62:6,9,13,14,
21 64:8 65:17
67:4,5,8,12,23
68:3,17,18
70:24 71:2
72:21,25 73:1
74:5,14 84:8
85:4,7 87:11
89:9,10,12,13,
16,17,19,20,22,
23,25 90:1,13,
16,17,24 91:3,
12,13,17,21,22,
24,25 92:3,4,6

**could've** 46:3,
4

**counsel** 9:17

**county** 9:25
10:1,17 13:22
17:15,17,23
28:14 71:17
72:20 73:6,16,
25

**couple** 84:6

**court** 9:4,5,12
11:11,13,18
13:3 37:20
53:14

**courtesy**
77:19

**Covington**
10:10

**crime** 23:20

**criminal** 22:22
30:17,21 32:14
71:1 84:10,14,
15,23

**crooked** 48:11

**CROSS** 79:17
87:4

**crowd** 45:22

**current** 9:7

**cursor** 12:1

**cussing** 83:11

**cut** 18:13 63:16
68:20,22

---

**D**

**daily** 20:25

**damaged**
68:13

**date** 23:7

**dates** 16:16
18:24

**David** 67:14
76:22

**Davis** 74:4,14

**day** 9:7 20:19,
21 68:8 69:9,
10,15 77:9 78:7
87:19

**dealing** 64:18
69:3

**December**
23:8

**decide** 25:7
35:21

**decided** 18:10,
12

**deep** 21:3
25:13 26:18
27:10

**defendant**
9:24 12:18

**defendants**
10:8,14,17 76:9

**defined** 83:21

**department**
10:2 15:11,20,
23 16:3,6 17:7,
18,22,23 18:8,
12,21 19:1
22:22 24:16,18
28:8 29:7



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 29 of 37 PageID
#: 3014
The Deposition of ROGER MCDONALD, taken on February 25, 2022

97

30:11,13,15,16,
21,23,25 31:14,
17 32:9,14,20
33:4 38:3
39:15,20 41:18
44:22 45:12
50:14,19 78:6
88:17

**depending**
45:7 46:5

**deposed** 12:8

**deposition** 9:9
12:21 13:2 47:7
51:25 74:17,20
75:11 79:8
92:14,17

**deputy** 9:9,25
10:1,22 11:10,
21 12:8 37:18
46:25 47:7,12,
24 79:8,13 81:5
82:24 83:25
87:1 89:7

**describing**
41:8

**detect** 26:17

**detective** 15:2,
15,17 21:7 65:1
91:21

**detective's**
32:12 69:16

**detectives**
21:4,10 67:25

**detention**
21:24 71:17
72:20 73:6,16,
25

**determined**
40:4

**device** 33:21

**devices** 33:23

**difference**
16:17

**differently**
31:10

**DIRECT** 11:19

**direction** 43:4

**disapprove**
70:16

**disciplinary**
18:14,17

**disclose** 25:19

**disclosed**
38:4,11

**discuss** 20:10,
20 64:12 75:10,
22

**discussed**
64:14 77:25
78:18

**disorderly**
64:3

**dispatch**
38:20,24 39:3,5
40:3,5,7 46:1

**dispatched**
38:17 40:25

**dispatching**
41:3

**District** 9:12

**division** 16:20

**document**
23:17 24:8,11
25:1,11,15
33:13 34:15
47:19,24 48:1,
19 54:16 63:21
69:18,22,24

**documentatio
n** 86:15

**documentatio
ns** 71:4

**documented**
61:9 67:3,23,24
68:3 86:13
91:16

**documenting**
33:4 73:21

**documents**
11:24 61:3
74:16,25 75:1
76:4,5

**dollar** 77:8

**door** 42:19
56:15,16 68:7

**doors** 43:24

**dots** 12:2

**drag** 80:10
81:9,11

**dragged**
58:20,25

**dragging** 59:3

**drive** 35:8
38:14 41:23
42:9,23,25
43:5,8,13,14,18
44:18 45:9

**driver's** 27:8

**driving** 24:25

**drove** 27:20,
21,22 43:17

**due** 18:14

**DUI** 24:20

**duties** 20:1
65:2

**duty** 70:8

_____

**E**

**e-mail** 75:5,19

**earlier** 18:7
47:12 50:7
59:21 61:20
64:2 74:2 85:13
89:14 90:21
91:9,11

**eastern** 75:21

**Ed** 19:19,20
76:15

**Edmonds** 21:8
76:13 79:21

**education**
14:9,12,14,16

**Eggleston**
21:11 76:18
79:21

**electric** 49:19

**electronic**
34:24

**Elkton** 78:7

**emergency**
40:24 89:21
90:12

**emotions**
90:4,7,8,11

**employed**
17:21 78:8

**employee**
12:16

**employment**
18:3,4

**EMS** 51:16

**encountered**
80:10 89:16

**end** 28:14 43:6
68:18

**enforcement**
14:24 15:6,8
22:19 48:3 92:1

**engaging**
83:22

**enter** 50:13
51:2 55:21 68:5

**entered** 50:16

**entering** 50:21

**entire** 18:17
28:19 31:16
82:12

**environment**
84:3

**EPB** 49:18

**escalated**
80:16

**established**
70:24

**estimate** 45:19

**events** 20:20

**everybody's**
25:8

**everyone's**
41:1

**evidence** 24:5,
12,24 25:5,12,
16,17 74:13

**evidently**
57:11 71:3,4

**EXAMINATIO
N** 11:19 79:17
87:4 89:5

**exculpatory**
24:5,12 25:12

**excuse** 22:2
40:10

**exhibit** 42:7,11
43:10,12 47:23,
25 53:10,12,15,
18,23

**exhibits** 53:11

**exigent** 59:15

**existed** 73:21

**experience**
26:13,20 28:4,
22 48:3

**experienced**
48:3 58:5 92:1

**explain** 30:7
31:7

**explosion**
52:17

**extensive**
59:15

**extreme** 62:21

_____

**F**

**face** 63:24

**facility** 21:20,
21

**fact** 11:3 45:2

**faded** 46:13

**fair** 13:6,9,13
31:11 32:2,19
38:10 44:9 58:2
65:25 66:2,5,8,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 30 of 37 PageID
#: 3045
The Deposition of ROGER MCDONALD, taken on February 25, 2022

98

9 70:19,20
71:11 90:4,19,
23 91:7,8

**Fairway** 9:19

**familiar** 37:18,
21 48:2 52:1,5
66:21 67:14
73:9

**farmers** 27:22

**fashion** 90:23

**FBINA** 22:23

**February** 9:7
47:9 79:10

**feel** 56:25 73:3

**feet** 56:4,5,7,11
59:24 89:15,16

**female** 75:4

**field** 31:1

**fight** 28:9 50:23
57:21 58:4

**fighting** 57:11

**file** 35:15

**filed** 35:13
36:20

**files** 25:24

**filing** 35:16

**filled** 34:22

**find** 35:17

**fingerprinting**
24:24

**fire** 26:1,4,15,
17,19,20,23,24
28:19 38:13,21
40:20 41:7,18
44:21 45:12,15
50:14,19,24
52:12 54:11
55:15,22 56:2,
18,21 57:1
64:25 65:11
66:15,19,24
67:4,5,15 68:6,
8 69:11 70:5
72:21 81:11
87:22 88:5,11,

17 89:12 90:19
91:20,23

**firefighter**
27:7,17 28:1,11

**firefighters**
45:24 52:11

**firefighting**
28:5,21

**fireman** 26:4

**firemen** 50:20,
24 65:14

**fires** 28:9,10,
14,16,24 50:23

**flame** 41:17

**flames** 44:1,2,
4,6

**flash** 52:17

**fleet** 16:20

**floppy** 35:8

**Flowers** 66:21

**focus** 81:15

**folder** 35:12

**follow** 67:25

**force** 80:24

**forgot** 42:5

**form** 29:10
31:23 83:24
85:5,17,23
86:21

**formal** 18:3
31:15 32:6

**foul** 83:11

**Frankfort**
10:13

**friend** 77:10
78:11,16

**friends** 77:18
78:14 88:8

**friendships**
78:25

**front** 41:23
42:9,19,23
52:21 56:15

**full** 12:5 37:14

**furnished** 76:6

—————

**G**

**gasoline** 60:2,
10 85:10,16,21
86:9,13,16,19
91:12,15 92:2,6

**gave** 38:6
51:17 88:16

**general** 16:21
22:23 24:25
39:1 69:21
82:1,2,9

**generally**
12:11 39:5
42:22 69:9

**Georgetown**
10:5

**Gilbert** 9:4

**give** 11:14
12:21 32:24
38:8 50:16
61:21 66:20
74:3

**glad** 77:9

**GNS** 9:13

**goal** 22:12
89:24

**good** 11:21
41:10 78:14
80:3

**Goodlettsville**
27:24

**graduate** 14:2,
4 23:5

**graduated**
27:4

**Great** 10:22

**Green** 9:13
10:18

**Gregory** 10:20
66:23 77:5
87:9,12,13
88:2,7,13

**ground** 51:15
59:4,6,7 71:21
81:13,17,20,22
82:3,6,10,14,19

**grow** 13:21

**growing** 52:12

**guess** 24:7
25:8 31:2,5
32:2,17,19
58:20 64:10
74:24 77:14

**guesstimate**
28:15

**guilt** 36:12

**guy** 90:8

**guys** 90:10

—————

**H**

**half** 15:18

**hand** 11:11
35:6

**handwritten**
35:11

**hang** 57:16
77:18 88:9

**hanging** 79:1

**happen** 13:5
73:2,3 88:10

**happened**
17:10 24:13
25:2 35:5 41:4
51:16 60:21
71:16 72:25
73:11 84:18

**happening**
20:23

**hard** 28:12
34:24 37:6
39:21 48:11
86:11

**head** 90:10

**health** 13:15

**hear** 60:25
61:11

**heard** 61:5,8
62:5

**hearing** 72:2

**heat** 56:25
59:15

**heater** 28:19

**heavily** 68:12

**heavy** 41:17
43:25 44:6,10,
13 46:5 52:11
55:15

**helped** 26:24
58:9,10,17

**Hey** 41:2 78:8

**Higgins** 19:18,
19,20 21:7,15,
19 22:1,2
46:16,19 49:20,
25 50:1,8 63:10
71:15,16,20,23
72:6,11,14
73:11,22 76:15
78:5,16 79:22

**Higgins'** 65:9

**high** 13:23,25
14:1,14 27:4
39:22 90:5

**highlight**
58:24

**highlighted**
61:24

**hired** 14:19
15:1,5,10

**history** 84:4

**hit** 12:4

**hold** 10:24
61:21

**home** 28:25
51:11 54:11,12,
15 55:5,18,21
56:23

**honestly** 46:3
56:24 59:3
60:23 72:3
81:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 31 of 37 PageID
#: 3016
The Deposition of ROGER MCDONALD, taken on February 25, 2022
99

Honey 18:1

hotspot 26:14

hotspots 26:11

hour 27:10

hours 19:8 22:21 24:19,22 26:8

house 28:20 41:16 42:23 51:22 52:16

hover 12:1

human 25:8

hung 78:12

---

**I**

ID 10:24

IDENTIFICATION 42:11 43:12 47:25 53:23

image 41:25 42:10

implanted 39:7

important 25:10 92:3

impressive 62:17

in-service 24:15,17

inaudible 78:21

include 25:3

included 67:11

including 91:10

inculpatory 24:12 25:11

independent 54:1,2 59:5 90:22

individual 40:19

individually 41:3

inform 71:20 72:6,11,14

informal 18:3 31:12

information 24:12 25:3,19, 25 34:16 38:3, 11,23 48:7 65:16 66:8 67:11 76:2 86:10,20 91:16, 24

informed 91:20,21,23

injure 55:17

injuries 63:23, 25 89:25

innocence 25:17 36:12

inside 41:9 45:2,3 56:22

instruct 13:12

instructor 88:4,13

interaction 61:12 67:7,11 69:23 73:21

interactions 60:18 72:15 74:10 87:15,21

interest 27:25

interested 28:2

interrupt 61:19 65:22

interview 33:16

interviewing 32:10,21 33:20

interviews 23:18 33:5,7,18 34:4,5,7,9

intoxicated 52:25 59:21

intoxication 64:3,15

investigating 20:11

investigation 26:1,5 88:11,12 92:3

investigations 21:1,3 23:21

investigative 69:15

investigator 25:22 67:16 91:24

investigators 25:24 66:16,18 67:5 68:8 69:11

involved 28:25 90:8

issues 18:15

---

**J**

J.A. 10:16

jail 21:20 77:17

jailer 73:10,14 77:13

Jaman 76:24

jar 61:3

Jenkins 10:17 73:10,14 77:7, 11,15,23

Jennifer 10:7 75:6 79:20

Jim 19:23 76:20

job 15:6 16:9 17:10,14 27:16 44:22 45:12

jobs 18:1

join 17:17

joined 28:7 29:6 30:14,24

joining 17:22

Jones 19:22,24

Justice 22:22 30:17,21 32:14

---

**K**

Kansas 9:19

keeping 27:9, 13 35:4,8 44:21

Kemp 14:10

Kentuckiana 9:5

Kentucky 9:6, 12 10:3,11,13, 14,18,21 13:22 15:8 88:5

killing 71:24

kind 21:2 25:2 27:6,12 28:16 31:3 77:19 78:9 81:19

kinds 24:21

kitchen 28:19

knew 55:22 77:16,17

knowing 72:9

knowledge 28:5 86:7 91:2 92:5,7

---

**L**

ladder 80:23

laid 51:15,19

Langen 10:7 11:7 75:7,14, 18,23 76:2 79:18,20 81:1,4 82:22 89:3 92:10

language 83:11

large 45:22,23

larger 40:12

Larry 19:22

law 14:24 15:6, 8 22:18 48:3 92:1

lead 25:21 54:15 55:2

learn 24:4 26:16 65:11 66:11

learned 23:12, 15,17,20,23 24:1 25:1 65:16,23,25 66:6,7

learning 61:20

leave 16:6 18:14 55:4,7 68:14

leaving 17:21 78:6

left 18:7 64:21, 22 68:24 69:1, 3,6

legal 23:23

level 90:9

Lexington 10:3,6

lip 63:16

listen 34:8

live 77:12

located 9:5 42:10 44:17 46:5

location 9:15 38:25

Locations 25:4

log 36:24 49:16

Logan 10:16 13:22 17:15,17, 22 71:17 72:20 73:5,16,25

logged 49:17

long 12:13 15:13,17 16:13

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

21:16 32:15,16
37:16,17 44:7,9
46:1,6 51:5
59:18 76:1
77:15 81:25
83:17

**long-term**
77:22

**longer** 17:13

**looked** 45:23
63:19 71:25

**lot** 22:5 28:14
29:4 45:4,15,16
51:7

**lots** 30:19,20
50:20

**Louisville** 9:6
10:20 14:10
22:21

**love** 18:5

**low** 39:22

**lower** 42:12

**Luckily** 62:14

**lucky** 17:12
18:16 28:13
82:13

_____

**M**

_____

**made** 53:11
62:2,4

**Main** 9:6

**maintenance**
16:20

**make** 16:22
20:3 22:10 28:3
29:16 36:18
39:9,12 45:10
61:1,5,8 62:1,5
83:4 88:9 90:16

**making** 31:24

**Malles** 10:4

**man** 84:20

**manually**
36:23

**mark** 42:7
47:23 53:10,17

**marked** 42:11
43:12 47:25
53:15,23

**marshal** 66:24

**marshal's**
87:22

**marshals** 67:4

**Maryland**
37:19

**math** 49:9

**matter** 9:10
45:2 84:24 87:9

**Maureen** 10:4

**Mcdonald** 9:10
10:23,25 11:4,
10,21 12:8
37:18 47:7
79:8,13,19 81:5
82:24 83:25
87:1 88:24 89:7

**meaning** 25:15
64:9 66:2

**meant** 22:2
78:21

**Mederville**
28:13

**medications**
13:18

**meeting** 20:20
75:20

**meetings**
20:18

**member** 73:15

**memory** 13:19
46:13 51:5
52:19 61:2,4
63:22 74:12
80:2 84:9,17

**mentioned**
18:7 21:6 30:2
43:20 44:1
59:21 61:20

**met** 67:20
77:21

**might've** 53:11

**Mill** 78:21

**Mills** 19:17
21:7,14,19,23,
25 46:14,15,19
48:22 49:1
50:1,8 58:9,17
59:6 64:1,6,15
78:3 79:21
81:10,13

**mind** 29:4,5
37:14 52:19
67:19 72:4
74:24 84:3,21
86:16 88:1

**mine** 35:20
48:25 81:23

**minimize**
89:25

**minutes** 46:4
49:7 50:2 54:10
84:7

**Miranda** 24:1

**mistake** 53:11

**mobile** 54:10,
12,15

**Molly** 9:18
11:22 53:14
81:1 82:22

**moment** 19:7
30:6 57:12 78:8
81:22 86:2,16
90:25

**moments** 90:6

**month** 17:20
27:11

**months** 15:7

**morning** 11:21

**mother** 52:2
74:4

**move** 39:18
56:14 57:19,20,
24,25 58:9,10,
17 61:13 80:23
81:14 89:19

**moved** 15:2

16:4,14 33:23
34:1 35:7 59:2
60:21 78:9

**moving** 45:9
57:13 62:10

**multiple** 41:3

**murder** 70:13

_____

**N**

_____

**names** 49:22
51:23 66:20
80:3

**nature** 25:8
39:1

**needed** 20:12,
21 38:11,25
39:17 40:12
41:4 68:1 69:12
80:23 81:23
89:19 90:15

**neighborhood
s** 45:17

**night** 58:4
66:19 69:8,9
87:19 90:5
91:14

**normal** 65:2
84:5

**notebook**
34:12,13

**notes** 33:13,14
34:15 35:19,20,
22,23,24 36:1,
4,15,19

**notice** 51:25
83:6

**number** 9:13
40:7,8,14,16,
17,19 48:13,25
53:15

**numbers**
48:24 49:22

_____

**O**

_____

**object** 13:11

**Objection**
83:24 85:5,17,
23 86:21

**obligation**
24:4

**obligations**
23:23

**observations**
69:18

**observe** 41:15
62:23 63:2,10,
13,16

**observed**
59:21

**occurred**
73:17 84:15

**odor** 92:2

**offer** 81:20

**offered** 80:9

**offering** 82:3,
10

**office** 10:3,6,
10,18 17:16
35:17 36:23
37:8 87:22

**officer** 10:8
15:9,13 18:12
21:11,19 22:19
23:13,24 31:8
37:2 40:6,10,
16,18 46:14,15,
16,19 48:4,22
49:1,20,25
58:9,17 63:10
64:1,6,15 71:16
72:11,14 73:11,
22 76:18 78:3,
5,16,22 79:21,
22 81:10 92:1

**officers** 16:25
19:5,12,16
20:6,9,10,11,
22,25 21:17
22:12 34:6
36:15 37:12,23
39:17,19,22,24
40:11,13,21
41:6,19 45:11,
24 46:8 47:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 33 of 37 PageID
The Deposition of ROGER MCDONALD, taken on February 25, 2022 #: 3018

101

50:8 61:17
65:19,21 83:6
90:2

officers' 83:12

on- 64:25

on-the-job
31:4,5

one's 28:12

one-on-one
31:3

online 9:3

onlookers
41:11

oral 32:3

order 46:11

orders 83:12

origin 26:17

overheating
28:19

overtime
18:13

owner 56:21

**P**

p.m. 19:10
48:15 49:5 69:2
92:17

packed 63:1

pad 36:2

paper 34:13
70:21

park 27:14

parked 43:8

part 10:1 24:7
36:17 42:12
61:25 81:15

part-time 15:8
16:8 17:15

parties 11:3

party 12:20

passed 21:3

29:5

passive 62:10
80:9 82:3,10,18

passively
57:8,15

patrol 15:1,3,
13 16:3,4,12,
13,17,19,20,24
18:20 53:25
65:2,3

pay 16:22 18:5,
10,13 27:18

pen 70:21

Pendergraf
19:23 76:20
79:22

pending 9:11

people 27:9,13
41:9 45:16,19
48:24 52:6
62:18 78:1,15
82:14

period 27:1
31:1

permanently
17:14

person 50:16
54:9,10,12
82:4,5

personal
33:24 77:18
91:2

personally
72:19,24 73:6

pertinent
91:18

phone 79:25
88:9

photography
24:23

physically
44:17

pick 40:7 52:6
74:7

picture 12:2

pin 11:25 12:5

place 28:3 38:3
55:24

plaintiff 9:19,
22 11:22

plaintiff's 9:16

plant 49:19

point 17:2
18:20 21:13
23:11 32:22
33:22 34:1
36:24 37:24
39:23 40:24
44:10,20 46:23
50:19 52:12,20
53:25 55:8,14
57:4,22 60:3,
10,16 63:4 65:1
70:6,10 72:18
79:14 80:16
81:12,16

points 45:7

police 10:8,14
14:17 15:11,19,
23 16:3 17:7,22
18:8,11,21
23:1,3,5,9,13,
24 24:16,18
28:8 29:7
30:10,13,23
31:14 32:9,20
33:4 37:22 38:2
39:20 70:3 78:6
88:16

policies 29:8,
12,19,24 30:10
31:15,24 32:6
38:11

policing 14:16
24:25 84:4

policy 30:3
31:19,21,22
36:15 38:3

pops 88:1

porch 42:21

Port 71:17
72:16,25 73:11

position 18:13

80:23

positive 45:3
49:22

practice 34:3
69:21

prepare 74:19

presence 73:2,
4

pretty 22:23
24:6 26:25
30:20 36:17
41:10,13,19
44:12 45:1,23
50:15 56:5,7
64:22,23 68:12
70:20 88:4 90:7

primary 89:9,
24

printed 34:23

problem 50:6

procedure
61:10

procedures
29:8

proceedings
9:1 71:6

process 34:21
35:2

promoted 15:3
16:2

properly 33:4

prosecutors
38:4

prove 36:12

provide 20:25
25:21 27:6,13
30:3,14,24 48:7
70:1 76:2

provided
27:11 29:7
38:23 86:10,20

proximity
21:22 22:4
55:23,25 56:3
59:14 65:7
89:18

pull 11:1 25:24
29:19 36:23
41:24 81:1 82:8

pulled 36:25
43:17

pulling 58:7
90:18

punching 58:7

push 11:1 42:5

pushed 71:21

put 24:13 26:24
29:18,20 30:21
36:19 37:6
64:25 68:6,15
70:20 81:2,12,
17,20,22 82:14,
18,22 86:1,13

putting 59:3,6,
7 65:6,8,9

**Q**

qualify 41:7

question 13:4,
13 20:24 39:21
85:22 86:18

questions
13:2 33:14
79:14,15,19
80:6,9 85:2,9
86:3,25 87:6
88:20,24 89:1,3
92:9

quick 79:2

quickly 89:19

**R**

radio 38:17

raise 11:11

raising 83:10

ran 77:13 78:7

range 15:16
40:2 88:15

read 29:20,23
48:11 54:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 34 of 37 PageID
#: 3019
The Deposition of ROGER MCDONALD, taken on February 25, 2022

102

57:16 61:14
80:13 81:7 83:2
91:4

**reading** 31:24

**ready** 11:23

**reason** 21:17
22:6 72:22 73:8
82:6

**recall** 13:1 30:8
32:5,7,19 34:6,
8 36:13,14
37:11,13 38:10,
12 39:3 40:20
42:22 45:5,13
47:13,16 50:7,
10 51:1,2 53:21
61:19 65:9,10,
19,23,24 66:5,7
69:2,4,14 71:18
72:2,3,22
73:13,18,19
74:8 80:15,20
83:13 84:13
86:15,16 91:1,
10,12,13 92:7

**receive** 22:18
24:15,17

**received** 26:1
39:4 46:1

**recognize**
43:11 47:24
52:7

**recognized**
52:8

**recollect** 74:11

**recollection**
47:21 54:2
59:5,6 60:6
63:23 64:16
68:10 71:10
74:9 90:22 91:6

**record** 9:2
10:24 33:7
47:2,3,5,6 79:3,
4,6,7 92:14

**recorded**
33:17 34:7

**recorder**
33:11,12

**recorders**
33:24

**recording**
33:21,23 34:4
73:24

**REDIRECT**
89:5

**refer** 19:8

**refresh** 47:20

**regularly**
20:14,17

**relation** 88:11

**relevant** 24:9
25:5,7,9 34:16
67:6,11

**remain** 64:18

**remained**
44:23

**remember**
16:16 19:6,17
21:12,14,15,21
22:3,6 24:21
29:1,3,25 30:1,
12,19 31:16,17
32:11 33:6,8,12
35:4,9 36:6
37:4,15,18,25
38:5,7,20,22
40:23 41:16,18,
20 43:4,6,7,8,
23,25 44:4,5,6,
13,19,25 45:1,4
46:10,13,18,19
50:11,12,17,18,
19,21 51:12,13,
14,18,21,24
52:9,13,18,19,
24 53:2,3,6
56:3,12,17
57:2,3,5,6 58:3,
8,12,22 59:2,3,
8,18 60:1,3,9,
10,17,20,23
61:6,7,14,15,
16,17 63:4,12,
15,21,25 64:12,
17,20 65:5,8,20
66:10,12,14
67:2,21 68:7,9,
12,13 69:10,12,

17,20 70:2,3,6,
7,21 71:3,8,9,
13,15,22,25
72:5,8,13,17
73:3,23 74:1,6,
15 76:1 81:21,
25 82:7,8
84:11,12 85:10,
12,15,18 86:12
87:12,13,14,17,
20,21,24 88:10

**remembered**
22:4 85:11

**remembering**
39:11

**remind** 68:16

**remotely** 9:19,
22 10:2,6,10,
12,18,20

**rephrase** 13:5
25:14 67:9

**report** 24:14
25:2 35:11,25
36:23,25 69:19
70:1 86:14
91:16

**reported** 92:5

**reporter** 9:4
11:12,13,18
13:3 53:14

**Reporters** 9:5

**reports** 20:4
23:15 25:20,21
34:18,19,22
35:6,18,19
36:16,19 37:3,
10,12 70:4,7,10

**represent**
10:13 11:22
49:1,24 79:20
84:14 87:9

**representing**
9:4

**request** 49:18
57:11

**required** 32:5
34:18

**requirement**
36:3,6

**requires** 37:22

**requiring**
36:15

**residence**
54:9

**residential**
28:21,25

**resist** 81:12,17

**resistance**
58:6 62:10
80:9,16 81:19,
24 82:3,7,18

**resisting** 57:8,
15 62:9

**respond** 28:11
39:14 40:13

**responded**
38:13 39:16

**response** 42:2
80:8 85:8 86:19

**responses**
33:15

**rest** 90:10

**restrictions**
37:11

**retire** 17:12

**retired** 17:14
77:13

**Retirement**
17:16

**return** 69:7

**review** 64:9
70:4 74:25 75:2

**reviewed**
70:10

**ride** 31:9

**Rights** 24:1

**road** 43:14

**Robert** 9:10,
20,22 11:22
71:23 80:9
81:11,19

**Robinson-
staples** 9:21

**Roger** 9:9
10:25 11:3 47:7
79:8

**Ron** 19:17

**room** 33:17

**rotated** 20:8

**rotation** 20:7

**RPD** 42:8

**RPD1** 47:23

**RPD3** 48:6

**running** 42:16
43:15 90:4

**runs** 16:22

**Russellville**
9:11 10:8,9
12:17 14:20
15:11,19,23
16:3 17:7,22
18:21 24:16,18
27:3 28:7 29:7
30:10,13,23
31:14 32:9,20
33:4 38:2 39:19
45:22 78:6
79:23

——————

**S**

**Sadly** 85:18

**safe** 20:3,5
22:10,13,14,16
27:9,13 41:12
45:11 90:1,16

**safety** 40:12
55:8,10,12
59:11 81:23
89:9,12

**Sally** 71:17
72:15,25 73:11

**Sam** 66:21

**Saralynn**
51:20

**scanned** 48:10



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 35 of 37 PageID
The Deposition of ROGER MCDONALD, taken on February 25, 2022
#: 3020
103

scene 22:15
23:20 33:19
34:11 38:13,16
39:14 40:5,22
41:5,8,10,14
46:2,9,17,22
47:14 48:8,18
49:8 50:1 51:10
52:8,11 53:5
55:9 59:22
63:7,17 64:18,
22 65:1,14,17,
24 66:6,13
67:23 68:3,14
69:1,7,16 74:4,
10 83:20 89:24
90:2

scenes 51:7

scheduled
20:14,17

school 13:23,
25 14:1,15 27:4

Scott 9:25 10:1

screen 11:25
12:6 42:1,6,13
47:21 53:8
81:2,5 82:23,25

secretary
35:13

secure 35:16
65:3

seeking 64:7

send 14:22
40:11

senior 31:8

separately
88:2

September
18:20 23:4 32:8
33:3 38:14
39:20

sergeant 15:3,
22 18:23,25
81:13

sergeants
17:1

serving 85:1

set 33:16 52:18

share 81:2

sharing 62:12

sharper 84:21

sheet 49:2,25
68:15

Sheriff 9:25

Sheriff's 10:1
17:16,17,23

shift 19:6,8,11,
13 20:19,20
31:18,20

show 11:24
25:17 41:24
43:10 47:19
53:7 61:23
63:20

showing 71:4

shows 49:14

side 41:23
52:21 54:17
58:21

Siegel 10:19
87:5,9 92:11

sign 30:1 36:24

signed 36:25
37:1

simple 28:18

single 38:7
41:16

sir 13:21 87:7,
10 88:18

sit 34:8 83:13

sitting 52:5

situation 33:11
62:21 89:22
90:12,13

situations
82:15

skills 28:5

skipped 53:16

small 21:4 26:3
39:15 42:20

51:12,18

smell 59:25
91:13 92:6

smelled 59:24
60:2,12 85:16,
21 86:9,12,19
91:15

smelling 60:4,
6,10 85:10
86:16 91:10,12

Smith 10:15
77:1

smoke 41:17
43:21,24,25
44:6,10,13
52:11 55:15
57:3 91:14

smoothly
16:23

solemnly
11:13

sort 20:7,8 31:3
32:22,25 83:22

sound 13:6,9,
13

sounds 75:8

Sowell 10:16
11:8 89:1

speak 20:12
38:8 46:21
66:13,15 71:15
73:10,15,20
75:3,13

speaking 16:8
46:17 73:19

specific 30:14
32:19,24 33:3
36:14 38:10
43:21 44:2 50:8
82:1 87:24 91:3

specifically
39:3,10 46:11
51:2 65:24
84:13 87:23

specifics
87:14,16

spoke 46:22
67:22 79:25

spoken 68:2
75:17 87:25

spot 45:8

spray 27:8
50:24 62:13,20,
23 72:12

sprayed 62:11,
12 72:12

spraying
50:20

sprays 62:15

staffing 16:20

stand 21:17
45:8,17

standard
31:25

stands 21:24
22:6

STAPLES 9:21
11:6

start 12:1

started 11:23
15:1 23:4 27:4
35:7,8 54:15
55:1 88:16

starting 9:16
58:13 83:3

starts 26:15

state 9:14
10:14,23 27:11
34:25 35:4
66:24 67:15
77:16 87:22
88:5

statement
62:4,5

statements
61:1 62:1,2
83:5

States 9:11

stay 27:14
45:11

stayed 45:11
78:5

staying 22:10

step 54:13,19,
21

stick 29:4

sticks 67:19

Stilz 9:23 88:24
92:12

stood 32:24

stop 62:12

stopped 27:2
54:13,21 55:6
56:8,25 57:8

store 77:8

stored 34:25

straight 18:24

street 9:6
42:16 44:20,23
58:21

strike 24:16
28:10 30:9
34:20 36:14
40:4 63:6,10,13
64:10 74:24
76:8 91:11

striking 63:9

structure
38:21 50:13
56:21 68:5,11
89:19

stuck 72:4

studied 37:24

stuff 22:24
37:15

subject 54:14

subjects 32:21

submitted
70:5

substances
60:7 91:10

Suite 9:6

supervise



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 171    Filed 10/03/25    Page 36 of 37 PageID
The Deposition of ROGER MCDONALD, taken on February 25, 2022
#: 3021

104

16:24,25 17:3
19:12 21:7,11

**supervised**
17:2 21:6,9

**supervising**
19:3,16

**supervision**
14:23

**supervisor**
19:1,21,24 20:1
39:13

**supervisors**
32:3

**Supplemental**
69:25

**Supreme**
37:20

**surely** 71:8

**suspect** 25:16
66:11

**suspect's**
25:17

**suspected**
65:12

**swear** 11:12,13

**Sydney** 9:2
47:8 79:9

**system** 49:18

_____

**T**

**takes** 16:19

**taking** 13:18
33:18 69:14

**talk** 62:18 78:1

**talked** 25:4
74:21 87:18

**tase** 62:25 63:2

**taser** 63:1

**tasers** 63:3

**tasing** 63:5

**tasks** 69:2

**taught** 24:8,11
25:11,15,19

**technician** 9:3

**techniques**
82:13

**telling** 65:19

**ten** 77:14

**ten-minute**
46:24

**Tennessee**
27:24

**tenure** 28:11
29:13

**test** 84:22

**testified** 47:12
50:7 52:10
54:23 57:7
60:13 62:5
63:20 64:2
70:23 71:1 74:2
80:8 84:2,23
85:8,12 86:5
87:11 89:14
90:21 91:4,9,11

**testify** 13:16
71:6 72:24 73:1
80:21 90:7

**testifying**
53:21 54:2
71:11 84:9,13
85:19

**testimony**
11:14 54:6
57:14,18 58:11,
16 59:23 60:4
61:15,24,25
62:8 70:17
76:10 80:13
81:2,16 86:17
90:25

**that'd** 49:5

**thing** 20:8 31:3
36:7,8 46:12
78:9

**things** 24:25
26:11 27:9,15
29:5 33:18
34:9,13,14 35:1

39:11 45:15
59:19 83:20
84:18

**thinking** 31:18,
20

**thought** 25:10

**threats** 61:5,8

**Thursday**
75:15,16

**time** 9:8 17:2
19:4,6,21
21:13,16 23:11
27:4,19 30:10
32:16,22 33:18,
22 34:1 36:25
37:9,16,25 38:7
39:13,24 40:24
44:9,20 46:23
47:3,9,17 53:25
60:3 63:4 65:1
70:7 72:18
75:17,21 77:12
79:4,10 87:2
92:15

**times** 45:8

**today** 9:4,7
11:24 13:16
47:9 74:16,25
76:6 79:10 80:5
83:13 84:19,21
87:1,11

**today's** 74:19
92:14

**told** 75:24,25

**tone** 40:25

**tons** 41:11

**totally** 82:20
83:18

**touch** 78:5

**traffic** 46:5

**trailer** 41:16,21
42:21 43:13
44:14 45:1,6
50:21 51:3,22
52:21,22 53:1
54:17 55:2
56:3,4,8,18
58:10,18 59:1,

10,14 60:15,22
61:13 65:7 68:5
80:11 89:8,16

**training** 22:18,
20,22,25 23:10
24:7,15,17,20,
22,23 26:2
27:6,8,11,12
29:21 30:3,14,
16,20,24 31:1,
3,4,6,12,19,22,
23 32:6,9,12,
18,20 33:3
36:18 88:5

**trainings**
32:13,24

**transcribe**
13:3

**transcript** 54:6
82:25 83:3

**transported**
21:20

**transporting**
21:23

**tree** 58:23

**trial** 12:24
53:22 54:3,6
57:7 61:23
70:23 71:1,8
80:14 81:1
83:15,19 84:10,
14,15 85:2,12,
15,19 86:8,18
90:25

**trials** 84:23

**trooper** 77:16

**trouble** 82:22

**truck** 27:20,21

**trucks** 27:14
45:24

**true** 82:19,20
83:23 86:10

**truth** 11:15,16
24:21

**turn** 24:5
34:18,19 40:3
83:5

**turned** 25:23

**type** 20:7 33:18
40:24 41:2 63:9
67:20

**typically** 39:11

_____

**U**

**Uh-huh** 48:21
49:6 54:20,23,
25 55:10,13
56:9 58:15
77:24 81:18
84:16

**underneath**
49:13

**understand**
29:6,20,21
30:3,5 32:16
37:16 39:10
44:8 83:18

**understood**
31:25 49:20

**unit** 40:7,14,17,
19 48:9,13,20
49:2,10,11

**United** 9:11

**units** 41:3

**unsteady**
59:24

**unusual** 26:11
39:14

**update** 20:22

**updated** 29:12,
14 70:3

**updates** 21:1
29:17,18

_____

**V**

**verbal** 42:2
70:1

**verbally** 13:3

**verify** 29:23

**versus** 9:10
37:19 39:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

video 9:3,8
12:1,5 33:17
47:8 72:18
73:24 79:9

videotape
73:21

view 62:20

violent 62:19
82:4,15

vision 22:9

voice 83:10

volunteer
26:4,19,20,22
27:7,17,18 28:1
88:17

volunteered
85:20

_____

**W**

_____

walk 14:24
54:10

walked 68:11

walking 54:9

wanted 22:15

wanting 83:11

watch 22:9
31:9 45:17

water 27:9
50:20,24

wearing 63:19

week 52:4
75:16 80:1

weeks 14:13,
18 23:7,9 31:2,
9

West 9:5 10:14
67:14 76:22

Western 9:12

whatsoever
63:25

whistle 26:23

wide 41:16

wife 17:24,25

William 77:1

window 54:11

windows
43:24 52:15

witnesses
32:10 66:13
67:22

work 17:15
20:18,21 21:4
26:24 27:3,23
30:7 34:21
78:1,13,25

worked 15:7
26:4,21 31:7
35:2 37:8 39:5,
12

working 19:9,
13 24:18

worried 44:21

would've
18:25 39:5,25
40:21 50:15
60:13 61:9,10
62:5 67:3,7,10,
11,23,24 68:3
69:24 72:4,8
73:8

wreck 26:24

write 23:15
34:14

written 36:2
70:4

wrote 33:14
35:6

_____

**Y**

_____

year 14:4 15:18
22:21 24:19,23
27:1 28:15
29:15 35:5

years 12:14
14:11 15:2,14
17:19 26:22
27:23 33:24
37:5 77:14,20
88:7

Yell 9:10,20,22
11:22 21:20,23
51:23,25 52:20,
24 53:4,12
54:17,21 55:4
57:7,15 58:4,
10,17 59:7,14,
20,25 60:7,12,
15,19,22,25
61:12,24,25
62:8,11,13,23,
25 63:6,11,13,
19 64:2,19 65:3
66:11 67:8,12
69:3 70:14,18,
21 71:16,21,24
72:7,12,15,20
73:12,22,25
75:25 80:9
81:19 83:5,14
84:23 85:10,16,
21 86:9,20 89:8
90:22 91:12,15

Yell's 53:22
54:2 55:12
63:16,24 71:1,7
80:16 91:3

yelling 83:11

younger 84:20

_____

**Z**

_____

zeros 68:21

Zoom 10:2,10,
17 75:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com