

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 1:20-CV-0047-GNS

# ROBERT YELL

# V.

# CITY OF RUSSELVILLE, ET AL.

## DEPONENT:

## RONALD  MILLS

## DATE:

## February 14, 2022



a courtroom **powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1           IN THE UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF KENTUCKY

3                   AT BOWLING GREEN

4              CASE NO. 1:20-CV-0047-GNS

5             CHIEF JUDGE GREG N. STIVERS

6             MAG. H. BRENT BRENNENSTUHL

7

8                     ROBERT YELL,

9                      Plaintiff

10

11                         V.

12

13           CITY OF RUSSELLVILLE, ET AL.,

14                     Defendants

15

16

17

18

19

20

21

22

23    DEPONENT:  RONALD MILLS

24    DATE:       FEBRUARY 14, 2022

25    REPORTER:  SYDNEY LITTLE



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

1                  APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ROBERT YELL:
4    Elliot Slosar, Esquire
5    Amy Staples, Esquire
6    Molly Campbell, Esquire
7    Loevy & Loevy
8    311 North Aberdeen Street
9    Third Floor
10   Chicago, Illinois 60607
11   Telephone No.: (312) 243-5900
12   E-mail: elliot@loevy.com
13         amy@loevy.com
14         campbell@loevy.com
15   (Appeared via videoconference)
16
17
18
19
20
21
22
23
24
25

Page 4

1              APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, DAVID WEST, WILLIAM SMITH,
4    JAMAN CHILDERS:
5    Alea A. Arnett, Esquire
6    Kentucky State Police Legal Office
7    919 Versailles Road
8    Frankfort, Kentucky 40601
9    Telephone No.: (502) 782-1800
10   E-mail: alea.arnett@ky.gov
11   (Appeared via videoconference)
12
13   ON BEHALF OF THE DEFENDANTS, BUSTER CANNON, CITY OF
14   GEORGETOWN:
15   Maureen C. Malles, Esquire
16   Sturgill, Turner, Barker & Moloney, PLLC
17   333 West Vine Street
18   Suite 1500
19   Lexington, Kentucky 40507
20   Telephone No.: (859) 255-8581
21   E-mail: mmalles@sturgillturner.com
22   (Appeared via videoconference)
23
24
25

Page 3

1              APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, RONALD MILLS:
4    Benjamin Siegel, Esquire
5    Elizabeth Stone, Esquire
6    August Pozgay, Esquire
7    Department of Housing, Buildings and Construction
8    Public Protection Cabinet
9    500 Mero Street
10   Suite 218NC
11   Frankfort, Kentucky 40601
12   Telephone No.: (502) 573-0365
13   E-mail: benjamin.siegel@ky.gov
14         betsy.stone@ky.gov
15         august.pozgay@ky.gov
16   (Appeared via videoconference)
17
18
19
20
21
22
23
24
25

Page 5

1              APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, RUSSELLVILLE DEFENDENTS:
4    Jennifer L. Langen, Esquire
5    Jeffrey C. Mando, Esquire
6    Adams Law, PLLC
7    40 West Pike Street
8    Covington, Kentucky 41011
9    Telephone No.: (859) 495-3798
10   E-mail: jlangen@adamsattorneys.com
11         jmando@adamsattorneys.com
12   (Appeared via videoconference)
13
14   ON BEHALF OF THE DEFENDANTS, BUSTER CANNON, SCOTT COUNTY
15   KENTUCKY:
16   Lynn Sowards Zellen, Esquire
17   Kinkead & Stilz
18   PNC Bank Tower
19   301 East Main Street
20   Suite 800
21   Lexington, Kentucky 40507
22   Telephone No.: (859) 296-2300
23   E-mail: lzellen@ksattorneys.com
24   (Appeared via videoconference)
25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

APPEARANCES (CONTINUED)

1
2
3   ON BEHALF OF THE DEFENDANTS, BILL JENKINS, LOGAN COUNTY:
4   Aaron D. Smith, Esquire
5   J.A. Sowell, Esquire
6   Lindsey Porter, Esquire
7   English Lucas Priest & Owsley LLP
8   1101 College Street
9   PO Box 770
10  Bowling Green, Kentucky 42101
11  Telephone No.: (270) 781-6500
12  E-mail: asmith@elpolaw.com
13      jasowell@elpolaw.com
14      lporter@elpolaw.com
15  (Appeared via videoconference)
16
17  Also Present: Andie Layne - Videographer
18
19
20
21
22
23
24
25

Page 7

INDEX

1
2                                           Page
3
4   PROCEEDINGS                               9
5   DIRECT EXAMINATION BY MS. STAPLES        12
6   CROSS EXAMINATION BY MS. ARNETT          113
7   EXAMINATION BY MR. POZGAY                117
8   REDIRECT EXAMINATION BY  MS. STAPLES     124
9
10                      EXHIBITS
11                                           Page
12  1 - Fire Investigation Report Bates Stamp
13      - AG00001-AG00013                    25
14  2 - Fire Investigation Report Bates Stamp
15      - AG00001                            30
16  3 - Alan Gregory and Jack Flowers Personnel
17      Cabinet Bates Stamp - YELL 001079 -
18      YELL 001138                          33
19  4 - Affidavit for Search Warrant Bares Stamp
20      - KSP000032 - KSP000033              50
21  6 - Continuation Supplementary Uniform
22      Offense Report Bates Stamp - KSP000051  71
23  7 - Continuation Supplementary Uniform
24      Offense Report Bates Stamp - KSP000102  82
25

Page 8

STIPULATION

1
2
3   The VIDEO deposition of ROBERT MILLS was taken at
4   KENTUCKIANA COURT REPORTERS, LLC, 730 WEST MAIN STREET,
5   SUITE 101, LOUISVILLE, KENTUCKY 40202, via
6   videoconference in which all participants attended
7   remotely, on MONDAY the 14TH day of FEBRUARY 2022 at
8   10:06 a.m.; said deposition was taken pursuant to the
9   FEDERAL Rules of Civil Procedure.  The above-referenced
10  notarial act involved the use of communication
11  technology.  Specifically, the court reporter appeared
12  by videoconference pursuant to KRS 423.455 and complied
13  with all statutory requirements.
14
15  It is agreed that SYDNEY LITTLE, being a Notary Public
16  and Court Reporter for the State of INDIANA, may swear
17  the witness.
18
19
20
21
22
23
24
25

Page 9

PROCEEDINGS

1
2
3       VIDEOGRAPHER:  All right.  We are on the
4   record.  My name is Andie Layne, I'm the online
5   video technician and court reporter [sic] today
6   representing Kentuckiana Court Reporters, located at
7   730 West Main Street, Suite 101, Louisville,
8   Kentucky 40202.  Today is the 14th today of February
9   2022.  The time is 10:06 a.m. We're convened by
10  videoconference to take the deposition of Ronald
11  Mills in the matter of Robert Yell versus city of
12  Russellville, et al., pending in the United States
13  District Court for the Western District of Kentucky
14  1:20-CV-0047-GNS.  Will everyone but the witness
15  please state your appearance, how you're attending,
16  and the location you're attending from, starting
17  with plaintiff's counsel?
18      MS. STAPLES:  Amy Robinson Staples for the
19  plaintiff, Robert Yell.  And I'm attending remotely
20  from my home in Shelbyville, Kentucky.
21      MR. SLOSAR:  Elliot Slosar, also on behalf of
22  the plaintiff.  Attending remotely from Lemont,
23  Illinois.
24      MS. CAMPBELL:  Molly Campbell, also on behalf
25  of the plaintiff, Robert Yell.  Attending remotely



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  from Fairway, Kansas.
2      MR. MANDO:  Jeff Mando on behalf of the
3  Russellville police officer defendants.  Appearing
4  today remotely from Russellville, Kentucky with the
5  -- my client and witness, Ron Mills.
6      MS. LANGEN:  Jennifer Langen also on behalf of
7  the Russellville police officer defendants.
8  Appearing from my office in Covington, Kentucky via
9  Zoom.
10      MS. ZELLEN:  Lynn Zellen on behalf of Buster
11  Cannon, and Scott County, Kentucky.  Appearing
12  remotely via Zoom from my home in Lexington,
13  Kentucky.
14      MS. MALLES:  Maureen Malles on behalf of the
15  city of Georgetown, and Buster Cannon.  Attending
16  from my office in Lexington.
17      MR. POZGAY:  August Pozgay on behalf of Alan
18  Gregory.  And attending from Lexington, Kentucky by
19  Zoom.
20      MR. SIEGEL:  Benjamin Siegel, also on behalf of
21  Alan Gregory.  Attending remotely from my office in
22  Frankfort, Kentucky.
23      MS. ARNETT:  Amber Arnett --
24      MR. SOWELL:  J.A. Sowell on behalf of the Logan
25  County defendants.  Appearing from our office in

Page 11

1  Bowling Green, Kentucky via Zoom.  And as mentioned,
2  Sydney, Lindsey Porter will be taking over at some
3  points, and she's also representing them as well.
4      MS. ARNETT:  Okay.  And Amber Arnett.  I
5  represent the Kentucky State Police defendants,
6  Childers, West, and Smith.  Attending from Frankfort
7  remotely.
8      VIDEOGRAPHER:  And Mr. Mills, will you please
9  state your full name for the record?
10      THE WITNESS:  Ronald Mills.
11      VIDEOGRAPHER:  And do you have a photo ID on
12  you?
13      THE WITNESS:  I do.
14      VIDEOGRAPHER:  Will you just hold it up to the
15  camera for me?  Thank you.  Do all parties agree
16  that the witnesses, in fact, Mr. Mills?
17      MS. STAPLES:  We do.
18      VIDEOGRAPHER:  Thank you.
19      MR. SLOSAR:  Yes.
20      VIDEOGRAPHER:  And when you're ready,
21  Mr. Mills, will you raise your right hand so the
22  court reporter can swear you in?
23      COURT REPORTER:  Do you solemnly swear or
24  affirm that the testimony you're about to give will
25  be the truth, the whole truth, and nothing but the

Page 12

1  truth?
2      THE WITNESS:  I do.
3      COURT REPORTER:  Thank you.  You may begin.
4          DIRECT EXAMINATION
5  BY MS. STAPLES:
6      Q   Good morning, Mr. Mills, how are you?
7      A   Good.  How are you this morning?
8      Q   I'm doing well.  Thank you.  My name is Amy,
9  and I am one of the attorneys that represents the
10  plaintiff, Robert Yell, in this litigation.
11      A   Okay.
12      Q   And I'm going to be asking you some questions
13  today.
14      MS. STAPLES:  I should have asked this before
15  we went on the record.  Jeff, can you pin the screen
16  for Mr. Mills for me please?
17      MR. MANDO:  What are you asking me?  Amy,
18  you're frozen or I'm not -- what are you asking me
19  to do?
20      MS. STAPLES:  If you click -- go to my screen
21  on your screen, and right click.  At the top you
22  should see three little button -- three little dots
23  that come up.
24      MR. MANDO:  It's not doing it.
25      MS. STAPLES:  -- my screen?

Page 13

1      MR. MANDO:  No.  It's not doing that, Amy.  I'm
2  trying.
3      MS. STAPLES:  Okay.  So you're -- did you click
4  on my box?
5      MR. MANDO:  I clicked on -- yeah.  I'm clicking
6  on your photograph on your box.  Yeah.
7      MS. STAPLES:  Okay.  And there's no -- and when
8  you right click, three little dots aren't coming up
9  in the top of the screen?
10      MR. MANDO:  I'm right clicking your screen --
11      MS. STAPLES:  Uh-huh.
12      MR. MANDO:  -- and not there -- three little
13  dots are not coming up.
14      MS. STAPLES:  Okay.  You know what?  We can
15  deal with it on a break.  It's okay.  I just -- it
16  makes it easier if I have to show Mr. Mills some
17  documents, it makes it easier for him to see.
18      MR. MANDO:  I understand what you're saying,
19  and I'm just trying to make sure I -- it's just not
20  responding to me at this point.
21      MS. STAPLES:  Okay.
22      MR. MANDO:  And Amy, I'm on your box, so...
23      MS. STAPLES:  All right.  Well, we'll just deal
24  with it on a break.  I should have said something at
25  the beginning, and I forgot about that, so...

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB     Document 172     Filed 10/03/25     Page 6 of 51 PageID #:
3028
The Deposition of RONALD ADAMS, taken on February 14, 2022

14..17

Page 14

BY MS. STAPLES:
2     Q     All right, sir.  Have you ever been deposed
3  before?
4     A     Yes, I have.
5     Q     What's the last time that you gave a
6  deposition?
7     A     2006, if my memory's right.
8     Q     Was that in a civil, or a criminal case?
9     A     In a civil case.
10    Q     And what type of case was that, sir?
11    A     It was involving the Russellville Police
12  Department.
13    Q     Can you recall the name of that case?
14    A     I don't.  I was the complainant.  The city of
15  Russellville was the defendants.
16    Q     Okay.
17    A     Or, the police department.
18    Q     You had filed suit against the City of
19  Russellville?
20    A     I had.
21    Q     And what was that in regard to?
22    A     Regards to a reduction in -- in rank here at
23  the -- at the police department.  There was a
24  disagreement between myself and the -- and the chief at
25  the time.

Page 15

1     Q     And how did that litigation end?
2     A     Well --
3     Q     What was the result?
4     A     -- we settled.
5     Q     All right.  We may get back into that a little
6  bit more in a bit.  Sir, I'm going just go through some
7  of the rules today.  First and foremost, it is very
8  likely that I will ask a question that asks a question.
9  If I do so, I'd like for you to please let me know that,
10 and I'll do my best to rephrase the question.  Okay?
11    A     Okay.
12    Q     If for any reason you can't hear me, or you
13 don't understand the question, let me know that at as
14 well.  None of us want you guessing today to what I'm
15 asking you.
16    A     Okay.
17    Q     And because we're on video, and there're
18 several different attorneys participating remotely,
19 we would ask that you do your best to answer the
20 questions verbally, as opposed to nodding your head.
21    A     Will do.
22    Q     All right.
23    A     Understood.
24    Q     If at any time today you need a break for any
25 reason whatsoever, please let me know that, and we'll be

Page 16

1  sure to get you that break.  I just ask that if there's
2  a question that's pending, you go ahead and answer the
3  question first.
4     A     Okay.
5     Q     And during the deposition today, some of the
6  attorneys, both there in the room with you, and
7  remotely, will have some objections to the questions I'm
8  asking.  If you hear an attorney object, I would ask
9  that you hold off before giving your answer to let them
10 state their objection.  And then you'll be able to go
11 ahead and proceed with your answer, unless your attorney
12 instructs you not to do so.
13    A     Understood.
14    Q     All right.  Thank you, sir.  Do you have any
15 health conditions that would affect your ability to
16 testify competently here today?
17    A     No, ma'am.  Not that I'm aware of.
18    Q     Oh, I cut out just a little bit.  What was
19 your answer?
20    A     I said no, ma'am.  Not that I'm aware of.
21    Q     Okay.  Great.  Are you taking any type of
22 medication that would affect your memory?
23    A     No, ma'am.
24    Q     All right.  Sir, is it true that you served in
25 the United States military?

Page 17

1     A     I did.
2     Q     What branch did you serve?
3     A     United States Navy.
4     Q     And what years did you serve in the United
5  States Navy?
6     A     1977 to 1997.
7     Q     Did you retire from the Navy?
8     A     I did.
9     Q     And when you retired from the Navy in 1997,
10 what was your rank and title?
11    A     I was an E-6.  That was a first-class boiler
12 technician.  And my duty station at the time I retired
13 was chief of security at the telecommunications stations
14 on the island of Guam.
15    Q     Chief of security where?
16    A     The Naval telecommunications station on Guam.
17    Q     Okay.
18    A     NCTAMS is what it's known as.
19    Q     I'm assuming a chief of security position is
20 equivalent to a law enforcement position?
21    A     Correct.
22    Q     And how long did you hold that position, sir?
23    A     I was there for just under three years.
24    Q     While you served in the Navy, did you receive
25 any fire training?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

```
 1    A    Yes, ma'am.
 2    Q    What type of training did you receive
 3  regarding fire training in the Navy?
 4    A    Shipboard firefighting, damage control
 5  firefighting.
 6    Q    Can you explain that to me a little bit,
 7  please?
 8    A    In the Navy, all sailors are firefighters.
 9  If you have a fire on your ship, there's no place to
10  run, so every -- everyone has to be trained at -- in
11  combating fires aboard a ship.
12    Q    What did that training entail?
13    A    Initial training at Naval training station,
14  San Diego.  There are several firefighting schools. Some
15  are strictly firefighting where you're putting out
16  different classes of fires, but everything from an alpha
17  fire to a delta fire, and there are different
18  classifications there depending on the material that's
19  burning.  And then there are other firefighting training
20  that -- that involve other damage controls, such as
21  flooding, and -- and fire combined, and -- and different
22  types of -- of damage you may receive on a ship during
23  combat conditions.
24    Q    You're going to have to help me out a little
25  bit.  I understood you to say that it included a
```

Page 19

```
 1  firefighting from alpha to delta; is that correct?
 2    A    Correct.
 3    Q    And what does that mean, sir?
 4    A    Okay.  An alpha fire is anything that leaves
 5  an ash, such as paper, wood, things like that.  A bravo
 6  fire would be a fuel fire.  A charlie fire's an
 7  electrical fire.  And then a delta fire is a specialty
 8  fire, such as things like magnesium burning.
 9    Q    And is it accurate to say that you received
10  training on all four types of that fire?
11    A    Yes, ma'am.
12    Q    How many hours of firefighter training do you
13  think you received while you were in the Navy?
14    A    Over a 20-year period, it would be -- I -- I
15  couldn't say exactly.  The initial firefighting class is
16  a three, or four-day class.  And then there's
17  sustainment training, every couple years you return for
18  a -- a refresher course, which may be just a day.
19    Q    Did you say that was every year, or every
20  couple years?
21    A    Every couple of -- any time you change
22  commands, or any time your command has the ability to do
23  without part of its crew to send them to the firefighter
24  training.  Anyone who has been away from that training
25  for the longest period of time would be the first to go.
```

Page 20

```
 1    Q    While you served in the Navy during that 20
 2  years, did you have the opportunity to fight some fires?
 3    A    I did.
 4    Q    Do you have an estimate of how many fires that
 5  you fought during that time?
 6    A    Actual fires would've been two.
 7    Q    Two?  And where did those fires fit on the
 8  classification of alpha to delta?
 9    A    There was a fire on the USS Okinawa.  We
10  assisted their fire -- their -- their crew fighting that
11  fire.  And then there were probably everything except
12  delta involved in that fire.  There -- there was a -- it
13  involved a -- a large portion of the ship, so there were
14  several different things on fire at the time.
15    Q    And what was the second type of fire that you
16  fought?
17    A    The second fire was a brush fire, and it was
18  -- it was on the island of Guam.  But I -- and I was not
19  a firefighter at that time, but being in the Navy when
20  our fire department responded, then of course we -- we
21  assisted.
22    Q    Did your training include how to determine the
23  origin of a fire?
24    A    No, ma'am.
25    Q    Did it include how to determine the cause of a
```

Page 21

```
 1  fire?
 2    A    No, ma'am.
 3    Q    Were you trained on the meaning of flashover?
 4    A    No, ma'am.
 5    Q    Do you have an independent knowledge of what
 6  the term "flashover" means when it comes to fire?
 7    A    Just what I believe that I can -- and I'm not
 8  sure my term flashover would be an accurate term.
 9    Q    What is it that you believe flashover means?
10    A    Once air -- be it there's smoke, and there's
11  heat, and there's fuel.  Once air gets to it, then it
12  will flash into a fire.
13    Q    And you said that -- when there's heat
14  included in those conditions, it flashes over; is that
15  right?
16    A    Yes.  Heat, fuel, and air.
17    Q    Did you have an understanding of what full
18  room involvement means when it comes to fires?
19    A    My understanding is that the -- the -- the
20  entire room would be involved in the fire.  That would
21  just be a -- a -- the layman's understanding of it.
22    Q    The entire room would become engulfed in
23  flames?
24    A    I would say that would be a fully involved
25  room.  Yes, ma'am.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of RONALD MILLS, taken on February 14, 2022

22..25

Page 22

1    Q    Okay.  Did you receive any type of
2  certification for your firefighter training when you
3  were in the Navy?
4    A    Just a -- a recording in our -- in our
5  personnel files that we had attended the training.
6    Q    Did the fire training that you received in the
7  Navy include training on the National Fire Protection
8  Association guidelines?
9    A    I'm not familiar with those, no.
10   Q    Okay.  Now, sir, after you retired from the
11 Navy in 1997, did you begin a career in civilian law
12 enforcement?
13   A    Yes, ma'am.
14   Q    Can you walk me through your law enforcement
15 career?
16   A    I tested with multiple police departments, and
17 I was accepted by the Bowling Green Police Department.
18 I was a member of the Bowling Green Police Department
19 when I attended the police academy in Richmond at EKU.
20 I was at Bowling Green for two years, roughly, including
21 police academy time.  And then I was driving through
22 Russellville, and -- and noticed that -- that they were
23 hiring police officers, and I applied, and was -- and
24 was hired by the Russellville Police Department.
25   Q    Are you from western Kentucky, originally?

Page 23

1    A    I am not.  I'm originally from Fresno,
2  California.
3    Q    How did you end up in Bowling Green, Kentucky?
4    A    My wife is originally from Kentucky, and it
5  happened to be one of the places that we decided we
6  wanted to reenter civilian life.
7    Q    I'd assume there's a little bit of difference
8  between Fresno, California and Bowling Green; is that
9  correct?
10   A    There is.  She actually wanted to stay in
11 California, and I wanted to come to Kentucky, so...
12   Q    Interesting.  Okay.  So you started out your
13 career in Bowling Green, and I think you stated you were
14 there for a couple years; is that correct?
15   A    Yes, ma'am.  Yes, ma'am.
16   Q    And then you applied and were hired by the
17 Russellville Police Department?
18   A    Correct.
19   Q    Can you recall the year that you began your
20 employment with the Russellville Police Department?
21   A    Yes, ma'am.  It was October 10, 1999.
22   Q    All right.  And when you were hired on October
23 10, 1999 with the Russellville Police Department, in
24 what position were you hired?
25   A    Patrol officer.

Page 24

1    Q    How long did you remain an officer with the
2  Russellville Police Department?
3    A    Until 2006.
4    Q    Sir, according to the documents that I've
5  seen, it appeared that your badge number while you were
6  with Russellville was 831; is that correct?
7    A    Correct.
8    Q    Okay.  So it's accurate to state that you were
9  employed with the Russellville Police Department on
10 September 11th of 2004; is that right?
11   A    Yes, ma'am.
12   Q    What rank were you on September 11, 2004?
13   A    Sergeant.
14   Q    Were you on duty on the evening of September
15 11, 2004?
16   A    Yes, ma'am.  Yes, ma'am.
17   Q    And were you dispatched to a disturbance on
18 North Morgan Street in Russellville?
19   A    Yes, ma'am.
20   Q    Sir, I sent some exhibits to counsel this
21 morning.
22        MS. STAPLES:  Jeff, were you able to print
23   those out, or do I need to share my screen for the
24   exhibits?
25        MR. MANDO:  You're going to need to share your

Page 25

1  screen --
2        MS. STAPLES:  Okay.
3        MR. MANDO:  -- I was on the road when you sent
4    that e-mail, so...
5        MS. STAPLES:  Okay.  I understand.  Sir, if you
6    give me just one second, I'd like to pull up a
7    document for your review.
8        MR. MANDO:  Some of them, Amy, I might have
9    with me just in my own file, so (Inaudible).
10 BY MS. STAPLES:
11   Q    Okay.  All right.  Mr. Mills, are you able to
12 see the document that's on the screen?
13        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
14   A    Yes, ma'am.
15   Q    Do you recognize this document?
16   A    It appears to be a CAD from our dispatch.
17   Q    And you're familiar with CADs from your law
18 enforcement career?
19   A    Yes, ma'am.
20   Q    Could you just give me a quick explanation as
21 to what a CAD is?
22   A    A citizen calls our dispatch with a complaint,
23 or report of some type, our dispatchers create a
24 document, a record of that -- of that call, times,
25 places, personnel involved, and then the -- the CAD will

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1  continue on, any actions that are taken, or any
2  communications between the officers, or the -- or the
3  person calling and our dispatcher.
4      Q    Okay.  And according to this document, is it
5  accurate to state that there was an incoming call on
6  9-11-2004 at 1919?
7      A    Yes, ma'am.
8      Q    And that would be 7:19 p.m.; is that correct?
9      A    Correct.
10     Q    And the event was a disturbance in progress?
11     A    Yes, ma'am.
12     Q    And the name of the caller was a Charlotte
13 Bellar?
14     A    Yes, ma'am.
15     Q    Okay.  Now, my apologies.  This apparently was
16 scanned a little crooked, so some --
17     A    That's okay.
18     Q    -- of the information is cut off, but I'm
19 going to jump to the third page of this document.
20 Do you see your unit number there?
21     A    Yes, ma'am.
22     Q    And we've established your unit number's 831;
23 is that correct?
24     A    Correct.
25     Q    What does 10-18 stand for in police code?

Page 27

1      A    En route.
2      Q    So is it accurate that you were en route at
3  1920?
4      A    Yes, ma'am.
5      Q    And again, that would be 7:20 p.m., correct?
6      A    Correct.
7      Q    All right.  So you agree with me that you got
8  the call, and you headed towards North Morgan Street on
9  7:20 p.m. that evening?
10     A    Yes, ma'am.
11     Q    Was anyone in the vehicle with you when you
12 received that call?
13     A    My K-9.
14     Q    Were you a K-9 handler with the Russellville
15 Police Department at that time?
16     A    Yes, ma'am.
17     Q    And what types of cases did you work with your
18 K-9?
19     A    Ed, he was trained in patrol and narcotics.
20     Q    Was your K-9 an arson K-9?
21     A    No, ma'am.
22     Q    Arson detection K-9?
23     A    No, ma'am.
24     Q    Okay.  Do you recall, while you were en route
25 to the scene there at North Morgan, to -- receiving

Page 28

1  another call from dispatch about a potential fire?
2      A    Yes, ma'am.
3      Q    And that call was received just a few minutes
4  after you got the initial disturbance call; is that
5  correct?
6      A    Correct.
7      Q    Okay.  So after receiving those calls, did you
8  proceed to the location?
9      A    Yes, ma'am.
10     Q    And where did you arrive first?
11     A    I arrived on Morgan Street for the -- at the
12 initial caller's residence.
13     Q    Okay.  At Ms. Bellar's residence?
14     A    Yes, ma'am.
15     Q    And you spoke with Ms. Bellar at that time?
16     A    Yes, ma'am.
17     Q    Was anyone else present at the scene when you
18 were speaking with Ms. Bellar?
19     A    No, ma'am.
20     Q    And while speaking with Ms. Bellar, did she
21 inform you that the home behind hers appeared to be on
22 fire?
23     A    Yes, ma'am.
24     Q    Did you personally observe any evidence of the
25 home being on fire while you were at Ms. Bellar's?

Page 29

1      A    Yes, ma'am.
2      Q    And what did you see?
3      A    As I stepped to the side of Ms. Bellar's home,
4  I could see the house behind her, and there was smoke
5  coming from around the eaves, and there appeared to be
6  fire in the windows at -- at the back of the house.
7      Q    So while you were standing at Ms. Bellar's
8  home, you could see the back of the residence that was
9  on fire?
10     A    Correct.
11     Q    And you could see smoke coming from the eaves,
12 and flames in the back of the home; is that correct?
13     A    It appeared to be flames.  I -- I hadn't
14 approached the house yet.
15     Q    Were those flames coming outside of the house
16 at that time, or were they enclosed inside?
17     A    They enclosed.
18     Q    Did you proceed to the residence that was on
19 fire?
20
21
22     A    Yes, ma'am.  I did.
23     Q    Did you do so via foot?
24     A    Yes, ma'am.
25     Q    Okay.  And did Ms. Bellar follow you there?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1    A    She did.
2    Q    And when you first approached that residence,
3 what did you observe?
4    A    There was smoke coming from the back of the
5 house. There was, again, a -- a glow in the windows.
6 I was working my -- I was working way around to the
7 front of the house, and Ms. Bellar informed me that
8 there may be children inside the house.
9    Q    Okay. Now, I'm going to pull up a second
10 document which I've marked as Plaintiff's Exhibit number
11 2.
12         (EXHIBIT 2 MARKED FOR IDENTIFICATION)
13         MR. MANDO:  (Coughs) excuse me.
14         MS. STAPLES:  And Sydney, for the record, that
15    CAD report has been marked as Plaintiff's Exhibit
16    number 1.
17         COURT REPORTER:  Got it.  Thank you.
18 BY MS. STAPLES:
19    Q    Give me just one second, please, sir.  All
20 right, sir.  Are you able to see this document on my
21 screen?
22    A    Okay.  Investigate -- a fire investigation
23 report?
24    Q    Correct.
25    A    Yes, ma'am.

Page 31

1    Q    Have you ever seen this document before to
2 your knowledge?
3    A    No, ma'am, I haven't.
4    Q    All right.  For the record, this is what's
5 Bates stamped AG00001.  I am going to scroll down
6 because specifically what I'm interested in is whether
7 you recognize the structure in some photos that were
8 attached to this report.
9    A    Okay.
10    Q    And I'll represent to you that this fire
11 investigation report is the report that was drafted
12 regarding the fire that is at hand today.  All right.
13 Do you recognize this structure, sir?
14    A    Yes, ma'am.
15    Q    Is this the residence that you saw on fire?
16    A    Yes, ma'am.
17    Q    Okay.  My understanding is that this is a
18 picture of the front of the house.  Does that look
19 familiar to you?
20    A    Yes, ma'am.
21    Q    And would you agree that that is the front of
22 the trailer?
23    A    Yes, ma'am.
24    Q    Okay.  Do you recognize the second picture?
25    A    It's -- I guess, would be the side of the

Page 32

1 house.
2    Q    All right.  And do you recognize this third
3 picture?
4    A    That would be the rear of the home.
5    Q    And this is the view that you first observed
6 when walking over to the fire; is that correct?
7    A    No, ma'am.  Not from this angle.
8    Q    No?
9    A    No.
10    Q    I believe that's the opposite side of the
11 trailer; is that correct?
12    A    Correct.
13    Q    All right.  Let me see if we can find -- well,
14 I think the rest of these are internal pictures.  So
15 that third picture that I showed you of the rear,
16 that's not the --
17    A    That --
18    Q    -- trailer that you saw?
19    A    That's the angle from what would be the -- the
20 northwest -- coming from the northwest direction.  And I
21 would've approached from the other back corner.
22    Q    Okay.
23    A    From the southeast corner.
24    Q    Let me show you another document, and see if
25 you recognize this, and if that will help us.  For the

Page 33

1 record, I am showing the witness what I've marked as
2 Plaintiff's Exhibit number 3.  It is Bates stamped Logan
3 Circuit 45.  Do you -- can you see this on my screen,
4 sir?
5         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
6    A    Yes, ma'am.
7    Q    Do you recognize this document?
8    A    It looks like a floor plan of the home.
9    Q    Okay.  Can you tell me, by looking at this
10 document, which way that -- or which part of this
11 trailer that you first observed?
12    A    The rooms that are marked "Bedroom" and "East
13 Room."
14    Q    Okay.
15    A    Okay.  I would've been coming from -- from
16 looking at the document, the top right.
17    Q    Top right.  All right.
18    A    Yes, ma'am.
19    Q    And --
20    A    And I believe the photo you showed me was from
21 the top left.
22    Q    Okay.  I understand.  Thank you for making
23 that clarification.  So when you first observed the
24 smoke coming from the trailer, was it coming from the
25 area of the east room and bedroom?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1       MS. ARNETT: Object to form.
2       A    The -- the bedroom and east room, yes, ma'am.
3  That -- that side of the house.
4       Q    Okay.  And when you said that you first
5  observed flames in the home, where did you first observe
6  those flames when you were looking at the building
7  externally?
8       A    Externally, there was smoke coming from the
9  window, and I could see glow in the windows.  I -- I
10  didn't actually have a -- look at flames until I was
11  at the front door.
12      Q    Okay.  Thank you for that clarification.
13  So from what room was the glow coming from, according to
14  your observation?
15      A    The -- the bedroom.  The back bedroom.
16      Q    All right.  We're probably going to -- well,
17  let me ask you this.  You said that you first approached
18  from the rear, and then you made your way around to the
19  front of the trailer; is that correct?
20      A    Correct.
21      Q    When you first approached the trailer, did you
22  observe any individuals present there at the scene?
23      A    No, ma'am.
24      Q    Did you observe anyone leaving the vicinity of
25  the trailer when you first approached?

Page 35

1       A    No, ma'am.
2       Q    Were any other law enforcement officers
3  present at that time?
4       A    I don't believe Officer Higgins had arrived at
5  that time.  In fact, no, as I was making my way around
6  to the front of the trailer, I was instructing other
7  responding officers to -- to pick it up, to -- to -- to
8  increase their speed in getting there because I was
9  informed there may be children in the house, and I
10  needed help.
11      Q    And how were you informing the officers of
12  that -- the need for speed?
13      A    That's -- with my -- with my portable radio.
14      Q    Okay.  Is it accurate to state that when you
15  first came around to the front of the trailer there
16  weren't any fire department personnel there?
17      A    Correct.
18      Q    Now, when you walked around to the front of
19  the trailer, what did you observe?
20      A    I went to the front steps, the front door,
21  I leaned in, stepped in just inside the door, not really
22  entering the home, but -- but just inside, and was
23  calling out for anyone that -- that may be inside.
24      Q    Did you get a response to that, sir?
25      A    I did not.

Page 36

1       Q    Let me show you that diagram just one more
2  time.  You said that she walked around to the front of
3  the structure, and leaned in.  When you leaned into the
4  front of the structure, what room was it that you were
5  leaning into?
6       A    That would be the living room.
7       Q    Okay.  And here, where it says, "April picking
8  up SaraLynn," would that be the front door that you
9  leaned into?
10      A    That is the front door.  Yes, ma'am.
11      Q    All right.  Was the front door open, or closed
12  when you first arrived there?
13      A    Front door was open.
14      Q    When you leaned into the structure, what did
15  you observe in the home?
16      A    There was smoke in the home, and there was
17  active fire in the bedroom that we identified before,
18  in the back of the house.
19      Q    Where was the smoke that you observed?
20      A    Along the ceiling.  Along the ceiling, and --
21  and just in the room.
22      Q    And when you're -- when you say along the
23  ceiling, in the room, what room are you speaking of?
24      A    The -- the living room that I was standing in.
25      Q    Okay.  And you testified that there was active

Page 37

1  fire in the back bedroom?
2       A    Correct.
3       Q    That's the same bedroom where you had seen the
4  glow from the rear of the home; is that correct?
5       A    Correct.
6       Q    All right.  I'm assuming if you were able to
7  see that there was fire in that back bedroom, that the
8  door to that bedroom was open.  Is that an accurate
9  assumption?
10      A    I don't believe there was a door.
11      Q    There was not a door.  Okay.  Now, when you
12  first arrived and leaned into that structure, was one of
13  your concerns determining whether or not anyone was in
14  the home?
15      A    Correct.
16      Q    Was your -- another one of your concerns in
17  determining where the fire was located at that time?
18      A    Yes.
19      Q    And your testimony is that the fire at that
20  time was located in that back bedroom?
21      A    Correct.
22      Q    Okay.  After leaning in and hollering out and
23  observing the location of the fire, what did you do
24  next?
25      A    I believe I stepped away from the -- from the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB   Document 172   Filed 10/03/25   Page 12 of 51 PageID #3034
The Deposition of RONALD MASH, taken on February 14, 2022
38..41

Page 38

1  structure and saw April Carpenter coming down the
2  street.
3      Q    At the time that you saw April Carpenter
4  coming down the street, were you aware that she was the
5  mother of the children that were in the trailer?
6      A    I didn't recognize her at first.
7      Q    Had you -- were you familiar with
8  Ms. Carpenter prior to this date?
9      A    Yes, ma'am.
10     Q    How were you familiar with Ms. Carpenter?
11     A    We had responded to the location on -- on
12 domestic disturbance calls in the past.
13     Q    Okay.  Now, when you saw Ms. Carpenter
14 approaching the structure, from what direction was
15 Ms. Carpenter approaching?
16     A    She was coming from the north.
17     Q    And would that have been towards the front of
18 the trailer?
19     A    The side of the trailer.
20     Q    Did you speak to Ms. Carpenter when she first
21 walked up to the scene?
22     A    I did not -- I did not recognize her at first.
23 I -- I spoke with Ms. Bellar, and when I realized who
24 Ms. Carpenter was, she was between myself and the -- and
25 the structure, going across the yard.  I -- I tried to

Page 39

1  intercept her, and she stepped inside the -- the door,
2  and picked up Saralynn.
3      Q    What steps did you take to try to intercept
4  her?
5      A    Well, I was walking toward her, trying to get
6  between her and the structure, and calling to her,
7  telling her not to go in.  And she stepped in, grabbed
8  Saralynn.  Well, she turned around, she handed Saralynn
9  to me, and we both stepped back away from the trailer.
10     Q    When you first leaned into the structure, did
11 you -- I know you said you didn't make contact with
12 anyone by yelling, but did you observe anyone in the
13 trailer?
14     A    I did not.
15     Q    So you did not see Saralynn there when you
16 first leaned into the structure --
17     A    No.  I --
18     Q    -- is that right?  Okay.  Saralynn was
19 Ms. Carpenter's infant daughter; is that correct?
20     A    Correct.
21     Q    Okay.  And so you said she stepped in,
22 retrieved Saralynn, and then what did she do with
23 Saralynn?
24     A    She turned toward me and I took Saralynn from
25 her, and we -- we exited the house.

Page 40

1      Q    What did you do next?
2      A    I gave Saralynn to Ms. Bellar.  She was in
3  front.  I handed her to Ms. Bellar, and then I
4  reapproached the house because that was a confirmation
5  that -- that there -- there were children inside, and at
6  that time I entered the house.
7      Q    What do you remember about Saralynn's
8  condition at the time that Ms. Carpenter handed her off
9  to you?
10     A    She was limp, unresponsive.  I -- I -- I don't
11 know if I can describe how it -- how it felt my hands.
12 I don't want to -- I don't want to sound disrespectful,
13 but it felt almost like a -- a greasy ham.
14     Q    And, you know, sir, I should have said this
15 from the beginning, and my apologies for failing to do
16 so, but I can only imagine what this situation was like
17 for you, being one of the first responders there on the
18 scene, considering the tragic, you know, circumstances
19 that took place thereafter.  So I am sorry that I had to
20 kind of bring you back to this time and place, but I
21 appreciate you being so forthcoming.
22     A    I understand.
23     Q    I know it's a difficult thing to think about,
24 I'm sure.  When Ms. Carpenter retrieved Saralynn from
25 the trailer and handed her back to you, had any other

Page 41

1  first responders arrived yet at the scene?
2      A    During that time, Officer Higgins had arrived.
3      Q    And Officer Higgins was a colleague of yours
4  with -- at the Russellville Police Department; is that
5  right?
6      A    Yes, ma'am.
7      Q    Okay.  Can you recall what rank Officer
8  Higgins held at that time?
9      A    He was a patrol officer.
10     Q    And you were a sergeant at that time; is that
11 right?
12     A    Correct.
13     Q    Was Officer Higgins one of the officers that
14 you supervised in your role as sergeant?
15     A    When I was a supervisor of the shift, yes.
16     Q    Okay.  Did you speak to Officer Higgins when
17 he arrived?
18     A    I did.  I believe I advised him to stay with
19 April Carpenter, and that's when I gave Saralynn to -- I
20 believe I gave Saralynn to Ms. Bellar, that -- that
21 seems to be my recollection, but I know it was a
22 neighbor standing out front.  And then -- and then I
23 reapproached the trailer.
24     Q    Now, sir, it's my understanding that April
25 Carpenter entered the trailer a second time.  Is that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 13 of 51 PageID #:3035
The Deposition of RONALD MILAM, taken on February 14, 2022
42..45

Page 42

1  your recollection?
2      A    No, ma'am.
3      Q    You don't recall her going into the trailer a
4  second time with Officer Higgins?
5      A    No, ma'am.
6      Q    Okay.
7      A    Not -- not to my knowledge.  No, ma'am.
8      Q    Okay.  You testified a bit ago that you
9  entered the trailer a second time; is that correct?
10     A    Correct.
11     Q    Did anyone go into the trailer with you at
12 that time?
13     A    Officer Higgins had followed me into the
14 trailer, yes.
15     Q    How far did you go into the trailer upon that
16 second entry?
17     A    About halfway across the living room.
18     Q    Let me share that diagram with you one more
19 time.  Can you see that, sir?
20     A    Yes, ma'am.
21     Q    Okay.  If you're looking here at the living
22 room, can you tell me what you see there in this
23 diagram?
24     A    Okay.  I see where April picked up Saralynn.
25 I see a couch.  I see a figure identified as myself, and

Page 43

1  then the layout of the trailer.
2      Q    Okay.  And the area in which April picked up
3  Saralynn, I believe that was a -- what was purported to
4  be, like, a baby bed.  Did you observe that baby bed
5  when you walked into the trailer that second time?
6      A    I did not.
7      Q    Okay.  And as you stated, there was a couch
8  there in the living room?
9      A    Correct.
10     Q    And is it accurate to say that you stood close
11 there to the couch?
12     A    In -- in front of the couch, yes.
13     Q    Okay.  Which was about halfway across the
14 living room?
15     A    That's where I went -- the -- this diagram is
16 not exactly, of course, but it would've been in front of
17 the couch, would -- which would've been about halfway
18 across the living room, yes.
19     Q    Okay.  Where on this diagram would you place
20 Officer Higgins at this time?
21     A    Between me and the -- and the front door.
22     Q    Okay.  When you're standing there in front of
23 the couch, what did you observe in regard to the fire?
24     A    The back bedroom was still on fire.  There was
25 still flames in the back bedroom.  And --

Page 44

1      Q    And that's the same one that you observed --
2      A    Correct.
3      Q    -- initially being on fire?  Okay.
4      A    Correct.  The same bedroom.  And there was a
5  fire on the opposite living room wall where it would've
6  -- toward the hallway.
7      Q    Would it help if I put that diagram back up
8  again?
9      A    Sure.  Okay.  It would've been the -- on the
10 wall between the living room and the first bedroom going
11 down the hallway.
12     Q    Okay.  The -- and are you speaking -- the
13 bedroom here that also says blanket and sheet?
14     A    Correct.
15     Q    Okay.  So the fire, at that point, was on the
16 wall in between the back bedroom where you had initially
17 seen the fire and then this -- the first bedroom to the
18 left?
19     A    On the wall.  I don't know if it was in the
20 bedroom or not.  I never made it that far.
21     Q    Okay.  So you saw it in the hallway there?
22     A    Correct.  And also -- by then there was also
23 fire in the kitchen.
24     Q    And can you recall what that wall in the
25 hallway was made of?

Page 45

1      A    I do not.
2      Q    My understanding from reading the documents is
3  that that wall had some wooden paneling on it.  Does
4  that refresh your recollection?
5      A    I -- I wouldn't argue with that.
6      Q    Okay.
7      A    Wood -- wood paneling.
8      Q    Is it -- okay.  So you testified that you saw
9  it in the back bedroom, in the hallway, and in the
10 kitchen at this point?
11     A    On the -- in the back bedroom, on the wall
12 leading to the hallway, and the kitchen.
13     Q    Okay.  All right.  And the wall that you're
14 speaking of leading to the hallway was the wall in that
15 back bedroom where you initially observed the fire?
16     A    No, ma'am.  In the -- in the back bedroom, and
17 now in the kitchen behind me.
18     Q    Yes, sir.
19     A    And then on the wall, it -- it -- coming out
20 of the back bedroom room, there's a hallway.
21     Q    Yes, sir.
22     A    The wall op -- the -- then the wall opposite
23 of the hallway.
24     Q    Okay.
25     A    So it would've been that -- the common wall

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  between the living room, and the first bedroom.
2      Q    Thank you.  Now, there were no flames near the
3  couch where you were standing; is that right?
4      A    Correct.
5      Q    And there were no flames -- well, strike that.
6  Is it your testimony that you never observed the baby
7  bed in that living room, or just not the first time that
8  you leaned into the structure?
9      A    I didn't notice it on either entry.
10     Q    Okay.  Regardless, did you observe any flames
11 within the living room itself?  The living room area?
12     A    Just on the far wall connecting the first
13 bedroom.
14     Q    And what were your observations regarding the
15 smoke?
16     A    The smoke was getting pretty intense at that
17 time.
18     Q    And when you say the smoke was getting pretty
19 intense, what do you mean by that?
20     A    It was lowering from the ceiling, the -- the
21 -- the layer of smoke above the ceiling was getting
22 thicker, down to where we had to bend over in order to
23 not have our heads in the smoke, and smoke was starting
24 to go out the front door.
25     Q    Was the front door still open at this point?

Page 47

1      A    Yes, ma'am.
2      Q    How would you describe the heat, or the
3  temperature inside the structure at that time?
4      A    It was extremely hot.
5      Q    When reading your trial testimony in this
6  case, I believe that you testified that it was the type
7  of heat that blast you in the face.  Is that an accurate
8  description of the heat --
9      A    Yes.
10     Q    -- that you felt?
11     A    Yes.  See, I believe I described it as -- as
12 putting your face down to the oven when you open the
13 oven door.  So -- and -- that -- that -- that's the best
14 way I could describe it, you know, was to put your face
15 down, then open the oven door, when the heat first come
16 out.  It -- it was -- it was intense.
17     Q    And now, I believe that the heat was so
18 intense that you stated that you became concerned with
19 the fact that Officer Higgins was in the trailer; is
20 that accurate?
21     A    Yes.  Yes, ma'am.
22     Q    And why did you have that concern
23 specifically?
24     A    At the time I was a K-9 officer and I wore a
25 different uniform.  The -- the street uniform for the

Page 48

1  police officers is -- is a polyester type, and the
2  extreme heat will melt that.  My uniform was a -- more
3  of a cotton type of work uniform because with the K-9
4  sometimes I'm out in -- in the brush, or -- or in the
5  wooded area, and it's a uniform better suited to that.
6      Q    I understand.  Now, once you observed this
7  smoke beginning to roll out the front door as you
8  described, is it then that you became concerned that a
9  flashover was going to occur?
10     A    That's -- if -- if my term of flashover is
11 correct, you know, it's a -- that I was concerned that
12 with the smoke going out the front door, and the -- and
13 the contact with the oxygen, that it would create, you
14 know, a -- a flash fire.
15     Q    So at that --
16     A    And again, I'm not sure if I'm using the term
17 flash fire correct.
18     Q    But when you are testifying about a flash
19 fire, you're talking about the heat, and air combining,
20 and rolling over, you said?
21     A    And -- and just -- a -- a -- a -- a burst into
22 flames, correct.
23     Q    Burst in the flames.  Was it at that point
24 that you exited the trailer?
25     A    Yes, ma'am.

Page 49

1      Q    And you -- did you exit through the same front
2  door that you had entered?
3      A    Yes, ma'am.
4      Q    And what did you observe once you stepped
5  outside the trailer?
6      A    Other police officers, and firefighters were
7  arriving.  And at that time we stepped across the
8  street.  There were a lot of neighbors gathering, so we
9  stepped across the street and at that point our role
10 became crowd control so that the firefighters could do
11 their job.
12     Q    Before you stepped across the street to
13 perform crowd control, did you observe anything
14 regarding the fire, and the structure itself?
15     A    I noticed there was more smoke coming out of
16 it than -- than initially, of course, as -- as it was
17 growing.  Then I noticed the -- the kitchen area, that
18 there was fire coming -- I seem to believe there was
19 fire coming from the eaves in the kitchen area, and it
20 was starting to -- it -- I believe at one point it blew
21 out that window.
22     Q    Did you also observe flames spreading into the
23 living room area?
24     A    I wouldn't be able to see that.  Where --
25 where the fire went to inside the house after I exited

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 15 of 51 PageID
#3037
The Deposition of RONALD MAY, taken on February 14, 2022

50..53

Page 50

1  the second time, I wouldn't be able to testify to.
2      Q     All right, sir.  Give me just a second to --
3      A     Okay.
4      Q     -- pull something up here.
5      A     I know there were flames starting in the
6  living room area when I exited.
7      Q     All right, sir.  I'm going to share another
8  document with you on my screen.  We've marked this as
9  Plaintiff's Exhibit 4.  It is a transcript of some of
10 the trial testimony.  And specifically, I am going to
11 page 24.  Do you recall testifying at the criminal trial
12 in this case, sir?
13            (EXHIBIT 4 MARKED FOR IDENTIFICATION)
14     A     I do.
15     Q     And do you recall being asked at the time by
16 the prosecutor about what you observed regarding the
17 fire in the structure?
18     A     It's been a while, but yeah.
19     Q     Sure.
20     A     I remember him talking to me.
21     Q     If you will, if you just want to start at line
22 2 here on the screen.  Do you see that?
23     A     Uh-huh.
24     Q     And read down through line 11.
25     A     Okay.

Page 51

1      Q     Let me know when you're finished.
2      A     Yeah.  The question was, "When you left the
3  burning building, where was the smoke line?"  A, "It was
4  rapidly falling.  And like I said, it was rolling out
5  the front door.  And I became concerned that with the
6  contact with the oxygen out there, and we left.  Right
7  after we left, we got out in the front yard, and within
8  an immediate amount of time, we had the rollover," if I
9  used the term correctly, "where flames were coming out
10 the doors and out through the eaves along the kitchen."
11 And that's when -- what we saw there.  "And then it
12 rapidly spread throughout the rest of the living room."
13 But see, I don't know -- it -- it -- it would've been
14 due to -- what I was concerned about where the -- the
15 smoke had flashed into fire.  Now, whether it came --
16 what direction?  I -- I couldn't tell you the travel of
17 the fire inside the house.
18     Q     Okay.  But according to this testimony, you
19 observed it rapidly spreading throughout the rest of the
20 living room; is that correct?
21     A     Correct.  And that would've been the -- the --
22 the windows and everything in the front.
23     Q     Okay.
24     A     As far as -- as far as line of sight into the
25 house, everything from there would've been through the

Page 52

1  windows.
2      Q     All right.  And you testified just a bit ago
3  that your -- or that you observed the kitchen window
4  blow out; is that right?
5      A     I believe it was the kitchen window that blew
6  out.
7      Q     Did you observe any other windows blow out of
8  the trailer?
9      A     No.  By that time, the firefighters were doing
10 their job.  You know, there was a lot of noise, a lot of
11 windows being broke, and I'm not sure what the -- the
12 chain of events would've been at that point with the
13 fire.
14     Q     But the kitchen window that you saw blow out,
15 that was a result of the fire spreading, not as a -- not a result
16 of a firefighter, or any other individual purposely
17 breaking that window --
18     A     Correct.
19     Q     -- is that right?
20     A     Correct.  Correct.
21     Q     Okay.  All right.  Now, based on what you'd
22 observed with the fire spreading, and coming out the
23 doors, and you're concerned about flashover, is it
24 accurate that you then called dispatch, and alerted
25 dispatch to the fact that the room was -- the trailer

Page 53

1  was now fully involved?
2      A     I can't recall if I told them that or not.
3  I don't know about the rest of the trailer.  Like I
4  said, the firefighters were on scene at the time, and
5  the scene was turned over to them as far as any -- any
6  further dealing with the fire.
7      Q     So sitting here today, you have -- you don't
8  have a recollection of alerting dispatch to the fact
9  that you believed the structure was fully involved?
10     A     I may have told them that, but I -- I -- I
11 don't recall specifically.
12     Q     Sure.  Let me just pull up your testimony
13 again.
14     A     Okay.
15     Q     Would you agree with me that the testimony
16 that you gave in this trial was closer in time to what
17 you observed than sitting here today?
18     A     Absolutely.
19     Q     All right.  Let me pull that up.  I'm just
20 going to go two or three pages down.  All right, sir.
21 If you just want to start looking -- or start reading at
22 line 11 and go through line 21, this may refresh your
23 recollection as to what you alerted dispatch.
24     A     Okay.  11 said, "And when was the first time
25 you observed any fire about the couch or the baby bed,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB     Document 172     Filed 10/03/25     Page 16 of 51 PageID #3038
The Deposition of RONALD MILLS, taken on February 14, 2022

54..57

Page 54

1  or did you?" I said, "Well, after we had entered to
2  this point, and we were being cut off by the fire here,"
3  excuse me, "we exited here, and never went back in
4  again. At that time it was when we had flames start to
5  come out from under the eaves of the kitchen, and it
6  rapidly came around to the front. Now, exactly what
7  caught on fire, what sequence there, I don't know, but
8  at that point, I informed dispatch that it was now
9  'fully involved.'" Okay. What -- was the term I used
10 because now there was no way to reenter the -- the room.
11     Q.   Okay. So does that refresh your recollection
12 as to alerting dispatch to the fact that the fire
13 appeared to be fully involved?
14     A.   Yeah. I -- I mean, I can't sit here now and
15 say I remember doing that, but apparently I did.
16     Q.   Okay. Now, sir, when you were in the
17 structure the second time -- well, yeah. When you were
18 in the structure the second time, were you able to
19 locate the other child that was in the trailer?
20     A.   No, ma'am.
21     Q.   And how long would you estimate that you were
22 in the structure that second time that you entered?
23     A.   Less than a minute, probably. It seemed like
24 an eternity, but less than a minute --
25     Q.   And -- oh, go ahead. I'm sorry.

Page 55

1      A.   No. I was going to say, just, in real time.
2  Yeah.
3      Q.   Sure. And you were in that structure less
4  than a minute because of the conditions; is that right?
5      A.   Correct.
6      Q.   Because the heat was so intense?
7      A.   Yeah. The smoke was increasing, yes. And at
8  that point, like I said, we had fire in the kitchen,
9  which was now behind us. So there would've been no
10 escape route.
11     Q.   Sure. How much time passed between the first
12 time that you leaned in into the structure, and the
13 second time that you entered the structure?
14     A.   Oh, gosh. Been a very short distance. I -- I
15 -- I stepped out, handed Saralynn off and went right
16 back to the front door. I -- I just -- again, you know,
17 time, you know, kind of races sometimes. A minute or
18 so. I mean, a couple minutes --
19     Q.   And -- sure. And my reading of your testimony
20 at trial was exactly that, you said it was a minute or
21 so.
22     A.   Okay.
23     Q.   So you do -- you've got a great memory.
24     A.   Tell my wife that.
25     Q.   So other than the two times that we've

Page 56

1  discussed, when you leaned in, then when you walked into
2  the structure to -- in front of the couch area, did you
3  enter the trailer at any other time?
4      A.   After the fire had been extinguished, and the
5  -- I entered with the fire investigators once they
6  arrived on the scene.
7      Q.   Okay.
8      A.   Until then, I had not reentered the fire -- or
9  reentered the home.
10     Q.   So while it was ablaze, you were only in the
11 structure two times; is that right?
12     A.   Correct.
13     Q.   And then once the fire investigators arrived
14 at the scene, you entered the structure with them?
15     A.   Correct.
16     Q.   And what fire investigators are you speaking
17 of?
18     A.   David West, with the -- with the state, and
19 Gregory.
20     Q.   Alan Gregory?
21     A.   Yes, ma'am. That would be -- that would be
22 them on the scene.
23     Q.   And Alan Gregory was with the state fire
24 marshal; is that correct?
25     A.   I believe, yes, ma'am.

Page 57

1      Q.   The fire occurred around, you know, 7:20, 7:30
2  that -- the evening of September 11th. Do you have any
3  recollection of when you entered the structure with the
4  fire investigators? Was it that evening?
5      A.   It'd been several hours later. Yes, ma'am.
6          MS. STAPLES: All right, sir. We've been going
7  for a little over an hour. If it's okay with you,
8  we're going to take just a quick break; is that
9  okay?
10         THE WITNESS: Yes, ma'am.
11         MS. STAPLES: Five minutes sound good?
12         THE WITNESS: Yep. Sounds good.
13         MS. STAPLES: All right.
14         VIDEOGRAPHER: We're off the record. The time
15 is 11:14 a.m.
16         (OFF THE RECORD)
17         VIDEOGRAPHER: We are back on the record for
18 the deposition of Ronald Mills being conducted by
19 videoconference. My name is Andie Layne, today is
20 February 14, 2022. The time is 11:22 a.m.
21         MS. STAPLES: Andie, I --
22         MR. SLOSAR: Wait, Andie --
23         MS. STAPLES: -- on my end it said that the
24 recording had --
25         MR. SLOSAR: Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 17 of 51 PageID
#3039
The Deposition of RONALD MILLS, taken on February 14, 2022

58..61

Page 58

1          COURT REPORTER:  Sorry about that.
2          MR. SLOSAR:  Sorry.
3          MS. STAPLES:  Okay.  So we're back recording
4    now?
5          COURT REPORTER:  Yeah.
6    BY MS. STAPLES:
7     Q    Okay.  All right, Mr. Mills, are you there?
8     A    Yes, ma'am.
9     Q    Okay.  Thank you for that break.
10    A    Thank you.
11    Q    Well, hey, like I said, you are my -- you tell
12   me any time that you need one, okay?  You don't have to
13   --
14    A    No problem.
15    Q    You don't have to wait on me.
16    A    No problem.
17    Q    All right.  Right before we left, you said
18   that several hours later, on the night of the fire, you
19   went the back into the trailer with David West and Alan
20   Gregory; is that correct?
21    A    Correct.
22    Q    And you knew David West and Alan Gregory to be
23   fire investigators; is that correct?
24    A    Yes, ma'am.
25    Q    Okay.  Did you know Mr. West prior to this

Page 59

1    occasion?
2     A    No, ma'am.  Not that I recall.
3     Q    But you did understand him to be a fire
4    investigator for the Kentucky State Police?
5     A    Yes, ma'am.
6     Q    Okay.  And did you know Alan Gregory prior to
7    meeting him there at the scene that evening?
8     A    I don't believe so.
9     Q    Did you know -- did you learn that Mr. Gregory
10   was an investigator with the State Fire Marshal's
11   office?
12    A    Yes, ma'am.
13    Q    What about Sam Flowers?  Did you meet
14   Mr. Flowers there at the scene that evening?
15    A    I'm not familiar with a Mr. Flowers.
16    Q    Okay.  He was also an individual with the
17   State Fire Marshal's office, but that doesn't ring any
18   bells for you?
19    A    No, ma'am.
20    Q    All right.  So your recollection is that you
21   went back into the trailer with David West and Alan
22   Gregory?
23    A    Correct.
24    Q    And this was later in the evening on September
25   11th of 2004; is that right?

Page 60

1     A    Yes, ma'am.
2     Q    All right.  And what did you do while you were
3    in the trailer with Mr. West and Mr. Gregory?
4     A    They just -- like we've just done here, they
5    -- they walked me through -- or I walked them through
6    where I had gone into the trailer, how far I entered the
7    trailer, and what I saw when I went in.
8     Q    And that included seeing fire in that back
9    bedroom when you initially leaned into the trailer?
10    A    Yes, ma'am.
11    Q    And that being the only point at which you saw
12   flame, at that point?
13    A    At that point, yes, ma'am.  The only place I
14   caught -- saw flame was in that back bedroom.
15    Q    And you informed both Mr. West and Mr. Gregory
16   about that?
17    A    Yes, ma'am.
18    Q    And let me ask you this.  Were Mr. West and/or
19   Mr. Gregory taking notes while you were walking through
20   the structure with them?
21    A    I don't recall.
22    Q    All right.  So you told them that you saw
23   flame only in the back bedroom on your initial walk --
24   or your initial time into the structure?
25    A    Correct.

Page 61

1     Q    You told them that the second -- oh, well
2    strike that.  You told them that you also saw smoke in
3    the ceiling of the living room during that initial lean
4    into the structure?
5     A    I rec -- can't recall if I said that, but that
6    would be a -- a normal part of the conversation of my
7    observation, yes.
8     Q    And you informed both Mr. West and Mr. Gregory
9    that you had entered the structure a second time?
10    A    Correct.
11    Q    And you informed both Mr. West and Mr. Gregory
12   that upon the second time entering the structure, you
13   again saw the fire in the back bedroom?
14    A    Yes, ma'am.
15    Q    And you informed them at that time that the --
16   you also observed fire along that back wall?
17    A    Yes, ma'am.
18    Q    And you informed both Mr. Gregory and Mr. West
19   at that time that you saw flames in the kitchen area?
20    A    Correct.
21    Q    And you informed both Mr. West and Mr. Gregory
22   that the smoke was beginning to come down from the
23   ceiling at that point?
24    A    I'm sure I did.  I -- I can't -- I can't
25   recall the -- the conversation exactly, but just walked

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  them through what I saw at the time, as we've done
2  today.  And then leaving because the smoke was getting
3  so intense, we went back out the door.
4      Q    And you also informed Mr. West and Mr. Gregory
5  of the intense heat that you experienced when walking
6  into the structure that second time; is that right?
7      A    I don't know if I mentioned the heat to them.
8  I -- I do know that I told them we left because we -- it
9  was getting too smoky, we couldn't breathe.  We were
10  going to have to get out of the -- of the trailer.
11  Whether I mentioned the heat or not, I -- I -- I can't
12  say yes or no.
13      Q    Did you tell Mr. West and Mr. Gregory about
14  the window blowing out in the kitchen?
15      A    I don't remember if I informed them or not.
16      Q    Sir, as someone who had training in fighting
17  fires, and someone who had experience in fighting fires,
18  you understood the importance of passing along your
19  observations to the fire investigators; is that right?
20      A    My training in fighting fires is a lot
21  different fires than structure fires.
22      Q    Well, did you think it important to tell the
23  fire investigators what you had observed in the trailer
24  that day?
25      A    Yes.

Page 63

1      Q    I mean, you knew, as the first person on the
2  scene, that what you observed would be important to
3  their investigation; is that right?
4      A    Of course.
5      Q    And so you did your best to be accurate and
6  thorough with what you told them regarding your
7  observation, right?
8      A    Yes, ma'am.
9      Q    Okay.  We went through what you told them
10  regarding the two times that went in the structure.
11  Did you also tell Mr. West and Mr. Gregory what you
12  observed when you first arrived at the scene?
13  Specifically, did you tell the fire investigators about
14  seeing the glow in that back bedroom window?
15      A    I may have.  It's -- I -- I -- I can't recall
16  specifically the conversation with them, but I walked
17  them through the chain of events, you know, as they were
18  asking, what next?  So...
19      Q    I think I asked you this, but I'm not sure.
20  Did -- were either Mr. Gregory or Mr. West taking notes
21  while we are walking them through what you'd observed?
22      A    I don't recall.
23      Q    Okay.  Were they asking you questions as you
24  all walked through the structure?
25      A    Just as to where -- how far I had gone and

Page 64

1  what I had seen, yes, ma'am.
2      Q    So they asked you, specifically, what you had
3  observed when you were there in the structure?
4      A    Yes, ma'am.
5      Q    Okay.  Okay.  So you spoke with Mr. West and
6  Mr. Gregory there at the scene.  Was there any other
7  occasion that you spoke with any other fire investigator
8  involved in this case about what you observed that
9  evening?
10      A    No, ma'am.
11      Q    Do you recall ever speaking with a Buster
12  Cannon?
13      A    No, ma'am.
14      Q    Do you know who Buster Cannon is, sir?
15      A    I know who he is now.  I -- I didn't know who
16  he was then.  I don't believe I ever met him.
17      Q    Okay.  And you don't believe that you met him
18  there at the scene of the fire?
19      A    If I did, I wasn't aware of who he was.
20      Q    All right.  Now, did you personally document
21  your actions and your observations in a written report?
22      A    A uniform citation, I think, is the only
23  report that I -- that I wrote.
24      Q    And the uniform citation wasn't in regard to
25  the fire itself, right?

Page 65

1      A    No, ma'am.
2      That's a different matter that we'll talk
3  about here later.  But when it came to what you
4  personally observed and the actions that you took
5  regarding the fire itself, you didn't create a report
6  about that?
7      A    No, ma'am.  I don't recall that.
8      Q    Is there a reason why you didn't create that
9  report?
10      A    The -- the -- the fire was -- wasn't under my
11  investigation, of course.  I -- I gave a report, a
12  verbal report, to the investigators that were
13  investigating the fire.
14      Q    And you --
15      A    More as a witness, than as a reporter.
16      Q    Okay.  And when you gave that verbal report to
17  the fire investigators, you assumed that they would take
18  that information that you gave to them when conducting
19  their fire investigation; is that right?
20      A    Yes, ma'am.
21      Q    Did you think that the information that you
22  relayed to the investigators would then be documented
23  accurately by those investigators?
24      A    I would assume so.
25      Q    And did you think that the information that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RONALD MOSS, taken on February 14, 2022

Page 66

1  you gave to the investigators would be thoroughly
2  documented by the investigators?
3      A    I would assume so.
4      Q    We looked at the fire investigation report
5  just quickly so I could show you the photos.  Did you
6  ever see the fire investigation report that was created
7  in this case?
8      A    No, ma'am.  I haven't.
9      Q    Did you have the opportunity to learn what
10 information the investigators included in that report?
11     A    I don't know of their conclusions.  No, ma'am.
12     Q    Okay.  Do you know of the information that
13 they included within the report?  Not just their
14 conclusions, but their --
15     A    Well, I --
16     Q    -- the information that was included?
17     A    I -- I -- I have not read a report.  I don't
18 know what the -- what they -- what they came to.
19     Q    Okay.  So it wasn't as if they took down
20 information from you, and then handed you a report and
21 said, hey, is this accurate?
22     A    No, ma'am.
23     Q    They never did that?
24     A    No, ma'am.
25     Q    All right.  Now, sir, you said that you --

Page 67

1  after you exited the trailer the second time and alerted
2  dispatch to the fact that the fire was fully involved,
3  that you then went into crowd control mode; is that
4  correct?
5      A    Correct.
6      Q    A crowd of people had arrived there at the
7  scene?
8      A    Yes, ma'am.
9      Q    That included some neighbors?
10     A    Yes, ma'am.
11     Q    At some point did you observe Robert Yell run
12 towards the trailer?
13     A    Yes, ma'am.
14     Q    And he did so after you had exited the
15 structure the second time while you were doing crowd
16 control; is that right?
17     A    Yes, ma'am.
18     Q    Okay.  Where were you physically when you
19 observed Mr. Yell run towards the trailer?
20     A    In the street.
21     Q    Was the street in front of the trailer --
22     A    Yes, ma'am.
23     Q    -- or behind the trailer?
24     A    In front of.
25     Q    And by this time were other law enforcement

Page 68

1  officials present?
2      A    Yes, ma'am.
3      Q    Did that include Officer Higgins?
4      A    Yes, ma'am.
5      Q    What other law enforcement personnel do you
6  recall being there at the time that you witnessed
7  Mr. Yell run towards the trailer?
8      A    Chad Eggleston had arrived.  At some point
9  Roger McDonald had arrived.  At some point, Barry Dill
10 had arrived.  I think that was later in the evening.
11 I can't recall who else may have been there.
12     Q    Okay.  And Chad Eggleston and Mr. McDonald and
13 Mr. Dill, were they all colleagues of yours from the
14 Russellville Police Department?
15     A    Were they all what, ma'am?
16     Q    Colleagues of yours at the Russellville Police
17 Department?
18     A    Yes, ma'am.
19     Q    And it's your testimony that you think that
20 Mr. Dill arrived later in the evening; is that right?
21     A    Yes, ma'am.
22     Q    He wasn't there when you first witnessed
23 Mr. Yell running towards the trailer?
24     A    Correct.  He was -- he was not on shift that
25 night.

Page 69

1      Q    Okay.
2      A    He had been contacted at home.
3      Q    All right.  And when you first observed Robert
4  running towards the trailer, he was expressing concern
5  that his son was still in the trailer; is that right?
6      A    Yes, ma'am.
7      Q    And Mr. Yell attempted to go into the trailer;
8  is that right?
9      A    No, ma'am.
10     Q    No?  He wasn't stopped by officers from
11 entering the trailer?
12     A    He -- he would -- was heading toward the
13 trailer.  I -- I can't say what his intent would've
14 been, but he was never allowed to get close enough to
15 attempt to enter.
16     Q    Okay.  But you do agree that he was running
17 towards the trailer?
18     A    Yes.  He was coming from in between the
19 houses, and down the street toward our -- toward the
20 trailer, yes.
21     Q    And he was stopped before he was actually
22 allowed to enter the trailer?
23     A    Yes, ma'am.
24     Q    And who stopped Mr. Yell from going further?
25     A    I believe it was myself and McDonald.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    Q    How did you stop Mr. Yell from proceeding
2  further?
3    A    Just by -- by taking ahold of him and -- and
4  pulling him to the side of the street.
5    Q    Was Mr. Yell tackled to the ground at that
6  point?
7    A    No, ma'am.
8    Q    You said that you had to pull him across the
9  street; is that right?
10   A    We -- we got ahold of him.  He was yelling at
11  us, trying to pull away from us, and we -- then we -- we
12  took him to the side of the street, yes.
13   Q    When you took him to the side of the street,
14  for one thing, you were worried about his safety;
15  is that right?
16   A    Yes, ma'am.
17   Q    You were worried about him getting so close to
18  the fire?
19   A    Oh, yes, ma'am.  By then there was no physical
20  way to enter the -- the home.
21   Q    Now sir, Mr. Yell was intoxicated when he
22  arrived at the scene there; is that right?
23   A    That is my belief.  Yes, ma'am.
24   Q    And ultimately you charged him with disorderly
25  conduct; is that right?

Page 71

1    A    Yes, ma'am.
2    Q    You placed him under arrest?
3    A    Yes, ma'am.
4    Q    I'm going to show you a document if you'll
5  give me just a second.  Are you able to see this
6  document, sir?
7    A    Yes, ma'am.  That's the uniform citation.
8    Q    Okay.  And for the record, this is what I've
9  marked as Plaintiff's Exhibit number 6.  It's Bates
10  stamped Yell 3374.  Right, I'm going to go down to the
11  very bottom.  Do you see the officer's signature there
12  at the bottom of the report, sir?
13        (EXHIBIT 6 MARKED FOR IDENTIFICATION)
14   A    Yes, ma'am.
15   Q    And whose signature is that?
16   A    That is mine.
17   Q    Okay.  And you are the author of this report;
18  is that correct?
19   A    Yes, ma'am.  And those are my charges, yeah.
20   Q    Okay.  And you agree with me that according to
21  this uniform citation, you charged Mr. Yell with
22  disorderly conduct?
23   A    Correct.
24   Q    And you did so at -- well, you arrested Mr.
25  Yell; is that right?

Page 72

1    A    Yes.
2    Q    And you did so at 1930?
3    A    Yes, ma'am.
4    Q    Okay.  And according to the citation, Mr.
5  Yell, a suspect in a disturbance, was disorderly at a
6  trailer -- or as a trailer was burning down on Bonnie
7  Drive; is that right?
8    A    Yes, ma'am.
9    Q    And the trailer was burning down and the
10  above's family members were suspected to be inside?
11   A    Correct.
12   Q    And that Mr. Yell was a suspect in the burning
13  of the trailer?
14   A    I had been informed that -- that he had --
15  that -- so it -- it was -- of course, there were a lot
16  of suspects, so...
17   Q    So we established earlier that you received
18  the call of the initial disturbance around 7:20 that
19  evening; is that right?
20   A    Yes, ma'am.
21   Q    And that you arrived on the scene around 7:25;
22  is that right?
23   A    Yes, ma'am.
24   Q    Okay.  And within five minutes later, Mr. Yell
25  was being arrested; is that right?

Page 73

1    A    The -- the arrest time on the document, I
2  would have to say, would be approximate.
3    Q    Approximate.  Okay.  But you would think it's
4  within a few minutes; is that right?
5    A    The -- I know the firefighters had already
6  arrived on the scene.  Their arrival time would be
7  documented, and it would be within a few minutes after
8  their arrival.
9    Q    Okay.  So regardless, pretty quickly into all
10  this, Mr. Yell was arrested; is that right?
11   A    Yes, ma'am.
12   Q    And pretty quickly into learning of this fire,
13  Mister -- you had learned that Mr. Yell was considered a
14  suspect; is that right?
15   A    That was based on the neighbor's statement
16  when I arrived, that he set his house on fire.
17   Q    And what --
18   A    And -- and that would be Ms. Bellar.
19   Q    Ms. Bail -- excuse me, Ms. Bellar informed you
20  that Mr. Yell had set his house on fire?
21   A    When I arrived for the disturbance, and then
22  we had the call the -- the house was on fire.  When I
23  arrived and was approaching the house, she came out and
24  met me and she said, "He set his house on fire."
25   Q    And did you document that information in a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1  report anywhere, sir?
2      A    As I said, there was no written report that I
3  -- that I generated.
4      Q    So your documentation of Mr. Yell being
5  considered a suspect in a fire was based on a statement
6  that Ms. Bellar had allegedly made to you?
7      A    Correct.  There was more of a notation on the
8  citation, than a charge.
9      Q    What do you mean by that?
10     A    Just a notation, just -- just to -- the -- the
11 -- the entire incident, ma'am.  I -- I don't understand.
12     Q    Well, I -- okay.  I think we're -- I'm not
13 understanding what you're trying to --
14     A    Okay.
15     Q    I think you were making -- you were trying to
16 differentiate between making a notation and between
17 trying to -- making a charge.  Is that what you're
18 saying?
19     A    Correct, yeah.  He -- he was not charged,
20 ma'am.
21     Q    You didn't charge Mr. Yell with arson; is that
22 correct?
23     A    Oh, no, ma'am.
24     Q    But you noted within your report that at the
25 time of his arrest he was considered a suspect in the

Page 75

1  fire?
2      A    Well, that -- that he had been named, but as
3  -- as someone who may have set the fire.
4      Q    Did you ever question Ms. Bellar formally in
5  this case?
6      A    I did not.  No, ma'am, I did not.
7      Q    Have you ever reviewed any statements that
8  Ms. Bellar gave in this state -- in this case?
9      A    I don't believe I have.
10     Q    Would you have expected Ms. Bellar to relay
11 the statement that you just made that she said that
12 Robert had set his house on fire to the investigators
13 when she was giving her formal statement?
14     A    I would assume that she would, yes, ma'am.
15     Q    Okay.  Sir, when you placed Robert under
16 arrest, did you search him for weapons?
17     A    Yes, ma'am.
18     Q    Did you find any weapon on Mr. Yell?
19     A    No, ma'am.
20     Q    Did you find anything of relevance, or --
21 well, strike that.  Did you find anything on Mr. Yell's
22 person during your search of him?
23     A    No, ma'am.  I don't recall taking anything
24 from him, so...
25     Q    While you were at the scene, did you spray

Page 76

1  Mr. Yell with chemical spray?
2      A    No, ma'am.
3      Q    Did you observe anyone else spraying Mr. Yell
4  there at the scene with chemical spray?
5      A    No, ma'am.
6      Q    Did you tase Mr. Yell?
7      A    No, ma'am.
8      Q    Did you observe anyone else tasing him?
9      A    No, ma'am.
10     Q    Did you strike Mr. Yell in any way while you
11 were there at the scene?
12     A    No, ma'am.
13     Q    Did you observe anyone else do so?
14     A    No, ma'am.  I know he pulled away from us and
15 then attempted to -- he was running toward Officer
16 Higgins, and Officer Higgins put his arm up to stop him.
17 That would've been the only thing considered any type of
18 strike.
19     Q    Mister -- Officer Higgins testified that he
20 struck Mr. Yell in the chest.  Did you observe that?
21     A    That would've been when he put his arm up to
22 stop Yell from coming toward him, and his -- his palm
23 and hand would've been in -- in Mr. Yell's chest.
24     Q    When you were arresting Mr. Yell there at the
25 scene, did you observe a laceration on his lip?

Page 77

1      A    No, ma'am, I didn't.  Not that I recall.
2      Q    Did you observe any blood coming from
3  Mr. Yell's face at the time of arrest?
4      A    No, ma'am.
5      Q    Did you personally transport Mr. Yell to jail?
6      A    No, ma'am.  I didn't.
7      Q    Are you aware of what officer transported him?
8      A    Officer Higgins.
9      Q    Is it accurate to say that eventually, you did
10 go to the Logan County Detention Center that evening?
11     A    I did.
12     Q    Can you recall when you arrived there?
13     A    I don't.  It would've been on the -- it
14 would've been on the CAD.
15     Q    Okay.  Let's pull that back up.  Hold on just
16 one second, please.  All right.  We're looking again at
17 what we've marked as Plaintiff's Exhibit 1.
18     A    10-97 is where we'd be at location.
19     Q    10 -- and that's what I am going to ask you.
20 10-97 is at location?
21     A    Yes, ma'am.
22     Q    Okay.  What's 10-56 mean?
23     A    10-56 is the jail.
24     Q    And like I said, you know, the way this was
25 scanned in, part of the report is cut off.  But would

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  you agree with me that at 19:48:29 it was reported that
2  someone was at the jail with Mr. Yell -- had arrived at
3  the jail?
4       A   Yes, ma'am.
5       Q   Are you familiar with what Officer Higgins'
6  badge number was?
7       A   824, I believe.
8       Q   Maybe 834?
9       A   834, yes, ma'am.
10      Q   Okay.
11      A   34.
12      Q   And although this is cut off, it does appear
13  that there's a four at the end of that unit number, as
14  far as someone arriving there at the jail?
15      A   Yes, ma'am.
16      Q   All right.  So let me skip on down here, and
17  tell me if you see your unit number.
18      A   Okay.  I see it.
19      Q   All right.  Would you agree with me that this
20  document notes your arrival at the jail?
21      A   At --
22      Q   10:56 at --
23      A   This -- 10-18 as I am departing.  I'm on my --
24  I'm en route to the jail.
25      Q   Oh.  Oh, okay.

Page 79

1       A   So at 10-18, I was en route to the -- I was
2  10-18 to the jail.
3       Q   Okay.
4       A   At -- at -- is that 2102?
5       Q   Yes, sir.
6       A   Okay.  And then there's my number again, and
7  it looks like at 2109 is when I have arrived at the
8  jail.
9       Q   So if Mr. Higgins arrived at the jail with
10  Mr. Yell at 1948, and you arrived there at 2109, you
11  arrived approximately an hour-and-a-half later, give or
12  take a few minutes?
13      A   Yes, ma'am.
14      Q   All right.  Now, when you arrived at the jail,
15  what did you do?
16      A   I retrieved Mr. Yell's shoes, his shorts, and
17  wiped his hands.  The fire investigators requested those
18  items for their investigation.
19      Q   Where in the jail was Mr. Yell housed when you
20  first arrived?
21      A   In the sallyport, still.
22      Q   Okay.  Who was present in the sallyport when
23  you first arrived there?
24      A   Officer Higgins was there, and maybe there
25  were a couple deputy jailers.

Page 80

1       Q   Okay.
2       A   That's --
3       Q   Do you know which deputy jailers were there?
4       A   I do not.
5       Q   Did you know a Deputy Jailer Hayes?
6       A   I can't recall him.
7       Q   Do you know a Deputy Jailer Porter?
8       A   I can't recall.  I -- I can't picture them in
9  my mind, so...
10      Q   Okay.  I understand.  Regardless, Officer
11  Higgins, and two deputy jailers were present in the
12  sallyport with Mr. Yell when you first arrived; is that
13  right?
14      A   Yes, ma'am.
15      Q   Okay.  And you said that you collected
16  Mr. Yell's shoes; is that right?
17      A   Yes, ma'am.
18      Q   And that was a pair of boots?
19      A   Correct.
20      Q   Okay.  And you collected his shorts; is that
21  right?
22      A   Yes, ma'am.
23      Q   And you wiped his hands; is that right?
24      A   Yes.
25      Q   And what was the purpose of wiping his hands?

Page 81

1       A   The fire investigators had asked me to do
2  that.  I assume they were checking for any type of
3  residue of anything on his hands.
4       Q   Can you call what -- which fire investigator
5  requested that you go collect that evidence?
6       A   I cannot.  It was just collectively them
7  asking me to go get that, so...
8       Q   And when you were wiping Mr. Yell's hands down
9  to collect this evidence, was he still handcuffed?
10      A   Yes, ma'am.  He was.
11      Q   So you took his shoes, his shorts, and the --
12  did you -- well, strike that.  Did you use a cloth to
13  wipe down his hands, or was it a type of swab?  How did
14  you collect the evidence off of his hands?
15      A   I remember I -- with a paper towel type, just
16  to the wipe -- just to wipe off his hands.
17      Q   And what did you do with that wipe after you
18  used it on his hands?
19      A   I returned all of that to the fire
20  investigators on the scene.
21      Q   Did you place that wipe in a special type of
22  container, or a bag?
23      A   It would've been in a -- an evidence bag, just
24  a regular evidence bag.
25      Q   Did you also put Mr. Yell's clothing in an

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 23 of 51 PageID
#: 3045
The Deposition of RONALD #: 3045, taken on February 14, 2022

82..85

Page 82

1  evidence bag?
2      A    I believe I put his clothing in a paper bag.
3  The boots were put into cans.  I guess the best way to
4  describe those would be, like, a paint can type can.
5      Q    They were metal canisters?
6      A    Yes, ma'am.
7      Q    And you said that you took the evidence that
8  you had collected back to the scene; is that right?
9      A    Turned it over to the fire investigators, yes,
10 ma'am.
11     Q    And did you turn that over to Detective West?
12     A    I can't recall which one I handed it to.
13     Q    Did you come to learn that that evidence was
14 sent off for testing?
15     A    No, ma'am.  That was the last of my
16 involvement with it.
17     Q    I'm going to show you a couple documents, and
18 this will be collective exhibit, Plaintiff's Exhibit
19 number 7, Bates stamped KSP 389, and 392.  Sorry, sir,
20 I've got a bunch of tabs that I've got to go through to
21 get the report I'm looking for.  All right.  Sir, have
22 you ever seen this document before?
23          (EXHIBIT 7 MARKED FOR IDENTIFICATION)
24     A    I have not.
25     Q    Would you agree with me that it states it's a

Page 83

1  Request For Evidence Examination?
2      A    Yes, ma'am.
3      Q    All right.  And specifically what I wanted to
4  ask you about were these exhibits here.
5      A    Yeah.
6      Q    You see where it notes Exhibit 41?
7      A    Yes, ma'am.
8      Q    It says it's a "Metal paint can containing the
9  left brown leather work boot of Robert Yell worn at the
10 time of fire"?
11     A    Okay.
12     Q    Would that have been one of the work boots
13 that you retrieved from Mr. Yell?
14     A    Yes, ma'am.
15     Q    Exhibit 42 says it's the "Right brown leather
16 work boot of Robert Yell worn at the time of the fire."
17 That, again, is another one of the shoes that you
18 retrieved from Mr. Yell there in the sallyport?
19     A    Yes, ma'am.
20     Q    Okay.  Exhibit 44 says it's a "Metal paint can
21 containing cotton swabs of Robert Yells hands by Officer
22 Mills Unit 831 RPD."
23     A    Okay.
24     Q    That would be the towel, or the wipe that
25 you've used on Mr. Yell's hands; is that right?

Page 84

1      A    Correct.  Correct.
2      Q    And then item number 46 says it's a "Metal can
3  containing a pair of khaki shorts worn by Robert Yell at
4  the time of the fire."  And --
5      A    Yes, ma'am.
6      Q    -- the piece of clothing that you retrieved
7  from Mr. Yell?
8      A    Correct.
9      Q    Mr. Yell wasn't wearing a shirt at the time of
10 his arrest; is that right?
11     A    Correct.
12     Q    Okay.  Sir, did you come to learn that the --
13 all of those items that you collected were tested by the
14 KSP lab?
15     A    No, ma'am.
16     Q    Did you ever come -- well, let me strike that.
17 Let me show you another report.  This is part of
18 Plaintiff's Exhibit number 7.  Can you see this report
19 on the screen, sir?
20     A    Yes, ma'am.
21     Q    You'd agree with me that this says it's a
22 report from the Central Forensic Laboratory of the
23 Kentucky State Police?
24     A    Yes, ma'am.
25     Q    All right.  And it lists all the material that

Page 85

1  was submitted for testing.  And that includes those
2  exhibits that you and I just went over 41, the left
3  shoe; 42, the right shoe; 44, the plastic bag containing
4  cotton swabs, and 46 -- I think it's 46 that was
5  Mr. Yell's shorts.  You see all that?
6      A    Yes, ma'am.
7      Q    And the examination that was requested was the
8  identification of ignitable liquids.  Do you see that?
9      A    Yes, ma'am.
10     Q    And then under the results of the examination,
11 it says that there were no ignitable liquids identified,
12 and several of these exhibits, if not all, but
13 specifically including the evidence that you collected
14 from Mr. Yell; is that right?
15     MR. MANDO:  Are you asking --
16     A    Yes, ma'am --
17     MR. MANDO:  -- objection.  Are you asking
18          (Inaudible)
19 BY MS. STAPLES:
20     Q    Were you ever made aware of the fact that
21 there were no ignitable liquids found on the evidence
22 that you had collected from Mr. Yell?
23     A    No, ma'am.
24     Q    Sir, can you recall how long that you remained
25 at the Logan County Detention Center that evening of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 24 of 51 PageID
#:3046
The Deposition of RONALD MOORE, taken on February 14, 2022
86..89

Page 86

1  September 11, 2004?
2      A    It would've been a short time.  The CAD should
3  have when I -- when I left the jail.  As far as I -- it
4  -- it would -- it would not have been an extended amount
5  of time.
6      Q    I think you testified at trial it was around
7  45 minutes, but let's pull up that CAD and see if we can
8  make that determination.
9      A    That -- that would've been the longest that I
10 was there.  Yes, ma'am.
11     Q    All right.  We established, and according to
12 this CAD, you arrived at the jail at 2109; is that
13 right?
14     A    Yes, ma'am.
15     Q    All right.  So let's see if we can find on
16 here when you left.
17     A    And 10-56 at -- if you'll move your cursor for
18 me.  Oops, that's our cursor, isn't it?  Oh yeah, 2150.
19     Q    2150.
20     A    So -- yeah.  Approximately -- approximately 40
21 minutes would be -- would be an accurate time.
22     Q    Okay.  Now, during that 40 minutes that you
23 were at the Logan County Detention Center, did you speak
24 with Mr. Yell?
25     A    Just to retrieve his clothing.

Page 87

1      Q    Did you question Mr. Yell in any way?
2      A    No, ma'am.
3      Q    Did you observe any other officer questioning
4  Mr. Yell while you were there in the sallyport?
5      A    No, ma'am.  Not that I recall.
6      Q    Okay.  While you were at the Logan County
7  Detention Center during that 40 minutes, did you spray
8  Robert Yell with chemical spray?
9      A    No, ma'am.
10     Q    Did you observe any other individual spray
11 Mr. Yell with chemical spray while you were there?
12     A    No, ma'am.
13     Q    Were you aware of the fact that Mr. Yell had
14 been sprayed with chemical spray prior to your arrival?
15     A    I did not know that.  No, ma'am.
16     Q    While you were there at the Logan County
17 Detention Center on September 11, 2004, did you observe
18 any physical altercation between Mr. Yell and Officer
19 Higgins?
20     A    No, ma'am.
21     Q    Did you witness Officer Higgins say anything
22 to Mr. Yell during your 40 minutes there in the
23 sallyport with him?
24     A    No, ma'am.  I -- during my time there, Officer
25 Higgins, I believe, was filling out citations, talking

Page 88

1  with the jailers.  I collected the -- the -- the items
2  from Mr. Yell, and packaged it up.  Then once I was
3  finished all that, I would've left, so...
4      Q    Was Mr. Yell cooperative in giving his
5  clothing and shoes to you?
6      A    No, ma'am.
7      Q    In what way was he uncooperative?
8      A    When I asked him to -- to pick up his feet,
9  you know, so that I can remove his shoes, and he
10 refused.  And so I had to lean down and actually pick up
11 his feet, remove his -- his clothing from him.  He -- he
12 -- he was -- he was not -- I wouldn't say resisting, but
13 he was not cooperating or assisting, so...
14     Q    But he wasn't resisting?
15     A    Yeah.  Just standing there like I hadn't been
16 talking to him, so...
17     Q    Were you aware at the time that you were
18 collecting Mr. Yell's clothing from him that Officer
19 Higgins had told him that his children had perished in
20 the fire?
21     A    No, ma'am.
22     Q    Did you hear Robert say anything to Officer
23 Higgins while you were there in the sallyport?
24     A    Not that I recall.  I don't believe he said
25 anything at the time.

Page 89

1      Q    Now, I asked you earlier if you had written a
2  report regarding your observations regarding the fire.
3  Did you write a report regarding your interaction with
4  Mr. Yell there in the sallyport?
5      A    No, ma'am.
6      Q    And why didn't you draft a report about that?
7      A    He -- my actions were recorded with the fire
8  marshal as far as just collecting evidence and returning
9  it to them.  And my movements were documented on the
10 CAD.
11     Q    Sir, were you personally involved in the
12 decision to charge Mr. Yell with murder?
13     A    No, ma'am.
14     Q    Were you personally involved in the decision
15 to charge Mr. Yell with arson?
16     A    No, ma'am.
17     Q    Okay.  You said that Robert didn't say
18 anything at the time that you were collecting the
19 evidence; is that right?
20     A    Not that I recall, I mean.
21     Q    Okay.  Did you speak with Officer Higgins
22 while you were there in the sallyport about anything
23 that had transpired between he and Mr. Yell in the
24 sallyport?
25     A    No, ma'am.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

1    Q    Mr. Higgins didn't tell you that he had pushed
2 Robert to the floor there in the sallyport?
3    A    No, ma'am.
4    Q    Were you aware of fact that all of the --
5 well, strike that.  Were you aware of the fact that
6 there was a camera that was recording the sallyport on
7 the night in question?
8    A    I know the jail has cameras in the sallyport,
9 and throughout the jail.  Yes, ma'am.  I assume it's
10 always recording.
11    Q    Okay.  Did you have any conversation with
12 anyone about the recording of the sallyport that night?
13    A    No, ma'am.
14    Q    Were you familiar with Jailer Bill Jenkins?
15    A    Yes, ma'am.
16    Q    Did you ever speak with Jailer Jenkins about
17 anything that occurred that night in the sallyport?
18    A    No, ma'am.
19    Q    Did you speak with any other member of the
20 Logan County Detention Center about what had occurred
21 there that night in the sallyport?
22    A    No, ma'am.
23    Q    Did you ever personally view the recording of
24 what occurred that night in the sallyport?
25    A    No, ma'am.

Page 91

1    Q    Did you ever have that recording in your
2 possession for any reason?
3    A    I did not.
4    Q    Now, sir, you did not arrest April Carpenter
5 at the scene on September 11, 2004, did you?
6    A    No, ma'am.
7    Q    Do you know if Ms. Carpenter was ever arrested
8 in connection with anything that happened there on 9-11
9 of 2004?
10    A    No, ma'am I don't.
11    Q    Did you observe that Ms. Carpenter was also
12 intoxicated there at the scene?
13    A    Yes, ma'am.  She appeared to be.
14    Q    But as far as you know, she was never charged
15 with alcohol intoxication that evening?
16    A    Not to my knowledge.  No, ma'am.
17    Q    Did you collect any evidence from
18 Ms. Carpenter, like you collected from Mr. Yell?
19    A    No, ma'am.
20    Q    Were you ever requested to do so?
21    A    No, ma'am.
22    Q    And it was the fire marshals that requested
23 that you collect that evidence from Mr. Yell
24 specifically; is that right?
25    A    Yes, ma'am.

Page 92

1    Q    But they never asked you to do the same with
2 Ms. Carpenter?
3    A    No, ma'am.
4        MS. STAPLES:  Are you doing okay, sir?  You
5 need a break?  I'm at a good stopping point if you
6 need one for a minute.
7        THE WITNESS:  Well, that's up to you.
8        MS. STAPLES:  No.  No.  No.  I'm fine.  I just
9 wanted to see how you were doing.
10        THE WITNESS:  We're fine.
11 BY MS. STAPLES:
12    Q    All right.  I'm going to switch gears with you
13 a little bit, okay?
14    A    Okay.
15    Q    Can you tell me what you did to prepare for
16 today's deposition, sir?
17    A    Long drive from Knoxville.  Yeah.  But a --
18 just a --
19    Q    Oh, sorry.  I didn't know you were in
20 Knoxville.  We could have tried to do this closer for
21 you.
22    A    That's okay.
23    Q    My apologies on that.
24    A    That's okay.  Just going over in my mind what
25 -- what took place that night.

Page 93

1    Q    Sure.
2    A    And, you know, wanting to be as accurate as I
3 could.
4    Q    Yeah.  I appreciate that.  Did you ever you
5 any documents?
6    A    The -- the testimony that I made at the
7 original trial, I've seen that, yes.
8    Q    Okay.  Did you review any reports or anything?
9    A    No, ma'am.
10    Q    Okay.  Sir, were you served with a copy of the
11 complaint in this action?  And I can help you out a
12 little bit.
13    A    No.
14    Q    I think we filed a complaint back in March of
15 2020.  So we're going on --
16    A    A hunch --
17    Q    -- two years now.  Can you recall receiving a
18 copy of that complaint --
19    A    I --
20    Q    -- as far as you know?
21    A    No, ma'am.  But that doesn't mean that I
22 didn't, but...
23    Q    Yeah.
24    A    Yeah.  Yeah.  That's a long time ago.
25    Q    Of course.  Understand.  Understand.  Well,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1   let me ask you this.  Have you had any conversations
2   with Kenneth Edmonds about this case in the last couple
3   years?
4       A    No, ma'am.
5           MR. MANDO:  Objection.  Wait a minute.  I want
6       to make sure that that question is limited to
7       outside of my presence since I also represent
8       Mr. Edmonds.
9           MS. STAPLES:  Yes.
10          MR. MANDO:  So she's asking about questions
11      with any conversations with Edmonds about the case
12      outside of presence with the lawyers.
13  BY MS. STAPLES:
14      Q    Yeah.  And Mr. Mills, let me explain that.
15  I don't want to know about any conversations that you
16  had with your attorneys.  And so, you know, that's
17  confidential, so I'm not asking you questions about
18  that.
19      A    Yes, ma'am.
20      Q    So outside of any meetings that you had
21  jointly with these individuals or conversations with
22  your attorneys, have you had any discussions with
23  Kenneth Edmonds about this civil litigation?
24      A    No, ma'am.
25      Q    Okay.  And I guess I should have asked you

Page 95

1   first, if you know who Kenneth Edmonds is?
2       A    Yes, ma'am.
3       Q    And was Kenneth Edmonds a colleague of yours
4   at the Russellville Police Department?
5       A    Yes, ma'am.  He was a detective.
6       Q    Okay.  Now, we've talked about the fact that
7   Officer Higgins was a colleague of yours; is that
8   correct?
9       A    Yes, ma'am.
10      Q    Have you had any conversations outside the
11  presence of your attorneys with Mr. Higgins about this
12  civil litigation?
13      A    Just that it existed.
14      Q    And what do you mean by that?
15      A    Well, Ed Higgins and I are friends.
16      Q    Okay.
17      A    And we've been friends for a long time.  Every
18  year, you know, since this incident we -- we've
19  contacted each other and -- and said, hey, how you
20  doing?  You know, it was a pretty rough night that
21  night.  We've seen each other, his -- his kids used to
22  come out and ride horses at my house.  And so we're --
23  we're friends.  Specifically about any charges in this
24  case, or -- or any -- any testimony, or anything
25  involving this case and everything, no, ma'am, we've

Page 96

1   not.
2       Q    I know we touched on this a little bit
3   earlier, but what effect would you say that this fire,
4   and what you witnessed that night, what effect has that
5   had on you?
6       A    It bothers me.  It bothers me that -- that we
7   didn't get the last child out.
8       Q    As a result of what you observed that evening,
9   is that kind of ingrained in your mind?
10      A    I would say yes, ma'am.
11      Q    Okay.  So you and Mr. Higgins check in with
12  each other every year on the anniversary of the fire or
13  thereabout?
14      A    It's kind of hard to ignore the date.
15      Q    Yeah.  For a couple different reasons, right?
16      A    Yes.  Yes.  We -- we talk about other things
17  as well.  And he was, for a while, living in an area
18  that was closer to me.  So he wanted to let me know
19  that.  His son lives in the area where I am over there.
20  So, you know, we want to make sure there's contact
21  there.  He told me I was divorced and everything, just
22  normal friendship things that --
23      Q    Sure.  Did you have the same type of
24  relationship with Detective Edmonds?
25      A    No, ma'am.  My relationship with Detective

Page 97

1   Edmonds was more professional than personal.
2       Q    Okay.  But I think your testimony was that in
3   regard to this civil litigation, you and Mr. Higgins
4   haven't really discussed the specifics of that?
5       A    No, ma'am.  We haven't.
6       Q    Okay.  And is there a reason why the two of
7   you haven't discussed it?
8       A    I mean, we -- we both know about it.  And with
9   -- I guess with our knowledge of such things, we just
10  kind of naturally want to not go into depth with
11  different things.
12      Q    So you purposely tried to avoid that
13  conversation?
14      A    We -- we -- we'd know about the, you know, me
15  traveling up here, and -- and just about, you know, what
16  had transpired that night.  But there's -- there's
17  nothing specifically about this particular case moment,
18  and...
19      Q    You testified earlier that Chad Eggleston was
20  a colleague of yours at the police department; is that
21  right?
22      A    Yes, ma'am.
23      Q    Have you had any conversations with Officer
24  Eggleston about this civil suit or case within the last
25  couple years?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1    A    No, ma'am.
2    Q    You know who Jim Pendergraff is?
3    A    Yes, ma'am.
4    Q    And who's Mr. Pendergraff?
5    A    He was the chief of police at the time.
6    Q    And are you friends with Mr. Pendergraff?
7    A    Not outside of work.  No, ma'am.
8    Q    Okay.  Have you and Chief Pendergraff had any
9    specific conversations about this case, or this civil
10   litigation in the last couple years?
11   A    No, ma'am.
12   Q    Now, you talked -- you stated that you came to
13   know Detective West; is that right?
14   A    Yes, ma'am.
15   Q    And that was through this investigation, or
16   did you know him prior to this --
17   A    This --
18   Q    -- criminal case?
19   A    -- through this invest -- I -- I had seen him
20   before, but I hadn't had any interaction with him.
21   Q    Have you had any interaction, or conversation
22   with Detective West about this civil litigation?
23   A    No, ma'am.
24   Q    Are you familiar with KSP Officer Childers?
25   A    No, ma'am.

Page 99

1    Q    Are you familiar with a KSP Officer William
2    Smith?
3    A    No, ma'am.
4    Q    I asked you earlier if you knew Buster Cannon,
5    and I think you said that you now know who he is; is
6    that right?
7    A    I now know who he is.  Yes, ma'am.
8    Q    Have you had any conversation with Mr. Cannon
9    about this case at all?
10   A    No, ma'am.
11   Q    And that's either the criminal case or this
12   civil litigation?
13   A    Correct.  I don't believe I've ever spoken to
14   him.
15   Q    Okay.  You talked about your interaction with
16   arson investigator Gregory.  Have you had any
17   conversation with Mr. Gregory in the last couple years
18   regarding this civil litigation?
19   A    No, ma'am.
20   Q    Have you had any conversation with Mr. Gregory
21   in the past couple years about the underlying criminal
22   case?
23   A    No, ma'am.
24   Q    All right.  And I think you said you knew who
25   Bill Jenkins was, right?

Page 100

1    A    Yes, ma'am.
2    Q    Have you talked with bill Jenkins about this
3    civil litigation at all?
4    A    I have not.
5    Q    Okay.  Sir, you testified earlier that when
6    you were employed with the Bowling Green Police
7    Department, that you attended the police academy at EKU;
8    is that right?
9    A    Correct.
10   Q    Would that have been in 1998?
11   A    Yes, ma'am.  Beginning of '98.
12   Q    And while you were at that police academy at
13   EKU, did you learn the basics of becoming a police
14   officer?
15   A    Yes, ma'am.
16   Q    Did you have any instruction on how to draft
17   written reports?
18   A    Yes, ma'am.
19   Q    Did you have any instruction on how to
20   document what you learned from witnesses?
21   A    Some.  Yes, ma'am.
22   Q    Did you have any instruction at the police
23   academy about conducting crime scene investigations?
24   A    Yes, ma'am.  It's all very basic.
25   Q    And how many weeks of the police academy did

Page 101

1    you attend?
2    A    Gosh, it's changed so many times.  When I was
3    there, I believe it was nine at the time.
4    Q    Okay.
5    A    It's been a little while.
6    Q    I understand.
7    A    I -- I think -- I think I was one of the last
8    classes to go through at that length.  I think the folks
9    that were coming in after us was an extended academy.
10   Q    You got lucky, huh?
11   A    Yeah.
12   Q    While you were at the police academy during
13   that nine weeks, did you learn what your legal
14   obligations were as they relate to interrogations of
15   suspects?
16   A    Yes, ma'am.  There was a class on that.
17   Q    For example, did you have instruction on
18   giving a suspect his Miranda rights?
19   A    Yes, ma'am.
20   Q    Did you have any instruction on the obligation
21   to turn over exculpatory evidence in a case?
22   A    Yes, ma'am.
23   Q    You were taught that it was important to
24   document anything that is conceivably relevant in an
25   investigation; is that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RONALD MARSH, taken on February 14, 2022

102..105

Page 102

1    A    Yes, ma'am.
2    Q    So you were taught not just to document
3  inculpatory evidence, but to also document potential
4  exculpatory evidence; is that right?
5    A    Yes, ma'am.  And again, it's all very basic at
6  that time.
7    Q    Now once you joined the Russellville police
8  department, were you given any training specifically by
9  the Russellville police department?
10   A    No, ma'am.  Just field training with the --
11 with the supervising sergeant at the time.
12   Q    And what did that field training involve?
13   A    Area familiarization.  You can't very well
14 respond in a town that you don't know your way around
15 in.  So area familiarization.  Just the 10 codes are
16 different, they're not all the same in every department.
17 So learning the -- 10 codes, learning the operating
18 procedures of -- of the particular department you're
19 with.
20   Q    And was that training set, like, for a
21 specific time period for instance, the police academy
22 being nine weeks.  Were there a set number of weeks that
23 you got training from the field training officer?
24   A    No, ma'am.
25   Q    Now, when you first joined the Russellville

Page 103

1  police department, were you provided with a copy of any
2  policies and procedures?
3    A    I'm sure.  I'm sure there were at the time.
4  Yeah.
5    Q    And when you say that you're sure that there
6  were, does that mean that yes you were, or you assume
7  that you were?
8    A    I don't recall giving -- be given a copy of
9  policy and procedures.  The -- the first I remember of
10 any policy and procedures would've been several years
11 later in as far as in a written form, that I was aware
12 of.
13   Q    And I think you testified you were with the
14 police department in Russellville from '99 until 2006;
15 is that right?
16   A    Yes, ma'am.
17   Q    Do you know when within that six-to-seven-year
18 period that you first were given a copy of the written
19 policies and procedures?
20   A    It would've been during Chief Pendergraff's
21 term as chief.  We went through the procedures to become
22 a certified department, and I believe that the policy
23 and procedures that I was aware of became at that time,
24 that -- that they were written at that time in order to
25 -- to meet accreditation standards.

Page 104

1    Q    Sitting here today, do you know when that
2  accreditation process was completed?
3    A    I -- I do not.
4    Q    Do you have any idea if that occurred before
5  September of 2004?
6    A    I can't recall that.  No.  I'm not sure the
7  date.
8    Q    And when you were given training by the -- of
9  field training, did that include any training on writing
10 reports?
11   A    No, ma'am.
12   Q    Did that include any training on interviewing
13 witnesses?
14   A    No, ma'am.
15   Q    Just speaking about your specific practice,
16 what was your specific practice when it came to
17 documenting information that you learned for witnesses?
18 For instance, would you audio record conversations that
19 you had witnesses?  Would you take notes?  Would you
20 draft a report?  What was your standard practice in
21 documenting information?
22   A    If I was conducting the investigation, it
23 would've been -- any suspect would've been recorded.
24 Any witnesses on the scene would've been notes, and then
25 statements that included in the report, any photos I may

Page 105

1  have taken, they would've all been included in my
2  report.
3    Q    Now, I think you qualified that by saying if
4  you were conducting the investigation.
5    A    Correct.
6    Q    Did you mean something specific with that?
7    A    No.  No.  I thought that's what you asked me.
8  I'm not quite --
9    Q    Okay.
10   A    Yeah.
11   Q    Well, I was just trying to determine if you
12 were making -- well, if there was certain situations
13 where you would perform those tasks and other situations
14 where you wouldn't?
15   A    No.  I -- I -- I thought you was asking me
16 about my investigation, if I was investigating, what
17 would I do?
18   Q    Okay.  Yes.
19   A    Here and --
20   Q    Yes.  Okay.
21   A    -- and that -- that's -- yeah.
22   Q    Okay.
23   A    Yeah.  In my investigations, that would be my
24 course of action.
25   Q    Got you.  So it was your typical procedure

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  when you were interviewing a suspect that you would
2  audio record that suspect interview?
3      A   Yes.  That would be preferred.
4      Q   Okay.  And it was your typical procedure that
5  if you were interviewing witnesses at a scene that you
6  would take notes about the information that you learned;
7  is that right?
8      A   Yes, ma'am.
9      Q   Did you take notes when you were speaking with
10  Ms. Bellar there at the scene?
11     A   No.  That was a comment that Ms. Bellar made
12  as I was heading toward the house.  I never interviewed
13  Ms. Bellar.
14     Q   Okay.  Did you interview any individuals in
15  this case?
16     A   No, ma'am.  I didn't.
17     Q   Sir, were you in charge of the scene there on
18  Bonnie Drive on September 11, 2004?
19     A   I was the initial officer on the scene --
20     Q   Yeah.
21     A   -- and then -- excuse me?
22     Q   Oh, I said yes, sir.  I'm sorry.
23     A   And I was the initial officer on the scene,
24  and then as -- as others arrived, the -- the fire
25  department took over the fire scene.

Page 107

1      Q   Okay.  Prior to November of 2004 -- or, I'm
2  sorry, September of 2004, had the Russellville Police
3  Department provided you internally with any training on
4  your obligations in disclosing -- well, in documenting
5  and disclosing exculpatory information?
6      A   No, ma'am.
7      Q   So you got some basic training on that
8  obligation when you were at the police academy; is that
9  right?
10     A   Correct.
11     Q   Did you have any further training on that
12  obligation thereafter?
13     A   To provide exculpatory evidence?
14     Q   Yes, sir.
15     A   No, ma'am.  No specific training.
16     Q   Okay.  So the only training that you had
17  received prior to September of 2004 regarding
18  documenting, disclosing exculpatory information was the
19  training that you had received at the police academy?
20     A   Correct.
21     Q   Okay.  As a patrol sergeant with the
22  Russellville Police Department in September of 2004, who
23  was your immediate supervisor?
24     A   My immediate supervisor on that night was
25  Roger McDonald.  And my -- my shift at the time was --

Page 108

1  was a little bit different because I was a K-9 officer.
2  Each shift had their -- their patrol sergeants.
3  My starting and stopping time when I came on and -- and
4  went home after duty did not fall with the same start
5  and stop time of the shifts.
6      Q   Okay.
7      A   So I would start in the middle of one shift,
8  and go home in the middle of the next shift because I
9  was -- I was active during the time that was most likely
10  a K-9 was going to be involved, and so my -- my hours
11  were tailored to that.  And --
12     Q   What were your hours?
13     A   I believe at the time it was from 7:00 to --
14  7:00 to 4:00.
15     Q   7:00 p.m.?
16     A   -- 7:00 p.m.  7:00 p.m. to -- to -- to 3:00,
17  or 4:00.  And that was -- it would vary because those --
18  the nighttime hours were when the K-9 was -- was the
19  most valuable tool.  And the --
20     Q   That's when the drug dealers were out?
21     A   Exactly.  Well, it's -- that -- that's when
22  there the most need for K-9.
23     Q   Okay.
24     A   But now as one sergeant would leave, then --
25  then I would become the senior sergeant -- I would

Page 109

1  become the -- shift supervisor.
2      Q   Okay.
3      A   If -- if it was a sergeant's day off, or if
4  the sergeant were to -- to go home and the next shift,
5  it was their sergeant's day off, then I would be the
6  supervising sergeant until I went home.  Then it would
7  be turned over to the senior officer.
8      Q   Okay.  Is it accurate that Roger McDonald was
9  a captain at the time in September of 2004?
10     A   I can't believe if he was promoted to captain
11  yet, or not.  I know -- I -- I believe anyway, Barry
12  Dill had been promoted to captain, and I'm not sure if
13  Roger McDonald had been promoted yet or not.
14     Q   Okay.  Regardless, if Mr. McDonald was on
15  shift at the same time that you were on shift, was he
16  your immediate supervisor?
17     A   Yes, ma'am.
18     Q   Okay.  And so if he was on shift at the time
19  you were on shift, you would report to Roger McDonald,
20  right?
21     A   Correct.
22     Q   Okay.  And Chief Pendergraff -- or Jim
23  Pendergraff was chief at the time; is that right --
24     A   Correct.
25     Q   -- in September, 2004?  Did you have occasion

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 30 of 51 PageID
#: 3052
The Deposition of RONALD MILLS, taken on February 14, 2022

110..113

Page 110

1  where you would report directly to the chief?
2      A    Not unless it was something he asked me
3  specifically.  If I was taking anything to him, it
4  would've been a violation of chain of command.  Unless
5  it was something specifically involving the K-9.
6      Q    What do you mean by that?
7      A    If I -- if I needed repairs to the kennel,
8  if I needed equipment, if I -- I was scheduling a K-9
9  training, I would do that with Chief Pendergraff.
10     Q    Okay.  Now, in September of 2004, did you
11 regularly discuss cases and investigations with Roger
12 McDonald?
13     A    Not necessarily.  If he ever had a question
14 about a case, or about an incident that happened while
15 he was gone, then he would ask me about it.  But I don't
16 recall regular meetings.
17     Q    Okay.  And that was going to be my next
18 question.  So you -- there wasn't -- you didn't have in
19 place, like, set regular meetings where you would
20 discuss the investigations that you were conducting?
21     A    No, ma'am.
22     MS. STAPLES:  Okay.  All right, sir.  If we
23 could take just another quick break; is that okay?
24     THE WITNESS:  Sure.
25     MS. STAPLES:  All right.

Page 111

1      VIDEOGRAPHER:  Off the record.  The time is
2  12:40.
3      (OFF THE RECORD)
4      VIDEOGRAPHER:  We are back on the record for
5  the deposition of Ronald Mills being conducted by
6  videoconference.  My name is Andie Layne.  Today is
7  February 14, 2022.  The time is 12:50.
8      MS. STAPLES:  All right, thank you, Mr. Mills,
9  for that break.  I appreciate it.  I think that I am
10 done with my questioning at this time, but some of
11 the other attorneys here on the Zoom may have some
12 questions for you as well.
13     THE WITNESS:  Yes, ma'am.
14     MS. ARNETT:  Jeff, I do have some questions.  I
15 didn't know if you wanted -- if you had any
16 questions?
17     MR. MANDO:  No.  Amber, if you have questions,
18 go ahead.
19     MS. STAPLES:  Oh, we couldn't hear you, Jeff.
20     MR. MANDO:  Whoever wants to go next, Amber,
21 or --
22     MS. STAPLES:  We can't hear you at all.
23     MS. ARNETT:  We can't hear you.
24     MR. MANDO:  Can you hear me now?
25     MS. ARNETT:  Barely.

Page 112

1      MS. STAPLES:  A little bit.
2      MR. MANDO:  Yeah.  And --
3      MS. STAPLES:  Oh.
4      MR. MANDO:  How about now?
5      MS. STAPLES:  Yes.  We can hear you now.
6      MR. MANDO:  All right.  I think Amber said she
7  has some questions.  So Amber, if you're ready,
8  we're ready to go ahead with that.  Whoever else.
9      MS. ARNETT:  Okay.  It's really brief actually.
10 And let me see.  Amy, I need to share your exhibit
11 that's the floor plan.
12     MS. STAPLES:  You want me to share it?
13     MS. ARNETT:  Could you?  Because that might
14 actually be easier.  I can't remember which number
15 it was.  I meant to mark that down.
16     MS. STAPLES:  It's number 3.
17     MS. ARNETT:  Okay.
18     MS. STAPLES:  But I can pull it up if you would
19 like me to.
20     MS. ARNETT:  I appreciate it.  That's the only
21 one --
22     MS. STAPLES:  Okay.
23     MS. ARNETT:  -- that I need.
24     MS. STAPLES:  I'll let you get by with one.
25     MS. ARNETT:  Thank you.

Page 113

1      MS. STAPLES:  Give me just a second.  I just
2  got to get to it.
3      CROSS EXAMINATION
4  BY MS. ARNETT:
5      Q    And Mr. Mills, my name's Amber Arnett.  I'm
6  the attorney who represents the state police defendants
7  in that case.  And that includes Jaman Childers, William
8  Smith, and David West.
9      A    Okay.
10     Q    And you testified earlier that you did not
11 know Mr. Childers or Mr. Smith; is that correct?
12     A    Correct.
13     Q    Okay.  And you testified earlier about the
14 second time you entered the trailer that you did see --
15 and correct me if I'm restating your testimony
16 incorrectly -- but you did see -- you said fire in the
17 back bedroom, a fire in the kitchen, and did you say --
18 what was the other?  It was on the wall between the --
19     A    It was --
20          Go ahead.
21     A    The the -- the common wall between the
22 living room and the first bedroom going down the
23 hallway, so it would've been the --
24     Q    It is --
25     A    -- the wall directly across from the front



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 31 of 51 PageID
#3053
The Deposition of RONALD MILLS, taken on February 14, 2022

114..117

Page 114

1  door.
2     Q    Okay.
3         MS. ARNETT:  Amy, would you mind using your
4    pointer to identify that?
5     Q    Is it that wall?
6     A    That --
7     Q    Do you see where that pointer is?
8     A    Correct.  Along that wall, yes.
9     Q    Okay.  Okay.  That's all I needed for that
10   exhibit.  Thank you.  I just wanted to be very specific
11   about which wall we were talking about.  Okay.  And Mr.
12   Mills, the other question I have is that Mr. West's
13   documentation indicates that he did not arrive on the
14   scene until September 12th at 10:15 a.m.  So you had
15   previously testified that you had a conversation with
16   the fire investigators, and they asked you to retrieve
17   the evidence items from Mr. Yell.
18    A    That's why -- assume that they were on the
19   scene.
20    Q    But you didn't know that --
21    A    But I -- I had not dealt with them before.
22    Q    Okay.  Do you have a specific recollection of
23   having that conversation with David West the night of
24   the fire?  Or is it possible that occurred at some other
25   time, or that it did not occur with David West at all?

Page 115

1     A    It may not have been David West.  Whoever was
2    on the scene that night requested the -- items be
3    retrieved from Robert Yell.
4     Q    Okay.  And --
5     A    But I had not -- I had not dealt with them
6    before, so I may not have the other names correct.
7     Q    Okay.  And so are evidence and any testimony
8    showing that David West did not arrive on the scene
9    until the morning of September 12th, do you have any
10   recollection, evidence, any, you know, recollection of
11   any conversations with him that would dispute that?
12    A    Well --
13        MS. STAPLES:  Amber, can I ask for your
14   clarification?  Sorry.  Did you say it was that
15   12:15 a.m. on the 12th?
16        MS. ARNETT:  No, 10:15.  I'm sorry.
17        MS. STAPLES:  10:00.  Okay.  No, that's okay.  I
18   thought I -- thank you.
19   BY MS. ARNETT:
20    Q    That's okay.  I just want to know, do you have
21   independent recollection, or a specific recollection
22   that would dispute David West's testimony or
23   documentation showing that his first time on the scene
24   was not until September 12th at 10:15 a.m.?
25    A    No, ma'am.  I don't.

Page 116

1     Q    Could you repeat that?  I'm sorry.
2     A    I -- I said no, I don't have any --
3     Q    Okay.
4     A    -- anything to dispute that.  Like I said,
5    I -- I had not worked with them before, and if it wasn't
6    him specifically that was on the scene that night, I --
7    I may have names confused.
8     Q    Okay.  And if you had returned the doc -- I'm
9    sorry, the evidence that you collected from Mr. Yell to
10   a fire investigator on the scene, do you remember when
11   that was?  What is it that night or the next day?  Before
12   --
13    A    Believe it was that night.
14    Q    Okay.  Or do you recall was it before you left
15   your shift at 3:00 or 4:00 a.m. on September 12th?
16    A    Depends when I got off that night.
17    Q    And if you don't recall that's okay --
18    A    I don't recall -- I don't recall who I
19   specifically handed it to.
20        MS. ARNETT:  Okay.  Okay.  That's all the
21   questions I have, Mr. Mills.  I appreciate your
22   time.
23        THE WITNESS:  Yes, ma'am.
24        MR. MANDO:  How about the other guys.  The
25   other state people?  August, or Ben, anybody from --

Page 117

1         MR. POZGAY:  Mr. Mando, I'm having trouble
2    hearing you.  August Pozgay here.  I have a few
3    questions as well --
4         MR. MANDO:  Okay.
5         MR. POZGAY:  -- on behalf of Alan Gregory, but
6    if Mr. Mills' attorney would like to ask questions
7    first, I'm happy to wait as well.
8         MR. MANDO:  Yeah.  Go ahead.
9              EXAMINATION
10   BY MR. POZGAY:
11    Q    Okay.  Mr. Mills, can you hear me all right?
12    A    Yes, sir.
13    Q    My name's August Pozgay, I'm one of the
14   attorneys for Alan Gregory.  Just have a few quick
15   questions about your arrival to the scene.  Earlier you
16   testified that you walked around the structure when you
17   had first arrived at the scene; is that correct?
18    A    From the rear of the structure around to the
19   front, yes.
20    Q    So you didn't walk all the way around the
21   structure from one point all the way around back to that
22   same point, correct?
23    A    No, sir.
24    Q    So you did not walk all the way around the
25   structure to observe the fire from all sides of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 118

1   structure; is that correct?
2        A    Correct.  That is correct.
3        Q    You also testified that April Carpenter
4   approached the structure from the north towards the side
5   of the trailer; is that right?
6        A    Correct.
7        Q    Can you recall which side of the trailer that
8   would've been?
9        A    The north side of the trailer.  The -- the --
10  the street runs north and south.
11       Q    And which side is the entrance to the trailer
12  on, do you recall?
13       A    On the -- it would be on the west side of it.
14       MR. POZGAY:  Okay.  Ms. Staples, would you mind
15  pulling up that diagram again?  Would it be possible
16  for you to pull that up again?
17       MS. STAPLES:  Sure.
18       MR. POZGAY:  I appreciate that.  Thank you.
19  BY MR. POZGAY:
20       Q    Mr. Mills, can you just point me to where in
21  this Exhibit 3 -- where you think the entrance is to the
22  structure?
23       A    Oh.  Oh, okay.  Right here.
24       Q    Okay.  So can you describe it for me?
25       A    It -- it's a porch with a front door on it

Page 119

1   just entering the house.
2        Q    Okay.  And on this diagram, which side of the
3   diagram is it on?
4        A    It would be on the -- the west.  I -- I know
5   that the arrow up there is pointing true north, but the
6   -- the street in front of the structure is -- runs north
7   and south.  So that would be the -- the west side of the
8   house.
9        Q    Okay.  Do you see sort of three bars at the
10  bottom and right of that diagram at the intersection of
11  the kitchen, and the living room area?
12       A    Yes, sir.
13       Q    Do you know what those three bars are?
14       A    Those would be the steps to the house.
15       Q    Okay.  And is that the main entrance area?
16       A    Yes, sir.
17       Q    Okay.  So when you came into the -- when you
18  put your head in to check it out the first time, that's
19  where you were?  That was your vantage?
20       A    Correct.
21       Q    Now, the second time you went in, you
22  testified that there was already a lot of smoke in the
23  air; is that right?
24       A    Correct.
25       Q    How many feet could you see in front of you

Page 120

1   through that smoke?
2        A    I could see across the room.  The smoke was --
3   was mainly still on the -- on the ceiling area.
4        Q    And at some point you said you also had to
5   sort of duck lower or get lower because of the smoke; is
6   that right?
7        A    Correct.
8        Q    And when did that happen?
9        A    Just before we exited.
10       Q    Now, I believe Ms. Arnett had asked you a
11  question about the different areas you saw when you
12  stepped in, but just remind me.  When you looked in that
13  second time, you were looking in, and to your right was
14  the kitchen, across from you was the living room, and
15  further across from you is that first -- is that larger
16  bedroom; is that right?
17       A    There's the large bedroom toward the back of
18  the -- of the structure.  That's where the initial fire
19  was.  As I entered about halfway across the living room,
20  there was also a fire in the kitchen, which was now
21  behind me, and on the living room wall which was
22  directly across from the kitchen.
23       Q    So the second time you went in --
24       A    -- on the west side of the hallway.
25       Q    Thank you, sir.  So the second time you went

Page 121

1   in, you saw fire in three different areas; is that
2   correct?
3        A    Correct.
4        Q    And the first time you went in, you didn't see
5   a baby bed the first time you went in, did you?
6        A    No.  I didn't notice that until after the
7   fact.
8        Q    From your vantage when you went in, the only
9   things you could see were immediately around you,
10  correct?  There were walls in the way otherwise?
11       A    Yeah.
12       MS. STAPLES:  Objection to form.
13       Q    Could you see past any of the walls around you
14  when you first went in?
15       A    No, sir.
16       Q    So is it possible that there could have been
17  fire elsewhere in the trailer that you didn't see?
18       A    I can't answer that.  I'm sure that that is
19  possible, but I can't say there was.
20       Q    Well, I asked if it was possible.  Would you
21  agree that it's possible that there could have been fire
22  in other areas that you couldn't see?
23       A    Yes, sir.
24       Q    I want to shift gears a little, and go back to
25  some of the things you said about your training in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 33 of 51 PageID #3055
The Deposition of RONALD MANNS, taken on February 14, 2022

122..125

Page 122

1   Navy.  You mentioned that -- I believe you testified
2   that your training in fighting fires in the navy was a
3   lot different than structure fires; is that correct?
4       A    Correct.
5       Q    And you also testified that you'd actually
6   been in and fought two fires yourself; is that correct?
7       A    Correct.
8       Q    During your training on fire in the Navy, was
9   the term flashover ever defined for you?
10      A    No, sir.
11      Q    And during your training in fire in the Navy,
12  was the term fully involved ever defined for you?
13      A    No, sir.
14      Q    So when you used those terms during your
15  testimony, is it fair to say you were just describing a
16  fire worsening?
17          MS. STAPLES:  Objection to form.
18      Q    You can answer the question.
19      A    Okay.  Yes.  When I -- my term for fully
20  involved was that the -- we could no longer access the
21  -- the structure.  The -- the -- the fire -- there was
22  fire everywhere at that point.
23      Q    You also testified earlier that you arrived at
24  the scene, spoke to a neighbor, did a look into the
25  entrance of the trailer, then came back a second time.

Page 123

1   That's just a overall summary of what happened when you
2   first arrived; is that right?
3       A    Yes, sir.
4       Q    And how much time did that take in all, in
5   your memory of it?
6       A    Not very long.  I know when I arrived that
7   when she said the house was on fire, I immediately went
8   to the structure.  Looked in to yell for -- for folks,
9   didn't get a response.  I'd -- I'd say everything took
10  place probably within just a -- short time, maybe five
11  minutes altogether.  But from the time that I -- that --
12  that I arrived on scene to going over, yelling in, and
13  then -- then going back in to see if we could gain
14  further access, maybe five minutes as a -- as a round
15  number.
16          MR. POZGAY:  Thank you.  No further questions.
17  Thank you for your time, sir.
18          THE WITNESS:  Thank you.
19          MR. MANDO:  Anybody else?  Anybody from Logan
20  County or -- Lynn, do you have anything on behalf of
21  Buster Cannon?
22          MS. ZELLEN:  I do not have any questions on
23  behalf of Buster Cannon or Scott County.
24          MR. MANDO:  Okay.  And --
25          MR. SMITH:  Nothing from Logan County.

Page 124

1           MR. MANDO:  Okay.  So --
2           MS. MALLES:  Nothing here either, Jeff.
3           MR. MANDO:  Okay.  Thank you.  And so that
4   circles us back to you, Amy.
5                 REDIRECT EXAMINATION
6   BY MS. STAPLES:
7       Q    I do have just a few call up -- follow-up
8   questions, sir.  I want to go back to your recollection
9   of walking through the trailer with the fire
10  investigators.  Is it your recollection that you went
11  back into the trailer with two different fire
12  investigators?
13      A    Could have been.  That night -- was the
14  investigators on the scene that -- that asked for my
15  retrieval of -- of the items from -- from Robert Yell.
16  Now, when I walked through with -- with David West, that
17  could have been the next day because we walked through
18  it -- I walked through it several times with several
19  different people.  And so they were, you know, asking me
20  different questions.  You know, our investigator, the
21  fire investigators, so my time was going through with
22  which person and some of the people that I may not be
23  familiar with, could not be who I thought they -- they
24  may have been, so...
25      Q    Okay.  So you --

Page 125

1       A    May have the names wrong, so...
2       Q    Understand.  You walked through the trailer,
3   you said, several times with different people after the
4   fire was extinguished?
5       A    Correct.
6       Q    Did you walk through the trailer with
7   investigators the evening of the fire?
8       A    I seem to recall going in afterwards when --
9   when -- once the scene was -- was safe.  That may or may
10  not been with investigators, with the fire
11  investigators.
12      Q    And I think you just testified -- oh, I'm
13  sorry.  I thought you were finished.  Go ahead.
14      A    No.  No.  No.  No.  That -- that -- that's
15  right, I'm -- because like I said, it's been so long
16  ago, and each time I'm trying to separate those, so...
17      Q    I understand.  So you walked through the scene
18  with fire invest -- with personnel from the fire
19  department; is that correct?
20      A    Yes.
21      Q    And you walked through the scene with
22  individuals that you believe to be fire investigators;
23  is that correct?
24      A    Correct.
25      Q    You have a specific recollection of walking

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 34 of 51 PageID
#: 3056
The Deposition of RONALD MILLS, taken on February 14, 2022
126..129

Page 126

1  through the scene with David West?
2      A    Yes.  We walked through -- I know we walked
3  through the next day because he was asking me --
4      Q    The next day.
5      A    -- you know, during -- I remember it being
6  daylight at that point, and walking through the -- the
7  scene.  So it would -- there were several times, and
8  like I said, I may have the time with David West
9  confused with another time that I went through there.
10  But I do know that I walked through with him at one
11  point.
12      Q    And when you walked through the scene with
13  David West, you were telling David West what you
14  observed when you approached the structure; is that
15  correct?
16      A    Correct.
17      Q    And you told him what you observed the first
18  time you leaned into the structure; is that correct?
19      A    Correct.
20      Q    And you told him what you observed the second
21  time that you physically walked into the structure and
22  stood in front of the couch?
23      A    Yes, ma'am.
24      Q    In front -- and when you were standing there
25  in front of the couch, you could see other areas within

Page 127

1  the structure, not just there in the living room,
2  correct?
3      A    I could see the bedroom in the -- the back
4  where the initial fire was, and I could see into the
5  kitchen where there was fire.  I could not see down the
6  hallway.
7      Q    Okay.  And you believe that you also -- or,
8  strike that.  You also walked through the scene with
9  State Fire Marshal Alan Gregory; is that correct?
10      A    Yes, ma'am.  At some point.
11      Q    And you don't know if it was that evening, or
12  if it was the next day; is that right?
13      A    Correct.
14      Q    How long after -- we'll strike that.  During
15  these various walkthroughs that you did with others at
16  the fire scene, were all those done within the first 24
17  hours of the fire?  Were those done within the first 72
18  hours of the fire?  Were you there weeks later?  Can you
19  give me --
20      A    I --
21      Q    -- an estimate of when you completed your
22  walkthroughs with those individuals?
23      A    I would believe it was in the first 24 hours.
24      Q    And each time that you walked through that
25  structure, you were telling the individuals what it was

Page 128

1  that you personally observed.
2      A    Correct.
3      Q    I don't know how to ask you this other than
4  just to say, was it necessary for you to have specific
5  fire training to be able to personally observe where you
6  saw flames in the home?
7      A    No, ma'am.
8      Q    In other words, if you'd never had --
9      MS. ARNETT:  Object to form.
10      Q    If you had never had fire training, you could
11  have still walked into a structure and personally
12  observed what you saw?
13      A    Correct.
14      Q    And what you personally saw is what you told
15  those fire investigators.
16      A    Correct.
17      MS. STAPLES:  All right, sir.  That's all the
18  follow-up I had for you.
19      MR. MANDO:  All right.  So any further
20  questions from August or from Lynn, Maureen,
21  anybody?  Amber?
22      MS. ARNETT:  No further questions.
23      MS. ZELLEN:  Nothing further for me either.
24  Thank you
25      MS. MALLES:  None here.

Page 129

1      MR. MANDO:  Thanks Maureen.
2      MR. POZGAY:  Nothing further here.  Thank you.
3      MR. MANDO:  All right.  Well we are -- did I
4  cover Logan County?  Did that trigger any questions
5  from Logan County?
6      MR. SMITH:  No, Jeff.  We're good.  I
7  appreciate it.
8      MR. MANDO:  Thanks.  All right.  So we're done
9  then, I think.  Madam Court Reporter, we'll take
10  signature on that deposition, please, and that can
11  be done through my office.
12      COURT REPORTER:  Great.  Thank you.
13      MR. MANDO:  Send it to me with the errata sheet
14  and everything.  I'll get it signed.  We'll take
15  e-tran on the transcript.
16      COURT REPORTER:  Sounds good.
17      MS. STAPLES:  And Mr. Mills.  Mr. Mills, thank
18  you so much for your time.  I appreciate it, and I
19  am sorry that you had to travel an extended area.  I
20  had -- I wasn't aware of that.  My apologies.
21      MR. MANDO:  Well, it was -- don't worry about
22  it.  It was -- that was all part of the initial plan
23  when we were going to do these on consecutive days
24  so --
25      MS. STAPLES:  I understand.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 35 of 51 PageID #: 3057
The Deposition of RONALD MANDO, taken on February 14, 2022
130..132

Page 130

1    -- we're cool.
2        MS. STAPLES:  All right.  Thank you guys.
3    Appreciate it.
4        MR. MANDO:  Thanks everybody.
5        COURT REPORTER:  Real quick.
6        MR. MANDO:  Yeah.
7        COURT REPORTER:  Ms. Staples, how would you
8    like your copy?
9        MS. STAPLES:  Oh, e-tran, please.
10       COURT REPORTER:  And would you like a copy of
11   the video?
12       MS. STAPLES:  Not at this time.
13       COURT REPORTER:  All right.  Great.  Mr. Mando,
14   did you want a copy of the video?
15       MR. MANDO:  No.  Not at this time.  Thank you.
16       COURT REPORTER:  All righty.  Let's see,
17   Mr. Pozgay, how would you like your copy?  Pozgay.
18       MR. POZGAY:  No video, but e-tran please.
19       COURT REPORTER:  No video.  E-tran.  Okay.
20       MR. POZGAY:  And just one copy, thank you.
21       COURT REPORTER:  All right.  Great.
22   Ms. Malles?  How would --
23       MS. MALLES:  Same here.  Yes.  Same here.
24       COURT REPORTER:  Same?  Okay.
25       MS. MALLES:  Yes.  Thank you.

Page 131

1        COURT REPORTER:  No problem.  And let's see.
2    Ms. Arnett, how would you like your copy?
3        MS. ARNETT:  Same thing for me.  No video, but
4    I would like one copy of the e-transcript.
5        COURT REPORTER:  Okay.  Ms. Porter?
6        MR. SOWELL:  She's signed off.  I'm back on.
7        COURT REPORTER:  Okay.
8        MR. SOWELL:  -- same here for us.  Thank you.
9        COURT REPORTER:  Okay.  Great.  And Ms. Zellen?
10       MS. ZELLEN:  Keep it simple.  Same for us,
11   please.
12       COURT REPORTER:  Sounds good.  All righty.
13       MS. STAPLES:  And everybody, before you jump
14   off, just a reminder that there is no deposition
15   tomorrow, and that Wednesday's deposition is the
16   second part of Mr. Gregory's deposition, beginning
17   at this same time, 10:00 Eastern.
18       MR. MANDO:  All right.  Got it.  Thanks, Amy.
19   Appreciate --
20       MS. STAPLES:  Thank you, everyone.
21       COURT REPORTER:  Thank you.
22       (DEPOSITION CONCLUDED AT 1:15 P.M.)
23
24
25

Page 132

1               CERTIFICATE OF REPORTER
2                 STATE OF INDIANA
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded mechanically by me and then reduced
10   to type written form under my direction, and constitutes
11   a true record of the transcript as taken, all to the
12   best of my skill and ability. I certify that I am not a
13   relative or employee of either counsel, and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.
16
17
18
19
20
21
22   SYDNEY LITTLE,
23   COURT REPORTER/NOTARY
24   MY COMMISSION EXPIRES ON: 12/09/2029
25   SUBMITTED ON: 02/23/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

EXHIBIT 1_
MILLS 25:13
30:15,16 77:17

EXHIBIT 2_
MILLS 30:10,
11,12

EXHIBIT 3_
MILLS 33:2,5
118:21

EXHIBIT 4_
MILLS 50:9,13

EXHIBIT 6_
MILLS 71:9,13

Exhibit 7_Mills
82:18,19,23
84:18

**1**

**1** 25:13 30:16
77:17

**10** 23:21,23
77:19 102:15,
17

**10-18** 26:25
78:23 79:1,2

**10-56** 77:22,23
86:17

**10-97** 77:18,20

**101** 9:7

**10:00** 115:17
131:17

**10:06** 9:9

**10:15** 114:14
115:16,24

**10:56** 78:22

**11** 24:12,15
50:24 53:22,24
86:1 87:17 91:5
106:18

**11:14** 57:15

**11:22** 57:20

**11th** 24:10 57:2
59:25

**12:15** 115:15

**12:40** 111:2

**12:50** 111:7

**12th** 114:14
115:9,15,24
116:15

**14** 57:20 111:7

**14th** 9:8

**1919** 26:6

**1920** 27:3

**1930** 72:2

**1948** 79:10

**1977** 17:6

**1997** 17:6,9
22:11

**1998** 100:10

**1999** 23:21,23

**19:48:29** 78:1

**1:15** 131:22

**1:20-CV-0047-
GNS** 9:14

**2**

**2** 30:11,12
50:22

**20** 20:1

**20-year** 19:14

**2004** 24:10,12,
15 59:25 86:1
87:17 91:5,9
104:5 106:18
107:1,2,17,22
109:9,25
110:10

**2006** 14:7 24:3
103:14

**2020** 93:15

**2022** 9:9 57:20
111:7

**21** 53:22

**2102** 79:4

**2109** 79:7,10
86:12

**2150** 86:18,19

**24** 50:11
127:16,23

**3**

**3** 33:2,5 112:16
118:21

**3374** 71:10

**34** 78:11

**389** 82:19

**392** 82:19

**3:00** 108:16
116:15

**4**

**4** 50:9,13

**40** 86:20,22
87:7,22

**40202** 9:8

**41** 83:6 85:2

**42** 83:15 85:3

**44** 83:20 85:3

**45** 33:3 86:7

**46** 84:2 85:4

**4:00** 108:14,17
116:15

**6**

**6** 71:9,13

**7**

**7** 82:19,23
84:18

**72** 127:17

**730** 9:7

**7:00** 108:13,14,
15,16

**7:19** 26:8

**7:20** 27:5,9
57:1 72:18

**7:25** 72:21

**7:30** 57:1

**8**

**824** 78:7

**831** 24:6 26:22
83:22

**834** 78:8,9

**9**

**9-11** 91:8

**9-11-2004** 26:6

**98** 100:11

**99** 103:14

**A**

**a.m.** 9:9 57:15,
20 114:14
115:15,24
116:15

**ability** 16:15
19:22

**ablaze** 56:10

**aboard** 18:11

**above's** 72:10

**Absolutely**
53:18

**academy**
22:19,21 100:7,
12,23,25 101:9,
12 102:21
107:8,19

**accepted**
22:17

**access** 122:20

123:14

**accreditation**
103:25 104:2

**accurate** 19:9
21:8 24:8 26:5
27:2 35:14 37:8
43:10 47:7,20
52:24 63:5
66:21 77:9
86:21 93:2
109:8

**accurately**
65:23

**action** 93:11
105:24

**actions** 26:1
64:21 65:4 89:7

**active** 36:17,25
108:9

**Actual** 20:6

**advised** 41:18

**affect** 16:15,22

**affirm** 11:24

**AG00001** 31:5

**agree** 11:15
27:7 31:21
53:15 69:16
71:20 78:1,19
82:25 84:21
121:21

**ahead** 16:2,11
54:25 111:18
112:8 113:20
117:8 125:13

**ahold** 70:3,10

**air** 21:10,11,16
48:19 119:23

**Alan** 10:17,21
56:20,23 58:19,
22 59:6,21
117:5,14 127:9

**alcohol** 91:15

**alerted** 52:24
53:23 67:1

**alerting** 53:8
54:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

allegedly 74:6

allowed 69:14,
22

alpha 18:16
19:1,4 20:8

altercation
87:18

altogether
123:11

Amber 10:23
11:4 111:17,20
112:6,7 113:5
115:13 128:21

amount 51:8
86:4

Amy 9:18 12:8,
17 13:1,22 25:8
112:10 114:3
124:4 131:18

and/or 60:18

Andie 9:4
57:19,21,22
111:6

angle 32:7,19

anniversary
96:12

apologies
26:15 40:15
92:23 129:20

apparently
26:15 54:15

appearance
9:15

appeared 24:5
28:21 29:5,13
54:13 91:13

Appearing
10:3,8,11,25

appears 25:16

applied 22:23
23:16

approached
29:14 30:2
32:21 34:17,21,
25 118:4
126:14

approaching
38:14,15 73:23

approximate
73:2,3

approximately
79:11 86:20

April 36:7 38:1,
3 41:19,24
42:24 43:2 91:4
118:3

area 33:25 43:2
46:11 48:5
49:17,19,23
50:6 56:2 61:19
96:17,19
102:13,15
119:11,15
120:3 129:19

areas 120:11
121:1,22
126:25

argue 45:5

arm 76:16,21

Arnett 10:23
11:4 34:1
111:14,23,25
112:9,13,17,20,
23,25 113:4,5
114:3 115:16,
19 116:20
120:10 128:9,
22 131:2,3

arrest 71:2
73:1 74:25
75:16 77:3
84:10 91:4

arrested 71:24
72:25 73:10
91:7

arresting
76:24

arrival 73:6,8
78:20 87:14
117:15

arrive 28:10
114:13 115:8

arrived 28:11
35:4 36:12

37:12 41:1,2,17
56:6,13 63:12
67:6 68:8,9,10,
20 70:22 72:21
73:6,16,21,23
77:12 78:2
79:7,9,10,11,
14,20,23 80:12
86:12 106:24
117:17 122:23
123:2,6,12

arriving 49:7
78:14

arrow 119:5

arson 27:20,22
74:21 89:15
99:16

ash 19:5

assisted
20:10,21

assisting
88:13

Association
22:8

assume 23:7
65:24 66:3
75:14 81:2 90:9
103:6 114:18

assumed
65:17

assuming
17:19 37:6

assumption
37:9

attached 31:8

attempt 69:15

attempted
69:7 76:15

attend 101:1

attended 22:5,
19 100:7

attending
9:15,16,19,22,
25 10:15,18,21
11:6

attorney 16:8,

11 113:6 117:6

attorneys 12:9
15:18 16:6
94:16,22 95:11
111:11 117:14

audio 104:18
106:2

August 10:17
116:25 117:2,
13 128:20

author 71:17

avoid 97:12

aware 16:17,20
38:4 64:19 77:7
85:20 87:13
88:17 90:4,5
103:11,23
129:20

———

B

baby 43:4 46:6
53:25 121:5

back 15:5 29:6,
8,12 30:4 32:21
34:15 36:18
37:1,7,20 39:9
40:20,25 43:24,
25 44:7,16
45:9,11,15,16,
20 54:3 55:16
57:17 58:3,19
59:21 60:8,14,
23 61:13,16
62:3 63:14
77:15 82:8
93:14 111:4
113:17 117:21
120:17 121:24
122:25 123:13
124:4,8,11
127:3 131:6

badge 24:5
78:6

bag 81:22,23,
24 82:1,2 85:3

Bail 73:19

Barely 111:25

Barry 68:9
109:11

bars 119:9,13

based 52:21
73:15 74:5

basic 100:24
102:5 107:7

basics 100:13

Bates 31:5
33:2 71:9 82:19

bed 43:4 46:7
53:25 121:5

bedroom
33:12,25 34:2,
15 36:17 37:1,
3,7,8,20 43:24,
25 44:4,10,13,
16,17,20 45:9,
11,15,16,20
46:1,13 60:9,
14,23 61:13
63:14 113:17,
22 120:16,17
127:3

began 23:19

begin 12:3
22:11

beginning
13:25 40:15
48:7 61:22
100:11 131:16

behalf 9:21,24
10:2,6,10,14,
17,20,24 117:5
123:20,23

belief 70:23

believed 53:9

Bellar 26:13
28:15,18,20
29:25 30:7
38:23 40:2,3
41:20 73:18,19
74:6 75:4,8,10
106:10,11,13

Bellar's 28:13,
25 29:3,7

bells 59:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ben 116:25

bend 46:22

Benjamin
10:20

bill 90:14 99:25
100:2

bit 15:6 16:18
18:6,25 23:7
42:8 52:2 92:13
93:12 96:2
108:1 112:1

blanket 44:13

blast 47:7

blew 49:20
52:5

blood 77:2

blow 52:4,7,14

blowing 62:14

boiler 17:11

Bonnie 72:6
106:18

boot 83:9,16

boots 80:18
82:3 83:12

bothers 96:6

bottom 71:11,
12 119:10

Bowling 11:1
22:17,18,20
23:3,8,13 100:6

box 13:4,6,22

branch 17:2

bravo 19:5

break 13:15,24
15:24 16:1 57:8
58:9 92:5
110:23 111:9

breaking
52:17

breathe 62:9

bring 40:20

broke 52:11

brown 83:9,15

brush 20:17
48:4

building 34:6
51:3

bunch 82:20

burning 18:19
19:8 51:3 72:6,
9,12

burst 48:21,23

Buster 10:10,
15 64:11,14
99:4 123:21,23

button 12:22

———————

C

———————

CAD 25:16,21,
25 30:15 77:14
86:2,7,12 89:10

CADS 25:17

California
23:2,8,11

call 25:24 26:5
27:8,12 28:1,3,
4 72:18 73:22
81:4 124:7

called 52:24

caller 26:12

caller's 28:12

calling 26:3
35:23 39:6

calls 25:22
28:7 38:12

camera 11:15
90:6

cameras 90:8

Campbell 9:24

canisters 82:5

Cannon 10:11,
15 64:12,14
99:4,8 123:21,
23

cans 82:3

captain 109:9,
10,12

career 22:11,
15 23:13 25:18

Carpenter
38:1,3,8,10,13,
15,20,24 40:8,
24 41:19,25
91:4,7,11,18
92:2 118:3

Carpenter's
39:19

case 14:8,9,10,
13 47:6 50:12
64:8 66:7 75:5,
8 94:2,11
95:24,25 97:17,
24 98:9,18
99:9,11,22
101:21 106:15
110:14 113:7

cases 27:17
110:11

caught 54:7
60:14

ceiling 36:20,
23 46:20,21
61:3,23 120:3

Center 77:10
85:25 86:23
87:7,17 90:20

Central 84:22

certification
22:2

certified
103:22

Chad 68:8,12
97:19

chain 52:12
63:17 110:4

change 19:21

changed 101:2

charge 74:8,
17,21 89:12,15
106:17

charged 70:24
71:21 74:19
91:14

charges 71:19
95:23

charlie 19:6

Charlotte
26:12

check 96:11
119:18

checking 81:2

chemical 76:1,
4 87:8,11,14

chest 76:20,23

chief 14:24
17:13,15,19
98:5,8 103:20,
21 109:22,23
110:1,9

child 54:19
96:7

Childers 11:6
98:24 113:7,11

children 30:8
35:9 38:5 40:5
88:19

circles 124:4

Circuit 33:3

circumstance
s 40:18

citation 64:22,
24 71:7,21 72:4
74:8

citations 87:25

citizen 25:22

city 9:11 10:15
14:14,18

civil 14:8,9
94:23 95:12
97:3,24 98:9,22
99:12,18 100:3

civilian 22:11
23:6

clarification
33:23 34:12

115:14

class 19:15,16
101:16

classes 18:16
101:8

classification
20:8

classifications
18:18

click 12:20,21
13:3,8

clicked 13:5

clicking 13:5,
10

client 10:5

close 43:10
69:14 70:17

closed 36:11

closer 53:16
92:20 96:18

cloth 81:12

clothing 81:25
82:2 84:6 86:25
88:5,11,18

code 26:25

codes 102:15,
17

colleague 41:3
95:3,7 97:20

colleagues
68:13,16

collect 81:5,9,
14 91:17,23

collected
80:15,20 82:8
84:13 85:13,22
88:1 91:18
116:9

collecting
88:18 89:8,18

collective
82:18

collectively
81:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

combat 18:23

combating 18:11

combined 18:21

combining 48:19

command 19:22 110:4

commands 19:22

comment 106:11

common 45:25 113:21

communicatio ns 26:2

competently 16:16

complainant 14:14

complaint 25:22 93:11,14, 18

completed 104:2 127:21

conceivably 101:24

concern 47:22 69:4

concerned 47:18 48:8,11 51:5,14 52:23

concerns 37:13,16

CONCLUDED 131:22

conclusions 66:11,14

condition 40:8

conditions 16:15 18:23 21:14 55:4

conduct 70:25 71:22

conducted 57:18 111:5

conducting 65:18 100:23 104:22 105:4 110:20

confidential 94:17

confirmation 40:4

confused 116:7 126:9

connecting 46:12

connection 91:8

consecutive 129:23

considered 73:13 74:5,25 76:17

contact 39:11 48:13 51:6 96:20

contacted 69:2 95:19

container 81:22

continue 26:1

control 18:4 49:10,13 67:3, 16

controls 18:20

convened 9:9

conversation 61:6,25 63:16 90:11 97:13 98:21 99:8,17, 20 114:15,23

conversations 94:1,11,15,21 95:10 97:23 98:9 104:18 115:11

cool 130:1

cooperating 88:13

cooperative 88:4

copy 93:10,18 103:1,8,18 130:8,10,14,17, 20 131:2,4

corner 32:21, 23

correct 17:21 19:1,2 23:9,14, 18 24:6,7 26:8, 9,23,24 27:5,6 28:5,6 29:10,12 30:24 32:6,11, 12 34:19,20 35:17 37:2,4,5, 15,21 39:19,20 41:12 42:9,10 43:9 44:2,4,14, 22 46:4 48:11, 17,22 51:20,21 52:18,20 55:5 56:12,15,24 58:20,21,23 59:23 60:25 61:10,20 67:4,5 68:24 71:18,23 72:11 74:7,19, 22 80:19 84:1, 8,11 95:8 99:13 100:9 105:5 107:10,20 109:21,24 113:11,12,15 114:8 115:6 117:17,22 118:1,2,6 119:20,24 120:7 121:2,3, 10 122:3,4,6,7 125:5,19,23,24 126:15,16,18, 19 127:2,9,13 128:2,13,16

correctly 51:9

cotton 48:3 83:21 85:4

couch 42:25 43:7,11,12,17, 23 46:3 53:25

56:2 126:22,25

Coughs 30:13

counsel 9:17 24:20

County 10:11, 25 77:10 85:25 86:23 87:6,16 90:20 123:20, 23,25 129:4,5

couple 19:17, 20,21 23:14 55:18 79:25 82:17 94:2 96:15 97:25 98:10 99:17,21

court 9:5,6,13 11:22,23 12:3 30:17 58:1,5 129:9,12,16 130:5,7,10,13, 16,19,21,24 131:1,5,7,9,12, 21

cover 129:4

Covington 10:8

create 25:23 48:13 65:5,8

created 66:6

crew 19:23 20:10

crime 100:23

criminal 14:8 50:11 98:18 99:11,21

crooked 26:16

CROSS 113:3

crowd 49:10, 13 67:3,6,15

cursor 86:17, 18

cut 16:18 26:18 54:2 77:25 78:12

---

### D

damage 18:4, 20,22

date 38:8 96:14 104:7

daughter 39:19

David 56:18 58:19,22 59:21 113:8 114:23, 25 115:1,8,22 124:16 126:1,8, 13

day 19:18 62:24 109:3,5 116:11 124:17 126:3,4 127:12

daylight 126:6

days 129:23

deal 13:15,23

dealers 108:20

dealing 53:6

dealt 114:21 115:5

decided 23:5

decision 89:12,14

defendants 10:3,7,25 11:5 14:15 113:6

defined 122:9, 12

delta 18:17 19:1,7 20:8,12

departing 78:23

department 14:12,17,23 20:20 22:17,18, 24 23:17,20,23 24:2,9 27:15 35:16 41:4 68:14,17 95:4 97:20 100:7 102:8,9,16,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 40 of 51 PageID
#: 3062
The Deposition of RONALD MILLS, taken on February 14, 2022
137

103:1,14,22
106:25 107:3,
22 125:19

departments
22:16

depending
18:18

Depends
116:16

deposed 14:2

deposition
9:10 14:6 16:5
57:18 92:16
111:5 129:10
131:14,15,16,
22

depth 97:10

deputy 79:25
80:3,5,7,11

describe 40:11
47:2,14 82:4
118:24

describing
122:15

description
47:8

detection
27:22

detective
82:11 95:5
96:24,25 98:13,
22

Detention
77:10 85:25
86:23 87:7,17
90:20

determination
86:8

determine
20:22,25
105:11

determining
37:13,17

diagram 36:1
42:18,23 43:15,
19 44:7 118:15
119:2,3,10

Diego 18:14

difference
23:7

differentiate
74:16

difficult 40:23

Dill 68:9,13,20
109:12

DIRECT 12:4

direction
32:20 38:14
51:16

directly 110:1
113:25 120:22

disagreement
14:24

disclosing
107:4,5,18

discuss
110:11,20

discussed
56:1 97:4,7

discussions
94:22

disorderly
70:24 71:22
72:5

dispatch
25:16,22 28:1
52:24,25 53:8,
23 54:8,12 67:2

dispatched
24:17

dispatcher
26:3

dispatchers
25:23

dispute
115:11,22
116:4

disrespectful
40:12

distance 55:14

District 9:13

disturbance
24:17 26:10
28:4 38:12
72:5,18 73:21

divorced
96:21

doc 116:8

document
25:7,12,15,24
26:4,19 30:10,
20 31:1 32:24
33:7,10,16 50:8
64:20 71:4,6
73:1,25 78:20
82:22 100:20
101:24 102:2,3

documentatio
n 74:4 114:13
115:23

documented
65:22 66:2 73:7
89:9

documenting
104:17,21
107:4,18

documents
13:17 24:4 45:2
82:17 93:5

domestic
38:12

door 34:11
35:20,21 36:8,
10,11,13 37:8,
10,11 39:1
43:21 46:24,25
47:13,15 48:7,
12 49:2 51:5
55:16 62:3
114:1 118:25

doors 51:10
52:23

dots 12:22
13:8,13

draft 89:6
100:16 104:20

drafted 31:11

drive 72:7
92:17 106:18

driving 22:21

drug 108:20

duck 120:5

due 51:14

duty 17:12
24:14 108:4

---

**E**

E-6 17:11

e-mail 25:4

e-tran 129:15
130:9,18,19

e-transcript
131:4

earlier 72:17
89:1 96:3 97:19
99:4 100:5
113:10,13
117:15 122:23

easier 13:16,17
112:14

east 33:12,25
34:2

Eastern
131:17

eaves 29:5,11
49:19 51:10
54:5

Ed 27:19 95:15

Edmonds
94:2,8,11,23
95:1,3 96:24
97:1

effect 96:3,4

Eggleston
68:8,12 97:19,
24

EKU 22:19
100:7,13

electrical 19:7

Elliot 9:21

employed 24:9
100:6

driving 22:21

employment
23:20

en 27:1,2,24
78:24 79:1

enclosed
29:16,17

end 15:1 23:3
57:23 78:13

enforcement
17:20 22:12,14
25:18 35:2
67:25 68:5

engulfed 21:22

entail 18:12

enter 56:3
69:15,22 70:20

entered 40:6
41:25 42:9 49:2
54:1,22 55:13
56:5,14 57:3
60:6 61:9
113:14 120:19

entering 35:22
61:12 69:11
119:1

entire 21:20,22
74:11

entrance
118:11,21
119:15 122:25

entry 42:16
46:9

equipment
110:8

equivalent
17:20

errata 129:13

escape 55:10

established
26:22 72:17
86:11

estimate 20:4
54:21 127:21

et al 9:12

eternity 54:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 41 of 51 PageID
#: 3063
The Deposition of RONALD  MILLS, taken on February 14, 2022
138

evening 24:14
27:9 57:2,4
59:14,24 64:9
68:10,20 72:19
77:10 85:25
91:15 96:8
125:7 127:11

event 26:10

events 52:12
63:17

eventually
77:9

evidence
28:24 81:5,9,
14,23,24 82:1,
7,13 83:1
85:13,21 89:8,
19 91:17,23
101:21 102:3,4
107:13 114:17
115:7,10 116:9

examination
12:4 83:1 85:7,
10 113:3 117:9
124:5

exculpatory
101:21 102:4
107:5,13,18

excuse 30:13
54:3 73:19
106:21

exhibit 25:13
30:10,12,15
33:2,5 50:9,13
71:9,13 77:17
82:18,23 83:6,
15,20 84:18
112:10 114:10
118:21

exhibits 24:20,
24 83:4 85:2,12

existed 95:13

exit 49:1

exited 39:25
48:24 49:25
50:6 54:3 67:1,
14 120:9

expected
75:10

experience
62:17

experienced
62:5

explain 18:6
94:14

explanation
25:20

expressing
69:4

extended 86:4
101:9 129:19

externally
34:7,8

extinguished
56:4 125:4

extreme 48:2

extremely
47:4

---

**F**

face 47:7,12,14
77:3

fact 11:16 35:5
47:19 52:25
53:8 54:12 67:2
85:20 87:13
90:4,5 95:6
121:7

failing 40:15

fair 122:15

Fairway 10:1

fall 108:4

falling 51:4

familiar 22:9
25:17 31:19
38:7,10 59:15
78:5 90:14
98:24 99:1
124:23

familiarization
102:13,15

family 72:10

February 9:8

57:20 111:7

feet 88:8,11
119:25

felt 40:11,13
47:10

field 102:10,12,
23 104:9

fight 20:2

fighting 20:10
62:16,17,20
122:2

figure 42:25

file 25:9

filed 14:18
93:14

files 22:5

filling 87:25

find 32:13
75:18,20,21
86:15

fine 92:8,10

finished 51:1
88:3 125:13

fire 17:25 18:3,
9,17,21 19:4,6,
7,8,10 20:9,10,
11,12,14,15,17,
20,23 21:1,6,
12,20 22:6,7
28:1,22,25
29:6,9,19 30:22
31:10,12,15
32:6 35:16
36:17 37:1,7,
17,19,23 43:23,
24 44:3,5,15,
17,23 45:15
48:14,17,19
49:14,18,19,25
50:17 51:15,17
52:13,15,22
53:6,25 54:2,7,
12 55:8 56:4,5,
8,13,16,23
57:1,4 58:18,23
59:3,10,17 60:8
61:13,16 62:19,
23 63:13 64:7,

18,25 65:5,10,
13,17,19 66:4,6
67:2 70:18
73:12,16,20,22,
24 74:5 75:1,3,
12 79:17 81:1,
4,19 82:9
83:10,16 84:4
88:20 89:2,7
91:22 96:3,12
106:24,25
113:16,17
114:16,24
116:10 117:25
120:18,20
121:1,17,21
122:8,11,16,21,
22 123:7 124:9,
11,21 125:4,7,
10,18,22 127:4,
5,9,16,17,18
128:5,10,15

fire's 19:6

firefighter
19:12,23 20:19
22:2 52:16

firefighters
18:8 49:6,10
52:9 53:4 73:5

firefighting
18:4,5,14,15,19
19:1,15

fires 18:11,16
20:2,4,6,7
21:18 62:17,20,
21 122:2,3,6

first-class
17:11

fit 20:7

flame 60:12,14,
23

flames 21:23
29:12,13,15
34:5,6,10 43:25
46:2,5,10
48:22,23 49:22
50:5 51:9 54:4
61:19 128:6

flash 21:12
48:14,17,18

flashed 51:15

flashes 21:14

flashover
21:3,6,8,9 48:9,
10 52:23 122:9

flooding 18:21

floor 33:8 90:2
112:11

Flowers 59:13,
14,15

folks 101:8
123:8

follow 29:25

follow-up
124:7 128:18

foot 29:23

foremost 15:7

Forensic
84:22

forgot 13:25

form 34:1
103:11 121:12
122:17 128:9

formal 75:13

formally 75:4

forthcoming
40:21

fought 20:5,16
122:6

found 85:21

four-day 19:16

Frankfort
10:22 11:6

Fresno 23:1,8

friends 95:15,
17,23 98:6

friendship
96:22

front 30:7
31:18,21 34:11,
19 35:6,15,18,
20 36:2,4,8,10,
11,13 38:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB       Document 172       Filed 10/03/25       Page 42 of 51 PageID
#: 3064
The Deposition of RONALD  MILLS, taken on February 14, 2022

139

40:3 41:22
43:12,16,21,22
46:24,25 48:7,
12 49:1 51:5,7,
22 54:6 55:16
56:2 67:21,24
113:25 117:19
118:25 119:6,
25 126:22,24,
25

**frozen** 12:18

**fuel** 19:6 21:11,
16

**full** 11:9 21:17

**fully** 21:24
53:1,9 54:9,13
67:2 122:12,19

--------------

**G**

--------------

**gain** 123:13

**gathering** 49:8

**gave** 14:5 40:2
41:19,20 53:16
65:11,16,18
66:1 75:8

**gears** 92:12
121:24

**generated**
74:3

**Georgetown**
10:15

**give** 11:24
25:6,20 30:19
50:2 71:5 79:11
113:1 127:19

**giving** 16:9
75:13 88:4
101:18 103:8

**glow** 30:5 34:9,
13 37:4 63:14

**good** 12:6,7
57:11,12 92:5
129:6,16
131:12

**gosh** 55:14
101:2

**grabbed** 39:7

**greasy** 40:13

**great** 16:21
55:23 129:12
130:13,21
131:9

**Green** 11:1
22:17,18,20
23:3,8,13 100:6

**Gregory** 10:18,
21 56:19,20,23
58:20,22 59:6,
9,22 60:3,15,19
61:8,11,18,21
62:4,13 63:11,
20 64:6 99:16,
17,20 117:5,14
127:9

**Gregory's**
131:16

**ground** 70:5

**growing** 49:17

**Guam** 17:14,16
20:18

**guess** 31:25
82:3 94:25 97:9

**guessing**
15:14

**guidelines**
22:8

**guys** 116:24
130:2

--------------

**H**

--------------

**halfway** 42:17
43:13,17
120:19

**hallway** 44:6,
11,21,25 45:9,
12,14,20,23
113:23 120:24
127:6

**ham** 40:13

**hand** 11:21
31:12 76:23

**handcuffed**
81:9

**handed** 39:8
40:3,8,25 55:15
66:20 82:12
116:19

**handler** 27:14

**hands** 40:11
79:17 80:23,25
81:3,8,13,14,
16,18 83:21,25

**happen** 120:8

**happened**
23:5 91:8
110:14 123:1

**happy** 117:7

**hard** 96:14

**Hayes** 80:5

**head** 15:20
119:18

**headed** 27:8

**heading** 69:12
106:12

**heads** 46:23

**health** 16:15

**hear** 15:12 16:8
88:22 111:19,
22,23,24 112:5
117:11

**hearing** 117:2

**heat** 21:11,13,
16 47:2,7,8,15,
17 48:2,19 55:6
62:5,7,11

**held** 41:8

**hey** 58:11
66:21 95:19

**Higgins** 35:4
41:2,3,8,13,16
42:4,13 43:20
47:19 68:3
76:16,19 77:8
79:9,24 80:11
87:19,21,25
88:19,23 89:21
90:1 95:7,11,15

96:11 97:3

**Higgins'** 78:5

**hired** 22:24
23:16,22,24

**hiring** 22:23

**hold** 11:14 16:9
17:22 77:15

**hollering**
37:22

**home** 9:20
10:12 28:21,25
29:3,8,12 32:4
33:8 34:5 35:22
36:15,16 37:4,
14 56:9 69:2
70:20 108:4,8
109:4,6 128:6

**horses** 95:22

**hot** 47:4

**hour** 57:7

**hour-and-a-
half** 79:11

**hours** 19:12
57:5 58:18
108:10,12,18
127:17,18,23

**house** 29:4,6,
14,15 30:5,7,8
31:18 32:1 34:3
35:9 36:18
39:25 40:4,6
49:25 51:17,25
73:16,20,22,23,
24 75:12 95:22
106:12 119:1,8,
14 123:7

**housed** 79:19

**houses** 69:19

**hunch** 93:16

--------------

**I**

--------------

**ID** 11:11

**idea** 104:4

**identification**
25:13 30:12

33:5 50:13
71:13 82:23
85:8

**identified**
36:17 42:25
85:11

**identify** 114:4

**ignitable** 85:8,
11,21

**ignore** 96:14

**Illinois** 9:23

**imagine** 40:16

**immediately**
121:9 123:7

**importance**
62:18

**important**
62:22 63:2
101:23

**Inaudible** 25:9
85:18

**incident** 74:11
95:18 110:14

**include** 20:22,
25 22:7 68:3
104:9,12

**included** 18:25
21:14 60:8
66:10,13,16
67:9 104:25
105:1

**includes** 85:1
113:7

**including**
22:20 85:13

**incoming** 26:5

**incorrectly**
113:16

**increase** 35:8

**increasing**
55:7

**inculpatory**
102:3

**independent**
21:5 115:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 43 of 51 PageID #: 3065
The Deposition of RONALD   MILLS, taken on February 14, 2022
140

individual
52:16 59:16
87:10

individuals
34:22 94:21
106:14 125:22
127:22,25

infant 39:19

inform 28:21

information
26:18 65:18,21,
25 66:10,12,16,
20 73:25
104:17,21
106:6 107:5,18

informed 30:7
35:9 54:8 60:15
61:8,11,15,18,
21 62:4,15
72:14 73:19

informing
35:11

ingrained 96:9

initial 18:13
19:15 28:4,12
60:23,24 61:3
72:18 106:19,
23 120:18
127:4 129:22

initially 44:3,
16 45:15 49:16
60:9

inside 29:16
30:8 35:21,22,
23 39:1 40:5
47:3 49:25
51:17 72:10

instance
102:21 104:18

instructing
35:6

instruction
100:16,19,22
101:17,20

instructs
16:12

intense 46:16,
19 47:16,18

55:6 62:3,5

intent 69:13

interaction
89:3 98:20,21
99:15

intercept 39:1,
3

interested
31:6

Interesting
23:12

internal 32:14

internally
107:3

interrogations
101:14

intersection
119:10

interview
106:2,14

interviewed
106:12

interviewing
104:12 106:1,5

intoxicated
70:21 91:12

intoxication
91:15

invest 98:19
125:18

Investigate
30:22

investigating
65:13 105:16

investigation
30:22 31:11
63:3 65:11,19
66:4,6 79:18
98:15 101:25
104:22 105:4,
16

investigations
100:23 105:23
110:11,20

investigator

59:4,10 64:7
81:4 99:16
116:10 124:20

investigators
56:5,13,16 57:4
58:23 62:19,23
63:13 65:12,17,
22,23 66:1,2,10
75:12 79:17
81:1,20 82:9
114:16 124:10,
12,14,21 125:7,
10,11,22
128:15

involve 18:20
102:12

involved
20:12,13 21:20,
24 25:25 53:1,9
54:13 64:8 67:2
89:11,14
108:10 122:12,
20

involved.' 54:9

involvement
21:18 82:16

involving
14:11 95:25
110:5

island 17:14
20:18

item 84:2

items 79:18
84:13 88:1
114:17 115:2
124:15

J

J.A. 10:24

jail 77:5,23
78:2,3,14,20,24
79:2,8,9,14,19
86:3,12 90:8,9

Jailer 80:5,7
90:14,16

jailers 79:25
80:3,11 88:1

Jaman 113:7

Jeff 10:2 12:15
24:22 111:14,
19 124:2 129:6

Jenkins 90:14,
16 99:25 100:2

Jennifer 10:6

Jim 98:2
109:22

job 49:11 52:10

joined 102:7,
25

jointly 94:21

jump 26:19
131:13

K

K-9 27:13,14,
18,20,22 47:24
48:3 108:1,10,
18,22 110:5,8

Kansas 10:1

kennel 110:7

Kenneth 94:2,
23 95:1,3

Kentuckiana
9:6

Kentucky 9:8,
13,20 10:4,8,
11,13,18,22
11:1,5 22:25
23:3,4,11 59:4
84:23

khaki 84:3

kids 95:21

kind 40:20
55:17 96:9,14
97:10

kitchen 44:23
45:10,12,17
49:17,19 51:10
52:3,5,14 54:5
55:8 61:19
62:14 113:17
119:11 120:14,

20,22 127:5

knew 58:22
63:1 99:4,24

knowledge
21:5 31:2 42:7
91:16 97:9

Knoxville
92:17,20

KSP 82:19
84:14 98:24
99:1

L

lab 84:14

Laboratory
84:22

laceration
76:25

Langen 10:6

large 20:13
120:17

larger 120:15

law 17:20
22:11,14 25:17
35:2 67:25 68:5

lawyers 94:12

layer 46:21

layman's
21:21

Layne 9:4
57:19 111:6

layout 43:1

leading 45:12,
14

lean 61:3 88:10

leaned 35:21
36:3,9,14 37:12
39:10,16 46:8
55:12 56:1 60:9
126:18

leaning 36:5
37:22

learn 59:9 66:9



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 44 of 51 PageID
#: 3066
The Deposition of RONALD MILLS, taken on February 14, 2022

141

82:13 84:12
100:13 101:13

**learned** 73:13
100:20 104:17
106:6

**learning** 73:12
102:17

**leather** 83:9,15

**leave** 108:24

**leaves** 19:4

**leaving** 34:24
62:2

**left** 33:21 44:18
51:2,6,7 58:17
62:8 83:9 85:2
86:3,16 88:3
116:14

**legal** 101:13

**Lemont** 9:22

**length** 101:8

**Lexington**
10:12,16,18

**life** 23:6

**limited** 94:6

**limp** 40:10

**Lindsey** 11:2

**lip** 76:25

**liquids** 85:8,
11,21

**lists** 84:25

**litigation** 12:10
15:1 94:23
95:12 97:3
98:10,22 99:12,
18 100:3

**lives** 96:19

**living** 36:6,24
42:17,21 43:8,
14,18 44:5,10
46:1,7,11 49:23
50:6 51:12,20
61:3 96:17
113:22 119:11
120:14,19,21
127:1

**locate** 54:19

**located** 9:6
37:17,20

**location** 9:16
28:8 37:23
38:11 77:18,20

**Logan** 10:24
33:2 77:10
85:25 86:23
87:6,16 90:20
123:19,25
129:4,5

**long** 17:22 24:1
54:21 85:24
92:17 93:24
95:17 123:6
125:15 127:14

**longer** 122:20

**longest** 19:25
86:9

**looked** 66:4
120:12 123:8

**lot** 49:8 52:10
62:20 72:15
119:22 122:3

**Louisville** 9:7

**lower** 120:5

**lowering** 46:20

**lucky** 101:10

**Lynn** 10:10
123:20 128:20

———

**M**

———

**Madam** 129:9

**made** 34:18
44:20,25 74:6
75:11 85:20
93:6 106:11

**magnesium**
19:8

**main** 9:7
119:15

**make** 13:19
39:11 86:8 94:6
96:20

**makes** 13:16,
17

**making** 33:22
35:5 74:15,16,
17 105:12

**Malles** 10:14
124:2 128:25
130:22,23,25

**Mando** 10:2
12:17,24 13:1,
5,10,12,18,22
24:25 25:3,8
30:13 85:15,17
94:5,10 111:17,
20,24 112:2,4,6
116:24 117:1,4,
8 123:19,24
124:1,3 128:19
129:1,3,8,13,21
130:4,6,13,15
131:18

**March** 93:14

**mark** 112:15

**marked** 25:13
30:10,12,15
33:1,5,12 50:8,
13 71:9,13
77:17 82:23

**marshal** 56:24
89:8 127:9

**Marshal's**
59:10,17

**marshals**
91:22

**material** 18:18
84:25

**matter** 9:11
65:2

**Maureen** 10:14
128:20 129:1

**Mcdonald**
68:9,12 69:25
107:25 109:8,
13,14,19
110:12

**meaning** 21:3

**means** 21:6,9,
18

**meant** 112:15

**medication**
16:22

**meet** 59:13
103:25

**meeting** 59:7

**meetings**
94:20 110:16,
19

**melt** 48:2

**member** 22:18
90:19

**members**
72:10

**memory** 16:22
55:23 123:5

**memory's**
14:7

**mentioned**
11:1 62:7,11
122:1

**met** 64:16,17
73:24

**metal** 82:5
83:8,20 84:2

**middle** 108:7,8

**military** 16:25

**Mills** 9:11 10:5
11:8,10,16,21
12:6,16 13:16
25:11 57:18
58:7 83:22
94:14 111:5,8
113:5 114:12
116:21 117:11
118:20 129:17

**Mills'** 117:6

**mind** 80:9
92:24 96:9
114:3 118:14

**mine** 71:16

**minute** 54:23,
24 55:4,17,20
92:6 94:5

**minutes** 28:3

**meant** 112:15

55:18 57:11
72:24 73:4,7
79:12 86:7,21,
22 87:7,22
123:11,14

**Miranda**
101:18

**Mister** 73:13
76:19

**mode** 67:3

**Molly** 9:24

**moment** 97:17

**Morgan** 24:18
27:8,25 28:11

**morning** 12:6,
7 24:21 115:9

**mother** 38:5

**move** 86:17

**movements**
89:9

**multiple** 22:16

**murder** 89:12

———

**N**

———

**name's** 113:5
117:13

**named** 75:2

**names** 115:6
116:7 125:1

**narcotics**
27:19

**National** 22:7

**naturally**
97:10

**Naval** 17:16
18:13

**navy** 17:3,5,7,
9,24 18:3,8
19:13 20:1,19
22:3,7,11
122:1,2,8,11

**NCTAMS**
17:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

necessarily
110:13

needed 35:10
110:7,8 114:9

neighbor
41:22 122:24

neighbor's
73:15

neighbors
49:8 67:9

night 58:18
68:25 90:7,12,
17,21,24 92:25
95:20,21 96:4
97:16 107:24
114:23 115:2
116:6,11,13,16
124:13

nighttime
108:18

nodding 15:20

noise 52:10

normal 61:6
96:22

north 24:18
27:8,25 38:16
118:4,9,10
119:5,6

northwest
32:20

notation 74:7,
10,16

noted 74:24

notes 60:19
63:20 78:20
83:6 104:19,24
106:6,9

notice 46:9
121:6

noticed 22:22
49:15,17

November
107:1

number 24:5
26:20 30:10,16
33:2 71:9 78:6,

13,17 79:6
82:19 84:2,18
102:22 112:14,
16 123:15

number's
26:22

_____

O

object 16:8
34:1 128:9

objection
16:10 85:17
94:5 121:12
122:17

objections
16:7

obligation
101:20 107:8,
12

obligations
101:14 107:4

observation
34:14 61:7 63:7

observations
46:14 62:19
64:21 89:2

observe 28:24
30:3 34:5,22,24
35:19 36:15
39:12 43:4,23
46:10 49:4,13,
22 52:7 67:11
76:3,8,13,20,25
77:2 87:3,10,17
91:11 117:25
128:5

observed 32:5
33:11,23 34:5
36:19 44:1
45:15 46:6 48:6
50:16 51:19
52:3,22 53:17,
25 61:16 62:23
63:2,12,21
64:3,8 65:4
67:19 69:3 96:8
126:14,17,20
128:1,12

observing
37:23

occasion 59:1
64:7 109:25

occur 48:9
114:25

occurred 57:1
90:17,20,24
104:4 114:24

October 23:21,
22

office 10:8,16,
21,25 59:11,17
129:11

officer 10:3,7
23:25 24:1 35:4
41:2,3,7,9,13,
16 42:4,13
43:20 47:19,24
68:3 76:15,16,
19 77:7,8 78:5
79:24 80:10
83:21 87:3,18,
21,24 88:18,22
89:21 95:7
97:23 98:24
99:1 100:14
102:23 106:19,
23 108:1 109:7

officer's 71:11

officers 22:23
26:2 35:2,7,11
41:13 48:1 49:6
69:10

officials 68:1

Okinawa 20:9

online 9:4

Oops 86:18

op 45:22

open 36:11,13
37:8 46:25
47:12,15

operating
102:17

opportunity
20:2 66:9

opposed 15:20

opposite 32:10
44:5 45:22

order 46:22
103:24

origin 20:23

original 93:7

originally
22:25 23:1,4

oven 47:12,13,
15

oxygen 48:13
51:6

_____

P

p.m. 26:8 27:5,
9 108:15,16
131:22

packaged 88:2

pages 53:20

paint 82:4 83:8,
20

pair 80:18 84:3

palm 76:22

paneling 45:3,
7

paper 19:5
81:15 82:2

part 19:23
33:10 61:6
77:25 84:17
129:22 131:16

participating
15:18

parties 11:15

passed 55:11

passing 62:18

past 38:12
99:21 121:13

patrol 23:25
27:19 41:9
107:21 108:2

Pendergraff
98:2,4,6,8
109:22,23
110:9

Pendergraff's
103:20

pending 9:12
16:2

people 67:6
116:25 124:19,
22 125:3

perform 49:13
105:13

period 19:14,
25 102:21
103:18

perished
88:19

person 26:3
63:1 75:22
124:22

personal 97:1

personally
28:24 64:20
65:4 77:5
89:11,14 90:23
128:1,5,11,14

personnel
22:5 25:25
35:16 68:5
125:18

photo 11:11
33:20

photograph
13:6

photos 31:7
66:5 104:25

physical 70:19
87:18

physically
67:18 126:21

pick 35:7 88:8,
10

picked 39:2
42:24 43:2

picking 36:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 46 of 51 PageID
#: 3068
The Deposition of RONALD  MILLS, taken on February 14, 2022
143

picture 31:18,
24 32:3,15 80:8

pictures 32:14

piece 84:6

pin 12:15

place 18:9
40:19,20 43:19
60:13 81:21
92:25 110:19
123:10

places 23:5
25:25

plaintiff 9:19,
22,25 12:10

plaintiff's 9:17
30:10,15 33:2
50:9 71:9 77:17
82:18 84:18

plan 33:8
112:11 129:22

plastic 85:3

point 13:20
44:15 45:10
46:25 48:23
49:9,20 52:12
54:2,8 55:8
60:11,12,13
61:23 67:11
68:8,9 70:6
92:5 117:21,22
118:20 120:4
122:22 126:6,
11 127:10

pointer 114:4,7

pointing 119:5

points 11:3

police 10:3,7
11:5 14:11,17,
23 22:16,17,18,
19,21,23,24
23:17,20,23
24:2,9 26:25
27:15 41:4 48:1
49:6 59:4
68:14,16 84:23
95:4 97:20 98:5
100:6,7,12,13,
22,25 101:12

102:7,9,21
103:1,14 107:2,
8,19,22 113:6

policies 103:2,
19

policy 103:9,
10,22

polyester 48:1

porch 118:25

portable 35:13

Porter 11:2
80:7 131:5

portion 20:13

position 17:19,
20,22 23:24

possession
91:2

potential 28:1
102:3

Pozgay 10:17
117:1,2,5,10,13
118:14,18,19
123:16 129:2
130:17,18,20

practice
104:15,16,20

preferred
106:3

prepare 92:15

presence 94:7,
12 95:11

present 28:17
34:22 35:3 68:1
79:22 80:11

pretty 46:16,18
73:9,12 95:20

previously
114:15

print 24:22

prior 38:8
58:25 59:6
87:14 98:16
107:1,17

problem
58:14,16 131:1

procedure
105:25 106:4

procedures
102:18 103:2,9,
10,19,21,23

proceed 16:11
28:8 29:18

proceeding
70:1

PROCEEDING
S 9:1

process 104:2

professional
97:1

progress
26:10

promoted
109:10,12,13

prosecutor
50:16

Protection
22:7

provide 107:13

provided
103:1 107:3

pull 25:6 30:9
50:4 53:12,19
70:8,11 77:15
86:7 112:18
118:16

pulled 76:14

pulling 70:4
118:15

purported
43:3

purpose 80:25

purposely
52:16 97:12

pushed 90:1

put 44:7 47:14
76:16,21 81:25
82:2,3 119:18

putting 18:15
47:12

_____

**Q**

qualified 105:3

question 15:8,
10,13 16:2,3
51:2 75:4 87:1
90:7 94:6
110:13,18
114:12 120:11
122:18

questioning
87:3 111:10

questions
12:12 15:20
16:7 63:23
94:10,17
111:12,14,16,
17 112:7
116:21 117:3,6,
15 123:16,22
124:8,20
128:20,22
129:4

quick 25:20
57:8 110:23
117:14 130:5

quickly 66:5
73:9,12

_____

**R**

races 55:17

radio 35:13

raise 11:21

rank 14:22
17:10 24:12
41:7

rapidly 51:4,
12,19 54:6

read 50:24
66:17

reading 45:2
47:5 53:21
55:19

ready 11:20
112:7,8

real 55:1 130:5

realized 38:23

reapproached
40:4 41:23

rear 32:4,15
34:18 37:4
117:18

reason 15:12,
25 65:8 91:2
97:6

reasons 96:15

rec 61:5

recall 14:13
23:19 27:24
41:7 42:3 44:24
50:11,15 53:2,
11 59:2 60:21
61:5,25 63:15,
22 64:11 65:7
68:6,11 75:23
77:1,12 80:6,8
82:12 85:24
87:5 88:24
89:20 93:17
103:8 104:6
110:16 116:14,
17,18 118:7,12
125:8

receive 17:24
18:2,22 22:1

received 19:9,
13 22:6 27:12
28:3 72:17
107:17,19

receiving
27:25 28:7
93:17

recognize
25:15 31:7,13,
24 32:2,25 33:7
38:6,22

recollection
41:21 42:1 45:4
53:8,23 54:11
57:3 59:20
114:22 115:10,
21 124:8,10
125:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 47 of 51 PageID
#: 3069
The Deposition of RONALD MILLS, taken on February 14, 2022
144

record 9:4 11:9
12:15 25:24
30:14 31:4 33:1
57:14,16,17
71:8 104:18
106:2 111:1,3,4

recorded 89:7
104:23

recording 22:4
57:24 58:3
90:6,10,12,23
91:1

REDIRECT
124:5

reduction
14:22

reenter 23:6
54:10

reentered
56:8,9

refresh 45:4
53:22 54:11

refresher
19:18

refused 88:10

regard 14:21
43:23 64:24
97:3

regular 81:24
110:16,19

regularly
110:11

relate 101:14

relationship
96:24,25

relay 75:10

relayed 65:22

relevance
75:20

relevant
101:24

remain 24:1

remained
85:24

remember
40:7 50:20
54:15 62:15
81:15 103:9
112:14 116:10
126:5

remind 120:12

reminder
131:14

remotely 9:19,
22,25 10:4,12,
21 11:7 15:18
16:7

remove 88:9,
11

repairs 110:7

repeat 116:1

rephrase
15:10

report 25:23
30:15,23 31:8,
11 64:21,23
65:5,9,11,12,16
66:4,6,10,13,
17,20 71:12,17
74:1,2,24 77:25
82:21 84:17,18,
22 89:2,3,6
104:20,25
105:2 109:19
110:1

reported 78:1

reporter 9:5
11:22,23 12:3
30:17 58:1,5
65:15 129:9,12,
16 130:5,7,10,
13,16,19,21,24
131:1,5,7,9,12,
21

Reporters 9:6

reports 93:8
100:17 104:10

represent 11:5
31:10 94:7

representing
9:6 11:3

represents
12:9 113:6

Request 83:1

requested
79:17 81:5 85:7
91:20,22 115:2

residence
28:12,13 29:8,
18 30:2 31:15

residue 81:3

resisting
88:12,14

respond
102:14

responded
20:20 38:11

responders
40:17 41:1

responding
13:20 35:7

response
35:24 123:9

rest 32:14
51:12,19 53:3

restating
113:15

result 15:3
52:15 96:8

results 85:10

retire 17:7

retired 17:9,12
22:10

retrieval
124:15

retrieve 86:25
114:16

retrieved
39:22 40:24
79:16 83:13,18
84:6 115:3

return 19:17

returned 81:19
116:8

returning 89:8

review 25:7
93:8

reviewed 75:7

Richmond
22:19

ride 95:22

rights 101:18

righty 130:16
131:12

ring 59:17

road 25:3

Robert 9:11,
19,25 12:10
67:11 69:3
75:12,15 83:9,
16,21 84:3 87:8
88:22 89:17
90:2 115:3
124:15

Robinson 9:18

Roger 68:9
107:25 109:8,
13,19 110:11

role 41:14 49:9

roll 48:7

rolling 48:20
51:4

rollover 51:8

Ron 10:5

Ronald 9:10
11:10 57:18
111:5

room 16:6
21:18,20,22,25
33:13,25 34:2,
13 36:4,6,21,
23,24 42:17,22
43:8,14,18
44:5,10 45:20
46:1,7,11 49:23
50:6 51:12,20
52:25 54:10
61:3 113:22
119:11 120:2,
14,19,21 127:1

rooms 33:12

rough 95:20

roughly 22:20

round 123:14

route 27:1,2,24
55:10 78:24
79:1

RPD 83:22

rules 15:7

run 18:10
67:11,19 68:7

running 68:23
69:4,16 76:15

runs 118:10
119:6

Russellville
9:12 10:3,4,7
14:11,15,19
22:22,24 23:17,
20,23 24:2,6,9,
18 27:14 41:4
68:14,16 95:4
102:7,9,25
103:14 107:2,
22

---

**S**

safe 125:9

safety 70:14

sailors 18:8

sallyport
79:21,22 80:12
83:18 87:4,23
88:23 89:4,22,
24 90:2,6,8,12,
17,21,24

Sam 59:13

San 18:14

Saralynn 36:8
39:2,8,15,18,
22,23,24 40:2,
24 41:19,20
42:24 43:3
55:15

Saralynn's
40:7



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00047-GNS-HBB    Document 172    Filed 10/03/25    Page 48 of 51 PageID
#: 3070
The Deposition of RONALD MILLS, taken on February 14, 2022
145

scanned 26:16
77:25

scene 27:25
28:17 34:22
38:21 40:18
41:1 53:4,5
56:6,14,22
59:7,14 63:2,12
64:6,18 67:7
70:22 72:21
73:6 75:25
76:4,11,25
81:20 82:8
91:5,12 100:23
104:24 106:5,
10,17,19,23,25
114:14,19
115:2,8,23
116:6,10
117:15,17
122:24 123:12
124:14 125:9,
17,21 126:1,7,
12 127:8,16

scheduling
110:8

schools 18:14

Scott 10:11
123:23

screen 12:15,
20,21,25 13:9,
10 24:23 25:1,
12 30:21 33:3
50:8,22 84:19

scroll 31:5

search 75:16,
22

security 17:13,
15,19

send 19:23
129:13

senior 108:25
109:7

separate
125:16

September
24:10,12,14
57:2 59:24 86:1
87:17 91:5

104:5 106:18
107:2,17,22
109:9,25
110:10 114:14
115:9,24
116:15

sequence 54:7

sergeant
24:13 41:10,14
102:11 107:21
108:24,25
109:4,6

sergeant's
109:3,5

sergeants
108:2

serve 17:2,4

served 16:24
17:24 20:1
93:10

set 73:16,20,24
75:3,12 102:20,
22 110:19

settled 15:4

share 24:23,25
42:18 50:7
112:10,12

sheet 44:13
129:13

Shelbyville
9:20

shift 41:15
68:24 107:25
108:2,7,8
109:1,4,15,18,
19 116:15
121:24

shifts 108:5

ship 18:9,11,22
20:13

Shipboard
18:4

shirt 84:9

shoe 85:3

shoes 79:16
80:16 81:11

83:17 88:5,9

short 55:14
86:2 123:10

shorts 79:16
80:20 81:11
84:3 85:5

show 13:16
32:24 36:1 66:5
71:4 82:17
84:17

showed 32:15
33:20

showing 33:1
115:8,23

sic 9:5

side 29:3 31:25
32:10 34:3
38:19 70:4,12,
13 118:4,7,9,
11,13 119:2,7
120:24

sides 117:25

Siegel 10:20

sight 51:24

signature
71:11,15
129:10

signed 129:14
131:6

simple 131:10

sir 14:2,10 15:6
16:14,24 17:22
19:3 22:10
24:4,20 25:5
30:19,20 31:13
33:4 35:24
40:14 41:24
42:19 45:18,21
50:2,7,12 53:20
54:16 57:6
62:16 64:14
66:25 70:21
71:6,12 74:1
75:15 79:5
82:19,21 84:12,
19 85:24 89:11
91:4 92:4,16
93:10 100:5

106:17,22
107:14 110:22
117:12,23
119:12,16
120:25 121:15,
23 122:10,13
123:3,17 124:8
128:17

sit 54:14

sitting 53:7,17
104:1

situation 40:16

situations
105:12,13

six-to-seven-
year 103:17

skip 78:16

Slosar 9:21
11:19 57:22,25
58:2

Smith 11:6
99:2 113:8,11
123:25 129:6

smoke 21:10
29:4,11 30:4
33:24 34:8
36:16,19 46:15,
16,18,21,23
48:7,12 49:15
51:3,15 55:7
61:2,22 62:2
119:22 120:1,2,
5

smoky 62:9

solemnly
11:23

son 69:5 96:19

sort 119:9
120:5

sound 40:12
57:11

Sounds 57:12
129:16 131:12

south 118:10
119:7

southeast
32:23

Sowell 10:24
131:6,8

speak 38:20
41:16 86:23
89:21 90:16,19

speaking
28:18,20 36:23
44:12 45:14
56:16 64:11
104:15 106:9

special 81:21

specialty 19:7

specific 98:9
102:21 104:15,
16 105:6
107:15 114:10,
22 115:21
125:25 128:4

specifically
31:6 47:23
50:10 53:11
63:13,16 64:2
83:3 85:13
91:24 95:23
97:17 102:8
110:3,5 116:6,
19

specifics 97:4

speed 35:8,12

spoke 28:15
38:23 64:5,7
122:24

spoken 99:13

spray 75:25
76:1,4 87:7,8,
10,11,14

sprayed 87:14

spraying 76:3

spread 51:12

spreading
49:22 51:19
52:22

stamped 31:5
33:2 71:10
82:19

stand 26:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

standard 104:20

standards 103:25

standing 29:7 36:24 41:22 43:22 46:3 88:15 126:24

Staples 9:18 11:17 12:5,14, 20,25 13:3,7, 11,14,21,23 14:1 24:22 25:2,5,10 30:14,18 57:6, 11,13,21,23 58:3,6 85:19 92:4,8,11 94:9, 13 110:22,25 111:8,19,22 112:1,3,5,12, 16,18,22,24 113:1 115:13, 17 118:14,17 121:12 122:17 124:6 128:17 129:17,25 130:2,7,9,12 131:13,20

start 50:21 53:21 54:4 108:4,7

started 23:12

starting 9:16 46:23 49:20 50:5 108:3

state 9:15 11:5, 9 16:10 24:8 26:5 35:14 56:18,23 59:4, 10,17 75:8 84:23 113:6 116:25 127:9

stated 23:13 43:7 47:18 98:12

statement 73:15 74:5 75:11,13

statements

75:7 104:25

states 9:12 16:25 17:3,5 82:25

station 17:12, 16 18:13

stations 17:13

stay 23:10 41:18

stepped 29:3 35:21 37:25 39:1,7,9,21 49:4,7,9,12 55:15 120:12

steps 35:20 39:3 119:14

stood 43:10 126:22

stop 70:1 76:16,22 108:5

stopped 69:10, 21,24

stopping 92:5 108:3

street 9:7 24:18 27:8 28:11 38:2,4 47:25 49:8,9,12 67:20,21 69:19 70:4,9,12,13 118:10 119:6

strictly 18:15

strike 46:5 61:2 75:21 76:10,18 81:12 84:16 90:5 127:8,14

struck 76:20

structure 31:7, 13 36:3,4,14 37:12 38:1,14, 25 39:6,10,16 46:8 47:3 49:14 50:17 53:9 54:17,18,22 55:3,12,13 56:2,11,14 57:3 60:20,24 61:4,

9,12 62:6,21 63:10,24 64:3 67:15 117:16, 18,21,25 118:1, 4,22 119:6 120:18 122:3, 21 123:8 126:14,18,21 127:1,25 128:11

submitted 85:1

suit 14:18 97:24

Suite 9:7

suited 48:5

summary 123:1

supervised 41:14

supervising 102:11 109:6

supervisor 41:15 107:23, 24 109:1,16

suspect 72:5, 12 73:14 74:5, 25 101:18 104:23 106:1,2

suspected 72:10

suspects 72:16 101:15

sustainment 19:17

swab 81:13

swabs 83:21 85:4

swear 11:22,23

switch 92:12

Sydney 11:2 30:14

――――――

T

tabs 82:20

tackled 70:5

tailored 108:11

taking 11:2 16:21 60:19 63:20 70:3 75:23 110:3

talk 65:2 96:16

talked 95:6 98:12 99:15 100:2

talking 48:19 50:20 87:25 88:16 114:11

tase 76:6

tasing 76:8

tasks 105:13

taught 101:23 102:2

technician 9:5 17:12

telecommunications 17:13, 16

telling 39:7 126:13 127:25

temperature 47:3

term 21:6,8 48:10,16 51:9 54:9 103:21 122:9,12,19

terms 122:14

tested 22:16 84:13

testified 36:25 42:8 45:8 47:6 52:2 76:19 86:6 97:19 100:5 103:13 113:10, 13 114:15 117:16 118:3 119:22 122:1,5, 23 125:12

testify 16:16 50:1

testifying 48:18 50:11

testimony 11:24 37:19 46:6 47:5 50:10 51:18 53:12,15 55:19 68:19 93:6 95:24 97:2 113:15 115:7, 22 122:15

testing 82:14 85:1

there're 15:17

thereabout 96:13

thicker 46:22

thing 40:23 70:14 76:17 131:3

things 19:5,8 20:14 96:16,22 97:9,11 121:9, 25

thought 105:7, 15 115:18 124:23 125:13

time 9:9 14:5, 25 15:24 17:12 19:21,22,25 20:5,14,19 22:21 27:15 28:15 29:16 35:3,5 36:2 37:17,20 38:3 40:6,8,20 41:2, 8,10,25 42:4,9, 12,19 43:5,20 46:7,17 47:3,24 49:7 50:1,15 51:8 52:9 53:4, 16,24 54:4,17, 18,22 55:1,11, 12,13,17 56:3 57:14,20 58:12 60:24 61:9,12, 15,19 62:1,6 67:1,15,25 68:6 73:1,6 74:25 77:3 83:10,16 84:4,9 86:2,5, 21 87:24 88:17,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25 89:18 93:24
95:17 98:5
101:3 102:6,11,
21 103:3,23,24
107:25 108:3,5,
9,13 109:9,15,
18,23 111:1,7,
10 113:14
114:25 115:23
116:22 119:18,
21 120:13,23,
25 121:4,5
122:25 123:4,
10,11,17
124:21 125:16
126:8,9,18,21
127:24 129:18
130:12,15
131:17

**times** 25:24
55:25 56:11
63:10 101:2
124:18 125:3
126:7

**title** 17:10

**today** 9:5,8
10:4 12:13
15:7,14,24
16:5,16 31:12
53:7,17 57:19
62:2 104:1
111:6

**today's** 92:16

**told** 53:2,10
60:22 61:1,2
62:8 63:6,9
88:19 96:21
126:17,20
128:14

**tomorrow**
131:15

**tool** 108:19

**top** 12:21 13:9
33:16,17,21

**touched** 96:2

**towel** 81:15
83:24

**town** 102:14

**tragic** 40:18

**trailer** 31:22
32:11,18 33:11,
24 34:19,21,25
35:6,15,19
38:5,18,19
39:9,13 40:25
41:23,25 42:3,
9,11,14,15
43:1,5 47:19
48:24 49:5
52:8,25 53:3
54:19 56:3
58:19 59:21
60:3,6,7,9
62:10,23 67:1,
12,19,21,23
68:7,23 69:4,5,
7,11,13,17,20,
22 72:6,9,13
113:14 118:5,7,
9,11 121:17
122:25 124:9,
11 125:2,6

**trained** 18:10
21:3 27:19

**training** 17:25
18:2,3,12,13,19
19:10,12,17,24
20:22 22:2,5,6,
7 62:16,20
102:8,10,12,20,
23 104:8,9,12
107:3,7,11,15,
16,19 110:9
121:25 122:2,8,
11 128:5,10

**transcript** 50:9
129:15

**transpired**
89:23 97:16

**transport** 77:5

**transported**
77:7

**travel** 51:16
129:19

**traveling**
97:15

**trial** 47:5 50:10,
11 53:16 55:20
86:6 93:7

**trigger** 129:4

**trouble** 117:1

**true** 16:24
119:5

**truth** 11:25
12:1

**turn** 82:11
101:21

**turned** 39:8,24
53:5 82:9 109:7

**type** 14:10
16:21 18:2
20:15 22:1
25:23 47:6
48:1,3 76:17
81:2,13,15,21
82:4 96:23

**types** 18:22
19:10 27:17

**typical** 105:25
106:4

———————

**U**

**Uh-huh** 13:11
50:23

**ultimately**
70:24

**unclear** 15:8

**uncooperative**
88:7

**underlying**
99:21

**understand**
13:18 15:13
25:5 33:22
40:22 48:6 59:3
74:11 80:10
93:25 101:6
125:2,17
129:25

**understanding**
21:17,19,21
31:17 41:24
45:2 74:13

**understood**
15:23 16:13

18:25 62:18

**uniform** 47:25
48:2,3,5 64:22,
24 71:7,21

**unit** 26:20,22
78:13,17 83:22

**United** 9:12
16:25 17:3,4

**unresponsive**
40:10

**USS** 20:9

———————

**V**

**valuable**
108:19

**vantage**
119:19 121:8

**vary** 108:17

**vehicle** 27:11

**verbal** 65:12,
16

**verbally** 15:20

**versus** 9:11

**vicinity** 34:24

**video** 9:5 15:17
130:11,14,18,
19 131:3

**videoconferen
ce** 9:10 57:19
111:6

**view** 32:5
90:23

**violation** 110:4

———————

**W**

**wait** 57:22
58:15 94:5
117:7

**walk** 22:14
60:23 117:20,
24 125:6

**walked** 35:18
36:2 38:21 43:5

56:1 60:5 61:25
63:16,24
117:16 124:16,
17,18 125:2,17,
21 126:2,10,12,
21 127:8,24
128:11

**walking** 32:6
39:5 60:19 62:5
63:21 124:9
125:25 126:6

**walkthroughs**
127:15,22

**wall** 44:5,10,16,
19,24 45:3,11,
13,14,19,22,25
46:12 61:16
113:18,21,25
114:5,8,11
120:21

**walls** 121:10,
13

**wanted** 23:6,
10,11 83:3 92:9
96:18 111:15
114:10

**wanting** 93:2

**weapon** 75:18

**weapons**
75:16

**wearing** 84:9

**Wednesday's**
131:15

**weeks** 100:25
101:13 102:22
127:18

**west** 9:7 11:6
56:18 58:19,22,
25 59:21 60:3,
15,18 61:8,11,
18,21 62:4,13
63:11,20 64:5
82:11 98:13,22
113:8 114:23,
25 115:1,8
118:13 119:4,7
120:24 124:16
126:1,8,13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**West's** 114:12 115:22

**western** 9:13 22:25

**whatsoever** 15:25

**wife** 23:4 55:24

**William** 99:1 113:7

**window** 34:9 49:21 52:3,5, 14,17 62:14 63:14

**windows** 29:6 30:5 34:9 51:22 52:1,7,11

**wipe** 81:13,16, 17,21 83:24

**wiped** 79:17 80:23

**wiping** 80:25 81:8

**witnessed** 68:6,22 96:4

**witnesses** 11:16 100:20 104:13,17,19, 24 106:5

**wood** 19:5 45:7

**wooded** 48:5

**wooden** 45:3

**words** 128:8

**wore** 47:24

**work** 27:17 48:3 83:9,12,16 98:7

**worked** 116:5

**working** 30:6

**worn** 83:9,16 84:3

**worried** 70:14, 17

**worry** 129:21

**worsening** 122:16

**would've** 20:6 32:21 33:15 43:16,17 44:5,9 45:25 51:13,21, 25 52:12 55:9 69:13 76:17,21, 23 77:13,14 81:23 86:2,9 88:3 103:10,20 104:23,24 105:1 110:4 113:23 118:8

**write** 89:3

**writing** 104:9

**written** 64:21 74:2 89:1 100:17 103:11, 18,24

**wrong** 125:1

**wrote** 64:23

—————

**Y**

—————

**yard** 38:25 51:7

**year** 19:19 23:19 95:18 96:12

**years** 17:4,23 19:17,20 20:2 22:20 23:14 93:17 94:3 97:25 98:10 99:17,21 103:10

**yell** 9:11,19,25 12:10 67:11,19 68:7,23 69:7,24 70:1,5,21 71:10,21,25 72:5,12,24 73:10,13,20 74:4,21 75:18 76:1,3,6,10,20, 22,24 77:5 78:2 79:10,19 80:12 83:9,13,16,18 84:3,7,9 85:14, 22 86:24 87:1,

4,8,11,13,18,22 88:2,4 89:4,12, 15,23 91:18,23 114:17 115:3 116:9 123:8 124:15

**Yell's** 75:21 76:23 77:3 79:16 80:16 81:8,25 83:25 85:5 88:18

**yelling** 39:12 70:10 123:12

**Yells** 83:21

—————

**Z**

—————

**Zellen** 10:10 123:22 128:23 131:9,10

**Zoom** 10:9,12, 19 11:1 111:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com