UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:20-CV-00047-GNS

ROBERT YELL                                                                    PLAINTIFF

v.

THE CITY OF RUSSELLVILLE et al.                                               DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motions for Summary Judgment (DN 159, 160, 162, 164, 177, 184), Defendants' Motions for Leave to File Excess Pages (DN 158, 161, 163, 176, 178, 224), Defendant's Motion to Exclude (DN 182), Plaintiff's Motions to Exclude (DN 179, 180, 181), and Plaintiff's Motion for Leave to File Excess Pages and Leave to Seal (DN 211). The motions are ripe for adjudication.

## I.     STATEMENT OF FACTS AND CLAIMS

This matter arises from a deadly mobile home fire in Russellville, Kentucky in 2004. Plaintiff Robert Yell ("Yell") and his girlfriend April Carpenter ("Carpenter") lived in a rented mobile home with their daughter Saralynn Yell ("Saralynn"), Carpenter's son Cameron Carpenter ("Cameron"),[1] and Carpenter's two children from her previous marriage. (Carpenter Dep. 17:17-20, Oct. 22, 2024, DN 173; Yell Dep. 37:3-10, 100:2-15, DN 170). On Saturday, September 11, 2004, Yell and Carpenter went to visit friends in their neighborhood where they began to drink and Yell smoked marijuana. (Yell Dep. 110:1-111:10, 114:1-116:12). The couple began to argue

---

[1] There is evidently some dispute as to Cameron's parentage. While Yell contends that Cameron was his biological child, Carpenter's ex-husband, Lester Carpenter, signed Cameron's birth certificate. (Yell Dep. 34:8-24, Sep. 30, 2022, DN 170).

1

and Yell allegedly choked Carpenter with enough force to burst a blood vessel in her eye. (Yell Dep. 119:8-121:22, 126:8-128:8; Carpenter Dep. 119:5-122:6). Carpenter then sought refuge at a friend's house along with two of the children. (Carpenter Dep. 26:26:15-24).

At some point, Carpenter's friend called the police to report a domestic disturbance. (Mills Dep. 24:17-26:14, Feb. 14, 2022, DN 172). Afterwards, Carpenter left the friend's house and returned to the mobile home to find it ablaze. (Carpenter Dep. 27:7-13). While Carpenter and Defendant Russellville Police Officer Ronald Mills ("Mills") were able to save Saralynn, Cameron was killed in the fire. (Carpenter Dep. 28:23-29:10; Mills Dep. 39:5-25).

Yell was subsequently arrested and transported to the Logan County Jail. (Higgins Dep. vol. II, 61:1-7, 65:22-68:7, Jan. 24, 2024, DN 168). A number of law enforcement officers and investigators from various agencies became involved in the fire and criminal investigations, including Defendant Alan Gregory ("Gregory") of the Kentucky State Fire Marshall's office; Defendant Buster Cannon ("Cannon"), an accelerant detecting canine ("ADC") handler, a Georgetown, Kentucky firefighter, and a Scott County Sheriff's Deputy; Defendants Ed Higgins ("Higgins"), Chad Eggleston ("Eggleston"), and Robert Edmonds ("Edmonds"), officers with the Russellville Police Department; and David West ("West"), a detective and fire investigator with the Kentucky State Police ("KSP").[2] (Gregory Dep. vol. I, 13:22-14:4, Feb. 11, 2022, DN 209-3; Cannon Dep. 41:7-14, 165:1-3, Nov. 8, 2022, DN 174; Higgins Dep. vol. I, 31:11-17, Sep. 13, 2022, DN 167; Eggleston Dep. 26:9-17, Feb. 25, 2022, DN 166; Edmonds Dep. 53:16-57:22, Sep. 14, 2022, DN 169; West Dep. 14:24-15:1, Oct. 11, 2024, DN 209-6).

---

[2] Yell also named former State Fire Marshall Samuel Jack Flowers ("Flowers") as a defendant. (Compl. ¶ 30, DN 1). Flowers died in 2015, and the Court denied Yell's Motion to Appoint a Special Representative for Flowers' estate. (Order 1-2, DN 42).

In 2006, Yell was convicted of first-degree arson, second-degree manslaughter, and first-degree assault and was sentenced to 52 years in prison. (Def.'s Mot. Summ. J. Ex. P, at 4, DN 159-17 [hereinafter New Trial Order]). Yell maintained his innocence and repeatedly sought to vacate his conviction, alleging that his counsel was ineffective and that the prosecution's expert witnesses lied at trial. (New Trial Order 1). Yell was finally granted a new trial in 2016, when Logan Circuit Court (Kentucky) found that the opinions given by the prosecution's experts—that the fire had multiple points of origin and that the ADC alerts indicated the presence of accelerants—were unreliable. (New Trial Order 7-9). Following the state court's grant of a new trial, the Commonwealth's attorney dismissed the charges against Yell without prejudice. (Def.'s Mot. Summ. J. Ex. Q, at 1, DN 159-18).

Yell claims that Defendants withheld evidence in violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), fabricated evidence, failed to intervene in the others' constitutional violations, and conspired to violate his constitutional rights. (Compl. ¶¶ 102-119, 127-140). Defendants, in various groups, move for summary judgment on Yell's claims against them, for leave to file motions in excess of the page limitations imposed by the local rules, and to exclude one of Yell's experts. (Def.'s Mot. Summ. J., DN 159; Defs.' Mot. Summ. J., DN 160, Defs.' Mot. Summ. J., DN 162; Defs.' Mot. Summ. J., DN 164; Defs.' Mot. Summ. J., DN 177; Defs.' Mot. Summ. J., DN 184; Def.'s Mot. Leave, DN 158; Defs.' Mot. Leave, DN 161; Defs.' Mot. Leave, DN 163; Defs.' Mot. Leave, DN 176; Defs.' Mot. Leave, DN 178; Def.'s Mot. Leave, DN 224; Defs.' Mot. Exclude, DN 182). Yell responds to Defendants' motions for summary judgment and moves for leave to file a response longer than permitted by the local rules,[3] to seal an exhibit,

---

[3] All parties seek leave to file motions and responses in excess of the page limitations imposed by the local rules. None object to these motions and this case is complex. Accordingly, all of these motions are granted.

and to exclude certain opinions of Defendants' experts.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J., DN 209; Pl.'s Mot. Leave, DN 211; Pl.'s Mot. Exclude Byron, DN 179, Pl.'s Mot. Exclude Ott, DN 180; Pl.'s Mot. Exclude Martinez, DN 181).

## II.        JURISDICTION

The Court exercises subject-matter jurisdiction over this action based upon federal question jurisdiction and supplemental jurisdiction over the state-law claims.  28 U.S.C. §§ 1331, 1367(a).

## III.       DISCUSSION

### A.        Defendant Alan Gregory (DN 159)

Gregory moves for summary judgment on Yell's claims against him.  (Def.'s Mot. Summ. J. 12, DN 159 [hereinafter Gregory's Mot. Summ. J.]; *see also* Compl. ¶¶ 92-119, 127-140, 151-155, 160-174).  In his response, Yell voluntarily dismisses his malicious prosecution, supervisory liability, state law malicious prosecution, negligent infliction of emotional distress, and negligence claims against Gregory and all other defendants.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1, DN 209).  Accordingly, Defendants are granted summary judgment on those claims.  Yell's remaining claims against Gregory are for due process, fabrication of evidence, failure to intervene, conspiracy, and intentional infliction of emotional distress ("IIED").

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of disputed material facts.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine factual dispute for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

4

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 1.      *Due Process Brady Claim*

Gregory argues that Yell's *Brady* claim[4] against him should be dismissed because he did not suppress materially favorable evidence related to electrical malfunction as a potential source of the fire. (Gregory's Mot. Summ. J. 22-24). Under *Brady*, prosecutors may not withhold or suppress evidence favorable to a criminal defendant. *Brady*, 373 U.S. at 87. *Brady*'s holding has since been clarified to impose an affirmative duty on the prosecution to hand over favorable evidence. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). The Sixth Circuit has ruled that *Brady* includes a derivative obligation for police officers—and forensic scientists—to turn over favorable evidence, so long as its exculpatory value is "apparent" to the officers. *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 579 (6th Cir. 2025) (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 382-89 (6th Cir. 2009)).

---

[4] While the Complaint casts Yell's "due process" claim as encompassing Defendants' various alleged violations of his due process rights, his response indicates that this claim is based only on Defendants' withholding of evidence. (*Compare* Compl. ¶ 103 ("Defendants . . . deprived [] Yell of his constitutional right to a fair trial"), *with* Pl.'s Combined Resp. Defs.' Mots. Summ. J. 58 (arguing that a trial is warranted on Yell's "[d]ue [p]rocess Brady [c]laim . . . .")).

5

To prove a *Brady* violation, a plaintiff must show three things:  (1) that the evidence at issue is favorable to him because it would have helped to show his innocence or impeach an unfavorable witness; (2) that the evidence was suppressed by the state; and (3) that he was prejudiced by the suppression.  *Id.* at 578; *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Generally, "*Brady* does not require officials to act with a nefarious intent . . . .  Rather, prosecutors can violate *Brady* not only though malicious concealment but also through honest mistakes." *Clark*, 130 F.4th at 579 (internal citation omitted) (citing *United States v. Agurs*, 427 U.S. 97, 110 (1976)).

Different standards apply, however, when officials merely fail to preserve evidence.  *See Wilson v. Sheldon*, 874 F.3d 470, 479 (6th Cir. 2017).  "While a showing of bad faith is not necessary to establish a constitutional violation where the state fails to disclose material exculpatory evidence, a showing of bad faith is required to establish a constitutional violation where the state fails to preserve evidentiary material that might have been exculpatory."  *Id.* (quoting *Swan v. Meko*, No. 16-5120, 2017 WL 3270780, at *2 (6th Cir. May 23, 2017)).  To prove bad faith, the plaintiff must show "official animus" or a "conscious effort to suppress exculpatory evidence" by officials.  *Id.* (quoting *Swan*, 2017 WL 3270780, at *2).

Gregory argues that a bad faith standard should apply to his alleged *Brady* violations because evidence of electrical malfunctions "was merely potentially useful and not materially exculpatory." (Gregory's Mot. Summ. J. 23).  This argument mischaracterizes Yell's claims. Yell has alleged that Gregory, among others, "deliberately withheld exculpatory evidence . . . ." (Compl. ¶ 104).  This purportedly includes "evidence unearthed during their investigation which illustrated accidental sources of the fire"—e.g., electrical malfunction.  (Compl. ¶¶ 62-63).

6

Accordingly, Yell's claim is that Gregory failed to disclose—not failed to preserve—exculpatory evidence, so the bad faith standard does not apply.

With regard to the prejudice prong of a *Brady* claim, "[a plaintiff] must show that the allegedly suppressed evidence was material; in other words, that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Jackson*, 925 F.3d at 815 (internal quotation marks omitted) (quoting *Strickler*, 527 U.S. at 280, 281). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Monson v. City of Detroit*, No. 22-2050, 2024 WL 84093, at *9 (6th Cir. Jan. 8, 2024) (internal quotation marks omitted) (quoting *France v. Lucas*, 836 F.3d 612, 630 (6th Cir. 2016)), *cert. denied sub nom. Ghougoian v. Monson*, 144 S. Ct. 2659 (2024).

Yell's arguments are largely non-responsive to Gregory's motion for summary judgment on his *Brady* claim based on the withholding of evidence of other sources of the fire. Instead, Yell argues that Gregory withheld "key impeachment evidence that would have undermined his arson opinion . . . and further exculpated [Yell] . . . ." (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 67). Specifically, Yell argues that Gregory withheld evidence that he:

> (1) learned from dispatch that the fire had been fully involved; (2) was told by Officer Mills that both full-room involvement and flashover had occurred;[5] (3) was also told by first responder Chief Williamson that the fire was fully involved; and (4) destroyed personal notes he took about the investigation, which may very well have contained documentation of this crucial evidence that he suppressed.

---

[5] "'[F]lashover' is defined as '[a] transitional phase in the development of a compartment fire in which surfaces exposed to thermal radiation reach ignition temperature more or less simultaneously and fire spreads rapidly throughout the space resulting in full room involvement or total involvement of the compartment or enclosed area.'" (Def.'s Reply Mot. Summ. J. 3 n.4, DN 225 [hereinafter Gregory's Reply Mot. Summ. J.] (citation omitted)). "'[F]ull room involvement' is a "condition in a compartment fire in which the entire volume is involved in fire." (Gregory's Reply Mot. Summ. J. 3 n.3 (citation omitted)).

(Pl.'s Combined Resp. Defs.' Mots. Summ. J. 67 (footnote added)).  Yell, however, has not brought a claim for the suppression of any of that evidence.  In the Complaint, Yell asserts that Gregory "intentionally failed to disclose evidence unearthed during their investigation which illustrated accidental sources of the fire" and "withheld documentation regarding evaluation of even the most common and likely accidental ignition sources, such as a failure in the trailer's electrical system . . . ."  (Compl. ¶¶ 62-63).

Under his claim for *Brady* violations, Yell alleges that Gregory and others "deliberately withheld *exculpatory* evidence" and "breached their legal and constitutional duties to provide *exculpatory* evidence to [] Yell[,]" while making no mention of withheld impeachment evidence.[6] (Compl. ¶¶ 104, 108).  While Yell makes three passing mentions of impeachment evidence elsewhere in the Complaint, these are insufficient to state a claim for a standalone *Brady* claim based on withheld impeachment evidence.  *See Grinnell v. City of Taylor*, No. 21-2748, 2022 WL 1562291, at *5 (6th Cir. May 18, 2022) (holding that parties may not expand their claims at the summary judgment stage); *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665-66 (6th Cir. 2012) (holding that party was not entitled to expand his claims at summary judgment); *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the

---

[6] There is no difference in the seriousness of withholding impeachment evidence as compared to withholding exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676-77 (1985).  The Supreme Court has, however, treated impeachment evidence as distinct for the purposes of *Brady*, and not merely as a type of exculpatory evidence.  *See, e.g.*, *Strickler*, 527 U.S. at 280 ("[T]he duty encompasses impeachment evidence as well as exculpatory evidence."  (citation omitted)). Exculpatory evidence is evidence that tends to directly negate the guilt of a criminal defendant. *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004).  Impeachment evidence is evidence that undermines a witness's credibility.  *Garcia-Morquecho v. Sessions*, 694 F. App'x 388, 391 (6th Cir. 2017) (citing *Evidence*, Black's Law Dictionary (10th ed. 2014)).  Yell's allegations that Gregory met with Cannon before P.J.'s walkthrough, failed to document P.J.'s walkthrough, failed to disclose evidence of accidental fire sources, and withheld documentation of accidental fire sources are insufficient to put Gregory on notice of a claim against him for withholding impeachment evidence.  (Compl. ¶¶ 57, 60, 62-63).

extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal.").

Because Yell's response does not address Gregory's arguments about the *Brady* claim for withholding exculpatory evidence of electrical malfunction as a potential source of the fire, Gregory's motion is granted as to that claim. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011))); *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759 (E.D. Ky. 2019) (explaining that when a plaintiff fails to respond to arguments in a summary judgment motion, the plaintiff concedes those arguments not addressed).  Moreover, Yell cannot recharacterize the bases for his *Brady* claim at summary judgment and Gregory's motion is granted as to any other bases for *Brady* violations raised for the first time in Yell's response.

### 2.    *Fabrication of Evidence*

Gregory next moves for summary judgment on Yell's fabrication of evidence claims against him.  (Gregory's Mot. Summ. J. 24).  He argues that this claim is duplicative of Yell's malicious prosecution and *Brady* claims against him and should therefore be dismissed. (Gregory's Mot. Summ. J. 24).  First, Yell has voluntarily dismissed his Fourth Amendment malicious prosecution claims, so Gregory's duplicity arguments are moot as to Yell's Fourth Amendment fabrication claim.  (Pl.'s Resp. Defs.' Mots. Summ. J. 3 n.1).  Second, Gregory's arguments do not compel the dismissal of Yell's Fourteenth Amendment fabrication claim. Gregory acknowledges that "[t]he Due Process Clause of the Fourteenth Amendment is *also* 'violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.'" (Gregory's Mot. Summ. J. 24); *Jackson*,

9

925 F.3d at 815 (emphasis added) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)). *Jackson*, however, does not stand for the proposition that *Brady* claims and fabrication claims cannot proceed alongside each other under the Fourteenth Amendment.[7] The Sixth Circuit in *Jackson* held that the plaintiff-appellant's *Brady* and fabrication claims both survived summary judgment. *Jackson*, 925 F.3d at 815-17, 837. Like the plaintiff in *Jackson*, Yell is bringing distinct claims for withholding evidence and fabrication of evidence. (Compl. ¶¶ 102-119). His fabrication claims, therefore, are not duplicative.

Further, the Sixth Circuit has recognized fabrication-of-evidence claims under both the Fourth and Fourteenth amendments. *Clark v. Abdallah*, 131 F.4th 432, 447 (6th Cir. 2025) (citing *Hoskins v. York*, No. 23-5325, 2024 WL 2894648, at *2 (6th Cir. June 10, 2024)). The Sixth Circuit has explained the difference between the protections provided by the amendments:

> The Fourth Amendment's protection against unreasonable seizures prohibits the government from arresting and detaining individuals without probable cause that they committed an offense. The Fourth Amendment is violated when probable cause rests on fabricated evidence presented to a grand jury or to a judge determining probable cause. When individuals present claims that they were unlawfully detained based on fabricated evidence, we tend to consider them under the rubric of malicious prosecution. Because Fourth Amendment claims turn crucially on the lack of probable cause, a law-enforcement defendant may defeat liability by showing that, notwithstanding the fabricated evidence, probable cause supported detention.
>
> The Fourteenth Amendment, by contrast, prohibits the government from depriving a person of liberty without due process of law. The due-process right is infringed when the prosecution presents "evidence [that] is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." Because the core of the right at issue here is not the

---

[7] As the Sixth Circuit explained in *Gregory*:

> The *situs* of injury is distinct and therefore Plaintiff should be able to pursue both legal theories. It is not the role of this Court to restrict Plaintiff's choice of viable legal theories. Other courts have allowed plaintiffs to pursue two legal theories under § 1983 premised on the same underlying facts.

*Gregory*, 444 F.3d at 750.

> deprivation of liberty but the right to a fair trial, "a stand-alone fabrication-of-evidence claim can survive without regard to probable cause."

*Id.* (alteration in original) (internal citations omitted) (citation omitted). Thus, while Yell may bring fabrication claims under both the Fourth and Fourteenth Amendments, the nature of Yell's Fourth Amendment claim is complicated by his voluntary dismissal of his malicious prosecution claims. (*See* Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1 ("While Plaintiff has a viable malicious prosecution claim, he voluntarily agrees to dismiss this claim so that he can focus the scope of an eventual trial—and briefing—on the egregious due process violations committed by Defendants through their fabrication of false evidence and withholding of exculpatory evidence (in addition to failure to intervene and conspiracy).")). While Yell's abandonment of his malicious prosecution claims suggests that his Fourth Amendment fabrication claim should also be dismissed, he explicitly states that he is dismissing his specific claims for federal and state law malicious prosecution, not his fabrication claims. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1).

Yell's briefing on the issue, however, indicates that he has abandoned his Fourth Amendment fabrication claim. For example, Yell's argument in his response turns on the contention that Gregory's alleged fabrication would have impacted the *jury verdict*. (Pl.'s Resp. Combined Defs.' Mots. Summ. J. 75-76). While impact on a jury verdict is a key inquiry under Fourteenth Amendment fabrication analysis, it does not play a central role in a Fourth Amendment analysis because the Fourth Amendment protects against pretrial deprivations of liberty. *Compare Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (elements of Fourteenth Amendment claim), *with Adams v. Lexington-Fayette Urb. Cnty. Gov't*, 154 F.4th 501, 512 (6th Cir. 2025) (stating that the Fourth amendment applies to *pretrial* deprivations of liberty).

11

To succeed on a Fourteenth Amendment fabrication-of-evidence claim, a plaintiff must show that "a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills*, 869 F.3d at 484 (alterations in original) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). Whether the false evidence could have affected the jury's judgment does not depend on "whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury." *Jackson*, 925 F.3d at 816. Thus, a Section 1983 claim may lie where fabricated evidence "'is used as [the] basis for a criminal charge' . . . because, absent that evidence, there would have been no jury." *Id.* (first alteration in original) (citation omitted); *see also Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) ("[E]ven if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect." (citation omitted)). Fabrication claims often rely on circumstantial evidence, and circumstantial evidence is sufficient to defeat summary judgment if it would allow a reasonable jury to infer the elements of the claim. *Ferris v. City of Cadillac*, 726 F. App'x 473, 479 (6th Cir. 2018); *see Jackson*, 925 F.3d at 814.

Yell alleges that Gregory fabricated his own opinion that the fire was intentional "by employing 'pre-flashover' methods to investigate a 'post-flashover fire'" and fabricated his finding that the fire had multiple points of origin. (Compl. ¶¶ 51-52). Yell also alleges that Gregory fabricated unconfirmed alerts by Cannon's ADC, P.J. (Compl. ¶ 55). Gregory replies that Yell misrepresents the evidence in several ways. (Gregory's Reply Mot. Summ. J. 9-10).[8]

---

[8] Gregory provides a 28-page appendix detailing instances in which Yell misstates or mischaracterizes evidence in the record. (Def.'s Reply Mot. Summ. J. Ex. A, DN 225-1). The Court agrees with Gregory's contention that Yell's citations to the record are at least overstated.

Yell first argues that his claim based on Gregory's allegedly fabricated conclusion should survive because Gregory intentionally employed pre-flashover investigation methods when he knew that flashover had occurred, rendering his methodology inaccurate. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 70-72). Yell asserts that Gregory acknowledged that burn pattern analysis would not be helpful to determining the cause of a fire in a post-flashover fire scene. The cited deposition testimony does not, however, support this contention. Asked if he understood that the general rules of thumb he relied on to determine a fire's origin lose their value in a post-flashover environment, Gregory replied "[t]o a point, yes." (Gregory Dep. vol. II, 73:20-23, Feb. 16, 2022, DN 209-4). This indicates Gregory's belief that the general rules of thumb he used could be useful even in a post-flashover environment and Yell does not cite to any testimony from Gregory indicating otherwise. Regardless, Gregory maintains his opinion that no flashover occurred. (Gregory Dep. vol. II, 85:14-25, 108:5-20). If Gregory did not believe that flashover occurred and he used pre-flashover investigation methods, then no jury could find that he fabricated his investigation report. While he may have been arguably incorrect, that is not fabrication. Further, Yell has not established that either full-room involvement or flashover definitively occurred. Mills reported he saw fire on one living room wall and "going down the hallway[,]" not that the paneling had "erupted in flames" as Yell claims. (Mills Dep. 44:4-11, 60:2-17). Gregory testified in this case that there was not sufficient damage to the paneling in these rooms to constitute flashover in his opinion, which is also depicted in photographs. (Gregory Dep. vol. II, 86:1-21; Gobert Report 15-17, DN 159-20). Thus, there is no genuine dispute of material fact as to Gregory's fabrication of his conclusions. Yell has pointed to nothing in the record supporting the assertion that Gregory secretly believed that flashover had actually occurred or that his initial opinions were knowingly misstated. Yell's citation to Gregory's supposed admission that first responders informed him that

13

flashover occurred is unavailing.[9]    Accordingly, Gregory's motion is granted as to Yell's fabrication claim against him.

### 3.    *Failure to Intervene*

Yell also alleges that Gregory failed to intervene when others were violating Yell's constitutional rights.  (Compl. ¶¶ 127-131).  While not entirely clear from the allegations in the Complaint, Yell seems to assert that Gregory failed to intervene in Cannon's manufacturing of alerts by his ADC, "P.J."  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 88 ("Gregory and West were present for the fabricated alerts manufactured by Defendant Cannon.")).  Gregory argues that this claim should be dismissed because he was only involved in the fire investigation and had no reason to know of any alleged constitutional harms committed by Cannon.  (Gregory's Mot. Summ. J. 24-25).

To succeed on a failure to intervene claim, a plaintiff must show that the defendant:  (i) "observed or had reason to know" that constitutional harm was occurring; and (ii) "had both the opportunity and the means to prevent the harm from occurring."  *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (internal quotation marks omitted) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  Because a failure to intervene claim is based on another's unconstitutional actions, "to succeed on a claim for failure to intervene, a plaintiff must show that there was an underlying constitutional violation."  *Greene v. Crawford Cnty.*, 22 F.4th 593, 615 (6th Cir. 2022) (internal quotation marks omitted) (citation omitted).

There is no dispute that Gregory was present for P.J.'s walkthroughs of the trailer.  (Gregory Dep. vol. I, 99:13-15).  Presence alone, however, cannot be the factual basis for a failure

---

[9] Gregory stated that when he arrived on the scene the fire chief showed him "where he saw fire coming out [of the trailer], and what rooms were involved[,]" not that flashover had occurred. (Gregory Dep. vol. I, 77:25-78:4).

to intervene claim. *See Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3 (6th Cir. Mar. 6, 2017) ("[A]n officer's 'mere presence . . . , without a showing of some direct responsibility, cannot suffice to subject [the officer] to liability' . . . . " (second alteration in original) (quoting *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013))). When a party has no reason to know that a constitutional violation is occurring, he is not liable for failing to intervene. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: . . . that any constitutional violation has been committed by a law enforcement official . . . ." (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988))); *cf. Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395-96 (6th Cir. 2001) (finding that failure to intervene liability did not extend to an officer who "did not observe or have reason to know" that a constitutional violation occurred).

In this instance, there are no facts indicating that Gregory was familiar with ADCs or the proper procedures for a walkthrough with an ADC. (Gregory Dep. vol. I, 21:4-6). Yell has not shown that it would have been possible for Gregory to know, without the specialized dog-handling training that Cannon had, that the methods Cannon used to allegedly fabricate P.J.'s alerts were improper. Accordingly, Yell has not established evidence from which a reasonable jury could conclude that Gregory had reason to know that a constitutional violation occurred with respect to Cannon's use of the ADC. Gregory's motion is granted as to Yell's failure to intervene claim.

### 4.    *Conspiracy*

Yell also alleges that Gregory entered a conspiracy to deprive him of his constitutional rights under Section 1983. (Compl. ¶¶ 57, 61, 132-140). "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d

15

935, 943-44 (6th Cir. 1985).  To prevail on a Section 1983 conspiracy claim, a plaintiff must prove that:  "(1) a single plan existed; (2) defendants shared in the general conspiratorial objective to deprive the plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury."  *Jacobs v. Alam*, 915 F.3d 1028, 1043 (6th Cir. 2019) (internal quotation marks omitted) (citing *Webb*, 789 F.3d at 670).  Conspiracy also requires an underlying claim for a constitutional violation.  *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) (citation omitted).

Gregory first argues that he did not commit any overt acts in furtherance of the alleged conspiracy.  (Gregory's Mot. Summ. J. 26).  As discussed above, Yell has not shown that Gregory fabricated the conclusions in his report, which would constitute an overt act.  Gregory also argues that because he merely participated in "an overarching, legitimate operation to determine the cause of the . . . trailer fire[,]" Yell has not shown that he shared in a conspiratorial objective to deprive Yell of his constitutional rights.  (Gregory's Mot. Summ. J. 26).

The facts that Gregory and Cannon met for breakfast before Cannon took P.J. to the scene and that Gregory shared with Cannon some information about the fire are insufficient to allow a jury to speculate regarding the existence of a conspiracy.  Facts tending to show that defendants worked together on an investigation are not, on their own, enough to prove the existence of a conspiracy to violate constitutional rights.  *Allen v. Linn Cnty. Bd. of Comm'rs*, No. 2:23-CV-02453-HLT-BGS, 2024 WL 3066168, at *12 (D. Kan. June 20, 2024) (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010)).  Yell also contends that the ADC's hits were later proven to be false, which shows that Yell and Cannon conspired to fabricate evidence of arson.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 89-90).  The fact that the ADC's "hits" later tested negative for accelerant in the state crime lab is not necessarily indicative of a conspiracy.  ADCs

16

are known to return false positives. (Cannon Report 19-20, DN 218-1; Byron Report 6-8, DN 179-1). In fact, the unreliability of ADCs is one of the bases cited by Yell in his efforts to overturn his conviction. (Kerr Dep. 36:9-22, Oct. 14, 2024, DN 183-5; New Trial Order 1-2). What is missing here is evidence indicating that Gregory was somehow complicit in false alerts by P.J. Accordingly, unconfirmed ADC hits do not prove Yell's conspiracy claim.

Neither Gregory nor Cannon recalled conferring about the existence of any points of origin of the fire for P.J. to examine. (Gregory Dep. vol. I, 94:1-96:24; Cannon Dep. 250:9-16). Yell points only to Cannon's admissions that they may have discussed Gregory's "preliminary conclusions regarding the origin of the fire" at the breakfast. (*See, e.g.*, Cannon Dep. 254:14-18). This is different than the two discussing the six specific areas where P.J. alerted. Mere discussion of Gregory's initial impressions does not support an inference of conspiracy. Because the request for an ADC would naturally flow only from an inspector's suspicion that a fire may have involved foul play, it would have been obvious to Cannon, even if he never met with Gregory, that Gregory's initial conclusion was that arson was a possibility.[10] Accordingly, a reasonable jury could not find that Gregory entered into a conspiracy with Cannon to deprive Yell of his constitutional rights and Gregory's motion is granted as to Yell's conspiracy claim.

### 5.    *Intentional Infliction of Emotional Distress*

Gregory also seeks summary judgment on Yell's IIED against him. (Gregory's Mot. Summ. J. 27-28). While Yell did not voluntarily dismiss his IIED claims, he fails to respond to

---

[10] The potential discussion of Gregory's preliminary theory of the fire at breakfast is not dispositive on Yell's conspiracy claim. As Yell's counsel acknowledged at Gregory's deposition, it would have been obvious to Cannon that Gregory or another investigator had concerns about accelerant use. (*See* Gregory Dep. vol. I, 97:13-19 ("Q: Well, certainly there would be no need for Mr. Cannon to bring his puppy out to the scene if accelerants weren't being investigated, right? A: . . . [A] dog is as important to rule it in, as is to rule it out. . . . [Flowers] knew I had some concerns, or Flowers wouldn't've requested it.")).

Gregory's arguments for summary judgment.  Accordingly, Gregory's motion is granted with respect to this claim.  *See Degolia*, 381 F. Supp. 3d at 759 (explaining that when a plaintiff fails to respond to arguments in a summary judgment motion, they concede those that they fail to address).

### 6.    *Qualified Immunity*

Gregory seeks qualified immunity on each of Yell's outstanding claims against him. (Gregory's Mot. Summ. J. 12-13).  Because there are no remaining claims against Gregory, the issue of qualified immunity is moot.

### B.    Defendants Buster Cannon, The City of Georgetown, and Scott County (DN 160, 184)

At the outset, the Court notes that two motions for summary judgment have been filed on Cannon's behalf:  one addressing the claims against Cannon individually and the claims against Scott County; and another addressing the claims against Cannon individually and the claims against the City of Georgetown.  (Defs.' Mot. Summ. J. 1, DN 160; Defs.' Mot. Summ. J. 1, DN 184).  The motion filed by Scott County, however, almost exclusively argues that Scott County, not Cannon individually, should be granted summary judgment.  (*See* Defs.' Mem. Supp. Mot. Summ. J. 5, DN 160-1 ("Only one fact offers *any* connection between Cannon's employment as a SCSD deputy sheriff and Yell's prosecution:  Cannon wore his SCSD uniform to Yell's jury trial.")).  Yell does not meaningfully address Scott County's argument in his response, only including a single heading in his "Facts" section stating that "A Jury Is Best Equipped to Determine Which Entity (Or Both) is Liable for Defendant Cannon's Misconduct[.]"  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 19).  Because Yell fails to address Scott County's arguments, Scott County

18

is granted summary judgment on Yell's claims against it.[11]   Yell likewise fails to respond to

Georgetown's basis for summary judgment, which is therefore also granted.

Remaining are the claims against Cannon in his individual capacity:  (i) withholding of

evidence; (ii) fabrication of evidence; (iii) failure to intervene; (iv) conspiracy; and (v) IIED.

      **1.**     ***Due Process Brady Claim***

Cannon argues that he should be awarded summary judgment on Yell's *Brady* claim

against him.  (Defs.' Mem. Supp. Mot. Summ. J.  21-22, DN 184-1 [hereinafter Georgetown Defs.'

Mem. Supp. Mot. Summ. J.]).  Cannon avers that:  (i) he had no duty to turn over evidence of

alternative—i.e., non-intentional—sources of the fire because he was participating in the

investigation as a canine handler only and not a fire investigator; and (ii) evidence of alternative

ignition sources was readily available to Yell and his criminal defense attorneys.  (Georgetown

Defs.' Mem. Supp. Mot. Summ. J. 21-22).  Yell responds that Cannon withheld evidence of the

---

[11] Regardless, Yell's claim against Scott County would fail on the merits.  Municipalities cannot be held liable under a theory of respondeat superior.  *See Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014).  Instead, under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a party must point to the municipality's own illegal acts.  *Id.* at 694 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.").  In the Complaint, Yell brought distinct *Monell* claims against the City of Russellville and Logan County.  (Compl. ¶¶ 141-150).  Yell did not assert *Monell* claims against Scott County—or the City of Georgetown.  While he did include paragraphs in many of his constitutional claims alleging that the described misconduct was due to a lack of training by the municipal defendants, this is insufficient to bring *Monell* claims against Scott County and the City of Georgetown.  (Compl. ¶¶ 110-112, 131, 140).  When a plaintiff seeks to expand his claims at the summary judgment phase, he may not do so if the new claim causes unfair surprise to a defendant.  *See Grinnell*, 2022 WL 1562291, at *5.  Adding additional *Monell* claims against Scott County and the City of Georgetown would cause unfair surprise.  Logically, if a plaintiff explicitly includes a certain claim against only a subset of defendants, it follows that he is not bringing that claim against the other defendants.

unreliability of P.J.'s alerts and withheld evidence of his own belief that P.J.'s alerts were unreliable.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 58-64).

These arguments reveal a fundamental disagreement as to what behavior is included in Yell's *Brady* claim against Cannon.  Cannon implicitly argues that the claim is for failing to turn over evidence of alternative ignition sources.  (Georgetown Defs.' Mem. Supp. Mot. Summ. J. 21-22).  On the other hand, Yell raises arguments about Cannon's alleged failure to turn over evidence impugning the accuracy of P.J.'s alerts.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 58-64).  The Complaint alleges that Cannon and other defendants "deliberately withheld exculpatory evidence . . . ."  (Compl. ¶ 104).  Specifically, Yell alleges that Cannon and others "fabricated unconfirmed results[,]" "showed [P.J.] where to sniff[,]" "failed to document or accurately video record the walk through[,]" and "falsely averred that the dog's nose was 'more sensitive' than a laboratory test and that [P.J.] was nearly 100% accurate in alerting to the presence of ignitable liquids."  (Compl. ¶¶ 55, 59-61).  Regarding the final allegation, Yell specifically alleges that Cannon "stated as such although he had *no* records of P.J.'s accuracy . . . ."  (Compl. ¶ 61).

Taken together, these allegations are sufficient to state claims for both the withholding of evidence of ignition sources and of P.J.'s accuracy.  The Complaint gives Cannon notice that Yell intended to bring claims for the withholding of both categories of evidence.  In his response, however, Yell does not address Cannon's arguments for dismissal of his *Brady* claims for Cannon's alleged withholding of alternative sources of the fire and instead only pursues arguments about P.J.'s accuracy.  Accordingly, Cannon's motion will be granted with respect to Yell's claims based on the withholding of evidence of alternative fire sources.

Thus, only Yell's claims based on the withholding of evidence of P.J.'s accuracy remain.  Cannon argues that he cannot be liable for withholding this evidence because he made his

20

statements about P.J.'s accuracy at trial and he is shielded by absolute immunity for his trial testimony and preparation for that testimony.  (Georgetown Defs.' Mem. Supp. Mot. Summ. J. 8-9).  Yell contends this argument misconstrues the nature of a *Brady* claim.  While Cannon is entitled to absolute immunity for his trial testimony, Yell is not attempting to impose liability based on that testimony.  Instead, Yell contends that Cannon withheld evidence demonstrating P.J.'s unreliability before trial and that this evidence was material.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 58-60).  Yell's arguments focus on two pieces of evidence:  (i) Cannon's own belief that P.J. was unreliable; and (ii) KSP lab reports reflecting P.J.'s unconfirmed alerts.

Yell has not established a *Brady* violation as to Cannon's own beliefs about P.J.'s reliability.  At an evidentiary hearing in the state court before Yell's criminal trial, the prosecutor, the defense attorney, and the judge all questioned Cannon and heard testimony about his opinion of P.J.'s reliability.  (*See Daubert* Hr'g Tr. 16:24-17:12, 29:11-25, 46:20-47:23, Jan. 3, 2006, DN 160-7).  Yell's defense counsel was therefore aware of Cannon's opinions about P.J.'s accuracy before trial, including both his feeling that P.J. was generally reliable and the concession that she sometimes made false "hits."  (*See Daubert* Hr'g Tr. 16:24-17:12, 29:11-25, 46:20-47:23).  Yell's argument that Cannon concealed his own negative opinions about P.J.'s accuracy is unsupported by any evidence.  Accordingly, Cannon will be granted summary judgment on Yell's *Brady* claim based on his opinions of P.J.'s reliability.

The record regarding the withholding of the KSP lab reports is less clear.  Yell argues that Cannon, by failing to report the lab results for the samples taken from P.J.'s hits, concealed evidence of P.J.'s unreliability.  (Pl.'s Combined Resp. Defs. Mots. Summ. J. 59-60).  Central to Yell's argument is Cannon's supposed testimony that KSP lab reports regarding P.J.'s hits were "automatically sent" to him.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 60; Cannon Dep. 49:6-

13). This out-of-context quote misconstrues Cannon's testimony. Reviewing the testimony as a whole, it is clear that Cannon testified that he was automatically sent the lab reports only when acting as the *lead* fire investigator; for cases in which he was not acting as the lead investigator— as is true in most of the cases P.J. worked, and the present case—Cannon was not provided with the KSP report. (Cannon Dep. 48:18-53:22).[12]

While the Court must view the evidence in the light most favorable to the plaintiff at the summary judgment phase, it does not do so blindly. This evidentiary standard does not compel the Court to accept deposition testimony stripped of its context as the sole support for a plaintiff's claim. Moreover, the testimony offered by Cannon in the pretrial evidentiary hearing made clear that he knew that P.J. was not infallible. Even accepting Yell's false positive calculations as accurate,[13] there is no indication that Cannon had evidence of the *rate* of false positives at the time of Yell's trial, just knowledge that false positives sometimes occurred as Cannon disclosed at the evidentiary hearing. (Georgetown Defs.' Reply Mot. Summ. J. 12-13)

There is no duty under *Brady* to create evidence. *Baker v. Barrett*, 16 F. Supp. 3d 815, 845 (E.D. Mich. 2014) ("Although *Brady* requires disclosure of exculpatory evidence, it is well established, that '*Brady* . . . does not require the government to create exculpatory material that does not exist.'" (alteration in original) (quoting *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980))). Further, there is no evidence that the value of individual false positives in other cases involving P.J. but not Cannon was apparent to him. Accordingly, the motion for summary judgment on this claim against Cannon is granted.

---

[12] For example, Cannon testified: "I would have never gotten anything back because I did not investigate the fire. Whoever submitted the samples would have got the report." (Cannon Dep. 53:8-10).

[13] Cannon disputes the accuracy of Yell's calculations. (Defs.' Reply Mot. Summ. J. 7-8, DN 227 [hereinafter Georgetown Defs.' Reply Mot. Summ. J.]).

### 2.    *Fabrication of Evidence*

Cannon also seeks summary judgment on Yell's Fourth and Fourteenth Amendment fabrication of evidence claims against him.  (Georgetown Defs.' Mem. Supp. Mot. Summ. J. 19). As discussed above, Yell has abandoned his Fourth Amendment fabrication claim and Cannon's motion is granted as to that claim.  As to the Fourteenth Amendment Claim, Cannon argues that Yell cannot prove that he knowingly fabricated P.J.'s six unconfirmed hits.  (Georgetown Defs.' Mem. Supp. Mot. Summ. J. 19).  Yell responds that the evidence supports a fabrication claim because it shows that Cannon had a motive to fabricate, failed to document the walkthrough, and disregarded the training provided to him by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 81-83).

As to Cannon's motive for fabrication, Yell argues that before he performed his walkthrough, Cannon was aware of Gregory's "arson theory and [] believed origins of the fire." (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 83).  Cannon replies that this overstates the evidence concerning Gregory's communications with Cannon.  (Georgetown Defs.' Reply Mot. Summ. J. 12).  Yell indeed fails to fully support his arguments with evidence.  Gregory testified that he and Cannon went to breakfast and discussed Gregory's "preliminary" findings "to a point."  (Gregory Dep. vol. II, 13:3-19).  Gregory further testified that he could not recall if he told Cannon of his belief that the fire was intentional or that there were six points of origin.  (Gregory Dep. vol. I, 93:9-13, 94:11-21, 96:18-24).  As Gregory noted, however, it would have been obvious to Cannon that Gregory had questions about the origin of the fire and whether arson was involved because he requested the services of an ADC.  (Gregory Dep. vol. I, 96:19-24 ("[I]f I hadn't . . . had areas of concern, he wouldn't've been there.")).  Similarly, Cannon's testimony cited by Yell does not bear the weight Yell asks of it.  Cannon testified that he and Gregory went to breakfast where Gregory

23

may have provided him with information about preliminary findings, conclusions, burn patterns, and information leading Cannon to believe the fire was potentially arson. (Cannon Dep. 138:6-20, 246:8-11, 250:17-23, 254:14-18). Further, Gregory testified that while he did share his preliminary impressions with Cannon, he denied communicating any final decision about the fire's origin. (*See* Gregory Dep. vol. II, 13:14-14:12; Gregory Dep. vol. I, 93:19-25 ("Q: . . . [Y]ou did not tell Buster Cannon your opinions about whether this fire was intentionally set or not, in that breakfast conversation? . . . A: I may have said I had questions about it, but I did not say that I had already decided.")). Even construing the cited testimony in the manner most favorable to Yell, it fails to support the contention that Gregory told Cannon he had determined the fire was an arson or told him that the fire had six potential points of origin.

Yell's argument that Cannon failed to document is similarly unsupported by the evidence. While all agree that Cannon's walkthrough of the fire scene with P.J. was not recorded, no evidence supports the claim that Cannon was to blame for the lack of recording. The uncontroverted evidence indicates that others at the scene—potentially Edmonds or Gregory—were responsible for videotaping P.J.'s walkthroughs. (Gregory Dep. vol. I, 109:10-18; *Daubert* Hr'g Tr. 46:7-17; Edmonds Dep. 238:22-240:14). It was only after Cannon and P.J. completed the walkthrough and left the scene that Cannon learned the video camera had malfunctioned and the walkthroughs were not recorded. (*Daubert* Hr'g Tr. 49:21-50:10, 53:2-6; Gregory Dep. vol. I, 108:23-109:21; Edmonds Dep. 238:22-244:15). Yell has pointed to nothing in the record indicating that Cannon intentionally failed to document the walkthrough—Cannon believed he was being videotaped, but it turned out that the walkthrough was not recorded, through no fault of his own. (Cannon Dep. 284:1-15; *Daubert* Hr'g Tr. 49:21-50:10 ("[Edmonds] was [an] inept video operator."); Gregory Dep. vol. I, 108:23-109:21; Edmonds Dep. 238:22-244:15).

24

Cannon and Yell also disagree as to whether it was consistent with his ATF training for Cannon to conduct two walkthroughs with P.J.—the first with a long leash and the second with a short leash. (*Compare* Pl.'s Combined Resp. Defs.' Mots. Summ. J. 82 ("First, Defendant Cannon intentionally departed from his ATF training when he placed PJ on a short leash, took her to certain spots in the trailer, and 'put [his] hand down and lead her . . . wherever I want her to go.'" (alterations by Plaintiff)), *with* Georgetown Defs.' Reply Mot. Summ. J. 4 ("Two scene walkthroughs to alternate from long leash to short leash techniques are entirely consistent with ATF training methods and practices.")). It is unnecessary to reach this issue. Cannon's purported departure from his ATF training could be evidence that he conducted his walkthrough negligently, but there is no constitutional claim for negligent investigation. *Garner v. Harrod*, 656 F. App'x 755, 760 (6th Cir. 2016). Thus, Cannon's ATF training has no bearing on whether he violated Yell's constitutional rights.

The larger issue that the training argument seems to approach, however, is whether Cannon's use of a second walkthrough with a short leash and alleged guiding of P.J.'s head and nose to certain spots could support a reasonable inference of fabrication. Cannon again disputes Yell's characterization of the facts at issue. (Georgetown Defs.' Reply Mot. Summ. J. 5 n.4). While Yell avers that Cannon directed P.J. to certain areas of interest in the house, Cannon replies that Yell cites testimony out of context and that he directed P.J. to areas throughout the trailer as a normal part of the short leash walkthrough process. (*Compare* Pl.'s Combined Resp. Defs.' Mots. Summ. J. 82, *with* Georgetown Defs.' Reply Mot. Summ. J. 5 n.4). Cannon's testimony indicates that he did not present P.J. with specific spots where he thought accelerant may be, (*See, e.g.*, 2010 Hr'g Tr. 50:1-18, Dec. 7, 2010, DN 209-11 ("I don't go to a direct point where I think there may be something located.")), although he did point P.J. to areas where he thought accelerant may be

25

detected. (*See, e.g.*, Cannon Dep. 29:1-16 ("Q: . . . [B]ased on your testimony in 2010, you led her to the area where you thought that accelerants may be found, correct? A: Correct.")). While Yell argues that Cannon's testimony about leading P.J. to certain areas presents a triable fabrication claim, this argument misses the mark. Even interpreted in the light most favorable to Yell, the cited statements reflect that Cannon led P.J. to specific *areas* in the trailer, but *not* to "spots" as Yell claims or "direct points" as Cannon testified. (Cannon Dep. 29:6-13). This is different than Cannon leading P.J. to specific points to induce a false alert. A jury could not conclude that Cannon fabricated P.J.'s alerts based on the testimony cited by Yell. Accordingly, there is no genuine dispute of fact as to whether Cannon fabricated P.J.'s alerts. Cannon's motion is granted on this basis.

### 3.    *Failure to Intervene*

Yell also alleges that Cannon failed to intervene in the violation of Yell's constitutional rights. The apparent basis of Yell's claim is Cannon's alleged failure to intervene in Gregory's fabrication of P.J.'s alerts. (Compl. ¶¶ 60-61). Yell's response, however, clarifies that Cannon failed to intervene when Gregory allegedly shared "his arson opinion and the supposed points of origin that he wanted confirmed." (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 88). As discussed above, the breakfast conversation indicates that Gregory and Cannon worked together, but does not itself evidence a constitutional violation. *See Allen*, 2024 WL 3066168, at *12. There is no underlying claim based on the conversation itself. Instead, a portion of Yell's claims are based on the fruits of the breakfast conversation—e.g., Cannon's fabrication of P.J.'s alerts and Gregory's fabrication of his report. Absent an underlying constitutional violation based on the conversation itself, a failure to intervene claim against Cannon cannot survive. *Greene*, 22 F.4th at 615. While Yell asserts that Cannon and P.J. should not have participated in the walkthrough after Cannon

26

spoke with Gregory, there is no evidence that the conversation included anything with which Cannon could have intervened. Accordingly, Cannon's motion is granted as to Yell's failure to intervene claim.

### 4. *Conspiracy*

Yell claims that Cannon entered into a conspiracy to violate Yell's constitutional rights. (Compl. ¶¶ 132-140; Pl.'s Combined Resp. Defs.' Mots. Summ. J. 20-21, 88 ("As shown above, Defendants Cannon and Gregory went to breakfast prior to Defendant Cannon ever going to the scene where Defendant Gregory provided Defendant Cannon with his arson opinion and the supposed points of origin that he wanted confirmed.")). As discussed above, evidence indicating that two parties worked together on an investigation is not sufficient to establish the existence of a conspiracy. *Allen*, 2024 WL 3066168, at *12 (citing *Grider*, 618 F.3d at 1260). Accordingly, Cannon's motion is granted with respect to Yell's conspiracy claim.

### 5. *Intentional Infliction of Emotional Distress*

Cannon also moves for summary judgment on Yell's IIED claim. (Georgetown Defs.' Mem. Supp. Mot. Summ. J. 27). Yell fails to respond to any arguments regarding this claim, so Cannon's motion is granted on that basis.

### 6. *Qualified Immunity*

Cannon seeks qualified immunity on each of Yell's outstanding claims against him. Because there are no remaining claims against Cannon, the Court does not need to consider qualified immunity.

### C. **Defendants Bill Jenkins and Logan County (DN 161, 162)**

The Court granted the joint motion voluntarily dismissing Jenkins and Logan County. (Order 1, DN 214). Accordingly, Jenkins and Logan County's Motion for Leave to File Excess Pages (DN 161) and Motion for Summary Judgment (DN 162) are denied as moot.

D.      **Defendants Kenneth Edmonds, Chad Eggleston, John Higgins, Ronald Mills, Jim Pendergraf, and The City of Russellville (DN 164)**

Russellville Defendants have also moved for summary judgment on Yell's claims against them. (Defs.' Mot. Summ. J. 1, DN 164 [hereafter Russellville Defs.' Mot. Summ. J.]). In his response, Yell voluntarily dismisses his claims against Mills and Jim Pendergraf ("Pendergraf"). (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1). Accordingly, summary judgment will be granted to Mills and Pendergraf. Yell further voluntarily dismisses his *Monell* claim against the City of Russellville. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1). Yell also voluntarily dismisses his supervisory liability, federal law malicious prosecution, state law malicious prosecution, negligent infliction of emotional distress, and negligence claims against all defendants. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1). Accordingly, Russellville Defendants' motion is granted as to those claims.

Remaining are Yell's *Brady*, fabrication, failure to intervene, and IIED claims against Edmonds, Eggleston, and Higgins.

1.      ***Due Process Brady Claims***

The remaining Russellville Defendants seek summary judgment on Yell's due process *Brady* claims against them. Russellville Defendants' first argument is that Yell's claims premised on allegations of a negligently conducted investigation must fail as a matter of law. (Russellville Defs.' Mot. Summ. J. 25-26). The Court does not construe Yell's due process claim as stemming from Russellville Defendants' negligent investigation, but they will be granted summary judgment on Yell's due process claim to the extent that it is. *Garner*, 656 F. App'x at 760 (no claim for manner in which investigation is conducted).

As to Yell's due process claims premised on *Brady* violations, Russellville Defendants argue that Eggleston and Higgins were not "involved in or aware of the alleged evidence at

28

issue[,]" and thus did not violate Yell's *Brady* rights. (Russellville Defs.' Mot. Summ. J. 27). Yell evidently agrees, as he only argues that a *Brady* claim should proceed against Edmonds. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 58, 64-66). Accordingly, Eggleston and Higgins will be granted summary judgment on Yell's *Brady* claim.

Russellville Defendants aver that Edmonds should be granted summary judgment on Yell's claims that he withheld videos of the trailer walkthrough and Yell's arrival at the jail's sallyport. (Russellville Defs.' Mot. Summ. J. 26-27). Yell responds that his claim against Edmonds is based on the withholding of certain statements made to him by Carpenter and because Edmonds does not address this issue in his motion, he has waived any argument on the issue. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 65-65). While "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[,]" this is true when a non-movant's response fails to respond to the movant's arguments. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *see Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff fails to address [a claim] in response to a motion for summary judgment, the claim is deemed waived." (alteration in original) (internal quotation marks omitted) (quoting *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 F. App'x 567, 568-69 (6th Cir. 2015))); *see also Hayton Organics, Inc. v. Krieger's Wholesale Nursery, Inc.*, 803 F. Supp. 3d 627, 635 (W.D. Mich. 2025) (finding issue had been waived where plaintiff did not respond to defendant's summary judgment argument); *Edmondson v. Bell*, No. 4:19-CV-00078-JHM, 2021 WL 2096058, at *6 (W.D. Ky. May 24, 2021) (same). Yell does, however, fail to respond to Russellville Defendants' motion for summary judgment on Yell's *Brady* claim based on Edmonds' withholding of video evidence. Accordingly, Russellville Defendants' motion is granted as to that claim.

The existence of a claim based on Edmonds's withholding of Carpenter's statements is not readily evident from the Complaint, so Edmonds will not be faulted for failing to raise the issue in his motion for summary judgment.  In particular, Yell claimed that Edmonds "intentionally failed to document or accurately video record the walk through with PJ . . . ." (Compl. ¶ 60).  This is the only paragraph specifically alleging an act of withholding by Edmonds.  Moreover, Carpenter is only mentioned by name once in the Complaint.  (Compl. ¶ 35).  While Yell's *Brady* claim alleges generally that "Defendants . . . deliberately withheld exculpatory evidence," this is insufficient to put Edmonds on notice of a claim against him for withholding any statements by Carpenter. (Compl. ¶ 104).

This is fatal to Yell's remaining *Brady* claim against Edmonds.  As discussed above, a party may not expand his or her claims at the summary judgment stage.  *See Grinnell*, 2022 WL 1562291, at *5.  Accordingly, Russellville Defendants' motion is granted as to a *Brady* claim against Edmonds based on the withholding of Carpenter's statements which was not asserted in the Complaint.

### 2.    *Fabrication of Evidence*

Russellville Defendants further seek summary judgment on Yell's claims against them for fabrication of evidence.  (Russellville Defs.' Mot. Summ. J. 31).  As discussed above, Yell has abandoned his Fourth Amendment fabrication claim and Russellville Defendants' motion is granted as to that claim.

Russellville Defendants first argue that the Complaint does not allege that Edmonds "fabricated any evidence whatsoever" and therefore he cannot be held liable.  (Russellville Defs.' Mot. Summ. J. 31).  Yell does not respond to this argument, so Edmonds will be granted summary judgment on Yell's fabrication claim against him.  (*See* Pl.'s Combined Resp. Defs.' Mots. Summ.

J. 69 (arguing that a trial is necessary on Yell's fabrication claim against Gregory, Higgins, and Cannon)).

Yell alleges that Higgins and Eggleston fabricated inculpatory statements they attributed to Yell on the night of the fire. (Compl. ¶¶ 64-70, 72). Russellville Defendants argue that because Yell cannot remember what he said or did after his arrest on the night of the arson, he has not created a genuine dispute of material fact on the issue. (Russellville Defs.' Mot. Summ. J. 30-31). In his response, Yell focuses on two of the allegedly fabricated statements: (1) Eggleston's statement that Yell said "[i]f she had done to you what she done to me, you would have done the same f[***]ing thing[;]" and (2) Higgins's statement that Yell said "you don't know how evil I am . . . ." (Compl. ¶¶ 64, 66; Pl.'s Combined Resp. Defs.' Mots. Summ. J. 79). Yell testified that while these statements do not sound like things he would say, he does not remember the events of that night. (Yell Dep. 200:6-202:3).

Russellville Defendants contend that pursuant to the Sixth Circuit's decision in *Wysong v. City of Heath*, 260 F. App'x 848 (6th Cir. 2008), Higgins and Eggleston are entitled to summary judgment on the fabrication claim. In *Wysong*, the plaintiff was arrested following a diabetic episode where he did not remember what he did or what happened. *Id.* at 857. The plaintiff later sued the arresting officers, asserting they used excessive force. *Id.* at 851. According to the defendant officers, the plaintiff violently resisted arrest and they had to use force to subdue him. *Id.* at 850. The Sixth Circuit reversed the district court's denial of summary judgment, holding that because the plaintiff had no memory of what occurred, the officers' accounts were undisputed. *Id.* at 858 ("This is a case where the officers and third-party witness tell a story that establishes the officers' right to qualified immunity. . . . [Plaintiff] cannot beat something with nothing.").

Yell responds that he testified that he never made the statements attributed to him by Higgins and Eggleston, and, with regard to the second "evil" statement, testimony about his interaction with Higgins in the sallyport conflicts with Higgins' assertion that he made the statement. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 79-80). The testimony cited by Yell, however, does not support that contention. First, Yell denied admitting that he intentionally set the fire. (Yell Dep. 146:25-147:8). Second, while Yell stated he never made the "same thing" statement, this was immediately after he testified that he had no independent memory of his interactions with Eggleston or Higgins on the night of the fire. (Yell Dep. 200:6-24, 201:1-15 ("Q: And before lunch today, you testified that you have no independent memory of any communication between you and Officer Higgins either at the scene . . .; is that correct? A: Yes ma'am. . . . Q: And you . . . testified that you have no independent memory of any communication with Officer Higgins at the sallyport of the jail . . . ? A: That's right.")). Yell's denial, therefore, appears more rooted in his general disbelief that he would say such things, not his memory of the night in question. (Yell Dep. 201:11-15, 202:1-3).[14]

Despite Yell's assertions that he did not make the allegedly fabricated statements, the denials in context do not create a genuine dispute of material fact. Under *Wysong*, a blank memory without extrinsic evidence to back up a plaintiff's explanation of events is "nothing." *Wysong*, 260 F. App'x at 858. This determination tracks the Sixth Circuit's decisions on the evidentiary value of denials at the summary judgment stage. "On the one hand, convenient memory lapses do

---

[14] Similarly, deputy jailer William Porter who was in the sallyport when Yell was brought to the jail testified that he did not *recall* hearing Yell make the "evil" statement, not that Yell did not make the statement as Yell now contends. (Porter Dep. 85:15-17, Feb. 1, 2022, DN 165). Deputy jailer Jerry Hayes also testified that he did not recall Yell's statements in the sallyport. (Hayes Dep. 45:13-46:15, Dec. 10, 2021, DN 209-45). Of course, the "if she had done to you" statement attributed to Yell was not made at the sallyport. (Pl.'s Resp. Defs.' Mots. Summ. J. Ex. 43, at 2, DN 209-43).

not create factual disputes that are genuine." *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 839-40 (6th Cir. 2021) (collecting cases).  Given Yell's admission that he has no memory of the night of the fire until he was pulled out of the police cruiser at the jail and does not remember any interaction with Higgins, his blanket denials can hardly be characterized as unequivocal.  (*See* Yell Dep. 132:20-134:1).  Accordingly, there is no genuine dispute of material fact as to the statements and Higgins and Eggleston will be granted summary judgment on Yell's fabrication claim.

### 3.        *Failure to Intervene*

Russellville Defendants also move for summary judgment on Yell's failure-to-intervene claims against them.  (Russellville Defs.' Mot. Summ. J. 34).  As to Edmonds, Yell argues that he and West were present for the other's "coercive interrogation of [] Carpenter that resulted in [] Edmond[s]'s fabricated report."  (Pl.'s Combined Resp. Defs.' Mot. Summ. J. 88).  This assertion is not sufficient to create failure to intervene liability against Edmonds or West.  As discussed above, Yell's Complaint does not include a claim of coercing any statement from Carpenter, who is only mentioned twice.  Both Edmonds and West are granted summary judgment on Yell's *Brady* claims based on Carpenter's interrogation.  Accordingly, the motion is granted with respect to the failure to intervene claim against Edmonds.

Yell's argument for the survival of his failure to intervene claim against Eggleston and Higgins is largely the same: "Eggleston was present for the fabrication of inculpatory statements attributed to [Yell] by [] Higgins.  And vice versa."  (Pl.'s Combined Resp. Defs.' Mot. Summ. J. 88-89 (citations omitted)).  A jury could not find that Eggleston and Higgins fabricated the inculpatory statements based on Yell's blanket denial that he would have made such statements in the face of Yell's attested memory lapse.  Absent underlying unconstitutional conduct, there can

33

be no claim for failure to intervene. *Greene*, 22 F.4th at 615. Accordingly, Russellville Defendants' motion will be granted with respect to Eggleston and Higgins.

### 4.    *Conspiracy*

Yell's conspiracy claims against Higgins and Eggleston are based on the other's alleged fabrication of Yell's inculpatory statements. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 90 ("For their part, Defendants Higgins and Eggleston fabricated inculpatory statements attributable to Plaintiff that interlocked with Defendants' theory of the case."). Because no underlying claim remains against Higgins and Eggleston for this or any other conduct, Russellville Defendants' motion is granted with respect to Yell's conspiracy claim against Higgins and Eggleston.

Similarly, there are no remaining claims against Edmonds because a jury could not conclude that he participated in a conspiracy to deprive Yell of his constitutional rights. Accordingly, Russellville Defendants' motion is granted with respect to Edmonds.

### 5.    *Intentional Infliction of Emotional Distress*

Russellville Defendants also move for summary judgment on Yell's IIED claim. (Russellville Defs.' Mot. Summ. J. 43). As discussed above, Yell fails to respond to any arguments regarding this claim, so Russellville Defendants' motion is granted on that basis.

### 6.    *Qualified Immunity*

Because no claims remain against Russellville Defendants, the Court need not address the issue of qualified immunity.

### E.    **Defendants Jaman Childers, William T. Smith, and David West (DN 177)**

KSP Defendants move for summary judgment on Yell's claims against them. (Defs.' Mot. Summ. J. 1, DN 177 [hereinafter KSP Defs.' Mot. Summ. J.]). In his response, Yell voluntarily dismisses his claims against Childers and Smith. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1). Accordingly, KSP Defendants' motion is granted as to Childers and Smith. Yell also

voluntarily dismisses his supervisory liability, federal law malicious prosecution, state law malicious prosecution, negligent infliction of emotional distress, and negligence claims against all defendants. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 3 n.1). KSP Defendants' motion is granted as to those claims as well. Therefore, West is the only remaining KSP Defendant.

According to Yell, "West was a fire investigator with KSP, was the lead KSP investigator in this case, and brought the charge of arson against [him]." (Compl. ¶¶ 25, 76). He alleges that West fabricated his conclusion that the fire was intentional, fabricated his finding that the fire had multiple points of origin, fabricated PJ's alerts, failed to document PJ's walkthrough, conspired with the other defendants to frame Yell, and withheld evidence of accidental sources of the fire. (Compl. ¶¶ 50, 52, 55, 60-63). In his response to KSP Defendants' motion, however, Yell asserts that West, along with Edmonds, withheld Carpenter's exculpatory statements in violation of Yell's *Brady* rights, withheld exculpatory statements from first responders in violation of Yell's *Brady* rights, failed to intervene in Cannon's fabrication of PJ's alerts, and conspired to deprive Yell of his constitutional rights. (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 64-67, 88-90).

### 1. *Due Process Brady Claim*

As with Russellville Defendants, the parties disagree about the nature of Yell's *Brady* claim against West. First, there is scant mention of the *Brady* claim in West's motion for summary judgment. West points to three discrete pages of his motion where his argument for summary judgment was asserted. (Defs.' Reply Mot. Summ. J. 1, DN 226 [hereinafter KSP Defs.' Reply Mot. Summ. J.]). The bulk of this argument is contained in a single paragraph:

> Similarly, Mr. Yell's due process claims also fail. "[T]here is no constitutionally protected right to the manner in which a criminal investigation is conducted." Det. West considered reasonable alternative sources or theories of the fire and noted that in his investigation. Mr. Yell alleges no separate injury; thus, his due process claims also fail.

(KSP Defs.' Mot. Summ. J. 18 (alteration in original) (internal citation omitted) (citing *Anderson v. Knox Cnty.*, No. 6:17-CV-133-KKC, 2018 WL 7500205, at *6-7 (E.D. Ky. Oct. 3, 2018))).  Yell argues that this is insufficient to raise a motion for summary judgment on the issue and West has therefore waived his arguments on this claim.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 65).

Indeed, "[i]t is not enough for a party to 'mention a possible argument in the most skeletal way' and leave the court to 'put flesh on its bones.'" *Ricks v. Pauch*, No. 2:17-CV-12784, 2020 WL 1640166, at *25 (E.D. Mich. Apr. 2, 2020) (quoting *McPherson*, 125 F.3d at 995).  The three sentences above are not sufficient on their own to warrant a grant of summary judgment on Yell's *Brady* claim against West.

Yell, in his response, however, argues that his *Brady* claim is based on the withholding of two categories of evidence:  Carpenter's exculpatory statements, and first responders' statements about flashover.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 64-67).  As discussed above regarding Yell's claims against Edmonds, the Complaint fails to state a *Brady* claim for the withholding of Carpenter's statements.  Similarly, the Complaint does not state a *Brady* claim for the withholding of the first responder statements.  In his response, Yell avers that West failed to turn over evidence that "(1) [] Mills informed him of his observations of flashover; and (2) [Russellville Firefighter Poole ("Poole")] informed him of his flashover observations."  (Pl.'s Resp. Defs.' Mots. Summ. J. 66).  The Complaint only alleges that the Defendants as a whole "dismissed" Mills' account of the fire's appearance when he first arrived on the scene and does not mention Poole at all.  (Compl. ¶ 53).  These allegations are limited at best and are certainly not sufficient to put West on notice of the existence of a Constitutional claim that he withheld evidence of the first responders' statements.  Accordingly, West's motion is granted.

### 2.     *Fabrication of Evidence*

Yell abandons his fabrication claims against West in his response.  (*See* Pl.'s Combined Resp. Defs.' Mots. Summ. J. 69-88 (arguing that Yell's fabrication claims should continue against Gregory, Higgins, Eggleston, and Cannon)).  Accordingly, West's motion is granted with respect to Yell's fabrication claim.

### 3.     *Failure to Intervene*

West also moves for summary judgment on Yell's failure-to-intervene claim against him. (KSP Defs.' Mot. Summ. J. 17-18).  In response, Yell identifies two constitutional violations in which West purportedly failed to intervene:  the fabrication of P.J.'s alerts by Cannon and the coercive interrogation of Carpenter that led to Edmond's fabricated report.  (Pl.'s Combined Resp. Defs.' Mots. Summ. J. 88).  West avers that "[w]ithout an underlying [constitutional] violation, there is no evidence to support a . . . failure-to-intervene claim."  (KSP Defs.' Reply Mot. Summ. J. 4).  Yell has failed to state a claim regarding Carpenter's statements and points to no evidence supporting the claim that West was responsible for any false alerts by the ADC.  Accordingly, West's motion is granted.

### 4.     *Conspiracy*

Because there are no underlying allegations from which a jury could conclude that West joined in a conspiracy, his motion is granted as to Yell's conspiracy claim.

### 5.     *Intentional Infliction of Emotional Distress*

KSP Defendants also move for summary judgment on Yell's IIED claim.  (KSP Defs.' Mot. Summ. J. 18).  Yell fails to respond to any arguments regarding this claim, so KSP Defendants' motion is granted on that basis.

### 6.     *Qualified Immunity*

Because no claims remain against KSP Defendants, the Court need not address the issue of qualified immunity.

### F.     <u>Plaintiff's Motions to Exclude Testimony of Douglas Byron and Brett Martinez (DN 179, 181)</u>

Yell moves to exclude certain pieces of testimony from two of Cannon's experts.  (Pl.'s Mot. Exclude Byron 3-4, DN 179; Pl.'s Mot. Exclude Martinez 1, DN 181).  Because there are no claims remaining against Cannon, these motions are denied as moot.

### G.     <u>Plaintiff's Motion to Exclude Testimony of G. Henry Ott (DN 180)</u>

Similarly, Yell moves to exclude only certain pieces of testimony offered by West and Gregory's fire investigation expert, G. Henry Ott ("Ott").  (Pl.'s Mot. Exclude Ott 1, DN 180). Because there are no remaining claims against West or Gregory, Yell's motion is denied as moot.

### H.     <u>Defendants' Motion to Exclude Testimony of Paul Bieber (DN 182)</u>

Cannon and the City of Georgetown move to exclude the testimony of Yell's expert, Dr. Paul Bieber ("Bieber").  (Defs.' Mot. Exclude Bieber 1, DN 182).  Because there are no remaining claims against Cannon or the City of Georgetown, this motion is denied as moot.

### I.     <u>Yell's Administrative Motions (DN 211)</u>

### 1.     *Motion for Leave to File Excess Pages*

Yell moves for leave to file excess pages in his response to Defendants' motions for summary judgment.  (Pl.'s Mot. Leave 1, DN 211).  Given the complexity of the issues, the fact that Yell would be entitled to file an individual response to each motion, and the fact that his motion for leave is unopposed, it is granted.

### 2.    *Motion for Leave to Seal*

Additionally, Yell moves for leave to file Exhibit 60 to his response under seal.  (Pl.'s Mot. Leave 2).  Yell states that Exhibit 60, the complete file of Commonwealth's Attorney, "contains information related to a Department of Family Services Investigation that relates to minors, along with personally identifying information such as social security numbers and other data."  (Pl.'s Mot. Leave 2).

There is a "strong presumption" in favor of the openness of court records because of the public's interest in understanding what evidence the courts use in making their decisions.  *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 939 (6th Cir. 2019) (quoting *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016)).  This strong presumption can only be overcome when the party seeking to seal shows a compelling reason why the documents should be sealed, and the seal is narrowly tailored to fit that reason.  *Id.*

Here, there is compelling reason to seal:  Yell represents that nearly 4,000 pages contain information about minors and personally identifying information.  Sealing the entire file, however, is not a narrowly tailored solution, as most of it does not contain the sensitive content that Yell identifies.  Accordingly, Yell's motion is granted in that the entire unredacted file will be sealed, but Yell is directed to file a redacted version in the public record.

### IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motions for Leave (DN 158, 163, 176, 178, 224) are **GRANTED**.

2.    Plaintiff's Motion for Leave (DN 211) is **GRANTED**.  The Clerk shall seal the file of the Commonwealth's Attorney (DN 212), and Plaintiff shall file a redacted version with the Court by **August 13, 2026**.

39

3.      Defendants' Motions for Summary Judgment (DN 159, 160, 164, 177, 184) are **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

4.      Defendants' Motion for Leave (DN 161), Motion for Summary Judgment (DN 162), and Motion to Exclude (DN 182) are **DENIED AS MOOT**.

5.      Plaintiff's Motion to Exclude Byron (DN 179), Motion to Exclude Ott (DN 180), and Motion to Exclude Martinez (DN 181) are **DENIED AS MOOT**.

6.      The Clerk shall strike this matter from the active docket.

**Greg N. Stivers, Judge**
**United States District Court**
August 3, 2026

cc:     counsel of record

40